## An Opinion in the Case of Wyckoff

## v. MetLife et al.

**United States District Court**
**Western District of Pennsylvania**

**Robert Boyd Carter, CLU, ChFC**
**Louisville, Kentucky**

**May 1, 2006**

## Introduction and Statement of Facts:

I was first approached about this case in April, 2006, by the firm of Behrend & Ernsberger, representing the Plaintiff. I formulated my opinion after reading the documents and depositions listed in the Plaintiff's pre-trial statement, the case file and attached exhibits, the Defendants' motion for summary judgement and the Plaintiff's response and related court rulings, the deposition of the Plaintiff and the deposition of Agent Kenneth F. Kaczmarek, the Pennsylvania Market Conduct Examination Report of Metropolitan Life, issued February 11, 1994, the Connecticut Insurance Department Report of Investigation in the Matter of: Metropolitan Life Insurance Company, dated October 14, 1998, the Florida Department Of Insurance Examination of Metropolitan Life, authored by Mr. Thomas Tew, dated March 6, 1994, VHS Tape MetLife APP Research-Four Focus Groups MP00004026568, expert opinions filed in Solarchick v. Metropolitan Life, Hazen v MetLife, Kintner v. MetLife, Eck v. MetLife, Mohney v. MetLife, Kresovich v. MetLife, documents and depositions in several other cases, and several authoritative texts. A copy of my CV is attached.

Robert Wyckoff was approached in 1991 by Norman Molchan, an agent with MetLife.

Mr. Wyckoff was a financially unsophisticated person of modest means. He graduated from high school in 1945, then served in the Army Air Corps. After his honorable discharge he was hired by U. S Steel as a machinist, from where he retired. His life insurance and investment experience was very limited.

## 1991 "Vanishing" Premium Sale

The agent in 1991 sold Robert Wyckoff a $10,000 Whole Life policy with a premium of $59.40 per month payable for 14 years under a "vanishing premium" scheme, which MetLife calls Accelerated Premium Plan. Thereafter, according to the computer illustration provided by the agent dated 6/18/91, all future premiums would be paid by policy dividends and internal values. Indeed, the illustration featured the word "None" beginning in the 15th year in the column titled "Annual Cash Outlay for Year." The word "None" continued under that column until the end of all premiums, when Mr. Wyckoff would be 98 years old.

    A. The way I understand it, to be 14 years. At the end of 14 years.

    Q. Is that Mr. Molchan told you?

A. That's correct.

Q. So you do recall?

A. That's correct.
(Robert Wyckoff deposition, P. 173:22-174:3).

At the sales meeting, Agent Molchen attempted to first sell a $20,000 whole life policy with payments of $1,289 per year and hand-wrote on the illustration, providing further emphasis to the representation that the payment of out-of-pocket premiums ended in the 14th year, and circled the amount of money in the policy at age 78 of $10,043 and the death benefit of $23,442. According to the illustration, the actuarially projected date of death is at age 78. Due to financial limitation, Mr. Wyckoff decided to go with the presentation made for a $10,000 policy that cost less than the $20,000 policy.

The policy was subsequently issued with a health rating after underwriting review and issued at $73.20 per month which has been consistently paid by Mr. Wyckoff.

Mr. Wyckoff did not read the policy upon receipt, instead he relied upon the sales presentation made by Agent Molchen. The policy was delivered in a "sleeve" and was never opened.

Q. You said you didn't read the policy, either; right? Just to clarify, did you read any part of the policy, such as the first page, the second page, or did you just not read any of it?

A. No, It was handed to me in a sleeve. You know, I took the sleeve and put it in that box with the rest of the policy.

Q. You didn't even look at the front page?

A. No. (Robert Wyckoff deposition, P. 183:12-22).

The policy requires premiums payments for 36 years. However, the policy provides that the premiums may be paid by using dividends, interest or automatic premium loans. Therefore, the sales presentation is not inconsistent with the terms of the policy since according to the terms of the policy all of the premiums may be paid either out-of-pocket or from the values in the policy. Thus, the source of the premium payments becomes the issue, and whether there is enough money paid into the policy from any source sufficient to cover the remaining premiums after the policyholder stops making out-of-pocket premium payments as represented at the time of sale.

3

The United States Court of Appeals for the Third Circuit in this case entered an order and a memorandum opinion.  On page 6 of the opinion the Court sets forth that:

> We held in *Dilworth* that if a policyholder believes, based on representations made by an insurer's agent, that he owns a "vanishing premium" life insurance policy, the actual provisions of the policy do not unambiguously contradict that belief by stating a different length of premium payments. *Id.* at 351-52.  The crux of the issue "is not whether the premiums are payable...but from what source the premiums should be derived." *Id.* at 352 (quoting *Asad v. Hartford Life Ins. Co.*, 116 F.Supp.2d 960, 965 (N.D. Ill.2000).

> Thus while the actual policy in *Dilworth* indicated that 86 years of payments would be required, even had Dilworth been aware of this provision, it would not have been inconsistent with the agent's representations that after ten years of payments the remaining payments would come from accrued dividends and interest payments. *Id.* at 351.  In addition, we have held that the statement "the results are not guaranteed," contained either within the policy or in illustrations, is not directly inconsistent with or contradictory to a policyholder's belief in the vanishing premium nature of the policy. *See Tran*, 408 F.3d at 138.

This confusion as to the amount of out-of-pocket premium payments required apparently resulted from the Agents' failure to explain the policies adequately, either at the point of sale or upon delivery of the issued contracts.

> Q: Did anyone from MetLife or a MetLife sales representative review the 1991 policy with you when you received it?

> A: In its entirety?

> Q.  Any part of it.

> A.  I say no.

> Q.  No? Okay

> A.  I say no. (Robert Wyckoff deposition, P. 183:3-11).

There was no opportunity to review deposition testimony by Mr. Molchen's since he died prior to the taking of a deposition.

The 1991 policy issued was on MetLife form 7-87, a form that lacked certain disclosure language that related to the sale of the policy and using dividends to pay the future premiums. Form 7-87 as sold was not approved by the Pennsylvania Insurance Department.

MetLife omitted the following language:

> "You may ask us to pay premiums with a combination of yearly dividends, the cash value to any paid-up additions and/or any dividend accumulations. As long as these values are great enough, out-of-pocket premiums need not be paid to keep your policy in force."

This language was designed to protect the consumer by providing the additional disclosure of information that may alert the consumer that the sales representations regarding the "Accelerated Payment Plan," or "vanishing" premiums may not actually work as represented. In other words, this disclosure language was designed to protect a consumer in Mr. Wyckoff's situation where the policy was sold in 1991 pursuant to the "Accelerated Payment Plan," or "vanishing" premiums scheme.

## 1994 "Vanishing" Premium Sale

In 1994, after Robert Wyckoff was retired from U.S. Steel, he contacted MetLife since U.S. Steel was decreasing the amount of group life insurance coverage it provided from $33,000 to $28,500. (Robert Wyckoff deposition, P. 247:11-17, Exhibit 17). Mr. Wyckoff wanted to supplement the amount of life insurance coverage he was losing from his employer U.S. Steel. The group life insurance coverage provided by U.S. Steel provided the option to the retired employees to supplement the reduction in coverage by purchasing their own individual policy. Mr. Wyckoff was responsible for payment of all premiums on any additional coverage he purchased.

Mr. Wyckoff was subsequently contacted by MetLife Agent Kenneth Kaczmarek. Similar to the sale in 1991, Kenneth Kaczmarek sold Mr. Wyckoff a $4,500 Whole Life policy with a premium of $34.23 per month payable for 10 years.

> Q. Do you believe that anything Mr. Kacczmarek told you, during your meetings, regarding the 1994 policy, was untrue?
>
> A. Other than the fact policy, the $4,500 policy, was similar to the $10,000 policy.

5

Q. Okay – go ahead.

A. And it had a diminishing premium at the end of ten years.

Q. So I understand, Mr. Kaczmarek told you that after ten years, you would not have to pay premiums on the policy anymore; is that right?

A. Right. He may not have used those exact words, but I mean he - - how should I say? I can't tell you the exact words he said. I know he used insurance talk . . .

Q. But you were led to believe that after ten years you didn't have to pay premiums on the '94 policy anymore?

A. Yes sir. (Robert Wyckoff deposition, P. 233:1-22)

The policy was sold as of August 2, 1994 and delivered on August 11, 1994. Kenneth Kazmarek made 1.5 sales for the month of August 1994. See MP2461000386-387.

The 1994 policy issued was on MetLife form 7-87, a form that lacked certain disclosure language that related to the sale of the policy and using dividends to pay the future premiums. Form 7-87 as sold was not approved by the Pennsylvania Insurance Department.

MetLife omitted the following language:

> "You may ask us to pay premiums with a combination of yearly dividends, the cash value to any paid-up additions and/or any dividend accumulations. As long as these values are great enough, out-of-pocket premiums need not be paid to keep your policy in force."

This language was designed to protect the consumer by providing the additional disclosure of information that may alert the consumer that the sales representations regarding the "Accelerated Payment Plan," or "vanishing" premiums may not actually work as represented. In other words, this disclosure language was designed to protect a consumer in Mr. Wyckoff's situation where the policy was sold in 1994 pursuant to the "Accelerated Payment Plan," or "vanishing" premiums scheme.

## The Policies in the Case:

The two policies the MetLife agents sold to the Plaintiff in 1991 and in 1994 are whole

6

life policies with premiums payable to Age 100.

They are participating, meaning that they shared in the divisible surplus of the Company--its distributable profits.

Policy dividends, however, cannot be guaranteed because mortality charges, administrative charges and economic factors have caused MetLife's dividends to decline significantly starting in 1992 through the present. MetLife also changed its form of corporate ownership in 2000 from a mutual company owned by its policyowners (such as Mr. Wyckoff) to a stock company owned by its shareholders. From then on policyowners would take second-place to shareholders in the competition for profits and policy dividends.

"Vanishing premium" is a scheme to use anticipated high dividends, plus internal transfers of policy values and money, to make the apparent cash outlay into a Whole Life policy seem to be zero. One prominent text calls the concept of "vanishing premium" an "erroneous" term and warns that it is "potentially misleading." (Black & Skipper, Life & Health Insurance, 13th Edition, P. 94.)

Another prominent authority cautions: "There is no guarantee that the so-called vanishing premiums will actually vanish, or, if they do vanish, that they will never reappear." (Beam, ed., Fundamentals of Insurance for Financial Planning, P. 193.)

Indeed, MetLife's use of the term "Accelerated Premium Plan" for its vanishing premium scheme is itself misleading, since there is nothing "accelerated" about the premium. The policyowner pays the stipulated premium–and no more–and hopes it will vanish someday.

Instead, given the low-interest environment since 1992 and the conversion to stock-company status, it seems highly unlikely that Mr. Wyckoff's premiums will ever "vanish."

## The Agents' Deviations from the Standard of Care:

Section 637 of the Insurance Protection Act of the Commonwealth of Pennsylvania states:

"No agent or solicitor of any insurance company, association or exchange, and no insurance broker, shall issue, circulate or use, or cause or permit to be issued, circulated or used, any written or oral statement or circular misrepresenting the terms of any policy issued or to be issued by such company, association or exchange, or make an estimate, with intent

to deceive, of the future dividends under such policy."

The Purdons Pennsylvania Statutes, sections 40 P.S. ' 277, 40 P.S. ' 472, and 40 P.S. ' 1171.5 prohibit any insurance agent or insurance company to:

> ...issue, circulate, or use, or cause or permit to be issued, circulated or used, **any written or oral statement or circular misrepresenting the terms of any policy issued** or to be issued by such company, association, or exchange or make an estimate, **with the intent to deceive, of the future dividends payable under such policy.** (Emphasis added)

The Unfair Insurance Practices Act requires full and proper disclosure of the material terms of a policy, anything to the contrary is prohibited and is an unfair or deceptive practice as defined in section:

> Section 40-19-105. Unfair methods of competition, unfair or deceptive acts Section 40-19-105. Unfair methods of competition, unfair or deceptive acts or Section 40-19-105. Unfair methods of competition, unfair or deceptive acts or practices defined:
>
> (a) Unfair Methods of Competition and unfair or deceptive acts or practices in the business of insurance means:
>
> (1) Making, publishing, issuing or circulating any estimate, illustration, circular, statement, sales presentation, omission comparison which:
>
>> (i) Misrepresents the benefits, advantages, conditions or terms of any insurance policy.
>
> (12) **Making false or fraudulent statements or representations on or relative to an application for an insurance policy,** for the purpose of obtaining a fee, commission, money or other benefit from any insurers, agent, broker or individual. (Emphasis added)

This code section also identifies and defines false advertising as making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of insurance business, which is untrue, deceptive or misleading.

8

Also Pennsylvania Purdons statutes set forth that an agent or the insurance company has a duty to not misrepresent the manner in which a policy will perform over time.

The two MetLife agents clearly deceived Mr. Wyckoff about the expected dividend rates and premium-payment periods of the two whole life policies and also about the so-called "vanishing premium" scheme.

Most importantly, the two agents failed to meet an agent's highest ethical obligations: that all the agent's actions meet the clients' needs and that every recommendation is understood so that all decisions made by the clients are informed decisions.

### MetLife's Complicity:

At all times, throughout the two dubious sales situations to Mr. Wyckoff, both sales agents were employee Agents for MetLife. They were also captive agents, meaning ones who can only represent a single company—in effect, employees. MetLife was responsible at all times for their supervision and their actions.

MetLife's supervision of the agents was woefully inadequate.

In an internal audit Kenneth Kazmarek was cited for accumulating 13 known consumer complaints between 1989 and 1995 made against him by policyholders of Metropolitan Life for misrepresentations made in the sale of life insurance. See Account Rep Inquiry for Complaints by Region and District, Fantaski v. MetLife MP2372000533. Those complaints prompted MetLife to issue an astounding $27,797.00 in refunds to disaffected policyowners. See MP2372000533.

As an example of Ken Kazmarek's unethical and improper attitude and demeanor towards policyholders, in response to one of the complaints regarding a misrepresentation as to the cost of the policy sold, Ken Kazmarek stated that as far as he was concerned, "this is a 'crock'." See MP4011112996

However, Metropolitan Life's investigation proved otherwise. Vice-President J.P. Smith wrote to Ray Osekowski of the Pennsylvania Insurance Department on July 15, 1991 that: "We have completed our investigation and we feel that a reversal is in order. It does not appear that there are sufficient dividends in policy 62*******A to fund policy 88******UL indefinitely. The gross deposits of $1,920.00 will be recalled from policy 88******UL and will be used to restore the dividends to policy 62*******A. in the same amount. ... " See MP4011112985.

Failure to enforce its own rules regarding proper sales methods including

misrepresenting the costs of the policies through deceptively describing the amount of future dividends and the actual costs of the policies to the policyholders were criticisms of MetLife contained in a 1994 Market Conduct Examination conducted by the Commonwealth's Department of Insurance and which resulted in a $1.5 million fine.  As the Examination stated:

> "The referenced examples clearly demonstrate the noted pattern or sales practices and procedures used by MetLife sales representatives in utilizing sales illustrations based upon non-guaranteed projected values..."

MetLife, of course, provided the computer illustrations that deceived Mr. Wyckoff and promoted the demonstrably misleading "vanishing premium" scheme.  The same rules prohibiting misrepresentation that apply to agents also apply to companies.  The Market Conduct Examination determined that:

> "Use of this type of illustration, depicting future performance based only upon 'current interest' rates, by MetLife sales representatives has the effect of misleading consumers."

The Connecticut Department of Insurance on page 40-41 of the Report similarly found that:

> Misrepresentations of vanishing premium policies are difficult to prove.  It is often a case of the policyholder's word against the company's. Nevertheless, the cases are too numerous and too consistent to disregard the claims of policyholders.  It is also difficult to disregard policy illustrations prepared by the company which show prominently in the first column of the first page that no cash outlay is needed after a few years. The policyholders must turn to footnotes on page 3 of he illustration to find the reminder that dividends are not guaranteed.  Coupled with this disclaimer in other sales literature, however, is the statement that "MetLife has a long and distinguished history of making dividend payments to policyholders, going all the way back to the 1900's.  This kind of puffing is, of course, a time worn sales practice – but with little embellishment by an agent – it can easily mislead consumers.

Finally, as Michael Dupay has chronicled in a series of trenchant opinions in the Eck, Hazen, Kintner, Kresovich and Mohney cases, MetLife promoted a "corporate culture" which encouraged the evasion of rules and regulations–including strictly defined Company rules–and which isolated and ostracized whistleblowers and those seeking to curtail flagrantly anti-consumer activities.  These opinions are incorporated by

reference.

In the Expert Report filed in the Kintner case, to which I agree and adopt herein since my opinions in this case are premised in part on the information provided in the Expert Report filed in the Kitner case, the following was stated:

## Certain Deceptive and  Prohibitive Marketing Practices

Certain deceptive and prohibitive marketing practices referenced as "vanishing premium" and "performance" sales were used by Metropolitan Life to accomplish their goal of increasing their sales and profits at the expense of the innocent and trusting insureds. These prohibited marketing practices were known to be widely used by Metropolitan Life's "field" agents.  However, senior level management did not take corrective action until they were forced to do so by state regulators and the U.S. Justice Department in and after 1994.

## Vanishing Premium Concept

Individual life insurance policies were sold by the sales agents on the lives of Plaintiffs using a concept known at MetLife as the Accelerated Payment Plan or also known as "vanishing premium."  The term "vanishing premium" is defined as the concept of a vanishing premium represented to the insured by the sales agent to create the impression and expectation with the insured, that he/she will pay premiums for only a specified number of years. After that time period has elapsed, the insured would not be required to pay any more premiums out of their own pocket. The premiums are still owed, however they will be paid from the dividends and interest on the dividend accumulations that the policy earns.

To encourage the Plaintiffs to purchase these policies, the sales agents used policy illustrations to show that the duration of the premiums that the Plaintiffs would have to pay on these policies would be only seven years of premiums.

The policies which were delivered by mail, however, did not have these "vanishing premiums," and MetLife required additional premium payments on the policies, despite the Agent's and the subsequent representations from the MetLife employee through the phone call to the "800" Life number that there would be no additional required out-of-pocket premium payments, meaning they would "vanish" after seven years.

The documents that I have reviewed reveal that Senior Management of Metropolitan Life was very aware of these deceptive marketing practices by their sales force.  Rather than acknowledging their statutory and ethical responsibilities to their insureds,

11

MetLife's management did not stop the use of the deceptive sales practices until forced to do so.

## Chronology of Metropolitan Life's Corporate Culture

The following chronology of MetLife documents illustrates senior level management's awareness of Metropolitan Life Insurance Company's encouragement of deception in life insurance policy sales with total disregard of consumer needs. This chronology illustrates a corporate culture motivated totally to increase corporate profits in disregard to state regulations, MetLife's own stated procedures and to the financial and actuarial harm of the policyholders.

## 1989

As early as 1989, MetLife management was aware that the dividend and interest rates paid on its whole life policies were declining.  Despite this knowledge of declining dividend and interest rates, MetLife continued to sell whole life policies pursuant to the Accelerated Payment Plan that demonstrated dividend and interest rates that remained constant.  This means that in 1991 when the sales were made to the Plaintiffs, that MetLife was aware that the number of out-of-pocket premiums payments represented at the time of sale were inaccurate and the actual number of out-of-pocket premiums, in fact, would be for a longer period of time than was represented at the time of sale.

## October 17, 1979

A memo by Executive Vice President J.P. Maurer dated October 17, 1979 to the district sales managers referencing district office audits, speaks to his being disturbed that exceptions to company procedures are being cited that demonstrate the use of deceptive sales practices by the sales agents and a lack of management controls to curb the deceptive sales practices.  Mr. Maurer's memo suggests that"

> "Management is not responding to these reports and detailing their remedies to these exceptions."

His solution?  Create another unit to be a liaison between field management and the auditors, to assist in identifying the problems in management controls.  No authority was given to this liaison unit to enforce management controls.

## March 28, 1983:

Memo to Branch Managers from J.P. Maurer, Exec. Vice President, says, in part:

> "I am happy to say that the number of instances of dishonesty has shown a decrease…"

## August 10, 1985:

Memo from Jim Heffernan, Personal Insurance Marketing regarding "Policy on Dishonesty" letter:

> "The Policy on Dishonesty letter you inquired about has not been sent to the Field since April 3, 1980, and is not scheduled for call-up.

"After discussing the contents of this proposed release in March 1983, Messrs, Dice and Maurer decided that "…we do not need to tell people we expect them to be honest."

"The decision was made therefore to suspend this letter indefinitely or until such time as conditions may warrant its re-release."

"If you feel conditions are such that the letter or parts of it should be published at this time, we'll need to describe these conditions to Messrs. Dice and Maurer."

A further review of documents continues to illustrate that, although senior management was aware of the improper sales activities, no corrective acts or actions were taken.

## September 26, 1985

Vice President E.H. Stieglitz addressed in a memo to senior officers of Metropolitan Life Insurance Company, the summary of an employee law suit against a branch manager. The legal action asked for a multi million dollar judgment based on the following summary:

"The Branch Manager is accused of attempting to persuade and induce a Sales Representative (who has since resigned) to commit unethical and illegal activities in deceptively selling insurance by misrepresenting its benefits and by representing to customers that it would be to their benefit to cash in existing policies and purchase new insurance coverage through Metropolitan Life Insurance Company. Also, that the actions of the Branch Manager towards the Plaintiff included threatening and abusive language and actions designed to eliminate or destroy the Plaintiff's effectiveness as an insurance sales representative. The Complaint document also states that the Plaintiff advised superiors (the Agency Vice President and the Officer-in-Charge) of the wrongful actions of the Branch Manager, but they failed and refused to stop the wrongful actions toward the Plaintiff."

"Both the Complaint document and a letter from the Plaintiff acknowledge that these actions were in violation of the policies of Metropolitan Life Insurance Company."

"This case shows that there is a continuing need to guard against problem situations of this type, as it appears that some of our management people are still not following the Company policy on replacements. This case also strengthens our position that piggybacking should not be permitted, and that

> prompt and effective corrective action should be taken by upper-level Field
> management in any case where our firm policy regarding piggybacking is not
> being followed."

**May 3, 1989:**

A memo to Barbara C. Timpano, Vice President of Personal Insurance Controller, from
Crosby P. Engel, Field Quality Control Unit references a field employee misconduct
summary in 1988:

> "It provides clear evidence that some final decisions of line management were
> improper, given the dishonest and unethical nature of the infractions, and
> inconsistent with those made for similar irregularities discovered in other offices.
> I have highlighted those cases in which an impartial judge would question the
> action taken."

> "This demonstrates the need for an independent corporate ethics committee
> which can consider sensitive circumstances without being influenced by political
> or parochial concerns.  Not only would such a body remove the onus of making
> difficult and unpopular decisions from a single individual, but it would ensure
> much greater uniformity and fairness, and assist the Company in avoiding
> lawsuits charging discrimination."

A copy of this summary is included in this report because it speaks to the problem
nationally.

**October 3, 1990**

A study of MetLife's ethics in the sale of  life insurance products was performed by an
independent consultant, Beverly Loy Taylor, Ph. D.  In the study, it was found that
unethical sales practices were tacitly condoned and encouraged at MetLife.

**Met Life's Awareness of Vanishing Premium Failure**

Metropolitan Life's internal documents demonstrate that Metropolitan Life was aware
that they had a serious problem with how the APP illustrations were being used by the
sales agents to market the sale of policies.  This is demonstrated in a letter written from
the Director of Customer Services & Communications, Tulsa, Oklahoma to the Vice-
President in charge of Policy Administration & Customer Services, in November of
1992.

...Of equal or greater concern to me are the reappearing premiums we are likely to encounter on existing "AP" [Accelerated Payment] cases...As I understand it, once a policy is placed on AP, there is no ongoing "eligibility testing." In some cases, it may not surface for several years that the dividends have become inadequate to fund the policy premiums...We are currently dealing with many complaints where policies were sold on the basis that they would be eligible for AP in "X" years. "X" years is now here and, because of the dividend scale change, eligibility has been pushed into the future...**THE CURRENT PROBLEM IS ALSO COMPOUNDED BY THE WAY THESE POLICIES WERE SOLD. IN THE VAST MAJORITY OF CASES WE SEE, "AP" WAS SOLD AND EXPLAINED BY THE REPRESENTATIVE THAT THE POLICY WOULD BECOME "<u>PAID UP</u>" IN "X" YEARS. WHILE THIS MAY HAVE BEEN THE EASIEST WAY TO EXPLAIN THE CONCEPT TO THE POLICYHOLDER, IT ONLY COMPLICATES OUR EXPLANATION OF CURRENT INELIGIBILITY**...We cannot afford to leave policyholders with the impression that AP is a "*done deal*" or that their policies are "*paid up*" and no future premiums will ever be required unless we can be absolutely, positively sure of it (*assuming the policyholder leaves the dividend balance undisturbed*). This is the impression many of them have because of the way the policies were sold or explained. Tom, perhaps I'm crying "wolf" a little too soon, but from where I'm sitting and what I see, I think this could be a real problem unless we take some proactive measures to deal with it."

See, November 7, 1992 memorandum from Jim Rayl (emphasis added).

Then, the Director of Customer Services & Communications at the MetLife Customer Service Center in Warwick, Rhode Island, writes to the Vice President of P. I. Customer Services in Bridgewater, NJ) on December 17, 1992:

We have reviewed Jim Rayl's November 7, 1992 memorandum and your memorandum dated November 11, 1992. We agree with all the points made in Jim's memorandum....Tom, we do not feel Jim is crying 'wolf'. We have had to address many of the situations he describes. We feel a proactive approach is the best approach.

See, Kathy Schoos letter to Thomas La Badia (Vice President of P. I. Customer Services in Bridgewater, NJ) on December 17, 1992.

The Director of Customer Services & Communications, from Tulsa, Oklahoma then

writes to the Vice President of the MidAmerica Territory on December 23, 1992:

> These situations are occurring now on policies that were supposed to
> become paid up and it will impact us in the future when policies currently
> on AP will not have sufficient dividend balances to cover all future
> premiums.  Dave, attached is one such case which is a classic
> example....The policyholder became concerned and sought confirmation
> from the branch manager.  Attached is a copy of the letter from the
> Branch Manager....The letter states:
>
> > **"Once the premiums are paid for six years and the Automatic
> > Premium Payment is selected by you, the policy is paid-up."**

See December 23, 1992 memorandum from J. L. Rayl (Emphasis added).

On December 31, 1992 the Director of Customer Services & Communications at the
MetLife Customer Service Center in Tulsa writes to Director of Customer Services &
Communications at the MetLife Customer Service Center in Warwick:

> > **I'm not particularly optimistic, but no one will be able to say
> > we didn't try and tell them.**

See, December 31, 1992 memorandum from Director of Customer Services &
Communications at the MetLife Customer Service Center in Tulsa to the Director of
Customer Services & Communications at the MetLife Customer Service Center in
Warwick. (Emphasis added).

The Director of Customer Services & Communications in Tulsa, Oklahoma then writes
on  January 3, 1993 to a Sr. Business Systems Consultant in the Traditional Portfolio &
Dividends division of the Personal Insurance department in Bridgewater, NJ,
commenting on the position of  Metropolitan Life to have the sales agents to notify the
policyholders, whose policies were at risk as the premiums did not vanish as
represented at the time of sale:

> The vast majority of policyholders who are currently on the AP
> arrangement believe that no further premiums will be due on their
> policies. ... **If anyone believe that the majority of our Field
> Representatives will actually approach these customers and explain
> it, they're living in a dream world.**  Many of the writing reps are long
> gone and the others have no vested interest in communicating this kind of
> bad news to the customer."

See, January 3, 1993 memorandum from Director of Customer Services & Communications at the MetLife Customer Service Center in Tulsa. (Emphasis added)

The recommendation of the Director of Customer Services & Communications in Tulsa, Oklahoma, that MetLife directly notify the policyholders is not well received.  The Vice President of P.I. Customer Services in Bridgewater, NJ writes on January 12, 1993 to the Senior Vice President of PI Customer Services at the New York Home Office:

> Pam Duffy responded to Jim Rayl last month on his proposal to **retest all policies on APP and notify all those who no longer pass the eligibility test**.  **In lieu of that**, marketing is creating an education program with material to be sent to the field and policyholders on APP explaining how it works and why it is important to periodically recheck eligibility through their field office."

See, January 12, 1993 memorandum from Thomas M. La Badia (Vice President of P.I. Customer Services in Bridgewater, NJ) to Frank Lynch, (Senior Vice President of PI Customer Services at the NYHO)  (Emphasis added).

The Report of Market Conduct Examination of Metropolitan Life Insurance Company by the Pennsylvania Insurance Department was issued in March 11, 1994.  The Report reviewed the many deceptive marketing practices of MetLife that occurred in Pennsylvania from January 1, 1990 through December 31, 1992.  One of the examples of deceptive marketing practices related to the "vanishing premium" concept.  This is where the insurance company market a life insurance policy as having out-of-pocket premium payments for a set number of years, after which the out-of-pocket premium payments "vanish."  MetLife called its "vanishing premium," (that is alleged to be a deceptive sales practice), the Accelerated Payment Plan (APP).

Contained in the Report are examples of deceptive illustrations used by the MetLife sales agents.  Included are APP (vanishing premium) illustrations, similar to those used in the sales to Plaintiffs.

On page 72 of the Report, the Pennsylvania Insurance Department reaches the following conclusion:

> The referenced examples clearly demonstrate the noted pattern of sales practices and procedures used by MetLife sales representatives in utilizing sales illustrations based upon non-guaranteed projected values, and in many cases reinforcing the sales illustration values with cover

letters containing misleading statements concerning the insurance policy being sold.

See, Page 72 of the Report) (See also, Page 65 of the Report, which contains a letter from a Branch Manager in the western Pennsylvania region, John Lewis. The letter refers to a "vanishing premium" sale: "As shown in the breakdown below, you have met these requirements ... and now have **a paid-up policy with no other premiums to be paid**.") (Emphasis added) (See also, Pages 75-79 of the Report, which references a deceptive marketing practice, referenced in a cover letter and the enclosed APP illustration: "**This contract has to be paid for 7 years and it will be eligible for the Accelerated Payment Plan with no future payments required by you**") (Emphasis added).

In my opinion, the use by the sales agents and MetLife of the MetLife Accelerated Payment Plan to sell the two whole life policies in 1991 was deceptive, since MetLife knew or should have known that the representation of the limited number of years of out-of-pocket payments was deceptive and would not occur as projected and represented. Further, it is my opinion that Metropolitan Life Insurance Company is equally culpable because of their corporate procedures.

In 1996 MetLife did a study of its sales agents to ascertain the nature and extent of the problem with sales of policies using the Accelerated Payment Plan with "vanishing premiums." The sales agents represented that they were trained to sell the policies as paid-up in a defined number of years and they were not trained to sell the policies with an explanation that the dividend and interest rates were variable so the policies may require more out-of-pocket premium payments than set forth in the illustrations.  See MetLife APP Research – Four Focus Groups Bates Number MP0004026568).

## Professional Opinion:

It is my professional opinion, to a reasonable degree of certainty, that Mr. Wyckoff has been damaged by the actions of MetLife and its Agents, Norman Molchan and Kenneth F. Kaczmarek since:

He was sold products he did not understand and which did not fully meet his needs.

He was assured that current dividend rates would make all out-of-pocket premiums payments after fourteen year for the 1991 policy and after ten years for the 1994 policy, unnecessary.

19

He was not adequately informed that MetLife' knew or recklessly disregarded the fact that MetLife was unable to predict the amount of future dividends paid with any accuracy and that the amount of dividends paid in the future would be insufficient to pay the remaining premium payments requiring out-of-pocket premium payments beyond the number of years represented to make the sales.

He was sold Whole Life policies that were unnecessary as a device to generate agent commissions and which was improperly represented to be "vanishing premium" policies.

He will incur many years of additional premiums just to maintain these policies.

He has incurred continuing costs in his claim for just restitution, while enduring years of waiting.

It is my professional opinion, to a reasonable degree of certainty, that Metropolitan Life was deceptively and fraudulently selling policies pursuant a "vanishing" premium scheme, known as the "Accelerated Payment Plan."

It is my professional opinion, to a reasonable degree of certainty, that Robert Wyckoff was deceptively and fraudulently sold two whole life policies by Metropolitan Life and its sales agents pursuant a "vanishing" premium scheme, known as the "Accelerated Payment Plan."

It is my professional opinion, to a reasonable degree of certainty, that the Plaintiff, Robert Wyckoff, is due reasonable compensation from the Defendant MetLife as a result of its active participation in these deceptions and its failure to control the actions of its two agents.

In my professional opinion, it is established to a reasonable degree of certainty, that the sales agents and MetLife clearly ignored and violated the appropriate standards of care set forth by the Pennsylvania Legislature in the provisions of Purdons Pennsylvania Statutes, and in the Pennsylvania Insurance Code, and proceeded with MetLife Field Management's sanction to deceptively sell policies to consumers and Mr. Wyckoff using the "vanishing" premium sales tactic. known at MetLife as the Accelerated Payment Plan.   At the time of the transactions in 1991 and 1994 the policies purchased would never perform as represented and were destine to lapse.

20

## Damages:

First, Robert Wyckoff was led to believe he was purchasing a whole life policy in 1991 that he had to make out-of-pocket premium payments for 14 years for $73.20 per month, despite assurances that no outlay would be necessary after the 14th year. Instead, he will have to pay the Whole Life premium of $73.20 per month or $878.40 a year for 36 years or 22 additional years in unexpected additional outlay, since his "vanishing premium" scheme is highly unlikely ever to vanish. That total is $19,324.80 in unexpected additional outlay.

Second, Robert Wyckoff was led to believe he was purchasing a whole life policy in 1994 that he had to make out-of-pocket premium payments for 10 years for $34.23 per month, despite assurances that no outlay would be necessary after the 10th year. Instead, he will have to pay the Whole Life premium of $34.23 per month or $410.76 a year for 32 years or 22 additional years in unexpected additional outlay, since his "vanishing premium" scheme is highly unlikely to vanish. That total is $9,036.72 in unexpected additional outlay.

**The total of these amounts--$19,324.80; and $9,036.72--equals $28,361.52 in damages to reflect the additional cost of the policies in order for Mr. Wyckoff to receive the "benefit of the bargain" owed to him.**

**In addition the Plaintiff should also receive reasonable compensation for his court costs, attorney's fees and post-judgement interest and any punitive damages the court should award.**

Respectfully submitted,

Robert Boyd Carter, CLU, ChFC

130 Dorsey Station Road
Louisville, KY 40223
502-290-1630
rbclhc@insightbb.com

19