# Exhibit 1

# EXPERT WITNESS REPORT

Robert G. Wyckoff,

Plaintiff,

v.

Metropolitan Life Insurance Company and
Kenneth F. Kaczmarek,

Defendants.

Civil Action No. 00-2248

United States District Court
for the Western District of Pennsylvania
The Honorable Donetta W. Ambrose, District Judge

Submitted to:

McCarter & English, LLP

by

Kenneth I. Daniels
September 27, 2006

In connection with the above-referenced case, I have been asked to review the transactions relating to Robert Wyckoff's purchases of whole life insurance policies issued by Metropolitan Life Insurance Company ("MetLife") in 1991 and 1994. The following is my expert opinion report with respect to these transactions. My opinions are based upon the material that I reviewed, my education, training, knowledge and relevant experience. My opinions may change or be supplemented if additional information becomes available through discovery, deposition or otherwise and it is made available to me. In that event, I will provide a supplemental report.

Professional Qualifications and Experience

I currently provide independent consulting services to the financial services industry. Additional detail regarding my education, professional qualifications and experience is attached hereto as Exhibit A.

Materials Reviewed

I reviewed the following documents in connection with the preparation of this Report: Plaintiff's Complaint with exhibits; Defendants' First Set of Interrogatories and Plaintiff's Answers; Plaintiff's and Defendants' First Request for Production of Documents, respective Responses, and Supplemental Response by Plaintiff; Defendants' Answer and Amended Answer; Transcripts of depositions of Robert G. Wyckoff and Kenneth F. Kaczmarek with exhibits; Defendants' Motion for Summary Judgment and Plaintiff's Reply and supporting Memoranda of Law; Plaintiff's Pretrial Statement and Expert Opinion; District Court and Court of Appeals opinions in this and related cases; relevant Pennsylvania insurance regulations; Deposition Transcript of James Rayl and certain exhibits; MetLife policy history/status screens and annual policy statements, in-force illustrations; various sales representative, sales management and compliance program manuals, including but not limited to MetLife's Enhanced Compliance Program; 1994 Pennsylvania Market Conduct Report and 1998 Connecticut Report on MetLife; MetLife Life Insurance Buyer's Guide.

General Information

**Whole life insurance** – A whole life insurance policy is generally issued with a fixed face amount of insurance and requires a policyholder to pay premiums regularly for a stated period of years, or until the death of the insured. The period of time that premium payments are required is stated in the policy.

The policyholder typically pays a fixed, guaranteed premium amount at monthly, quarterly, semiannual, or annual intervals. Assuming premium payments are made as required by the premium payment schedule, the policy provides certain guarantees for the insured's entire life, including: level premiums, accumulation of cash value, non-forfeiture options; and, whenever the insured dies, the insured's beneficiaries are guaranteed a specified death benefit.

2

Many whole life policies are "participating policies," that is, the issuing company annually determines if a surplus has accrued on the policies and, if so, distributes a share of that surplus to each policyholder as a dividend at the end of that policyholder's policy anniversary year. Dividends are not guaranteed and can change from year to year.[1] If dividends are paid, the policyholder has options to use them in several ways: (1) buy paid-up additions, (2) leave them with the insurance company to accumulate at interest, (3) apply them toward the payment of premiums, or (4) receive them in cash. A whole life insurance policy, in addition to providing life insurance, will accumulate guaranteed cash value over time. The cash value can be borrowed against for emergencies or other needs, to help with educational expenses or retirement, and can also be used to help reduce out-of-pocket premium payments.

Summary of the Case

Plaintiff, Robert G. Wyckoff, purchased two whole life insurance policies from MetLife – one in 1991, the second in 1994, from two different MetLife sales representatives. His objective in each case was to purchase additional life insurance to assist his family after his passing. In addition, in the case of the 1994 policy, plaintiff was exercising his right to convert group life insurance under his employer's benefits plan to an individual policy.

Plaintiff's Complaint essentially alleges that each of these policies was misrepresented. Plaintiff claims that he was told he would only have to pay premiums for 14 and 10 years, respectively, and that misleading accelerated payment plan illustrations were used in connection with each sale.

Opinions

1.Based upon the documents and evidence I reviewed, it is my opinion that the MetLife whole life insurance policies purchased by Robert Wyckoff provided him with valuable benefits and were appropriate to his purposes at the time of purchase.

Mr. Wyckoff was quite familiar with whole life policies. Prior to the time he purchased the MetLife policies in question, he purchased three other whole life policies. At age 28, he purchased his first whole life policy in 1954, a $5000 face amount policy from Prudential. In 1970, he purchased a $1000 whole life policy from the Knights of Columbus. In 1985, he purchased a third whole life policy from Prudential with a face

---

[1] Dividends are in essence the distribution of divisible surplus by an insurance company. The Company's Board of Directors has the responsibility to determine the amount of dividends, if any, to be declared. Since an insurance company's potential liabilities extend far into the future, who can say what amount of a company's reserves are surplus? The process by which dividends are determined is complex. Although it involves an actuarial evaluation of three major components: mortality, expense and earnings, these components are affected by economic and other factors, many of which are outside the company's control. It is not possible to predict with any degree of certainty how these factors will interact. Accordingly, future dividends are not, and cannot be, guaranteed

3

amount of $10,000. As of his deposition, he continued to pay premiums and all three policies remained in force.

Whole Life insurance policies offer many benefits to the insured and can be used to meet many types of needs and circumstances. These benefits include: guaranteed and level premiums, accumulation of cash value, and a guaranteed death benefit of at least the face amount of the policy (less any outstanding loans) for the insured's entire life. The cash value can be borrowed against for emergencies or other needs, to help with educational expenses or retirement, and can also be used to help reduce out-of-pocket premium payments.

As discussed above, plaintiff already owned several whole life insurance policies issued by other insurance companies. In this case, it was Mr. Wyckoff who contacted MetLife both in 1991 and 1994 because he wanted more life insurance to increase the amount of money that he could leave to his family upon his passing. Plaintiff continues to pay premiums on each of his MetLife policies and they remain in force. So long as he continues to pay his premiums when they become due, he will continue to enjoy the benefits discussed above and, upon his passing, MetLife will be obligated to pay the death benefit described in his policies to his beneficiaries.

2. Based upon the documents and evidence I have reviewed, it is my opinion that MetLife provided plaintiff with adequate information so that plaintiff knew or should have known the number of years that premium payments on his whole life policies were payable. Plaintiff had no reasonable basis to expect or rely on any alleged statements made prior to MetLife Policy No. 915 409 338 M ("1991 Policy") being issued.

Plaintiff first contacted MetLife in June 1991. His objective was to buy additional life insurance to provide for his family upon his passing. Plaintiff did not say why he chose MetLife. Plaintiff testified that he did not know MetLife sales representative Norman Molchan and can't remember how he first came in contact with Mr. Molchan, but that he probably called Molchan's office (Wyckoff deposition, p. 130).

On June 24, 1991, Plaintiff met with Mr. Molchan and signed an application for a MetLife whole life insurance policy with a face amount of $10,000. He gave Mr. Molchan with a check in the amount of $59.40, which his application reflects is an amount equal to the expected monthly premium. Plaintiff alleges that he was also given two single page accelerated payment plan illustrations by Mr. Molchan at that time.

Attached to Plaintiff's Complaint as Exhibit 3 are two accelerated payment plan illustration pages; one for $20,000 of insurance with an annual premium of $1288.60, the other for $10,000 of insurance with an annual premium of $656.80. Both illustrations are dated 6/18/91 -- before MetLife sales representative Molchan met with plaintiff for the first time. Each illustration is for a Whole Life plan based upon the insured being a male non-smoker, age 65. Each illustration shows the stated premium to be payable for the insured's lifetime.

4

An illustration is not part of a life insurance policy and is not a contract, but it can be a valuable tool to illustrate how, using certain assumptions, a policy works. The illustration shows a policy's guaranteed minimum values, as well as non-guaranteed or illustrative values, and a year-by-year indication of how these policy values can develop.[2] If the assumptions change, so will the illustration. Clearly the illustrations included in plaintiff's Complaint were printed at a time before Mr. Molchan could have known that plaintiff was a current user of tobacco products. Once that information was known, the illustrations would use the "smoker" classification and smoker premium rates.[3]

Plaintiff attached two accelerated payment plan illustration pages to his Complaint, but in his deposition testimony he stated that he relied not on the printed illustrations but on Mr. Molchan's statement that his premiums "would be diminished in 14 years" (Wyckoff deposition p. 180-82). Plaintiff, however, does not say when that statement was purportedly made. Under the circumstances of this case, any reliance on such a statement would not have been reasonable.

Plaintiff was informed both in the application he signed and in his 1991 policy that a sales representative does not have authority to change the terms of the insurance contract or the benefits offered.[4]

---

[2]With regard to the cash outlay column, each illustration states:

> The cash outlay illustrated shows the results if the current dividend scale continues without change. Dividends are not guaranteed and may increase or decrease in the future. If future dividends decrease, it is possible that the cash value of additional insurance may not be sufficient in some future years to pay the full current premium and some cash outlay may be required. . . . Illustrative figures are not guarantees or estimates for the future.

The illustrations were based upon current rates, as required by Pennsylvania law.

[3] Within the insurance industry, companies generally charge higher rates to users of tobacco products, classified as "smokers." Smokers generally have higher mortality rates than do non-smokers. When MetLife underwrote plaintiff's policies, the public also generally knew of the increased health risks posed by the use of tobacco products.

[4] The application plaintiff signed on June 24, 1991, states on the signature page:

> No sales representative or other person except the president, secretary, or a vice president of Metropolitan may (a) make or change any contract of insurance; or (b) make any binding promise about insurance benefits; or (c) change or waive any of the terms of an application, receipt or policy.

The General Provisions on page 9 of the 1991 policy include the following language:

**The Contract**  This policy includes any riders and, with the application attached when the policy is issued, makes up the entire contract.

**Limitations on Sales Representative's Authority**

> No sales representative or other person except our President, Secretary, or a Vice-President may (a) make or change any contract of insurance; or (b) change or waive any of the terms of this policy. Any change must be in writing and signed by our President, Secretary, or a Vice-President.

There is also reason to question plaintiff's recollection and his deposition testimony account of what took place at the sales presentation for his 1991 Policy.

Plaintiff testified that both Mr. Molchan and Mr. Kaczmarek and a nurse were present when the 1991 Policy was sold to him (Wyckoff deposition pp. 125-27, 133, 136-37). He also testified that he signed the policy (Wyckoff deposition p.135; 138-39), not the application, even though he was questioned at length and recognized the difference. He further testified that the nurse was present during the meeting that Mr. Molchan gave him the1991 policy (Wyckoff deposition p.137). Finally, Plaintiff testified that the policy was presented to him in a sleeve, that no one from MetLife went over the policy with him, that he didn't read it and just placed it in a metal box with his other policies (Wyckoff deposition, p.182).

Plaintiff's account of the sales presentation for the 1991 Policy is not credible for the following reasons:

- It is uniform industry practice that before an insurance company issues a life insurance policy, the proposed insured must submit an application for life insurance. The sales representative does not have the authority to bind the issuing company nor issue a policy. Generally, the issuing insurance company does not issue a life insurance policy until it receives the application and underwrites the policy based upon the proposed insured's answers in the application, including medical questions and testing. Accordingly, Mr. Molchan would not have shown plaintiff his life insurance policy on the date that the sales presentation was made.

- It is unlikely that Mr. Kaczmarek accompanied Mr. Molchan on his sales presentation to Plaintiff in 1991 because they worked out of different offices -- eight miles apart. The whole life policy is straightforward and the face amount of plaintiff's 1991 Policy was relatively small. Therefore it would not be necessary for two experienced sales representatives from different offices to participate in the presentation. Moreover, Mr. Kaczmarek testified that he did not meet Plaintiff until 1994. Had Mr. Kaczmarek been part of the sales process in 1991, he would have been listed as an agent on the 1991 Policy application. Plaintiff also would have likely have called Mr. Kaczmarek in June 1994, if he was a MetLife representative known to him, rather than making a cold call to a local MetLife office.

- It would certainly not be usual for a nurse to be present at the initial sales call, because it is generally not known whether the sales prospects will decide to apply for life insurance prior to the meeting. In general, a sales representative would wait until an application is taken to arrange for a paramedical examination (for policies that require medical testing). It should be noted that plaintiff and Mr. Molchan signed the application for his 1991 policy on 6/24/91 and that the registered nurse, Virginia Renner, signed Part B of the of the application, consisting of specific medical questions on 07/02/91.

6

- The 1991 Policy indicates that it was countersigned and delivered by Norman Molchan Sr. on 8/2/91. When a policy is delivered by hand, it is usual for the sales representative to go over the basic terms of the policy with the insured. This is especially true when a policy is issued on different terms than as applied for and there was a significant change in the premium amount.

### The 1991 Policy

MetLife issued Policy No. 915 409 338 M to Robert G. Wyckoff as of June 27, 1991 ("1991 Policy") with a monthly premium of $73.20. It was delivered and countersigned by Norman Molchan Sr. on August 2,1991. A copy of the policy was produced from plaintiff's files and plaintiff admits that he received it.

Although plaintiff claims that the 1991 policy was handed to him in a sleeve and he put it in a metal box with his other policies without reading it, Plaintiff acknowledges that he may have glanced at the front page to see what he could comprehend, though he claims to have no idea what it said there (Wyckoff deposition, p. 183-84).

The language on the cover page of the 1991 Policy is clear and straightforward. It states at the top: Metropolitan Life Insurance Company will pay the amount of insurance and provide the other benefits of this policy according to its provisions (Wyckoff deposition, Exhibit 5). The cover page states the name of the insured, the specified face amount of insurance, the policy number and that it is a whole life policy.

Below the corporate signatures, the words "**Whole Life Policy**" are repeated and the following information is stated:

Life insurance payable when the insured dies.
Premiums payable for a stated period.
Annual dividends.

**10-Day Right To Examine Policy --** Please read this policy. You may return this policy to Metropolitan or to the sales representative through whom you bought it within 10 days from the day you receive it. If you return it within the 10-day period, the policy will be void from the beginning. We will refund any premium paid.

See Table of Contents on back.

The Premium Schedule on page 3 clearly states that premiums are due on the date of the policy and every 12 month(s) after that date. The Premium Schedule indicates a total life insurance premium of $73.20 per month payable for 36 years. The rest of the 1991 Policy document provides important information about other provisions of the policy that are easily referenced using the table of contents on the back cover.

7

The "Premium Payment" provision on Page 7 of the policy states: "**The benefits of your policy depend on the payment of premiums when due. Premiums are payable, while the insured is alive, on or before their due dates as shown in the premium schedule on page 3.**" (emphasis added). Nothing in the policy's Premium Schedule or anywhere else in the policy supports plaintiff's claim that he would be required to pay premiums for less than 36 years.

At or about the time that plaintiff's 1991 policy was issued, he received a letter from MetLife, dated July 31, 1991. The letter stated that nicotine had been found in his urine comparable to levels found in tobacco users and that the premium on the policy he was being offered was based upon those medical examination findings (Wyckoff deposition Exhibit 10). The letter urged him to read the enclosed statement and indicated that a copy of the letter have been sent to the MetLife sales representative. The enclosure, entitled "Your Information Rights " stated among other things, "if you believe that any information in our files is wrong or incomplete, you made past that we correct or amended. We will review and correct our files if we agree with you. If we do not agree with you, you may file in short statement of dispute with us." Plaintiff did not contest the information contained in MetLife's July 31, 1991 letter nor request any additional information.

Shortly thereafter, Plaintiff received a second letter from MetLife dated August 7, 1991 (Wyckoff deposition Exhibit 11). The letter was addressed to Plaintiff and referenced his policy number and a premium amount of $73.20 on the top right. It welcomed him to the check-o-matic arrangement and stated: "You have chosen to pay premiums for insurance . . . by monthly deductions payable through this checking account. If this arrangement is in connection with a new policy, your account representative will be in touch with you to deliver the policy shortly." It advised him that the first check to be drawn against his account would be dated August 12, 1991. Thereafter, a check or debit to your account will be dated the 27th of each month. Accordingly, by the time plaintiff first received his policy, he knew that his use of tobacco products changed the expected monthly premium on his policy from $59.40 to $73.20 per month. Under these circumstances, it was unreasonable for plaintiff not to review his policy when he received it.

Under Pennsylvania insurance law, all life insurance policies have to provide a period of time, at least 10 days, in which the policy owner has a right to examine their new policy. This "Right To Examine Policy," is quoted below from the cover page of plaintiff's policy. During this time, the purchaser can review the policy and ask questions to determine if the policy is what she expected it to be and confirm that it fits her needs. If for any reason he was not satisfied with the policy he received, he could return the policy within that period and receive a full refund of all premiums paid. If plaintiff had any questions or was unwilling to purchase his 1991 policy because it was issued at smoker rates (or for any other reason) he could return the policy during the 10 day "free look period" and gotten a full refund. Plaintiff had no questions, kept his policy and has continued to pay premiums.

8

In sum, plaintiff's 1991 Policy clearly states that the life insurance premium amount is $73.20 per month and is payable for 36 years. There is no basis for plaintiff to claim that premiums for his 1991 Policy were not payable for that time. In his deposition, plaintiff recognized that the policy's premium schedule was inconsistent with what he states Mr. Molchan told him (Wyckoff deposition p. 185). Indeed, plaintiff testified that the fact that the 1991 Policy is a whole life policy is contrary to Mr. Molchan's alleged statement that the policy premiums only need to be paid for 14 years (Wyckoff deposition p. 184).[5] There is also no basis for plaintiff to claim that the potential number of out-of-pocket premium payments was misrepresented. Once plaintiff knew that his use of tobacco products significantly increased the monthly premiums for his 1991 Policy, it was unreasonable for him not to inquire further, or to rely on any alleged statement made to him before MetLife or its representatives knew that information.

3. Based upon the documents and evidence I reviewed, it is my opinion that the 1994 whole life insurance policy purchased by Robert Wyckoff was consistent with the provisions of his employer-sponsored benefits program. Neither MetLife nor its sales representative Kenneth Kaczmarek, breached any fiduciary duty they had to plaintiff.

In June 1994, Plaintiff purchased a whole life insurance policy to replace group insurance that he was losing under his employer-sponsored program. Contrary to specific provisions within the policy, Plaintiff alleges that Mr. Kaczmarek told him that he would have to pay premiums on the 1994 policy for only ten years, at which time the policy would be self-funding. His Complaint alleges Mr. Kaczmarek failed to disclose that the policy being offered was a whole life policy with premiums due for 32 years and, thus, Mr. Kaczmarek never offered a full and complete disclosure of the policy at the point-of-sale. The Complaint also alleges that plaintiff was provided with a misleading accelerated payment plan illustration. As discussed below, there is no merit to plaintiff's claims regarding this transaction.

Plaintiff retired from United States Steel Corp. in November 1983 at age 57, with over 30 years of service. As part of his retirement benefits, Plaintiff was covered by a group term life insurance policy in accordance with the United States Steel Group Insurance Benefits Program ("Program"). The Program materials state that whenever a Program participant's life insurance is reduced or terminated, they have the right to replace the lost group insurance with an individual life policy from MetLife, without a medical examination being required.[6]

---

[5] Plaintiff testified with regard to his Prudential policies that because they were "whole life policies," premiums were payable for life. (Wyckoff deposition pp. 98-100).

[6] Part B, Section 1.19 of the Program materials states:

> Upon application to Metropolitan within 31 days after life insurance coverage under this Program is reduced or terminated, you may arrange to continue your life insurance protection under an individual policy, without medical examination, for an amount not greater than the amount of life insurance you have under this Program at the time of such reduction or termination. Such

Plaintiff was notified on his United States Steel payment stub for the month ending May 1994 that effective July 1994, his group life insurance coverage was being reduced from $33,000 to $28,500 -- $4,500.

Plaintiff testified that he contacted MetLife in June 1994 to exercise his right under his former employer's Program to convert the amount of group life insurance coverage he was losing to an individual policy (Wyckoff deposition pp.226, 229). He wanted to purchase a $4,500 policy to be able to maintain the level of insurance he had. He did not want it to drop any further. (Wyckoff deposition pp.226).[7] When he called, plaintiff did not ask for any MetLife representative in particular. MetLife sales representative Kenneth Kaczmarek testified that no agent was assigned to Mr. Wyckoff. His office asked him to meet with Plaintiff to help him convert his group insurance because none of the other sales representatives wanted to get involved because the commissions were not enough. He did it has a favor. Mr. Kaczmarek telephoned Mr. Wyckoff [on June 19] and arranged to meet him the next day (Kaczmarek deposition p. 15-17).

### The 1994 Policy

On June 20, 1994, plaintiff signed the limited application necessary to convert his group insurance and apply for a MetLife individual whole life insurance policy, with a face amount of $4,500. The advantage to plaintiff in exercising his conversion privilege is that pursuant to the terms of the Program, plaintiff was entitled to purchase an individual policy up to, but no more than the same amount of group life insurance coverage he was losing without the need to submit to a medical examination or answer medical questions.

MetLife issued whole life Policy No. 945 600 948 M to Robert G. Wyckoff with a total monthly premium of $34.23 as of August 2, 1994 ("1994 Policy"). The policy indicates that it was delivered in countersigned by Mr. Kaczmarek on 8/11/94. The 1994 policy that was issued by MetLife was appropriate to meet plaintiff's stated objective -- to provide additional funds for his family upon his passing and to replace the group insurance he was losing. It was also consistent with Plaintiff's conversion privilege under the United States Steel Benefits Program.

---

individual policy may be on any one of the forms of policy then customarily issued by Metropolitan other than a policy of term insurance. Any such policy will be issued for life insurance only, without disability benefits or special benefits in the event of accidental death, and will be issued at the rate applicable to your age and class of risk at that time.

This is known as a "conversion privilege" in the Program (p. B-3).

[7] Plaintiff's group insurance was reduced periodically under the Program in accordance with a fixed schedule of benefits. This was the seventh such reduction and the only time in eight planned reductions that plaintiff exercised his conversion privilege.

The illustration plaintiff produced in response to MetLife's discovery request does not support his claim. First it is dated 6/21/94 – the day after he signed the application for his 1994 policy. Moreover, nothing in the illustration supports his claim that he expected to pay premiums for only 10 years. The first page indicates, among other things, plan: whole life; amount of insurance: $4,500; yrs payable: lifetime.

The first paragraph of page 1 of the illustration states:

This illustration assumes that premiums for the first 23 years will be paid in cash. Thereafter, premiums may be paid each year through the use of dividends by canceling a portion of the additional insurance and using its cash value together with the current dividend, to pay the premium. To put this payment plan into effect contact your sales representative at that time.

The illustration document itself provides numerous statements that clarify the assumptions made in connection with the number of cash outlay payments set forth in the illustration.[8]

Likewise, the 1994 Policy delivered to plaintiff on August 11, 1994 provides no support for his claim. Its format is similar to his 1991 policy as described above. The cover page indicates that it is a Whole Life Policy and describes the 10-Day Right To Examine Policy. The premium schedule on page 3 states that premiums are due monthly. The total premium amount is $34.23 and payable for 32 years. The "Premium Payment" provision of the policy on page 7 of the policy contains the same language as plaintiff's earlier policy: **"The benefits of your policy depend on the payment of premiums when due. Premiums are payable, while the insured is alive, on or before their due dates as shown in the premium schedule on page 3."** (emphasis added). It also adds the following: "You may change the frequency of payment with our approval. You may ask us to pay premiums with a combination of yearly dividends, the cash value of any paid-up additions and/or any dividend accumulations. **As long as these values are great enough, out-of-pocket premiums need not be paid to keep your policy in force.** (emphasis added).

---

[8] For example, the paragraph at the bottom of page 1 of the illustration specifically addresses the total cash outlay. It states:

The cash outlay illustrated shows the results if the current dividend scale continues without change. Dividends are not guaranteed and may increase or decrease in the future. If future dividends decrease, it is possible that the cash value of additional insurance may not be sufficient in some future years to pay the full current premium and some cash outlay may be required. . . . Illustrative figures are not guarantees or estimates for the future.

The illustration was based upon current rates, as required by Pennsylvania law.

In addition to the 1994 policy contract itself, plaintiff's signature acknowledges receipt of a DISCLOSURE STATEMENT – STATE OF PENNSYLVANIA. Among other things, this document confirms amount of insurance, duration of coverage, annual premium, and full years payable. Plaintiff also signed a MetLife form acknowledging receipt of the Life Insurance Buyer's Guide on 6/24/94 (Wyckoff deposition Exhibit 18). The Buyer's Guide includes explanatory information on whole life insurance, guaranteed and illustrated figures, and urges policyholders to "Read your policy carefully. Ask your agent or company about anything that is not clear to you."

4. With respect to the life insurance transactions involved in this case, it is my opinion to a reasonable degree of certainty, that the actions of MetLife and its sales representatives did not fall below the standard of care expected of a licensed insurance agent and an insurance company in Pennsylvania at the time of the transaction. My opinion is based on the material I have reviewed in this case, my education, training and experience in the insurance industry and my review of applicable Pennsylvania Insurance Regulations.

5. With respect to the actions of Messrs. Molchan and Kaczmarek in connection with the sale of the 1991 and 1994 policies, based upon the material that I reviewed, it is my opinion that these sales representatives conducted their business with plaintiff properly and that MetLife provided reasonable and appropriate training and supervision of them.

During the period in which plaintiff Robert Wyckoff purchased his policies, MetLife had a well-defined supervisory structure and a detailed program of supervision in place. This program included extensive training of both sales representatives and their supervisors. Both were experienced, long-term representatives. Each was provided with manuals of instruction that included guidance on regulatory requirements as well as legal and ethical considerations with regard to sales procedures and practices. The sales representative manual gave extensive written guidelines with respect to, among other things, duties of the sales representative, use of advertising and other printed matter, prospecting for new business, replacements, completion of applications, premium payments, policy delivery and policy changes. MetLife provided both its own extensive training and encouraged approved industry training.

A separate manual of instructions was provided for sales management that set forth their responsibilities and provided them with detailed instructions, procedures and forms for supervision of sales personnel with respect to, among other things, recruiting, field training, new business procedures such as review and testing of applications, delivery of policies, countersignatures and replacements. Sales management was instructed to personally review and determine that the insurance applied for was appropriate to the circumstances and consistent with company guidelines.

In addition, MetLife had oversight systems in place. It had an internal auditing system in place to analyze and test business processes and procedures to ensure that adequate controls were in place and to detect potential abuses. Although Plaintiff never

complained about either of his policies, there was also a complaint-handling system that existed for the purposes of addressing and properly resolving policyholder complaints.

MetLife has continued to evolve its compliance and supervisory system by establishing an enhanced compliance program in February 1994. This program was fully communicated to all covered employees by December 31, 1994 and included the following five stated objectives:

1. Customer relationships will be based on a solid foundation of service, education and trust, customers will be able to easily secure answers to questions, let MetLife know about service problems, and get problems resolved.

2. All policies and procedures necessary to reasonably assure employee compliance with applicable laws, regulations and company policies will be clearly communicated to and understood by employees.

3. Employees will be able to easily secure answers to ethics and compliance questions and will be encouraged to report deficiencies without fear of retaliation.

4. Reporting relationships will be well delineated and responsibilities clearly assigned to facilitate and assure accountability for the thorough and timely handling of compliance issues.

5. Policies and procedures will be administered uniformly and compliance will be effectively monitored and audited, areas for improvement recognized, and corrective action plans fully implemented.

MetLife has also been a member of the Insurance Marketplace Standards Association ("IMSA") since 1998. Insurers who members of IMSA subscribe to the IMSA Code and commit to adhering to the six basic principles of ethical market conduct established by IMSA relating to the sale of individually-sold life and annuity products.

Based upon the material I reviewed in this case, my education, training and experience in the insurance industry, it is my opinion MetLife had a reasonable and appropriate training and supervision of its sales representatives during the time period that these policies were sold. There should be no question that punitive damages are not appropriate in this case.

6. Based upon the material that I reviewed, it is my opinion with respect to the transactions discussed above, that plaintiff has not suffered economic, financial, or other compensable damages.

13

Plaintiff was interested in obtaining additional life insurance to provide for his family upon his death and, in the case of the 1994 policy, to replace the group term life insurance that he was losing. As discussed above, the policies he purchased were each appropriate to his circumstances at the time of purchase. Each policy clearly set forth the policyholder's premium paying obligations -- both as to amount and duration.

As discussed more fully earlier in this report, certain of plaintiff's claims in his Complaint and expert professional opinions lack reasonable factual or legal basis, or are contrary to deposition testimony. With respect to the 1991 Policy, plaintiff failed to disclose that he was a current tobacco products user at the time of his application. When that information was confirmed through medical testing, plaintiff was so informed by MetLife and the monthly premium on this policy was increased. It would have been unreasonable for plaintiff to expect that nothing else might have changed or to rely on any statements allegedly made before that information was known. With respect to the 1994 policy, there is nothing to support plaintiff's claim that he would only have to pay out-of-pocket premiums for 10 years. With respect to both purchase transactions, plaintiff testified that he understood whole life policies were payable for a person's lifetime. Plaintiff's policies and other written documentation provided by MetLife and its sales representatives fully informed him so. Plaintiff continues to pay premiums when due and his policies remain in force.

At the time that the policies in question were sold, it was common in the insurance industry to illustrate, based upon certain current assumptions, how a policy owner might limit the number of premiums that would have to be paid in cash, or "out-of-pocket". MetLife referred to its version as the Accelerated Payment Plan. The Accelerated Payment Plan is not a type of policy itself, nor a provision of any policy, nor a guarantee. It is simply a way to pay premiums if the policy has accrued sufficient dividends and accumulated value. In fact, plaintiff produced a letter from The Prudential, dated November 13, 1995, which explained to plaintiff how Prudential's Abbreviated Payment Plan would work in connection with his 1985 Prudential policy.

The MetLife life insurance policies purchased by plaintiff have provided him with valuable benefits all these years. Although he is eighty years old, he continues to have life insurance coverage at the same level premium guaranteed rates he has always paid with guaranteed accumulation of cash value, nonforfeiture provisions and whenever he passes away, his beneficiaries are guaranteed specified death benefits. Accordingly, there has been no showing of harm and no basis for damages.

*/s/ Kenneth I. Daniels*
Kenneth I. Daniels

14

**KENNETH I. DANIELS**
**8375 Valley Tarn**
**Atlanta, Georgia 30350**
**(770) 804-0376**

## PROFESSIONAL EXPERIENCE

**Kenneth I. Daniels**                                    **November 1996 to Present**

Independent Consultant on Securities and Insurance Compliance

Overall services include development and review of supervisory, compliance and field examination systems, procedures and manuals for broker-dealers, investment advisers and variable insurance products. Litigation support services include case review and assessment, discovery and litigation consulting, and expert witness reports and testimony in court and arbitration cases. Appointed as Independent Consultant pursuant to SEC and State Securities Commission Settlement Orders to review broker-dealer/ investment adviser firm procedures and to recommend necessary changes. IMSA assessments and enhancements provided in conjunction with Groner & Associates.

**IFG Network Securities, Inc.**                          **April 2001 to October 2002**

Chief Compliance Officer

Overall responsibility for the Compliance program at a broker-dealer, investment adviser, insurance agency group of companies. Responsibilities included development, implementation and monitoring of systems and procedures to help ensure compliance with regulatory, industry and company rules and regulations. Review, interpret and communicate significant industry developments. Made recommendations to Senior Management regarding best practices, risk/liability and proposed solutions to compliance-related business issues. Supervised Compliance Department staff, involving oversight of internal compliance audits and regulatory examinations, advertising and sales literature review, registration& licensing, complaints, E&O claims, arbitrations and legal actions affecting the firm and its representatives, surveillance and monitoring of transactions. Participated in and make presentations at sales and training meetings. Developed and monitored Department budget. Represented the firm in Network-wide conferences and meetings.

**Prudential Insurance Company of America**               **February 1999 to November 2000**

Vice President, Operations & Control

Responsible for ensuring that Prudential's Southern Territory, its 22 Agencies, branch and detached offices operated consistently with laws, regulations and company policies, in a cost-effective and operationally efficient manner. Supervised the Territorial staff and Operations Control Managers in each agency who implement the Agency's compliance systems, expense planning and monitoring, and overall agency operations. Coordinated the annual planning process for the Territory and monitored progress toward goals of $3 million production and $35 million expense management.

**The Equitable Life Assurance Society**                  **August 1987 to November 1996**

Vice President and Counsel                                 August 1991 to November 1996

Responsible for advising Equitable's Divisional Senior Vice Presidents and Southern Region managers and agents on legal and compliance matters, including: hiring, terminations, agent contract issues, sales practices,

Exhibit A

Kenneth I. Daniels                                                                                          Page 2

customer and regulatory complaints, advertising and sales literature, outside business activities and the
establishment of marketing relationships with banks, CPAs, and trade associations. Also served as a legal and
compliance resource for Equitable's Agency Support Group, Advanced Markets Team and National Hiring
Office. Primarily responsible for responding to and favorably resolving several major State insurance inquiries.
Wrote Equitable's company-wide internal disciplinary action program and model sanction guidelines.

Vice President and Regional Compliance Director                        August 1987 to August 1991

Responsible for establishing and administering the compliance program for the Southern Region and its
agencies, including examination of field offices, education and training, registration and licensing, and
Review of field generated advertising and sales literature. Also responsible for resolution of regulatory
inquiries, oversight of sales complaints and special investigations on behalf of the Regional President.

**U.S. Securities and Exchange Commission**                        **August 1974 to July 1987**

Special Counsel, Office of Insurance Products and                        April 1983 to July 1987
Legal Compliance, Division of Investment Management

Served as Enforcement Liaison to the Commission's Regional Offices and other Home Office operating
Divisions providing guidance, legal interpretation and policy input on a broad range of issues arising out
of compliance examinations, investigations and enforcement actions conducted pursuant to the Investment
Company and Investment Adviser Acts. Regularly expressed the Division's views on these matters at open
and closed Commission meetings.

Senior Counsel, Division of Enforcement                                June 1980 to April 1983

Prosecuted and supervised enforcement cases involving non-disclosures, material misrepresentations,
market manipulations, options, proxy contests, tender offers, insider trading, investment company and
adviser violations, fraudulent tax offerings and false and delinquent reports.

Assistant Chief Counsel, Division of Enforcement                        December 1978 to June 1980

Responsible for advising the Enforcement Division on legal, technical, interpretive and policy matters.
Coordinated special projects and Division programs, prepared public statements and speeches for the
Director in connection with professional conferences and appearances before Congressional Committees,
and conducted a number of sensitive investigative matters.

Legal Assistant to Commissioner Irving M. Pollack                        June 1978 to September 1978

Reviewed and provided the Commissioner with independent judgment in all areas of the federal
Securities laws, including: interpretive releases, proposed rules and regulations, enforcement
recommendations, litigation, appellate issues, and settlement of actions before the Commission.

Attorney, Branch of Corporate Regulation, NYRO                        August 1974 to November 1978

Analyzed, investigated and prosecuted enforcement cases; assisted in appellate litigation. Represented
the Commission at hearings in bankruptcy reorganization proceedings in the Northeast Region.

Kenneth I. Daniels                                                                        Page 3

## EDUCATION

**Washington University School of Law**, St. Louis, Mo.        Juris Doctor
       Editor, <u>Washington University Law Quarterly</u>

**University of Rochester**, Rochester, N.Y.                 Bachelor of Arts, Psychology

## PROFESSIONAL DATA

Admitted to Practice:    New York State Courts; U.S. District Court, S.D.N.Y.;
                         U.S. Court of Appeals, Second Circuit; U.S. Supreme Court

Graduate of National Institute for Trial Advocacy 1979
Chartered Life Underwriter (CLU) 1990
Independent Assessor, Insurance Marketplace Standards Association (IMSA) (1997 – 2000)
Arbitrator, NASD Regulation   (1998 – present)
NASD Series 7, 24, 63 (1988-2004) and NASD Series 65 (1999-2004)
GA Life & Health, Variable Life, Variable Annuity, Property & Casualty licenses (1999-2005)

## PUBLICATIONS

Contributor to "Selling With Due Care – Issues That Shape The Life Insurance Business," **<u>Life Insurance Selling</u>**, April 1998.

"When Bad Things Happen To Good Agents" and "Don't Be A Compliance Casualty," **<u>Conclusions</u>,** a publication of the Atlanta Chapter of the American Society of CLU and ChFC;  May 1997 and May 1994, respectively.

"Financial Planning and Investment Advisors--A Guide Under the Federal and New Georgia Provisions," **<u>Atlanta Lawyer</u>**, Summer 1989.

"Dismissal of Stockholder's Derivative Action as Res Judicata," 1973 **<u>Washington University Law Quarterly</u>** 219.

## CASES IN WHICH I'VE TESTIFIED

Belli, et al v. Merrill Lynch, Pierce Fenner & Smith, et al., Circuit Court of Cook County Illinois; Case No. 91 L 18172

Smothers v. Merrill Lynch, Pierce Fenner & Smith, NASD Arbitration Case No. 95 -03814

Aiello v. Ferris Baker Watts, et al., NASD Arbitration Case No. 02 -- 07173

Sutton v. Merrill Lynch, Pierce Fenner & Smith, NASD Arbitration Case No. 03 - 03183

James v.  Intersecurities, et al., NASD Arbitration Case No. 02- 06274

Bise v. Merrill Lynch, Pierce Fenner & Smith, et al., NASD Arbitration Case No.03-02294

Jarrard v. Prudential Equity Group, Inc., NASD Arbitration Case No. 02-06055

Sims v. Washington Square Securities, Inc., et al., NASD Arbitration Case No. 03-08345

Wellman v. Charles Schwab & Co., Inc., et al., NASD Arbitration Case No. 03-05363

Kierce v. Connolly, NASD Arbitration Case No. 04-00078

Paul Bauer v. Metropolitan Life Insurance Company, et al., Court Of Common Pleas, Allegheny County, Pennsylvania, Civil Division, G. D. No. 95 - 15814

Freismuth v. Prudential Equity Group, Inc., NASD Arbitration Case No. 03-07779

Brainard v. American Skandia Life Assurance Corp.  Case No. 1: 03-C.V.-1698
U.S. District Court, N. D. Ohio, Eastern Division

Adams, etal. v. McFadden, etal., NASD Arbitration Case No. 03-05687

# Exhibit 2

**EXHIBIT 2**

**Robert Wyckoff**
**v.**
**Metropolitan Life Insurance Company, et al.**

**G.D. No. 95-7543**

**DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S LIST
OF CASE-SPECIFIC TRIAL EXHIBITS**

| No. | Date | Description |
|-----|------|-------------|
| | | **Policy No. 915 409 338** |
| | | Policy No. 915 409 338 |
| ML-A | 06-27-91 | $10,000 Whole Life Policy |
| | | [RGW000017-37] |
| ML-B | 06-24-91 | Receipt and Temporary Insurance Agreement |
| | | [RGW000040-41] |
| ML-C | 08-07-91 | MetLife Letter from Check-o-Matic Section |
| | | (informing Mr. Wyckoff of check-o-matic arrangement) |
| | | [RGW000001] |
| ML-D | 07-31-91 | MetLife Welcome Letter |
| | | (notifying Mr. Wyckoff of nicotine level) |
| | | [RGW000002-3] |
| ML-E | 06-18-91 | Illustration Prepared for Mr. Wyckoff for a $10,000 Policy |
| | | [RGW000004] |
| ML-F | 10-xx-06 | Personal Insurance Online Correspondence Screen |
| ML-G | 10-xx-06 | Quick Quote Summary |
| ML-H | 10-xx-06 | Base 4 Screen (Tefra Premiums) |
| ML-I | 10-xx-06 | Base 1-3 Screens |

| | | |
|---|---|---|
| ML-J | 10-xx-06 | Payment History |
| ML-K | 10-xx-06 | Inforce Dividend Data |
| ML-L | 10-xx-06 | Dividend Transaction History |
| ML-M | | Annual Policy Statements |
| ML-N | | Annual Dividend Statements |
| ML-O | | Agent Information (First Year Commission) [MP2461000066] |
| ML-P | | Paramedical/Blood and Urine Test form [RGW000049-51] |
| ML-Q | 12-17-91 | Quality Assurance Letter from MetLife [MP2461000357] |
| ML-R | 08-02-91 | Record of Payments Received by Norm Molchan [MP2461000366] |
| ML-S | 05-10-06 | Demutualization Screens [MP2461002148-2149] |
| ML-T | 10-xx-06 | Inforce Illustration |

### Policy No. 945 600 948

| | | |
|---|---|---|
| ML-U | 08-02-94 | Policy No. 945 600 948 $4,5000 Whole Life Policy [RGW000001-16] |
| ML-V | 07-29-94 | Statement of Policy Cost and Benefits Information Illustration for Policy No. 945 600 948 (showing Guaranteed Cash Value and Annual Dividend) [RGW000047-48] |
| ML-W | 06-21-94 | Illustration for a $4,500 Whole Life Policy [MP2461001986-1993] |

| | | |
|---|---|---|
| ML-X | 06-20-94 | Disclosure Statement – State of Pennsylvania<br>[MP2461000354] |
| ML-Y | 06-20-94 | Life Insurance Buyer's Guide Receipt<br>[MP2461001983] |
| ML-Z | 06-20-94 | Request for Check-o-Matic Arrangement<br>[MP2461001981] |
| ML-AA | 06-20-94 | Check to MetLife (insurance premium)<br>[MP2461001982] |
| ML-BB | | U.S. Steel Employee Benefits Guide<br>Group Policy No. 16200-G, A16200-G<br>[MP2461000158-245] |
| ML-CC | 07-28-94 | Life Conversion Data Entry Form<br>[MP2461000078] |
| ML-DD | 06-27-94 | Request for Group Life Insurance Conversion Data<br>[MP2461000079] |
| ML-EE | 05-xx-94 | Notice of Reduction in Life Insurance from U.S. Steel and Carnegie Pension Fund<br>[MP2461000355] |
| ML-FF | 10-xx-06 | Personal Insurance Online Correspondence Screen |
| ML-GG | 10-xx-06 | Quick Quote Summary |
| ML-HH | 10-xx-06 | Base 4 Screen (Tefra Premiums) |
| ML-II | 10-xx-06 | Base 1-3 Screens |
| ML-JJ | 10-xx-06 | Payment History |
| ML-KK | 10-xx-06 | Inforce Dividend Data |
| ML-LL | 10-xx-06 | Dividend Transaction History |
| ML-MM | | Annual Policy Statements |
| ML-NN | | Annual Dividend Statements |
| ML-OO | 05-10-06 | Demutualization Screens |

[MP2461002145-2147]

| | | |
|---|---|---|
| ML-PP | 10-xx-06 | Inforce Illustration |

### Prudential Policy D80 672 264

| | | |
|---|---|---|
| | | Prudential Policy D80 672 264 |
| ML-QQ | 04-01-85 | $10,000 Limited Payment Life Policy |
| | | [RGW000088-116] |
| | | Prudential Policy D80 672 264 |
| ML-RR | 04-25-85 | Statement of Contract Cost and Benefit Information |
| | | [RGW000080-82] |
| | | Annual Letter |
| ML-SS | 11-13-85 | (Policy update and values) |
| | | [RGW000079] |
| | | Prudential Policy D80 672 264 |
| ML-TT | | Monthly Coupon Book |
| | | [RGW000084-85] |
| | | Prudential Policy D80 672 264 |
| ML-UU | 06-03-87 | Important Notice About Insurance Applications |
| | | [RGW000086-87] |

### Miscellaneous

| | | |
|---|---|---|
| ML-VV | | Deposition Transcript of Robert Wyckoff (and exhibits) |
| ML-WW | | Deposition Transcript of Kenneth Kaczmarek (and exhibits) |
| ML-XX | | Plaintiff's Answers to MetLife's First Set of Interrogatories |
| ML-YY | 10-06-00 | Verification for Pleading with Inconsistent Allegations attached to Plaintiff's Complaint, signed by Plaintiff |
| ML-ZZ | | Verification attached to Plaintiff's Responses to Defendants' First Set of Interrogatories, signed by Plaintiff |

4

| | | |
|---|---|---|
| | | U.S. Steel Industrial Studies Program |
| ML-AAA | | Certificate for Completion of Transactional Analysis and Modern Supervision |
| | | [RGW000147] |
| ML-BBB | 09-01-70 | Knights of Columbus $1,000 Whole Life Insurance Certificate |
| | | [RGW000065-78] |
| | | Prudential Policy 19 673 379 |
| ML-CCC | 03-01-54 | $5,000 Modified Whole Life Policy |
| | | [RGW000117-128] |
| ML-DDD | 10-30-00 | Reimbursement Agreement (MetLife and Kaczmarek) |
| | | [MP2461000348-351] |
| ML-EEE | 04/00/81 | Accelerated Payment Plan brochure |
| | | [M129770180954-M129770180956] |
| ML-FFF | 07/05/88 | Memorandum from Alan Knepper to the Field Force re: L-95 and the Competitive Edge |
| | | [M069702430269-M069702430272] |
| ML-GGG | 09/00/90 | Manual of Instructions for Account Representatives |
| | | Clause 31 - Accel Pay Instructions for Notice Business Policies |
| | | [MP9365005866; MP9365005939- MP9365005949] |
| ML-HHH | 08/00/92 | Manual of Instructions for Account Representatives |
| | | Clause 31 - Accel Pay Instructions (Excluding Survivorship Whole Life (SWL) and Flexible Whole Life (FWL)) |
| | | [M129765770828; M129765770904-M129765770911] |
| ML-III | 11/23/92 | Email from Cheryl Fager to All Sales Offices re: AP Eligibility Quotes |
| | | [M109766910705] |
| ML-JJJ | 02/14/94 | Memorandum to the Field Force re: Accelerated Payment Plan (APP) Arrangement |
| | | [M099755790010-M099755790011] |
| ML-KKK | | Deliberately Left Blank |
| ML-LLL | 01/00/94 | MetLife Outlook: Special Edition No. 8 |

| | | |
|---|---|---|
| | | [M109759250024-M109759250027] |
| ML-MMM | 03/25/94 | Memorandum to the Field Force re: "The ABC's of Dividends" Brochure |
| | | [M099730610246] |
| ML-NNN | 02/00/94 | The ABC's of Dividends brochure |
| | | [M119712710286-M119712710293] |
| ML-OOO | 10/26/94 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement |
| | | [MP925000086581-MP925000086585] |
| ML-PPP | 11/14/94 | Memorandum to the Field Force re:  MetLife's Accelerated Payment Arrangement Brochure (PL-1303) |
| | | [MP925000093602-MP92500093603] |
| ML-QQQ | 10/00/94 | MetLife's Accelerated Payment Arrangement brochure |
| | | [MP925000086023-MP925000086029] |
| ML-RRR | 03/10/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications |
| | | [MP0004005643-MP0004005667] |
| ML-SSS | 03/27/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications |
| | | [MP925000157798-MP925000157800] |
| ML-TTT | 10/25/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications |
| | | [MP925000121158-MP925000121163] |
| ML-UUU | 12/14/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications |
| | | [MP925000121244-MP925000121258] |
| ML-VVV | 12/28/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications |
| | | [MP0004004957-MP0004004971] |
| ML-WWW | 08/18/97 | Memorandum to the Field Force re: Accelerated Payment Arrangement (AP) Option Program |
| | | [MP925000108107-MP925000108116] |
| ML-XXX | 03/00/97 | Answers to Your Questions About the Accelerated Payment Arrangement and Your MetLife Policy |
| | | [MP925000145315-MP925000145322] |
| ML-YYY | 10/26/94 | Memorandum to the Field Force re:  Sales Illustrations – Explanation Pages |

|  |  |  |
|---|---|---|
|  |  | [M109758660043-M109758660044] |
| ML-ZZZ | 01/12/95 | Memorandum to the Field Force re: Signature Requirement on Sales Illustrations |
|  |  | [M099749060082-MP099749060083] |
| ML-AAAA | 04/28/95 | Memorandum to the Field Force re: Proposed NAIC Illustration Regulation |
|  |  | [M099730850091] |
| ML-BBBB | 12/08/95 | Memorandum to the Field Force re: Signature Requirements on Sales Illustrations |
|  |  | [M099720291871-M099720291874] |
| ML-CCCC | 06/30/97 | Memorandum to the Field Force re: Signature Requirement on Illustrations Procedural Change |
|  |  | [MP925000074433-MP925000074436] |
| ML-DDDD | 05/00/86 | Branch/District Office Audit Program |
|  |  | [M049700141654-M049700141691] |
| ML-EEEE | 01/00/89 | Office of Consumer Relations manual |
|  |  | [MP0004025479-MP0004025521] |
| ML-FFFF | 09/00/91 | Audit Manual – An Administrative Guide to Auditing Department Policies and Procedures |
|  |  | [M049700142005-M049700142218] |
| ML-GGGG | 06/00/87 | Policy Guide for Business Conduct |
|  |  | [MP925000293708-MP925000293730] |
| ML-HHHH | 00/00/90 | Policy Guide for Business Conduct |
|  |  | [MP0004032321-MP0004032344] |
| ML-IIII | 09/00/86 | Manual of Instructions for Sales Management - Clause 50-A - Responsibilities and Accountabilities of Branch Managers/District Sales Managers [MP925000004896-4917, MP92500004919-4932] |
| ML-JJJJ | 04/03/80 | Memorandum to District Sales Management re: Form 228…Falsification of Company Records or Reports |
|  |  | [MP4011161601-MP4011161603] |
| ML-KKKK |  | This Space Intentionally Left Blank |
| ML-LLLL | 11/82 | Audit Committee Charter |
|  |  | Memorandum from J. Creedon to All Metropolitan Officers Re: Auditing Statement of Policy |
| ML-MMMM | 12/22/83 | Memorandum from J.P. Maurer to District Sales Managers re: Management Compensation Arrangements |

for the Year 1984

[MP0004006033-MP0004006038]

| | | |
|---|---|---|
| ML-NNNN | 10/22/86 | Memorandum from Charles E. Lavezzoli to the Field Force re: Honesty, Integrity and Fair Play [M109712990432] |
| ML-OOOO | 10/16/90 | Memorandum from Harry P. Kamen to All Department Heads (MLI and MP&C) re: Procedures for Dealing with Employee Misconduct [MP925000060366-MP925000060367] |
| ML-PPPP | 03/03/92 | Memorandum from Richard W. Abele re: Employee Misconduct Procedures [MP0004032888-MP0004032889] |
| ML-QQQQ | 12/14/92 | Memorandum from Richard N. Maurer to Regional Executives re: Honesty and Integrity - Our Basis for Doing Business [MP925000069240-MP925000069241] |
| ML-RRRR | 12/15/92 | Memorandum from Richard N. Maurer to Branch Managers and District Sales Management re: Honesty and Integrity - Our Basis for Doing Business [MP925000071488-MP925000071493] |
| ML-SSSS | 12/16/92 | Memorandum from Richard N. Maurer to the Field Force re: Honesty and Integrity - Our Basis for Doing Business [MP925000033100-MP925000033107] |
| ML-TTTT | 12/22/92 | Memorandum from Harry P. Kamen to All Officers re: Misconduct [MP925000299077-MP925000299078] |
| ML-UUUU | 04/00/93 | Audit of Sales Outlets [M049700141555-M049700141577] |
| ML-VVVV | 12/01/93 | Memorandum from Richard N. Maurer to the Field Force re: Ethical Business Conduct and Local Customer Service [M019807570122] |
| ML-WWWW | 01/14/94 | MetLife's Response to the PA Market Conduct Report [MP0004033080-MP0004033127] |
| ML-XXXX | 02/00/94 | MetLife Enhanced Compliance Program - February 1994 [MP925000059631-MP925000059676] |
| ML-YYYY | | Manual of Instructions for Account Representatives [M099740000032] |
| | 02/00/93 | |

|  | 07/00/94 | Clause 1A - Honesty and Integrity - Our Basis for Doing Business [M099740000053- M099740000058] |
|--|----------|---|
|  |  | Clause 1B - Standards for Business Conduct [M099740000059- M099740000060] |
| ML-ZZZZ | 01/03/94 | Memorandum to the Field Force re: Accelerated Payment Plan (APP) Arrangement, with attachment [M129759740061-M129759740062, M129779250354-M129779250356.001] |
| ML-AAAAA | 10/26/94 | Memorandum to the Field Force re: Sales Illustrations – Explanation Pages [M109758660043-M109758660044] |
| ML-BBBBB | 12/26/94 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement [M129759740281-M129759740285] |
| ML-CCCCC | 10/16/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications, with attachments [MP1298006674-MP1298006685] |
| ML-DDDDD | 03/04/94 | MetLife Enhanced Compliance Program Personal Insurance Workplan [M08971220028-M089712200092] |
| ML-EEEEE | 09/29/97 | Complaint in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla) [MP2364004494-4513] |
| ML-FFFFF | 04/19/06 | Civil Docket in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla) [MP2364004533-4541] |
| ML-GGGGG | 02/01/99 | Summary Judgment Order in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla) [MP2364004514-4526] |
| ML-HHHHH | 01/11/00 | Opinion by Tenth Circuit affirming Order in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla) [MP2364004529-4532] |
| ML-IIIII | 04/04/05 | Testimony of Harry Kamen in Kintner v. Metropolitan Life Insurance Co., Civil Action No. 01-1725 (p. 129-163) [MP2364004456-493] |

| | |
|---|---|
| ML-JJJJJ | Demonstrative Exhibit |
| ML-KKKKK | Demonstrative Exhibit |
| ML-LLLLL | Demonstrative Exhibit |
| ML-MMMMM | Demonstrative Exhibit |

MEI\5659824.2