# REPORT OF INVESTIGATION

### INTO SALES PRACTICES OF

# METROPOLITAN LIFE INSURANCE COMPANY

Submitted to

**TOM GALLAGHER**
FLORIDA INSURANCE COMMISSIONER
AND
CHAIRMAN METROPOLITAN WORKING GROUP
NATIONAL ASSOCIATION OF
INSURANCE COMMISSIONERS
Tallahassee, Florida

**ROBERT A. BUTTERWORTH**
ATTORNEY GENERAL STATE OF FLORIDA
Tallahassee, Florida

By

**THOMAS TEW**
Miami, Florida

March 6, 1994

# REPORT OF INVESTIGATION
## INTO SALES PRACTICES OF
## METROPOLITAN LIFE INSURANCE COMPANY

By

### THOMAS TEW

TABLE OF CONTENTS                                                      PAGE

I.    GENESIS AND SCOPE OF THE INVESTIGATION

          1.    Genesis . . . . . . . . . . . . . . . . . . .   1
          2.    Scope . . . . . . . . . . . . . . . . . . .   3

II.   SUMMARY CONCLUSION . . . . . . . . . . . . . . . . .   3

III.  METROPOLITAN . . . . . . . . . . . . . . . .   6

IV.   DANIEL RICHARD "RICK" URSO

          1.    Urso's Met Career . . . . . . . . . . .   8
          2.    Urso's Training . . . . . . . . . . . .   9
          3.    The Nurses Retirement Savings Plan

                A.    The Targeted Market — Nurses . . . 11
                B.    The Marketing Concept — Savings . . 11
                C.    Urso's Agents — A Profile . . . . 14

V.    TROUBLE IN PARADISE . . . . . . . . . . . . . . . 15

VI.   THE ESCALATION OF HOSTILITIES . . . . . . . . . . 30

VII.  METROPOLITAN'S OSTRICH APPROACH TO THE PROBLEM . . 32

VIII. THE NOTICE AND ORDER TO SHOW CAUSE . . . . . . . . 34

IX.   THE INITIAL PLAN OF RESTITUTION —
      URSO POLICYHOLDERS  . . . . . . . . . . . . . . 35

X.    A FAILED COMPLIANCE PROGRAM . . . . . . . . . . . 37

XI.   AWARENESS OF THE PROBLEM  . . . . . . . . . . . 39

            1.  Auditing . . . . . . . . . . . 39
            2.  Management . . . . . . . . . . . 40
            3.  Legal  . . . . . . . . . . . . 40

XII.  THE HEART OF THE PROBLEM  . . . . . . . . . . 41

XIII. THE EXPANDED PLAN OF RESTITUTION  . . . . . . . 41

            1.  The Initial Offer To Policyholder . . 42
            2.  Identifying Additional Policyholders
                To Be Contacted  . . . . . . . . . . 42

            A.  Even Premium Policyholders  . . . 43
            B.  The Relevant Offices and Agents . 44
            C.  Exclusions from the Even
                Premium Class  . . . . . . . . . 45
            D.  Start and End Date for Group
                Receiving Notice  . . . . . . . 46
            E.  Size of the Class  . . . . . . . 47
            F.  Form and Method of Notice  . . . 47
            G.  Form of Restitution  . . . . . . 49

XIV.  PROPOSED ENHANCED COMPLIANCE PROGRAM  . . . . . 50

            1.  Accountability and Organization . . . . 50
            2.  Personal Insurance Enhanced
                Compliance Program  . . . . . . . . . 52

            A.  Sales Material . . . . . . . . . 53
            B.  Training Management . . . . . . . 54
            C.  Training Sales Representatives  . . 54
            D.  Promotion and Recognition  . . . . 55
            E.  Recruiting . . . . . . . . . . 55
            F.  Monitoring . . . . . . . . . . 55

XV.   ACKNOWLEDGEMENT  . . . . . . . . . . . . . . . 56

ii

XVI. APPENDICES

A.  Organizational Charts
B.  Sales Material

    1.  Tax Advantaged Bonus Plan
       For Business Owners
    2.  Tax-Advantaged Retirement Plan
       Designed For Nurses

C.  Audit Report - November 8, 1991

D.  Correspondence, Memos and Other Documents

    1.  Illustrative Script
    2.  Spread Sheets
    3.  Excerpt from Illustration Reflecting
       Commissions
    4.  1990 Packet of Texas Communications
    5.  August 24, 1990 Discontinued Letter
    6.  January 15, 1991 Bertke Memo
    7.  April 25, 1991 Letter from Harold J.
       Harrison to Jim Hughes
    8.  April 25, 1991 Brochure
    9.  August 14, 1991 Letter from James
       Higgins to Regional Directors
   10.  September 25, 1991 Michaud Letter
   11.  October 14, 1991 Approved Letter
   12.  October 21, 1991 Approved Letter
   13.  October 25, 1991 Letter from Richard
       Maurer to Rudy Michaud
   14.  December 2, 1991 Approved Letter
   15.  March 26, 1992 Letter from Rudy
       Holtzman to Robert Crimmins
   16.  February 21, 1993 Letter from Mark
       Moser to Harry Kamen
   17.  June 22, 1993 Letter from William
       Goggans to Richard Maurer
   18.  July 2, 1993 Letter from William
       Goggans to Richard Handel
   19.  October 5, 1993 Letter from
       Commissioner Gallagher to Met
   20.  October 13, 1993 Appointment of Tom
       Tew

E.  Restitution  - Form of Letters

I.    GENESIS AND SCOPE OF THE INVESTIGATION

1.    Genesis

On October 12, 1993, Florida Insurance Commissioner and Treasurer Tom Gallagher and Florida Attorney General Robert A. Butterworth named Miami lawyer Thomas Tew to head a joint-agency investigation into certain sales practices of Metropolitan Life Insurance Company ("Met" or the "Company"). The investigation was sparked by a Notice and Order to Show Cause filed by the Florida Department of Insurance against Met on August 27, 1993, alleging violations of numerous Florida insurance statutes. The Order required Met to show cause why the Department should not revoke or suspend Met's Certificate of Authority to conduct business in Florida, impose a Cease and Desist Order and/or impose other penalties under Florida law.

The Notice and Order to Show Cause alleged that since at least 1989, Daniel "Rick" Urso, Manager of the District Sales Office for the Southeastern Head Office Branch for Met, had "trained, instructed, insisted and demanded that insurance agents, appointed and employed by Metropolitan, and engaged in the sale of life insurance products, utilize misrepresentations, fraud and other unlawful means to promote the sale of Metropolitan products on behalf of Metropolitan and with the company's approval."

The Florida Department's initial investigation revealed that from 1989 through October 1993 Urso's agency fraudulently sold to approximately 20,000 nurses nationwide "whole life" insurance policies or L-95s or L-98s (whole life paid up at ages 95 and 98, respectively) disguised as a "Nurses Retirement Savings Plan"

("Plan"). Whole life, L-95 and L-98 will be referred to as "whole life" in this report.

Urso's agents began their target-marketing campaign by purchasing mailing lists of nurses and other professionals throughout the country. These lists were used to mail, at Met's cost (which exceeded $1 million in 1992 alone), pre-approach letters highlighting "tax benefits," "flexibility," and "cash accessibility without penalty" under the Plan. More than 20 million of such misleading pre-approach letters were mailed and were signed by Met agents presenting themselves as "Nursing Representatives" or other unauthorized titles not identified with life insurance sales.

The pre-approach letters describing the Plan and the telephone solicitations used to gain sales interviews made no reference to "life insurance." Instead, those who responded to the pre-approach letter received a well-rehearsed sales pitch comparing the Plan to other savings or retirement-directed financial products. In the field, some Urso agents concealed the words "life insurance" on the insurance applications by carefully folding the application when client information was taken. When policies were delivered, some Urso agents would conceal any reference to life insurance by placing their business cards or their arms over particular insurance-related words.

Many agents used to their advantage the intimidating and confusing concepts inherent in insurance and investment-related products. For example, purchasers who asked whether the Plan was life insurance were advised that the Plan had an element or

2

component of life insurance. Significantly misleading was the practice of referring to premium payments as "monthly deposits." Those who purchased Plans believed they were making scheduled "deposits" to their retirement/savings plans. "Deposits" in round-numbered amounts such as $50.00, $100.00, etc., were suggested.

    2.   <u>Scope</u>

This investigation focuses on management's awareness of, and responses to, certain sales practices of Met's Personal Insurance Unit, a marketing unit comprising career agents, including Urso and his agents, who sell to individuals and small groups. Other marketing units such as group insurance, pension plans and mutual funds are not within the scope of this report. Information developed on individual agents was turned over to the Florida Department of Insurance for evaluation on a case-by-case basis and for possible enforcement action.

This report does not take issue with the fundamental soundness of Met's whole life policies; it challenges the manner in which those products were sold.

## II.  <u>SUMMARY CONCLUSION</u>

Each of Met's five sales territories[1] used personal insurance sales materials which, in direct violation of Met's stated procedures, were not approved by Met's New York legal department. A significant portion of these unapproved sales materials, in

---

[1]    Prior to 1992, Met had four territories.

3

addition to those used by Rick Urso's agency force, violated state
laws.

The use of illegal sales materials on a state-by-state basis
can be directly attributed to Met's lack of sales supervision and
a tacit approval of aggressive sales tactics within a highly-
competitive industry. Corporate mandates devised to insure the use
of "approved" sales literature were largely unknown or ignored by
those in the field or were unenforced by management.   Met's
marketing culture developed unimpeded by the constraints of
corporate audit, legal, and compliance reviews.   In fact, this
essential triumvirate operated independently of one another and did
not intersect in the review of sales, marketing materials and sales
practices.

Procedures to ensure compliance with state law were virtually
non-existent.  Although numerous databases existed and were readily
available to Met's senior management, management did not assign
responsibility to any department to monitor, cross-reference or
interpret information necessary to assure that marketing practices
complied with state law.  Further, Met did nothing to ensure that
the customer was purchasing the best product for his or her needs.
Even a cursory review of internally generated data would have
raised the question of whether a single product, whole life
insurance, was appropriate to meet the needs of a particular
profession spread nationwide (20,000 nurses, in Urso's case).
Imagine the management of a national brokerage firm ignoring
information that every account representative in a large office had

4

sold only one stock, and no other stocks, to every customer of that office.

The low priority given to compliance within the Met organization is reflected by the fact that only three attorneys were assigned part-time responsibility for reviewing sales literature (when, and if, voluntarily submitted) which was used in 50 states by approximately 22,000 agents yearly. Sales scripts and other sales practices used by the sales force were unregulated and apparently unexamined.

Urso's activities resulted in more than violations of states' laws. The customers of his agency suffered significant economic losses. Nurses who believed they had purchased a savings or retirement plan with "flexibility" and the "availability of cash without penalty" soon confronted the reality of whole life's characteristics, one of which is non-existent or limited cash value in the early years of the policy. The cash many thought was accruing for a rainy day was not accumulating dollar-for-dollar with the "deposits" made, as is the case with a savings plan. In fact, a nurse age 35 would not have any available cash in his or her Met whole life policy until after the 18th month; the cash values would not equal the "deposits" (premiums) paid without the use of Met's optimistic "dividend" schedules, and then not until after the 5th year at the earliest. Thus, those policyholders who allowed their policies to lapse (a high percentage) lost all their premiums paid:

5

As is usually the case with financial deceptions perpetrated on consumers, those harmed are the least equipped to absorb monetary losses. The legal and supervisory issues raised in this report are overshadowed by the larger human issue of economic pain and suffering. In view of the unfortunate circumstances under which the losses were incurred, Met has, commendably, proposed an appropriate plan of restitution and has adopted an innovative compliance program.

### III. METROPOLITAN

Met is headquartered at One Madison Avenue, New York, New York. With more than $1.1 trillion of life insurance in-force, Met is, by that measure, the largest life insurance company in North America. The Company has no stockholders but rather is a mutual company owned by its policyholders. As of July 1, 1993, the Company's capital base (surplus plus investment valuation reserves) amounted to approximately $6.6 billion. Met employs twenty-two thousand agents in its Personal Insurance unit spread through more than 950 career agent offices in five territories.[2/]

The Company is governed by an eight member Corporate Management Office (CMO) consisting of Harry P. Kamen, Chairman of the Board and Chief Executive Officer, Ted Athanissiades,

---

[2/]    Urso's office was within the Southeastern Territory which included the States of Florida, Georgia, South Carolina, North Carolina, Virginia, West Virginia, Pennsylvania, Maryland, Delaware, New Jersey, Mississippi and Alabama and the District of Columbia.    During 1992, the states of Pennsylvania, New Jersey, Maryland, Delaware, Virginia, North Carolina and South Carolina were placed in the Mideastern Territory and the Southeastern Territory was renamed the Southern Territory.

6

President, and six senior executive vice-presidents and executive vice-presidents.   Robert J. Crimmins is the executive vice president in charge of personal insurance.   The sales force is headed by Officers in Charge (OIC) in five geographic territories of the Company who, prior to January 1991, reported directly to Crimmins.   In January 1991, Richard Maurer was appointed Senior Vice President of Career Agency Operations.   All OIC's reported to Maurer; Maurer reported to Crimmins.

At the territorial level, the Marketing Vice President reports to the OIC, the Regional Sales Manager reports to the Marketing Vice President and the Branch and/or District Managers report to the Regional Manager.   From approximately 1983 to 1991, Urso was a manager of the Tampa or Southeast Home Office of Met.   This office is generally referred to as the "SEHO" office.   Urso reported to William Latta, the Regional Sales Manager for the Tampa region; Latta reported to James Higgins, Marketing Vice President for the Southeast Territory; and Higgins reported to Rudy Michaud, OIC of the Southeast Territory.   Dennis Schneider replaced Latta as Regional Sales Manager in 1991.   In 1992, William Goggans replaced Rudy Michaud and SEHO became a District Office rather than a Branch Office.[2]

---

[2]   A copy of the organizational charts of the Southeast Territory prepared by counsel for Met, are included in the Appendix at Tab A.

IV.  <u>DANIEL RICHARD "RICK" URSO</u>

   1.  <u>Urso's Met Career</u>

     Urso joined Met as a field trainer in September 1983.  Prior to that time, he had been a sales manager for John Hancock Insurance Company.  Urso was promoted to branch manager for the Tampa branch in December 1983.  His success is noteworthy.

     In 1989, Urso employed 21 sales persons in his branch office who generated commissions of approximately $580,000.  In 1990, with 32 sales persons, Urso generated commissions of $1 million; and in 1991, Urso's 67 sales persons generated commissions of $2 million. In 1992, Urso employed 92 sales persons who generated commissions of nearly $4 million dollars.  By 1993, Urso employed 120 persons in what had become the largest district office in the Met system.

     Urso's stellar career at Met is reflected by SEHO's selection as Sales Office of the Year for the Southern Territory for every year from 1989 through 1992 and Sales Office of the Year for the entire company in 1990 and 1991.

     Urso's salary increased commensurately with his Met accomplishments.  In 1989, Urso earned $270,000; in 1990, $390,000; in 1991, $584,000; and, in 1993, Urso earned $986,000, making him the sixth highest paid employee in the entire Met organization.

     Urso was sought out throughout Met to present his sales techniques nationwide in a variety of forums.  Richard Maurer, Career Operations Senior Vice-President, introduced "Targeting Dominant Needs," a series of training modules developed by Maurer's Field Training and Development Committee.  This "how to" module was

designed to guide the sales person through every step of the training and support of account representatives. Urso contributed significantly to this program which included many of the objectionable sales techniques.

Urso was invited to and participated in numerous Met training sessions and seminars. As late as February 1993, he attended a meeting of the Regional Executives of Met in Palm Springs, California, at which he presented training modules. The materials relating to the training module were widely distributed at that time.

### 2.   Urso's Training

Like all agents in the Southeastern Territory, Urso was trained at a Career Success School operated by Met in all five territories of the Company. The marketing philosophy instilled by these schools is illustrated in "Pre-appointment Training - Eighteen Steps to Success" published by Met's Southern Territory and dated July 24, 1992 (the "Pre-Training Manual"). Entrance to the Career Success School was conditioned upon reading the Pre-Training Manual. Once enrolled in Career School, new hires were required to obtain a copy of the "Southern Territory Presentation Book and Script" and to continually practice the book and script.

The script leads the sales trainee through a presentation to a hypothetical client, during which the objective of "obtaining financial security" through Met's "accumulation products" is emphasized. The 23-page script refers to a "concept" (in fact, whole life) offering "systematic savings, tax deferred growth, tax

9

free income, availability of cash, [and] disability waiver" but fails to once mention that life insurance is the product being discussed. A single section is illustrative of this deception: "It's quite unlike any savings vehicle. It's an <u>insured savings plan</u>. The reason they call it insured is because it's a <u>sure thing</u>." (Emphasis in the original script).

All sales representatives in the Southern Territory were also required to familiarize themselves with the "Stop and Go Savings Plan" set forth in the Southern Territory Presentation Book and Script. "Stop and Go" is one of a myriad of plans which emphasize the savings feature of life insurance and de-emphasize or fail to mention the insurance element. The consummate application of this strategy is evidenced in a nurses tape distributed throughout the Southern Territory under the direction of John Goubeaud, Marketing Services Manager for the Southern Territory since July 1992.[9] Featured on the tape is Ann Edwards who demonstrates how to adopt the Southern Territory's "Insureds Savings Stop and Go Plan" to the nurses market. The tape is blatantly misleading. It is doubtful that a prospect bombarded with this presentation would comprehend that life insurance was being sold rather than a savings plan. The tape suggests that the correct response to the prospect's query of whether the product is "like an added life insurance," should be met with the response that the product has a "component of life insurance."

---

[9] Mr. Goubeaud replaced Garry Volth who held that position from March 1990 through July 1992. Met terminated Mr. Volth in December 1993. Mr. Goubeaud presently holds the position of Director of Marketing Services.

10

3.    The Nurses Retirement Savings Plan

A.   The Targeted Market - Nurses

Urso targeted a group of individuals who were educated (nurses must complete 4+ years of college or a specialized nursing program) and skilled. Nurses are recognized professionals who work hard, encounter substantial stress as a result of their occupation, and often elevate their care-giving contribution to society over monetary rewards. Nurses are natural customers for savings and retirement plans because they are exposed daily to the chronological and economic happenstance of old age and illness.

Because of their staggered shifts, nurses are also a very convenient market. They can be sold twenty-four hours a day, seven days a week.

Met chose to offer a product to an occupational segment pre-conditioned to the need for financial planning. Current news of low interest rates, concerns about the adequacy of social security for retirement needs, and the growing national interest in savings products could not have escaped any nurse even casually attentive to the media. The Met libraries contained psychological studies indicating that nurses were a particularly attractive target for selling the concept of financial security.

B.   The Marketing Concept - Savings

Rick Urso did not develop for Met the concept of repackaging a traditionally-unattractive product (whole life) into a more popular form (retirement and savings plans). Rather, the idea of selling insurance disguised as "savings" was ingrained in Met's

11

marketing culture in the Southeast Territory years before Urso was hired.

Urso grasped the basic principals of his training to develop his nurses retirement plan. The first contact with the targeted market (nurses) was the pre-approach letter. These letters violated the advertising laws in virtually every state in the United States and were inappropriate because: (a) they did not mention life insurance; (b) they improperly marketed life insurance as a savings plan; (c) the product was rarely, if ever, in the client's best interests; and (d) the client was misled.

The savings theme carried over to the sales scripts the agents were required to learn verbatim. The script described a long term savings plan comparable to annuities, money markets, IRA's (Individual Retirement Accounts), CD's (Certificates of Deposits), and various other savings and pension plans which gave credibility to the Plan. The term "life insurance policy" was rarely, if ever, mentioned in the scripts.[5]

Nurses who purchased the Plan believed they were putting money away for retirement or were saving at the rate of their "deposits," a deceptively applied euphemism for premiums. Buyers of the Plan were encouraged to contribute monthly amounts they could save comfortably; "deposits" were set up in round-numbered amounts.

In electing to sell whole life, Urso ignored the needs of his customers for savings and retirement. Instead, his agents sold the

---

[5]    An illustrative script is included in the Appendix at Tab D-1.

12

highest commission product available to them, rather than a more suitable product generating lower commissions.

Met's commission on its whole life product is 55% of the first year's premium contrasted with a 2% first-year commission on an annuity product.[5] This fact explains why elaborate efforts were undertaken throughout Met and by Urso's team to concentrate on whole life to the exclusion of all other products offered by Met. The Personal Insurance Unit offered a wide range of excellent products to meet the needs of its customers. These products, annuities and mutual funds, for example, carry low commissions. Thus, this commission structure, standard in the industry, has the potential to create an irreconcilable conflict between the agent's need for commissions and the customer's need for a suitable product. An effective compliance program must address this potential for conflict. The absence of such a program will give rise to the problems addressed in this report.

Because of the acquisition expenses, including commissions, associated with the sale of Met's whole life policy, a nurse age 35 does not have any cash value in his or her policy until after the 18th month; guaranteed cash values may never equal the "deposits" (premiums) paid without the use of Met's optimistic dividend schedules, and then not until after the 5th year at best. In contrast, it is unlikely for an annuity not to reach a surrender value equal to the contributions made by the end of the second

---

[5]/ An excerpt from a Met illustration given to its sales force reflecting the different commissions for these products is attached to the Appendix at Tab D-3.

13

year.  Thus, if savings, not life insurance protection, is the
client's objective, an annuity is the preferred product.  Urso's
Plan, as well as many other marketing programs in use at Met,
distorted the financial facts and compromised the interests of
clients for the sake of commissions.  Even more deplorable,
however, is that this concept selling approach appealed to a
financial need, falsely promised a solution and, in the end,
ignored the objectives of the client.

### C.  Urso's Agents – A Profile

Urso sought out and hired highly motivated sales persons to
market his Nurses Retirement Savings Plan.  Urso preferred to
recruit agents with no prior insurance experience who he could
subject to rigorous training that refined the techniques taught at
the career success schools.  Urso required his agents to memorize
detailed telephone and personal presentation scripts; the personal
presentation scripts were approximately 11 pages of single-spaced
text.    The concept of a retirement savings plan is stressed
throughout the script; numerous improper references are made to
other financial and savings instruments.   New agents were
instructed to memorize the material within a six-week period, were
sometimes videotaped reciting the pitch, and were taken on sales
calls by a manager or trained sales person.

Agents could earn as much as $65,000 their first year by
calling on nurses throughout the United States.  Although agents
bore the expense of their travel, they realized substantial
commissions and bonuses for their efforts.  In 1993, 59 of Urso's

14

agents qualified for "Leader's Conference" and 19 qualified for "President's Conference."[1]

The Tampa office designated its agents as "Nurses Representatives" rather than insurance agents. This is a blatant violation of law which requires persons selling insurance to identify themselves as insurance salespersons.

## V.    TROUBLE IN PARADISE

Urso's marketing of the Nurses Retirement Savings Plan began in earnest in 1989. Problems arose almost immediately. During 1990, the Texas Department of Insurance registered complaints with Met's New York office regarding improper solicitations in the State of Texas; the State of North Carolina complained to the Tampa office of Met regarding improper solicitations; and the Tennessee Department of Insurance asked the SEHO branch to cease and desist using its pre-approach letter because it was misleading. Met advised Texas that all objectionable sales materials were destroyed and that the problem was resolved. Similar assurances were given to the other states.

The experiences of Texas, North Carolina and Tennessee are instructive. In January of 1990, the Texas Board of Insurance wrote to Patrick Hunt, Director of the Personal Insurance Compliance Bureau in Met's New York office, regarding an objectionable pre-approach letter that was sent to a consumer named

---

[1]    Performance within Met is rewarded by qualification for various "conferences" based on the level of premiums generated by the agent.

15

Ward and signed by Ed Moore, "Nursing Representative." Met took no action in response to this letter and on March 20, 1990, Texas again wrote to Mr. Hunt. William Latta addressed this matter with Urso and on April 13, 1990, Urso certified that the letter had been destroyed and that its further use would be discontinued. On November 15, 1990, Hunt wrote back to Texas advising that the objectionable letter had been destroyed.[9]

In North Carolina, the improper marketing efforts were persistent. On May 23, 1990, David Powell, a life insurance agent, complained to the North Carolina Department of Insurance regarding a pre-approach letter his wife, a nurse, received from Ken Hagen, "Nursing Representative." This complaint was forwarded to John Smith, Met Vice President, Tampa, by Joseph Williams of the North Carolina Department on June 19, 1990. On June 25, 1990, Williams again wrote to Smith, this time complaining of a similar letter which originated in High Point, North Carolina, signed by Tom Abbott, "R.N. Representative." On July 16, 1990, Smith wrote to the North Carolina Department and informed it that use of the letters had been discontinued. On July 24, 1990, Powell wrote to the North Carolina Department regarding yet another letter his wife had received, this time from the Tampa office. On August 6, 1990, North Carolina again wrote to Smith regarding the Powell complaint of July 24.

---

[9]    A copy of the packet referencing these communications is included in the Appendix at Tab D-4.

The correspondence from North Carolina was sent to Urso on August 13. Urso was advised to stop using the letter and, on August 24, he told Diane Shaffner, Consumer Affairs, that he would stop using it.[2/] On August 27, 1990, apparently based on the Urso certification, Met informed North Carolina that use of the letters would be discontinued. On October 15, 1990, however, Powell's wife received yet another pre-approach letter, this time signed by Don Payne, and on November 6, 1990, the North Carolina Department wrote to Smith regarding this letter. On November 30, 1990, Smith responded to the North Carolina Department confirming that the manager of the High Point, North Carolina, office had been told to stop using the letter and that the regional manager for the State of North Carolina had been similarly instructed.

In Tennessee, Patricia Allmond lodged a complaint with the Tennessee Department of Insurance on September 8, 1990, regarding a nurses' solicitation. On September 14, the Tennessee Department wrote to SEHO regarding the complaint. On September 20, 1990, Joann Fries, Met Consumer Relations, requested that Urso review the complaint and the insured's allegation that she believed she was buying a savings plan, not insurance. Urso responded to Fries and denied any deception. Fries communicated this response to the Tennessee Department. However, the Tennessee Department then provided Met with a copy of the nurse's letter and requested that

---

[2/]    A copy of Urso' memo to Shaffner and the objectionable letter is included in the Appendix at Tab D-5. This sales letter was equally objectionable to the one that Urso represented was destroyed and that he would cease using in his certification in connection with the Texas problem on April 13, 1990. (See Tab D-4).

it cease and desist using the letter.  On October 23, 1990, Met apologized to the Tennessee Department for overlooking the sales letter and issued a refund.

On November 1, 1990, Bruce Hemer, Director of Consumer Affairs in the New York Home Office of Met, sent a memo to Roy Bertke, Manager, Public and Consumer Affairs, SEHO, to which he attached a copy of the Tennessee packet.  Hemer stated, "I'd assume someone has 'come down hard' on the attached 'nursing item'."  In January 1991, Bertke wrote to Urso regarding his authorized sales literature stating that "the brochure misleads people, a violation of insurance laws in every state."[19]  Bertke's statement was accurate in 1991 and is accurate today.  Despite this acknowledgement, the practices continued.  Urso readily assured all who inquired that he would use only approved literature.  No further action was taken.

On February 20, 1991, the auditing department of Met submitted its report on the audit of the SEHO branch conducted in December 1990.  Despite the widespread awareness of the complaints from Texas, North Carolina and Tennessee, the report did not mention unauthorized sales literature but pointed out that mass mailing in the office cost more than $200,000 for the first ten months of 1990.

Ironically, at or about that time, the SEHO office was being reviewed for, and was ultimately named, Sales Office of the Year

---

[19]   A copy of Bertke's memo and the brochure are included in the Appendix at Tab D-6.

for 1990.  The selection as Office of the Year was made by the Officers in Charge of the territories and their supervisor, Richard Maurer.  These individuals reviewed spreadsheets on Urso's offices as well as those of other candidates.[11/]  Robert Crimmins, head of Met's Personal Insurance Unit, was aware of the problems with the unauthorized sales literature, and personally intervened to make sure that SEHO's selection as Office of the Year for 1990 did not embarrass Met.  Crimmins personally required the OIC, Rudy Michaud, to report to him, on a personal and confidential basis, regarding "stern controls" which would assist in the supervision of this "highly productive branch."  There is no evidence that Crimmins took any direct action to curtail the improper marketing practices of Urso.

Urso's widespread solicitations and the problems associated with them continued throughout 1991, with complaints registered in Florida, Virginia, New York, with various levels of the Met's Personal Insurance Unit and in other marketing units of the Company.  On April 25, 1991, Harold J. Harrison, National Marketing Director of Met Resources, the division of Met which services large company accounts, wrote to Jim Hughes in Denver regarding an objectionable nurse's letter that had been sent from Skokie, Illinois.  In his letter, Harrison pointed out that this was not the first time this type of nurse's solicitation had occurred, and stated:

---

[11/]    A copy of these spreadsheets are included in the Appendix at Tab D-2.

19

> These prospecting letters are highly questionable for the following reasons:
>
> 1. They don't mention life insurance.
> 2. Life insurance cannot be marketed as a "savings plan" in Illinois.
> 3. Is not in the client's best interest.
> 4. I sincerely doubt that Mr. Handel would approve of these letters.
> 5. The client is being misled.[13/]

Harrison's letter also included information transmitted to him by Ron Keller, financial advisor, Met Resources. Keller's memo to Harrison attached a pre-approach letter from "nursing representative" Brad Gillespie. During a telephone conversation with Gillespie, he allegedly told Keller that he (Gillespie) had purchased a mailing list of approximately 60,000 nurses located in Cook and Lake counties, Illinois.

On November 8, 1991, an audit report was issued on SEHO which congratulated SEHO on its selection as Met's 1990 District Sales Office of the Year, addressed the issue of unauthorized sales literature, and pointed out numerous problems with the pre-approach letters. The audit report contained the following summary of audit findings:

> Unauthorized sales literature has been utilized which is contrary to Mr. Richaud's 1990/91 letters to the field and could result in additional State "Cease & Desist" orders and cessation of underwriting privileges.
>
> Since 9/18/91, when Marketing restricted the number of pre-approach letters to 50 per representative, per week, 382,794 pre-approach letters have been mailed by the District in 21 business days.

---

[13/]   A copy of Harrison's letter is attached to the Appendix at Tab D-7.

20

The audit report also contained a fact sheet on the unauthorized pre-approach letters which identified the following problems:

| UNAUTHORIZED WORDING | EXPLANATION |
|---|---|
| Nursing Representative Deposits | "Made up" title. Not an acceptable synonym for premium. |
| Retirement Saving Plan | Name of policy & its benefits must be specified. |
| Investment World | Insurance cannot be referred to as an investment. |

Another questionable term used but omitted from the approved version:

| Guaranteed | New version adds approved nurses. |
|---|---|

The auditors also advised that complaints had been received from the States of North Carolina, Virginia and Florida. The report concluded:

> Continued use of the unapproved letters could lead to
> the eventual cessation of MetLife's privileges to
> underwrite insurance in the applicable states, according
> to Ms. L. Michele Ligon, J.D., Advanced Sales &
> Consulting Services, Marketing.

The audit report was distributed to two senior vice presidents of Met, three vice presidents, and two assistant vice presidents. It went to the senior vice president and Officer In Charge of the Southeastern Territory and the senior vice president and controller for the New York Home Office. At least eight persons in the New York Home Office received a copy of the audit report. Despite this widespread distribution, there is no evidence of any effective follow-up to the opinion expressed in the audit that "there is an immediate concern regarding pre-approach letters which should be

21

addressed by senior management to reduce the risk of negative publicity."[11]

Perhaps the lack of attention paid to the Urso problem can be attributed to the disarray and failure of communication among the sales force, the home office legal department and lawyers working for Met in the territories. Urso took advantage of the lack of standing and resources of the legal department by using letters which, apparently, had not been approved by the New York home office, based on his assertion that his literature had been approved by territorial level counsel within Met. While Met denies that territorial counsel had the authority to approve literature, it is clear that Met's upper level management was aware that they were approving literature and did not advise Urso or territorial counsel that this was prohibited.

Ms. L. Michele Ligon, J.D., Advanced Sales and Consulting Services, Marketing, was a lawyer employed in the consulting department of Met. She approved certain pre-approach letters and pamphlets which were ultimately disapproved by the home office legal department. Ligon also disapproved some materials which Urso continued to use.

Urso had mailed millions of pre-approach letters prior to 1991, and there is no evidence that these letters had been approved by anyone. In fact, Urso had certified that he would stop using certain letters on April 13, 1990, and on August 24, 1990. On

---

[11]    A copy of the narrative portion and fact sheets from the audit report is included within this Appendix at Tab C.

22

April 25, 1991, Ligon approved for use outside of North Carolina a nurses insured retirement plan brochure which was highly objectionable and which contained the same defects complained of in the letters distributed in Texas, North Carolina and Tennessee.[14] This brochure was substantially identical to one disapproved by New York and described as "misleading" by Roy Bertke in his memo to Urso of January 15, 1991.[15]

On August 14, 1991, James Higgins, Marketing Vice President, sent a memo to all regional executives doing business in the State of Florida regarding a very strong warning issued by the State of Florida in connection with a nurses letter.[16] Ligon apparently disapproved this letter on August 12, 1991, and on September 23, 1991, complained to Urso regarding his continued use of the letter.

On October 21, 1991, Urso gave all his sales managers a copy of the "only approved letter." It is substantially identical to the letter disapproved by Ligon on August 12, 1991.[17]

On October 25, 1991, Maurer sent a letter to Michaud that was being used in SEHO which was not approved. He asked Maurer to stop using this letter.[18] On November 8, 1991, Voith wrote to Michaud

---

[14]  A copy of this brochure is included in the Appendix at Tab D-8.

[15]  Compare this brochure at Tab D-8 with that found at Tab D-6.

[16]  A copy of the letter from Higgins, including the objectionable letter, is included in the Appendix at Tab D-9.

[17]  A copy of Urso's "approved" letter given to his sales representatives on October 21, 1991, is included in the Appendix at Tab D-12.

[18]  A copy of Maurer's letter to Michaud, including the objectionable letter is included in the Appendix at Tab D-13.

23

and provided him with a packet containing the various letters. This packet included a letter approved by Ligon as of October 14, 1991, which was substantially identical to that disapproved by her on August 12, 1991. Both were objectionable.[18/]

On November 7, 1991, Ligon told Voith that further use of any nurse's letter, even an "approved" one, was ill-advised. On December 2, 1991, she approved another version of the nurses letter.[19/] This letter was disapproved by Met's legal department on February 27, 1992. However, Ligon advised Voith on April 22, 1992, that it was approved.

Met claims that Ligon, while a lawyer, was not authorized to act as a lawyer in approving sales literature. Met claims that only the home office legal department of Met could approve or disapprove sales literature. While this position is consistent with Met's written policies, it is inconsistent with the procedures which were, de facto, utilized.

The troublesome saga of Urso continued throughout 1992. On March 26, 1992, Randy Holtzman, a branch manager in Ann Arbor, Michigan, wrote to Crimmins about Urso's intrusion into his Michigan territory. Holtzman advised Crimmins that SEHO had purchased a mailing list of nurses in the State of Michigan and was sending objectionable pre-approach letters to them. Holtzman

---

[18/]    A copy of the letter which Ligon approved as of October 14, 1991, is included in the Appendix at Tab D-11.

[19/]    A copy of the letter approved December 2, 1991, is included in the Appendix at Tab D-14.

24

advised Crimmins that Holtzman was receiving complaints from customers who did not understand what product they had purchased.[11]    Crimmins referred this problem to Maurer. Ultimately, Holtzman was criticized for allowing someone else to sell in his territory.

On August 21, 1992, Robert DiLorenzo, New York Home Office, wrote to Dennis Schneider advising him of a complaint of the Florida Department of Insurance and relating to him that Florida expected this matter to be investigated and the use of deceptive and misleading material discontinued.

On September 2, 1992, Bruce Hemer wrote to the vice president of the Mid-American Territory, David Martin, enclosing a nurses letter that was being used in Ohio and advising that Hemer had unconfirmed information that the originating sales office recently obtained a listing of thousands of nurses in Indiana. This letter originated in Met's office in Sharon, Pennsylvania.

In 1992, SEHO was selected as the Met Office of the Year for 1991, a selection requiring a review of the operations of Urso's office by all of the Officers In Charge of Met's five territories and Maurer.

In late 1992 and early in 1993, the persons responsible for sales literature in the Met Home Office legal department became more actively involved in the Urso problem.[12]    It appears that

[11]    A copy of Holtzman's March 26, 1992, letter to Crimmins is included in the Appendix at Tab D-15.

[12]    Metropolitan assigned only three attorneys on a part-time basis to review sales literature.

25

the legal department's protests regarding this problem were continuously ignored by the sales force. In assessing this situation at a later date, a senior consultant in Met's Marketing Communications Department acknowledged that review of pre-approach letters generally received low priority throughout the Company.

In response to complaints from the Florida Department regarding unauthorized sales literature, Rebecca Green, a consultant in the personal insurance consulting services division, and representatives of the Law Department met with Urso and Dennis Schneider in Tampa on October 14 and 15, 1992.

On November 2, 1992, Greene wrote to Dennis Schneider and enclosed versions of the sales letter and brochure for the nurses market that had been approved by Diana Seneszhak, of the Law Department. She also enclosed copies of Florida's advertising rules and explained the adverse consequences which could accrue to Met if it continued to use unauthorized sales material. Copies of Greene's letter were distributed to various persons in the Law Department and to Messrs. Goggans and Higgins. On November 18, 1992, Goggans wrote to Higgins regarding a packet of objectionable letters dated after November 2, 1992, he had recently obtained from Urso's office. Goggans asked Higgins to find out whether or not the letters had been approved, a curious request because Goggans, two weeks earlier, had received Greene's letter which transmitted the only letters approved for use by the law department.

Apparently, Urso was not satisfied with the letter provided him by Greene on November 2 which had approval of the Law

26

Department because, by January 20, 1993, Greene had determined that Urso was still using unauthorized letters. On February 8, 1993, Urso asked for permission to revise the previously approved letter which approval was given to him by Greene on February 9th. By February 11, 1993, Greene determined that Urso had departed from the revisions which were authorized. Urso responded by sending a memo to his account representatives on February 12, 1993, instructing them to use only approved literature.

The efforts of the legal department to curtail the sales activities were less than commendable; the legal department must, therefore, share in the blame for the proliferation of the Urso problem. The confusion, uncertainty and ineffectiveness of the legal department are further illustrated by contrasting the treatment the department accorded the Tax Advantage Bonus Plan ("TAB") created by, among others, Richard Maurer, with that given the Nurses Insured Retirement Plan developed by Urso.

In January 1993, 40,000 glossy color brochures were printed to promote the TAB plan. This brochure was apparently approved by the tax department but was never reviewed or approved by the legal department. Urso reviewed the TAB brochure, copied it and created an essentially identical nurses brochure.[12] Ten thousand copies of the nurses brochure were printed in April 1993. At or about that time, Urso met with Richard Mandel, a representative of Met's

---

[12]   Illustrative copies of the TAB brochure and the Nurses brochure are included in the Appendix at Tabs B-1 and B-2.

27

legal department, who approved a pre-approach letter patterned on the nurses brochure which Urso had created.

Subsequent to granting Urso approval to use the letter, Mandel discovered that the Nurses brochure and the TAB brochure were never approved by the legal department.[20] Mandel communicated to Urso that the letter which had tacitly been approved was no longer officially approved, but that he could continue to use the letter until a new letter was provided. A new letter was not forthcoming for approximately four weeks. At that time, Mandel also advised Urso to cease distribution of any Nurses brochures.[21] Urso advised Mandel that if the Nurses brochure was disapproved, the TAB brochure should likewise be disapproved. While distribution of the TAB brochure was apparently stopped in June 1983, the TAB brochures were not recalled until December 13, 1993. Met took nearly seven months to recall the objectionable and unapproved TAB brochures.

In late 1992, the "whistleblower" litigation was filed by former members of the Urso sales force in Tampa, Florida, detailing the widespread, pervasive and insidious nature of Urso's marketing plan. Representatives from Met's legal department visited Tampa in 1992 to investigate the allegations made in the lawsuits. In the lawsuits, and during depositions taken in early 1993 at which local counsel for Met was present, the agents alleged that they were

---

[20]    This is somewhat surprising because Mandel was the "legal department" and was the person who supervised the other two part-time attorneys working on literature approval.

[21]    Apparently, 8,200 of those brochures never left the warehouse and therefore only 1,800 were distributed.

28

required to learn and practice deceptive marketing techniques, including misrepresenting life insurance as savings plans, and were trained to physically cover the words "life insurance" in applications and policies.  No action was taken by Met's legal department in response to these allegations.

In February 1993, Mark Moser, one of the whistleblowers, wrote to Harry P. Kamen, then Senior Executive Vice President of Met.[20] Moser outlined the deceptive advertising practices of Urso and an apparent cover-up in the SEHO office regarding the Company's policy of Home Office approval of literature. Moser informed Kamen that a September 25, 1991, letter from Rudy Michaud communicating the requirement of Home Office approval of literature was never distributed throughout the SEHO office.[21]  Moser claimed he learned of the letter only upon opening a return letter from one of his prospects, a nurse who was married to a Met account representative.  The representative, incensed, returned the objectionable nurses letter with a copy of Michaud's letter. Moser was rebuked for bringing Michaud's letter to Urso's attention. Moser pleaded for Kamen to do something about the matter, stating, "the reason I'm writing you is because I heard you're a very honest and ethical person.  I hope this is true."  Kamen never saw this letter; the letter was processed by his secretary and referred to

---

[20]    A copy of Moser's letter to Kamen is included in this Appendix at Tab D-16.

[21]    A copy of Michaud's letter of September 25, 1991 is included with the Appendix at Tab D-10.