# EXHIBIT H

MAJOR ISSUES
PRELIMINARY DIVIDEND RECOMMENDATIONS
1989 SCALE

This memorandum identifies the major issues that confront us in formulating the 1989 Dividend Scale, and sets forth the recommendations that we will probably make if we intend to maintain dividends at approximately their current level. The issues can be broken down into four major categories.

1. Short-Term Financial Impact
2. Certain Matters of Theory
3. Marketing Concerns and Constraints
4. Innovative Strategies

Short-Term Financial Impact.  According to the first quarter projection submitted to the Controller's Dept. the projected 1988 U.S. MLIC Ordinary earnings are $82 million GAAP (down from $250 million in 1987), and -$85 million Statutory (down from $108 million). The projection assumes a continuation of the 1988 Dividend Scale. Each $100 million change in the scale (about a 9% change) would impact GAAP earnings by about $40 million in 1988 and $60 million in 1989.  Statutory earnings would be impacted by $88 million in 1988 and $12 million in 1989. The basic short-term financial question is whether we remain comfortable with the thin profits that a continued scale will generate. If we should reduce dividends, then by how much?

Obviously, the question of financial sufficiency depends on the underlying experience. For example, we may be quite confident that the thin profits are a temporary event that will be relieved with an expected closing of the expense gap. Or, the underlying strength of the deferred income assets may be so great that the thin profits are almost an accounting anomaly. Or, the thin profits may be entirely consistent with the conclusion that the scale is not sustainable given the emerging experience. And, there is the fundamental question of what exactly is the "right" level of profits.

Working from the 1987 GAAP Earnings by Source, the first quarter 1988 projection, and some crude extrapolations and adjustments, we can estimate the projected earnings by source on US Ordinary Traditional Life.

|  | 1987 | 1988 | Change |
|---|---|---|---|
| Expense Margin | 328 | 280 | - 48 |
| Interest Margin | 67 | - 70 | -137 |
| Mortality Margin | 85 | 98 | 12 |
| Other Margins | 61 | 64 | 4 |
| Operating Margin | 541 | 372 | -169 |
| Less Overhead Expenses | 409 | 409 | 0 |
| Operating Profit | 132 | - 37 | -169 |
| Surrender Gain | 48 | 50 | 3 |
| Earnings on Surplus | 73 | 69 | - 4 |
| Total Profit | 253 | 82 | -171 |

These breakdowns are still crude, but the basic story is clear. The Operating Margin shown here includes over $100 million on Accidental Death.

M1157

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 Cruise States Dist. Ct.

M109758530157


PLAINTIFF'S
EXHIBIT
Levine 11
CC 7/22/99

MP040110038?9

Extended Term and other "non-dividend" coverages, so the profit on the dividend paying business is that much less.

If we intend to maintain the current overall level of dividends, our strategy will be two-fold. First, we will identify "non-dividend" actions that can improve the earnings levels. Second, we will take the steps necessary to assure ourselves that dividends are sustainable despite the low apparent earnings. These will be set forth in our Final Recommendations.

There are "non-dividend" actions that can improve 1988 GAAP earnings from the level indicated in the first quarter projection. Appendix A shows how leveraged some of the margins are. We plan to reduce expenses by about $20 million (4%) through modifications to the compensation plan and other savings. Also, we feel that we could increase investment income by as much as $80 million (5%) by taking, say, $250 in capital gains and $39 million in dividends from our subsidiaries.

Also, with the expense and investment strategies that are being developed, we hope to establish that the overall level of dividends is sustainable. In other words, we hope to establish that the low GAAP profit levels are transitory and can be viewed as an investment in the future. Our current work on the expense gap suggests that some increase in the expense revenues will be necessary, but we would hope to use increases in interest credits to maintain the overall dividend level.

To argue that interest credits can be maintained or increased, in spite of the declining GAAP Interest Margin, we must refer back to the real strength of the deferred income assets. We can tolerate the negative margin as long as we are confident that the real rate of increase in the value of the assets is consistent with the amounts credited in the dividends. In measuring this "real rate of increase", the question is not whether the market value, per se, is growing, because the market value could decline (while the interest credit is guaranteed and non-forfeitable.) The question is, what is the asset value that we are not actuarially confident? (95%? 99%?) can be realized? We should be confident that the projected GAAP returns on the deferred income assets will soon exceed the credited rate. Factors that determine our "confidence" would include specific reviews of the individual properties and a sense of the ease and availability of asset harvesting.

A preliminary analysis suggests that we can be "actuarially confident" of significant asset values in excess of current GAAP book values. On real estate and joint ventures, the present estimated excess of market value over book is $1.6 billion. Although a more precise quantification and tracking mechanism is necessary, I would expect that any sort of reasonable harvesting program will enable us to be very confident of at least 25% of this amount. In this way, we could maintain, or even increase, most interest credits.

Whatever the circumstances, our current thinking is that the 10% credited rate on new illustrations will probably not be supportable.

Certain Matters of Theory. The main issues here involve the treatment of taxes and withdrawals, and the matter of "interest on free surplus".

For issues through 1987, the Internal Revenue Code allowed us to calculate tax gain using reserves that exceeded the cash value. For certain plans

M1157

M109758530158

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1291 United States Dist. Ct.

where this was the case (including some 1987 Portfolio products), we took advantage of this to credit the tax savings in the dividend formula. For 1988 and later issues, however, the tax reserve cannot exceed the cash value. The marginal taxes on the policies has increased, and this should be reflected in the dividends.

With respect to withdrawals, there is the question of whether to credit policyholders with "surrender gains". We did this in the 1987 Portfolio. But we rethought things with the 1988 Scale, and decided that any gains on withdrawals are illusory and should not be reflected in the dividend. (The gains are illusory because the release of liability on withdrawal overstates the "savings". It does not reflect the real loss in future operating margins -- the future "capacity" to carry non-direct expenses". Also, we felt that there are fundamental instabilities in "lapse supported" pricing.

I now feel that some middle ground might be supportable. In theory, we should be able to structure our pricing so that "less" of the total benefit accrues to those who surrender, and "more" accrues to those who remain. Specifically, if we have two blocks of business with different patterns of surrender values, but that are otherwise identical and that are experiencing the same rate of surrender, we should be able to pay higher annual dividends to those in the "low surrender value" block. Furthermore, to the extent that the measured lapse reflects transfers to Extended Term and not Cash Surrenders), there is probably a real increase in "capacity".

In the 1988 Dividend Scales, we significantly reduced the use of "interest on free surplus" in the dividend formula, and we anticipated further elimination in future scales. "Interest on free surplus" was not intended to be a permanent when it was introduced in 197_. We view it as a subsidy transfer from surplus to operations, and we now prefer to use more refined mechanisms (notably asset segmentation) to manage the balance between operations and surplus. Continued elimination of interest on free surplus is expected.

These refinements are important, and they impact new business illustrations (see below) and the balance among blocks. However, they will not have a substantial aggregate financial impact.

Marketing Concerns and Constraints. In refamiliarizing the field force with our Traditional Portfolio, we have been emphasizing (among other things), the positive aspects of the "portfolio rate philosophy", particularly in a declining interest environment. A draft field release is attached as Appendix B. The products, by and large, are viewed as competitive, and there are indications that some of our "new money" competitors will be dropping their dividend scales. We can continue to support this marketing emphasis if we reflect the real strength of the deferred income assets.

Having recognized the goal of maintaining scales as a means of supporting the portfolio philosophy, I still have specific concerns regarding the 1987 Portfolio products. The 10% interest credit may be too high under any circumstances, and there is the tax problem, and the need to reduce or eliminate "interest on free surplus". These all point to a scale reduction on new illustrations. We intend to restructure the portfolio for 1989 through banding, so we have the ability to differentiate inforce 1987-88 business from 1989 new business, in a way that minimizes the perceived impacts.

M1157

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1061 United States Dist. Ct.

M109758530159

If the financial circumstances warrant an overall dividend reduction, some approaches are probably more palatable than others. To a recent purchaser, for example, a reduction in the "AI on AI" rate will not be as visible as a reduction in base dividends. Of course, "total cash value" and "APP year" would still be impacted. If expense revenue factors must be increased, the "per policy" charges will impact the new business less than the "per premium" charges.

One of the most obvious impacts of a dividend reduction will be to increase the illustrative APP year. We should absolutely try to minimize the number of cases in which the APP year goes up by two or more. Appendix C shows the competitive impacts of certain dividend reduction strategies.

Innovative Strategies. Here, I have two specific ideas, but more are possible. First, we can consider reducing terminal dividends. A reduction in scheduled terminal dividends will reduce our GAAP liability, as we currently quantify it, thus providing a source of GAAP gain. This could be done with no adjustments to any annual dividends, but the more refined approach would be to increase the charges/reduce the credits as financial circumstances require, while viewing the reduction in terminal dividend as a release of required surplus, returnable to the policyholders via the annual dividend. In this way, we can still control that the total annual dividends are unchanged. Of course, there are some issues — regulatory, tax, administrative and actuarial. In the past, Board approval has been obtained for terminal dividend strategies, and the state has been informed.

Another possibility -- one that would "soften the blow" of a reduction on inforce policies -- would be a general offer enabling policyholders to switch to an adjustable loan rate. In return for the higher loan rate, the policyholder would benefit from an increase in the credited interest rate. We now credit 8.35% on our loan business, and 9.15% on most adjustable loan business. Even if we were forced to drop credited rates by 80 basis points, policyholders in the SI block could maintain their prospective dividends by consenting to the change. Of course, those not electing the change will see their rates decline.

Michael Levin
Assistant Actuary
PI Financial Management

May 24, 1988

M1157

M109758530160

Source: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

MP4011003862

APPENDIX A
DETAILS OF SOURCE OF EARNINGS

| | 1987 | 1988 | Change |
|---|---|---|---|
| Expense Charges | 476 | 506 | 30 |
| - Direct | 148 | 226 | 78 |
| - Fixed | 409 | 409 | 0 |
| - Gain | -81 | -129 | -48 |
| Interest Earnings | 1661 | 1575 | -86 |
| - Credits | 1594 | 1645 | 51 |
| - Gain | 67 | -70 | -137 |
| Mortality Charges | 756 | 804 | 48 |
| - Claims | 670 | 706 | 36 |
| - Gain | 85 | 98 | 12 |

MDL 1091
CONFIDENTIAL-PROPRIETARY

M1157

M10975853016

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

MP4011003864

APPENDIX B

May , 1988

To: The Field Force

Re  Market the Product not the Illustration

For fifty-odd years interest rates have been stable or going
up.  Dividend scales developed by companies changed
infrequently, and for a long time actual experience proved to
be better than illustrated.  In recent years interest rates
have backed off somewhat with the result that some of our
competitors have had to reduce their dividend scales and
similar action is imminent with many others.

A recent Tillinghast survey indicated that 10 out of 18 of our
competitors will be lowering their dividend scales either this
year or next.  As a result, companies like Metropolitan, who
rely on the portfolio rate philosophy, will have a major
advantage over those companies that rely on short term"
strategies.

As more and more of our customers experience these reductions
it is only natural for them to become more careful about
accepting dividend scale projections at face value.  Attempting
to downplay their skepticism is not the best way to handle this
situation.  In the long run it is better to meet them halfway:
get on their side and educate them regarding the products,
dividend, interest rate philosophies and the company
(Metropolitan) you are recommending.

But with the variety of new products available, compounded with
the complexity of sales illustrations; finding the policy that
best suits your customer is a difficult task.  It is essential
that, in competitive situations, you be able to explain to your
customers the difference.  The interest rate philosophy a
company uses greatly influences the rate of return they
illustrate and pay.

To assist you in this matter we have prepared an interest rate
philosophy explanation sheet accompanied by dividend scale
trends of some of our major competitors.  The time is right for
us to seize the advantage... our competitive portfolio rate of
return will position you and our products ahead of the
competition.

Personal Insurance Marketing

M1157:

M109758530162

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No 1091 United States Dist. Ct.

WHOLE LIFE COMPETITIVE POSITION 1988 vs. 1986
NONSMOKER LIFE - STD.(25M), PFD. (100M)

MALE 35

$25,000

| Company | Premium | TCV(AI) Age 65 | TCV/$1 of Premium | | | 1988 | Rank | |
|---|---|---|---|---|---|---|---|---|
| | | | 1988 | 1987 | 1986 | | 1987 | 1986 |
| Metropolitan L95 | $ 408.25 | $ 41,075 | 100.61 | 100.61 | 89.72 | 6 | 6 | 7 |
| Metropolitan Whole Life | 360.75 | 38,450 | 106.58 | 106.58 | 100.67 | 4 | 4 | 6 |
| Equitable | N/A | | | | | | | |
| J. Hancock | 392.75 | 33,263 | 84.69 | 84.69 | 84.69 | 7 | 8 | 8 |
| Prudential | 340.75 | 35,216 | 103.35 | 103.35 | 158.49 | 5 | 5 | 3 |
| Guardian | 355.00 | 48,131 | 135.56 | 53.17 | 95.33 | 1 | 1 | 1 |
| New England Life | 347.25 | 42,469 | 122.30 | 130.58 | 159.35 | 2 | 3 | 2 |
| Northwestern Mutual Life | 405.75 | 46,093 | 113.60 | 91.88 | 134.19 | 3 | 2 | 4 |

$100,000

| Company | Premium | TCV(AI) Age 65 | TCV/$1 of Premium | | | 1988 | Rank | |
|---|---|---|---|---|---|---|---|---|
| | | | 1988 | 1987 | 1986 | | 1987 | 1986 |
| Metropolitan L95 | 1,498 | 168,600 | 111.81 | 111.81 | 94.09 | 7 | 7 | 9 |
| Metropolitan Whole Life | 1,258 | 151,800 | 120.67 | 120.67 | 106.23 | 5 | 5 | 8 |
| Equitable | 1,355 | 148,714 | 109.75 | 109.75 | 127.73 | 9 | 9 | 6 |
| J. Hancock | 1,172 1st 3 1,458 | 161,732 | 114.36 | 114.36 | 114.36 | 6 | 6 | 7 |
| Guardian | 1,366 | 192,523 | 140.94 | 170.56 | 206.92 | 1 | 1 | 1 |
| NYLIC | 1,190 | 150,600 | 126.55 | 126.89 | 135.02 | 3 | 4 | 5 |
| Prudential | 1,273 | 140,864 | 110.66 | 110.66 | 173.84 | 8 | 8 | 2 |
| New England Life | 1,284 | 169,875 | 132.30 | 138.10 | 168.53 | 2 | 3 | 3 |
| Northwestern Mutual Life | 1,351 | 167,275 | 123.82 | 139.62 | 151.17 | 4 | 2 | 4 |

M11S7:

M109758530164

MDL ONLY
CONFIDENTIAL-PROPRIETARY

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1291  United States Dist. Ct.

MP401003865



M1157:

M109758530166

MDL 1091

CONFIDENTIAL PROPRIETARY

M1157

M1097585301E

MP4011003867