# EXHIBIT J

DRAFT

BACKGROUND MEMORANDUM
1989 DIVIDEND PROPOSALS

This memorandum reviews Metropolitan's dividend actions since 1982, in order to provide some context for the 1989 dividend proposals, and to anticipate future dividend actions. The dividend changes since 1982 reflect changes in all the basic elements -- mortality charges, expenses charges and interest credits -- as well as changes in formulas and philosophy. The first section of the memorandum is a general historical overview of actions since 1982. The second section provides greater detail with respect to specific experience elements, and explains the current situation with respect to those elements. The final section draws on this background to summarize our options in 1989.

I. Historical Overview.

In 1982, there was a complete dividend scale revision, applicable to all blocks of Ordinary and Industrial business. Since then, the history of scale revisions depends on the issue year block and type of product.

1983 and 1984. The only business on which dividends were revised in 1983 and 1984 were the permanent plans that had been sold since 1982. This included the major products that were then being sold and illustrated, such as $25 thousand (minimum) Whole Life Plus and $10 thousand (minimum) Life at 90. The most significant aspect of the scale revision was the introduction of a new dividend formula that explicitly incorporated the "Stop Gap" gain-based tax formula. The formulas under prior scales had no explicit reference to taxes -- because we were effectively taxed on net investment income, taxes could be accounted for in the credited interest rate. Under the new formulas, we could credit a "before tax" interest rate.

1985. In 1985, it might have been desirable to introduce a gain-based tax formula on all business, but systems limitations prevented this. The formula on 1982-86 business was adjusted to reflect the change to "Stark-Moore", as we understood it, but formulas were not changed on the pre-1982 business. Credited interest rates continued to diverge. In part, this was a continuation of the before tax/after tax distinction. Also, in light of the increased significance of low yielding real estate assets, we had assumed a "notional" allocation of investment income that shielded the 1982 & later business from real estate income.

1986. Almost all scales were increased in 1986, through changes in basically two factors. Credited interest rates were increased by 0.75% on pre-1982 business and by 0.50% (to 10.00%) on 1982 & later business. Also, the distributable "interest on free surplus" (a flat credit per $1000 of face amount) was increased from $0.35 to $0.50. Scales on Industrial business were not increased, but we did put into effect a 15% death benefit liberalization.

M1157

M019817630445

"once: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct."

- 2 -

**1987.** There was no change to inforce dividend scales in 1987 because we were busy with the 1987 Portfolio of new products. Dividends on the 1987 Portfolio products incorporated an improved tax formula, as well as the 10.00% credited rate and the $0.50 per thousand distribution of "interest on free surplus", and other changes discussed in greater detail below.

**1988.** A major goal in the 1988 scales for inforce business was to bring that business "into line" with the 1987 Portfolio pricing. Systems improvements now permitted us to employ a gain-based tax formula on all 1960 and later business, and, as discussed below, other pricing elements were significantly adjusted. On the pre-1960 business, the necessary systems improvements were not yet in place, and the only individual in PIAIS with substantial knowledge of the "old" systems was on disability. We therefore adjusted all dividends by a simple percentage factor. One of the desirable "technical refinements" for 1989 would be to put the pre-1960 business into the modern systems with the correct factors, but without a significant impact on the aggregate amount distributed.

In 1988, scales on most 1982-86 business were not changed -- the various refinements would have generated significant dividend reductions and we were not convinced that these refinements were entirely appropriate on this business. Also, scales on the small amounts of term business were left unchanged because we had some theoretical concerns about modifying the formulas that had historically been used for this business.

**Summary.** The foregoing history is summarized in the following chart. An "x" indicates a change in scale.

|              | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|--------------|------|------|------|------|------|------|------|
| Ordinary     |      |      |      |      |      |      |      |
| 1987 Portfolio |    |      |      |      |      |      | x    |
| 1982-86 perm | x    | x    | x    | x    | x    |      |      |
| 1982-86 term | x    |      |      | x    | x    |      |      |
| 1960-81 perm | x    |      |      | x    | x    |      | x    |
| 1960-81 term | x    |      |      | x    | x    |      |      |
| pre-1960     | x    |      |      | x    | x    |      | x    |
| Industrial   | x    |      |      | x    | x    |      |      |

**II. Major Experience Elements.**
Here, we will review the historical dividend actions, and their relationship to the 1989 proposals, with a more specific focus on particular experience elements.

**Interest Credits.** The matter of the credited interest rate is probably the most "obvious" issue affecting the 1989 dividend scales. Even with the 1988 adoption of the gain-

M1157

M019817630446

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 "United States Dist. Ct."

- 3 -

based tax formula for 1960-1981 business, the "before tax" credited rate on that business is less than the rate credited on 1982-1986 and 1987 Portfolio business. Specifically, on the pre-1982 business, the underlying distributable rate (before adjustment for policy loans) is 9.15%, and this is the rate that would be credited on adjustable loan rate business. On 1982 & later adjustable loan rate business, the credited rate is 10.00% What basis is there for maintaining this disparity?

Can we rely on the aforementioned "notional" allocation? I would rather not. As a purely practical matter, we have not been tracking the 1982 & later real estate and joint venture acquisitions relative to the assets (funds) of the 1982 & later business. If we were to track them, I suspect we would find that much of the RE and JV that would have been allocated to pre-1982 business is now in-surplus as a result of the superseding and more concrete allocation of assets between operations and surplus. The recent revision to our depreciation methods would also have eliminated some of the originally anticipated disparity. Finally, the primary reason that we are comfortable in crediting rates that exceed the nominal realized earned rates is that we are comfortable with the underlying but unrealized gains on deferred income assets -- it is exactly these assets that are minimized in the 1982 & later block under the "notional" allocation.

If we can justify the disparity between issue year blocks, or concretely plan to eliminate it over time, is the 10.00% credited rate simply too high in absolute terms? In the current interest rate environment, one's initial impression would probably be that this is an excessive and unsustainable rate. Still, it should be pointed out for the record that under the portfolio rate pricing philosophy, it is not per se wrong to credit and illustrate in excess of current rates. Just as the portfolio rate lags when current rates are rising, it should lag when (as now) current rates are falling. It is not impossible that the current assets, realistically assessed, could support a 10.00% credited rate. This is not to say that such an assessment has taken place, and it does not address the disparity among blocks.

In 1989, I would be comfortable continuing the 10.00% credited rate only if I was confident that we were prepared in time to bring our credited rates more in line with current rates. In the long term, I would recommend abandoning the portfolio rate pricing philosophy, but as a matter of equity and fair dealing, we should do so gradually.

<u>Interest on Free Surplus.</u> We have generally viewed this as distinct from the issue of the credited rate itself, but it is also a very apparent issue in 1989.

The concept of distributing interest on "free surplus" (the excess of assets over dividend funds) through a flat credit per $1000 of face originated in the 1974 scale. It was intended to offset expense charges, and it was only intended to be temporary. By 1987, we had become increasingly

M1157

M019817630447

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

- 4 -

uncomfortable with the concept for several reasons. First, the distinction between the interest on the free surplus, and the free surplus itself, is somewhat false. This is basically a distribution of surplus -- a subsidy from the entity equity to the policyholder. It is a negative margin that cannot be sustained indefinitely.

Second, even if we had originally been comfortable distributing the <u>interest</u> on the free surplus, by 1987 we had committed to a planned and formalized segregation of assets between operations and surplus. A key purpose of this segregation was to assure that the operations segment would stand on its own. And since surplus had such low yielding assets, there probably wasn't much interest to distribute anyway.

The third source of our discomfort related to the equities involved. It may have seemed unfair in 1974 that a new $10 thousand policy with no asset buildup would receive 10 times the interest on free surplus as an old $1000 policy with an asset buildup of, say, $500. Still, in 1974, a $10 thousand policy would have been considered "large", and the absolute impact would have been $2.25 per year (based on an interest on free surplus factor of $0.15 per $1000). By 1987, the disparity had grown tremendously. With a $0.50 factor, and "large" policies at the $100 thousand level, the absolute impact had grown to $49.50 per year. Still, the 1987 Portfolio pricing contained the same interest on free surplus as the 1986 scales.

In the 1988 scales, we set about to eliminate interest on free surplus. It was completely removed on most of the 1960-1981 business. Where it remains -- it is scheduled -- in the dividend formula, itself -- to be graded out over future durations. As a technical matter, it will be eliminated from the pre-1960 business when we put that business into the modern systems. Thus, the remaining problem is again the 1982-1986 business and the 1987 Portfolio business. I would at least like to see interest on free surplus graded out in those formulas.

<u>Taxes and Terminal Dividends.</u> These are probably the most complex issues affecting our dividend procedures. The historical overview explained how our emerging treatment of taxes contributed to the disparity in treatment between the pre-1982 business and the 1982 & later business. We now have a fairly clear sense of the marginal impact of taxes on the participating business. Essentially, if the asset goal (the "fund") grows faster than the tax reserve, then the pricing is anticipating an after tax gain. Necessarily, therefore, the pricing (the calculation of dividends) must provide for a before tax gain and the payment of the gain tax. Also, if the asset goal exceeds the tax reserve, then the pricing is anticipating an amount of tax equity on which a surplus tax will arise.

As we have refined this understanding, we have come to

M1157

M019817630448

"Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1075 United States Dist. Ct."

- 5 -

realize that Metropolitan's traditional approach to dividends has some definite tax inefficiencies, the most apparent of which is the planned accumulation of terminal dividends as part of the asset goal (the "fund"). Since terminal dividends are not guaranteed, the scheduled increase in terminal dividends is not offset by a corresponding increase in tax reserves. Each $1.00 increase in scheduled terminal dividend represents a planned after tax gain of $1.00, which must be funded by a before tax gain of about $1.50 -- i.e., a $1.50 reduction in the annual dividend. In fact, this situation arises in early durations, even before terminal dividends are payable, because the "slope" of the funds is forced to be steep enough to accrue a substantial terminal dividend by, say, year 20.

There is another early duration tax problem — one that would be relevant even if there were no terminal dividends. In simple terms, the fund increases faster than the tax reserve in most early durations because it is climbing out of the negative position that arose from the high first year expense charge. From a GAAP perspective, the amortization of DAC is reflected in the asset goal.

Given these constraints, we optimized the tax aspects of the 1987 Portfolio pricing in two ways. First, we eliminated terminal dividends on all products. Second, we generated funds on the assumption that policyholders would receive a "tax credit" in the first year that would partially offset the first year charge. The overall slope of the funds is therefore less steep. (From the GAAP perspective, this implies that we are using and amortizing an "after tax" DAC. This, perhaps, warrants further inquiry.) The main problem confronting us with the 1987 Portfolio business is that Federal tax law changes have caused reductions in tax reserves for some policies issued in 1988 and later, at some durations.

For the 1960-1981 business, we applied the 1987 Portfolio formula in the 1988 scales. In fact, we took the somewhat conservative (and technically easier) approach of using the guaranteed cash value as the tax reserve. (In practice, the guaranteed cash value is the minimum tax reserve.) This still led to problems at the early durations, notably on the 1979 Whole Life Revision block where terminal dividends generally emerge by duration 5. We always have the option of pursuing terminal dividend strategies, so, in a sense, the terminal dividend impact is quantifiable and controllable. More subtle is the "DAC amortization" problem. When funds were established on this business (before gain-based taxation), we did not give a tax credit to partially offset the first year expense charge. Where necessary, we have pegged dividends on some of this business, through the planned phaseout of interest on free surplus.

The 1982-1986 business is beset with the same early duration tax problems. But, at least here, the policies were issued under a gain-based tax, so there is some justification for recalculating the funds in a way that reflects the first year

M1157

M019817630449

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

- 6 -

tax savings. Another problem is that the 1983 and 1985 versions of the tax formulas have proven to be too liberal, reflecting misunderstandings (such as using the policy reserve as the tax reserve) and recurring pegging. In deferring dividend changes on this business, we have been hoping to review our overall approach to dividends and taxes from a more global perspective. The formulas may be sensible from a theoretical, marginal view of the business, but do they ignore other important elements of our tax situation? Do the total taxes charged under these formulas perhaps exceed the actual taxes generated and accrued? We are comfortable revising the tax formulas on blocks where the dividends are increasing anyway, but we have been cautious of making precipitous changes that will cause substantial reductions.

Mortality Charges. The dividend mortality tables on pre-1987 business were changed in 1982 and in 1985, and have not been changed since. Entirely new sets of tables are in place for the 1987 Portfolio business, incorporating a complete smoker/nonsmoker segregation.

The dividend mortality tables are intended to represent ultimate mortality. Since 1979, the dividend formulas on certain blocks have also attempted to reflect select mortality savings. Until 1987, this was done by using empirically derived adjustment factors. While probably reasonable in the aggregate, these factors are difficult to understand and to modify. With the 1987 Portfolio, we were able to write the formulas in such a way as to "correctly" reflect the select mortality savings - the entire matrix of select rates (by issue age and policy year) is used directly in the calculation.

In 1988, we eliminated the empirically derived adjustment factors on pre-1982 business. We could have rewritten the formulas with a complete matrix of select rates, but we found that actual current mortality (presumably including selection) was about equal to the mortality in the basic dividend mortality table. Since dividends on 1982-1986 business were not changed in 1988, those formulas still contain the empirically derived adjustment factors. Elimination of the factors is one of the "technical refinements" that would be desirable in 1989.

Expense Charges. Expense charges were increased in the 1982 and 1985 scales. With the pricing of the 1987 Portfolio, we introduced generally lower unit rates on the understanding that the resulting expense gap would be tolerable and manageable, and that improved pricing was necessary in order for us to compete and to increase productivity. In 1988, these lower rates were explicitly incorporated into the dividend scales for almost all the 1960-1981 business (and implicitly incorporated for the pre-1960 business.) If there is no change in these factors, we would still make the effort to extend them, explicitly, to all blocks of Ordinary business. I would characterize this as a "technical refinement".

M1157

M019817630450

"Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."

- 7 -

### III. 1989 Proposals.

It is my understanding that, from the short-term financial perspective, the overall magnitude of the scales would be acceptable if we simply continued the 1988 scales. In this regard, I see no objection to such technical refinements as the modernization of the pre-1960 systems and formulas.

The real question is whether the 1988 dividend scales on particular blocks, notably the 1982-1986 business and the 1987 Portfolio, are justifiable and sustainable. The changes that we are contemplating, in the areas of credited interest rates, interest on free surplus, and taxes, would not have tremendous financial impacts in 1988 and 1989 (perhaps $5-10 million), but would represent a step toward long-term improved product management and financial control.

The problems are not so clear and unambiguous that we must make scale reductions this year. If current conditions remain, we could perhaps defer changes for one more year, reflecting in part the portfolio rate pricing philosophy. Also, we cannot be blind to the marketing and competitive implications of a scale reduction on new and recent business.

In summary, the key to managing the 1982 and later business is to reduce the projected future dividends. Our major options, therefore, are as follows:

#### Proposals With Respect to Experience Elements

1. Immediate reduction of credited rate and interest on free surplus.

2. No reduction in 1989 scales, in view of the limited current financial impact and the "portfolio rate pricing philosophy", but have a firm internal strategic management plan to reduce future scales.

3. Phased gradual reduction of credited rate and interest on free surplus built into 1989 scales. The actual impact could begin in 1989, or it could be delayed one year.

#### Proposals With Respect to Planned Asset Accumulation

1. Reduction or elimination of future terminal dividends in order to reduce the "slope" of the funds and thereby increase annual dividends from what they otherwise would have been. This will offset the impact of charges to the experience elements.

2. Instead of reducing terminal dividends,

MIDM 101
CONFIDENTIAL PROPRIETARY

M1157

M019817630451

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

- 8 -

        possibly guarantee them if we are assured that we will be permitted to use them as a tax reserve.

3. Reexamination of first-year expense charges built into 1982-1986 funds for the purpose of reflecting first year tax credits, and thereby reducing the "slope" of the funds.

### Review of Overall Philosophy

1. Reexamination of overall tax treatment to assure consistency between tax charges and "actual taxes" incurred by the business.

2. Consider marketing approaches that would have policyholders pay some of the first year costs directly.

Michael Levine
Assistant Actuary
PI Financial Management

July 24, 1988

ML110

MDL 1091 CONFIDENTIAL-PROPRIETARY

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

M1157

M019817630452