10/21/98  18:17    SKADDEN ARPS → 1234567                    NO.262  P003

10/19/98  17:23 FAX 860 808 8593      PUBLIC SAFETY                    002

# STATE OF CONNECTICUT
# INSURANCE DEPARTMENT

## REPORT OF INVESTIGATION

### TO

#### GEORGE M. REIDER, JR.
#### INSURANCE COMMISSIONER
#### STATE OF CONNECTICUT

### IN THE MATTER OF:

## METROPOLITAN LIFE INSURANCE COMPANY

Submitted by:

Richard Blumenthal
Attorney General of Connecticut

John G. Haines
Assistant Attorney General

Daniel Harrigan, Director
Market Conduct Division
Department of Insurance

October 14, 1998

10/21/98  18:17    SKADDEN ARPS → 1234567                    NO.262 P004

10/19/98  17:23 FAX 860 808 8581 _____ PUBLIC SAFETY                    ☒003

## TABLE OF CONTENTS

| | | | PAGE |
|---|---|---|---|

I.   EXECUTIVE SUMMARY ................................................................. 1

II.  INTRODUCTION ...................................................................... 4
   A.   Statutory Authority ........................................................... 5
   B.   Background ..................................................................... 7
   C.   Connecticut Unfair Insurance Practices Act ............................... 7

III. DESCRIPTION OF INVESTIGATION .................................................. 8
   A.   Methodology ................................................................... 8
   B.   Life Insurance Concepts ...................................................... 10
   C.   Statistical Summary Of Consumer Complaints ............................. 13
        1.   Insurance Department Complaint Files ............................. 13
        2.   Agent Agee's Files ................................................... 18
        3.   Internal Compliance Audit Reports ................................. 22
        4.   MetLife Complaint Files ............................................ 22
        5.   Summary ............................................................... 23
   D.   Description Of Ethics And Compliance Programs ......................... 24
        1.   Enhanced Ethics And Compliance Program ......................... 24
             (a)   Management Structure ...................................... 26

i

10/21/98  18:17    SKADDEN ARPS → 1234567                    NO.262  P005

10/19/98  17:23 FAX 860 603 5591        PUBLIC SAFETY                    ☒004

    (b)    Individual Business Compliance Programs ....................... 27

        (i)    Compliance and Quality Assurance — Individual Business ............................................... 27

        (ii)    Computer Monitoring ..................................... 28

        (iii)    Replacement Checklist/Underwriting Review ...... 28

        (iv)    Call-Out Program .......................................... 29

        (v)    Agent Recruiting/Training ............................... 30

        (vi)    Compensation .............................................. 31

    2.    Summary ................................................................ 31

  E.    Complaint Settlement Practices .......................................... 32

  F.    Agent Discipline Reporting ................................................ 38

IV.    FINDINGS ................................................................................ 40

  A.    Churning ......................................................................... 40

  B.    Misrepresentations Of Vanishing Premium Policies ............................. 40

  C.    Complaint Handling ......................................................... 41

  D.    Agent Discipline Reporting ................................................ 41

  E.    Compliance With 1994 Stipulation And Consent Order ....................... 42

V.    CONCLUSION AND RECOMMENDATIONS .......................................... 42

**I.**

## EXECUTIVE SUMMARY

At the request of Insurance Commissioner, George M. Reider, Jr., Attorney General Richard Blumenthal, and the Market Conduct Division of the Insurance Department conducted a joint investigation of the life insurance sales practices of the Metropolitan Life Insurance Company ("MetLife") pursuant to Section 38a-16 of the Connecticut General Statutes.

The investigation which involved hundreds of pages of testimony and thousands of pages of documents took over six months and focused on allegations of churning in the sale of whole life insurance and misrepresentations of so-called "vanishing premium" policies. Other issues included whether MetLife complied with a 1994 Stipulation and Consent Order with the Insurance Department involving allegations that MetLife sold whole life insurance as retirement plans, and MetLife's pledge to adopt an enhanced compliance program. In addition, the investigators appointed by the Attorney General and the Insurance Commissioner examined claims that MetLife did not resolve churning and vanishing premium complaints fairly and that the company allowed agents who had engaged in churning to voluntarily resign.

In the life insurance context "churning" — also known as "twisting" — involves taking the cash values of an existing life insurance policy through misrepresentations or omissions and using the cash value of the first policy to acquire a replacement policy. Churning often results in a financial loss to the policyholder, while the agent gets a commission — usually all or a substantial part of the first year's premium. In addition to new start up

10/21/98   18:17    SKADDEN ARPS → 1234567                    NO.262  P007

10/19/98   17:24 FAX 860 888 5881         PUBLIC SAFETY                    ☒006

costs, there are other disadvantages for the consumer.  The premium for the new policy will likely be higher than for the same coverage under the old policy.  Older policies may also have better loan rates and nonforfeiture provisions, and a policy in force for two years or more is deemed "incontestable" — that is the company can no longer contest the statements in the application to deny coverage.  But the greatest danger is that when the cash value of the old policy becomes insufficient to cover the cost of the new policy, the policyholder may not be able to pay the premiums out-of-pocket.  Policyholders then stand to lose both the cash value of their old policy and the insurance protection they counted on.

The investigation also examined whether there were misrepresentations of "vanishing premium plans," which MetLife calls accelerated payment arrangements.  In this case policy illustrations in the form of computer printouts prepared by the company are used to graphically demonstrate to a potential customer that after a few years the policy will pay for itself.  Misrepresentations regarding vanishing premiums are often associated with churning.

The Market Conduct Division of the Insurance Department examined complaints against MetLife already in the Department's files as well as complaints supplied by the company and a former MetLife agent.  They determined that there were 155 complaints which contain reliable evidence of churning and misrepresentations of vanishing premiums.  On the basis of this and other evidence, the Report concludes that there is sufficient evidence to show that MetLife violated the Connecticut Unfair Insurance Practices Act ("CUIPA"), and the Report recommends that the Commissioner convene a hearing which could result in the revocation or suspension of MetLife's license in Connecticut or the imposition of a substantial fine.

Other matters were considered by the investigation including whether MetLife complied with a 1994 Stipulation and Consent Order which obligated the company to adopt an enhanced compliance program to prevent abusive sales practices. The MetLife "Enhanced Ethics and Compliance Program," discussed at length in the Report, was instituted following the settlement of claims that MetLife sold whole life insurance policies to approximately 20,000 nurses nationwide which were misrepresented as a "Nurses Retirement Plan." A 1994 Florida Report concluded that these violations were the result of a failed compliance program. The present Report finds that MetLife has instituted a new compliance program as promised in the 1994 Consent Order and that it has been effective at cutting abuses. This Report also finds that MetLife has an ongoing duty to maintain an effective compliance program.

The Report is less positive concerning the fairness of settlements offered to MetLife policyholders who complained of churning and misrepresentations of vanishing premium policies. The Report concludes that settlement offers were confusing, full of insurance jargon, and did not make consumers whole even when their complaints were justified. The Report also finds that the company's complaint resolution was inconsistent when dealing with essentially similar complaints. The failure to offer prompt and fair settlement of justified consumer complaints is not currently a defined violation of CUIPA. This Report demonstrates the need for an amendment to CUIPA to remedy this problem.

Finally, the Report rebukes MetLife for allowing agents to voluntarily resign where there is clear evidence that they were guilty of churning. This practice undermines the Insurance Department's ability to prevent churning and misrepresentations in the sale of life insurance, and it lessens the effectiveness of MetLife's programs to prevent unfair sales practices.

3

## II.

## INTRODUCTION

### A.    STATUTORY AUTHORITY

This report on life insurance sales practices of Metropolitan Life Insurance Company ("MetLife") in the State of Connecticut is issued as a result of a joint investigation by the Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department.  The investigation was instituted under the authority of Conn. Gen. Stat. § 38a-16,[1] which provides a broad mandate to the Insurance Commissioner and his representatives to investigate any matter arising under the insurance laws of the State of Connecticut.  This procedure is less restrictive than the traditional market conduct examination authorized by Conn. Gen. Stat. § 38a-15.

---

[1]    Conn. Gen. Stat. § 38a-16(a) provides:

The Insurance Commissioner or his authorized representative may, as often as he deems necessary, conduct investigations and hearings in aid of any investigation on any matter under the provisions of this title.  Pursuant to any such investigation or hearing, the commissioner or his authorized representative may issue subpoenas, administer oaths, compel testimony, order the production of books, records, papers and documents, and examine books and records.  If any person refuses to allow the examination of books and records, to appear, to testify or to produce any book, record, paper or document when so ordered, a judge of the Superior Court, upon application of the commissioner or his authorized representative, may make such order as may be appropriate to aid in the enforcement of this section.

4

10/21/98  18:18    SKADDEN ARPS → 1234567                                    NO.262  P010

10/19/98  17:25 FAX 860 808 5591        PUBLIC SAFETY                              @009

B.   <u>BACKGROUND</u>

The life insurance industry has been subject to heightened scrutiny in the decade of
the 1990s as a result of numerous class action lawsuits and actions by state insurance
regulators.  In recent years, life insurance companies including John Hancock, MetLife,
Phoenix Home Life, and Prudential[2] have paid substantial sums in fines and restitution to
policyholders to settle complaints regarding improper sales practices.

Generally, this heightened scrutiny has focused on improper replacement activity.
Most notably, this includes inducing consumers to use the cash value in an old policy to
buy a new one in order to generate a commission for the agent — a process known as
"churning."  In the typical case churning involves agents' failure to disclose the financial im-
pact on the policyholder of surrendering or using loans or withdrawals of cash values or
dividends from an existing policy (or policies) to purchase new policies or other financial
products sold by the company.  The result of this action – which usually will not appear un-
til several years later — is that after the value of the old policy is consumed by premiums on
the new one, the consumer has to pay the premiums or lose the policies.

Another practice of concern to regulators has been the promise of "vanishing premi-
ums" that fail to vanish.  This involves claims that insurance companies and their agents

---

[2]   See, Report of Investigation to George M. Reider, Jr., Insurance Commissioner of
the State of Connecticut, Life Insurance Sales Practices of the Prudential Insurance
Company of America, November 21, 1995; <u>In Re The Prudential Insurance Co. of</u>
<u>America</u>, 962 F. Supp. 450 (D. N.J. 1997); <u>Duhaini, et al. v. John Hancock Mutual</u>
<u>Life Insurance Company, et al.</u>, 989 F. Supp. 375 (D. Mass. 1997); <u>see also</u>, The
Life Underwriters Training Counsel ("LUTC") course "Piecing Together The Ethical
Puzzle" which became part of MetLife's training program in 1995 which recognizes
industry "scandals" regarding policy illustrations and replacement.  The course ma-
terial points out that one of the costs of such ethical lapses "is increasingly vocal de-
mands by state regulators for heavy regulation."  Life Underwriter Training Counsel,
<u>Piecing Together The Ethical Puzzle</u>, 1995, pp. 1-7, 1-10.

5

misrepresented that a single payment or a limited number of payments would be sufficient to pay the premiums on a life insurance policy in perpetuity.  Falling interest rates in the early 1990s made many policy illustrations based on higher rates prevailing in the prior economic cycle grossly optimistic.  When consumers received notice that they must continue to make payments beyond the period set out in company illustrations or — worse yet -- that they must resume premium payments, they complained to state regulators, and class action lawsuits quickly followed.

The impetus for the present action was an announcement in the press on November 6, 1997, that Florida, Texas and our neighboring state of Massachusetts were investigating allegations of churning by MetLife.  Shortly thereafter, we received a call from a former MetLife agent and manager who claimed to have evidence of this activity in Connecticut.  On November 24, 1997, an article appeared in the Wall Street Journal regarding a class action lawsuit against MetLife, In re Metropolitan Life Insurance Company Sales Practices Litigation, Misc. Docket No. 96-179-MDL 1091 (W.D.Pa.) which alleges, among other things, misrepresentations regarding vanishing premiums and churning.

We were also concerned because MetLife had entered into a Stipulation and Consent Order with the Insurance Commissioner in 1994 following allegations of misrepresentations in the sale of life insurance.  In the Matter of:  Metropolitan Life Insurance Company, Connecticut Insurance Department Docket No. LH 94-51.  The Stipulation and Consent Order which is attached hereto as Exhibit A alleged that MetLife agents sold whole life policies as retirement plans or savings plans in violation of Conn. Gen. Stat. § 38a-815.  Without admitting fault, MetLife agreed to make restitution and to pay a fine of $277,069.  In addition, as part of the Stipulation and Consent Order, MetLife pledged to develop and maintain an Enhanced Compliance Program described in Exhibit A and

6

discussed in more detail in this report. In view of the new allegations, we sought to determine whether MetLife was complying with its agreement to maintain an adequate compliance program, and whether the compliance program was effective.

Following a meeting between the Attorney General's Office and the Insurance Department, Commissioner George M. Reider, Jr. requested a joint investigation to examine life insurance sales practices of MetLife focusing primarily on churning and misrepresentations regarding vanishing premiums. Other issues were also considered including allegations of unfair treatment of churning victims, failure to report regulatory violations by MetLife agents, and compliance issues arising out of the 1994 Stipulation and Consent Order.

## C. CONNECTICUT UNFAIR INSURANCE PRACTICES ACT

Churning and misrepresentations in the sale of life insurance may violate the provisions of Chapter 704 of the Connecticut General Statutes, Conn. Gen. Stat. § 38a-815, et seq., commonly known as the Connecticut Unfair Insurance Practices Act ("CUIPA").

Conn. Gen. Stat. § 38a-815 provides in pertinent part that

[n]o person shall engage in this state in any trade practice which is defined in section 38a-816 as, or determined pursuant to sections 38a-817 and 38a-818 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

Conn. Gen. Stat. § 38a-816 specifically defines unfair or deceptive acts or practices

in the business of insurance to include the following conduct.

Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which: (a) Misrepresents the benefits, advantages, conditions or terms of any insurance policy; (b) misrepresents the dividends or share of the surplus to be received, on any insurance policy; ... (f) is a misrepresentation for the purpose of inducing or tending to induce the lapse, forfeiture, exchange, conversion or surrender of any insurance policy; (g) is a misrepresentation for the purpose of affecting a pledge or assignment of or affecting a loan against any insurance policy....

Misrepresentations regarding vanishing premiums and churning are covered by this

provision.

III.

## DESCRIPTION OF INVESTIGATION

A.    METHODOLOGY

The investigation examined the following areas and covered the period from 1980 to

1998.

1.    Whether there was evidence of churning by MetLife agents in Connecticut,

and, if so, the extent of the activity;

5

2.      Whether there was evidence of misrepresentations regarding vanishing premium policies;

3.      Whether MetLife violated the 1994 Stipulation and Consent Order with the Insurance Department;

4.      Whether current compliance systems are sufficient to prevent churning and misrepresentations in the sale of life insurance;

5.      Whether MetLife fairly resolved complaints of churning and misrepresentation of vanishing premium policies; and

6.      Failure to report regulatory violations by MetLife agents.

In examining these issues, we began by deposing Clyde Sells who was MetLife's Regional Vice President for the territory which included part or all of Connecticut from 1980 to December 30, 1987.  Mr. Sells was responsible for overall sales, agency growth, market conduct, ethics and compliance, retention, persistency and, in general, the quality of business in the Hartford region.

We also explored compliance issues by deposing Michael W. Flynn, an Assistant Vice President who is the regional compliance officer for individual business.  We followed up with a deposition of Pamela Prohonic, a consumer relations supervisor from MetLife's Consumer Affairs Division in Johnstown, Pennsylvania, to determine MetLife's procedures for dealing with consumer complaints.

At the initial stages of the investigation, we also met with former MetLife agent and manager Richard Agee, and we subpoenaed documents in his possession which he claimed showed evidence of churning.  We also subpoenaed a substantial number of documents from MetLife, including particularly complaint files, records and reports of agent misconduct and internal compliance and audit reports.  In addition, the Market Conduct

9

Division began an internal review of Insurance Department documents and obtained a listing of all consumer complaints involving MetLife. Those files were then retrieved by the Consumer Affairs Division of the Insurance Department and delivered to the Market Conduct Division. Market Conduct examiners removed unrelated complaints yielding a group of complaint files limited to allegations of improper sales practices related to individual life insurance products.

Finally, in order to ensure the fairness and completeness of this report, we invited the company to send a representative to address the allegations of misrepresentation and churning and related issues which arose in the process of the investigation including inconsistent responses to consumer complaints; agent supervision and procedures for recording and reporting instances of agent misconduct and disciplinary action.

A lengthy on-the-record statement was provided by Donald M. Stadler, Vice President, Compliance and Quality Assurance and Lawrence A. Vranka, Vice President, Special Services - Consulting Services.

B.    LIFE INSURANCE CONCEPTS

In order to understand how misrepresentations of vanishing premium policies (which MetLife refers to as "accelerated payment plans") and churning actually work to the detriment of policyholders, it is necessary to understand some basic life insurance concepts and where the "cash value" in a life insurance policy comes from.

Generally, whole life insurance premiums stay level for the life of the policy. Part of a whole life insurance policy premium pays for insurance protection — called the mortality charge — the other part goes into a reserve. The mortality charge rises as the insured gets

older, and the reserve is used later to pay for the increasing cost of insurance protection. The reserve is invested by the company and earns interest.[3/]

All whole life insurance policies have a cash surrender value, which consists of some or all of the premiums that have gone into the reserve.  Normally, the longer the policy is in effect, the higher the cash surrender value.  Policyholders who terminate their coverage can take the surrender value in cash, or they can take it as paid-up insurance.  While the policy remains in force, the cash surrender value can also be tapped through a policy loan on the terms and conditions set out in the policy.  The amount of the loan plus unpaid interest owed on the loan is deducted from the death benefit if the policyholder dies or from the cash surrender value if the insured cancels the policy.  Interest on a policy loan can completely eat up the cash surrender value over time.

The other source of cash in whole life policies is dividends.  A large percentage of the life insurance business in this country is conducted on the mutual or participating basis, under which the policyholder receives an annual dividend.  MetLife is a mutual company and pays dividends to its policyholders.  Dividends vary depending on a company's investment experience, death benefits, and other expenses.  A life insurance company must charge premiums which are adequate to take care of current deaths and to set up reserves for future deaths or maturities as well as to cover commissions, taxes, and other costs.  Any additional amount may be returned to the insured as a dividend.

Like cash surrender values, dividends may be paid in several ways.  They may be used to reduce future premiums, they may be used to purchase additional insurance, they may be taken in cash, or they may be left on deposit with the company to earn interest.

_____

[3/]     Anderson On Life Insurance, § 1.3 (1991).

11

10/21/98  18:18    SKADDEN ARPS → 1234567                              NO.262  P017

10/19/98  17:26 FAX 660 808 5591        PUBLIC SAFETY                      ☒016

The fact that dividends can be used to reduce or pay future premiums makes them a vital element in vanishing premium policies.

Two other policies which also have cash values and are susceptible to churning and misrepresentations of vanishing premiums are Universal Life and Variable life policies.

Universal life was introduced during a period of high interest rates in the late 1970s. It is a contract "where the investment feature and the insurance feature of a whole life policy have been 'decoupled.'"[d] One part acts like simple term insurance which pays off if the policyholder dies, while the investment account earns a modest guaranteed interest rate plus an unguaranteed (but hopefully high) rate of interest at the discretion of the company. Funds are deducted from the investment account to pay for the term part of the policy. That deduction is called the mortality charge. There are also deductions for administrative and other charges which vary widely from company to company.

Variable life policies sold by many companies are similar to whole life and universal life policies, with one major difference — cash value accumulations are not invested in the company's general investment account, but in separate accounts allowing policyholders to choose among investment options such as common stock, bonds, and treasury bills. Unlike traditional whole life policies, the policyholder bears the entire investment risk. In many variable life policies, both the death benefit and the cash value vary with the investment performance of the options chosen by the policyholder.[v]

---

[d]   Anderson on Life Insurance § 1.14 (1991).

[v]   Consumer Reports, September, 1993.

12

## C.    STATISTICAL SUMMARY OF CONSUMER COMPLAINTS

The Market Conduct Division of the Insurance Department reviewed the following
clauses of documents in the course of the investigation.

- Insurance Department Complaint Files

- Files Subpoenaed From Agent Richard Agee

- Internal Compliance Audit Reports Received From MetLife

- MetLife Complaint Files

- Records And Reports Of Agent Misconduct

### 1.    Insurance Department Complaint Files

The first step in the investigation was the review of consumer complaints which were
on file in the Department.  The Market Conduct Division obtained a listing of all consumer
complaints involving MetLife.  Those files were retrieved by the Consumer Affairs Division
and delivered to the Market Conduct Division.  Upon receipt of the files, Market Conduct
examiners performed an initial review of each file to determine whether the basis of the
complaint was relevant to a review of the company's individual life insurance sales prac-
tices.  Unrelated complaints, such as health insurance problems, were removed from the
group.  The initial review yielded a group of complaint files limited to allegations of improper
sales practices related to individual life insurance products.

The second step in the review process was the ranking of complaint files within the
relevant group to identify the files which provided strong indications of improper sales

10/21/98  18:18    SKADDEN ARPS → 1234567                                    NO.262  P019

10/19/98  17:57  FAX 860 308 5591        PUBLIC SAFETY                            ☒018

practices. Examiners assigned each file a score from 1 to 3 based on the strength of the complaint and the documentation accompanying it. Code 1 files contained detailed complaint letters and included persuasive documentation related to improper sales practices. Code 2 files were less useful as evidence of improper sales or solicitation activity. Code 3 files alleged improper sales or solicitation activity, but lacked sufficient documentation to be useful as evidence at this time.

The third step in the review process was an analysis of each of the complaint files. The agent and sales office involved in each case were noted in order to determine whether particular agents or sales offices generated a disproportionate number of complaints. Complaints were categorized according to the basis of the consumer's grievance, and the outcome or resolution of each case was noted in order to identify any trends related to the company's willingness to take action to reverse questionable transactions.

Finally, the contents of the Code 1 files were summarized. Market Conduct examiners drafted a brief explanation of the complainant's grievance and noted the company's response.

14

10/21/98  18:18    SKADDEN ARPS → 1234567                                    NO.262  P020

10/19/95  17:27 FAX 860 508 5891      PUBLIC SAFETY                              ☐010

The following summarizes the results of the review of Department complaint files:

### First Step - Initial Review Of Files

| | |
|---|---|
| Total files on Consumer Affairs' computer listings | 526 |
| Files on listings not received in Market Conduct | - 22 |
| Files received & reviewed by Market Conduct | 504 |
| Complaints unrelated to sales practices | 376 |
| Total files related to sales practices | 128 |

### Second Step - Scoring Of Files Related To Sales Practices

| | |
|---|---|
| Code 1 | 54 |
| Code 2 | 46 |
| Code 3 | 19 |
| Duplicate Files | 7 |
| Total | 121 |

### Third Step - Analysis Of Scored Files/Main Allegation In Complaint

| | |
|---|---|
| Vanishing premiums | 34 |
| Misleading or inaccurate information at time of sale | 26 |
| Churning | 26 |
| Misrepresentation (sold as investment or retirement plan)* | 22 |
| Other reasons* | 13 |
| Total | 121 |

### Churning

| | |
|---|---|
| Code 1 | 23 |
| Code 2 | 3 |
| Code 3 | 0 |

### Vanishing Premiums

| | |
|---|---|
| Code 1 | 10 |
| Code 2 | 17 |
| Code 3 | 7 |

---

*   These matters are beyond the focus of this report.

10/19/98  17:27 FAX 860 403 5591        PUBLIC SAFETY                        ☒020

## Outcome of Complaint

The examiners analyzed the outcomes of all of the Department's complaint files. Based on the content of the files, the analysis of the Code 1 and Code 2 complaint files are the most reliable. In some cases, financed policies were rescinded and the older policies which supplied the funds were restored. In other cases, the company maintained that no misrepresentation or churning had occurred and upheld the transactions in question. The analysis of the Code 1 and Code 2 files revealed that the Company's complaint resolution was inconsistent when responding to essentially similar complaints. The outcomes were distributed as follows:

| | |
|---|---|
| Rescission, restoration, or other corrective action | 21 |
| Transactions upheld | 23 |
| Other | 10 |
| Total Code 1 complaint files | 54 |

10/21/98   18:18     SKADDEN ARPS → 1234567                          NO.262  P022

10/19/98   17:28 FAX 860 808 5591          PUBLIC SAFETY                    @021

## Complaint Distribution Among Sales Offices

| Sales Office | Complaints | Sales Office | Complaints | Sales Office | Complaints |
|---|---|---|---|---|---|
| Bridgeport | 1 | Meriden | 4 | Rocky Hill | 1 |
| Bristol | 5 | Milford | 2 | Shelton | 4 |
| Cheshire | 3 | Monroe | 1 | Simsbury | 1 |
| Cromwell | 2 | New Canaan | 1 | Southbury | 1 |
| Danbury | 1 | New Fairfield | 1 | Stamford | 1 |
| Darby | 2 | New Haven | 5 | Stratford | 2 |
| East Haven | 1 | New Milford | 1 | Torrington | 1 |
| Enfield | 8 | Newington | 2 | Waterbury | 3 |
| Farmington | 1 | Northford | 1 | West Hartford | 1 |
| Glastonbury | 2 | Norwalk | 2 | Wethersfield | 1 |
| Groton | 2 | Norwich | 14 | Windsor | 1 |
| Guilford | 1 | Old Saybrook | 1 | Woodbury | 1 |
| Hamden | 2 | Orange | 1 | Unidentified | 37 |
| Lisbon | 1 | Plainfield | 1 | | |
| Manchester | 3 | Plainville | 1 | | |

17

2.    Agent Agee's Files

Early in the investigation, we subpoensed client files from a former agent and man-
ager of MetLife's Torrington, Connecticut, office who claimed that improper sales practices
had taken place in the Torrington office before he became the manager and that the com-
pany was not adequately responding to complaints.  Market Conduct Examiners performed
an analysis of the client files in Agee's possession.

As with the Department's complaint files, Market Conduct examiners performed an
initial review of the client files to determine whether they contained documentation suggest-
ing improper sales practices.  The files that passed the initial review were scored on the
same scale of 1 to 3 to indicate the strength of the documentation they contained.

The following summarizes the Department's review of Agent Agee's client files:

| | |
|---|---|
| Client files delivered to Department | 32 |
| Files not applicable to investigation | - 7 |
| Files applicable to investigation | 25 |

| | |
|---|---|
| Code  1 | 9 |
| Code  2 | 8 |
| Code  3 | 8 |
| Total | 25 |

Market Conduct examiners attempted to contact each of the 25 consumers whose
client files raised questions of improper sales practices, and succeeded in contacting 22 of
the 25.  Of the 22 consumers contacted by the Department, the examiners identified two
consumers who were willing to meet with the examiners to give a statement describing
their experience.  Each of the individuals dictated a statement to the examiners.  They are
set out below with the names of the consumer and the agent redacted.  The complete
statements are on file in the Market Conduct Division.  The statements provide classic

18

10/19/98  17:20 FAX 800 808 8591        PUBLIC SAFETY                        @023

descriptions of churning and misrepresentations of vanishing premium policies.  They are

also typical, albeit more complete, descriptions of complaints on file in the Insurance

Department.

### Statement Number 1

Date:  January 8, 1998

As I recall I was contacted by my Metropolitan representative to
discuss a change in my policy.  He came to our house and dis-
cussed some kind of a change in our insurance.  Our agent was
_____.  The change would increase my coverage,
and would not have cost me anything because they were using
the proceeds of my current policy to pay future premiums.  I was
very clear that I did not want to pay additional premiums on any
policy in the future.  After discussion with my agent I understood
that this would continue through "old age" without me having to
pay anymore for the policy.  I understood that by converting to
the new product I would most likely not have to pay in the future
because a projection was shown to me that had zero payments
for my lifetime.

While he might have mentioned that dividends were not guaran-
teed, his discussion centered around the non-payment because
that is specifically what I wanted as a consumer.  Over the inter-
vening years, I would get annual bills for that premium and I
would call the office and they would say to disregard the bill and
I would get a check which I would endorse and send back to
them.  I kept asking why they couldn't do this transaction auto-
matically since I was not supposed to pay a premium and I was
told that it was just the system and it would not allow for that
process.

I never liked that process and I was also suspicious, but since I
wasn't paying I didn't make an issue of it.  But when that agent
left, I was convinced there would be a problem because this
seemed like an abnormal procedure to me.

This year I got a bill and I got a dunning letter saying I would
have to pay or the policy would lapse.  I don't recall whether I
received a check.  After several attempts, I was able to get in
touch with my new representative to discuss the matter.  I also
spoke to people at the main office about this, and it was then
that I started questioning the balance on my account and what
was projected in the future because I was retiring and my in-
come was severely reduced.

19

I was told there was money for this year but probably next year I would have to pay several hundred dollars and the available moneys were already gone. I was very upset because this was not what I had understood would happen, and I would not have $650.00 to pay for life insurance so I realized all the principal I had for a policy I had paid for many years was practically gone, and I would not have the coverage into my old age that I thought I had purchased.

We set up a meeting at my house at my request to discuss my policy. I was upset to have learned that in the very near future my policy would be costing me out of pocket several hundred dollars per year and I asked what could be done about that.

I explained that it wasn't my understanding that I should be paying premiums. He then explained to me that the interest in the account was not sufficient to cover the premiums anymore and we proceeded to discuss other alternatives. I asked about term life with the money available and I did not want to have any further funds taken from my account until after this problem was addressed by the company.

He said I should contact the company directly with my concerns to see if some accommodation could be made due to my understanding of this policy.

· · ·

I really did not want any out of pocket expenses to be required and I clearly stated that to the agent. The materials I was shown and the discussions we had led me to believe that the transfer would not result in future payments being required. I have read the foregoing pages and affirm that they are an accurate transcription of my statement and is true to best of my recollection.

20

10/21/98  18:19    SKADDEN ARPS → 1234567                          NO.262  P026

10/19/98  17:29 FAX 850 808 5591      PUBLIC SAFETY                    ☒025

**Statement Number 2**

**Date: January 8, 1998**

My full name is _____ and my address is
_____. Sometime in 1989, _____ con-
tacted us to discuss insurance policies because $5,000.00 of in-
surance isn't much anymore. He discussed rolling over the old
policy into a new one. The old policy is no longer in force. Mr.
_____ said we would not have to pay for the new policy for a
long time, but we got bills from Met. Sometimes I would call Mr.
_____ and sometimes I would call Met. They would tell me I
didn't need to pay the bills. I asked if the bills could be broken
down into installments, and they said no, and to ignore the bills.

Recently, Mr. Agee contacted me to discuss my insurance poli-
cies. At that time, he used a desk-top computer and told me I
did not have to pay for the policy for another 2 years.

I had company that day, so I didn't spend much time with him. I
am concerned that I might owe a lot of money when it is time to
start paying premiums again. A new premium of $1390.00
would be difficult to pay.

I wish they had told me about the premiums during all the years
they told me not to pay. I attest that this statement is true and
accurate to the best of my recollection.

In each case, the agent got a commission on the much larger, new policy which was

paid for by the cash values of the old policies. Also, in each case when the cash values of

the old policies could no longer support the premium on the new policies the insureds were

faced with a choice of paying the premium -- which they likely could not afford -- or letting

the policy lapse. In both cases, the agent who was responsible was long gone by the time

the policies crashed.

21

10/21/98  18:19    SKADDEN ARPS → 1234567                                NO.262  P027

10/19/98  17:28 FAX 680 805 5581        PUBLIC SAFETY                        ☒026

### 3.    Internal Compliance Audit Reports

In response to the Insurance Department's request, MetLife supplied copies of reports of internal reviews performed by MetLife's Corporate Compliance Department. The reports covered compliance reviews performed between 1990 and 1997. The reports used several criteria to measure compliance with internal compliance standards. When exceptions were noted, such as an individual agent's unacceptably high ratios of financed replacement activity, the agents' manager would be notified. In most cases no disciplinary action was noted in the reports, as that decision appears to have been left to the discretion of the agency managers.

The fact that the company had defined acceptable ratios for replacement activity and financed policies, and had applied those standards during the internal audits appears to indicate that MetLife was aware that its sales force was potentially engaging in improper sales practices. When improper sales were identified, the audit reports rarely recommended contacting the consumers involved to determine whether their interests had been properly protected. We could not determine from the records whether consumers were in fact contacted, but based on the totality of the evidence, it appears likely they were not.

### 4.    MetLife Complaint Files

In response to information disclosed during depositions of MetLife personnel, the Department requested copies of complaints which were received directly by the company and which alleged churning or misrepresentation by agents in Connecticut. The company forwarded 137 complaint files to the Insurance Department. Of the 137 files, 16 had

involved Insurance Department intervention and were duplicates of files analyzed during the earlier review of the Insurance Department's complaint files. Therefore, the review of MetLife complaint files involved the analysis of 121 additional files. In general, the content of the MetLife complaint files was similar to the Department's complaint files.

### First Step - Initial Review of the Files

| | |
|---|---|
| Total Files Received from MetLife | 137 |
| Duplicates of the Department's Files | -16 |
| Total Files Reviewed | 121 |

### Second Step - Scoring of Files Related to Sales Practices

| | | |
|---|---|---|
| Code 1 | 113 | Policy rescinded and old policy restored |
| Code 2 | 6 | Rescission was denied |
| Code 3 | 2 | Information was not legible |
| | 121 | |

### Third Step - Analysis of Scored Files/Main Allegation in Complaint

| | |
|---|---|
| Churning | 118 |
| Other/Files not legible | 3 |
| | 121 |

5.    Summary

The Market Conduct Division's examination produced 155 Code 1 complaints which contain reliable evidence of churning and misrepresentation of vanishing premium policies. Many complaints involved both as in Statement Number 1 discussed above. Code 2 and 3 complaints may be usable as evidence of churning or misrepresentations of vanishing premium policies after further examination.

23

10/21/98  18:19    SKADDEN ARPS → 1234567                                      NO.262  P029

10/19/98  17:29 FAX 860 888 5591      PUBLIC SAFETY                          ☎028

### D. DESCRIPTION OF ETHICS, AND COMPLIANCE PROGRAMS

As part of the Stipulation and Consent Order entered into by the Insurance Department and MetLife in 1994 (Exhibit A), MetLife agreed to institute an Enhanced Ethics and Compliance Program as described in Attachment B of the Consent Order. We sought to determine whether MetLife was in compliance with the Consent Order, and whether the Enhanced Ethics and Compliance Program touted by the company was effective at preventing abusive sales practices.

We pursued this issue not only through analysis of consumer complaints, but also through a series of depositions of company officials involved in sales, compliance, and customer relations. We concluded by giving senior management an opportunity to make a statement on the record concerning MetLife's efforts to resolve its problems and to prevent future occurrences.

#### 1. Enhanced Ethics And Compliance Program

In response to questions about MetLife's handling of churning and misrepresentations of vanishing premiums, company officials pointed to MetLife's Enhanced Ethics and Compliance Program which was adopted in 1994. The program -- which continues to evolve -- emphasizes training, education, electronic monitoring, customer relations, and accountability. A new management structure was created to implement and supervise the program. Since 1994, MetLife represented that it has spent over $50 million on its enhanced compliance efforts.[u]

---
[u]    Statement of Donald M. Stadler, Vice President, Compliance and Quality Assurance, July 23, 1998, p. 12.

24

10/19/98  17:36 FAX 860 808 5591 .     PUBLIC SAFETY                          @029

At the outset, we would note that the Enhanced Ethics and Compliance Program appears to have been a response to a 1994 Florida investigation of MetLife's sales of whole life insurance policies to approximately 20,000 nurses nationwide which were misrepresented as a "Nurses Retirement Savings Plan"[77] MetLife subsequently entered into a consent decree with the State of Connecticut as previously discussed. The Florida MetLife report lays much of the blame on a failed compliance program.[78] It also refers to a "Proposed Enhanced Compliance Program" which was supposed to remedy the company's problems with its sales force.[79] (See also Exhibit A.)

The depositions, statements, and materials contained in the record of our proceedings describe this Enhanced Ethics and Compliance Program as it was actually implemented from 1994 to the present time.

---

[77]     Thomas Tew, Report of Investigation into Sales Practices of Metropolitan Life Insurance Company submitted to Tom Gallagher, Florida Insurance Commissioner and Robert A. Butterworth, Attorney General State of Florida, March 6, 1994 (hereinafter "The Florida Report").

[78]     Id. at 37.

[79]     Id. at 50-55.

(a)    Management Structure

The 1994 plan created a corporate Ethics and Compliance Department ("CEC") headed by the Company's Chief Compliance Officer. Among its duties, the CEC Department has fifty auditors who physically audit each agency in the Company. Compliance audits include a review of possible replacement activity, sales materials, policy delivery, settlement transactions, new business applications, agent licensing, business conduct, customer service, and policyholder complaints. A corporate customer relations unit is responsible for assuring that customer and regulatory complaints are handled properly, analyzing data on complaints for trends or recurring problems and reporting concerns to senior management. The CEC Department is also responsible for market conduct, NASD/SEC compliance, the Company's Policy Guide for Business Conduct, and it administers an Ethics Helpline.

As part of the Enhanced Ethics and Compliance Program each of MetLife's operational and staff units has its own Ethics and Compliance Officer — a vice president level position. Under the guidance of the CEC Department, Ethics and Compliance Officers develop and administer compliance programs for their business units.

In order to ensure that the emphasis on compliance reached the highest levels of the Company, in 1995 the Board of Directors created a sales practices committee composed of outside directors which has general oversight of compliance matters. There is also a business standards committee composed of senior management which is responsible for monitoring and providing guidance with respect to resolution of compliance issues. Ties to senior management were further tightened when overall responsibility for

28

compliance programs was assigned to a newly created position of Executive Vice President of Corporate Special Services on December 1, 1997.

Evidence was also presented of management's reinforcement of the importance of compliance and maintaining ethical standards through speeches, internal publications and messages to the field over the last four years. We would observe that while these pronouncements are somewhat self-serving they are useful in creating a corporate culture that discourages abusive sales practices.

(b)    Individual Business Compliance Programs

Since MetLife's problems can be traced to the sale of individual life insurance, the Company's Individual Business Department has initiated a number of special programs.

(i)    Compliance and Quality Assurance —
Individual Business

MetLife offered evidence that its Individual Business Department, which is primarily responsible for the sale of life insurance to individual policyholders, has its own Compliance and Quality Assurance Unit with a staff of over 60 employees. This unit is responsible for monitoring compliance of the Individual Business sales force and for following up on the Corporate Ethics and Compliance Department's annual reviews of each agency.

The Individual Business Compliance and Quality Assurance Unit is headed by a Vice-President of Corporate Special Services. It is organized to cover the following areas: Sales Practices, Policy Administration, Administrative Services, Investigations, Monitoring, Johnstown Client Relations Center, Good Business Practices, Sales Material Management

27

10/21/98  18:19    SKADDEN ARPS → 1234567                    NO.262  P033

10/19/98  17:38 FAX 800 808 5591        PUBLIC SAFETY                    ☒032

and Marketing Territory Local Oversight (Compliance officers assigned to each marketing territory).

                    (ii)    Computer Monitoring

In the course of this investigation, we were particularly interested in MetLife's ability to detect churning. In this regard, there was testimony that MetLife had the capacity to evaluate individual replacement transactions since 1982.[10]  The system could apparently match the movement of funds from one policy to another.

At the time the Enhanced Ethics and Compliance Program was introduced in 1994, a new and more sophisticated computer monitoring system became available which enabled MetLife management down to agency managers to monitor sales activities which may indicate improper replacement.  MetLife provided evidence that newer and even more sophisticated computer systems which can detect the movement of funds with respect to individual sales transactions are presently in use by the Compliance staff.

The testimony and documentary evidence supplied by MetLife stressed that no computer system can positively identify churning.  They can only monitor the movement of funds and reveal matches that may indicate improper replacement.  Where computer monitoring shows the movement of funds from one policy to another further investigation is required, and we were assured that the Enhanced Ethics and Compliance Program provides the necessary follow up.

---

[10]  Statement of Lawrence Vranka, Vice-President Special Services, July 23, 1998, p. 171.

10/19/95  17:31 FAX 860 808 5391       PUBLIC SAFETY                          ☒033

(iii)     Replacement Checklist/Underwriting Review

"Replacement" is generally any transaction in which one life insurance policy or an-
nuity contract is terminated and its values — including dividends, loans or cash values — are
used in connection with another policy or contract. MetLife's Agent Replacement Guide
recognizes that replacement of existing life insurance is generally not in the best interests
of the policyholder. Not all replacement is illegal, however. In order to ensure that any
such transaction is appropriate, MetLife instituted a replacement checklist in 1995.

The checklist requires the agent, among other things, to explain in writing why a pro-
posed replacement is recommended over keeping an existing policy intact. The checklist
is then reviewed by MetLife's underwriters to confirm the appropriateness of the
transaction.

(iv)     Call-Out Program

The primary distinction between replacement — which may or may not be illegal —
and churning which is illegal is full disclosure to the policyholder. Full disclosure is also the
key to compliance regarding vanishing premium policies. In order to ensure that full disclo-
sure was made to the policyholder by the agent and that the customer understands the
transaction, MetLife instituted a Call-Out Program in January, 1994. With few exceptions
not relevant here, applicants for individual life insurance policies are contacted by service
representatives from MetLife's Client Relations Center in Johnstown, Pennsylvania.

The service representatives attempt to make contact either before or shortly after
the policy is issued. According to Mr. Vranka, the questions are directed to confirming ba-
sic policyholder information and the policyholder's understanding of the transaction. For

29

example, policyholders are asked if they made any changes in their existing life insurance. If the answer is "yes," follow-up questions are asked about the nature of the changes and the funding of the policy. Questions are also directed to determine the policyholder's understanding of any vanishing premium arrangement. Problems are dealt with through follow-up action with the manager and the agent.

### (v)   Agent Recruiting/Training

We questioned MetLife officials about recruiting and training of new agents to determine if they were adequately trained to deal with issues of policy replacement and vanishing premiums. Evidence was presented that more intensive agent training was instituted as part of the Enhanced Ethics and Compliance Program in 1994. Before agents are allowed to go on a sales call, they receive eight weeks of training, and the initial training process is thirteen weeks. Ethics and Compliance training is part of this process. It was also pointed out that in the past two years managers received two two-day training sessions in a program called "The General Managers Guide To Compliance." In addition, background checks are required for new agents to look for a criminal record or previous regulatory violations.

We recognize the increased level of training and the emphasis on compliance as a positive step. Nevertheless, we are concerned that while retention rates for agents was better than the industry average of 15 percent — MetLife's retention was still in the 18 to 22 percent range. Such high turnover, causes concerns about the level of sophistication and training of new agents. In the present matter, however, it appears that many of the violations involved veteran agents.

30

10/21/98  18:19     SKADDEN ARPS → 1234567                                    NO.262  P036

10/19/98  17:31 FAX 860 808 8591        PUBLIC SAFETY                              @038

### (vi)    Compensation

Where compensation is based solely on sales, the pressure to produce can over-whelm the best of intentions and compliance programs. According to Mr. Sells, who retired as the Regional Vice-President in Connecticut in 1997, new sales counted for 40 percent of a manager's salary. The remainder depended on agency growth, compliance, retention and other factors. Mr. Stadler stated the compliance can count up to 20 percent of a man-ager's annual salary. A failing compliance grade can mean no bonus.

Mr. Stadler testified that MetLife is extending the compensation element for compli-ance to agents this year. He stated that an agent can make up to $1,000 per year based on compliance. In short, there did not appear to be anything in MetLife's current compensa-tion system that rewards agents or managers for raiding the values of existing policies, and compensation is reduced if compliance is not satisfactory.

### 2.    Summary

The Enhanced Ethics and Compliance Program was instituted as called for in the 1994 Stipulation and Consent Order between the Insurance Department and MetLife. The program also appears to be effective at detecting and preventing churning. We are con-cerned, however, by a September 8, 1998 story in the Wall Street Journal stating that Met-Life is cutting 10% of its non-sales work force -- or as many as 1,950 people by year end. We have asked MetLife to explain how these reductions will impact the compliance staff. In this regard, MetLife has an ongoing requirement to comply with the 1994 Stipulation and Consent Order.

### E.    COMPLAINT SETTLEMENT PRACTICES

Mr. Agee, the former MetLife agent and manager, had complained to the Insurance Department that MetLife was not offering prompt and fair settlements to policyholders who had been victims of churning. Based on Mr. Agee's complaint and others in the Insurance Department's files, we examined MetLife's settlement practices regarding churning complaints and misrepresentations of vanishing premium policies.

The Market Conduct Division's analysis of Code 1 files discussed above showed that MetLife's handling of complaints was inconsistent when responding to essentially similar complaints. Such inconsistencies are disturbing, but do not constitute an unfair insurance practice as defined in Conn. Gen. Stat. § 38a-816.

We find, however, that MetLife often resorted to insurance jargon, overly technical financial analysis and obfuscation in its dealings with policyholder's complaints. A good illustration of this is a settlement offer dated July 11, 1997 to policyholders who complained of churning. We apologize for setting out the entire letter, but it is only in doing so that one can fully appreciate the issue. The names of the policyholders have been removed to protect their privacy.

Dear Mr. and Mrs. _____.

Your letter of April 28, 1997 to the Office of The President has been referred to me to reply.

Policy 914 103 897 A was issued May 17, 1991 as a Life at 95 plan of insurance for $48,000. The policy was issued with a Paid-Up Additions Rider "PUAR." The policy is inforce and the $1,896.24 annual premium is currently paid to May 17, 1998. A total of $10,600.00 has been paid into the PUAR.

Policy 914 003 890 A was issued April 18, 1991 as a Life at 95 plan of insurance for $27,000. This policy was also issued with

a PUAR. The policy is inforce and the $831.90 annual premium is currently paid to April 18, 1998. A total of $4,722.00 has been paid into the PUAR.

For both policies, the cash value in the PUAR has been used to pay the premiums. In fact, a total of $10,681.57 and $4,631.13 has been withdrawn from the PUAR of policies 914 103 697 A and 914 003 890 A, respectively.

It appears as if the account representative may have been referring to the Accelerated Payment arrangement "AP" as a means of paying future premiums. Under the AP arrangement, dividends are left with MetLife, usually under the paid-up additional insurance dividend option. When the dividend balance, together with the future anticipated dividends, are sufficient to do so, future premiums may be automatically paid by dividends. Dividends, however, are not guaranteed.

The amount of dividends available for distribution depend in part on the claims that we pay, our expenses, and the result of our investments. Due to these factors, MetLife has had to reduce its dividend scales and as a result, has also had to revise the dates that some policies are eligible for AP. For some policies, additional premiums are required before dividends are sufficient to place the policy on AP.

Our records indicate that the AP eligibility date for policies 914 103 697 A and 914 003 890 A is May 17, 2004 and April 18, 2003, respectively. The account representative may have been under the impression that your policies would be eligible for AP much sooner, perhaps when the PUAR cash value was exhausted. However, this is not the case.

It is very difficult to predict when a policy will become eligible for AP. This payment arrangement is based on both earned and future dividends and MetLife cannot guarantee future dividends.

Near the time that policies 914 103 697 A and 914 003 890 A were issued, policies 600 300 527 A and 687 203 604 A insuring _____, and 680 704 873 MS and 794 605 111 M, insuring _____, were cash surrendered. Also, on May 15, 1991, dividends in the amount of $1,897.00 were withdrawn from policy 600 300 527 A. Each cash surrender and the dividend withdrawal stated above were done in conjunction with the issue of policies 914 103 697 A and 914 003 890 A.

In an effort to resolve this matter, we are offering to cancel polici[i]es 914 103 697 A and 914 003 890 A from issue and

33

recall the premiums and use these proceeds to restore your other policies. To restore your other policies, we would need to reverse the cash surrender payments and the dividend with-drawal from policy 600 300 527 A, and we would have to collect all back premiums. Please let me explain.

The total premiums paid to policy 914 103 697 A was $13,273.65. The total amount paid into the PUAR was $10,600.00. From these amounts, we would deduct the total amount of the withdrawals from the PUAR, in the amount of $10,681.87, and $695.57 to reverse a dividend withdrawal on June 11, 1997, which would leave a balance of $12,496.24 that could be used to restore policies 600 300 527 A and 687 203 604 A.

To restore policy 600 300 527 A, we would need to reverse the cash surrender amount of $3,913.57 and the dividend with-drawal of $1,897.00. We would also need to collect back premi-ums in the amount of $623.70. This represents payment of 66 monthly premiums of $9.45 from April 1992 to October, 1997. The total amount needed to restore policy 600 300 527 A is $6,434.27.

To restore policy 687 203 604 A, we would need to reverse the cash surrender amount of $8,038.93 and we would need a credit of $1,235.85, representing 21 quarterly premiums of $58.85 from June, 1992 to September, 1997. The total amount needed to restore policy 687 203 604 A is $9,274.78.

To restore policies 600 300 527 A and 687 203 604 A, we would need $15,709.05. We could deduct the $12,496.24 from policy 914 103 697 A, which would leave a balance of $3,212.81 needed from you.

The total amount of premiums paid to policy 914 003 890 A was $5,623.30 and the total amount paid into the PUAR was $4,722.00. From these amounts, we would deduct the total withdrawals from the PUAR, in the amount of $4,931.13, and a dividend withdrawal of $60.27 on April 23, 1997. The total amount available from policy 914 003 890 A is $5,553.90.

To restore policy 690 704 879 MS, we would need to reverse the cash surrender amount of $1,640.56. No premiums would need to be credited since the policy was fully paid-up when it was cash surrendered.

To restore policy 794 605 111 M, we would need a total of $2,325.50. This amount is needed to reverse the cash

34

surrender amount of $1,315.00 and to collect premiums in the amount of $1,007.50. This represents 25 quarterly premiums of $40.30 from June, 1991 to September, 1997.

To restore policies 890 704 873 MS and 794 805 111 M, we would need a total of $3,966.06. We could deduct this from the total proceeds from policy 914 003 890 A, which would leave a balance of $1,587.84 payable to Mrs. _____.

If you accept our offer to restore your policies, all applicable cash value and dividends would be credited. We would also send you a duplicate copy of the policies that are restored.

Please keep in mind, if you accept our offer, you will not have the insurance protection provided by policies 914 103 697 A and 914 003 890 A. We are offering to restore the following policies to Mr. _____ ; 800 300 527 A, a $5,000, Whole Life plan and 887 203 804 A, a $10,000, Whole Life plan. We are offering to restore the following policies to Mrs. _____ ; 890 704 873 MS, a $1,639, 20 Payment Life plan and 794 805 111 M, a $5,000, Whole Life plan.

A point to consider in favor of restoring your old policies is that once the policies are restored, you may have sufficient dividends to pay the premiums under the AP arrangement and avoid having to continue out-of-pocket premium payments.

If you want to accept this offer, please sign and date the bottom portion of this letter and return it along with policies 914 103 697 A and 914 003 890 A in the envelope provided. Please also send us a check for $2,517.24 as explained above.

A second option that you have is that you could place your policies on one of the nonforfeiture options; either Reduced Paid-Up insurance or Continued Term Insurance. In both cases, premiums would be discontinued. Under the Reduced Paid-Up Insurance, your coverage would continue with a paid-up status but for a lesser amount of insurance, $20,645.00 for policy 914 103 697 A and $11,414.00 for policy 914 003 890 A. Under the Continued Term Insurance, your coverage would continue as term insurance with the same face amount of insurance but would expire at a future date with no value.

Please advise us if you would like any additional information regarding the nonforfeiture options that are available to you.

35

10/21/98  18:20    SKADDEN ARPS → 1234567                                    NO.262  P041

10/19/98  17:33 FAX 860 808 8891        PUBLIC SAFETY                            ☑040

We have reviewed this matter very thoroughly and have found no basis to issue paid-up policies. We hope that you understand our position.

We hope that this information is helpful to you in retaining your insurance coverage. If you have any questions or other concerns, please contact me or my associate, Phil Wesner, at the address stated above or call 814-269-8402.

Sincerely

Leonard R Niczky, Director
Consumer Affairs

This letter may appear to be an extreme example, but in a deposition of a representative chosen by the company, we asked if the letter was typical of MetLife's response to justified complaints.

> **Q**   Does this letter meet company standards for responding to a consumer complaint?
>
> **A**   It appears to, yes.
>
> **Q**   Is this the type of letter that the company is using today to respond to consumer complaints?
>
> **A**   Of this nature, yes.
>
> **Q**   So this is a typical letter? I think that's what I'm asking.
>
> **A**   Sure.

Deposition of Pamela Prohonic, MetLife Supervisor of Consumer Relations, April 8, 1998, p. 54.

Even upon close examination, the offer made to the policyholders — a husband and wife — is nearly indecipherable. We do not find the letter to be illegal, but it is at best

36

10/19/98  17:33 FAX 860 803 5391      PUBLIC SAFETY                    ☒041

inappropriate and at worst an attempt to confuse policyholders who had already been vic-
tims of churning.

We were particularly disturbed that the letter requires the policyholders to pay, out-
of-pocket, an additional $2,517.24 to restore their old policies. Following a complaint to the
Insurance Department, MetLife offered to settle with the policyholders in January, 1998,
with no further out-of-pocket premium payments, and the matter was resolved.

In 1996 as part of their Enhanced Ethics and Compliance Program MetLife's con-
sumer relations function for individual business -- which in earlier times would have been
called the complaint department -- was consolidated in a single office in Johnstown, Penn-
sylvania. We questioned company officials extensively regarding the operation of the
Johnstown office to determine if MetLife was overreaching consumers. They pointed to the
Consumer Affairs Division with some pride and directed our attention to a 1997 letter from
the California Insurance Department stating that "considerable resources have been dedi-
cated to the handling of consumer complaints." In light of the case discussed in this sec-
tion, we do not share California's positive view. Moreover, to the extent MetLife claims it
has voluntarily taken steps to provide a remedy to policyholders who have been churned or
misled -- we find their efforts wanting. Finally, evidence of the recent treatment of churning
victims does not make us disposed to overlook or discount violations which predate the En-
hanced Ethics and Compliance Program which began in 1994. Simply stated, there was
evidence that customers who had been churned by MetLife agents were later offered con-
fusing and unfair settlements by the company.

37

### F.     AGENT DISCIPLINE REPORTING

Mr. Sells, the Regional Vice President testified in his deposition that "four or five" agents were given sanctions for churning in the "past three or four years." At first he stated that these agents were fired, but later he testified that they were allowed to resign.[18] This testimony supports the fact that churning occurred, that it had occurred recently and that MetLife management knew about it. Mr. Sells also testified that all the people involved were experienced agents.[19]

MetLife's legal counsel was asked to supply more information concerning the termination of the agents. The material furnished was very sketchy, as the company retained very little information on agents who were allowed to resign. Nevertheless, some of the information is quite telling.

A May 25, 1995, letter from an agency manager to Mr. Sells regarding one of the agents indicates that her FIP (Financed by In Force Policy) Ratio was too high, and the manager discussed the need to reduce it to "acceptable levels." This indicates that Sells knew that there was a high level of replacement activity by this agent. No other information was supplied to show that there was any follow-up by either the agency manager or Sells to determine if the agent was engaged in churning.

Similarly, the correspondence regarding a second agent shows that he had engaged in churning and misrepresentations of vanishing premiums. A September 18, 1996, letter from the agency manager to Mr. Sells sets out the manager's concerns regarding seven cases. This clearly supports the credibility of the consumer complaints reviewed by

---

[18]     Deposition of Clyde Sells, February 25, 1998, p. 107-108.

[19]     Id. at 109.

the Market Conduct Division's examiners and gives credence to their statistical summary. In this case, the Johnstown Client Relations Center did indicate that it was writing to policyholders, and this is clearly a step in the right direction. Nevertheless, the record shows that the agent was allowed to resign voluntarily, and no report was ever made to the Insurance Department.

No records were supplied regarding the third agent. All we have is Mr. Sells' testimony that he was allowed to resign voluntarily because of churning. Therefore, not only did MetLife not report the incident to the Insurance Department, but it also did not retain any records to aid the Department in taking action. Mr. Sells testified that to the best of his knowledge the agent is still selling insurance.

The record also contains a letter from the manager of MetLife's Groton office to the Johnstown Consumer Relation Center in which the manager describes a case of churning. The manager goes on to state that the agent was "asked to resign" in 1995 "for a documented history of similar transactions." The agents FIP ration was described as "well over 40 percent."

Finally, in response to a written request for information on individuals who were fired or allowed to resign in response to allegations of churning and misrepresenting vanishing premium policies during the period from 1980 to 1997, MetLife stated by letter of April 17, 1998, that it was impossible to obtain this information from their records.

Allowing agents to resign instead of disciplining or firing them for churning does not violate any statute. MetLife's response to these cases, however, amounts to sweeping the problem under the rug. We also note that the voluntary resignations took place after the institution of the Enhanced Ethics and Compliance Program. The fact that the agents were allowed to resign and go to work for other insurance companies undercuts the

effectiveness of MetLife's Compliance Program and leads us to question the seriousness of their commitment to preventing churning.

## IV.

## FINDINGS

### A.    CHURNING

There is ample evidence that MetLife agents engaged in churning in Connecticut and that MetLife's management knew or should have known that it was occurring.

### B.    MISREPRESENTATIONS OF VANISHING PREMIUM POLICIES

Misrepresentations of vanishing premium policies are difficult to prove. It is often a case of the policyholder's word against the company's. Nevertheless, the cases are too numerous and too consistent to disregard the claims of policyholders. It is also difficult to disregard policy illustrations prepared by the company which show prominently in the first column of the first page that no cash outlay is needed after a few years. The policyholders must turn to the footnotes on page 3 of the illustration to find the reminder that dividends are not guaranteed. Coupled with this disclaimer in other sales literature, however, is the statement that "MetLife has a long and distinguished history of making dividend payments to policyholders, going all the way back to the early 1900's." This kind of puffing is, of course, a time worn sales practice — but with little embellishment by an agent — it can easily mislead consumers.

10/21/98  18:20    SKADDEN ARPS → 1234567                    NO.262  P046

10/19/98  17:34 FAX 860 808 5591        PUBLIC SAFETY                    @046

We find that there is sufficient evidence to charge MetLife with violating Conn. Gen. Stat. § 38a-816(1)(a) and (b) regarding its sales of vanishing premium policies in Connecticut. We also find that the "call-out" program instituted as part of the Enhanced Ethics and Compliance Program should reduce consumer complaints in the future.

### C.    COMPLAINT HANDLING

The Insurance Department's Market Conduct examiners found that the company's complaint resolution was inconsistent when responding to essentially similar complaints. There was also evidence that MetLife offered settlements that were confusing, full of insurance jargon and did not make consumers with justified complaints whole. Currently, the failure to offer prompt and fair settlements to justified consumer complaints with such frequency as to indicate a general business practice is not a defined violation of CUIPA. We strongly recommend that Conn. Gen. Stat. § 38a-816(7) titled "Failure To Maintain Complaint Handling Procedures" be amended to include this as a violation.

### D.    AGENT DISCIPLINE REPORTING

MetLife's practice of allowing agents to voluntarily resign where there is clear evidence that they were guilty of churning (or other statutory violations), and the company's failure to maintain records of these incidents defeats any attempt by regulators to police abusive sales practices. Such action is not a violation of any state statute, but we view it as a very serious problem. We suggest that this issue be referred to the appropriate committee of the National Association of Insurance Commissioners for further study and an adequate remedy.

41

### E.   COMPLIANCE WITH 1994 STIPULATION AND CONSENT ORDER

We find that MetLife complied with the 1994 Stipulation and Consent Order by implementing the Enhanced Ethics and Compliance Program.  This duty is ongoing and may be subject to further review as needed.

We also find that the 1994 Stipulation and Consent Order dealing with the sale of whole life insurance as a retirement plan does not preclude or affect the State of Connecticut's right to proceed against MetLife for churning and misrepresentation of vanishing premium policies.

### V.

### CONCLUSION AND RECOMMENDATIONS

There is sufficient evidence that MetLife has engaged in violations of Conn. Gen. Stat. § 38a-816(1)(a), (b), (f), and (g) and that a proceeding under Conn. Gen. Stat. § 38a-817 would be in the interest of the public as provided therein.

42

10/21/98  18:20    SKADDEN ARPS → 1234567                          NO.262  P048

10/19/98  17:34 FAX 860 808 8591        PUBLIC SAFETY                    ⌀047

# EXHIBIT A

10/19/98  17:38 FAX 860 808 5391        PUBLIC SAFETY                    ☒045



# STATE OF CONNECTICUT
### *INSURANCE DEPARTMENT*

--------------------------------------------X
In the Matter of:                           :
                                            :
METROPOLITAN LIFE INSURANCE COMPANY,        :    Docket No. LH 94-51
                                            :
            Respondent.                     :
                                            :
--------------------------------------------X

### STIPULATION AND
### CONSENT ORDER

WHEREAS, Metropolitan Life Insurance Company, hereinafter
referred to as "Respondent", is a mutual life insurance
company incorporated under the laws of the State of New York
with its principal place of business at One Madison Avenue,
New York, New York 10010-3690, which holds a certificate of
authority to transact the business of insurance in the State
of Connecticut; and

WHEREAS, investigations and complaints have arisen in the
State of Connecticut and several other states regarding the
practice of Respondent's agents selling whole life policies as
retirement plans or savings plans from the Southeast Head
Office ("SEHO") Sales Office and other Respondent's sales
offices in violation of Conn. Gen. Stat. § 38a-815. A
significant element of this practice was targeting nurses and
other professionals. The National Association of Insurance
Commissioners established a task force (hereinafter "the Task

10/19/98  17:35 FAX 860 368 5591          PUBLIC SAFETY                      ☒049

-2-

Force") to address this matter.  The Florida Department of
Insurance chaired the Task Force and conducted investigative
activities on behalf of the members of the Task Force.

WHEREAS, without admitting that its activities violated
the laws of the State of Connecticut and in the interest of
fully and finally resolving and settling all issues relating
to the State of Connecticut Insurance Department's and the
Task Force's investigations, Respondent agrees to enter into
this Stipulation and Consent Order with the State of
Connecticut Insurance Department.  This Stipulation and
Consent Order relates only to the activities described herein.

WHEREAS, the Respondent being desirous of avoiding formal
administrative proceedings or future litigation, voluntarily
waives:

1.    any right to a hearing;

2.    any requirement that the Insurance Commissioner's
decision contain a statement of findings of fact and
conclusions of law; and

3.    any and all rights to object to or challenge before
the Insurance Commissioner or in any judicial proceeding any
aspect, provision, or requirement of the Stipulation and
Consent Order;

-3-

NOW, THEREFORE, upon the consent of the parties, it is
hereby ordered and adjudged:

1.  Restitution -- the Respondent will fund and institute
a restitution plan (described in Attachment A and incorporated
by reference herein).  Under the Restitution Plan, the
Respondent will contact those whole life policyholders
described in the Restitution Plan and offer them restitution
in the form of a refund of premiums with interest or
reformation of their whole life policy to an annuity from
inception of the whole life policy, or allow them to keep
their whole life policy if they choose.

2.  Compliance -- the Respondent has presented to the Task
Force an Enhanced Compliance Program (described in Attachment
B and incorporated by reference herein) which definitively
establishes the commitment of the Respondent to appropriate
sales practices, and procedures and accountability for
assuring compliance.

3.  Penalty -- the Respondent shall pay to the State of
Connecticut an administrative penalty in the amount of
$277,069.00, which takes into account the Restitution and
Compliance programs described herein, and is in addition to
all restitution made.

4.  The Respondent and the Insurance Department agree that
the terms for resolution of all issues raised herein are as

10/19/98  17:35 FAX 860 805 5591        PUBLIC SAFETY                    @031

-4-

specified in this Stipulation and Consent Order and serve to
resolve Insurance Department Docket Number LH 94-51.

5.  This Stipulation and Consent Order shall have no
effect as to the rights or claims of any individuals except
the State of Connecticut Insurance Department and the
Respondent.  This Stipulation and Consent Order shall not
affect the ability of the State of Connecticut Insurance
Department to investigate acts and practices of any licensed
agent of the Respondent or to take any appropriate enforcement
action against such agent warranted by such investigation.

Consented and agreed to this 19th day of April, 1994.

METROPOLITAN LIFE INSURANCE COMPANY

By: _____
    Alan M. Neiditch
    Vice-President

On this 19th day of April, 1994, before me, the subscriber,
personally appeared Alan M. Neiditch, the Vice-President of
Metropolitan Life Insurance Company, who I am satisfied is the
person who has signed the preceding Stipulation and Consent
Order, and, I having first made known to him the contents
thereof, he did acknowledge that he signed, sealed with the
corporate seal, and delivered the same as such officer
aforesaid and that the Stipulation and Consent Order is the
voluntary act and deed of such company made by virtue of the
authority vested in him by its Board of Directors.

_____
                    Secretary

-5-

STATE OF CONNECTICUT, INSURANCE DEPARTMENT

Dated at Hartford, Connecticut, this 2nd day of May, 1994.

Robert R. Googins
Insurance Commissioner

4884K

10/19/98  17:39 FAX 860 802 5591          PUBLIC SAFETY                              @053

Attachment A
April 1994
METROPOLITAN LIFE INSURANCE COMPANY

RESTITUTION PROPOSAL

The principal features of MetLife's restitution plan include:

MetLife will provide notice to a broad group of
policyholders that will include all those likely to have
received challenged literature (which relates to sales of
life insurance as a retirement or savings "plan" or program
without identification of the product as life insurance).
The group to be contacted will be defined by:

Policyholders, including lapsed policy-holders, who
bought whole life policies on an "even premium" (i.e.,
premium ending in 0 or 5 and odd face amount) basis
(frequently reflecting a purchase focused more on
accumulation than on the death benefit).

From (i) any MetLife agent who had 25% or more even
premium sales (as a percentage of the agent's whole
life sales) during any year 1980-1993 (excluding agents
who did not sell more than 4 even premium whole life
policies in any year during the restitution period and
agents who sold fewer than 10 whole life policies
during the entire period) or (ii) offices that had 15%
or more even premium sales (as a percentage of the
office's whole life sales) during any year 1990-1993 or
(iii) specific agents or, where appropriate, offices
identified through a survey of all MetLife sales
offices and a review of literature from the field as
having used retirement or savings plan sales literature
for whole life policies that does not identify the
product offered for sale.

The group to be contacted will consist of policyholders
who purchased during the period January 1, 1990 through
October 31, 1993.

With the exception of policyholders who bought
whole life policies as conversions from term or
group life policies, or with face amounts of $1
million or more.

The notice will offer to those policyholders identified in
accordance with the procedures described above and who complete
the claim form described below the option of a refund of all
premiums paid plus interest (at MetLife's annuity rates) or an
annuity funded in the amount of such a refund (premiums paid plus
interest).

To make a claim, a policyholder (or lapsed policyholder) will be required to submit a claim form within 45 days from the notice that (i) states that the policyholder was actually misled in connection with the purchase of the policy, (ii) describes the misrepresentation alleged and, if possible, identifies any misleading literature used and provides a copy of such literature if available, (iii) is signed and notarized, and (iv) may release MetLife from any claims in connection with the policy.

If possible, the refund program will be combined with settlement of class action litigation against MetLife. In that event, the refund offer and notice to policyholders may be subject to review and revision by the United States District Court.

MetLife is in the process of identifying policyholders in each state who will receive notice of the restitution proposal. MetLife previously made available to each state through the Florida Department of Insurance a preliminary list of such policyholders and will make available to the states a final list upon completion. Additionally, individuals who do not receive notice of the restitution offer but who assert during the pendency of the restitution program that they purchased a whole life policy based on misrepresentation of the policy as a retirement or savings plan will be offered restitution on the same terms as those receiving notice.

2

10734696

10/21/98  18:21     SKADDEN ARPS → 1234567                                      NO.262  P056

10/19/98  17:38 FAX 860 808 5591          PUBLIC SAFETY                          Ø055

Attachment B
April 1996
METROPOLITAN LIFE INSURANCE COMPANY

## MetLife's Enhanced Compliance Program

MetLife is proud of its reputation for honesty, integrity and
fair dealing.  The company's 125-year tradition of integrity has
been critical to its success and will continue to be the basis on
which it does business in the future.

To maintain the trust of its customers and to ensure that all
legal and regulatory requirements are met, MetLife has embarked
on a comprehensive review and strengthening of its compliance
structures and programs across all business units and product
lines throughout the company.  MetLife is committed to devoting
whatever resources are necessary to achieve an effective ethics
and compliance program that will protect its policyowners and
detect and deter potential problems.  MetLife's Enhanced Ethics
and Compliance Program will be designed and implemented to meet
the goals of effective training, education, communication,
supervision, auditing, discipline, and accountability.

### Accountability and Organization

The Enhanced Compliance Program creates new and expanded
organizational structures to ensure that compliance programs are
effectively developed, implemented, communicated and monitored.

The Corporate Ethics and Compliance Department, operating under
the direction of the Chief Compliance Officer, will be
responsible for developing, documenting, communicating and
administering enhanced corporate compliance programs; approving
each business unit's enhanced compliance program; monitoring
compliance throughout the company; auditing Personal Insurance
sales offices regarding compliance issues; and following up to
ensure any deficiencies are timely corrected.  The Chief
Compliance Officer will report directly to the Chairman and Chief
Executive Officer on compliance issues, will report significant
compliance issues to the Business Standards Committee (described
below), and will report periodically to the Audit Committee of
the Board.  Pursuant to its audit function, the Corporate Ethics
and Compliance Department will conduct onsite compliance
inspections of all sales offices at least annually and will
conduct periodic compliance meetings with employees.  The
Corporate Ethics and Compliance Department will report compliance
deficiencies to senior management and follow up to determine
whether corrective actions have been implemented.

Each business unit within the company (e.g., Personal Insurance,
Group Insurance) will designate an Ethics and Compliance Officer

("ECO") who shall be at least a vice president and who will report both to the company's Chief Compliance Officer and to the senior company officer responsible for that line of business. The Ethics and Compliance Officer and his or her staff will be accountable for overseeing the process of developing, documenting, communicating and administering compliance programs in that unit.

The Business Standards Committee, comprised of members of the Corporate Management Office (the company's top officers), will monitor and resolve significant control, audit and compliance issues. The Committee will receive and follow up on reports from senior management, the Chief Compliance Officer, the Corporate Controller and the General Auditor.

The Corporate Customer Relations Department, which reports to the President and Chief Operating Officer, will be responsible for ensuring appropriate and timely responses to customer and regulatory complaints, developing systems to generate enhanced reports on complaints, detecting patterns or instances of noncompliance, and reporting any such patterns to the Chief Compliance Officer and senior management of the relevant business unit.

In addition to their existing responsibilities, the Law Department and Auditing Department will be responsible for reporting compliance issues that come to their attention to the Corporate Ethics and Compliance Department.

Personal Insurance Enhanced Compliance Program

Because MetLife's personal life insurance sales force operates under the supervision of the Personal Insurance Department, the company has made the development and implementation of Personal Insurance ethics and compliance programs its highest priority.

Donald Stadler, an experienced vice president with a reputation for integrity, is the new Ethics and Compliance Officer for Personal Insurance.  He will be assisted by a staff of 20-25 employees.  Mr. Stadler and his staff will be responsible for

2

10/19/98  17:37 FAX 860 869 8581          PUBLIC SAFETY                      ☒087

overseeing the process of developing, documenting, monitoring and
administering Personal Insurance's enhanced ethics and compliance
program and communicating it to sales management, sales
representatives and other employees.  The enhanced program will
be communicated through distribution of documents and through
territorial, regional and branch conferences and meetings; in
addition, the enhanced program will be integrated into all
Personal Insurance training courses.  The program will be
monitored to detect noncompliance and to assure appropriate and
consistent disciplinary practices and timely reporting of
compliance activities.  Work has already begun to analyze the
effectiveness of existing policies and procedures and to
formulate enhanced policies and procedures to assure that ethics
and compliance problems do not arise in the future.

In conjunction with the Corporate Ethics and Compliance
Department and the Law Department, Personal Insurance has
conducted sales practices training programs around the country
during the past two months.  Substantial work has also begun in
the following areas:

**Sales Material**

A unit ("Sales Marketing Unit") will be established in Personal
Insurance responsible for the development or review of all
standard sales material and for ensuring Law Department approval
of all such material.  All members of the unit will attend a
training course conducted by the Law Department to ensure
familiarity with applicable laws and regulations.

Company policy will discourage sales representatives from
developing customized sales materials.  No customized materials
may generally be used unless they are approved by each of the
following:  branch manager, regional and/or territorial unit,
Sales Marketing Unit and the Law Department.

The longstanding requirement that all sales material and all
product or company training material be reviewed and approved by
the Law Department will be reinforced and communicated frequently
to all employees and sales representatives through education and
training courses, periodic reminders and certifications.

3

16W1791

All approved sales and training material will bear a Law
Department control number and will have an automatic expiration
date, beyond which it cannot be used or printed without further
Law Department approval.

After a brief transition period, no sales or training material
may be printed, distributed, stored in a warehouse, or otherwise
used unless it contains a current Law Department control number.

In addition to maintaining an advertising file of all approved
sales and training material, the Law Department will maintain a
record of all such material, including the control number, the
name or a description of the material, the unit or person to whom
approval was given, the date of approval, the name of the lawyer
giving approval, and other information.

### Training: Management

All personnel engaged in training must attend annual training
sessions which place appropriate emphasis on ethics and
compliance issues.

At least once annually, every person in sales management will
attend a training session which places appropriate emphasis on
ethics and compliance issues.

Every person in sales management will receive special training
with respect to any enhanced policies and procedures which are
implemented.

### Training: Sales Representatives

All sales representatives are required to attend, at least
annually, a continuing education course on ethics and compliance
issues.

All training material and manuals will be reviewed and revised to
ensure more effective communication of compliance policies and
procedures.

4

10521701

All training material, regardless of the medium, must be reviewed and approved by the Law Department prior to use.

### Promotion and Recognition

No person in sales or sales management will be promoted unless the person has a favorable compliance history, including review of any audit deficiencies, policyowner and regulatory complaints, litigation, and disciplinary actions.

Similarly, no person will receive official sales or sales management recognition (e.g., President's Conference or Managers' Hall of Fame) unless the person has a favorable compliance history.

### Recruiting

Personal Insurance will phase in a requirement of NASD licensing for all individuals within their first year of employment.  NASD licensing applications will be required prior to appointment.

### Monitoring

Every branch manager will conduct and document semi-annual reviews, for compliance purposes, of each sales representative's sales methodology.

An enhanced computer information system has been developed to monitor sales activities and compliance at the sales representative, branch office, and regional levels.

As noted above, the Corporate Ethics and Compliance Department will conduct annual onsite compliance audits of all branch offices.  These audits will be in addition to, not replacements for, audits conducted by the Audit Department.

In the coming months, Personal Insurance will continue to identify and implement policies and procedures designed to improve the prevention and detection of non-compliance, the monitoring and auditing processes, ethics training, and discipline.

5

10/21/98  18:21    SKADDEN ARPS → 1234567                    NO.262  P061

10/10/98  17:38 FAX 850 808 8581        PUBLIC SAFETY                    ☒060

## Reporting

Metlife will prepare a written report by January 15, 1995, detailing the status of the implementation and structuring of the Enhanced Compliance Program as of December 31, 1994. This report will be made available upon request to any state participating in the global settlement.

6

12922701

10/21/98  18:21    SKADDEN ARPS → 1234567                            NO.262  P062

10/20/98  TUE 10:42 FAX 860 808 5892        ATTY GEN OFFICE                    ☒002

## STATE OF CONNECTICUT
## INSURANCE DEPARTMENT

----------------------------------------X
In The Matter Of:                       :
                                        :
METROPOLITAN LIFE INSURANCE COMPANY,    :  Docket No. MC 98-104
                                        :
         Respondent.                    :
----------------------------------------X

### STIPULATION AND CONSENT ORDER

WHEREAS, Metropolitan Life Insurance Company, hereinafter referred to as "MetLife," is a mutual life insurance company incorporated under the laws of the State of New York with its principal place of business at One Madison Avenue, New York, New York 10010-3690, which holds a certificate of authority to transact the business of insurance in the State of Connecticut; and,

WHEREAS, pursuant to Conn. Gen. Stat. § 38a-16, the Insurance Commissioner of the State of Connecticut or his authorized representative may, as often as he deems necessary, conduct investigations and hearings in aid of any investigation on any matter under the provisions of Title 38a of the Connecticut General Statutes; and,

WHEREAS, the Insurance Commissioner appointed the Attorney General and the Market Conduct Division of the Insurance Department to conduct a joint investigation of the life insurance sales practices of MetLife; and,

WHEREAS, the investigation authorized by the Insurance Commissioner focused on allegations of churning in the sale of whole life insurance, and misrepresentations of so-called "vanishing premium" policies for the period from 1980-1997, and whether MetLife complied with the 1994 Stipulation and Consent Order entered by the Insurance Department In the Matter of Metropolitan Life Insurance Company, Docket No. LH 94-51; and,

WHEREAS, the Report of Investigation dated October 14, 1998 found, among other things, that

(i) There was sufficient evidence to charge MetLife with violating the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816(1)(a), (f), and (g) in that MetLife agents engaged in churning in the State of Connecticut prior to 1994 and that MetLife knew or should have known that it was occurring;

(ii) There was sufficient evidence to charge MetLife with violating Conn. Gen. Stat. § 38a-816(1)(a) and (b) regarding misrepresentations in the sale of so-called "vanishing premium" policies in the State of Connecticut by MetLife agents prior to 1994 and that MetLife knew or should have known of such misrepresentations;

(iii) There was insufficient evidence to show that MetLife violated the 1994 Stipulation and Consent Order in Docket No. LH 94-51 entered into between MetLife and the Insurance Department; and

(iv) The Report of Investigation concludes that a proceeding under the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-817 would be in the public interest; and,

WHEREAS, MetLife has fully cooperated with the joint investigation; and,

WHEREAS, in 1994 MetLife adopted and has implemented an enhanced ethics and compliance program; and,

2

WHEREAS, without admitting that its activities violated the laws of the State of Connecticut, and in the interest of fully and finally resolving all issues considered in the Report of Investigation dated October 14, 1998, MetLife agrees to enter into this Stipulation and Consent Order with the State of Connecticut Insurance Department; and,

WHEREAS, the Respondent being desirous of avoiding formal administrative proceedings or future litigation, voluntarily waives:

1.    any right to a hearing;

2.    any requirement that the Insurance Commissioner's decision contain a statement of findings of fact and conclusions of law; and

3.    any and all rights to object to or challenge before the Insurance Commissioner or in any judicial proceeding any aspect, provision, or requirement of the Stipulation and Consent Order;

NOW, THEREFORE, upon the consent of the parties, it is hereby ordered and adjudged:

1.    Remediation — MetLife will fund and carry out the remediation plan described in Attachment A and incorporated herein.

2.    Penalty — In addition to remediation, MetLife shall pay to the State of Connecticut an administrative penalty in the amount of $800,000.00 within thirty days of the date of this Order.

3.    Costs — MetLife shall reimburse the State of Connecticut the costs of the investigation conducted jointly by the Insurance Department and the Attorney General's Office in the amount of $50,000.00.

10/21/98  18:22    SKADDEN ARPS → 1234567                          NO.262  P065

10/20/98  TUE 10:43 FAX 860 808 5592        ATTY GEN OFFICE                    ☒005

4.    Contributions — MetLife agrees to pay to the State of Connecticut for the use of the Insurance Department and the Attorney General's Office the sum of $150,000 as Connecticut law provides for purposes of consumer education.

5.    MetLife agrees that if it enters into a plan of restitution or program of policyholder remediation with any other state, or federal agency or as a result of any court action which provides greater benefits to policyholders than the plan of remediation set out in Attachment A such benefits shall be offered to eligible policyholders in the State of Connecticut.

6.    This Stipulation and Consent Order shall have no effect as to the rights or claims of any individuals except the State of Connecticut Insurance Department and MetLife. This Stipulation and Consent Order shall not affect the ability of the State of Connecticut Insurance Department to investigate acts and practices of any licensed agent of MetLife or to take any appropriate enforcement action against such agent warranted by such investigation.

7.    This Stipulation and Consent Order shall be binding on MetLife, its successors and assignees.

8.    The Insurance Department and MetLife agree that the terms and language of this Stipulation and Consent Order were the result of good faith negotiations between them, and as a result, there shall be no presumption that this Stipulation and Consent Order shall be construed more strictly against any one party.

4

10/21/98  18:22    SKADDEN ARPS → 1234567                              NO.262  P066

10/20/98  TUE 10:44 FAX 860 808 5592      ATTY GEN OFFICE                  ☒006

Consented and agreed to this _____ day of October, 1998.

## METROPOLITAN LIFE INSURANCE COMPANY

BY:    _____
       Lawrence A. Vranka
       Vice President


## STATE OF CONNECTICUT
## INSURANCE DEPARTMENT

Dated at Hartford, Connecticut this _____ day of October, 1998.


       _____
       George M. Reider, Jr.
       Insurance Commissioner

5

10/21/98  18:22     SKADDEN ARPS → 1234567                                        NO.262  P067

10/20/98  TUE 10:44 FAX 860 808 5592          ATTY GEN OFFICE                          ☒007

October 20, 1998

Attachment A

Metropolitan Life Insurance Company's
Plan for Remediation for the State of Connecticut

Metropolitan Life Insurance Company ("MetLife") agrees to implement the follow-
ing remediation plan in the State of Connecticut.

Policyholder Surveys

MetLife will mail surveys to defined groups of its policyholders seeking to identify
individuals who might have purchased life insurance in a replacement transaction or be-
lieving that out-of-pocket premium payments would be required only for a fixed period of
time (so-called "accelerated premium payment arrangement" or "AP"). These mailings
will be sent to certain policyholders who purchased traditional non-term or non-variable
flexible premium life insurance policies (collectively referred to as "life insurance poli-
cies") during the period from January 1, 1988 to June 30, 1994. The surveys will ask
the policyholders to provide information relating to the circumstances under which they
purchased their life insurance policies.

In consultation with the Insurance Department and the Office of the Attorney
General, MetLife has developed a methodology for identifying which of its policyholders
will be mailed surveys. One group of policyholders will consist of persons who are iden-
tified using MetLife's internal computer systems as individuals who may have used val-
ues from an existing MetLife life insurance policy to pay all or part of the premiums on a
life insurance policy issued to them between January 1, 1988 and June 30, 1994. Met-
Life will use its computer systems in an effort to identify policyholders who withdrew val-
ues from an existing life insurance policy within three months prior to or thirteen months
after their purchase of the newly issued life insurance policy. This group will include
many policyholders not involved in replacement transactions but should include those
policyholders who used values from a MetLife life insurance policy to pay all or part of
the premiums on another MetLife life insurance policy, a practice that is lawful and may
be appropriate but which the Company has agreed to review on an individualized basis
through this survey process.

A second group of policyholders who will receive surveys will consist of individu-
als who may have purchased their life insurance policies expecting that their policies
would be eligible for the AP arrangement within a fixed period of time. Such expecta-
tions may be entirely appropriate but the transactions will be reviewed through this

10/21/98  18:22    SKADDEN ARPS → 1234567                              NO.262  P068

10/20/98  TUE 10:44 FAX 860 808 5592        ATTY GEN OFFICE                    ☒008

2

survey to confirm policyholder understanding of these transactions. Utilizing criteria that have been accepted by the Insurance Department and the Office of the Attorney General, MetLife will exclude from the group of survey recipients policyholders who took steps to delay or render impossible their policy's eligibility for the AP arrangement, such as by withdrawing dividends or taking loans on their policy.

MetLife does not propose to send a survey to any policyholder who responded to a previous survey from the Company regarding replacement. All materials sent to policyholders are subject to the prior approval of the Commissioner, and shall clearly indicate that they are being sent pursuant to a settlement agreement between MetLife and the Commissioner.

Forms of Remediation

MetLife will review the responses to the surveys and, where it concludes it is appropriate (subject to the third party monitoring described below), offer the following remediation to its policyholders:

1.   *Replacement Complaints.* For policyholders expressing substantiated replacement complaints in their survey responses (i.e., a purchase made pursuant to false or misleading sales presentations or with insufficient disclosure as to the nature of the transaction), MetLife will offer to restore the policyholders to their original life insurance policy, as if the replacement transaction had never occurred, and will make appropriate adjustments with respect to interest, dividends and premiums. In determining whether a complaint is substantiated, MetLife will use the replacement standards adopted as part of its enhanced ethics and compliance program.

2.   *AP Complaints.* For policyholders who have documentary proof that they would have to pay out-of-pocket premiums only for a fixed period of time, MetLife will offer the benefit of whatever bargain is reflected in the documentary proof. For purposes of this remediation plan, a standard policy illustration will not be considered sufficient documentary proof.

For policyholders who allege in their survey responses that they were told by a MetLife sales representative that they would have to pay out-of-pocket premiums only for a fixed period of time but who lack documentary proof of such a representation and for policyholders whose survey responses consist of a complaint that their life insurance policy is not eligible for the AP arrangement because it has not performed as well as they had expected based on the sales presentation they received from a MetLife sales representative, MetLife will offer a loan to finance any premium payments required during the period from the AP date originally illustrated to the date the policy actually becomes eligible for the AP arrangement. The loan will be made at no net out-of-pocket cost to the policyholder and will not be required to be repaid until the death claim is paid or the policy is surrendered.

3

### Application of Remediation Plan

Policyholder complaints received after the date of this agreement for policies sold between January 1, 1980 and December 31, 1987 or July 1, 1994 and December 31, 1997 that assert substantiated replacement complaints or are AP complaints with documentary proof that the policyholder would have to pay out-of-pocket premiums only for a fixed period of time will be accorded the benefits of the remediation plan. MetLife will not be required to mail surveys to such policyholders.

### No Release or Waiver by Policyholders

MetLife will not ask any policyholder who responds to the survey or who is offered remediation to execute a release or waiver of any legal rights that person might possess as a condition of receiving relief under this program.

### Independent Review of MetLife's Decisions

MetLife agrees to the appointment of a mutually acceptable third party to review MetLife's decisions whether to offer remediation to affected policyholders. The third party will be authorized to report MetLife's remediation decisions to the Insurance Department and to inform it whether the third party concurs or disagrees with each of those decisions and the reasons for any disagreement. MetLife agrees to pay the reasonable costs and expenses of the third party's review. If any cases of disagreement arise between MetLife and the third party, MetLife will be afforded an opportunity to present its findings and conclusions to the Insurance Department.

### No Admissions

Nothing in this remediation plan or in MetLife's implementation of this remediation plan shall be construed as an admission of any kind by MetLife nor shall this remediation plan or MetLife's implementation of this remediation plan be admissible in any legal proceeding, except a legal proceeding by the State of Connecticut to enforce the Stipulation and Consent Order with MetLife.