**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT G. WYCKOFF, | : CIVIL ACTION NO. 00-2248 |
|                 Plaintiff, | : |
| v. | : CHIEF JUDGE AMBROSE |
| METROPOLITAN LIFE INSURANCE COMPANY AND KENNETH F. KACZMAREK, | : |
|                 Defendants. | : |

**DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY'S AND KENNETH KACZMAREK'S BRIEF IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING THE CONNECTICUT MARKET CONDUCT EXAMINATIONS OF METROPOLITAN LIFE INSURANCE COMPANY AND <u>RELATED DOCUMENTS</u>**

**<u>PRELIMINARY STATEMENT</u>**

Defendants Metropolitan Life Insurance Company ("MetLife") and Kenneth Kaczmarek (collectively, "defendants") bring this Brief in Support of Motion in Limine to Exclude Evidence Regarding the Connecticut Market Conduct Report (the "Connecticut Report") and Related Documents. Plaintiff has identified the Connecticut Report as Plaintiff's Proposed Exhibit 34.[1] Plaintiff further listed numerous items on his Exhibit List which relate to the Connecticut Report.[2]

The Connecticut Report should be excluded on three grounds. First, it is irrelevant (Rules 401 and 402). Second, even if relevant -- which it is not -- the Connecticut Report's

---

[1] A copy of the Connecticut Report is attached to the Motion as Exhibit A.

[2] Plaintiff has identified a letter, dated December 19, 1997, from Daniel F. Harrigan, Program Manager, Market Conduct Division, State of Connecticut, to Harry P. Kamen as Exhibit 102. Exhibit No. 102 is attached to the Motion as Exhibit B. Plaintiff has identified the State of Connecticut Insurance Department Stipulation and Consent Order as Exhibit 103. Exhibit No. 103 is attached to the Motion as Exhibit C.

probative value is outweighed by the risk of unfair prejudice (Rule 403). Finally, the Connecticut Report is inadmissible as classic hearsay (Rule 802).

The Connecticut Report is irrelevant. Kenneth Kaczmarek, the sales representative in this case, is not mentioned in the Connecticut Report and did not participate in the investigations upon which the Connecticut Report is based, and thus had no opportunity to respond. Similarly, neither Plaintiff nor Plaintiff's policy is mentioned in the Connecticut Report or the related documents.

The Connecticut Report is not only irrelevant, but also inadmissible hearsay. The Connecticut Report is based on "hundreds of pages of testimony" from numerous unnamed policyholders and MetLife employees. See Ex. A at 1. The Connecticut Report even published lengthy quotes of unnamed policyholders. See Ex. A at 19 – 21. In order for evidence regarding the Connecticut Report to be admitted into evidence, Plaintiff must satisfy his burden of showing that the Connecticut Report fits within an exception to the hearsay rule. Plaintiff cannot meet that burden. The Connecticut Report is a product of one-sided investigations conducted without the safeguards of the adversarial process and thus lack the trustworthiness required to come within the official records exception to the hearsay rule. Furthermore, any probative value the Connecticut Report could have is outweighed by the overwhelming prejudicial impact on MetLife.

Plaintiff may try improperly to use the Connecticut Report as evidence of a trait or habit, though it is inadmissible for lack of relevance. The Connecticut Report was explicitly limited to life insurance sales practices in the Commonwealth of Connecticut. See Ex. A at 4. Mr. Kaczmarek is not mentioned in the Connecticut Report, namely because he has never conducted any business in Connecticut. In addition, neither Plaintiff nor Plaintiff's policy was referenced in the Connecticut Report. The Connecticut Report was issued "as a result of a joint investigation

by the Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department." Id. The Connecticut Report contains numerous "findings" regarding issues that have nothing to do with the issues presented in this case. For example, the Connecticut Report addresses whether MetLife violated the 1994 Stipulation and Consent Order entered into by MetLife and the Connecticut Insurance Department,[3] whether MetLife's current compliance systems are sufficient to prevent churning and misrepresentation in the sale of life insurance, and MetLife's purported failure to report regulatory violations by MetLife sales representatives. Id. at 8-9. Plaintiff has not alleged any claims of churning. The findings on those issues are not relevant to this case.

Allowing evidence of these entirely irrelevant findings in the Connecticut Report will serve only to confuse and prejudice the jury. Further, while the Connecticut Report found that there was sufficient evidence to charge MetLife with violations of Connecticut statutes regarding its sales of "vanishing premium," Plaintiff here is not bringing an action involving MetLife's purported violation of Connecticut statutes. Thus, any findings that MetLife violated such statutes are completely irrelevant.

Furthermore, the transactions at issue took place in Pennsylvania. The Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department have no jurisdiction to "investigate" transactions in Pennsylvania, nor did they do so. Accordingly, the Connecticut Report is entirely irrelevant to this case. Based on the information and arguments set forth above, any evidence regarding the Connecticut Report and the underlying investigations should be excluded.

---

[3] This Consent Order involved only allegations regarding misrepresentations that whole life insurance policies were sold as retirement or savings plans in violation of Conn. Gen. Stat. § 38a-815. See Ex. A at 6 and Exhibit A to same.

Furthermore, MetLife was not afforded the due process in the Connecticut Report proceedings to which it is entitled in this Court proceeding. See 40 Pa. P.S. §323.4 (setting forth the procedures applicable to insurance department examinations). Specifically, MetLife was denied: (1) the benefit of a hearing before an impartial trier of fact, (2) the protections of appropriate evidentiary rules, and (3) the opportunity to take sworn testimony subject to cross-examination. There was no regard for evidentiary rules.

## BACKGROUND

### I.    THE TRANSACTION AT ISSUE

Plaintiff makes "vanishing premium" claims with respect to two whole life policies purchased in 1991 and 1994. Specifically, Plaintiff claims that, in 1991, former MetLife sales representative Norman Molchan (deceased) misrepresented that Plaintiff could purchase a $10,000 Whole Life policy by paying out-of-pocket premiums for only fourteen years. Additionally, Plaintiff asserts that an illustration was used indicating that, in year 2011, the 1991 Policy would have a cash value of $7,746.00 and a death benefit of $12,112.00. On June 27, 1991, MetLife issued Policy No. 915 409 338 M ("1991 Policy") to Plaintiff as owner and insured. Initially, the 1991 Policy was sold with a monthly premium of $59.40 based on Plaintiff's classification as a non-smoker. However, a medical exam revealed nicotine in Plaintiff's urine and he was reclassified as a smoker. Thus, the 1991 Policy was issued with a higher monthly premium of $73.20. Plaintiff avers that he did not contest the higher premium. Nevertheless, he contends that, "by paying the additional amount of premium," he still would only have to pay out-of-pocket premiums for fourteen years.

Plaintiff admits that he contacted MetLife in 1994 because he was interested in exercising his conversion rights under an employer-provided group life insurance plan. On August 2, 1994, MetLife issued $4,500 Whole Life Policy No. 945 600 948 M ("1994 Policy") to Plaintiff as

4

owner and insured.  The 1994 Policy was converted partially from plaintiff's group term Policy No. G-16200G after he retired from U.S. Steel.  The monthly premium for the 1994 Policy was $34.23 payable for thirty-two years.  In the Complaint, Plaintiff alleges that former MetLife sales representative Kenneth Kaczmarek misrepresented that Plaintiff would have to pay monthly premiums on the 1994 Policy for only ten years, with no subsequent payments thereafter.  Plaintiff further alleges that Mr. Kaczmarek did not did not disclose that the 1994 Policy was, in fact, a whole life policy with payments payable for Plaintiff's death.  However, Plaintiff also concedes in the Complaint that the group term policy "could only be converted to a whole life policy."  Furthermore, Plaintiff signed a Receipt stating that he had received a "Life Insurance Buyer's Guide" from MetLife and a State of Pennsylvania Disclosure Statement indicating that he understood he had purchased a $4,500 whole life policy with annual premiums of $410.76 payable for thirty years.

## II.     THE CONNECTICUT REPORT

The Connecticut Report was issued on October 14, 1995 "as a result of a joint investigation by the Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department."  Ex. A at 4.  The Connecticut Report addresses issues such as whether MetLife violated the 1994 Stipulation and Consent Order, entered into by MetLife and the Connecticut Insurance Department in response to the Florida Market Conduct Report, whether MetLife's current compliance systems are sufficient to prevent churning and misrepresentation in the sale of life insurance, and MetLife's purported failure to report regulatory violations by MetLife sales representatives.  This Consent Order involved only allegations regarding misrepresentations that whole life insurance policies were sold as retirement or savings plans in violation of Conn. Gen. Stat. § 38a-815.  See Ex. A at 6 and

Exhibit A to same. Moreover, the Connecticut Report was explicitly limited to life insurance sales practices in the Commonwealth of Connecticut. <u>See</u> Ex. A at 4.

**ARGUMENT**

**I.  THE INTRODUCTION OF THE CONNECTICUT REPORT IS IRRELEVANT, HIGHLY PREJUDICIAL, AND BEYOND THE SCOPE OF THE TRANSACTIONS AT ISSUE.**

    **a. The Connecticut Report Should Be Excluded Because It Is Irrelevant and Has No "Nexus" to Plaintiff's Allegations.**

Plaintiff should not be permitted to alter the scope of this case with irrelevant documents and testimony. Federal Rule of Evidence 401 defines "relevant evidence" as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Nothing in the Connecticut Report has any bearing on establishing what occurred regarding Plaintiff's purchase of the policies at issue. Neither Plaintiff nor Plaintiff's policies is mentioned in the Connecticut Report. In addition, the sales representative, Mr. Kaczmarek, is not mentioned in the Connecticut Report. The Connecticut Report focuses on the Torrington, Connecticut MetLife office, which Mr. Kaczmarek never worked at.

The Connecticut Report addresses issues such as whether MetLife violated the 1994 Stipulation and Consent Order entered into by MetLife and the Connecticut Insurance Department, whether MetLife's current compliance systems are sufficient to prevent churning and misrepresentation in the sale of life insurance, and MetLife's purported failure to report regulatory violations by MetLife sales representatives.[4] This Consent Order involved only

---

[4] In the instance that the Connecticut Report is not found to be irrelevant – which it is – and portions of the Connecticut Report are admitted into evidence, the portions of the Connecticut Report that refer to MetLife's compliance should be admitted. The Stipulation and Consent Order obligated MetLife to adopt an enhanced compliance program to prevent abusive sales practices. The Connecticut Report found that MetLife's "Enhanced

6

allegations regarding misrepresentations that whole life insurance policies were sold as retirement or savings plans in violation of Conn. Gen. Stat. § 38a-815.  See Ex. A at 6 and Exhibit A to same.  Plaintiff has not made any such allegations.

Furthermore, the transaction at issue took place in Pennsylvania.  The Connecticut Attorney General and the Market Conduct Division of the Connecticut Insurance Department have no jurisdiction to "investigate" transactions in Pennsylvania, nor did they do so.  The Connecticut Report focuses on determining whether MetLife violated the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38(a)-815, a statute which does not apply to sales that occur in Pennsylvania, such as the transactions at issue in this case.  Accordingly, the Connecticut Report is entirely irrelevant to this case.

To the extent that Plaintiff asserts that the Connecticut Report is evidence of a trait or habit, such evidence is inadmissible under Federal Rule of Evidence 406 if that trait or habit is not relevant to the claims or defenses at issue.  See Petrokehagias v. Sky Climber, Inc., 2000 WL 1469334 (E.D. Pa. 2000).  As previously noted, the purported sales practices at issue in the Connecticut Report are unrelated to the sale to Plaintiff, and therefore, cannot constitute admissible evidence of a trait or habit.

### b. The Connecticut Report Should Be Excluded Because It Is Highly Prejudicial to MetLife.

Even if this Court were to determine that the Connecticut Report has relevant information to offer at trial -- which it does not -- pursuant to Federal Rule of Evidence 403, relevant evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice,

---

Ethics and Compliance Program," which was discussed at length in the Connecticut Report, has been effective in reducing abuses.  As such, if evidence of the Stipulation and Consent Order is admitted, the Court should necessarily also admit evidence of MetLife's compliance.  Failure to do so would unduly prejudice MetLife.

7

confusion of the issues, or misleading the jury." Fed. R. Evid. 403; see also Ex. D, Drummond v. Alia – The Royal Jordanian Airline Corp., 11 Fed. R. Evid. Serv. 1904, 1912-1913 (W.D. Pa. 1982) (noting that Rule 403 "vests the court with discretion to exclude relevant evidence if its probative value is outweighed by the danger of unfair prejudice" and holding that the accident Connecticut Report at issue should be excluded because it "contain[ed] conclusions as to the cause of the accident [and thus] . . . creat[ed] the potential for the jury to be unduly prejudiced by the Connecticut Report and to adopt the conclusion of another tribunal as its own rather than making an independent determination based on the facts as presented").

The Connecticut Report discusses matters that are of no relevance to Plaintiff's claims and are highly prejudicial to MetLife. The investigation was conducted with the purpose of determining whether MetLife violated a Connecticut statute which does not apply in the instant matter. In addition, the stamp of governmental authority for the Connecticut Reports, whether appropriate or not, would most likely unfairly sway the jurors, improperly inviting them to determine the facts of this case based on allegations that have never been proved by any sort of hearing. Admission of the Connecticut Report would serve only to distract the jurors from the task at hand -- deciding whether or not Plaintiff was defrauded and if so, whether the alleged fraud caused Plaintiff any damages. The potential for distraction is particularly significant given that any similarity of the allegations in this case to the allegations address in the Connecticut Report is minimal at best.

Accordingly, based on the foregoing arguments, the Connecticut Report, and any information regarding the Connecticut Report, should be excluded.

## II. THE CONNECTICUT REPORT CONSTITUTES INADMISSIBLE HEARSAY.

The Connecticut Report is classic hearsay. The Connecticut Report is based on "hundreds of pages of testimony" of unnamed policyholders and MetLife employees. See Ex. A

8

at 1. The Connecticut Report even contains lengthy quotes from unnamed policyholders.[5] See Ex. A at 19-21. MetLife has no opportunity to examine the anonymous witnesses whose testimony Plaintiff is attempting to transmit, word for word, into the courtroom through the Connecticut Report. In order for evidence regarding the Connecticut Reports to be admitted into evidence, Plaintiff must satisfy the burden of showing that the Connecticut Report fits within an exception to the hearsay rule. Plaintiff simply cannot meet that burden.

Plaintiff may claim that the Connecticut Report falls within the "official records" exception to the general hearsay rule. Federal Rule of Evidence 803(8)(c) provides that public records are, under certain circumstances, admissible as an exception to the general hearsay rules "unless [their] sources of information or other circumstances indicate lack of trustworthiness." Fed R. Evid. 803(8)(c) (emphasis added); see also Swietlowich v. Bucks County, 610 F.2d 1157, 1165 (3d Cir. 1979). Because the Connecticut Report fails to satisfy the requirement of trustworthiness, it constitutes inadmissible hearsay and should be excluded from evidence.

The Advisory Committee Notes to Rule 803(8) set forth four key indicia of trustworthiness: (1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when Connecticut Reports are prepared with a view to possible litigation. Fed. R. Evid. 803(8), Advisory Committee Notes. The Supreme Court in Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 168 n.11 (1988), noted that "[t]his trustworthiness inquiry . . . was the [Advisory] Committee's primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements in the Connecticut Report. Thus, a trial judge has the discretion, and indeed the obligation, to exclude

---

[5] Assuming the Connecticut Report is not found to be hearsay -- which it is -- the quotes of unnamed policyholders should be excluded under F.R.E. 805, requiring each layer of hearsay to fit within an exception to the hearsay rule

an entire part or portions thereof . . . that he determines to be untrustworthy. Moreover, safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative Connecticut Reports or portions of them." Id. at 167-68.

Two of these key indicia -- whether a hearing was held and possible motivational problems such as bias -- are clearly implicated in this case and compel the exclusion of the Connecticut Report and any other evidence or testimony regarding the Connecticut Report. First, no hearings were ever held on the purported "findings" in the Connecticut Report. Thus, the Connecticut Report's broad "conclusions" are without specific factual support and are based on nothing more than bare allegations and unsworn statements by policyholders reported second-hand by the examiners. Because the actual claims of specific individual policyholders were never subjected to the scrutiny of adversarial proceeding, the Connecticut Report lacks the requisite level of trustworthiness needed to be admissible. See, Ex. D, Drummond, 11 Fed. R. Evid. Serv. at 1908-10 (finding that an accident report prepared by the government of Qatar concerning an airline crash was untrustworthy because, among other reasons, "one can conclude that since there was no hearing conducted, there were very few procedural safeguards to protect against the inclusion of hearsay and irrelevant evidence. It is very possible that a large amount of hearsay and irrelevant evidence was included in the Connecticut Report. This results in hearsay within hearsay and the admission of other inadmissible evidence, which serve to undercut the trustworthiness of the Connecticut Report"); Denny v. Hutchinson Sales Corp., 649 F.2d 816, 822 (10th Cir. 1981) (affirming exclusion of government report based on its

---

before being admissible. Plaintiff can not satisfy the burden of showing that the quotes fit into an exception to the hearsay rule.

"untrustworthiness" where Connecticut Report's findings resulted from an ex parte investigation with no formal procedures and no opportunity to cross-examine witnesses); Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 303 (11th Cir. 1989) (citing cases in support of the "fact that no hearing was held in making [a] Connecticut Report affects its trustworthiness"). The findings in the Connecticut Report are based almost entirely on the hearsay statements of third parties and on a review of MetLife documents relating to insurance policies sold in Connecticut that have nothing to do with Plaintiff. The Connecticut Report is not based on any transactions or purported sales practices actually observed by the examiners.

The Connecticut Report contains numerous opinions expressed by the Connecticut Attorney General and the Market Conduct Division of the Connecticut Insurance Department on various aspects of MetLife's operations. See Ex. A at 40-42 (relating "Findings" of the Connecticut Report). The Connecticut Report concludes that MetLife has violated the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38(a)-815. See Ex. A at 2. MetLife, however, will have no opportunity to cross-examine the authors of these opinions. Accordingly, the Connecticut Report, and evidence regarding the Connecticut Report, should be excluded from the trial. See Wilson v. Attaway, 757 F.2d 1227, 1245 (11th Cir.1985) (the Connecticut Report excluded because, among other reasons, it failed to afford possibility of cross-examination); Hines, 886 F.2d at 303-304 (inability to cross-examine investigator who prepared the report is "a proper factor to take into consideration when deciding trustworthiness" of the report) (citations omitted).

The Connecticut Report is also rife with hearsay statements regarding interviews with unnamed policyholders. Hearsay statements of third parties do not become admissible simply because they appear in an official record. All such hearsay within hearsay is plainly inadmissible.

11

Because the Connecticut Report fails to satisfy the requisite indicia of trustworthiness, contains unauthorized expressions of opinions, and is rife with double hearsay, it fails to meet the hearsay exception for admissibility as a government Connecticut Report and, therefore, must be excluded from evidence.

Plaintiff may also erroneously contend that the Connecticut Report is admissible under Federal Rule of Civil Procedure 406 to show MetLife's routine practice. To the contrary, federal courts, including this Court, interpreting Rule 406 consistently hold that for evidence to be admitted as a corporation's routine practice, the conduct in question must be a "regular response to a specific situation."[6] <u>Becker v. ARCO Chem. Co.</u>, 207 F.3d 176, 204 (3d Cir. 2000) (holding that evidence that a business had a tendency to use pretenses when firing employees was not admissible as habit evidence under Rule 406, because it was not the sort of <u>semi-automatic, situation-specific evidence</u> that the rule admits); <u>Mobil Exploration and Producing U.S., Inc. v. Cajun Const. Services, Inc.</u>, 45 F.3d 96 (5th Cir. 1995) (To admit evidence as routine practice, there must be a sufficient pattern of conduct so that it is considered a uniform and regular response to a repeated situation); <u>McCarrick v. New York City Off-Track Betting Corp.</u>, No. 91 Civ. 5626, 1995 WL 261516, at *5 (S.D.N.Y. May 3, 1995) ("[i]n order to be admissible under [Rule 406] . . . the conduct at issue must constitute a 'regular response to a repeated specific situation.'") (quoting <u>Thompson v. Boggs</u>, 33 F.3d 847, 854 (7th Cir.1994)).

Moreover, Plaintiff's potential contention that the Federal Rule of Evidence 404(b) permits this type of evidence to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" is likewise without merit. To show that improper

---

[6] Moreover, it cannot be that the Report, concerning an insignificant number of transactions when compared with company wide sales practices, could be used to show routine.

bad acts evidence is admissible to show intent, this Court has held that "'the proponent must clearly articulate how that evidence fits into a chain of logical inferences, <u>no link of which may be the inference that the defendant has the propensity to commit the crime charged.</u>'" <u>Becker</u>, 207 F.3d at 191 (3d Cir. 2000) (quoting <u>United States v. Morley</u>, 199 F.3d 129, 133 (3d Cir. 1999)) (emphasis added).  In <u>Becker</u>, the plaintiff initiated an action against his former employer under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act, contending that his former employer discriminated against him on the basis of his age by terminating his employment.  <u>Id.</u> at 179.  The plaintiff sought to introduce evidence of his former employer's "manner" in which it had terminated another employee.  <u>Id.</u>  This Court ruled that such evidence is only admissible if the proponent can articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged.  Applying this test, the Court held that the evidence in question failed the test because the evidence of the employer's manner of terminating another of its employees was not relevant on the issue of whether it discriminated against the plaintiff <u>absent</u> the inference that the employer had a propensity to act in a certain way and that it acted in conformity with this prior conduct when it terminated the plaintiff.

Similarly, Plaintiff cannot articulate how the Connecticut Report fits into a chain of logical inferences pointing towards MetLife's purported intent without involving the inference that because MetLife allegedly acted a certain way in the past, it acted that way during sale of Plaintiff's policies.  Thus, the Connecticut Report is inadmissible to establish MetLife's alleged intent.

Also at issue in <u>Becker</u> was whether the evidence regarding the employer's manner of terminating another employee was admissible as evidence of a common plan or scheme.  This Court stated that in order to admit Rule 404(b) evidence as reflecting a plan or scheme, the

crimes must be part of a common or continuing scheme; the plan must encompass or include both crimes; and the crimes must be connected, mutually dependent and interlocking. Moreover, both crimes must be steps toward the accomplishment of the same final goal. Additionally, the Court noted that to be admissible under Rule 404(b), it is insufficient to show that each crime was "planned" in the same way. Instead, there must be an overall scheme of which each of the crimes is but a part. Id. at 197 (citation omitted).

The Court found in Becker that the evidence at issue was not admissible as proof of the defendants' plan based on these principles as there was no evidence presented that the two terminations were connected, mutually dependent or part of any larger goal of the former employer. See also J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259 (3d Cir. 1994) (In order for prior bad act evidence to be admissible to establish a common plan, plaintiffs must show that the acts "are part of a single series of events'") (quoting Government of the Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992)).[7] Here, Plaintiff has failed to show that the alleged acts of MetLife contained in the Connecticut Reports are part of a single series of events.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court exclude the Connecticut Market Conduct Report and any evidence regarding the Report from use at trial.

---

[7] In J & R Ice Cream, the plaintiff claimed that a franchisor had made misrepresentations concerning its expertise in site selection and the amount of maintenance charges applicable to the site selected for the plaintiff's franchise. The plaintiff introduced evidence that the franchisor made misrepresentations to other prospective franchisees concerning the amount of revenue a typical franchise could produce. The Third Circuit held that the introduction of that evidence was improper under Rule 404(b) because "the jury could have used the highly prejudicial, indeed almost inflammatory evidence to conclude that [the defendant] used misrepresentations in multiple aspects of its sales efforts." 31 F.3d at 1269.

                        Respectfully Submitted,

                        <u>s/ B. John Pendleton, Jr.</u>
                        B. John Pendleton, Jr.
                        McCARTER & ENGLISH, LLP
                        Four Gateway Center
                        100 Mulberry Street
                        Newark, NJ 07102
                        (973) 622-4444

                        Attorneys for Defendants
                        Metropolitan Life Insurance Company
                        and Kenneth Kaczmarek

Dated: October 3, 2006

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was served via electronic case filing system, on this 3rd day of October 2006 on the following counsel of record:

>Kenneth R. Behrend, Esq.
>Behrend and Ernsberger, P.C.
>Union National Bank Building
>306 Fourth Avenue, Suite 300
>Pittsburgh, PA  15222

    __s/ B. John Pendleton, Jr._____