

1

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

-----------------------------X

EDWARD W. IHNAT,                          CIVIL DIVISION

        Plaintiff,                        GD 94-17465

    v.

JOHN A. POVER, MARK
BATTALINE, WILLIAM J.                     COPY
BYTZURA, and METROPOLITAN
LIFE INSURANCE COMPANY,

        Defendants.

-----------------------------X

        9:35 a.m.
        Thursday, September 26, 2002

        300 Park Avenue
        New York, New York

DEPOSITION UPON ORAL EXAMINATION of

WILHELMENIA J. TAYLOR, Corporate Designee, taken

by PLAINTIFF, before ALBERT M. CITTONE, a

Certified Court Reporter and Notary Public of the

State of New York.

**CITTONE REPORTERS**
Certified Shorthand Reporters
Two Penn Plaza, Suite 1500
New York, New York 10120
(212)286-9222

2

1

2   A p p e a r a n c e s :

3            BEHREND & ERNSBERGER, PC
             Attorneys for Plaintiff
4                 Union Bank Building
                  306 Fourth Avenue, Third Floor
5                 Pittsburgh, Pa.  15222
             By:  MARK A. BARTHOLOMAEI, ESQ.
6                 412.391.2515

7            LEWIS & SARGENT LLC
             Attorneys for Defendant Gary Antonino
8                 Two Gateway Center, 18th Floor
                  Pittsburgh, Pa.  15222
9            By:  WILLIAM J. LABOVITZ, ESQ.
                  412.281.2490

10

11           MC CARTER & ENGLISH
             Attorneys for Defendants Taylor and
             Metropolitan Life Insurance Company
12                Four Gateway Center
                  100 Mulberry Street
13                Newark, New Jersey
             By:  PENELOPE M. TAYLOR, ESQ.
14                973.639.7947

15           ROBERT F. NOSTRAMO, ESQ.
             Attorney for MetLife
16                One Madison Avenue
                  New York, New York   10010-3690

17
     ALSO PRESENT VIA TELEPHONE:
18
             PINDALL & BELLO
19           Attorneys for Joel Shermann, George Weber,
             Steven Dervais
20                Three Gateway Center, 15 West
                  Pittsburgh, Pa.  15222
21           By:  MELISSA BARRETT, ESQ.

22           WAYMAN IRVIN & MC CAULEY
             Attorneys for Defendant Frank Carleni and
23           Ron Schrem
             By:  DAVID PARDINI, ESQ.
24

25

3

1

2          WILHELMENIA J. TAYLOR, residing at

3          505 Quincy Street, Brooklyn, New York

4          11221, sworn.

5

6    DIRECT EXAMINATION BY BARTHOLOMAEI:

7          Q    Good morning, Ms. Taylor.

8          A    Good morning.

9          MR. BARTHOLOMAEI:  As I mentioned,

10   I'll mention it for the record, I'm sick

11   today, worse than yesterday.  This is

12   pretty much the extent of the volume of my

13   voice.  I am going to try and go as long as

14   I can today.  I also want to make a

15   suggestion, whoever from defense counsel

16   has questions maybe can go first if they

17   want to.  Maybe I'll feel better over the

18   course of the hour taking some medication,

19   I don't know.  I can't see myself going the

20   whole duration of the deposition.  I really

21   don't feel well at all.  As far as talking,

22   it's been a limiting thing as well.  That's

23   pretty much all I have to say.

24          I will go and try to do as much as I

25   can and I guess we'll see what happens at

4

WILHELMENIA J. TAYLOR

1
2     that point.  If anybody, anybody in
3     Pittsburgh or here wants to go first with
4     their questions.
5         MR. NOSTRAMO:  Get started and go as
6     far as you can.
7         MR. LABOVITZ:  Please begin.
8     Q    Ms. Taylor, I went through some of
9     your background information yesterday, I'm not
10    going to cover that again today.
11        I wanted to ask you again if you
12    agree to testify on behalf of Metropolitan Life as
13    to its position regarding the Accelerated Payment
14    Plan, pursuant to Pennsylvania Rule 407.1E,
15    regarding corporate designees?
16    A    Yes.
17    Q    Ms. Taylor, could you define the term
18    Accelerated Payment Plan?
19        MS. TAYLOR:  Objection as to form.
20        MR. LABOVITZ:  Join.
21    A    The Accelerated Payment Arrangement
22    is an option, optional way of customers paying
23    premiums versus paying them out-of-pocket.  The
24    customer is using dividends to pay their premiums.
25    Q    What I just asked you about,

CITTONE REPORTERS
(212)286-9222

5

1                    WILHELMENIA J. TAYLOR

2    Accelerated Payment Plan, you used the term

3    Accelerated Payment Arrangement.   What is the

4    difference between Accelerated Payment Plan and

5    Accelerated Payment Arrangement?

6         A     In the mid '80s, the word "plan" was

7    used with the Accelerated Payment Arrangement.

8    Later on we began to use the term "Accelerated

9    Payment Arrangement" because it was felt it was

10   more descriptive.  It's not a plan.  It's a

11   payment arrangement that the customers like.

12        Q     Can you tell me again when that

13   change took place, it begun to be called the

14   Accelerated Payment Arrangement as opposed to

15   Accelerated Payment Plan?

16             MS. TAYLOR:  Objection as to form.

17        A     I don't remember exactly the date.  I

18   know there is documents that speak to the use of

19   the term "Accelerated Payment Arrangement".  I

20   believe it might have been in the '90s.

21        Q     In the minutes already?

22        A     Yes?

23        (OFF THE RECORD) (ON THE RECORD.)

24        Q     Who was involved in the decision to

25   use the term "Arrangement" as opposed to plan?

6

WILHELMENIA J. TAYLOR

1

2       A       From what I can recall, there was a

3   team of individuals who were working on

4   mechanizing the Accelerated Payment Arrangement

5   and it was decided as part of that team that we

6   would use the word "Accelerated Payment

7   Arrangement", the team decided.

8       Q       Can you tell me the names of

9   individuals that were part of that team?

10      A       It would probably be best if I could

11  look at a document.  I can tell you names.  Bill

12  Barnewold, myself, Jackie Thoresz.  A lot of other

13  people that I can't think of the names right now.

14  There is documents that speak about this team and

15  has the names of the members.

16      Q       What was the team called?

17      A       That particular team, I think we had

18  a name.  Something like Natural Work Team; Natural

19  AP Work Team.

20      Q       What was the reason for the creation

21  of the team?

22      A       From what I can recall, the team was

23  created to more mechanize the AP eligibility

24  process, how the bills would look when the

25  customers got their bills or anniversary

7

1          WILHELMENIA J. TAYLOR

2    statements, what kinds of letters would be sent to

3    customers when they requested AP eligibility.  It

4    was more like an administrative process to the AP

5    eligibility, to mechanize that administrative

6    process.  Billing, customer statements.

7          Q    Who was it that decided that this

8    team would be created at that time?

9          A    I'm not exactly sure who decided that

10   the team should be created.  I know there are

11   documents that talk about we should get together

12   and different units in the company should get

13   together, head office, people that were in

14   communications should get together and work

15   together as a team rather than each individually

16   doing separate jobs at the same time, but I'm not

17   exactly sure who said we should have a team.  I

18   think there is a document in the document list

19   that talks about when the team was established.

20         Q    Is that something you reviewed for

21   the deposition today?

22         A    Yeah, I remember looking at that.

23         Q    Do you know what document that was?

24         A    No.  I would know it when I saw it.

25   I don't know what number it had on it.

8

WILHELMENIA J. TAYLOR

1

2      Q      When did the Accelerated Payment Plan

3    first come to be at Metropolitan Life?

4      A      My recollection is that was about

5    1980.

6      Q      Why did Metropolitan Life start using

7    or offering the Accelerated Payment Plan?

8            MS. TAYLOR:  I just want to make an

9    outstanding objection, in that I think Ms.

10   Taylor said she would use the term

11   "Accelerated Payment Arrangement".  I don't

12   want to interrupt you and object to form as

13   to every question.  Go ahead.

14           MR. LABOVITZ:  I join in that.

15           MR. BARTHOLOMAEI:  I think Ms. Taylor

16   said up until the point sometime in the

17   '80s they used the term "Accelerated

18   Payment Plan".  I think when it was first

19   started it was also called the Accelerated

20   Payment Plan.  In other documents,

21   Arrangement as well.  That's what it was at

22   the time.

23           MS. TAYLOR:  I think both terms were

24   used if you look at documents.  What

25   happens, on the team they decided, let's

9

WILHELMENIA J. TAYLOR

1

2     all use one term.  I do think arrangement

3     was also, it's not as if it was one word

4     and then suddenly it was changed.

5          Anyway, let's just move on.

6          MS. TAYLOR:  I agree.

7          Q     I was asking you about when the

8     Accelerated Payment Plan or Arrangement was first

9     being used at Metropolitan Life and why they

10    offered that Accelerated Payment Plan?

11         A     All though I wasn't involved with the

12    Accelerated Payment Arrangement or Plan when it

13    was initially introduced, I believe that it was

14    just another option to pay premiums that was

15    offered to customers.  It was just another option

16    to paying premiums out-of-pocket.

17         Q     Did you say an option that would give

18    them a chance, instead of paying premiums

19    out-of-pocket?

20         A     They could continue to pay premiums

21    out-of-pocket or choose the Accelerated Payment

22    Arrangement if and when they become eligible for

23    it.

24         Q     What does that mean, become eligible

25    for it?

10

WILHELMENIA J. TAYLOR

1

2    A    The Accelerated Payment Arrangement

3  was paid on the use of dividends and because

4  dividends weren't guaranteed, customers may or may

5  not have been eligible to participate in the plan

6  based on the dividends in their policy.

7    Q    How did one become eligible?  Is that

8  something you could define?

9    A    How did one become eligible?  The

10  policy become eligible to participate in the plan

11  based on the dividends that were credited in the

12  plan over time.

13    Q    Was there some type of mathematical

14  formula or a certain point that defined when the

15  policy become eligible with participation in the

16  plan?

17    A    I'm not sure about a mathematical

18  formula, but when a policy was, when someone

19  requested AP eligibility, a test was done to

20  determine if there was enough dividends in the

21  policy and based on the current year's dividend

22  scale would that policy be eligible to participate

23  in it in the AP Arrangement.  I don't know about

24  the calculations behind that test.

25    Q    Is there a certain percentage or a

11

WILHELMENIA J. TAYLOR

1

2  certain number of dividends that were required to

3  be in the policy to make it eligible for the

4  Accelerated Payment Plan?

5          MS. TAYLOR:  What period of time are

6      you talking about?

7          MR. BARTHOLOMAEI:  Starting out when

8      the plan was first started.

9      A      I'm not sure what you mean by a

10  certain number of dividends.

11      Q      Well, you said a test was done to see

12  if there was sufficient dividends in the policy to

13  make it eligible for the Accelerated Payment Plan,

14  Arrangement. I'm asking if there was a certain

15  percentage or certain amount that was tested for?

16  For example, I don't know what the example would

17  be. Does that make anymore sense to you?

18      A      We're talking about dollars, dollar

19  amounts.

20      Q      I understand that. Was there a

21  certain dollar amount the dividends would have to

22  reach in order to qualify for the Accelerated

23  Payment Plan?

24      A      The test was based on each individual

25  policy because customers may have done things in

12

WILHELMENIA J. TAYLOR

1
2    the past, you know, taken dividends in cash,
3    withdrew dividends from their policy.  The test
4    was based on is there enough accumulated dividends
5    in their policy plus based on the current dividend
6    scale, would there be enough dividends using those
7    two factors to pay the premiums through the life
8    of the contract.  That was the test.

9        Q      Who performed that test or which
10   department of Metropolitan Life performed that
11   test?
12              MS. TAYLOR:  What time period?
13       Q      Starting with the Accelerated Payment
14   Plan?
15       A      The test was performed at one of
16   Metropolitan Life's administrative offices, a rep
17   could call and ask was the policy eligible.  The
18   reps were also provided with some software that
19   they could key-in information about the policy and
20   determine if the policy was eligible, if there was
21   enough dividends in the policy, would it be
22   eligible.
23              MS. TAYLOR:  Are you talking about a
24       later time period at that point?
25              THE WITNESS:  Both the head offices

13

1          WILHELMENIA J. TAYLOR

2       and the representatives were provided with

3       the software.

4          A    So if a customer called directly to

5    one of our service centers or the customer called

6    the representative, they both were provided with

7    the software, my recollection.

8          Q    Is that the case throughout the life

9    of the Accelerated Payment Plan or Arrangement or

10   did that change at some point?

11         MS. TAYLOR:   Are you saying was that

12         in effect from its introduction in 1980

13         through --

14         A    The test.

15         MS. TAYLOR:   The ability to determine

16         eligibility, that branch in the Home

17         Office, was that always the case?

18         A    As far as eligibility is concerned?

19         Q    Right?

20         A    Both the head offices.

21         Q    Can you state that again?   I'll

22   restate the question.

23         I was asking if that was the case

24   throughout the life of the Accelerated Payment

25   Plan or Arrangement as to who could determine,

14

1                    WILHELMENIA J. TAYLOR

2    perform the test for eligibility?

3         A    It's my recollection that both the

4    sales representatives and the service centers were

5    able to perform the test when the eligibility

6    software became available.  I don't recall if

7    someone came in prior to that software being

8    available, how they would determine eligibility.

9    Probably a manual process at the head offices.

10        Q    When did the software became

11   available?

12        A    I believe sometime in 1988, early

13   '88.

14        Q    Who was it that designed that

15   software?

16        A    I think it was our actuarial

17   department.

18        Q    Can you give me the names of any

19   people that were involved with that?

20        A    I believe Mike Levine was involved in

21   creating the software.

22        Q    Anybody else?

23        A    That's the only name I can remember.

24        Q    Have you heard the term "vanishing

25   premium"?

15

WILHELMENIA J. TAYLOR

1

2          A     Yes.

3          Q     What's the difference between

4    vanishing premium and the Accelerated Payment

5    Plan?

6               MS. TAYLOR:  Objection as to form.

7               MR. LABOVITZ:  Join.

8          A     I think --

9          Q     Is there a difference?

10         A     I think the word "vanishing premium"

11   is more of an industry term or using dividends in

12   the way I described the Accelerated Payment works.

13   The insurance industry used that term more to

14   describe that process.

15         Q     Was that a term used at Metropolitan

16   Life?

17         A     I think I've seen, it was used in

18   internal memorandums, but basically we used the

19   term "Accelerated Payment Arrangement" when we

20   spoke to our customers and reps mostly.  That term

21   was used somewhat.

22         Q     When you are referring to internal

23   memorandums, what does that mean?

24         A     Memorandums between me and another

25   staff member, between one Metropolitan Life person

16

1          WILHELMENIA J. TAYLOR

2    and another Life person.   Memorandums to a

3    customer.

4          Q       What would be the reason to use the

5    term "vanishing premium" as opposed to Accelerated

6    Payment Plan or Arrangement?

7          A       We may use the term to say the

8    Accelerated Payment Arrangement, also known in the

9    industry as vanishing premium.   Something like

10   that.

11         Q       Was the term "vanishing premium" used

12   at Metropolitan Life to describe any of its

13   products?

14         A       Not that I can recall.   It could be

15   in memorandums.   I didn't readily use it to

16   describe a product.

17         Q       Can you give me a definition of a

18   vanishing premium?

19         A       As I said before.   I believe the

20   industry used vanishing premium to describe the

21   use of dividends sometime in the future to pay

22   premiums on the policy.

23         Q       Did Metropolitan Life produce any

24   illustrations which contained the term "vanishing

25   premium"?

17

1          WILHELMENIA J. TAYLOR

2     A     Not that I can recall.

3     Q     When Metropolitan Life began using

4  the Accelerated Payment Plan, was that modeled

5  after a vanishing premium or another Accelerated

6  Payment Plan of another insurance company?

7          MS. TAYLOR:  Objection as to form.

8     A     I wasn't involved in the initial

9  development of the Accelerated Payment Arrangement

10  so I don't know.

11     Q     Do you know who would know about

12  that?

13     A     No, not really.  Someone probably in

14  the actuarial department back then may know.

15     Q     We talked earlier about the software.

16  What different variables were entered to determine

17  if the policy would be eligible for Accelerated

18  Payment Plan?

19     A     I don't remember all the variables,

20  but it would include the policy number, things

21  like the policy number, the year the policy was

22  issued.  I think it asked for the company's

23  description of the plan by plan code.  They use a

24  plan code to describe policies.

25          I would have to actually see the

18

1          WILHELMENIA J. TAYLOR

2    software to remember all the entries that needed

3    to be entered to get the answer.

4          Q          Were Accelerated Plan or Arrangement

5    products sold as paid up policies?

6                     MS. TAYLOR:  Objection as to form.

7                     MR. LABOVITZ:  Join.

8          A          They weren't Accelerated Payment

9    products.

10         Q          Illustrations?

11         A          What do you want to ask me again?

12         Q          I probably used the wrong word, you

13   are right.

14                    I was asking whether Accelerated

15   Payment illustrations, when a representative said

16   you qualified for this Accelerated Plan or

17   Arrangement, was that represented to a client or

18   customer that it would be a paid-up policy upon

19   completion of the plan?

20                    MS. TAYLOR:  Objection as to form.

21                    MR. LABOVITZ:  Join.

22         A          The illustrations weren't used to

23   determine eligibility for the Arrangement.  So I'm

24   not sure what you are asking.

25         Q          Was APP sold as a paid-up policy?

19

1                    WILHELMENIA J. TAYLOR

2        A      No.

3        Q      What training did representatives

4    receive in the ways to sell the Accelerated

5    Payment Plan?

6              MS. TAYLOR:   Objection as to form,

7         lack of foundation.

8        A      I wasn't involved in the training of

9    the reps, but I knew that reps had the ability to

10   use sales illustrations and they had a company

11   brochure they could give the customer that would

12   describe the Arrangement.

13       Q      Who designed these brochures?

14             MS. TAYLOR:   Which time are you

15        talking about?

16       Q      Which time period were you talking

17   about?  Was that throughout the life or did the

18   brochures become effective during a certain period

19   of time?

20       A      My recollection, the illustration and

21   a brochure was available and they evolved, evolved

22   over time.  Illustration and brochure was

23   available for reps to give the customer, that they

24   were posing the sale of the AP Arrangement to.

25       Q      Did those brochures represent the

20

1              WILHELMENIA J. TAYLOR

2    customer would be receiving a paid-up policy?

3         A    No.

4         Q    Was the Accelerated Payment Plan used

5    as a marketing tool to market policies to

6    customers?

7         A    It's my recollection that the

8    Accelerated Payment Arrangement, because it

9    provided some flexibility to customers, the

10   payment of their premiums, that it was used in the

11   marketing of life insurance.

12        Q    Did Metropolitan Life have any type

13   of tracking system to determine if a policy had

14   been sold using an Accelerated Payment Plan

15   illustration?

16        A    Did the company?  I don't believe the

17   company had a tracking system to know if the

18   representative used an Accelerated Payment

19   illustration, no.

20        Q    Was there any way for the company to

21   determine whether the sales representative had

22   used an Accelerated Payment Plan illustration in

23   the sales process?

24        A    Not that I can recall.

25        Q    What had to occur for a policy to

```
                                                    21
1              WILHELMENIA J. TAYLOR

2    perform as illustrated in the Accelerated Plan

3    illustration?

4              MS. TAYLOR:  Objection as to form.

5              MR. LABOVITZ:   Join.

6         Q      For example, did the dividend sale

7    have to remain the same throughout the life of the

8    illustration or did the interest rates remain the

9    same?  I'm wondering what variables had to remain

10   constant for the Accelerated Payment Plan to

11   remain as illustrated?

12             MS. TAYLOR:  Objection as to form.

13             MR. LABOVITZ:   Join.

14        A      The best way I can answer your

15   question is the AP illustration dealt, the sales

16   illustration dealt with the AP Arrangement by

17   showing the customer on the illustration that if

18   that current year's dividend remained the same

19   throughout the life of the contract, then the

20   policy would be eligible for the Accelerated

21   Payment Arrangement.

22        Q      What happened if the dividend changed

23   in the future, the dividend was different the next

24   year?

25        A      If the dividend was different the
```

22

1                    WILHELMENIA J. TAYLOR

2    customer, the AP year could be changed to be more

3    or less.

4           Q      In the event the dividend rate

5    changed after the illustration was produced and

6    shown to the customer, were customers contacted to

7    let them know that the AP year would change?

8                  MR. LABOVITZ:    Objection as to form.

9                  MS. TAYLOR:    Objection as to form.

10          A      What period of time are we talking

11   about?

12          Q      Any period of time, it doesn't

13   matter.

14          A      Because the illustration clearly

15   stated that the dividends weren't guaranteed and

16   that the AP year was based on dividends and they

17   weren't guaranteed.

18                 If a dividend changed the next year

19   or one year, we did not send out a letter to the

20   customer to tell the customer that the AP year had

21   changed, even if the AP year was shorter or

22   longer, because the customer had the option of

23   either asking for that Arrangement or not asking

24   for that Arrangement.

25          Q      You say asking for the Arrangement --

23

WILHELMENIA J. TAYLOR

2    A    Requesting to use the AP Arrangement.

3 They didn't have to use the AP Arrangement.

4    Q    Was the AP Arrangement plan something

5 that was used to sell policies to policyholders?

6 I asked you earlier if it was a marketing tool and

7 the answer you just gave me, you said they had the

8 option to request the Accelerated Payment Plan or

9 not.

10    What I'm asking now, is that

11 something that was used by sales representatives

12 to sell policies, Accelerated Payment Plan?

13    MS. TAYLOR:  Objection as to form.

14    Asked and answered.

15    MR. LABOVITZ:  Join.

16    A    The AP Arrangement was used to add

17 flexibility to a customer, used to add flexibility

18 to the payment of life insurance premiums and, as

19 a result of that additional flexibility, the sales

20 representatives did use it as part of their or

21 could use it as part of their sales presentation

22 to a customer.

23    Q    I think I understand the confusion of

24 my question.

25    What I was asking was whether it was

CITTONE REPORTERS
(212)286-9222

24

1                WILHELMENIA J. TAYLOR

2     something the customer would have to request or

3     something the sales representative would use as a

4     part of his sales presentation without the

5     customer requesting it?

6                     MS. TAYLOR:   Objection as to form.

7          A     I don't know what happened on each

8     individual sale, but a customer could approach a

9     representative about payment arrangements other

10    than he or she paying out-of-pocket or the

11    representative could explain this arrangement may

12    be available in the future based on dividends.

13         Q     It wasn't something the customer had

14    necessarily to request in order to have the

15    representative generate an illustration for him?

16         A     When I spoke about having the

17    customer request it, actually using or requesting

18    to know if they were eligible, the customer had

19    the option of either saying, I'm interested in

20    knowing if I'm eligible for the AP Arrangement,

21    and they would approach the company or rep.

22                     You are talking about the initial

23    sale?

24         Q     Right?

25         A     During the initial sale either one

25

1    WILHELMENIA J. TAYLOR

2    could request information about paying premiums,

3    an alternative to paying premiums out-of-pocket

4    for the life of the contract.

5         Q     Were customers advised of the option

6    of the Accelerated Payment Plan by the company in

7    any way?

8              MS. TAYLOR:   Objection as to form.

9              MR. LABOVITZ:   Join.

10        Q     What I mean, a direct mailing, other

11   than the sales representative speaking with them

12   or meeting with them?

13        A     You're talking as part of the initial

14   sales process?

15        Q     I just meant in general.  Did the

16   company send out mailings or brochures saying, we

17   have this Accelerated Payment Plan and you might

18   be eligible, or something you might want to ask

19   your representative about?

20        A     Not that I can recall.

21        Q     Was there any other means by which a

22   customer could become aware of the Accelerated

23   Payment Plan other than speaking with a sales

24   representative?

25             MS. TAYLOR:   Objection as to form.

26

WILHELMENIA J. TAYLOR

1

2     A     They could read it in the newspaper.

3     Q     Was that something that was

4  advertised in newspapers?

5     A     Not necessarily by Metropolitan Life,

6  but the whole idea of not paying all your premiums

7  out-of-pocket for the life of the contract,

8  customers could have read that idea anywhere and

9  asked us about it.

10     Q     Did Metropolitan Life advertise the

11  Accelerated Payment Plan or Arrangement in

12  newspapers or other publications?

13     A     Not that I'm aware of.

14          MS. TAYLOR:  Objection as to form,

15     lack of foundation.

16     Q     How were policyholders advised if the

17  company dividend rate changed?

18     A     I don't think we used the term

19  "dividend rate" when talking to customers, but --

20     Q     What's a better term?

21     A     The dividend scale.

22          The company, we didn't send something

23  out to customers that the dividend scale changed.

24  We informed them of what their dividend was for

25  that particular year.

27

1          WILHELMENIA J. TAYLOR

2     Q      How were they informed of that?

3     A      Either one, billing, anniversary-type

4  statements to the customer.

5          MR. BARTHOLOMAEI:  I think I need to

6     take a break.

7          (RECESS TAKEN) (AFTER RECESS).

8     Q   Ms. Taylor, before the short break I

9  was asking you, was a customer notified about what

10  you call the dividend scale.  You said they would

11  find out about that whatever the dividend was

12  through the anniversary statement; is that right?

13          MS. TAYLOR:  I think she also said

14     billing notices.

15     Q      Let me ask a different question.

16          Earlier you had said that if the

17  dividend sale changed, their AP year could change.

18  Then I asked how would they find out about the

19  billing scale, you said anniversary statement or

20  billing statement.

21          I'm asking how would they find out

22  how the AP year changed?

23          MS. TAYLOR:  Objection as to form.

24     Lack of foundation.  I think you are

25     mischaracterizing the testimony.

28

WILHELMENIA J. TAYLOR

1

2    A    If a customer was operating on the AP

3    Arrangement, they were told if they were no longer

4    eligible for AP required out-of-pocket premiums.

5    Is that what you are referring to?

6    Q    My understanding, there would be a

7    certain year when the dividends would be enough to

8    pay the premiums, they wouldn't have to pay

9    anymore premiums out-of-pocket.  Is that right?

10              MS. TAYLOR:  Objection as to form.

11              MR. LABOVITZ:  Join.

12    A    No, that's not right.

13    Q    Earlier you used the term "AP year".

14    What does that mean?

15    A    I believe I was referring to the year

16    illustrated on the sales illustration as to when

17    the AP Arrangement may be requested by the

18    customer based on that year's dividend scale.

19    Q    You say may be requested.  Is that

20    the same thing as when the year would be eligible

21    for the AP plan?

22    A    It may be eligible, but of course,

23    like I said before, it all depended how dividends

24    formed.  The dividends weren't guaranteed.  That

25    may be the year.

29

WILHELMENIA J. TAYLOR

1

2          Q       Let me show you a document.

3          MS. TAYLOR:   For the purpose of

4    everyone's information, Taylor 1 is a documented

5    entitled A Proposed Strategy for the Accelerated

6    Payment Plan (APP), prepared by Wilhemenia Taylor

7    and Jacqueline Thoresz.   Bates number is MP

8    4011003489 through 3498.

9                    There is another Bates number which

10   is MO 59701650694 through 703.

11                   (Document titled A Proposed

12   Strategy for the Accelerated Payment Plan (APP),

13   November 18, 1993, is received and marked Taylor 1

14   for identification.)

15         Q       Ms. Taylor, have you seen this

16   document before?

17         A       Yes.

18         Q       As Ms. Taylor, counsel, just said,

19   this was prepared by yourself and Ms. Thoresz.

20                   Can you tell me which part of this

21   document you prepared or are there specific parts

22   of this document you prepared?

23         A       It's my recollection that we really

24   did it together.   It wasn't like she took half and

25   I took another half.   She was part of the natural

30

WILHELMENIA J. TAYLOR

1

2    work team, we just worked on this document

3    together.

4          Q        What was the reason for the creation

5    of this document?

6          A        Jackie and I believed we needed to

7    take a look at the Accelerated Payment

8    Arrangement. We had been hearing questions from

9    the field. We had hired new reps who were

10   servicing existing customers and they had

11   questions about how the Arrangement worked.

12              Dividends went down in 1992 and that

13   was the first time I can remember that dividends

14   had went down. We wanted to be proactive and

15   provided what information we could to the reps and

16   our customers as well as make sure our systems

17   were working correctly with respect to the AP

18   Arrangement. That's what I could recollect.

19         Q        What was the significance of

20   dividends going down in 1992 with respect to the

21   Accelerated Payment Plan?

22         A        It was, the Accelerated Payment Plan

23   is dependent on dividends. 1992 was the first

24   year at Metropolitan Life that I remember that the

25   dividends actually went, the dividend scale went

31

1         WILHELMENIA J. TAYLOR

2    down.  That would have an impact or could have an

3    impact on certain customers becoming eligible for

4    the AP Arrangement.

5         Q     Is it possible that any of the

6    Accelerated Payment Plan illustrations were

7    performed as illustrated where the illustration

8    was generated prior to 1992?

9              MS. TAYLOR:  Objection as to form.

10             MR. LABOVITZ:  Join.

11       A     Could you ask that question again.

12       Q     Were any of the illustrations hold

13   true where the illustration was generated prior to

14   1992?

15             MS. TAYLOR:  Objection as to form.

16             MR. LABOVITZ:  Join.

17       A     Based on the scales -- you say prior

18   to 1992.

19             It's my recollection prior to 1992

20   the dividend scale had been going up, either going

21   up or remaining the same.  So it's very possible

22   that policies that were illustrated with the AP

23   arrangement were fine.  Some of them may have had,

24   1992 dividend scale may have had an impact, that

25   was one year.  We wanted to make sure we were

32

WILHELMENIA J. TAYLOR

1

2    prepared for the questions.

3        Q      What do you mean questions?

4        A      Questions from our sales

5    representative similar to the ones you are asking,

6    is this going to have an impact on policies that

7    were illustrated using AP Arrangement.

8        Q      What was the answer to that question?

9        A      It may and may not.   It's just one

10   year.  It hadn't happened before and this is the

11   first time it's happening.   It was normal for

12   people to want to ask questions.

13       Q      Can you explain how it is possible

14   that it wouldn't have an affect on an Accelerated

15   Payment arrangements?

16           MS. TAYLOR:   Objection as to form.

17       It calls for speculation.

18       A      The only thing I can give you an

19   example.

20           Let's say someone bought a policy in

21   the year.  The illustration that was used included

22   a dividend scale much lower than it was in 1992

23   and from that point in time the dividend scales

24   went up and up and up.

25           The illustration was based on the

33

WILHELMENIA J. TAYLOR

1
2  year, that current year's dividend.  If the
3  current year's dividend was a lower number than
4  1992 and this is the first time a dividend ever
5  went down, those policies that were illustrated
6  that way could be fine.
7          Q      What about the policies that were
8  sold in 1991, what would happen with respect to
9  those policies?
10         A      Those policies may have been impacted
11  by the 1992 dividend scale.  But if it was only
12  one year, the scale could have gone up in 1993 or
13  some subsequent year and made up for any
14  deficiencies on the dividend balances.
15         Q      Did the scale go up in 1993?
16         A      No, it went down in 1993.
17         Q      When was the next time the scale ever
18  went up or did it go up again?
19         A      I don't believe it ever went up
20  again.  I think it stayed the same in 1995, it
21  didn't change.
22              MS. TAYLOR:  I don't know if she
23          knows without showing her a document that
24          shows the dividend history, that she
25          necessarily remembers every year since

34

WILHELMENIA J. TAYLOR

1992.

MR. BARTHOLOMAEI:  I don't know that I can go much further with this deposition.

What do you want to do at this point?

MS. TAYLOR:  Let me talk to Rob?

MR. BARTHOLOMAEI:  Physically I don't know what to do.

MS. TAYLOR:  Let me talk to Rob.

(RECESS IS TAKEN)

MS. TAYLOR:  We just took a break because Mr. Bartholomaei is ill and really losing his voice and doesn't feel he can continue the deposition.

So what we all agreed on is that we would come back on Tuesday, October 1, and begin at 9:00 at McCarter & English, New York office.

We all discussed the fact it's important we proceed next week simply because the witness has prepared and really needs to conclude this.  So that she doesn't have to prepare again for the deposition.

We did ask that Plaintiff's counsel

35

WILHELMENIA J. TAYLOR

1

2   obtain a copy of the transcript of what's

3   transpired thus far so there is no

4   duplicative question on Tuesday, in other

5   words, so we don't cover ground we already

6   covered this morning, and I think that's

7   it.

8

9        (TIME NOTED:   10:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

```
1
2                A C K N O W L E D G M E N T
3
4    STATE OF NEW YORK)
                            :ss
5    COUNTY OF        )
6
7              I, WILHELMENIA J. TAYLOR, hereby
8    certify that I have read the transcript of my
9    testimony taken under oath in my deposition of
10   WILHELMENIA J. TAYLOR, that the transcript is a
11   true, complete and correct record of what was
12   asked, answered and said during this deposition,
13   and that the answers on the record as given by
14   me are true and correct.
15
16
17        _____
18              WILHELMENIA J. TAYLOR
19
20   Signed and subscribed to
     before me, this ____ day of
21   _____ 2002.
22   _____
     Notary Public
23
24
25
```

CITTONE REPORTERS
(212)286-9222

37

1

2                            CERTIFICATION

3    STATE OF NEW YORK   )
                                      ss
4    COUNTY OF NEW YORK )

5         I, ALBERT M. CITTONE, a Certified Court

6    Reporter and Notary Public of the State of New

7    York, DO HEREBY CERTIFY that WILHELMENIA J.

8    TAYLOR, the witness whose deposition is

9    hereinbefore set forth, was duly sworn, and that

10   such deposition is a true record of the testimony

11   given by such witness.

12        I FURTHER CERTIFY that I am not related to

13   any of the parties to this action by blood or

14   marriage, and that I am in no way interested in

15   the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto set my

17   hand this 27th day of September 2002.

18

19

20

21   ---------------------------------------

22              ALBERT M. CITTONE

23       Notary Public of the State of New York

24

25

```
                                                              38
1
2                               INDEX

3
   WITNESSES:                              PAGE / LINE
4
   WILHELMENIA J. TAYLOR
5
        DIRECT BY MR. BARTHOLOMAEI            3 /    7
6
7                       INDEX OF EXHIBITS:

8    EXHIBIT        DESCRIPTION           PAGE / LINE

9       1        Document titled A         29 /   12
                 Proposed Strategy for
10               the Accelerated
                 Payment Plan (APP),
11               November 18, 1993

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORESZ



*A Proposed Strategy*

*for the*

*Accelerated Payment Plan (APP)*

Prepared by

Wilhemenia Taylor
Life Product Merchandising
and
Jacqueline Thoresz
Marketing Communications

November 18, 1993

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No.1091. United States Dist. Ct.

M059701650694

## THE ACCELERATED PAYMENT ARRANGEMENT -- A PROPOSED STRATEGY

### BACKGROUND:

THORESZ

During the early 1980s, the life insurance industry introduced a new concept for paying whole life insurance premiums using policy dividends. Known throughout the industry as "vanishing premiums," this payment method allows policyholders to discontinue out-of-pocket premium payments by using their annual dividend and a portion of accumulated dividends to fund the policy. This payment was, and still is, very attractive to prospects because they can purchase life insurance protection without making lifetime out-of-pocket payments.

When MetLife first offered prospects its version of vanishing premiums, the Accelerated Payment Plan (APP), our investments were performing extremely well and dividend payments to policyholders were quite high. During this time, customers purchasing policies on an APP basis were only required to pay premiums for a short amount of time -- perhaps eight or ten years.

For the past several years, lower interest rates have caused MetLife's investment returns to be lower than previous years. As a result, we were forced to reduce our dividend scale. These dividend scale reductions have greatly impacted policies sold on the APP arrangement. Policyholders expecting to pay premiums via the APP arrangement after a certain number of years have been told that they must continue making out-of-pocket premium payments. Policyholders that have been paying premiums via APP for a number of years have been told that they must resume out-of-pocket premium payments. The result? Eroding confidence in this payment arrangement by both policyholders and Account Representatives.

### THE ATTENTION GIVEN TO APP BY THE MEDIA AND THE GOVERNMENT

There have already been a number of articles written about consumer reactions to the APP issue. However, we are fortunate that the issue has not gained greater prominence in the national media. The following articles discussing the APP issue have appeared in prominent magazines and newspapers:

NEWSWEEK, July 13, 1992: Article entitled "Buyer Beware" profiled families who had been hit hard by policies that were on the APP arrangement.

PROBE, February 8, 1993: Article entitled "Underfunding Life Insurance" describes APP as "driving life insurance policies that are going to run out of gas hundreds of miles from your destination. This is because you've chosen a 'vanishing' premium dividend option but never looked in the dividend tank to see how much further you could drive."

WALL STREET JOURNAL, March 16, 1992: Article entitled "Lower Rates Can Undercut a Life Policy's Performance" called the APP situation a "mess at the end of the rainbow."

Source: "Production and Use Subject to Case Management and Protective Orders in MDL No.1091. United States Dist. Ct."

M059701650695

-2-                              THORESZ

BUSINESS WEEK, July 5, 1993: "The insurance industry and regulators have been scrambling to improve disclosure since the crisis surfaced last year...So far, there has been much study but little action."

CONSUMER REPORTS, August, 1993. Article entitled "Can You Believe the Sales Illustration?" states that "some illustrations for vanishing premium plans specifically misled buyers by displaying zeros in the column showing the premiums they would be required to pay once the 'vanish' period begins. That gave the false impression that the policy was completely paid up and no further premiums were necessary."

Of perhaps greater concern than the media's coverage of APP is the negative publicity Senator Howard Metzenbaum of Ohio could give to the industry if he opens a hearing in his Senate subcommittee on antitrust, monopolies and business rights. Senator Metzenbaum said the following in an article that appeared in The Star-Ledger on June 16, 1993: "I think it's fair to say the people who bought cash value policies since the early 1980s have already had, or are about to have, rude awakenings."

**METLIFE'S OPPORTUNITY:**

By addressing this issue, on an aggressive, proactive basis MetLife can preserve the public's trust in the Company and enhance our reputation for providing quality customer service.

**ACTION TAKEN BY THE COMPETITION:**
Companies have begun to approach the APP issue in a variety of ways:

•Penn Mutual Life: include information on their annual statements stating when they expect the policy to lapse on a guaranteed and current dividend basis. They have also developed a pilot project that seeks to detect APP policies that are in danger of lapsing.

•The New England: is conducting seminars and classroom training in an attempt to educate their field force. They are also sending letters to customers suggesting they delay the vanish point for a couple of years to avoid a future policy lapse.

•Kemper Life: is sending letters to policyholders explaining that because interest rates are down, company investments are not performing as expected. As a result, it will take longer for premiums to vanish.

•Other companies: some companies are encouraging their agents to conduct annual or semi-annual reviews of their customers' policies. This allows them to spot potential reappearing premiums early.

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No.1091. United States Dist. Ct.

M059701650696

-3-                                        THORESZ

## PROBLEMS INHERENT IN THE APP PROCESS AND RECOMMENDED SOLUTIONS :

Before we can resolve this issue, it's important to fully understand the problems inherent in APP processing. The following outlines the problems associated with APP as well as our proposed solutions.

### Problem #1: Prospects, Policyholders and Account Reps Do Not Have a Clear Understanding of the APP Arrangement

Prospects, policyholders and even Account Representatives do not have a clear understanding of the effects that reduced dividends have on this payment arrangement. They do not realize that a dividend scale reduction may cause the APP year to be extended or require the policyholder to resume out-of-pocket premium payments.

Many customers believe that after paying premiums for a certain number of years their policies will become "paid-up." They do not realize that if dividends are not sufficient to pay the premium, the premium is still due and out-of-pocket payments must be made to keep the policy inforce. They do not understand that the APP arrangement is illustrated based on dividends that are not guaranteed and subject to change.

Solution: We need to better educate customers and Account Representatives about the APP concept.

One way to educate both prospects, policyholders and Account Reps is to develop a brochure that clearly explains the APP concept. This can be given to the prospect at the time of sale and should help eliminate any misunderstandings about APP.

We should also revise the disclosure information on policy illustrations to make the concept of APP easier for the prospect to understand. This new disclosure information should contain a statement notifying the prospect that when the policy is operating on APP, it is not a paid-up policy and premiums are due for the life of the contract. We should also consider discontinuing the word "none" in the premium outlay column on the illustration because it fosters the idea that the policy is paid-up. In addition, the disclosure information should also address the consequences if dividends are reduced from those illustrated.

To better educate the Field Force, we recommend creating a training guide for Account Representatives which would discuss the issues related to APP and how it impacts various customer groups. This training guide can also be used by Branch Managers and District Sales Managers to use in educating newly hired reps about the APP process.

Notice. Production and Use Subject to Case Management and Protective Orders in MDL No. 1061. United States Dist. Ct.

M059701650697

-4-                                    **THORESZ**

<u>Problem #2: Policyholders Who Fail Eligibility Testing Must Pay the Entire Premium Out-Of-Pocket</u>

In an attempt to reduce negative feelings on the part of customers regarding this payment arrangement and MetLife as a whole, we should present the policyholder with a number of payment options when a policy is not eligible for APP, or fails APP eligibility testing some time into the future. Currently their only option is to resume paying the full premium out-of-pocket.

When policies are not eligible to go on APP because the premium cannot be paid for the life of the contract, we currently offer an "all or nothing" option to the policyholder – they must pay the <u>full</u> premium. This is true even when there is a substantial dividend balance to pay the annual premium for a number of years.

We also use the "all or nothing" approach with policyholders whose policies have been operating on APP but fail the APP sufficiency test at a later date.

<u>Solution:</u> Offer Policyholders a Variety of Payment Options

We recommend offering policyholders the following alternatives to the "all or nothing" approach:

    a.    MetLife pays the full premium for as many years as the premium can be paid from dividends/PUAR. In essence, we are already doing this with existing APP policyholders since we do not perform a "full eligibility test" each year. Policies remain on APP until the annual premium cannot be paid from dividends and/or PUAR balances. Each year we simply test to verify that the annual premium can be paid from dividends and/or PUAR balances. We refer to this test as "sufficiency."

    b.    allow partial premium payments whereby the policyholder could pay a portion of the premium out-of-pocket and the balance would be withdrawn from dividends/PUAR.

    c.    Lump Sum Payment: clients with policies that include the Paid-Up Additions Rider can elect to make a payment to the PUAR that would allow the policy to go on APP.

    d.    Apply the current year's dividend plus an Automatic Premium Loan payment to pay the premium. Since this option would result in a reduction in the death and interest charges, it must be clearly spelled out to the policyholder.

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No.1091, United States Dist. Ct.

-5-

THORESZ

## Problem #3: Policies Sold On APP Are Not Tracked

Currently, policies sold on the APP concept are not identified on the Company's Policy Master File until they begin operating on APP. In addition, there is no electronic record of the year when the policy was illustrated to go on APP. As a result, we do not have a reliable means of targeting APP customers to pro-actively communicate with them regarding dividend scale reductions or changes in their expected APP eligibility.

## Solution: Develop A Tracking System That Begins At The Point of Sale

Account Representative should record on the application that the policy was sold on the APP concept. The rep should also record the year that the policy was illustrated to go on APP. This information should then be captured on the Policy Master File for future use.

One year before a policy is scheduled to go on APP (based on the information that's on the Master File), the system would automatically verify the policy's eligibility for APP and generate the appropriate policyholder correspondence.

## Problem #4: We Do Not Have a System In Place That Allows Us To Provide the Policyholder With APP Information Specific to His/Her Policy

We do not have a system in place that allows us to inform policyholders:

   a. the amount of dividends required for APP eligibility;

   b. the amount of dividends that can be withdrawn and still maintain APP eligibility.

## Solutions: Enhance APP Eligibility System

We need to enhance the APP Eligibility System so that it provides the specific dollar amount required for initial and continued APP eligibility.

## SUGGESTED STRATEGY FOR ADDRESSING THE APP ISSUE AT METLIFE:

MetLife's approach to marketing and administering policies using the Accelerated Payment Plan should be re-examined.

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No.1091. United States Dist. Ct.

M059701650699

-6-                                       **THORESZ**

We have identified the following areas that should be addressed as we look at MetLife's treatment of APP policies:

    I.  Communication with policyholders and potential customers
    II.  Field Training
    III.  Systems - Related Issues
    IV.  Administrative Training – Including Customer Service Representatives

In developing a strategy to address the four areas stated above, we have identified policyholder sub-groups that MetLife should tailor its planning towards:

    A.  Policyholders who are already on APP
    B.  Policyholders who are expecting to go on APP
    C.  Prospects who will be shown the APP concept at the point of sale

## SECTION I: COMMUNICATION WITH POLICYHOLDERS

**Proposed Action:**

1.  As mentioned earlier, we need to improve disclosure information on APP illustrations. This could be accomplished by revising the wording on the APP cover page to that suggested by the American Society of CLU & ChFC. This cover page should be a mandatory part of the illustration. The new wording would include:

    -the full premium paying period;

    -a clear statement that when the policy is operating on APP, the policy is not paid-up;

    -the consequences if dividends are reduced from those illustrated. The APP year may be extended or premium payments may have to be resumed at some point after the policy is on APP.

2.  We also need to design and produce a consumer brochure explaining the APP concept that the Account Rep can give to prospects (group C) at the point-of-sale. This brochure will help eliminate future misunderstandings by clearly explaining the APP concept to the prospect at the time of sale. It would include the SuperLedger concept which is easier to read and only includes the most pertinent APP information. It helps both the clients and the rep understand the concept.

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No.1091, United States Dist. Ct...

M0S9701650700

-7-                                    THORESZ

3.  Develop a letter to be mailed at issue from the New Business Processing Centers, to new policyholders who are expecting to go on APP some time in the future. This letter would explain the APP concept and help ensure that these policyholders understand what they purchased or more importantly what they did not purchase (a policy that becomes paid-up after a very short number of premium payments.)

Of course mailing these letters would be contingent upon our properly identifying these clients on the Company's Policy Master File.

4.  Draft two letters that can be used by the Field with existing policyholders. One letter would be tailored towards the concerns of policyholders who are already on APP, and the other letter would target policyholders expecting to go on APP.

By developing such letters, we would encourage communication between the rep and his/her customers in a manner that's consistent across the entire Field Force. We would also set the stage for increased direct contact between representatives and their customers, possibly facilitating future sales.

5.  Revise current APP policyholder letters produced by Customer Service Centers so that all messages related to APP are consistent. In addition, we need to create a special letter for those policyholders losing APP eligibility letting them know the various payment options that are available.

6.  Develop an article for MetLife Outlook, Personal Insurance's award-winning policyholder newsletter, explaining the APP arrangement and how it works. Gear the article towards group B (policyholders waiting to go on APP).

### SECTION II: FIELD COMMUNICATION AND TRAINING

Proposed Action:

1.  Develop letter from senior management to the OICs explaining the initiatives that we are undertaking in the area of APP including our plans for communicating with policyholders and the Field. The purpose of this letter is to seek suggestions and comments from the OICs. By gaining consensus from senior management, we will ensure that the needs of the Field are considered as we communicate with MetLife policyholders.

2.  Create a training guide including a "Question & Answer" section that will better educate and prepare the Field to communicate with customers. This guide would discuss concerns of all APP customer groups. In her "Straight Talk About Premiums and APP," Susan Schmidt-Burstein of P.I. Advanced Markets has created an excellent question and answer guide that helps educate reps in dealing

Source: Production and Use Subject to Case Management and Protective Orders in MDL No.1091. United States Dist. Ct.

MO59701650701

-8-                                                    THORESZ

with policyholder concerns related to APP. This guide could provide excellent background information for the overall training guide.

3.  Produce a general training package for Branch Managers and District Sales Managers to use in educating Account Reps about the APP concept. Once again, the information would target concerns of all three customer groups (A, B, and C).

4.  Develop a general release informing the Field that the Company is beginning to send information to policyholders on APP and that policyholders may be contacting them with questions or concerns. This purpose of this release would be to eliminate unexpected calls from policyholders to reps asking them questions they are not prepared to handle.

5.  Provide information to Customer Service Centers.

## SECTION III: SYSTEMS RELATED PROPOSALS

### Proposed Actions:

In order to improve the way we market and administer APP, we need to develop or improve our current systems so that we can better capture information related to APP, and track this information.

Here's how APP System Processing should Work:

1.  Once the Account Representative records on the life insurance application (or on some other form) that the policy was sold on the APP concept and the year it is scheduled to go APP, it should be captured and transferred to the Policy Master File.

2.  One year before a policy is scheduled to go on APP (based on the APP year provided at issue), the system would automatically verify the policy's eligibility for APP payments.

    a. If eligible, the system produces notification informing the rep and policyholder the good news.

    b. If not eligible, we produce appropriate notification to inform the rep and policyholder. The rep should contact the customer to discuss payment alternatives.

3.  We need to decide how we will handle APP eligibility testing and make the necessary changes to our system. At present, the initial test of a policy's eligibility for APP is calculated based on what we call a "full" eligibility test. Generally, this

Source: Production and Use Subject to Case Management and Protective Orders in MDL No.1091, United States Dist. Ct.

MOS9701650702

-9-                                    THORESZ

"full" check determines if annual premiums can be paid for all years remaining in the policy based on the dividend scale in effect at the time of the quote. If the test result is positive, the policy can go on APP the next policy anniversary. If the answer is negative, the system will calculate the future year of eligibility based on the dividend scale in effect.

However, we do not perform a "full eligibility" test each year. Policies remain on APP until the annual premium cannot be paid from dividends and/or PUAR balances. Each year we simply test to verify that the annual premium can be paid from dividends and/or PUAR balances. We refer to this test as "sufficiency."

4.   We need to develop an APP System that allows us to inform policyholders:

a. the amount of dividends required for a policy to be eligible for APP;

b. the amount of dividends that can be withdrawn and still maintain APP eligibility.

SECTION IV: ADMINISTRATIVE PERSONNEL AND CUSTOMER SERVICE REPS.

Proposed Actions:

1.   Create information/training guide similar to the ones that will be developed for Managers and Account Reps to teach/educate CSR's and help them better communicate this concept to policyholders.

2.   Develop a general information packet similar to the one given to the Field that can be distributed to all areas within P.I. that deal with APP policy issues. This will ensure that a consistent message is delivered to all customers.


CONCLUSION:

We propose that an APP Action Team be brought together to implement our strategy. It is recommended that key members of the APP Natural Work Team be part of this team which will have the responsibility of implementing this proposal and consolidating company-wide efforts at addressing this APP issue.

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No.1091, United States Dist. Ct.

M059701650703