

102

WILHELMENIA TAYLOR

1

2        Q     Then it says PUAR policies.  See that

3  part?

4        A     Yes.

5        Q     Was that a mistake?  You said they

6  weren't policies.  Policy of the Rider?

7        A     Yes.  Whole life policy with paid-up

8  additional Rider attached to it.

9        Q     What's the significance, if any, of

10  the 84 percent failing the eligibility test with

11  respect to the whole life policies with the

12  paid-up additional Rider?

13        A     I'm trying to recall what I meant by

14  this.

15          The paid-up additions Rider, the

16  value of the paid-up additions Rider could also be

17  used to pay the number premium due as part of the

18  Accelerated Payment Arrangement and from what I'm

19  reading here, Mike sampled 25 policies and there

20  wasn't enough value in the paid-up additions Rider

21  that would allow the premiums to be paid for the

22  life of the contract.  That's what I'm saying

23  here.

24        Q     What was done in response to that

25  determination?  Was any further study done?

103

1                    WILHELMENIA TAYLOR

2        A      I don't recall a further study being

3    done.

4        Q      Was any type of policy implemented or

5    policy change with respect to whole life policies

6    that contained or which had a paid-up additions

7    Rider?

8                    MS. TAYLOR:   Objection as to form.

9            That's a difficult question to understand,

10           also extremely broad.

11           Do you understand the question?

12                  THE WITNESS:   No.  I zoned out for a

13           minute.

14       Q      Mike conducted a sampling of 25 such

15   policies and 21 of the PUAR policies or 84 percent

16   failed the eligibility test?

17       A      Yes.

18       Q      The question I had, first I asked you

19   if a further study was done and you said no.  Now

20   I'm asking if anything was done by Met in reaction

21   to the results of that sampling?

22       A      The policy that were on AP, also used

23   in the paid-up additions Rider also received the

24   anniversary statements I talked about before and

25   these customers were also provided information

1                         WILHELMENIA TAYLOR

2    with respect to the AP eligibility on their

3    anniversary notices.

4         Q       Anything else outside the anniversary

5    notices?  Still talking about the billing

6    statements again.

7         A       The Metropolitan Life Outlook and

8    brochures and contact, encouraging representatives

9    to contact their customer.  No mass mailing issued

10   that we talked about before that I'm aware of.

11        Q       This is something I was trying to get

12   out before.  Maybe it wasn't clear.

13               The mailing of anniversary statements

14   to policyholders, be it a policy with a paid-up

15   additions Rider or not, any kind of whole life

16   policy that's Metropolitan Life policy?

17               MS. TAYLOR:  Repeat that.

18        Q       It's normal routine practice at Met

19   to send statements with whole life policies?

20        A       Some customers get a billing notice

21   and some people get anniversary statements.  AP

22   customers were getting anniversary statements.

23        Q       It was the company practice to send

24   AP customers anniversary statements?

25        A       From what I remember, yes.

105

1                    WILHELMENIA TAYLOR

2          Q       How long had that been the company

3     practice?

4          A       I believe, I'm not sure, maybe date

5     back to 1988 or so.

6          Q       What about prior to that?  Was there

7     an APP program prior to 1988?

8                  MS. TAYLOR:   Objection as to form.

9          A       Program?

10         Q       The Accelerated Payment Plan, did it

11    exist prior to 1988?

12         A       The Accelerated Payment Arrangement

13    was introduced in I believe 1981 or so.

14         Q       Why were anniversary statements first

15    sent in 1988?

16         A       I believe that was, my recollection,

17    around the first year that the first customer,

18    first group of customers that would begin to

19    become eligible for AP.

20         Q       Outside of the anniversary statement

21    which you said had been sent since 1988 and some

22    of the other things that were already done in

23    Metropolitan Life, was there anything new that was

24    done with respect to these people where it was

25    determined they didn't have sufficient dividend

106

WILHELMENIA TAYLOR

1

2   balance or dividends in their policy to allow the

3   policy to remain in APP?

4                    MS. TAYLOR:  Which specific people

5              are you referring to?  The 25 referred to

6              at page two?

7        Q     We can start with that, if you want.

8   Maybe I'll state the question again so it's clean.

9                    Outside of things that had already

10  been done at Metropolitan Life, policies already

11  in place, including the anniversary statements and

12  billing statements and other things, was anything

13  new initiated with respect to the people which

14  were identified as a part of the study we just

15  talked about, the 25 percent, to contact them and

16  let them know there were insufficient dividends or

17  dividend balances in their policies to allow it to

18  remain on APP?

19                   MS. TAYLOR:  Objection as to form.

20       A     I can't recall other than the things

21  you just mentioned.  Any special notifications

22  that were sent to these particular customers

23  identified in the study.

24                   (OFF THE RECORD)

25                   (LUNCHEON RECESS TAKEN)

107

WILHELMENIA TAYLOR

1

2            A F T E R N O O N   S E S S I O N

3

4    WILHELMENIA TAYLOR continues testifying as

5    follows:

6

7    CONTINUED DIRECT EXAMINATION BY MS. TAYLOR:

8            (Letter, November 4, 1995, Rayl

9    to Lynch is received and marked Taylor 11 for

10   identification)

11           MR. BARTHOLOMAEI:  For the record,

12       what I have just marked as Taylor

13       deposition Exhibit 11 is a November 4, 1995

14       letter from Jim Rayl to Frank Lynch

15       regarding Collapse Date Notification –

16       Accelerated Premium Payment.  Bates numbers

17       of MP 4011071129 through 71132.

18       Q    Ms. Taylor, if you could just take a

19   moment and read through at least the first page of

20   this document and I'm going to ask you some

21   questions about it.  If you want to read through

22   the rest, that's fine, but I have questions only

23   as to the first couple of pages.

24       A    I read page 1 and 2.

25       Q    The last paragraph on page one starts

108

1          WILHELMENIA TAYLOR

2      off, "The AP natural work team".  You see that?

3          A     Yes.

4          Q     Talks about a proposal suggesting

5      that all 93,000 policyholders currently on the AP

6      Arrangement be notified and Mr. Rayl says he was

7      lead to believe that the cost was prohibited or

8      cost was a consideration for not following through

9      with that proposal.

10              The first question I have, are you

11     aware of such a proposal that was considered by

12     the AP natural work team as described here by Mr.

13     Rayl?

14         A     I don't recall this proposal.

15         Q     Was there any proposal considered by

16     the AP natural work team of notifying all

17     policyholders who are currently on the AP

18     Arrangement?

19         A     I don't recall, but there were a lot

20     of memos in discussions that took place on the AP

21     team.  I don't recall specifically that proposal

22     to contact everyone.

23         Q     Was there any study done or any

24     investigation of the amount of money it would cost

25     to notify people who were on the AP Arrangement?

109

1                    WILHELMENIA TAYLOR

2          A     I also don't recall an amount or a

3    study.

4          Q     The company give any consideration to

5    the amount it would cost to notify a whole class

6    or the entire universe of people who are on the AP

7    Arrangement?

8                 MS. TAYLOR:  Objection as to form.

9          A     I don't recall the amount of money

10   with respect to notifying people you just

11   described.

12         Q     On the second page, Mr. Rayl talks

13   about the dividend scale having been lowered in

14   1996.

15               Do you have any knowledge as to

16   whether the dividend scale was lowered in 1996?

17         A     Yes, I believe the dividend scale was

18   lowered in 1996.

19         Q     What about at this point in time --

20   we are now talking about the end of 1995,

21   beginning of 1996 -- was any further contact made

22   with policyholders like we talked about before

23   outside of the anniversary statements, billing

24   statements or suggestion that representatives

25   contact policyholders who were participants in the

110

1                    WILHELMENIA TAYLOR

2    AP Arrangement?

3        A    Although I wasn't involved in the

4    Accelerated Payment Arrangement during this time

5    period, I recall that there was some documents

6    with respect to the announcement of the dividend

7    scale reduction for 1996 that encouraged

8    representatives to contact their customers as part

9    of the preparation for this deposition.

10       Q    Was any further contact made with

11   policyholders individually like we talked about

12   before?  I asked you a whole series of questions

13   before at that time in '92, '93.  Was anything

14   done at this point in time in late '95, '96?

15            MS. TAYLOR:  Other than the

16            communication she already discussed?

17            MR. BARTHOLOMAEI:  Other than what we

18            talked about.

19       A    I don't recall other communications

20   other than what we discussed.

21       Q    You are not aware of any?

22       A    No.  I wasn't involved in the AP

23   Arrangement at that point in time.  I'm trying to

24   recall from the documents I looked at.

25            (Letter, October 28, 1994, Rayl

111

1              WILHELMENIA TAYLOR

2    to Barbara Gardner is received and marked as

3    Taylor Exhibit 12 for identification)

4              MR. BARTHOLOMAEI:    What was just

5         marked as Taylor deposition Exhibit 12 is a

6         memorandum from Jim Rayl dated October 28,

7         1994.   This is addressed to Barbara Gardner

8         and the Bates numbers are MP 4011071009

9         through 71014.

10         Q       Is this something you have seen

11    before, Ms. Taylor?

12         A       No, I don't recall seeing this

13    before.

14         Q       Is this something that was used by

15    the natural work team?

16         A       Not that I can recall.   It's dated

17    October 19 '94 and I basically wasn't involved

18    with the natural work team after that.

19         Q       Do you know who would know the answer

20    to that?

21         A       I'm not even sure if I remember the

22    natural work team was still in existence in

23    October 19, '94.   I can't think of anyone who

24    would know this was used except some other members

25    of the natural work team.   There were several

112

1            WILHELMENIA TAYLOR

2    people on the team.

3                  (Letter, January 3, 1995, Rayl

4    to Barnewold is received and marked Taylor 13 for

5    identification)

6                  MR. BARTHOLOMAEI:  What has just been

7    marked as Taylor Exhibit 13 is a one-page

8    letter from Jim Rayl to Bill Barnewold

9    dated January 3, 1995 regarding field

10   announcement for AP anniversary statements.

11   Document bears Bates number MP 4011071008.

12          (OFF THE RECORD) (ON THE RECORD)

13                  (Letter, Darlane West to

14   Barbara Gardner, January 11, 1995 is

15   received and marked Taylor 14 for

16   identification)

17                  (Memo to the Field Force from

18   Metropolitan Life re AP Arrangement

19   Customer Communications is received and

20   marked Taylor 15 for identification)

21                  (Document titled Accelerated

22   Payment (AP) Arrangement, March 28, 1995,

23   by Bill Barnewold is received and marked

24   Taylor 16 for identification)

25                  (Memo to Distribution, from

113

WILHELMENIA TAYLOR

1

2      William T.  Barnewold, December 8, 1995, re

3      Accelerated Premium (AP) Arranged, plus

4      attachments, is received and marked Taylor

5      17 for identification)

6      Q      Ms. Taylor, you read this over?

7      A      Yes.

8      Q      Is this something you saw before

9  today?

10     A      I don't recall seeing this.

11     Q      This is another letter from Mr. Rayl

12  to Mr. Barnewold.  Mr. Rayl in the second to last

13  paragraph says:

14              If anyone believes that the majority

15  of our Field Representatives will actually

16  approach these customers and explain it, they are

17  living in a dream world.  Many of the writing reps

18  are long gone and the others have no vested

19  interest in communicating this kind of bad news to

20  the customer."

21              The question I have, is this

22  something that was considered in the proposed

23  strategies by the natural work team as to whether

24  the existing representatives would go and inform

25  customers that there may be issues with respect to

114

1                          WILHELMENIA TAYLOR

2      their Accelerated Payment plans where the plan or

3      policy had been sold by a prior representative who

4      no longer works at the company?

5                      MS. TAYLOR:  Objection as to form.

6          A      With respect to the rep's willingness

7      to do so?  I don't remember that being discussed

8      on the AP natural work team, although the reason

9      we created the brochures and educational pieces

10     was to explain how the AP Arrangement worked at

11     Metropolitan Life expressly for new

12     representatives who may be inheriting customers

13     that they didn't actually make the sale to.

14         Q      Were these brochures mailed to

15     policyholders or something the sales

16     representatives were supposed to distribute to

17     policyholders?

18                     MS. TAYLOR:   Objection to form.   I

19                 think this was asked and answered.  I know

20                 there was a discussion of ABC's dividends

21                 she specifically mentioned.

22                     MR. BARTHOLOMAEI:   I'm not clear

23                 whether that was something sent to Field

24                 Representatives and either mailed out from

25                 there or distributed from there or

115

WILHELMENIA TAYLOR

1

2      something mailed out from the Home Office

3      at Metropolitan Life?

4           THE WITNESS:   I believe the ABC's of

5      Dividends brochure was mailed out.

6           Q      Mailed out from where?

7           A      The payment process centers as stuff

8      included in bills to customers.   The brochures

9      were available and wording similar to the brochure

10     was included in the Metropolitan Life Outlook sent

11     to customers and Accelerated Payment brochure

12     could be used by the representative in a

13     discussion with either prospective customers or

14     customer regarding the AP Arrangement.

15           Q      Were any mailings done from the Home

16     Office or department of Metropolitan Life to

17     policyholders where the mailing only contained a

18     brochure talking about Accelerated Payment Plan?

19           A      I can't recall, but I don't believe

20     so.   I think it would be included with other

21     information about the policy.

22           Q      So these brochures were basically

23     stuffed in with a Bill or anniversary statement or

24     something like that?

25           A      The ABC's dividend brochure.   The

116

WILHELMENIA TAYLOR

1

2  other brochure could have been hand delivered and

3  discussed by the representative with the customer.

4      Q.    The ABC's brochure was the only one

5  mailed to the customer?

6      A.      That's that I recall.  This is 1995.

7  I don't remember from the documents what processes

8  and mailings took place after that date.  They

9  could be in the documents.  I can't recall right

10  now.

11      Q.    Was there any follow up done on

12  whether sales representatives were actually going

13  and distributing the brochures to policyholders?

14          MS. TAYLOR:  You mean the Accelerated

15      Payment Arrangement brochure.

16          MR. BARTHOLOMAEI:  Yes.

17      A.    Like a surveyor something?

18      Q.    Anything, where the branch office

19  somebody contacted and said, are your sales reps

20  distributing these brochures or policyholders

21  contacted, and said, have you received brochures

22  from your sales rep?  Any type of follow up?

23      A.    I can only speak what I know of.

24          Branch managers could have required

25  their sales reps or regional managers after we

117

1                          WILHELMENIA TAYLOR

2    made the brochures available.  I don't recall a

3    memo coming from the Metropolitan Life Home Office

4    or a survey conducted at that level.  It could

5    have been done at the more local level of the

6    field.

7          Q      I think you answered my question.  So

8    I'm clear.

9                        What I'm asking, was anything done at

10   the Home Office level to determine whether sales

11   representatives were either distributing, to

12   determine whether sales representatives were

13   distributing these brochures we just talked about?

14         A      I can't recall any action taken at

15   the Home Office level to determine whether the

16   representatives were using these brochures and

17   discussing these brochures with their customers.

18         Q      Are you aware of that action taken at

19   any level?

20                MS. TAYLOR:  Objection as to form.

21         Asked and answered.

22         A      Not a survey.  I can't really speak

23   to what the local management did.  It didn't

24   happen at the Home Office level.  It's very

25   conceivable it happened at the field office

118

WILHELMENIA TAYLOR

1

2    levels.

3    Q    I understand it's possible.

4    A    I'm not aware of it, no.

5        MR. BARTHOLOMAEI:  I'll mark this

6    next document as Taylor Exhibit 14.  It is

7    a one-page memorandum from Darlane West to

8    Barbara Gardner regarding AP Accelerated

9    Payment Arrangement.  Bates number of the

10    document is MP 4011070911.

11    Q    Prior to today, is this something you

12    had seen before?

13    A    No, I don't recall seeing this.

14    Q    Do you know who Darlane West is?

15    A    If I'm not mistaken, Darlane West was

16    at some time I think she participated on the AP

17    natural work team.

18    Q    What role did she play in the AP

19    natural work team?

20    A    She was a member of the customer

21    service organization that participated on the

22    team.

23    Q    In the second to last paragraph it

24    states, that it says in the next couple of weeks

25    the billing documents to carry the AP collapsed

```
 1                    WILHELMENIA TAYLOR

 2   date.

 3                Let me ask you first if you know what

 4   that means, the AP collapsed date?

 5                MS. TAYLOR:  Objection to form.

 6        A    I'm not sure what she means by

 7   collapsed date.

 8        Q    Is that a term used at Metropolitan

 9   Life?

10        A    It's in this memo.  It's not a term

11   I'm familiar with.

12        Q    The last two sentences of that same

13   paragraph says:

14                "A short statement on a billing

15   document is not enough.  We need to be providing a

16   complete explanation about the AP problems before,

17   underlined, we place any information on the

18   billing documents."

19                Is that something that was considered

20   by the natural work team in deciding which

21   information would be placed on the billing

22   documents sent to policyholders who were

23   participants in the AP Arrangement?

24                MS. TAYLOR:  Objection as to form.

25        A    I'm not sure what she's referring to
```

120

1                    WILHELMENIA TAYLOR

2    here because there was already information

3    including, from my recollection, the documents

4    that I reviewed, that was already included on the

5    billing document, anniversary statement for AP

6    customers.  I'm not sure what she's talking about

7    here.

8         Q     The paragraph above that.  The second

9    to last sentence says:

10                    "We can't continue to always rely on

11   our field associates to communicate policy

12   provisions to our policyholders."

13                    Is that something that was also

14   considered by the AP natural work team by others,

15   other people other than Ms. West who was part of

16   the team?  Did you understand the question?

17                    She says, we can't continue to always

18   rely on our field associates to communicate policy

19   provisions to our policyholders.  You told me she

20   was part of the AP natural work team.

21                    I'm asking were there others on the

22   AP natural work team who either made the same

23   suggestion or was that something that was

24   discussed on the AP natural work team?

25                    MS. TAYLOR:   Objection as to form.

121

1                    WILHELMENIA TAYLOR

2        A     First of all, I mean Ms. West appears

3   to be talking about the communication of policy

4   provisions by Field Representatives and it's a

5   pretty broad statement.

6              Always relying on the field sounds

7   more like her opinion.  I never heard that

8   discussed on the AP natural work team, that we are

9   always relying on field associates to communicate

10  policy provision and AP is not a policy provision.

11  I don't understand her statement even more.

12       Q     In that second to last paragraph

13  here, "our policyholders will not understand",

14  that's the second sentence.  Do you see that part?

15       A     Got it, yes.

16       Q     Was there any discussion done by the

17  AP natural work team as to the level of

18  understanding or communication that policyholders

19  had of billing statements like this?  Any testing

20  done showing it to people and asking them to

21  explain it or if they could explain it?

22             MS. TAYLOR:  Objection as to form.

23       A     She is referring to something for an

24  AP collapsed date.  Then she's saying, our

25  customers will not understand.

122

WILHELMENIA TAYLOR

1

2         So I don't recall us conducting a

3   study to decide if the billing documents that she

4   is referring to would be understandable to a

5   policyholder.  I don't recall any such study.

6         Q     What about a study investigating

7   whether, like I said, billing statements or

8   anniversary statements were understandable to

9   policyholders?

10        MS. TAYLOR:  I want to object to the

11        form.  I think the word "study" is

12        ambiguous, what a formal study is.  There

13        is a communications area.  And I believe

14        Ms. Taylor testified there was someone in

15        communications who was on that team and

16        objectively looks at documents in terms of

17        communications.  I don't know the word

18        "study" is that clear.

19        MR. BARTHOLOMAEI:  You can call it

20        what you want.  I'm asking about any type

21        of investigation, gathering of information

22        in order to obtain a result where people

23        looked into something such as the level of

24        understanding that people had when they

25        received their anniversary statement or

123

WILHELMENIA TAYLOR

1

2      billing statement of the information that

3      was contained in those statements.

4          Q      I gave you a couple of examples

5      before.  For example, someone was contacted and

6      said when you received your anniversary statement,

7      did you understand it could mean X or something of

8      that nature?

9          A      I'm not aware of it.

10         Q      What I just marked as Taylor Exhibit

11     15 is a three-page document to the Field Force

12     regarding the Accelerated Payment Arrangement,

13     Customer Communications dated March 27 1995.  MP

14     4011070918 to 70920.

15             On the right of the document it says,

16     Metropolitan Life Individual Sales Release.

17             The attachment is entitled MetLife's

18     Accelerated Payment Arrangement.  Is this

19     attachment, which looks like a brochure, is this

20     something you have been referring to during the

21     deposition today?

22         A      It appears to be, yes.

23         Q      What was the purpose of this

24     brochure?

25         A      To provide more education to MetLife

124

1          WILHELMENIA TAYLOR

2    customers on how the Accelerated Payment

3    Arrangement worked at MetLife in a question and

4    answer format.

5          Q    Just so we can identify it.  Can you

6    tell me, this was one of the brochures you were

7    referring to earlier, it was to be distributed by

8    sales representatives at the branch level?

9          A    It could have been.  If reps were

10   provided with a, I think a larger version of the

11   brochure.  This one was designed to be mailed.

12   This happened in 1995.

13         Q    Is this also a brochure mailed to

14   policyholders?

15         A    Reading this document it appears it

16   was mailed to customers.

17         Q    Can you tell me to whom this brochure

18   was mailed to generally?

19         A    Generally speaking, 1995 I wasn't

20   involved with AP.  I'm reading the document.  It

21   says it will be mailed with anniversary statements

22   to policies already active on the AP Arrangement

23   as well as being mailed to customers who newly

24   requested the AP Arrangement.

25         Q    Is this brochure something you have

125

WILHELMENIA TAYLOR

1

2    seen before?

3         A       The longer version, yes.

4         Q       What's the longer version, what does

5    that mean?

6         A       This is a one-page brochure and says,

7    although the format and design of the brochure has

8    been altered to meet postage requirements, the

9    text of the one-page AP insert is identical to the

10   text of the legally-approved consumer brochure.

11        Q       The one that was provided to sales

12   representatives is actually a three or four-page

13   brochure?

14        A       It may have been more than three or

15   four pages.  It's in the documents how many pages

16   it was.

17               This says there were eight pages,

18   third paragraph.

19        Q       Was this brochure created by the

20   natural work team?

21        A       Which brochure?

22        Q       The one we are looking at?

23        A       Since is identical in nature, the

24   natural work team did work on the brochure, yes.

25        Q       Who else worked on that besides the

126

WILHELMENIA TAYLOR

1

2    natural work team, if anybody?

3        A    I don't know, that I can think of.

4    The team worked on it and it was approved for

5    release.

6            MR. BARTHOLOMAEI:   What I have marked

7        as Taylor Exhibit 16 is a document entitled

8        Accelerated Payment Arrangement, and the

9        Bates numbers are MP 4011070905 through

10        70908 and there is a document signed by

11        Bill Barnewold annotated March 28, 1995.

12        Q    Is this something you've seen before,

13    Ms. Taylor?

14        A    I don't recall seeing this.

15        Q    On the front page there is a list of

16    names from different departments in MetLife and

17    the bottom right there is a little star and says

18    AP, I assume that stands for natural work team,

19    NWT Members.   There are stars next to the names of

20    people on this list.

21            I want to ask you generally if you

22    recognize some of these people as members of the

23    natural work team where it is indicated?

24        A    I recognize some of the names, yes.

25        Q    I don't see your name.   At this time

127

WILHELMENIA TAYLOR

1

2    you weren't on the natural work team, is that

3    right?

4         A    Correct.

5         Q    On page two, it says:

6              "The following AP actions are

7    contemplated for 1995."  There is a list of

8    several different I guess called AP actions.

9              Can you tell me which, if any, of

10   these, I'll use the word "actions" because that's

11   what it says in the document, were actually put

12   into effect in 1995?

13        A    I'd have to go through the documents

14   to see what was involved in the AP.  I would have

15   to check the documentation and compare it to the

16   documents.

17             Item 1, it appears that was done.  We

18   just looked at it.

19        Q    Go through them one by one.  What

20   about number two?

21        A    I don't know.  I would have to -- I

22   don't know if there is any document that speaks to

23   it other than this memo.

24             I can't recall if each one of these

25   things were done because I wasn't involved with

WILHELMENIA TAYLOR                    128

1
2    the unit.  I would have to compare it to other
3    documentation as part of in deposition to see if
4    there was something that spoke to the
5    implementation.
6         Q    Do you know who I would have to talk
7    to to find out which of these things were
8    implemented?
9         A    Probably Bill Barnewold, he would be
10   the person.
11        Q    Can you look at number three, first
12   paragraph of number three.  If you could, read
13   that please.
14        A    Okay.
15        Q    At the top of the page and right
16   below that paragraph, it says:
17             Additional members of top management
18   would have to approve or concur with, it says this
19   threshold strategy and the collapse year parameter
20   selected.
21             Can you tell me why that particular
22   strategy would have to be approved by the other
23   members of top management?
24             MS. TAYLOR:  Objection as to form,
25        lack of foundation.

129

WILHELMENIA TAYLOR

1

2      A      No, I don't know why.

3           MR. BARTHOLOMAEI:    What I just marked

4      as Taylor Exhibit 17 is a document, the

5      cover page is dated December 8, 1995 which

6      attaches a document dated December 4, 1995.

7      MP 4011070898 through 70903.

8      Q      Is this something you had seen

9      before?

10     A      I don't remember seeing it.

11     Q      Looking at the first page below the

12     box where it is redacted, do you see that?

13     A      Yes.

14     Q      At the next Board of Directors

15     meeting on December 19, 1995 John Tweedy will be

16     updating the members on what is being done to

17     overcome the concerns associated with "vanishing

18     premium" cases.

19          Can you tell me if the term

20     "vanishing premium" was something that was used at

21     the company at this time in 1995?

22          MS. TAYLOR:    Objection.

23     Q      To describe a certain type of case?

24     A      In 1995 I wasn't involved with the

25     Accelerated Payment Arrangement anymore.

130

1                    WILHELMENIA TAYLOR

2              I'm looking at this document and it

3    has vanishing premiums, the words in quotes.

4    Office obviously used, but I don't know if it

5    was -- I don't know if it was used other than in

6    context of this memo.

7         Q    Can you look at the second page

8    please.

9              First paragraph says:

10              "Using the 1996 dividend scale, we

11   determined how many policies are eligible for AP

12   and how many will collapse before the life

13   expectancy of the policy is reached."

14              Again uses that term "collapse".  Is

15   that something again you are familiar with?

16        A    Nope.  I'm not familiar with the use

17   of that term.

18        Q    Below that it says, the following AP

19   information was determined as of 11/27/95.

20              149,482 policies, total number active

21   AP cases.

22              114,647 are fully sufficient for the

23   life expectancy of the policy.

24              34,835 will collapse before reaching

25   life expectancy of the policy.

131

WILHELMENIA TAYLOR

1

2          It goes on to give how many will

3     collapse after 10 years, how many will collapse

4     between five and 10 years and then on and on.

5          Can you tell me what study was done

6     or what information or investigation was made,

7     what information was gathered, excuse me,

8     investigation was made to determine these numbers

9     for these statistics?

10     A     No, I can't.

11     Q     Do you know who could tell me that?

12     A     Probably Bill Barnewold.

13     Q     Paragraph underneath that says, the

14     expected rate of collapse then, this is based on

15     the 1995 dividend scale, was 18 percent of the

16     policies that are active on MetLife's AP

17     Arrangement.

18          Next sentence says, using 1996

19     dividend scale, it is now expected 23 percent of

20     our AP Arrangement will collapse before the policy

21     life expectancy is reached.

22          Can you tell me whether that was in

23     fact accurate at this point in time in 1995?

24          MS. TAYLOR:  Objection as to form,

25          lack of foundation.

132

WILHELMENIA TAYLOR

1

2          A       No, I can't.

3          Q       Do you know who would be able to

4    testify to that?

5          A       Most likely Bill Barneworld.

6          Q       Look at the page ending in Bates

7    number 902 please.

8                  At the top it has a heading, Future

9    AP work to be started in 1996.

10                 Then it says number one, "Add wording

11   as required to AP annual notices".

12                 What's an AP annual notice?

13         A       I'm not sure what he's referring to

14   here.

15         Q       Then it says A:

16                 "For policies within the five-year

17   collapse window and as long as they remain within

18   the five-year window, continue to provide updated

19   options and date information on those billing

20   notices each year.  Policies that subsequently

21   move on outside the five-year window will cease to

22   receive information about options and collapse."

23                 Can you tell me why policies outside

24   of a fifth year window would not be, the

25   policyholders would not be informed about a

133

WILHELMENIA TAYLOR

1

2  collapsed date as to their policy?

3          MS. TAYLOR:  Objection to form.  Lack

4      of foundation.

5      A      No, I have no idea what this is

6  talking about, the word "collapse".  I'm not sure

7  what options he's talking about either.  I'm not

8  familiar with any of that.

9      Q      Let me ask you to look at the last

10  page of the document please.  The last paragraph

11  says:

12          "A main obstacle securing/maintaining

13  the discipline required by our natural work team,

14  NWT, to work on AP while also working on their own

15  day to day jobs.  All of our members have other

16  high priority work that must be completed on a

17  timely basis.  No one is exclusively assigned to

18  work solely on the AP effort."

19          Is that something that was the case?

20  When you were working on the natural work team,

21  that you also had something other than AP going on

22  with your job?

23      A      Yes.

24      Q      Is that also the case that no one was

25  assigned exclusively to work on Accelerated

134

WILHELMENIA TAYLOR

1

2      Payment Plan type issues?

3            MS. TAYLOR:  Objection as to form,

4        lack of foundation.

5        A      Well, the AP natural work team and

6      all those members who were participating on the

7      work team had some part of their job typically

8      dealt with AP customer service reps, communication

9      folks, marketing people.

10            So to say that no one worked, no one

11     is exclusively assigned to work solely on the AP

12     effort --

13        Q      Is that accurate?

14            MS. TAYLOR:  Talking about people on

15        the work team?

16            MR. BARTHOLOMAEI:  Yes.

17        A      I don't know about everybody else's

18     job, I can only speak to mine.  There could have

19     been members that participated on the AP natural

20     work team when I was a part of it.  For me, I did

21     other things.

22        Q      Do you know who would know if there

23     were such people on the work team that were

24     assigned exclusively to work on AP issues only?

25        A      What time?  In '95?

135

1                     WILHELMENIA TAYLOR

2          Q       During the existence of the natural

3     work team?

4          A       It would have to be somebody who was

5     on the team from the start until the end.    I

6     believe Barnewold was on the team from the very

7     beginning.

8          Q       What was his role on the team?

9          A       I believe that the administrative

10    people, the ones who set up -- his role began with

11    the mechanization, getting the system prepared to

12    handle AP requests and he was a member like most

13    of us and that obviously he had a bigger role

14    later on.  He's writing memos now.   Perhaps he

15    would be the one that can tell you about who was

16    doing what.

17         Q       When MetLife disseminated APP

18    marketing materials at or at the point of sale,

19    when APP marketing materials were used, was it

20    known that there was a possibility that the APP

21    marketing materials would not be accurate

22    illustrations of the way the policy would be

23    performed?

24              MS. TAYLOR:   Objection to form.

25              (RECORD IS READ)

136

WILHELMENIA TAYLOR

1

2          MS. TAYLOR:  Objection as to form, I

3      think it's confusing and known by him.

4      Also assumes facts.

5      Q      Did you understand that?

6      A      Not really.

7      Q      I can rephrase it if you need me to.

8              When MetLife created APP marketing

9      materials, something we talked about earlier in

10     the deposition, I asked you if APP was a marketing

11     tool and you said it was.  I'm asking when MetLife

12     created marketing materials, was it known by

13     MetLife that the APP plans wouldn't necessarily

14     perform as represented at the time of sale by the

15     sales representative to the policyholder?

16          MS. TAYLOR:  Objection as to form.

17          It assumes facts that haven't been

18          established.  Also mischaracterizes her

19          prior testimony.

20          MR. BARTHOLOMAEI:  Do you want it to

21          be read back with numerous clauses,

22          subparts?

23          (RECORD IS READ)

24          MS. TAYLOR:  There has also a lack of

25          foundation.  I'll just add that objection

137

WILHELMENIA TAYLOR

1    also.

2

3    A    It appears to be asking me about

4    something that the representative would be doing

5    and I don't know -- you said something about the

6    representative.  I think.

7    Q    The representatives didn't create the

8    APP marketing materials, right, they didn't draw

9    them up themselves and type them up in the office?

10    A    That's why I have a problem with the

11    question.

12    Q    All I was saying was that the

13    representative would eventually have to show that

14    to the customer.  You understand what I'm saying?

15    As far as it getting to the customer through the

16    representative?

17    A    Yes.

18    Q    The question was when MetLife created

19    the marketing materials themselves, did MetLife

20    know the marketing materials wouldn't necessarily

21    illustrate the policy accurately if there was some

22    kind of change in the dividend sale or whatever

23    other variable there might have been?  Do you

24    understand that?

25    MS. TAYLOR:  Let me put an objection

WILHELMENIA TAYLOR                    138

1
2          on the record.  It assumes facts that
3          haven't been established.
4          A.    The illustration as given to the
5    customer as part of an APP discussion with the rep
6    was the illustration in some type of consumer
7    brochure.  The illustration is just that, it's an
8    illustration of how the APP Arrangement would work
9    based on using current year's dividend scale and
10   so that, I don't know how they could possibly know
11   something else further down the road when they
12   were using the current year's dividend sale.
13         Q     I think this is getting to what I was
14   asking you about.
15               When you just said, "I don't know how
16   they could possibly know something further on down
17   the road", what did you mean by that?
18         A     I thought the question was did
19   MetLife know it would not perform the
20   illustration?
21         Q     Correct.
22         A     The illustration is just that.   It
23   uses the facts of a dividend scale that was in
24   effect at that time.
25               Based on that set of information the

139

WILHELMENIA TAYLOR

1

2    illustration is prepared and it's not trying to

3    look forward out to the future.  It's based on

4    using the current year's dividend and produce the

5    sales illustration based on that dividend scale.

6    I don't know how to answer the question.

7         Q      I think that does answer the

8    question.

9                Why wasn't the illustration produced

10   looking into the future, like you said?

11              MS. TAYLOR:   Objection as to form.

12          This was asked and answered.   She

13          previously had testified about the fact it

14          was her understanding that insurance laws

15          or regulations required companies to

16          illustrate using the current dividend

17          scales.   It was a requirement and I believe

18          that was her testimony last week.

19              She can answer it again but it's

20          already in the other transcript.

21        Q      Answer again if you can.

22        A      When sales illustrations are

23   produced, Met as well as other life insurance

24   companies were limited to the use of the dividend

25   scale in effect at the time the illustration is

140

1          WILHELMENIA TAYLOR

2    being produced and did not use any other dividend

3    scale in the production of that sales illustration

4    and that was, as far as my recollection, that was

5    a regulation of the law, that was a requirement.

6    We didn't have any alternative.

7          Q    At the time of the sale where an APP

8    illustrations was used, was any needs analysis

9    done in connection with an APP sale as to whether

10   the person would be able to afford the policy if

11   the dividend scale did drop or some variable

12   change that changed the AP year of the policy?

13              MS. TAYLOR:  Objection as to form.

14              Are you asking her if she knows what

15         happened during a particular transaction

16         involving a particular policyholder and

17         sales rep?  That seems to be what you are

18         asking her.

19              MR. BARTHOLOMAEI:  In essence that is

20         what I'm asking her with respect to what

21         MetLife's policies were with respect to AP

22         sales and she is the AP corporate designee.

23              MS. TAYLOR:  The way you phrased it

24         is in a specific situation.  You're asking

25         whether there was a policy.  That's a

141

1                    WILHELMENIA TAYLOR

2          different issue.

3               MR. BARTHOLOMAEI:   That is what I'm

4          asking.

5               MS. TAYLOR:   Why don't you restate

6          the question then.

7          Q     Was there a MetLife policy where the

8     sales agent was to do a needs analysis at the

9     point of sale to determine if a proposed insured

10    or a prospective customer could afford the policy

11    if the AP year changed on the policy?

12              MS. TAYLOR:   Objection as to form.

13         A     I don't recall and I wasn't involved

14    in how you are instructed to market the AP

15    concept.

16              But overall I have read documents in

17    the past to conducting a needs analysis in the

18    sale of all life insurance sales regardless

19    whether it was an AP sale or not and I don't

20    remember any policy with respect to

21    representatives doing some special needs analysis

22    based on a fluctuation or change in the AP

23    eligibility of a customer.

24         Q     How often did policies sold, pursuant

25    to APP, not qualify for APP in the year that's set

142

1                    WILHELMENIA TAYLOR

2    forth in the APP illustration?

3                    MS. TAYLOR:  Objection as to form.

4          A    I don't know the answer to that

5    question, but there may be documents, even ones we

6    already spoke to, that might give us information

7    as to when policies may not be able to stay on APP

8    that were already on APP with respect to those

9    that weren't on APP and shown illustrations.

10                    I don't have any information that I

11   can recall that tells me about that.

12          Q    Do you know who might know that?

13          A    No, I don't.

14          Q    Can you tell me what information an

15   Account Representative was trained to provide to

16   customers at the time of sale with respect to the

17   Accelerated Payment Plan?

18          A    Although I wasn't in the training

19   department, I know that a sales illustration was

20   available for use by the rep as well as consumer

21   brochures that explain the AP Arrangement.

22          Q    Did the sales rep have to use a sales

23   illustration in making an Accelerated Payment

24   sale?

25                    MS. TAYLOR:  Objection to form.

143

1                        WILHELMENIA TAYLOR

2          A      If he was using an Accelerated

3    Payment sale, he would most likely use an

4    illustration.  If he was just generally speaking

5    about the Accelerated Payment Arrangement, it

6    would not necessarily be, he wouldn't necessarily

7    be using an illustration.  Could be something that

8    comes up in a conversation with a customer.

9          Q      I guess what I'm asking, could a

10   sales rep at the point of sale say:  "We have this

11   thing called an Accelerated Payment Plan, I would

12   like to put you on this.  You're only going to

13   have to pay for seven years, after that the

14   dividend balance would be enough", whatever it is,

15   explain the Accelerated Payment Plan but not

16   necessarily show the person an illustration?

17               MS. TAYLOR:  Objection to form, calls

18          for speculation.  Lack of foundation.

19          Q      I'm asking if there is a Met policy

20   against that or you necessarily always have to

21   provide the person with an illustration when

22   making an Accelerated Payment sale?

23               MS. TAYLOR:  Objection as to form.

24   -      A      The last question, am I answering the

25   last question.

144

1              WILHELMENIA TAYLOR

2          (RECORD IS READ)

3          MS. TAYLOR:  Also a compound

4      question.

5          A    I understand the last part, was there

6      a policy required.  My understanding, correct, a

7      use of sales illustration in an AP sales by a rep?

8      Is that what you are asking?

9          Q    Yes.

10         A    I don't recall a policy that said you

11     had to use a sales illustration if you were

12     discussing AP.  I don't know what a rep would do

13     or not do, but I don't recall a specific policy.

14         Q    Who was it at MetLife that approved

15     the reduction to the dividend scale in the early

16     '90s?

17         A    My understanding it was the Board of

18     Directors that approved the dividend scales.

19         Q    Is that the same for every year?

20         A    My understanding it was the Board of

21     Directors.

22         Q    What about interest rate reductions?

23         MS. TAYLOR:  Objection.  I think it's

24     beyond the scope of this deposition.  This

25     is an AP deposition and interest rates

145

1                          WILHELMENIA TAYLOR

2              don't relate to that.

3              Q      Prior to the reduction of the

4      dividend scale in 1992, was any consideration

5      given by the MetLife Board of Directors on how a

6      reduction would affect policyholders on APP?

7              A      I'm not sure if it was the 1992

8      dividend scale, but I recall seeing a document

9      when I prepared for this deposition that discusses

10     someone at Met providing information to the Board

11     of Directors with respect to APP, the impact

12     dividends have on an APP.  I seem recall there was

13     discussion about that.

14             Q      Was it a document we looked at today?

15             A      I don't think so.

16             Q      Can you tell me what that document

17     was?

18             A      Something that came from the

19     actuaries to the Board.

20             MR. BARTHOLOMAEI:  Is that something

21     you can provide, Penny Taylor?

22             MS. TAYLOR:  We produced to you

23     memoranda that were prepared, memos.

24     Before the Board reaches a decision, they

25     review a recommendation.  The actuarial

146

WILHELMENIA TAYLOR

1

2  department prepares memos and say for this

3  year this is our recommendation and that

4  goes through their recommendation and

5  analysis.  We produced those.  That is what

6  she's referring to.

7       She's not on the Board of Directors

8  or actuarial department, but there are

9  documents that talk about the

10  considerations and you do have those.

11       MR. BARTHOLOMAEI:  I think at this

12  point I don't have any further questions.

13       I would like to request that some of

14  the documents that you have identified, at

15  least you said you think you referred to a

16  document and hoping some of those would

17  have been here today.  It may have been

18  some of those I weeded out to make the

19  deposition go a little quicker.  If some of

20  those can be identified where you were

21  referring to a specific document that we

22  eventually didn't get to.

23       MS. TAYLOR:  I'll reserve as to that

24  issue and I obviously need to discuss it.

25       Does anyone else have any questions,

147

1                    WILHELMENIA TAYLOR

2       people in Pittsburgh?

3              MR. LABOVITZ:   No, we do not have

4       questions.

5              MS. TAYLOR:   I think we're finished.

6

7          (TIME NOTED:  2:42 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

148

1

2                  A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK)
                                  :ss
5    COUNTY OF          )

6

7               I, WILHELMENIA J. TAYLOR, hereby

8    certify that I have read the transcript of my

9    testimony taken under oath in my deposition of

10   October 1, 2002; that the transcript is a true,

11   complete and correct record of what was asked,

12   answered and said during this deposition, and

13   that the answers on the record as given by me

14   are true and correct.

15

16

17   _____

18          WILHELMENIA J. TAYLOR

19

20   Signed and subscribed to
     before me, this _____ day of
21   _____ 2002.

22   _____
     Notary Public
23

24

25

149

1

2                    CERTIFICATION

3    STATE OF NEW YORK   }
                              ss
4    COUNTY OF NEW YORK  }

5         I, ALBERT M. CITTONE, a Certified Court

6    Reporter and Notary Public of the State of New

7    York, DO HEREBY CERTIFY that WILHELMENIA J.

8    TAYLOR, the witness whose deposition is

9    hereinbefore set forth, was duly sworn, and that

10   such deposition is a true record of the testimony

11   given by such witness.

12        I FURTHER CERTIFY that I am not related to

13   any of the parties to this action by blood or

14   marriage, and that I am in no way interested in

15   the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto set my

17   hand this 4th day of November 2002.

18

19

20

21   ------------------------------------------

22            ALBERT M. CITTONE

23      Notary Public of the State of New York

24

25

```
 1                                                          150

 2

 3                              INDEX

 4   WITNESSES:                              PAGE / LINE

 5   WILHELMENIA TAYLOR

 6       DIRECT BY MR. BARTHOLOMAEI               3 /    6

 7

 8                      INDEX OF EXHIBITS:

     EXHIBIT      DESCRIPTION               PAGE / LINE
 9
        2         Letter, December 7,        35 /   10
10                1992, Rayl to Tom
                  LaBadia
11
        3         Letter, December 17,       55 /   17
12                1992, Kathy Schoos to
                  LaBadia
13
        4         Letter, December 11,       58 /   24
14                1992, Schramm to
                  Duffy, plus
15                attachments

16      5         Letter, December 23,       62 /   12
                  1992, Rayl to Martin,
17                plus attachments

18      6         Letter, Rayl to           65 /   19
                  Schoos, December 31,
19                1992

20      7         Letter, January 12,        67 /   22
                  1993, LaBadia to Lynch
21
        8         Letter, January 19,        69 /   18
22                1994, Rayl to Crimmins

23      9         Memo to Frank Lynch        72 /    2
                  from LaBadia March
24                30, 1994

25     10         Letter, April 14,          82 /   25
```

| | | | | |
|---|---|---|---|---|
| | | | | 151 |
| 1 | | | | |
| 2 | | 1994, Wilhelmenia | | |
| 3 | | Taylor to Greg Doby, plus attachments | | |
| 4 | 11 | Letter, November 4, 1995, Rayl to Lynch | 107 / | 8 |
| 5 | | | | |
| 6 | 12 | Letter, October 28, 1994, Rayl to Barbara Gardner | 110 / | 25 |
| 7 | | | | |
| 8 | 13 | Letter, January 3, 1995, Rayl to Barnewold | 112 / | 3 |
| 9 | | | | |
| 10 | 14 | Letter, Darlane West to Barbara Gardner, January 11, 1995 | 112 / | 13 |
| 11 | | | | |
| 12 | 15 | Memo to the Field Force from Metropolitan Life re AP Arrangement Customer Communications | 112 / | 17 |
| 13 | | | | |
| 14 | | | | |
| 15 | 16 | Document titled Accelerated Payment (AP) Arrangement, March 28, 1995, by Bill | 112 / | 21 |
| 16 | | | | |
| 17 | | | | |
| 18 | 17 | Memo to Distribution, from William T. Barnewold, December 8, 1995, re Accelerated Premium (AP) Arranged, plus attachments | 112 / | 25 |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |