

**CONFIDENTIAL**

Thomas La Badia
Vice-President
P. I. Customer Services
Bridgewater  Area 2-E

RE:  Reappearing UL Premiums — Accelerated Payment Cases

We have reviewed Jim Rayl's November 7, 1992 memorandum and your
memorandum dated November 11, 1992.

We agree with all the points made in Jim's memorandum.

Ongoing eligibility testing for policies currently operating on
Accelerated Payment has become a necessity because of current
economic conditions.  Even if we undergo an economic recovery
which will allow us to increase our dividend scales in future
years, the lowering of the 1992 and 1993 dividend scales could
impact policies currently operating on AP, after the recovery has
taken place.

Our customers will be more accepting of the problem if they are
notified while lower returns on investments are a reality.  If we
wait until after economic recovery to tell them that a policy is
no longer eligible for AP because of something that happened in
the past, we could create more ill-will.  We do not want to
unnecessarily alarm our customers.  However, we feel we owe it to
our customers to notify them as soon as we become aware of a
problem.

We strongly agree that some type of letter or brochure that fully
explains AP should be sent to a customer as soon as his/her
policy is placed on AP.  Too many policyholders interpret AP as
making their policy "fully paid up".  So, when they are told
their policy is no longer eligible for AP due to lowered dividend
scales or dividend withdrawals, they almost immediately start to
complain or accuse the sales representative of lying.

Tom, we do not feel Jim is crying "wolf".  We have had to address
many of the situations he describes.  We feel a proactive
approach is the best approach.

Kathy Schoos
Director
Customer Services & Communications
MetLife Customer Service Center — Warwick

December 17, 1992

cc:  J. Abela, J. Rayl, B. Glittone, P. Knott

Thomas LaBadia
Vice-President
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater — AREA 2-E

Re    "Reappearing UL Premiums" – Accelerated Payment Cases

Tom, the article which follows appeared in the *National Underwriter* and it dealt with the idea of "reappearing premiums" on UL policies. Of equal or perhaps even greater concern to me are the reappearing premiums we are likely to encounter on existing "AP" cases. I raised this issue with Paul Garaveglia and John Hodel during their recent visit so perhaps it is being addressed. But I had not heard anything and this article prompted me to think about it again.

As I'm sure you're aware, as a result of the change in dividend scale this year we had cases where eligibility quotes were done by our sales offices at year end 1992 which indicated policies were eligible. However, when they came into us in early 1993 after our electronic systems had been modified for the new scale, these cases became ineligible and could not be placed on AP. This change in dividend scale has undoubtedly impacted the eligibility status of many of the policies currently on AP. I'm sure it goes beyond those that were placed on AP last year but would have been declared ineligible this year. As I understand it, once a policy is placed on AP, there is no ongoing "eligibility testing."

In some cases, it may not surface for several years that the dividends have become inadequate to fund the policy premiums. The point I tried to make to John and Paul was that it would be a lot easier to explain this situation to our policyholders now than it might be in the future. In otherwords, the national economy and the dramatic decline in interest *(and earnings)* rates is very obvious. If we notify these policyholders now that they may well have a problem in the future, they should be able to recognize what is happening in our economy. If, on the other hand, we wait until their policies run out of dividend values, it might be at a time when the economy and interest rates are much higher. And it would be more difficult to explain and harder for the policyholder to accept.

We are currently dealing with many complaints where policies were sold on the basis that they would be eligible for AP in "X" years. "X" years is now here and, because of the dividend scale change, eligibility has been pushed into the future. In spite of the "disclaimer" on the illustration about dividend projections, the policyholders get pretty upset and want to claim "misrepresentation." But, we have found that if you can get them to calm down and "look around" at what has happened, they will usually accept it. This would not be the case if the changes that have taken place in the economy weren't so obvious.

CONFIDENTIAL

NOTE: THE CURRENT PROBLEM IS ALSO COMPOUNDED BY THE WAY THESE POLICIES WERE SOLD. IN THE VAST MAJORITY OF CASES WE SEE, "AP" WAS SOLD AND EXPLAINED BY THE REPRESENTATIVE THAT THE POLICY WOULD BECOME "PAID-UP" IN "X" YEARS. WHILE THIS MAY HAVE BEEN THE EASIEST WAY TO EXPLAIN THE CONCEPT TO THE POLICYHOLDER, IT ONLY COMPLICATES OUR EXPLANATION OF CURRENT INELIGIBILITY. WE NEED TO PROVIDE POLICYHOLDERS WITH A BETTER UNDERSTANDING AND EXPLANATION OF "AP" AS WELL AS THE POTENTIAL IMPACT OF ECONOMIC CONDITIONS. WE WOULD BE MUCH BETTER OFF TO EXPLAIN THIS AT THE TIME THE POLICY IS PLACED ON "AP" THAN AT SOME POINT IN THE FUTURE WHEN DIVIDENDS BECOME INADEQUATE TO COVER PREMIUMS.

Tom, my recommendation would be to run new eligibility tests on all cases *currently on AP*. If they fail the eligibility testing or perhaps are even close to failing, we should notify those policyholders <u>NOW</u> that they may run into a problem in the future. I think our explanation will be much more readily accepted now. On the other hand, I think any significant number of policyholders are so affected in the future, it could do great damage to our image of financial stability and all the great strides we have made in becoming a customer oriented Company. For cases where eligibility is inadequate or "close," we could recommend that the policyholder pay one *(or more)* additional year's premium.

I would also recommend a couple other steps. One, we may wish to consider "tightening" up our eligibility testing. I have heard that we may be going to have another change in dividend scale. If this occurs, we will have another whole block of policies that could potentially have the same problem.

In addition, I think some type of letter or a little brochure should be prepared and sent to policyholders when they place their policies on AP. It should explain the AP concept in plain english as well as where dividends come from and why they are impacted by the general economy. In doing so, this would help to reinforce the initial disclaimer on dividend projections.

We cannot afford to leave policyholders with the impression that AP is a *"done deal"* or that their policies are *"paid-up"* and no future premiums will ever be required unless we can be absolutely, positively sure of it *(assuming the policyholder leaves the dividend balance undisturbed)*. This is the impression many of them have because of the way the policies were sold or explained.

Tom, perhaps I'm crying *"wolf"* a little too soon, but from where I'm sitting and what I see, I think this could be a real problem unless we take some proactive measures to deal with it.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 7, 1992

cc  Barbara Gardner

CONFIDENTIAL

Page 2

# Companies Are Tackling 'Reappearing' Premiums

By Linda Koco

"It's not a pretty story, but it's a real story, and one we're going to hear about more in the future," said Ben Hannum, a partner of Safe Harbor Financial brokerage in Philadelphia.

He was referring to the arrival of so-called "reappearing" premiums on universal life policies that were written on a vanish- or single-premium basis during the 1980s.

News reports have recently surfaced about companies notifying owners of such policies that they'll have to pay additional premiums—sometimes whopping ones—just to keep their policies in force. The reason most often cited is lower-than-projected investment performance, stemming from the nation's falling interest rate environment, and sometimes complicated by policy loans, skipped premiums, or failure to pay dump-in premiums as intended.

Mr. Hannum tells of one man with a $50,000 single-premium UL who was upset to learn that he will run out of policy by the time he is 67 years old, even if he lowers the face amount to $25,000. To keep the policy in force, the man had to deposit more money.

"Four or five years ago, I don't think agents or companies ever envisioned this would happen," he said.

The extent to which it is happening is a matter of dispute. Company executives contacted by National Underwriter indicated that most of their companies' existing UL policies have "no problems." This may be because their companies wrote very little, vanish-premium business in the 1980s or because they used conservative interest assumptions, the executives said.

Some also questioned the implications which UL critics draw from reappearing premium stories. The premiums may have come back due to heavy policy loan activity rather than lower-than-expected investment performance, they said.

Even so, the executives indicated that if today's low interest rate environment continues much longer, there will be more reappearing—and more increasing—UL premiums, and policy lapses may follow as angry and financially-strapped policyholders cancel out. Because of this, a number of companies are taking steps to "preempt" the problem.

PennMutual Life, for instance, is piloting a program that will detect existing contracts with declining cash values. "We will send a letter to the client and agent that will say what might happen if there is no change in the future," said Tom Harr, assistant vice president and product manager of the Philadel-

Cont'd on Page 18

CONFIDENTIAL

CONFIDENTIAL

# Cos. Go Proactive On Reappearing UL Premiums

*(Cont'd from Page 15)*

...

David G. Martin
Vice-President
MidAmerica Territory

Re    Referral of Accelerated Payment Plan as "Paid-Up"

Dave, as the attached file will indicate, I have been expressing my serious concern about the impact of our changing dividend scales and how it affects policyholders currently on AP and those who are expecting their policies to go on AP. From our perspective, the problem has been seriously compounded because of the marketing strategy used to sell or explain the concept of AP. It is very apparent from our experience that a substantial percentage of these policyholders were told that once AP took effect, they were "paid up" policies. With another dividend scale change for 1993, this problem is going to become even more serious.

The feedback I received from New York was that the marketing side of the house did not feel that the use of the term "paid-up policy" was a widespread practice. Based on the phone calls and letters we receive, I believe it is much more common than is realized. Considering the number of cases we encounter, if it was not widespread, it was still widespread enough that it may cause significant problems. These situations are occurring now on policies that were supposed to become *paid up* and it will impact us in the future when policies currently on AP will not have sufficient dividend balances to cover all future premiums.

Dave, attached is one such case which is a classic example. Inasmuch as it involves a sales office in MidAmerica, I thought you might be interested in seeing it. The policyholder became concerned and sought confirmation from the branch manager. Attached is a copy of the letter from the Branch Manager. While the Branch Manager may have attempted to cover himself in the second paragraph, the first paragraph would appear to be very clear as to when AP would take effect and the fact that future premiums would not be required. The letter states:

> "Once the premiums are paid for six years and the Automatic Premium Payment is selected by you, the policy is *paid-up*." (Emphasis Mine)

Dave, I am also attaching my file so you will have more of the background. This is having a growing negative impact on some of our policyholders as well as our administrative operation. But I am much more concerned about the potential impact it could have on our future marketing efforts if we don't attempt to address this issue with our policyholders soon.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 23, 1992

cc    Barbara Gardner    (Current Attachments Only)

**CONFIDENTIAL**

Metropolitan Life Insers.    Company
Metropolitan Property and Liability Insurance Company
Highland Place, Suite 305
6151 Wilson Mills Road, Highland Heights, OH 44143
(216) 449-3900


Metropolitan Life
AND AFFILIATED COMPANIES

**Craig J. Rutheatz**
Branch Manager

Registered Representative
Leaders Conference
2 Times Qualified

Dr. ███████████████████

Dear Dr. ███████

This letter is in response to some of the concerns you have
on policy #90██████ PR. Once the premiums are paid for six
years and the Automatic Premium Payment is selected by you,
the policy is paid-up. Thus you do not have to pay any more
and the extended term insurance would not apply after
payment is made for six years.

The dividends are decided by the Board of Directors of
Metropolitan Life Insurance Company. To the best of our
capabilities, we pay the illustrative cash value as shown on
the illustration. An illustration and a comparison with CD
is attached. However, the illustrative dividends are not
guaranteed. A 20 year dividend comparison is also attached.

I hope, I have answered all your questions. However, feel
free to call me at 216-449-3900 if you would like any more
clarification.

Sincerely,

Craig J. Rutheatz
Branch Manager

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

Life/Health/Annuities · Automobile · Homeowners ·
*Not yet available in all states

ATTN: Dividend Plan Unit
MetLife, P. O. Box 21209
Tulsa, Oklahoma - 74121-1209

November 16, 1992

REF: Paid up policy in six years for Policy #90████PR issued to ████████

Dear Sir/Madam:

· This is regarding some concerns I have regarding the policy sold to me by your sales agent Ranjan Jagetia (in Highland Heights branch, Ohio). He sold this policy emphasizing that the policy will be paid in full in five years, and at worst in six years. I bought this policy because I was assured by Metlife sales representatives that this insurance scheme is an investment scheme compared to simpler but cheaper term insurance schemes. I was also told that this policy will almost guarantee 12% rate of interest in addition to life insurance, and act as money sheltering plan in future.

Upon receipt of the contract, I was puzzled by the wordings of the letter which seemed to imply, I may have to pay indefinitely depending upon the dividend rate. I was very much concerned, and sought clarifications from the branch manager Mr. Craig Ruthsatz. I was told that it was certain that I would not have to pay more than six annual premiums of $3427.50 for six continous years even under the worst circumstances. The branch manager further assured me that METLIFE is best in the business, and will follow its dividend scale although it is decided yearly by the board of directors, and it could go through minor variations. I requested him to give these assurances in writing as the representatives of METLIFE insurance company. I was given the enclosed letter signed by Mr. Craig Ruthsatz which clearly assured me of METLIFE's commitment to have the policy paid up by the end of six years. The contract was accepted by me subject to these assurances.

Recently, I came to know that payment period is being changed by insurance companies. I contacted Ranjan Jagetia, and he told me that main office has my policy as being paid up on November 1997 at the current dividend rate. I was very much concerned, and sent a photocopy of the written commitment to Ranjan Jagetia who in turn promised to send to the main office immediately.

After Ranjan Jagetia failed to give satisfactory answer, I talked to Kim - the customer representative at the main office ( 1-800-MET-LIFE) on November 16, 1992, and she said that the written commitment from the branch manager will be honored, and I should explain the situation to your office. I hope that you would find this explanation satisfactory. As suggested by Kim, I am enclosing a copy of the letter given by the branch manager. Please let me know if you need any more information. I am also enclosing my third premium as a token of trust. However, I will request a written assurance from the main office that the confusion has been taken care of. If I have to pay more and possibly indefinitely simply to have life insurance, I will prefer to choose much cheaper group term insurance for next ten to fifteen years ( After which I will have sufficient savings to support my family without any insurance) from other agencies of which I am a member, instead of sinking my money.

With best regard ████████

Dr. ████████

████████ (home) ████████ (work)

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

Kathy Schoos
Director
Customer Services & Communications
MetLife Customer Service Center - Warwick

Re   Accelerated Payment Plan

Kathy, I just want to say "Thanks" for your letter of support on this to Tom LaBadia. In one of my conversations with Tom, he indicated that the "marketing" people felt that the number of representatives using the term "paid-up" was limited to a very small number. Needless to say, I disagreed with this and have been trying to illustrate that this is not the case. Your letter of support should also help make the point.

I don't remember the exact details, but Tom mentioned that Dave Martin was one of the people involved in the discussions that took place on this issue. If I remember correctly, I think Dave is chairman of some field committee that was supposed to address how we dealt with the dividend scale change, etc. I also assume it was Dave that felt the use of the term "paid-up" was not widespread.

It just so happened that I received a great complaint case and the policyholder had a letter from one of Dave's Branch Managers using the term "paid-up." Consequently, I wrote the attached letter to Dave. Although he may have been aware of it, I also sent him a copy of my entire file on this including the TMOS files from several complaints we received. I considered also sending this to Tom LaBadia and/or Frank Lynch, but considering my already strained relationship with Dave, I decided against it as I'm sure it would have annoyed him. I am just in hopes that this makes enough of a point that he might be willing to change his position.

But anyway, thanks for the letter. I'm not particularly optimistic, but no one will be able to say we didn't try and tell them.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 31, 1992

CONFIDENTIAL

ATTN: Dividend Plan Unit
MetLife, P. O. Box 21209
Tulsa, Oklahoma - 74121-1209                                    November 16, 1992

REF: Paid up policy in six years for Policy #90████PR issued to ████████

Dear Sir/Madam:

    This is regarding some concerns I have regarding the policy sold to me by your sales agent Ranjan Jagetia (in Highland Heights branch, Ohio). He sold this policy emphasizing that the policy will be paid in full in five years, and at worst in six years. I bought this policy because I was assured by Metlife sales representatives that this insurance scheme is an investement scheme compared to simpler but cheaper term insurance schemes. I was also told that this policy will almost guarantee 12% rate of interest in addition to life insurance, and act as money sheltering plan in future.

    Upon receipt of the contract, I was puzzled by the wordings of the letter which seemed to imply, I may have to pay indefinitely depending upon the dividend rate. I was very much concerned, and sought clarifications from the branch manager Mr. Craig Ruthsatz. I was told that it was certain that I would not have to pay more than six annual premiums of $3427.50 for six continous years even under the worst circumstances. The branch manager further assured me that METLIFE is best in the business, and will follow its dividend scale although it is decided yearly by the board of directors, and it could go through minor variations. I requested him to give these assurances in writing as the representatives of METLIFE insurance company. I was given the enclosed letter signed by Mr. Craig Ruthsatz which clearly assured me of METLIFE's commitment to have the policy paid up by the end of six years. The contract was accepted by me subject to these assurances.

    Recently, I came to know that payment period is being changed by insurance companies. I contacted Ranjan Jagetia, and he told me that main office has my policy as being paid up on November 1997 at the current dividend rate. I was very much concerned, and sent a photocopy of the written commitment to Ranjan Jagetia who in turn promised to send to the main office immediately.

    After Ranjan Jagetia failed to give satisfactory answer, I talked to Kim - the customer representative at the main office ( 1-800-MET-LIFE) on November 16, 1992, and she said that the written commitment from the branch manager will be honored, and I should explain the situation to your office. I hope that you would find this explanation satisfactory. As suggested by Kim, I am enclosing a copy of the letter given by the branch manager. Please let me know if you need any more information. I am also enclosing my third premium as a token of trust. However, I will request a written assurance from the main office that the confusion has been taken care of. If I have to pay more and possibly indefinitely simply to have life insurance, I will prefer to choose much cheaper group term insurance for next ten to fifteen years ( After which I will have sufficient savings to support my family without any insurance) from other agencies of which I am a member, instead of sinking my money.

With best regards

Dr. ████████

████████ (home)    ████████ (work)

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

To:   Frank Lynch
      Senior Vice President
      PI Customer Services
      NYHO
      Area - 5H

Re:   *Referral of Accelerated Payment Plan as "Paid Up"*

In reference to your note and Jim Rayl's 12\23 memorandum (copies
attached).  I have been working with Pam Duffy and Mike Harwood on
this issue and the related "Reappearing Premiums" that are
occurring because of lower dividend scales, higher cost of
insurance charges, and lower UL interest rates.

Pam Duffy responded to Jim Rayl last month on his proposal to
retest all policies on APP and notify all those who no longer pass
the eligibility test.  In lieu of that, marketing is creating an
education program with material to be sent to the field and
policyholders on APP explaining how it works and why it is
important to periodically recheck eligibility through their field
office.


Sincerely,


Thomas M. La Badia
Vice President                                    CONFIDENTIAL
P.I. Customer Services
Bridgewater
Area ~ 2E



January 12, 1993



cc:   Pam Duffy, Barbara Gardner, Jim Rayl

Robert J. Crimmins
Executive Vice-President
Personal Insurance

Dear Bob

I have tried to refrain from writing or bothering you unless I felt I had something really important to say because I know you are wrestling with far more important issues. But, in your recent conference call (which was very well received) you stated that more people needed to be able to reach you. In view of recent events, I thought it might be timely to give you a little reality check with the front lines to let you know how the situation looks from here. I will try and be as brief as possible but there is a lot of ground to cover.

I just learned that Vince was going to be leaving Customer Services to become your chief Planning Officer. On the one hand, that makes perfect sense. If there's anything you need, it is more people like Vince who hold the Company's interests first and then calls it as he sees it. Right or wrong, agree or disagree, you know he's not operating for some personal gain or based on some irrelevant personal agenda. I am sure he will be an extremely valuable asset to you in his new role.

At the same time, Customer Services and PI Administration is suffering a loss that may spell the difference between the success or failure of our customer service goals. And, because of everything that has, or is likely to transpire, these goals have become more important than at any time in my career with the Company. The media attention that was being focused on the Company is starting to shift to the industry as a whole. When that occurs, it may have an even greater impact (and policyholder reaction) on the Company than the specific MetLife publicity. But, it still brings with it a tremendous *opportunity* for the Company to strengthen its image by capitalizing on its customer service operations as well as its Field Force. Jim Valentine was just here and mentioned that one of the new Corporate strategies was to: *Build customer relationships based on; Service, Education and Trust.*

*Sound familiar?* It seems to me that you and I were discussing these potential benefits of Teleservicing *back in 1982 after you first envisioned it.* What an opportunity we have. For a long time I didn't think I would ever see the senior levels of management begin to be genuinely concerned with customer service, much less talk about it as a major strategy and priority. But, because of what's happened in the market place, it is recognized that it's become a necessity if we are to attract and retain business. And, the recent events give us an opportunity to make Teleservicing an even more valuable resource for Personal Insurance. But, the real question is: *Can PI actually begin to capture the full potential of this resource and its impact on the customer?*

I now have some grave doubts. If it's going to happen, from the customer's perspective, it will have to happen at this level of the organization. All the discussion at the high levels of the Company will not change customer perception. WE WILL! While I think we're running 200 miles an hour trying to make this happen, much of the organization has become an anchor that is only dragging us down. From my own personal perspective, with Vince, *there was hope.* Without him, I'm inclined to say there's not much chance that we can really achieve these goals unless other significant changes are forthcoming.

CONFIDENTIAL

A couple of years ago, when Frank took over as the first senior officer actually responsible for Customer Service, I told you I was pleased with the decision. This finally positioned us *(at least organizationally and on paper)* to make some dramatic progress. The centralization of the administrative work to Warwick and Tulsa combined with Teleservicing created a powerful customer service operation. It also provided many new opportunities for change and progress with respect to our customers and the delivery of customer service. But, for the most part, the moment and opportunity was lost.

While there was some change, it was basically *"business as usual"* and everybody continued working on their own personal agendas and would not listen to this level of the organization. The incompetent leadership of this office only exacerbated that problem. Most of the change continued to be driven from the top down instead of from the bottom up. Major *strategic change* which was trying to come from the bottom up continued to run into brick walls or be ambushed along the way. Bear in mind that the two Customer Service Centers were now dealing with our entire customer base. Having that scope to our operations put us in touch with what was happening all over. It gave many issues a new level of magnitude and priority. We saw many things happening with our customer base.

In spite of this, great things have still been accomplished at the front line employee level. The employee growth of the two Customer Service Centers actually enabled us to change our *"culture"* with respect to the way we think about and deal with our customers. But the fact is, at the upper organization level few people really wanted to hear our ideas. They did not want to discuss the new opportunities and possibilities this organization change created. While there were valid distractions in our Corporate organization *(i.e., Bridgewater move)* that had some impact on the level of progress we could make, the organization was, and still is, primarily consumed with its own self-interests and personal agendas.

I spent years trying to get people to listen to the potential of proactively addressing the customer complaints that came through Teleservicing *(including those from nurses)*. Some of these were truly frightening and deserved swift and decisive action. We long ago proposed a centralized Consumer Relations organization that would oversee the marketing complaints. It needed to have some real authority and be empowered to take corrective action with the Regions and/or Branches. The *one and only* attempt to address this was a valiant effort made by Vince during that brief period when he was responsible for Teleservicing before. But, the organization changed and it became apparent that this was an exercise in futility so for once in my life I actually *gave up* and dropped the issue. Based on complaints over the past three years, I tried to convince people we were *(and are)* sitting on a *"time bomb"* with the way *"Accelerated Payment"* was presented and sold to our customers. We are now moving, albeit very slowly, to address this issue, but again, nobody wanted to listen until it got really serious. I see this issue as being equally or perhaps even more dangerous than the Florida situation.

To effect change, our general modus operandi is to form *"Task Forces"* or *"Natural Work Teams"* to study the issues. In most cases, these are driven from the top down, controlled by personal agendas, and don't even involve the appropriate players. There almost seems to be an overt conspiracy against involving or even asking the opinions of the people who do the work or would have to live with the consequences.

CONFIDENTIAL

2

The current Teleservicing and Corporate 800 number Task Forces had no representation from Kathy or I until Vince stepped in and insisted upon it. We have jerked around and failed to take significant action with *"address changes"* since my days as manager of FES. Our current effort has gone on for over two years and we appear destined to develop a separate system that most of the users don't want, at least in the form it is taking. Again, we have a task force comprised primarily of "systems" people and a couple of token "users." Had people listened years ago, we wouldn't be considering this a major problem today.

*Single Image* is another example. This has been debated for on to three years now. Vince has had a dramatic impact on the progress of this project but we should be much further ahead than we are. The competition has leap frogged us on this. But, this was a *"bottom up"* project as opposed to a *"top down"* so getting the necessary support and action (prior to Vince) has been all but impossible. It still wasn't easy for Vince to get it off the dime and it is finally progressing, but at a pace that still puts full installation a couple of years away if not more. This, while we take 120 programmers off their projects to look for "expense savings." It almost borders on absurdity. Give the users the systems we want and need and we'll eventually get the savings, but not without the up front investment.

The Baldrige feedback was right on target with the statement that *"Planning for operational improvement is not as rigorous as planning for cost reduction."* We always go for the short term solutions. It's easier for people to cover their fannies by achieving the short term expense reductions than stretch for the long term savings by delivering the systems to meet the future needs. At the same time, we allow resources and money to be devoted to *"pie in the sky"* electronic projects coming from the top down that won't serve the users, aren't wanted, and we know won't work. (*I can cite examples but won't waste the space.*) Single Image is living testimony to our short sighted vision and the unwillingness of our people to take a risk. But, the Company has created the culture because this behavior continues to get recognized and rewarded.

With many of our change issues around the organization, we have a propensity to get everyone involved and let *everyone decide*. This is not effective participative management or a democracy. All it does is allow people to cover their fanny by having no individual to hold accountable or responsible. Every democracy needs a leader. All we should be guaranteed is that the affected parties to any change will be heard. Letting everyone *decide* only wastes time and impedes progress. After we have had our say, we need someone with a little vision, a little common sense, some savvy and the authority to make the decision and move forward. We try and get a consensus on too many things from the wrong people so we become impotent on the strategic issues that really matter. On the small decisions, we delegate everything upward because we don't hold people accountable. Consequently, we can't even get the small decisions made.

Kathy and I could probably help develop a *realistic and workable* strategy on the Corporate 800 number in a day. Instead, people have been involved that don't begin to understand the call center complexities. I have devoted hours upon hours trying to make people understand that the current direction would bring disaster, especially for the *customers of Personal Insurance*. But, again, nobody (*other than Vince*) wanted to listen to the facts and consider involving those who would be expected to make it work.

(*Although Vince has been extremely supportive since he took over, are you aware that we have been intentionally returning a "busy" signal to thousands of policyholder calls because we have been in a battle to play "catch up" on the staffing from 1992?*)

CONFIDENTIAL

3



While I guess Barbara is theoretically supposed make certain these issues are heard and understood, there isn't a chance. She isn't about to worry about the Company, the PI Customer or anyone else if it gets in the way of her own personal agenda or she can score more points by keeping her mouth shut and fully support Mr. Valentino's slightly flawed idea. But fortunately, I had a "one on one" with Jim Valentino and I think he finally began to understand the problems and issues at stake. But, someone still has to lead the charge if we are really going to make the changes required to meet the needs of the PI customer while implementing 800+MET-LIFE as the "Corporate" number.

Bob, there has been a revolution going on at this level of the organization. The size and scope of the two Customer Service Centers has dramatically changed the way every employee in this building looks at our customers. The revolution in the market place with respect to customer service is also very apparent to our employees. It is this level of the organization that should be driving change. This office represents about 42% of our customer base. If Barbara is to be the sole representative of that constituency within the organization, God help us, the customers and the Company. Her real impact and damage may not be visible for several years, but it will be there. I see no way our customers' interests will ever be adequately expressed and they will absolutely never come ahead of her own. We have changed so much at this level of the operation that most of those who have not been here in the midst of the battle cannot begin to comprehend what has taken place. She doesn't have a clue and most others are too busy to listen because of their own interests or agendas.

I've been knocking myself out trying to manage 200 people and tolerating all of Barbara's nonsense because, with Vince in place, there was hope. There was someone *listening* whose first concern was what was best for the Company. There was someone *brave enough* to be less worried about what was *politically correct* and who would stand up and be counted on the critical issues. And, it certainly didn't hurt that it was someone I considered a friend and who made it possible for me to tolerate this horrible environment.

Bob, now more than ever, we are confronted with opportunity. The opportunity exits to truly capitalize on everything that's happened. Between the establishment of a "Corporate" 800 Number and the further development of Teleservicing, we could use this resource to create a new image for the Company. In the process, we could:

+ Build or substantially reinforce the *relationships* with our customers through *easy access* and a concerted effort to make certain they are *educated*

+ Build or substantially reinforce the *trust level* of our customers

+ Develop *Sales Opportunities* beyond anything currently imagined

Bob, I know you've heard all of this before, but what you're hearing me say now is that IT ISN'T going to happen unless some dramatic changes take place in the administrative organization. With Vince gone, you need somebody who will *listen to the front lines*. You need some *(realistic)* visionaries and some risk takers. But, most of all, you need someone who is capable of driving this change within the organization and can make it happen. And, that's where it all falls apart as I'm not sure that such a person exists. I thought if anybody could do it, Vince could. But, even then, I wasn't sure he would be able to get past all the organizational blockades and barriers.

CONFIDENTIAL

4

I recently told you that I thought you were the only person who could lead Personal Insurance out of this current situation. I meant that. You are the only one who can truly *inspire* the organization. But I was also operating on the assumption that Vince would continue to be there to challenge and shake-up the administrative organization. In fact, I really thought he would be the heir apparent to Frank, and would then be in a position where he could really make the needed changes. But, I have no doubts that he will have equal, or perhaps greater impact in his new role. But, the entire PI organization needs to be shaken up to meet the challenge and seize the opportunity that we face.

Bob, I hope this does not come across as just being my frustration or that I'm just griping and complaining. I am trying to convey my sense of loss with the repositioning of Vince and also give you a picture of the way it looks from here. I have long since accepted that I'm not going to change the Company. Vince did give me a glimmer of hope that it might really change but, at this point, my expectations are pretty low.

I also hope you realize that I am in no way trying to blame you for what I perceive to be the problems in Customer Services. You placed your faith and trust in people and as far as I'm concerned, it is they who let you down. You are at far too high a level to be able to know or control what's happening at this level of the organization. To a degree, we are today the product of a 125 years of a "Corporate culture" that is really hard to change, although some progress has definitely been made.

As I have told some people lately, I am glad that I am approaching the end of my career rather than the beginning. After everything that transpired a couple of years ago over my difficulties with Barbara, and Frank made it clear that I really had no choice but to leave or endure, I knew where I stood. I have no real expectation that things will change at this office so if I can last another three years and four months, I fully expect to be out of here. I won't take one more day of this environment than I have to. And, I certainly can't fight all the Corporate and customer issues on my own. I'll have to work when I leave, but I really think I can go sell telephone switcher or find work in the call center/telephone field to supplement my retirement. But, I would really much rather be here if things were going to change and we were going to make a legitimate effort to become all we can be.

The fate of Personal Insurance will be determined by that time. MetLife will either be well on the road to being recognized as "The Company noted for the high ethics and integrity of its Field Force as well as its genuine caring and concern for its customers as demonstrated by its Customer Service operation" . . . . . . or it will probably continue to be just the "second largest life insurance company."

Even Jim Valentino acknowledged that PI is on the leading edge within the Company with respect to our Teleservicing and customer service. But, we should be on the leading edge within the entire industry. That's not going to happen unless there are some changes. We do have the opportunity in front of us, but I have serious doubts that enough of the organization is truly up to the challenge and commitment it will take to capitalize on the situation and go after the long term rewards and success that are possible.

CONFIDENTIAL

5

Bob, I have a feeling that Vince will be much happier in his new role and, in some ways, he's probably breathing a sigh of relief that he won't have to deal with the organization in the same way as he did in Customer Services. But, he will be sorely missed. I truly wish both of you all the best as you grapple with the overwhelming challenge that faces Personal Insurance. If it can be done, it is only you who can do it.

Please don't feel that I expect or want any personal response. All I want is to be heard, for whatever it's worth. But, do know that you, the Company and the customers have the loyalty, commitment and dedication of myself and my entire management team to do our very best to see that your visions are carried out, no matter what the obstacles. It is you who has inspired me and, in turn, enabled me to inspire them. If anything happens to that, it will be real hard to find a good reason to care anymore.

Warmest personal regards

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 19, 1994

CONFIDENTIAL

6

MET401107I023

ATTACHMENT
4

To:      Frank Lynch
         Senior Vice-President                      **CONFIDENTIAL**
         PI Customer Services
         NYHO, Area - 5H

From:    Thomas M. La Badia
         Vice-President
         PI Customer Services
         Bridgewater, Area - 2E

Re:      *Request From Mr. Tweedie Concerning UL Customers*
         *With Target Premiums Inadequate To Carry Policies*

I have had several quick meetings on this subject and the related Traditional Business
issues (e.g. Vanishing Premium/APP, Impact of Reduced Dividend Scales on Purchase
Assumptions, etc.).

The most proper and comprehensive method of providing our customers with the
impact of changes to dividend scales, interest rates and cost of insurance charges would
require several major long term initiatives included in which are the following:

   1.  Capture at Issue all information related to how a case was sold including
   purchase assumptions related to expected cash flow in and out of the contract.
   Retain and react to these assumptions whenever disturbed by changes in our
   inforce pricing(e.g. Dividend Scale Change, UL Interest Rate, Cost of Insurance
   Rate, etc.).  Relate these changes to the policyholder life cycle goals such as
   College Funding, Pension Maximization, etc.

   2.  Communicating changes to the policyholder along with possible alternative
   actions would require the restoration of a main frame inforce illustration system
   which could be generated by the Administrative Systems loading of necessary
   data to reflect changes and alternatives.  This is presently only available via a
   Sales Representative entering necessary data and "what if" alternatives into a PC
   based inforce illustration system.

Both of the above initiatives are being addressed by people involved in major
compliance activity, however, preliminary estimates indicate that a very lengthy and
expensive effort will be required.

1

As an alternative, I have asked my units to quickly devise a short term strategy based upon data and information presently available. We expect to have several proposals very shortly.

Among the alternatives being addressed are:

> 1. A redesigned bill having 3 alternatives which minimize the risk of unexpected premium being required for those already on APP.

> 2. More complete and direct notification to UL policyholders who may not be aware that their policies may not be supported by the planned, target premium and/or present cash flow into the accumulation fund.

> 3. Etc.

When the proposals are completed, we will forward them to you as well as to the various units, task forces and committees that are addressing the longer term strategy.

*Thomas M. La Badia*

Thomas M. La Badia

March 30, 1994

cc: Tweedie, Miller, Kelly, Doby, Stadler, Kopolovics, Delaney, Loquasto, Ruggieri, Barnewold

CONFIDENTIAL

Mr. Greg Doby
Vice-President


Re   Accelerated Payment Plan -- Alternatives


Greg, Bill Barnewold called and provided me with his estimate of
the cost and timeframe for implementing the APP alternatives
outlined in the attached memorandum.  In his estimation, the
changes could be made in  two-three months for a cost of
approximately $45,000.  However, If these changes are implemented
as part of the Fall 1994 portfolio changes, the cost would be about
$10,000 less.  Please let me know how we should proceed.


*Willie Taylor*

Wilhelmenia J. Taylor
Product Manager
Life Product Planning
Bridgewater, NJ, Ext. 1250


April 14, 1994


Attachment


cc:  Barnewold, DiPiazza, LaBadia, McLoughlin, Rigby


CONFIDENTIAL

APR 21 '94  8:02  FROM METLIFE                TO 82528847            PAGE.006

Mr. Greg Doby
Vice-President


Re   Accelerated Payment Plan -- Payment Options


This memo supplements our recent meeting with Tom LaBadia,
Mike DiPiazza, Bill Barnewold and Pat McLoughlin.  The goal of
this meeting was to develop a quick strategy for improving our
communications with policyholders already on APP.

As you know, the current situation is as follows:

Situation #1:

When a policyholder initially requests APP, a "full
eligibility test" is performed.  This test determines if the
annual premium can be paid for the remaining "life of the
policy."  If the policy fails this test, the policyholder
is told that the policy cannot go on APP and the the full
annual premium must be paid out-of-pocket until such time as
the policy does become eligible.  This is true even when
there is a substantial dividend balance to pay the annual
premium for a number of years, e.g. 15 years.

Situation #2:

When a policy passes the initial eligibility test, premiums
are paid each year through the APP arrangement provided the
policy passes a "sufficiency test."  We refer to this test
as a "sufficiency test" because it simply verify that the
dividend/PUAR balance is "sufficient" to pay the annual
premium due that year.  It does not check to see if this can
be done for the remaining life of the policy.  When a policy
fails this sufficiency test, it is taken off the APP
arrangement and the policyholder is sent a regular bill for
payment of the premium.

Our goal is to reduce negative feelings on the part of our
customers regarding this payment arrangement by offering them
other payment alternatives.  The specific group we intended to
initially target are the policyholders described in situation #2.
However, I believe we should take the same approach for the
policyholders described in situation #1.


CONFIDENTIAL

-2-

I have attached a copy of Mike Rigby's January 11, 1994 memorandum wherein Company records indicate nearly 83,000 policies are currently on APP as of year-end 1993. Of those, 25% do not have sufficient dividends/dividend balances to remain on APP for the "life of the contract." It is also important to note that these figures do not include policies with a Paid-Up Additions Rider (4,551). However, Mike conducted a sampling of 25 such policies and 21 of the PUAR policies or 84%, failed the eligibility test.

As discussed at the meeting, for each policy already on APP, a "full" eligibility test would be conducted as part of the anniversary processing. We agreed on the following approach for polices that fail the eligibility test.

Offer the policyholder the following options:

#1.  MetLife pays the full annual premium from dividends and/or PUAR for as many years as the balance(s) is sufficient. Include the calendar year in which the dividend/PUAR balance(s) will not be sufficient to pay the full premium. It is important to note that this date may change based on dividend scale decreases or increases.

We should, also let them know that thereafter, we can or will use the annual dividend credited each year toward the payment of the premium.

From what I have seen of policies that fail the eligibility test, the projected annual dividend for the "APP failure year," is substantial and is often only a year or two prior to the year in which the annual dividend would exceed the premium, i.e., crossover year. For example:

| | |
|---|---|
| Annual Premium | $7315 |
| Annual Div."APP Failure Yr." | $7055 (18th Year) |
| Crossover Year Dividend | $7520 (19th Year) |

#2.  policyholder pays a partial premium -- the difference between the annual dividend and the annual premium.

Although this payment option mirrors the Premium Reduction Dividend option on the surface, the existing dividend option (AI or DWI) would not be changed.

#3.  policyholder pays the full annual premium out of pocket

CONFIDENTIAL

-3-

An additional option could be offered to clients whose policies
fail the eligibility test, but includes the Paid-Up Additions
Rider (PUAR):

> #4. policyholder makes a lump sum payment to the PUAR that
> would allow the policy to go on APP effective with that
> anniversary

The anniversary eligibility test will be based on the dividend
scale then in effect. Therefore, any increase or decrease in our
dividend scale may:

> •change the policy year provided in payment option #1.

> •cause a policyholder who re-established eligibility when
> they originally elected payment option 4 (lump sum PUAR
> payment) to again become ineligible because of the dividend
> scale reduction.

Options #1, #2 and #3 do not attempt to re-establish eligibility
but instead offer alternatives to eligibility. Each year the
policyholder will be offered all three options and provided with
the most current information in order to make an informed
decision.

When presenting these payment options to policyholders, we should
also tell them the effect each option will have on their
dividend/PUAR values. Based on the amount of data that would be
included on the APP Anniversary Statement, I believe we should
change the size of the existing form to an 8 1/2" X 11" form with
an additional perforated return stub. See sample attached.

The anniversary statement should include wording along the
following lines :

**CONFIDENTIAL**

> "The premiums for this policy are being paid through our
> Accelerated Payment Plan. Under this payment plan, the
> annual premium is paid by withdrawing the premium amount
> from the [policy's dividend balance], as long as the balance
> is sufficient.

> Based on our current dividend scale, we have determined that
> the full annual premium can be paid until mo/day/year. As a
> result, we offer you the following payment options:

| | |
|---|---|
| Option #1 | ) |
| Option #2 | ) Specific wording for each |
| Option #3 | ) option will be developed |
| Option #4 (PUAR cases only) | ) |

[ ] varies based on the APP Type selected by policyholder.

-4-

The following is a list of the four APP types available:

| | |
|---|---|
| AP Type 1 | Withdraw PUAR values only to pay annual premiums |
| AP Types 2 & 3 | Withdraw dividends and PUAR values to pay annual premium |
| | Type 2 = withdraw PUAR first, followed by dividends |
| | Type 3 = withdraw dividends first, followed by PUAR |
| AP Type 4 (AI or DWI) | Withdraw only dividends to pay premiums |

If you have any questions, please give me a call on Ext. 1250 in Bridgewater.

Willie Taylor
Wilhelmenia J. Taylor
Product Manager
Life Product Planning
Bridgewater, NJ

April 4, 1994

cc:  B. Barnewold, M. DiPiazza, T. LaBadia
     P. McLoughlin, M. Rigby

CONFIDENTIAL

### FUTURE STATUS OF POLICIES ON THE ACCELERATED PAYMENT PLAN

A policy level projection of policies on the accelerated payment plan (APP) as of 11/93 was completed based on year end 1993 information. This analysis involved 82,778 policies and showed that 25% of the policies currently on APP have insufficient dividends and dividend balances to remain on APP. Attached is a breakdown by year of the dates of failure of these policies.

In my analysis of policies on APP I have excluded 4,551 policies with a paid up additions rider (PUAR). I will continue to work on these as time permits. A random sample of 25 policies with PUAR were tested using the online CWS APP quote system and 21 policies failed to sustain APP.

The following assumptions should be noted:

1) The 1994 dividend scale will continue unaltered.

2) Policies with both AI and DWI balances will use both dividend balances to remain on APP.

3) Policy holders will not withdraw any dividend balances other than for the APP arrangement.

4) No policyholder deaths, disabilities or cash surrenders.

In addition, some of the policies on APP as of 11/93 had become non-premium paying by 12/31/93.  Some had their cash-value paid while 180 policies were on extended term implying they had reached there anniversary after 11/93 and had insufficient dividends and dividend balances to pay their 1993 premium.

*M K R*

Michael K. Rigby
Actuarial Associate

1/11/94

CONFIDENTIAL

APR 21 '94  8:04  FROM METLIFE          TO 02520847      PAGE.011

## NUMBER OF POLICIES BY YEAR
### FALLING OFF APP STATUS
(Excludes policies with PUAR)

| YEAR | POLICIES |
|------|----------|
| 1994 | 517 |
| 1995 | 878 |
| 1996 | 1,595 |
| 1997 | 2,153 |
| 1998 | 2,484 |
| 1999 | 2,575 |
| 2000 | 2,390 |
| 2001 | 2,064 |
| 2002 | 1,282 |
| 2003 | 962 |
| 2004 | 807 |
| 2005 | 735 |
| 2006 | 627 |
| 2007 | 477 |
| 2008 | 359 |
| 2009 | 279 |
| 2010 | 270 |
| 2011 | 160 |
| 2012 | 111 |
| 2013 | 60 |
| 2014 | 68 |
| 2015 | 23 |
| 2016 | 28 |
| 2017 | 16 |
| 2018 | 5 |

| TOTAL | 20,925 |

CONFIDENTIAL

Frank Lynch
Senior Vice-President
ILI Customer Services

Re "*Collapse Date Notification*" - Accelerated Premium Payment

Frank, I have just reviewed the October 25th release to the Field on:

*Accelerated Payment (AP) Arrangement Customer Communications*

I hate to keep beating a dead horse but I am sorely disappointed. As the records will show, based on all the customer feedback we were getting about three years ago, I recommended that the Company take *immediate action* to address the Accelerated Payment issue with our policyholders. The result has been that it has taken the Company the best part of three years to begin to deal with this problem with specific affected policyholders. This action is outlined in the above release and, based on the "re" line, the Company apparently believes it is now "communicating" this issue to some of its affected customers. This communication consists of an innocuous statement on the billing document that will be confusing at best or will enrage those who believe they have been misled.

Of real concern is the fact that the Company is not fully addressing the problem. It is only notifying (not *explaining to*) those policyholders whose AP arrangement is going to cease within the next *five* years. The Company's failure to notify the entire 25% of the AP policyholders whose policies would currently be ineligible based on current AP calculations seems indefensible. I recognize that the Company has tried to address the AP issue in general terms with its policyholders through *MetLife Outlook* and other communications. But, we have not attacked the problem directly by going straight to those specific policyholders who we know are at risk. And, part of the problem is the fact that since the AP arrangement was never properly explained to the policyholder in the first place, he or she may not realize the Company is talking about them in some of the general communications.

The *AP Natural Work Team* offered several proposals to deal with specific policyholders. One proposal suggested notifying all 93,000 policyholders currently on the AP arrangement and I believe giving them the specifics for their policy. There was at a projected cost of $150,000 and I'm led to believe the cost was a consideration for not doing it. While this approach excludes all those policyholders *currently expecting* their policies to be "*paid-up*" in the near future, it would have at least addressed those whose AP arrangement is currently projected to fail at some future date. If cost was the reason for not doing it, it seems to me that $150,000 could wind up being an insignificant amount in light of some of the judgements currently being awarded associated with vanishing premium cases.

CONFIDENTIAL

DEPOSITION
EXHIBIT
#6

And, the Company's failure to deal with the whole spectrum of potential AP misrepresentation is only going to prolong the agony. At this pace, our Customer Service Representatives and Consumer Relations areas will never be able to get out from under these difficult calls and complaints. Is the intent to pray that if we address it a little at a time we are at less risk? Somehow I don't think that strategy is going to work. Considering all the current lawsuits associated with *vanishing premiums*, it only increases the length of time the Company is vulnerable to once again being brought to its knees by some future class action suit or renegade Insurance Commissioner. And, any such action will once again demoralize the entire Field Force, customer service organization and the CSRs who have to live through it.

The Company should make no mistake about it, as I graphically illustrated several years ago from our phone calls, many of our representatives *DID* misrepresent AP to our customers. Applicants or policyholders were told their policies would be *"paid-up"* in *"X"* years with no further premiums required. Some of this may have been done out of ignorance, a lack of training or knowledge, but, whatever the reason, . . . . *it was done* and the Company needs to recognize and address that fact.

And, as we now know, this was the terminology and tactic used to sell these policies throughout the industry. Yet, in spite of our educational efforts, the Company is going forward on a very limited basis with our *known* AP problem policyholders. This is being done in an environment where other insurance companies are having judgements against them right and left for real and alleged misrepresentations associated with vanishing premiums. Do we not run a far greater risk of lawsuits, heavy fines or actions forced by some state Insurance Department by *failing* to deal with this issue head on!???

We have now lowered our dividend scale for 1996. This probably means that the 25% figure is now lower. And, we don't know how many are still out there *"waiting and expecting"* to be eligible on some future date that isn't going to happen. The lower dividend scale is going to further exacerbate the AP problem and will make it even more difficult to deal with our policyholders. The Company has lowered it at a time when, in the eyes of the policyholder, we should be raising it. The stock market has gone crazy, interest rates are up, and most investments would appear to be recovering.

Had we addressed this problem three years ago, it would have been much easier for the customers to accept that the economy was a major factor in our Accelerated Payment problems. The Customer Service Centers were far more successful in appeasing even misrepresented policyholders at that time by adequately explaining AP and the relationship between dividends and the economy. But, the Service Centers have really only been dealing with those policyholders who are expecting their policies to become *eligible* for AP. Now, we will begin dealing with those policyholders whose policies are *currently* on AP as well as those *who are expecting* their policies to go on AP at some future date.

**CONFIDENTIAL**

Page 2

Even though we are only addressing a small piece of the affected customer base, this current communication was obviously not considered from a customer perspective. The one statement "*Your dividends will pay the premiums until —*" is hardly an explanation to those policyholders who are most likely under the impression that he or she *will never have to pay another premium*. And, as much as some people might like to believe our representatives will be out there to explain it, I think history tells us it won't happen. Most of the reps involved in the sales are long gone and those who are there won't want to deliver this kind of bad news to anyone. It is the Customer Service Representatives who will eventually get these calls.

The lower dividend scale for 1996 will undoubtedly give us a new wave of *Accelerated Payment* complaints a few years from now when we don't meet those dates. Like it or not, our reps did mislead policyholders. If the Company intends to be *World Class*, the customer service organization needs to compensate for our reps by ensuring that, as a Company, we *communicate effectively* with our policyholders and that we *educate* them. One or two sentences on a billing document hardly qualifies.

Perhaps now that I'm back in the real world most of the time, I find my skepticism is returning. It is still my perception that in ILI, customer service interactions are viewed primarily as an expense versus being an opportunity or an investment in the Company's future. I believe Kathy Schoos brought this point home very well in her excellent response to Larry Baum's LOMA study comparisons. As she so eloquently pointed out to Larry, ILI's administrative mentality still seems to be that a *three minute* phone call has to be better than a *four minute* phone call. The assumption always seems to be that cheaper has to be better. It seems that little or no consideration is given to the value of spending a little time trying to actively educate our customers or trying to *build a relationship*. And, enhancing our efforts to generate even greater numbers of sales opportunities is going to add time. At a time when our existing customer base would appear to be critical to the Company's future livelihood, constant focus on the expense side or "*numbers*" is a very shortsighted philosophy.

It is also totally contrary to the Company's stated *Market Reach Strategy* to *Build Customer Relationships through Service - Education & Trust*. The Company's approach to handling *Accelerated Payment* is not service, does not educate and will not create trust. This, and failure to develop a genuine customer focus that permeates the entire organization, will only serve as evidence to those on the front lines with the customer that while the Company may talk the talk, it's not walking the walk.

After the devastation the call centers experienced as a result of the publicity, restoration and restitution, we have recovered. All of us want to put that unfortunate part of MetLife's history behind us. MetLife Express appeared to provide hope and evidence that MetLife is going to change. But, if we don't put *all* of our bad experience behind us, making a complete transformation to a customer focused Company is going to be exceedingly difficult or impossible. Our Customer Service Representatives will be among the first to know whether the change is real or not. They will be taking the phone calls and complaints over the coming years. And, if they don't sense that the Company is seriously addressing these issues with genuine customer focus, all the rhetoric about MetLife becoming a *World Class* customer service organization will be just that.

CONFIDENTIAL

After Phase 2, I was excited and optimistic. I walked away from my five months on MetLife Express walking on a cloud with high hopes and high expectations for the Company and for Individual Life Insurance. For the first time in a long time I had a sense of renewed hope and enthusiasm that the *value and opportunity* associated with the delivery of customer service was finally being recognized. Everything I saw and heard during our CMO presentations and interactions told me that the most senior management of this Company really did want to change MetLife. I sincerely believe they want all the customer service organizations to be genuine advocates for the customer and become the model for the industry with respect to the delivery of customer service.

I continue to have a strong sense that the very senior management of this Company does want the change. So does the bottom. Everywhere I went and continue to go around the Company, the "*front lines*" are eager and ready for change. They recognize that, as a Company, we must change. But now, as I have time to reflect on it, perhaps the Company has bitten off more than it can chew. Creating an entire organization that is genuinely customer focused and driven to action based on customer needs will be a monumental challenge for this Company. This would be an outstanding achievement if it were the only MetLife Express initiative. But, when you really get inside the ILI organization, there is just so much history and culture to overcome that I really don't know if it can be accomplished.

For years within ILI, the marketing organization was the center of its universe. The Field drove most of the major actions taken. The needs or wants of the customer usually wound up pretty far down on the priority list. If ILI is to survive, and hopefully flourish, we must make the *customer* the center of the universe. But, this will require a totally new culture and mindset and so much of the organization is so far removed from the customers that they cannot properly relate to the issues at hand. The entire administrative and systems organization and its associated culture must develop a real commitment to the customer and the delivery of a dramatically higher level of customer service.

In Phase 2, I thought MetLife Express did a good job of outlining why this must happen and the benefits associated with it. But, consolidation, new technologies or even a new organization will not bring all the needed changes. For an organization to change, *the people in it must change* and I don't see that MetLife Express has the power to make that happen. From my vantage point, the approach the Company has taken to AP would appear to be testimony to the fact that the Company has a very long way to go towards achieving a real customer focus and meeting the customer service challenge.

**CONFIDENTIAL**

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 4, 1995

cc  Gardner & Tweedie

Page 4

Barbara J. Gardner, ACS
Vice-President
MetLife Customer Service Center - Tulsa

Re  Consumer Education "Wish List"

Barbara, many of our problems and complaints with customers are due, in part, to their lack of understanding of insurance principles in general and/or the lack of understanding of specific aspects of their policy or transaction. The problems we are experiencing and are going to face with "AP" *(Accelerated Payment)* cases are a prime example. Policyholders believe their policies are supposed to be "paid-up" in "X" years. Or, those currently on AP believe their policies are already paid up. Many, if not most, of these policyholders do not begin to understand the true concept of AP. They do not fully realize that premiums are still due on these policies until age 95 or 98 and that the "AP" arrangement is really only a method of using the dividends to pay those policies. As you know, because of the changing dividend scales, we have continued to experience ongoing complaints because premium payments continue to be required on many of these policies. And, we face a similar problem with UL policies in that *Target Premiums* are going to be inadequate to maintain some of them.

Now admittedly, this monster was created primarily because of the marketing approach used by some of our Field Force and their own lack of understanding of the implications of this concept. But, with proper consumer education, we could have greatly reduced the negative impact that we have already experienced as well as that which is going to explode in the future.

A significant percentage of our Field Force does not understand many aspects of the policies they sell or the impact of some of the policy provisions. For example, some don't understand the complications that can arise from improper or ill advised beneficiary designations *(minor children)*. In C/L/D, we encountered many complaints and "reversals" because representatives did not understand or adequately explain to their client the differences between a *Partial Cash Withdrawal* versus a *Loan* on a UL policy.

My point is this; *we are not ever going to be able to fully resolve the problem with our Field Force.* With the number of new representatives that we appoint each year and the heavy demands of just learning how to sell, it will take these people years to become knowledgeable in all the administrative nuances of our products. This problem is also compounded by the fact that the level of administrative knowledge or training varies greatly from branch office to branch office.

Many of the problems and complaints we experience would be non-issues had the policyholder thoroughly understood their policy or the administrative aspects associated with various transactions. The establishment of a Consumer Education department supported through advertising and Teleservices provides MetLife with an opportunity that may be unparalleled in the industry right now. At the very least, it gives us a definite edge on the competition as well as the opportunity to do a far better job of educating our policyholders, thereby avoiding many of the complaints and misunderstandings in the future. As we have witnessed, while almost everyone owns a life insurance policy, very few really understand how it works or the many benefits and options that are available to them as a policy owner.

**CONFIDENTIAL**

The best part is that instead of looking at consumer education as an expense, it should be viewed as an *investment as well as a marketing strategy*. If handled properly, many of our consumer education activities could easily be turned into advertising and marketing opportunities. Our Consumer Education effort should not be limited to MetLife policyholders. Instead, we should embark on an effort to educate all consumers. Done well, many non-customers could surely be turned into MetLife clients.

As I see it, there are three different types of opportunities to provide information that will educate our customers as well as promote our products and services. These are:

### STRICTLY METLIFE CONSUMER INFORMATION/EDUCATION

An example would be like one of the examples from Kathy's list such as providing better information on how to read a *Dividend Anniversary Statement* and providing an explanation of terms.

### CONSUMER EDUCATION/PRODUCT PROMOTION & EXPLANATION

An example might be providing information on the differences between a *Whole Life* policy versus *Term versus Universal Life*. This could serve to educate both our own policyholders or be offered to non-policyholders. In both cases, it offers opportunity for follow-up contact and potential sale. A similar example would be a generic piece which provides an explanation of how mutual funds work, the various types (*Aggressive Growth, Money Market, Tax-Exempt, Etc.*), and how they might be used to help an individual meet specific investment objectives.

### SPECIFIC PRODUCT INFORMATION

In this scenario, we may have a more sophisticated customer or current non-customer who understands the concepts, but wants product specific information such as something that describes our various mutual funds and illustrates performance history. Or, something that provides specifics on our annuity, whole life or term products. While some effort would always be made to have this provided through the Career Agency Force, it should be recognized that some percentage of respondents *will not want to talk to a representative for the initial contact*. However, "follow-up" calls should be made to these individuals to see if a Representative can be of assistance once they have had time to review the material.

Having said this, I will attempt to categorize and list some of the types of material we have considered. Also attached is the list which Kathy Schoos prepared for John Abela. We are in agreement with everything on Kathy's list.

CONFIDENTIAL

2

## Pure Consumer Education

| | | |
|---|---|---|
| Various Brochures or "Automated Letters" Providing Detailed Explanations of the Impact of Some Policy Transactions | Policy Loan | - A detailed explanation as to the impact of taking out a policy loan, effect of unpaid interest, potential termination of policy - tax consequences, etc. |
| | Dividends | - Explanation of Dividend Options, advantages, of "Paid-Up" Insurance - Potential Tax Consequences |
| | Payments | - Advantages/Disadvantages of various payment arrangements "AP" - Non-Forfeiture Options associated with Lapse & non-payment of premiums. |
| TAX RELATED Considerations and Consequences Associated with Life Insurance | There should be a general, but comprehensive, booklet, which describes all the various tax issues associated with life insurance. This would include an explanation of the tax deferred status of most policies, those that are classified as "MECs" (Modified Endowment Contracts) and their tax implications, the concept of general taxable gain on a policy as well as the taxable implications associated with dividends (DWI, potential taxable gain from dividends, etc.). It could also explain and advise how some of these consequences might be avoided (i.e., using dividends to purchase paid-up additional insurance as opposed to DWI or cash). | |
| General Company History Including Financial Stability | With people expressing concern or interest in the Company, we should have something in the way of a "PR" piece to send them that tells them about MetLife, a little of its history and traditions, its size in relation to the other companies and its financial stability. | |
| Industry Ratings | We should be able to send a piece of literature that explains the various organizations rating the insurance industry and how to read the ratings. There should probably be a separate attachment which can be kept current as to MetLife's ratings by these organizations. | |
| Contract Considerations When Purchasing a Life Insurance Policy | This could explain in plain English the important contract considerations: Rights of the policyowner - explanation and purpose of naming a contingent owner - things to consider when naming a beneficiary (minor children) and types of bene designations - explanation of rights and reasons for naming contingent beneficiary(ies). How and when to change ownership or beneficiaries. | |
| Glossary & General Information on Policy Riders and Provisions | This could include a layman's explanation of what the following riders/provisions are and why you might not want them: Disability Waiver, Accidental Death, Accelerated Death Benefit Rider, Paid-Up Additions Rider, AIB, SIB, etc. | |
| Explanation of Policy Values | Information on how policies accumulate cash value. Differences between "Guaranteed Cash Value," Dividends, Cash Value of Additional insurance purchased by Dividends, etc. It could also explain how value information can be accessed and how these values can be used (income at retirement, etc.). | |
| 800 Customer Service | Some type of brochure or "PR" piece is needed that touts the availability of PF Customer Service (800+MET-5000) and provides a list of the information and services that can be obtained. While our number appears on many documents, we don't have anything that makes reference to the services & information available. This same brochure should provide a strong "reminder" to be sure and give us a call whenever the person moves or has an important life event. The same or similar brochure may want to touch on the services available through 800+MET-LIFE. | |
| Replacement | We have some literature available but we need something more comprehensive. It should be sent in any instance where a CSR perceives the customer may be surrendering their policy or considering replacement. The material should provide the policyholder with a clear and objective explanation of "churning," describe the marketing strategies of some companies with respect to replacement and the "Term Versus Whole Life" argument, and it should cover the many potential benefits associated with policies that have been inforce for awhile such as the growth in guaranteed cash value and possible current dividend performance versus annual premium cost. | |

Bill Barnewold
Sr. Business Systems Consultant
Traditional Portfolio & Dividends
Personal Insurance
Bridgewater - AREA 3E-2

Re  Field Announcement for AP Anniversary Statements

Bill, I have reviewed the proposed *Field Announcement* and *Anniversary Statements*. I would just like to go on record one last time saying that I think the Company is making a serious mistake. Using only the *Anniversary Statements* to notify those policyholders who are currently on AP that their dividends are now insufficient to maintain the policy is going to create confusion and has the potential to create a backlash of complaints and ill will unlike anything to date.

The vast majority of policyholders who are currently on the AP arrangement believe that no further premiums will be due on their policies. Many of these policies have been represented to the customers as having been *"paid up."* Consequently, they will be confused by the rather terse statement that *"Your dividends will pay the premiums until ____"* and the balance of the text. I would be. In spite of our statement that *"dividends are not guaranteed,"* these customers will not automatically understand how *or why* their policy has been affected. And, in the absence of any meaningful explanation, many are likely to become outraged once they realize that more premiums may become due at some point in the future.

For the life of me I do not understand why all these people couldn't have been sent a letter that explains the impact of the economy on the dividends and its corresponding impact on AP. We are going to great lengths to make certain our "new" AP customers understand the arrangement. Why shouldn't we do the same with these? Many would still be upset, but that number would most likely be much smaller than what we're going to encounter now. Again, I stand by my perception that we are not fully considering our actions from the *CUSTOMER's* perspective. And, in light of everything else that has transpired, I can't believe the Company would want to risk handling such a sensitive issue in such a cavalier manner.

If anyone believes that the majority of our Field Representatives will actually approach these customers and explain it, they're living in a dream world. Many of the writing reps are long gone and the others have no vested interest in communicating this kind of *bad news* to the customer.

The *Anniversary Statements* included in the proposal don't make any reference to the 800 number. I assume the 800+MET-5000 number is now on them so perhaps we can salvage a few when they call. But, I hope everyone is truly prepared for the consequences of handling these AP cases in this manner.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 3, 1995

cc  LaBadia, Gardner & Schoos            **CONFIDENTIAL**

Barbara Gardner, ACS
Vice President
MetLife Customer Service Center – Tulsa

Re·    AP – Accelerated Payment arrangement

Barbara, in the fall of 1993, an AP NWT was established to address the growing concerns associated with the AP arrangement. Even at that time, there was clear recognition that immediate attention must be given to educating our policyholders about AP.

Since many of these policyholders believe that their policy is paid-up or at the very least that *no further premiums will ever be due*, it was the goal of the AP NWT to initiate an educational program. This program included: a *Welcome letter* that would be sent out on every policy placed on AP and any policy changes that affected the AP arrangement would generate a letter to the policyholder. In addition, the billing documents and anniversary statements would contain information about the projected *collapse date* for the AP arrangement.

Even with all these efforts, I have a concern that we are not doing enough nor are we doing it fast enough. For example; an AP Consumer Brochure was developed to provide information about the AP arrangement and how it works. The original intent of this brochure was to send it to all new AP policyholders along with the AP *Welcome letter*. However, I have recently learned that it is only going to be given to our field associates. While I agree that this brochure should be available to the field, it should also accompany the AP *Welcome letter*. We can't continue to always rely on our field associates to communicate policy provisions to our policyholders. We have to start ensuring that all affected policyholders are notified in a uniform and informed manner.

Also, in the next couple of weeks, the billing documents to carry the AP *collapse date*. ·Our policyholders will not understand. Attached is a copy of a memo from Jim Rayl stating his concerns about how we are communicating this information. I am in complete agreement. A short statement on a billing document is not enough. We need to be providing a complete explanation about the AP problems *before* we place any information on the billing documents.

In today's environment, if we are not careful how and what we communicate, the situation will become explosive. To further illustrate that this is not a problem to be taken lightly, I am attaching an article from the December issue of *Best's Review* on this very subject. If we are going to provide *World Class Customer Service*, we have to do a better job of informing our policyholders.

*Darlene West*
Darlene West, ACS
Manager
Cash/Loan/Dividend/Maturities
MetLife Customer Service Center – Tulsa

January 11, 1995                    **CONFIDENTIAL**

CONFIDENTIAL

**MetLife**

Marketing Communications
MetLife Individual Sales

Re  Accelerated Payment (AP) Arrangement Customer Communications

To  The Field Force

Communication is an integral component of outstanding customer service.  The effectiveness of our communication depends on how well and how consistently we provide our customers with important information about their MetLife policies.

This communication process is especially meaningful when it serves to educate policyholders about the value of the MetLife products and services that are available to them.

To help educate policyholders regarding MetLife's Accelerated Payment (AP) arrangement, an easy-to-read, question-and-answer consumer brochure was developed and introduced to the Field Force last year.  This eight-page brochure, entitled "MetLife's Accelerated Payment Arrangement..." (Form 18000121938), examines how the AP arrangement works and defines the crucial role that dividends play in the arrangement.

In order to ensure that all AP policyholders receive this vital information, this brochure has been redesigned as a one-page insert that will be mailed with anniversary statements to policyholders already active on the AP arrangement beginning in April.  Also beginning in April, all policyholders who become newly active on the AP arrangement will now receive a copy of the insert along with a "Welcome to AP" customer letter.

Although the format and design of the brochure has been altered to meet postage requirements, the text of the one-page AP insert is identical to the text of the legally-approved consumer brochure.  A sample of the insert version of the brochure is attached for your information.

For the past several months, the AP Natural Work Team, representing key business units within the Individual Life Insurance and MetLife Individual Sales organizations, has been implementing a multi-level, proactive customer communications strategy.  Future announcements will follow outlining when and how additional information regarding the AP arrangement will be provided to policyholders.

March 27, 1995

Attachment                                        9503L03(exp0695)MLIC-LD

## MetLife's Accelerated Payment Arrangement...

### ...an alternative to paying premiums out-of-pocket

When You Purchase A MetLife Whole Life Insurance Policy, You Receive:

- insurance protection that's guaranteed for a lifetime;
- level premiums;
- attractive dividends;
- guaranteed cash value buildup;
- loan and withdrawal provisions.

While you can certainly appreciate the benefits of whole life insurance, you probably aren't looking forward to paying premiums for the rest of your life. Now you can get whole life insurance protection without spending your whole life paying for it.

**The Accelerated Payment Arrangement**
MetLife offers a premium payment arrangement that allows you to system-atically apply a portion of accumulated dividends to pay your annual premiums after you have paid premiums out-of-pocket for a number of years. This arrange-ment, known as the Accelerated Payment (AP) arrangement, eliminates the need for you to pay your premiums by cash, check or money order.

**Let Your Dividends Work For You...**
One of the most attractive features of participating life insurance is that it pays dividends. Although dividends are never guaranteed, MetLife has a long and distinguished history of making dividend payments to policyholders, going all the way back to the early 1900s.

Some policyholders look forward to receiving their dividend check in the mail, while others take advantage of the other dividend options we offer. Among these are allowing the dividends to accumulate with interest, or using them to purchase additional paid-up insurance.

**Dividends And The Accelerated Payment Arrangement**
Although not a dividend option, you can also use your dividends to pay premiums through our Accelerated Payment (AP) arrangement. To be eligible for this premium payment arrangement, you must pay premiums out-of-pocket for a certain number of years. You must also leave the policy's dividends with MetLife, usually under the Additional Paid-Up Insurance dividend option. When the dividend balance, together with all future dividends (based on the then current dividend scale) is sufficient to pay all future premiums, you can elect to pay premiums through the AP arrangement.

**Can I Use Any Other Policy Values To Pay Premiums Under The Accelerated Payment Arrangement?**
Yes. If your policy includes MetLife's Paid-Up Additions Rider (PUAR), you can use the cash value of this rider, along with your dividends, to pay your premiums under the AP arrangement.

**The Accelerated Payment Arrangement Sounds Too Good To Be True. What's The Catch?**
There isn't any. However, it's important to understand that because the AP arrangement is completely dependent on dividends, it is not guaranteed. Think of dividends as the fuel for this payment vehicle. Any fluctuations in dividends will directly impact this payment arrangement. Any increase in dividends may allow you to elect the AP arrangement sooner than originally anticipated. On the other hand, a decrease in dividends could require you to make more out-of-pocket payments than expected before becoming eligible for the AP arrangement. Also, subsequent reductions in dividends may result in your having to pay a portion of some premium payments in cash or even resuming full premium payments years after you started using the AP arrangement.

**What Impact Does The AP Arrangement Have On My Policy Values?**
When you choose the AP arrangement your policy's guaranteed cash value will continue to grow as stated in your policy. However, your accumulated dividends will be reduced as compared to what they would have been if you had paid premiums out of your pocket. Therefore, you might prefer to pay the premiums yourself so that dividends may continue to increase the value of the policy.

CONFIDENTIAL





**Does Taking Advantage Of The Accelerated Payment Arrangement Mean That I Have A Fully Paid-Up Policy?**
No. This method of paying premiums does not make the policy "paid-up" or reduce the number of years premiums must be paid. It simply allows you to pay your premiums using the policy's dividends, as long as the dividend balance is sufficient, instead of paying them out-of-pocket.

**How Does This Payment Arrangement Differ From The Premium Reduction Dividend Option?**
Under the Premium Reduction dividend option, only the current year's dividend is used to offset, or completely pay, the current premium. Therefore, if the premium is greater than the dividend, you will need to make a partial premium payment out-of-pocket. When the annual dividend is greater than the current premium, the total premium is paid by the dividend. With the AP arrangement, the annual premium will be paid by your entire dividend balance, not just the current year's dividends.

**If Dividends Aren't Guaranteed, Then What Is?**
If the premiums are paid when due, we will pay the beneficiary the death benefit stated in the policy. That's not a promise — it's a guarantee. We will provide that benefit whenever the insured dies — whether it's next week, next year or 70 years from now. In addition, the policy has a cash value that is guaranteed to increase over time.

**When My Premiums Are Paid Through The Accelerated Payment Arrangement, Will I Receive A Statement?**
Yes, you will receive an anniversary statement approximately four weeks before your policy's anniversary date. This statement will show the amount due as well as how long your policy can remain on the AP arrangement, based on the current dividend scale.

You will be given the option of either paying the premium out-of-pocket or having it paid under the AP arrangement. If not paid by you, the premium will be paid through the AP arrangement 21 days after its due date.

**How Can I Find Out When I Can Begin Paying My Premiums Using The Accelerated Payment Arrangement?**
You must contact your MetLife Representative and let him or her know that you would like to pay your life insurance premiums through the AP arrangement. A determination will be made regarding whether or not your policy's dividend and/or PUAR balance(s) are sufficient to implement this payment arrangement. You can also call 1-800-MET-5000 during regular business hours and speak to one of our Customer Service Representatives.

**Aside From A Fluctuation In Dividends, What Other Factors Can Cause Me To Pay Premiums Out-Of-Pocket After I Begin The Accelerated Payment Arrangement?**
There are certain transactions that may adversely affect this payment arrangement.
Here are some examples:
* If you take a policy loan or fail to pay loan interest;
* If you withdraw policy values.

There are also certain transactions that can cancel the AP arrangement. Some examples include:
* If you change your dividend option;
* If you change your frequency of payment from annual to some other mode of payment.

**What Happens If All My Future Premiums Can't Be Paid Through The Accelerated Payment Arrangement?**
If all of your future policy premiums can no longer be paid through the AP arrangement, MetLife will notify you regarding the year that you have to once again begin paying your premiums out-of-pocket. You should contact your MetLife Representative to discuss alternative payment arrangements.

It's important to understand that the AP arrangement may not be a permanent way to eliminate out-of-pocket premiums. And it will impact the growth of your policy. If you have any questions about dividends or the Accelerated Payment arrangement, please call your MetLife Representative, or call 1-800-MET-5000 during regular business hours. We will be happy to assist you.

**◆MetLife**

Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010

CONFIDENTIAL



## Consumer Education With Advertising/Marketing Related Potential

| | |
|---|---|
| **Whole Life Versus Term Versus UL – ULII** | This was also the first item on Kathy's list. We could offer this via advertising and also have this available for customer inquiries. There continues to be more and more focus on the argument of permanent insurance versus term. A thorough but objective pamphlet or booklet should be available which explains the basic concepts and differences between permanent and term insurance. This could include a long term net cost comparison, concept of a level premium and death benefit, tax deferred savings features, etc. It should also cover the general uses and application of both types of insurance as well as some of the pros and cons and explain why everyone should have a basic program that includes some permanent insurance. Perhaps a separate section could then explain how Universal Life differs from Whole Life as well as the differences with multi-funded Universal Life. While the tone of the booklet should not be to try and "sell" something, it could certainly provide a list of our basic offerings with a bold imprint to call 1-800+MET-LIFE if there are any questions. In some instances it might be appropriate for a CSR or account representative to call the recipient a week or two after the booklet is sent just to see if they have any questions or are interested in speaking with an Account Representative. |
| **Estate Planning** | This could also be offered via advertising to a targeted market or audience. It should also be available to our customer base so it could be sent by the CSR in appropriate situations. It should be an objective booklet or pamphlet on when and why estate planning becomes a serious need. It should outline the primary elements or considerations in general estate planning. It could cover the high cost of dying, the risks associated with improper planning and/or how someone's estate or insurance benefits may not be handled as they anticipated if proper planning was not done. Consideration could be given to including a video, a worksheet or a PC program that would permit the individual to determine the value of their estate. Again, the tone should not be to try and sell anything. However, as an example it could illustrate how our Survivorship Whole Life (or any life insurance policy) can be used to address specific estate problems. Again, a call could be made to the recipient to determine if they have any additional questions (after booklet on Trusts?) or if they would like to speak with an Account Representative. |
| **Trusts** | This might go hand in hand with the Estate Planning booklet and could also be offered via advertising or to our customers in the appropriate situations. It should provide general information on the various types of trusts and trust agreements and their common usages and purpose. It should cite a few examples as to how life insurance policies are affected and used in conjunction with estate planning. It should also explain how an individual might get a trust established. Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |
| **Planning For The Future (Not Just Retirement) Family Insurance Needs and Other Considerations** | Most of the younger generation go through life giving very little thought to the future and some of the implications. Part of this brochure should be a "checklist" of things to consider. For example:<br>• The need for a will and the dangers of not having one<br>• Guardianship of children - who gets the kids if both parents were to die<br>• Problems with elderly and/or incapacitated parents - Power of Attorney<br>• The high cost of dying in general - funeral and final expense considerations<br>• Life insurance needs for self - why have insurance on spouse and children? (Level premium - protection plus tax deferred savings, etc.)<br>• Include a list of lifestyle changes that trigger a need for financial review; i.e. having a baby, marriage, divorce, death of spouse, parents, new home, etc.<br>• The odds against collecting retirement from existing or single employer<br>• Property and Casualty needs - Personal liability issues - what else should be covered and for how much?<br>Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |

CONFIDENTIAL

4

MET011071012

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| Basic Or "Preliminary" Financial Needs Analysis | This could be offered in many ways. However, many people might be interested in doing their own "Basic or Preliminary" Financial Needs Analysis. We could advertise and offer at no cost a simple but objective worksheet that highlights some of the key areas and allows an individual to determine on their own some of their areas of need and compare that to their existing program. It should be clearly stated that it is not intended for detailed needs analysis, but is only to provide a basic understanding and example of some of the considerations involved. This could be offered free and kept to a reasonable level of expense. We might also consider offering at nominal cost, a videotape that takes a person through the general Financial Needs process. Also, at nominal cost or perhaps free, a PC program diskette that will walk them through a basic Financial Needs Analysis and allow some "modeling" of insurance and/or savings aspects. All of this should be relatively generic, objective, but with strong recommendation that a formal needs analysis be done by a competent professional. Again, whenever this is sent, a follow-up call should be made to determine if we can be of additional service and/or arrange for contact by an Account Representative. |
| Retirement Planning | The detailed Retirement Planning Guide that was recently prepared by Pensions is outstanding but obviously expensive. Perhaps a modified version of that could be made available on a more general basis. Again, a follow-up call should be made. |
| Investment Guide | A general guide to saving and investing could be prepared which outlines some of the reasons as to why this is needed, not only for retirement, but college, home purchase, starting a family, etc. Like the Retirement Guide, it should have savings tables illustrating the amount of savings required to generate money in the future at varying rates of return. It should also cover tax deferred versus non-tax deferred savings issues. It could suggest an initial foundation of life insurance, but should also cover and explain other savings and investment options such as mutual funds and annuities. The booklet could encourage the individual to call us for more specific information on any of the various investment options or vehicles. Again, a follow-up call should be made. |
| Encourage Communication | We should offer or routinely send a sticker or refrigerator magnet that encourages customers to call the 800 number every year to discuss any important life events that may have occurred or questions they might have about their policy or insurance in general. Perhaps this could be sent in the "Welcome to MetLife" letter that will go out from Ted A. The "welcome" letter might also stress the contact and service available through our toll-free number. A major objective here would be the establishment and maintenance of a permanent ongoing relationship between the customer and the Company in addition to any relationship that might exist with the representative which, in most cases, will only be temporary. |
| Mutual Funds | We are getting more and more questions or opportunities to discuss our Mutual Funds. We should have two separate pieces of literature available. One should be for the first time investor who is interested in learning more about Mutual Funds. This piece should explain how mutual funds work and the various types of funds and their objectives (aggressive growth, income, money market, etc.). We should then have a piece that can be sent to the more sophisticated investor that is familiar with mutual funds, but is interested in the types of funds we have available and their performance history. Again, a follow-up call should be made. |
| Checklists | Offer a variety of checklists for things to consider when:<br>• Buying a New Home - Homeowners, Mortgage Protection, schools, taxes, etc.<br>• Selling a Home - New paint, selling costs, etc.<br>• You find yourself unemployed (laid off) - Vested Retirement funds & lump sum distributions; COBRA, Unemployment Compensation, Debt/payment modification, etc.<br>• You are starting a small business - Operating capital, insurance, workers comp, etc.<br>• You're going to have a baby - Things you need, how it changes your life, why purchase life insurance, cost of college, etc. |

CONFIDENTIAL

5

## Consumer Education With Advertising/Marketing Related Potential

| | |
|---|---|
| Premium/Plan Quotes | We continue to get people calling to ask if we can provide them with an "approximate" quote over the phone as to how much a given amount of insurance might cost. With the increased exposure and advertising of 800-+-MET-LIFE, we are likely to get many more "curiosity" calls. While we would always try and refer them to an Account Representative, there is always going to be some percentage of callers that are going to want some preliminary information before he or she will be willing to speak with a representative. While we should be able to quote these online (based on personal data entered into the terminal), all verbal quotes should be followed-up by generating a professional-looking written quote that would provide approximate premium amounts for basic plans of insurance, both term and permanent. Perhaps only "standard" rates should be quoted and all such quotes should carry a disclaimer to the effect that the premium amount can be influenced either way by underwriting factors as well as optional riders that may be elected for the policy. However, many people have no idea as to what life insurance might cost them and would be open to seeing an Account Representative if we could first provide some basic information. And, in doing so, we might even make the sale easier. Whenever a quote is provided, we could also emphsis the need for a full Financial Needs Analysis. But, the customer would still have a general idea as to the cost of life insurance. |

As I indicated, in addition to all the above, we are in agreement that material should be available on all the items listed in the memo from Kathy Schoos.

Barbara, again, by combining the power of advertising with Consumer Education and our Teleservicing operations, there is tremendous opportunity to make great strides towards achieving our market reach strategies. But, it should also be recognized that while our primary thrust should always be to support these efforts through our Career Agency Force, the reality is that in some geographic areas we are not going to have an Account Representative presence to follow-up on all the marketing opportunities that can be generated. A fundamental decision must be made as to whether or not we are going to ignore these opportunities or find other methods to seize them. Wherever possible, we need that personal relationship established with a local representative but, as evidenced by some of what has been already been achieved with some policyholders (Mr. ▇▇▇ for example), it is possible to maintain a close and personal relationship with our policyholders through an effective teleservicing and customer service support organization.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center – Tulsa

October 28, 1994

cc Valentino, Porpora, Cross & Schoos

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

6

Tom LaBadia
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater
    AREA 2-E

Re  Referrals to "AP" as Paid-Up

Tom, as you know, in my previous correspondence concerning *Accelerated Payment*, I indicated that our Account Representatives usually referred to the policy as being *"paid-up"* once the AP took over.  I think the attached may help to support this statement.  Just over the course of a few days, I ran into several complaints in which the policy was referred to as being paid-up.

I am also attaching a couple other ones relating to the dividend scale change and the change in AP eligibility dates.  These give a little flavor as to the sensitivity of this issue with some policyholders.

It should be recognized that these are only the *complaint* cases.  We receive many other *non-complaint* phone calls where the policy was referred to as being *paid-up* under this arrangement but no formal complaint was involved.

J. L. Rayl
Director
Customer Services & Communications
- MetLife Customer Service Center – Tulsa

December 7, 1992

cc  Barbara Gardner

CONFIDENTIAL

TO:          Distribution

FROM:        William T. Barnewold
             ILI Customer Services
             Bridgewater Area 3E X2202

DATE:        December 8, 1995

RE:          Accelerated Premium (AP) arrangement


The attached summarizes several accomplishments of our AP Natural
Work Team and outlines other key items close to being installed.
Additionally, some of the AP (new and old) items are mentioned
which will be addressed in 1996.

At the next Board of Directors meeting on December 19, 1995, John
Tweedy will be updating the members on what is being done to
overcome the concerns associated with "Vanishing Premium" cases.
Our AP NWT actions will be one of the initiatives cited by Mr.
Tweedy at that meeting.

So, it is appropriate to provide all of you with this same
information and to recognize the outstanding work performed by
all participating AP NWT representatives.



_William T. Barnewold_

CC: LaBadia, Doby



CONFIDENTIAL

REDACTED - ATTORNEY
CLIENT

CONFIDENTIAL

TO:     Thomas LaBadia
        Vice-President
        ILI Customer Services
        Bridgewater

FROM:   William Barnewold
        Project Manager
        ILI Customer Services
        Bridgewater Area 3E X2202

DATE:   December 4, 1995

Re:     Accelerated Payment (AP) arrangement Policies

We electronically reviewed the Notice Business Policy Master file
and Paid Up Additions Rider file to obtain current statistics
about our active AP cases. Using the 1996 dividend scale, we
determined how many policies are eligible for AP and how many
will collapse before the life expectancy of the policy is
reached. For policies whose AP arrangements will collapse, we
categorized the number of policies into groupings by year.

The following AP information was determined as of 11/27/95:

   149,482 policies is the total number of active AP cases
   114,647 are fully sufficient for the life expectancy of policy
    34,835 will collapse before reaching life expectancy of policy
     7,945 will collapse after 10 years
    13,588 will collapse somewhere between 5 and 10 years
     8,760 will collapse somewhere between 2 and 5 years
     4,542 will collapse within 2 years

On March 10, 1995, using the 1995 dividend scale, there were a
total of 122,777 active AP policies. Of that number, 100,811 were
determined to be fully sufficient and 21,966 would collapse. The
expected rate of collapse then was 18% of the policies that are
active on MetLife's AP arrangement.

Using the 1996 dividend scale, it is now expected that 23% of our
AP arrangements will collapse before the policy life expectancy
is reached.

The following AP NWT activities were pursued in an effort to
better educate our policyholders about MetLife's AP arrangement,
to prepare them if their AP arrangement doesn't meet expectations
and to offer alternatives that will keep AP arrangements afloat.

Completed and Installed:

1.  In October 1994, Billing Notices started informing policy holders that AP arrangements cannot pay their next premium.

    Policyholders are advised to pay premiums out of pocket or contact their MetLife sales rep about making alternate payment arrangements. The field release instructed sale reps to use current year dividend for paying partial premium but the balance of the premium due must be paid out of pocket by policyholders. This method of payment will cease being a manual procedure when AP options are installed next month. There were between 5-15 policies each week that were offered this alternative in their billing notice between October 1994 and November 1995. The AP NWT representatives in Marketing and Customer Service Centers have reported that this enhancement was hardly noticeable by the field force and policyholders since it was implemented judging by the number of inquiries received.

2.  In March 1995, AP letters were introduced and mailed to policyholders directly when they terminate their AP arrangement or change their policy, mode of payment or dividend option. A SONIC message is sent to sales offices.

3.  AP arrangement stuffers in letters 4/95; Annual Notices 8/95

    The MetLife AP arrangement 1 page stuffer contains the same information that is in MetLife's multi-page AP arrangement brochure. In April 1995, we started mailing the stuffer to policyholders with their AP Eligibility letters and Welcome to AP letters. In August 1995, we mailed the stuffer with AP Anniversary Statement/Billing Notice. The latter will continue for 1 year. The multi-page brochure is given to policyholders primarily by sales reps and customer service reps as opportunities present themselves.

4.  In October 1995, Billing Notices started showing Collapse Date when AP arrangements are within 5 years of being insufficient to pay premiums.

    Additional wording was included to advise policyholders that their AP arrangements will collapse and indicates the future anniversary date when collapse will occur. They are told to contact their MetLife sales rep if they have questions and to inquire about payment alternatives. A SONIC message is sent to the sales office.

CONFIDENTIAL

5.    ABCs of Dividends and Outlook

The ABCs of Dividends brochure was reprinted and advertised in Outlook which was mailed to policyholders on a regular basis during the 2nd Quarter of 1994 through the 1st Quarter of 1995. Information about AP arrangements was one of the sections in ABCs that was included in Outlook. Recipients were instructed to call or return a tear off in the same envelope with their premium payment if they wanted a copy of ABCs. Marketing Communications informed us that they received 6,271 requests for single and multiple copies of ABCs of Dividends.

Pending completion and installation

1.    As of December 1995, we will start mailing AP Letters directly to policyholders at the time they disrupt their AP arrangement by taking loans, withdrawing dividends or making PUAR withdrawals. This policyholder action causes the AP arrangement to collapse before the life expectancy of the policy. The Customer Service Reps are already alerted to this fact on PIOS before entering the transaction and are in a position to advise policyholders beforehand. A SONIC message will be sent to sales office for each AP letter mailed to a policyholder.

2.    Starting with February 1996 policy anniversaries, the Billing Notice portion of the Anniversary Statements will offer options to policyholders whose AP arrangements are collapsing within 5 years.

The AP options are 1) pay this year's premium out of pocket 2) use current year dividend to pay part of this year's premium and pay the remainder out of pocket or 3) allow premium to be paid by the AP arrangement.

Each option will show the year to which AP arrangement will pay premiums if that option is chosen by the policyholder. A SONIC message showing this same information will be sent to the sales office.

The AP Billing Notice will state that dividends are not guaranteed and that calculations shown are based on current scales and are therefore subject to change in the future.

3.    Additional Survivorship Whole Life policy support is being developed and close to installation whereby premiums will be paid electronically through the AP arrangement. SWL policies already have AP support installed to determine eligibility and send billing notices.

CONFIDENTIAL

Future AP work to be started in 1996

1.   Add wording as required to AP annual notices.

   a. For policies within the 5 year collapse window, and as long as they remain inside a 5 year window, continue to provide updated options and date information on those Billing Notices each year. Policies that subsequently move outside the 5 year window will cease to receive information about options and collapse.

   b. Add "dividends are not guaranteed" wording to annual notices sent to 1) fully sufficient AP cases and 2) those who will collapse but are outside the 5 year window and not being offered options.

   NOTE: eventually all communications mailed to policyholders containing dividend information will have the "dividends are not guaranteed" phrase included in their text in 1996.

2.   Explore further how Administrative systems can capture and store meaningful AP information on electronic files which is indicative of the understanding reached between sales rep/broker and policyholder at time of illustration and policy issue. Some information is already being captured in signed illustrations and put on microfilm.

   At the time of illustration and policy issue, information such as type of AP arrangement and start up year to automatically test for AP eligibility has to be recorded on Administration files. Automated letter correspondence would be required to verify this information with the policyholder and rep/broker shortly after issuance of a policy. Future correspondence to inform policyholders, sales reps/brokers of eligibility and disposition of their AP arrangement at time of activation will be necessary too.

3.   Provide additional AP arrangement systems support for Flexible Whole Life plans, for new L98 with Paid Up Additions Riders and for Flexible Additional Insurance Riders.

4.   Expand the electronic calculation of AP eligibility and other systems support to include payment of rider premiums as part of our AP arrangement processing (other than PUAR and FLAIR).

In addition to all that is mentioned above, there are other AP activities being worked on by ILI units besides the NWT. One of these activities is the New Business Placement Call Out program which is ongoing and being conducted by Johnstown. Policyholders are asked about their policy including questions about AP. There is also a Policyowners Manual, being developed by ILI Prod Mkt Dev, that will soon be given out with every new issue of Life at 98 policies. This document also contains information about AP.

CONFIDENTIAL

In summation, our AP NWT has made significant progress by implementing much needed support at a time when MetLife is being questioned by its policyholders, the media, outside insurance departments as well as by members of our own legal, ethical and compliance units. The AP activities that are installed and those close to being completed have reached that point because of the determination of our NWT to overcome the obstacles that we faced.

A main obstacle was securing/maintaining the discipline required by our NWT to work on AP while also working on their own day to day jobs. All of our members have other high priority work that must be completed on a timely basis. No one is exclusively assigned to work solely on the AP effort. We, like many other NWTs, are faced with being spread out between remote sites including Tulsa, Warwick, Scranton, New York and Bridgewater. We accomplished our objectives with very minimal travel. Instead, but not without difficulty, we maximized the use of teleconferencing. Through all of this, the AP NWT managed to accomplish its most meaningful objectives which I outlined above.

_William Barnes Sr_

CONFIDENTIAL

ACCELERATED PAYMENT (AP) ARRANGEMENT

**Tulsa Customer Services**

B. Gardner
D. West *
C. Fager *
D. Lyons
J. Eidschun *
L. Grant *

**Warwick Customer Services**

C. Farugia *
K. Schoos *
A. Smith
B. Glittone *
T. Thomas *
P. Knott *

**I.L.I. Financial Mgmt.**

R. Schlanger    BRW 3E
G. Fallahee     BRW 3E
T. Weigand      BRW 3E
A. Compasano    BRW 1N
R. Flanagan     BRW 1N
R. Musen        BRW 1E

**I.L.I. Career Agy. Oper.**

M. Harwood      BRW 1E
K. Kirk *       BRW 1N
B. Kerr *       BRW 1N

**I.L.I. Product Planning**

A. Kandel *     BRW 1N
M. Kaplan       BRW 1N

**I.L.I. Marketing**

R. Steve *      BRW 1NW
D. McGrath *    BRW 1NW

**Law**

I. Shuman *     NYHO  7G

cc  AP nwt

**I.L.I. Customer Services**

T. LaBadia          BRW 2E
S. Kopolovics       BRW 2E
J. Hodel            SCC
R. Delaney *        SCC
R. Schramm          BRW 3E
W. Barnewold *      BRW 3E
R. Brennan *        BRW 2E
T. Brownlee *       SCC
A. Corrente *       SCC
K. Craven *         SCC
N. Giacometti       SCC
R. Kubick *         SCC
E. Kocis *          SCC
L. Kochis           SCC
K. Gawel            SCC
J. Kozlowski *      BRW 3E
T. Lovelace *       SCC
W. Magnot *         SCC
J. McClurg          SCC
R. Ruggieri         BRW 3E
J. Tyson *          SCC
B. DeSandre *       BRW 3E
P. McLoughlin *     BRW 3E
K. McCleneghan*     SCC
K. Panzino *        BRW 3E
J. Rightor          SCC
E. Wasser *         SCC

**I.L.I.    Consulting Services**

L. Vranka           NYHO 5E
M. McDermott*       NYHO 5E

**Canadian Operations**

C. Ferguson
C. Hanrichs  Can
P. Roy       Can. 1

* - AP NWT MEMBER

CONFIDENTIAL

5C0735E90BB11EA8

·MAR 28 '95 19:07

Accelerated Payments

The following AP actions are contemplated for 1995. Activity number 3 requires further concurrence by additional members of top management. Target dates for completion and installation are provided in most cases.

1.  The stuffer version of the AP arrangement brochure has been printed and a supply of about 85,000 has been delivered to Scranton. Another 15,000 brochures will be attached to the field release.

    All active AP policyholders will have the stuffer version of the brochure mailed to them in the same envelope with their AP Anniversary Statement. It will take a calendar year to reach them all.

    The Welcome to AP letters, which installed on March 9, 1995, will now have a stuffer included in the envelope as they are mailed.

    ██████████████████████████████████  The mailings will
    begin in early April 1995.

2.  Special runs are being made to determine how many base policies with/without PUAR have an AP arrangement that is going to collapse before the life expectancy of the policy is reached. Policies are going to be valued by PRIOS/Engine to determine how many are going to collapse. The policies will be categorized as collapsing within a year, within 2 years, within 5 years, within 10 years and 10 years or more. Policy numbers and other information will be extracted from the master files.

3.  If an AP arrangement is expected to "collapse" at the anniversary after next, then "collapse" year will be shown on Anniversary Statements. It is intended not to show "collapse" year information when an AP arrangement is more than two anniversaries away from "collapse". Additional testing is underway to enable this type of collapse year sensitivity. The 2 year anniversary threshold may be temporary but it is a planned to reach those who are closer to "collapse".

    Additional members of top management have to approve this threshold strategy and the collapse year parameter selected. Based on results of item 2, above and experience with the 2 year anniversary threshold policies, a decision can be made to stay with 2 years or alert policyholders when within 5, 10 or more anniversary years of the expected collapse.

CONFIDENTIAL

REDACTED - ATTORNEY
CLIENT

MAR 28 '95 19:07

Billing documents will continue to be used to advise policyholders when their AP arrangement becomes and remains "insufficient" to pay the next anniversary's premium.

4.  A new SONIC message has to be developed which can be sent to sales offices everytime an "insufficient" date is shown on Billing documents and when "collapse" year is shown on an Anniversary Statement. A link between the Daily Reports Trail and Weekly Anniversary trail will be needed to accomplish this task.  The text of a new SONIC message must be developed and approved. It is believed that additional LD approval won't be needed for the SONIC message wording. System development investigation has begun but it is expected to take sometime to implement this requirement.

5.  The 12 AP letters and SONIC messages that show "collapse" year and "insufficient" information are being tested and checked out. These letters will advise policyholders at the time when they take a loan or make a withdrawal that has disrupted their AP arrangement. The "collapse" year in the letters, unlike the anniversary statements, will be the projected date of collapse regardless how many years that is beyond the upcoming anniversary.

█████████████████ A date for installation is being targeted for mid-April 1995. There are no plans to mail stuffers with these AP letters.

6.  One day turn around for placing eligible policies on AP is actively being developed. Target dates for completion are expected shortly.

This may require some change in wording or in the mailing schedules for "AP Eligibility" and "Welcome to AP" letters. It may be desirable to combine wording from both types of letters and have a single mailing in these situations.

7.  Systems development is continuing for the 4 options that will be offered to policyholders whose AP arrangements will collapse or become insufficient. The purpose of the options is to extend the tenure of the AP arrangement. Target dates for completing this effort are expected shortly.

Option 1 was mentioned several times in the preceding paragraphs. This shows "collapse" year on AP anniversary statements.

The wording for Option 1 on the AP anniversary statement will be expanded somewhat to advise that use of current dividend can be applied to pay premiums until the dividends are depleted. If there is a PUAR, cash values are used in a similar manner. The AP arrangement can be kept afloat until YYYY at which time payments may have to be made out of

CONFIDENTIAL

REDACTED - ATTORNEY CLIENT

pocket. "Collapse" year will be recalculated prior to each anniversary.

Option 2 will be offered on Billing documents if there is a current dividend or cash value in a PUAR. The AP arrangement can be kept afloat if the policyholder makes a partial out-of-pocket payment to supplement the residual monies in the policy and/or PUAR. Partial support for this option installed last October but involves manual intervention. Extra systems support is required to automate the procedure that will combine dividend, cash value and partial payment to keep the AP arrangement afloat.

Option 3 will be offered when there is PUAR. The Billing document has to show exactly how much money must be dumped into the PUAR to keep the AP arrangement afloat.

Option 4 will appear on the Billing document. It advises the policyholder to pay the entire premium out of pocket.

The brochure and stuffer version of "MetLife's Accelerated Payment arrangement" will have to be revised to include the above mentioned options to coincide with the implementation of the systems support.

The reprinted stuffers will be mailed with "Welcome to AP" letters and with anniversary statements.

8.  AP arrangement processing for SWL/SIB - targeted for 8/95.

9.  AP arrangement processing for FWL/AIB.

10.  AP arrangement processing for new PUAR.

11.  AP arrangement processing for new L98.

12.  AP arrangement processing for FAIR.


*Bill Barnewold*
Bill Barnewold

March 28, 1995


**CONFIDENTIAL**

Pamela J. Duffy
Vice-President

Re: Reappearing UL Premiums and APP Cases

Tom LaBadia received the attached memo from Jim Rayl of the Tulsa Customer Service
Center regarding APP situations. The memo provides additional information with
regards to Jim's previous statements that policyholders believe that a policy is "paid-up"
when the APP arrangement is operative and may be unaware that premiums are being
paid by dividends and or PUAR value.

This information may be useful to you in preparing your communications on how APP
really works.

Richard W. Schramm, FLMI
Manager
Personal Insurance Customer Services
Bridgewater Area (3E)   Ext.  2316
December 11, 1992

cc:  (Cover memo only)  B. Gardner (Tulsa), T. LaBadia, J. Rayl (Tulsa)

CONFIDENTIAL