Ex A

# CONDENSED TRANSCRIPT

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

------------------------X

EDWARD W. IHNAT,                              CIVIL DIVISION

        Plaintiff,                        GD 94-17465

    v.

JOHN A. POVER, MARK
BATTALINE, WILLIAM J.
BYTZURA, and METROPOLITAN
LIFE INSURANCE COMPANY,

        Defendants.

------------------------X

                9:35 a.m.
                Wednesday, September 25, 2002

                300 Park Avenue
                New York, New York

        DEPOSITION UPON ORAL EXAMINATION of

WILHELMENIA J. TAYLOR, Corporate Designee, taken

by PLAINTIFF, before ALBERT M. CITTONE, a

Certified Court Reporter and Notary Public of the

State of New York.

---

## CITTONE REPORTERS
### Certified Shorthand Reporters
Two Penn Plaza, Suite 1500
New York, New York 10120
(212)286-9222

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA
-----------------------------X

EDWARD W. IHNAT,                    CIVIL DIVISION
            Plaintiff,             GD 94-17465
      v.
JOHN A. POVER, MARK
BATTALINE, WILLIAM J.
BYZURA, and METROPOLITAN
LIFE INSURANCE COMPANY,
            Defendants.
-----------------------------X

                        9:35 a.m.
                        Wednesday, September 25, 2002
                        300 Park Avenue
                        New York, New York

      DEPOSITION UPON ORAL EXAMINATION of
WILHELMENIA J. TAYLOR, Corporate Designee, taken
by PLAINTIFF, before ALBERT M. CITTONE, a
Certified Court Reporter and Notary Public of the
State of New York.

---

**2**

Appearances:

      BEHREND & ERNSBERGER, PC
      Attorneys for Plaintiff
            Union Bank Building
            306 Fourth Avenue, Third Floor
            Pittsburgh, Pa. 15222
      By:  MARK A. BARTHOLOMAEI, ESQ.
            412.391.2515

      LEWIS & SARGENT LLC
      Attorneys for Defendant Gary Antonino
            Two Gateway Center, 18th Floor
            Pittsburgh, Pa. 15222
      By:  WILLIAM J. LABOVITZ, ESQ.
            412.281.2490

      MC CARTER & ENGLISH
      Attorneys for Defendants Taylor and
      Metropolitan Life Insurance Company
            Four Gateway Center
            100 Mulberry Street
            Newark, New Jersey
      By:  PENELOPE M. TAYLOR, ESQ.
            973.639.7947

      ROBERT F. NOSTRAMO, ESQ.
      Attorney for MetLife
            One Madison Avenue
            New York, New York 10010-3690

ALSO PRESENT VIA TELEPHONE:
      PINDALL & BELLO
      Attorneys for Joel Shermann, George Weber,
      Steven Dervais
            Three Gateway Center, 15 West
            Pittsburgh, Pa. 15222
      By:  CLARE M. BELLO, ESQ.

      KAIGER & ALPERN
      Attorneys for Michael LeBonne
            1404 Grant Building
            Pittsburgh, Pa.
      By:  DAVID BRUMFIELD, ESQ.

      WAYMAN IRVIN CAULEY
      Attorneys for Kate Philman and Crischoski,
      Frank Carleni and Ron Schrem
      By:  DAVID PARDINI, ESQ.

---

**3**

      WILHELMENIA J. TAYLOR, residing at
      505 Quincy Street, Brooklyn, New York
      11221, sworn.

DIRECT EXAMINATION BY MR. BARTHOLOMAEI:
      Q    Good morning, Ms. Taylor. My name is
Mark Bartholomaei, and I have to apologize. I've
developed somewhat of a cold over the past
evening, I guess. And I'm going to give you a
couple of instructions.
            If there is a question I ask you
don't hear or you don't understand, ask me to
repeat the question, and I'll try to speak it
louder or rephrase the question, if you don't
understand the question.
            Once I do ask a question, all of your
answers have to be audible, as far as you have to
say yes or no, whatever the answer may be. You
can't nod your head or shake your head. It can't
be transcribed.
            Other than that, I don't think I have
other instructions, unless you have any questions.
      A    I'm fine.
            MS. TAYLOR: Another housekeeping

---

**4**

                  DIRECT - TAYLOR

matter, I'm marking the deposition
transcript "Confidential pursuant to the
Protective Order," and in addition, Ms.
Taylor will read and sign the transcript.
      Q    Ms. Taylor, do you understand you
have been called here today as a corporate
designee witness under Pennsylvania Witness
Procedure 407.1E?
      A    Yes.
      Q    Do you agree to testify on behalf of
Metropolitan Life as to the subject matter of the
FIP rate?
      A    Yes.
      Q    What qualifications do you have to
testify? What's your experience that you have to
be able to testify as to the corporate position
for the FIP rate?
      A    With respect to the FIP rate, I
administered the FIP system with respect to
handling adjustments to -- adjustments that were
requested from the field.
      Q    Is there anything else?
      A    I also distributed the reports. I
communicated with the field typically via

**5**

DIRECT - TAYLOR

2 telephone with respect to any questions they may
3 have about the reports.
4    Q   The FIP reports?
5    A   Yes.
6    Q   Is that all?
7    A   Unless there is anything else you
8 want to ask me.
9    Q   Let me get some of your general
10 background.
11       Can you describe briefly your
12 educational background for me.
13    A   Basically, I completed high school
14 and about a year and a half at Fordham University
15 at a department they called Excel. I didn't get
16 the degree. I went there for about a year and a
17 half. That's formal education. That's about it.
18    Q   When did you start working in
19 Metropolitan Life?
20    A   In 1966, as a student after school.
21    Q   What did you do there?
22    A   File lots of papers.
23    Q   How long did you work in the capacity
24 as a person who files?
25    A   Up until I graduated from high school

**6**

DIRECT - TAYLOR

2 in 1967. Then I became a secretary of the
3 company.
4    Q   Which department did you work in?
5    A   Personal Health Insurance and
6 Employee Benefit Plans.
7    Q   What was your next position after
8 that?
9    A   I believe my next position after
10 that, I went to work in our Business Economics
11 Department, also in the capacity as a secretary.
12    Q   What year was that, roughly?
13    A   I don't recall exactly the year.
14 Probably early '80s.
15    Q   What was your next position after
16 that?
17    A   Then I left the Business Economics
18 Department, and I went to work in a unit called
19 the Field Procedures Unit.
20    Q   What does the Field Procedures Unit
21 do?
22    A   The Field Procedure Unit wrote
23 instructions to the field either on company policy
24 or changes in laws.
25    Q   What year did you start working in

**7**

DIRECT - TAYLOR

2 the Field Procedures Unit?
3    A   I'm not exactly sure about the year,
4 but I would say, mid '80s.
5    Q   What did you do in the field
6 procedures unit?
7    A   I designed or revised forms used by
8 the field to submit certain transactions to the
9 company, change of address forms, kind of
10 administrative forms the field would use. I also
11 updated manuals to reflect any changes that may
12 have been announced in the field rules.
13    Q   Did that include the manual of
14 instructions for account representatives?
15    A   Yes.
16    Q   When you worked in the Field
17 Procedures Unit, did you do any work with the FIP
18 rate?
19    A   No, I did not.
20    Q   What's the next position you had
21 after the Field Procedures Unit?
22    A   Then I went to work in a product
23 planning area and working with the FIP system at
24 that time.
25    Q   When was that?

**8**

DIRECT - TAYLOR

2    A   I believe that was 19, maybe, 86.
3    Q   What was your title at that time?
4    A   I believe it was product planning
5 associate.
6    Q   What does the product planning area,
7 what do they do?
8    A   The product planning area distributed
9 information to the field about new products,
10 instructional manuals and how to complete the
11 application for a new product, description of the
12 new product. My focus, however, in that
13 department, however, was the FIP system.
14    Q   How did the FIP system relate to the
15 product planning area?
16    A   The FIP system, as far as I know,
17 didn't really relate to the product planning area.
18 It just happened to be sitting in that unit. The
19 administration of that system happen to be sitting
20 in that unit when I got there.
21    Q   What was your next position after
22 working in the product planning area?
23    A   I moved to corporate ethics and
24 compliance.
25    Q   When was that?

9

DIRECT - TAYLOR

1
2    A    1994, late 1994.
3    Q    How long did you remain in that
4 position?
5    A    I went to that department as a
6 director, and I stayed in that position for about,
7 little over a year.
8    Q    What happened then?
9    A    Then I was promoted to the position
10 of assistant vice president and subsequently to
11 vice president, where I still worked in that
12 department.
13    Q    When you were promoted to assistant
14 vice president, was that in the Corporate Ethics
15 Department?
16    A    Yes.
17    Q    That's where you currently work?
18    A    That's where I currently work.
19    Q    Beginning at the time of late '94 up
20 until the present, have you done any work with the
21 FIP rate?
22    A    No, I have not.
23    Q    That's not within your responsibility
24 anymore?
25    A    No.

10

DIRECT - TAYLOR

1
2    Q    Can you tell me what the company
3 definition of the FIP rate is?
4    A    The definition of the FIP rate is a
5 ratio between the number of policies placed by a
6 representative or an office as compared to the
7 number of overall transactions that the system
8 matched to those places.
9    Q    Which system is that?
10    A    The FIP system.
11    Q    Is that a computer system?
12    A    Yes.
13    Q    Was that always a computer system?
14    A    As much as I can remember.
15    Q    When was the FIP rate begun at
16 Metropolitan Life?
17    A    Well, I'm not sure when the actual
18 rate was done, but it's my understanding, even
19 though I wasn't there at the time, that the FIP
20 system was developed in 1981.
21    Q    What's the difference between the FIP
22 system, as you call it, and the FIP rate?
23    A    Well, the system is the actual
24 matching of the transactions, and the rate is
25 comparing those matches to the places.

11

DIRECT - TAYLOR

1
2    Q    Can you give me again the time when
3 the FIP system was started at Metropolitan Life?
4    A    I believe it was 1981.
5    Q    What was the reason for the creation
6 of the FIP system?
7    A    I wasn't there at the time, but in
8 working in that department, it was my
9 understanding, it was requested to get a handle on
10 how much the representatives in the field was
11 using existing policy values to finance the sale
12 of new policy.
13    Q    Was there something happening at that
14 time that caused the creation of the FIP system?
15    A    I don't know if anything was
16 happening, but I know that someone, the company
17 was interested in knowing. I guess it's good
18 business.
19    Q    Are you referring to someone in
20 particular?
21    A    From what I have been told, it was
22 Irv Stieglitz that initiated the FIP system.
23    Q    Ms. Taylor, you mentioned Mr.
24 Stieglitz. You said, from what you have been
25 told.

12

DIRECT - TAYLOR

1
2        What were you referring to when you
3 said specifically from what you have been told?
4 Was this a conversation you had with someone?
5    A    A conversation with Frank Dochniak.
6    Q    Who is that?
7    A    He was my boss at the time, when I
8 was working with the FIP system.
9    Q    You said that Mr. Stieglitz was
10 interested in establishing some kind of system to
11 track policy matching; is that right?
12    A    It's my understanding, the company
13 was interested in knowing this information. Mr.
14 Stieglitz spearheaded the implementation of the
15 system.
16    Q    Do you know who designed the FIP
17 system?
18    A    No. I don't know who designed it.
19    Q    Do you know if it was modeled after a
20 similar system of another insurance company?
21    A    No, I don't.
22    Q    Do you know who would know that?
23    A    No.
24    Q    Is there a difference between the
25 term "FIP rate" and FIP ratio"?

13

DIRECT - TAYLOR

1
2    A    Not to me.  To me, it's the same
3 thing.
4    Q    Were both of those terms used at
5 Metropolitan Life, or was one used as opposed to
6 the other?
7    A    When we produced the reports, I
8 believe the term was "ratio."  The field, they
9 used the word "rate."
10    Q    Were there any memoranda or reports
11 generated prior to the implementation of the FIP
12 system which discussed the possibility of
13 implementing a FIP rate system?
14    A    I believe, in reviewing some of the
15 documents, there was a memorandum talking about
16 designing a system to identify this use of
17 inforced equity business.  I remember something,
18 something in my review of the documents.
19    Q    Who at Metropolitan Life had to
20 approve the implementation of the FIP system
21 before it was actually implemented?
22    A    I don't know that.  When I got there,
23 it was already implemented.
24    Q    Do you know who would know the answer
25 to that question?

14

DIRECT - TAYLOR

1
2    A    No.
3    Q    Is it you don't know the person's
4 name, or could you tell me the position of the
5 person that would be responsible or who would have
6 to approve the system before it went into place?
7    A    No.  I don't know.  I don't know who
8 would have to approve it.  The only name I would
9 remember was Mr. Stieglitz's name.  He was an
10 officer of the company at that time, I believe.
11    Q    Can you tell me the names, or if not
12 the names, the positions, of anybody at
13 Metropolitan Life who had input into the creation
14 of the FIP system?
15    A    You want to repeat that question.
16    Q    The question was, can you tell me the
17 names of the people that had any input into the
18 creation of the FIP system?  If not their name,
19 can you tell me their position?
20    A    With respect to the creation of the
21 system?
22        (OFF THE RECORD)(ON THE RECORD)
23    Q    The last question I asked you was
24 regarding the names of any individuals that had
25 input into the creation of the FIP system.

15

DIRECT - TAYLOR

1
2    A    Again, based on discussion I had with
3 Frank, the only other name I remember hearing with
4 respect to the creation of the system was Pierre
5 Maurer.
6    Q    What involvement did Mr. Maurer have?
7    A    I don't know what his involvement
8 was, but it was my understanding, Mr. Stieglitz
9 created the system at the request of Mr. Maurer.
10    Q    Did Mr. Stieglitz have some kind of
11 computer background?
12    A    I don't know.  Back then, I doubt if
13 there was much of a background of computers.
14    Q    Do you know who actually designed the
15 computer program for the FIP system?
16    A    No.
17    Q    Do you know if it was designed by
18 someone at Metropolitan Life or perhaps some other
19 company?
20    A    I don't know if it was designed in
21 whole or in part at Metropolitan Life.  I'm sure
22 Metropolitan Life had some kind of input into it.
23    Q    Do you know who would know the answer
24 to that, as far as the computer program design?
25    A    Probably Irv Stieglitz.

16

DIRECT - TAYLOR

1
2    Q    Is Mr. Stieglitz still working at the
3 company?
4    A    No.
5    Q    Do you know when he left the company?
6    A    No.  It was many years ago, though.
7    Q    Mr. Maurer doesn't work there either,
8 does he?
9    A    No.
10    Q    Do you know when he left the company?
11    A    I think it was in the '90s.
12    Q    At the time when the FIP system was
13 developed, what was his position in the company,
14 Mr. Maurer?
15    A    I know he was an officer.  I'm not
16 sure what his title was.
17    Q    Is there anybody else that you know
18 of, other than Mr. Maurer and Mr. Stieglitz, who
19 had a hand in creation of the FIP system?
20    A    Those are the only two names that I
21 can remember.
22    Q    Would the president of the company
23 have had to approve the implementation of the FIP
24 system?
25    A    I don't know.

17

DIRECT - TAYLOR

2    Q   Is there anybody that you know of as
3 far as a position at Metropolitan Life that would
4 have to approve the implementation of the FIP
5 system?
6    A   No, not that I know of.
7    Q   When were the FIP ratio reports first
8 generated?
9    A   First generated? I don't know when
10 the reports were first generated. When I got
11 there, they were already being generated.
12    Q   Do you know who would know the answer
13 to that?
14    A   No. Probably Irv Stieglitz, when it
15 was first created.
16      MS. TAYLOR: If you look at some of
17 the documents we produced, she may be able
18 to speak to those issues. I do believe
19 there are documents that discuss that.
20      MR. BARTHOLOMAEI: Discuss the --
21      MS. TAYLOR: The reports, and you can
22 see when they started.
23      MR. BARTHOLOMAEI: I didn't come
24 across anything that talked about when the
25 reports were first generated. That's why I

18

DIRECT - TAYLOR

2 was asking the question.
3      If you know something, perhaps you
4 can tell me at a break, a Bates number,
5 whatever.
6    Q   Let's talk about the reports for a
7 second.
8      When the reports were first
9 generated, do you know what information was
10 contained in the reports?
11    A   No. I don't know when the reports
12 were first generated. There may be, in that large
13 stack of documents, something that tells us that.
14 I don't know anything about when they were first
15 generated.
16    Q   You don't remember reviewing anything
17 that talked about that?
18    A   Not when they were first generated. I
19 can't recall.
20    Q   What's the first time that you
21 remember seeing a FIP report? Is that when you
22 first started, in May of 86?
23    A   Yes.
24    Q   At that time what information was on
25 the FIP report?

19

DIRECT - TAYLOR

2    A   I believe there are samples of the
3 reports in those documents. I can go over what my
4 recollection is.
5      It had the number of policies placed,
6 the number of matches the system identified. It
7 had the old policy numbers involved in the match.
8 The new policy numbers, the policy numbers for the
9 new sale. It had an identification of the
10 representative involved in the match. It had the
11 sales office number and name. It had what
12 territory the sales office reported to,
13 identifier. It had the amount of the withdrawal
14 transaction. It had the premium of a new policy.
15 I believe it also had the premium of an old
16 policy.
17      Those are the kinds of things I
18 remember. I would take a look at a sample report.
19    Q   That would be fine, if you would.
20      MS. TAYLOR: I think we produced
21 hundreds of reports.
22      MR. BARTHOLOMAEI: I don't have a FIP
23 report.
24    Q   Is there something you want to refer
25 to --

20

DIRECT - TAYLOR

2    A   No.
3    Q   Who determined the information you
4 just gave me, the different things listed on the
5 FIP report, who determined whether information
6 would be contained on the FIP report?
7    A   When I started working there, the
8 report was already established and set up. It
9 pretty much remained the same over time that I can
10 remember.
11    Q   When you say "over time," up until
12 the point when you left the company or left the
13 department?
14    A   When I left that unit.
15    Q   From '86 to late '94, is -- late '94
16 is the time period you are talking about?
17    A   Yes.
18    Q   Can you tell me if that information
19 was also contained on the reports when the reports
20 were first generated?
21    A   I don't know.
22    Q   Do you know who would know that?
23    A   No, I don't know who would know that.
24      MS. TAYLOR: I do want to just note,
25 we have produced reports from very early

21

DIRECT - TAYLOR

1  on. I think if you look at the reports,
2  you will see what was in those reports.
3  Obviously, if you had copies with you of
4  those earlier reports, I think Ms. Taylor
5  can speak to that.
6      MR. BARTHOLOMAEI: What I really want
7  to know is, who decided that that
8  information would be contained on the
9  earlier reports, and I don't think I can
10  look at that from looking at a FIP report.
11  Your comment doesn't really get at what I'm
12  asking about, but thank you.
13      Q   Ms. Taylor, do you know if the
14  information changed at all from the time the
15  reports were first started up until the time you
16  started working in the private planning area?
17      A   No, I don't know if they changed.
18      Q   Do you know who would know that?
19      A   No, I don't.
20      MS. TAYLOR: What time period were
21  you talking about?
22      MR. BARTHOLOMAEI: From the time the
23  reports were first generated, May of '86,
24  when Ms. Taylor started working in the
25

22

DIRECT - TAYLOR

1  private planning area, when she said she
2  became aware of the content of the reports.
3      MS. TAYLOR: I want to note, we
4  produced documents, and I reviewed some of
5  those documents with Ms. Taylor, that do
6  indicate what was happening with the system
7  prior to, prior to May of 1986.
8      So there are some documents you can
9  show her if you want to do that. She may
10  be able to speak to that.
11      MR. BARTHOLOMAEI: I'm not aware of
12  anything that talks about the specific
13  changes in the reports themselves, the
14  content of the report, be it policy
15  matched, premium of the old policy,
16  premium, new policy. I haven't come about
17  any documents that talked about the change
18  in the content.
19      MS. TAYLOR: I was speaking about the
20  system changes.
21      MR. BARTHOLOMAEI: That's not what
22  I'm asking.
23      MS. TAYLOR: Again, I think we
24  produced probably hundreds of these
25

23

DIRECT - TAYLOR

1  reports. If you show Ms. Taylor some of
2  the reports from the earlier time period
3  versus the later time period, I think she
4  can point out to you if there were
5  differences. The reports speak for
6  themselves.
7      MR. BARTHOLOMAEI: I understand that.
8  At the same time, I think -- I don't think
9  it's my obligation to come here and educate
10  the difference in the reports. It's
11  something that should have been done --
12      MS. TAYLOR: Let me note something.
13  Ms. Taylor is attempting to give the best
14  information she can concerning the FIP
15  system which came into existence in or
16  about 1981, and we are talking about a time
17  period that spans a couple decades.
18      So it really, in my view, is your
19  obligation to have documents with you
20  because I don't think any person could be
21  expected to remember everything over two
22  decades.
23      MR. BARTHOLOMAEI: Unfortunately, I
24  don't think your view is consistent with
25

24

DIRECT - TAYLOR

1  the requirements of the Pennsylvania rules.
2      Q   Ms. Taylor, from the time the FIP
3  reporting system was begun, can you tell me about
4  any changes in the FIP reporting system or, if you
5  remember, any changes -- I know there might have
6  been many changes. From my understanding, there
7  were changes -- what's the first thing you
8  remember there having been changes as far as what
9  was reported in the FIP reporting system?
10      You want me to rephrase that?
11      A   As you said, there were many changes
12  to the adjustment system. I don't remember --
13  there were also some changes to what the system
14  automatically matched and automatically adjusted.
15      One of the things I can remember the
16  system being changed to do was, if a policy was
17  originally placed and then became not taken, for
18  example, that match would be automatically
19  deducted from the number of matches distributed to
20  the sales office or the rep.
21      Q   What was the reason for that change?
22      A   The reason for the change was, the
23  policy, the new policy was not delivered, accepted
24  by the customer, or there was the ratio between
25

25

DIRECT - TAYLOR

1
2  that withdrawal that happened, the transaction
3  that generated the match, not matched to the new
4  issue because the new issue was not in effect, was
5  one of the first things I remember, about the
6  system being changed to automatically withdraw
7  that match against the rep or the office.
8      Q    Is there anything else that you
9  remember being changed?
10     A    Let's see. Changed for even
11 documents that were about to endow within the last
12 year, it automatically matched in the system. We
13 allowed for an adjustment in that case. That was
14 one of the adjustments that were made to the
15 system, a manual one, but we allowed for it
16 nonetheless.
17     Q    What other changes were there?
18     A    There were a lot of changes over
19 time, and there were releases we sent out to the
20 field announcing either electronic changes made to
21 the system or ones we would have to do manually.
22 They spread out over the time I was there, between
23 1986 and the time I left in 1994.
24     Q    I have some documents, and we'll talk
25 about those changes.

26

DIRECT - TAYLOR

1
2  You said "the adjustment system."
3  What's the adjustment system?
4      A    Well, the FIP system matched manual
5  transactions to a new leasehold policy, and one of
6  the adjustments that would happen in the system,
7  if, for example, if the new policy was taken by
8  the customer, the system would automatically be
9  adjusted to subtract that match from either the
10 branches or the eight sales offices' number of
11 matches, as well as the representatives' numbers
12 of matches.
13     So we had adjustments that were
14 handled electronically in the system as well as
15 adjustments that had to be manually processed.
16     Q    Who was it that, when the FIP system
17 was first begun, who was it that first handled
18 these adjustments, or was there a specific
19 department that handled the adjustments?
20     MS. TAYLOR: What time period?
21     MR. BARTHOLOMAEI: When it was first
22 begun.
23     A    When it was first begun, I don't have
24 a recollection of an adjustment system at that
25 time. I have a recollection of an adjustment

27

DIRECT - TAYLOR

1
2  system when I joined the unit.
3      Q    Do you know when the adjustment
4  system was first begun?
5      A    Adjustments were processed before I
6  joined the unit. I was trained on how to process
7  them. I don't know exactly what year they began
8  the adjustments, but I believe there may be
9  documents that discuss when the adjustments were
10 actually begun. I don't remember exactly.
11     Q    You mentioned another term, you said
12 "the match system."
13     What's the definition of the match
14 system?
15     A    Well, the match system is basically
16 the FIP system.
17     Q    I guess the adjustment system is
18 something that happens after the match system
19 triggers a match; is that right?
20     A    Yes. Typically, yeah.
21     Q    Something I meant to ask you about
22 before, you just talked about, you received some
23 training, I guess, when you started working in the
24 product planning area.
25     What did that training consist of?

28

DIRECT - TAYLOR

1
2      A    The training consisted of processing
3  adjustments that were requested by the field to
4  the system, reviewing the request.
5      Q    Can you take me through that process
6  of processing an adjustment?
7      A    There was a form designed for use by
8  the field, sales offices, to request an adjustment
9  to a match that occurred in the system. They
10 would submit that form —
11     Q    Who is "they," the branch manager or
12 sales representative?
13     A    The branch manager would submit that
14 form to the Product Planning Unit, where I worked,
15 and they would request that a particular match be
16 adjusted to the system, one form per match.
17     Q    When you say "adjusted," you mean
18 that the match is eliminated?
19     A    Yes.
20     Q    What happened after that, after you
21 received the form?
22     A    I would receive the form. I would
23 put a date and stamp on the form when I received
24 it, and then I would look at various computer
25 systems to see if the reason for the match was

29

DIRECT - TAYLOR

1  valid.
2
3  Q   What systems were those?
4  A   That was the electronic system that
5  would basically tell me if the policy was still in
6  force. It was a system that basically told me the
7  status of the old policy and new policy and
8  what -- the reason for the adjustment that the
9  manager was requesting was valid.
10  Q   What was the name of that computer
11  system?
12  A   The name of that -- there were
13  several computer systems, depending what type of
14  policy it was. All the information wasn't kept in
15  one system.
16  Q   Depending what request was from a
17  branch manager, you would look at one system
18  versus another?
19  A   Or several systems.
20  Q   What would happen in the event you
21  were working to eliminate the match?
22  A   I would make such a notation on the
23  form that was originally submitted that the match
24  was being adjusted, and a copy of a form was sent
25  back to the branch manager, and a copy of that

30

DIRECT - TAYLOR

1
2  form was submitted to a unit in the department
3  that actually created the keypunch cards. The
4  keypunch cards were ran up against the FIP system
5  to effect the adjustment.
6  Q   Can you explain that for me, how the
7  actual match was adjusted in the system?
8  A   The match was adjusted: The keypunch
9  operator would enter the old policy number, the
10  new policy number, the branch identity and the
11  date, what report the match happened on, and the
12  system would subtract that match from that report.
13  Q   Was a new report generated at that
14  time?
15  A   A new report, no.
16  Q   If at any time you want to take a
17  break, just let me know.
18  Other than the review of the computer
19  systems, was there any other investigation that
20  was done into the match for reasons of adjustment?
21  A   Well, the reasons for the matches was
22  pretty straightforward, and most, if not all, what
23  we needed to know, what happens on the electronic
24  system because the FIP system was using other
25  systems to determine there was going to be a match

31

DIRECT - TAYLOR

1
2  in the first place. I could easily tell if the
3  policy wasn't in force anymore.
4  For example, if the older policy was
5  one year from maturity. It was pretty clear-cut
6  on the adjustment policy.
7  Q   At the time when you first started
8  working in the product area, what were the
9  different reasons for which a branch manager could
10  request an adjustment for a FIP match?
11  A   There was a form, I believe it was
12  also in the manual, that listed all the reasons
13  for adjustment. There were several of them. I
14  review them as part of my document review. I
15  can't remember each and every reason for
16  adjustment.
17  :   If you want to go over that, we could
18  go over them.
19  Q   In the event that the form submitted
20  by the branch manager and whoever is reviewing the
21  match determines that it -- in effect, the match
22  should remain or stay, what would happen at that
23  point?
24  A   There was a place on the form the
25  manager submitted that said the match was not

32

DIRECT - TAYLOR

1
2  going to be -- the adjustment was not going to be
3  approved, and that form was sent back to the
4  manager.
5  Q   Did the sales representatives
6  themselves have any role in the process of
7  adjusting matches as far as, were they questioned
8  in any way about the nature of the transaction
9  that generated the match?
10  A   It was a branch manager's
11  responsibility to discuss the matches with the
12  representatives when they got the reports to
13  determine if these matches were valid and also to
14  discuss, the manager saw some kind of pattern the
15  representative was using, valid, as well as if
16  they saw a pattern of financing on the part of the
17  representative; that is, using these inforced
18  values as a method of sale to sell their new
19  business. That was the branch manager's
20  responsibility.
21  Q   How did the FIP reporting system
22  impact the compensation of the branch managers?
23  A   The FIP ratio had an impact on the
24  branch manager's compensation, and that impact
25  varied over time.

**33**

DIRECT - TAYLOR

2 Q   Can you tell me how it varied over
3 time?
4 A   At one point in time, the manager's
5 compensation was impacted by the FIP ratio based
6 on, the lower the ratio, it's my understanding,
7 the more he received in compensation; the higher
8 the ratio, the less he received in some form of
9 his compensation.
10 At some point in time, if the ratio
11 was below a 15-percent ratio, the manager received
12 all of his or her compensation. If it was above,
13 they didn't receive a special compensation.
14 Q   Can you tell me what that first point
15 in time is, it seems it was on a prorated basis,
16 where the manager received a compensation based on
17 the actual ratio as opposed to the second point in
18 time when you talked about the 15-percent ratio?
19 A   I'm not exactly sure of the date. I
20 know there is documents that have dates when they
21 implemented the differences in the ratios and the
22 differences in the compensation.
23 Q   Can you give me an approximate date
24 when the 15-percent FIP ratio policy was
25 implemented with respect to the compensation of

**34**

DIRECT - TAYLOR

2 the branch manager?
3 MS. TAYLOR: Objection as to form.
4 A   There is a document that has the
5 actual date. I believe it was in the late '80s,
6 early '90s.
7 The rule said, the branch manager's
8 compensation -- I mean the FIP ratio was less than
9 15 percent, then the manager received whatever
10 compensation he or she was entitled to.
11 Q   Is that a specific document you are
12 referring to that you know the title of or just
13 something you saw?
14 A   There was a specific document that I
15 prepared some time ago that talked about when that
16 change was made.
17 Q   Do you know who made the decision to
18 implement that new 15-percent FIP ratio policy?
19 MS. TAYLOR: Objection to form.
20 MR. LABOVITZ: Objection to form, and
21 I'll make a continuing objection to your
22 references to a 15-percent policy so I
23 don't continually interrupt the deposition.
24 Q   Do you want me to repeat that?
25 A   Yes.

**35**

DIRECT - TAYLOR

2 Q   You testified earlier about a
3 15-percent FIP ratio that was created, a
4 15-percent number that was established with
5 respect to branch managers' commissions.
6 Didn't you say something like that?
7 A   The branch manager's compensation.
8 Q   Can you explain that again for me.
9 A   Branch manager's compensation was
10 impacted by the FIP ratio, and there was a time
11 when it was, a branch manager's FIP ratio was less
12 than 15 percent, it -- the branch manager was paid
13 either from compensation based on whatever the
14 rules were for him or her to receive a certain
15 compensation. If the branch manager's FIP ratio
16 was above 15 percent, it had a negative impact on
17 his or her compensation.
18 Q   Who was it that established that
19 policy that you just talked about?
20 A   I'm not -- I can't recall who
21 established the policy, because I didn't work in
22 the comp unit. I don't know who established that
23 rule with respect to how the manager would be paid
24 with compensation.
25 Basically, we ran the reports, did

**36**

DIRECT - TAYLOR

2 the adjustments, and at the end of the year the
3 branch had a FIP ratio of some number, and it was
4 used in the compensation.
5 Q   Do you know who I would have to talk
6 to to find that out, who established that policy
7 that you were discussing?
8 A   It would have to be someone who
9 worked in the compensation unit, who was working
10 in the compensation unit when those rules were --
11 with respect to how a manager was going to be paid
12 was established.
13 Q   Do you know if that's still the case
14 today, that that 15 percent policy with respect to
15 branch managers, their compensation?
16 MS. TAYLOR: Objection as to
17 form.
18 A   I don't know. The FIP stipulation
19 doesn't exist today.
20 Q   Obviously not.
21 When you left the product planning
22 area, was that also the case at that time, there
23 was the 15-percent ratio with respect to the
24 branch manager's relation to their compensation?
25 MS. TAYLOR: Objection as to form.

37

DIRECT - TAYLOR

1
2  A   I'm not exactly sure.
3      Repeat that question.
4  Q   When you left the product planning
5  area, you said, sometime in 1994, were those
6  procedures still in place with regard to the
7  15-percent ratio with respect to branch managers'
8  compensation?
9  A   I believe by 1994, the FIP ratio was
10 not included as part of the manager's
11 compensation, calculation of compensation.
12 Q   When did that stop, that calculation?
13 A   I think 1993, but I wrote a memo,
14 note, that outlines those changes, and they are in
15 documents that we looked at.
16 Q   When the FIP-reporting system was
17 first implemented, did it affect the compensation
18 of the branch manager in any way?
19 A   I don't know how it affected it when
20 it was first established.
21 Q   Do you know who would know?
22 A   Again, probably someone in the
23 compensation section.
24 Q   Do you know who made the decision
25 that the FIP ratio would have some effect on the

38

DIRECT - TAYLOR

1
2  compensation of branch managers?
3  A   It's my recollection that it was
4  probably Pierre Maurer.
5  Q   How did you come to that
6  understanding?
7  A   I believe it's some of the documents
8  I looked at.
9  Q   Are you referring to the same memo
10 that you generated?
11 A   No.
12 Q   You are referring to a different
13 document?
14 A   Different document.
15 Q   Is that something you can identify if
16 we go through some documents?
17 A   If we went through some documents, I
18 would probably -- I would know it if I saw it. I
19 don't know if I could find it in that file, but I
20 would know it if I saw it.
21 Q   Do you know the reason why the
22 decision was made to have the FIP ratio have some
23 impact on the compensation of branch managers?
24 A   I believe the company felt that it
25 was not in the best interest of the company to

39

DIRECT - TAYLOR

1
2  have representatives as a method of selling using
3  inforce policy values for the sale of new
4  business. To that extent, they believed the best
5  way to help ensure that that didn't happen was to
6  have the managers monitor and supervise that
7  activity, and to the extent they did a good job,
8  they would be compensated for that or receive all
9  their compensation, whatever they used in the
10 calculation of the compensation. To the extent
11 they didn't do a good job, it would be a negative
12 to them. That's my understanding.
13 Q   So we're clear, the question I'm
14 asking, I'm asking for the position of the
15 company. I know that's your understanding. Just
16 so you know, the answers you gave are on behalf of
17 the company, even though it may be your
18 understanding as well.
19      I think you understand that, right?
20      MS. TAYLOR: Objection.
21 A   Yes.
22 Q   Did the branch managers receive some
23 type of bonus for having a lower FIP ratio, their
24 branch having a lower FIP ratio?
25 A   I wouldn't say the branch received

40

DIRECT - TAYLOR

1
2  some type of bonus. I do know the FIP ratio was
3  calculated as part of their compensation, was
4  included in the calculation of their compensation.
5  Whether it's characterized as a bonus, I don't
6  know. I don't know that.
7  Q   I guess what I'm asking, if the FIP
8  ratio in the branch was lower, were the branch
9  managers compensated in addition to what the
10 regular compensation would be, or were they only
11 penalized if their FIP ratio was higher?
12      MS. TAYLOR: Objection as to form.
13      MR. LABOVITZ: Objection as to form.
14 Q   Do you understand the question?
15 A   I believe I understand the question.
16      I'm not versed enough in compensation
17 to really answer your question as to whether it
18 was a bonus or it was just a penal thing.
19 Q   What did you say?
20 A   You said it was to penalize the
21 branch manager.
22      I do know the FIP ratio had an impact
23 on the branch manager's compensation. I don't
24 know if it was a bonus or it was just used to
25 penalize a manager.

41

DIRECT - TAYLOR

2 Q So it's not the term, I want to make
3 sure it wasn't the term "bonus" that you were
4 disagreeing with me on.
5 What I wanted to know was if they
6 received extra money if their branch's FIP was
7 low.
8 A Right.
9 Q You said, no.
10 A I'm not sure how the unit used the
11 FIP when they calculated the compensation.
12 Q Again, would I have to talk to
13 someone in the compensation unit?
14 A Yes.
15 Q What about with sales
16 representatives, how did the FIP ratio affect the
17 earnings of the sales representatives, if at all?
18 A The FIP ratio did not have an impact
19 on the sales representatives.
20 Q Do you know if any consideration was
21 given by the company to have the FIP ratio affect
22 the earnings of sales representatives?
23 A You're talking about at any time
24 during the life of the FIP system?
25 Q Right.

42

DIRECT - TAYLOR

2 A I can't recall if there was any
3 consideration given. There may have been, there
4 may be documents that talk about that. I don't
5 remember seeing anything. When I went to the unit
6 and when I left the unit, the representatives'
7 compensation was not impacted by the ratio.
8 Q Maybe the term "consideration" isn't
9 the best term I could use.
10 What I'm referring to, to clarify,
11 any correspondence, memorandum generated, any
12 discussions that you are aware of that were the
13 topic of sales representatives' earnings being
14 affected by the FIP rate, if those existed, are
15 you aware of those?
16 A No, I'm not.
17 Q At the outset of the FIP reporting
18 system, when reports were generated, who did the
19 reports go to? I don't mean specific people. I
20 mean their position in the company.
21 A There may be documents that speak
22 about the initial distribution of the reports
23 before I joined the unit back in 1981, but when I
24 joined the unit, I can tell you who the reports
25 were distributed to back in May of 1986.

43

DIRECT - TAYLOR

2 Q '81 through '86, you don't
3 necessarily know?
4 A Right off the top of my head, I don't
5 remember. I know there were documents that talked
6 about distribution of reports going back in time.
7 Q Is that also a document that you
8 could identify if you were shown the document?
9 A If I were shown the document, yes.
10 Q Is that something you reviewed in
11 preparation for your deposition today?
12 A Yes.
13 Q Why don't you tell me, in 1986, who
14 the reports went to.
15 A The reports were distributed to, two
16 sets of reports were distributed to the regional
17 vice president.
18 Q The regional office?
19 A Yes.
20 One for them and one that they were
21 asked to distribute to the sales office. Two
22 sets, one for them, one for them to distribute to
23 the sales office.
24 Q That's a regional office within a
25 territory?

44

DIRECT - TAYLOR

2 A Yes, also a copy to the territory.
3 Q Also a copy to the territory?
4 A Yes.
5 Q Anybody else that received a report?
6 A That's what I can recall. There are
7 documents that talk about the exact distribution.
8 I believe that's also in that memorandum I spoke
9 to that I prepared.
10 Q Do you have a copy of that with you
11 today?
12 MS. TAYLOR: It's in the box of
13 materials that you identified. It's a 1994
14 memo.
15 MR. BARTHOLOMAEI: I think I might
16 have that.
17 MS. TAYLOR: Yes.
18 Q You say reports were generated,
19 and -- three copies, and one was sent to the
20 territory, and two of the copies were sent to the
21 regional office?
22 A And we kept a copy.
23 Q Was there someone that printed these
24 reports out, or were they automatically generated
25 by a computer system?

45

DIRECT - TAYLOR
1
2    A   Automatically generated by a computer
3  system.
4    Q   With what frequency?
5    A   Monthly.
6    Q   When we are talking about reports
7  being generated, is it always the same type of
8  report as the report -- I'm assuming you
9  are referring to a report for the branch office;
10  is that right?
11       MS. TAYLOR: Objection.
12       MR. LABOVITZ: Objection to form.
13    Q   Were there different types of reports
14  generated?
15    A   Yes.
16    Q   What different types were those?
17    A   There was a report we called a
18  summary report.
19       MS. TAYLOR: Did you say, on a weekly
20  basis?
21       MR. BARTHOLOMAEI: She said, monthly.
22    A   There was a detailed report. There
23  was a report listing the ratios for all the
24  representatives in the office.
25    Q   The branch office?

46

DIRECT - TAYLOR
1
2    A   The branch office.
3    Q   What was that report called?
4    A   I think it was called like a rolling
5  12-month report for the reps. It was detailed in
6  that memo we just talked about.
7    Q   Would it help you to refer to that
8  memo when I asked you these questions?
9    A   Yes.
10       MR. BARTHOLOMAEI: Off the record.
11       (OFF THE RECORD)(ON THE RECORD)
12    Q   Ms. Taylor, before our break, I was
13  asking some questions about the report
14  distribution. You referred to a document.
15       The document that I have in front of
16  me is consecutively Bates numbered MP9365000370
17  through 372, and is this the document you are
18  referring to?
19    A   Yes.
20    Q   Is this a document you prepared?
21    A   Yes.
22       MS. TAYLOR: For the people who are
23  participating by phone, this document is
24  entitled "Finance by Inforce Policies
25  (FIP)." The last page is dated March 31,

47

DIRECT - TAYLOR
1
2  1994. Above the date Ms. Taylor's
3  signature -- not signature. Ms. Taylor's
4  name appears.
5       PERSON: Would you please repeat the
6  Bates number.
7       MS. TAYLOR: MP9365000370 through
8  372.
9       I believe there were multiple copies
10  of this in the documents that were
11  identified by Behrend & Emsberger. There
12  might be another one with the same Bates
13  number -- with a different Bates number, I
14  mean.
15       MR. BARTHOLOMAEI: I want to make a
16  comment for the record. I'm not trying to
17  be difficult.
18       I'm not going to hold up the
19  deposition each time I identify a document
20  to have the document identified by you and
21  the Bates number reread every time I refer
22  to an exhibit because I think it will
23  prolong this deposition.
24       We talked about this before in front
25  of the judge, as far as the procedures for

48

DIRECT - TAYLOR
1
2  people participating by telephone. Outside
3  of identifying the Bates number of the
4  document, I'm not going to have the
5  deposition stopped every time I use the
6  document for you to identify the document
7  by date or whatever it's called and reread
8  the Bates number for anybody else, because
9  Judge Whalen has stated, because people are
10  participating by telephone by their own
11  risk, if there is a poor connection or
12  something that can't be heard, that's not
13  something that can hold up a deposition.
14       MS. TAYLOR: I don't think that was
15  Judge Whalen's decision.
16       Furthermore, the reason I repeated
17  the Bates number was because you have a
18  cold, and you are speaking very softly, and
19  therefore, it's very difficult to hear. I
20  was actually trying to help out.
21       MR. BARTHOLOMAEI: You didn't hear
22  me?
23       MS. TAYLOR: I think it's hard to
24  hear you. To tell the truth, I think the
25  court reporter may be having trouble

49

DIRECT - TAYLOR

1
2  hearing you. You are soft spoken because
3  you have a cold.
4      Let's move on.
5      MR. BARTHOLOMAEI: I'll ask everybody
6  here in the room here today, somebody
7  doesn't hear the Bates number, please tell
8  me at that time.
9      Sir, if you don't hear the –
10     MR. BRUMFIELD: Clare did that. She
11  asked to repeat the Bates number.
12     MR. BARTHOLOMAEI: I don't think she
13  did. Patty started identifying the
14  document and the date.
15     Regardless, this isn't something – I
16  would not repeat the Bates number for
17  people that don't hear it on the telephone.
18     MR. BRUMFIELD: You will read it.
19     MR. BARTHOLOMAEI: No, I won't.
20     MS. TAYLOR: That takes about 10
21  seconds. Let's move on.
22     Q  Ms. Taylor, getting back to this
23  document, what was the purpose of your preparation
24  of this document?
25     A  Someone asked me to prepare this

50

DIRECT - TAYLOR

1
2  document back in 1994. I don't remember who asked
3  me to prepare it, but I did prepare it.
4      Q  Do you know the reason why you were
5  asked to prepare the document? Did the person
6  tell you why they wanted you to prepare it?
7      A  It's my recollection that back in May
8  of 1994, I had been posting – telling my
9  supervisor that I wanted to go on to another
10  position in the company, and I was looking at
11  postings on the posting board. I thought it would
12  be a good idea if I kind of memorialized all of
13  the things I knew about the FIP system in one spot
14  because at that point in time, I was the only one
15  working on the reports. Someone did ask me to
16  prepare it. I don't know who did at that time.
17     Q  Before our break, I was asking about
18  the different types of reports. You talked about
19  a summary report, a daily report and something you
20  referred to as a rolling 12-month report.
21     Does this document help refresh your
22  recollection as to any other types of reports or
23  different names of reports?
24     A  Yes, it does.
25     Q  When you talked before about the

51

DIRECT - TAYLOR

1
2  summary report, what was the summary report?
3      A  The summary report listed the current
4  month matches and ratio, as well as the date
5  matches and ratio for every sales office, every
6  region, every territory and a roll-up of those
7  numbers on a company basis.
8      Q  Is the summary report for the whole
9  company?
10     A  Yes, broken down by sales office,
11  region, territory and then company.
12     Q  Who received copies of those reports?
13     A  One copy was distributed to the
14  territorial officers in the territory, a copy of
15  the summary report because that summary report
16  gave them the FIP ratio for the month, the date or
17  their regions and sales office, and we kept a copy
18  of the report.
19     Q  Other than the territorial offices
20  did anyone else in the company receive copies of
21  these summary reports?
22     A  Not on a routine basis. If someone
23  requested we send them to a particular office,
24  region or territory, we would, of course, give it
25  to them.

52

DIRECT - TAYLOR

1
2      Q  Was this summary report also
3  generated on a monthly basis?
4      A  Yes.
5      Q  When you said if someone requested a
6  copy of the report, you would give it to them,
7  does that hold true for anybody in the company, or
8  are there certain levels or positions in the
9  company that would be able to obtain copies of
10  these summary reports?
11     A  Well, we retained the reports.
12  Anyone wanting a copy of the report would come to
13  us.
14     Q  My question: For example, the sales
15  representative called you up and said I want a
16  copy of the summary report, is that something they
17  could obtain, or only someone in a management
18  position could obtain?
19     A  If a salesperson called, we would say
20  they would have to speak to their manager for the
21  FIP report. We wouldn't give a copy to the sales
22  rep.
23     Q  Who at the company would be able to
24  request, obtain a copy of the summary report?
25     MR. LABOVITZ: Objection.

53

DIRECT - TAYLOR

1    A    People like the branch, if a region
2  wanted a copy, they lost a copy, they wanted it
3  replaced, someone from the Auditing Department
4  wanted a copy of the record, we would give them a
5  copy of the report. Someone from the Compensation
6  Department wanted a copy of the report, we would
7  give them a copy of the report.
8    Q    Were these summary reports routinely
9  sent to members of the management such as a
10  president of the company?
11    A    No.
12      MS. TAYLOR: You mean by Ms. Taylor's
13    unit?
14      MR. BARTHOLOMAEI: By whoever sent
15    them out.
16    A    I was distributing the reports. No,
17  we did not retain copies from the FIP reports to
18  the president of the company.
19    Q    I'm asking in general.
20    A    I don't know what anyone else might
21  have done with them once I gave it to them, but I
22  didn't distribute it.
23    Q    Outside of distributing the report,
24  was any analysis of the report conducted by the

54

DIRECT - TAYLOR

1  products planning area whichever accompanied or
2  existed with respect to individual summary
3  reports?
4      MS. TAYLOR: Objection to form.
5      MR. LABOVITZ: Objection to form.
6    Q    Do you understand the question?
7    A    Not really.
8    Q    Outside of just distributing the
9  report, was there any type of analysis, for
10  example, any comment, the best word I can think,
11  of the analysis of the report that was done by the
12  product planning area, for example, the FIP report
13  for this month is higher than the last one, give
14  the territorial –
15    A    Yeah, there were reports produced,
16  not every month. If we were asked to do some
17  analysis, we would do an analysis. Typically,
18  Frank Dochniak would do the analysis, comparing
19  one month to another. If one of the officers in
20  the department was going out to visit a particular
21  branch or region, particularly a region or
22  territory, they might ask us, what were the FIP
23  ratios for that office as part of them preparing
24  for their visit.

55

DIRECT - TAYLOR

1    Q    Was there any routine analysis done
2  of these summary reports, as far as every six
3  months a report was generated talking about the
4  prior six months, every quarter or year?
5    A    I don't recall doing an analysis on a
6  routine basis.
7    Q    Were yearly reports generated which
8  contained the same information as the summary
9  report, but for a yearly basis?
10    A    The report that was created at the
11  end of the year, let's say the December report,
12  because the reports included the current month's
13  information, as well as the year-to-date
14  information, it included all of one year on that
15  one report.
16    Q    The summary reports that were
17  generated, did they necessarily include the prior
18  12 months or 11 months?
19    A    The summary reports, no. The current
20  month and year-to-date for an office, sales
21  office, region, territory, company.
22    Q    Outside of the territorial office, no
23  one else received these reports on a routine basis
24  from your department?

56

DIRECT - TAYLOR

1      MS. TAYLOR: Objection as to form.
2      MR. LABOVITZ: Join.
3    Q    You can answer.
4    A    No.
5    Q    Let's talk about what you call the
6  detailed report.
7      What was that?
8    A    The detailed report showed exactly, I
9  don't know what it says, the details, the detailed
10  information about the old policy and new policy.
11  For example, the name of the owner, the insured,
12  the premium, the amount withdrawn, the identity of
13  the representative involved in the match. It also
14  included the current and year-to-date of placed
15  policies for that particular office.
16    Q    Talking about a branch office,
17  branch?
18    A    Branch office, yes. It showed the
19  number of fit matches and ratio of each office.
20    Q    When you say the ratio for each
21  office, what types of offices are there?
22    A    Sales office. Each sales office had
23  a number of matches, a number of places and the
24  resulting ratio of those two numbers.

57

```
1              DIRECT - TAYLOR
2      Q   Is this a detailed report for the
3  region?
4      A   No. For the sales office, the
5  agency, the branch.
6      Q   So it would be a detailed report of
7  the branch office and the sales representatives
8  who work in that office?
9      A   Yes.
10     Q   Were reports generated which detailed
11 the regional office and the various branch offices
12 within the regional office, whatever region it may
13 be?
14     A   No. Rather, the regional office
15 received a copy of the detailed report for each
16 branch or sales that reported to it.
17     Q   Were reports generated which, outside
18 of the summary report, which contained the FIP
19 ratio for the various branch offices within a
20 region and of the region itself?
21     A   Say that again.
22     Q   You told me about a summary report
23 which basically went from the company down and
24 talked about a detailed report which was the
25 branch office and sales office.
```

59

```
1              DIRECT - TAYLOR
2  report?
3      A   Yes.
4      Q   The third report you identified, you
5  said it was a rolling 12-month report.
6          I think you were referring to a
7  report on an individual sales representative; is
8  that right?
9      A   Yes.
10     Q   What information was contained on
11 those reports?
12     A   That report showed the number of
13 placed policies and the number of matches for each
14 representative in a particular office and the
15 ratio associated with those places and matches.
16     Q   Did the information contained on
17 those reports change over time?
18     A   Not that I can recall.
19     Q   Who received copies of those reports?
20     A   We distributed two copies of that
21 report to the region: Again, one copy for their
22 use and one copy to be sent to the branch, sales
23 office.
24     Q   Did the sales representative
25 necessarily receive a copy of his or own rolling
```

58

```
1              DIRECT - TAYLOR
2          I'm asking if there was a report
3  generated for the region itself which talked about
4  the regional offices and branch office?
5      A   That would be the summary report.
6      Q   I'm just asking if there was a
7  specific report generated just for each specific
8  region. Does that make sense?
9      A   Yes.
10     Q   I know the summary report contains a
11 lot more information.
12     A   The summary report included the
13 number of matches, the number of placements on a
14 current and year-to-date basis for each sales
15 office that reported to a region. So a region got
16 a listing of the FIP reported to each sales
17 office.
18     Q   The summary report also contained a
19 ratio for the company; is that right?
20     A   Not on the reports the region
21 received.
22     Q   The region only received a report for
23 its own sales offices?
24     A   Right.
25     Q   That was also called a summary
```

60

```
1              DIRECT - TAYLOR
2  12-month report directly?
3      A   Not from us. We distributed directly
4  to the region.
5      Q   Was it the region's responsibility to
6  distribute those reports to the sales
7  representatives?
8      A   No.
9      Q   Was it the region's responsibility to
10 distribute the reports to the branch managers?
11     A   The branch managers.
12     Q   Was it the branch manager's
13 responsibility to distribute a copy of the sales
14 representative's individual report to him or her?
15     A   No.
16     Q   What was the reason for the sales
17 representative not receiving a copy of the FIP
18 report?
19         MS. TAYLOR: Objection as to form.
20         MR. LABOVITZ: Join.
21     A   The FIP report was really a
22 management tool, and so the report that was sent
23 to the branch manager included the information for
24 each representative in the office. So the listing
25 would have several representatives' names on it,
```

61

DIRECT - TAYLOR

1  and it was the branch manager's responsibility to
2  use that report in conjunction with the detailed
3  report and discuss the matches each month with the
4  representatives.
5  Q    Could the FIP reporting system, the
6  system which generated the reports, be manipulated
7  to generate reports with respect to individual
8  representatives? I'm saying, generate a report
9  for Joe Smith for the past two years, what his FIP
10  ratios have been over those two years; is that
11  something that could be done?
12  A    I don't recall that being done, but
13  we could go back and look at microfiche for the
14  information over time.
15  Q    You could look at the reports
16  themselves?
17  A    More than likely, we would look at
18  the reports on microfiche.
19  Q    I guess my question is, was it
20  possible to generate reports according to whatever
21  detail, whatever variables the person desired they
22  wanted to know about; there were only these
23  reports you described that were able to be
24  generated by the system?

62

DIRECT - TAYLOR

1  MS. TAYLOR: Objection as to form.
2  A    These were the reports automatically
3  generated by the system, and the system didn't
4  have a way of inquiring the system and saying I
5  want this, that and the other based on certain
6  time frames, certain people, no. You would have
7  to set up a report to run. It would be
8  predetermined what would be in the report.
9  Q    We talked earlier about the
10  relationship between the FIP ratio and branch
11  manager and how it relates to the branch manager's
12  compensation, and I wanted to ask you again about
13  any way in which the FIP ratio related to sales
14  or -- let me ask first, any way in which FIP ratio
15  related to the sales representative himself or
16  herself.
17  MS. TAYLOR: Objection to form.
18  MR. LABOVITZ: Objection to form.
19  Q    Do you want me to rephrase that
20  question?
21  A    Yes.
22  Q    Did the FIP ratio have any impact on
23  the sales representative?
24  MS. TAYLOR: Objection as to form.

63

DIRECT - TAYLOR

1  MR. LABOVITZ: Join.
2  A    Should I answer?
3  Q    Sure.
4  A    It had an impact on the sales
5  representative, not compensation. The manager had
6  a conversation with the sales representative about
7  their activity. That's the kind of impact it
8  would have on the rep.
9  Q    When you say the branch manager had
10  discussions with the sales representative, what
11  are you referring to?
12  A    The company encouraged, told
13  management it was their responsibility to use this
14  report, these reports in fact, to have discussions
15  with sales representatives as to what was
16  appearing on the reports. Could be an individual
17  transaction they wanted to discuss with the rep,
18  or it could be that they saw a pattern, where the
19  representative was using these values to support
20  the sale of a business. In any event, the manager
21  should review the reports and have a discussion
22  with the representative, what they saw on the
23  reports.
24  Q    Beyond these discussions with the

64

DIRECT - TAYLOR

1  branch manager, was there any other way in which
2  the FIP ratio had any effect on the sales
3  representative?
4  A    The branch manager could actually put
5  in, if he felt -- he or she felt it was necessary,
6  review applications submitted by the rep, call
7  customers that had applications that were
8  submitted. The corrective action or lack of
9  corrective action wasn't needed was left up to the
10  manager of his or review of the reports, to
11  actually discuss what was matching in the system
12  with the representative.
13  Q    Were there company guidelines which
14  detailed corrective action that the branch manager
15  should take with respect to FIP ratio of sales
16  representatives?
17  A    Yes.
18  Q    What were those?
19  A    Corrective action, one of the
20  corrective actions would be to attempt to correct
21  the situation by having these discussions with
22  representatives, restating the company policy with
23  respect to the FIP system, and the manager could
24  even terminate the rep if necessary, not solely

65

DIRECT - TAYLOR

1
2  based on the number, because the number doesn't
3  mean the representative is doing anything wrong,
4  but based on discussions with the rep, reviewing
5  applications and files, the manager could even
6  terminate the rep.
7      Q    When you say the number doesn't
8  necessarily indicate the sales rep was doing
9  something wrong, can you explain that?
10     A    Because the system matched the new
11 issue to a withdrawal transaction. There was this
12 adjustment process we talked about before.
13         If the manager wasn't reviewing the
14 reports and asking for adjustments, if the
15 representative's ratio could stay high, outside of
16 the ones done automatically, the manager had an
17 obligation to look at those reports and discuss it
18 with the rep. The rep's explanation of the match
19 might be fine.
20     Q    I didn't want to interrupt you.
21         Let me ask you what you mean when you
22 say the rate could stay high.
23         What do you consider to be high?
24     A    High is anything that shouldn't be on
25 there, that should be off, in my opinion.

66

DIRECT - TAYLOR

1
2      If I had a match and I sold three
3  policies and had three matches, I probably had a
4  hundred percent ratio. Those policies may be not
5  taken, and it would reduce my ratio. Or a manager
6  discusses a match with a rep and even though that
7  case became not taken, the manager may want to
8  discuss the entire transaction with the rep, not
9  just the fact it should be adjusted or not
10 adjusted.
11     Q    Was it the company's policy that
12 branch managers were to discuss all matches with
13 sales representatives?
14     A    Yes.
15     Q    Was there a company policy as to what
16 point a sales representative would be terminated
17 in connection with FIP ratio?   -
18     A    No. Never gave a number and said a
19 rep's ratio at a certain number, that they should
20 be terminated.
21     Q    Was that something that was ever
22 discussed in the company or any consideration ever
23 given to that?
24     A    Given to?
25     Q    A policy where sales representatives

67

DIRECT - TAYLOR

1
2  could be terminated for having a certain FIP
3  ratio.
4      A    No.
5      Q    Were any sales representatives
6  terminated for having high FIP ratios?
7      A    I recall one instance in a branch
8  identified as, I believe, 702 Marine Park where
9  reps were terminated for not necessarily having a
10 high FIP ratio, but using inforced policy as a
11 method of sale.
12     Q    Is that in Michigan?
13     A    No. In Brooklyn.
14         MS. TAYLOR: I want to mention, Ms.
15     Taylor is not in the area that actually
16     makes the termination decisions.
17         THE WITNESS: That's just my
18     recollection of someone being terminated
19     using FIP as a method of selling.
20     Q    Were any sales representatives in the
21 Pittsburgh region terminated for having high FIP
22 ratio during the time period starting in the early
23 '80s and going through the mid '90s?
24         MR. LABOVITZ: Objection.
25         MS. TAYLOR: Objection as to form.

68

DIRECT - TAYLOR

1
2      Lack of foundation.
3      A    I wouldn't know that.
4      Q    Do you know who would know that?
5      A    I would suspect the region, branch
6  manager, regions and territories that were
7  reported to would know that.
8      Q    Do you know whether the branch
9  manager had the authority to terminate a sales
10 representative for having a high FIP ratio?
11     A    Everything that we told the manager
12 with respect to termination involving the use of
13 inforced policy value was not based on the number.
14 We cautioned against the number. Where it was
15 determined the rep was indeed using this practice
16 as a method of sale, the manager could terminate
17 the rep.
18     Q    When reports were generated, and I'm
19 referring specifically to the reports we talked
20 about earlier which detailed the FIP ratios of
21 individual sales representatives, was there any
22 kind of care or flag which was something that made
23 the department aware certain sales representatives
24 had certain FIP ratios or --
25         MS. TAYLOR: Objection as form.

69

DIRECT - TAYLOR

1
2    Q   Do you understand that?
3    A   No.
4    Q   You told me reports were generated
5 and distributed.
6          Was there something in the system
7 which ever indicated to the people generating the
8 reports that there was a high FIP ratio contained
9 in the report?
10          MS. TAYLOR: Objection as to form.
11          MR. LABOVITZ: Join.
12    A   No.
13    Q   For example, we talked earlier about
14 the 15-percent number.
15          Was there anything that said, okay,
16 here's a stack with the names of 25 sales
17 representatives and three of them have a FIP
18 ratios in excess of 15 percent, some of them are
19 in the 40 range?
20          Do you understand what I'm saying?
21    A   Yeah.
22          MS. TAYLOR: Objection as to form.
23          MR. LABOVITZ: Join.
24    A   The 15-percent ratio we referred to
25 was at that time a branch level. It wasn't at a

70

DIRECT - TAYLOR

1
2 representative level. There wasn't like a red
3 flag that said these representatives have a FIP
4 ratio over any particular number.
5    Q   Was there of a particular number
6 established by the company with respect to a FIP
7 ratio where a sales representatives him or herself
8 was supposed to keep their match rate under that
9 certain number?
10    A   Not that I can recall.
11    Q   So there was no similar 15-percent
12 ratio with respect to sales representatives
13 themselves individually?
14    A   Again the 15-percent ratio was, as we
15 were discussing, kind of related to what the
16 compensation people did with the numbers. Since
17 there was no compensation to the reps, there was
18 no similar number. The manager was supposed to
19 review the reports. If it was just one case they
20 wanted to discuss with the rep...
21          The ratio with respect to the reps,
22 didn't set a number, told managers to do anything
23 special, didn't have an effect on their
24 compensation. I think I answered your question.
25    Q   I think you did.

71

DIRECT - TAYLOR

1
2          When reports were generated with
3 respect to individual sales representatives and
4 that match was indicated, and you said, the match
5 was not -- let's say there was no adjustment
6 requested by the branch manager. What was done,
7 if anything, by the company at that point with
8 respect to that match with the sales
9 representative?
10          MS. TAYLOR: Objection as to form.
11    Q   Do you want me to rephrase that?
12    A   Yes.
13    Q   When a report was generated and the
14 report indicates there was a match on the FIP
15 system for a sales representative, what was done
16 by the company when the branch manager didn't
17 request an adjustment, the branch manager didn't
18 dispute the match?
19    A   It stayed as part of the ratio.
20    Q   Did anybody at the company contact
21 the policyholder to find out what had happened
22 with respect to the specific transaction?
23          MS. TAYLOR: You're asking in a
24 specific case?
25          MR. BARTHOLOMAEI: As a general

72

DIRECT - TAYLOR

1
2 company policy, what the company policies
3 were when a report indicated there was a
4 match.
5    Q   Whatever the match was for,
6 replacement transaction, equity-funding issue, the
7 branch manager received a copy of the report,
8 didn't request an adjustment, and you are just
9 saying the match stayed on the ratio.
10          My question is, was there a company
11 policy with respect to determining if, in fact,
12 the match was correct or what had happened in the
13 specific transaction to cause the match?
14          MS. TAYLOR: Objection as to form.
15          MR. LABOVITZ: Objection to form.
16          What time period are you referring
17 to?
18          MR. BARTHOLOMAEI: The time period
19 where the FIP reporting system existed.
20    A   Sounds like you're asking me two
21 questions.
22          If there was no request from the
23 branch manager to adjust the match that was
24 reported, the match stayed on the report.
25          With respect, I think -- what did you

73

DIRECT - TAYLOR

1
2 ask me about?
3     Q    Given that scenario where the match
4 stayed on, there was no request for an adjustment,
5 was anything further done, anything done at all
6 from the company standpoint to determine the
7 nature of the transaction that triggered the
8 match?
9     A    What do you mean by "nature"?
10     Q    For example, the match was triggered
11 because of a replacement transaction.
12     A    The FIP system, it matched a
13 withdrawal of $100 to a newly issued policy, it
14 took into account nothing to do with replacement.
15 This discussion would happen with the manager and
16 rep – the manager could easily see it was a long
17 dividend, cash surrender and saw what was
18 purchased.
19         I'm not sure – if something happened
20 contacting the customer, it would be at the local
21 office level with respect to the FIP report.
22     Q    If there was a cash surrender and it
23 triggered a FIP match, outside of the branch
24 manager having a discussion with the sales
25 representative about that match or possibly doing

74

DIRECT - TAYLOR

1
2 whatever investigation they did at the branch
3 level, was there anything else done within the
4 company to determine the reason for the match or
5 nature of the transaction?
6         MS. TAYLOR: Objection as to form.
7         MR. LABOVITZ: Join.
8     A    I don't know.
9         MS. TAYLOR: I don't know she would
10     know the details of individual specific
11     transactions.
12     Q    I'm asking about a company policy.
13 For example, you told me, when a FIP match was
14 triggered on the report, and let's say a dividend
15 withdrawal that triggered the match, it would be
16 up to the branch manager to have a discussion with
17 the sales representative and say, what happened
18 here, you got a match in the FIP report system; is
19 that right?
20     A    With respect to financing, yes, using
21 inforced business to support new sales.
22     Q    Outside of the branch manager having
23 a conversation with the sales representative, was
24 there anything else, anything as far as a Met
25 policy where any further investigation was done by

75

DIRECT - TAYLOR

1
2 either a different department of Metropolitan
3 Life, I don't know who, to determine the nature of
4 the transaction similar to the conversation that a
5 branch manager would have with a sales rep, some
6 other independent person?
7         Do you understand what I'm saying?
8     A    I think I understand what you are
9 saying, but my response would be, not using the
10 FIP report to do that. What this cash surrender
11 and new match did in other departments, how that
12 was reported to them and what they did with the
13 information, I don't know.
14         The FIP reports themselves was a
15 management tool for the sales offices, not
16 something that the corporation would use to
17 monitor anything else that was going on.
18     Q    For example, were FIP reports
19 provided to the Auditing Department at
20 Metropolitan Life?
21     A    On request.
22     Q    Do you know how the FIP reporting
23 system was used by the Auditing Department?
24     A    As far as I know, when they went out
25 and conducted an audit of a sales office, they may

76

DIRECT - TAYLOR

1
2 have used the FIP report, after some analysis they
3 did, to discuss the report with the manager, reps,
4 customers, any number of things. Whatever
5 auditors do.
6     Q    Was there any other department at
7 Metropolitan Life who used the FIP reporting
8 system in their regular course of business?
9     A    Regular course of business?
10         MS. TAYLOR: Objection as to form.
11         MR. LABOVITZ: Objection to form, and
12     also I think it lacks foundation, and you
13     are calling for speculation.
14         MR. BARTHOLOMAEI: I don't think it
15     calls for speculation. I'm asking if a
16     department at Metropolitan Life used the
17     system.
18     A    The system?
19     Q    Requested the report for information,
20 any reason.
21     A    I don't think auditing would ask.
22     Q    I was using auditing as an example.
23 I didn't know if there are other departments that
24 requested FIP reports on a routine basis.
25     A    In requesting auditing, I don't know

77

DIRECT - TAYLOR

1
2 if you can characterize that as routine. If they
3 requested the information from us, we would send
4 it to them. The reports were distributed on a
5 routine basis, the way I described it in this
6 memo. Other units can discuss information
7 contained in the reports.
8    Q   Besides the Auditing Department,
9 which other units you are referring to would ask
10 for reports?
11    A   Compensation Unit.
12    Q   Anybody else?
13       MS. TAYLOR: I think she testified a
14 little about this before. She said, on
15 occasion she would provide specific reports
16 when people were visiting a region.
17       MR. BARTHOLOMAEI: I was getting more
18 at different units of Metropolitan Life
19 that would have use for these FIP reports.
20    A   No.
21    Q   Was there any Metropolitan Life
22 policy to withdraw commissions for sales
23 representatives if the sale of a representative
24 that earned the commission had triggered a FIP
25 match?

78

DIRECT - TAYLOR

1
2       MS. TAYLOR: Objection as to form.
3 Asked and answered.
4       MR. LABOVITZ: Join.
5       THE WITNESS: Do I answer this
6 question?
7       MR. BARTHOLOMAEI: Yes, if you
8 understand it.
9    A   The FIP system was not used with
10 respect to compensating a rep. So the system
11 wasn't used to pay a rep commission or not pay a
12 rep a commission or determining whether a rep
13 should be paid a commission or not.
14    Q   Did the FIP reporting system relate
15 in any way to branch managers obtaining a certain
16 conference designation? What I mean by that, a
17 Leader's Conference, a President's Conference or
18 President's Council designation.
19       MS. TAYLOR: Objection as to form.
20    Q   Do you know what those three things
21 are?
22    A   I know what they are.
23       Would you repeat the question.
24    Q   Did the FIP reporting system have any
25 impact on whether a branch manager would be

79

DIRECT - TAYLOR

1
2 permitted to obtain or attend one of those
3 conferences?
4    A   That would be on example of a
5 situation where the branch manager, supervisor,
6 region and territory could use, and the company
7 suggested they review the FIP system in
8 determining whether branch managers should attend
9 certain conferences.
10    Q   Was there a company policy where, for
11 example, branch managers would not be allowed to
12 attend a conference if their FIP ratio was at a
13 certain number?
14       MS. TAYLOR: Objection as to form.
15 Lack of foundation.
16    A   I don't recall a policy per se that
17 said if a manager had a certain ratio, he or she
18 could not attend a conference.
19       MS. TAYLOR: I don't think that's a
20 decision of hers.
21    A   I would provide the information,
22 someone wanted the information to know what the
23 ratio for the branch was. They had this
24 information anyway. If they wanted more detail
25 about matches, we would provide it. We didn't

80

DIRECT - TAYLOR

1
2 decide. I don't know about a policy either,
3 specific policy.
4    Q   Do you know who I would have to talk
5 to to find out about that?
6    A   About a specific policy?
7    Q   Yes.
8    A   I would suspect someone in the
9 compensation unit would handle recognition and
10 compensation both. I consider the President's
11 Conference and Council recognition.
12    Q   We are not talking a management's
13 Leader's Conference -- I know I used the term
14 "President's Council" and "President's
15 Conference." They are associated with sales
16 representatives, not necessarily branch managers.
17       Do you know what I'm referring to
18 when I say manager's conference?
19    A   I believe it was up to the discretion
20 of management at the local level to decide if
21 someone should or not attend the conferences. I
22 don't know what those guidelines were.
23    Q   Similarly, I want to ask, with
24 respect to sales representatives, was there any
25 company policy where sales representatives would

81

DIRECT - TAYLOR

1  be, rather, not be permitted to attend either a
2  Leader's Conference or President's Conference
3  based on their FIP ratio?
4      A   Again, I don't know about a policy,
5  but local management would decide, because FIP
6  ratio was a number. How they use that number in
7  determining whether a rep should or not attend a
8  conference, I don't recall a policy.
9      Q   You said this a couple times:  FIP
10  was a number, and it was up to management how it
11  was supposed to be used.
12          I had asked you at the beginning of
13  the deposition what the purpose of the FIP ratio
14  is.
15          My understanding of what you said
16  was, it was a ratio that was supposed to indicate
17  whether a representative was using replacement or
18  equity funding as a method of selling.
19          Did I get that wrong?
20      MS. TAYLOR: Objection to form.
21      A   I think so.
22      Q   Can you tell me again the purpose of
23  the FIP ratio.
24      A   The purpose of the FIP ratio was to

82

DIRECT - TAYLOR

1  give management -- I prefer really to speak to the
2  report. The report that was sent to the manager,
3  which included a FIP ratio, was a tool for the
4  manager to assist the manager in determining if a
5  representative was using inforced policy values to
6  support the sale of new business.
7          I want to be clear, it did not
8  include any reference as to whether the policies
9  or transactions involved were replacement. Just
10  using inforced policy values, selling new
11  business, as a rep, using it as a method of sale.
12  That's kind of what the tool was intended for, the
13  report was intended for.
14      Q   Ms. Taylor, you said, at some point
15  the FIP reporting system was done away with; is
16  that right?
17      MS. TAYLOR: Objection to form.
18      MR. LABOVITZ: Join.
19      Q   It ceased to exist?
20      A   I think it became something else.
21      Q   What did it become?
22      A   I think it became MSAMS.
23      Q   What is MSAMS?
24      A   I can tell you what the acronym

83

DIRECT - TAYLOR

1  means: Metropolitan Sales Activity Monitoring
2  System.
3      Q   Give me a definition of what the
4  MSAMS system was.
5      A   I'm not versed on MSAMS. I know
6  sometime after 1994, the FIP system was, the paper
7  reports were not distributed, and they made the
8  reports available electronically. At some point
9  in time after 1994, MSAMS was developed which
10  replaced, it replaced the FIP system. I'm not
11  well-versed in MSAMS. It's my understanding they
12  show similar types of information.
13      Q   Do you know who made the decision to
14  make the change from the FIP reporting system to
15  the MSAMS reporting system?
16      A   No. I think there is documents
17  included here that talks about the MSAMS system.
18      Q   Do you know the reason why the change
19  was made from the FIP system to the MSAMS system?
20      A   The MSAMS system, my understanding,
21  matched, had more information, do a better job at
22  matching is what I'm saying, do a better job at
23  matching the transactions.
24      Q   How would it do a better job?

84

DIRECT - TAYLOR

1      A   I believe a lot of those manual
2  adjustments that would take place in the manual
3  system could be handled by MSAMS without
4  processing a manual match -- manual adjustment.
5  I'm sorry.
6      Q   Was the MSAMS system more
7  comprehensive than the FIP system as far as the
8  different areas, different match areas?
9      MS. TAYLOR: Objection as to form.
10      MR. LABOVITZ: Objection as to form.
11      A   I don't know.
12          What I do know, the MSAMS system,
13  remember when you asked me about the query type
14  things, can you ask a system? That was one of the
15  major differences between the FIP and MSAMS
16  system: You could get different types of reports.
17          As far as the detailed differences
18  between the two, I don't know.
19      Q   Are you aware of any documents which
20  talk about the discontinuance of the FIP reporting
21  system?
22      A   I believe there might be documents in
23  there replacing FIP with MSAMS, not necessarily
24  discontinuing the information provided to the

85

DIRECT - TAYLOR

2 sales offices.

3   Q   Was any analysis of the FIP reporting
4 system conducted which at some point determined
5 that it was necessary to implement a new system
6 over the MSAMS system?

7   A   I don't know about that.

8   Q   Do you know who would know about
9 that?

10   A   I remember reviewing some documents
11 while preparing for this deposition that were
12 written by Mike Levine that talked about some
13 analysis, expanding the FIP system or creating a
14 new system. I don't remember the details of what
15 it was.

16   Q   Who is Mike Levine?

17   A   He is an actuary of the company.

18   Q   What was his involvement – let me
19 ask you in general first, did he have any
20 involvement in the creation or any changes in the
21 FIP reporting system?

22       MS. TAYLOR: Objection as to form.

23   A   Not that I know of.

24   Q   When you mentioned Mr. Levine's name,
25 how –

86

DIRECT - TAYLOR

2   A   Talking about MSAMS.

3   Q   Mr. Levine have anything to do with
4 the FIP reporting system at all?

5       MS. TAYLOR: Objection as to form.

6   A   I don't know.

7   Q   You mentioned Mr. Levine's name in
8 connection with the MSAMS system.

9       In what relation did you mention Mr.
10 Levine's name with the MSAMS system?

11   A   The reason I mentioned his name,
12 because I thought you asked me about any analysis
13 being done as to whether a new system should be
14 created. That's the context I recall, seeing some
15 documents where Mr. Levine may have done some
16 analysis.

17   Q   You said Mr. Levine worked in the
18 Actuary Department?

19   A   I said he was an actuary.

20   Q   Which department did he work in?

21   A   When?

22   Q   During the time this analysis was
23 conducted.

24   A   I think he, from reviewing the
25 documents, he was probably – in several years, he

87

DIRECT - TAYLOR

2 was in several different departments. He could
3 have been in the Actuarial Department. Could have
4 been in the Marketing Department. Depends on what
5 memo you are talking about or when he did a
6 particular analysis. He wasn't in one department
7 that I can recall from 1985 or '6.

8   Q   Does Mr. Levine still work at
9 Metropolitan Life?

10   A   No, I don't believe he still works
11 there.

12   Q   Do you know when he stopped working
13 there?

14   A   No, but I think it wasn't like 10
15 years ago. More recent than that. Few years ago,
16 I think. I'm not sure.

17   Q   What analysis was done of the FIP
18 reporting system to determine that it would be
19 replaced by the MSAMS system?

20       MS. TAYLOR: Objection as to form.

21       It was asked and answered.

22       MR. LABOVITZ: Join.

23       MR. BARTHOLOMAEI: I'm asking for the
24   specific.

25   Q   I know you said Mr. Levine may have

88

DIRECT - TAYLOR

2 conducted some analysis. I'm asking what that
3 analysis was.

4   A   Oh, I don't know. I believe it's an
5 analysis, in some of the documents I looked at.

6   Q   At any point in time, starting with
7 the creation of the FIP reporting system, was the
8 system relaxed in any way?

9       MS. TAYLOR: Objection as to form.

10   Q   Do you understand the term "relaxed"?

11   A   No.

12   Q   For example, was it done away with
13 at all? Was there a point in time, it started in
14 1981, where, in 1984, they said, we're not going
15 to use the FIP reporting system, and maybe they
16 continued again in 1985?

17   A   No, not that I'm aware of.

18   Q   Are you aware of any "FIP
19 experiments" that were done by the company?

20   A   Yes.

21   Q   What is your awareness of those
22 experiments?

23   A   I can't remember in detail each one
24 of the experiments, but I know there are documents
25 that detail what the experiments were.

89

DIRECT - TAYLOR

1
2      There was an experiment that involved
3  the use of dividends.
4      Outlined on the report that I wrote,
5  January 1988, there were two experiments initiated
6  in various regions: One where the FIP program was
7  expended in several regions for a period of two
8  years; the other involved the use of dividends,
9  dividend withdrawals.
10     MS. BELLO:  Can you repeat the end of
11  your answer.
12     THE WITNESS:  The use of dividend
13  withdrawals.
14     MR. BARTHOLOMAEI:  Ms. Taylor is
15  reading from this document. I'll mark it
16  as an exhibit. Mark this as Taylor 1
17     (Document titled "Financed by
18  Inforce Policies (FIP) is received and
19  marked Taylor Exhibit 1 for
20  identification.)
21     Q    Getting back to the question I was
22  asking you about experiments, and you were telling
23  me about the second experiment in which you said
24  it involved dividend withdrawals --
25     A    Yes.

90

DIRECT - TAYLOR

1
2      Q    -- can you explain that further, when
3  you said the experiment involved dividend
4  withdrawals?
5      A    For 18 months, matches involving
6  dividend withdrawals where at least 50 percent of
7  the first-year annualized premium on the new
8  policies is paid by the policy owner and not by
9  the use of dividends were not considered a match.
10     So you would look at the annualized
11  premium. If a customer paid at least half of
12  those dividends, half of the premium
13  out-of-pocket, the dividend associated with that
14  would not be considered a match as long as the
15  dividend withdrawal didn't exceed 50 percent.
16     Q    What was the reason for conducting
17  this experiment?
18     MS. TAYLOR: Objection to form.
19     Q    I'm talking about the second one you
20  were referring to.
21     MS. TAYLOR: Objection as to form.
22  Lack of foundation.
23     A    I don't know the reasoning behind
24  conducting the experiments. Basically, I
25  processed the distribution of the reports,

91

DIRECT - TAYLOR

1
2  answered any questions that came in. I don't know
3  the rationale beyond establishing the 50/50, as we
4  called it, dividend, what's the word I'm looking
5  for, dividend adjustment.
6      Q    You said "50/50."
7      What does that mean?
8      A    Well, 50 percent needs to be paid out
9  of the pocket by the customer. The other 50
10  percent was the dividend withdrawal we matched.
11  Then it was not considered a match in the system,
12  for the ratio.
13     MS. TAYLOR: For particular areas.
14     A    There were certain areas that
15  participated in both of the programs, both of the
16  experiments. It was not a company-wide
17  experiment.
18     Q    Was one of those areas the Pittsburgh
19  region?
20     A    For which?
21     Q    The 50/50.
22     A    Yes.
23     Q    Who made the decision to implement or
24  conduct this experiment you are talking about?
25     A    I don't know who made the decision to

92

DIRECT - TAYLOR

1
2  conduct it. I know who announced it in a release.
3  I don't know who made the decision. I believe
4  there is a document, when it was announced to the
5  field, it went, it went under Mr. Crimmins's
6  signature.
7      Q    Do you know who would know the reason
8  for the experiment being conducted?
9      A    One was Crimmins. I'm sure he would
10  know. I don't know who he discussed it with. I
11  don't know who else besides him would know.
12     Q    Do you know who else in the company,
13  as far as a position, would be involved in making
14  that type of determination about a FIP experiment?
15     Do you understand the question?
16     A    The determination, I didn't know what
17  the protocol was with respect to making decisions
18  on what was adjusted in the system or not. The
19  release came out over Crimmins's signature. I
20  assume at least he would know.
21     Q    I think what I'm asking, was there a
22  certain department in the company that would make
23  these determinations, the Marketing Department or
24  whatever it was, that would say, okay, we're going
25  to do an experiment on FIP? Where would that

93

DIRECT - TAYLOR

2 determination be generated, from which department
3 of the company?
4       A    The FIP system was being overseen by
5 the Product Planning Department. If anyone wanted
6 a change to be made on how adjustments were
7 processed, it wouldn't be at the department, the
8 unit that actually processed the assessments,
9 processed the adjustments. It would be some
10 higher level of management, different level of
11 management. It may have included several people.
12 I don't really know.
13      Q    There wasn't a specific department
14 responsible for implementing policy changes with
15 respect to FIP ratio?
16      A    No, not that I know of. Not a
17 certain department, no.
18      Q    There wasn't a certain position
19 either, a person that was responsible for that?
20      A    No, not that I know of.
21      Q    What were the results of the 50/50
22 experiment in the Pittsburgh region?
23          MR. LABOVITZ:  Objection to form.
24      A    I don't remember what the results
25 are, but I do recall there are -- some documents

94

DIRECT - TAYLOR

2 speak to what the results were with respect to
3 that experiment. I'm not sure specifically it
4 includes Pittsburgh. I think it speaks to the
5 overall results, including Pittsburgh.
6       Q    Do you know what the overall result
7 was of the experiment?
8       A    I don't recall what it was. I
9 believe it's in one of those documents over there.
10 If you showed it to me, we could talk about it.
11      Q    You said there was a field release by
12 Mr. Crimmins talking about the experiments.
13          Was there also a release
14 discontinuing the experiment or saying the
15 experiment was over?
16      A    Which experiment?
17      Q    The one, whatever the field release -
18 was referring to.
19      A    I think the field release referred to
20 maybe both experiments.
21          Which one are you talking about?
22      Q    Either.
23          Were there field releases which
24 identified or stated that the experiments were
25 completed, they were being stopped?

95

DIRECT - TAYLOR

2       A    I'm not sure. I'm not sure if they
3 are the document that specifically said the
4 experiment is over. They did get in touch with
5 each of the regions, the territory involved in the
6 experiment and tell them it was over.
7       Q    How were the regions chosen to
8 participate in the experiment?
9       A    I don't know.
10      Q    Do you know who would know that?
11      A    Probably Mr. Crimmins. I don't know.
12 I can only speculate he would know.
13
14          (LUNCHEON RECESS TAKEN.)
15
16
17          A F T E R N O O N   S E S S I O N
18
19
20
21 WILHELMENIA TAYLOR continues testifying as
22 follows:
23
24 CONTINUED DIRECT EXAMINATION BY MR. BARTHOLOMAEI:
25      Q    Ms. Taylor, I want to ask you some

96

DIRECT - TAYLOR

2 follow-up questions about some things that were
3 discussed this morning, specifically with respect
4 to a line of questioning I was asking you
5 regarding branch managers and their duty to
6 oversee the sales representatives and the impact
7 that had on the FIP ratio of their individual
8 branch.
9          The question I wanted to ask was,
10 what oversight was there over the branch managers
11 to determine if they were overseeing the
12 individual sales reps in their FIP ratios?
13          MS. TAYLOR:  Objection as to form,
14          regarding your characterizing of her prior
15          testimony.
16      Q    Do you remember the line of
17 questioning I'm talking about, when we talked
18 about the branch managers and their job to monitor
19 the FIP rate of the sales representatives?
20      A    Yes.
21      Q    The question I have, was there any
22 oversight of the branch managers by someone else
23 in the company to determine if they were, in fact,
24 performing that task?
25      A    I don't know specifically about any

97

DIRECT - TAYLOR

1
2  person or unit responsible to determine if the
3  branch manager was actually having discussions or
4  reviewing FIP reports with the representatives,
5  no.
6      Q   Do you know who might know the answer
7  to that?
8      A   I don't know who would necessarily
9  know the answer to that, but I believe that the
10 territorial vice presidents had discussion with
11 the regions, and the regions had discussions with
12 the branch managers about the FIP ratios. As far
13 as verifying, the managers actually had
14 discussions with the reps and some documentation,
15 I don't know about that.
16     Q   Were branch managers ever disciplined
17 for not having discussions and monitoring the FIP
18 ratios you talked about earlier?
19     A   I don't know.
20         MS. TAYLOR: Objection as to form.
21 Lack of foundation.
22         MR. LABOVITZ: Join.
23     Q   You said you didn't know?
24     A   I don't know.
25     Q   Was there a company policy that

98

DIRECT - TAYLOR

1
2  branch managers were to be disciplined if their
3  branch FIP rate was at a certain level?
4      A   That they were to be disciplined?
5      Q   Right.
6      A   Not that I am aware of.
7      Q   Outside of the effect on the
8  compensation of the branch managers and maybe
9  their ability to attend a conference we talked
10 about earlier, was there any other effect that the
11 FIP rate had on branch managers?
12     A   I can't speak to any effect that his
13 or her supervisors might have had on managers as
14 far as the ratio.
15         As far as my recollection from the
16 documents, I don't know of any other
17 mandatory-type thing that would happen based on
18 the ratio.
19     Q   Was there a duty, according to
20 Metropolitan Life, policy of the regional manager
21 to determine whether, or monitor whether, the
22 branch manager, in fact, is performing his task of
23 having those discussions and monitoring the FIP
24 ratio of his sales representatives?
25         MS. TAYLOR: Objection as to form.

99

DIRECT - TAYLOR

1
2         MR. LABOVITZ: Join. Lack of
3  foundation.
4      A   There was a manual of instructions
5  that the regional offices used. I don't remember
6  if there was any actual policy written as to what
7  should take place at the regional office level to
8  make sure the managers were indeed monitoring it.
9  I would say, it was expected that they would.
10     Q   Expected by whom?
11     A   Expected by the company.
12         The report was a management tool for
13 all levels of management in the field.
14     Q   Was there any policy in place to
15 determine whether that expectation of the company
16 was actually met?
17     A   I don't know exactly what you mean.
18     Q   You said there was an expectation.
19 You said the company expected that that took
20 place.
21         I'm asking you if there was anything
22 the company did to either realize whether that in
23 fact did take place or enforce the fact that their
24 expectation was being carried out?
25         MS. TAYLOR: Objection as to form.

100

DIRECT - TAYLOR

1
2  Lack of foundation.
3         MR. LABOVITZ: Join.
4      A   Releases that went to the field with
5  respect to financing oftentimes were addressed.
6  Several I reviewed in the documentation addressed
7  the entire field force. Any memos sent out to
8  managers also were copied at the supervisory level
9  above them. The company's policy with respect to
10 the use of inforced values, generally speaking,
11 was reiterated.
12         I don't specifically remember
13 anything that said the manager's supervisor should
14 do X, Y, Z to make sure that was being done. I
15 don't remember that specifically. That may be in
16 some of the documents. I can't remember.
17     Q   Do you recall seeing that in any of
18 the documents you reviewed?
19     A   Not specifically at the office of the
20 regional level, I don't remember that.
21     Q   Was there any Metropolitan Life
22 policy where the branch manager would be
23 terminated for having an excessive FIP ratio at
24 his branch?
25         MS. TAYLOR: Objection as to form.

101

DIRECT - TAYLOR

1
2  Lack of foundation. Also, previously asked
3  and answered.
4     MR. LABOVITZ: Objection as to form.
5  You can answer that, if you remember
6  what the question was.
7  Q   I asked before about discipline.
8     I'm asking about termination as a
9  form of discipline, if that was something set
10 forth in the policy, where a branch manager can be
11 terminated from his branch for having a high FIP
12 ratio.
13 A   If a branch manager is not monitoring
14 the activities of their sales representatives,
15 including FIP, the branch manager would be
16 terminated. Specifically wording saying, if your
17 branch ratio is up some certain level, you will be
18 terminated, I don't remember that policy.
19    What I remember speaking to before,
20 any representative who uses financing to help to
21 support new sales could be terminated. That would
22 be on an individual basis.
23 Q   The question I was about to ask was,
24 were any branch managers ever terminated for
25 having an excessive FIP rate?

102

DIRECT - TAYLOR

1
2     MR. LABOVITZ: Objection to form.
3  Lack of foundation.
4     MS. TAYLOR: I join.
5  A   If you're asking me if the manager
6  himself had an excessive FIP rate, or are you
7  talking about the FIP rate for the representatives
8  from his office? The manager himself has a rate
9  as well.
10 Q   Is that a rate based on his sales?
11 A   The rate based on the fact the sales
12 representatives, for all intents and purposes,
13 like a regular sales representative, they sell
14 policies and have matches, they show up on the
15 report as well.
16 Q   In your last answer, you said, "I
17 don't know of any policy written down, but a
18 branch manager could be terminated if he doesn't
19 do what he's supposed to be doing with regard to
20 monitoring the sales representative." I'm asking
21 if you know any specific incidents.
22 A   The 702 Marine Park office, I believe
23 the branch manager was also terminated.
24 Q   Do you know of any others?
25 A   Not that I am aware of, that I can

103

DIRECT - TAYLOR

1
2  remember.
3  Q   With regard to the FIP experiments
4  that we talked about earlier, you talked about two
5  experiments.
6     Are you aware of any others, other
7  than those two we talked about earlier?
8  A   Not that I can recall.
9  Q   Was it uncovered at Metropolitan Life
10 that sales representatives were circumventing the
11 FIP reporting system?
12    MS. TAYLOR: Objection as to form.
13    MR. LABOVITZ: Join.
14 A   Most systems, yes, some
15 representatives were attempting to circumvent the
16 system.
17 Q   By what means were sales
18 representatives attempting to circumvent the
19 system?
20 A   I can't remember all of them, but I
21 do remember that addresses at one point in time
22 was an issue, the address on the old policy versus
23 a new policy, because addresses were a criteria in
24 the match.
25 Q   Are you referring to a scenario where

104

DIRECT - TAYLOR

1
2  someone would change road to avenue, and it
3  wouldn't trigger a match because it was a
4  different address?
5  A   That could be an example or other
6  examples of addresses. We knew if the addresses
7  weren't the same, that would not trigger a match.
8  Q   Was anything done, take an address
9  example, anything done to correct that problem?
10 A   Yes.
11 Q   What was that?
12 A   From what I can recall, an
13 enhancement to the system was made: If an address
14 change covered, I'm not exactly sure what the
15 period of time was, a certain period of time from
16 the date of the new issue, that, that we would
17 then match against the changed address.
18 Q   Besides the address change, the
19 address issue, what other ways were there that
20 sales representatives attempted to circumvent the
21 FIP reporting system?
22 A   I can't remember, off the top of my
23 head, the ways in which they tried to circumvent
24 the system.
25    The address thing is what I recall.

105

DIRECT - TAYLOR

1    There may be some documents that discuss it in
2    what we reviewed before the deposition.
3        Q   Is that something you can identify as
4    far as a specific document?
5        A   No. I remember something in there
6    about circumvent, and there were warnings that
7    representatives shouldn't try to circumvent the
8    system.
9        Q   What was the company policy regarding
10   what was to happen when it was determined that a
11   sales representative was attempting or had, in
12   fact, circumvented the FIP reporting system?
13           MS. TAYLOR: Objection as to form.
14   Lack of foundation.
15           MR. LABOVITZ: Join.
16       A   The manager, after -- the manager
17   could be terminated for that kind of behavior.
18       Q   Was there a policy that the manager
19   should necessarily terminate a representative if
20   he is found to have intentionally circumvented the
21   FIP reporting system?
22       A   No. From what I recall, all the
23   documents I looked at, the manager could, but did
24   not have to.

106

DIRECT - TAYLOR

1        (Document titled "New Issues
2    Apparently Financed by Present Policy
3    Values" is received and marked Exhibit
4    Taylor 2 for identification.)
5            MR. BARTHOLOMAEI: For the record,
6    what I have just marked as Taylor 2 is
7    Bates Number M1O9712990414 through 0420.
8        Q   Is this a document you've seen
9    before?
10       A   Doesn't look familiar. I don't
11   recall seeing this.
12       Q   This isn't something you wrote,
13   right?
14       A   No.
15       Q   This document, the first page is an
16   introduction section, and says, there is some
17   bullet points underneath there:
18           "During the 1970s, the cash outflow
19   associated with the cash surrenders, policy loan
20   and dividend withdrawals increased significantly
21   at Metropolitan and throughout the industry.
22           "In 1980, at Metropolitan, the amount
23   involved in these transactions hit the one billion
24   dollar mark."

107

DIRECT - TAYLOR

1        The question I want to ask you, from
2    the company perspective, is that accurate, in 1980
3    the amount of cash involved, associated with cash
4    policy loans and dividend withdrawals hit the one
5    billion dollar mark?
6            MS. TAYLOR: Objection as to
7    form.
8        A   I don't know.
9        Q   Do you know who would know that?
10       A   Maybe someone who produces the annual
11   statement. I don't know.
12       Q   This document is entitled "New Issues
13   Apparently Financed by Present Policy Values."
14   Then says, "Presentation notes."
15           Do you know if these notes -- this
16   is, in fact, notes used by someone in a
17   presentation?
18       A   I don't know.
19       Q   Do you have any information about a
20   specific presentation where these issues were
21   discussed?
22       A   No.
23       Q   Do you know if there was a
24   presentation or some type of -- let's stick with a

108

DIRECT - TAYLOR

1    presentation to the field force where it was set
2    forth that a FIP reporting system is going to be
3    implemented at Metropolitan Life back in the early
4    '80s?
5        A   I don't even know. Is that when this
6    was produced? No.
7        Q   It refers to 1980.
8        A   No, I don't know.
9            MS. TAYLOR: You don't know?
10           THE WITNESS: I don't know.
11       Q   Would you look at page five at the
12   top. It's letter D, match cases section.
13           The third bullet point underneath
14   that section says:
15           "In the case of 'split commission
16   cases' -- Do you see that
17       A   Yes.
18       Q   -- "only one representative and
19   office receive the match charge. This is the
20   Primary Writing Representative, identified as the
21   'Agent of Record' for servicing purposes."
22           Do you know who determined that only
23   the Primary Writing Representative would receive a
24   match in the case of a split commission as far as

109

DIRECT - TAYLOR
2 the FIP reporting system is concerned?
3        MS. TAYLOR: Objection as to form.
4 Lack of foundation.
5        MR. LABOVITZ: Join.
6     A    No.
7     Q    Do you know that that was, in fact,
8 the case at Metropolitan Life?
9     A    What was?
10     Q    That only the Primary Writing
11 Representative would be –
12     A    Yes.
13        MS. TAYLOR: Let him finish the
14     question, because he just gave not even a
15     full question, I think.
16     Q    The question was, was it, in fact,
17 the case, Metropolitan Life, only the Primary
18 Writing Representative would be identified with a
19 match in a split commission case in the FIP report
20 system?
21     A    Yes.
22     Q    Do you know what the purpose was of
23 only attributing a match to the primary writing
24 agent?
25     A    I believe it was a system limitation,

110

DIRECT - TAYLOR
2 that the system could only match it to one rep,
3 not split a half a match, half a match to you and
4 half a match to me, for example, if we were
5 involved in the sale. That's my recollection. It
6 was like system limitation.
7     Q    Are you aware – did sales
8 representatives attempt to circumvent the FIP
9 reporting system by making them the second line
10 signer, not the primary writing representative?
11     A    My review of documents, and it was
12 true, some representatives were using – making
13 themselves not the primary writing in order to
14 avoid receiving.
15     Q    What was done by Metropolitan Life to
16 attempt to address that scenario?
17        MS. TAYLOR: Objection as to
18     form, foundation.
19        MR. LABOVITZ: Join.
20     Q    Was anything done?
21     A    I know there was nothing done with
22 the system. There would be a limitation on what
23 we could match and match. I don't know what was
24 done to the representatives that actually did this
25 kind of thing.

111

DIRECT - TAYLOR
2     Q    When you say there was a limitation
3 who you could match, what does that mean?
4     A    There was limitation as to whether we
5 could split a match between multiple
6 representatives. The system had a limitation, one
7 match to one rep. We didn't have the ability to
8 take one match and split it among more than one
9 person.
10     Q    Was it ever discussed that each rep
11 would be attributed with a match if two people
12 went and sold the policy?
13        MS. TAYLOR: Objection to form.
14     A    Part of that problem was, the FIP
15 ratio was also dependent upon the placing number,
16 how many policies were placed. They didn't have
17 to take the policy and split it among multiple
18 people as well in order to get a ratio.
19     Q    Which documents are you referring to
20 when you say you reviewed some documents that you
21 are basing your answer to that question on,
22 whether representatives had not made themselves
23 the primary writing agent in an attempt to
24 circumvent the FIP rate?
25     A    I'm not sure what the number is, but

112

DIRECT - TAYLOR
2 there was documents there that talk about that
3 scenario, and as part of processing the
4 adjustments, the question came up. Our
5 explanation was, we couldn't split the matches
6 between multiple representatives. We had to split
7 the placement between them. It was a system
8 limitation.
9     Q    Was any other type of system
10 implemented to attempt to correct this problem?
11     A    I don't believe we were ever able to,
12 from what I recollect, charge a match to multiple
13 representatives of the FIP system.
14     Q    Was it called fip or called FIP?
15     A    Both.
16     Q    On page six there is a section titled
17 "No-Match Cases."
18        It goes through various points here:
19 DIVIDEND WITHDRAWALS OF $100 OR LESS. CHANGE
20 ALLOWANCES. TERM CONVERSIONS. UNIVERSAL LIFE
21 TERM CONVERSIONS. TEN-DAY FREE LOOK CASES.
22 LAPSED POLICY. INDUSTRIAL POLICIES.
23        Who determined at Metropolitan Life
24 which cases, which types of transactions would not
25 trigger a match?

113

DIRECT - TAYLOR
1
2    MS. TAYLOR: Objection as to form. I
3    think this was asked and answered before.
4        You can answer again.
5    A    I don't know who decided on which
6    transactions would actually match or not match in
7    the system.
8    Q    Looking at this list -- did you want
9    to say something else?
10    A    No.
11    Q    Looking at this list here, is there
12    anything else that you are aware of that would not
13    trigger a match, any other type of transaction
14    that's not on this list?
15        MS. TAYLOR: During what time
16    period?
17    Q    During the time period when the FIP
18    system was in place.
19    A    I have to take this list and compare
20    it to the documentation that happened in this
21    particular year this would not match.
22        Like I said, things change all the
23    time. I don't know when this thing was written.
24    I can't remember what was justifiable and what
25    wasn't, what did match and didn't match over a

114

DIRECT - TAYLOR
1
2    particular period of time.
3    Q    I guess what I'm asking, can you tell
4    by looking at this list, can you tell me if there
5    were any other types of transactions that you know
6    about sitting here today that would not trigger a
7    match which are not contained in this list?
8        MS. TAYLOR: Objection as to form.
9    A    Not that I can recall, not by just
10    looking at this list.
11        (Memo, February 15, 1985, re:
12    Piggybacking and Replacement Business, to
13    Officers-in-Charge, and others, from J.P.
14    Maurer is received and marked Taylor
15    Exhibit 3 for identification.)
16        MS. TAYLOR: For the record and for
17    those of you in Pittsburgh, the Bates
18    number is M039811820053 through 054.
19        This is a February 15, 1985 letter
20    from Mr. Maurer to Officers-in-Charge,
21    Agency Vice Presidents, Regional Sales
22    Managers, Branch Managers and District
23    Sales Managers in the United States.
24    Q    The first question I have for you,
25    Ms. Taylor, is whether you have seen this document

115

DIRECT - TAYLOR
1
2    before.
3    A    As part of the preparation for the
4    deposition, yes.
5    Q    Do you know why this document was
6    sent to the people I just mentioned, people in
7    those positions?
8    A    It appears that someone was following
9    up on another memo he sent to the entire field
10    force and addressing something specifically to the
11    management level people. This is all management
12    level people here.
13        I don't know why he decided to send
14    this particular letter. This seems like a
15    follow-up to another letter.
16    Q    The last paragraph on the first page
17    says:
18        "To further assist you, we are
19    developing a new quarterly 'Financed by In-Force
20    Policies' report summarizing each individual's
21    experience over the prior 12-month period."
22        Do you see that?
23    A    Yes.
24    Q    Do you know what the reason was for
25    developing this new type of FIP report? It says,

116

DIRECT - TAYLOR
1
2    "We are developing a new quarterly..."
3    A    Yes.
4    Q    It says, "...to further assist you."
5        I want to know, what was the reason
6    why this new report was developed in 1985?
7        MS. TAYLOR: Objection to form. Lack
8    of foundation.
9        MR. LABOVITZ: Join.
10    A    I don't know. Maybe this memo
11    outlined it here, why it did this.
12    Q    In this letter, the subject of the
13    letter says, "Regarding piggybacking replacement
14    business, FIP reporting system." The question I
15    have, it is a reporting system that would monitor
16    piggybacking activity?
17        MS. TAYLOR: Objection as to form.
18        MR. LABOVITZ: Join.
19    A    Yes.
20    Q    What is the company definition of
21    piggybacking?
22        MS. TAYLOR: Objection as to form.
23        MR. LABOVITZ: Join.
24    A    The same as the definition of
25    financing. The use of inforce values, premiums to

117

DIRECT - TAYLOR
2 support the sale of new business as a method of
3 selling.
4    Q    Piggybacking something that was
5 contrary to company policy?
6        MS. TAYLOR: Objection as to form.
7        MR. LABOVITZ: Join.
8    A    Yes.
9    Q    On the second page of this document,
10 last paragraph, second sentence, says:
11        "Stress that there is no
12 justification," underlined, "for circumvention of
13 Replacement Business Rules through techniques such
14 as piggybacking, and that it is completely
15 unethical, unbusinesslike and dishonest."
16        You see that?
17    A    Yes.
18    Q    Is that something that was set forth
19 in any Metropolitan Life manual or policy
20 statement you are aware of?
21        MS. TAYLOR: You are asking those
22    identical words?
23        MR. BARTHOLOMAEI: Yes, or something
24    to that effect.
25    A    Circumvention of the FIP reporting

118

DIRECT - TAYLOR
2 system. Mention of that was included in the
3 manuals and that it was not an acceptable
4 behavior. I don't specifically recall something
5 in the manual as it spoke to the rewritten
6 business, replacement business. I don't remember,
7 because I dealt with FIP reporting business and
8 not this replacement business.
9        (Letter, Jim Flynn to Chuck
10    Lavezzoli, October 25, 1985 is received and
11    marked Taylor Exhibit 4 for
12    identification.)
13        MR. BARTHOLOMAEI: For the record,
14    the Bates number of this document is
15    MP4011048809 through 44810. It's an
16    October 25, 1985 letter from Jim Flynn to
17    Chuck Lavezzoli.
18    Q    Have you ever seen this letter
19 before?
20    A    I don't remember this.
21    Q    The first paragraph, there is a – it
22 is written that:
23        The FIP or the use of policy values
24 for the financing of new insurance is related to
25 the use of cash, loan, dividends as a method of

119

DIRECT - TAYLOR
2 sale. The next sentence talks about, "No
3 reference has ever been made to the use of a
4 change allowance."
5        First of all, what is a change
6 allowance?
7    A    I'm not an expert on change
8 allowances. Generally speaking, when someone
9 changes from one plan of insurance to another,
10 there is a calculation made, and some of the
11 premium can be refunded back to the policyholder.
12 That's my really broad definition of a change
13 allowance.
14        I know it involved the return of some
15 dollar amount to the customer.
16    Q    Was this change allowance something
17 that was included as a match category in the FIP
18 report system?
19    A    I believe at some point in time, we
20 looked at change allowances. I can't remember if
21 it was automatically matched in the system or not.
22 That happened later on, or it was something we
23 looked at outside the system.
24    Q    Further down on this first page, last
25 paragraph, the second sentence says:

120

DIRECT - TAYLOR
2        "With the assistance of the Auditing
3 Division, we discovered in these branches that
4 there is the frequent use of change allowances to
5 finance universal life. While I have no facts to
6 go on, I've been told this is a nationwide
7 practice."
8        The question I have, did Metropolitan
9 Life do any analysis of change allowances to fund
10 universal life policies to determine if it was a
11 nationwide practice in the company?
12        MS. TAYLOR: Objection as to form.
13    A    Not that I can recall. I remember
14 the subsequent change allowances being discussed,
15 but I don't know if we did something along a
16 nationwide basis, or did we – I can't remember.
17    Q    Was it, in fact, a nationwide
18 practice, as Mr. Flynn here suggestions?
19        MS. TAYLOR: Objection as to form.
20    A    I don't know that.
21        (Letter, George Trotta to
22    agency vice presidents, regional sales
23    managers, branch managers and district
24    sales managers dated November 25, 1985 is
25    received and marked Taylor Exhibit 5 for

121

DIRECT - TAYLOR

1  identification.)
2  identification.)
3     MR. BARTHOLOMAEI: We'll mark the
4  next document as Taylor Exhibit 5. The
5  Bates number of the document is
6  MLPH970200017008. It's a one-page
7  document, a letter from George Trotta to
8  agency vice presidents, regional sales
9  managers, branch managers and district
10  sales managers dated November 25, 1985.
11     MR. LABOVITZ: Is there another Bates
12  number?
13     MS. TAYLOR: JJ106652.
14     MR. BARTHOLOMAEI: Thanks.
15     Q  Have you seen this letter before, Ms.
16  Taylor?
17     A  Doesn't seem familiar to me. I don't
18  recall seeing it.
19     Q  Do you know who Mr. Trotta was?
20     A  Yes.
21     Q  In the last paragraph it says?
22     "Consideration is being given to
23  modifying the FIP system to report changed
24  transactions of this nature." And it's referring
25  to the, I guess, the prior sentence, the change

122

DIRECT - TAYLOR

1
2  allowances we talked about earlier.
3     Do you know if the FIP system was, in
4  fact, modified to report these types of
5  transactions, as it is stated in this letter?
6     A  I don't remember.
7     Q  The next sentence talks about the
8  issue of addresses --
9     A  What?
10     Q  "More immediately, we are advising
11  the Field Auditing staff to be alert to the
12  possible use of change allowances to finance new
13  business as well as the use of 'bogus' addresses
14  to avoid matches in the FIP system."
15     I believe we talked about that
16  before, the issue of the addresses. You had told
17  me that the FIP system was, in fact, changed to
18  detect these bogus addresses?
19     A  No --
20     MS. TAYLOR: Objection as to form.
21     MR. LABOVITZ: Join.
22     A  Not bogus addresses.
23     The system was changed to look at
24  policies involved in a match or would normally be
25  involved in a match. When an address change came

123

DIRECT - TAYLOR

1
2  through, we would attempt to see with that knew
3  address information, do we have a match.
4     If it was a bogus address, we
5  wouldn't know.
6     Q  Was any change to the system, FIP
7  reporting system made with regard to the bogus
8  addresses?
9     MS. TAYLOR: Objection as to form.
10     MR. LABOVITZ: Objection to form.
11     Q  You are saying, if it was a bogus
12  address, you wouldn't know?
13     A  Right.
14     MS. TAYLOR: Objection to form.
15     Q  Was any corrective action taken with
16  respect to the FIP reporting system where bogus
17  addresses could be identified?
18     MS. TAYLOR: Objection as to form.
19     MR. LABOVITZ: Join.
20     A  The only modification that was made
21  was to identify in an attempt to match addresses
22  that was changed.
23     (Memorandum by Michael Levine
24  is received and marked Taylor Exhibit 6 for
25  identification.)

124

DIRECT - TAYLOR

1
2     MR. BARTHOLOMAEI: Marking this next
3  document as Taylor Exhibit 6, and this is a
4  memorandum from Mike Levine, and the Bates
5  numbers are MO69701171060 through 701070.
6     Q  Is this something, did you see this
7  before?
8     A  I recall seeing this in preparation
9  of the deposition.
10     Q  Do you know when -- when was this
11  memorandum generated?
12     A  I don't know when it was generated.
13  There is no date on here.
14     Q  What was the purpose of this
15  memorandum being generated?
16     MS. TAYLOR: Objection as to form.
17  Lack of foundation.
18     MR. LABOVITZ: Join.
19     A  I don't know.
20     Q  Were the FIP reporting systems
21  relaxed as a result of this memorandum being
22  generated?
23     MS. TAYLOR: Objection as to form.
24  Lack of foundation.
25     A  I don't know, and I don't even know

125

DIRECT - TAYLOR
1 when this memo was written. I have no idea if the
2 system was changed as a result of anything in
3 here.
4
5    Q    Did Mr. Levine play any role in the
6 relaxation of the FIP reporting system?
7    A    I'm having a little problem with
8 "relaxation." What do you mean?
9    Q    In this memorandum, it keeps using
10 the term "relaxed." In the first paragraph, first
11 page it says, "The current policies can be
12 relaxed."
13        The last page, it talks about two
14 suggested approaches: First, the rule should be
15 relaxed incrementally. That's in the middle of
16 the second paragraph.
17        That's why I'm using the term
18 "relaxed." It seems to be something used by
19 people in the company. I could be wrong about
20 that.
21        MS. TAYLOR: Objection as to form.
22    Q    I'm just reading this from the
23 memorandum.
24        The question was whether Mr. Levine
25 played any role in the relaxation of the FIP

126

DIRECT - TAYLOR
1
2 reporting system.
3        MS. TAYLOR: Objection as to form.
4    A    I don't know.
5    Q    Was the FIP reporting system ever
6 relaxed?
7    A    I don't know the system was ever
8 relaxed or not. I know changes were made to the
9 changes as we spoke about earlier.
10    Q    Prior to your preparation for this
11 deposition, is this something you had seen before,
12 this memorandum?
13    A    No.
14    Q    Do you know who this was distributed
15 to?
16    A    No.
17    Q    Do you know if this was distributed -
18 at all?
19    A    No, I don't know.
20    Q    Have you ever heard the term
21 "defensive replacement"?
22    A    Yes.
23    Q    What does that mean?
24    A    We would receive requests, adjustment
25 request from the field where they were claiming

127

DIRECT - TAYLOR
1
2 that they conserved the business for the company
3 because the customer was about to leave the
4 company, and in defense, in a defensive role, they
5 say they shouldn't be penalized for matching the
6 system.
7    Q    What was the system's policy?
8    A    My response back when I received this
9 adjustment, I can't make a judgment call.
10 Defensive replacements are not considered as
11 adjustments.
12    Q    Was that something that was debated
13 at the company, whether to allow defensive
14 replacement or whether to not have defensive
15 replacement trigger a match in the FIP reporting
16 system?
17    A    It wasn't compatible with
18 adjustments. There may be some documents that
19 talk about defensive replacement and whether it
20 should be adjustable situation or not. I don't
21 believe it ever was.
22        (Letter, November 11, 1987,
23        memo to branch managers and district sales
24        managers re Financed by Inforce Policies
25        (FIP) is received and marked Taylor Exhibit

128

DIRECT - TAYLOR
1
2 7 for identification.)
3        MR. BARTHOLOMAEI: I'm marking the
4 next document as Taylor Exhibit 7. It's a
5 November 11, 1987 letter from Bob Crimmins
6 to branch managers and district sales
7 managers. Bates numbers are MO99731220748
8 through 749.
9    Q    Is this the letter you were referring
10 to earlier from Mr. Crimmins?
11    A    Yes.
12    Q    Is this something that you reviewed
13 in preparation of the deposition?
14    A    Yes.
15    Q    What about before that? Had you ever
16 seen this letter before?
17    A    Yes.
18    Q    Is this something that was
19 distributed within the department where you
20 worked?
21    A    Yes, because it had an impact on my
22 job.
23    Q    What was the impact on your job or
24 your department?
25    A    Processing the adjustments.

129

```
1           DIRECT - TAYLOR
2      Q    On the second page it says,
3   "Effective for 1988." Do you see that? "The
4   amount of any management bonus will not be
5   affected if the FIP ratio is below 15 percent,
6   i.e. the current rating scale will be eliminated."
7           Do you see that?
8      A    Yes.
9      Q    Did that, in fact, take place at
10  Metropolitan Life?
11     A    Yes.
12     Q    Do you know what the basis was for
13  making that decision?
14     A    No, I don't.
15     Q    Do you know who would know that?
16     A    No, I don't know who would know. I
17  would suspect Mr. Crimmins would know.
18     Q    Are you aware of any memoranda or any
19  documents which discuss contemplation of this
20  policy, that the amount of any management bonus
21  will not be affected if the FIP ratio is below 15
22  percent?
23          (RECORD IS READ.)
24          MR. LABOVITZ: Objection to form.
25     A    I don't recall any memorandum
```

130

```
1           DIRECT - TAYLOR
2   discussing contemplation of this happening. I
3   don't recall that.
4      Q    Were any studies done which lead to
5   this policy being implemented at Metropolitan
6   Life?
7           MS. TAYLOR: Objection as to form.
8           MR. LABOVITZ: Objection as to form.
9      A    I don't know.
10     Q    Under number two, the next full
11  paragraph that starts with:
12          "Our analysis of the FIP program
13  indicates that an extension in the match period
14  for cash surrender transactions is appropriate.
15  Effective with policies placed with January 1998
16  issue dates such transactions will be recorded as
17  a match if the old policy is surrendered within
18  six months before or 12 months after new issue"."
19          Do you see that?
20     A    Yes.
21     Q    How is that different than the prior
22  policy?
23          MR. LABOVITZ: Objection to form.
24          MS. TAYLOR: Join.
25     A    The match policy was six months
```

131

```
1           DIRECT - TAYLOR
2   before or six months after.
3      Q    That changed after?
4      A    I don't believe that ever changed.
5      Q    Do you know why that changed?
6           MS. TAYLOR: Objection to form.
7           MR. LABOVITZ: Join.
8      A    I don't recall why. Not what the
9   effective date of this letter says, effective 1988
10  January, I don't believe it was implemented then.
11  I think it happened later on down the line.
12     Q    When did that happen?
13     A    There is a document somewhere in that
14  group that speaks when that was gone. I believe
15  that was after I left the unit.
16     Q    After 1994?
17     A    Yes. I'm not sure. I seem to
18  recall, I wasn't there.
19     Q    "During 1988, we plan to experiment
20  in additional areas to determine the feasibility
21  of making further changes in the program." Do you
22  know what that's referring to, what experiments
23  that's referring to?
24          MS. TAYLOR: Objection as to form.
25          MR. LABOVITZ: Join.
```

132

```
1           DIRECT - TAYLOR
2      A    I don't know what it means by that
3   sentence.
4      Q    Do you know of anything in 1988 which
5   was done in terms of an experiment?
6      A    It might be what we were talking
7   about earlier.
8           MS. TAYLOR: That's Exhibit Taylor 1.
9      Q    What was the result of the changes
10  that are detailed in this letter by Mr. Crimmins?
11          MS. TAYLOR: Objection as to form.
12     A    What do you mean by "results"?
13     Q    Did the FIP rate increase for the
14  company?
15          MS. TAYLOR: Which specific changes
16  are you talking about? This talks about a
17  whole bunch of things.
18          MR. BARTHOLOMAEI: Let's stick with
19  the ones I went through.
20     Q    The first one, talking about the
21  management bonus not being effective, what was the
22  result of that change with respect to the FIP
23  ratios of branch managers?
24          MS. TAYLOR: Objection as to form.
25     A    I can't recall what the impact of
```

133

DIRECT - TAYLOR

1   those changes were. I would have to look at them
2   and compare prior years to what happened after
3   that.
4       Q   Do you recall generally if there was
5   a result, not necessarily the specific numbers?
6       A   Generally, I don't recall whether
7   they -- it's hard to answer that question overall
8   because some managers' numbers may have went up,
9   some of them went down, some stayed the same. I
10  don't remember overall what the impact of these
11  changes had on the, on the company's FIP ratios.
12      Q   Do you know whether branch managers'
13  FIP ratio went down as a result of this change?
14          MS. TAYLOR: Objection as to form.
15      Asked and answered.
16          MR. LABOVITZ: Join.
17      A   No, I don't recall specifically the
18  numbers went down or up.
19          MS. TAYLOR: Objection as to form
20          (Letter to officers-in-charge,
21      re: FIP program, January 18, 1988, from
22      Robert J. Crimmins is received and marked
23      Taylor Exhibit 8 for identification.)
24          MR. BARTHOLOMAEI: The court reporter

134

DIRECT - TAYLOR

1   has marked this next document as Taylor 8,
2   and it is a January 8, 1988 letter from Mr.
3   Crimmins to officers in charge, bearing the
4   Bates Number MLPH 0013687 through 688.
5   ML001149 through 50 is the other
6   name.
7       Q   Have you had a chance to review this
8   document?
9       A   Yes.
10      Q   Is this something you have seen
11  before?
12      A   As part of the preparation for this
13  deposition.
14      Q   What about prior to that?
15      A   No.
16      Q   Was your department made aware that
17  FIP experiments were being conducted in 1988?
18      A   Yes.
19      Q   How were you made aware?
20      A   I don't remember exactly what vehicle
21  was used. Frank Dochniak, who I reported to, told
22  me what the experiments were and what regions were
23  participating in these experiments. I think the
24  experiments were somewhat optional.

135

DIRECT - TAYLOR

1       Q   You say "somewhat optional"?
2       A   Yes.
3       Q   How is that?
4       A   I don't think that everyone had to
5   participate in the experiments if they didn't want
6   to.
7       Q   Are you saying it was up to the
8   region whether they wanted to participate?
9           MS. TAYLOR: Objection as to form.
10      A   Yes.
11      Q   Who made the determination whether
12  the region would choose to participate in the
13  experiment?
14      A   I'm not sure. I know who made the
15  decision. This memorandum is basically saying he
16  left it up to the officers in charge to announce
17  these experiments. I guess they could choose to
18  announce them or not announce them.
19      Q   You said it was optional whether the
20  region wanted to participate in the experiment.
21      What I want to know, who made the
22  decision whether the region would participate?
23  For example, was it the officer in charge of the
24  territory that would say, this region is going to

136

DIRECT - TAYLOR

1   participate, this one isn't, or was it the head of
2   the region who would say, my region is not going
3   to participate?
4       A   It's my recollection the officer in
5   charge of the territory would be involved in
6   selecting the regions that could participate in
7   the program. It was still up to that region if
8   they wanted to participate in the program.
9       Q   Who was it in the region itself that
10  would determine whether they would participate in
11  the program?
12      A   The regional vice president.
13          (March 1, 1988 letter from Mr.
14      Schroeder to Harold Leff is received and
15      marked Taylor Exhibit 9 for
16      identification.)
17          MR. BARTHOLOMAEI: Taylor 9 is a
18      one-page letter from Mr. Schroeder dated
19      March 1, 1988 to Harold Leff,
20      M039841420144.
21      Q   Do you know who Mr. Schroeder was?
22      A   Yes.
23      Q   Who is he? What was his job at the
24  company?

137

DIRECT - TAYLOR

2  A  He was involved in the Compensation
3  Department.
4  Q  We talked about the Compensation
5  Department a couple times in the deposition.
6  What was his job in the Compensation
7  Department?
8  A  I don't know what his job was. I
9  just know he worked there, and he was a management
10 level person.
11  Q  Is this letter something you have
12 seen before?
13  A  As part of the preparation for my
14 deposition.
15  Q  What about prior to that?
16  A  No.
17  Q  In the third paragraph it says:
18  This is referring to communication
19 from Bob Crimmins, talking about the elimination
20 of endowments within the final three years as a
21 match in the FIP system. The basic reason for
22 communication was to point out new ways to earn
23 first-year commissions. "It seems to me that our
24 strong policy against replacement business may be
25 eroding with letters like this."

138

DIRECT - TAYLOR

2  Is this something considered by the
3  company, that the changes in the FIP system were
4  eroding the company's policy with respect to
5  replacement business?
6  MS. TAYLOR: Objection as to form.
7  MR. LABOVITZ: Objection as to form.
8  A  I was reading it as you were reading
9  it, and I didn't get the exact same impression
10 that you did.
11  It appeared to me, he was referring
12 to the fact that announcement was made with
13 respect to endowments and how they were handled in
14 the FIP system, and says, "Along those same lines,
15 we also decided to eliminate these cases from the
16 replacement business rules," and my take was, the
17 rest of this memorandum was speaking to how it
18 impacted the replacement rules, not the FIP
19 system.
20  (Memo, Al Pritchard to all
21 sales reps, is received and marked Taylor
22 Exhibit 10 for identification.)
23  MR. BARTHOLOMAEI: The court reporter
24 has marked this next document as Taylor 10.
25  It's a memo to all sales reps from Al

139

DIRECT - TAYLOR

2  Pritchard. The Bates number is
3  M099730930027.  The subject line says,
4  "Great news: Dividend withdrawals without
5  FIP."
6  Q  Do you know who Al Pritchard was?
7  A  No.
8  Q  Have you ever seen this before?
9  A  No, not that I can recall.
10  Q  Was there any time when you could
11 make a dividend withdrawal without triggering a
12 FIP match?
13  A  If the dividend withdrawal was less
14 than $100.
15  Q  Go ahead.
16  A  No. You go.
17  Q  I was actually referring to the
18 dividend withdrawal over $100. Was that ever a
19 case, with respect to the FIP reporting system, a
20 dividend withdrawal over $100 would not trigger a
21 FIP match?
22  A  Yes. There came a point in time
23 where we learned that Mr. Crimmins had announced
24 to the field, dividends would not be a match in
25 the FIP system.

140

DIRECT - TAYLOR

2  Q  When was that?
3  A  Around January 1989.
4  Q  What was the reason for that policy
5  change?
6  MS. TAYLOR: Objection to form. Lack
7  of foundation.
8  MR. LABOVITZ: Objection to form.
9  A  I don't know.
10  Q  Do you know who would know that?
11  A  Maybe Mr. Crimmins.
12  MS. TAYLOR: I just want to make
13 something clear. Was that company-wide or
14 in certain areas?
15  THE WITNESS: Southern territory.
16  Q  Why was the southern territory
17 chosen?
18  MS. TAYLOR: Objection to form. Lack
19 of foundation.
20  MR. LABOVITZ: Join.
21  A  I don't know.
22  Q  Something that Mr. Crimmins might
23 know as well?
24  A  Yes.
25  MS. TAYLOR: Objection to form.

141

DIRECT - TAYLOR

2  Calls
3    for speculation.
4    Q   Did you say, "Yes"?
5    A   He may know.
6        (Letter, September 30, 1988,
7    Rudolph Michael to the agency vice
8    presidents and regional sales managers,
9    southeastern territory is received and
10   marked Taylor Exhibit 11 for
11   identification.)
12       MS. TAYLOR: We marked Taylor Exhibit
13   11. The Bates number is MP4011004273
14   through 04274. Also MLPH870301006222 and
15   6233.
16       This is a September 30, 1988 letter
17   from a person whose name I can't read, but
18   he is a senior vice president of the
19   southern head office, from Ruddy Mitchell
20   to agent vice presidents and regional sales
21   manager, southern sales territory.
22   Q   I want to ask you if this is
23   something you have seen before.
24   A   Not that I can recall.
25   Q   I want to ask specifically about the

142

DIRECT - TAYLOR

2  last paragraph in this letter. It says:
3        "Let's make the most of our
4    opportunities, and increase our share of the
5    market. If our FIP ratio raises up to 15 percent,
6    so be it."
7        See that?
8    A   Yes.
9    Q   Is this something that was taking
10   place in the company at the time where the vice
11   presidents of the company had an attitude, if the
12   FIP ratio raised up to 15 percent, then so be it?
13       MS. TAYLOR: Objection. Lack of
14   foundation, compound question, and I think
15   there are a number of other objections in
16   there.
17   A   I don't know.
18   Q   Are you aware of any other letters
19   like this that talk about so be it if the FIP
20   ratio goes up?
21       MS. TAYLOR: Objection as to form.
22   A   No, I don't remember.
23       (December 13, 1988 letter, re:
24   FIP experiments, Frank Dochniak to Harold Leff is
25   received and marked Taylor Exhibit 12 for

143

DIRECT - TAYLOR

2  identification.)
3        MR. BARTHOLOMAEI: I will mark this
4    next group of pages as Taylor 12, and the reason I
5    say "group of pages," because I attached a page at
6    the back which is really a blown-up version of the
7    second page, which is easier to read.
8        The Bates numbers are M099714950048.
9    There is an MN099270 and then going back to the
10   original Bates number M099714950054.
11       This is a December 13, 1998 letter
12   from Mr. Dochniak to Mr. Leff regarding FIP
13   experiments, and I have attached something that
14   was attached to it which referred to the
15   Pittsburgh region, which was a larger document.
16   I'm concerned with the Pittsburgh region. I
17   attached a blown-up version of it, a more readable
18   version of it as well.
19   Q   Mr. Dochniak, he was your boss at
20   that time?
21   A   Yes.
22   Q   On that first page it says, "50/50
23   Dividend Experiment," the first page of the
24   exhibit.
25       See that, towards the bottom?

144

DIRECT - TAYLOR

2  A   Yes.
3    Q   It refers specifically to Pittsburgh,
4    and says:
5        "While four regions were designated
6    to participate, it appears Pittsburgh was the only
7    region to fully engage in the experiment. The
8    regions production results are less favorable than
9    the territory and there has been a 45 percent
10   increase in the FIP. In the remaining regions,
11   production ratios are mixed and the FIP ratios
12   remained essentially flat."
13       The first question I have, is this
14   something the company was made aware of, that the
15   Pittsburgh region had a 45 percent increase in the
16   FIP as a result of the 50/50 dividend experiment
17   in that region?
18       MS. TAYLOR: Objection to form. Lack
19   of foundation.
20       MR. LABOVITZ: Join.
21   A   I'm not exactly sure when you say
22   "the company."
23   Q   That's a good point. I'll clarify
24   that.
25       Was this something conveyed to, say,

145

DIRECT - TAYLOR

1
2  the president of the company, that an experiment
3  was done in Pittsburgh, and there was a 45 percent
4  increase in the FIP?
5       MS. TAYLOR: Objection as to form.
6       MR. LABOVITZ: Join.
7   A  I don't know.
8   Q  Do you know who was informed of the
9  results of the FIP experiment, the 50/50 Dividend
10 Experiment in Pittsburgh?
11  A  Obviously, Mr. Leff and Mr. O'Leary.
12 I don't know who else got a copy of this memo.
13  Q  Other than the 45 percent increase in
14 FIP, were there any other effects of the 50/50
15 dividend experiment in the Pittsburgh region?
16       MS. TAYLOR: Objection as to form.
17       MR. LABOVITZ: Objection as to form.
18       MS. TAYLOR: Lack of foundation.
19  A  Other what?
20  Q  Effects. Other than the FIP
21 increasing by 45 percent, was there anything else
22 that happened as a result of conducting the
23 experiment in the Pittsburgh region?
24  A  I don't know.
25  Q  Can you look at the last page, the

146

DIRECT - TAYLOR

1
2  larger version of the Pittsburgh, PA section which
3  was attached to this report. There is some
4  numbers in that section.
5       I was wondering if you could
6  interpret those for me or tell me what's being
7  enumerated or described there.
8       MS. TAYLOR: Objection as to form.
9  Lack of foundation.
10      You haven't even established the
11 witness prepared this document.
12  A  I don't know what number you are
13 talking about.
14  Q  It looks like it says, "Year-to-date
15 October 1988, '87."
16      I wonder if you can tell me that's
17 referring to.
18  A  I don't know what those numbers mean.
19  Q  Do you know what PLI premium refers
20 to?
21  A  Not in the context of this memo.
22  Q  What about NSC?
23  A  I know what the abbreviation stands
24 for, net sales credit. I don't know what it means
25 in the context of this memo.

147

DIRECT - TAYLOR

1
2   Q  Do you know who would know that?
3   A  No.
4       (Letter, Michael Levine to Ed
5  Morrissey, March 26 1990 is received and
6  marked Taylor Exhibit 13 for
7  identification.)
8       MR. BARTHOLOMAEI: The court reporter
9  just marked this next document Taylor 13.
10 The Bates numbers are MP4011003832 through
11 833. It is a March 26, 1990 letter from
12 Mr. Levine to Mr. Ed Morrissey.
13  Q  First question I have is, do you know
14 who Mr. Morrissey is?
15  A  No, I don't.
16  Q  Never heard that name before?
17  A  No.
18  Q  Says here, he's the senior manager of
19 Deloitte & Touche.
20      The question I have is, what, if any,
21 relationship did Deloitte & Touche have with
22 monitoring the FIP system at Metropolitan Life?
23  A  I don't know.
24  Q  Did you ever work with them when you
25 were working in the department?

148

DIRECT - TAYLOR

1
2   A  I can't recall.
3   Q  Was an audit ever done of the FIP
4  reporting system?
5   A  Not that I can recall, while I was
6  involved in it.
7       (Document titled "Financed by
8  Inforce Policies Program," July 12, 1990 is
9  received and marked Taylor Exhibit 14 for
10 identification.)
11      MR. BARTHOLOMAEI: The court reporter
12 just marked this next document Taylor 14,
13 and the Bates numbers are MP9553004402
14 through 44112 and a second set,
15 MP9365004401 through 4411.
16  Q  The first question I have, what was
17 the purpose of this document being created?
18      MS. TAYLOR: Objection as to form.
19 Lack of foundation.
20      MR. LABOVITZ: If I can interrupt for
21 a moment. Is there another Bates range?
22 Your list of Bates ranges for FIP
23 deposition topics. Your MP range stops at
24 9365 number.
25      MS. TAYLOR: This is a 9365 number.

149

DIRECT - TAYLOR

2  Q  The question is, what was the purpose
3  of the creation of this document?
4      MS. TAYLOR:  Objection as to form.
5  Lack of foundation.
6  A  I don't recall. I don't know.
7  Q  Have you ever seen this before?
8  A  I don't recall seeing this before.
9  Q  Have you ever seen a report in this
10  format before?
11     MS. TAYLOR:  Objection as to form.
12  Q  Is this something done every year in
13  the company, a FIP program analysis or something
14  to that effect?
15  A  No. In this format, no.
16  Q  Would you look at page three, three
17  on the bottom. Says:
18     "FIP Experiments. "As a result of
19  discussions during the November 1987 OIC meeting,
20  two experiments were introduced in January of
21  1988."
22     Do you know who was present at that
23  meeting in 1987, the OIC meeting?
24  A  No, but -- I'm reviewing the
25  documents we just read. I believe the document

150

DIRECT - TAYLOR

2  stated Mr. Crimmins said in a meeting we had, he
3  at least was in attendance. I don't know about
4  anyone else.
5  Q  You've never seen this report before;
6  is that right?
7  A  No. I don't recall that report.
8  Q  Do you know who Mr. O'Leary is?
9  A  Yes.
10  Q  What did he do?
11     MS. TAYLOR:  At the time of this
12  memo?
13     MR. BARTHOLOMAEI:  Yes.
14  A  I reported to Frank Dochniak in the
15  chain. Frank Dochniak reported to Art O'Leary.
16  Art was also my boss.
17  Q  What was Mr. O'Leary's position in --
18  the company at that time?
19  A  I believe he was assistant vice
20  president. He was working in product planning.
21  Q  Was it Mr. O'Leary's job to perform
22  analysis of the FIP reporting system?
23  A  I wouldn't say it was his job, but he
24  could request that others assist him in preparing
25  a memorandum of this type.

151

DIRECT - TAYLOR

2  Q  Is that something he was supposed to
3  do?
4      MS. TAYLOR:  Objection as to form.
5  Lack of foundation.
6  A  I really don't know what his
7  responsibilities were.
8      (February 8, 1991 letter,
9  Robert Crimmins to Messrs. Cannatella,
10  Martin, Michaud, Peress is received and
11  marked Taylor Exhibit 15 for
12  identification.)
13     MR. BARTHOLOMAEI:  The court reporter
14  has marked this next document as Taylor 15.
15  It's a one-page letter from Robert Crimmins
16  to Messrs. Cannatella, Martin, Michaud and
17  Peress, dated February 8, 1991. The Bates
18  number is MP4011105584.
19  Q  Ms. Taylor, have you seen this letter
20  before?
21  A  I don't recall seeing this letter.
22  Q  Please take a minute and review this.
23  I have some questions about it.
24     (WITNESS PERUSES DOCUMENT.)
25  Q  First paragraph is referring to

152

DIRECT - TAYLOR

2  figures for the year by region. Mr. Crimmins is
3  saying he is disappointed in the figures.
4      Do you know what figures they were?
5      MS. TAYLOR:  Objection as to form.
6  Q  Maybe a better question is:  In 1991,
7  do you know what the FIP rate of the company was?
8  A  No.
9  Q  The first paragraph of this letter,
10  the second to last sentence says, "My immediate
11  reaction is to deny or substantially reduce
12  bonuses for regional executives where the FIP
13  ratio exceeded some level, such as 20 percent."
14     Was a policy like that ever
15  implemented at Metropolitan Life, where it would
16  reduce bonuses for regional executives if they had
17  a FIP rate in their region?
18     MS. TAYLOR:  Objection as to form.
19     MR. LABOVITZ:  It calls for
20  speculation.
21  A  I don't recall a policy being set as
22  you described.
23     (Documents entitled "System
24  Requirements Documentation," April 17, 1991
25  are received and marked Taylor Exhibit 16

153

DIRECT - TAYLOR

1 for identification.)
2
3    MS. TAYLOR: The court reporter
4 marked this next document as Taylor 16.
5 For the record, the Bates numbers are
6 M109733000069 through 75. This is titled
7 "SCN-OF-FIP System Requirements
8 Documentation," annotated April 17, 1991.
9    Q    The first question I have is, what
10 was the "SCN-OF-FIP" System?
11    A    I don't think there ever was a
12 SCN-OF-FIP System. I think there was some
13 discussion about making some changes on the FIP
14 system, and those discussions were characterized
15 as SCN-OF-FIP."
16    Q    Do you know who came up with the name
17 SCN-OF-FIP"?
18    A    No, I don't remember.
19    Q    This was something that was never
20 implemented?
21    A    Not that I can remember.
22    Q    Do you know generally what the
23 differences were that were contemplated?
24    A    I would have to read the document in
25 detail.

154

DIRECT - TAYLOR

1
2    (Letter, September 3, 1993,
3 T.J. McHale to Michael Levine, re: FIP is
4 received and marked Taylor Exhibit 17 for
5 identification.)
6    MR. BARTHOLOMAEI: The court reporter
7 has marked this next document Taylor 17:
8 One-page letter from Mr. or Ms. McHale to
9 Mike Levine dated September 3, 1993. The
10 Bates number is M069701171327.
11    Q    First, Ms. Taylor, have you seen this
12 letter before?
13    A    I don't remember.
14    Q    This letter, in the third paragraph,
15 refers to commission splits where the FIP charge
16 goes to a retired sales representative.
17    A    I stand corrected. It seems I recall
18 seeing this memo as part of my preparation for
19 this deposition. I started reading it.
20    Q    Did this, in fact, occur, where a
21 representative would contact a retired sales
22 representative, and that sales representative
23 would be charged with the FIP match on a
24 commission split?
25    A    I would have no way of knowing if

155

DIRECT - TAYLOR

1
2 that happened or not.
3    Q    Is that something that was addressed
4 by the company, as far as you talked before, there
5 was an issue with primary writing agent, there was
6 an issue with address changes? Was this also
7 something that was addressed in the formulation of
8 the FIP match policy at Metropolitan Life?
9    MS. TAYLOR: Objection as to form.
10    MR. LABOVITZ: Objection as to form.
11    A    I think we spoke before about
12 splitting of FIP matches among more than one
13 representative. I'm thinking, this is what this
14 is referring to.
15    Q    I'm referring specifically where it's
16 talking about retired sales representatives
17 attributed with a match. It says here: "who,
18 since he is retired, is not very concerned with
19 the FIP charge".
20    Is that something that came to light
21 it in the company, that representatives were using
22 retired sales representatives to take the FIP
23 match for one of their sales?
24    A    I had no knowledge of that.
25    (November 8, 1993 letter, Mr.

156

DIRECT - TAYLOR

1
2 Vranka to Mr. Shoop, re: Targeted market
3 conduct examination is received and marked
4 Taylor Exhibit 18 for identification.)
5    MR. BARTHOLOMAEI: The court reporter
6 just marked this next document Taylor 18:
7 One-page letter from Mr. Vranka dated
8 November 18 1993 to Mr. Shoop of the
9 Pennsylvania Department of Insurance, Bates
10 number ML078187.
11    Q    The first question I have, let me ask
12 you if you have seen this before.
13    A    I recall seeing this during my
14 preparation.
15    Q    Did the company, Metropolitan Life,
16 provide a FIP report or FIP information to the
17 Pennsylvania Department of Insurance in connection
18 with a market economic examination in 1993?
19    MS. TAYLOR: Objection as to form.
20    Lack of foundation.
21    MR. LABOVITZ: Join.
22    A    I'm reading this document, and it
23 appears it is saying that enclosed are -- this is
24 Item Number 3? Item Number 4, document showing
25 the distribution of FIP report.

157

DIRECT - TAYLOR

1
2  Q  What I'm asking about specifically is
3  whether actual reports were provided to the
4  Pennsylvania Insurance Department in connection
5  with the market economic examination.
6  A  I don't know.
7      (December 17, 1993 letter,
8  McHale to Crimmins is received and marked
9  Taylor Exhibit 19 for identification.)
10     MR. BARTHOLOMAEI:  The court reporter
11  has marked this next document as Exhibit
12  19.  It is a one-page letter from again
13  someone with the last name McHale dated
14  September 17, 1993 to Mr. Crimmins
15  regarding FIP experiment.  Bates number is
16  M039809620027.
17  Q  Ms. Taylor, take a minute and look
18  this over.
19     (WITNESS PERUSES DOCUMENT.)
20  Q  This document refers to yourself?
21  A  Yes.
22  Q  It says here that you performed a
23  search for files concerning FIP experiments.
24     Do you see that?
25  A  Yes.

158

DIRECT - TAYLOR

1
2  Q  It says, referring to you, that you
3  and Mr. Dochniak believe the files were discarded
4  as a result of the, quote/unquote, clean-up prior
5  to a relocation to Bridgewater prior to the
6  clean-up prior to the Baldrige site visit.
7     What is that referring to when it
8  says "clean-up"?
9  A  I'm not sure what he's referring to,
10  but there came a time in 1992 when I moved from
11  the New York Home office to Bridgewater, New
12  Jersey location, and we packed up our files, and
13  we moved them to a new location.
14  Q  This is just talking about a move?
15  A  Yes.
16     MR. LABOVITZ:  Objection to form.
17     MS. TAYLOR:  Objection to form.
18  A  I don't know what he's talking about.
19  Q  Do you know who this McHale person
20  is?
21  A  Yes.
22  Q  Man or woman?
23  A  Man.
24  Q  What's his name?
25  A  Tom.

159

DIRECT - TAYLOR

1
2  Q  Do you remember having a conversation
3  with Mr. McHale about this?
4  A  I don't remember a conversation.
5  Q  Do you remember doing a search with
6  Mr. Dochniak regarding the FIP experiment, as
7  described in this letter?
8  A  No.  Frank Dochniak was in New York,
9  and I was in Bridgewater, New Jersey.  I don't
10  remember searching for results of the experiment.
11  I don't believe I had much in the way of the
12  experiment.  I'm not sure what he's asking,
13  talking about here I couldn't find.  It's obvious
14  I had information later on.  I'm not sure exactly
15  what Tom was asking me specifically, if he did
16  speak to me.
17  Q  Do you know who John Christopher is?
18  A  The name sounds familiar.  He is
19  someone in the field chain at the regional sales
20  office level, I think.
21  Q  Did you do any investigation or
22  perform any investigation into the FIP experiment
23  being conducted in Pittsburgh?
24     MS. TAYLOR:  Objection as to form.
25  A  No.

160

DIRECT - TAYLOR

1
2  Investigation?
3  Q  It says here -- I'll rephrase that.
4     Do you know who Bob Scott is?
5  A  To the best of my recollection, Bob
6  Scott was someone who worked in the compensation
7  unit.
8  Q  Do you recall anything about these
9  missing files?  It says at the bottom, "If any
10  other information is gathered or files discovered,
11  I will immediately get it to you."
12     MS. TAYLOR:  Objection as to
13  form.
14  A  I don't know about files missing in
15  the first place, so no.
16  Q  In the second to last paragraph,
17  right above the sentence I just read you, it's
18  referring to a pilot program.
19     Have you heard that term before,
20  "pilot program"?
21  A  I believe that's the same program we
22  have been speaking about earlier in Pittsburgh.
23  Q  Same as the experiment?
24  A  Yes.
25  Q  Later on, that sentence says, "The

161

```
1          DIRECT - TAYLOR
2  program ran in Pittsburgh region for one and a
3  half years."
4          Is that, in fact, correct?
5      A   Somewhere around there.
6          (Letter, April 25, 1994,
7  Stadler to Savarese, re: Inclusion of UL
8  II data into the FIP system is received and
9  marked Taylor Exhibit 20 for
10 identification.)
11         MR. BARTHOLOMAEI: The court reporter
12 has marked this next exhibit as Taylor 20.
13 Bates number is M059700960612, a letter
14 from George Savarese to D.M. Stadler,
15 entitled "Inclusion of UL II Data into the
16 FIP System."
17     Q   The question I have is, was UL II
18 ever included in the FIP calculation?
19     A   It's my recollection that it was
20 included.
21     Q   When was that?
22     A   I don't remember the date, but I
23 believe there is documents that include a date
24 that the UL II policy was included.
25     Q   Do you know how long after the
```

162

```
1          DIRECT - TAYLOR
2  introduction of the UL II that it became included
3  in the FIP system?
4          MS. TAYLOR: Objection as to form.
5      A   I don't remember when the UL II was
6  introduced. I'm sure there is documents over
7  there.
8      Q   Are any of those documents documents
9  you can identify?
10     A   No.
11         (Letter, Ms. Taylor, July 11,
12 1994, to Mr. Doby is received and marked
13 Taylor Exhibit 21 for identification.)
14         MR. BARTHOLOMAEI: The court reporter
15 has marked this next document Taylor 21,
16 and it's a two-page document signed by Ms.
17 Taylor dated July 11, 1994 to Mr. Doby, and
18 the Bates numbers of M059700960876 and 877.
19     Q   Ms. Taylor, I assume you've seen this
20 document before?
21     A   Yes.
22     Q   What was the purpose of this
23 document?
24     A   I'm going to read it again. It's
25 been a while.
```

163

```
1          DIRECT - TAYLOR
2          (WITNESS PERUSES DOCUMENT.)
3      Q   Have you seen this before?
4      A   Yes.
5      Q   Did you write this letter?
6      A   Yes.
7      Q   What was the purpose of this letter?
8      A   The purpose of this letter was to
9  inform Greg Doby, who was my boss at the time, a
10 transaction that I believed was not being reported
11 to the FIP system, which were 1035 exchanges
12 involving new UL II contracts.
13     Q   What was the reason for reporting
14 that to Mr. Doby?
15     A   I reported to him. I reported to him
16 at the time, as well as there was a transition
17 process going on between my involvement in the FIP
18 system and my turning that responsibility over to
19 Mike Rigby, R-i-g-b-y.
20     Q   What I meant was, why was it
21 necessary to report this information to Mr. Doby
22 about a transaction that you didn't think was
23 being covered by the FIP system?
24     A   Because I felt it was important that
25 someone know, knew, what's not being included and
```

164

```
1          DIRECT - TAYLOR
2  what impact it may have on the FIP ratio if it was
3  included.
4      Q   Is this something that should have
5  been included in the FIP system?
6          MS. TAYLOR: Objection as to form.
7  It
8  calls for speculation.
9          MR. LABOVITZ: Objection as to form.
10     A   It was my thought that these
11 transactions should be included in the FIP system.
12     Q   It says here on the second page at
13 the top:
14         "It is important to remember that the
15 adjusted FIP ratios are understated since they do
16 not include dividend withdrawals, loans, or
17 partial ULI surrenders used to fund new UL II
18 policies."
19         Is that what you are referring to
20 when you are saying something not recorded by the
21 FIP system?
22     A   No. I was talking about --
23     Q   1035 exchanges?
24     A   -- 1035 exchanges.
25     Q   What is this referred to here?
```

165

DIRECT - TAYLOR

1
2    A    I believe this refers to the UL II
3  policies not being matched in the FIP system.
4    Q    You are writing to Mr. Doby about
5  that?
6    A    I basically -- I guess it's included,
7  that statement, to let him know. I don't think
8  it's the first time he knew.
9         (Memo from IPCSTF to IPDON,
10       5/2/95 is received and marked Taylor
11       Exhibit 22 for identification.)
12       MR. BARTHOLOMAEI: The court reporter
13  has just marked this next two-page document
14  as Exhibit Taylor 22. The Bates numbers
15  are M119733020672 and 673. The subject is
16  FIP on SAMS and MSAM.
17    Q    Is this something you have seen
18  before?
19    A    I believe I saw it in my preparation
20  for this meeting, but I don't recall seeing it
21  prior to that.
22    Q    Do you know what the purpose of this,
23  looks like an e-mail, is?
24       MS. TAYLOR: Objection as to form.
25       Lack of foundation.

166

DIRECT - TAYLOR

1
2    A    No.
3    Q    Were there any discussions or
4  memoranda exchanged at Metropolitan Life regarding
5  differences between the MSAM system and the FIP
6  reporting system?
7    A    I remember seeing some memorandum and
8  documents in preparing for this deposition. All
9  this appears to be taking place after I wasn't
10  involved in the FIP system anymore.
11    Q    Is that around the time the MSAM
12  system replaced the FIP system or the FIP system
13  evolved into the MSAM system?
14       MS. TAYLOR: Objection as to form.
15    A    I can't remember. It obviously
16  hadn't taken place yet. It looks like that might
17  be the discussions that was beginning.
18    Q    I know I asked you earlier about the
19  date when the FIP system ended and the MSAM system
20  took over.
21       I was wondering if this helped you
22  determine that or refreshed your recollection at
23  all as to when that happened.
24       MS. TAYLOR: Objection as to form.
25    A    (No verbal response)

167

DIRECT - TAYLOR

1
2    Q    Is that a no?
3    A    No.
4         (Letter, June 7, 1995,
5  Fielhauer to Stadler is received and marked
6  Exhibit Taylor 23 for identification.)
7         MR. BARTHOLOMAEI: The court reporter
8  has marked this document as Taylor 23. The
9  Bates numbers are M119733020059 through
10  062. It is a June 7, 1995 letter from Mr.
11  Fielhauer, Director of the Corporate Ethics
12  and Compliance Department, to Mr. Stadler,
13  entitled "FIP System Enhancements."
14    Q    Ms. Taylor, have you seen this
15  document before?
16    A    I may have seen it in my preparation
17  for this deposition.
18    Q    Can you tell me why this document was
19  generated?
20       MS. TAYLOR: Objection as to form.
21  Lack of foundation.
22       MR. LABOVITZ: Join.
23    A    No, I cannot. No.
24    Q    Who was responsible for any analysis
25  of the MSAM system or FIP system with respect to

168

DIRECT - TAYLOR

1
2  its replacement of possible FIP reporting system?
3       MS. TAYLOR: Objection to form.
4       MR. LABOVITZ: Lack of foundation.
5    A    When I left the unit, the FIP
6  reporting system become the responsibility of Mike
7  Rigby. Mike Rigby was involved in the creation of
8  the EMSAM system.
9    Q    Do you know who Thomas Fielhauer is?
10    A    Yes.
11    Q    Who is he, besides being the director
12  of the individual life insurance ethics and
13  compliance?
14    A    That's him. He worked in the
15  southern territory and worked for Don Stadler, who
16  he was writing to.
17    Q    On the first page, where it says
18  "General overview," there is four bullet points
19  there.
20       Can you tell me, I don't want to read
21  through each one out loud, can you tell me if
22  these were actually implemented at Metropolitan
23  Life?
24       MS. TAYLOR: Objection as to form.
25       Lack of foundation.

169

DIRECT - TAYLOR

2 A I don't know if these are
3 recommendations. I can't tell you.
4 Q Do you know who would know that?
5 A Probably Mr. Rigby.
6 Q This letter is dated in 1995.
7 You didn't work in that department
8 anymore, right?
9 A No, I didn't.
10 (RECESS TAKEN)(AFTER RECESS)
11 MR. BARTHOLOMAEI: I don't have any
12 further questions. Thank you.
13
14 CROSS-EXAMINATION BY MR. LABOVITZ:
15 Q It's been a long day for you, so I'll
16 keep this short.
17 My name is bill Labovitz, and we met
18 briefly this morning. We represent, my firm and
19 I, represent Gary Antonino. As I said, a couple
20 questions for you.
21 Isn't it true that the 15-percent FIP
22 rate, or ratio, that we discussed today was an
23 internal guideline?
24 A Internal guideline for what? I don't
25 understand your question.

170

DIRECT - TAYLOR

2 Q That its purpose was as an internal,
3 self-imposed internal guideline.
4 MS. TAYLOR: Objection as to form.
5 A Fifteen-percent ratio that we
6 discussed today, it's my recollection we were
7 relating that to how managers were compensated.
8 So it was not a guideline. The number that was
9 used in determining whether a FIP ratio had an
10 impact on management's compensation.
11 Q Let me show you...
12 (Document titled "Metropolitan
13 Life Insurance Company's Response to
14 Pennsylvania Insurance Department Market
15 Conduct Report" is received and marked
16 Taylor Exhibit 24 for identification.)
17 Q I show you what's been marked by the
18 court reporter as Taylor Deposition Exhibit 24.
19 MR. LABOVITZ: For the record, this
20 is Metropolitan Life Insurance Company's
21 Response to Pennsylvania Insurance
22 Department Market Conduct Report. The copy
23 that I have in front of me at least bears
24 the Bates range ML000436 through and
25 including 458.

171

DIRECT - TAYLOR

2 Q There is no need to go through the
3 document page by page. I'll direct you to a
4 particular portion. You are welcome to review the
5 whole thing, if you like.
6 Do you recognize this document?
7 A No, I don't.
8 Q Have you ever seen this document?
9 A I don't recall seeing this document.
10 Q I would like you to direct your
11 attention, if you could, to page five of this
12 document, ML000442. I direct you specifically to
13 the second full paragraph on the page, and that
14 paragraph begins with the statement:
15 "Significantly, MetLife's goal of
16 limiting the sale of new policies that are
17 financed by inforced policies of 15 percent is not
18 a regulatory mandate, but merely a self-imposed
19 internal guideline."
20 Do you see that statement?
21 A Yes, I do.
22 Q Is that consistent with your
23 understanding that this 15 percent was a
24 self-imposed internal guideline?
25 A Yes.

172

DIRECT - TAYLOR

2 Q Would it be fair also, would it be
3 fair to say also that this 15-percent FIP rate, or
4 ratio, was a benchmark or an indicator? Would
5 that be an accurate characterization?
6 MS. TAYLOR: Objection as to form.
7 MR. BARTHOLOMAEI: Join.
8 Q You may answer, if you understand the
9 question.
10 A I really don't understand the
11 question.
12 Q Let me direct your attention to -- I
13 only have one copy of this with me. This is the
14 transcript of the deposition of Corporate Designee
15 James Gould. I don't see a need to mark it. I'll
16 show this to you in a moment, a transcript taken
17 of his deposition on August 20, 2002.
18 First of all, do you know James
19 Gould?
20 A Yes.
21 Q Who is he?
22 A He worked in the MetLife's Auditing
23 Department.
24 Q Let me show you -- if you don't mind,
25 since I have only one copy, I look on with you.

173

DIRECT - TAYLOR

1
2      Reading on page 178 of the deposition
3  transcript, lines -- starting on line 12 --
4  rather, line 10:
5      "The 15 percent, keeping in mind the
6  FIP is not an audit tool, it's not something that
7  was developed by auditing, FIP was developed not
8  required. It was developed by management to
9  monitor the activities of sales offices and
10  regions. The 15 percent is simply a number they
11  came up with. It could have been 20, could have
12  been 25, could have been five. They felt 15
13  percent was a reasonable number and simply used as
14  a benchmark, above and below. Really, nothing
15  more than that.
16      "Above 15, you're in trouble. It's a
17  benchmark. It seems like a percentage that would
18  be appropriate."
19      That ends at Line 24, also on page
20  178.
21      Is it your belief or opinion that
22  this 15 percent was merely a benchmark?
23      MS. TAYLOR: Objection to form.
24      MR. BARTHOLOMAEI: Objection. Asked
25  and answered.

174

DIRECT - TAYLOR

1
2      A  I'm going to attempt to answer the
3  question with respect to the 15-percent number
4  that's being used here.
5      The 15-percent number, if you're
6  referring to that as to rather how it impacted
7  management's compensation, that was a real number.
8  It was 15 percent. We talked about it having a
9  sliding scale or being 15 percent or above 15
10  percent or below 15 percent.
11      The way I'm reading this statement,
12  it's just talking about, 15 percent was just a
13  number. Used in what context? I mean, when
14  management was reviewing the reports at the local
15  offices, he may have used some other number, I
16  don't know, when he's dealing with the sales
17  representatives. Could have been, I don't know,
18  20.
19      Q   So 20 percent could have been used?
20      MS. TAYLOR: Objection as to form.
21  Calls for speculation.
22      A  I'm not sure what you mean by the
23  15-percent number. When we're talking
24  compensation, it was not -- it was self-imposed.
25  It wasn't a regulatory requirement.

175

DIRECT - TAYLOR

1
2      There were a guideline, that's what's
3  troubling me here, internal guideline.
4      MS. TAYLOR: He's not referring to
5  that document anymore. He's referring to
6  Gould's testimony.
7      Q   I'm referring to Mr. Gould's
8  testimony.
9      A  He said it could have been any
10  number?
11      MS. TAYLOR: I think she has answered
12  the question, and said it was a real number
13  and that the 15 affected compensation. So
14  I think she has answered the question.
15      Q   Do you agree with Mr. Gould's
16  testimony that, as he said, the 15 percent is a
17  number they came up, could have been 20, could
18  have been 25, could have been five?
19      MS. TAYLOR: Objection as to form.
20  Asked and answered. She already answered
21  the question.
22      I'm instructing her not to answer.
23  She answered it.
24      Q   Were you involved in any discussions
25  at Metropolitan Life as to use of a ratio other

176

DIRECT - TAYLOR

1
2  than 15 percent to determine compensation?
3      MS. TAYLOR: Objection as to form.
4      MR. BARTHOLOMAEI: Objection as to
5  form.
6      Ms. Taylor specifically?
7      MS. TAYLOR: You're assuming facts,
8  first of all.
9      MR. LABOVITZ: You are entitled to
10  make objections. That's fine.
11      Q   Do you need to take a break, Ms.
12  Taylor?
13      A  No, I don't think so.
14      Not that I can recall.
15      Q   What I'm getting at here, isn't it
16  the case, this 15-percent FIP rate, ratio, was not
17  a formal Metropolitan Life policy?
18      MS. TAYLOR: Objection as to form.
19  It was asked and answered.
20      She explained, I think two or three
21  times what it was in her -- as to her
22  understanding of the 15 percent. She
23  did -- it did impact, it did have effect on
24  compensation. She said that three times.
25      MR. LABOVITZ: From my perspective,

177

DIRECT - TAYLOR

1
2  cross-examining her and asking her
3  questions, I'm entitled --
4      MS. TAYLOR: To ask the same
5  questions over and over again...
6      MR. LABOVITZ: I think the record
7  will speak for itself, Ms. Taylor, and I
8  reject that mischaracterization. I do not
9  believe she's answered that question
10  previously.
11      MR. BARTHOLOMAEI: She answered it
12  and said the exact opposite.
13      MR. LABOVITZ: I think I am entitled
14  to go down this line of questioning.
15      Q   Isn't it true, this 15-percent rate
16  is not -- was not a formal Metropolitan Life
17  policy?
18      MS. TAYLOR: Objection as to form.
19      MR. BARTHOLOMAEI: Join.
20      Q   You may answer.
21      A   The 15-percent number, 15-percent
22  number that was used at Metropolitan Life, as I
23  know it, related to how the FIP ratio impacted
24  management's compensation. The 15-percent number
25  was used in determining the compensation,

178

DIRECT - TAYLOR

1
2  determining whether management -- how management
3  would be compensated.
4      Q   Was this 15-percent figure for
5  compensation, was it adopted by the Metropolitan
6  Life Board of Directors, to your knowledge?
7      A   Not that I'm aware of, no.
8      Q   Was it adopted by any Met policy
9  committee, to the best of your knowledge?
10      MS. TAYLOR: Objection as to form.
11      A   Policy committee. I'm not sure what
12  that is. I don't know.
13      Q   Were minutes prepared reflecting the
14  adoption of 15-percent ratio?
15      A   Minutes prepared?
16      Q   Any Board minutes you are aware of,
17  Met is aware of.
18      A   I'm not.
19      MS. TAYLOR: That -- she is not aware
20  of minutes. She was not on the Board of
21  Directors. I frankly don't believe she
22  received Board minutes. I don't think she
23  would know that.
24      Q   Do you know whether a formal policy
25  directive was ever adopted by Met CEO with respect

179

DIRECT - TAYLOR

1
2  to the 15-percent rate?
3      A   No, I don't know that.
4      MS. TAYLOR: Objection as to form.
5      Q   You may answer.
6      A   I would not know that.
7      Q   Did this 15-percent rate appear in
8  any Metropolitan Life manual?
9      A   I don't remember if it appeared in
10  any manual. I believe it appeared in the types of
11  field releases for the compensation unit.
12      MS. TAYLOR: If you show her a couple
13  of manuals, she'll be able to tell you
14  that. I know somewhere in the documents
15  that were sent there were a lot of manuals.
16  If you show her some...
17      Q   Sitting here right now, are you aware
18  if that 15-percent rate does appear in any manual?
19  You may have answered, you are not sure. Is that
20  right?
21      A   I'm not sure.
22      Q   Let me show you -- again, I just have
23  one copy. This is testimony of Robert Crimmins
24  "In the Matter of the Arbitration between Charles
25  Garitzky and Metropolitan Life," December 20,

180

DIRECT - TAYLOR

1
2  1996. I'll show it to you, and look over your
3  shoulder for a moment simply because I have one
4  copy.
5      Page 561 starting on line four, "The
6  FIP had no idea that it was just a guideline. It
7  was a tool. In fact, it is still a tool the
8  people can monitor their business with."
9      Do you agree with that statement of
10  Mr. Crimmins I just read?
11      MS. TAYLOR: Objection as to form.
12      You're reading virtually a similar
13  statement of Gould's. She just told you
14  what she believes the 15 percent was. I
15  don't know how many different ways you want
16  her to tell you that. Standing on her
17  head? She already said it, Bill, and I
18  think you are just asking the same question
19  over and over again.
20      MR. LABOVITZ: I disagree.
21      Q   If you understand the question,
22  please answer the question, unless you are
23  instructed not to.
24      MS. TAYLOR: I'm instructing her not
25  to

181

DIRECT - TAYLOR

1    DIRECT - TAYLOR
2    answer.
3    Q    Is it the case that Metropolitan Life
4    sales forces in regional areas, including
5    Pittsburgh, had been allowed to use existing
6    policy dividends without restriction in terms of
7    the creation of new business from 1989 to 1990?
8        MS. TAYLOR: Objection as to form.
9    A    I believe you are referring to the
10   experiment that we spoke about earlier today.
11   Matches involving dividend withdrawals where at
12   least 50 percent of the first-year annualized
13   premium. I'm reading from my notes I had before.
14       MS. TAYLOR: I want clarification.
15       Are you asking her whether, in the
16   Pittsburgh region, during 1989 to '90 that
17   the use of dividends to pay premiums on
18   another policy constituted a fit match? Is
19   that your question?
20       MR. LABOVITZ: Whether those were
21   lifted. My exact language was, allowing to
22   use the dividends without restriction, in
23   other words, whether controls were lifted
24   during that period, '89 to '90.
25       MS. TAYLOR: This deposition is about

182

1    DIRECT - TAYLOR
2    FIP matches and FIP system. We need to tie
3    your question to the FIP system.
4        MR. LABOVITZ: I believe and, I
5    apologize if I'm not sufficiently clear,
6    but I believe that I am, not having the FIP
7    controls in place during that time, '89 and
8    '90. That's what my question is getting
9    at.
10       MS. TAYLOR: I don't know what you
11   mean by not having FIP controls in place.
12   Q    Did you understand my question?
13   A    I think I understood your question.
14       The FIP controls were in place.
15   Q    You were referring -- you started to
16   go back, I believe -- refer to Taylor Deposition
17   Exhibit 1, is that correct, is that the document -
18   you prepared?
19   A    Right.
20   Q    Were you aware of any other
21   experiments that were implemented in the
22   Pittsburgh region other than the one you testified
23   to today?
24       MS. TAYLOR: Relating to FIP system?
25       MR. LABOVITZ: Yes.

183

1    DIRECT - TAYLOR
2    A    No, I don't recall any other
3    experiment.
4    Q    When you prepared your memo, the 1994
5    memo, did you rely on particular background,
6    particular documents? When you prepared this
7    memorandum, Taylor Exhibit 1, did you rely on
8    particular documents that formed the basis of this
9    memoranda?
10   A    Parts of it.
11   Q    Can you identify documents upon which
12   you relied?
13   A    No.
14   Q    Earlier Mr. Bartholomaei asked you
15   about Exhibit 19. I'm not going to belabor the
16   point.
17       A question in terms of clarification
18   which I have: Exhibit 19 refers to, files were
19   discarded as a result of the clean-up prior to the
20   relocation to Bridgewater and clean-up prior to
21   the Baldridge site visit.
22       Were there documents relating to this
23   Pittsburgh FIP experiment, as it's been referred
24   to, that were discarded as a consequence of these
25   office moves?

184

1    DIRECT - TAYLOR
2    A    I'm not sure if he is talking about
3    Frank's files, my files. I don't recall
4    discarding any documents dealing with the FIP's
5    experiments.
6    Q    Do you know whether your documents or
7    others, at least in the possession of other Met
8    employees, whether documents related to, again,
9    the Pittsburgh FIP experiment were discarded as a
10   consequence of any of these moves?
11   A    Metropolitan Life employees is big.
12   I would have no idea.
13   Q    Looking at Exhibit 14, Taylor Exhibit
14   14, this is a document prepared by, at least on
15   the cover sheet, Arthur O'Leary, Personal
16   Insurance Marketing.
17       I'm directing to you to the
18   background section on the first page of the
19   document, MP 9365004402, specifically the sixth
20   paragraph. It states:
21       "The 1981 match ratio was 15.9
22   percent, which was considered to be excessively
23   high. A ratio of 5 percent was established as the
24   objective for 1982."
25       Was the 1981 Metropolitan Life match,

185

DIRECT - TAYLOR
2  or ratio --
3  MS. TAYLOR: Objection as to form.
4  A  I don't know.
5  Q  -- match or ratio for 1982 five
6  percent?
7  MS. TAYLOR: Objection to form.
8  A  I don't know.
9  Q  I'm wondering, as a corporate
10  designee, whether you have knowledge, on FIP,
11  whether there is an objective of five percent
12  ratio in 1982?
13  MS. TAYLOR: Objection as to
14  form. Asked and answered.
15  A  As a corporate designee, the most I
16  would be backwards, memos like this. I don't know
17  that's the case or not. I can't answer that yes.
18  Q  Do you have any reason to doubt the
19  accuracy of this document?
20  MS. TAYLOR: Objection as to form.
21  Calls for speculation.
22  She previously testified she had
23  never seen the document before, except -- I
24  don't know if she even saw it in
25  preparation. She has never seen it before

186

DIRECT - TAYLOR
2  Q  Isn't it true, there is not
3  necessarily a relationship between a high FIP
4  ratio and improper replacement activity?
5  A  That's true.
6  Q  So there is not automatically a
7  problem if there is a FIP ratio in excess of that
8  15 percent benchmark; is that right?
9  A  Again, you are referring to it as a
10  benchmark. It's not necessarily a problem when
11  the FIP ratio is higher, no.
12  Q  So I can understand better this FIP
13  ratio, wouldn't you agree that a FIP ratio of 50
14  percent doesn't necessarily mean an agent was
15  involved in replacement activity 50 percent of the
16  time; is that right?
17  MS. TAYLOR: Objection as to form.
18  A  A FIP ratio of 50 percent doesn't
19  mean the rep was involved in any replacement.
20  Q  Because I think you testified
21  earlier, you could have, let's say, two or three
22  policies and that could impact -- I think you
23  testified earlier this morning, you could have a
24  100-percent ratio with a sale, by virtue of a sale
25  of two or three policies?

187

DIRECT - TAYLOR
2  A  You have two matches and two new
3  issues, you have a hundred percent.
4  MR. LABOVITZ: Those are all the
5  questions I have at this time. I thank you
6  for your time.
7  MS. TAYLOR: Does anyone in
8  Pittsburgh on the telephone have anything?
9  MS. BELLO: We have no questions.
10
11  REDIRECT EXAMINATION BY MR. BARTHOLOMAEI:
12  Q  Ms. Taylor, we talked earlier about,
13  when you told me what you would do as far as when
14  a match was reported, you would go into the
15  computer system and check, a couple different
16  systems you would check to determine if, in fact,
17  the match was correct.
18  MS. TAYLOR: Objection.
19  I think she said that in terms of a
20  request for an adjustment.
21  Q  Request for an adjustment. That's
22  right. I apologize.
23  Are you familiar with life insurance
24  applications?
25  A  Familiar with? I know what it looks

188

DIRECT - TAYLOR
2  like.
3  Q  For, let's say, a whole life policy.
4  A  You're talking about today?
5  Q  Yes.
6  A  I haven't looked at a life insurance
7  application in probably 10, 15 years.
8  Q  What about the time when you worked
9  in the department, when you worked with the FIP
10  reporting system, were you generally familiar with
11  life insurance applications, part of your job?
12  A  There were rare occasions where we
13  had to be concerned about what was written on the
14  life insurance application. We didn't routinely
15  look at life insurance applications.
16  Q  You said earlier, for example, a
17  dividend withdrawal over $100 would trigger a FIP
18  match on a reporting system.
19  How was it determined a dividend
20  withdrawal had taken place, a dividend withdrawal
21  was over $100?
22  MS. TAYLOR: Objection as to form.
23  A  The company had a system that
24  recorded when it processed a withdrawal policy.
25  The FIP system used the information from that

189

DIRECT - TAYLOR

1   system to determine the amount and type of
2   transaction.
3       Q   Was that the consolidated warrants
4   system?
5       A   Yes.
6       Q   Did you use the consolidated warrants
7   system in any way in your job when you worked with
8   the FIP reporting system?
9       A   I used the information that that
10  system, reports that that system produced.
11      Q   Was a FIP match triggered where cash
12  surrender of a Metropolitan Life policy was
13  performed to fund the new Metropolitan Life
14  policy?
15      A   Well, it would match, a cash
16  surrender would match regardless of if the money
17  was used to fund it or not used to fund it. Find
18  a new issue, a withdrawal and match it.
19      Q   What about if the policy surrendered
20  was a policy from a different company, Prudential,
21  would that trigger another – would that trigger a
22  match?
23      A   The FIP system did not involve
24  withdrawals or new issues from other companies.

190

DIRECT - TAYLOR

1       Q   Was it ever discussed at Metropolitan
2   Life that the FIP system should be changed to
3   involve withdrawals or cash surrenders of policies
4   from other companies?
5       A   Not that I can recall.
6       Q   Is there anywhere, a life insurance
7   application that you can identify where it's
8   indicated that a policy was being funded with
9   funds from an existing policy?
10      MS. TAYLOR: Objection as to form. It
11  calls for speculation.
12      A   I'm not exactly sure of your
13  question.
14      Q   Are you familiar with Question 12C on
15  the life insurance application?
16      A   What's that?
17      Q   Guess you are not.
18      A   I may be familiar with the question,
19  but not the number.
20      Q   I don't have it in front of me. It's
21  a question that basically states: Is any policy
22  being cash surrendered, loan taken, dividend
23  withdrawal to fund the instant policy being

191

DIRECT - TAYLOR

1   applied for.
2       MS. TAYLOR: Objection as to form.
3   You are misstating it, I think.
4       MR. LABOVITZ: Join.
5       A   What do you want to know?
6       Q   Are you aware of such a question on a
7   life insurance application, where it's indicated
8   whether the policy being purchased is using funds
9   from existing policy?
10      A   I remember there was a question like
11  that on the application.
12      Q   Was that question used to determine
13  whether a FIP match was triggered in connection
14  with the FIP reporting system?
15      A   No, it was not. Not that I can
16  recall.
17      MR. BARTHOLOMAEI: Those are all the
18  questions I have.
19      MS. TAYLOR: We're going to reconvene
20  tomorrow to do the AP stuff.
21
22      (TIME NOTED: 4:20 P.M.)

192

1
2
3      A C K N O W L E D G M E N T
4   STATE OF NEW YORK)
                       :ss
5   COUNTY OF        )
6
7      I, WILHELMENIA J. TAYLOR, hereby
8   certify that I have read the transcript of my
9   testimony taken under oath in my deposition of
10  September 25, 2002; that the transcript is a
11  true, complete and correct record of what was
12  asked, answered and said during this deposition,
13  and that the answers on the record as given by
14  me are true and correct.
15
16
17
18      _____
           WILHELMENIA J. TAYLOR
19
20  Signed and subscribed to
    before me, this ____ day of
21  _____ 2002.
22
    _____
23  Notary Public
24
25

193

```
 1
 2                     CERTIFICATION
 3   STATE OF NEW YORK  )
                          ss
 4   COUNTY OF NEW YORK )
 5         I, ALBERT M. CITTONE, a Certified Court
 6   Reporter and Notary Public of the State of New
 7   York, DO HEREBY CERTIFY that WILHELMENIA J.
 8   TAYLOR, the witness whose deposition is
 9   hereinbefore set forth, was duly sworn, and that
10   such deposition is a true record of the testimony
11   given by such witness.
12         I FURTHER CERTIFY that I am not related to
13   any of the parties to this action by blood or
14   marriage, and that I am in no way interested in
15   the outcome of this matter.
16         IN WITNESS WHEREOF, I have hereunto set my
17   hand this 21st day of October 2002.
18
19
20
21         -------------------------------------
22              ALBERT M. CITTONE
23         Notary Public of the State of New York
24
25
```

194

```
 1
 2                      INDEX
 3   WITNESSES:                       PAGE / LINE
 4   WILHELMENIA J. TAYLOR
       DIRECT BY MR. BARTHOLOMAEI       3 /   6
 5     CROSS BY MR. LABOVITZ          169 /  14
       REDIRECT BY MR. BARTHOLOMAEI   187 /  11
 6
 7           INDEX OF EXHIBITS:
 8   EXHIBIT   DESCRIPTION          PAGE / LINE
 9      1    Document titled          89 /   6
            Financed by Inforce ,
10          Policies (FIP)
11      2    Document titled New     106 /   2
            Issues Apparently ,
12          Financed by Present
            Policy Values
13
14      3    Memo, February 15,      114 /  11
            1985, re:
15          Piggybacking and
            Replacement Business,
16          to
            Officers-in-Charge,
17          and others, from J.P.
            Maurer
18      4    Letter, Jim Flynn to    118 /   9
            Chuck Laverzoli,
19          October 25, 1985
20      5    Letter, George Trotta   120 /  21
            to agency vice
21          presidents, regional
            sales managers,
22          branch managers and
            district sales
23          managers dated
            November 25, 1985
24
        6    Memorandum by Michael   123 /  23
25           Levine
```

195

```
 1
 2
 3      7    Letter, November 11,    127 /  22
            1987, memo to branch
 4          managers and district
            sales managers re
 5          Financed by Inforce
            Policies (FIP)
 6      8    Letter to               133 /  21
            officers-in-charge,
 7          re:  FIP program,
            January 18, 1988
 8
 9      9    March 1, 1988 letter    136 /  14
            from Mr. Schroeder to
10          Harold Leff
11      10   Memo, Al Pritchard to   138 /  20
            all sales reps
12      11   Letter, September 30,   141 /   6
            1988, Rudolph Michael
13          to the agency vice
            presidents and
14          regional sales
            managers,
15          southeastern territory
16      12   December 13, 1988       142 /  23
            letter, re:  FIP
17          experiments, Frank
            Dochniak to Harold
18          Leff
19      13   Letter, Michael         147 /   4
            Levine to Ed
20          Morrissey, March 26
            1990
21
22      14   Document titled         148 /   7
            Financed by Inforce ,
23          Policies Program, July
            12, 1990
24      15   February 8, 1991        151 /   8
            letter, Robert
25          Crimmins to Messrs.
```

196

```
 1
 2          Cannatella, Martin,
            Michaud,
 3
 4      16   Documents entitled      152 /  23
            System Requirements ,
            Documentation,
 5
 6      17   Letter, September 3,    154 /   2
            1993, T.J. McHale to
 7          Michael Levine, re:
            FIP
 8      18   November 8, 1993        155 /  25
            letter, Mr. Vranka to
 9          Mr. Shoop, re:
            Targeted market
10          conduct examination
11      19   December 17, 1993       157 /   7
            letter, McHale to
12          Crimmins
13      20   Letter, April 25,       161 /   6
            1994, Stadler to
14          Savarese, re:
            Inclusion of UL II
15          data into the FIP
            system
16      21   Letter, Ms. Taylor,     162 /  11
            July 11, 1994, to Mr.
17          Doby
18
19      22   Memo from IPCSTF to     165 /   9
            IPDON, 5/2/95
20      23   Letter, June 7, 1995,   167 /   4
            Fielhauer to Stadler
21
22      24   Document titled         170 /  12
            Metropolitan Life,
23          Insurance Company's
            Response to
24          Pennsylvania
            Insurance Department
25          Market Conduct Report
```