


**COPY**

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

------------------------------X

EDWARD W. IHNAT,                    CIVIL DIVISION

       Plaintiff,               GD 94-17465

        v.

JOHN A. POVER, MARK
BATTALINE, WILLIAM J.
BYTZURA, and METROPOLITAN
LIFE INSURANCE COMPANY,

       Defendants.
------------------------------X

       9:45 a.m.
       October 1, 2002

      300 Park Avenue
      New York, New York

CONTINUED DEPOSITION UPON ORAL EXAMINATION

of WILHELMENIA J. TAYLOR, Corporate Designee,

taken by PLAINTIFF, before ALBERT M. CITTONE, a

Certified Court Reporter and Notary Public of the

State of New York.

---

# CITTONE REPORTERS
### Certified Shorthand Reporters
Two Penn Plaza, Suite 1500
New York, New York  10120
(212)286-9222

```
                                                            2
 1

 2   A p p e a r a n c e s:

 3                  BEHREND & ERNSBERGER, PC
                    Attorneys for Plaintiff
 4                      Union Bank Building
                        306 Fourth Avenue, Third Floor
 5                      Pittsburgh, Pa.  15222
                    By:  MARK A. BARTHOLOMAEI, ESQ.
 6                       412.391.2515

 7                  MC CARTER & ENGLISH
                    Attorneys for Defendants Taylor and
 8                  Metropolitan Life Insurance Company
                        Four Gateway Center
 9                       100 Mulberry Street
                         Newark, New Jersey
10                  By:  PENELOPE M. TAYLOR, ESQ.
                         973.639.7947
11
                    ROBERT F. NOSTRAMO, ESQ.
12                  Attorney for MetLife
                        One Madison Avenue
13                      New York, New York   10010-3690

14   ALSO PRESENT VIA TELEPHONE:

15                  PINDALL & BELLO
                    Attorneys for Joel Shermann, George Weber,
16                  Steven Dervais
                        Three Gateway Center, 15 West
17                      Pittsburgh, Pa.  15222
                    By:  MELISSA BARRETT, ESQ.
18
                    WAYMAN IRVIN & MC CAULEY
19                  Attorneys for Defendant Frank Carleni and
                    Ron Schrem
20                  By:  KATE J. FAGAN, ESQ.

21                  LEWIS & SARGENT LLC
                    Attorneys for Defendant Gary Antonino
22                      Two Gateway Center, 18th Floor
                        Pittsburgh, Pa.  15222
23                  By:  WILLIAM J. LABOVITZ, ESQ.
                         412.281.2490
24

25
```

3

1

2          WILHELMENIA TAYLOR, having previously

3               been sworn, continues testifying

4               under oath as follows:

5

6    CONTINUED DIRECT EXAMINATION BY MR. BARTHOLOMAEI:

7          Q     Ms. Taylor, we're going to continue

8    your deposition which abruptly ended last week

9    because I wasn't feeling well and I apologize for

10   that again.   I wanted to continue with this

11   document which was previously marked as Taylor

12   Exhibit 1, which is the Proposed Strategy for the

13   Accelerated Payment Plan.

14              I wanted to ask you about a section

15   on page three.   Do you need a minute to review

16   this again?

17         A     No.   You can go ahead.

18         Q     This page, looks like it begins to

19   identify some problems.   There is a heading that

20   says:

21              "Problem #1:   Prospectus,

22   Policyholders and Account Reps Do Not Have a Clear

23   Understanding of the APP Arrangement".

24              What study was done to determine that

25   the prospects policyholders and Account Reps do

4

1                    WILHELMENIA TAYLOR

2    not have a clear understanding as to the APP

3    Arrangement?

4              MS. TAYLOR:  Objection to form, lack

5         of foundation.

6         A    It's my recollection that a study was

7    not necessarily done at Metropolitan Life but we

8    received feedback from members who were working on

9    the APP mechanization process, customer service

10   people, marketing people, people in

11   communications, that they were getting certain

12   questions regarding the APP Arrangement which lead

13   them to believe there may have been some

14   situations where customers either did not remember

15   or did not understand.

16             And we had new representatives that

17   were joining the company and they weren't quite

18   clear sometimes on how the AP Arrangement worked.

19        Q    How were the representatives not

20   clear as to how the AP Arrangement worked?

21             MS. TAYLOR:  Objection to form.

22        A    It's my recollection most of the

23   questions that came in from the reps were

24   representatives who inherited existing customers

25   when they came and joined the company and they

5

1                                WILHELMENIA TAYLOR

2      were servicing these customers and they wanted

3      more information on how the Accelerated Payment

4      worked at Metropolitan Life.

5           Q     At this time we are talking about, I

6      believe it's sometime in late '92, early '93, even

7      up to late '93, what training did representatives

8      receive in the workings of the Accelerated Payment

9      Arrangement?

10          A     I wasn't involved with the training

11     and I wasn't in the training department.  So I

12     can't really speak to the training the reps

13     received and in reviewing the documents, I didn't

14     see information in there specifically about the

15     training that they received.

16          Q     Do you know who would know the answer

17     to that question?

18          A     No, I do not.

19          Q     You just stated that new

20     representatives had some questions about the

21     Accelerated Payment Arrangement where they

22     inherited customers who were already on the

23     accelerated arrangement.  What training was

24     provided to those customers, if any, to educate

25     them on how the Accelerated Payment worked?

6

WILHELMENIA TAYLOR

1

2        MS. TAYLOR:  Objection to form.  You

3    said training to customers.

4        MR. BARTHOLOMAEI:  I'm sorry.

5    Q        Representatives, I misspoke?

6    A        With respect to the training of the

7    representatives and customers I was speaking

8    about, it wasn't necessarily customers that were

9    on the AP Arrangement.  It was customers that were

10   inquiring as to their eligibility, mostly their

11   eligibility for the AP Arrangement, not customers

12   who already operated on the AP Arrangement.

13   Q        Was any further training provided to

14   representatives at that time to help answer the

15   customer's questions?

16   A        I'm not exactly sure about the date,

17   but this was a time where, I believe it's in the

18   documents, where a brochure was created that

19   discussed the Accelerated Payment Arrangement to

20   be used by the representatives as well as to be

21   able to be given by the customers.  There was

22   another brochure that discussed dividends

23   generally and there was an area in that brochure

24   that discussed the Accelerated Payment

25   Arrangement.  There was something called Straight

7

WILHELMENIA TAYLOR

1

2    Talk About AP that was provided to

3    representatives.

4         Q     During what time period was this?

5         A     I'm not exactly sure about the time

6    period.  If we look at the documents I can show

7    you what they were.

8         Q     Was that in the '90s?

9         A     I believe it was the '90s, I can't

10   exactly be sure.

11        Q     When you were just talking about

12   feedback, you said feedback came in and questions

13   came in.  What does that exactly mean it came in?

14   Where did they come to?

15        A     We had 1-800 numbers at Met.

16   Customers would call the 1-800 number and ask

17   questions.  Representatives could call what they

18   then described as their head office, the

19   administrative that did the work that had to be

20   done on the policies.  Those were the typical ways

21   inquiries would come.

22        Q     How did that information come to you?

23        A     I was part of a group that was

24   working on the continued mechanization of the

25   accelerated paid process.

8

WILHELMENIA TAYLOR

1

2      Q      This is getting back to my first

3   question when I asked you if any type of study was

4   done.  Maybe a better question would have been why

5   was this information gathered?

6      A      Well, the information, if information

7   came about, it really wasn't gathered.  Maybe you

8   would have a group of people on how to mechanize

9   the process.

10             During those discussions if you are

11   designing a form or you are creating letters,

12   people will give their, would give information on

13   what they found or experienced during that time

14   with customers or the reps.

15      Q      For example, if policyholders call on

16   the 800 number, has a question about their

17   Accelerated Payment Plan, how did that information

18   eventually get to you?

19      A      Members of the customer service unit

20   was part of the group that was working on AP

21   mechanization.  During our discussions on how we

22   should either design or redesign letters or

23   communications, discussions came up about what if

24   customers were telling the customer service reps.

25      Q      Is this something that was recorded

```
 1                WILHELMENIA TAYLOR              9

 2   as far as every time someone would call with an AP

 3   question, someone would keep a log and say, okay,

 4   I have an AP question, or this person didn't

 5   understand their AP might change; things like

 6   that?

 7        A     I don't remember any log.

 8        Q     How was the information, I used the

 9   word "gathered" before, I don't quite understand.

10          I'm sure questions, I'm sure

11   questions come in of all different varieties on

12   the 800 number.  By whatever means people are

13   calling in from.  Just society in general.

14          How is the group of AP information

15   tabulated or gathered?

16          MS. TAYLOR:  Objection as to form.

17        A     Again I don't believe it was

18   tabulated and I really can't speak to how the

19   customer service reps were able to bring the

20   information to the table when they were, I should

21   say I'm not sure how the customer service reps

22   were providing this information to the folks that

23   were on the mechanization group, but that group

24   did discuss feedback they got from the customer

25   service reps.
```

10

WILHELMENIA TAYLOR

1

2    Q    Talking about Account Representatives

3  now.  What was it the Account Representatives did

4  not have a clear understanding of with respect to

5  the Accelerated Payment Plan?

6         MS. TAYLOR:  Objection as to form.

7    A    As I said before, the calls in that

8  particular document which basically talked about

9  mostly new representatives who didn't know how the

10 Accelerated Payment process worked at Met.  It was

11 a detailed process about the type of forms we had

12 to deplete.

13        Sometimes they weren't privy to the

14 illustration or knew what the customer was told in

15 the first place because they didn't make the sale

16 and now they were servicing the customer's request

17 and they wanted information on how to process that

18 request at Metropolitan Life.

19   Q    With respect to policyholders, what

20 was it this study found that policyholders did not

21 understand about the Accelerated Payment Plan?

22        MS. TAYLOR:  Objection as to form.

23     The witness couldn't know as to the

24     understanding of the policyholder.

25        MR. BARTHOLOMAEI:  I said what did

11

1          WILHELMENIA TAYLOR

2          the study find?

3              MS. TAYLOR:   The study couldn't find

4          anything either.   I don't think she

5          testified there was a study.

6              MR. BARTHOLOMAEI:   I'm referring to

7          Exhibit 1, the proposed strategy for the

8          Accelerated Payment Plan.

9          Q     The question was, what was it this

10         document found that policyholders did not have an

11         understanding of with respect to the Accelerated

12         Payment Plan?

13             MS. TAYLOR:   Objection as to form.

14         A     It's my recollection the members from

15         the customer service unit told a group that

16         customers were using the term "paid-up" when they

17         were calling to Request the Accelerated Payment

18         Arrangement.   They seemed to be confused that the

19         policy was paid-up versus being on the Accelerated

20         Payment Arrangement.

21         Q     What does paid-up mean?

22         A     Paid-up means there are no more

23         premiums required on the policy regardless if it's

24         out-of-pocket, paid by the funds in the policy.

25         There is no premiums required to keep the policy

```
                                                    12
 1                  WILHELMENIA TAYLOR

 2   in force.

 3        Q      Was any investigation done as to if

 4   customers had the belief as to their policies

 5   being paid-up?

 6               MS. TAYLOR:  Objection as to form.

 7        A    I don't believe there was an

 8   investigation.

 9        Q      What was Metropolitan Life's

10   understanding of why customers were coming to form

11   the belief their policies were paid-up?

12               MS. TAYLOR:  Objection as to form.

13        A      I don't know what Met's belief was.

14   We were just dealing with the information we were

15   having.  Customers were using the term "paid-up"

16   in their request for the Accelerated Payment

17   Arrangement, but I don't believe Metropolitan Life

18   had a belief.

19        Q      Was any investigation done to

20   determine what information was being given to

21   policyholders or proposed insureds at the time of

22   sale that would lead them to believe their

23   policies would eventually become paid-up?

24               MS. TAYLOR:  Objection as to form.  I

25          just want to clarify that Ms. Taylor would
```

13

WILHELMENIA TAYLOR

1

2      not, for instance, know about necessarily

3      any kind of investigation or audit that was

4      done because she's not in the Auditing

5      Department and there could have been

6      something separate from the natural work

7      team that's in documents that she's unaware

8      of.

9               She can answer to the best of her

10     recollection.

11     A      I don't know about an investigation

12     being done.

13     Q      Let's talk about in this document.

14     On page three again there is a Solution section,

15     says:

16               "We need to better educate customers

17     and Account Representatives about the APP

18     concept."

19               Do you see that?

20     A      Yes.

21     Q      How was it determined that customers

22     needed to be educated about the APP concept?

23     A      Again it's going back to the

24     information that was coming from the members who

25     represented the customer service unit on the team

14

WILHELMENIA TAYLOR

1
2  and they were telling us that customers were using

3  the terms "paid-up" and so that we clearly

4  understood there had to be some confusion there

5  because the policies weren't paid-up and we wanted

6  to make sure the customers knew that in their

7  discussions with the customer service unit or at

8  any time during the process when AP was discussed.

9       Q      Were the customer service

10 representatives trained in any certain way to

11 address questions which policyholders had with

12 respect to the Accelerated Payment Plan?

13            MS. TAYLOR:   Objection as to form.

14       Lack of foundation.

15       A      Again I don't know about the training

16 that the customer service reps had, but I do know

17 we received a feedback from members on the team

18 that basically said they were answering the

19 questions, but I don't know about the training.

20       Q      What was the proposed method by which

21 customers should be educated about the Accelerated

22 Payment Plan?

23            MS. TAYLOR:   During what time period?

24       Q      Talking about this 1992, '93 time

25 period?

15

1                        WILHELMENIA TAYLOR

2        A      With respect to this proposal we are

3    reading now, it included a discussion about a

4    consumer brochure that could be given to customers

5    that discussed the Accelerated Payment

6    Arrangement, that could be given to the prospects

7    either at the point of sale or any other time they

8    had questions.

9        Q      What about policyholders who had

10   already been sold policies?

11       A      That consumer brochure could be given

12   to either customer, either if AP was being

13   discussed during the sales process or customers

14   who were already on the Accelerated Payment

15   Arrangement.

16       Q      Is that something that was done?

17       A      It's my understanding there was a

18   brochure created that discussed AP.

19       Q      Is that the Straight Talk on AP?

20       A      It was a brochure called the

21   Accelerated Payment Arrangement.  That was the

22   more customer-oriented brochure that could be used

23   by the reps as well as the customers, either

24   customers on AP or during the point of sale.

25       Q      Is that brochure something that was

16

WILHELMENIA TAYLOR

1
2   mailed to customers who had already been sold

3   policies using the accelerated plan illustrations?

4        A    I don't believe that was mailed to

5   customers on a corporate-wide basis. Surely

6   representatives had the opportunity to mail that

7   brochure to their customers or deliver it to them.

8        Q    Is that something they were required

9   to do?

10       A    I don't believe they were required to

11   do it, no.

12       Q    What was the reason why those

13   brochures weren't mailed to all customers who had

14   previously been sold a policy using an Accelerated

15   Payment Plan illustration?

16       A    One, I don't believe the customer

17   knew every customer that was shown the Accelerated

18   Payment Arrangement illustration at the point of

19   sale.

20       Q    Say that again?

21       A    The company didn't know all customers

22   that were shown Accelerated Payment Arrangement

23   illustration at the point of sale.

24       Q    What about the known customers? What

25   was the reason why brochures of that type weren't

17

WILHELMENIA TAYLOR

1

2    mailed to the known customers who the company did

3    know had been sold the policy using an Accelerated

4    Payment Plan illustration?

5        A    It's my recollection --

6            MS. TAYLOR:  I'm sorry.  Objection as

7        to form.  I think you are misstating facts.

8        There was I believe another brochure sent

9        to people on AP.

10       A    There was another brochure sent to

11   customers.  It was called I believe the ABC's of

12   Dividends.  In that ABC's of Dividends, it also

13   discussed the Accelerated Payment Arrangement and

14   that was mailed to customers.

15       Q    To all customers?

16       A    Not to all customers, no.

17       Q    Who was it mailed to?

18       A    I don't remember exactly the

19   population of the customers.  I knew it was mailed

20   to customers where the Accelerated Payment

21   Arrangement may or may not be used.  I think there

22   is a document in there that talked about exactly

23   who was the audience for the brochure.  I don't

24   remember who the audience was.

25       Q    What was the name of that brochure?

18

WILHELMENIA TAYLOR

1

2      A      I believe it was called the ABC's of

3   Dividends.

4      Q      What year was that produced?

5      A      I can't recall, but there is a

6   document that talks about when it was produced and

7   distributed.

8      Q      Is that something you can identify, a

9   document?

10     A      If you showed it to me, I could say

11   that's it.

12            MS. TAYLOR:   I think it might have

13            been in the materials that you identified

14            in that list, in the 150 something

15            documents.

16     Q      Getting back to this page, page three

17   of the proposed strategy.  What was the proposed

18   strategy to educate Account Representatives as to

19   the Accelerated Payment Plan or arrangement?

20     A      It's my recollection that there was a

21   training piece or, how could I describe it,

22   something called I believe Straight Talk about AP.

23            That was distributed to the field as

24   well as the accelerated customers brochure we

25   spoke about a few minutes ago.

19

1        WILHELMENIA TAYLOR

2            The way the brochure was constructed,

3    I believe it was a question and answer series and

4    provided information to any reader, whether a

5    customer prospect or other rep.

6            In addition to that, the Straight

7    Talk about AP was also distributed to the field.

8            MS. TAYLOR:   I wanted to mention

9            we're going to designate the transcript,

10           from the deposition taken on September 26,

11           as confidential, pursuant to the Protective

12           Order and also designating this transcript

13           as confidential pursuant to the Protective

14           Order and Ms. Taylor will read and sign all

15           of the transcripts.

16       Q      Were Account Representatives

17    instructed to go and visit their clients and

18    explain any particular aspect of the Accelerated

19    Payment Plan to them?

20           MR. LABOVITZ:   Excuse me, what time

21           frame are you referring to?

22           MR. BARTHOLOMAEI:   The same time

23           frame.   Sometime in 1992 or '93.

24           MS. TAYLOR:   What was the question?

25       Q      Whether Account Representatives were

WILHELMENIA TAYLOR

1

2    instructed to go out and visit their customers and

3    explain any aspect of the Accelerated Payment Plan

4    to them?

5        A    It's my recollection that when

6    changes in the dividend scales were announced,

7    that representatives were encouraged to discuss

8    the impact of dividends on their customers.

9    Accelerated Payment customers would definitely

10    fall in that category.

11        Q    How were they encouraged to do that?

12        A    I believe the release to the field

13    basically discussing the dividend change said, I

14    don't remember the exact words, encouraged them to

15    discuss the impact of dividends on their

16    policyholders policies.

17        Q    Is that something that's referred to

18    the Accelerated Payment Plan specifically?

19        A    I don't really recall, but it may

20    have.  If we looked at the releases, I can tell

21    you if it said it or not.

22        Q    The document we are looking at refers

23    to:

24            "Training guide to be used by Branch

25    Managers and District Sales Managers to use in

21

WILHELMENIA TAYLOR

1

2    educating newly hired reps about the APP process."

3            Is that something actually produced

4    or created.

5        A    It's my recollection that the

6    Straight Talk about AP was the vehicle that was

7    used to, the Straight Talk about AP as well as the

8    consumer brochure, I believe those were the items

9    that were used to provide a representative with

10   more information about AP.  I don't believe it had

11   the words "training manual" on it.  I believe it

12   was those items.  That's what I recollect.

13       Q    On the same page, on page three in

14   the second paragraph under the Solution section.

15   The third sentence says:

16            "We should also consider

17   discontinuing the word "none" in the premium

18   outlay column on the illustration because it

19   fosters the idea the policy is paid-up."

20            Do you see that?

21       A    Yes.

22       Q    How is that determined that was

23   something that could be a solution to the problem

24   which is identified in the problem number one

25   section?

22

1                    WILHELMENIA TAYLOR

2              MS. TAYLOR:  Objection as to form.

3         A    From what I can remember, it wasn't

4   necessarily that it was.  It wasn't a

5   determination.  It was more of an opinion.

6              The illustration was being looked at

7   more or less under a microscope to basically say

8   we're hearing from the customer service reps that

9   customers are using the words "paid-up"

10             If you take a look at the

11  illustration piece by piece and if you looked at

12  it in its entirety, there should be no confusion.

13  But if you looked at it and looked at the words

14  "none," perhaps that's some of the reasons why the

15  customers are using the words "paid-up".

16             In order to try to eliminate that

17  mind set and make sure that it was clear to

18  customers that the policies weren't paid-up, it

19  was an opinion that perhaps if we did not include

20  the words "none" that the customers would be

21  looking at the illustration in a more totality

22  with a proper disclosure with respect to the

23  premium outlay rather than just the words "none".

24             We looked at every piece of the

25  illustration of the disclosure language, we looked

23

WILHELMENIA TAYLOR

1

2      at the premium at the lay column and said, okay,

3      perhaps that's why they are doing it, they are

4      looking at the premium outlay and not looking at

5      the disclosure language on the bottom.

6          Q      I'm not quite sure I understand.

7      What was it about the word "none" that came to

8      lead you to believe that customers were forming a

9      belief that the policies were paid-up?

10          A      The only way I can describe it, I

11      looked at the illustration, a group of us, the AP

12      natural work team, myself included.

13                When we looked at the illustration as

14      a whole, there appeared to us there should be no

15      confusion as to how the Accelerated Payment

16      arrangements work if the policy wasn't paid-up.

17      Since we were hearing fed-up customers were

18      calling up and using the term "paid-up," we

19      started looking at each piece of the illustration

20      and said perhaps this word might be causing some

21      confusion.

22          Q      Was there a proposed alternative of

23      using the word "none"?

24          A      No.  It was just an observation and

25      there was no alternative to "none".  It was just

24

WILHELMENIA TAYLOR

1

2      an observation.

3          Q      It says here the word "none" fosters

4      the idea that the policy is paid-up.  Right?

5          A      Yes, that's what it says.

6          Q      How is it determined that the word

7      "none" fostered the idea the policy is paid-up?

8                 MS. TAYLOR:  Objection as to form.

9                 Asked and answered.

10         A      Again, if you looked at the

11     illustration in its entirety, there should have

12     been no confusion, at least the group didn't

13     belief there should be any confusion as to the how

14     the Accelerated Payment Arrangement work.

15                If you took that out of context and

16     just looked at the word, you might believe there

17     were no premiums due on the policy.

18         Q      When you say when the natural work

19     team was looking at the illustration, you thought

20     there should be no confusion about the

21     illustration, who were the members of the natural

22     work team?  We may have gone over this before.  Is

23     that something you can identify now?

24         A      There is a document, several

25     documents in there that listed the natural work

```
 1                    WILHELMENIA TAYLOR              25
 2   team with names.
 3          From what I can remember, there were
 4   members from the administrative section which
 5   would handle the actual request; customer service
 6   folks; people from communications; marketing.
 7   That kind of a group.  But I don't remember the
 8   exact names of all the individuals.
 9          Q     How were the people chosen for the
10   natural work team?
11          A     I don't know how the people were
12   chosen.  I just know my boss told me I would be on
13   the natural work team.
14          Q     What was the degree of familiarity
15   with the Accelerated Payment Plan of the members
16   of the natural work team?
17          MS. TAYLOR:  Objection as to form.
18          A     I don't know what degree they had,
19   the familiarity.
20          The members of the work team, like I
21   said, customer service people who processed the
22   actual request for AP, people in communications
23   who may not even have been involved in the
24   original communication but they were just people
25   familiar with writing communications, and myself.
```

26

WILHELMENIA TAYLOR

1
2       So I don't know what degree they had of
3       involvement.
4               Q       Were people generally experienced
5       with the workings of the Accelerated Payment Plan?
6                       MS. TAYLOR:   Objection.
7               A       Some were and some weren't.
8               Q       Anyone on the actuarial department on
9       the natural work team?
10              A       Not that I can remember.
11              Q       Look at the next page, page four.
12      What I want to know, there is a variety of
13      solutions, again detailed on the bottom in
14      response to the problem #2, which says:
15                      "Policyholders Who Fail Eligibility
16      Testing Must Pay the Entire Premium
17      Out-Of-Pocket".
18                      The question is, which, if any, of
19      these solutions were actually implemented to solve
20      what's identified as problem #2?
21              A       Any particular time frame?
22              Q       Again I'm asking after the creation
23      of this document, the date of it is November 18,
24      1993?
25              A       I believe that there came a time, I

27

WILHELMENIA TAYLOR

1
2    believe it's in the documents, that there was

3    alternatives offered to the customer.    I'm not

4    sure about number, the D, I'm not sure about D.

5    The other ones sound familiar.

6         Q      A, B and C?

7         A      Yeah.

8         Q      Anything other than what's listed on

9    this document that was either implemented or

10   proposed to address what I just identified as

11   problem #2?

12        A      There was a long list of, there were

13   several options.   If you show me -- there was a

14   document in there, pretty large document I believe

15   that talks about alternatives, payment options for

16   the Accelerated Payment Arrangement.   I'm not sure

17   if they match up one-to-one.   We can go over them.

18   I think they're in the pile.

19        Q      Let's look at the next page.   This is

20   something I asked you about when we started the

21   deposition, whether there was a tracking system

22   for Accelerated Payment Plan policies.

23            I believe this section refers to a

24   proposal that it should be somehow indicated on

25   the application whether a policy was being sold

28

1          WILHELMENIA TAYLOR

2   using the Accelerated Payment Plan illustration;

3   is that right?

4              MS. TAYLOR:   Objection as to the term

5          "Accelerated Payment Plan" policies.

6          Q   Do you see that under Solutions,

7          A   Right.   I just want to make sure, in

8   the original part of your question you mentioned

9   the word whether it was illustrated.   The concept

10  would have been used without using an

11  illustration, just discussing.

12             Could you repeat the question again?

13         Q   Was such a tracking system ever

14  implemented?

15         A   Not that I am aware of.

16         Q   What was the reason why a tracking

17  system was not implemented?

18         A   I don't know the reason why either.

19         Q   Did you receive any feedback as to

20  your solutions in this proposed strategy?   I'm

21  talking about the document in general now.

22         A   It's my recollection that, as part of

23  the natural work team, what we began doing was

24  focusing on the communications aspect, the ABC's

25  of Dividends, the Accelerated Payment brochure,

29

WILHELMENIA TAYLOR

1

2  customer letters, but I don't remember getting

3  like a response back on the memo that said, forge

4  ahead, go ahead and do this, don't do that.

5          I don't remember getting something

6  like that.

7      Q      Was this followed up on the

8  suggestion that there be a tracking system?

9      A      In my review of the documents in

10  preparation for the deposition, I believe there is

11  documents in there that discussed that, but I

12  don't remember receiving that during the time

13  frame this document was released.

14      Q      Could you look at page six, please,

15  Section 1.  It says Proposed Action.

16          "As mentioned earlier, we need to

17  improve disclosure information on APP

18  illustrations."

19          What disclosure information is that

20  referring to?

21      A      This document is discussing a cover

22  page and I'm reading the wording that's in this

23  memo, but I really -- I'm having a hard time

24  reading through these letters.  Sorry.

25          MS. TAYLOR:  What page are you

30

WILHELMENIA TAYLOR

1          reading from?

2                  MR. BARTHOLOMAEI:  Page six, Section

3          1, Proposed Action number 1.

4                  MS. TAYLOR:  Okay.

5          A      It appears that we were talking about

6   adding a new, adding a new page that would include

7   the wording that's listed here on Proposed Action

8   number 1.

9          Q      That's the CLU wording?

10         A      I don't even remember what that is

11  now.

12         Q      Why was it suggested that this

13  wording be added to the Metropolitan Life APP

14  illustrations?

15         A      I believe, trying to remember back, I

16  think that the group thought that it would just

17  enhance what was already there.

18                 MS. TAYLOR:  Do you want me to have

19                 someone blow that up?  Can we take a break.

20                 She is refreshing her recollection with a

21                 document that the print is small.  I'm

22                 going to have it blown up.

23                     (RECESS TAKEN) (AFTER RECESS)

24                 MS. TAYLOR:  Is that any better?

31

WILHELMENIA TAYLOR

1

2          THE WITNESS:  Yes.

3          (RECORD IS READ)

4          A        It's my recollection that the APP

5    natural work team believed that based on the,

6    based on what we were hearing from the customer

7    folks that were on the team, we could further

8    explain the APP Arrangement on the illustration by

9    adding some additional wording.

10                    It's my recollection that what's

11   included here on this document is suggestions that

12   would further explain how the arrangement worked

13   for the customer, for purposes of including it for

14   a customer to read on the illustration.    That's my

15   recollection.

16         Q        What was the basis for the

17   determination that this particular information

18   should be added to the Metropolitan Life APP

19   illustrations?

20                    MS. TAYLOR:   Objection as to form.

21            Asked and answered.

22         A        Again it's my recollection based on

23   what we were hearing from members of the natural

24   work team with respect to what customers were

25   saying to them that if we enhanced what was on the

32

WILHELMENIA TAYLOR

1

2    illustration, it might further explain the APP

3    arrangements to the customer on the illustration

4    itself.

5          Q    Is that something that was done?

6          A    I believe this was done.  I'm not

7    sure about each piece of it, but it's my

8    recollection that all, some, if not all of this

9    suggestion was implemented.

10         Q    This information was added to the

11   illustration?

12              MS. TAYLOR:  Objection as to form.

13         A    I believe so.

14         Q    What was the effect of the addition

15   of this information to APP illustrations?

16              MS. TAYLOR:  Objection as to form.

17         A    I don't know.

18         Q    Was there any change in the

19   information that customers were giving to customer

20   service representatives after the change of

21   information on the APP illustrations?

22         A    I believe this change took place

23   after my involvement in the AP process and

24   although I believe this change was made, I don't

25   know about the impact it had on what customers

33

WILHELMENIA TAYLOR

1

2   were saying.  I didn't see any documents that said

3   we had any information from the feedback from

4   customer service people.

5       Q    When you said your involvement in the

6   AP process ended, when was that?

7       A    I believe probably late 1994, early

8   1995.

9       Q    What happened at that time?

10      A    I left the department then, was

11  involved in the process end.  Basically assigned

12  other duties.

13      Q    Probably something I should have

14  asked you earlier.

15           Maybe at this time you can describe

16  your general background with respect to the

17  Accelerated Payment Plan or what you did at

18  Metropolitan Life that involved that?

19      A    I was a part of a group that was put

20  together I believe in late 1987, early 1988 to

21  mechanize the AP eligibility once a customer

22  requested it.

23           And I continued to stay involved in

24  the whole mechanization of the whole AP process at

25  Metropolitan Life until 1994 or so, early 1995.

34

WILHELMENIA TAYLOR

1

2  That process is documented in all the documents in

3  the reading I did before, preparing for this

4  deposition.

5      That's basically my involvement.

6      Q    What does mechanization mean?

7.     A    As I used the term, it was a way of

8  determining if a policy was eligible to actually

9  use the Accelerated Payment Arrangement, what type

10 of communications would be sent to customers who

11 requested it who were operating on the

12 arrangement.  That whole process of producing

13 letters, statements, testing for eligibility.

14 That's what I call mechanization, where someone is

15 not handling it on a case by one case,

16 case-by-case basis.

17      Q    This proposed strategy document,

18 Exhibit 1, seems it goes a little bit further than

19 what you were talking before now.  Was that the

20 extent of your involvement, this mechanization

21 process, or were there other things you were

22 involved with?

23      A    As being part of the natural work

24 team, the natural work team, its involvement

25 included the mechanization, the communications.

35

WILHELMENIA TAYLOR

1  
2  And as a result of having all those different

3  aspects of APP working together.  That's how it

4  kind of relates to this document.

5       Q     Do you have any actuarial background

6  at all?

7       A     No.

8       Q     Let me move onto another document

9  here.

10                 (Letter, December 7, 1992, Rayl

11  to Tom LaBadia is received and marked Taylor 2 for

12  identification).

13       Q     What I have just marked as Taylor

14  Exhibit 2 is a December 7, 1992 letter from Jim

15  Rayl to Tom LaBadia.  The Bates number is MP

16  4011071038.

17             Ms. Taylor, if you could just take a

18  minute and look through this, I'm going to ask you

19  a few questions about it.

20             First of all, have you seen this

21  letter before?

22       A     Yes.  In preparation for the

23  deposition, yes.

24       Q     Do you know who Mr. Rayl is?

25       A     I know he was someone that worked in

36

WILHELMENIA TAYLOR

1

2     the Tulsa head office.  That's basically it.

3          Q     What about Mr. LaBadia, who is he?

4          A     My recollection was that Tom LaBadia

5     was heavily involved in the systems, electronic

6     processing -- IT stuff as we call it today -- back

7     then.

8          Q     The first paragraph of this letter,

9     Mr. Rayl I guess referring to a previous

10    correspondence where he says:

11              "I indicated that our Account

12    Representatives usually referred to the policy as

13    being paid-up once the AP took over."

14              The question I have, is that

15    something that was determined by Metropolitan Life

16    through any type of investigation, that Account

17    Representatives have referred to policies as being

18    paid-up once the Accelerated Payment Plan took

19    over?

20              MR. BARTHOLOMAEI:  Objection as to

21         form.  Lack of foundation.

22              MR. LABOVITZ:  Is there another Bates

23         range?  That does not appear in your list

24         of depo topics and we are looking for that

25         particular document.

37

WILHELMENIA TAYLOR

1

2      MR. BARTHOLOMAEI:  It's possible it's

3      not on the list.  I brought copies of this

4      document with me here today for that

5      reason.

6      MR. LABOVITZ:  Okay.

7      A      I don't know anything about an

8  investigation of this type.

9      Q      Was any feedback received from

10  customers like you described earlier, people who

11  called the 800 number, by whatever means it was

12  that Account Representatives have been telling

13  them their policy was paid-up, quote/unquote, when

14  the Accelerated Payment Plan took over?

15      A      The feedback I recall getting

16  especially on the AP natural work team was that

17  customers were using this term when describing

18  their request to be on AP.  I didn't hear about

19  representatives using this term.

20      Q      When you say customers were using the

21  term "paid-up", was any inquiry made from the

22  customers as to where they were getting that term

23  from?

24      A      I don't know.  I don't know what the

25  customer service reps actually asked them.  I know

38

WILHELMENIA TAYLOR

1

2    in our meetings they explained to them the policy

3    wasn't paid-up if they were asking for the

4    Accelerated Payment Arrangement.

5                Certain customers when called up

6    asked about that.  When they were talking about

7    the Accelerated Payment Arrangement, customer

8    service reps explained how that arrangement worked

9    rather than paid-up.

10        Q     The term "paid-up", is that a term

11   used at Metropolitan Life?

12        A     It's a term they use in the entire

13   insurance industry.  There are policies that can

14   become paid-up.

15        Q     What does paid-up mean?

16             MS. TAYLOR:  Objection as to form.

17        Asked and answered.

18        A     Paid-up means there are no premiums

19   due on the policy.  The policy does not have any

20   premiums that must be paid because there are no

21   premiums due.

22        Q     On the Accelerated Payment Plan

23   illustration we talked about earlier there is a

24   column that says "none" as far as the premium

25   outlay column.  Is that "none" referring to the

39

1                    WILHELMENIA TAYLOR

2    fact at that point in premiums are due?

3         A    No.

4         Q    What does that refer to?

5         A    That's referring to the fact, with

6    respect to monies being paid out-of-pocket by the

7    customer, if dividends are sufficient, the

8    customer does not have to have a premium outlay

9    out-of-pocket.  Premiums are paid in another

10   fashion using the dividends.

11        Q    In those brochures we talked about

12   earlier, was it discussed that Account

13   Representatives should not use the term "paid-up",

14   rather when providing information to customers

15   with respect to their Accelerated Payment Plan

16   illustration?

17             MS. TAYLOR:  Do you have the

18        documents?  I think it would be helpful if

19        you showed them to her.

20             MR. BARTHOLOMAEI:  I don't think I

21        do.

22             MS. TAYLOR:  They were in the

23        documents you identified, the Straight Talk

24        and also the brochure.  She can give her

25        best recollection, but they are long

40

WILHELMENIA TAYLOR

1

2      documents.

3          A      It is my recollection that I believe

4      the brochures included wording as you described,

5      as well as the instructions to the field on how to

6      process an AP request, that it instructed the reps

7      not to use the word "paid-up".  That dated back I.

8      think in '80 sometime, not to use the word

9      "paid-up".

10         Q      Were representatives questioned as to

11     whether they were using the term "paid-up"?

12             MS. TAYLOR:  During what time period?

13             MR. BARTHOLOMAEI:  After the time

14     period --

15         Q      The time period I'm most concerned

16     about, what I want to know about is from late 1992

17     in through 1993 when these documents were

18     generated.  The date of this one is December 7,

19     1992.  The one we are looking at right now.

20             MS. TAYLOR:  I want to note that Ms.

21     Taylor is not in the customer complaint

22     area.  There could have been customer

23     complaints and conversations with reps that

24     she would not necessarily be privy to and I

25     don't think she would have knowledge as to

41

WILHELMENIA TAYLOR

1

2     whether anyone in the entire company ever

3     questioned a rep.  She can give her best

4     answer to that question.

5          MR. BARTHOLOMAEI:  I understand that.

6     I really want to know about Metropolitan

7     Life policy or procedure.

8          Q     Whether they, being the company, at

9     some point either sent out a questionnaire or did

10    some type of investigation or had some

11    communications with their representatives as to

12    whether they were using the term "paid-up" at the

13    point of sale in connection with an Accelerated

14    Payment Plan?

15         A     I don't have any information.  I

16    don't know, I don't recall, reading the documents

17    before coming to this deposition, that that would

18    occur, but as far as a questionnaire, information

19    was included in documents sent out to reps like

20    the brochure, the Straight Talk, the ABC's of

21    Dividends that spoke to that issue regardless of

22    whether we knew the rep was using it or not.

23              It was basically told to any rep they

24    should not be using, using these vehicles.  They

25    should not be using that term.

42

WILHELMENIA TAYLOR

1

2      Q      Besides the brochures we talked

3  about, were policyholders contacted in any way on

4  an individual basis to give them information about

5  their policy, the policy that had been sold using

6  an APP?

7              MS. TAYLOR:  Objection as to form,

8         lack of foundation.  I don't know she would

9         know about specific sales reps.

10             MR. BARTHOLOMAEI:  I'm asking about a

11        policy that the company instituted.

12     Q      Some type of directive or policy

13 where policyholders were to be contacted on an

14 individual basis besides sending a mass mailing of

15 brochures, all reps have to go and contact known

16 policyholders where the policy had originally been

17 sold using the Accelerated Payment Plan?

18     A      I don't believe the company told reps

19 they must contact policyholders sold using the AP

20 concept, but it was recommended that reps discuss

21 the AP Arrangement with their customers.

22     Q      When was that?

23     A      I believe probably, maybe arranged

24 1992 or so, 1993.  I'm not sure exactly what the

25 dates were.

43

WILHELMENIA TAYLOR

1

2        From what I can recall, from when the

3   first dividend deduction occurred, the company

4   suggested the reps contact their customers where

5   Accelerated Payment Arrangement might be something

6   the customer, the sale may have involved the use

7   of the Accelerated Payment Arrangement discussed

8   during the sale.

9        Q    Why was it suggested they contact the

10  customers and not require the sales

11  representatives contact these people?

12       A    My recollection being involved in AP

13  at that time was that one year's dividend scale

14  reduction may not necessarily mean that it would

15  have a negative impact on the AP eligibility year,

16  but that it may.  I believe that was the first

17  year that dividends were reduced at Metropolitan

18  Life.

19        It was something that the company

20  thought should be discussed with the policyholders

21  because it may have an impact on customers that

22  were sold with the AP Arrangement.

23        It wasn't definite, but suggested

24  that reps talk to their customers about it since

25  it was the first year that dividends were reduced.

44

WILHELMENIA TAYLOR

1

2      Q      At some point did it become definite?

3      A      What?

4      Q      You said it wasn't definite, I assume

5   you are referring to the policies would be

6   affected in any way because of one year's dividend

7   reduction; is that right?  Is that what you are

8   referring to?

9      A      What I'm referring is that the

10  dividend scale reduction that took place in 1992

11  may or may not have had an effect on the AP

12  eligibility year for an individual customer.

13              So at that time, since dividends are

14  used in the payment of premiums on the AP

15  Arrangement, it was suggested that the

16  representatives who had customers that were sold

17  on the AP Arrangement discuss the dividend scale

18  reduction with their customers when they were

19  notified of the change.

20      Q      The next question I wanted to ask, at

21  some point did it become definite the policy you

22  just described would be affected by what was going

23  on with the dividend scale at Metropolitan Life?

24              MS. TAYLOR:  Objection as to form.  I

25          believe she addressed this at the last

WILHELMENIA TAYLOR                                          45

1

2    deposition and explained it depends on the

3    facts and circumstances, the issue date of

4    the policy, what activity -- I think we

5    went over this before.

6         MR. BARTHOLOMAEI:  I remember and I

7    reviewed the transcript.  This is the point

8    we ended on last time.  I believe the last

9    question of the deposition was whether the

10   dividend scale ever went back up after 1992

11   in Metropolitan Life.

12   Q    I believe you said it had not?

13   A    I believe that's correct.

14        MS. TAYLOR:  Went back up from what

15   year, though?

16        MR. BARTHOLOMAEI:  Prior to 1992.

17        MS. TAYLOR:  Whether there is an

18   increase or decrease, you have to say

19   specifically.  You are saying did the scale

20   in effect in 1992, did it ever go above

21   that?

22        MR. BARTHOLOMAEI:  I understand what

23   you are saying.

24   Q    That Metropolitan Life never

25   increased its dividend scale after 1992?  Is that

CITTONE REPORTERS
(212)286-9222

46

1                    WILHELMENIA TAYLOR

2  right?

3          A       I believe that's correct.

4          Q       At some point did it become definite

5  that all policies sold prior to 1992 would not

6  perform as illustrated where an APP illustration

7  was used at the point of sale?

8                  MR. LABOVITZ:  Object to the form.

9          A       I don't believe it became definite,

10  no.  I'm not an actuarial, I don't believe it

11  became definite all policies sold prior to 1992

12  would not perform.

13         Q       Were there any policies sold prior to

14  1992, the type of policy we've been talking about,

15  that would perform as illustrated?

16                 MS. TAYLOR:  Objection as to form.

17         A       As illustrated you are saying?

18         Q       Right.

19         A       To the best of my recollection, yes.

20         Q       How is that possible?

21         A       The best example that I can give you

22  is if a policy was illustrated, let's say in the

23  early 1980s and the then current dividend scale

24  was used in the illustration and depending on what

25  the customer, if the customer did nothing else,

47

WILHELMENIA TAYLOR

1   those policies should be eligible for AP.

3       Q       You are saying because, and I believe
4   we talked about this last time too briefly before
5   the deposition ended, in the '80s the dividend
6   scale went up for a while.

7               I guess what you are referring to,
8   since 1992, if the amount the dividend scale
9   dropped equaled the amount it had gone up since
10  they brought their policy along with other
11  variables, it's possible the policy could perform
12  as illustrated or are you referring to something
13  else?

14      A       I'm not exactly sure what you said.

15              Basically what I'm saying is if a
16  policy was illustrated in a year other than 1992,
17  which was your question and the example I gave was
18  somewhere in the '80s, those policies could
19  perform and because it's my recollection that the
20  dividend scale went down for the first time in
21  1992, the dividend scale at the time those
22  illustrations were created was used when they
23  created the illustrations, those policies should
24  perform.

25      Q       How was it possible that a reduction

46

WILHELMENIA TAYLOR

1

2  in the dividend scale in 1992 would not affect

3  illustration of one of the policies you are

4  talking about?

5          MS. TAYLOR:  Objection as to form.

6      It calls for speculation.

7          I want to clarify something.  You are

8      talking about every number on the

9      illustration?

10         MR. BARTHOLOMAEI:  Perform as

11     illustrated.

12         MS. TAYLOR:  You are not just

13     talking --

14         MR. BARTHOLOMAEI:  About the AP year.

15         MS. TAYLOR:  Are you clear about

16     that?  He is talking about every possible

17     number.

18     Q     I'm talking performed as illustrated.

19  I don't see how it's possible, to put it in the

20  form of a question, is it possible if you

21  illustrated the policy in '93 and the dividend

22  scale goes up the next year, the policy will

23  perform as illustrated on the illustration?

24     A     I thought the questioning was

25  surrounding the AP year.  Sorry.