

49

WILHELMENIA TAYLOR

1

2        Q      As illustrated?

3            MS. TAYLOR:  Do you need an

4    illustration to answer the question?

5            THE WITNESS:  I'm not sure if I can

6    answer the question even with the

7    illustration.  My focus has always been on

8    the AP part of the illustration, the

9    premium outlay area.

10           I need the question restated again.

11           MS. TAYLOR:  I also don't want you to

12   speculate, Ms. Taylor.  We are going to be

13   producing a witness or witnesses regarding

14   illustration.  If you don't have the

15   specific knowledge of that component of

16   illustrations --

17           THE WITNESS:  I don't have that.

18           MR. BARTHOLOMAEI:  I'm asking about

19   Accelerated Payment Plan illustrations.  I

20   understand this may come up in a different

21   deposition as well.

22       Q    My question is, you may be able to

23   answer it, you may not be --

24       A    I'm clear now.

25       Q    Whether it is possible for a policy,

50

WILHELMENIA TAYLOR

1

2    like you said, sold sometime in the '80s, to

3    perform as illustrated once there is a reduction

4    in the dividend scale by Metropolitan Life?

5              MS. TAYLOR:  Objection to form.  I

6         think the term you are using, to perform as

7         illustrated, is ambiguous, I really do.  I

8         don't understand what that means.

9              MR. BARTHOLOMAEI:  I can define it.

10             MS. TAYLOR:  If you are asking if you

11        have one illustration there is a change in

12        the dividend scale up or down, if you

13        reillustrate during the following year,

14        doing an inforce illustration, will they be

15        identical?

16             MR. BARTHOLOMAEI:  My question is

17        whether what is given to policyholders at

18        the time of sale, an illustration, is going

19        to hold true, one, three years later they

20        can look at whatever year is being

21        illustrated and the number is accurate if

22        there is a change in the dividend scale.

23             THE WITNESS:  I can't say --

24        A    If the dividend scale goes up or down

25   and what is shown to a customer sometime after

51

WILHELMENIA TAYLOR

1

2  that illustration is prepared, can either be the

3  same or different; I really don't know.

4        Now that I understand your question

5  better.

6    Q    How was it possible it could be the

7  same?

8    A    How is it possible the illustration

9  can be the same?

10       MS. TAYLOR:  I think the question is

11  beyond just an AP eligibility issue.  He is

12  getting into every possible figure on that

13  illustration.  I don't know Ms. Taylor

14  would know about every specific detail of

15  the AP illustration.

16       THE WITNESS:  I basically told Mark

17  my focus was on the premium outlay area of

18  the illustration and how dividends may or

19  may not affect the year in which that

20  happened.

21       I'm getting a little bit confused.

22       MS. TAYLOR:  I think she can discuss

23  an AP illustration in terms of the impact.

24       MR. BARTHOLOMAEI:  I'll get to that.

25       MS. TAYLOR:  If you are getting into

52

1                    WILHELMENIA TAYLOR

2        all the other specific details of that

3        illustration that aren't focusing on the

4        accelerated, out-of-pocket cash outlay

5        aspect, I don't know she can answer that.

6              MR. BARTHOLOMAEI:  My clients were

7        given time, at the top it says Accelerated

8        Payment Plan illustration.  That's what I'm

9        asking about.  There is information given

10       on those documents that is relevant on this

11       deposition.

12             MS. TAYLOR:  Do you have an

13       illustration with you?  Maybe it would help

14       if you have one in front of her.

15             MR. BARTHOLOMAEI:  I don't want to

16       ask about specific cases either.

17             MS. TAYLOR:  At least if she had it

18       in front of her --

19             MR. BARTHOLOMAEI:  I think I

20       understand her answer and want to ask some

21       questions about the AP year and

22       illustrations as well.

23       Q     Maybe you can answer those a little

24   bit easier.

25             At some point after 1992, did it

53

WILHELMENIA TAYLOR

1    become -- I know I asked this question before.  I

2    just wanted a clear answer given what we talked

3    about.

4            At some point after 1992, did it

5    become impossible that the AP year would be the

6    same as any policy that had been sold prior to

7    1992 using an Accelerated Payment Plan

8    illustration?

9            MS. TAYLOR:  Objection as to form.

10   A    What did become impossible?

11   Q    The policy, the AP year remain the

12   same?

13           MS. TAYLOR:  Didn't she already

14   answer that in terms of giving examples,

15   there could be situations of policies sold

16   in the early '80s?

17           MR. BARTHOLOMAEI:  I'm talking about

18   up until today.

19           MS. TAYLOR:  I just want to remind

20   Ms. Taylor not to speculate.  There are so

21   many variables that go into that.

22           MR. BARTHOLOMAEI:  I agree.

23           MS. TAYLOR:  I don't know she has a

24   specific chart that tell us her every

54

1                WILHELMENIA TAYLOR

2         specific policy.

3              Q      Was there a determination made at

4    Metropolitan Life that all of the AP or all the

5    policies you sold prior to 1992 using AP

6    illustrations were not going to perform as

7    illustrated?

8                     MS. TAYLOR:   Objection as to form.

9              Q      With respect to the AP year?

10             A      I don't believe so.

11             Q      Do you know as of today what

12   percentage of policy are not going to perform with

13   respect to the AP year as illustrated prior to

14   1992?

15                    MS. TAYLOR:   Objection as to form.

16             Q      Do you know the amount of policies

17   that are not going to perform as illustrated with

18   respect to the AP year that were sold prior to

19   1992?

20             A      No.

21             Q      Was a study ever done to that effect

22   sometime after 1992 as to the amount of policies

23   that would not perform with respect to the AP year

24   as a result of the reduction, the dividend scale

25   at Metropolitan Life?

55

1                        WILHELMENIA TAYLOR

2          A     I believe in a review of the

3    documents preparing for the deposition there was a

4    document that discussed the number of policies

5    that may or may not be eligible for AP based on a

6    dividend scale reduction.  I'm not exactly sure

7    what year it was.  There was a document there.

8               MS. TAYLOR:  We'll get to that

9               eventually.

10         Q     Do you recall generally if there was

11   a percentage or number?

12         A     No, it was in the document, the

13   number.

14              MS. TAYLOR:  I think there may have

15              been more than one document, Mark, as I

16              recall.  A couple over time.

17              (Letter, December 17, 1992,

18   Kathy Schoos to LaBadia is received and marked

19   Taylor 3 for identification)

20              MR. BARTHOLOMAEI:  For the record,

21              what I have just marked as Taylor Exhibit 3

22              is a December 17, 1992 letter from Kathy

23              Schoos to Tom LaBadia.  The Bates number is

24              MP 4011070959.

25         Q     Ms. Taylor, is this something you

56

1                    WILHELMENIA TAYLOR

2    have seen before?

3              MR. LABOVITZ:  Is this another

4    document that is not in the deposition

5    topic list?  I don't believe the Bates

6    number you indicated is on the list.

7              MS. TAYLOR:  I'm not sure whether it

8    is or not.  I have copies here for people

9    who are here.

10             MR. LABOVITZ:  Certainly given the

11   fact you prepared a lengthy list of

12   deposition topics and distributed that to

13   counsel, it does not seem to make sense to

14   now provide documents that are not on such

15   a list.

16             MS. TAYLOR:  There is no obligation

17   for me to provide copies of documents that

18   I'm going to be using at a deposition to

19   people that are not here at the deposition

20   and the list that I sent out in no way

21   represented that was the entire field of

22   documents that would be used at these

23   depositions.  I think actually it

24   represented to the contrary.

25             I did bring enough for anybody that

57

WILHELMENIA TAYLOR

1
2     would come here to the deposition today.
3             MS. TAYLOR:  What I can do is when we
4     take a break I can fax to Clair's office a
5     copy of Exhibits, Taylor 2 and Taylor 3.
6             Mark, if you know there are others
7     you are going to mark, during the lunch
8     break I can fax those others, if you know.
9     Even if they are not premarked.  I can fax
10    one of the sets to them.
11            MR. LABOVITZ:  We would appreciate
12    that and that is a good suggestion, Penny.
13    Q        Is this something you had seen
14    before?
15    A        I don't remember seeing this before.
16    I could have, but I don't recall it.
17    Q        In the paragraph that begins with "We
18    strongly", the last sentence says, referring to
19    policyholders, says:
20            "So, when they are told their policy
21    is no longer eligible for AP due to lowered
22    dividend scales or dividend withdrawals, they
23    almost immediately start to complain or accuse the
24    sales representative of lying."
25            Is that something that was told to

58

1                        WILHELMENIA TAYLOR

2      the natural work team in response to

3      policyholders, the information given to them, that

4      the individual policy may or may note be eligible

5      for AP due to dividend scale withdrawals?

6            A     No.  I don't remember what you just

7      read being passed onto the AP natural work team.

8                        With respect to the reps lying,

9      dividend withdrawals typically at Metropolitan

10     Life meant a customer made a withdrawal of their

11     policy.

12                      So no.

13           Q     This is referring to, the second

14     sentence, to a memorandum from Mr. Rayl.

15                      Is that something you are familiar

16     with?

17           A     Is that the memorandum we just looked

18     at.

19                 MS. TAYLOR:  She already testified

20        she didn't recall seeing it previous to

21        perhaps just the prep for this dep.

22           A     If that's the one you are talking

23     about, yes.

24                      (Letter, December 11, 1992,

25     Schramm to Duffy, plus attachments, is received

CITTONE REPORTERS
(212)286-9222

59

WILHELMENIA TAYLOR

1

2    and marked Taylor 4 for identification)

3         MR. BARTHOLOMAEI:  What I have just

4    marked as Taylor Exhibit 4 is a cover

5    letter from Richard Schramm to Pamela Duffy

6    dated December 11, 1992 which attaches Mr.

7    Rayl's November 7, 1992 memorandum to Mr.

8    LaBadia that was discussed in the last

9    Exhibit.  Bates number MP 4011070960

10   through 70964.

11        Q    Looking at this, I was perhaps

12   confused.  I don't think the last document we

13   looked at was Mr. Rayl's memorandum referred to, I

14   think this is.  That's why I asked if you remember

15   familiar with Mr. Rayl's memorandum which is the

16   second and third page of what I just marked as

17   Taylor Exhibit 4.

18        Are you familiar with this memorandum

19   of Mr. Rayl to Mr. LaBadia?

20        A    No?

21             MS. TAYLOR:  The one dated November

22   7?

23             MS. TAYLOR:  Right.

24        Q    This isn't something you have seen

25   before?

60

WILHELMENIA TAYLOR

1

2      A    No, I don't recall seeing this

3  before.

4      Q    Do you know if any consideration was

5  given to the proposals of Mr. Rayl in this

6  memorandum by members of either the natural work

7  team or members of management at Metropolitan

8  Life?

9      A    I'd have to review this whole

10  memorandum.  I'm not sure what's being stated in

11  this memorandum.

12      Unless there are things Mr. Rayl is

13  saying that wind-up being implemented by the

14  natural work team, Mr. Rayl was not part of the

15  natural work team.  I don't recall seeing this

16  memorandum.  Is there any part of the memo you

17  want to ask me about specifically?

18      Q    What I want to know, because you're

19  here to testify on behalf of the corporation,

20  whether the issues addressed in this memorandum

21  specifically addressed by Mr. Rayl were taken into

22  consideration, whether any policy was implemented

23  as a result of this memorandum specifically?

24      MS. TAYLOR:  I think she already

25      testified she has no recollection of ever

61

1                     WILHELMENIA TAYLOR

2          seeing this memorandum nor does she have a

3          recollection of the natural work team

4          receiving it.  Whether there may have been

5          things he raised in here that are dealt

6          with and responded to is a completely

7          different question.  What is your question?

8          Whether specifically in response to this

9          memo?

10              MS. TAYLOR:  Whether the company

11         implemented any type of policy or policy

12         change.

13              MS. TAYLOR:  He is saying in specific

14         response to this memo.

15              THE WITNESS:  I have to try to read

16         it.

17              MS. TAYLOR:  I think she doesn't know

18         the answer to that.

19         Q    Who is Pamela Duffy?

20         A    Pamela Duffy was a vice president

21    that was, I believe back in 1992, she was in

22    charge of the marketing area.

23         Q    What does that mean, she was in

24    charge of the marketing area?

25         A    Marketing of personal insurance

62

WILHELMENIA TAYLOR

1
2  policies.  I think the department was called
3  Product Planning.
4        Q     You were part of that department at
5  one time; is that right?
6        A     Yes.
7        Q     Do you know who Barbara Gardner is?
8        A     I believe during that time Barbara
9  Gardner may have been in charge of the customer
10  service centers.
11        (RECESS TAKEN.) (AFTER RECESS.)
12              (Letter, December 23, 1992,
13  Rayl to Martin, plus attachments, is received and
14  marked Taylor 5 for identification)
15        MR. BARTHOLOMAEI:  What I have just
16        marked as Taylor deposition Exhibit 5 is a
17        letter from Jim Rayl to David Martin dated
18        December 23, 1992 which attaches some other
19        documents and the Bates numbers are MP
20        4011071027 through 71029.
21        Q     Ms. Taylor, if you need a minute to
22  look at this, please take a minute and I'll ask
23  you if you have seen this letter before from Mr.
24  Rayl, the first page of the Exhibit?
25        A     No, I don't recall.

63

1                WILHELMENIA TAYLOR

2        Q    Do you know with who Mr. Martin is,

3   other than what it says on the document?

4        A    That's the extent of what I know his

5   title, he was in charge of the mid America

6   territory.

7        Q    Do you know if any consideration was

8   given by Metropolitan Life to this specific letter

9   from Mr. Rayl with respect to problems concerning

10  the AP year and that policies were being, excuse

11  me, policyholders were being told their policies

12  would be paid-up?

13            MS. TAYLOR:  Objection as to form?

14       A    I'm reading it now.

15       Q    Is this something that was considered

16  by either the natural work team or any other

17  department of Metropolitan Life with respect to

18  the issues that are described here, this

19  particular letter I'm referring to now?

20            MS. TAYLOR:  Objection as to form,

21       lack of foundation.

22       A    There is a lot of things being

23  discussed in this memo.  Is there one particular

24  thing you are asking me?

25       Q    Mr. Rayl generally is talking about

64

WILHELMENIA TAYLOR

1

2    policyholders being told once the AP took effect

3    their policies would be paid-up.  That's in the

4    first paragraph.

5         Then he goes onto talk about, in the

6    second paragraph, these situations are now

7    occurring on policy that are supposed to become

8    paid-up and will impact in the future when

9    policies will not have sufficient dividend

10   balances to cover all future payments.

11        The last sentence says:

12        "I am much more concerned about the

13   potential impact it could have on our future

14   marketing efforts if we don't attempt to address

15   this issue with our policyholders soon."

16        The question I asked, is this letter

17   talking about these issues considered by

18   Metropolitan Life or the natural work team as a

19   warning of what was to come in the future with

20   respect to Accelerated Payment Plan policies?

21        MS. TAYLOR:  Objection to form.  She

22   can speak to the Actual Work team.  There

23   are so many people in the company, I don't

24   know if she knows whether there was one

25   person out of hundreds that might have

65

1                          WILHELMENIA TAYLOR

2            responded to this.

3            A       With respect to the natural work

4       team, the consumer brochure, ABC's dividends,

5       Accelerated Payment brochure, my recollection is

6       they both discussed the policies were not,

7       quote/unquote, paid-up.  That's the extent to

8       which I can recollect.  I believe there were

9       articles in a publication called Metropolitan Life

10      Outlook that discussed the Accelerated Payment

11      arrangement in effect the policy wasn't paid-up.

12              Those are the things I can recollect

13      on how the company spoke to the situation paid-up

14      versus the Accelerated Payment arrangement.

15           Q       Can you tell me whether this letter

16      was considered?

17           A       I don't recall ever seeing this

18      letter.

19                      (Letter, Rayl to Schoos,

20      December 31, 1992, is received and marked Taylor 6

21       for identification)

22                      MR. BARTHOLOMAEI:  What I have just

23              marked as Taylor deposition 6 is a one-page

24              letter from Mr. Rayl dated December 31,

25              1992 to Kathy Schoos Bates number MP

66

1                    WILHELMENIA TAYLOR

2        4011071025.

3            Q    What I want to ask you about is

4   specifically in the first paragraph in this

5   letter.  It's referring to in the second sentence.

6   It says:

7            "In one of my conversations with Tom,

8   he indicated that the 'marketing' people felt that

9   the number of representatives using the term

10  'paid-up' was limited to a very small number.

11  Needless to say, I disagreed with this and have

12  been trying to illustrate that this is not the

13  case."

14            The question I have, was any study

15  done of the number of representatives that have

16  been using the term "paid-up" during the point of

17  sale process?

18            MS. TAYLOR:  Objection as to form.  I

19        do again want to reiterate Ms. Taylor would

20        not have knowledge, for instance, of any

21        investigations or studies that might have

22        been conducted by auditing or by people in

23        customer relations because her area, she

24        was not in the consumer complaint area.

25            Q    What I am referring to, specifically

67

WILHELMENIA TAYLOR

1
2     it says he indicated the number of marketing
3     people, the number of reps indicating the number
4     of paid-up was a very small number.
5                  Was there any information or
6     determination made of someone in the marketing
7     department of how many representatives using
8     paid-up with interactions of policyholders or
9     insureds?
10                 MS. TAYLOR:  Object to form.
11         A     I'm not aware of any study.  In
12    reading the document you just gave me, in the
13    second paragraph, Mr. Rayl goes on to say, he
14    assumed it was Dave that felt the term "paid-up"
15    was not widespread.
16                 There are a lot of opinions going on
17    here.  I wasn't aware of any study or
18    investigation.
19         Q     Have you seen this letter before?
20         A     I don't recall seeing this letter
21    before.
22                 (Letter, January 12, 1993,
23    LaBadia to Lynch, one page, is received and marked
24    Taylor 7 for identification)
25                 MR. BARTHOLOMAEI:  What I have just

68

1              WILHELMENIA TAYLOR

2        marked as Taylor deposition 7 is a January

3        12, 1993 letter from Tom LaBadia to Frank

4        Lynch.   Bates number is MP 4011070957.

5        Q     Ms. Taylor, have you had an

6    opportunity to review this document?

7        A     Yeah, I just did.

8        Q:    Let me ask you first, is this

9    something you have seen before?

10       A     No, I don't remember seeing this

11   before.

12       Q     The second paragraph, it's referring

13   to a proposal to retest all policies on APP and

14   notify all of those who no longer pass the

15   eligibility test.

16             Is that something that was done at

17   Metropolitan Life or was that a policy that was

18   implemented?

19       A     I don't recall that being

20   implemented.

21       Q     Was that something that was given

22   consideration?

23       A     I guess so.  This memo is basically

24   saying they considered it.

25       Q     Why wasn't that done?

69

1                          WILHELMENIA TAYLOR

2          A      I don't know why it wasn't done.

3          Q      Is there any study done or

4    investigation into this proposal and whether it

5    should be implemented at Metropolitan Life?

6          A      Reading this document, it appeared

7    that Tom LaBadia is basically saying in lieu of

8    what Mr. Rayl was suggesting that there be some

9    educational material.

10                 I don't know how that determination

11   came about.

12         Q      Do you know who Frank Lynch is other

13   than what it says in the document?

14         A      Basically he was in charge of the

15   customer service area.

16         Q      For the whole company?

17         A      I believe so.

18                 (Letter, January 19, 1994, Rayl

19   to Crimmins is received and marked Taylor 8 for

20   identification)

21                 MR. BARTHOLOMAEI:   What I have just

22              marked as Taylor deposition 8 is a January

23              19, 1994 correspondence from Mr. Rayl to

24              Bob Crimmins.   The Bates numbers are MP

25              4011071018 through 71023.

70

1                    WILHELMENIA TAYLOR

2        Q    Ms. Taylor, I know this is a somewhat

3    lengthy document again with very small print.   I

4    want to ask you first, is this something you

5    reviewed in preparation for the deposition or

6    something you have also seen before today?

7        A    I hadn't seen it before today.   I

8    don't recall seeing this.   I don't recall.

9        Q    I don't want you necessarily to go

10   through it, we'll be sitting here for another

11   hour.

12             Can you tell me whether this specific

13   document was given any consideration by either the

14   natural work team or members of management at

15   Metropolitan Life with respect to any policies

16   which related to the Accelerated Payment Plan?

17             MR. BARTHOLOMAEI:   Objection as to

18        form.   Lack of foundation.

19        Q    I'm talking about company policies,

20   not life insurance policies.

21             MS. TAYLOR:   I want to reiterate

22        again.   While Ms. Taylor can answer as to

23        whether this was something she recalls the

24        natural work team seeing, that's a

25        different issue than knowing whether anyone

71

WILHELMENIA TAYLOR

1

2    in the company, which consists of hundreds

3    of employees, might consider this.

4         MR. BARTHOLOMAEI:  I think I limited

5    my question to the natural work team or

6    members of management.  I understand it

7    could be hundreds of people.  If she knows,

8    she knows.

9         MS. TAYLOR:  Members of management I

10   think is vague also.  I don't know what you

11   mean by members of management.  There are a

12   lot of people in management.

13        Again, are you asking about this

14   specific document?

15        MR. BARTHOLOMAEI:  Right.

16        MS. TAYLOR:  Not generally, topics

17   that are mentioned generally?

18        MR. BARTHOLOMAEI:  Correct.

19        MS. TAYLOR:  This specific document?

20        MR. BARTHOLOMAEI:  Correct.

21   A    I have no recollection of the natural

22   work team connected with this document, nor do I

23   know if anyone else who might have received it

24   made any policy changes that I know of.  Never saw

25   it before.  Don't recall seeing it.

72

1          WILHELMENIA TAYLOR

2                (Memo to Frank Lynch from

3     LaBadia March 30, 1994 is received and marked

4     Taylor 9 for identification)

5                MR. BARTHOLOMAEI:  What I have just

6     marked as Taylor deposition Exhibit 9 is a

7     two-page document.  Letter from Mr. LaBadia

8     dated March 30, 1994 to Frank Lynch.  Says

9     regarding the request from Mr. Tweedy

10    concerning UL customers with target

11    premiums inadequate to carry policies.

12    Bates numbers MP 4011070947.

13               MS. TAYLOR:  I just want to note

14    something for the record.  I obviously

15    don't know what you are marking.  Your firm

16    identified probably over 150 documents and

17    we took a lot of time to sit down, I should

18    say Ms. Taylor took time to review those

19    documents.  So far only one or possibly two

20    you marked as being in that group.

21          It's not really very productive to

22    identify 150 documents and have a witness

23    waste time reviewing all those documents

24    and you don't mark any of them.  In fact,

25    what you do is mark other documents.  If

73

WILHELMENIA TAYLOR

1

2   you're going to do that, at least identify

3   documents you intend to use.  This witness

4   spent a lot of time in reviewing documents

5   that are never going to be marked at this

6   deposition.

7        MR. BARTHOLOMAEI:  I understand.  In

8   response to that, what we did, we

9   identified documents which had been

10  identified by Metropolitan Life as the

11  range of documents which supposedly related

12  to the Accelerated Payment Plan, likewise

13  with the FIP from your letters.  You sent

14  us letters saying here are documents,

15  whatever the documents happen to relate to.

16       I have other documents here that were

17  in that group.  I don't know whether the

18  ones I marked so far have or have not been

19  in that group.  I wanted to give people the

20  idea of what we were asking about, trying

21  to be considerate.

22       In the future you don't want us to

23  designate a range ahead of time, we could

24  do that.

25       MS. TAYLOR:  If you are expecting a

74

1          WILHELMENIA TAYLOR

2     witness to review things and asking a

3     witness to take the time to do that, please

4     hone in on the documents you truly expect

5     to mark because it's a waste of the

6     witness' time to go through a bunch of

7     materials that aren't going to be marked.

8     We did that to try to expedite the

9     deposition.

10         What's happening virtually none of

11    those documents are being used and

12    everything, I'm saying with the exception

13    of Taylor 1 and perhaps another document,

14    was not even identified.  Let's just move

15    on.

16         MR. BARTHOLOMAEI:  Okay.  I'll just

17    say it wasn't something that was

18    intentional, asked the witness to review

19    things I wasn't going to use.

20         Like I said, these were things I

21    thought were the comprehensive universe of

22    APP documents.  I realized there are things

23    that came up after I sent you the list that

24    were going to be used.  That maybe the

25    case.

75

1      WILHELMENIA TAYLOR

2          MS. TAYLOR:  Again identifying 150

3      plus documents and asking the witness to

4      look at those to expedite, this witness

5      spent over a day and a half reviewing all

6      those documents.  What I'm saying is, it

7      was really for no purpose whatsoever.  It

8      was almost a complete waste of time.

9          She tried to comply with your

10     request, despite the short notice and

11     identification, and took time out of her

12     business day, a lot of time, to sit down

13     and look at that stuff.

14         MR. BARTHOLOMAEI:  Fine.  In the

15     future we would not identify the documents

16     then if that's what you want.

17         MS. TAYLOR:  The fact is you are

18     identifying them and asking the witness to

19     look at them and then you're not using

20     them.

21         MR. BARTHOLOMAEI:  We've gone through

22     eight Exhibits.  Out of the eight I used,

23     two that were identified prior to the

24     deposition today.  I have a lot more

25     documents here I planned to use and perhaps

76

WILHELMENIA TAYLOR

1

2    some of those on the list.  I apologize if

3    all of the documents haven't been on the

4    list.  Some of has, some hasn't.

5        Like I represented to the people in

6    Pittsburgh, the items on the list weren't

7    always comprehensive to the documents I

8    would be using at the deposition.  I

9    apologize Ms. Taylor had to take time to

10   review all these documents.  At that time I

11   had not completely determined which ones

12   would be used.  Let's keep going with the

13   deposition.

14       Q    Is this something you have seen

15   before, Ms. Taylor?

16       A    I don't recall seeing this document.

17       Q    On the second page, it refers to some

18   proposed strategies.  It gives a couple of

19   alternatives there.  The second one says:

20           "More complete and direct

21   notification to UL policyholders who may not be

22   aware that their policies may not be supported by

23   the planned, target premium and/or present cash

24   flow into the accumulation fund."

25           The question I have is whether any

77

WILHELMENIA TAYLOR

1
2      different information or specific information was

3      gathered with respect to people who had bought

4      universe life policies in connection with the

5      Accelerated Payment Plan?

6              MS. TAYLOR:  Objection as to form.  I

7          think you have a misunderstanding or you

8          are just not properly asking the question.

9              If you're talking about universal

10         life policies in terms of Accelerated

11         Payment illustrations, I'm going to

12         instruct the witness not to answer because

13         Accelerated Payment Arrangement by its

14         nature can only apply to whole life

15         policies.  It cannot apply to universal

16         life policies in that they are not

17         participating policies in which dividends

18         are paid.

19         Q     Let me ask you a question then.  Were

20     Accelerated Payment Plan illustrations used to

21     sell term-life insurance policies?

22              MS. TAYLOR:  Objection.

23         A     The Accelerated Payment Arrangement

24     illustrations were used only in conjunction with

25     whole life policies.

78

1                    WILHELMENIA TAYLOR

2          Q        Not used for universal life policies

3    either?

4                    MS. TAYLOR:   Objection as to form.

5          A        Accelerated Payment Arrangement

6    illustrations were to be used in conjunction with

7    universal life policies.

8          Q        Was it improper according to

9    Metropolitan Life policy for a sales

10   representative to use an Accelerated Plan

11   illustration in connection with universal life

12   policy?

13                   MS. TAYLOR:   Objection as to form.   A

14         couple policies at the same time?

15                   MR. BARTHOLOMAEI:   Someone used an

16         Accelerated Payment Arrangement to sell a

17         universal policy.

18                   MS. TAYLOR:   I don't understand that.

19         You can even generate one for a UL policy.

20                   MR. BARTHOLOMAEI:   I guess that's the

21         answer.

22         A        You are using the word "to sell".

23         Q        If someone sold someone a universal

24   life policy and handed them an illustration that

25   SAID Accelerated Payment at the top, was that

79

1                         WILHELMENIA TAYLOR

2      contrary to Metropolitan Life policy?

3            A     It's contrary to Metropolitan Life

4      policy to provide a prospect with an illustration

5      for or a policy for which that illustration could

6      not be created.

7            Q     Were Metropolitan Life

8      representatives permitted to sell policies using

9      illustrations which used the term "vanishing

10     premium" on them?

11           A     I don't recall that.  I don't recall

12     using the words "vanishing premiums," part of the

13     text included in the illustration.

14           Q     What I'm asking is whether it was

15     improper according to Metropolitan Life policy for

16     sales representatives to use illustrations during

17     the course of a sale which used the term

18     "vanishing premium" on them?

19                 MS. TAYLOR:  Objection as to form.

20           It assumes facts that haven't been

21           established.

22           Q     I'll phrase it a different way.  Were

23     representatives permitted to use illustrations

24     that contained the term "vanishing premium"?

25           A     I have to limit my response to the

80

WILHELMENIA TAYLOR

1
2 illustrations that I have seen with respect to
3 the, that I know about, with respect to the
4 Accelerated Payment Arrangement.
5        I don't recall any use of the word
6 "vanishing premium" on those illustrations.  If
7 representatives were using something other than
8 the company produced illustrations, it was my
9 understanding they should be using what the
10 company provided and I don't recall seeing those
11 words on the illustration.
12      Q    I understand you don't have a
13 personal recollection of that or that being used.
14        My question, I think it's a pretty
15 simple question, you are here to testify on behalf
16 of the company.  You may or may not know the
17 answer to the question, maybe someone else would
18 know.
19        I want to know if there was a company
20 policy that illustrations were not to be used
21 which contained the term "vanishing premium" on
22 them?
23      A    I'm not aware of a company policy
24 that specifically said that.  I'm not aware.
25      Q    It was possible then or allowable for

81

WILHELMENIA TAYLOR

1
2  a sales representative to use an illustration

3  which used the term "vanishing premium"?

4         MS. TAYLOR:  Objection as to form.

5  You are mischaracterizing his testimony,

6  Mr. Bartholomaei.  She is saying its

7  company policy you use authorized

8  illustrations.  She's not aware of

9  authorized illustrations that use that

10  language.  She did not say they were

11  permitted to use it.

12    Q    If a sales representative used an

13  illustration which contained the term "vanishing

14  premium," would that be improper?

15    A    I think for a representative to use

16  an illustration that had terminology on it, it

17  wouldn't be a company approved illustration.  I

18  don't think that would be proper that a

19  representative should be using an illustration not

20  approved for use by the company.  That's my

21  response.

22    Q    Was it permitted that that sales

23  representatives could use other company

24  illustrations which contained the term "vanishing

25  premium" when selling a product of another

82

1                    WILHELMENIA TAYLOR

2    company?

3              MS. TAYLOR:  Objection as to form.

4       A    I'm not aware, I'm not aware of or

5    know of company policy with respect to

6    representatives selling other than Metropolitan

7    Life policies.

8       Q    You are saying you are not aware of

9    what the policy is or whether there was such a

10   policy?

11      A    It was my understanding that

12   Metropolitan Life representatives were to sell

13   Metropolitan Life policies, that that was the

14   policy.

15      Q    Do you know who Mr. Tweedy was?

16      A    Yes, basically.

17      Q    Who was he?

18      A    At some point in time he was in

19   charge of the Personal Insurance Department I

20   believe.  Personal Insurance Department.

21      Q    What does that mean?

22      A    There was a department --

23      Q    A line of business?

24      A    Yes, called Personal Insurance.

25              (Letter, April 14, 1994,

83

1                    WILHELMENIA TAYLOR

2   Wilhelmenia Taylor to Greg Doby, plus attachments,

3   is received and marked Taylor 10 for

4   identification)

5            MR. BARTHOLOMAEI:  What I have just

6       marked as Taylor deposition 10 is a

7       document which contains a cover letter from

8       Ms. Taylor dated April 14, 1994 to Greg

9       Doby which attaches a memorandum from Mr.

10      Rigby to Mr. Doby which is dated January

11      11, 1994.  The Bates numbers are MP

12      4011070949 through 70955.

13       Q    I think this may have been one of the

14   documents you were referring to earlier, is that

15   right?  It talks about the number of policies

16   falling off APP status.  Do you see the last page

17   where it talks about that?

18       A    Yes, I see it.

19       Q    Is this a document you reviewed in

20   preparation of the deposition today?

21       A    Yes.

22       Q    On the first page you are writing a

23   cover letter to Mr. Doby, is that right, letter to

24   Mr. Doby?

25       A    Yes.

84

WILHELMENIA TAYLOR

1

2    Q    What was the reason for sending a

3    letter to Mr. Doby?  I'm asking why you sent it to

4    Mr. Doby in particular?

5         A    Mr. Doby was my supervisor.

6         Q    At the time?

7         A    At the time, yes.

8         Q    What was the response to this letter

9    or was there a response?

10        A    It's my recollection, although I

11   don't believe it was written, that plans were put

12   into place to offer policyholders some options

13   with respect to how their premiums could be paid,

14   either in lieu of the Accelerated Payment

15   Arrangement or using the Accelerated Payment

16   Arrangement.

17        Q    Is that a decision that was made by

18   Mr. Doby?

19        A    It's my recollection that it was a

20   decision that was, at least it was implemented by

21   way of the natural work team as part of its review

22   of communications to customers, including the

23   anniversary statements and notice of payments due,

24   as well as any alternatives to paying the premiums

25   by way of the Accelerated Payment Arrangement.

85

WILHELMENIA TAYLOR

1

2     Q     What I'm referring to specifically on

3     this letter that you wrote, I'm paraphrasing it.

4          It says, the changes could be made in

5     two to three months for a cost of $45,000 or if we

6     are to do them in the fall it will cost $10,000

7     less.  Please let me know how to proceed.

8          What was the response from Mr. Doby,

9     if any?

10    A     It's my recollection the change was

11    concluded in the fall.

12    Q     What was the reason for doing the

13    change in the fall versus the ensuing two to three

14    months?

15    A     I believe there is either documents

16    or a document that speaks to the reason for

17    including this change as part of an entire

18    portfolio revision, I believe.  It's in the list

19    of documents and speaks to some other priorities

20    in that it may be more efficient to do it then

21    than separate.  It's a document where I think Tom

22    LaBadia was writing Greg Doby.

23    Q     What do you mean by more efficient?

24    A     You can make it a change when you are

25    doing other things or do it separately.

WILHELMENIA TAYLOR                    86

1    It's my recollection, Tom's response

2    to Greg outlining the reasons wanting or

3    suggesting it be done in the fall.  It's my

4    recollection Greg agreed to it being done in the

5    fall.

6    Q    Basically to save money, is that what

7    you are saying?

8    A    No.

9         MS. TAYLOR:  Objection as to form.

10   Q    When you said you could do it at the

11   same time as other things --

12   A    I believe that document clearly

13   outlines the reasons for waiting until fall rather

14   than doing it then.  I don't remember what the

15   reasoning was.  I think it might have been some

16   resource issues as well.

17   Q    What does that mean, resource issues?

18   A    People to work on the change.

19   Q    Maybe we'll get to that later on.

20        Of these proposed, you refer to them

21   as APP alternatives, which ones were actually

22   implemented by the company of the ones that are

23   detailed in this memorandum or were they all

24   implemented?  I don't know if you can tell me that

87

WILHELMENIA TAYLOR

1    generally.  I don't want to go through sentence by

2    sentence through this document.  This is something

3    you have seen or reviewed prior to today.

4

5        A    I believe we spoke about this

6    earlier, that some of these options outlined in

7    this memo did get implemented sometime after the

8    date of this memo, sometime after 1994.  There is

9    also documents there that refer to, I believe it's

10   called an APP Options Program or something

11   similar.

12       Q    The second, third, fourth and fifth

13   pages of this Exhibit is something you wrote, is

14   that right?

15       A    Yes.

16            MS. TAYLOR:  Which pages?

17            MR. BARTHOLOMAEI:  Second, third,

18       fourth and fifth.

19       A    Number four?

20       Q    Of the Exhibit.  Actually the first

21   page too, right?

22       A    Yes.

23       Q    You are attaching this piece of

24   correspondence or document generated by Mr. Rigby.

25            What was the reason for attaching

1                    WILHELMENIA TAYLOR                    88

2    that document and the chart on the back of that

3    document?

4         A         I believe I attached Mike Rigby's

5    January 11, 1994 memorandum to my memorandum

6    because I made reference to the information on

7    page two of the report which says:

8              "I have attached a copy of Mike's

9    memo where Mike indicates that 83,000 policies are

10   currently on APP as of year-end 1993 to support

11   the suggestion on how we offer policyholders an

12   alternative way of paying their premiums or APP

13   eligibility testing.

14        Q         At the time of the generation or

15   creation of Mr. Rigby's memorandum, it says:

16             25,000 of the policies that were

17   done, it's almost 82, 83,000 policies that were

18   currently on APP had insufficient dividends and

19   dividend balances to remain on APP.

20             Do you see that in the future status

21   of the policies?

22             MR. TAYLOR:   Object to the form.   It

23        says, for the life of the policy, also.

24        Q         It says:

25             "This analysis involving 82,778

1                    WILHELMENIA TAYLOR                    89

2    policies and showed that 25 percent of the

3    policies currently on APP have insufficient

4    dividends" --

5            MS. TAYLOR:  Where is that?

6            MR. BARTHOLOMAEI:  Mr. Rigby's

7    document.

8        Q    Do you see that part?

9        A    Yes.

10       Q    At this time in 1994, was anything

11   done by the company to contact these 20 some

12   thousand policyholders where it is identified

13   those policyholders had insufficient dividends and

14   dividend balances to remain on APP?

15           MS. TAYLOR:  Objection to form.  I

16       want to reiterate that's for the life of

17       the contract.

18           MR. BARTHOLOMAEI:  In his memo, he

19       doesn't say life of the contract.

20           MS. TAYLOR:  Her characterization of

21       it.  She is characterizing and concluding

22       those numbers are based on the life of the

23       contract.

24       Q    Do you want me to repeat the

25   question?

90

WILHELMENIA TAYLOR

1

2      A      Yeah.

3      Q      What I was asking was, I'm taking a

4  rough number 25 percent of 82 or 83,000.  I was

5  asking whether the 20,000 people who were included

6  in this study were determined that those people

7  currently did not have enough dividends and

8  dividend balances to remain on APP, were contacted

9  by the company at that time?

10            MS. TAYLOR:  Objection as to form.

11     A      I don't believe there was a

12  policyholder, customer contact of these customers

13  that Mike's memorandum refers to and is testing

14  they were contacted.

15     Q      Why not?

16     A      Part of how the APP Arrangement works

17  is that it's a portion based on dividends and I

18  can't -- we had experienced dividend scale

19  reduction at that point in time and dividends

20  could go up or down.

21            We had sent information to our

22  representatives to tell them about contacting

23  their customers because they would know, they

24  would know more who would be interested being on

25  the APP Arrangement than the company as a whole

1                    WILHELMENIA TAYLOR                    91

2    and we provided the educational material.

3              So it's my recollection there was no

4    corporate contact of these customers, but that the

5    contact was made by the Account Representatives.

6         Q      The question I asked was why was

7    there no contact with the company?  I understand

8    it suggested the sales representatives contact

9    them and there were educational materials and

10   everything you told me so far.

11             I'm looking here at a specifically

12   identified group of people that supposedly, there

13   was a study done by Mr. Rigby of these roughly

14   83,000 policies and out of those 25 percent were

15   identified to have insufficient dividends and

16   dividend balances to remain in APP.

17             The question I'm asking, why did not

18   the company contact these people?

19             MS. TAYLOR:  Objection as to form.  I

20        think this is a very broad question because

21        she testified before about communications

22        in general about Metropolitan Life Outlook.

23        Those were sent out.  There was information

24        provided in billing statements, certain

25        billing statements and in anniversary

92

WILHELMENIA TAYLOR

1

2      statements.  This is a very, very broad

3      question.

4            MR. BARTHOLOMAEI:  I don't think it's

5      a broad question and I can make it more

6      specific.

7      Q      In that these roughly 20,000 people

8      who are specifically identified in this study, why

9      each of those 20,000 people were not contacted by

10     the company after it had been determined that

11     those individual policyholders had insufficient

12     dividends or dividend balances for them to remain

13     on APP?

14           MS. TAYLOR:  Objection as to form.

15     Again I think you are mischaracterizing

16     these numbers.

17           MR. BARTHOLOMAEI:  How am I

18     mischaracterizing the numbers?  I stated I

19     didn't take a calculator and do a --

20           MS. TAYLOR:  You are

21     mischaracterizing the aspect for the life

22     of the contract.  You are not making that

23     clear.

24           MR. BARTHOLOMAEI:  I'm reading it

25     from this page.  I can read the sentence

1                    WILHELMENIA TAYLOR                    93

2       again.

3           I want to know, however you want to

4       characterize it, I want to know why the 25

5       percent of the 82,778 policyholders were

6       not contacted individually by the company

7       once it was determined as a result of this

8       study that their policies had insufficient

9       dividend balances or dividends to allow it

10      to remain on APP?

11          MS. TAYLOR:  Objection as to form.

12          Also these numbers are in terms of

13      policies, not policyholder.

14          MS. TAYLOR:  I understand that as

15      well.

16      A      I don't remember exactly.  We're

17      looking at 1994 here.  There were processes in

18      place that anniversary statements provided

19      information to the customer as to the fact their

20      policies could be paid by AP and if it wasn't

21      going to, the policies couldn't be paid by the AP

22      Arrangement, then they asked them for additional

23      funds.

24          I probably could do better if I had

25      the anniversary statements here.  There was a lot

94

WILHELMENIA TAYLOR

1  

2   of information sent, included on the anniversary

3   or annual dividend statement to the customer that

4   gave them information as if their premiums were

5   paid by AP and if it wasn't what the alternatives

6   were. That was an annual processing that took

7   place rather than doing a huge large mailing to a

8   group of people, to this particular group of

9   people that were identified in the study Mike did.

10        I can't categorize we didn't contact

11   customers individually when their anniversary

12   process came up for eligibility. I don't know

13   about a mass mailing that went out to these

14   customers that Mike identified.

15      Q     Outside of the anniversary

16   statements, was any other contact made of that you

17   know of?

18       MS. TAYLOR:  Objection as to form.

19     What kind of contact are you talking about?

20     Could a sales rep --

21       MR. BARTHOLOMAEI:  Anybody from the

22     Home Office pick up the phone and called

23     each of these people and said, you know

24     what, we just did a study and determined

25     your policy has insufficient dividends to

```
 1                    WILHELMENIA TAYLOR                    95

 2         be allowed to remain on APP.

 3         Q      Did you know that?

 4              MS. TAYLOR:  Object to form.

 5         A      At the time he did the study he

 6   writes the 1994 dividend scale, that the study

 7   assumed certain things, that the 1994 dividend

 8   sale would continue unaltered.

 9                    Like I said, as far as an one-time

10   mailing to 20,000 customers as you mentioned, I

11   don't believe the company did a mass mailing but I

12   believe there was information on each individual's

13   anniversary statement as spoke to the AP

14   eligibility.

15         Q      That was the same for everybody that

16   had AP, right, the anniversary statement contained

17   the same information, not specific information ---

18         A      It spoke to their eligibility, their

19   particular policy.

20         Q      Anniversary statements are sent to

21   every policyholder?

22              MS. TAYLOR:   Objection as to form.

23         A      No.  Anniversary forms are sent to

24   whole life customers and specific wording was

25   included on notices and specific wording included
```

1                    WILHELMENIA TAYLOR                96

2    on those on AP.

3         Q     I'm referring to anniversary

4    statements sent to every policyholder who had a

5    policy where the policy was on APP, whether it was

6    eligible or not, those people still received

7    anniversary statements; right?

8         A     They received anniversary statements

9    and if they were on AP, there was specific wording

10   on that anniversary statement that spoke to the

11   eligibility.

12        Q     I know you said there was no mass

13   mailing done you knew about. Was there any other

14   contact done with respect to policyholders that

15   are mentioned in this memorandum?

16             MS. TAYLOR:  I think she mentioned

17        the other day there were also billing

18        notices.

19        A     Sales representatives. I can't speak

20   to it.

21        Q     Let me ask it this way. Outside of

22   the anniversary statements and billing statements,

23   was there anything else initiated from the Home

24   Office to contact these people I just talked

25   about, to let them know their policies had

1                   WILHELMENIA TAYLOR        97

2   insufficient dividends or dividend balances to

3   remain on APP?

4           MS. TAYLOR:   Other than what she has

5   talked about --

6           MR. BARTHOLOMAEI:   I'm talking about

7   the specific thing --

8           MS. TAYLOR:   Something specifically

9   directed to these people?

10          MR. BARTHOLOMAEI:   Correct.   I keep

11   saying it over and over.   Maybe I'm not

12   clear.

13     Q     I want to talk about these

14   specifically 20,000 people.

15          Anything specifically initiated from

16   the Home Office of Metropolitan Life to contact

17   these specific people who owned these policies?

18     A     Not in a mass mailing form.

19     Q     Any form?

20     A     Their annual statements, if they were

21   operating on AP, they got a specific anniversary

22   statement that spoke to their eligibility.

23     Q     What about outside of anniversary

24   statements?

25     A     What I mentioned before, the stuff

WILHELMENIA TAYLOR                                    98

1

2    that was included in mailings to customers, AP

3    brochures that representatives provided.  Talking

4    about again a mass mailing to this group, I don't

5    recall anything.

6          Q       Any kind of phone contact?

7          A       Not that I know of.

8          Q       Any kind of direction to the

9    individual representative who sold their policy to

10   go out and visit them and talk to them about their

11   policy?  Do you have any knowledge of that?

12         A       If you're talking about specific

13   policy numbers or specific client names listed on

14   this, I don't recall that.  Overall

15   representatives, just what you said, for AP

16   customers.

17         Q       The last page of this document, there

18   is a chart, number of policies by year falling off

19   AP status.

20                 This is something you've seen before?

21         A       Yes.

22         Q       Is this something you can interpret

23   for me as far as what this chart shows?  I

24   understand the title of the chart.  It gives year,

25   starts with the year 1994 up to 2018.  On the

WILHELMENIA TAYLOR                    99

1  priority there is a number.

3      Can you tell me why the number starts
4  to increase and decrease at the end, what's the
5  significance of this chart?

6      MS. TAYLOR:  Objection as to form.
7      It's a compound question.  She can only
8      give her understanding of the document.
9      She obviously didn't prepare it.

10     A     I believe the table is showing, for
11  example, in 1994, 517 policies based on the
12  testing criteria that might use that would fall
13  off APP status.

14      I'm not sure if that's helpful or
15  not.

16     Q     There is a total of we talked about
17  earlier, 20 some thousand odd people, that fall
18  off of APP status.  Am I reading in a right?

19      MS. TAYLOR:  Objection.  She just
20      testified she is not sure what he meant by
21      falling-off APP status.

22     A     He has a total and at the heading.
23  It says, falling off APP status.

24      I don't recall exactly.  I'm looking
25  at the memo.  I don't know if he describes what

100

1               WILHELMENIA TAYLOR

2    falling off APP status means.

3        Q      You attached this to your memorandum?

4        A      Right.

5        Q      What was your understanding of the

6    significance of this chart?

7        MS. TAYLOR:  At the time?

8        MR. BARTHOLOMAEI:  Yes.

9        A      It's my recollection and I think I

10   kind of outlined it on page two of my memorandum

11   and it starts out with the first paragraph.  I

12   have attached a copy of Mike Rigby's January 11

13   memo.

14        The point I wanted to bring out here,

15   of those 25 percent, of those 25 percent that do

16   not have sufficient dividends, dividend balances

17   to remain on APP, I really stressed here the life

18   of the contract.  Meaning that it was my

19   impression from what Mike provided that the

20   testing included sufficiency test to see if there

21   was enough dividend balances to pay the premiums

22   for the entire life of the contract based on then

23   current dividend scale.

24        Q      Well, that number that was the result

25   of Mr. Rigby's study, is that something at the

101

WILHELMENIA TAYLOR

1

2  time that surprised you or something you expected

3  to be the case, that 25 percent of the 80 some

4  thousand had insufficient dividends to allow them

5  to remain on APP?

6          MS. TAYLOR:  Objection as to form.

7      A    I don't recall having an expectation

8  of what the number would be.  I can't say it

9  surprised me or didn't surprise me.  Mike did a

10  test, he did a study and came back with the

11  information.

12     Q    You didn't look at it and say, wow,

13  25 percent, that's a high number, or, wow, that's

14  something that's unexpected?

15          MS. TAYLOR:  Objection as to form.

16      That's asked and answered.  Compound.

17      question.

18      A    I can't recall.  I don't recall

19  having a reaction as to wow.

20     Q    Let me ask you about the paid-up.

21          It says, however, Mike conducted a

22  sampling of 25 such policies and 21 of the PUAR

23  policies.

24          See that?

25      A    Yeah.