Ex C
(3 of 4)

102

WILHELMENIA TAYLOR

1

2       Q       Then it says PUAR policies.  See that

3   part?

4       A       Yes.

5       Q       Was that a mistake?  You said they

6   weren't policies.  Policy of the Rider?

7       A       Yes.  Whole life policy with paid-up

8   additional Rider attached to it.

9       Q       What's the significance, if any, of

10  the 84 percent failing the eligibility test with

11  respect to the whole life policies with the

12  paid-up additional Rider?

13      A       I'm trying to recall what I meant by

14  this.

15              The paid-up additions Rider, the

16  value of the paid-up additions Rider could also be

17  used to pay the number premium due as part of the

18  Accelerated Payment Arrangement and from what I'm

19  reading here, Mike sampled 25 policies and there

20  wasn't enough value in the paid-up additions Rider

21  that would allow the premiums to be paid for the

22  life of the contract.  That's what I'm saying

23  here.

24      Q       What was done in response to that

25  determination?  Was any further study done?

103

1                    WILHELMENIA TAYLOR

2          A      I don't recall a further study being

3    done.

4          Q      Was any type of policy implemented or

5    policy change with respect to whole life policies

6    that contained or which had a paid-up additions

7    Rider?

8                    MS. TAYLOR:  Objection as to form.

9          That's a difficult question to understand,

10         also extremely broad.

11         Do you understand the question?

12                   THE WITNESS:  No.  I zoned out for a

13         minute.

14         Q      Mike conducted a sampling of 25 such

15    policies and 21 of the PUAR policies or 84 percent

16    failed the eligibility test?

17         A      Yes.

18         Q      The question I had, first I asked you

19    if a further study was done and you said no.  Now

20    I'm asking if anything was done by Met in reaction

21    to the results of that sampling?

22         A      The policy that were on AP, also used

23    in the paid-up additions Rider also received the

24    anniversary statements I talked about before and

25    these customers were also provided information

104

1            WILHELMENIA TAYLOR

2    with respect to the AP eligibility on their

3    anniversary notices.

4        Q       Anything else outside the anniversary

5    notices?  Still talking about the billing

6    statements again.

7        A       The Metropolitan Life Outlook and

8    brochures and contact, encouraging representatives

9    to contact their customer.  No mass mailing issued

10   that we talked about before that I'm aware of.

11       Q       This is something I was trying to get

12   out before.  Maybe it wasn't clear.

13               The mailing of anniversary statements

14   to policyholders, be it a policy with a paid-up

15   additions Rider or not, any kind of whole life

16   policy that's Metropolitan Life policy?

17               MS. TAYLOR:  Repeat that.

18       Q       It's normal routine practice at Met

19   to send statements with whole life policies?

20       A       Some customers get a billing notice

21   and some people get anniversary statements.  AP

22   customers were getting anniversary statements.

23       Q       It was the company practice to send

24   AP customers anniversary statements?

25       A       From what I remember, yes.

105

WILHELMENIA TAYLOR

1

2      Q      How long had that been the company

3    practice?

4      A      I believe, I'm not sure, maybe date

5    back to 1988 or so.

6      Q      What about prior to that?  Was there

7    an APP program prior to 1988?

8              MS. TAYLOR:  Objection as to form.

9      A.    Program?

10     Q      The Accelerated Payment Plan, did it

11   exist prior to 1988?

12     A      The Accelerated Payment Arrangement

13   was introduced in I believe 1981 or so.

14     Q      Why were anniversary statements first

15   sent in 1988?

16     A      I believe that was, my recollection,

17   around the first year that the first customer,

18   first group of customers that would begin to

19   become eligible for AP.

20     Q      Outside of the anniversary statement

21   which you said had been sent since 1988 and some

22   of the other things that were already done in

23   Metropolitan Life, was there anything new that was

24   done with respect to these people where it was

25   determined they didn't have sufficient dividend

106

WILHELMENIA TAYLOR

1

2    balance or dividends in their policy to allow the

3    policy to remain in APP?

4            MS. TAYLOR:  Which specific people

5        are you referring to?  The 25 referred to

6        at page two?

7        Q    We can start with that, if you want.

8    Maybe I'll state the question again so it's clean.

9            Outside of things that had already

10   been done at Metropolitan Life, policies already

11   in place, including the anniversary statements and

12   billing statements and other things, was anything

13   new initiated with respect to the people which

14   were identified as a part of the study we just

15   talked about, the 25 percent, to contact them and

16   let them know there were insufficient dividends or

17   dividend balances in their policies to allow it to

18   remain on APP?

19           MS. TAYLOR:  Objection as to form.

20       A    I can't recall other than the things

21   you just mentioned.  Any special notifications

22   that were sent to these particular customers

23   identified in the study.

24           (OFF THE RECORD)

25           (LUNCHEON RECESS TAKEN)

107

1          WILHELMENIA TAYLOR

2          A F T E R N O O N   S E S S I O N

3

4     WILHELMENIA TAYLOR continues testifying as

5     follows:

6

7     CONTINUED DIRECT EXAMINATION BY MS. TAYLOR:

8              (Letter, November 4, 1995, Rayl

9     to Lynch is received and marked Taylor 11 for

10    identification)

11             MR. BARTHOLOMAEI:  For the record,

12        what I have just marked as Taylor

13        deposition Exhibit 11 is a November 4, 1995

14        letter from Jim Rayl to Frank Lynch

15        regarding Collapse Date Notification -

16        Accelerated Premium Payment.  Bates numbers

17        of MP 4011071129 through 71132.

18        Q   Ms. Taylor, if you could just take a

19    moment and read through at least the first page of

20    this document and I'm going to ask you some

21    questions about it.  If you want to read through

22    the rest, that's fine, but I have questions only

23    as to the first couple of pages.

24        A   I read page 1 and 2.

25        Q   The last paragraph on page one starts

108

1                    WILHELMENIA TAYLOR

2    off, "The AP natural work team".  You see that?

3         A    Yes.

4         Q    Talks about a proposal suggesting

5    that all 93,000 policyholders currently on the AP

6    Arrangement be notified and Mr. Rayl says he was

7    lead to believe that the cost was prohibited or

8    cost was a consideration for not following through

9    with that proposal.

10              The first question I have, are you

11   aware of such a proposal that was considered by

12   the AP natural work team as described here by Mr.

13   Rayl?

14        A    I don't recall this proposal.

15        Q    Was there any proposal considered by

16   the AP natural work team of notifying all

17   policyholders who are currently on the AP

18   Arrangement?

19        A    I don't recall, but there were a lot

20   of memos in discussions that took place on the AP

21   team.  I don't recall specifically that proposal

22   to contact everyone.

23        Q    Was there any study done or any

24   investigation of the amount of money it would cost

25   to notify people who were on the AP Arrangement?

109

1                    WILHELMENIA TAYLOR

2          A      I also don't recall an amount or a

3    study.

4          Q      The company give any consideration to

5    the amount it would cost to notify a whole class

6    or the entire universe of people who are on the AP

7    Arrangement?

8                  MS. TAYLOR:   Objection as to form.

9          A      I don't recall the amount of money

10   with respect to notifying people you just

11   described.

12         Q      On the second page, Mr. Rayl talks

13   about the dividend scale having been lowered in

14   1996.

15                Do you have any knowledge as to

16   whether the dividend scale was lowered in 1996?

17         A      Yes, I believe the dividend scale was

18   lowered in 1996.

19         Q      What about at this point in time --

20   we are now talking about the end of 1995,

21   beginning of 1996 -- was any further contact made

22   with policyholders like we talked about before

23   outside of the anniversary statements, billing

24   statements or suggestion that representatives

25   contact policyholders who were participants in the

110

1          WILHELMENIA TAYLOR

2     AP Arrangement?

3          A     Although I wasn't involved in the

4     Accelerated Payment Arrangement during this time

5     period, I recall that there was some documents

6     with respect to the announcement of the dividend

7     scale reduction for 1996 that encouraged

8     representatives to contact their customers as part

9     of the preparation for this deposition.

10         Q     Was any further contact made with

11    policyholders individually like we talked about

12    before?  I asked you a whole series of questions

13    before at that time in '92, '93.  Was anything

14    done at this point in time in late '95, '96?

15              MS. TAYLOR:  Other than the

16         communication she already discussed?

17              MR. BARTHOLOMAEI:  Other than what we

18         talked about.

19         A     I don't recall other communications

20    other than what we discussed.

21         Q     You are not aware of any?

22         A     No.  I wasn't involved in the AP

23    Arrangement at that point in time.  I'm trying to

24    recall from the documents I looked at.

25              (Letter, October 28, 1994, Rayl

111

1                    WILHELMENIA TAYLOR

2    to Barbara Gardner is received and marked as

3    Taylor Exhibit 12 for identification)

4            MR. BARTHOLOMAEI:   What was just

5            marked as Taylor deposition Exhibit 12 is a

6            memorandum from Jim Rayl dated October 28,

7            1994.   This is addressed to Barbara Gardner

8            and the Bates numbers are MP 4011071009

9            through 71014.

10           Q     Is this something you have seen

11   before, Ms. Taylor?

12           A     No, I don't recall seeing this

13   before.

14           Q     Is this something that was used by

15   the natural work team?

16           A     Not that I can recall.  It's dated

17   October 19 '94 and I basically wasn't involved

18   with the natural work team after that.

19           Q     Do you know who would know the answer

20   to that?

21           A     I'm not even sure if I remember the

22   natural work team was still in existence in

23   October 19, '94.  I can't think of anyone who

24   would know this was used except some other members

25   of the natural work team.  There were several

112

WILHELMENIA TAYLOR

1    WILHELMENIA TAYLOR

2    people on the team.

3                    (Letter, January 3, 1995, Rayl

4    to Barnewold is received and marked Taylor 13 for

5    identification)

6                    MR. BARTHOLOMAEI:  What has just been

7    marked as Taylor Exhibit 13 is a one-page

8    letter from Jim Rayl to Bill Barnewold

9    dated January 3, 1995 regarding field

10   announcement for AP anniversary statements.

11   Document bears Bates number MP 4011071008.

12              (OFF THE RECORD) (ON THE RECORD)

13                    (Letter, Darlane West to

14   Barbara Gardner, January 11, 1995 is

15   received and marked Taylor 14 for

16   identification)

17                    (Memo to the Field Force from

18   Metropolitan Life re AP Arrangement

19   Customer Communications is received and

20   marked Taylor 15 for identification)

21                    (Document titled Accelerated

22   Payment (AP) Arrangement, March 28, 1995,

23   by Bill Barnewold is received and marked

24   Taylor 16 for identification)

25                    (Memo to Distribution, from

113

WILHELMENIA TAYLOR

1

2     William T. Barnewold, December 8, 1995, re

3     Accelerated Premium (AP) Arranged, plus

4     attachments, is received and marked Taylor

5     17 for identification)

6     Q    Ms. Taylor, you read this over?

7     A    Yes.

8     Q    Is this something you saw before

9  today?

10    A    I don't recall seeing this.

11    Q    This is another letter from Mr. Rayl

12  to Mr. Barnewold. Mr. Rayl in the second to last

13  paragraph says:

14         If anyone believes that the majority

15  of our Field Representatives will actually

16  approach these customers and explain it, they are

17  living in a dream world. Many of the writing reps

18  are long gone and the others have no vested

19  interest in communicating this kind of bad news to

20  the customer."

21         The question I have, is this

22  something that was considered in the proposed

23  strategies by the natural work team as to whether

24  the existing representatives would go and inform

25  customers that there may be issues with respect to

114

1                    WILHELMENIA TAYLOR

2    their Accelerated Payment plans where the plan or

3    policy had been sold by a prior representative who

4    no longer works at the company?

5                    MS. TAYLOR:  Objection as to form.

6         A      With respect to the rep's willingness

7    to do so?  I don't remember that being discussed

8    on the AP natural work team, although the reason

9    we created the brochures and educational pieces

10   was to explain how the AP Arrangement worked at

11   Metropolitan Life expressly for new

12   representatives who may be inheriting customers

13   that they didn't actually make the sale to.

14        Q      Were these brochures mailed to

15   policyholders or something the sales

16   representatives were supposed to distribute to

17   policyholders?

18                   MS. TAYLOR:  Objection to form.  I

19               think this was asked and answered.  I know

20               there was a discussion of ABC's dividends

21               she specifically mentioned.

22                   MR. BARTHOLOMAEI:  I'm not clear

23               whether that was something sent to Field

24               Representatives and either mailed out from

25               there or distributed from there or

115

1          WILHELMENIA TAYLOR

2          something mailed out from the Home Office

3          at Metropolitan Life?

4               THE WITNESS:  I believe the ABC's of

5          Dividends brochure was mailed out.

6          Q        Mailed out from where?

7          A        The payment process centers as stuff

8     included in bills to customers.  The brochures

9     were available and wording similar to the brochure

10    was included in the Metropolitan Life Outlook sent

11    to customers and Accelerated Payment brochure

12    could be used by the representative in a

13    discussion with either prospective customers or

14    customer regarding the AP Arrangement.

15         Q        Were any mailings done from the Home

16    Office or department of Metropolitan Life to

17    policyholders where the mailing only contained a

18    brochure talking about Accelerated Payment Plan?

19         A        I can't recall, but I don't believe

20    so.  I think it would be included with other

21    information about the policy.

22         Q        So these brochures were basically

23    stuffed in with a Bill or anniversary statement or

24    something like that?

25         A        The ABC's dividend brochure.  The

116

WILHELMENIA TAYLOR

1

2    other brochure could have been hand delivered and

3    discussed by the representative with the customer.

4        Q     The ABC's brochure was the only one

5    mailed to the customer?

6        A     That's that I recall.  This is 1995.

7    I don't remember from the documents what processes

8    and mailings took place after that date.  They

9    could be in the documents.  I can't recall right

10   now.

11       Q     Was there any follow up done on

12   whether sales representatives were actually going

13   and distributing the brochures to policyholders?

14            MS. TAYLOR:  You mean the Accelerated

15       Payment Arrangement brochure.

16            MR. BARTHOLOMAEI:  Yes.

17       A     Like a surveyor something?

18       Q     Anything, where the branch office

19   somebody contacted and said, are your sales reps

20   distributing these brochures or policyholders

21   contacted, and said, have you received brochures

22   from your sales rep?  Any type of follow up?

23       A     I can only speak what I know of.

24            Branch managers could have required

25   their sales reps or regional managers after we

117

1                        WILHELMENIA TAYLOR

2    made the brochures available.  I don't recall a

3    memo coming from the Metropolitan Life Home Office

4    or a survey conducted at that level.  It could

5    have been done at the more local level of the

6    field.

7         Q      I think you answered my question.  So

8    I'm clear.

9                        What I'm asking, was anything done at

10   the Home Office level to determine whether sales

11   representatives were either distributing, to

12   determine whether sales representatives were

13   distributing these brochures we just talked about?

14        A      I can't recall any action taken at

15   the Home Office level to determine whether the

16   representatives were using these brochures and

17   discussing these brochures with their customers.

18        Q      Are you aware of that action taken at

19   any level?

20             MS. TAYLOR:  Objection as to form.

21        Asked and answered.

22        A      Not a survey.  I can't really speak

23   to what the local management did.  It didn't

24   happen at the Home Office level.  It's very

25   conceivable it happened at the field office

118

WILHELMENIA TAYLOR

1

2   levels.

3        Q      I understand it's possible.

4        A      I'm not aware of it, no.

5             MR. BARTHOLOMAEI:   I'll mark this

6   next document as Taylor Exhibit 14.   It is

7   a one-page memorandum from Darlane West to

8   Barbara Gardner regarding AP Accelerated

9   Payment Arrangement.   Bates number of the

10   document is MP 4011070911.

11        Q      Prior to today, is this something you

12   had seen before?

13        A      No, I don't recall seeing this.

14        Q      Do you know who Darlane West is?

15        A      If I'm not mistaken, Darlane West was

16   at some time I think she participated on the AP

17   natural work team.

18        Q      What role did she play in the AP

19   natural work team?

20        A      She was a member of the customer

21   service organization that participated on the

22   team.

23        Q      In the second to last paragraph it

24   states, that it says in the next couple of weeks

25   the billing documents to carry the AP collapsed

119

1                    WILHELMENIA TAYLOR

2    date.

3                    Let me ask you first if you know what

4    that means, the AP collapsed date?

5                    MS. TAYLOR:  Objection to form.

6        A    I'm not sure what she means by

7    collapsed date.

8        Q    Is that a term used at Metropolitan

9    Life?

10       A    It's in this memo.  It's not a term

11   I'm familiar with.

12       Q    The last two sentences of that same

13   paragraph says:

14               "A short statement on a billing

15   document is not enough.  We need to be providing a

16   complete explanation about the AP problems before,

17   underlined, we place any information on the

18   billing documents."

19               Is that something that was considered

20   by the natural work team in deciding which

21   information would be placed on the billing

22   documents sent to policyholders who were

23   participants in the AP Arrangement?

24               MS. TAYLOR:  Objection as to form.

25       A    I'm not sure what she's referring to

120

1                    WILHELMENIA TAYLOR

2    here because there was already information

3    including, from my recollection, the documents

4    that I reviewed, that was already included on the

5    billing document, anniversary statement for AP

6    customers.  I'm not sure what she's talking about

7    here.

8         Q    The paragraph above that.  The second

9    to last sentence says:

10                    "We can't continue to always rely on

11   our field associates to communicate policy

12   provisions to our policyholders."

13                    Is that something that was also

14   considered by the AP natural work team by others,

15   other people other than Ms. West who was part of

16   the team?  Did you understand the question?

17                    She says, we can't continue to awways

18   rely on our field associates to communicate policy

19   provisions to our policyholders.  You told me she

20   was part of the AP natural work team.

21                    I'm asking were there others on the

22   AP natural work team who either made the same

23   suggestion or was that something that was

24   discussed on the AP natural work team?

25                    MS. TAYLOR:  Objection as to form.

121

1                          WILHELMENIA TAYLOR

2          A       First of all, I mean Ms. West appears

3    to be talking about the communication of policy

4    provisions by Field Representatives and it's a

5    pretty broad statement.

6                   Always relying on the field sounds

7    more like her opinion.  I never heard that

8    discussed on the AP natural work team, that we are

9    always relying on field associates to communicate

10   policy provision and AP is not a policy provision.

11   I don't understand her statement even more.

12         Q       In that second to last paragraph

13   here, "our policyholders will not understand",

14   that's the second sentence.  Do you see that part?

15         A       Got it, yes.

16         Q       Was there any discussion done by the

17   AP natural work team as to the level of

18   understanding or communication that policyholders

19   had of billing statements like this?  Any testing

20   done showing it to people and asking them to

21   explain it or if they could explain it?

22                 MS. TAYLOR:  Objection as to form.

23         A       She is referring to something for an

24   AP collapsed date.  Then she's saying, our

25   customers will not understand.

122

1          WILHELMENIA TAYLOR

2          So I don't recall us conducting a

3     study to decide if the billing documents that she

4     is referring to would be understandable to a

5     policyholder.  I don't recall any such study.

6          Q     What about a study investigating

7     whether, like I said, billing statements or

8     anniversary statements were understandable to

9     policyholders?

10          MS. TAYLOR:  I want to object to the

11          form.  I think the word "study" is

12          ambiguous, what a formal study is.  There

13          is a communications area.  And I believe

14          Ms. Taylor testified there was someone in

15          communications who was on that team and

16          objectively looks at documents in terms of

17          communications.  I don't know the word

18          "study" is that clear.

19          MR. BARTHOLOMAEI:  You can call it

20          what you want.  I'm asking about any type

21          of investigation, gathering of information

22          in order to obtain a result where people

23          looked into something such as the level of

24          understanding that people had when they

25          received their anniversary statement or

123

WILHELMENIA TAYLOR

1
2       billing statement of the information that

3       was contained in those statements.

4           Q    I gave you a couple of examples

5       before.  For example, someone was contacted and

6       said when you received your anniversary statement,

7       did you understand it could mean X or something of

8       that nature?

9           A    I'm not aware of it.

10          Q    What I just marked as Taylor Exhibit

11      15 is a three-page document to the Field Force

12      regarding the Accelerated Payment Arrangement,

13      Customer Communications dated March 27 1995.  MP

14      4011070918 to 70920.

15              On the right of the document it says,

16      Metropolitan Life Individual Sales Release.

17              The attachment is entitled MetLife's

18      Accelerated Payment Arrangement.  Is this

19      attachment, which looks like a brochure, is this

20      something you have been referring to during the

21      deposition today?

22          A    It appears to be, yes.

23          Q    What was the purpose of this

24      brochure?

25          A    To provide more education to MetLife

124

1              WILHELMENIA TAYLOR

2   customers on how the Accelerated Payment

3   Arrangement worked at MetLife in a question and

4   answer format.

5         Q      Just so we can identify it.  Can you

6   tell me, this was one of the brochures you were

7   referring to earlier, it was to be distributed by

8   sales representatives at the branch level?

9         A      It could have been.  If reps were

10  provided with a, I think a larger version of the

11  brochure.  This one was designed to be mailed.

12  This happened in 1995.

13        Q      Is this also a brochure mailed to

14  policyholders?

15        A      Reading this document it appears it

16  was mailed to customers.

17        Q      Can you tell me to whom this brochure

18  was mailed to generally?

19        A      Generally speaking, 1995 I wasn't

20  involved with AP.  I'm reading the document.  It

21  says it will be mailed with anniversary statements

22  to policies already active on the AP Arrangement

23  as well as being mailed to customers who newly

24  requested the AP Arrangement.

25        Q      Is this brochure something you have

125

WILHELMENIA TAYLOR

1

2    seen before?

3         A       The longer version, yes.

4         Q       What's the longer version, what does

5    that mean?

6         A       This is a one-page brochure and says,

7    although the format and design of the brochure has

8    been altered to meet postage requirements, the

9    text of the one-page AP insert is identical to the

10   text of the legally-approved consumer brochure.

11        Q       The one that was provided to sales

12   representatives is actually a three or four-page

13   brochure?

14        A       It may have been more than three or

15   four pages.  It's in the documents how many pages

16   it was.

17             This says there were eight pages,

18   third paragraph.

19        Q       Was this brochure created by the

20   natural work team?

21        A       Which brochure?

22        Q       The one we are looking at?

23        A       Since is identical in nature, the

24   natural work team did work on the brochure, yes.

25        Q       Who else worked on that besides the

126

1              WILHELMENIA TAYLOR

2    natural work team, if anybody?

3          A    I don't know, that I can think of.

4    The team worked on it and it was approved for

5    release.

6              MR. BARTHOLOMAEI:   What I have marked

7          as Taylor Exhibit 16 is a document entitled

8          Accelerated Payment Arrangement, and the

9          Bates numbers are MP 4011070905 through

10         70908 and there is a document signed by

11         Bill Barnewold annotated March 28, 1995.

12         Q    Is this something you've seen before,

13   Ms. Taylor?

14         A    I don't recall seeing this.

15         Q    On the front page there is a list of

16   names from different departments in MetLife and

17   the bottom right there is a little star and says

18   AP, I assume that stands for natural work team,

19   NWT Members.   There are stars next to the names of

20   people on this list.

21              I want to ask you generally if you

22   recognize some of these people as members of the

23   natural work team where it is indicated?

24         A    I recognize some of the names, yes.

25         Q    I don't see your name.   At this time

127

WILHELMENIA TAYLOR

1

2      you weren't on the natural work team, is that

3      right?

4              A      Correct.

5              Q      On page two, it says:

6              "The following AP actions are

7      contemplated for 1995."   There is a list of

8      several different I guess called AP actions.

9                     Can you tell me which, if any, of

10     these, I'll use the word "actions" because that's

11     what it says in the document, were actually put

12     into effect in 1995?

13             A      I'd have to go through the documents

14     to see what was involved in the AP.   I would have

15     to check the documentation and compare it to the

16     documents.

17                    Item 1, it appears that was done.   We

18     just looked at it.

19             Q      Go through them one by one.   What

20     about number two?

21             A      I don't know.   I would have to -- I

22     don't know if there is any document that speaks to

23     it other than this memo.

24                    I can't recall if each one of these

25     things were done because I wasn't involved with

WILHELMENIA TAYLOR                                    128

1    the unit.  I would have to compare it to other

2    documentation as part of in deposition to see if

3    there was something that spoke to the

4    implementation.

5          Q    Do you know who I would have to talk

6    to to find out which of these things were

7    implemented?

8          A    Probably Bill Barnewold, he would be

9    the person.

10          Q    Can you look at number three, first

11    paragraph of number three.  If you could, read

12    that please.

13          A    Okay.

14          Q    At the top of the page and right

15    below that paragraph, it says:

16          Additional members of top management

17    would have to approve or concur with, it says this

18    threshold strategy and the collapse year parameter

19    selected.

20          Can you tell me why that particular

21    strategy would have to be approved by the other

22    members of top management?

23          MS. TAYLOR:  Objection as to form,

24    lack of foundation.

129

WILHELMENIA TAYLOR

1

2    A    No, I don't know why.

3        MR. BARTHOLOMAEI:  What I just marked

4    as Taylor Exhibit 17 is a document, the

5    cover page is dated December 8, 1995 which

6    attaches a document dated December 4, 1995.

7    MP 4011070898 through 70903.

8    Q    Is this something you had seen

9    before?

10    A    I don't remember seeing it.

11    Q    Looking at the first page below the

12    box where it is redacted, do you see that?

13    A    Yes.

14    Q    At the next Board of Directors

15    meeting on December 19, 1995 John Tweedy will be

16    updating the members on what is being done to

17    overcome the concerns associated with "vanishing

18    premium" cases.

19        Can you tell me if the term

20    "vanishing premium" was something that was used at

21    the company at this time in 1995?

22        MS. TAYLOR:  Objection.

23    Q    To describe a certain type of case?

24    A    In 1995 I wasn't involved with the

25    Accelerated Payment Arrangement anymore.

130

1                    WILHELMENIA TAYLOR

2                I'm looking at this document and it

3    has vanishing premiums, the words in quotes.

4    Office obviously used, but I don't know if it

5    was -- I don't know if it was used other than in

6    context of this memo.

7        Q    Can you look at the second page

8    please.

9                First paragraph says:

10               "Using the 1996 dividend scale, we

11   determined how many policies are eligible for AP

12   and how many will collapse before the life

13   expectancy of the policy is reached."

14               Again uses that term "collapse".  Is

15   that something again you are familiar with?

16       A    Nope.  I'm not familiar with the use

17   of that term.

18       Q    Below that it says, the following AP

19   information was determined as of 11/27/95.

20               149,482 policies, total number active

21   AP cases.

22               114,647 are fully sufficient for the

23   life expectancy of the policy.

24               34,835 will collapse before reaching

25   life expectancy of the policy.

131

WILHELMENIA TAYLOR

1

2        It goes on to give how many will

3   collapse after 10 years, how many will collapse

4   between five and 10 years and then on and on.

5        Can you tell me what study was done

6   or what information or investigation was made,

7   what information was gathered, excuse me,

8   investigation was made to determine these numbers

9   for these statistics?

10      A    No, I can't.

11      Q    Do you know who could tell me that?

12      A    Probably Bill Barnewold.

13      Q    Paragraph underneath that says, the

14   expected rate of collapse then, this is based on

15   the 1995 dividend scale, was 18 percent of the

16   policies that are active on MetLife's AP

17   Arrangement.

18      Next sentence says, using 1996

19   dividend scale, it is now expected 23 percent of

20   our AP Arrangement will collapse before the policy

21   life expectancy is reached.

22      Can you tell me whether that was in

23   fact accurate at this point in time in 1995?

24      MS. TAYLOR:  Objection as to form,

25      lack of foundation.

132

WILHELMENIA TAYLOR

1

2       A    No, I can't.

3       Q    Do you know who would be able to

4 testify to that?

5       A    Most likely Bill Barneworld.

6       Q    Look at the page ending in Bates

7 number 902 please.

8       At the top it has a heading, Future

9 AP work to be started in 1996.

10      Then it says number one, "Add wording

11 as required to AP annual notices".

12      What's an AP annual notice?

13     A    I'm not sure what he's referring to

14 here.

15       Q    Then it says A:

16      "For policies within the five-year

17 collapse window and as long as they remain within

18 the five-year window, continue to provide updated

19 options and date information on those billing

20 notices each year.  Policies that subsequently

21 move on outside the five-year window will cease to

22 receive information about options and collapse."

23      Can you tell me why policies outside

24 of a fifth year window would not be, the

25 policyholders would not be informed about a

133

1    WILHELMENIA TAYLOR

2    collapsed date as to their policy?

3        MS. TAYLOR:  Objection to form.  Lack

4      of foundation.

5        A    No, I have no idea what this is

6    talking about, the word "collapse".  I'm not sure

7    what options he's talking about either.  I'm not

8    familiar with any of that.

9        Q    Let me ask you to look at the last

10    page of the document please.  The last paragraph

11    says:

12            "A main obstacle securing/maintaining

13    the discipline required by our natural work team,

14    NWT, to work on AP while also working on their own

15    day to day jobs.  All of our members have other

16    high priority work that must be completed on a

17    timely basis.  No one is exclusively assigned to

18    work solely on the AP effort."

19            Is that something that was the case?

20    When you were working on the natural work team,

21    that you also had something other than AP going on

22    with your job?

23        A    Yes.

24        Q    Is that also the case that no one was

25    assigned exclusively to work on Accelerated

134

WILHELMENIA TAYLOR

1

2   Payment Plan type issues?

3           MS. TAYLOR:  Objection as to form,

4       lack of foundation.

5       A    Well, the AP natural work team and

6   all those members who were participating on the

7   work team had some part of their job typically

8   dealt with AP customer service reps, communication

9   folks, marketing people.

10          So to say that no one worked, no one

11  is exclusively assigned to work solely on the AP

12  effort --

13      Q    Is that accurate?

14          MS. TAYLOR:  Talking about people on

15      the work team?

16          MR. BARTHOLOMAEI:  Yes.

17      A    I don't know about everybody else's

18  job, I can only speak to mine.  There could have

19  been members that participated on the AP natural

20  work team when I was a part of it.  For me, I did

21  other things.

22      Q    Do you know who would know if there

23  were such people on the work team that were

24  assigned exclusively to work on AP issues only?

25      A    What time?  In '95?

135

1                    WILHELMENIA TAYLOR

2        Q        During the existence of the natural

3    work team?

4        A        It would have to be somebody who was

5    on the team from the start until the end.    I

6    believe Barnewold was on the team from the very

7    beginning.

8        Q        What was his role on the team?

9        A        I believe that the administrative

10   people, the ones who set up -- his role began with

11   the mechanization, getting the system prepared to

12   handle AP requests and he was a member like most

13   of us and that obviously he had a bigger role

14   later on.    He's writing memos now.    Perhaps he

15   would be the one that can tell you about who was

16   doing what.

17       Q        When MetLife disseminated APP

18   marketing materials at or at the point of sale,

19   when APP marketing materials were used, was it

20   known that there was a possibility that the APP

21   marketing materials would not be accurate

22   illustrations of the way the policy would be

23   performed?

24              MS. TAYLOR:    Objection to form.

25              (RECORD IS READ)

136

WILHELMENIA TAYLOR

1

2    MS. TAYLOR:  Objection as to form, I

3    think it's confusing and known by him.

4    Also assumes facts.

5    Q    Did you understand that?

6    A    Not really.

7    Q    I can rephrase it if you need me to.

8         When MetLife created APP marketing

9    materials, something we talked about earlier in

10   the deposition, I asked you if APP was a marketing

11   tool and you said it was.  I'm asking when MetLife

12   created marketing materials, was it known by

13   MetLife that the APP plans wouldn't necessarily

14   perform as represented at the time of sale by the

15   sales representative to the policyholder?

16        MS. TAYLOR:  Objection as to form.

17        It assumes facts that haven't been

18        established.  Also mischaracterizes her

19        prior testimony.

20        MR. BARTHOLOMAEI:  Do you want it to

21        be read back with numerous clauses,

22        subparts?

23        (RECORD IS READ)

24        MS. TAYLOR:  There has also a lack of

25        foundation.  I'll just add that objection

137

WILHELMENIA TAYLOR

1      also.

2          A    It appears to be asking me about

3      something that the representative would be doing

4      and I don't know -- you said something about the

5      representative.  I think.

6          Q    The representatives didn't create the

7      APP marketing materials, right, they didn't draw

8      them up themselves and type them up in the office?

9          A    That's why I have a problem with the

10     question.

11         Q    All I was saying was that the

12     representative would eventually have to show that

13     to the customer.  You understand what I'm saying?

14     As far as it getting to the customer through the

15     representative?

16         A    Yes.

17         Q    The question was when MetLife created

18     the marketing materials themselves, did MetLife

19     know the marketing materials wouldn't necessarily

20     illustrate the policy accurately if there was some

21     kind of change in the dividend sale or whatever

22     other variable there might have been?  Do you

23     understand that?

24         MS. TAYLOR:  Let me put an objection

138

WILHELMENIA TAYLOR

1

2          on the record.  It assumes facts that

3          haven't been established.

4          A.    The illustration as given to the

5    customer as part of an APP discussion with the rep

6    was the illustration in some type of consumer

7    brochure.  The illustration is just that, it's an

8    illustration of how the APP Arrangement would work

9    based on using current year's dividend scale and

10   so that, I don't know how they could possibly know

11   something else further down the road when they

12   were using the current year's dividend sale.

13         Q     I think this is getting to what I was

14   asking you about.

15               When you just said, "I don't know how

16   they could possibly know something further on down

17   the road", what did you mean by that?

18         A     I thought the question was did

19   MetLife know it would not perform the

20   illustration?

21         Q     Correct.

22         A     The illustration is just that.   It

23   uses the facts of a dividend scale that was in

24   effect at that time.

25               Based on that set of information the

139

WILHELMENIA TAYLOR

1

2    illustration is prepared and it's not trying to

3    look forward out to the future.  It's based on

4    using the current year's dividend and produce the

5    sales illustration based on that dividend scale.

6    I don't know how to answer the question.

7        Q        I think that does answer the

8    question.

9                Why wasn't the illustration produced

10   looking into the future, like you said?

11               MS. TAYLOR:   Objection as to form.

12               This was asked and answered.  She

13               previously had testified about the fact it

14               was her understanding that insurance laws

15               or regulations required companies to

16               illustrate using the current dividend

17               scales.  It was a requirement and I believe

18               that was her testimony last week.

19               She can answer it again but it's

20               already in the other transcript.

21       Q       Answer again if you can.

22       A       When sales illustrations are

23   produced, Met as well as other life insurance

24   companies were limited to the use of the dividend

25   scale in effect at the time the illustration is

140

1                    WILHELMENIA TAYLOR

2    being produced and did not use any other dividend

3    scale in the production of that sales illustration

4    and that was, as far as my recollection, that was

5    a regulation of the law, that was a requirement.

6    We didn't have any alternative.

7          Q      At the time of the sale where an APP

8    illustrations was used, was any needs analysis

9    done in connection with an APP sale as to whether

10   the person would be able to afford the policy if

11   the dividend scale did drop or some variable

12   change that changed the AP year of the policy?

13               MS. TAYLOR:  Objection as to form.

14               Are you asking her if she knows what

15          happened during a particular transaction

16          involving a particular policyholder and

17          sales rep?  That seems to be what you are

18          asking her.

19               MR. BARTHOLOMAEI:  In essence that is

20          what I'm asking her with respect to what

21          MetLife's policies were with respect to AP

22          sales and she is the AP corporate designee.

23               MS. TAYLOR:  The way you phrased it

24          is in a specific situation.  You're asking

25          whether there was a policy.  That's a

141

1                    WILHELMENIA TAYLOR

2           different issue.

3                    MR. BARTHOLOMAEI:  That is what I'm

4           asking.

5                    MS. TAYLOR:  Why don't you restate

6           the question then.

7           Q       Was there a MetLife policy where the

8    sales agent was to do a needs analysis at the

9    point of sale to determine if a proposed insured

10   or a prospective customer could afford the policy

11   if the AP year changed on the policy?

12                   MS. TAYLOR:  Objection as to form.

13          A       I don't recall and I wasn't involved

14   in how you are instructed to market the AP

15   concept.

16                   But overall I have read documents in

17   the past to conducting a needs analysis in the

18   sale of all life insurance sales regardless

19   whether it was an AP sale or not and I don't

20   remember any policy with respect to

21   representatives doing some special needs analysis

22   based on a fluctuation or change in the AP

23   eligibility of a customer.

24          Q       How often did policies sold, pursuant

25   to APP, not qualify for APP in the year that's set

142

1                    WILHELMENIA TAYLOR

2      forth in the APP illustration?

3                    MS. TAYLOR:  Objection as to form.

4           A      I don't know the answer to that

5      question, but there may be documents, even ones we

6      already spoke to, that might give us information

7      as to when policies may not be able to stay on APP

8      that were already on APP with respect to those

9      that weren't on APP and shown illustrations.

10                   I don't have any information that I

11     can recall that tells me about that.

12          Q      Do you know who might know that?

13          A      No, I don't.

14          Q      Can you tell me what information an

15     Account Representative was trained to provide to

16     customers at the time of sale with respect to the

17     Accelerated Payment Plan?

18          A      Although I wasn't in the training

19     department, I know that a sales illustration was

20     available for use by the rep as well as consumer

21     brochures that explain the AP Arrangement.

22          Q      Did the sales rep have to use a sales

23     illustration in making an Accelerated Payment

24     sale?

25                   MS. TAYLOR:  Objection to form.

143

1                    WILHELMENIA TAYLOR

2        A     If he was using an Accelerated

3   Payment sale, he would most likely use an

4   illustration.   If he was just generally speaking

5   about the Accelerated Payment Arrangement, it

6   would not necessarily be, he wouldn't necessarily

7   be using an illustration.   Could be something that

8   comes up in a conversation with a customer.

9        Q     I guess what I'm asking, could a

10  sales rep at the point of sale say:  "We have this

11  thing called an Accelerated Payment Plan, I would

12  like to put you on this.   You're only going to

13  have to pay for seven years, after that the

14  dividend balance would be enough", whatever it is,

15  explain the Accelerated Payment Plan but not

16  necessarily show the person an illustration?

17            MS. TAYLOR:  Objection to form, calls

18        for speculation.   Lack of foundation.

19        Q     I'm asking if there is a Met policy

20  against that or you necessarily always have to

21  provide the person with an illustration when

22  making an Accelerated Payment sale?

23            MS. TAYLOR:  Objection as to form.

24   -    A     The last question, am I answering the

25  last question.

144

1                    WILHELMENIA TAYLOR

2              (RECORD IS READ)

3              MS. TAYLOR:  Also a compound

4         question.

5         A    I understand the last part, was there

6    a policy required.  My understanding, correct, a

7    use of sales illustration in an AP sales by a rep?

8    Is that what you are asking?

9         Q    Yes.

10        A    I don't recall a policy that said you

11   had to use a sales illustration if you were

12   discussing AP.  I don't know what a rep would do

13   or not do, but I don't recall a specific policy.

14        Q    Who was it at MetLife that approved

15   the reduction to the dividend scale in the early

16   '90s?

17        A    My understanding it was the Board of

18   Directors that approved the dividend scales.

19        Q    Is that the same for every year?

20        A    My understanding it was the Board of

21   Directors.

22        Q    What about interest rate reductions?

23        MS. TAYLOR:  Objection.  I think it's

24        beyond the scope of this deposition.  This

25        is an AP deposition and interest rates

145

WILHELMENIA TAYLOR

1

2          don't relate to that.

3          Q     Prior to the reduction of the

4     dividend scale in 1992, was any consideration

5     given by the MetLife Board of Directors on how a

6     reduction would affect policyholders on APP?

7          A     I'm not sure if it was the 1992

8     dividend scale, but I recall seeing a document

9     when I prepared for this deposition that discusses

10    someone at Met providing information to the Board

11    of Directors with respect to APP, the impact

12    dividends have on an APP.  I seem recall there was

13    discussion about that.

14         Q     Was it a document we looked at today?

15         A     I don't think so.

16         Q     Can you tell me what that document

17    was?

18         A     Something that came from the

19    actuaries to the Board.

20              MR. BARTHOLOMAEI:  Is that something

21    you can provide, Penny Taylor?

22              MS. TAYLOR:  We produced to you

23    memoranda that were prepared, memos.

24    Before the Board reaches a decision, they

25    review a recommendation.  The actuarial

146

WILHELMENIA TAYLOR

1

2    department prepares memos and say for this

3    year this is our recommendation and that

4    goes through their recommendation and

5    analysis. We produced those. That is what

6    she's referring to.

7         She's not on the Board of Directors

8    or actuarial department, but there are

9    documents that talk about the

10   considerations and you do have those.

11        MR. BARTHOLOMAEI: I think at this

12   point I don't have any further questions.

13        I would like to request that some of

14   the documents that you have identified, at

15   least you said you think you referred to a

16   document and hoping some of those would

17   have been here today. It may have been

18   some of those I weeded out to make the

19   deposition go a little quicker. If some of

20   those can be identified where you were

21   referring to a specific document that we

22   eventually didn't get to.

23        MS. TAYLOR: I'll reserve as to that

24   issue and I obviously need to discuss it.

25        Does anyone else have any questions,

147

```
 1              WILHELMENIA TAYLOR

 2    people in Pittsburgh?

 3         MR. LABOVITZ:  No, we do not have

 4    questions.

 5         MS. TAYLOR:  I think we're finished.

 6

 7    (TIME NOTED:  2:42 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

148

1

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK)
                              :ss
5    COUNTY OF          )

6

7              I, WILHELMENIA J. TAYLOR, hereby

8    certify that I have read the transcript of my

9    testimony taken under oath in my deposition of

10   October 1, 2002; that the transcript is a true,

11   complete and correct record of what was asked,

12   answered and said during this deposition, and

13   that the answers on the record as given by me

14   are true and correct.

15

16

17        _____

18              WILHELMENIA J. TAYLOR

19

20   Signed and subscribed to
     before me, this _____ day of
21   _____ 2002.

22   _____
     Notary Public
23

24

25

149

1

2                    CERTIFICATION

3    STATE OF NEW YORK   }
                                   ss
4    COUNTY OF NEW YORK  }

5        I, ALBERT M. CITTONE, a Certified Court

6    Reporter and Notary Public of the State of New

7    York, DO HEREBY CERTIFY that WILHELMENIA J.

8    TAYLOR, the witness whose deposition is

9    hereinbefore set forth, was duly sworn, and that

10   such deposition is a true record of the testimony

11   given by such witness.

12       I FURTHER CERTIFY that I am not related to

13   any of the parties to this action by blood or

14   marriage, and that I am in no way interested in

15   the outcome of this matter.

16       IN WITNESS WHEREOF, I have hereunto set my

17   hand this 4th day of November 2002.

18

19

20

21   ------------------------------------

22              ALBERT M. CITTONE

23       Notary Public of the State of New York

24

25

```
                                                    150
1

2
                            INDEX
3

4   WITNESSES:                          PAGE / LINE

5   WILHELMENIA TAYLOR

6       DIRECT BY MR. BARTHOLOMAEI         3 /   6

7
                    INDEX OF EXHIBITS:
8
    EXHIBIT    DESCRIPTION            PAGE / LINE
9
       2       Letter, December 7,     35 /  10
10             1992, Rayl to Tom
               LaBadia
11
       3       Letter, December 17,    55 /  17
12             1992, Kathy Schoos to
               LaBadia
13
       4       Letter, December 11,    58 /  24
14             1992, Schramm to
               Duffy, plus
15             attachments

16     5       Letter, December 23,    62 /  12
               1992, Rayl to Martin,
17             plus attachments

18     6       Letter, Rayl to         65 /  19
               Schoos, December 31,
19             1992

20     7       Letter, January 12,     67 /  22
               1993, LaBadia to Lynch
21
       8       Letter, January 19,     69 /  18
22             1994, Rayl to Crimmins

23     9       Memo to Frank Lynch     72 /   2
               from LaBadia March
24             30, 1994

25     10      Letter, April 14,       82 /  25
```

151

| | | | | |
|---|---|---|---|---|
| | | 1994, Wilhelmenia Taylor to Greg Doby, plus attachments | | |
| 11 | | Letter, November 4, 1995, Rayl to Lynch | 107 / | 8 |
| 12 | | Letter, October 28, 1994, Rayl to Barbara Gardner | 110 / | 25 |
| 13 | | Letter, January 3, 1995, Rayl to Barnewold | 112 / | 3 |
| 14 | | Letter, Darlane West to Barbara Gardner, January 11, 1995 | 112 / | 13 |
| 15 | | Memo to the Field Force from Metropolitan Life re AP Arrangement Customer Communications | 112 / | 17 |
| 16 | | Document titled Accelerated Payment (AP) Arrangement, March 28, 1995, by Bill | 112 / | 21 |
| 17 | | Memo to Distribution, from William T. Barnewold, December 8, 1995, re Accelerated Premium (AP) Arranged, plus attachments | 112 / | 25 |