# EXHIBIT   A1

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

253
1    Q.   This is that meeting with the attorneys in
2  January of '96?
3    A.   Yes.
4    Q.   Okay.  We will hold on that.  Do you have
5  any basis, do you have any personal knowledge as to
6  whatever was communicated in that meeting was
7  communicated to anyone else in MetLife?
8    A.   The meeting was precipitated by a memo I
9  wrote to CMO members.  No, I do not have any
10  specific knowledge that --
11    Q.   It went beyond --
12    A.   No.
13    Q.   -- the legal organization?
14    A.   No.
15    Q.   Okay.  Now, one of your allegations is you
16  had a history, and I will quote here, "history of
17  reporting violations."
18    A.   Yes.
19    Q.   Including violations, churning and
20  accelerating premiums, vanishing premiums, which we
21  have sort of generically referred to as "public
22  policy."
23    A.   Yes.
24    Q.   I will now be more specific.  It's those
25  issues that we are now talking about in terms of
         ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                254
1  public policy, the accelerated payments, the --
2    A.   Yes.
3    Q.   -- vanishing premiums, the churning
4  allegations, correct?
5    A.   Yes.                    **CONFIDENTIAL**
6    Q.   And those are problems that obviously
7  there was general publicity with regard to issues
8  raised against MetLife and other insurance
9  companies by various lawsuits, insurance
10  commissioners, et cetera.  I assume it was brought
11  to your attention in that respect like every other
12  MetLife employee, but it was also, I take it,
13  brought to your attention to by customers who would
14  call in to the call center organization, raising
15  issues?
16    A.   My efforts started long before MetLife was
17  the subject of investigation and litigation on
18  those issues.
19    Q.   All right.  Now, I am going to mark a
20  number of documents here that you produced to us
21  not necessarily to go over them in any great
22  specificity, --
23    A.   Okay.
24    Q.   -- but for you to help me identify and
25  understand which ones you think fall in this
         ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                255
1  category.
2    A.   Sure.
3       (Certain documents were marked Deposition
4  Exhibits 37 through 43, inclusive, for
5  identification by the reporter.)
6       THE WITNESS:  Okay.
7    Q.   (BY MR. POOR)  What I am interested in,
8  tell me which groups reflect your history of
9  reporting violations in obtaining the status of
10  whistle blower, as alleged in Paragraph 43, so we
11  can talk about those without talking about the ones
12  that --

13 anyone did affirmatively to say to you, "it's a bad
14 thing that you are raising this, don't do this any
15 more, you are in trouble for" — when I say
16 criticism, that's what I am talking about in that
17 line?
18    A.  No, I don't recall any specific criticism.
19    Q.  Okay.  Now, which one of these documents
20 generated a meeting with lawyers?
21    A.  That one.
22    Q.  Now, you have handed me documents that
23 Bates stamped PL-01199 through -01202.
24    A.  Yes.
25       MR. POOR:  Why don't we mark that
       ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                261
1 separately just for the purposes —
2       THE WITNESS:  Sure.
3       MR. RAYL:  (Affirmative head nod).
4       MR. POOR:  — of keeping it straight.
5       Would you mark this as 46.
6    (A certain document was marked Deposition
7 Exhibit 46 for identification by the reporter.)
8    Q.  (BY MR. POOR)  This is a memo you wrote to
9 Mr. Lynch in November of '95, expressing your
10 concern over the field release on AP arrangements?
11    A.  Yes.
12    Q.  Okay.  What happened after you sent that
13 letter to Mr. Lynch?
14    A.  I did get a note from him, I believe
15 that's the one that he responded to, said it was of
16 interest, asked for some statistics, but it also
17 was copied to Mr. Tweddie, who was a CMO member,
18 but it was sometime — I'm trying to keep my years
19 straight — no, I guess it was relatively quickly,
20 December-January, somewhere in that time frame I
21 received a call from the law department and they
22 wanted to know when I would be in New York and that
23 they would like to discuss AP with me.
24    Q.  Okay.  Who did you get the call from?
25    A.  It was either Mr. Finnegan or — I believe
       ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                262
1 it was Kevin Finnegan.
2    Q.  Who is an attorney in the law department?
3    A.  Yes.
4    Q.  Okay.  And then you did have a meeting
5 with the lawyers in the law department?
6    A.  It met with Kevin Finnegan and Robert
7 Nostramo.
8    Q.  Okay.  Between sending the letter and your
9 meeting, did you have any other communication with
10 Mr. Lynch or anyone else in the organization on
11 this issue other than perhaps asking for
12 statistics?
13    A.  Most of what I wrote on this issue started
14 in 1992.  No, I don't —
15    Q.  I meant not on this issue, necessarily,
16 but specifically in response to this memo?
17    A.  No.
18    Q.  The next thing substantively really that
19 happened was the meeting with the attorneys?
20    A.  Yes, it was.
21    Q.  Okay.
22       MR. POOR:  I am going to ask him about the
23 meeting with the attorneys for the purposes of the
24 deposition, Brian.  Obviously, you know it's our
25 position that this is a privileged communication,
       ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**