**EXHIBIT B1**

To All Customer Service Representatives, Trainers & Resource

Re Settlement With The State of Pennsylvania &
   Related Publicity - "Churning" and "Replacement"

On Friday, March 4th, it is expected that the Pennsylvania Department of Insurance will release a formal announcement that it has reached a settlement and agreement with MetLife. The state of Florida is expected to make a similar announcement next Monday. Both of these actions have the possibility of generating another wave of negative publicity for the Company and/or the insurance industry. This could, in turn, create concern among some of our policyholders about the Company, its financial stability, etc.

You should have adequate material to answer any questions about our financial stability. At this point in time we still have outstanding ratings from all the rating agencies and there's no reason to believe these will change, or change significantly. Even if one or more of these were to be lowered a notch, our ratings would still be far superior to the vast majority of insurance companies. And, in relation to our total assets, the amount of fines we are paying *(1.5 million to Pennsylvania - potentially 20 million in total to Florida and other states)* plus the potential refunds to policyholders is relatively small.

> Although you can't say it to a customer, keep in mind that the settlement required for Prudential on their securities situation continues to be quoted at 640 million. Just yesterday morning it was on the business news that it had the potential of going to a billion. And, the impact on Prudential's financial stability was not cited in the broadcast as a major concern.

The situation in the state of Pennsylvania primarily revolves around the issue of *"churning."* This is a term that can be used with respect to life insurance or stocks. Stock brokers *"churn"* stocks when they *"buy and sell"* stocks from an existing portfolio primarily to generate commissions to themselves rather meet the customers' investment objectives. In some cases customers give their broker full authority to *"buy and sell"* on their behalf and in other cases the stockbroker persuades their clients to sell existing stocks to buy different ones. This has always been a problem with unethical brokers in the brokerage world.

The same principal can apply to life insurance. *"Churning"* occurs when the values from one or more policies are used to purchase a new one for the primary purpose of generating commissions rather than serving the client's best interest.

> BUT, NOT EVERY CASE OF *"REPLACEMENT"* IS CHURNING FOR COMMISSIONS. Just like in the brokerage world, in some cases it is in the best interest of the client to replace and in some cases it isn't. *It all depends . . . . . .*

Let me give you a personal experience. Several years ago I had two or three policies I had taken out when I first started with the Company. By the time they were about 15 years old, they were paying pretty good dividends and accumulating cash value. But, I also had significant loans on the policies and the dividends were not accumulating as I had withdrawn them all. At that point in my life, I really needed much more insurance protection than what these policies offered. And, because of the change in insurance products over the years, the pricing and performance of the newer policies had really become much better once you got past the initial costs *(first few policy years)*. The bottom line was that I could purchase significantly more total insurance coverage for relatively few additional premium dollars if I replaced the policies.

**CONFIDENTIAL**



DEPOSITION EXHIBIT

Had I left the dividends in the old policies, it might not have made sense to cancel them. They probably would have been eligible or close to being eligible for "AP" *(Accelerated Payment)*. I might also have been able to use the dividends to repay some of the loans. But, that was not the case. I had policies that were paying good dividends and accumulating cash value, but they were also being eaten up by the loans and loan interest. And, another consideration was the fact that I could not afford to pay premiums on the additional coverage I needed plus maintain the old policies. Therefore, I determined that I would be better off to put all my premium dollars into a new policy. So, I cashed in my old policies and replaced the coverage with a single, larger face amount policy.

> My point is this; . . . Technically, this could be classified as *"churning"* by an outsider looking in *(such as a state Insurance Department)*. However, I made an INFORMED decision which I personally believed was in my best interests. Therefore, the Account Representative writing the new policy did nothing wrong.

Now, it gets more complicated. Most policyholders are not sophisticated enough in their insurance knowledge to make this kind of judgement and decision on their own. Suppose the representative makes this same assessment and arrives at the same conclusion and convinces a policyholder to replace his older policies. Again, to someone not knowing the full circumstances, it could have the *"appearance"* of *churning* when it really isn't.

In many cases, the Account Representative *(and the customer)* will recognize that there is a need for a lot higher face amount of insurance than the individual's current policies provide. Consequently, the representative will do this evaluation and suggest to the customer that they can increase their protection for relatively few dollars in additional premiums.

Now, the advent of the Universal Life policies and the PUAR on Whole Life further complicated this whole replacement issue and, unfortunately, some of the tactics that were used in convincing the client to update their insurance. UL and the PUAR provided a vehicle whereby the money from the old policy(ies) could be transferred *("dumped")* to the new policy to further assist with covering higher premiums and/or higher insurance amount requirements. Again, this can still be in the client's best interests and there is nothing wrong with it PROVIDED the policyholder has some understanding as to what has transpired and knows what to expect in the future.

Because of the potential for unethical *"churning"*, MetLife established electronic systems and controls years ago to monitor and detect this kind of activity. It is tracked for every representative. When a new policy is issued, it is matched against the Company's existing records to determine if any other policies are being cancelled. The system can detect a cancellation up to 13 months AFTER the new policy is issued. When a match is found, it is tracked and the percentage of such matches are commonly referred to as the representative's "FIP Ratio" *(Financed by Inforce Policies)*. It is recognized that, in some small percentage of cases, it may be in the policyholder's best interests to replace their policies. As long as the representative's FIP Ratio was very low *(under 15% of total applications I think)*, it is not a major concern. But, if a representative's ratio is near or exceeds this percentage, the Branch Manager is held accountable to investigate and take appropriate action. When policies are *"replaced,"* they are also subject to *"Rewritten Business"* rules. In essence, this means the representative does not earn full commissions. He or she essentially only earns commissions on the difference in premium between the old policy(ies) and the new one.

CONFIDENTIAL

The total opposite of this scenario is apparently what happened in Pittsburgh. As I understand the situation, there was an organized effort on the part of some representatives to actively churn business while taking specific measures to circumvent the Company's auditing and system controls on FIP and Rewritten Business. One of the ways this was done was by keeping the old policies inforce for more than 13 months before letting them lapse or be cash surrendered. In some cases, it may have still been in the policyholder's best interests to replace the policies but the manner in which it was done violated Company and Insurance Department regulations. In many cases it undoubtedly was not in their best interest, primarily because the policyholders did not understand what was happening. The manner in which these were policies were sold or represented was clearly NOT in keeping with Company guidelines OR Insurance Department regulations. Consequently, the Company is being fined heavily and we are going to offer all these policyholders the opportunity to totally "undo" these transactions.

This situation gets even worse in some cases because of the way the policies were misrepresented or sold. Customers were told that there would be no *"out of pocket"* expense to the policyholder or that it would be *"free."* In some of these instances the representatives thought this would work or be true. They thought the values being transferred from the old policies would be sufficient to keep the new policies going until they could go on "AP" *(Accelerated Payment)*, thereby resulting in no premiums having to be paid by the policyholder. But, the change in dividend scales and the change in AP eligibility dates probably contributed to complaints which surfaced these cases. I suspect that many of these policyholders did not understand the whole concept of "AP" and the potential for additional premiums being required. The subsequent investigation revealed that these tactics were fairly widespread in the Pittsburgh area and, as some of the publicity you have seen reported, a significant number of sales employees were terminated.

We must now be prepared to deal with the fact that:

The Publicity May Generate Calls
From Policyholders Who Are Concerned
Because They Had Old Policies Replaced With A New One(s)

DO NOT AUTOMATICALLY ASSUME THERE WAS WRONGDOING!

*Do Not Say Anything The Policyholder Can Construe As Acknowledgement Of Wrongdoing!*

The problem with this whole issue is the fact that there are *a thousand shades of gray*. And, all of this is complicated by the fact that in most cases the policyholder won't really remember or have a thorough understanding of all the considerations involved at the time of the sale. But, let's assume the Account Representative made an honest assessment of the client's existing insurance protection as well as their future needs and objectives. And, based on this, truly believed it was in the client's best interest to replace the older policies. Now, let's further assume the Account Representative explained in good detail to the client why he believed this should be done. And, after hearing the representative, the client agreed and has now replaced all his older policies with a new one(s).

CONFIDENTIAL

3

The odds are that the client probably only truly understood 25% to 50% of what the representative tried to explain. And, if more than a year has gone by, the policyholder probably only remembers about 10% of the facts and conversation. This also assumes we're dealing with a representative who really knew his stuff. The probability is that the client was really relying on his "trust" of the representative and the Company.

Now, let's say it's two or three years later. What do you think the odds are that the client really remembers what the representative told him at the time? Let's also suppose he now picks up a newspaper or sees something on T.V. about the *"scams"* in Pittsburgh where representatives were *"bilking"* customers by getting them to *"replace"* their old policies with new insurance *"just to generate commissions."*

If this person is a reasonable human being, he or she will not be able to help but become concerned that he or she may have been a *"victim."* If the Representative who wrote the policy is still active with the Company and their relationship with the client is still good, the representative will probably be able to satisfy the policyholder that they had made the right decision. But, in many cases, the representative is not still there. *Where do they turn?* In all probability, to 800+MET-LIFE.

Now, as I mentioned before, there are a thousand shades of gray involved. And, there will undoubtedly be cases in other areas where the replacement was NOT in the customer's best interests or the transaction was not properly explained. Other issues involved will include; *how knowledgeable was the representative? Was the advice given to the customer well intentioned but not complete? Did the customer have other needs that were a consideration (but are now forgotten) such as a need for some instant cash that would be available through the cash surrender of the old policies?*

My point is this; Depending upon the extent of the publicity, there could be a lot of concern generated among policyholders who really did the *right thing* in replacing their older policies. Or, at the very least, did not do a wrong thing. But, the circumstances could be very different for *EVERY* situation. Therefore, as you handle these calls, please keep the following in mind:

❶ If the customer expresses concern that a Representative "talked them into" replacing older policies something along those lines, your first words should be something along the lines of:

> *Mr/Ms Policyholder, I would like to reassure you that there are many situations where it makes perfect sense and really is in the policyholder's best interests to replace their older policies with a new one. There are many things to take into consideration when making such a decision and each situation is different. It just depends upon the individual circumstances for each person and their personal needs or objectives.*

You should immediately follow-up with a question about their "new" policy:

> *May I ask if you feel there is some problem with the insurance protection you now have? I will be more than happy to review that policy(ies) with you?*

❷ The odds are that in most cases, the policyholder was satisfied until the publicity created some concern. I expect that in most instances they may have a few questions about their new policy but will be generally satisfied with it. If they have questions about their policy, do your best to answer them.

**CONFIDENTIAL**

4

MP401107065

❸   Any publicity is likely to give the policyholder the impression that *all replacement is bad*. If, after your first attempt to satisfy the customer they still express serious concerns because of what was in the media, you can consider saying something along the lines of;

> *Mr/Ms Policyholder, I understand your concern. And, I assure you that MetLife is equally concerned. But, I'm sure you can appreciate that the news media has a tendency to emphasize only the worst possible scenario. As I mentioned before, with the dramatic change in the insurance industry and the types and increased competitiveness of our products over the last several years, there many situations where replacing older policies with a new one makes perfect sense.*
>
> *Have you attempted to discuss this with your Representative?*

ANSWER IS "NO!"

> *Mr/Ms Policyholder, your representative would be the person most familiar with your specific situation. Why don't you give him/her a call and let them know you would like to discuss your concerns.*

ANSWER IS "YES" - OR - "THE REPRESENTATIVE NO LONGER WORKS FOR MET"

You will receive more specific instructions. But, until those are received, do the following: If the policyholder has discussed the situation with their representative and he/she still has concerns, . . . OR the representative is no longer active, you should make every effort to satisfy the policyholder's concerns. If you are unable to do so, then it will become a case for Consumer Relations. Advise the policyholder something along the lines as follows:

> *Mr/Ms Policyholder, I am very sorry that I can't put your mind at ease on this situation, but if you are still concerned, our Consumer Relations Unit will be more than happy to look into this further. I will refer this situation to them, but in order for them to do a proper investigation, you will need to send them a letter which outlines your specific concerns as well as everything you can remember that transpired at the time your new policy was sold. If you have any material that was given to you by the sales representative at that time, it would be very helpful to our Consumer Relations people if you could include a copy of that material.*

Then provide the policyholder with the address for Consumer Relations. Classify the call as a "*Complaint*" - Use Source Code "*TV*" and send a referral to Consumer Relations to let them know they should expect to hear from the policyholder.

---

You should be alert to the fact that you may need to respond to a variety of questions regarding the new policy. There is a fair probability that you could get into some questions regarding the premium payments and/or when the policy will be eligible for "AP." It is very possible that "AP" was discussed in conjunction with the sale of the new policy.

**CONFIDENTIAL**

5

## BUT, THERE CAN BE A FINE LINE AS TO WHETHER THE POLICY WAS POTENTIALLY MISREPRESENTED WHEN IT COMES TO "AP"

Any questions or problems with "AP" should generally be, by themselves, a totally separate issue. As you know, we already have lots of questions regarding the change of "AP" eligibility dates. These issues would be unrelated to the *"churning or replacement"* subject unless promises were made in conjunction with the sale which were obviously clear misrepresentation at the time. If you cannot satisfy the customer's concerns about any "AP" or related issues, then handle it as a Consumer Relations case as outlined previously.

We will provide you with additional information when it becomes available. There will be special campaigns in place to deal with affected policyholders. It is also expected there will be a special "interrupt" screen on PIOS for policies issued in Pennsylvania which were specifically associated with The Sales Representatives involved.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

March 4, 1994

*File This Memo Under Special Campaigns - Temporary Procedures*

CONFIDENTIAL

MP40110706566

Barbara J. Gardner
Vice-President

Re    1990 Performance - Teleservices

Barbara, because of all of the activities we both had going, we were never able to connect on the Objectives meeting. I ran across some of the material I prepared and thought you might still be interested in reviewing this information even though it is a little outdated.

Particular attention should be paid to the increases in the C/L/D volumes. There is a dramatic increase in UL payment transactions. For the most part, these are much more time consuming and clerically intensive than regular Notice business.

The complexity of our correspondence work is also increasing. We are encountering many cases where people do not understand their UL policies or how they were funded from other inforce policies. This results in lengthy investigation and, in some cases, complicated reversal transactions to restore old or previously cash surrendered policies to their original status.

We continue to be vulnerable in our Cash/Loan/Dividend area. While we have extensive training taking place, it is a slow process because of the varied and complex activities. We are continuing to watch our staffing in this area as we cannot afford to be caught short as Teleservices expands. The other head offices will surely use any such faltering on our part to argue for having work referred back to them.

At any rate, we will continue to monitor our volumes in this area to make certain we have the appropriate level of staffing to keep pace with the increasing work being generated by the expansion of Teleservices.


J. L. Rayl
Manager
Teleservices - C/L/D

September 15, 1990

CONFIDENTIAL

MP4011070657