# CONDENSED TRANSCRIPT

Deposition of: Robert G. Wycoff

September 17, 2003

Robert G. Wycoff vs.
Metropolitan Life Insurance Company



*Court Reporting & Video Services*

600 Warner Centre
332 Fifth Avenue
Pittsburgh, PA 15222
412-263-2088

**www.pghdepo.com**

THIS TRANSCRIPT HAS BEEN
LOADED INTO SUMMATION

SEP 26 2003

**Page 1**

```
1
2            IN THE COURT OF COMMON PLEAS OF
             WESTMORELAND COUNTY, PENNSYLVANIA
3
                       -----
4
    ROBERT G. WYCOFF,    ) CIVIL DIVISION
5
       Plaintiff, ) No. 1011 of 2000
6                       )
       vs.     ) Deposition of
7              ) ROBERT G. WYCOFF
    METROPOLITAN LIFE   )
8   INSURANCE COMPANY and ) Filed on behalf of
    KENNETH F. KACZMAREK,  ) the Defendants
9                       )
       Defendants.  ) Counsel of Record for
10             ) this Party:
11             ) Robert P. Lesko, Esq.
12             ) McCarter & English
               ) Four Gateway Center
13             ) 100 Mulberry Street
               ) Newark, NJ 07102
14
               -----
15
    REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
16  WITHOUT AUTHORIZATION FROM THE CERTIFYING
    AGENCY
17
               -----
18
19
20
21
22
23
24
25
```

**Page 2**

```
1
2          DEPOSITION OF ROBERT G. WYCOFF
3   the Plaintiff herein, called by the Defendants
4   for examination, taken pursuant to the
5   Pennsylvania Rules of Civil Procedure, by and
6   before Kurt M. Ament, a Registered Professional
7   Reporter and a Notary Public in and for the
8   Commonwealth of Pennsylvania, at the law
9   offices of Thorp, Reed & Armstrong, 14th Floor,
10  One Gateway Centre, Pittsburgh, PA, on
11  Wednesday, September 17, 2003 at 9:27 a.m.
12             -----
13

    COUNSEL PRESENT:
14
    For the Plaintiff:
15
       Behrend & Ernsberger
16     by Mark A. Bartholomaei, Esq.
17  For the Defendants:
18     McCarter & English
       by Robert P. Lesko, Esq.
19
20
21
22
23
24
25
```

**Page 3**

```
1
2                    I N D E X
3                      -----
4
5       WITNESS:  ROBERT G. WYCOFF
6
7   E X A M I N A T I O N :        PAGE
8
9   BY MR. LESKO                    5
10
11  E X H I B I T S :               PAGE
12
```

```
13  WYCOFF DEPOSITION EXHIBIT NO. 1     24
14  WYCOFF DEPOSITION EXHIBIT NO. 2     65
15  WYCOFF DEPOSITION EXHIBIT NO. 3     65
16  WYCOFF DEPOSITION EXHIBIT NO. 4     65
17  WYCOFF DEPOSITION EXHIBIT NO. 5     122
18  WYCOFF DEPOSITION EXHIBIT NO. 6     128
19  WYCOFF DEPOSITION EXHIBIT NO. 7     170
20  WYCOFF DEPOSITION EXHIBIT NO. 8     171
21  WYCOFF DEPOSITION EXHIBIT NO. 9     175
22  WYCOFF DEPOSITION EXHIBIT NO. 10    190
23  WYCOFF DEPOSITION EXHIBIT NO. 11    195
24  WYCOFF DEPOSITION EXHIBIT NO. 12    218
25  WYCOFF DEPOSITION EXHIBIT NO. 13    220
```

**Page 4**

```
1
2   E X H I B I T S :               PAGE
3
```

```
4   WYCOFF DEPOSITION EXHIBIT NO. 14    227
5   WYCOFF DEPOSITION EXHIBIT NO. 15    234
6   WYCOFF DEPOSITION EXHIBIT NO. 16    244
7   WYCOFF DEPOSITION EXHIBIT NO. 17    247
8   WYCOFF DEPOSITION EXHIBIT NO. 18    259
9   WYCOFF DEPOSITION EXHIBIT NO. 19    261
```

```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Page 5

1
2           PROCEEDINGS
3              -----
4           ROBERT G. WYCOFF
5    the Plaintiff herein, having been first duly
6    sworn, was examined and testified as follows:
7           EXAMINATION
8    BY MR. LESKO:
9        Q.   Mr. Wycoff, we introduced ourselves
10   just a moment ago before we went on the record.
11   For the record, let me introduce myself again.
12   My name is Robert Lesko.
13       I work for the law firm of McCarter
14   & English.  We are counsel for the Defendant,
15   Metropolitan Life Insurance Company, in this
16   case.
17       A.   Okay.
18       Q.   Sir, have you ever had a deposition
19   taken before?
20       A.   No, sir.
21       Q.   Let me just explain briefly some
22   background in the deposition so it will go a
23   little bit smoother for us or insure that it
24   goes smoother for us.
25       This is a formal court proceeding,

Page 6

1           R. Wycoff - by Mr. Lesko
2    notwithstanding the fact we are in an informal
3    setting here in the conference room.  As you
4    see to your right and to my left between us is
5    a court reporter who is taking down everything
6    that we say.
7        I will be asking questions today,
8    and to the best of your ability, you will be
9    providing me with answers.  The court reporter
10   is going to take down everything that we say.
11       Because he is taking down everything
12   that we say, it is important that we not talk
13   over each other or interrupt each other because
14   all we're going to have is a black and white
15   record.  He has to get everything down on this
16   page so we can read it.
17       He can't take us down two at a time.
18   If we interrupt each other, then we -- the
19   answers might not be reflected correctly, the
20   question may not -- you may not fully
21   understand the question.  99 percent of the
22   time I will ask a question and before it is a
23   quarter of the way out of my mouth, you will
24   know the answer.  Let me finish the question so
25   the record is clear.

Page 7

1           R. Wycoff - by Mr. Lesko
2        It will give us an opportunity to do
3    a couple of other things.  It will give you a
4    moment to digest the question, consider it and
5    make sure your answer is accurate to the best
6    of your ability.
7        Your attorney, seated to your left,
8    may also want to insert an objection and if you
9    pause for a second or two, that will give him
10   an opportunity to do that.  If he does do that,
11   unless he directs you not to answer, you can go
12   ahead and answer the question.
13       If you have a problem with my
14   question in terms of not being able to
15   understand it, it's not clear, ask me for a
16   clarification.  I will be glad to do that for
17   you.
18       If you don't ask for a
19   clarification, for all intents and purposes, we
20   will assume that you understood the question
21   and answered accurately
22       Is that fair?
23       A.   Sounds fair enough to me.
24       Q.   Once the transcript of our
25   proceeding here is compiled, it can be used in

Page 8

1           R. Wycoff - by Mr. Lesko
2    the context of this litigation.  It can be
3    introduced at trial for impeachment purposes or
4    to establish facts and for other purposes.
5        Because of that, because it is a
6    formal proceeding, and in light of the oath
7    that you just took, please be sure to provide
8    the most accurate answers that you can, another
9    reason just to take your time and make sure you
10   understand the question and can recall the
11   answer.
12       If you can't recall an answer, let
13   me know.  It's perfectly okay.  We don't expect
14   you to remember everything, especially back in
15   '91 or '94.
16       If you are estimating at a date or
17   an amount, something along those lines, please
18   let me know you are estimating because it may
19   not be clear that you're estimating once we
20   read the transcript whenever it is compiled.
21       As a general rule, I don't want you
22   to guess at answers because we want to make
23   sure you have accurate answers.  There is a
24   fine line between estimating and guessing.
25   Just let us know how sure you are of a response

2 (Pages 5 to 8)

Page 9

1    R. Wycoff - by Mr. Lesko
2  if you are not sure.
3      Okay?
4      A.  (Nods affirmatively.)
5      Q.  All your responses need to be verbal
6  as opposed to a nod of the head or shrug of the
7  shoulders or um-hum or huh-uh so that the court
8  reporter can get it down.
9      A.  Sure.  I understand.
10      Q.  If you need to take a break at any
11  time during the deposition, for any reason, you
12  just want to get some air, need to use the
13  bathroom, phone call, let me know.  We can take
14  a break.
15      If there is a pending question, I'd
16  rather get the answer first and then take the
17  break.  During the breaks, please do not
18  discuss with your attorney, or anyone else, the
19  contents of this litigation or the allegations
20  of this litigation or questions in the
21  deposition.
22      If you do, I might ask you what the
23  content of your conversations were.
24      Okay?
25      A.  Outside of this room?  Did you say

Page 10

1    R. Wycoff - by Mr. Lesko
2  that?
3      Q.  Once this proceeding begins, until
4  it's concluded, you're not permitted to speak
5  with your attorney about this case, with one
6  exception:  If you think I ask you a question
7  and the answer would require you to disclose
8  attorney/client privileged information,
9  communications between yourself and information
10  you learned from your attorney, for example,
11  you can discuss that with your attorney to
12  determine whether or not that privilege
13  applies.
14      Then if it does, Mr. Bartholomaei
15  will instruct you not to answer, I am sure.
16      A.  Very good.
17      MR. BARTHOLOMAEI:  Mr. Lesko,
18  before we start, I just wanted to give you
19  these four pages.  Mr. Wycoff, in going through
20  some of his things, has located or actually not
21  for the first time, Mr. Wycoff went and made
22  some photocopies of his awards that he won.
23      These are photocopies of trophies
24  that he put on a photocopy machine.  He just
25  wanted us to bring them in and give them to

Page 11

1    R. Wycoff - by Mr. Lesko
2  you.
3      MR. LESKO:  Okay.  Great.
4  Thank you very much.
5      MR. BARTHOLOMAEI:  Sure.
6      Q.  Before we get started, do you have
7  any questions for me, Mr. Wycoff, about the
8  deposition?
9      A.  Not really.  I'm ready to answer
10  whatever you ask.
11      Q.  Okay.
12      A.  To the best of my ability.
13      Q.  Let's get going, then.  Did you
14  bring with you, other than these four pages,
15  which are marked for the record RGW 00148
16  through 151, did you bring any other materials
17  with you today?
18      A.  No, sir.
19      Q.  Did you meet with -- back up:  Have
20  you ever been a party to any other lawsuit?
21      A.  No, sir.
22      Q.  Did you meet with anybody or discuss
23  this deposition with anybody in preparation for
24  today's testimony?
25      A.  Outside of the law firm?

Page 12

1    R. Wycoff - by Mr. Lesko
2      Q.  Yes.
3      A.  No, sir.
4      Q.  Did you meet with your lawyers in
5  preparation for the deposition?
6      A.  From time to time, yes.
7      Q.  How many meetings did you have?
8      A.  I really don't know.  I didn't count
9  the envelopes I received.  But it didn't have
10  anything -- not pertaining to the speaking of
11  points of the deposition, but scheduling.
12      Q.  Okay.  I understand.  Did you meet
13  with them at any point to discuss what your
14  testimony might be today?
15      A.  Once.  With Barbara Ernsberger.
16      Q.  When was that?
17      A.  I didn't bring that information with
18  me.
19      Q.  Best you can recall?  Last week?
20  Last month?
21      A.  Two weeks, two and a half weeks ago.
22      Q.  How long was that meeting, if you
23  recall?
24      A.  Well --
25      Q.  Approximately?

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 13

1      R. Wycoff - by Mr. Lesko
2      A.   20 minutes.  That's an estimate.
3      Q.   Did Ms. Ernsberger show you any
4   documents during that meeting?
5      A.   No, she did not.
6      Q.   Okay.
7      A.   No, she did not.
8      Q.   Did you discuss -- you might have
9   answered this already.  I apologize.  I may
10  forget answers along the course of the
11  deposition.  If you already answered, help me
12  out and tell me what you said:
13        Did you meet with anybody else other
14  than your attorneys?
15     A.   No, sir.
16     Q.   Did you discuss this deposition with
17  anybody else over the near term?
18     A.   No, sir.
19     Q.   I assume you graduated from high
20  school, Mr. Wycoff?
21     A.   That's right.
22     Q.   What high school did you graduate
23  from?
24     A.   Braddock High School.
25     Q.   When was that?

Page 14

1      R. Wycoff - by Mr. Lesko
2      A.   1944-'45.  I was what they called a
3   mid year.  They had mid year that instead of
4   everybody graduated in May, they had some
5   graduate at the end of the summer.
6        We took classes ahead of time,
7   because I was in the service then.  So there
8   was a handful of us.  Some in the Navy, some in
9   the Marines.  I was in the Air Corps.
10     Q.   Was it Reserves or active duty?
11     A.   I signed up in June of '44.  We knew
12  we were going to be taken.
13     Q.   I see.
14     A.   So we sort of doubled up, more or
15  less, our studies.
16     Q.   So you graduated before you actually
17  left?
18     A.   Right.  Our commencement was
19  actually held the following May.  I was already
20  gone.
21     Q.   So you said you were in the Air
22  Corps?
23     A.   Army Air Corps.
24     Q.   That was in 1944-'45?
25     A.   Right.

Page 15

1      R. Wycoff - by Mr. Lesko
2      Q.   How long were you in that?
3      A.   I got out in December of '46.
4   December of '46 and enlisted in the Reserves
5   then for three years, starting in January of
6   1947.
7      Q.   What was your job in the Army Air
8   Corps?
9      A.   I was a mechanic.
10     Q.   Anything else?
11     A.   We were supposed to go -- we didn't
12  get there, but we were supposed to go to
13  gunnery school.  We had an epidemic of scarlet
14  fever out in Colorado.  So that put the skids
15  to that for about three months.
16     Q.   So your only job in the Air Corps
17  was a mechanic?
18     A.   Yes, sir.
19     Q.   You fixed planes?
20     A.   Yes, sir.  Airplane and engine
21  mechanic is what it was called.  Our MO was
22  747.  MOS, rather.  MOS 747.
23     Q.   After the Army Air Corps, you said
24  you joined the Reserves?
25     A.   Yes, sir.  Army Air Corps Reserves.

Page 16

1      R. Wycoff - by Mr. Lesko
2      Q.   How long did you remain in the
3   Reserves?
4      A.   Three years.
5      Q.   After you ceased active duty in the
6   Army Air Corps, did you attend any further
7   education, college or anything of that sort?
8      A.   Went to -- I was hired by U.S. Steel
9   and went through their apprentice machinist --
10  machinist apprentice program.  I started there
11  in 1948, I believe in March of '48, and got out
12  in, I think, November of '52.  I received my
13  papers at that time.
14     Q.   Sorry to interrupt you.  When you
15  say papers, what do you mean by that?
16     A.   Machinist's diploma.  You get like a
17  diploma.
18     Q.   Okay.
19     A.   At that time, you are a machinist
20  starting.  You go from a machinist starting --
21  after about six months, you go to machinist
22  intermediate.  After another six months, you go
23  to machinist standard, which, in their terms,
24  is a top-rated machinist.
25        So it takes a year -- from the time

4 (Pages 13 to 16)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 17

R. Wycoff - by Mr. Lesko

1
2  you get your machinist's diploma until you
3  become a machinist standard, a year goes by.
4      Q.   Okay.  Subsequent to obtaining your
5  machinist diploma, did you take any further
6  education courses?
7      A.   Not at that time, no.
8      Q.   At any time since then, have you?
9      A.   Yes, sir.  We took several courses,
10  management courses within U.S. Steel's program
11  They had that set up for employees, and for
12  machinists.
13       I was in process engineering for a
14  while, management, I was an instructor,
15  machinist instructor, and also then I went to
16  Community College of Allegheny County, the
17  south campus.  That's located in West Mifflin.
18       I went there for oral communication.
19  That was Oral Communication 1 and Oral
20  Communication 2.
21      Q.   You said that that -- U.S. Steel set
22  up a program for you at the University of
23  Pittsburgh?
24      A.   Yes.  It was through them to -- in
25  order to be an apprentice instructor, to go

Page 18

R. Wycoff - by Mr. Lesko

1
2  through vocational education classes at the
3  University of Pittsburgh.
4       This was night school.  So about
5  6:20 -- I remember the hours very vividly --
6  6:20 in the evening until about 10:20 at night.
7  This is just an estimate now:  I remember twice
8  a week, twice a week, and then some weeks it
9  was three times a week.  But that was rarely.
10      Q.   You did that for about three years;
11  is that right?
12      A.   Yes.
13      Q.   You listed, in responses to
14  Interrogatories, U.S. Steel machinist
15  apprentice graduate.
16       Is that what you mentioned before,
17  what resulted in your machinist diploma?
18      A.   Yes, sir.
19      Q.   All right.
20      A.   The machinist apprentice program
21  takes approximately four years.  It might vary,
22  due to, during the course of the four years, if
23  you would be laid off for a month or two
24  months, then that puts you back.  Longevity
25  time may take longer.  Won't take less, but may

Page 19

R. Wycoff - by Mr. Lesko

1
2  take a little bit longer, due to either layoffs
3  or strike.
4      Q.   I think you mentioned also something
5  having to do with management.  Is that -- that
6  you had some management training?
7      A.   Management classes, right.
8      Q.   Who offered the management classes?
9      A.   U.S. Steel.
10      Q.   So that was?
11      A.   Within the company.
12      Q.   What kind of subjects were covered
13  in your management classes?
14      A.   Oh, how to deal with your skills
15  that you have in the shop.  You know, it's not
16  like being in an office.  Skills, getting the
17  most out of your employees, how to treat them
18  right, tell them what their responsibilities
19  are, what your responsibilities are, get them
20  to cooperate.  We pretty much did that.
21      Q.   Did you have any finance courses in
22  connection with that management training?
23      A.   Finance courses?
24      Q.   Yes.  Having to do with company
25  budgets?

Page 20

R. Wycoff - by Mr. Lesko

1
2      A.   No, sir.
3      Q.   Or raising funds, anything like
4  that?
5      A.   No, sir.
6      Q.   Did you have any math courses in
7  connection with your management classes?
8      A.   We had math courses within the
9  machinist apprentice program, yes.
10      Q.   What kind of math courses?
11      A.   Trade theory, geometry, trig and
12  basic math, measurements.
13      Q.   Have you ever taken any probability
14  and statistics courses?
15      A.   No.
16      Q.   What about accounting type courses?
17      A.   Accounting?  When I was with -- this
18  goes way back.  This goes to what was called
19  Business Training College, BTC, which I think
20  eventually became Point Park College.
21      Q.   Okay.
22      A.   God.  I completely forgot about
23  that.
24      Q.   When was that?  When did you go to
25  Business Training College?

5 (Pages 17 to 20)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 21

1    R. Wycoff - by Mr. Lesko
2        A.    I was only there, if I was there a
3    year. This was before I even started with U.S.
4    Steel.
5        Q.    So after you returned from active
6    duty in the service?
7        A.    Yes, right. It was in accounting.
8    But it really -- I was pushing myself to go to
9    class. It really wasn't my cup of tea, I guess
10   you call it. I am good with my hands. So it
11   really wasn't -- I guess my realization was
12   that accounting wasn't going to be for me. I
13   went from there then and hooked up with U.S.
14   Steel.
15       Q.    Was Business Training College a
16   four-year college or two-year college?
17       A.    I believe that was two years at that
18   time.
19       Q.    So when you started, you had in mind
20   a two-year degree in accounting; is that right?
21       A.    In the end?
22       Q.    Right. That's what you were going
23   for?
24       A.    Right. One of the fellows that was
25   in our class that I remember was a gentleman

Page 22

1    R. Wycoff - by Mr. Lesko
2    that eventually became manager of a Mellon Bank
3    years down the road; not after he got
4    graduated, but on down the road.
5        Q.    Okay.
6        A.    He went there two years. Accounting
7    and what's the other thing? Problems on
8    Democracy or something like that.
9        Q.    Political science?
10       A.    Not political science. What was the
11   name of that other course? I can't remember.
12   But there was another course. Had something to
13   do with -- we used to call them Problem Solving
14   on Democracy, POD. It was something similar,
15   like we had in high school. Civics.
16       Q.    So you just took the two courses,
17   Accounting and Problems on Democracy while you
18   were there?
19       A.    That was part of the course.
20       Q.    The curriculum?
21       A.    Right. I mean, it wasn't a course
22   from that.
23       Q.    I see.
24       A.    It was a class within.
25       Q.    But you did have an accounting

Page 23

1    R. Wycoff - by Mr. Lesko
2    course while you were at Business Training
3    College?
4        A.    Right.
5        Q.    Did you have --
6        A.    Very minimal I call that, from what
7    I can remember.
8        Q.    Can you recall any other courses
9    that you had while you were there?
10       A.    No.
11       Q.    Were you going full-time at the
12   time?
13       A.    I can't even remember that. That's
14   been so long ago. I completely forgot about
15   going there, until you asked that question.
16       Q.    Do you recall whether you went to
17   classes during the day or at night?
18       A.    Daytime.
19       Q.    You were not working at U.S. Steel
20   at the time, were you?
21       A.    No.
22       Q.    You also received a certificate in
23   industrial -- in the industrial studies program
24   at U.S. Steel; is that right?
25       A.    Yes, sir.

Page 24

1    R. Wycoff - by Mr. Lesko
2            MR. LESKO: Let's go ahead and
3    mark this as Exhibit 1, please.
4            (Wycoff Exhibit No. 1 was
5    marked for identification.)
6        Q.    Can I see that back just for a
7    moment. I'll give it right back. I didn't
8    make a copy for myself.
9            There are two certificates on this
10   sheet marked as Exhibit 1. I call them
11   certificates. Maybe there is another name for
12   them.
13           They essentially indicate that you
14   had successfully completed a course in
15   Transactional Analysis, fall of 1975, and a
16   course in Modern Supervision, spring of 1973.
17           Is that right?
18       A.    Um-hum. That's correct.
19       Q.    Do you recall what the Transactional
20   Analysis course consisted of?
21       A.    Well, had to do with machine
22   operations. At that time, we had a lot of new
23   machinery in the shop that had readouts on
24   them.
25       Q.    That had?

6 (Pages 21 to 24)

Powers, Garrison & Hughes

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 25

1    R. Wycoff - by Mr. Lesko
2        A.    Readouts on them for vertical,
3    horizontal, longitudinal readings,
4    calibrations.  So in order to understand the
5    procedure of these machine operations and
6    setups, and how these were to involve -- when
7    you were machining on these machines, not all
8    the machines had these readouts, but primarily
9    most of the machines did.
10        So we had to know how to program --
11    not exactly program the machine, but program
12    the machine in the operations to know like, on
13    down the line -- in the course of mill work,
14    there are a lot of breakdowns.  What I mean is
15    outages.  So you have to determine which
16    machine operations should be done first on what
17    machine.
18        So this all, more or less, entered
19    into it.
20        Q.    So then the phrase Transactional
21    Analysis or title Transactional Analysis had
22    nothing to do with financial transaction --
23        A.    No.
24        Q.    Anything to do with budgeting?
25        A.    This was strictly -- any of these

Page 26

1    R. Wycoff - by Mr. Lesko
2    courses had to do with working in the shop,
3    working in the machine shop.
4        Q.    The actual operations in the machine
5    shop?
6        A.    That's correct.
7        Q.    As opposed to the economics of
8    operating the machine shop?
9        A.    I would say so, yes.  As far as we
10    tried to get the job done as smoothly and as
11    quickly as possible because when a mill is
12    down, that's lost money to that mill.  That's
13    lost wages to the men that work there.  You
14    know, some of them had to leave to go home.
15    They couldn't stay there on the job because
16    they weren't able to do their job.
17        Until we get part of this operation
18    or this machine -- the equipment machined
19    properly and get it back on line again, then
20    those men could be called back to work.
21        That's why we had to determine which
22    had the higher priority of the jobs that came
23    into the shop.
24        Q.    Did the training regarding
25    determining the priority of jobs, did that

Page 27

1    R. Wycoff - by Mr. Lesko
2    include training --
3        A.    What machine would go on first.  One
4    job didn't have to go on one machine and then
5    leave.  It went from -- they would do certain
6    machine operations on this one machine.  Then
7    go to another machine to continue operations on
8    it.  So you had to coordinate this.
9        Q.    Were you trained in cost benefit
10    analysis during that Transactional Analysis
11    course?
12        A.    No.  We were strictly -- had to do
13    with machining operations as quickly as
14    possible.
15        Q.    Were you trained in time cost
16    analysis?
17        A.    No.  We had estimators that came in
18    to estimate certain machines.  I guess you
19    would call it time study.
20        Q.    Okay.
21        A.    They would come in and time study
22    certain machines to set a rate for a machine.
23    So once they determined certain machine
24    operations on certain machines, enough that
25    they were able to establish a pattern, then

Page 28

1    R. Wycoff - by Mr. Lesko
2    they were able to complete the time study and
3    then allow a standard to set up saying when
4    this job comes in, this job, we estimate, will
5    take so long to do when you have certain
6    machine operations to do.
7        The next time that job comes in, it
8    may not require the same amount of time to
9    machine it because there may not be as many
10    steps to complete.  But you had a basic,
11    standard guideline that you were to follow.
12    Not us, the time-setting men.
13        Q.    Okay.
14        A.    Okay?
15        Q.    So the time study men would provide
16    you the guidelines?
17        A.    They would put the time on the job.
18    In other words, require time that the job,
19    under these machine operations, normal machine
20    operations, when the job should be done.
21        Q.    Then somebody would have to make a
22    determination as to which job goes first so as
23    to make the process as efficient as possible?
24        A.    As soon as they come into the shop.
25    Some jobs, even though they may have a higher

7 (Pages 25 to 28)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 29

1    R. Wycoff - by Mr. Lesko
2  priority over other jobs, they may not be in
3  the shop yet. But you just can't let that
4  other job that has less priority just set
5  there. So you got to start machining that, you
6  know. We had to be very critical of time
7  because, you know, if the mill is down, steel
8  production is...
9    Q.   Somebody had to make the decisions
10  as to what jobs to put on the machines at any
11  given time?
12    A.   That's right. Every turn did work
13  eight hours. We worked three turns: daylight,
14  afternoon, nightturn. Every turn would be
15  reached by the previous turn of what they were
16  doing, what was coming in, what machine was
17  operating. You know, just where you stood.
18    Q.   That Transactional Analysis training
19  course, was that the kind of stuff that was
20  taught to you?
21    A.   Yes. This and modern supervision.
22    Q.   Sorry? What was the second part?
23    A.   Modern supervision. It all works
24  in.
25    Q.   Were all machinists required to take

Page 30

1    R. Wycoff - by Mr. Lesko
2  those courses?
3    A.   No.
4    Q.   Was it a voluntary program?
5    A.   This had nothing to do with the
6  machinist program, this (indicating).
7    Q.   What did it have to do with?
8    A.   Just what we were talking about.
9    Q.   Was that a voluntary program?
10    A.   Yes, sir.
11    Q.   Were you selected to participate in
12  those programs?
13    A.   Well, they requested it.
14    Q.   The company requested that you
15  participate in those training programs?
16    A.   Right.
17    Q.   Do you know why they requested you
18  to participate in those?
19    A.   Well, I can't say for sure, but I
20  would imagine they wanted to make sure we had
21  the right stuff.
22    Q.   So you were targeted as supervisor
23  material; is that right?
24    A.   (Nods affirmatively.)
25    Q.   Okay.

Page 31

1    R. Wycoff - by Mr. Lesko
2    A.   I nodded my head yes.
3    Q.   Thank you. I forgot to remind you.
4    A.   These were very good studies, by the
5  way.
6    Q.   Beg your pardon?
7    A.   They were very good studies, by the
8  way.
9    Q.   Good courses, good classes?
10    A.   Yes.
11    Q.   So I take it from our discussion so
12  far that once you returned from the Army Air
13  Corps and decided that accounting at the
14  Business Training College wasn't for you, you
15  started at U.S. Steel?
16    A.   Yes, sir.
17    Q.   Your position was machinist
18  apprentice; is that right?
19    A.   That's correct.
20    Q.   Are you retired now, sir?
21    A.   From U.S. Steel?
22    Q.   Yes.
23    A.   Yes.
24    Q.   When did you retire from U.S. Steel?
25    A.   November of 1983.

Page 32

1    R. Wycoff - by Mr. Lesko
2    Q.   Congratulations! That's great.
3    A.   Thank you.
4    Q.   Between the time you started as a
5  machinist apprentice in 1983, did you work
6  continuously with U.S. Steel?
7    A.   On strike -- naturally, I had to
8  raise a family so you try to work. 1959 -- I
9  take that back. I'm not sure of the year. But
10  we worked for Bethlehem Steel Works in Rankin
11  4:30 to one o'clock in the morning, the
12  afternoon shift.
13        We were on strike with U.S. Steel
14  and went to work for Bethlehem in their machine
15  shop. That was a deadman's turn: 4:30 to one.
16  My wife hated it.
17    Q.   How long did you do that for,
18  approximately?
19    A.   I think about one week shy of a year
20  That's how I remember that.
21    Q.   Then you returned to U.S. Steel
22  then?
23    A.   Yes. After the strike was over.
24    Q.   Your position at Bethlehem was the
25  same or similar --

8 (Pages 29 to 32)

Powers, Garrison & Hughes

Page 33

1    R. Wycoff - by Mr. Lesko
2    A.    Machinist.
3    Q.    Any other interruptions in your
4 employment with U.S. Steel?
5    A.    I am trying to think how many
6 strikes I was involved in.
7    Q.    Let me ask it this way: During your
8 time with U.S. Steel, did you work in any other
9 position, other than a machinist?
10    A.    Machinist instructor for U.S. Steel.
11 Apprentice.
12    Q.    All right. Excluding U.S. Steel for
13 the moment, from the time you started with U.S.
14 Steel until the time you retired in 1983, did
15 you work for any other company other than as a
16 machinist?
17    A.    Other?
18    Q.    Yes.
19    A.    Than a machinist?
20    Q.    Yes.
21    A.    No.
22    Q.    Now, during your employment with
23 U.S. Steel, subsequent to attaining the level
24 of machinist standard, did you hold any other
25 positions with the company? I think you just

Page 34

1    R. Wycoff - by Mr. Lesko
2 mentioned machinist instructor?
3    A.    Um-hum.
4    Q.    And was -- were you also a machinist
5 at the time?
6    A.    Yes, sir.
7    Q.    When did you start as a machinist
8 instructor, roughly?
9    A.    1972, I believe. This is just an
10 estimate, now. I can't remember.
11    Q.    That's okay.
12    A.    I was trying to remember what kind
13 of car I was driving at that time. That gives
14 me the year. I know I had a 1974 Pontiac.
15 That was new. I was an instructor before
16 that. So it had to be before 1974.
17    Q.    About how long did you hold that
18 position?
19    A.    Again, I am going back to the car I
20 was driving.
21    Q.    Was it until --
22    A.    Probably three years; three to four
23 years. That would be about it.
24    Q.    Other than machinist instructor, did
25 you hold any other titles?

Page 35

1    R. Wycoff - by Mr. Lesko
2    A.    Turn foreman. Oh. Well, they gave
3 us the title, but it -- it had to do -- I was
4 involved in scheduling. So they had me as --
5 their term, process engineer, and I did the
6 scheduling of the apprentices, because I was
7 their instructor, one of their instructors.
8    Q.    Okay.
9    A.    So I had to fit them into the
10 schedule, the weekly schedule. So we made --
11 every week we made the schedule out for the
12 apprentices: their school, who was going to go
13 to school, who was going to work on what
14 machine to get their required amount of hours
15 on the machine.
16    We had a form that showed the
17 different stages of the machinist apprentice
18 program, and what we determined was the
19 required amount of hours in a column and it was
20 like an itemized program, so we tried to stick
21 as close to this, use this as a guideline: so
22 many hours here, 1800 hours here, 900 hours
23 here. You know, something like that.
24    We tried to stick with that. I had
25 to keep track of these hours on the machine

Page 36

1    R. Wycoff - by Mr. Lesko
2 apprentice so they wouldn't -- some didn't get
3 too few hours here and some get too many here.
4    Q.    Okay.
5    A.    Tried to coordinate that.
6    Q.    You mentioned also -- I think you
7 said turn foreman?
8    A.    Yes, sir.
9    Q.    What is a turn foreman?
10    A.    Turn foreman, you are in charge of
11 the shop. We are talking about the machine
12 shop. I have to speak in those terms.
13    You are in charge of the machine
14 shop for the eight hours that you are out
15 there. You're in charge of all the machining
16 operations. You're in charge of all the --
17 responsible for all the men that are there:
18 machinists, machine operators, helpers,
19 material handlers. You are responsible for
20 that. You're in charge. You make the
21 decisions.
22    Q.    Any other positions?
23    A.    That's it.
24    Q.    With the company?
25    A.    That's it.

9 (Pages 33 to 36)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 37

1    R. Wycoff - by Mr. Lesko
2    Q.   You also told us in your responses
3  to Interrogatories, you worked with the Cauley
4  Detective Agency?
5    A.   Yes, sir.
6    Q.   As a security guard; is that right?
7    A.   Yes.
8    Q.   It also notes here receptionist,
9  Duquesne Light, executive offices.  Is that
10 where you were stationed as a security guard?
11   A.   Yes, sir.
12   Q.   Did you also serve as the
13 receptionist?
14   A.   Yes, sir.
15   Q.   That was between 1987 and 1997; is
16 that right?
17   A.   Yes, sir.
18   Q.   From '97 to the present, you worked
19 for Firm Security Systems?
20   A.   That's correct.
21   Q.   As a security guard?
22   A.   Yes, sir.
23   Q.   Were you an employee of Cauley?  You
24 didn't own the company?
25   A.   No.  I was an employee of Cauley

Page 38

1    R. Wycoff - by Mr. Lesko
2  Detective Agency.
3    Q.   You are an employee of Firm Security
4  Systems, as well?
5    A.   That's right.
6    Q.   You don't have any ownership
7  interest in that?
8    A.   No, sir.
9    Q.   Mr. Wycoff, did you ever, or at any
10 time, during your career after your active
11 services in the Army Air Corps, obtain a
12 license, professional license, to sell real
13 estate, for example?
14   A.   No, sir.
15   Q.   No professional license to sell
16 securities or insurance, I take it, either?
17   A.   None whatsoever.
18   Q.   What is your wife's occupation?  I
19 assume you're married?
20   A.   Housewife, homemaker.
21   Q.   Did she ever work outside of the
22 home since you have been married?
23   A.   Well, you are going to laugh at
24 this.  She worked for one day in a bookstore.
25 During the course of that day, she had to go to

Page 39

1    R. Wycoff - by Mr. Lesko
2  the rest room.  She said, "My, God, they showed
3  me steps leading down to what looked like a
4  dungeon," and she said, "I turned right around
5  and I came right back up and I told the
6  gentleman there, 'Sorry, but I have to leave.
7  I am no longer going to work here.'"
8        Out the door she went.
9    Q.   And that was it.
10   A.   Another time was over at Kennywood.
11 She went over there and thought just to give
12 her something to do.  I guess she was getting
13 bored just being a homemaker.  This was after
14 the family had been grown, naturally.  They put
15 her over there.
16       The first job they gave her was to
17 clean out a popcorn machine.  You can imagine,
18 after popping popcorn for God knows how many
19 times during the course of the day.  I guess it
20 is thickly coated in areas.  Maybe the person
21 that cleaned it prior to her didn't get into
22 the corners properly.
23       She cleaned this popcorn machine but
24 that was it for her for Kennywood.  That was
25 the extent of my wife's outdoor activities, so

Page 40

1    R. Wycoff - by Mr. Lesko
2  to speak.
3    Q.   You have children?
4    A.   Yes.
5    Q.   How many children do you have?
6    A.   Five.
7    Q.   Boys?  Girls?
8    A.   Three boys, two girls.
9    Q.   What are their names?
10   A.   Robert David, Barry George, James
11 Thomas, Donna Lee and Michele Marie.  Michele
12 one L.  That's the French way, the real way.
13 The real Michele.
14   Q.   Good, healthy family, five kids?
15   A.   Yes, sir.  Thank you.
16   Q.   They're all grown and out of the
17 house now, I take it?
18   A.   Yes.
19   Q.   Did all of your children attend
20 college?
21   A.   No.  The reason why I hesitated
22 there for a bit, the one boy decided not to
23 attend.  He decided to be a steamfitter
24 instead.
25   Q.   Okay.

10 (Pages 37 to 40)

Powers, Garrison & Hughes

Page 41

```
1          R. Wycoff - by Mr. Lesko
2       A.   That was our youngest son. The
3   older son, Robert, did attend the University of
4   Dayton.
5       Q.   Did he graduate?
6       A.   Yes, sir.
7       Q.   What was his degree in? Do you
8   know?
9       A.   Business administration and
10  computer.
11      Q.   Computer science?
12      A.   Something like that.
13      Q.   How about Barry? Did he attend
14  college?
15      A.   No. Barry was an auto mechanic. He
16  had schooling. He went to schools from Saab
17  schooling. He also had schooling -- he worked
18  for Bell South when he was living down in Fort
19  Lauderdale.
20          He probably had schooling down there
21  I'm not sure just exactly how much he had.
22      Q.   James is a steamfitter?
23      A.   Steamfitter, yes, sir.
24      Q.   How about Donna? Did she attend
25  college?
```

Page 42

```
1          R. Wycoff - by Mr. Lesko
2       A.   Donna is -- you would have to help
3   me on this. She works for a group of doctors
4   where she takes information down, medical
5   information down over -- through headphones, or
6   through -- I guess the doctors talk to them
7   through a cassette. Whatever you call that.
8   There is a word for it. It is a terminology.
9   Something graphy. I forget.
10      Q.   Stenography?
11      A.   No, not stenography. Has to do with
12  medical terms. She sees patients that come
13  into this clinic, like, okay, and I don't know
14  how many doctors. They're associated with this
15  clinic. She takes down information. It has to
16  do with prescriptions, medications.
17          Now, she is not the only one there.
18  I think there's maybe three or four other women
19  that do the same thing as Donna. She had to go
20  to school for that. You know, for that.
21      Q.   It's not a secretary?
22      A.   No, no. Has nothing to do with -- I
23  think everything she does is on the computer,
24  keyboard.
25      Q.   So she works in a doctor's office
```

Page 43

```
1          R. Wycoff - by Mr. Lesko
2   and she's had some kind of medical training?
3       A.   Right. I would call it a clinic,
4   rather than a doctor's office.
5       Q.   Is she a nurse?
6       A.   If you want to check on it, you
7   might be able to find out. I don't even think
8   my wife would know the name of it. My wife is
9   not good with names, either.
10      Q.   But did she attend college for that?
11      A.   No, no.
12      Q.   She attended some kind of
13  vocational?
14      A.   Medical studies.
15      Q.   How about Michele, with one L?
16      A.   No. Michele she works at a housing
17  complex down in Lockwall, Texas. She has to do
18  with when families move in to an apartment
19  complex, she has to go in there.
20          I guess she is some sort of
21  maintenance coordinator, I guess you would call
22  it, where she checks on what's needed to be
23  done in an apartment. When people move out
24  before the next family or occupancy moves in,
25  she goes in and checks what has to be done. Do
```

Page 44

```
1          R. Wycoff - by Mr. Lesko
2   the walls need to be painted? They probably
3   paint it every time somebody moves out. How is
4   the carpet? You know, she checks on that.
5          She takes care of the swimming
6   pools, two swimming pools. That, I know.
7       Q.   An apartment manager?
8       A.   No. Not per se. I think she works
9   in unison with the complex manager.
10      Q.   Okay.
11      A.   What her exact title is, I don't
12  know.
13      Q.   That's good. What is Robert's
14  occupation?
15      A.   Dave is a senior -- I hope I have
16  his card here. He just got a new card. Senior
17  process -- it is more than a process -- maybe
18  you can help me on this. He goes into a
19  company and sees what they need for software
20  and then he tells them what software they're to
21  use.
22      Q.   Is he a consultant?
23      A.   Senior consultant, yes.
24      Q.   Computer consultant?
25      A.   Right. He designs or initiates the
```

11 (Pages 41 to 44)

Page 45

1    R. Wycoff - by Mr. Lesko
2  software. He is going to kill me. He is going
3  to say, "He asked you for the damn card and you
4  didn't have one."
5    Q.  Do any of your children own all or
6  part of their businesses?
7    A.  No. At this time, no.
8    Q.  Have they ever?
9    A.  Barry did. He had an auto garage,
10  auto repair garage.
11    Q.  How big was the garage or how many
12  employees?
13    A.  Employees? Two.
14    Q.  Has anybody in your family ever
15  sought or attained a professional license to
16  sell real estate or securities or insurance?
17    A.  No, sir.
18    Q.  Does anybody in your family or any
19  of your friends work for an insurance company?
20    A.  No, sir.
21    Q.  Do you have any friends or family
22  that sell insurance?
23    A.  Do I have friends of family --
24    Q.  Friends or family that sell
25  insurance?

Page 46

1    R. Wycoff - by Mr. Lesko
2    A.  No, sir.
3    Q.  I am going to assume, Mr. Wycoff,
4  that you have some bank accounts; is that
5  right? Checking and savings account?
6    A.  Um-hum.
7    Q.  You have both checking and savings
8  accounts?
9    A.  Checking.
10    Q.  Just a checking?
11    A.  Yes, sir.
12    Q.  Do you have any investment accounts,
13  such as an IRA or 401-K or some kind of
14  retirement savings account?
15    A.  No, sir.
16    Q.  Do you have any other investment
17  accounts, such as mutual funds?
18    A.  No, sir.
19    MR. BARTHOLOMAEI: Objection to
20  form. Only reason I say that, I don't think
21  there's any testimony that he has any
22  investment accounts.
23    MR. LESKO: I said other
24  investment accounts.
25    MR. BARTHOLOMAEI: All right.

Page 47

1    R. Wycoff - by Mr. Lesko
2    MR. LESKO: Fair enough.
3    Q.  Do you own any securities, any
4  stock?
5    A.  No, sir.
6    Q.  Do you own any bonds?
7    A.  No, sir.
8    Q.  Have you ever owned stocks or bonds?
9    A.  Yes, sir.
10    Q.  When was the last time you owned
11  stocks or bonds?
12    A.  When I was still working for U.S.
13  Steel. I owned stock.
14    Q.  Did you hold the stock in a
15  retirement account?
16    A.  I don't know what you determine as
17  that. It was the withdrawal from our wages. I
18  can't even recall the amount that was withdrawn
19  -- but we would purchase a certain percentage
20  of stock every pay.
21    Q.  Was that U.S. Steel stock?
22    A.  Yes.
23    Q.  Have you ever owned stock other than
24  U.S. Steel?
25    A.  I am trying to remember the name of

Page 48

1    R. Wycoff - by Mr. Lesko
2  the company. I got burned on that sucker. It
3  had something to do with -- no, it wasn't. No,
4  no. It wasn't that stock.
5    Q.  Well, that stock that you can't
6  remember the name of, how did you buy it?
7    A.  Stock market. They advertised it --
8  I heard it from a couple of other foremen at
9  work. They said it seems like it is a good --
10  had something to do with the space program.
11    The reason why I hesitated on the
12  stock, it wasn't Rockwell stock, but it had
13  something to do with the Rockwell name. Either
14  Rockwell was -- one of the Rockwells was in
15  management of this company, and it had to do
16  with -- and I can't remember the name of the
17  damn thing.
18    Q.  You bought the stock independently?
19    A.  $200 worth of stock. That's all it
20  was.
21    Q.  Through a broker?
22    A.  Yeah.
23    Q.  Other than that stock, no other
24  stock?
25    A.  That's it.

12 (Pages 45 to 48)

Page 49

R. Wycoff - by Mr. Lesko
1
2   Q.   Never owned any other stock?
3   A.   No, sir.
4   Q.   The U.S. Steel stock, did that ever
5   pay you a dividend?
6   A.   Did that ever pay me a dividend? I
7   don't believe.
8   Q.   Is it possible you might have
9   received a dividend that was automatically
10  reinvested in more U.S. Steel stock?
11  A.   I really can't remember.
12  Q.   You don't know?
13  A.   No.
14  Q.   What did you do with the U.S. Steel
15  stock? Did you sell it?
16  A.   I cashed it in to have home
17  improvements.
18  Q.   About how long ago was that? Was
19  that right around the time you retired or
20  sometime before that?
21  A.   Prior to me retiring. Prior to me
22  selling my home.
23  Q.   Who prepares your tax returns?
24  A.   I did myself for a while for a
25  handful of years.

Page 50

R. Wycoff - by Mr. Lesko
1
2   Q.   All right.
3   A.   Up until the time that I -- the year
4   it was necessary for me to put down about the
5   bonds, or the stock, rather. That's when I
6   went to H & R Block. From that time on, I went
7   to H & R Block.
8   Q.   Okay. Have you ever consulted a
9   financial adviser or financial planner?
10  A.   No, sir.
11  Q.   Do you know anybody who works as a
12  financial planner?
13  A.   No, sir.
14  Q.   Mr. Wycoff, during the course of
15  this litigation, you produced, presumably to
16  your attorneys, who then produced to us,
17  documents relating to MetLife and other
18  insurance companies.
19         Do you recall that?
20  A.   Documents?
21  Q.   Yes. Papers concerning insurance
22  policies with MetLife and other insurance
23  companies.
24         Do you recall producing those
25  documents?

Page 51

R. Wycoff - by Mr. Lesko
1
2   A.   I produced an insurance policy. I
3   don't understand what you mean by papers.
4   Q.   Well, I am including the insurance
5   policies in that question. You produced
6   insurance policies, you produced some annual
7   statements, you produced some letters between
8   MetLife and yourself; things of that nature.
9   A.   I can make a statement that I tried
10  to produce everything that you were asking.
11  Q.   I understand.
12  A.   So if those papers were among what I
13  produced...
14  Q.   Right. I am trying to establish
15  whether or not you recall producing those
16  documents, actually gathering them and
17  providing them to your attorneys?
18         MR. BARTHOLOMAEI: He is not
19  saying you did anything wrong. He is just
20  asking you if you remember giving them to us.
21  A.   Yes. If you are trying to pinpoint
22  how many times I did this --
23  Q.   No. Here's what I'm getting at: I
24  was going to ask you where did you get the
25  documents from? Where did you keep them?

Page 52

R. Wycoff - by Mr. Lesko
1
2   A.   Oh. At home.
3   Q.   At home where? In a box? In a
4   drawer? In a file?
5   A.   In a steel box with the rest of the
6   insurance policies.
7   Q.   Okay.
8   A.   It is an old metal box. I bet I
9   have had this box for -- I don't know how long.
10  Q.   You kept all of your papers relating
11  to your insurance policies in that box?
12  A.   That's right.
13  Q.   Did you keep anything else in the
14  box, other than papers relating to insurance
15  policies?
16  A.   No.
17  Q.   Now, when you say papers relating to
18  insurance policies, do you mean papers relating
19  to all insurance policies that you have ever
20  had, or just the MetLife policies?
21  A.   All the insurance policies.
22  Q.   Were they organized in any fashion
23  in the box or did you just throw them in there?
24  A.   Just in the box.
25  Q.   Okay. All right. Great. Did you

13 (Pages 49 to 52)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 53

1    R. Wycoff - by Mr. Lesko
2  put every piece of paper that you received,
3  regarding the insurance policies, in the box,
4  or did you sometimes throw stuff out?
5     A.   Everything that I had pertaining to
6  insurance policies would have been the
7  insurance policies themselves.  They were all
8  in the box.
9     Q.   You receive annual statements, don't
10  you, for the MetLife policies that you own?
11     A.   That, we kept, staples, yes.  Wife
12  made sure she kept those.
13     Q.   That came in the mail, those
14  statements?
15     A.   Yes.
16     Q.   Once you got them in the mail, what
17  would do you with them?  Put them in a box or
18  somewhere else?
19     A.   No.  They went with our canceled
20  checks, I believe, in that area.
21     Q.   Maybe we are referring to two
22  different things.  I am referring to annual
23  statements, just outlining how the policy is
24  performing, as opposed to billing statements?
25        MR. BARTHOLOMAEI:  If you don't

Page 54

1    R. Wycoff - by Mr. Lesko
2  know what he is talking about, I don't want you
3  to guess.  Maybe he will show you one later in
4  the deposition and you can identify it.
5     A.   I don't know.  When you are saying
6  papers, you know, the only thing we got was
7  dividend things that come in the mail, going
8  back in extra insurance.  I wouldn't even count
9  that as a paper.
10     Q.   Just a little slip?
11     A.   Right.
12     Q.   What did you do with those little
13  slips?  Did you throw them out or keep them in
14  the box or did you do something else with them?
15  As a general rule, I am talking about now,
16  not -- it's my understanding --
17     A.   Pretty much -- my wife opens up most
18  of the mail.  I do, too, but she does --
19  because I am not there during the day.
20     Q.   Right.
21     A.   I don't know.  I really don't.  I
22  really don't.  I know she keeps bank statements
23  or something like that.
24     Q.   So your wife is responsible for
25  deciding what you all keep and what you

Page 55

1    R. Wycoff - by Mr. Lesko
2  discard; is that right?
3     A.   Well, give or take.
4     Q.   She may ask you whether or not you
5  want to keep it, but, otherwise, she is the
6  first person in that process; is that right?
7     A.   I would say so, yes.
8     Q.   All I am trying to determine, here,
9  Mr. Wycoff, is whether you have kept everything
10  that you have been provided by MetLife or, you
11  know, discarded some stuff that you thought
12  might have been irrelevant.
13     A.   I can say this:  Whatever I had or
14  whatever we had, including my wife and myself,
15  I produced.
16     Q.   What I am trying to establish is
17  what you had.  In other words, is what you had
18  and what you produced --
19     A.   Tell you the truth, I can't even
20  answer that now, because what I gave, what I
21  tried to turn in, what I did turn in, I can't
22  even tell you what it was that I turned in.
23        Everything at that time, I gave what
24  you wanted, to the best of my ability.
25     Q.   I understand.

Page 56

1    R. Wycoff - by Mr. Lesko
2     A.   I have nothing else.
3     Q.   I understand.  I have no reason to
4  doubt that.
5     A.   Whether you want to call them papers
6  or forms, or slips of paper, you know...
7     Q.   Anything that you received from --
8  we will limit it to MetLife?
9     A.   Emptied everything out.
10     Q.   What I am trying to establish is
11  whatever you might have received in the mail or
12  what a MetLife insurance agent might have given
13  you, I am trying to determine whether
14  everything you ever received from MetLife or a
15  MetLife agent made it into this box which was
16  ultimately produced to us.
17        Conversely, is it possible you
18  received some material that you perceived as
19  junk mail or otherwise irrelevant and you
20  tossed it in the garbage instead of cluttering
21  your box?
22        Do you understand what I am asking
23  for?
24     A.   If it had to do with insurance, I
25  would have seen it.  I don't recall seeing

14 (Pages 53 to 56)

Page 57

1      R. Wycoff - by Mr. Lesko
2  anything like that.
3      Q.   I don't think we got there yet.
4      A.   My wife doesn't get involved with
5  insurance issues, what have you.  She lets me
6  take care of that.
7      Q.   Let me ask you this:  I receive a
8  lot of -- by way of example, I receive a lot of
9  junk mail every day from various financial
10  institutions, insurance companies or otherwise,
11  which I immediately determine is junk mail.  I
12  have no time to read it.  I throw them in the
13  garbage.
14      Or if I do read it, I find it is
15  irrelevant and I don't need it, don't save it
16  and throw in the garbage.
17      What I am trying to determine is
18  whether or not you have received some mail from
19  MetLife over the years that, perhaps, you
20  determined you didn't need?
21      A.   Pertaining to what?
22      Q.   Pertaining to anything.  Pertaining
23  to insurance policies?
24      MR. BARTHOLOMAEI:  I am going
25  to object to the form.  I think it's way too

Page 58

1      R. Wycoff - by Mr. Lesko
2  general the way you are asking the question.
3  He testified about his wife.  Sometimes she
4  opens the mail and she might determine that
5  it's something they don't want to keep.  Maybe
6  if you can show him specific documents --
7      MR. LESKO:  I got it.
8      MR. BARTHOLOMAEI:  -- he might
9  be able to identify if he keeps those.
10      MR. LESKO:  I understand your
11  objection.
12      Q.   Let me ask you this question:  Yes
13  or no.  Are you certain that you have kept
14  every piece of paper sent to you by MetLife
15  relating to the policies that have been issued
16  in this litigation?  Are you certain that you
17  have?
18      A.   Yeah.
19      Q.   You're certain that you have every
20  piece of information MetLife has ever provided?
21      A.   If it was addressed to me, and I
22  opened it up, I would say yes.
23      Q.   Okay.  Are you certain that you
24  opened up every piece of mail from MetLife that
25  was addressed to you?

Page 59

1      R. Wycoff - by Mr. Lesko
2      A.   I can't be sure.
3      Q.   Are you certain that your wife saved
4  every piece of mail from MetLife addressed to
5  you that she opened?
6      A.   I would say so, yes.
7      Q.   You are certain of that?
8      A.   I would say so.
9      Q.   Did you ask her that question?
10      A.   I know my wife.
11      Q.   So your answer is just based upon
12  your familiarity with your wife?
13      A.   That's correct.
14      Q.   Good enough.  During the course of
15  your employment with U.S. Steel -- let me back
16  up:
17      Are you certain that you have
18  maintained all records pertaining to any other
19  insurance policy, other than MetLife policies,
20  as well?
21      A.   Yes.
22      Q.   During the course of your employment
23  with U.S. Steel, did you ever receive a
24  benefits binder?
25      A.   Benefits binder?

Page 60

1      R. Wycoff - by Mr. Lesko
2      MR. BARTHOLOMAEI:  Object to
3  the form of the question.  Are you talking
4  about a physical binder, like a three-ring
5  binder, or are you talking about a binder in
6  the context of an insurance term, binder?
7      MR. LESKO:  I was talking about
8  a three-ring binder.
9      MR. BARTHOLOMAEI:  Okay.  Do
10  you know what that is?
11      MR. LESKO:  Or some other kind
12  of binder.
13      A.   Like a loose-leaf binder?
14      Q.   Yes.
15      A.   Not that I know of.
16      Q.   You received benefits through the
17  course of your employment from U.S. Steel; is
18  that right?  I am talking about life insurance,
19  health insurance, disability insurance
20  benefits?
21      MR. BARTHOLOMAEI:  Objection to
22  the form.
23      A.   You mean hospitalization through
24  U.S. Steel?  Is that what you're talking about?
25      Q.   Yes.

15 (Pages 57 to 60)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 61

1      R. Wycoff - by Mr. Lesko
2      A.   Certainly.
3      Q.   You received life insurance benefits
4 though U.S. Steel, as well; is that right?
5      A.   Life insurance policies.
6      Q.   Life insurance coverage?
7      A.   Yes.
8      Q.   Put it that way.
9      A.   Yes.
10     Q.   Okay. Did you ever receive a
11 booklet or any other document that described or
12 listed those benefits for you?
13     A.   No.
14     Q.   Did you ever receive something
15 called the Summary Plan Description relating to
16 your employee benefits at U.S. Steel?
17     A.   No.
18     Q.   I take it then that you don't have
19 any such documents at home?
20     A.   That's correct.
21     Q.   Which means if you did receive it,
22 you didn't keep it; is that right?
23     A.   I just said I didn't receive it.
24     Q.   I understand. If you are mistaken
25 and you did receive it, then you didn't keep

Page 62

1      R. Wycoff - by Mr. Lesko
2 it; is that right?
3         MR. BARTHOLOMAEI: Ahh.
4 Objection to form.
5      A.   If I'm saying that I didn't receive
6 it, how could I be mistaken?
7      Q.   Have you ever made a mistake before,
8 sir?
9         MR. BARTHOLOMAEI: Objection.
10 Don't answer that.
11     Q.   Are you saying that you have never
12 made a mistake before?
13        MR. BARTHOLOMAEI: Don't
14 answer.
15     Q.   Isn't that what you just told me?
16 Have you ever forgotten something before?
17        MR. BARTHOLOMAEI: Don't
18 answer. Wait until he gets through with a
19 real question. Then we will go on with the
20 deposition. Go on. I am directing him not to
21 answer. Ask your next question.
22        MR. LESKO: There's no basis
23 for that direction, Mr. Bartholomaei.
24        MR. BARTHOLOMAEI: Take it up
25 with the court. Ask your next question.

Page 63

1      R. Wycoff - by Mr. Lesko
2     Don't say anything.
3     Q.   Mr. Wycoff, list for me all the
4 policies of life insurance, other than MetLife
5 insurance, that you own, please.
6        MR. BARTHOLOMAEI: Did you say
7 own?
8        MR. LESKO: That he owns, yes.
9        MR. BARTHOLOMAEI: Okay.
10     A.   I have a policy with Knights of
11 Columbus.
12     Q.   What is the Policy Number of that
13 policy? What is the Policy Number for the
14 Knights of Columbus policy?
15     A.   I don't know.
16     Q.   You forgot?
17     A.   I don't know.
18     Q.   Did you ever know?
19     A.   Policy Number?
20     Q.   Did you ever know the Policy Number?
21     A.   Off by heart? No.
22     Q.   How many policies do you have with
23 Knights of Columbus?
24     A.   One.
25     Q.   When did you apply for that policy?

Page 64

1      R. Wycoff - by Mr. Lesko
2     A.   When I joined the Knights of
3 Columbus. Now, when was that? I can't
4 remember.
5     Q.   You can't remember?
6     A.   I can't remember, no.
7     Q.   Any other life insurance policies?
8     A.   Yes, I have two policies with
9 Prudential.
10     Q.   Any others?
11     A.   No. Other than Metropolitan Life.
12     Q.   What are the amounts of insurance
13 coverage provided -- what is the amount of
14 insurance coverage provided under the Knights
15 of Columbus policies, if you recall?
16     A.   Knights of Columbus is one thousand
17 dollars.
18     Q.   How about the Prudential policies?
19     A.   One policy is for 10,000, and the
20 other policy is for 5,000.
21     Q.   Did you purchase those -- the
22 Prudential Insurance Company policies through
23 an agent or a broker?
24     A.   Through an agent.
25     Q.   Do you remember his name?

16 (Pages 61 to 64)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 65

R. Wycoff - by Mr. Lesko
1
2   A.   Mr. Seddan.
3   Q.   Mr. Seddan?
4   A.   Yes.
5   Q.   How do you know Mr. Seddan?
6   A.   He was the insurance agent, I
7   believe, for my mother. It was through him.
8   S-E-D-D-A-N, I believe. I believe you'll have
9   all the information there.
10       MR. LESKO: Let's mark these as
11   Exhibits 2 through 4.
12       (Wycoff Exhibit Nos. 2-4 were
13   marked for identification.)
14   Q.   Was there an agent through whom you
15   purchased the Knights of Columbus policy?
16   A.   I know there was an agent, but I
17   can't remember his name.
18   Q.   Let me hand you what has been marked
19   as Exhibit 2; Exhibit 3, Exhibit 4 and we will
20   refer to them in the next couple of minutes.
21       MR. LESKO: Exhibit 2, for the
22   record, is -- consists of a life insurance
23   policy issued by the Knights of Columbus. The
24   Policy Number is K 6302. It may be K 36021.
25       It also contains some other -- at

Page 66

R. Wycoff - by Mr. Lesko
1
2   least one other document which appears to
3   relate to that policy.
4       For the record, the Bates numbers on
5   the exhibit are RGW 000065 through 78.
6       Exhibit 3 is a Prudential policy
7   No. D 80672264 and some related documents. For
8   the record, the Bates numbers RGW 000079
9   through 116.
10       Exhibit 4 is another Prudential
11   policy and may or may not be some related
12   documents in that exhibit. It is Bates numbers
13   RGW 0000117 through 128.
14       I looked on the back of Exhibit 2 in
15   the application portion, Mr. Wycoff. I was
16   trying to find the agent's name. If it's
17   there, it's illegible, the signature. So...
18   A.   Okay.
19   Q.   Exhibit 2 is the -- yes, that's it
20   (indicating). Whatever this agent's name was
21   who sold you the Knights of Columbus policy,
22   did you know him before you purchased the
23   policy from him?
24   A.   No.
25   Q.   Did you meet with this agent before

Page 67

R. Wycoff - by Mr. Lesko
1
2   purchasing the policy?
3   A.   I am trying to think back. A group
4   of us joined the Knights of Columbus at the
5   same time. Whether the agent came out to the
6   council and was talking about insurance and if
7   he took names down pertaining to who would be
8   interested in purchasing insurance...
9   Q.   Okay. Mr. Wycoff, for
10   clarification, are you thinking out loud now or
11   telling us your recollection?
12   A.   I'm just thinking out loud. I
13   remember meeting an agent, but I don't remember
14   where it was.
15   Q.   But you remember it was about the
16   Knights of Columbus policy?
17   A.   Yes.
18   Q.   Do you remember whether or who was
19   present for your meeting?
20   A.   No, I can't. Even looking at it, I
21   can't.
22   Q.   That was -- well, do you remember
23   when you met with the agent?
24   A.   You mean prior to signing the --
25   Q.   I guess you looked at the

Page 68

R. Wycoff - by Mr. Lesko
1
2   application. Without looking at the
3   application, do you independently recall when
4   it was that you met with the agent?
5   A.   When it was?
6   Q.   What year?
7   A.   Do you want a year?
8   Q.   Yes.
9   A.   No. I can't remember a year.
10   Q.   If you do look at the application,
11   it appears to be signed in 1970. It might be
12   September 4, 1970.
13       Does that refresh your recollection
14   as to when you met with him?
15   A.   No.
16   Q.   Is this policy still in force?
17   A.   Yes, sir.
18   Q.   Other than the documents that are in
19   front of you, marked as Exhibit 2, do you have
20   any other documents relating to this policy at
21   all?
22   A.   No, sir.
23   Q.   How was the premium paid on this
24   policy?
25   A.   How was it paid?

17 (Pages 65 to 68)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 69

1      R. Wycoff - by Mr. Lesko
2      Q.   Yes.  Do you pay it monthly?
3  Yearly?  Semiannually?
4      A.   It's not annually, not semiannually.
5      Q.   Okay.
6      A.   I am trying to look at the figures
7  here.  It must be quarterly.
8      Q.   Do you know whether you're still
9  paying on this policy?  Are you still paying a
10  premium for this policy on a periodic basis?
11      A.   I believe so, yes.
12      Q.   How was it paid?  Was it paid by
13  check in the mail or paid through automatic
14  withdrawal from your checking account or some
15  other way?
16      A.   Check.
17      Q.   So you get a bill periodically?
18      A.   Canceled check.
19      Q.   And then somebody pays it?
20      A.   Yes.
21      Q.   Do you handle the household bills or
22  does your wife do that?
23      A.   Wife does that.
24      Q.   Put that aside.  The Prudential
25  policy, marked as Exhibit 3, you mentioned that

Page 70

1      R. Wycoff - by Mr. Lesko
2  the agent or broker who sold you that policy is
3  Mr. Seddan; right?
4      A.   Yes, sir.
5      Q.   It's Robert Seddan?
6      A.   Yes, sir.
7      Q.   Do you remember when you met with
8  Mr. Seddan to purchase that policy?
9      A.   I see here it says April 1, 1985.  I
10  don't remember that date, no.
11      Q.   Just look back at Exhibit 2 for one
12  moment, sir.  Flip to page 5 of the policy.
13  It's Bates No. 70.  In the lower right-hand
14  corner you will see the number 70.
15      A.   Okay.
16      Q.   You see in the right-hand column,
17  near the top, there is a section called, "14,
18  dividends."  Do you see that?
19      A.   Yes.
20      Q.   Did you know this policy provides
21  for payment of dividends?
22          MR. BARTHOLOMAEI:  Objection to
23  form.
24      A.   Did I know it had dividends?
25      Q.   Have you ever read this policy

Page 71

1      R. Wycoff - by Mr. Lesko
2  before today?
3      A.   Whatever dividends we get goes right
4  back into the insurance.
5      Q.   On the Knights of Columbus policy?
6      A.   Yeah, on the Knights of Columbus
7  policy.
8      Q.   Actually, flip for me to page 76,
9  Bates No. 76, please.
10      A.   Okay.
11      Q.   Now, on the left-hand side of the
12  page, about halfway down, there is a question
13  or an item No. 15.  Do you see that?  Left-hand
14  side.  It's difficult to read.  The copy
15  quality is difficult to read.
16          Have you read item No. 15 there,
17  Mr. Wycoff?
18      A.   I am trying to.
19      Q.   Let me read it for the record and
20  tell me if I read it wrong.  "Any dividends
21  apportionable under the benefits certificate
22  hereby applied for are to be."  It gives some
23  options.  Option No. 3 is checked.  It says,
24  "Deposit with interest."
25          Do you see that?

Page 72

1      R. Wycoff - by Mr. Lesko
2      A.   Yes, I do.
3      Q.   There is another option there that
4  says, No. 2, "Apply to reduced contributions."
5  No. 4 is "Apply to purchase paid-up additions."
6          Do you see that?
7      A.   Um-hum.
8      Q.   Do you know what paid-up additions
9  are?
10      A.   No, sir.
11      Q.   Have you ever heard the phrase
12  paid-up additional insurance?  Have you heard
13  that phrase before or no?
14      A.   I don't remember.
15      Q.   You said a moment ago that whatever
16  dividends you got under the policy would have
17  been -- would have gone directly to insurance;
18  is that right?
19      A.   I am pretty sure that's what we have
20  under the policy.
21      Q.   What do you mean by that?  I didn't
22  mean to interrupt you.  What do you mean by it
23  would go directly into insurance?  I may be
24  misquoting you.  That's the gist of what you
25  said.

Powers, Garrison & Hughes

Page 73

1    R. Wycoff - by Mr. Lesko
2    A.   It goes to purchase additional
3  insurance, the dividends.  We don't receive
4  cash money from the dividends.
5         It just goes to purchase more
6  insurance.
7    Q.   Thereby, increase the death benefit
8  under the policy; correct?
9    A.   Correct.
10   Q.   Now, having seen this item No. 15 in
11  the application, does that refresh your
12  recollection as to how dividends paid under
13  this policy, the Knights of Columbus policy,
14  are handled?
15   A.   It says here, "Deposit with
16  interest."
17   Q.   Right.  So does that indicate that
18  the dividends are deposited with the insurance
19  company and paid interest?
20   A.   I guess it is.
21        MR. BARTHOLOMAEI:  Don't guess
22  at the answer, Mr. Wycoff.  Just give the
23  answer the best that you can.
24   A.   "Deposit with interest."
25        MR. BARTHOLOMAEI:  He is asking

Page 74

1    R. Wycoff - by Mr. Lesko
2  if it refreshes your recollection as to how the
3  dividends are applied in your Knights of
4  Columbus policy.  Does it?
5    A.   Yes.
6    Q.   Okay.  How are those dividends
7  applied?
8    A.   I can't say, "I guess."
9    Q.   What is your understanding of how
10  the dividends are applied, based on your
11  reading of this item of the application?
12   A.   "Deposit with interest."
13        (Reviewing document.)
14   A.   Does that mean -- I can't answer you
15  with a question?
16   Q.   No, you can't.  If you cannot
17  formulate an understanding based upon that,
18  that's your answer.  If you have an
19  understanding, based upon your reading of the
20  application or that item of the application,
21  let me know what it is.
22   A.   I would say no, I don't understand.
23   Q.   No understanding, okay.  Do you
24  still think that the dividends under the
25  Knights of Columbus policy are applied to buy

Page 75

1    R. Wycoff - by Mr. Lesko
2  additional insurance?
3    A.   I can see here it isn't.
4    Q.   Flip back to page 70 for me, please.
5        MR. BARTHOLOMAEI:  Page 70,
6  Mr. Wycoff.
7        THE WITNESS:  Sorry.
8    A.   Okay.
9    Q.   We were looking at this provision
10  before.  It is No. 14, Dividends.  Do you see
11  that?
12   A.   Okay.
13   Q.   The first paragraph, the last
14  sentence of the first paragraph says, "The
15  person in control of the certificate may, on
16  each dividend due date, elect to have the
17  dividend."
18        Then it gives options.  Option C is
19  "left on deposit and credited annually with
20  interest at the rate declared by the order from
21  time to time but not less than two percent per
22  annum."
23        Do you see that?
24   A.   Yes, I see that.
25   Q.   Now, having read that provision and

Page 76

1    R. Wycoff - by Mr. Lesko
2  having seen item No. 15 on the application
3  which indicates an election to deposit with
4  interest, do you now have an understanding as
5  to what the disposition of your dividends,
6  under this Knights of Columbus policy, is?
7    A.   (Reviewing document.)  I don't know.
8  "Left on deposit and credited annually with
9  interest at the rate declared by The Order from
10  time to time" -- what do they mean at the rate
11  declared by The Order from time to time?  What
12  do they mean by that?  What is The Order?
13   Q.   I can't answer your questions.
14  But --
15   A.   It must be the Knights of Columbus
16  Order or the home office, I guess.
17   Q.   Is the Knights of Columbus sometimes
18  referred to as The Order, or The Order of the
19  Knights of Columbus?
20   A.   You're right.  When you read this
21  and you're talking about insurance...
22   Q.   Do you recall whether or not the
23  agent that sold you this policy told you that
24  the policy pays dividends?
25   A.   No, I can't say that.

19 (Pages 73 to 76)

Page 77

1     R. Wycoff - by Mr. Lesko
2     Q.   Before looking at this provision
3  today, did you know that this policy paid
4  dividends?
5     A.   To my knowledge, I would say no.
6     Q.   You didn't know it?
7     A.   I didn't know it.
8     Q.   Again, I think I might have asked
9  you this question. I want to make sure.
10  Please keep that in front of you.
11     Did you ever read this policy before
12  today?
13     A.   I don't believe so, no.
14     Q.   Do you recall whether the agent --
15  strike that. Do you recall how you received
16  the policy? Was it in the mail or did somebody
17  deliver it to you?
18     A.   I can't remember. I can't remember.
19     Q.   Okay. Look at page 76 again for me
20  for a moment, please.
21     A.   Okay.
22     Q.   The handwriting, providing
23  information in response to the questions, is
24  that your handwriting?
25     Do you recognize this as yours?

Page 78

1     R. Wycoff - by Mr. Lesko
2     A.   Yes, this looks like mine.
3     Q.   Okay.
4     A.   Yes, that looks like mine.
5     Q.   You can put that aside now,
6  Mr. Wycoff. I want to take a look at Exhibit
7  3, which is one of the Prudential policies and
8  related documents.
9     The agent or broker who sold you
10  this policy was Mr. Seddan; is that right?
11     A.   Seddan, yes.
12     Q.   Do you remember -- strike that. Did
13  you meet with Mr. Seddan before you purchased
14  this policy?
15     MR. BARTHOLOMAEI: Objection.
16  Form.
17     A.   I don't know.
18     Q.   Okay.
19     A.   I can't remember.
20     MR. LESKO: What is the basis
21  for the objection?
22     MR. BARTHOLOMAEI: Lack of
23  foundation. I will say the same thing for the
24  last policy. You never had him identify the
25  policy. It is just a basic thing you do when

Page 79

1     R. Wycoff - by Mr. Lesko
2  you show someone a document.
3     I will keep objecting until do you
4  that with the documents, including this one and
5  the future documents.
6     MR. LESKO: Okay.
7     Q.   Take a look at Exhibit 2 for me,
8  please. Is the complete Knights of Columbus
9  insurance policy -- strike that.
10     Did you ever purchase a Knights of
11  Columbus insurance policy?
12     A.   Did I ever purchase?
13     Q.   I have to establish a foundation
14  based upon your lawyer's objection, Mr. Wycoff.
15  Did you ever purchase a policy?
16     A.   Yes.
17     Q.   Is that the policy that you
18  purchased?
19     A.   Yes.
20     Q.   You can put that aside. Did you
21  ever purchase a policy of life insurance from
22  Prudential Life Insurance Company?
23     A.   Yes.
24     Q.   Exhibit 3, is one of the policies
25  that you purchased from Prudential contained

Page 80

1     R. Wycoff - by Mr. Lesko
2  within that exhibit?
3     A.   I can't be sure unless I had the
4  policy here and check the policy number with
5  this Policy Number.
6     Q.   Well, are you?
7     A.   Are you asking me to go by what's
8  here?
9     Q.   No. What I want you to do is flip
10  through that exhibit. As I mentioned before, I
11  acknowledge that some extraneous documents,
12  which are related to that policy, are attached.
13     But the policy's included, at least
14  to my understanding, it is included. If you
15  look starting on Bates No. 88 and going back
16  from there, I think that you will see what
17  purports to be a policy.
18     Can you tell me if that is the
19  policy or one of the policies that you
20  purchased from Prudential?
21     I will make the representation and
22  Mr. Bartholomaei can correct me if I'm wrong,
23  but the pages marked with the Bates number,
24  with the prefix, RGW, are documents which were
25  produced by your lawyers on your behalf in

20 (Pages 77 to 80)

Robert G. Wycoff,                                                    Robert G. Wycoff v.
September 17, 2003                            Metropolitan Life Insurance Company

---

Page 81

1          R. Wycoff - by Mr. Lesko
2    connection with this litigation. If that
3    helps.
4        A.    What was the question again?
5        Q.    Is that one of the policies that you
6    purchased from Prudential?
7        A.    (Reviewing document.) You have my
8    name spelled wrong. Let me see where the hell
9    I signed it.
10       Q.    Take a look at page 113. Page 112
11   and 113.
12       A.    Okay. (Reviewing document.) This
13   isn't my writing, printing here. This has to
14   be the agent's.
15       Q.    You're referring to the information
16   provided in response to the questions?
17       A.    I guess that is. Spelled my name
18   wrong. I never even noticed that until now.
19       Q.    Page 113 in the lower right-hand
20   corner, is that your signature?
21       A.    Yes, sir.
22       Q.    Let me ask you again: Is this one
23   of the policies that you purchased from
24   Prudential?
25       A.    Yes, it is.

---

Page 82

1          R. Wycoff - by Mr. Lesko
2        Q.    Have you ever seen this document
3    before? The policy, that is?
4        A.    As it is being presented to me here
5    now?
6        Q.    Have you ever seen this policy, the
7    original, or a copy, before?
8            MR. BARTHOLOMAEI: He is
9    talking about from 88 through 116; is that
10   right?
11           MR. LESKO: That's correct.
12           MR. BARTHOLOMAEI: Are you
13   including 116?
14           MR. LESKO: I just want to know
15   if the policy contained in this exhibit is the
16   policy that he purchased from Prudential.
17           MR. BARTHOLOMAEI: I am just
18   trying to clarify for the record what you are
19   claiming as the policy. Because you put
20   together here -- starts with 79 and goes
21   through 115. Apparently, only a portion of it
22   is the policy.
23           MR. LESKO: I am not claiming
24   that any portion is the policy. I am asking
25   whether or not the policy is contained within

---

Page 83

1          R. Wycoff - by Mr. Lesko
2    that range of documents, which are stapled
3    together and marked as Exhibit 3.
4        A.    Yes.
5        Q.    That's the policy you purchased from
6    Prudential; is that right?
7        A.    Yes.
8        Q.    Now that we have got that
9    foundation, I can ask you some questions about
10   it. Do you know whether or not this policy
11   provides for payment of dividends? Did you say
12   you believe it did?
13           MR. BARTHOLOMAEI: He is not
14   asking you to go through the policy and
15   determine if it does. He is just asking for
16   your recollection as to whether the policy pays
17   dividends or not. You can go ahead and answer
18   it, if you can.
19       A.    I don't know.
20       Q.    You have no recollection whether or
21   not it pays dividends? I am not asking you
22   whether it does or not. I want to know what
23   your recollection, as to whether or not it pays
24   benefits, is? If you have no recollection, you
25   have no recollection.

---

Page 84

1          R. Wycoff - by Mr. Lesko
2            MR. BARTHOLOMAEI: Objection to
3    form. Can you read that back, please.
4            (Question read back.)
5            MR. BARTHOLOMAEI: I am going
6    to ask you to rephrase the question or ask it
7    again. You said benefits. I think it is a
8    little different than dividends.
9        Q.    Mr. Wycoff, I will tell you what.
10   Look at page 88. Bottom of the page, right-
11   hand side of the page. What does the last line
12   say?
13       A.    "Eligible for annual dividends, as
14   stated under dividends."
15       Q.    Does that refresh your recollection
16   as to whether or not this policy pays dividends
17   or is eligible to receive dividends?
18       A.    Yes. That's stated right there.
19       Q.    Okay.
20           MR. BARTHOLOMAEI: He's not
21   asking you to read it. He is asking you if it
22   refreshes your recollection or helps you recall
23   that the policy pays dividends. Okay? Do you
24   understand the difference?
25           Mr. Wycoff, Mr. Lesko is trying to

---

21 (Pages 81 to 84)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 85

1          R. Wycoff - by Mr. Lesko
2   get your best answer, your best recollection or
3   memory of things that have happened in the past
4   and things that, you know, are related to this
5   insurance policy.
6          He's not asking you to read this and
7   determine something. He's asking for your
8   recollection or memory as to whether it pays
9   dividends.
10         He is asking you, from reading this,
11  does it help you remember something. If it
12  does, tell him that it does. If it doesn't,
13  tell him that it doesn't.
14         Do you understand?
15         THE WITNESS: I understand
16  that.
17         MR. BARTHOLOMAEI: He is not
18  trying to trick you. He is just asking for
19  your best memory.
20  A.   I would say yes.
21  Q.   It does refresh your recollection?
22  A.   I would say yes.
23  Q.   I might add to that, Mr. Wycoff, it
24  didn't occur to me that you might be thinking
25  I'm trying to trick you.

Page 86

1          R. Wycoff - by Mr. Lesko
2          MR. BARTHOLOMAEI: I wasn't
3   implying that he was thinking that.
4          MR. LESKO: I understand. But,
5   you know...
6   Q.   I don't hold any allusions that I
7   could trick you into saying something that you
8   don't believe is true. I am going to try to
9   ask simple questions. If you know the answer,
10  you know the answer. If not, let me know
11  that. We will move on. We will get done
12  quicker.
13  A.   I can be here all day.
14  Q.   No one wants that.
15         MR. LESKO: Off the record.
16         (Discussion off record.)
17         (Short break.)
18  BY MR. LESKO:
19  Q.   Are you all right to go ahead?
20  A.   Yes.
21  Q.   We were talking about the policy
22  which is included as part of Exhibit 3, issued
23  by Prudential.
24         Before today, have you ever read
25  this policy before?

Page 87

1          R. Wycoff - by Mr. Lesko
2   A.   No, sir.
3   Q.   Do you remember how it was delivered
4   to you?
5   A.   No, sir.
6   Q.   By that, I mean was it in the mail
7   or hand delivered? You don't recall?
8   A.   I can't remember.
9   Q.   Do you recall whether the agent,
10  Mr. Seddan, ever reviewed the policy with you
11  after it was issued?
12  A.   I can't remember. I really can't.
13  Q.   Do you recall meeting with
14  Mr. Seddan for purposes of applying for this
15  policy?
16  A.   Do I remember? No, I don't
17  remember.
18  Q.   As a point of reference, this policy
19  has a contract date of April 1st, 1985. The
20  application indicates that it was completed on
21  March 18th, 1985.
22         That would have been after you
23  retired from U.S. Steel; is that right?
24  A.   Right.
25  Q.   Does that refresh your recollection

Page 88

1          R. Wycoff - by Mr. Lesko
2   as to whether or not you met with Mr. Seddan
3   regarding this policy?
4   A.   No, it doesn't.
5   Q.   Do you remember any conversations
6   with Mr. Seddan regarding this policy?
7   A.   No.
8   Q.   Do you recall whether or not
9   Mr. Seddan contacted you, or you contacted
10  Mr. Seddan for purposes of applying for this
11  policy?
12  A.   Ask that question again.
13  Q.   Do you recall who initiated the
14  contact prior to -- strike that. That's poorly
15  worded.
16         Do you recall whether Mr. Seddan
17  contacted you to sell you this policy?
18  A.   It would have been me.
19  Q.   So you would have contacted
20  Mr. Seddan to purchase this policy?
21  A.   Yes.
22  Q.   Do you recall now your conversation
23  with Mr. Seddan, or you just don't remember?
24  A.   No, I don't.
25  Q.   Okay. This policy has a face amount

22 (Pages 85 to 88)

Page 89

1          R. Wycoff - by Mr. Lesko
2    of $10,000; is that right?
3          A.    That's correct.
4          Q.    Do you recall why you decided to
5    purchase this policy?  What was your objective
6    in purchasing this policy?
7          A.    To have extra insurance.
8          Q.    Why did you want extra insurance?
9          A.    Primarily, for my family, my wife.
10         Q.    So you just wanted to increase the
11   amount of money that you would leave for them
12   upon your passing; is that right?
13         A.    That's correct.
14         Q.    It wasn't for any other purpose,
15   such as to cover funeral expenses, for example,
16   or was it?
17         A.    I can't determine that.  I mean, it
18   was extra insurance.
19         Q.    Okay.  Would you turn, please, for
20   me, to page 83 in that exhibit.  That page has
21   copies of three business cards on it; is that
22   right?
23         A.    It appears to be.
24         Q.    Do you know who the people are that
25   are identified on those business cards?

Page 90

1          R. Wycoff - by Mr. Lesko
2          A.    Do I know them?
3          Q.    Yes.  Have you ever met them?
4          A.    I don't recall those names.  I don't
5    know.
6          Q.    Do you have any understanding as to
7    why these three business cards were in your
8    files?
9          A.    Do I know why they were there?
10         Q.    Yes.
11         A.    No.
12         Q.    The first page of Exhibit 3 is a
13   letter dated November 13, 1995 from Prudential
14   to you.
15              Do you see that?
16         A.    Yes.
17         Q.    The first sentence says, "This
18   annual letter is intended to update you about
19   your policy and its values."
20              Do you see that?
21         A.    Yes.
22         Q.    Do you recall receiving annual
23   letters from Prudential to update you about
24   your policy and its values?
25         A.    Yes.

Page 91

1          R. Wycoff - by Mr. Lesko
2          Q.    Did you receive them every year?  I
3    will strike that.  Have you received them every
4    year since this policy was issued in 1985?
5          A.    I can't say for sure if we did every
6    year.
7          Q.    Do you recall whether you saved all
8    of the annual letters that you received from
9    Prudential?
10         A.    That came through the mail?
11         Q.    Did you save them all?
12         A.    I would say so, yes.
13         Q.    Where do you keep the annual letters
14   that you receive from Prudential?
15         A.    I keep those with my income tax
16   stuff, I believe.
17         Q.    The annual letters?
18         A.    Yes.  If it had to do with dividends
19   or additional insurance or what have you.
20         Q.    This page, the first page of Exhibit
21   3, was this kept with your tax returns?
22         A.    This one -- if it's pertaining to
23   dividends, yes.  If it's not pertaining to
24   dividends, no.  Because dividends, I always
25   make sure that I turn it in to my income tax,

Page 92

1          R. Wycoff - by Mr. Lesko
2    on my income tax.  This wouldn't have anything
3    to do with income taxes.
4          Q.    So anything you received from
5    Prudential, any annual letter you received from
6    Prudential that did not refer to dividends,
7    would be kept with your Prudential documents,
8    your Prudential papers; is that right?
9          A.    No.  No.  No.
10         Q.    If it's not kept with your
11   Prudential papers, not kept with your dividend,
12   where would you keep it?
13         A.    Something like this would be kept --
14   I really don't know.
15         Q.    Are you certain that you kept all of
16   the annual statements, annual letters, sent by
17   Prudential?
18         A.    Annual letters?
19         Q.    Yes.  This is an annual letter; is
20   that right?
21         A.    (Reviewing document.)  Ask that
22   question again.
23         Q.    Are you certain that you kept all of
24   the annual letters provided to you by
25   Prudential?

23 (Pages 89 to 92)

Page 93

1    R. Wycoff - by Mr. Lesko
2         MR. BARTHOLOMAEI: What annual
3    letters are you talking about?
4    Q.    Mr. Wycoff, can you look at the
5    first sentence of this letter again.  Tell me
6    what it says, the first three words.
7    A.    "This annual letter."
8    Q.    Does that imply this letter was
9    provided annually?
10    A.    Yes.
11    Q.    I am referring to this as an annual
12    letter.  Have you -- are you certain that you
13    kept all of the annual letters provided to you
14    by Prudential?
15         MR. BARTHOLOMAEI: Objection to
16    form.
17    Q.    If you are not certain, the answer
18    is no.
19         MR. BARTHOLOMAEI: That is not
20    the answer, if he's not certain.
21         MR. LESKO:  The question is:
22    Is he certain that he kept all of the annual
23    letters.  If he's not certain, the answer is
24    no.
25         MR. BARTHOLOMAEI: I will tell

Page 94

1    R. Wycoff - by Mr. Lesko
2    you the reason why he is confused, is because
3    you're saying annual letters.  I don't know if
4    he got other letters annually.
5         MR. LESKO: He testified that
6    he got others, Mark.
7         MR. BARTHOLOMAEI: No, no.  He
8    could receive four or five different types of
9    letters on an annual basis from Prudential.  Is
10    that what you are talking about?
11         MR. LESKO: I am talking about
12    this letter.
13         MR. BARTHOLOMAEI: This is the
14    way the deposition normally goes:
15         (Attorneys talking over top one
16    another.)
17         MR. LESKO: Wait.  Whoa, whoa,
18    whoa.  Excuse me.
19         MR. BARTHOLOMAEI: Have you
20    seen a letter like this before?  He will say
21    yes.  You say --
22         MR. LESKO: Excuse me,
23    professor.
24         MR. BARTHOLOMAEI: Yes, maybe I
25    do.  Maybe I don't.

Page 95

1    R. Wycoff - by Mr. Lesko
2         MR. LESKO: Excuse me,
3    professor.
4         MR. BARTHOLOMAEI: That's the
5    way it should work.
6         MR. LESKO: Excuse me,
7    professor.  What law school do you teach for?
8         MR. BARTHOLOMAEI: When you are
9    telling him annual letters, he's confused.
10    That's why he can't answer your question.  I'm
11    telling you what the problem is just from an
12    observational point of view.
13         MR. LESKO: Can we have you
14    sworn in?  If you want to keep testifying, we
15    will have you sworn in.
16         MR. BARTHOLOMAEI: I am trying
17    to help you with the deposition.
18         MR. LESKO:  I don't want your
19    help, Mark.  You are hindering the deposition.
20    That's what you are trying to do.
21         MR. BARTHOLOMAEI: I am trying
22    to make it go faster.
23         MR. LESKO:  Knock it off.  I
24    want an answer to my question.
25         MR. BARTHOLOMAEI: He can't

Page 96

1    R. Wycoff - by Mr. Lesko
2    answer the question.  He's already given his
3    answer.  I'm directing him not to answer.
4    Q.    Mr. Wycoff, have you received
5    letters from Prudential like this other than
6    this one?
7         MR. BARTHOLOMAEI: You can
8    answer that.
9    A.    Yes, we have.
10    Q.    Did you keep them?
11    A.    As a rule?
12    Q.    Did you keep them, as a fact?  As a
13    matter of fact, did you keep them?
14    A.    To keep them, as you would an
15    heirloom, I would have to say I don't know if I
16    kept all of them.
17    Q.    If you kept them and we asked for
18    them, you would have produced them; right?
19    A.    That's correct.
20    Q.    Thank you.  There is a paragraph in
21    this letter underneath the columns which show
22    you the figures, the numbers.  It says, "If you
23    elect and are interested in the abbreviated
24    payment plan, which is a payment option that
25    uses dividends to pay premiums, you may be

24 (Pages 93 to 96)

Page 97

1    R. Wycoff - by Mr. Lesko
2    interested to know that if dividends continue
3    according to their current schedule, your
4    policy could abbreviate in 2002."
5        Do you see that?
6    A.    (Reviewing document.) I see it.
7    Q.    Did you elect the abbreviated
8    payment plan for this policy?
9    A.    I don't know. I really don't know.
10    Q.    Did anybody ever ask you whether you
11    wanted to elect an abbreviated payment plan?
12    A.    I don't know.
13    Q.    Have you ever heard of Prudential's
14    abbreviated payment plan before today?
15    A.    I don't know.
16    Q.    Let's look at -- Mr. Wycoff, the
17    policy contained in Exhibit 3, are you still
18    paying premiums on that policy?
19    A.    Yes, we are.
20    Q.    How long do you have to continue to
21    pay premiums on this policy?
22    A.    How long? I believe this is --
23        MR. BARTHOLOMAEI: He is not
24    asking you to look through this, Mr. Wycoff.
25    Just answer his questions. If can you answer

Page 98

1    R. Wycoff - by Mr. Lesko
2    his question, give him an answer. He is not
3    looking for you to analyze the document. If he
4    is, he will ask you to do that.
5    A.    What was the question again?
6    Q.    How long do you have to pay premiums
7    on this policy?
8    A.    Every year.
9    Q.    Every year. For how many years?
10    A.    I believe this is a whole life
11    policy here.
12    Q.    Right.
13    A.    I believe.
14    Q.    Sorry?
15    A.    I said I believe this is a whole
16    life policy.
17    Q.    So how many years do you have to pay
18    for the policy, for the premiums?
19    A.    Your whole life.
20    Q.    Okay. Let's look at Exhibit 4.
21        MR. LESKO: Exhibit 4, for the
22    record -- I think I already identified it for
23    the record with the Bates numbers.
24    Q.    Can you tell me what that exhibit
25    is, Mr. Wycoff, please.

Page 99

1    R. Wycoff - by Mr. Lesko
2    A.    An insurance policy from Prudential.
3    Q.    What is the issued date, the policy
4    date? When was it issued?
5    A.    March 4, 1954.
6    Q.    Are you looking at the policy on the
7    first page for that date?
8    A.    Yes.
9    Q.    I read it March 1, 1954. Is that
10    right?
11    A.    What did I say?
12    Q.    I think you said March 4.
13    A.    All right. It is March 1st.
14    Q.    What kind of policy is this? Is
15    this also a whole life policy? Feel free to
16    take a look at the policy.
17    A.    (Reviewing document.)
18    Q.    Let me direct you to the bottom of
19    the first page, very bottom. What does it say?
20    A.    Very bottom? "Modified whole life
21    policy."
22    Q.    Does that give you an idea what kind
23    of life insurance this is?
24    A.    A whole life policy.
25    Q.    How long are premiums payable?

Page 100

1    R. Wycoff - by Mr. Lesko
2    A.    Premiums payable for life.
3    Q.    Is it your understanding of a whole
4    life policy that premiums are payable for your
5    life?
6    A.    On these policies.
7    Q.    Did Mr. Seddan also sell you this
8    policy?
9    A.    That, I don't know. I can't
10    remember that.
11    Q.    You mentioned before that your
12    relationship with Mr. Seddan, other than the
13    fact that he sold you at least one of these
14    policies, was the fact that he had written life
15    insurance for your mother; is that correct?
16    A.    Right.
17    Q.    Do you know when he wrote life
18    insurance for your mother, or when he sold life
19    insurance to your mother?
20    A.    I was younger then. I don't know.
21    Q.    Was it at or about the same time
22    that he sold you the life insurance policy in
23    1985?
24    A.    No.
25    Q.    Was it much earlier than that?

25 (Pages 97 to 100)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 101

1        R. Wycoff - by Mr. Lesko
2        A.    Yes.
3        Q.    A matter of years or decades or
4    what?
5        A.    Decades. My mother died in 1972.
6    So...
7        Q.    Okay. All right. Did you have a
8    personal relationship with Mr. Seddan?
9        A.    No.
10       Q.    Other than the time that you called
11   him to purchase life insurance, had you spoken
12   to him before that about anything?
13       A.    No.
14       Q.    Did you make a claim against your
15   mother's life insurance policy when she passed
16   away? Did you claim the death benefit?
17       A.    That might have been my sister who
18   did that. My sister was older.
19       Q.    How did you get Mr. Seddan's name
20   and number?
21       A.    I don't know. Called up the central
22   office, I guess. I don't know.
23       Q.    You just called Prudential and asked
24   for Mr. Seddan?
25       A.    Not remembering, I don't know.

Page 102

1        R. Wycoff - by Mr. Lesko
2        Q.    You just don't remember. All right.
3    So I take it that when you decided that you
4    wanted to buy insurance for Prudential in 1985
5    or so, you just recalled Mr. Seddan was your
6    mother's insurance broker; is that right?
7        A.    I would say so.
8        Q.    Again, I might have asked this
9    question. Have you ever spoken to Mr. Seddan
10   since you purchased the 1985 policy from
11   Prudential?
12       A.    No.
13       Q.    Do you know whether this policy,
14   this policy being Exhibit 4, the 1954 policy,
15   does that policy provide for payment of
16   dividends?
17             Without looking at it, do you recall
18   whether it does or not?
19       A.    No, I don't remember.
20       Q.    Okay. Mr. Wycoff, I want to take a
21   step back for a moment. We have been reviewing
22   a number of insurance policies that were issued
23   by Prudential and Knights of Columbus.
24             I want you to tell me what your
25   understanding is of the nature of life

Page 103

1        R. Wycoff - by Mr. Lesko
2    insurance. What is it?
3        A.    Life insurance is an avenue that you
4    can partake in to assure some sort of financial
5    stability on down the road in case of a death
6    or a need. So it is not a burden on your
7    family in the case of a death. To protect your
8    wife.
9        Q.    Okay.
10       A.    Security for the family, as much as
11   possible, as much as you can afford.
12       Q.    If I understand your answer
13   correctly, life insurance provides potentially
14   two different benefits:  the death benefit and
15   some kind of cash benefit; is that right?
16       A.    I guess that's my understanding. I
17   guess most policies do.
18       Q.    Most policies do what?
19       A.    Do have those what you just stated
20   there:  death benefit and I guess you call
21   it -- what?  A cash value?  What's the word?
22   I'm not using the right -- I am not using
23   insurance language.
24       Q.    Cash value is the phrase typically
25   used in insurance industry.

Page 104

1        R. Wycoff - by Mr. Lesko
2        A.    Yes. I would say that they have
3    that, yes.
4        Q.    Have you ever heard the phrase term
5    insurance before?
6        A.    Term insurance? I believe I have.
7        Q.    What is your understanding of that?
8    How is it different than -- let me step back a
9    second. The life insurance that you described,
10   your understanding of the life insurance, are
11   you referring to whole life policies or
12   something else?
13       A.    Insurance, in general.
14       Q.    Is it your understanding that all
15   life insurance has both a death benefit and a
16   cash value?
17       A.    That's what I thought.
18       Q.    Did you know that --
19       A.    That may or may not be true. I
20   don't know.
21       Q.    Did you know that there is a product
22   typically called term insurance that provides a
23   death benefit but does not build a cash value?
24   Were you aware of that?
25       A.    No, sir.

26 (Pages 101 to 104)

Powers, Garrison & Hughes

Robert G. Wycoff                                                    Robert G. Wycoff v.
September 17, 2003                              Metropolitan Life Insurance Company

Page 105

1      R. Wycoff - by Mr. Lesko
2      Q.   Who pays a death benefit on a life
3   insurance policy in the event of a death?
4      A.   Who pays it?
5      Q.   Yes, who pays?
6      A.   The insurance company.
7      Q.   What is the quid pro quo for the
8   life insurance company to provide a death
9   benefit?
10         Do they do it for free?
11     A.   What do you need to produce? Death
12  certificate?
13     Q.   No.  Do they provide that service
14  for free?
15         MR. BARTHOLOMAEI:  What
16  service?
17     Q.   Life insurance.
18         MR. BARTHOLOMAEI:  Who is
19  "they"?
20     Q.   You can answer the question.
21     A.   Does the insurance company -- state
22  that again.
23     Q.   You have to pay a premium for life
24  insurance; is that right?
25         MR. BARTHOLOMAEI:  Objection to

Page 106

1      R. Wycoff - by Mr. Lesko
2   form.
3      Q.   Mr. Wycoff, if you want life
4   insurance from a -- if you want life insurance
5   from a life insurance company, what do you have
6   to do to get life insurance?
7         MR. BARTHOLOMAEI:  Objection to
8   form.
9      Q.   Do you have to pay for life
10  insurance?
11         MR. BARTHOLOMAEI:  Do you have
12  to fill out an application? Do you have to
13  call an agent?
14     Q.   Do you have to pay for life
15  insurance?
16         MR. BARTHOLOMAEI:  Oh, man.
17  Are you asking him the abstract or about his
18  specific case or just hypotheticals?
19     Q.   Please answer that last question.
20     A.   Do you have to pay for insurance?
21  Is that what you are asking?
22         MR. BARTHOLOMAEI:  Do you have
23  to pay? Or does someone have to pay? Could a
24  company provide it for him and pay for it for
25  him? Are you asking him if he individually has

Page 107

1      R. Wycoff - by Mr. Lesko
2   to pay for life insurance?
3      Q.   You can answer that question.
4      A.   If I want insurance, I have to pay
5   for it.
6      Q.   So the life insurance companies
7   don't provide life insurance for free? They
8   expect to be paid for it; is that right?  Is
9   that your understanding?
10     A.   That's correct.
11     Q.   Now, do you understand that life
12  insurance companies -- strike that.  Do you
13  understand that a life insurance company takes
14  a risk when they issue a life insurance policy
15  in exchange for a premium?
16     A.   No, I don't.
17     Q.   You don't?
18         MR. BARTHOLOMAEI:  He said,
19  "No, I don't," in case you didn't hear him.
20     Q.   If you were to purchase a life
21  insurance policy and pay a single premium and
22  then pass away, and your beneficiary received
23  the entire death benefit, which is typically in
24  excess of the first premium, wouldn't the life
25  insurance company lose money?

Page 108

1      R. Wycoff - by Mr. Lesko
2         MR. BARTHOLOMAEI:  Objection to
3   form.
4      A.   I don't see what you are --
5         MR. BARTHOLOMAEI:  Ask him some
6   questions about his case, instead of
7   hypothetical questions about life insurance.
8      A.   I don't understand what you are
9   talking about.
10         MR. BARTHOLOMAEI:  Maybe this,
11  maybe that. He said I don't understand what
12  you're asking, in case you didn't hear him.
13     Q.   I will clarify the question.
14     A.   I don't understand what you want
15  from me.
16         MR. BARTHOLOMAEI:  Let him ask
17  another question.
18     Q.   I just want you to answer the
19  questions. That's all I want. Do you have any
20  understanding as to how much total premiums you
21  have paid to MetLife for your 1994 policy to
22  date?
23     A.   No.
24     Q.   Do you know how much in premiums you
25  have paid to MetLife for your 1991 policy to

27 (Pages 105 to 108)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 109

1    R. Wycoff - by Mr. Lesko
2  date?
3    A.  No.
4    Q.  What is the death benefit on your
5  1991 MetLife policy?
6    A.  $10,000.
7    Q.  Do you know whether you paid in
8  excess of $10,000 in premiums so far?
9    A.  I don't know.
10    Q.  You don't know, or you didn't pay
11  that much?
12    A.  I say I don't know.  Off the top --
13  no, I don't.
14    Q.  Do you know what the premium is on
15  your 1991 MetLife policy?  Do you recall?
16    A.  $73 and some odd cents.  20 cents,
17  30 cents.
18    Q.  Is it $73.20?
19    A.  (Nods affirmatively.)
20    Q.  Okay.
21       MR. LESKO:  Excuse me for one
22  second.
23       (Short break.)
24    Q.  Mr. Wycoff, you pay that $73.20
25  premium on a monthly basis; is that right?

Page 110

1    R. Wycoff - by Mr. Lesko
2    A.  That's correct.
3    Q.  So you paid about $878.40 a year; is
4  that right?
5    A.  You got the calculator there.  I
6  don't know.
7    Q.  I will represent to you that
8  according to this calculator, $73.20 times 12
9  months is 878.4.  You have paid that ever since
10  June of 1991; is that right?
11    A.  From the inception of the policy?
12    Q.  Yes.
13    A.  Yes.
14    Q.  So that's June 27, '91 to June 27 of
15  2003 is 12 years; is that right?
16    A.  You have got the calculator.
17    Q.  '91 to 2003 is 12 years, isn't it?
18    A.  Are you doing the math or do you
19  want me to do the math?
20    Q.  I am asking you if June 27, 1991 to
21  June 27, 1993 is 12 years?
22    A.  Yes.
23       MR. BARTHOLOMAEI:  No, it's
24  not.
25       MR. LESKO:  It's not?

Page 111

1    R. Wycoff - by Mr. Lesko
2       MR. BARTHOLOMAEI:  It's not.
3  Can you read that back?
4       (Reporter read from record as
5  requested.)
6       MR. BARTHOLOMAEI:  It's clearly
7  not.
8       MR. LESKO:  You're right.  It
9  is 12 years and a day.  My humblest apologies.
10       MR. BARTHOLOMAEI:  It's clearly
11  not.
12       MR. LESKO:  '91 to 2003 is not
13  12 years.
14       MR. BARTHOLOMAEI:  That's not
15  what you said.  Do you want to read it back
16  again.  Please read it back again.
17       MR. LESKO:  I don't want it
18  read back.  Maybe you can clarify it for me,
19  Mr. Bartholomaei.  Why is it not?
20       MR. BARTHOLOMAEI:  Because
21  you're saying, Mr. Lesko, 1991 to 1993 and
22  that's two years, not 12 years.  Would you like
23  him to read it back?
24       MR. LESKO:  I said 2003.
25       MR. BARTHOLOMAEI:  Please read

Page 112

1    R. Wycoff - by Mr. Lesko
2  it back so we're clear.
3  BY MR. LESKO:
4    Q.  Mr. Wycoff --
5       MR. BARTHOLOMAEI:  Excuse me.
6  I asked the court reporter to read something
7  back.  He's going to do it.
8    Q.  Mr. Wycoff --
9       MR. LESKO:  Mr. Bartholomaei,
10  you are not conducting this deposition.  I'm
11  conducting --
12       MR. BARTHOLOMAEI:  I'm allowed
13  to have him read something back.
14    Q.  I am going to rephrase the question
15  based upon Mr. Bartholomaei's objection.
16       MR. BARTHOLOMAEI:  I guess,
17  when we get the transcript, we will all know.
18    Q.  June 27, 1991 to June 27, 2003, is
19  that 12 years?
20    A.  Yes.
21    Q.  I guess you made the same mistake I
22  did earlier.  That's 12 years.  Do you have any
23  understanding as to how much premium you have
24  paid on the policy, the 1991 policy issued by
25  MetLife?

28 (Pages 109 to 112)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 113

1     R. Wycoff - by Mr. Lesko
2        A.   No.
3           MR. BARTHOLOMAEI: Don't answer
4     that. He's already answered that once.
5        Q.   Mr. Wycoff -- strike that.
6     Mr. Wycoff, are you aware that -- what is your
7     understanding of the purpose of an application
8     for insurance?
9        A.   You are applying for an insurance
10    policy.
11       Q.   You provide information about
12    yourself; is that right?
13       A.   Yes.
14       Q.   Let's refer to Exhibit 3, for
15    example. Flip to page 112.
16       A.   All right.
17       Q.   Now, this application contains
18    questions relating to your health, doesn't it?
19       A.   Where is that at? I imagine it
20    does, but I haven't been able to find it.
21       Q.   Check on page 113, question number
22    27.
23       A.   Okay.
24       Q.   Those are questions relating to your
25    health; is that right?

Page 114

1     R. Wycoff - by Mr. Lesko
2        A.   Yes.
3        Q.   Question number 30 requests, asks
4     you to provide details regarding affirmative
5     answers to the questions above it; is that
6     right?
7        A.   Yes.
8        Q.   In response, you have provided
9     information related to certain health
10    conditions, visits to doctors, et cetera; is
11    that right?
12       A.   Correct.
13       Q.   Flip back to the previous page.
14       A.   Okay.
15       Q.   For example, take a look at question
16    No. 13. I beg your pardon. Not 13. Look at
17    No. 15, please.
18       A.   (Reviewing document.)
19           MR. BARTHOLOMAEI: He's reading
20    it to himself.
21       Q.   Have you read question No. 15?
22       A.   Yes. Was I going to travel out --
23       Q.   I am not asking you to respond to
24    the question. That question asks for
25    information regarding your travel activity, is

Page 115

1     R. Wycoff - by Mr. Lesko
2     that right, or intentions to travel?
3        A.   Yes.
4        Q.   Do you have any understanding as to
5     why Prudential wanted you to complete this
6     application and submit it to them?
7        A.   Why?
8        Q.   Yes.
9        A.   To find out what my health condition
10    was, my children, my family; pertinent
11    information, I guess, pertaining to me.
12       Q.   Do you have any understanding as to
13    why Prudential, an insurance company, wants
14    that information?
15       A.   Why? I don't know. I guess
16    primarily to find out if you are in good enough
17    health to be insured. If you're not in good
18    enough health to be insured, I am sure they
19    wouldn't insure you then.
20       Q.   Why not?
21       A.   I don't know what different
22    insurance companies' policies are. That's my
23    understanding.
24       Q.   I am asking for your understanding.
25    You said if you're not in good enough health,

Page 116

1     R. Wycoff - by Mr. Lesko
2     you are sure they would not insure you. Why do
3     you say that?
4        A.   Just for their protection.
5        Q.   So they evaluate the information in
6     the application to determine whether or not you
7     are a good risk? Is that accurate, as to your
8     understanding?
9        A.   I don't know if I would use the word
10    risk.
11       Q.   What word would you use?
12       A.   You would be a preferred customer.
13    I guess you would put it that way.
14       Q.   What about your health would make
15    you preferred or not preferred to an insurance
16    company, in your understanding?
17       A.   It's fairly obvious. If you weren't
18    in good health, you wouldn't be a preferred
19    customer.
20       Q.   Why?
21       A.   We would go back to health again.
22       Q.   What does health have to do with
23    whether you're preferred or not preferred?
24       A.   I can't answer that. That's just my
25    opinion.

29 (Pages 113 to 116)

Powers, Garrison & Hughes

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 117

1    R. Wycoff - by Mr. Lesko
2    Q.   I am asking the basis of your
3    opinion, sir.
4    A.   That's it.
5    Q.   Is it because a person in poor
6    health is more likely to die sooner?
7            MR. BARTHOLOMAEI: Objection to
8    form.
9    A.   I can't answer for the insurance
10   company.
11   Q.   I am asking for your understanding.
12          MR. BARTHOLOMAEI: I think he
13   gave you his understanding. A person in
14   complete --
15          MR. LESKO: Come on, Mark.
16          MR. BARTHOLOMAEI: I don't
17   understand what you're getting at. He
18   doesn't --
19          MR. LESKO: That doesn't
20   surprise me.
21          MR. BARTHOLOMAEI: Mr. Wycoff
22   doesn't understand the question. He gave you
23   his best answer. Ask the next question.
24          MR. LESKO: Mr. Wycoff didn't
25   tell me he didn't understand the question.

Page 118

1    R. Wycoff - by Mr. Lesko
2            MR. BARTHOLOMAEI: He said I
3    don't know what you are getting at.
4            MR. LESKO: He doesn't have to
5    know what I'm getting at. He has to just
6    answer the question.
7    Q.   My question is --
8            MR. BARTHOLOMAEI: That's one
9    of the funniest things I've ever heard.
10   Q.   My question is, is it your
11   understanding that a person in poor health
12   would not be a preferred customer for a life
13   insurance company because he or she is more
14   likely to die sooner? Is that your
15   understanding?
16   A.   Generally speaking, I would say
17   yes.
18   Q.   Thank you.
19          MR. LESKO: We could have
20   gotten that five minutes ago.
21          MR. BARTHOLOMAEI: That's
22   probably true if you had asked that question
23   five minutes ago.
24          MR. LESKO: That is the
25   question I asked. The transcript will bear

Page 119

1    R. Wycoff - by Mr. Lesko
2    that out. Maybe we can have a little meeting
3    when the transcript comes in. How about that?
4            MR. BARTHOLOMAEI: What do you
5    mean by that?
6            MR. LESKO: So we can talk
7    about the transcript, of whether that question
8    was asked.
9    A.   I really got a long day, so...
10   Q.   All right. So do you have any
11   understanding, Mr. Wycoff, as to whether or not
12   your health, as represented on that
13   application, affected the amount of premium to
14   be paid for that policy?
15   A.   I don't know.
16   Q.   You don't know?
17   A.   No.
18   Q.   Is it your understanding that a
19   person in poorer health would be required to
20   pay higher premiums than a person in good
21   health?
22   A.   I don't know that, either.
23   Q.   Is it your understanding that a
24   person of advanced age has to pay higher
25   premiums on an insurance policy than a person

Page 120

1    R. Wycoff - by Mr. Lesko
2    who is much younger?
3    A.   That's understood.
4    Q.   That's understood?
5    A.   Yes.
6    Q.   Thank you. Have you ever heard the
7    phrases, "Mortality rate" before, or the
8    phrase, "Mortality rate" before?
9    A.   Maybe reading it in the newspaper or
10   hearing it on the news.
11   Q.   Do you know what it means?
12   A.   Yes.
13   Q.   What does it mean?
14   A.   The rate of death.
15   Q.   What is the -- have you ever heard
16   the term, "Expense rate," in the context of
17   insurance before?
18   A.   No.
19   Q.   Have you ever heard the term, "Cost
20   of insurance" before? The phrase, "Cost of
21   insurance"?
22   A.   Maybe in -- oh, hell. In the course
23   of conversation with people, you may hear
24   somebody, "The cost of insurance is this."
25          MR. BARTHOLOMAEI: Mr. Wycoff,

30 (Pages 117 to 120)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 121

1           R. Wycoff - by Mr. Lesko
2     he is asking you for a recollection.  If you do
3     not have a recollection, I don't want you to
4     guess.
5           A.    No, I don't.
6                 MR. BARTHOLOMAEI:  Or don't
7     make something up.
8           Q.    Do you know what cost of insurance
9     means?
10          A.    What you are paying in premiums.
11          Q.    Okay.  What are dividends?
12          A.    Dividends?  Definition of dividends?
13    They come from -- oh.  They come from your --
14    from making -- what is the word I want?  The
15    on-time payments, that you are never late with
16    a payment.
17                Once your payments are paid and
18    being that you are paying on time, you don't
19    owe any back payments, and you are right up to
20    snuff on your payments, on your policy, and the
21    insurance company rewards you.
22                Is that -- I don't know.
23          Q.    That's fine.  I asked for your
24    understanding.  That's what I wanted.  That's
25    fine.

Page 122

1           R. Wycoff - by Mr. Lesko
2           Have you ever heard the term
3     "dividends" used in the context of stocks,
4     company stocks, such as U.S. Steel?
5           A.    I can't remember.
6           Q.    Do you know what dividend means in
7     that context?
8           A.    Eligible for more stock.
9           Q.    What is the dividend comprised of?
10    Do you know?  Isn't it comprised of surplus
11    revenue in the company's hands?
12          A.    I can't say.
13          Q.    Okay.  What is --
14                MR. LESKO:  We will mark this
15    policy as the next exhibit, please.
16                (Wycoff Exhibit No. 5 was
17    marked for identification.)
18          Q.    Mr. Wycoff, I am handing you what
19    has been identified or what's been marked for
20    identification purposes as Exhibit 5.  That is
21    a document bearing Bates No. RGW 000017 through
22    37.
23                Do you recognize that document?
24          A.    Yes.
25          Q.    What is it?

Page 123

1           R. Wycoff - by Mr. Lesko
2           A.    Metropolitan Life Insurance policy,
3     Robert G. Wycoff.
4           Q.    What is the face amount?
5           A.    $10,000.
6           Q.    The date of issue?
7           A.    June 27, 1991.
8           Q.    What kind of policy is it?
9           A.    Whole life.
10          Q.    Who sold you that policy?
11          A.    Metropolitan Life.
12          Q.    How long are premiums payable for
13    this policy?
14          A.    Premiums payable for a stated
15    period.
16          Q.    Do you know how long that period is?
17          A.    It says here whole life policy.
18    Payments payable for a stated period.
19          Q.    That means to you that it's payable
20    for your whole life?
21          A.    That's what it says here.
22          Q.    Turn to page 19 of that policy for
23    me.  Look, if you will, under -- you see the
24    heading in the middle of the page there,
25    centered, "Premium schedule."

Page 124

1           R. Wycoff - by Mr. Lesko
2           "Premiums are due on of date of
3     policy and every one month after that date"?
4           A.    Yes.
5           Q.    Underneath that, you see there are
6     three or four columns?  There's a couple column
7     headings, Premium Amount, Years Payable?
8           Do you see those?
9           A.    Um-hum.
10          Q.    The first row, do you see where it
11    says, "Life insurance"?
12          A.    Yes.
13          Q.    To the right under premium amount it
14    says $73.20?
15          A.    Yes, sir.
16          Q.    Then it says under the years
17    payable, it says 36.  Do you see that?
18          A.    Yes, sir, I do see that.
19          Q.    Having read that, can you tell me
20    now how long premiums are payable under this
21    policy?
22          A.    36 years.
23          Q.    It's not necessarily your whole
24    life, right, but it's 36 years?
25          A.    36 years.

31 (Pages 121 to 124)

Powers, Garrison & Hughes

Page 125

1      R. Wycoff - by Mr. Lesko
2          MR. BARTHOLOMAEI: I am going
3   to -- sorry to interrupt you. I didn't want to
4   interrupt your line of questioning. I wanted
5   to mention for the record the witness was
6   looking at Bates No. 19 and not page 19 of the
7   policy. Because people can't see this when
8   they are reading the transcript.
9          MR. LESKO: I appreciate your
10  clarification.
11     Q.   If you flip back to -- don't flip
12  back. Do you know the name of the agent or
13  broker who sold you this policy?
14     A.   Mr. Molchan and Mr. Kaczmarek.
15     Q.   Kaczmarek?
16     A.   Yes.
17     Q.   You mentioned Mr. Molchan. Do me a
18  favor. Flip back to the back of the page of
19  the back of the exhibit, page 36. Second to
20  the last page. For ease of reference, because
21  it seems to pick up the pages, I am referring
22  to the Bates numbers when I say page number 36.
23          Do you see at the bottom of the page
24  there, all the way to the left -- wait a
25  minute. I beg your pardon.

Page 126

1      R. Wycoff - by Mr. Lesko
2      A.   You did say 36, didn't you?
3      Q.   I did. Sorry. I flipped to the
4   wrong page. I am looking for the right page
5   now. It is actually page number 33.
6      A.   All right.
7      Q.   Middle of the page, left-hand side,
8   do you see the signature there under Witness?
9      A.   Yes, sir.
10     Q.   Can you read the signature?
11     A.   Yes, sir.
12     Q.   What does it say?
13     A.   Norman, middle initial looks like an
14  E., Molchan, Sr.
15     Q.   Mr. Molchan, is it Molchan or
16  Molche? Do you recall?
17     A.   I'm just pronouncing it the way --
18     Q.   I understand.
19     A.   M-O-L-C-H-A-N, I believe it was.
20     Q.   That's correct. Molchan.
21  Mr. Molchan was a MetLife representative; is
22  that right?
23     A.   Yes, sir.
24     Q.   Does this help you recall who it was
25  that sold you the policy? Before you said

Page 127

1      R. Wycoff - by Mr. Lesko
2   Mr. Molchan and Mr. Kaczmarek. Was it both of
3   them or was it just Mr. Molchan?
4      A.   Both of them.
5      Q.   Both?
6      A.   Both of them.
7      Q.   Both of them sold you this policy?
8      A.   Mr. Molchan evidently was -- what?
9   The senior agent and Mr. Kaczmarek was there as
10  his associate.
11     Q.   I see. Do you recall meeting with
12  Mr. Molchan regarding this policy, regarding
13  applying for this policy?
14     A.   Yes.
15     Q.   Do you remember when that was? If
16  you want to look at the point of application,
17  you should do that.
18     A.   What was that? 1991?
19     Q.   Yes. On page 36 of this exhibit,
20  there is a date next to your signature or what
21  purports to be your signature.
22          That's 7-2-91. July 2, 1991. Do
23  you see that at the bottom of the page?
24     A.   Right.
25     Q.   Is that your signature next to the

Page 128

1      R. Wycoff - by Mr. Lesko
2   date?
3      A.   Yes, sir.
4      Q.   So does this at least refresh your
5   recollection as to when this application was
6   completed?
7          MR. BARTHOLOMAEI: Objection to
8   form.
9          MR. LESKO: Strike that.
10     Q.   Did you meet with Mr. Molchan on
11  July 2, 1991?
12     A.   (No response.)
13          MR. LESKO: Mark that for me.
14          (Wycoff Exhibit No. 6 was
15  marked for identification.)
16          MR. BARTHOLOMAEI: He is asking
17  you if you remember meeting him on that day?
18          THE WITNESS: No, I don't.
19     Q.   You don't remember meeting with him?
20     A.   Not on that date, no.
21     Q.   You do remember meeting with him at
22  some point; is that right?
23          MR. BARTHOLOMAEI: He's already
24  testified to that. He said yes.
25     A.   Did I recall -- ask me the question

32 (Pages 125 to 128)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 129

```
1          R. Wycoff - by Mr. Lesko
2    again.  Or have him repeat it.
3         Q.   That's okay.  I will ask it again.
4    You did meet with Mr. Molchan at some point in
5    time; is that right?
6         A.   Yes.
7         Q.   Thank you.  Let me show you what has
8    been marked as Exhibit 6.  Tell me if you
9    remember seeing that document before.
10             MR. LESKO:  For the record,
11   that's Bates numbers RGW 00004. 41 and 40.
12        A.   (Reviewing document.)  No.
13        Q.   You don't remember seeing this
14   document?
15        A.   No, I don't.
16        Q.   Okay.  Put that aside.  Prior to
17   your first meeting with Mr. Molchan, had you
18   ever met him before?  Sorry.  Strike that
19   question.
20             Prior to your first meeting with
21   Mr. Molchan, regarding this policy, which has
22   been marked as Exhibit 5, had you ever met
23   Mr. Molchan before?
24        A.   No.
25        Q.   How did you first come into contact
```

Page 130

```
1          R. Wycoff - by Mr. Lesko
2    with Mr. Molchan?  By that, I mean did you
3    speak to him on the phone, or the first time
4    you contacted him, was it in person?
5         A.   God. I have no idea.  I can't
6    remember.  Probably called his office.
7             MR. BARTHOLOMAEI:  Don't guess.
8         Q.   Don't guess.  My next question --
9    you're anticipating my next question -- do you
10   know whether you contacted -- whether you
11   initiated the contact with Mr. Molchan or he
12   initiated it?
13        A.   Off the record.  I am trying to
14   think --
15        Q.   He can't go off the record unless we
16   tell him.  I prefer everything on the record
17   unless it's unrelated to the case.
18        A.   I am going to correct my answer.  I
19   honestly can't say for sure.
20        Q.   That's fine.  Maybe I can ask you
21   another question, too, which will help you
22   remember:  Do you remember -- well, strike
23   that.
24             Did you have an objective in mind in
25   purchasing this policy?  Do you remember
```

Page 131

```
1          R. Wycoff - by Mr. Lesko
2    earlier we talked about why you purchased, I
3    think it was the -- well, one of the policies
4    issued by Prudential, or Knights of Columbus.
5             You said you wanted more money upon
6    your passing for your family?
7         A.   Right.
8         Q.   Did you purchase this policy for the
9    same reason, or did you have some other
10   specific objective in mind?
11        A.   Same reason.
12        Q.   Did you, at some point, make a
13   determination that it would be necessary to
14   have -- to leave more money to your family
15   prior to purchasing this policy?
16        A.   Specific reason?
17        Q.   I will rephrase that.  You said that
18   the reason you purchased this policy is
19   because, like the other policy we talked about
20   earlier, you just wanted to leave more for your
21   family upon your passing; is that right?
22        A.   Um-hum.  That's true.
23        Q.   What I am trying to get at is when
24   did you decide that you wanted to leave more
25   for your family upon your passing?  Was it
```

Page 132

```
1          R. Wycoff - by Mr. Lesko
2    after you met with Mr. Molchan or before you
3    met with Mr. Molchan?
4             In other words, Mr. Wycoff, did you
5    decide you needed more insurance and go out and
6    get this policy, or did Mr. Molchan present it
7    to you and you figured that it was a good idea,
8    you should have more?
9         A.   I would say before.
10        Q.   Before?
11        A.   I would say before.
12        Q.   Does that help your recollection as
13   to whether or not you contacted Mr. Molchan or
14   he contacted you?
15        A.   Hmm.
16        Q.   If it doesn't help your
17   recollection, we will move on.
18        A.   I can't say.  I really can't say.
19        Q.   Did you have a personal relationship
20   with Mr. Molchan before you purchased this
21   policy?
22        A.   No, sir.
23        Q.   Since you purchased this policy,
24   again, this is the '91 policy, Exhibit 5, have
25   you met or spoken with Mr. Molchan?
```

33 (Pages 129 to 132)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 133

R. Wycoff - by Mr. Lesko
1
2    A.    No, sir.
3    Q.    During your meetings -- strike
4    that. I think before you said you couldn't
5    recall whether it was one meeting with
6    Mr. Molchan or more than one.
7        Am I remembering that correctly?
8    A.    I don't believe he said that. I
9    can't recall.
10    Q.    You can't recall whether it was one
11    or more than one?
12    A.    No.
13    Q.    But you do recall at least one
14    meeting; is that right?
15    A.    Yes, sir, one meeting.
16    Q.    Do you recall who else was present
17    at that meeting?
18    A.    His associate, Mr. Kaczmarek, and a
19    medical nurse.
20    Q.    There was a nurse with them?
21    A.    Yes, sir.
22    Q.    Do you recall whether that -- the
23    nurse was with them during -- strike that. You
24    don't know whether it was one or more meeting.
25        Where did that meeting take place?

Page 134

R. Wycoff - by Mr. Lesko
1
2    A.    At my home.
3    Q.    You were the only one from your
4    family present for that meeting?
5    A.    Um-hum.
6    Q.    Do you recall how long the meeting
7    lasted?
8    A.    I have no idea.
9    Q.    Do you recall everything that was
10    said during that meeting?
11    A.    No, sir, I do not.
12    Q.    Okay.
13    A.    God, no.
14    Q.    Do you recall whether you were shown
15    documents at that meeting? Strike that.
16        Did Mr. Kaczmarek or Mr. Molchan or
17    the nurse present you with any documents during
18    that meeting?
19    A.    Relating to what?
20    Q.    Anything. Any documents at all?
21    A.    Mr. Molchan showed me -- he used it
22    as a sample, according to his -- the way he
23    explained it to me, he said, "I want to explain
24    to you a good feature of this policy."
25    Q.    Okay.

Page 135

R. Wycoff - by Mr. Lesko
1
2    A.    He said, "I don't have the original
3    form to show you. I will use this form as a
4    sample, and I will show you what this feature
5    is."
6        So he proceeded to use this form to
7    show me that at the end, after X amount of
8    years would expire -- it turned out to be 14
9    years, that's what he had marked -- that the
10    premiums would -- you wouldn't have to pay any
11    more premiums.
12        I said -- you know, I agreed with
13    him. I said, "That is a good policy, that is a
14    good feature."
15        Mr. Kaczmarek, you know, he
16    concurred.
17    Q.    Okay.
18    A.    But that was the only -- if the
19    nurse had anything there -- she asked for a
20    urine test, and I did give that. But, now,
21    whether she had any forms there or not, I can't
22    recall. She may have.
23    Q.    That sample that you referred to,
24    that Mr. -- was it Mr. Molchan who showed it to
25    you?

Page 136

R. Wycoff - by Mr. Lesko
1
2    A.    Um-hum.
3    Q.    That sample that Mr. Molchan showed
4    to you, was that the only document that he
5    presented during the meeting?
6    A.    Other than the policy there itself.
7    Q.    Did he present you with the policy
8    during your meeting?
9    A.    From what I can understand, yes.
10    Q.    Do you recall whether or not he
11    presented you with a policy during your first
12    meeting or was it sometime later?
13    A.    I am trying to determine.
14    Q.    Let me ask it this way: Did you
15    fill out an application for insurance at some
16    point in time with Mr. Molchan?
17    A.    You have to do that to get an
18    insurance policy, yes.
19    Q.    I take it, what you're telling me,
20    is you don't specifically recall filling out
21    the application? Is that right?
22    A.    I remember the policy.
23    Q.    Do you specifically recall
24    completing, signing the application?
25    A.    Signing the policy, yes. But a

34 (Pages 133 to 136)

Powers, Garrison & Hughes

Page 137

1    R. Wycoff - by Mr. Lesko
2  form? Is the form the policy? Is that what
3  you are talking about? Is that what you're
4  asking?
5    Q.   I don't know what form you are
6  referring to. Let me ask you this question:
7  Was the nurse present when Mr. Molchan gave you
8  the policy?
9    A.   She was at the house that day.
10  Whether she was right there, when he gave me
11  the policy --
12    Q.   That's what I'm asking. To be
13  specific and clear, was the nurse there at your
14  house during the meeting when Mr. Molchan gave
15  you that policy?
16    A.   Yes.
17    Q.   When I say policy, by the way, we
18  understand each other we're talking about
19  Exhibit 5; is that right?
20    A.   Yes.
21    Q.   Okay. Did Mr. Molchan present you
22  with any brochures about MetLife during the
23  meeting?
24    A.   No.
25    Q.   No?

Page 138

1    R. Wycoff - by Mr. Lesko
2    A.   No.
3    Q.   Do you recall every single document
4  that he presented to you at that meeting?
5    A.   There's only two that I recollect.
6    Q.   Those were the sample?
7    A.   Sample forms that he was showing me
8  about the premiums and the policy itself.
9    Q.   And the actual policy. Do you
10  recall signing any documents during the
11  meeting?
12    A.   Documents? Are you talking about
13  insurance policies?
14    Q.   Sure. Insurance policy would fit in
15  my definition of documents, yes.
16    A.   Signing an insurance policy? Yes.
17    Q.   So you signed an insurance policy?
18    A.   Any other document, I did not sign.
19    Q.   Do you know what an application for
20  insurance is? Do you know what I am referring
21  to when I use that phrase? That is a bad
22  question.
23    I will restate it: Is an
24  application for an insurance and an insurance
25  policy the same thing, in your mind?

Page 139

1    R. Wycoff - by Mr. Lesko
2    A.   In my mind? No.
3    Q.   An application for insurance, as we
4  have discussed earlier, is a document you
5  complete and submit to the insurance company
6  and they decide whether to issue a policy of
7  insurance; is that correct? Does that comport
8  with your understanding?
9    A.   Right.
10    Q.   So now, with that understanding in
11  mind, I am going to ask you that question I
12  asked you before again: What document did you
13  sign, during the meeting with Mr. Molchan,
14  regarding this policy? Was it the policy, the
15  application or something else?
16    A.   The policy.
17    Q.   You signed the policy, okay.
18  Mr. Wycoff, do you smoke?
19    A.   No, sir.
20    Q.   Did you ever smoke?
21    A.   Yes, sir.
22    Q.   When was the last time you had a
23  cigarette?
24    A.   The boys were in Little League. So
25  that would have been 1960 --

Page 140

1    R. Wycoff - by Mr. Lesko
2    Q.   Did you --
3    A.   '60, '61.
4    Q.   You have never smoked since then?
5    A.   That's correct.
6    Q.   Not a single cigarette?
7    A.   Not a cigarette.
8    Q.   How about cigars? Do you smoke
9  cigars?
10    A.   No. I may chew on one once in a
11  while.
12    Q.   Have you ever smoked cigars?
13    A.   No.
14    Q.   You said you may chew on a cigar
15  once in a while; is that right?
16    A.   Yes.
17    Q.   Have you always done that throughout
18  your adult life?
19    A.   For the most part, yard work. I got
20  into that habit in the steel plant. A lot of
21  us did that, just to -- there's so much residue
22  in the atmosphere, and to try to keep the
23  proper saliva in your mouth, to get rid of
24  those -- the components that are in the air,
25  and so that's what we did.

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

---

Page 141

1   R. Wycoff - by Mr. Lesko
2   Q.   Did you ever use chewing tobacco?
3   A.   At times, yes.  When I couldn't get
4   a cigar or didn't have a cigar.
5   Q.   Do you still do that?
6   A.   From time to time.
7   Q.   Have you done that from time to time
8   throughout your adult life?
9   A.   Yes.
10   Q.   How about a pipe?  Do you ever use a
11   pipe, smoke a pipe?
12   A.   No, never smoked a pipe.
13   Q.   You mentioned a document before.
14       MR. BARTHOLOMAEI:  Hold on one
15   second.  Off the record.
16       (Discussion off record.)
17       (Lunch recess from 12:35 p.m.
18   to 1:25 p.m.)
19   BY MR. LESKO:
20   Q.   Mr. Wycoff, do me a favor.  Take a
21   look at Exhibit 5.  Turn to the back of that,
22   page 30.
23       MR. BARTHOLOMAEI:  Before we
24   start, I wanted to say something before we
25   began.  I am going to ask that the court

---

Page 142

1       R. Wycoff - by Mr. Lesko
2   reporter make the audio tape a part of the
3   record in this deposition.  We can discuss,
4   after the deposition is over, if there's a
5   specific method that the court reporting agency
6   prefers to do that.  I am stating that on the
7   record at this time.  You can continue with the
8   questions, Mr. Lesko.
9   Q.   Mr. Wycoff, before we get into the
10   questions, we just had a lunch break.  Did you
11   talk with your attorney during the lunch break
12   about this case?
13       MR. BARTHOLOMAEI:  Objection.
14   Do not answer that question.
15   Q.   Your attorney, did you talk with
16   your attorney during lunch break about this
17   case?
18       MR. BARTHOLOMAEI:  I direct you
19   not to answer the question.
20       MR. LESKO:  What is the basis
21   for your objection?
22       MR. BARTHOLOMAEI:  Attorney/
23   client privilege.
24       MR. LESKO:  There is a Hall
25   case in this district which says that once a

---

Page 143

1       R. Wycoff - by Mr. Lesko
2   deposition begins, there is no attorney/client
3   privilege over communications.
4       Are you familiar with that case?
5       MR. BARTHOLOMAEI:  Which
6   district is that?
7       MR. LESKO:  Western District of
8   Pennsylvania, Mr. Bartholomaei.  I am surprised
9   you're not aware of that.
10       MR. BARTHOLOMAEI:  I suggest
11   that you call the judge.
12       MR. LESKO:  I am not going to
13   call the judge now.  If we do call the judge
14   and she finds in our favor, unfortunately,
15   we're going to have to have Mr. Wycoff back
16   here again and further inconvenience him at
17   your direction.
18       MR. BARTHOLOMAEI:  My
19   direction?
20       MR. LESKO:  Because of your
21   direction.
22       MR. BARTHOLOMAEI:  Okay.  Are
23   you sure we're in the Western District on this
24   case?
25       MR. LESKO:  Am I sure we are in

---

Page 144

1       R. Wycoff - by Mr. Lesko
2   the Western District in this case?
3       MR. BARTHOLOMAEI:  Yes.
4       MR. LESKO:  Is this case
5   pending in the Western District?
6       MR. BARTHOLOMAEI:  Yes.
7       MR. LESKO:  Does that matter?
8       MR. BARTHOLOMAEI:  You're
9   talking about something, with the Western
10   District.  I am wondering what you were
11   referring to.
12       MR. LESKO:  I am referring to
13   an opinion that was issued in the Western
14   District of Pennsylvania.
15       MR. BARTHOLOMAEI:  Okay.  That,
16   for some reason -- why are you telling me about
17   that opinion?
18       MR. LESKO:  You know what,
19   Mr. Bartholomaei, we can have this discussion
20   off the record if you want?
21       Do you want to proceed with this
22   discussion?
23       MR. BARTHOLOMAEI:  Sure.
24       MR. LESKO:  Off the record.
25       (Discussion off record.)

36 (Pages 141 to 144)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 145

1      R. Wycoff - by Mr. Lesko
2            MR. LESKO: Back on the record.
3    For the record, as a courtesy to
4    Mr. Bartholomaei, I suggested that we step
5    outside in the hallway to discuss the issue of
6    attorney/client privilege and the effect -- the
7    effect of the Hall case on that privilege and
8    how it might be -- it might lend interpretation
9    in Pennsylvania Rules of Civil Procedure and
10   attorney/client privileges in Pennsylvania.
11         Mr. Bartholomaei has rejected the
12   client to do so. That's fine. We're not going
13   to discuss it. I suggest that Mr. Bartholomaei
14   go ahead and look up that case and see whether
15   or not it's relevant to the attorney/client
16   privilege. Then we can have the discussion.
17         MR. BARTHOLOMAEI: I am willing
18   to discuss it right now.
19         MR. LESKO: We're not going to
20   discuss it in front of your client. As a
21   courtesy to you and as a courtesy to your
22   client --
23         MR. BARTHOLOMAEI: We don't
24   need the courtesy.
25         MR. LESKO: Also, because it is

Page 146

1      R. Wycoff - by Mr. Lesko
2    inappropriate, as you well know.
3          MR. BARTHOLOMAEI: Why is that?
4    Q.   Mr. Wycoff, turn to Exhibit 5 for me
5    at the back.
6          MR. LESKO: Oh. Let me make
7    something clear. Mr. Bartholomaei, is it safe
8    to say any question I ask him or your witness
9    regarding the -- your conversations with him
10   during lunch regarding this case, you will
11   direct him not to answer?
12         MR. BARTHOLOMAEI: I will tell
13   you what, Mr. Lesko: I will let Mr. Wycoff
14   answer the questions about what we talked about
15   at lunch if you and your firm will agree to
16   tell me what you talked about with your
17   witnesses at lunch when I conducted a
18   deposition. Is that fair?
19         MR. LESKO: No.
20         MR. BARTHOLOMAEI: Why not?
21         MR. LESKO: I am not going to
22   agree to that.
23         MR. BARTHOLOMAEI: So it's okay
24   for us, but not for you?
25         MR. LESKO: I didn't say that.

Page 147

1      R. Wycoff - by Mr. Lesko
2            MR. BARTHOLOMAEI: Please give
3    me an explanation as to why that wouldn't be
4    okay since you have this magical case.
5          MR. LESKO: Next time you take
6    a deposition of one our witnesses, you can make
7    that assertion. Then we will take the
8    position, whatever position is appropriate. We
9    can raise that issue when it becomes an issue.
10   It is not an issue right now.
11         I am asking your client and I am
12   asking you the question for the purposes of the
13   record so we can move on in this deposition --
14         MR. BARTHOLOMAEI: You have my
15   answer.
16         MR. LESKO: -- whether or not
17   you will continue to instruct him not to answer
18   as to questions regarding his conversations
19   with you regarding this case during the break?
20         MR. BARTHOLOMAEI: Like I said,
21   we've taken depositions --
22         MR. LESKO: The answer is yes
23   or no.
24         MR. BARTHOLOMAEI: We have
25   taken depositions, and they would apply to this

Page 148

1      R. Wycoff - by Mr. Lesko
2    case. If you are willing to disclose to me the
3    conversations that you or members of your firm
4    had with those witnesses during your lunch
5    break, then, you know, we could do the same.
6          MR. LESKO: I guess I will have
7    to establish the record. We will take even
8    more time out of your client's day.
9    Q.   Mr. Wycoff, did you discuss with
10   Mr. Bartholomaei, during the break, any of the
11   testimony that you rendered this morning?
12         MR. BARTHOLOMAEI: Again, don't
13   answer the question.
14   Q.   Mr. Wycoff, did you discuss with
15   Mr. Bartholomaei, during the break, any
16   testimony or questions that he anticipates
17   being raised during the afternoon session?
18         MR. BARTHOLOMAEI: Don't
19   answer.
20   Q.   Mr. Wycoff, did you speak with
21   Mr. Bartholomaei during the break concerning
22   any topic or issue relating to this litigation?
23         MR. BARTHOLOMAEI: I direct him
24   not to answer the question.
25         MR. LESKO: Okay.

37 (Pages 145 to 148)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 149

1       R. Wycoff - by Mr. Lesko
2       Q.   Mr. Wycoff, please turn to exhibit
3   or go to Exhibit 5. Turn to page 30. Take a
4   look at page 30. These are the Bates numbers
5   again, page 30 through 36.
6       Tell me if that's the application
7   that you submitted -- strike that.
8       Tell me if you recognize those
9   pages.
10      A.   30 through 33? Is that what you
11  said?
12      Q.   30 through 36.
13      A.   (Reviewing document.) That's not my
14  writing. That's for sure. I should say
15  printing. 36? That is an application here for
16  life insurance.
17      Q.   Have you ever seen this application
18  for life insurance before?
19      A.   I don't recall. I don't recall.
20      Q.   Do you, otherwise, know whether this
21  is the application for life insurance that you
22  submitted to MetLife for consideration in
23  issuing the 1991 policy?
24          MR. BARTHOLOMAEI: Objection to
25  form.

Page 150

1       R. Wycoff - by Mr. Lesko
2       Q.   Let me rephrase the question. Did
3   you submit an application to MetLife seeking
4   issuance of the 1991 policy? Mr. Wycoff?
5       A.   One minute. Yes, I have. Or, yes,
6   I did.
7       Q.   Yes, you did? Is this that
8   application?
9       A.   It certainly looks like it.
10      Q.   Okay. Now, Mr. Wycoff --
11      A.   Yes.
12      Q.   I'm sorry. I will wait until you
13  are done reviewing the application, if you
14  like.
15      A.   Okay.
16      Q.   Are you done?
17      A.   Um-hum.
18      Q.   When you submitted this application,
19  to MetLife, did you know that MetLife was going
20  to rely on the information provided in the
21  application?
22          MR. BARTHOLOMAEI: Objection to
23  form.
24      Q.   To determine whether or not to issue
25  the policy?

Page 151

1       R. Wycoff - by Mr. Lesko
2       (Cellphone interruption.)
3          MR. BARTHOLOMAEI: Objection to
4   form.
5       Q.   Let me rephrase it. Was it your
6   understanding that MetLife would rely upon the
7   information provided in the application in
8   deciding to issue the 1991 policy?
9          MR. BARTHOLOMAEI: If you can
10  answer as to what MetLife would rely on, please
11  answer the question.
12          MR. LESKO: That's not the
13  question.
14          MR. BARTHOLOMAEI: Read the
15  question back.
16      Q.   The question is: Is it your
17  understanding that MetLife would rely on the
18  information contained in this application in
19  deciding whether or not to issue the policy?
20      A.   I would say it's up to the insurance
21  company. It wouldn't be up to me. All I did
22  was give the information in regards to the
23  application, from what I can see here.
24      Q.   What is your understanding, as to
25  why this application was submitted? What is

Page 152

1       R. Wycoff - by Mr. Lesko
2   the purpose of it? Your understanding?
3       A.   Most of it to see how the applicant
4   checks out physically.
5       Q.   We talked earlier --
6       A.   That seems to be the majority of it.
7   If he's -- if he has no physical -- what should
8   I say? Disabilities, I guess. How can I word
9   it? I don't know what you people --
10      Q.   Sorry. Go ahead. Finish your
11  answer.
12      A.   They want a history of your -- the
13  insurance companies want a history of your age,
14  your physical condition, what abnormalities
15  that you have had.
16      Q.   Do you have an understanding as to
17  why the insurance companies want that
18  information?
19      A.   If you are qualified to be eligible
20  for an insurance policy.
21      Q.   It's so they can decide whether or
22  not to issue a policy; right?
23      A.   That's correct.
24      Q.   And is it your understanding that
25  MetLife would rely on the information contained

38 (Pages 149 to 152)

Powers, Garrison & Hughes

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 153

1　　　　R. Wycoff - by Mr. Lesko
2　in this application in making that decision?
3　　　A.　I don't see why not.
4　　　Q.　Is it your understanding that they
5　would rely?
6　　　A.　Rely on this information that's on
7　the application?
8　　　Q.　Yes.
9　　　A.　Certainly.
10　　　Q.　Was it your intention, when you
11　submitted this application, that MetLife should
12　rely on information contained herein, or in
13　this application?
14　　　A.　Certainly.
15　　　Q.　With that understanding, you would
16　never submit false or misleading information to
17　the insurance company for them to rely on,
18　would you?
19　　　A.　No, sir. I didn't put everything on
20　here, but evidently, the agent did. He asked
21　me questions. I answered them.
22　　　Q.　Did the agent -- strike that. Turn
23　to page 31 of the application.
24　　　A.　Okay. I have it here.
25　　　Q.　You see paragraph -- sorry, not

Page 154

1　　　　R. Wycoff - by Mr. Lesko
2　paragraph -- question No. 9, Tobacco Use?
3　　　A.　Question No. 9.
4　　　Q.　The question reads, "Indicate date
5　proposed insured last smoked/used." By the
6　way, you are the proposed insured in this
7　application; is that right?
8　　　A.　Yes.
9　　　Q.　It says, "Indicate date proposed
10　insured last smoked or used cigarettes, cigar,
11　pipe, smokeless tobacco." Under Cigarettes it
12　says 1960.
13　　　Do you see that?
14　　　A.　Right.
15　　　Q.　Under Cigar, the box next to Never,
16　has an X in it. Do you see that?
17　　　A.　Right.
18　　　Q.　Under Pipe, again, the box next to
19　Never has an X in it; is that right?
20　　　A.　Right.
21　　　Q.　Smokeless tobacco says never; right?
22　　　A.　Right.
23　　　Q.　The answer given with respect to
24　smokeless tobacco is not true, is it?
25　　　　MR. BARTHOLOMAEI: Objection to

Page 155

1　　　　R. Wycoff - by Mr. Lesko
2　form.
3　　　Q.　Is it true that you've never used
4　smokeless tobacco?
5　　　　MR. BARTHOLOMAEI: Objection to
6　form. That is a ridiculous question. Has
7　nothing to do with this. This was done in
8　1991.
9　　　Q.　Answer the question.
10　　　　MR. BARTHOLOMAEI: He already
11　testified that he has.
12　　　Q.　Answer the question.
13　　　　MR. BARTHOLOMAEI: Don't
14　answer. You have already answered the
15　question.
16　　　Q.　The question is: Is it true that
17　you've never used smokeless tobacco? Is that
18　true?
19　　　　MR. BARTHOLOMAEI: Again,
20　that's the same question. I am directing him
21　not to answer again for the second time.
22　Because he's already been asked and answered
23　that question.
24　　　　MR. LESKO: He has not been
25　asked -- he has not been asked that question

Page 156

1　　　　R. Wycoff - by Mr. Lesko
2　and he's not answered it.
3　　　　MR. BARTHOLOMAEI: You asked
4　him earlier in the deposition. He said, "Yeah,
5　you know, at times I've used smokeless
6　tobacco." You know the answer.
7　　　　MR. LESKO: I asked a very
8　different question early in the deposition. I
9　don't understand the basis for your direction
10　not to answer it.
11　　　Frankly, you're abusing your role
12　here in directing him not to answer. I think
13　you know that.
14　　　　MR. BARTHOLOMAEI: Go ahead.
15　You can tell him. Tell him again.
16　　　Q.　Is that true, Mr. Wycoff, that
17　you've never used smokeless tobacco?
18　　　　MR. BARTHOLOMAEI: Is what
19　true?
20　　　Q.　That you've never used smokeless
21　tobacco?
22　　　　MR. BARTHOLOMAEI: He's not
23　asking you about this document right now. He's
24　asking you a question if you've ever used
25　smokeless tobacco.

39 (Pages 153 to 156)

Page 157

1    R. Wycoff - by Mr. Lesko
2        MR. LESKO: Excuse me. I will
3    rephrase the question.
4        MR. BARTHOLOMAEI: Please do.
5    Q.   Is the answer to this question, No.
6    9, regarding use of smokeless tobacco, where it
7    says never, is that true?
8        MR. BARTHOLOMAEI: You are
9    asking him was it true in 1991?
10       MR. LESKO: I am asking him is
11   it true now.
12       MR. BARTHOLOMAEI: Then that
13   has nothing to do with this. Many things have
14   happened since 1991, as you know.
15   Q.   Go ahead and answer the question.
16   A.   I've used smokeless tobacco.
17   Q.   So it's not true that you've never
18   used it; right?
19       MR. BARTHOLOMAEI: Objection to
20   form. Don't answer that.
21   A.   No.
22       MR. LESKO: This is
23   ridiculous.
24   Q.   I am going to ask you the next
25   question that I've intended to ask for the last

Page 158

1    R. Wycoff - by Mr. Lesko
2    ten minutes, but for your lawyer's
3    interruptions.
4        As of 1991, when you signed this
5    application, was the answer to this question
6    true?
7        MR. BARTHOLOMAEI: I will tell
8    you what. I am going to put on the record
9    right now -- and I've held off doing this
10   throughout the course of this deposition -- but
11   because people won't be able to understand or
12   know of the tone of your voice and the manner
13   in which you have been asking questions during
14   the morning session and now again in the
15   afternoon session -- I find your tone to be
16   very abusive, offensive.
17       I don't think discovery depositions
18   should be conducted in this manner. It's very
19   unprofessional, very inappropriate. That is
20   why I asked to have the tape recording of this
21   deposition made part of the record.
22       If it continues, it is the position
23   of our law firm, that we will suspend the
24   deposition, or reconvene at another time and
25   ask to have the deposition videotaped.

Page 159

1    R. Wycoff - by Mr. Lesko
2        The video camera will be pointed on
3    you, Mr. Lesko, to show the judge and to show
4    whomever how you have been asking questions.
5        I am giving you fair warning at this
6    time that if that continues, that is what will
7    happen.
8        MR. LESKO: Are you finished?
9        MR. BARTHOLOMAEI: I am
10   finished.
11       MR. LESKO: Mr. Bartholomaei,
12   first, I welcome and accept your challenge to
13   have --
14       MR. BARTHOLOMAEI: It's not a
15   challenge.
16       MR. LESKO: It most certainly
17   is a challenge. It's a calculated challenge to
18   affect these proceedings just like the rest of
19   your interruptions all day.
20       For the record, I will note that,
21   yes, I have been exasperated by your repeated
22   interruptions, your inappropriate direction to
23   your client not to answer perfectly valid
24   questions which are not subject to the
25   attorney/client privilege or work product

Page 160

1    R. Wycoff - by Mr. Lesko
2    doctrine and your overall abuse of these
3    proceedings. With that said --
4        MR. BARTHOLOMAEI: I will note
5    for the record that that last statement, your
6    tone of voice is completely inappropriate. I
7    don't think I've ever raised my voice. I am
8    not taking an argumentative tone with you,
9    Mr. Lesko.
10       I am simply making objections on
11   behalf of my client. You are taking them
12   either personally or you're taking them in a
13   manner in which most attorneys don't. It is
14   very unprofessional.
15       I ask that you just go on with the
16   deposition and just try and control yourself.
17   That's all I am asking.
18       MR. LESKO: I will go on with
19   the deposition. I will note for the record
20   that you have not been sworn in here today.
21   Your statements regarding my conduct are
22   worthless and they are completely inaccurate.
23   They're inaccurate characterizations designed
24   to secure an advantage which again is another
25   abuse of the process.

40 (Pages 157 to 160)

Robert G. Wycoff                                          Robert G. Wycoff v.
September 17, 2003                        Metropolitan Life Insurance Company

Page 161

1       R. Wycoff - by Mr. Lesko
2           MR. BARTHOLOMAEI: The tape
3    will bear the account.
4           MR. LESKO: I have acted in a
5    complete and professional manner, contrary to
6    the way you have acted today. You have
7    continually impugned my deposition style, my
8    ability to ask a question, all in front of your
9    client to showboat. That's essentially what it
10   is, a big showboat.
11          I have asked you earlier today to
12   step outside the room so we could discuss the
13   issues outside of the presence of your client
14   so as not to taint this process. Quite
15   frankly, it was as a courtesy to you which I
16   think shows the utmost professionalism.
17          You can make all the
18   characterizations and unilateral statements
19   impugning my character and conduct all you
20   want. It's worthless.
21          I welcome the challenge for a video
22   or audio tape of this deposition. I will tell
23   you right now, it will be a shame to have to
24   have Mr. Wycoff come back here again.
25          I am going to ask the court reporter

Page 162

1       R. Wycoff - by Mr. Lesko
2    to read the last question, because of this
3    diatribe on your behalf which required a
4    response from me, has carried on for about five
5    minutes. I lost my train of thought.
6    Congratulations.
7           Let's hear the last question,
8    please.
9           (Question read back.)
10      Q.   I am going to restate the question
11   for purposes of the record so I don't have to
12   page back. Mr. Wycoff, looking at page 31,
13   which is part of the application attached to
14   the 1991 policy, question No. 9, Tobacco Use,
15   it says, "Indicate date proposed insured last
16   smoked or used smokeless tobacco." The box
17   "never" has an X in it.
18          As of 1991, when you signed this
19   application, was that answer true?
20      A.   No.
21      Q.   Let's look at the same question.
22   "Indicate date proposed insured last smoked or
23   used a cigar."
24          Do you see that?
25      A.   Um-hum.

Page 163

1       R. Wycoff - by Mr. Lesko
2       Q.   The box is checked Never. Do you
3    see that?
4       A.   (Nods affirmatively.)
5       Q.   Was that answer true as of 1991 when
6    you signed this application?
7       A.   Smoking, no. Chewed on -- I never
8    smoked a cigar. Never smoked a pipe.
9       Q.   But you used cigars prior to 1991;
10   right?
11          MR. BARTHOLOMAEI: Objection to
12   form.
13      A.   No.
14      Q.   Did you use cigars prior to 1991?
15      A.   No.
16      Q.   You never used a cigar prior to
17   1991? That's your testimony?
18      A.   No.
19      Q.   Didn't you testify --
20      A.   After -- this would have been --
21   when in the hell was I chewing the cigars? It
22   may have only been one time that I even did
23   that.
24      Q.   It was while you worked at U.S.
25   Steel; right?

Page 164

1       R. Wycoff - by Mr. Lesko
2       A.   Cigars at U.S. Steel to chew on?
3    Only time I can recall doing it -- I never
4    bought cigars to chew on. They would have had
5    to come from somebody that had a cigar. I
6    said, "Give me that to chew on." Stick it in
7    my mouth and just gnaw on a little bit.
8       Q.   Was that before 1991?
9       A.   Was that before '91? It is so hard
10   to remember. To my knowledge, I only did this
11   one time. Like I said, I never bought cigars.
12   I doubt it, no. I would say no.
13      Q.   Let's go to Exhibit 3, please, which
14   is the policy or the policy-related documents
15   pertaining to the policy issued by MetLife --
16   by Prudential, rather.
17      A.   Okay.
18      Q.   On page 113, at the very bottom of
19   the page, is that your signature in the lower
20   right-hand portion?
21      A.   Yes, it is.
22      Q.   Is this page part of the application
23   that you submitted to Prudential Insurance
24   Company?
25      A.   This is to Prudential. Did you say

41 (Pages 161 to 164)

Robert G. Wycoff
September 17, 2003

Robert G. Wycoff v.
Metropolitan Life Insurance Company

Page 165

1      R. Wycoff - by Mr. Lesko
2    Metropolitan?
3        Q.   I think I said Prudential.  If I
4    didn't, I apologize.  Is this part of the
5    application that you submitted to Prudential
6    Insurance Company?
7        A.   Yes, it is.
8        Q.   Did you intend for Prudential to
9    rely on the information provided in this
10   application?
11           MR. BARTHOLOMAEI:  Objection to
12   form.
13       Q.   Mr. Wycoff?
14       A.   Yes, I did.
15       Q.   Let's take a look at question No. 24
16   on that page, please.  For the record it says,
17   "Has the proposed insured or spouse ever
18   smoked? A, proposed insured."  There's two
19   boxes, yes and no.
20           Do you see that?  Which box is
21   checked?
22           MR. BARTHOLOMAEI:  The document
23   speaks for itself.  Are you just asking him to
24   read it out loud?
25       Q.   Which box is checked, Mr. Wycoff?

Page 166

1      R. Wycoff - by Mr. Lesko
2           MR. BARTHOLOMAEI:  He is asking
3    you right here which one of these two boxes is
4    checked.
5        A.   The no box.
6        Q.   You are the proposed insured
7    referred to in that question; right?
8        A.   Yes, sir.
9        Q.   Is that answer true or false?
10       A.   Has proposed insured -- ever smoked?
11   I guess in that instance, it's false.
12       Q.   So you allowed two applications to
13   be submitted to the insurance companies
14   containing false information --
15           MR. BARTHOLOMAEI:  Objection to
16   the form.
17           MR. LESKO:  Strike that.
18           MR. BARTHOLOMAEI:  That's
19   completely inappropriate.
20       Q.   You submitted two applications to
21   insurance companies containing false
22   information about yourself, didn't you?
23           MR. BARTHOLOMAEI:  Objection to
24   form.  Assumes facts not in evidence.
25       Q.   You can go ahead and answer.

Page 167

1      R. Wycoff - by Mr. Lesko
2           MR. BARTHOLOMAEI:  You know
3    what?  I am directing him not to answer the
4    question.
5           MR. LESKO:  You're what?
6           MR. BARTHOLOMAEI:  Directing
7    him not to answer the question.
8           MR. LESKO:  What's the basis
9    for that?
10           MR. BARTHOLOMAEI:  The question
11   is completely inappropriate.  It is trying to
12   trick the witness.  It totally assumes facts
13   that are not in evidence.  He can't answer
14   that.
15           MR. LESKO:  What facts?
16           MR. BARTHOLOMAEI:  For example,
17   the fact that the agent completed the
18   applications.  Okay?  And not Mr. -- Mr. Wycoff
19   didn't check these boxes.  Those facts.
20           MR. LESKO:  Thank you.
21           MR. BARTHOLOMAEI:  You're
22   welcome.
23           MR. LESKO:  It doesn't assume
24   those facts.  Mr. Wycoff --
25           MR. BARTHOLOMAEI:  You asked

Page 168

1      R. Wycoff - by Mr. Lesko
2    him that way.  That's why I directed him not to
3    answer.  I think there is a different way you
4    can ask him --
5        Q.   Did you direct the agents, either
6    Mr. -- did you direct Mr. Seddan?  Did you ever
7    direct Mr. Seddan not to submit this
8    application to Prudential?
9        A.   Not to present this?
10       Q.   Yeah.
11       A.   No.
12       Q.   Did you tell Mr. Seddan that this
13   application contains false information
14   regarding your smoking?  Do you recall ever
15   telling him that?
16       A.   No.
17       Q.   But you certified, in signing the
18   application, that all of the information
19   contained in this application is true or was
20   true; right?
21       A.   I really don't know what the hell I
22   told him.  I don't know.  I'm not even
23   guessing.
24       Q.   Take a look, Mr. Wycoff, on page 113
25   of that application for Prudential.  It's part

42 (Pages 165 to 168)