Westlaw.

Not Reported in A.2d                                                              Page 1
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

C
Only the Westlaw citation is currently available.
Court of Common Pleas of Pennsylvania, Philadelphia County.
COMMONWEALTH OF PENNSYLVANIA, by D. Michael Fisher, Attorney General, Plaintiff
v.
BASF CORPORATION, et al., Defendants
**No. 3127, CONTROL NO. 120186.**

March 15, 2001.


OPINION

HERRON, J.
**\*1** Presently before this court are the Preliminary Objections of Defendants, BASF Corporation ("BASF"), Knoll Pharmaceutical Company ("Knoll"), Carter H. Eckert, Gilbert H. Mayor, Neil Kurtz, Barbara Buhler, Mark Kuhl, Scott E. Bowman and James J. Schimelfenig (collectively "Defendants") to the Amended Complaint of Plaintiff, the Commonwealth of Pennsylvania ("the Commonwealth").

For the reasons set forth in this Opinion, the Preliminary Objections are sustained in part and overruled in part.


BACKGROUND

A. *Factual History* [FN1]


FN1. These facts were gleaned from the Amended Complaint, and are accepted as true for purposes of ruling on preliminary objections. *See Tucker v. Philadelphia Daily News, 757 A.2d 938, 941-42 (Pa.Super.Ct.2000)*

Millions of Americans suffer from hypothyroidism and other thyroid diseases because the thyroid gland cannot sufficiently produce thyroxine to regulate the human body's metabolism. Am.Compl. at ¶ 27. Synthroid, available only by prescription, was the first synthetic version of thyroxine, which is developed and manufactured by Defendants. *Id.* at ¶ 29. Several other levothyroxine sodium drugs have since been developed by different manufacturers and, like Synthroid, were grand-fathered in under the Food, Drug and Cosmetics Act of 1938. *Id.* at ¶ 31. Consequently, these other drugs have never been through the New Drug Application or Abbreviated New Drug Application processes necessary for the FDA to establish bioequivalence (or "AB rating"). *Id.* at ¶ 36. When a drug is given an AB rating under the FDA's bioequivalence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 2
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

testing protocols, it can be interchanged or substituted with other drugs and is listed in the FDA publication known in the pharmaceutical industry as the "Orange Book." *Id.* at ¶ ¶ 34-39. Defendant, Boots Pharmaceuticals, Inc. ("Boots"), <sup>FN2</sup> successor by merger to Flint Laboratories ("Flint"), the manufacturer of Synthroid, openly publicized that there were no drugs that were AB-rated to Synthroid, though AB-rating does not necessarily equate with lack of bioequivalence or ability to interchange or substitute drugs. *Id.* at ¶ ¶ 37-39.

> FN2. Boots, a Delaware corporation authorized to do business in Pennsylvania and having done business in Pennsylvania during the relevant time period, merged with Knoll in April 1995. Am.Compl. at ¶ 6. Throughout this Opinion, any references to Boots or Flint Laboratories shall be understood as Knoll and/or BASF, which is the parent corporation of Knoll. And in April, 1995, BASF bought the drug division of the Boots Company, PLS, known as Boots Pharmaceuticals, Inc. *Id.* at ¶ ¶ 5-9.

In 1986, Daniels Pharmaceuticals, Inc. ("Daniels"), the manufacturer of Levoxyl (a competing synthetic version of levothyroxine sodium), asserted that Levoxyl was bioequivalent to Synthroid. *Id.* at ¶ 44. As a result of Daniels' efforts and an imminent threat of FDA action to withdraw levothyroxine sodium's "grand-fathered" status, Flint, in 1987, commissioned a study by Dr. Betty Dong ("Dr.Dong") to ascertain the bioequivalence of Synthroid, Levoxyl and two other generic levothyroxine sodium drugs. *Id.* at ¶ ¶ 49-51. Dr. Dong was known to favor Synthroid to other levothyroxine drugs and Boots purportedly expected the study to reveal that these drugs were inferior to Synthroid. *Id.* at ¶ ¶ 53-54. Then, in 1990, Boots received raw data from the study, indicating that the drugs were bioequivalent to Synthroid and therefore equally effective in treating hypothyroidism. *Id.* at ¶ 56. Boots realized that unless immediate action were taken, Synthroid's market share would drop from 80% to 45% or less if the FDA were to rate generic and less expensive levothyroxine drugs as bioequivalent. *Id.* at ¶ 58. Thereafter, Boots allegedly took various actions in an attempt to discredit Dr. Dong's study and threatened to withhold its consent to the publication of the study's results and attempted to delay or suppress its publication. *Id.* at ¶ ¶ 59-78. The study, which proved sound upon review, had been ready for publication in January, 1995. *Id.* at ¶ ¶ 70, 84.

**\*2** Despite defendants' efforts, the FDA became aware of Dr. Dong's study. *Id.* at ¶ 85. On November 7, 1996, the FDA informed Knoll (successor to Boots) that it had violated the Food, Drug and Cosmetic Act, 21 U.S.C. § 331(a), by misbranding Synthroid when Knoll knew of and possessed Dr. Dong's study results. *Id.* at ¶ 86. Thereafter, on April 16, 1997, the *Journal of the American Medical Association* ("JAMA") published the study which had concluded that millions of dollars per year could be saved in the United States through the use of generic equivalents to Synthroid. *Id.* at ¶ 88. After news of Dr. Dong's study was publicized, some states considered changing their lists of approved generic equivalent drugs to include generic equivalents to Synthroid. *Id.* at ¶ 89. In response, Knoll, through its representatives, the individual defendants, began an allegedly misleading ad campaign, directed to state agencies, claiming that "there is no substitute for Synthroid." *Id.* at ¶ 90.

The Commonwealth is allegedly the fourth largest state user of Synthroid. *Id.* at ¶ 94. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Commonwealth paid for Synthroid prescriptions through Pennsylvania Medicaid, Pennsylvania's Pharmaceutical Assistance Contract for the Elderly ("PACE"), Pharmaceutical Assistance Contract for the Elderly Needs Enhancement Tier ("PACENET") and Pennsylvania Employees Benefit Trust Fund ("PEBTF"), plans which use state dollars to assist poor people, the elderly and state employees in paying for levothyroxine sodium. *Id.* at ¶ 95. Pursuant to contract and certain laws and regulations, defendants provide various rebates to the Commonwealth. *Id.* at ¶ 96. Pennsylvania citizens which receive prescriptions through PACENET and PEBTF pay a greater co-pay for generic levothyroxine sodium than for Synthroid. *Id.* at ¶ 97.

Between 1992 and April of 1996, representatives of Boots/Knoll/BASF, sent correspondence and letters to Commonwealth agencies which were designed to deceive Commonwealth employees and induce them into making written representations about Synthroid to support Defendants' "scheme" to convince health care professionals that there is no bioequivalent or substitute for Synthroid. *Id.* at ¶ ¶ 98-102. As a result of the "misleading" ad campaign(s), Defendants persuaded Pennsylvania physicians to specify Synthroid in their levothyroxine sodium prescriptions and convinced patients to request it, causing the Commonwealth and payors to pay for or reimburse their insureds for Synthroid instead of other less expensive brand and generic levothyroxine sodium drugs. *Id.* at ¶ 107. Defendants' actions to delay the recognition and approval of bioequivalent alternatives to Synthroid has purportedly caused the Commonwealth to spend more than it otherwise would have spent for the purchase or reimbursement of thyroid medicine due to both (1) the artificial inflation of the price paid for Synthroid and (2) the selection of Synthroid instead of bioequivalent or generic alternative medicine. *Id.* at ¶ 108.

**\*3** Under this factual background, Plaintiff commenced the present action in this court.[FN3]

> [FN3.] As will be discussed in more detail below, as a result of the same conduct alleged in this action, dozens of federal class action claims were filed by individual consumers and third party payors, which were consolidated in the United States District Court for the Northern District of Illinois. *See In re Synthroid Marketing Litigation, 1997 WL 564075, at \*1 (N.D.Cal. Aug.21, 1997)* ("MDL Class Action"). On August 4, 2000, the United States District Court entered an order granting final approval for the settlement of the class action lawsuit. *In re Synthroid Marketing Litigation, 110 F.Supp.2d 676 (N.D.Ill.2000).* Further, on September 8, 2000, the court entered a final order and judgment, approving the stipulation and settlement of both the consumer settlement class and the third party payor settlement, which permanently released defendants from the future claims for the same conduct alleged in this action. *See* Final Order and Judgment of *In re Synthroid Marketing Litigation,* Civ. A. No. 97 C 6017, MDL No. 1182 (N.D.Ill. Sept. 8, 2000). The Commonwealth purportedly participated in the MDL Class Action but did not settle nor was it a party to that action. *See* 2/12/01 N.T. 5-9.

B. *Procedural History*

On May 12, 2000, the Commonwealth filed its original Complaint, in its capacity as sovereign and as *parens patriae* on behalf of its citizens, seeking injunctive relief, civil penalties and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

monetary damages. Specifically, the Complaint set forth Counts for (1) violation of the Unfair Trade Practices and Consumer Protection Law ("UTP/CPL"), 73 Pa.C.S.A. § § 201-1 *et seq.;* (2) breach of contract; (3) false claims; (4) civil conspiracy; (5) fraud; (6) fraudulent misrepresentation; (7) fraudulent concealment; (8) negligent misrepresentation; (9) unjust enrichment; and (10) "unclaimed funds" pursuant to the "Escheat Property Act", 72 P.S. § § 1301.1 et seq. The gravamen of the Complaint is that Defendants have wrongfully secured and maintained the market share for their levothyroxine sodium drug product, Synthroid, by (1) misrepresenting in advertisements and promotional campaigns that Synthroid had no bioequivalent which would be interchangeable with generic levothyroxine sodium drug products and (2) by delaying the publication of a study which would have proved otherwise.

On July 11, 2000, Defendants filed their original Preliminary Objections. Plaintiff filed its Motion to Strike the Preliminary Objections and, in the alternative, requested to file an Amended Complaint on July 31, 2000. On October 4, 2000, this Court entered an Order, denying the Motion to Strike and granting the request to file an Amended Complaint, while deferring any ruling on the Preliminary Objections. On October 24, 2000, Plaintiffs filed their Amended Complaint. Thereafter, Defendants filed Preliminary Objections to the Amended Complaint, in the nature of a demurrer.[FN4] Specifically, these Objections asserted the following:

> [FN4.] For purposes of clarity, this court should emphasize that the only complaint before it is the Amended Complaint which supersedes the original complaint and takes its place, even though it is very similar to the original pleading. Therefore, the only Preliminary Objections before the court are those filed to the Amended Complaint since the original ones have been rendered moot. *See Vetenshtein v.. City of Philadelphia,* 755 A.2d 62, 67 (Pa.Commw.Ct.2000)(an amended complaint virtually withdraws the original complaint and takes its place). Moreover, Defendants did not reassert all of their original Objections, but only moved to dismiss Counts I, II, III, IV, IX and X. At oral argument, defense counsel contended that Plaintiff's claim is essentially one for fraud and the other claims are legally insufficient. 2/12/01 N.T. 3, 39-40

(1) the inability of the Commonwealth to bring claims for restitution as *parens patriae* on behalf of Pennsylvania citizens;
(2) failure to state a cause of action under the UTP/CPL in Count I, asserting that civil penalties are not allowed for each "claim for payment" and that the alleged misrepresentations do not equate to "claims for payment", as well as requesting that the jury demand be stricken as to this count;
(3) failure to state a cause of action for breach of contract in Count II based on a failure to allege a breach of the Rebate Agreement and Addendum, as well as moving to strike the claim against all defendants but Knoll, the sole party to the Rebate Agreement and Addendum;
(4) failure to state a cause of action for unjust enrichment in Count IX, asserting that unjust enrichment cannot be pled in the alternative when the claim is based on a written contract;
(5) failure to state a cause of action for false claims in Count III, contending that Plaintiff does not allege facts to establish that Defendants submitted claims for payment, let alone false claims;
**\*4** (6) failure to state a cause of action for civil conspiracy in Count IV, arguing that Plaintiff

Not Reported in A.2d                                                              Page 5
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

fails to allege the requisite plurality to maintain this claim and fails to allege that the individual defendants acted beyond the scope of their agency roles;
and
(7) failure to state a cause of action for unclaimed funds under the Escheat Statute in Count X based on a failure to allege that the tangible property is located in the Commonwealth or that the funds from the settled class action lawsuit are actually unclaimed.

Preliminary Objections at ¶¶ 7-35.

This court heard oral argument on the Objections on February 12, 2001. The court will address each of the Objections *seriatim.*


## LEGAL STANDARD

Rule 1028(a)(4) of the Pennsylvania Rules of Civil Procedure [Pa.R.C.P.] allows for preliminary objections based on legal insufficiency of a pleading or a demurrer. When reviewing preliminary objections in the form of a demurrer, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News,* 757 A.2d 938, 941-42 (Pa.Super.Ct.2000). Preliminary objections, whose end result would be the dismissal of a cause of action, should be sustained only where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazara,* 746 A.2d 642, 643 (Pa.Super.Ct.2000) (citation omitted). Moreover,

[I]t is essential that the face of the complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible.

*Bailey v. Storlazzi,* 729 A.2d 1206, 1211 (Pa.Super.Ct.1999). However, the pleaders' conclusions of law, unwarranted inferences from the facts, argumentative allegations, or expressions of opinions are not considered to be admitted as true. *Giordano v. Ridge,* 737 A.2d 350, 352 (Pa.Commw.Ct.1999), *aff'd.* 559 Pa. 283, 739 A.2d 1052 (1999), *cert. denied,* 531 U.S. 928, 121 S.Ct. 307, 148 L.Ed.2d 246 (U.S.2000). In addition, it is not necessary to accept as true averments in the complaint which conflict with exhibits attached to the complaint. *Philmar Mid-Atlantic, Inc. v. York Street Associates II,* 389 Pa.Super. 297, 300, 566 A.2d 1253, 1254 (1989).


## DISCUSSION

A. The Commonwealth Has Standing as *Parens Patriae* to Bring Restitution Claims Only on Behalf of its Citizens Who Opted Out or Were Not Included in the Multi-district Class Action Settlement, But, the Commonwealth Can, in its Own Right, Bring its Request for Injunctive Relief, Civil Penalties and Restitution

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 6
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Defendants first assert that the Commonwealth's claims as *parens patriae,* seeking restitution on behalf of its citizens, are barred with respect to all Pennsylvania consumers except the relatively few Pennsylvania consumers that opted out of the settlement and release in the MDL Class Action. Preliminary Objections at ¶¶ 7-9. At oral argument, counsel for defendants clarified that they were asserting that the Commonwealth can only bring direct claims on behalf of itself and also as *parens patriae* with respect only to citizens who have not already released their claims based on the same conduct in this action. 2/12/01 N.T. 8 ("N.T.").

**\*5** Plaintiff, in turn, argues that the settlement in the MDL Class Action is not final but is currently on appeal to the Seventh Circuit, and that defendants oversimplify the concept of *parens patriae,* since that concept allows for the Commonwealth to maintain its other *parens patriae* claims (e.g., for injunctive relief) in order to protect all current and future consumers of levothyroxine sodium drugs. Pl. Mem. of Law, at 7-9. The Commonwealth also contends that "the proposed settlement and any possible recovery by Pennsylvania citizen-class members does not act to waive the statutory civil penalties the Commonwealth is entitled to recover from Defendants pursuant to the UTP/CPL." *Id.* at 9, 566 A.2d 1253. At oral argument, counsel for Plaintiff asserted that "the right of the Commonwealth to bring the suit isn't exactly coterminous with the release." N.T. 25. However, counsel did concede that "[t]o the extent that one of the persons upon whose basis we have brought suit has released his claim, then ... we cannot recover that which has been released by that person." *Id.* at 27, 566 A.2d 1253.

*Parens patriae* means literally "parent of the country" and "refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability. It is a concept of standing utilized to protect those quasi-sovereign interests such as [the] health, comfort and welfare of the people, interstate water rights, [the] general economy of the state, etc." Black's Law Dictionary 1003 (5th ed.1979)), *quoted in Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 599 n. 8, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Summarizing the principles of the *parens patriae* doctrine, the United States Supreme Court has stated the following:
In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development-neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract-certain characteristics of such interests are so far evident. These characteristics fall in two general categories. First, a State has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

*Snapp,* 458 U.S. at 607.

Both federal and state courts in Pennsylvania consistently uphold the right of the Commonwealth to sue in its capacity as *parens patriae* to vindicate substantial state interests, both economic and physical. *See Pennsylvania v. Porter,* 659 F.2d 306, 314-16 (3d Cir.1981)(upholding right of Commonwealth to bring an action as *parens patriae* and in its own right to enjoin police officers and borough officials for violations of civil rights and upholding Commonwealth's interest in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

preventing further violations and in safeguarding the health and safety of its citizens); *Commonwealth v. Russell Stover Candies,* Civ.A.No. 93-1972, 1993 WL 145264, at *7 (E.D.Pa. May 6, 1993)*("A state can sue as *parens patriae* for the protection of its people or its general economy."); *Commonwealth ex rel. Fisher v. Phillip Morris, Inc.,* 736 A.2d 693, 701-02 (Pa.Commw.Ct.1999)*(footnotes and citations omitted)(Kelly, J., dissenting); *In the Interest of K.B.,* 432 Pa.Super. 586, 591 n. 11, 639 A.2d 798, 801 n. 11 (1994).

**\*6** In support of its position, Defendants rely upon *In re Baldwin-United Corporation,* 770 F.2d 328 (2d Cir.1985), which enjoined several states through their Attorneys General from bringing actions seeking recovery for damages which were already subject to multidistrict class action settlements. *Id.* at 341-42. In *Baldwin,* which involved class actions that had been consolidated in federal court, 18 of the 26 class actions had reached stipulated settlements which had been provisionally approved by the court and were awaiting final approval. *Id.* at 336. The United States Court of Appeals for the Second Circuit deemed that the injunction was appropriate to aid in the federal court's jurisdiction over the settlement because, as a condition of the settlement, the plaintiffs had agreed to release all claims arising under federal and state law on the same conduct alleged in the later state action. *Id.* The court further stated:

as a practical matter[,] no defendant in the consolidated federal actions in the present case could reasonably be expected to consummate a settlement of those claims if their claims could be reasserted under state laws, whether by states on behalf of the plaintiffs or by anyone else seeking recovery of money to be paid to the plaintiffs. Whether a state represented itself to be acting as a "sovereign" in such a suit or described its prayer as one for "restitution" or a "penalty" would make no difference if the recovery sought by the state was to be paid over to the plaintiffs. The effect would be to threaten to reopen the settlement unless and until it had been reduced to a judgment that would have res judicata consequences.... If states or others could derivatively assert the same claims on behalf of the same class or members of it, there could be no certainty about the finality of any federal settlement.

*Id.* at 337. While federal cases are generally not binding on this court, this court finds the reasoning and circumstances in *Baldwin* to be instructive in the present instance.

Here, in its Amended Complaint, Plaintiff explicitly avers that it "brings this action in its capacity as sovereign, and as *parens patriae* on behalf of its citizens, for injunctive relief, civil penalties, and to recover damages which the Commonwealth and its citizens have sustained as a result of the unlawful and concerted action of the Defendants, manufacturers and marketers of the prescription drug Synthroid." Am.Compl. at ¶ 1. Plaintiff is apparently asserting its *parens patriae* claims on behalf of Pennsylvania citizens who receive prescriptions through PACENET and PEBTF and those who pay a greater co-pay for Synthroid than for other levothyroxine sodium. *Id.* at ¶ 97. Plaintiff is also bringing claims for damages on behalf of payors, including itself, where, as a result of Defendants' actions, it and other payors have been caused to pay for or reimburse their insureds for Synthroid instead of less expensive levothyroxine sodium drugs. *Id.* at ¶¶ 107, 109. In addition, Plaintiff is apparently stating its claim for injunctive relief on behalf of "thousands of Pennsylvanians [who] use Synthroid without question" and the thousands who would continue to use it throughout all or most of their lifetimes to their financial detriment. *Id.* at ¶ 111. Taking these allegations as true, this court finds that the Commonwealth

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

has expressed a quasi-sovereign interest in protecting the physical and economic health of its citizens and would, at first glance, be able to maintain a *parens patriae* action. *See Snapp,* 458 U.S. at 607.

**\*7** However, as Plaintiff acknowledges, dozens of federal class action claims were filed by individual consumers seeking monetary damages and certain individual consumers opted out of the proposed settlement in the class action litigation, including Pennsylvania consumers. *Id.* at ¶ ¶ 113, 213. Both the consumer class actions and the third party payor actions, in which 37 states through their Attorney General have joined, were consolidated in the United States District Court for the Northern District of Illinois. *See In re Synthroid Marketing Litigation,* 1997 WL 564075, at \*1 (N.D.Cal. Aug.21, 1997) ("MDL Class Action"). Defendants concede that Pennsylvania was not one of the 37 states which joined this class action. *See* N.T. 7. On July 19, 1999, the District Court entered orders certifying the consumer class, as those consumers in the United States who purchased Synthroid between January 1, 1990 to the present, as well as all insurance providers and other third party payors ("TPP"), including self-funded plans but excluding governmental agencies, that paid Synthroid expenses incurred by any consumer in the United States and Puerto Rico during the Class Period. *See In re Synthroid Marketing Litigation,* 188 F.R.D. 295, 302 (N.D.Ill. July 19, 1999); and *In re Synthroid Marketing Litigation,* 188 F.R.D. 287, 295 (N.D.Ill. July 19, 1999), respectively. On August 4, 2000, the United States District Court entered an order granting final approval for the settlement of the MDL class action lawsuit. *In re: Synthroid Marketing Litigation,* 110 F.Supp.2d 676 (N.D.Ill.2000). Further, on September 8, 2000, the District Court entered a final order and judgment, approving the stipulation and settlement of both the Consumer Settlement Class and the TPP Settlement Class, which permanently released defendants from future claims for the same conduct alleged in this action. *See* Final Order and Judgment of *In re: Synthroid Marketing Litigation,* Civ. A. No. 97 C 6017, MDL No. 1182 (N.D.Ill. Sept. 8, 2000) ("Final Order").[FN5] The District Court explicitly declared that the Stipulation was binding on all Consumer Settlement Class Members and TPP Settlement Class Members and it was preclusive in all pending and future lawsuits or other proceedings. Final Order, at ¶ 18. The "Released Claims" included any of the claims by the Consumer Plaintiffs or by the TPP Settlement Class and include many of the same claims arising in the present action. *Id.* at ¶ 1(mm). The "Release" acts as a permanent bar to those included in the Consumer Settlement Class and the TPP Settlement Class. *See* Exhibit A to Final Order, at ¶ 13. However, it does not include any retail pharmacy that is not a TPP, any personal injury claims, or any claim arising out of an actionable breach of a service agreement entered into by the Releasees, their successors and assigns, and any TPP. *Id.* In addition, the Release does not include the Commonwealth and/or its agencies, as represented by the Attorney General, since the Commonwealth did not join in the MDL Class Action and was explicitly excluded from the definition of the Consumer Settlement Class and TPP Settlement Class. *See id.* at ¶ ¶ 1(j), 1(yy).

> FN5. The Stipulation and Settlement included in the definition for the "Consumer Settlement Class" all individuals or their legal representatives in the United States and Puerto Rico who purchased Synthroid during the Class Period and (i) do not validly exclude themselves from participation under this Stipulation, and (ii) are not governmental entities and/or agencies represented by state Attorneys General, and (iii)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are not TPPs or recipients of Synthroid exclusively through state funded pharmaceutical drug programs who made no payments for Synthroid, and (iv) are not the Individual Defendants. *See* Exhibit A to Final Order, at ¶ 1(j).

Further, the "TPP Settlement Class" means "individually and/or collectively, all TPPs in the United States and Puerto Rico who (i) do not validly exclude themselves from participation under this Stipulation, and (ii) are not governmental entities and/or agencies represented by state Attorneys General. *Id.* at ¶ 1(fff). "TPP Plaintiff(s)" includes Blue Cross & Blue Shield of Alabama; Louisiana Health Service & Indemnity Company d/b/a Blue Cross & Blue Shield of Louisiana; Aetna U.S. Healthcare, Inc.; Aetna Life Insurance Co.; Corporate Health Insurance Co., Inc.; and Brokerage Concepts, Inc. *Id.* at ¶ 1(bbb).

**\*8** In order to assure the finality of the Class Action settlement and to adhere to the District Court's exclusive jurisdiction over the settlement, this court cannot now allow the Commonwealth to assert *parens patriae* claims on behalf of Pennsylvania citizens who released the Defendants for the same conduct alleged in this action. However, those Pennsylvania citizens who did opt out or were not included in the settlement should not now be denied any right to recovery, even though the number of these citizens is unclear and must be determined through subsequent discovery. Further, government agencies such as, Pennsylvania Medicaid, PACE, PACENET, PEBTF, which assist poor people, the elderly and state employees in paying for levothyroxine sodium (*See* Am.Compl. at ¶ 95), were excluded from the settlement and the release. Exhibit A to Final Order, at ¶ 1(j). Under these circumstances, the Commonwealth may bring restitution claims as *parens patriae* only on behalf of those Pennsylvania citizens who opted out or were not included in the MDL Class Action Settlement. The Commonwealth, however, is not barred from bringing direct claims for restitution or civil penalties, or claims for injunctive relief either as *parens patriae* or on its own behalf.

Therefore, as outlined above, Defendants' Preliminary Objection with respect to Plaintiff's standing as *parens patriae* is sustained in part and overruled in part.

B. Plaintiff States a Cause of Action for Civil Penalties and Injunctive Relief under the UTP/CPL Where it Alleges That "Each Claim for Payment of Synthroid Is Tainted by Defendants' Actions and Is Subject to Civil Penalty"; but Plaintiff Is Not Entitled to a Jury Trial for this Claim

Defendants argue that Plaintiff's claim in Count I under the UTP/CPL, seeking to impose civil penalties for each "claim for payment" fails as a matter of law because (1) the UTP/CPL does not provide for the payment of civil penalties based upon "claims for payment"; and (2) Plaintiff does not allege facts to establish that Defendants made any "claims for payment." Defs. Mem. of Law, at 7. Defendants also move to strike Plaintiff's demand for a jury trial with respect to its UTP/CPL claim. *Id.* at 6 n. 3. Plaintiff, in response, argues that Defendants misinterpret both the UTP/CPL and the allegations of the Amended Complaint which set forth a cause of action under the UTP/CPL. Pl. Mem. of Law, at 10-12.

At oral argument, Defendants' counsel asserted that the Commonwealth's request for civil

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 10
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

penalties is really based on every reaction to a purported misrepresentation or every time the doctor who purportedly heard this misrepresentation prescribed Synthroid, while the statute only provides civil penalties for each time the defendant had committed an unlawful act. N.T. 16-17. In response, Plaintiff's counsel argued that Defendants, through a chain of actions and misrepresentations regarding Synthroid, ultimately profit from the Commonwealth and its citizens who are caused to pay more for Synthroid and by doctors and druggists who are caused to prescribe it, rather than prescribing the generic drug. *Id.* at 20-21.

**\*9** "Unfair methods of competition" and "unfair or deceptive acts in the conduct of any trade or commerce" are unlawful under the UTP/CPL. 73 P.S. § 201-3. The UTP/CPL defines "unfair methods of competition" or "unfair or deceptive acts" as including but not limited to the following:
(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have ...;

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(viii) Disparaging the goods, services or business of another by false or misleading representation of fact;

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4). A "false advertising" claim under sub-section (v) may be sustained if the plaintiff shows (1) that defendants' advertisement is a false representation of fact, (2) that it actually deceives or has a tendency to deceive a substantial segment of its audience, and (3) that the false representation is likely to make a difference in a purchasing decision. *Weinberg v. Sun Co., Inc.,* 740 A.2d 1152, 1167 (Pa.Super.Ct.1999)(citing *Commonwealth v. Hush-Tone Indus.,* 4 Pa.Commw. 1, 21 (1971)).

The UTP/CPL empowers the Attorney General to bring an action, in the name of the Commonwealth, to restrain by temporary or permanent injunction any conduct declared to be unlawful under section 3 of the Act. 73 P.S. § 201-4. A court, in its discretion, may direct the defendant(s) to make restitution to any person injured on account of defendants' violation of the Act. 73 P.S. § 201-4.1.[FN6] In addition, Section 8 of the UTP/CPL states, in pertinent part, that:

> [FN6.] As noted in the analysis of the *parens patriae* claims, the Commonwealth may only bring claims for restitution on its own behalf, and for those citizens who opted out or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 11
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

were not included in the MDL Class Action settlement.

[i]n any action brought under section 4 of this act, if the court finds that a person, firm or corporation is wilfully using or has wilfully used a method, act or practice declared unlawful by section 3 of this act, the Attorney General ... acting in the name of the Commonwealth ... may recover, on behalf of the Commonwealth ... a civil penalty of not exceeding one thousand dollars ($1,000) per violation, which civil penalty shall be in addition to other relief which may be granted under sections 4 and 4 .1 of this act.

*73 P.S. § 201-8(b).* While a trial court has authority to impose a civil penalty for "each improper act, each false statement and each inadequate disclosure," the court abuses its discretion if such penalties are merely duplicative fines. *Commonwealth ex rel. Corbett v. Ted Sopko Auto Sales and Locator,* 719 A.2d 1111, 1114 (Pa.Commw.Ct.1998)(quoting *Commonwealth ex rel. Kane v. Flick,* 33 Pa.Commw. 553, 560, 382 A.2d 762, 765 (1978)).

Here, Count I of the Amended Complaint incorporates by reference all of the preceding allegations. Am.Compl. at ¶ 132. The gravamen of Plaintiff's UTP/CPL claim is that between 1992 and April of 1996, defendants engaged in deceptive and/or fraudulent behavior, as well as conducting a misleading ad campaign, in suppressing the conclusion of their own commissioned study that Synthroid was bioequivalent with other levothyroxine sodium drugs. *Id.* at ¶ ¶ 134-145, 382 A.2d 762. Plaintiff also alleges that the individual defendants Schimelfenig and Bowman induced Commonwealth employees to make representations about Synthroid in order to induce Pennsylvania physicians, pharmacists, health care professionals to prescribe Synthroid and to induce consumers to request and continue using Synthroid. *Id.* at ¶ ¶ 135-140, 382 A.2d 762. In particular, Plaintiff sets forth the following allegations:
**\*10** 141. Pennsylvania's consumers were harmed by Defendants' fraudulent and deceptive representations and actions when those consumers and their physicians made choices about their use of levothyroxine products.
142. Each misleading advertisement placed by Defendants and appearing in Pennsylvania is subject to civil penalty.
143. Defendants' unfair and/or deceptive acts or practices have limited the ability of numerous consumers to obtain or evaluate information material to their decision about the purchase of levothyroxine products.
144. The Commonwealth and its citizens have suffered and will continue to suffer irreparable harm unless the acts and practices complained of herein are permanently enjoined.
145. Each claim for payment of Synthroid is tainted by Defendants' actions and is subject to civil penalty...

*Id.* at ¶ ¶ 141-45, 382 A.2d 762. Plaintiff also explicitly alleges that Defendants designed, manufactured, marketed and sold Synthroid. *Id .* at ¶ ¶ 3-10, 382 A.2d 762. In addition, Plaintiff alleges that it paid 62,193 Synthroid claims for PACE and 51,604 Synthroid claims for Pennsylvania Medicaid in the first quarter of 1999. *Id.* at ¶ 117, 382 A.2d 762.

Accepting these allegations as true, as this court must when reviewing a demurrer, this court cannot now say with certainty that Plaintiff has failed to state a cause of action under the UTP/CPL or that "each claim for payment" for Synthroid could not be subject to civil penalty as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 12
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

constituting a "misrepresentation" by Defendants or those whom they induced to act. Rather, Defendants' Preliminary Objection to Count I seems to center on the propriety of assessing civil penalties for each "claim for payment" of Synthroid. Clearly, civil penalties may not be assessed if they are merely duplicative fines, but it is up to this court's discretion whether such penalties need to be assessed. *Commonwealth ex rel. Corbett,* 719 A.2d at 1114. However, the issue of whether civil penalties can be assessed for each time Synthroid was prescribed by Pennsylvania doctors and pharmacists, as a result of Defendants' actions, is better left to later discovery. Moreover, Plaintiff properly requests civil penalties for each misleading advertisement placed by Defendants and appearing in Pennsylvania. Am.Compl. at ¶ 142. Further, it is reasonable to infer that Defendants, as the manufacturers of Synthroid, would expect payment and to eventually make a profit each time Synthroid was sold, regardless of whether they, themselves, made the actual demand for payment.

Therefore, with respect to Plaintiff's prayer for civil penalties, this court overrules the Preliminary Objection to Count I.

Nonetheless, recently, this court explicitly held that the UTP/CPL does not include a right to demand a jury trial. *See Greiner v. Erie Ins. Exchange, et al.,* February 2000, No. 3053, slip op. at 15 (C.P.Phila.Nov. 15, 2000) (Herron, J.). Moreover, it is clear that only the court and not a jury may award injunctive relief. For this reason, Defendants' Motion to Strike the Jury Demand as to Count I is granted.

C. Plaintiff Fails to State a Cause of Action for Breach of Contract by Failing to Allege a Breach of a Duty Imposed by the Contract and There Is No Independently Enforceable Duty of Good Faith; Defendants Other than Knoll May Not Be Held Liable for Breach of Contract Where They Are Not Parties to the Contract

**\*11** Defendants first argue that Plaintiff fails to state a claim for breach of contract in Count II of its Amended Complaint since Plaintiff fails to allege that Defendant Knoll failed to perform any of its responsibilities under the Rebate Agreement and Addendum. Defs. Mem. of Law, at 9-10. Defendants further assert that Plaintiff cannot rely on any express or implied covenant of good faith and fair dealing because no separate cause of action for breach of the duty of good faith exists absent a breach of contract. Defs. Reply Br., at 6. In addition, Defendants assert that Count II should be dismissed as to the other Defendants besides Knoll since only Knoll and the Pennsylvania Department of Aging are parties to the Rebate Agreement and Addendum. Defs. Mem. of Law, at 9 n. 5. In response, Plaintiff contends that the Rebate Agreement and Addendum incorporated an "integrity" provision and that the law in Pennsylvania allows for a breach of the implied duty of good faith and fair dealing. Pl. Mem. of Law, at 13-14. *See* Am.Compl., Exhibit A-Rebate Agreement and Addendum.

In Count II of the Amended Complaint, Plaintiff sets forth the following allegations, in pertinent part:
147. On February 10, 1993, the Commonwealth, acting through the Department of Aging, entered into a Rebate Agreement with Knoll Pharmaceuticals, in part relating to Synthroid. That

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract has been renewed yearly and was amended by Addendum dated March 21, 1997. Defendant Carter Eckert signed the Addendum as President of Knoll. The Contract and Addendum are attached hereto as Exhibit "A".

148. Contracts with the Commonwealth and its agencies contain General Terms and Conditions as a separate attachment.

149. In general, those terms and conditions contain promises to deal fairly and honestly with the Commonwealth.

150. Defendants' false, misleading and deceptive claims regarding Synthroid and other levothyroxine sodium products in advertising, promotion or labeling was and is not fair or honest.

151. Defendants have breached their contract with the Commonwealth as set forth above.

Am.Compl. at ¶¶ 147-149.

To establish a cause of action for breach of contract, the plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.1999) (citations omitted). Further, "[w]hile not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Id.* at 1058.

It is true that Plaintiff alleged the existence of a contract between itself and Knoll, as well as generally averring that Knoll, in misrepresenting the nature of Synthroid, breached either the express "integrity" provision in the General Terms and Conditions or the implied contractual duty of good faith. Further, in the "wherefore" clause to Count II, Plaintiff requests judgment against Defendants in an amount in excess of $100,000. Am.Compl. at 28. Though Plaintiff does not explicitly plead resultant damages from Defendants' purported breach of contract, its allegations sufficiently imply such damages. Despite these allegations, this court finds that Plaintiff has failed to state a breach by Knoll of its performance responsibilities under the Rebate Agreement and Addendum ("Agreement") and that Pennsylvania law does not allow for a cause of action for an independent breach of the duty of good faith in these circumstances.

**\*12** First, the Agreement requires that Knoll, as manufacturer is responsible for the following: (1) to "provide the Department the average manufacturer price for the calendar quarter;" (2) to "provide the identity of all of [its] covered prescription drugs;" (3) to "calculate and ... make a rebate payment to the Department;" and (4) "to pay to the Department an amount sufficient to cover all costs associated with providing electronic claims data to [Knoll] for verification purposes." Am.Compl., Exhibit A at 2-4. Further, under the General Terms and Conditions, attached and incorporated into the Agreement, Knoll promised it "shall maintain the highest standards of integrity in the performance of this Agreement and shall take no action in violation of state or federal laws, regulations, or other requirements that govern contracting with the Commonwealth." *Id.,* Attachment C, at ¶ 3(B). Plaintiff's allegations do not state how Knoll failed to perform its contractual duties, other than generally averring a breach of the duty of good faith. Though Plaintiff attempts to state a claim for breach of contract, the gravamen of the Amended Complaint, in its entirety, sounds more properly in fraud. Further, this court need not accept as true allegations in the complaint which conflict with exhibits attached to it. *Philmar,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 14
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

389 Pa.Super. at 300, 566 A.2d at 1254.

Moreover, Pennsylvania law does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract. The duty of good faith is said to arise under the law of contracts, not under the law of torts. *Creeger Brick and Building Supply Inc. v. Mid-State Bank and Trust Company, SEDA,* 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989). As a matter of law, "[e]very contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Donahue v. Federal Express Corp. .,* 753 A.2d 238, 242 (Pa.Super.Ct.2000) (citations omitted). Good faith has been defined as "[h]onesty in fact in the conduct or transaction concerned." *Id.* (quoting 13 Pa.C.S.A. § 1201 of the Uniform Commercial Code). Types of bad faith in the performance of a contract include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. *Somers v. Somers,* 418 Pa.Super. 131, 136, 613 A.2d 1211, 1214 (1992) (quoting Restatement (2d) of Contracts § 205(d)). The duty of good faith does not compel the parties to surrender rights which it has been given by statute or by the contractual terms. *Creeger Brick,* 385 Pa.Super. at 36-37, 560 A.2d at 154. The underlying principle behind the implied covenant of good faith is "that neither party shall do anything to injure or destroy the rights of the other party to receive the benefits of the agreement." *CMS Enterprise Group v. Ben & Jerry's Homemade, Inc.,* 1995 WL 500847, at * 7 (C.P. Northhampton Aug. 3, 1995) (citation omitted). However, the duty of good faith, whether express or implied in a contract, does not create independent substantive rights nor can it override the express contractual terms. *Id. See also, Marlin v. Borg-Warner Corp.,* 1991 WL 346305, at *7 (C.P. York Aug. 14, 1991)("There may be an express or implied covenant of good faith and fair dealing in any contract between the parties, but if so, its breach is a breach of contract rather than an independent breach of a duty of good faith and fair dealing.")(citing *Engstrom v. John Nuveen & Co.,* 668 F.Supp. 953, 958 (E.D.Pa.1987).

**\*13** Therefore, even taking all of Plaintiff's allegations as true, this court does not find that it has stated a cause of action for breach of contract since Plaintiff failed to allege that Knoll failed to or improperly performed one of its duties imposed by the Agreement and, absent a breach of contract, there is no independent duty of good faith under Pennsylvania law.

Moreover, Defendant BASF and the individual defendants may not be held liable where they are not parties to the contract. "[I]t is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short,* 408 Pa.Super. 563, 571, 597 A.2d 175, 178 (1991)(holding that corporate president cannot be liable for breach of contract where he is not a party to the contract). *See also, Fleetway Leasing Co. v. Wright,* 697 A.2d 1000, 1003 (Pa.Super.Ct.1997)("a person who is not a party to a contract cannot be held liable for breach by one of the parties to a contract"); *Commonwealth v. Noble C. Quandel Company,* 137 Pa.Commw. 252, 260, 585 A.2d 1136, 1140 (1991)(same).

In addition, a parent corporation is not normally liable for the contractual obligations of its subsidiary, even if that corporation is its wholly-owned subsidiary. *Norbers v. Crucible, Inc.,* 602 F.Supp. 703, 706 (W.D.Pa.1985) (citation omitted). "Such liability occurs only by application of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the 'alter ego' theory to pierce the corporate veil." *Id. See also, Commonwealth v. Vienna Health Prods., Inc., 726 A.2d 432, 434 (Pa.Commw.Ct.1999)*("a corporation is to be treated as a separate and independent entity even if its stock is owned entirely by one person."); *Shared Communications, Servs. of 1800-80 JFK Blvd., Inc. v. Bell Atlantic Props., Inc., 692 A.2d 570, 573 (Pa.Super.Ct.1997)*("[a]lthough a parent and a wholly owned subsidiary do share common goals, they are still recognized as separate and distinct legal entities."). There is a strong presumption against piercing the corporate veil. *Lumax Indus., Inc. v. Aultman, 543 Pa. 38, 41-42, 669 A.2d 893, 895 (1995)*. The general standard for piercing the corporate veil is "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Id.* (quoting *Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir.1967)*, *cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)*. *See also, Kiehl v. Action Mfg. Co., 517 Pa. 183, 190, 535 A.2d 571, 574 (1987)*(adhering to the same standard for piercing the corporate veil); *Village At Camelback Property Owners Ass'n, Inc. v. Carr, 371 Pa.Super. 452, 461, 538 A.2d 528, 532-33 (1988)*(relating the same standard as it applies to shareholders of the corporation);

It is also true that "[w]here a party contracts with a corporation through a corporate agent who acts within the scope of his authority and reveals his principal, the corporate principal alone is liable for breach of contract." *Daniel Adams Associates, Inc. v. Rimbach Publishing, Inc.. 360 Pa.Super. 72, 79, 519 A.2d 997, 1000-01 (1987)*(stating also that "[a] corporation is a creature of legal fiction which can 'act' only through its officers, directors and other agents.") (citations omitted).

**\*14** Here, Plaintiff does not set forth any allegations which would compel this court to pierce the corporate veil and treat BASF as the "alter ego" of Knoll, in order to make BASF liable for a breach of contract. Plaintiff also does not allege that the individual employees acted outside the scope of their employment. Rather, as will be addressed in more detail below, Plaintiff's claim against Defendants in Count IV, sounding in civil conspiracy, belies an attempt to blend BASF and Knoll into the same legal entity or to hold that the individual defendants acted outside the scope of their employment, which would otherwise make them liable for a breach of contract.

Therefore, this court sustains Defendants' Preliminary Objections to Count II as against Knoll, BASF and the other Defendants.

> D. Plaintiff Has Properly Pled its Unjust Enrichment Claim in the Alternative to its Breach of Contract Claim and Has Sufficiently Stated the Elements for Such a Claim

In a footnote, Defendants reassert their Preliminary Objection to Count IX of the Amended Complaint-the unjust enrichment claim, arguing that this quasi-contractual doctrine is inapplicable where the claims are based on a written contract. Def. Mem. of Law, at 10 n. 6. Plaintiff, in turn, contends that the Commonwealth has properly pled its unjust enrichment claim in the alternative. Pl. Mem. of Law, at 15.

Clearly, Plaintiff is permitted to plead causes of action in the alternative. *See* Pa.R.C.P. 1020(c).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Further, the complaint is not defective merely because the causes of action are inconsistent or conflicting. *Baron v. Bernstein,* 175 Pa.Super. 608, 610, 106 A.2d 668, 669 (1954). Plaintiff may properly plead causes of action for breach of contract and unjust enrichment in the same complaint. *See, e.g., J.A. & W.A. Hess, Inc. v. Hazle Township,* 465 Pa. 465, 468, 350 A.2d 858, 860 (1976)(holding that trial court erred in refusing to consider unjust enrichment claim along with breach of contract claim); *Lampl v. Latkanich,* 210 Pa.Super. 83, 88, 231 A.2d 890, 892 (1967).

Unjust enrichment is a quasi-contractual doctrine based in equity which requires the plaintiff to establish the following: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Wiernik v. PHH U.S. Mortgage Corp.,* 736 A.2d 616, 622 (Pa.Super.Ct.1999), *appeal denied,* 561 Pa. 700, 751 A.2d 193 (2000).

In Count IX of the Amended Complaint, Plaintiff clearly alleges that it conferred a benefit on the defendant pharmaceutical companies by paying them for the increased medical costs for Synthroid under Medicaid and state medical assistance programs, along with state employee health insurance. Am.Compl. at ¶ ¶ 206-208. Plaintiff also alleges that the defendant pharmaceutical companies "knew of and appreciated the benefits that Pennsylvania's payment of increased health care costs conferred on them." *Id.* at ¶ 209, 751 A.2d 193. Further, Plaintiff alleges that Defendants' acceptance and retention of the benefits (e.g., the millions of dollars of "ill-gotten" profits) from their unfair and deceptive acts would be inequitable, unconscionable and unjust. *Id.* at ¶¶ 209-211, 751 A.2d 193.

**\*15** Taking these allegations as true, it is clear that Plaintiff sufficiently plead a claim for unjust enrichment and is allowed to plead in the alternative. Therefore, Defendants' Preliminary Objection to Count IX is overruled.

E. Plaintiff Has Stated a Cause of Action under Pennsylvania's Medicaid Fraud Abuse and Control Act, 62 P.s. § § 1401 *et Seq.,* by Alleging That Defendants Directly and Indirectly Caused Exposure to the Commonwealth to Claims for Payment for Synthroid Through Providers Instead of less Expensive Bioequivalents

Defendants demur to Count III, arguing that Plaintiff failed to allege facts that Defendants submitted any claims, let alone false ones, to Plaintiff for the payment of Synthroid. Defs. Mem. of Law, at 11-12. Defendants also contend that Plaintiff cannot rely on Pennsylvania's Medicaid Fraud Abuse and Control Act, 62 P.S. § § 1401 *et seq.* ("Act"), since Plaintiff's allegations of "false claims" are apparently allegations of misrepresentation and are not the types of claims for payment prohibited by the Act. *Id.* In response, Plaintiff asserts that there is common law and statutory support for a cause of action for "false claims" and that the Act is especially pertinent to the present case since the Commonwealth has spent millions of dollars providing Synthroid to its elderly and impoverished citizens on medical assistance. Pl. Mem. of Law, at 16-17.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 1407(a) of the Act makes it unlawful, *inter alia,* to:
(1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information for the purpose of obtaining authorization for furnishing services or merchandise under medical assistance.

(2) Solicit or receive or to offer to pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in case or in kind from or to any person in connection with the furnishing of service or merchandise for which payment may be in whole or in part under the medical assistance program ...

(7) Submit a claim which misrepresents the description of services, supplies or equipment dispensed or provided ...

(12) Enter into an agreement, combination or conspiracy to obtain or aid another to obtain reimbursement or payments for which there is not entitlement.

62 P.S. § 1407(a)(1), (a)(2), (a)(7), and (a)(12). A person who violates any provision of subsection (a) is guilty of a felony of the third degree with a maximum penalty of $15,000 and seven years imprisonment. *Id.* at § 1407(b)(1). In addition, the Commonwealth also has the authority to immediately terminate a provider agreement, upon notice to the provider, and institute a civil suit against such provider for twice the amount of excess benefits or payments plus legal interest from the date the violation(s) occurred. *Id.* at § 1407(c)(1).[FN7]

> FN7. The term "provider" is defined in the Act as "any individual or medical facility which signs an agreement with the department to participate in the medical assistance program, including, but not limited to, licensed practitioners, pharmacies, hospitals, nursing homes, clinics, home health agencies and medical purveyors." 62 P.S. § 1401. Since neither party presents any argument for excluding Defendants from the Act, this court will assume that they may be included. Knoll, especially, may be construed as a "provider" since it is a party to the Rebate Agreement and Addendum, which is a requisite agreement for getting reimbursed from PACE and the General Assistance Program. Am.Compl., Exhibit A, at 1.

**\*16** The Pennsylvania Supreme Court has stated that "[t]he purpose of the Medicaid Fraud and Abuse Control Act is 'to eliminate fraudulent, abusive and deceptive conduct and practices that may occur." *Commonwealth v. Lurie* 524 Pa. 56, 61, 569 A.2d 329, 331 (1990). As such, a violation under § 1407(a) requires knowing, willful or intentional conduct. *Id.* at 64, 569 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 18
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

329, 569 A.2d at 333.

In Count III of the Amended Complaint, Plaintiff alleges the following, in pertinent part:

153. Defendants' products are widely distributed in the Commonwealth through a variety of channels. Defendants exercise control over the marketing and sales activity of the distributors of Synthroid in the Commonwealth.

154. By not providing notice of material facts, Defendants intended to, or carelessly and recklessly caused, exposure of the Commonwealth to claims for or payment of artificially inflated prices for Synthroid through providers, directly and indirectly, and/or claims for or payments of Synthroid purchases, instead of less expensive bioequivalent medicine.

155. The Commonwealth was unaware of the above-concealed facts, and would not have acted as it did had the Defendants disclosed the false and fraudulent facts of which they were aware as set forth above.

156. Defendants acted knowingly and willingly, or with careless disregard.

157. The Commonwealth is uniquely affected by the Defendants' actions due to the Commonwealth's administration of health programs for its citizens, expenditures of public funds to pay for Defendants' Synthroid products, and expenditures for health insurance of state employees.

Am.Compl. at ¶ ¶ 153-57. Plaintiff also alleges that certain individual Defendants induced Commonwealth employees to make written representations about Synthroid and the lack of its bioequivalent in other levothyroxine sodium products. *Id.* at ¶ ¶ 98-100. Further, Defendants allegedly sent these representations along with an alert sheet and other letters from the corporate defendants to health care professionals in the Commonwealth to persuade Pennsylvania physicians and pharmacists to prescribe Synthroid. *Id* . at ¶ ¶ 101-107. In addition, Plaintiff alleges that Defendants acted in concert with each other in deceiving the Commonwealth and suppressing the truth about Synthroid. *Id.* at ¶¶ 19-21.

Accepting these allegations as true, along with the other facts alleged in the Amended Complaint, it appears that Plaintiff may have stated a violation under § 1407(a)(1), (a)(7) and/or (a)(12) of the Medicaid Fraud and Abuse Control Act. Therefore, the demurrer to Count III is overruled.

F. Plaintiff Sufficiently States a Cause of Action in Count IV for Civil Conspiracy since a Parent Corporation and its Subsidiary Are Treated as Separate Legal Entities Absent Allegations to Treat Them as Each Other's "Alter-Ego;" Respective Employees of Both Corporations May Be Found Liable for Civil Conspiracy

Defendants demur to Count IV of the Amended Complaint, contending that Plaintiff has not alleged more than one conspirator since a corporate entity cannot be found to have conspired with itself and the individual defendants are not alleged to have acted outside the scope of their authority as employees. Defs. Mem. of Law, at 13-14. Plaintiff, in turn, asserts that Pennsylvania law allows for a civil conspiracy claim to be made against a parent corporation and one or more of its subsidiaries. Pl. Mem. of Law, at 18-20.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*17** "In order to state a cause of action for civil conspiracy, a plaintiff must show 'that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.' " *Brinich v. Jencka,* 757 A.2d 388, 403 (Pa.Super.Ct.2000) (citations omitted). Moreover, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Rutherfoord v. Presbyterian-University Hosp.,* 417 Pa.Super. 316, 333-34, 612 A.2d 500, 508 (1992)(determining that agents of a corporation acting within the scope of their employment cannot be liable for civil conspiracy). *See also, Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 212-13, 412 A.2d 466, 473 (1979)(holding that sole shareholder/director/officer of a corporation could not conspire with his corporation as a matter of law).

Nonetheless, the Pennsylvania Superior Court has held that there is no per se rule that a parent and a wholly owned subsidiary cannot be found liable for civil conspiracy. *Shared Communications Services,* 692 A.2d at 573. Rather, a parent and its subsidiary are separate and distinct entities and the corporate form will not be disregarded lightly. *Id.* at 573-74. In addition, the court made the following distinction:
Unlike a sole shareholder/officer/director, who is necessarily involved in every intimate aspect of his corporation, a corporate parent may have varying degrees of involvement with its corporate subsidiary. While it is certainly possible to find a parent/subsidiary arrangement that is as close as the individual/corporate relationship in *Thompson Coal* [*supra* ], it is equally possible to find a parent/subsidiary relationship that is entirely distant.

*Id.* at 574. Under circumstances where a parent and its subsidiary are essentially corporate alter egos, a count for civil conspiracy will not lie because of the absent requisite plurality of actors. *Id.* A court decides this issue on a case-by-case basis. *Id.*

Here, the Amended Complaint alleges that prior to April, 1995, BASF, Knoll and Boots were separate and distinct legal entities with no corporate affiliation. Am.Compl. at ¶ ¶ 5-9.[FN8] After April, 1995, Boots merged with Knoll, which then became a subsidiary of BASF. *Id.* at ¶ ¶ 5-6. Defendants Eckert, Mayor, Kurtz and Bowman are alleged to be officers, directors, and/or employees of Boots. *Id.* at ¶ ¶ 11-13, 16. Defendants Buhler and Kuhl are representatives of Knoll. *Id.* at ¶ ¶ 14-15. Defendant Schimelfenig was an employee and account executive for Knoll/BASF. *Id.* at ¶ 17. The individual defendants allegedly participated actively in suppressing the facts about Synthroid as related to other levothyroxine sodium drugs. Further, as alleged, each defendant is sued individually, as a primary violator, and as an aider, abettor and co-conspirator who substantially assisted in the wrongful conduct complained of in the Complaint. *Id.* at ¶ ¶ 19-21. In addition, beginning in 1990, Defendants had reached a common agreement to participate in conduct to suppress, misrepresent and manipulate the Synthroid bioequivalency research and to engage in deceptive advertising and marketing of Synthroid. *Id.* at ¶ ¶ 159-163.

   FN8. Plaintiff also asserted that in 1990, Boots acquired Flint, which commissioned Dr. Dong's Study. Pl. Mem. of Law, at 19 n. 7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 20
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

**\*18** Under the facts alleged, this court must hold that Defendants may be treated as separate suable entities who could be found liable for civil conspiracy, especially since the alleged wrongful conduct dates back to 1990 and the merger did not take place until 1995. Further, as analyzed in Part C of this Opinion, Plaintiff sets forth no allegations which compel this court to treat BASF and Knoll as each other's corporate "alter ego". Therefore, the demurrer to Count IV is overruled.


G. Plaintiff Has Failed to State a Cognizable Claim under the Unclaimed Property Law, 72 P.s. §§ 1301.1 *et seq.,* since the District Court Holds Exclusive Jurisdiction over the Disbursement of All Settlement Funds from the Multi-district Class Action

Finally, Defendants demur to Count X of the Amended Complaint, asserting that a claim under the Unclaimed Property Law,[FN9] 72 Pa.C.S.A. §§ 1301.1 *et seq.,* is an *in rem* proceeding and Plaintiff fails to aver that any of the funds are physically located within the Commonwealth in order for the court to have jurisdiction over the action. Defs. Mem. of Law, at 15. At oral argument, Defendants' counsel contended that the funds alleged in this count are the settlement funds that are under the jurisdiction of the United States District Court for the Northern District of Illinois and are not located in Pennsylvania. N.T. 14. Plaintiff, in turn, asserts that the language of the Unclaimed Property Law is broader than Defendants' position and that the settlement funds of the multi-district class action represent an intangible "chose in action." Pl. Mem. of Law, at 20-21. Further, plaintiff argues that it is undisputed that thousands of Synthroid consumers live in Pennsylvania and that the Commonwealth's claim is therefore authorized. *Id.* at 21.


> FN9. Defendants explicitly refer to this law as the "Escheat Statute" which is the previous name of the law that was repealed in 1971.1929, April 9, P.L. 343, art. XIII, §§ 1301-1304, *repealed* 1971, Aug. 9, P.L. 286, No. 74, § 30, eff. Jan. 1, 1972. All future references to this law in this Opinion shall be understood as the "Unclaimed Property Law," added 1982, Dec. 9, P.L. 1057, No. 248, § 5, imd. effective.

The Unclaimed Property Law provides the following in pertinent part:
(a) All abandoned and unclaimed property and property without a rightful or lawful owner as hereafter set forth is subject to the custody and control of the Commonwealth:
1. If it is tangible and physically located within the Commonwealth; or
2. If it is intangible, and (i) the last known address of the owner, as shown by the records of the holder, is within the Commonwealth; or (ii) the last known address of the owner as shown by the records of the holder is within a jurisdiction, the laws of which do not provide for the escheat or custodial taking of such property, and the domicile of the holder is within the Commonwealth; or (iii) no address of the owner appears on the records of the holder and the domicile of the holder is within the Commonwealth.... or (iv) no address of the owner appears on the records of the holder and the domicile of the holder is not within the Commonwealth, but it is proved that the last known address of the owner is in the Commonwealth.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 21
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

72 Pa.C.S.A. § 1301.2(a). Under the clear language of this statute, Defendants are correct that tangible property must be physically located within the Commonwealth for this court to exercise jurisdiction over it. *See O'Connor v. Sperry and Hutchinson Co.,* 32 Pa.Commw. 599, 603, 379 A.2d 1378, 1380 (1977), *aff'd,* 488 Pa. 340, 412 A.2d 539 (1977)(noting that "an action in escheat ... is essentially an *in rem* proceeding ... in order for the court to have jurisdiction over the cause of action in escheat, it must have jurisdiction over the res ... [or] the court is without power to adjudicate with respect to the subject matter."). *See also, Texas v. New Jersey,* 379 U.S. 674, 677, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965)("With respect to tangible property, real or personal, it has always been the unquestioned rule in all jurisdictions that only the State in which the property is located may escheat.").

**\*19** Here, it appears that plaintiff seeks the portion of the proposed settlement (in excess of $200 million) in the multi-district class action to which Pennsylvania consumers are entitled. *See* Am.Compl. at ¶¶ 213-15. Therefore, one characterization of this property may be the right to receive settlement funds in the future which is an intangible "chose in action." [FN10] *See Texas,* 379 U.S. at 677 (stating that "intangible property, such as a debt which a person is entitled to collect, is not physical matter which can be located on a map."). Under the Unclaimed Property Law, the Commonwealth may take custody over unclaimed intangible property if the last known address of the holder is within the Commonwealth. 72 Pa.C.S.A. § 1301.2(a)(2). *See also, Texas,* 681-82 (holding that the State of the creditor's last known address as shown by the debtor's books and records has the power to escheat the debt; otherwise the right to escheat belongs to the debtor's State of corporate domicile, subject to the claims of another State upon proof that the last known address of the creditor was within its borders). *See also, Delaware v. New York,* 507 U.S. 490, 498-500, 113 S.Ct. 1550, 123 L.Ed.2d 211 (1993).

> FN10. "Chose in Action" includes "a right to personal things of which the owner has not the possession" and "personalty to which the owner has a right of possession in future, or a right of immediate possession." Black's Law Dictionary at 219 (5th ed.1979) (citations omitted).

Notwithstanding how the property in question is characterized, the real issue before this court is whether the Northern District of Illinois has exclusive jurisdiction over the unclaimed settlement funds so that this court is divested of jurisdiction over Plaintiff's claim. The Final Order of the District Court included the following pertinent passage:
The Court retains continuing and exclusive jurisdiction over the parties to the Stipulation for purposes necessary or proper: (1) for the consummation, administration, supervision, interpretation, construction and/or enforcement of the Stipulation and the Final Order and Judgment; (2) for supervising the management and disbursement of the funds in the First Settlement Fund and/or the Second Settlement Fund; (3) to protect and effectuate the Final Order and Judgment; and (4) for any other necessary purpose.

Final Order at ¶ 31. Similarly to this court's analysis above regarding the *parens patriae* claims, this court should not now interfere with the District Court's jurisdiction over the MDL Class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 22
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Action settlement since such interference would frustrate that settlement. *See Baldwin,* 770 F.2d at 336-37. Moreover, it is unclear that any of the settlement funds is currently unclaimed. Under these circumstances, this court finds that it does not have jurisdiction over the settlement funds.

Therefore, Defendants' Preliminary Objection to Count X is sustained.


CONCLUSION

For the reasons stated, this court sustains the demurrers to Counts II and X, pursuant to Rule 1028(a)(4), Pa.R.C.P. Counts II and X are dismissed without prejudice.[FN11] This court also sustains, in part, the Preliminary Objection regarding the Commonwealth's standing to bring *parens patriae* claims insofar as the Commonwealth is barred from bringing claims on behalf of its citizens, except for those citizens who opted out or were not included in the MDL Class Action. The Commonwealth may assert direct claims for restitution or civil penalties, as well as its claim for injunctive relief on its own behalf or as *parens patriae.* The motion to strike the jury demand as to the UTP/CPL claim in Count I is granted. This court also overrules the Preliminary Objections to Counts I, III, IV and IX. An Order will be entered this date in accord with this Opinion.


FN11. In the event that Plaintiff can cite a cognizable breach of contract claim against Defendants or should Plaintiff demonstrate that the District Court disbursed the settlement funds and those funds remain unclaimed, then Plaintiff may reassert its claims under Counts II and X.


ORDER

**\*20** AND NOW, this 15th day of March, 2001, upon consideration of Defendants' Preliminary Objections to the Amended Complaint, Plaintiff's opposition thereto, all other matters of record, having heard oral argument on these Preliminary Objections and in accord with the Opinion being filed contemporaneously with this Order, it is hereby ORDERED as follows:
1. The Preliminary Objection regarding the Commonwealth's standing to bring *parens patriae* claims is Sustained in part and Overruled in part, insofar as the Commonwealth is only barred from bringing restitution claims on behalf of those Pennsylvania citizens who released Defendants in the Multi-District Class Action Settlement. In any event, the Commonwealth may bring restitution claims, claims for injunctive relief and claims for civil penalties on its own behalf and on behalf of those Pennsylvania citizens who opted out or were not included in the settlement.
2. the demurrers to Counts I; III; IV; and IX are Overruled.
3. the demurrers to Counts II and X are Sustained; Counts II and X are dismissed without prejudice; and
4. the motion to strike the jury demand as to the claim under the UTP/CPL is Granted.


Pa.Com.Pl.,2001.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Com. v. BASF Corp.
Not Reported in A.2d, 2001 WL 1807788 (Pa.Com.Pl.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.