# EXHIBIT B

MP401107104 6

Thomas LaBadia
Vice-President
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater — AREA 2-E

Re "Reappearing UL Premiums" - Accelerated Payment Cases

Tom, the article which follows appeared in the *National Underwriter* and it dealt with the idea of "reappearing premiums" on UL policies. Of equal or perhaps even greater concern to me are the reappearing premiums we are likely to encounter on existing "AP" cases. I raised this issue with Paul Garavaglia and John Hodel during their recent visit so perhaps it is being addressed. But I had not heard anything and this article prompted me to think about it again.

As I'm sure you're aware, as a result of the change in dividend scale this year we had cases where eligibility quotes were done by our sales offices at year end 1992 which indicated policies were eligible. However, when they came into us in early 1993 after our electronic systems had been modified for the new scale, these cases became ineligible and could not be placed on AP. This change in dividend scale has undoubtedly impacted the eligibility status of many of the policies currently on AP. I'm sure it goes beyond those that were placed on AP last year but would have been declared ineligible this year. As I understand it, once a policy is placed on AP, there is no ongoing "eligibility testing."

In some cases, it may not surface for several years that the dividends have become inadequate to fund the policy premiums. The point I tried to make to John and Paul was that it would be a lot easier to explain this situation to our policyholders now than it might be in the future. In otherwords, the national economy and the dramatic decline in interest *(and earnings)* rates is very obvious. If we notify these policyholders now that they may well have a problem in the future, they should be able to recognize what is happening in our economy. If, on the other hand, we wait until their policies run out of dividend values, it might be at a time when the economy and interest rates are much higher. And it would be more difficult to explain and harder for the policyholder to accept.

We are currently dealing with many complaints where policies were sold on the basis that they would be eligible for AP in "X" years. "X" years is now here and, because of the dividend scale change, eligibility has been pushed into the future. In spite of the "disclaimer" on the illustration about dividend projections, the policyholders get pretty upset and want to claim "misrepresentation." But, we have found that if you can get them to calm down and "look around" at what has happened, they will usually accept it. This would not be the case if the changes that have taken place in the economy weren't so obvious.

CONFIDENTIAL

MP40107104?

NOTE: THE CURRENT PROBLEM IS ALSO COMPOUNDED BY THE WAY THESE POLICIES WERE SOLD. IN THE VAST MAJORITY OF CASES WE SEE, "AP" WAS SOLD AND EXPLAINED BY THE REPRESENTATIVE THAT THE POLICY WOULD BECOME "PAID-UP" IN "X" YEARS. WHILE THIS MAY HAVE BEEN THE EASIEST WAY TO EXPLAIN THE CONCEPT TO THE POLICYHOLDER, IT ONLY COMPLICATES OUR EXPLANATION OF CURRENT INELIGIBILITY. WE NEED TO PROVIDE POLICYHOLDERS WITH A BETTER UNDERSTANDING AND EXPLANATION OF "AP" AS WELL AS THE POTENTIAL IMPACT OF ECONOMIC CONDITIONS. WE WOULD BE MUCH BETTER OFF TO EXPLAIN THIS AT THE TIME THE POLICY IS PLACED ON "AP" THAN AT SOME POINT IN THE FUTURE WHEN DIVIDENDS BECOME INADEQUATE TO COVER PREMIUMS.

Tom, my recommendation would be to run new eligibility tests on all cases *currently on AP.* If they fail the eligibility testing or perhaps are even close to failing, we should notify those policyholders NOW that they may run into a problem in the future. I think our explanation will be much more readily accepted now. On the other hand, if any significant number of policyholders are so affected in the future, it could do great damage to our image of financial stability and all the great strides we have made in becoming a customer oriented Company. For cases where eligibility is inadequate or "close," we could recommend that the policyholder pay one *(or more)* additional year's premium.

I would also recommend a couple other steps. One, we may wish to consider "tightening" up our eligibility testing. I have heard that we may be going to have another change in dividend scale. If this occurs, we will have another whole block of policies that could potentially have the same problem.

In addition, I think some type of letter or a little brochure should be prepared and sent to policyholders when they place their policies on AP. It should explain the AP concept in plain english as well as where dividends come from and why they are impacted by the general economy. In doing so, this would help to reinforce the initial disclaimer on dividend projections.

We cannot afford to leave policyholders with the impression that AP is a *"done deal"* or that their policies are *"paid-up"* and no future premiums will ever be required unless we can be absolutely, positively sure of it *(assuming the policyholder leaves the dividend balance undisturbed)*. This is the impression many of them have because of the way the policies were sold or explained.

Tom, perhaps I'm crying "wolf" a little too soon, but from where I'm sitting and what I see, I think this could be a real problem unless we take some proactive measures to deal with it.

Jim

CONFIDENTIAL

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 7, 1992

cc Barbara Gardner

FROM: GILLETTE, MELVYN MSG#: 92-02747784
TO : BRANCH MANAGERS SENT: 11/05/92 01:51 PM PRIORITY: 2
SUBJ: ACCELERATED PAYMENT CASES

---

MELVYN GILLETTE - INSURANCE ADVISORY - WESTERN HEAD OFFICE
PHONE (510) 830-8172 FAX (510) 830-9796 ELECTRONIC MAIL ID = MLG

---

SOME REPRESENTATIVES ARE EXPERIENCING DIFFICULTIES EXPLAINING TO THEIR CLIENTS THE NEED FOR ADDITIONAL YEARS PREMIUM UNDER AN ACCELERATED PAYMENT PLAN CAUSED BY THE REDUCTION IN THE DIVIDEND SCALE IN THE 1992 SCALE. SOME MAY ASSUME THAT THIS IS AN ABERRATION THAT WILL NEVER HAPPEN AGAIN. THEY MAY HAVE MADE SUCH A STATEMENT TO THEIR CLIENTS. METROPOLITAN'S ACTION NEEDS TO BE EXPLAINED TO THE CLIENT IN THE CONTEXT OF WHAT IS HAPPENING IN THE NATIONAL ECONOMY. (DROP IN INTEREST, ETC.)

THE SEPTEMBER ISSUE OF "LIFE ASSOCIATION NEWS" HAS AN ARTICLE TITLED "REAPPEARING PREMIUMS, THE GHOSTS OF POLICIES PAST" WHICH I RECOMMEND TO THOSE REPS TO HELP EXPLAIN THE SITUATION TO THEIR CLIENTS.

THE SAME INFORMATION IS CAN BE USED WITH UNIVERSAL LIFE POLICIES WHERE THE DECREASE IN INTEREST BEING CREDITED TO THESE POLICIES HAS MADE IT NECESSARY TO PAY MORE YEARS OR INCREASE THE PREMIUM.

MELVYN

MDL 1091 CONFIDENTIAL

M109734760225

CONFIDENTIAL

M1647

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

Thomas LaBadia
Vice-President
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater – AREA 2-E

MP401070961

Re "Reappearing UL Premiums" - Accelerated Payment Cases

Tom, the article which follows appeared in the *National Underwriter* and it dealt with the idea of "reappearing premiums" on UL policies. Of equal or perhaps even greater concern to me are the reappearing premiums we are likely to encounter on existing "AP" cases. I raised this issue with Paul Garavaglia and John Hodel during their recent visit so perhaps it is being addressed. But I had not heard anything and this article prompted me to think about it again.

As I'm sure you're aware, as a result of the change in dividend scale this year we had cases where eligibility quotes were done by our sales offices at year end 1992 which indicated policies were eligible. However, when they came into us in early 1993 after our electronic systems had been modified for the new scale, these cases became ineligible and could not be placed on AP. This change in dividend scale has undoubtedly impacted the eligibility status of many of the policies currently on AP. I'm sure it goes beyond those that were placed on AP last year but would have been declared ineligible this year. As I understand it, once a policy is placed on AP, there is no ongoing "eligibility testing."

In some cases, it may not surface for several years that the dividends have become inadequate to fund the policy premiums. The point I tried to make to John and Paul was that it would be a lot easier to explain this situation to our policyholders now than it might be in the future. In otherwords, the national economy and the dramatic decline in interest *(and earnings)* rates is very obvious. If we notify these policyholders now that they may well have a problem in the future, they should be able to recognize what is happening in our economy. If, on the other hand, we wait until their policies run out of dividend values, it might be at a time when the economy and interest rates are much higher. And it would be more difficult to explain and harder for the policyholder to accept.

We are currently dealing with many complaints where policies were sold on the basis that they would be eligible for AP in "X" years. "X" years is now here and, because of the dividend scale change, eligibility has been pushed into the future. In spite of the "disclaimer" on the illustration about dividend projections, the policyholders get pretty upset and want to claim "misrepresentation." But, we have found that if you can get them to calm down and "look around" at what has happened, they will usually accept it. This would not be the case if the changes that have taken place in the economy weren't so obvious.

CONFIDENTIAL

MP4011070962

NOTE: THE CURRENT PROBLEM IS ALSO COMPOUNDED BY THE WAY THESE POLICIES WERE SOLD. IN THE VAST MAJORITY OF CASES WE SEE, "AP" WAS SOLD AND EXPLAINED BY THE REPRESENTATIVE THAT THE POLICY WOULD BECOME "PAID-UP" IN "X" YEARS. WHILE THIS MAY HAVE BEEN THE EASIEST WAY TO EXPLAIN THE CONCEPT TO THE POLICYHOLDER, IT ONLY COMPLICATES OUR EXPLANATION OF CURRENT INELIGIBILITY. WE NEED TO PROVIDE POLICYHOLDERS WITH A BETTER UNDERSTANDING AND EXPLANATION OF "AP" AS WELL AS THE POTENTIAL IMPACT OF ECONOMIC CONDITIONS. WE WOULD BE MUCH BETTER OFF TO EXPLAIN THIS AT THE TIME THE POLICY IS PLACED ON "AP" THAN AT SOME POINT IN THE FUTURE WHEN DIVIDENDS BECOME INADEQUATE TO COVER PREMIUMS.

Tom, my recommendation would be to run new eligibility tests on all cases *currently on AP.* If they fail the eligibility testing or perhaps are even close to failing, we should notify those policyholders NOW that they may run into a problem in the future. I think our explanation will be much more readily accepted now. On the other hand, if any significant number of policyholders are so affected in the future, it could do great damage to our image of financial stability and all the great strides we have made in becoming a customer oriented Company. For cases where eligibility is inadequate or "close," we could recommend that the policyholder pay one *(or more)* additional year's premium.

I would also recommend a couple other steps. One, we may wish to consider "tightening" up our eligibility testing. I have heard that we may be going to have another change in dividend scale. If this occurs, we will have another whole block of policies that could potentially have the same problem.

In addition, I think some type of letter or a little brochure should be prepared and sent to policyholders when they place their policies on AP. It should explain the AP concept in plain english as well as where dividends come from and why they are impacted by the general economy. In doing so, this would help to reinforce the initial disclaimer on dividend projections.

We cannot afford to leave policyholders with the impression that AP is a *"done deal"* or that their policies are *"paid-up"* and no future premiums will ever be required unless we can be absolutely, positively sure of it *(assuming the policyholder leaves the dividend balance undisturbed).* This is the impression many of them have because of the way the policies were sold or explained.

Tom, perhaps I'm crying "wolf" a little too soon, but from where I'm sitting and what I see, I think this could be a real problem unless we take some proactive measures to deal with it.

Jim

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

CONFIDENTIAL

November 7, 1992

cc Barbara Gardner

MP4011071038

Tom LaBadia
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater
AREA 2-E

Re Referrals to "AP" as Paid-Up

Tom, as you know, in my previous correspondence concerning *Accelerated Payment*, I indicated that our Account Representatives usually referred to the policy as being *"paid-up"* once the AP took over. I think the attached may help to support this statement. Just over the course of a few days, I ran into several complaints in which the policy was referred to as being paid-up.

I am also attaching a couple other ones relating to the dividend scale change and the change in AP eligibility dates. These give a little flavor as to the sensitivity of this issue with some policyholders.

It should be recognized that these are only the ***complaint*** cases. We receive many other ***non-complaint*** phone calls where the policy was referred to as being *paid-up* under this arrangement but no formal complaint was involved.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 7, 1992

cc Barbara Gardner

CONFIDENTIAL

Frank Lynch
Senior Vice-President
P.I. Customer Service

MP401071016

Re Customer Complaint - Changing Dividend Scale

Frank, I have been trying to make this point for a long time, particularly as it applies to the impact on *Accelerated Payment* and its effect on eligibility dates and what we are going to encounter when our policyholders are confronted with their *"collapse dates."*

I thought you might find this first hand feedback from one of our policyholders to be of interest, particularly as it relates to his comparison of MetLife with other companies. We should be doing a much better job of informing and educating our customers. Our anniversary statements should be revised to provide complete information including cash values. In doing so, we could easily "promote" the positive aspects and benefits of their contract.

For those policies currently on AP with values which are deemed inadequate to cover all future premiums, it's my understanding that we really don't even plan to write them a letter to explain it. The *collapse date* is just going to appear on their statement. We continue to get complaints every day because we are not informing policyholders about the dividend situation and the fact that their "AP" date is now off into the future. Just wait until those who are on "AP" find out their policy will not be continued as "paid up" as they were led to believe. As I understand it, 25% of the cases on AP do not have sufficient values to carry them to the end of the premium paying period.

Had we informed them a year or two ago and really tried to explain things, it would have been very easy to point to the economy as the reason for the changing the dividend scales and its impact on AP eligibility. As it is now, interest rates are climbing and people will not relate as well to the economic situation. And, worse than that, many will blame the situation on all our recent troubles and the fines we have had to pay, in spite of our protestations that it will not affect dividends.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

September 29, 1994

cc Barbara Gardner

CONFIDENTIAL

MP4011007 8

Bill Barnewold
Sr. Business Systems Consultant
Traditional Portfolio & Dividends
Personal Insurance
Bridgewater - AREA 3E-2

Re Field Announcement for AP Anniversary Statements

Bill, I have reviewed the proposed *Field Announcement* and *Anniversary Statements*. I would just like to go on record one last time saying that I think the Company is making a serious mistake. Using only the *Anniversary Statements* to notify those policyholders who are currently on AP that their dividends are now insufficient to maintain the policy is going to create confusion and has the potential to create a backlash of complaints and ill will unlike anything to date.

The vast majority of policyholders who are currently on the AP arrangement believe that no further premiums will be due on their policies. Many of these policies have been represented to the customers as having been *"paid up."* Consequently, they will be confused by the rather terse statement that *"Your dividends will pay the premiums until ____"* and the balance of the text. I would be. In spite of our statement that *"dividends are not guaranteed,"* these customers will not automatically understand how *or why* their policy has been affected. And, in the absence of any meaningful explanation, many are likely to become outraged once they realize that more premiums may become due at some point in the future.

For the life of me I do not understand why all these people couldn't have been sent a letter that explains the impact of the economy on the dividends and its corresponding impact on AP. We are going to great lengths to make certain our "new" AP customers understand the arrangement. Why shouldn't we do the same with these? Many would still be upset, but that number would most likely be much smaller than what we're going to encounter now. Again, I stand by my perception that we are not fully considering our actions from the CUSTOMER'S perspective. And, in light of everything else that has transpired, I can't believe the Company would want to risk handling such a sensitive issue in such a cavalier manner.

If anyone believes that the majority of our Field Representatives will actually approach these customers and explain it, they're living in a dream world. Many of the writing reps are long gone and the others have no vested interest in communicating this kind of *bad news* to the customer.

The *Anniversary Statements* included in the proposal don't make any reference to the 800 number. I assume the 800+MET-5000 number is now on them so perhaps we can salvage a few when they call. But, I hope everyone is truly prepared for the consequences of handling these AP cases in this manner.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 3, 1995

cc: LaBadia, Gardner & Schoos

CONFIDENTIAL

FAGER

Barbara Gardner, ACS
Vice President
MetLife Customer Service Center - Tulsa

Re AP - Accelerated Payment arrangement

Barbara, in the fall of 1993, an AP NWT was established to address the growing concerns associated with the AP arrangement. Even at that time, there was clear recognition that immediate attention must be given to educating our policyholders about AP.

Since many of these policyholders believe that their policy is *paid-up* or at the very least that *no further premiums will ever be due*, it was the goal of the AP NWT to initiate an educational program. This program included: a *Welcome* letter that would be sent out on every policy placed on AP and any policy changes that affected the AP arrangement would generate a letter to the policyholder. In addition, the billing documents and anniversary statements would contain information about the projected *collapse date* for the AP arrangement.

Even with all these efforts, I have a concern that we are not doing enough nor are we doing it fast enough. For example, an AP Consumer Brochure was developed to provide information about the AP arrangement and how it works. The original intent of this brochure was to send it to all new AP policyholders along with the AP *Welcome* letter. However, I have recently learned that it is only going to be given to our field associates. While I agree that this brochure should be available to the field, it should also accompany the AP *Welcome* letter. We can't continue to always rely on our field associates to communicate policy provisions to our policyholders. We have to start ensuring that all affected policyholders are notified in a uniform and informed manner.

Also, in the next couple of weeks, the billing documents to carry the AP *collapse date*. Our policyholders will not understand. Attached is a copy of a memo from Jim Rayl stating his concerns about how we are communicating this information. <u>I am in complete agreement.</u> A short statement on a billing document is not enough. We need to be providing a complete explanation about the AP problems <u>before</u> we place any information on the billing documents.

In today's environment, if we are not careful how and what we communicate, the situation will become explosive. To further illustrate that this is not a problem to be taken lightly, I am attaching an article from the December issue of Best's Review on this very subject. If we are going to provide *World Class Customer Service*, we have to do a better job of informing our policyholders.

Darlene West

Darlene West, ACS
Manager
Cash/Loan/Dividend/Maturities
MetLife Customer Service Center - Tulsa

January 11, 1995

MDL 1091 CONFIDENTIAL

M069702251058

"Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct."



FAGER

# Calling the BOMB SQUAD

*by Sean Armstrong*

MDL 1091

*"Hi, Bob. Do you remember that life insurance policy I sold you in 1984? Yeah, back when Bobby Jr. was in little league. Anyway, you know how I said you'd be able to stop paying premiums in 10 years. Well, it's going to be a little longer than that. Ah—actually, quite a bit longer. Could be as much as 10 years. Oh, by the way, did Bobby's baseball scholarship come through?"*

M069702251059

Notes. "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.



It's a financial adviser's nightmare: You felt comfortable projecting a 10-year vanish on your client's whole life policy when you sold it. It all made sense. You'd heard the mantra a hundred times. "This company has not lowered its dividends in 50 years." Well, times have changed drastically, and if you're an agent or a company executive and you have clients who bought life insurance thinking their premiums were going to go away, you may be sitting on a time bomb.

Forget about NAIC regulations and "plain English" illustrations. The real problem is potentially more damaging. Although one company is going to spend $10 million to contact policyholders throughout the country, the industry has failed to alert thousands of other customers who can't hear the time bomb ticking. It's impossible to tell how many cases there are, but the wide popularity of the vanishing premium concept in the mid-to late-1980s, coupled with the fact that the typical vanish period was between seven and 10 years, paints a disturbing picture. Today, that same premium is unlikely to "vanish" before the 12th and, sometimes, the 18th year or longer.

Unfortunately, what began as a simple and understandable concept in the marketing department of now-defunct Executive Life Insurance Co., Los Angeles, mutated in the heat of competition. Then technology set the monster loose. Able to generate illustrations from their personal computers, agents caught ledger fever. What started as agent abuse became part of built-in policy mechanics. It got to the point where agents could be misleading even if they were going by the book. "I don't think companies paid much attention to this as a big lie," says Roger Heath, a principal at Towers Perrin's insurance general management consulting practice, Dallas.

The high inflation of the 1970s began to ebb toward the end of the decade. Interest rates peaked in 1982 and began declining steadily. Because of a lag effect on company investment returns, it took agents and companies several years to digest the fact that rates would no longer continue their steady uphill climb. "We were all kind of in a period of blissful unawareness," says Richard Weber, chairman of the American Society of CLU & ChFC's life insurance illustration questionnaire task force. "And everyone's shocked when, in 1987, Northwestern Mutual lowers its dividend scale. In 1988, a few more companies lowered their dividends. Everyone was in shock."

As with other interest-sensitive products, a small adjustment in an interest rate will amplify over time, resulting in an enormous difference between reality and expectations. It's the derivatives debacle on a personal scale. But many agents reacted to the news by ignoring the problem, according to Weber. Many, according to Heath, simply went on plugging the same high interest rates into their illustrations.

When they began to get a grasp of the problem, agents were confused and anxious. "I think that troubled a lot of us. The idea of going back to clients and having to say 'remember that illustration we looked at? Well it didn't work out,'" says Weber. Ideally, agents would have clearly explained that an illustration was not a guarantee. However, perhaps out of ignorance, or to keep the sales pitch simple, agents misled their clients. "Now we've got to go back and say those things," says Weber, "and it's embarrassing, and we're concerned about getting blamed and concerned about letting down clients."

Thomas Wolfe, a well known agent and author echoed these concerns in a speech delivered at the American Society of CLU & ChFC's annual meeting in October. He said there is a huge amount of life insurance, sold using the vanishing premium concept, that's just waiting to blow up. Companies most at risk are those that aggressively pushed the vanishing premium concept in their sales efforts. Wolfe says agents lack support from carriers in the effort to contact unwitting policyholders. Many carriers have directed their agents to conduct in-force reviews, but most have not made it mandatory.

Weber says the only company that's developed a program to that effect is Manulife Financial of Toronto. According to John Barr, in-force management director, Manulife plans to have its agents and representatives visit each of its 35,000 policyholders in the United States by December 1995. The goal of the project, with an estimated price tag of $10 million, is to explain the effect of lower interest rates on each customer's policy. "We know the majority of the policies were sold on a vanish basis," Barr says. "In most cases, we do have some original illustrations on them. We plan to take them and go from there."

Even at Manulife, the effort is just beginning. "There's a lot of business out there where the client hasn't been contacted yet," says Weber. Delivering the news is not going to be easy. Agents have to prepare themselves psychologically for a hostile situation. "There is going to be anger," he says. But the reality is: If agents or company representatives don't make the call—no matter how ugly the conversation may turn out to be—they may soon be hearing from angry customers. Or worse yet, their lawyers.



Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

M069702251060

Attorney Thomas Tew of Tew & García-Pedrosa, who masterminded a massive lawsuit against Metropolitan Life Insurance Co., New York, and its agents, costing the company more than $20 million in fines, says the environment has changed. A recent case illustrates the threat. In October, an Alabama state judge upheld a jury award of $25.4 million against Prudential from a couple who claimed they were defrauded by the company and one of its former agents. In the suit, the plaintiffs, Leslie and Rebecca Gallant of Eufala, alleged that agent Charlie Whatley told them their policy would be paid up in 10 years. They later found out that payments would be due for the rest of their lives. After the MetLife case, Tew says he's been getting a lot of phone calls, the majority of which are from companies seeking to insulate themselves from similar lawsuits.

When companies turn to their nemesis for advice, it's a good indication they're scared. Of course, all company approved illustrations include footnotes explaining that they are based on many non-guaranteed performance variables and that, technically, a premium will be due as long as the policyholder lives. "The courts are not looking so much to the contract," says Weber. "They're saying, 'What was the substance of what was communicated to this client, not only in the contract but in the illustration.'"

Because of the agents' autonomy in the sales process, companies have no way of knowing how the product was presented. The safest sales pitch would point out that illustrations are not predictions of future performance, Weber says. Rather they are meant to show a policyholder how his pattern of premium payments and the carrier's future experience might interact. Weber demonstrates the dangerous approach: "There are eight premiums here and don't worry about all that footnote stuff. This company has never decreased its dividend scale. I can tell you, what's in my illustration is conservative. It's not aggressive." In response to the dangerous example, Weber says, "I think you've got yourself a lawsuit there."

Despite the growing risk of legal action, the typical insurance company, according to Heath, is not giving this problem the attention it should. Now that time has elapsed, Heath says he's starting to see big lawsuits like the one in Alabama. He says he gets one or two calls a month from consumer plaintiffs looking for advice. He also gets one or two calls a month from insurance companies asking for litigation support.

*ALERTING POLICYHOLDERS*

Some companies still don't know there's a problem, according to Heath. Customers are unaware that if they have stopped paying premiums in accordance with the illustrated plan, the policy may be headed toward a lapse. It's a slow process that won't show up on in-force statements. They may not know there's a problem until they get a termination notice in the mail. A lot depends on how a company's service department works, according to Heath. But the situation may be out of control. "Insurance companies have let attorneys who are rabble rousing create expectations for large punitive damages," he says.

According to Tew, there has been no major change in the underlying liability inherent in illustrations. What's changed, he says, is an awareness among policyholders that certain illustrations may be suspect and that they may have been exploited by an unscrupulous agent. "There is a growing consumer awareness that they ought to be a little more skeptical," he says. "The premium isn't vanishing. The policy is cannibalizing itself."

Tew says new attention to compliance within companies and the government is being driven by lawsuits. "Do you think we would have this reform if there weren't lawsuits like this? I don't think so." He foresees more cases like the Gallants'. He says companies are handicapped by tension between management and company marketing departments. "No one wants to tell marketing the bad news," he says. And it is bad news for salespeople. As in MetLife's case, a sweeping overhaul of compliance procedures and sales practices can severely curtail sales. Tew says sometimes the only person who can deliver that news is an outsider.

Policyholders are equally in the dark. The annual statement they get from their insurance companies showing cash values and dividends doesn't tell policyholders what they need to know. Many people who bought insurance in the mid-80s with the expectation that they would pay eight or 10 premiums have no way of knowing that number has probably gone up to between 12 and 18 premium payments, according to Weber. "The customer gets the premium notice, and they say, 'Wait a minute, I wasn't supposed to pay this,' and they call the company and they call the agent," says Weber. "And, of course, the company has no idea what the custom-



*Richard Weber, chairman of the American Society's illustration task force, predicts growing problems with vanishing premiums that don't go away.*

M0697022251061

er is talking about." Weber cites one case where a customer found out he would have to pay 32 annual premiums, when the illustrated projection was nine. The problem, warns Weber, is huge. "There isn't a single illustration that was based on current assumptions in 1985 through 1989 that is going to come true."

Not sure who's to blame, companies haven't decided whether they or their agents should be breaking the bad news. In many cases, they realize that they need the agents' cooperation. Agents have information the carrier doesn't. They know how the sales pitch was made. "So I think there's a turf disagreement as to who should be doing what," says Weber. Agents claim they are not getting enough support from the companies. But the carriers might not think they're getting the cooperation they need from agents. Or the information may simply not be there: With agents leaving the business all the time, there are a lot of orphan policyholders who may not know their coverage is about to vanish.

CREATING POSITIVE SPIN

There is a way to put a positive spin on this difficult situation. Weber cites one agent who handled it this way: "Five years ago," he said to the client, "we identified the estate liquidity need, and you were delighted to be able to solve that problem for 20 cents on the dollar. There was no other product or investment you could make that could solve your problem so inexpensively. Now I'm coming back to you today, and it's going to cost you 30 cents on the dollar. It's still a good deal. There still isn't anything that comes close to doing what you need it to do when you need to do it for as low a price, even though that price tag has gone up substantially."

Beyond dumping more money into the contract, reactivating a vanished premium or reducing face amounts, Manulife policyholders may opt for underwriting-free conversions to certain term or variable life products. Of course, conversion to term involves using the cash value in a permanent policy to pay premiums for a non-permanent one. With the variable option, policyholders—by taking on the policy's investment risk—may be able to achieve the originally projected performance.

Weber has conducted focus groups with dozens of policyholders who owned substantial amounts of life insurance. In a mock-up of a communication to policyholders, researchers explained that the amount of premiums they had expected to pay was now going to increase substantially. "The reactions we got from them," he says, "were a valuable learning experience. The first lesson: A customer is never happy about bad news. But they are much more accepting of it when it comes from the person who sold them the policy." The other extreme, according to Weber, is that they are angriest when bad news comes from an impersonal letter from some president whose name is scrawled by a machine on the bottom of the page. "That was important for us because we were about to do a mail campaign, and what that told us was no, it's got to be face-to-face contact," he says.

> *"There isn't a single illustration that was based on current assumptions in 1985 through 1989 that is going to come true."*

The other lesson was that customers want to hear the bad news as soon as the agent knows it. And they want to know specifically how it affects them. The agent has to go to the client, explain the impact and then help the client determine whether the original needs still exist. There is a reason why that may not still exist: That client may have bought a lot of insurance with the anticipation of a lot of inflation, which would increase the value of their estate along with their future tax liability. "Inflation didn't continue, it's not there. Maybe they don't need so much insurance any longer," says Weber. Perhaps that client's solution is to reduce the number of premium payments to their original number by decreasing the death benefit. "This may not be appropriate for everyone, but we certainly have seen it," says Weber.

The end result, according to Weber, is a new way of looking at life insurance. Trying to teach agents and brokers that a life insurance policy is simply another asset that has to be managed. When I came into the business in 1967, it was still true that when you bought life insurance, you bought it, you signed the paperwork and you put it in a safe place, and you never looked at it again. You can't do that anymore. Too much has happened in the last 15 years. Agents vanish, companies vanish, the premium does not vanish." ■


THE BEST MAILING LISTS FOR THE INSURANCE AND FINANCIAL SERVICE INDUSTRIES

LISTS FOR RECRUITING

LICENSED INSURANCE AGENTS AND FINANCIAL PLANNERS

| | | | |
|---|---|---|---|
| Life & Disability Agents | 1,083,492 | Life Insurance Agencies | 236,877 |
| Fire & Casualty Agents | 448,883 | Property & Casualty Agencies | 271,742 |
| Financial Planners, CLU's, MDRT's | 87,795 | Insurance Company Home Offices | 3,854 |

Send For Free Brochure Showing Breakdowns By Sectional Centers

LISTS FOR PROSPECTING

Age & Income
New Move-Ins
Real Estate Agents
Accountants, Bankers
Investors
Homeowners
Working Women
Doctors, Lawyers
Postal Workers
Affluent Americans
Top Executives
Senior Citizens
Military Retirees
Opportunity Seekers
Small Business Owners
School Children
Stockbrokers
Nurses, Teachers

Call Us For All Your List Needs — If the List Exists, We Can Get It for You

GEORGE STERNE AGENCY
254 E. Grand Ave.
Escondido, CA 92025
Phone 800/772-8174
619/432-6913
Fax 619/432-9570


Notice. "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 [illegible] States Dist. Ct.



M069702251062