

1

1     IN THE UNITED STATES DISTRICT COURT FOR THE
      NORTHERN DISTRICT OF OKLAHOMA

2

3  JAMES L. RAYL,          )
                           )
4          Plaintiff,      )
                           )
5       vs.                ) No. 97-CV-505 H(M)
                           )
6  METROPOLITAN LIFE       )
   INSURANCE CO., INC.,    )
7                          )
           Defendant.      )

8
9
10
11       VIDEO DEPOSITION OF JAMES L. RAYL,
12   taken on behalf of the defendant, pursuant to
13   notice and agreement as to time and place and the
14   Federal Rules of Civil Procedure, on Wednesday,
15   February 25, 1998, at the law offices of
16   Strecker & Associates, 1600 NationsBank Center,
17   15 W. Sixth Street, Tulsa Oklahoma, before me,
18   Maynard E. Peterson, RPR, RMR, Certified Shorthand
19   Reporter within and for the State of Oklahoma.
20
21
22
23                                        **CONFIDENTIAL**
24
25

          ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

2

1        A p p e a r a n c e s:
2
3  For the Plaintiff:
4        J. BRIAN RAYL, Esquire
         Parker, Staggs & Associates, P.C.
5        Southern Ridge
         6506 South Lewis, Suite 220
6        Tulsa, OK 74136
7
8  For the Defendant:
9        J. STEPHEN POOR, Esquire
         Seyfarth, Shaw, Fairweather & Geraldson
10        55 East Monroe Street
         Chicago, ILL 60603
11           and
         KEVIN S. FINNEGAN
12        Assistant General Counsel
         MetLife
13        One Madison Avenue
         New York, NY 10010-3690
14
15
16
17
18
19
20
21
22
23
24
25

        ESQUIRE CORPORATE SERVICES

13
14
15
16
17
18
19      MR. POOR: This is a discovery deposition
20  taken in the case of James L. Rayl vs. Metropolitan
21  Life Insurance Company, currently pending in the
22  United States District Court for the Northern
23  District of Oklahoma, taken pursuant to the Federal
24  Rules of Civil Procedure, notice and agreement of
25  the parties as to time and place.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

6

1          JAMES L. RAYL,
2  being produced, sworn and examined on behalf of the
3  defendant, deposeth and saith as follows:
4          DIRECT EXAMINATION
5  BY MR. POOR:
6      Q.  Good morning, Mr. Rayl.
7      A.  Good morning.
8      Q.  Okay. Would you please state your name,
9  sir, spell your last name for the record.
10     A.  James Lee Rayl, R-a-y-l.
11     Q.  And you are the plaintiff in this case,
12  correct, Mr. Rayl?
13     A.  Yes.
14     Q.  Have you ever been deposed before, sir?
15     A.  No.
16     Q.  Have you ever testified in any type of
17  formal court or administrative proceeding?
18     A.  No.
19     Q.  Take just a moment, let me just take a
20  moment, Mr. Rayl, and describe to you the ground
21  rules that I have --
22     A.  Okay.
23     Q.  -- for a deposition. I am sure you have
24  been briefed on what to expect. But a deposition
25  is my opportunity to ask you questions about your

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

7

1  background, continue with MetLife, the facts and
2  allegations that you have surrounding the Complaint
3  that you filed against MetLife.
4      A.  (Affirmative head nod).
5      Q.  It is not my intention to be confusing or
6  tricky or misleading or in any way to attempt to
7  deceive you, but if for any reason you don't
8  understand any question I ask, don't hear it, or
9  are confused by it or for any reason want me to
10  repeat the question, rephrase it, if you will tell
11  me, I will be happy to do so.
12     A.  Good.
13     Q.  Okay?
14     A.  (Affirmative head nod).
15     Q.  If you answer the question, I am going to
16  work on the assumption that you have heard it and
17  understood it and are answering the question that
18  is being asked. Fair enough?
19     A.  Fair.
20     Q.  From time to time witnesses will tend to
21  give nonverbal answers, shakes of heads or
22  perhaps --
23     A.  Yes.
24     Q.  -- an "uh-huh," I will correct you. It is
25  not meant to be in any way offensive to you, but

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

1  simply the court reporter needs --
2      A.  I understand.
3      Q.  -- to have a verbal answer.
4          And the way this process works, Mr. Rayl,
5  it is also useful if you allow me to finish my
6  question and then you give the answer.  It is very
7  difficult for the court reporter to report two
8  people talking at the same time.
9      A.  Okay.
10     Q.  Okay?  It's an informal process, if you
11 need a break, want to confer with your attorney,
12 you should feel free to do so.  I will ask if there
13 is a pending question to answer the question before
14 we take a break, but --
15     A.  Okay.
16     Q.  -- at any time.
17     A.  (Affirmative head nod).
18     Q.  Okay?
19     A.  Sure.
20     Q.  Are you on any medication today, sir?
21     A.  Yes.
22     Q.  What medication is that?
23     A.  I take Zestril 5 milligrams once a day,
24 Mevacor 40 milligrams once a day and Lopressor 50
25 milligrams twice a day.

           ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        9

1      Q.  What is Zestril prescribed for?
2      A.  It has to do with my heart condition, but
3  I can't really tell you exactly.  I was on a number
4  of drugs before my last surgery and they have
5  reduced the regimen to this, and they are different
6  drugs.
7      Q.  All designed for your heart condition?
8      A.  The Mevacor is for cholesterol; the other
9  two are for my heart.
10     Q.  Do these drugs, at least, to your
11 knowledge, in any way interfere with your ability
12 to hear and understand a question and --
13     A.  No, they do not.
14     Q.  Do they in any way interfere with your
15 recollection or your ability to answer questions?
16     A.  No, they do not.
17     Q.  Other than conferences with your attorney,
18 have you spoken with or done anything to prepare
19 for the deposition today?
20     A.  No.
21     Q.  And I am excluding any conversations or
22 things you have seen with him today.
23     A.  No, I have not.
24     Q.  Other than documents you may have reviewed
25 with your counsel or shown to you by counsel, have

           ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        10

1  you looked at any documents to prepare for today?
2      A.  The documents that we forwarded as part of
3  the document production, I did review.
4      Q.  Okay.  What is your address, sir?
5      A.  1824 South Gardenia Avenue, and that's
6  G-a-r-d-e-n-i-a, Broken Arrow, Oklahoma 74012.
7      Q.  Is that a private home or --
8      A.  Yes.
9      Q.  -- an apartment?
10     A.  A private home.
11     Q.  Did you own or rent the home?
12     A.  I own.

**CONFIDENTIAL**

1    A.  Continuing education, specialized
2  management courses, things like that.
3    Q.  Some of them have even been offered
4  through MetLife or reimbursed by MetLife?
5    A.  Yes.
6    Q.  You first went to work for MetLife in
7  1962?
8    A.  Yes, April 9th.
9    Q.  Prior to going to work for MetLife, what
10  kind of employment history did you have?
11    A.  When I graduated from high school, I
12  worked at a department store just as a retail clerk
13  in Ohio. I left there to move to Washington, D.C.,
14  where I lived with my brother. And I was employed
15  by Columbia Federal Savings & Loan as a teller
16  prior to joining MetLife.
17    Q.  What job did you first hold with MetLife?
18    A.  I was what was classified as a field
19  auditor.
20    Q.  You stayed in the field of auditing area
21  for a number of years, correct?
22    A.  About ten years, yes.
23    Q.  Ten. Until the early Seventies?
24    A.  Until I came to Tulsa in January of 1973.
25    Q.  During the period you were in field

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

14

1  auditing, where were you located?
2    A.  I was originally working out of
3  Washington, D.C., probably for four or five years;
4  I don't remember exactly. Then I was relocated to
5  Cleveland, Ohio, and I worked out of Cleveland: I
6  traveled a lot and -- prior to coming to Tulsa.
7    Q.  What did you do generally in the field of
8  auditing area?
9    A.  The job started out as auditing individual
10  sales representatives of the company. I ultimately
11  moved on to what was called a regional or a
12  supervisor at that time, where I supervised the
13  full auditing of our sales offices.
14    Q.  What did that auditing consist of? When
15  you say "auditing of sales offices," what is that?
16    A.  Primarily, at that time -- the job has
17  changed over the years, but primarily at that time
18  it was -- instead of auditing or being responsible
19  for an individual representative, I had to go in
20  and review the accounts of all the representatives
21  in the office. And it was primarily to determine
22  whether or not they were taking funds from the
23  company. You occasionally got into other
24  irregularities, but it was primarily monetary
25  auditing.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

15

1    Q.  When you moved to Tulsa in January of
2  1973, what did you move to Tulsa to do?
3    A.  I was manager of what was called cash
4  control and accounting at that time. It was
5  primarily the check-writing operation.
6    Q.  Let's just briefly run through your career
7  with Met, and get it in some chunks of time here
8  and then we can come back and go over it.
9    A.  Okay.
10    Q.  You stayed in that function about how
11  long?
12    A.  I would almost -- I am somewhat poor at

**CONFIDENTIAL**

)11069551

MP4011069552

13  remembering those things, it is spelled out in my
14  application, which you have that document.
15  Q.  I won't hold you to the dates, --
16  A.  Okay.
17  Q.  -- just give us a general --
18  A.  The cash control and accounting division,
19  when it started, had about 11 people.  It then
20  assumed responsibility for transferring our premium
21  payments from our sales offices, where the
22  processing of premium payments from our sales
23  offices to our service center, where it grew to
24  approximately a hundred-plus employees, probably
25  about four years.  So that would put it somewhere

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

16

1  around '77, I guess, I was promoted to a position
2  of divisional manager, which meant I had the
3  responsibility for other managers in the building.
4  I was, in essence, reported directly to the vice
5  president and held that job, oh, probably three or
6  four years, I'm not sure exactly, until the
7  position was eliminated, at which time I accepted a
8  demotion and became manager of the Human Resources
9  operation.
10         While in Human Resources, I had
11  responsibility and some of this overlapped, I can't
12  give you the exact times, I had responsibility for
13  the financial control area, which was all the
14  budget and expense activity for the service center
15  as well as the field operations.
16         I also was responsible for managing our
17  personal health insurance and employee benefit plan
18  division for part of that time.
19         Then -- and I should -- it is probably
20  relevant to go back and say that at one point while
21  I was divisional manager, working directly with the
22  senior vice president as, in essence, a project
23  assignment, we initiated MetLife's first call
24  center operation.
25  Q.  We will come back to that.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

17

1  A.  Okay, that's fine.
2  Q.  I am really just interested --
3  A.  Okay.
4  Q.  -- in the chain of job titles.
5  A.  Okay.
6  Q.  Then we can come back and cover --
7  A.  Fine.
8  Q.  -- the evolution of those jobs and what
9  you did in far more detail.
10  A.  Okay.
11  Q.  I am just trying to get the skeleton, --
12  A.  Sure.
13  Q.  -- we can come back and put the skin on
14  it.
15  A.  In 1986, I was asked by senior vice
16  president Frank Lynch to go back and -- or, in
17  essence, assume managerial responsibility for the
18  Teleservicing operation for individual business.
19  There were some other reorganization-type things
20  going on, and I held that position until August
21  22nd of 1996.
22  Q.  And you are currently employed by MetLife,
23  correct?
24  A.  Yes.
25  Q.  What is your current job title?

ESQUIRE CORPORATE SERVICES

1    A.  Director of Planning, Development &
2  In-Force Management.
3    Q.  And you have been employed consistently by
4  MetLife from 1962 up to today?
5    A.  Yes.  Other than the period when I did not
6  have a formal position.
7    Q.  But you continued on the payroll —
8    A.  Yes.
9    Q.  — and then you get paid?
10    A.  Yes.
11    Q.  You have not worked for any other
12  companies during this —
13    A.  No.
14    Q.  — 1962 to the present?
15    A.  Right.
16    Q.  All right.  When you moved to Tulsa in
17  January of 1973, you became manager of cash control
18  and accounting?
19    A.  (Affirmative head nod).
20        MR. POOR:  Why don't we take a short
21  break.
22        THE WITNESS:  Sure.
23        (Brief recess.)
24        MR. POOR:  Would you please read back my
25  question.

1    (The last question and answer were read by the
2  reporter.)
3    Q.  (BY MR. POOR)  The answer is "yes."
4  Okay.  And you held that position until you became
5  divisional manager?
6    A.  Yes.
7    Q.  What did you do as manager of cash control
8  and accounting?  Let's start at the beginning
9  before the processing of premium payments was
10  transferred in.
11    A.  The initial position when I came out here
12  was a very small unit.  It was responsible for
13  writing and controlling all the disbursement and
14  checks for policy transactions, such as cash
15  surrenders, loans, dividend withdrawals, death
16  claims.
17    Q.  So this function was the function that
18  actually got a piece of paper to the policyholder,
19  the check to the policyholder?
20    A.  The check, yes.
21    Q.  Was there any other similar function of
22  that elsewhere in MetLife or is this where that —
23  is it centralized in Tulsa?
24    A.  No.  When we came out here in '73, it was
25  a part of a company's decentralization program, and

1  there were a number of similar offices all assigned
2  a specific geographic part of the country.  And we
3  did it for that geographic part of the country.
4    Q.  For the region covered by Tulsa at that
5  time?
6    A.  Yes.
7    Q.  During this period when you were manager
8  of cash control and accounting, as you have already
9  told me, there came a time when the processing of
10  premium payments function was transferred into your
11  unit —
12    A.  Yes.

CONFIDENTIAL

13    Q.   – or moved into your unit?
14    A.   Yes.
15    Q.   What was that function?
16    A.   Basically, prior to that function, our
17   premium payment or the policyholders mailed premium
18   payments to their local sales office, and we had
19   somewhere around I think probably 1200 sales
20   offices, and it was centralized in each of the
21   service center locations.
22        So that payment processing function with
23   the checks and the deposits and all of that was
24   moved into the service center and that's what I had
25   responsibility for, the transition and then the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

21

1   ongoing management.
2    Q.   Were there other service centers around
3   the country doing similar kinds of functions?
4    A.   Yes.
5    Q.   This is another responsibility you had for
6   the Tulsa region? Was this also a regional based,
7   geographic based?
8    A.   At that time they were referred to as
9   "territories," but yes.
10    Q.   You held that position until you were
11   promoted to the divisional manager position?
12    A.   Yes.
13    Q.   What functions did you supervise as
14   divisional manager?
15    A.   It's a little bit hard to describe. I
16   reported directly to what was then known as the
17   operations vice president, and I did various and
18   sundry project management types of things at
19   various times, specific divisions and those
20   managers reported to me. But it was – and also at
21   that time I did specific projects and handled
22   things for our officer in charge. It was just a
23   general support management function.
24    Q.   The operations VP, let's start from the
25   initiation of your -- you moved into that

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

22

1   position --
2    A.   Yes.
3    Q.   – and reported to whom?
4    A.   Will Hartshorn.
5    Q.   Did you have any direct reports to you?
6    A.   At various times, I did, yes.
7    Q.   At the beginning?
8    A.   Throughout – throughout – to be honest,
9   I just really don't remember a lot of it, other
10   than the fact that at various times I would be
11   asked to look over specific functions and have them
12   report to me.
13        I had the Human Resources reporting to
14   me. I had other divisions reporting to me off and
15   on, depending upon what the need; in other words,
16   where there was a need for closer direct
17   supervision or management of the operation or of
18   that particular function or activity, then I was
19   generally the one that was assigned that task.
20    Q.   You then moved into the manager of Human
21   Resources position about 1983?
22    A.   Yes. It is somewhere in that
23   neighborhood; I would have to --
24    Q.   And that was a result of the elimination
25   of the divisional manager position, correct?

ESQUIRE CORPORATE SERVICES

MP4011069554

911069555

23

1    A.  Yes.
2    Q.  How were you informed that the divisional
3    manager position was being eliminated?
4    A.  I don't recall specifically, it was after
5    a period of disability with my first surgery that I
6    actually came back to work and found out that my
7    official position title had changed to manager of
8    special projects or something like that.
9    Q.  And then from there you transitioned to
10   manager of Human Resources?
11   A.  Yes.
12   Q.  Did you become aware that the divisional
13   manager layer was eliminated throughout MetLife?
14   A.  Yes.
15   Q.  You indicated that shortly before this you
16   had been out on a period of disability.
17   A.  Yes.
18   Q.  For what condition?
19   A.  Triple bypass.
20   Q.  This was your first triple bypass?
21   A.  Yes.
22   Q.  When did you have that surgery?
23   A.  I think it was October 1982, but I would
24   really have to confirm that with the medical –
25   Q.  That's all right.
        ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

24

1    A.  I mean it is documented in some of that
2    stuff you have got.
3    Q.  And then you were out for a period of
4    disability recuperating from the surgery, –
5    A.  Yes.
6    Q.  – the bypass?
7    A.  (Affirmative head nod).
8    Q.  When you became manager of the Human
9    Resources function, to whom did you report?
10   A.  There was a new operations officer brought
11   in, Mr. Hartshorn had been assigned a different
12   level of responsibility, and it was Dennis
13   McAuliffe.
14   Q.  Let me understand the organization of the
15   Tulsa facility now.  At that point in time, at the
16   point in time that you were the manager of Human
17   Resources, you reported to Mr. McAuliffe, who held
18   what position?
19   A.  I do not know what the official title was,
20   but, in essence, he took over responsibility for
21   all the then existing operations with the exclusion
22   of the Teleservicing and Telemarketing operation.
23   Q.  Okay.
24   A.  But all the normal divisions reported to
25   Dennis.
        ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

25

1    Q.  Generally, what were those divisions?
2    A.  They would have been policyholder
3    services, at the time I think there was claims;
4    there may have been – there was personal health
5    insurance and employee benefit plans, and the
6    organization has undergone so many changes, I mean
7    the basic functions are there, but –
8    Q.  Then Teleservicing was somewhere else, or
9    not physically, but reporting somewhere else?
10   A.  Reporting to Mr. Hartshorn.
11   Q.  And Mr. McAuliffe – I didn't quite
12   understand your answer.  Did he report also to Mr.

**CONFIDENTIAL**

MP401109955B

13    A.   The segment was headed up -- the managers
14  at that time some of them would have been Vejan
15  Rizzo, Don Lyons, James Ruede.  And it's just hard
16  for me to recall at the various times who was there
17  without checking some information.
18    Q.   Where was Ms. Gardner in the organization
19  prior to responsibility for the Teleservices and
20  Telemarketing?
21    A.   She was in Human Resources, as I remember.
22    Q.   Okay.
23    A.   She was also in the position I vacated,
24  what was then became known as financial electronic
25  services at some period too, but --

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

31

1     Q.   But at the time she was in the Human
2   Resources position?
3     A.   That's my recollection, yes.
4     Q.   Okay.  How did it come about that you
5   became manager of Human Resources in this 1993 time
6   period?
7     A.   1983?
8     Q.   I mean 1983 time period.
9     A.   It was important that I have a formal
10  job.  The one I had was, as I indicated, was
11  temporary and not a formal position, and I had to
12  have a formal job, and I requested to Mr. Crimmins
13  that that is the position I would like to have.
14    Q.   Had that position been previously held by
15  Ms. Gardner?
16    A.   Yes.
17    Q.   And she then moved over to become the
18  manager of Teleservices?
19    A.   Yes.
20    Q.   Okay.  As manager of Human Resources and
21  Ms. Gardner as manager of Teleservices, were you
22  roughly peers?
23    A.   On paper, it would look that way, yes, but
24  it was kind of a different organization at the
25  time.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

32

1     Q.   Why was it -- and I assume you had
2   conversations with Mr. Crimmins about where you
3   were going to fall in the organization with the
4   elimination of the divisional manager position and
5   what job you were going to have, et cetera.
6     A.   Yes.
7     Q.   Why was it that you wanted in the Human
8   Resources position as opposed to the Teleservices
9   area?
10    A.   Because Mr. Hartshorn was being placed in
11  charge of Teleservices at that time and I decided I
12  would rather not report to him.
13    Q.   Why is that?
14    A.   At the time I felt a little betrayed.
15    Q.   By Mr. Hartshorn?
16    A.   Hartshorn.
17    Q.   And can you please describe to me why,
18  what had happened to make you feel that way?
19    A.   I saw the potential elimination of my
20  position.
21    Q.   Now, the divisional manager position --
22    A.   Yes.
23    Q.   -- we are talking about.
24    A.   And I just had a lot of difficulty
25  accepting that he did not give me warning and tell

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

13    from whom or how you came to have that belief?
14    A. I assumed that it was as a result of
15    conversations I would have had with Dennis,
16    that's -- that's -- he would have been the one to
17    tell me that.
18    Q. You don't have a specific recollection --
19    A. No.
20    Q. -- of that, but that would seem to be how
21    it would come about?
22    A. There may be something in all the
23    documentation that I have provided that would
24    trigger a more concise memory, but --
25    Q. Okay. Now, at that point in time, you
           ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        41
1    were providing Human Resource support to the
2    Teleservicing area?
3    A. Yes.
4        MR. RAYL: Excuse me, Mr. Poor, could we
5    take a short recess at your next convenience,
6    stopping point?
7        MR. POOR: We can do it now, if you would
8    like, sure.
9        MR. RAYL: Yes, sure.
10       (Brief recess.)
11    Q. (BY MR. POOR) Focusing on this time
12    period shortly before this general meeting you are
13    referring to with Mr. Lynch, were you aware of any
14    dissatisfaction or issues relating to Ms. Gardner's
15    performance as manager of the Teleservicing area?
16    A. Not -- not specifically. There -- no,
17    there were issues associated with the
18    reorganization and the marketing part of it, but,
19    you know, I don't remember.
20    Q. Was there a general reorganization or
21    reshuffling of the deck over on that piece of the
22    business going on generally?
23    A. At the time Ms. Gardner had it, there was
24    a lot of focus on the Telemarketing aspect of the
25    operation, and that was the piece that was being
           ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        42
1    reorganized and moved to Florida. And, in essence,
2    it was taken away or moved out of the call center,
3    and --
4    Q. You were aware of that prior to the
5    meeting with Mr. Lynch?
6    A. Oh, yes.
7    Q. Okay. And what was being left in Tulsa
8    was the Teleservicing --
9    A. Yes.
10    Q. -- piece? All right. The general, when
11    you say "general meeting with Mr. Lynch," a meeting
12    with whom?
13    A. My recollection is that he typically came
14    out and met with the entire management team of the
15    office.
16    Q. And that is your general recollection of
17    this particular meeting?
18    A. Yes.
19    Q. Okay. I assume there were a number of
20    topics covered in that meeting other than
21    Telemarketing/Teleservices.
22    A. Yes, I assume so.
23    Q. Would these typically be full-day
24    meetings, half day, hour?
25    A. I really don't remember. There's been so
           ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP4011069562

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

1   many differences over the years in those --
2   typically, it's my recollection would be they were
3   a day.
4       Q.   What do you recall about this meeting as
5   it related to Teleservicing/Telesales?
6       A.   The only thing I remember, and this
7   meeting, I guess, would have taken place after I
8   had some responsibility.  The only meeting I
9   remember is one where we did do a presentation to
10  Mr. Lynch, and we had prepared some material for
11  him on the Teleservicing and the directions and
12  steps we were trying to take.
13      Q.   Who is "we"?
14      A.   The Teleservicing organization, the people
15  that worked there.
16      Q.   Who actually did the presentation?
17      A.   I don't remember.
18      Q.   I mean did you do it personally or --
19      A.   I assume I did, but I really don't -- I
20  don't remember.
21      Q.   Okay.  Was Ms. Gardner at this time
22  involved in the Teleservicing/Telemarketing?
23      A.   Not at the time of this meeting.
24      Q.   Okay.  So your assumption of at least some
25  responsibilities for Teleservicing had happened

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

**CONFIDENTIAL**

44

1   prior to this meeting?
2       A.   Yes.
3       Q.   Okay.  And then the Teleservicing team put
4   on a presentation for Mr. Lynch about goals,
5   aspirations, where that function was going to go?
6       A.   We prepared a presentation.  We prepared
7   material.  I do not remember the specific
8   presentation with respect to what necessarily was
9   discussed or done at that meeting, other than the
10  fact that we had prepared material for him.
11      Q.   Okay.  At that time you were also still
12  manager of Human Resources?
13      A.   That's my recollection.
14      Q.   Okay.  Following that meeting, what
15  happened with regard to the transfer of your
16  responsibilities out of Human Resources into
17  Teleservicing?
18      A.   I'm -- I don't even remember what the
19  chain of events at that time, except that I did
20  ultimately become totally responsible or solely
21  responsible for Teleservices.
22      Q.   And someone else took on the Human
23  Resource function?
24      A.   Yes.
25      Q.   At the time you became manager of

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

45

1   Teleservices, whatever your precise title was at
2   the time, to whom did you report?
3       A.   Dennis McAuliffe.
4       Q.   What was the size of the -- Can we refer
5   to it as "call center"?
6       A.   Yes, that's fine.
7       Q.   All right.  What was the size of the call
8   center at that time?
9       A.   It was somewhere between 12 and 15
10  customer service representatives, and the total
11  staff was probably 20.
12      Q.   With the total staff including supervisors

011069563

C11069555

1   centers had gone beyond assuming responsibility
2   just for individual life insurance. We also had
3   assumed responsibility for what was known as the
4   corporate 800 number, which was being promoted as
5   the single number any customer could call when they
6   really didn't know where or how to reach the
7   appropriate area within MetLife.
8      Q.   Let's focus on the end of '95 for a
9   moment, because I know there was some consolidation
10   of call centers going on in '96.
11      Prior to that consolidation of call
12   centers, --
13      A.   Yes.
14      Q.   -- what other call centers were there in
15   MetLife?
16      A.   There was property and casualty; there was
17   dental; there was disability; there was vision
18   care; there was -- and part of the organization
19   called MetSource. There was annuities, group
20   annuities, and there were basically 22 call centers
21   identified during Phase 2 of MetLife Express.
22      Q.   Okay. And those calls centers grew up
23   predominantly around various product lines?
24      A.   Yes.
25      Q.   And the 22 were varying sizes?

1      A.   Yes.
2      Q.   Some very small, --
3      A.   Yes.
4      Q.   -- some relatively large?
5      A.   (Affirmative head nod).
6      Q.   Okay. What other call centers were there
7   in individual business?
8      A.   The other call center was in Warwick,
9   Rhode Island. And between the Warwick and the
10   Tulsa sites, we handled the entire United States
11   for individual life insurance and corporate 800.
12      Q.   Okay. With regard to calls that came in
13   on the corporate 800 number with questions other
14   than individual life products, --
15      A.   Yes.
16      Q.   -- someone called in for a disability
17   policy, for example, --
18      A.   Yes.
19      Q.   -- and assuming it wasn't just a simple
20   request to be sent information or something, was
21   the function of the CSR to then get that person to
22   the call center with responsibility for that
23   particular product line?
24      A.   That was one of the functions, yes. There
25   were a number of initiatives that the company was

**CONFIDENTIAL**

1   undertaking and they would use the corporate 800
2   number to support a wide range of special
3   projects. One of them was our life advice
4   program. So it was a very wide range of calls.
5      Q.   Okay. But as to the calls that would, for
6   example, stick with disability.
7      A.   Sure.
8      Q.   There was at that time a specific call
9   center for the disability --
10      A.   Yes.
11      Q.   -- product line? That if I had known the
12   right number as a policyholder, that's the number I

15    Q.  One of the functions of the CSR in your
16 area was if the call came to them to get routed, if
17 that was the issue --
18    A.  Yes.
19    Q.  -- to that particular call center.
20    A.  (Affirmative head nod).
21    Q.  Okay.  How long had the Warwick facility
22 been in existence or when did it first come into
23 existence?
24    A.  I believe it was around 1988.
25    Q.  Okay.  From 1986 until 1988, the first

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

51

1 couple of years that you had responsibility for the
2 call center in Tulsa, did your responsibilities
3 remain the individual business piece in the Tulsa
4 territory?
5    A.  Yes.
6    Q.  Okay.  And then Warwick came into
7 existence in approximately 1988 to do what?
8    A.  There were many discussions during that
9 period of time as to the future of the call
10 centers, what their role was to be with an
11 individual insurance.  There were moves where some
12 people wanted to consider establishing a call
13 center in each of our offices, but, basically, it
14 was agreed that the company needed to go with more
15 than one and the strategy at that time was to at
16 least start a second one in the Northeast.
17    Q.  And Warwick performed similar functions
18 for the territory out of Warwick?
19    A.  Yes.
20    Q.  Okay.  So then for a while, policyholders
21 in the Tulsa territory and policyholders in the
22 Warwick, the Northeast, had call centers but with
23 no call center specifically covering --
24    A.  Yes.
25    Q.  -- other areas of the country?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

52

1    A.  Yes.
2    Q.  Okay.  That then changed at some point?
3    A.  Yes.
4    Q.  Do you recall, approximately, when that
5 changed?  I mean, let me rephrase it.
6        I know that during this time period other
7 product lines are growing, --
8    A.  Right.
9    Q.  -- call centers.  I am now focusing on the
10 ILI, the individual business piece.
11    A.  The entire history is probably in that
12 folder that covered the advancement of
13 Teleservices.
14    Q.  All right.  We will come to that specific
15 document.
16    A.  It was a slow, agonizing process to expand
17 it nationwide, and -- but it was through the early
18 Nineties.
19    Q.  Okay.  Were there at any point other call
20 centers handling the ILI individual business other
21 than Warwick and Tulsa up through this '95 time
22 period?
23    A.  No.
24    Q.  Okay.  We are back up to 1986.  I
25 understand your reporting relationships, I want to

ESQUIRE CORPORATE SERVICES

MP401106956 6

011069559

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

58

1     A.  He has a very good mind.  He's certainly
2  lived through the creation of the building and
3  understood the work and the work flow issues and
4  things like that.  But by the same token, he had
5  his strengths and weaknesses like we all do.
6     Q.  Ms. Gardner had her strengths and
7  weaknesses?
8     A.  Yes.
9     Q.  You have your strengths and weaknesses?
10     A.  Yes.
11     Q.  You also say you were not surprised.  And
12  why were you not surprised?
13     A.  Barbara, and this is in no way meant as a
14  criticism, because it is clearly what the company
15  has become and what it rewards, but she -- she
16  understood the politics and knew how to use the
17  politics for advancement, as many people do.
18     Q.  Now, focusing on that particular point in
19  time, when she becomes --
20     A.  Yes.
21     Q.  -- when the announcement is made, I know
22  we are not quite sure when that was, when you say
23  she understood the politics and knew how to use it
24  for advancement, what are you referring to?  And
25  now, again, I am putting you back in the time frame

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

59

**CONFIDENTIAL**

1  at that time.  We will cover subsequent events down
2  the road.
3     A.  It was probably to provide -- I don't
4  think I can answer that with any specificity.
5  There's just a lot of things there.  I mean --
6  well, --
7     Q.  Give me an example of what you are talking
8  about, that would have happened by that point in
9  time?
10     A.  Okay.  One example would be that you
11  consistently say the right thing at the right times
12  to provide people with what they would prefer to
13  hear or --
14     Q.  Can you give me an example of something
15  involving Ms. Gardner that would have happened
16  where you felt that --
17     A.  No, I mean I don't know that there is
18  anything specific.  It is just a difference in
19  management styles, that's all.
20     Q.  What was the difference in management -- I
21  assume when you say "difference in management
22  styles," meaning a difference in your management
23  style.
24     A.  Yes.
25     Q.  What was the difference in management

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

60

1  styles that you saw between you and Ms. Gardner?
2  Describe what you mean by that statement for me.
3     A.  My management style was to consistently
4  say what I thought when an issue was in either the
5  company's interest or the customer's interest.  And
6  I had a very defined feeling as to right and wrong,
7  and I -- I would not hesitate to voice an unpopular
8  opinion.
9     Q.  And contrast that with Ms. Gardner.
10     A.  It just wasn't her personality style to --
11  she didn't -- well, those things weren't the big
12  issues with her.  They were with me.

1    A.  Len was an especially frustrating person.
2    Q.  Okay.  Staying at this point in time now,
3  in the 1988-1989 time period, I think you said
4  Warwick was started up in the '88 time period.
5    A.  I believe so, yes.
6    Q.  What was your relationship with or were
7  your responsibilities with regard to the startup
8  and the early phases of the Warwick operation?
9    A.  Other than initially providing them
10  support and then working with Kathy Schoos, who was
11  in charge of it in Warwick, on a number of common
12  issues, I mean I had no direct responsibility, but
13  the two of us spent the best part of our life
14  trying to advance Teleservices at that time.
15    Q.  She was your counterpart --
16    A.  Yes.
17    Q.  -- in Warwick?
18    A.  (Affirmative head nod).
19    Q.  And to whom did she report during this
20  time period?  This '88-'89 time period.
21    A.  I believe it was John Abela, who was
22  Barbara's counterpart.
23    Q.  Okay.  During the '88 to '90 time period,
24  the period we are talking about, did you share --
25  I'm not quite sure what you were telling me, did

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
69

1  you share calls with Warwick or were you simply
2  sharing knowledge and --
3    A.  Knowledge and information and support,
4  yes.
5    Q.  Were they also getting 800 numbers, calls,
6  or was that still going to Tulsa?
7    A.  No.  They started up and they were taking
8  the 800 number calls from their territory and their
9  part of the country.
10    Q.  Okay.  So their operation mirrored yours,
11  but just for a different part of the company?
12    A.  Yes.
13    Q.  Would there be occasions -- we talked
14  about there being occasions where your CSRs would
15  route the calls perhaps to a specific property, the
16  P&C folks or a particular product line.
17    A.  Yes.  The corporate 800 number did not
18  happen in that time frame.
19    Q.  The corporate 800 number was later?
20    A.  Yes.
21    (A certain document was marked Deposition
22  Exhibit 2 for identification by the reporter.)
23    Q.  (BY MR. POOR)  Mr. Rayl, I am handing you
24  what has been marked as Deposition Exhibit No. 2.
25  I ask you to take a look at that document and tell

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
70

1  me whether you recognize it?
2    A.  I recognize it as probably one of the
3  reviews I received, yes.
4    Q.  Okay.  The second page, bottom left-hand
5  corner, do you recognize that as being your
6  signature?
7    A.  Yes, I do.
8    Q.  Okay.  And it will appear you signed this
9  document February 4th, 1991?
10    A.  Yes.
11    Q.  Okay.  During the course of your
12  employment with MetLife, you would receive a

**CONFIDENTIAL**

011069573

13 performance review typically on an annual basis?
14    A.  Typically, yes.
15    Q.  Okay.  Typically given to you by your
16 direct —
17    A.  Yes.
18    Q.  — supervisor, correct?
19    A.  (Affirmative head nod).
20    Q.  And you, in turn, would do performance
21 reviews typically on an annual basis —
22    A.  Yes.
23    Q.  — of people reporting to you, correct?
24    A.  Yes.
25    Q.  So we are starting with the 1990, but you

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

71

1 had performance reviews prior to 1990?
2    A.  Yes.
3    Q.  Okay.  This happens to be one, and in the
4 bottom right-hand corner of the second page, you
5 recognize that is Ms. Gardner's signature?
6    A.  Yes.
7    Q.  Now, I know the forms changed from time to
8 time over the course of the period.
9    A.  (Affirmative head nod).
10    Q.  But during the period of time you reported
11 to Ms. Gardner, was there a certain process she
12 followed in terms of going through annual review
13 with you?
14    A.  I can't really say it was a process; it
15 was done differently in different years.
16    Q.  Okay.  Well, let's talk about this one, —
17    A.  Sure.
18    Q.  — to the best you recall.  The
19 handwriting that is on this document, other than
20 your signature, do you recognize that as Ms.
21 Gardner's handwriting?
22    A.  Yes, it appears to be.
23    Q.  Okay.  Do you recall sitting down with her
24 and going over this review with her?
25    A.  This specific one?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

72

1    Q.  Yes.
2    A.  No, I don't.
3    Q.  Okay.  Do you recall getting it — let me
4 ask you the flip side.
5       Is it your recollection you simply got
6 this in the mail?
7    A.  No, I would — no, I would suspect that we
8 sat down, I just don't remember.
9    Q.  You don't recall one way or the other?
10    A.  No, no.
11    Q.  Do you have any recollection as of the
12 year end 1990 what the size of the Teleservices
13 area was?
14    A.  I can't say with any certainty.  At that
15 point, I assume it to have been in the neighborhood
16 of 40 to 50, but that could be wrong.
17    Q.  Looking at the first page, "Overview of
18 Responsibilities," the first line, she's written —
19 and it would appear that this section is the key
20 responsibilities for 1990.  The first one is
21 "Expand Teleservices throughout 1990" and then
22 there's "(GLHO & SEHO)."
23    A.  Uh-huh.
24    Q.  Do you know what those acronyms stand for?
25    A.  Great Lakes Head Office and Southeastern

ESQUIRE CORPORATE SERVICES

MP4011069574

15    A.  Uh-huh.

16    Q.  Drawing your attention to the section

17 entitled "Development Needs," the first point here

18 is "Separate business issues from

19 personal/emotional and subjective review.  Jim can

20 tend to make things 'personal' concerns,"

21 "personal" being in quotes.

22        Do you recall any conversation with Ms.

23 Gardner, either at this specific review or related

24 to this topic during this time period —

25    A.  Sure.

1    Q.  — on this particular issue?

2    A.  (Affirmative head nod).

3    Q.  What do you recall?

4    A.  I don't remember any specific

5 conversations, but you have got the evidence of my

6 personal concerns as to the way the company was

7 dealing with many issues associated with customer

8 service.  I was trying to live up to a mission and

9 a vision that was given to me by Robert Crimmins

10 and, as you have got in there, you have got the

11 documentation which outlines my concerns to him at

12 the time because of my continuing frustration with

13 the middle levels of the organization failing to

14 deal with the real issues.  But I did make some of

15 them personal.

16    Q.  Okay.  Now, we had talked earlier about

17 the differing management styles you and Ms. Gardner

18 had.

19    A.  Yes.

20    Q.  Did you view this as reflecting the

21 differing management styles that you and Ms.

22 Gardner had?

23    A.  It's — yes, I reviewed — I mean

24 that's — and it's — it clearly was a valid

25 developmental issue.  I mean I did over the years

1 learn to deal more effectively with many of those

2 issues and not make them quite as personal and go

3 strictly on the basis of the business need or the

4 business issue.  So, yes, it was a —

5    Q.  Now, the second topic is "Trust your

6 teammates."

7    A.  Uh-huh.

8    Q.  "Management associates at all levels will

9 work with you.  Share your agenda, ask for

10 support."

11        Do you have any recollection of what the

12 issues reflect in that developmental need were?

13    A.  Not specifically, no.

14    Q.  Okay.  Now, under the "Developmental

15 Plan," Section G, it talks about a review in the

16 CLD area.

17    A.  Yes.

18    Q.  What is the "CLD" area?

19    A.  I guess in '91 or thereabouts, in addition

20 to Teleservices, which I guess I had overlooked

21 before, I also assumed responsibility for what was

22 known as the cash loan dividend area.  Because it

23 was such an integral part of many of the customer

24 concerns coming through Teleservicing, it was

25 thought that some improvements might be attained if

**CONFIDENTIAL**

MP401106957G

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

1    I took responsibility for that area.
2        Q.  And who talked to you about taking on
3    responsibility on for that area?
4        A.  That was Barbara.
5        Q.  Okay.  What was the CLD area?
6        A.  It was part of the policyholder services
7    division.  It stands for "cash, loan and dividend.
8        Q.  What did they do?
9        A.  Oh, they processed all cash surrenders,
10   all loan transactions and all dividend
11   transactions.
12       Q.  And when you say this was an integral part
13   of customer concerns, people would call in saying
14   "can I take a loan, can I?" --
15       A.  Fifty percent, or thereabouts, of the
16   phone calls in general dealt with some aspect of a
17   cash loan dividend area.  Now, this doesn't mean
18   that they were the specific transactions, but in
19   terms of quoting values, asking questions about
20   their dividends, asking tax questions related to
21   these transactions.
22       Q.  And the numbers in the processing of those
23   issues was in the CLD area?
24       A.  Yes.
25       Q.  Okay.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100,NORCROSS,GA 888-486-4044

79

1        A.  And there was -- part of it was also to
2    move as much of those transactions to the telephone
3    to try and resolve them at that point, also.
4        Q.  And so the goal, I take it, you and
5    Ms. Gardner had was by moving that function under
6    your supervision, there could be a closer
7    integration --
8        A.  Yes.
9        Q.  -- of those functions?  Did that
10   integration in fact happen?
11       A.  To a large degree, it did.  At the time we
12   took it, it was very small.  There -- as a result
13   of additional reorganizations, other offices were
14   closed.  At the time I took it, the cash loan
15   dividend area had about 30 to 35 people.  We took
16   work from other offices and it grew to about 120,
17   which I was managing in conjunction with the call
18   center.  And it was eventually split off as a
19   separate division somewhere around '94 or '95.
20       Q.  Did Warwick have the same type of
21   structure --
22       A.  Yes.
23       Q.  -- related to CLD?
24       A.  Yes.
25       Q.  Do you recall expressing any disagreement

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

80

1    over the review for your performance in 1990?
2        A.  I have expressed disagreement with a
3    number of my performance appraisals.  As far as any
4    on this one, no, I do not recall expressing any
5    particular disagreement.
6        Q.  Okay.
7            MR. POOR:  Take about a two-minute break,
8    washroom break.
9            THE WITNESS:  Great.
10           (Brief recess.)
11       (Certain documents were marked Deposition
12   Exhibits 3 and 4 for identification by the

MP401069586

13    Q. — where you say that there is something
14  in here — I am now asking questions —
15    A.  Well, —
16    Q.  — about what Ms. Gardner did that was
17  harassment/ —
18    A.  Okay.
19    Q.  — mental and emotional abuse —
20    A.  This specific memo to him doesn't relate
21  to some of those things.  There should be other
22  documents that do.
23    Q.  Okay.  That's fine.  I am just trying to
24  understand.
25    A.  Okay.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

101

1    Q.  Okay.  Well, you also indicate in this
2  letter in the next few pages that you felt she also
3  treated Mr. Lyons inappropriately.
4    A.  Yes.
5    Q.  I assume Mr. Lyons reported directly to
6  her as well.
7    A.  Yes.
8    Q.  Do you have a recollection of where he was
9  in the organization at that time?
10    A.  I believe policyholder services, but I'm
11  not sure.
12    Q.  Okay.
13    A.  Mr. Lyons, I believe, sent his own
14  documents to Frank.
15    Q.  Do you have any recollection of actions or
16  incidences involving Mr. Lyons that fall into this
17  category?
18    A.  No, I don't remember any specifics.
19    Q.  Turning to page 3 in the middle, the
20  paragraph starts "Barbara is a 'master
21  manipulator'..."
22    A.  Yes.
23    Q.  That paragraph, then it talks about her
24  trying to buy people's loyalty, manipulating
25  people.  And you give an example of a former

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

102

1  employee, Dick Moser, "Moser,"—
2    A.  Yes.
3    Q.  — something like that.  Either with
4  regard to specifically with the Moser situation, if
5  that's the best example you can give me or with
6  another example you can give me, can you try to
7  help me understand what you are talking about in
8  terms of this description of her conduct.
9    A.  Other than what I have said here, I
10  mean — no, I could probably present any number of
11  people that could cite their own situations, but —
12    Q.  Well, I am more interested, and I know,
13  Mr. Rayl, you know what you are —
14    A.  Right.
15    Q.  — talking about here, but you need to
16  understand I don't; I wasn't there.  So I need you
17  to help me, it would be helpful to me if you could
18  give me an example.  And you can talk about the
19  Dick Moser situation, if you care to?
20    A.  Yes, I don't even —
21    Q.  Give me an example of what she was doing
22  that led you to describe her as, you know, buying
23  people's loyalty or being a master manipulator.
24    A.  At this time Barbara's management style
25  was not such that if she wanted you to do something

ESQUIRE CORPORATE SERVICES

103

1  specifically, that she would just tell you this is
2  what she wanted you to do.  She appeared at the
3  time to be dealing from her own agenda, and she
4  bestowed favor in the form of compensation or
5  whatever on people that were most prone to vocally
6  and actively support whatever it was that she
7  wanted to do.
8      Q.  Well, give me an example of when you said
9  she had her own agenda.  Give me an issue in which
10 that manifested itself.
11     A.  I don't know of any really off the top of
12 my head, particularly at this time here.  There
13 were -- well, I don't remember any.
14     Q.  I take it these would have been issues
15 that you and she disagreed on.
16     A.  It may have been a number of issues,
17 anywhere from -- relating to issues affecting the
18 customer service center, issues affecting -- or
19 customers, issues affecting the work environment,
20 any number of things.
21     Q.  But, as you sit here today, you can't give
22 me a specific example of any one of those things?
23     A.  Not -- you know, I tend -- I am a
24 reasonably sensitive and as obviously has been
25 stated, somewhat emotional person, to the extent

104

1  that I operate from a sense of passion.  I
2  supported the company, and I supported its
3  customers with passion, with caring for the right
4  and wrong.
5        I was not interested in political agendas;
6  I was generally focused, as I believe my letters to
7  Crimmins and those people support, on issues that I
8  felt were important to the company, the customer.
9        The company, as a whole, gets itself
10 involved in any number of actions, directions or
11 whatever, where certainly some of these issues are
12 not the primary concern.
13       So those might have been the kinds of
14 issues with which I disagreed.
15       In other words -- well, it's -- we could
16 spend all day talking about that.
17     Q.  Well, I don't want to spend all day
18 talking about it, but I also need to have a better
19 understanding of what you are talking about.
20       For example, we had talked earlier about
21 staffing levels.
22     A.  Yes.
23     Q.  And staffing levels are referred to in
24 your performance review for 1991.
25     A.  Yes.

105

1      Q.  And, you know, growing a business and yet
2  what kind of resources is this company going to
3  develop to support that expansion.
4      A.  Yes.
5      Q.  And it seems clear from the documents you
6  turned over to us that you strongly disagreed with
7  that decision by the company in terms of the level
8  of resources they were devoting to the
9  Teleservicing area.  Is that a fair statement?
10     A.  But it was really a bigger issue than
11 that.  It really revolved around the company on the
12 one hand paying lip service to the concept of

**CONFIDENTIAL**

4011069587

Page   42

13  providing good customer service while they tie your
14  hands behind your back and then don't devote the
15  resources or the strategic issues, technology,
16  systems or whatever, to support that.
17      As a company, we still haven't decided
18  where, when and how customer service should be
19  delivered.
20   Q.  It's not an easy set of issues, is it?
21   A.  It seemed pretty easy during many of those
22  periods.  It certainly surfaced in MetLife Express,
23  although the fact -- but that's another whole set
24  of issues.  But it is pretty easy for any company
25  to make a certain level of commitment to its

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

106

1  customers.  MetLife pays a lot of lip service and
2  does not deliver it.
3   Q.  Well, one of the issues, and I understand
4  in your view it is a broader issue, but let's focus
5  on -- we are now talking in 1991, the staffing
6  levels and the amount of resources the company was
7  prepared to devote to the growth of the
8  Teleservicing area.
9      There were many areas of MetLife in terms
10  of its operations outside of Teleservicing area,
11  correct?
12   A.  Yes.
13   Q.  Okay.  There are thousands of employees
14  who work for MetLife, correct?
15   A.  Yes.
16   Q.  There are many functional areas of
17  MetLife, correct?
18   A.  Yes.
19   Q.  There are many areas within the company
20  that need to be supported and funded for the
21  overall success of the company, correct?
22   A.  Yes.
23   Q.  And Teleservicing certainly is one of
24  those, correct?
25   A.  Yes.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

107

1   Q.  And at some level of the corporation,
2  there has to be a business decision as to taking
3  all of those pieces together, the varying levels of
4  funding and support for those varied support
5  functions, correct?
6   A.  Yes.
7   Q.  Okay.  Now, you were in the Teleservicing
8  function in Tulsa, --
9   A.  Right.
10   Q.  -- correct?  And as you have described it,
11  that was your passion, correct?
12   A.  Yes.
13   Q.  And there were disagreements, differing
14  views on the amount of resources going to be
15  devoted to the Teleservicing, correct, over the
16  years?
17   A.  Yes.
18   Q.  Okay.  And from time to time you disagreed
19  with those decisions, correct?
20   A.  I disagree with those positions -- or
21  those decisions and my disagreement, one, while
22  there were other functional parts of the company,
23  it was individual life insurance that brought
24  MetLife to its knees because of its sales
25  practices.  It's individual insurance that could

ESQUIRE CORPORATE SERVICES

MP401106958B

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

108

1  not —
2      Q.  Let me back up to the answer to my
3  question —
4      A.  Okay.
5      Q.  — here for a second.  Let's keep on track
6  here.  Somewhere over you there is some very basic
7  resource decisions being made, where the company
8  resources were going, correct?
9      A.  Yes.
10      Q.  Okay.  And you certainly had a belief that
11  that decision was not focusing enough resources on
12  the development of Teleservices, correct?
13      A.  When we were blocking thousands of phone
14  calls that we couldn't even answer —
15      Q.  I am simply asking whether you — I am
16  not trying to get into who was right or who was
17  wrong, Mr. Rayl.  You disagreed —
18      A.  Yes, —
19      Q.  — to the Teleservices?
20      A.  — I did.
21      Q.  And you viewed the Teleservicing area as
22  an extremely important function for MetLife,
23  correct?
24      A.  Yes.
25      Q.  Okay.  And I take it from your answers

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100,NORCROSS,GA 888-486-4044

109

1  that, you know, by virtue of the amount of
2  resources being developed in Teleservicing in this
3  area was also your perception that others somewhere
4  above you in the chain didn't view Teleservicing
5  with the same level of importance to the company's
6  mission that you did; is that fair?
7      A.  Correct.
8      Q.  Okay.  And you expressed that disagreement
9  on a —
10      A.  Repeatedly.
11      Q.  Repeatedly.  To Ms. Gardner, to others
12  within the organization, —
13      A.  Yes.
14      Q.  — correct?  Did it, looking at the
15  documents such as the one you wrote to Mr. —
16  what's the one Mr. Lynch, Mr. Lynch, that we were
17  talking about, and there are obviously others, —
18      A.  Right.
19      Q.  — to Mr. Crimmins, Mr. Donnelly, —
20      A.  Right.
21      Q.  — there were a variety of people within
22  the organization, many of whom are very critical of
23  your supervisor, Ms. Gardner.  Let's stick with
24  those.  Did it occur to you that writing those
25  memoranda, regardless of whether what you are

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

110

1  saying in there was right or wrong, and going
2  around Ms. Gardner to others above her in the
3  hierarchy, was not the way most managers handled
4  those issues within the organization?  I mean —
5      A.  Absolutely.  And that's why most companies
6  get in the condition they are in.  If I had been
7  interested in my advancement, that was suicide.
8      Q.  Okay.  Did anyone ever sit down with you
9  and say, "You know, Jim, you really ought to sit
10  down and work these issues through with Barbara;
11  writing these memos to Vince, or Frank, or Bob or
12  whatever isn't going to be effective in

1  document and educate Dr. Friedewald as to some of
2  the things that could be used to satisfy those
3  concerns.
4    Q.  Okay.
5    A.  The next one, --
6    Q.  Which is No. 14.
7    A.  -- which is No. 14, is another document
8  because of -- I did not feel that -- well, I felt
9  that the overall systems issues associated with all
10  of the customer service and across the organization
11  were being seriously underestimated as to their
12  significance and their cost by the so-called
13  information technology team that was the one
14  responsible for doing this, and I was trying to
15  educate Dr. Friedewald on what I saw some of those
16  issues were and what I saw, based on the
17  observations of the site visits we made and -- to
18  try and give him some idea as to what the
19  technology -- level of technology really was that
20  was out there.
21    Q.  When was this document prepared?
22    A.  This is April 19th, 1995.
23    Q.  It was sort of midway through the process?
24    A.  Yes.
25    Q.  Who was on the IT team?
        ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                169
1    A.  It was led by -- I am not sure who it was
2  led by, there was a whole separate team.  They were
3  not part of the customer service team.  It was
4  another whole MetLife Express team that was
5  functioning independently from us.
6    Q.  Okay.  Now, No. 15, a series of documents
7  addressed to Mr. Friedewald by you, May 16th of
8  '95, with a bunch of attachments.
9    A.  Yes.  One of the critical issues that
10  consensus could not be agreed upon was again how
11  was individual business going to deliver service to
12  its customers and what role should the sales
13  offices play in that activity.  This was --
14    Q.  What do you mean by that?
15    A.  There has been in the company a culture
16  that makes -- that managing officers believe that
17  all customer service should be provided by the life
18  insurance representative or by the local sales
19  office.  The reality is the sales offices are
20  ill-equipped to do that.  There is such turnover
21  and now the reduction in the size of the sales
22  force, it isn't a practical option.
23        But the company has never taken a
24  position that Teleservicing or anything else should
25  be the primary source for customer service with
        ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                170
1  developing a system than to support any other
2  alternatives.
3        Part of what I did in MetLife Express was
4  to do an extensive analysis of sales office
5  transactions, also trying to illustrate that the
6  service delivered by our sales offices merely as a
7  matter of process was inferior to what could be
8  delivered through Teleservicing, and that it might
9  make more sense to define sales office role as
10  being that of sales support.
11        And then there is just a ton of documents
12  in here related to that.

CONFIDENTIAL

1    This was a document that I produced as
2  part of an analysis; some of the information came
3  from some information gathered by Jim Major or a
4  survey that he did, but most of this was stuff that
5  I put together to try and estimate how many phone
6  calls were coming from the sales offices -- or the
7  sales offices were receiving.
8    Q. Okay. Exhibit 20 appears to be documents
9  relating to your visits to various sites, Aurora,
10  et cetera.
11    A. Yes. This was -- I ended up doing the
12  most extensive documentation on site visits, and
13  this was just a record of all of our site visits
14  during Phase 2.
15    Q. Okay. Exhibit 21 appears to be a document
16  you prepared for Mr. Jeffrey in January of '96.
17    A. Yes. This was a rather elaborate and
18  extensive document. With the four call centers,
19  there would be need -- there was a need for a
20  telecommunications traffic management center. And
21  this is a document I prepared with some information
22  and help from my telecommunications people on what
23  needed to be considered and what they needed to do
24  to to set up that traffic management center.
25    Q. Okay. Exhibit 22?

1    A. This appears to be a wide assortment of
2  the letters and documents I wrote trying to advance
3  the customer service and call center issues.
4    Q. All as part of MetLife Express?
5    A. No, this had nothing to do with MetLife
6  Express. June '95, that -- I sent Mr. Crimmins the
7  sales office information, here's March of 1996,
8  yes, these were for the most part independent of
9  MetLife Express. Some of these go back to 1988.
10    Q. Okay. Then Exhibits 23, 24 and 25, they
11  appear to be some of the summary presentation
12  documents on MetLife Express as it relates to the
13  call center organization.
14    A. Yes. These two were done by Booz-Allen.
15  This is based on what I wrote and what I prepared
16  to the company's corporate management office --
17    Q. Okay.
18    A. -- at the conclusion of Phase 2.
19    Q. All right. Now, let's talk about some of
20  the basic conclusions as it relates to the call
21  center in terms of the reengineering and
22  restructuring.
23    One of the fundamental decisions of the
24  customer service team was consolidate the number of
25  calls, correct?

**CONFIDENTIAL.**

1    A. Yes.
2    Q. Going from 22-some-odd calls centers down
3  to four.
4    A. Yes.
5    Q. Okay. And consolidating the
6  responsibilities that were going to be handled by
7  the call center organization in those four center,
8  correct?
9    A. Yes.
10    Q. Now, what is a virtual call center? What
11  does that mean to you?
12    A. A virtual call center is essentially that

1    Q.  This is that meeting with the attorneys in
2  January of '96?
3    A.  Yes.
4    Q.  Okay.  We will hold on that.  Do you have
5  any basis, do you have any personal knowledge as to
6  whatever was communicated in that meeting was
7  communicated to anyone else in MetLife?
8    A.  The meeting was precipitated by a memo I
9  wrote to CMO members.  No, I do not have any
10  specific knowledge that --
11    Q.  It went beyond --
12    A.  No.
13    Q.  -- the legal organization?
14    A.  No.
15    Q.  Okay.  Now, one of your allegations is you
16  had a history, and I will quote here, "history of
17  reporting violations."
18    A.  Yes.
19    Q.  Including violations, churning and
20  accelerating premiums, vanishing premiums, which we
21  have sort of generically referred to as "public
22  policy."
23    A.  Yes.
24    Q.  I will now be more specific.  It's those
25  issues that we are now talking about in terms of
          ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                    254
1  public policy, the accelerated payments, the --
2    A.  Yes.
3    Q.  -- vanishing premiums, the churning
4  allegations, correct?
5    A.  Yes.
6    Q.  And those are problems that obviously
7  there was general publicity with regard to issues
8  raised against MetLife and other insurance
9  companies by various lawsuits, insurance
10  commissioners, et cetera.  I assume it was brought
11  to your attention in that respect like every other
12  MetLife employee, but it was also, I take it,
13  brought to your attention to by customers who would
14  call in to the call center organization, raising
15  issues?
16    A.  My efforts started long before MetLife was
17  the subject of investigation and litigation on
18  those issues.
19    Q.  All right.  Now, I am going to mark a
20  number of documents here that you produced to us
21  not necessarily to go over them in any great
22  specificity, --
23    A.  Okay.
24    Q.  -- but for you to help me identify and
25  understand which ones you think fall in this
          ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                    255
1  category.
2    A.  Sure.
3    (Certain documents were marked Deposition
4  Exhibits 37 through 43, inclusive, for
5  identification by the reporter.)
6    THE WITNESS:  Okay.
7    Q.  (BY MR. POOR)  What I am interested in,
8  tell me which groups reflect your history of
9  reporting violations in obtaining the status of
10  whistle blower, as alleged in Paragraph 43, so we
11  can talk about those without talking about the ones
12  that --

**CONFIDENTIAL**

401069647

13    Q.  Okay.
14    Q.  -- fall outside.
15    A.  No. 40 is outside.
16    Q.  Okay.  Let me set that up here.
17    A.  This is background, this is really
18    background information, not specifically the
19    documents.
20    Q.  Okay.  That's 42.  Okay.
21    A.  There is a whole collection missing on
22    complaints by --
23    Q.  Okay.
24    A.  All right.
25    Q.  I thought I had pulled all the ones you
          ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        256
1    had produced that had some label of --
2    A.  Well, if files were together, I have
3    actually got those files if you want to look at
4    them.
5        MR. RAYL:  Could this file over here have
6    any, Mr. Poor?
7        (Handed to counsel.)
8        MR. POOR:  Okay.
9    (A certain document was marked Deposition
10   Exhibit 44 for identification by the reporter.)
11   Q.  (BY MR. POOR)  I thought it was the same
12   file, to be honest with you, but --
13   A.  Well, wait a minute, they might be still

**CONFIDENTIAL**

14   two separate files.  Yes, they are different.
15   Q.  Okay.
16   A.  41 is not, but there is a whole series of
17   files or two files dealing with complaints that are
18   not here.
19   Q.  Okay.
20   A.  Subject to policyholder complaints.
21   Q.  And this one which is just external,
22   labeled as simply "external newspaper articles," --
23   A.  Right.
24   Q.  -- and things?
25   A.  Right.
          ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        257
1    Q.  I believe there is one more set of
2    documents around.  It should have been two files,
3    separate files, one would have been stuff I
4    specifically wrote and another one is all dealt
5    with policyholder complaints.
6    A.  I can give you the numbers if that would
7    help.
8    Q.  If you can give me the numbers, maybe I
9    can --
10   A.  Yes.  Oh, I don't believe it.
11       MR. POOR:  Why don't we go off the record
12   now.
13       THE WITNESS:  1377 -- no, wait a minute.
14   1414 to 1491 was the primary file related to
15   policyholder complaints.
16       (Discussion off the record.)
17   Q.  (BY MR. POOR)  Okay.  So the groups of
18   documents that reflect the allegations in Paragraph
19   33 about your advocacy of public policy issues are
20   Deposition Exhibit 44, which are Bates stamped
21   01193, Deposition Exhibit 43, Bates stamped 01377
22   to 01413, Deposition Exhibit 37, Bates stamped
23   01112 to 01153.
24   A.  Some of these are related documents, but
25   they are part of that.
          ESQUIRE CORPORATE SERVICES

Page   103

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

258

1   Q.   Right.  Exhibit 39, 01154 through 01192 --
2   A.   38.
3   Q.   -- which is Exhibit 38, and what will be
4   marked when we make a copy as Deposition Exhibit
5   45, Bates stamped PL-01414 through -01491.
6   A.   Yes.
7   Q.   Okay.  Some of these are documents
8   authored by you; some of them are complaints bought
9   to your attention, for example, some are letters
10  from lawyers, some are --
11  A.   Right.
12  Q.   -- complaints from some individuals?
13  A.   Supporting the issue, yes.
14  Q.   Right.  For example, what is Exhibit 38.
15  A.   That was -- it was one of the few
16  documents that I submitted that really was not
17  written to a superior; it was a document I authored
18  illustrating how we were trying to have the CSRs,
19  at that time they were CSRs, deal with these issues
20  and the publicity related to the churning
21  allegations and some of those activities.
22  Q.   Okay.  And this went to CSRs, trainers and
23  resource assistants?
24  A.   Yes.
25  Q.   And you authored this document?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

259

1   A.   Yes, I did.
2   Q.   Okay.  Now, on any of the documents
3   covered in these various deposition exhibits, did
4   you receive criticism, feedback that was critical?
5   A.   Not -- I'm trying to think -- other than,
6   for example, there's one situation in there where I
7   tried to explain the AP problem.  It went to
8   someone in marketing, who turned around and tried
9   to say it didn't exist, and I went back and proved
10  to one of his own branch managers was having a
11  problem.  I didn't receive direct criticism for
12  that, with the exception of being criticized, if
13  you will, by the law department for my persistence
14  in trying to draw attention to these issues.
15  Q.   And that's in this meeting?
16  A.   That's in the meeting, yes.
17  Q.   Okay.  We will come back, put aside that
18  meeting.
19  A.   Okay.
20  Q.   Is that meeting the only time that you
21  have viewed yourself as having been criticized over
22  raising these issues?
23  A.   I guess I don't know where to draw the
24  fine line between criticism and where people
25  clearly indicate they don't want to hear it any

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

260

1   more, but --
2   Q.   There's a very clear line in my mind, let
3   me explain to you what it is.  I understand that
4   sometimes you view this as falling on deaf ears.
5   A.   Yes.
6   Q.   You understand.
7   A.   (Affirmative head nod).
8   Q.   And sometimes you will have people say,
9   "You know, Jim, just go talk to somebody else, I
10  don't want to hear it any more."
11  A.   (Affirmative head nod).
12  Q.   Okay.  I'm more interested in anything

**CONFIDENTIAL**

13 anyone did affirmatively say to you, "it's a bad
14 thing that you are raising this, don't do this any
15 more, you are in trouble for" -- when I say
16 criticism, that's what I am talking about in that
17 line?
18     A.  No, I don't recall any specific criticism.
19     Q.  Okay.  Now, which one of these documents
20 generated a meeting with lawyers?
21     A.  That one.
22     Q.  Now, you have handed me documents that
23 Bates stamped PL-01199 through -01202.
24     A.  Yes.
25          MR. POOR:  Why don't we mark that

1 separately just for the purposes --
2          THE WITNESS:  Sure.
3          MR. RAYL:  (Affirmative head nod).
4          MR. POOR:  -- of keeping it straight.
5          Would you mark this as 46.
6          (A certain document was marked Deposition
7 Exhibit 46 for identification by the reporter.)
8     Q.  (BY MR. POOR)  This is a memo you wrote to
9 Mr. Lynch in November of '95, expressing your
10 concern over the field release on AP arrangements?
11     A.  Yes.
12     Q.  Okay.  What happened after you sent that
13 letter to Mr. Lynch?

**CONFIDENTIAL**

14     A.  I did get a note from him, I believe
15 that's the one that he responded to, said it was of
16 interest, asked for some statistics, but it also
17 was copied to Mr. Tweddie, who was a CMO member,
18 but it was sometime -- I'm trying to keep my years
19 straight -- no, I guess it was relatively quickly,
20 December-January, somewhere in that time frame I
21 received a call from the law department and they
22 wanted to know when I would be in New York and that
23 they would like to discuss AP with me.
24     Q.  Okay.  Who did you get the call from?
25     A.  It was either Mr. Finnegan or -- I believe

1 it was Kevin Finnegan.
2     Q.  Who is an attorney in the law department?
3     A.  Yes.
4     Q.  Okay.  And then you did have a meeting
5 with the lawyers in the law department?
6     A.  It met with Kevin Finnegan and Robert
7 Nostramo.
8     Q.  Okay.  Between sending the letter and your
9 meeting, did you have any other communication with
10 Mr. Lynch or anyone else in the organization on
11 this issue other than perhaps asking for
12 statistics?
13     A.  Most of what I wrote on this issue started
14 in 1992.  No, I don't --
15     Q.  I meant not on this issue, necessarily,
16 but specifically in response to this memo?
17     A.  No.
18     Q.  The next thing substantively really that
19 happened was the meeting with the attorneys?
20     A.  Yes, it was.
21     Q.  Okay.
22          MR. POOR:  I am going to ask him about the
23 meeting with the attorneys for the purposes of the
24 deposition, Brian.  Obviously, you know it's our
25 position that this is a privileged communication,

268



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Q.  Okay.  Anything else, Mr. Rayl, that

**REDACTED - ATTORNEY CLIENT**

P401106965J

269

1  happened or that people said to you or wrote to you
2  or communicated to you that, other than what we
3  have covered, that leads you to the belief that
4  your involvement in these public policy issues was
5  a factor in these personnel decisions we have been
6  talking about?
7      A.  I think the fact that I have been so
8  persistent on those issues with so many people over
9  so much time, that -- that there is a strong
10  possibility that it's in there.  I mean I think
11  that -- there's -- in other words, very few people
12  at the senior level of the company, and
13  particularly, when we have -- we had investigations
14  and everything going on, could dare tell me, "oh,
15  don't ever tell us there's a problem," nobody could
16  say that to me.
17      Q.  And nobody did?
18      A.  Nobody did.  So I mean nobody was going to
19  tell me to stop or whatever, but clearly they
20  didn't act on it, either.  So --
21      Q.  All right.  Have we now covered all of the
22  facts that leads you to believe that your public
23  policy actions affected these employment
24  decisions?  I don't mean to infer there's more; I
25  just want to make sure we have covered them.

**CONFIDENTIAL**

270

1      A.  Basically, I believe they could have been
2  a consideration in the actions against me, yes.
3      Q.  Okay.  Now, your second allegation is that
4  MetLife breached its contract with you in I guess
5  all four of these jobs.
6      A.  Yes.
7      Q.  Okay.
8      (Certain documents were marked Deposition
9  Exhibits 47 through 50, inclusive, for
10  identification by the reporter.)
11      Q.  (BY MR. POOR)  Mr. Rayl, I have handed you
12  documents marked Deposition Exhibits 47 through 50.

Page  108

Ex 2

# PERSONAL INSURANCE DEVELOPMENT REVIEW FOR 19 _90_

## FOR OFFICERS, MANAGERS AND PROFESSIONALS

Name: _Jim Pagl_          Dept/Region/Branch: _PI / Tulsa_

Position: _Mgr Teleservices_          Time in Position: _____

**A. Overview of Responsibilities**

EXPAND TELESERVICES THROUGHOUT 1990 (GLHO & SEHO)

CONTINUE STRONG CUST SATIS INDICES

REVIEW EXPENDITURE LEVELS FOR TELESERVICES AND
REDUCE STAFF/LINE RATIOS

INTERFACE WITH MULTIPLE SUPPORT ORGANIZATIONS TO
ACHIEVE ORG GOALS

**B. Accomplishments Against Goals/Expectations**

EXPANSION COMPLETED. NOTIFICATIONS TO CUSTOMERS
(INTERNAL) WERE TIMELY & DETAILED. CUST SERVICE
LEVELS WERE SUSTAINED - 800 ACCESS REMAINED
AT ACCEPTABLE LEVELS.

FOCUS GROUPS, QUESTIONNAIRES, SERVICE ADVISORY COUNCIL -
ALL INDICATE STRONG LEVELS OF SATISFACTION.

·MET BUDGET GUIDELINES. THIS REMAINS AN AREA WHERE
ADDITIONAL MEASURING SHOULD BE DONE.

**C. Overall Assessment of Performance and Contribution Made During Past Year**

EXPANSION OCCURRED WITH A MINIMUM NUMBER OF
COMPLAINTS AND ACTUALLY PRODUCED HARD DATA CONFIRMED
STRONG CUST SATIS LEVELS. ENORMOUS TRAINING CHALLENGES
WERE MET WHILE THE CONDITION OF THE WORK WAS
MONITORED AND CONTROLLED FOR MINIMAL TIME SERVICE
DELAYS. JIM'S INPUT AS A MEMBER OF THE TELESERVICES
PLANNING BOARD HAS BEEN INSTRUMENTAL IN SETTING SYSTEMS
PRIORITIES & ENHANCEMENTS. HE'S ALSO
DELIVERED SEVERAL SPECIAL PROGRAMS (CALLPATH
FOR EXAMPLE)

**D. Business Goals for This Year**

MEET EXPENSE OBJECTIVES FOR THE DIVISION

CONTINUE TELESERVICES EXPANSION AND FULFILL
CUST SATISFACTION EXPECTATIONS

CONTRIBUTE TO TEAM OBJECTIVES/PROGRAMS FOR HO OFC

DEPOSITION
EXHIBIT
2
_Kagl_

### E. Principal Strengths

- SETS VERY HIGH STANDARDS FOR HIMSELF AND THOSE WHO WORK FOR HIM
- HANDS-ON APPROACH TO THE BUSINESS FUNCTIONS HE'S RESPONSIBLE FOR. EXTREMELY KNOWLEDGABLE
- WELL ORGANIZED & EFFECTIVE PLANNER. SUCCEEDS IN BRINGING PLANS TO ACTION.

### F. Development Needs

> SEPARATE BUSINESS ISSUES FROM PERSONAL/EMOTIONAL & SUBJECTIVE REVIEW. JIM CAN TEND TO MAKE THINGS "PERSONAL" CONCERNS.

> TRUST YOUR TEAMMATES. MGMT ASSOCIATES AT ALL LEVELS WILL WORK WITH YOU. SHARE YOUR AGENDA, ASK FOR SUPPORT.

> GIVE YOURSELF A BREAK. RELAX; GET AWAY FROM IT. YOU'LL REFRESH AND RECHARGE YOUR ENTHUSIASM.

### G. Development Plan/Actions (e.g., training, special assignments)

1991 WILL REQUIRE EVEN GREATER FOCUS ON THE "PROCESSES" NECESSARY TO IMPROVE THE EFFICIENCY & CUST SATISFACTION WITH WORK WE DO.

A REVIEW – DETAILED/THOROUGH – IS NEEDED IN C-L-D., IDENTIFYING AREAS WHICH CAN BE ELIMINATED, AUTOMATED OR IMPROVED FOR EFFECTIVENESS.

CUSTOMER STRATEGIES WILL BE NEEDED FOR DEALING EFFECTIVELY WITH A NATIONWIDE BASE (PRIMARILY INTERNAL) THROUGHOUT THE TRANSITION.

### H. Employee Comments

**CONFIDENTIAL**

_____ 8-4-91
Employee Signature/Date

_____ 1-25-91
Reviewing Manager Signature/Date

_____
Next Level Manager Signature/Date

18000080912 (1090) Printed in U.S.A.

MP4011069978

Ex 22

**CONFIDENTIAL**

Robert J. Crimmins
Executive Vice-President
Corporate Management Office

Re    Service Work Performed by Sales Office Clerical Force

Bob, among the recommendations that will not be made this week, at least by the Customer Service Team, is the implementation of a formal program to begin transferring the service work performed by the sales office clerical staff to the Service Centers. By far, the largest percentage of work performed by the sales offices comes in by telephone. Based on the findings of DALBAR, the level of service and treatment that a policyholder might find when calling a sales offices is a "crapshoot" *(their words, not mine, as this is what they said in the presentation they gave to MetLife Express).*

The recommendation for a formal service *"hand-off"* between the sales force and the Service Center was among the first hypotheses developed by the Customer Service Team. As things progressed, we modified our position to encompass only those service transactions coming into the branch offices by telephone. This would have been fine with me. This proposal also received some support from the Retail Team but they have been very divided on this issue. Therefore, as a team, we opted not to pursue it. But, it may still wind up among their final recommendations.

Whatever happens, I just want you to know that I researched this issue rather extensively and circulated the enclosed report. I believe Frank Lynch sent this to Dick Fleming and perhaps John Tweedie. The fact remains that we could substantially improve customer service and reduce costs if we would move as much of the service work out of the sales offices as possible. As a Company, we spend a lot of time *chasing ourselves* between the sales office and the Service Center. If we were dealing with the customer directly, a lot of this and a lot of the paper would *"go away."* However, it does hold the potential for another two to three million phone calls per year for the Service Centers.

Bob, I don't expect you to read all of this, I just wanted you to know of its existence. I also know that you are not in a position to take any real action. It may, however, prompt you to ask a question or raise an issue in the upcoming presentations and deliberations. And, for what it's worth, if you are interested in a candid opinion about any of the recommendations put forward by the Customer Service Team, I'd be more than willing to oblige.

In general, my only words would be that many things make sense at the high, *conceptual* level. But, at the practical level, they can probably only be implemented to some limited degree. Consequently, I suspect there are some differences between what is recommended at this time and what can really be implemented effectively. So, all the recommendations will require some careful consideration and analysis in Phase III. At the same time, if there isn't some really powerful force driving whatever recommendations are approved, I can see a lot of obstacles to actually getting them implemented.



DEPOSITION
EXHIBIT
22
Ryl

At any rate, Bob, this has still been a wonderful experience and I very much appreciate the opportunity. It was good for my mind, my spirit and my soul. I can now face going back to Tulsa with a new level of motivation and enthusiasm. And, Bill has asked that I stay involved *(from Tulsa)* so I will be happy to do that assuming it can be made to work. In the meantime, I will looking forward to seeing you, perhaps on the boat ride. Thanks again for everything.

Warmest personal regards

J. L. Rayl
Customer Service Team
MetLife Express

June 19, 1995

**CONFIDENTIAL**

**Jim Bell**
**Director**
**Information Technology**
**Canadian Head Office**

MP4011070331

**Re   Teleservicing**

After taking a look at my files, I find I don't have any single document or small collection of documents that would specifically address the issues associated with starting a teleservicing operation. Consequently, I went through and just picked out anything that I thought might be remotely of interest.

In the early years we had a lot of dialogue on the *cost justification* issue. That always frustrated me to no end because I always felt it was a *business decision* that was driven by the customers and the competition. But, as we discussed, MetLife has had a very difficult time in making a firm commitment to the delivery of world class customer service and, in spite of MetLife Express, still hasn't reached universal agreement on how the service should be delivered.

However, all this aside, I would hope that you could convince the skeptics that, at the very least, an 800 number is a service alternative that should be available for all the orphans and policyholders who do not have quick and easy access to a sales office or sales representative. And, there are many other benefits such as:

- Ensuring customers receive a consistent level of service from well-trained and knowledgeable Customer Service Representatives
- More opportunities to develop sales opportunities
- Conservation of assets and policies

Jim, I have some idea of what you're up against and I wish you luck. We would welcome your visit and the opportunity to show your folks what we're doing. We're still only scratching the surface of the ultimate potential for teleservicing but a lot of thinking will have to change.    I hope some of this material is  helpful and if there's anything else I can do or you have any questions, please let me know.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

March 1, 1996

**CONFIDENTIAL**

John H. Tweedie
Executive Vice-President
Individual Life Insurance
AREA 5-E

MP401107033

Re  Quality Assurance *"Outcalling"* Program - Johnstown

John, it is my understanding that plans are going forward to expand the Johnstown *Quality Assurance* program.  Based on my experience and knowledge of call center operations and the perspective I developed while serving on MetLife Express, I would like you to consider a few reasons why I feel expanding this operation in Johnstown would be the wrong long-term approach for the Company.  My reasoning is as follows:

### Telecommunications Technology

In order to handle any type of outcalling activity *on a productive basis*, a high level of telecommunications technology should be utilized.  Outbound calls should be handled through sophisticated predictive dialing equipment with answer detection.  This does all the dialing and accurately screens out busy signals and answering machines.  Without such technology, people will generally spend more time dialing, getting busies, no answers, or answering machines than they will actually spend talking on the phone.  With appropriate equipment and some degree of computer/telephone integration, the individuals handling these calls would spend the majority of their time talking to customers.

While it is my understanding that some type of *automatic dialing* equipment may be used in Johnstown, I suspect it is a far cry from the level of sophistication that was recommended to be included in the call center recommendations made by MetLife Express.

### Customer Service Issues

While I understand the primary intent of these calls is associated with the verification of information associated with recently issued policies, it is bound to occur that some of these customers will have existing MetLife policies.  Consequently it is likely that service issues might be raised for these existing policies or the customer may have service questions on the new policy.  I don't know how these will be handled, but from a customer perspective, ideally these would be fully addressed at the time of the call.
I don't know whether Johnstown intends to attempt this or not, but I can assure you that the employees there will not have the same level of training and knowledge found in the two ILI call centers.  By the same token, if it is Johnstown's intent not to handle these issues but refer the customer to the 800 number or their representative, the Company would not be creating the best perception of our customer service.  We also would not be maximizing the value and impact of that first phone contact with the customer.

**CONFIDENTIAL**

This first call should be used to enhance the image of the Company and be the beginning of the customer service relationship. In addition to obtaining whatever information is desired for the *quality assurance* aspect of the program, it would be a great time to reinforce the MetLife's commitment to customer service and assure the customer that we are prepared to fulfill our obligations with respect to meeting their customer service needs. Ideally, this should be done by someone fully capable and prepared to deal with customer service issues.

## Ultimate Cost Effectiveness

A major problem in achieving maximum employee utilization and efficiency in the ILI call centers is the extreme volume fluctuations. It is virtually impossible to maintain *exactly* the right number of CSRs available at all times to handle calls. Outcalling, particularly with effective use of technology and "*call blending,*" is one of the most effective ways to *smooth out* those fluctuations. All CSRs can be utilized for inbound calls when volumes are heavy but, as things lighten up, some CSRs can be diverted to the outbound calls and inbound and outbound calls can be *mixed* to ensure maximum CSR utilization.

John, the ultimate call center vision that we discussed at MetLife Express clearly encompassed outcalling programs. If you remember, my presentation, I mentioned the idea of *proactive customer contact* to ensure that we maintained and built upon our customer relationships. This activity would definitely fall into that scope, even though these calls are primarily for a specific purpose associated with the recent policy issue. But, as a Company, I believe we would be a lot better off to have them handled by our customer service *professionals*.

If you have any questions or there's any additional information I can provide, please feel free to let me know.

**CONFIDENTIAL**

J. L. Rayl, ACS
Director
Customer Services & Communications
**MetLife Customer Service Center - Tulsa**

July 20, 1995

Page 2

MP41107O333

**Vincent J. Donnelly**
**Vice-President**
**P.I. Planning**
**AREA 5-E**

**Re  Customer Services Task Force**

Vince, enclosed is a copy of the *"Strategic Plan"* that we developed back in September of 1993.  As I indicated, it is essentially the direction Steve White discussed in a recent conference call.  The primary difference is that 800+MET-LIFE is now being used as the *"generic"* or Corporate number.  The new number for Personal Insurance will be 800+MET-5000.

I have also enclosed some other material that may or may not be of interest.  This includes the latest report I have from the White Task Force sub-committee on the *generic* 800 number.  I will try and summarize some of what has transpired in recent months.

–　The Goodman Customer Services Task Force became the White Task Force.  It also apparently developed a broader mission.  This Task Force has been operating independently of such things as *"Project 2000."*  The Customer Services Task Force already had a sub-committee addressing the issue of a Corporate or *"Generic"* 800 number.  This started prior to Steve White's involvement.

–　Kathy was a member of this sub-committee *(as a result of your efforts last year)*.  This sub-committee was moving forward as a *Corporate Information Systems* project *(not P.I.)*.  A separate system was being proposed and designed for the "Corporate" CSR.  To my knowledge, Suzanne Flynn, a Project Manager in Corporate Info Systems has been the primary leader in this project.  *(She works in Parsippany.)*  PI is still involved through Luci Chez's organization but I don't think PI has any real control over the direction of the sub-committee but we are the most influential.

–　It became apparent that this sub-committee was overlapping with goals and activities of *"Project 2000."*  This issue was raised and Suzanne Flynn began attending the *Project 2000* meetings and I assume is now a member of this group also.

–　Steve White has recently energized his Task Force.  He has given presentations on the changes needed in Customer Service.  He has broken his focus into three broad areas.  Simply defined, it is the concept of achieving:

　　(1)  *Customer Loyalty* through

　　(2)  Improved *Business Processes* and

　　(3)  Higher levels of *Employee Commitment*

**CONFIDENTIAL**

1