

## EQUIPMENT

Although more offices are moving towards upgraded phone equipment, there would be duplication of expense for ACD (*Automatic Call Distributor*) equipment. In some instances there could be substantial expense involved if we must upgrade or replace a phone system that would not otherwise be upgraded. If a new switch is required it could easily cost in the neighborhood of one million dollars or more.

Additional hardware and software expense could be required to provide forecasting and historical call information for multiple sites. For Central, this capability is projected to have an upfront cost between 65 to 90 thousand dollars.

Some duplication of personal computing and word processing systems would be required to support multiple sites.

## VOICE RESPONSE EQUIPMENT

One of the emerging technologies with respect to providing 800 service is the facility to provide information (and potentially service) through voice response systems. There could be significant expense involved if this equipment must be duplicated in every site.

**CONFIDENTIAL**

MP4011070471

# New Technology

MP401107042 72

## VOICE RESPONSE EQUIPMENT

Voice response technology offers new and exciting opportunities with respect to the level of service it can provide our customers. Currently, however, there is considerable concern and debate as to just how this fits in with the overall Teleservicing focus and objective.

Voice response equipment has demonstrated it is well suited to providing information and limited service in certain environments. It is used by our Pensions Department in the form of our *"BenePhone"* and is used very successfully by a major mutual fund to provide a fairly wide range of information and services.

There are open questions as to how this technology fits in with Teleservices applications. *It is the opinion of this writer* that, at the present time, this technology should be limited to specific transactions and applications using numbers other than 1+800+MET-LIFE. Because of its nature and limited capabilities, the general customer base should NOT be subjected to having to deal with this technology until we are fully prepared to provide a full line of services.

Security is a major issue. A touch tone phone is also required and a substantial percentage of our policyholder base still does not have access to one. There are also additional considerations which could cause it to serve as an irritant rather than be perceived as an attempt to provide *"state of the art"* service.

**CONFIDENTIAL**

MP401107O473

## VOICE RESPONSE - Cont'd.

At the same time, voice response technology has a definite role to play in the Teleservices operation. We are getting ready to pilot voice response equipment on the 1+800+MET-PAYS number by using it to quote ULII unit values. This is a transaction that is well suited to voice response technology.

It is recommended that future experimentation with voice response be limited to specific products and transactions which lend themselves fully to the existing capabilities of this technology. More importantly, our efforts in this area should be *separate and distinct* from the 1+800+MET-LIFE activity, particularly while we are in an expansion mode. We should not risk having a negative impact on our policyholder base by subjecting them to a technology that is still in its infancy.

**CONFIDENTIAL**

MP4011070474

# OTHER  CONSIDERATIONS

# AND  ADVANTAGES

# TO  A  NATIONWIDE

# TELESERVICES  OPERATION

CONFIDENTIAL

## Administrative Transaction Processing

Teleservices has made steady progress towards a *"single workstation concept"* and processing transactions to completion rather than just providing information.

Because of this gradual evolution, it has been impossible to determine and quantify the exact clerical offsets that have taken place within the Head Office. There is no question that a portion of the work done in Teleservices would normally have been handled in other parts of the Head Office or by the sales office and there have been some resulting savings. It also stands to reason that a nationwide expansion of the Teleservices operation would result in some additional clerical savings in other offices.

But, it should also be recognized that there is a portion of the Teleservices work that might not have been done at all, as without the availability of the 800 number, the policyholder might not have sought the information or attempted to initiate the transaction.

At the same time, Teleservices is completing other work beneficial to the Company that was not specifically initiated. For example; a policyholder may call for one reason but, as a result of the call, we have determined that our address on file is incorrect. Consequently, we are seizing the opportunity to change the address as we may or may not have otherwise received a formal request to do so. We also obtain social security numbers during calls.

There are substantial opportunities for Teleservices to achieve additional clerical offsets for the completion of administrative transactions. These can be accomplished through the following means:

- Additional Electronic Systems and Enhancements

- Changing Company Requirements

- Expanded Processing Authority and Responsibility For Teleservices

CONFIDENTIAL

MP4011070475

## Electronic Systems and Enhancements

The major electronic system being proposed is the development of an electronic "transaction suspense file" and "turnaround" document. For example; if a call is received for a change of beneficiary transaction, the CSR would call up a *"Change of Bene"* screen on the CRT.

This screen would then prompt the CSR to enter all the required information at the time of the call. The transaction would be "stored" in a suspense file and an appropriate letter and completed *"Change of Bene"* form would be mailed to the owner to be signed. When the signed form is returned, the transaction would be "released" from the suspense file and applied to the master file. This system could be applied to all transactions requiring signed forms. There would be savings associated with reduced correspondence, the elimination of form completion errors and problems with illegibility.

Other lesser changes and enhancements to our systems can improve the completion ratio for transactions handled by Teleservices.

## Changing Company Requirements

In the *Change of Bene* example cited, significant processing improvements could be achieved if the Company would waive the requirement that the beneficiary designation must be endorsed on the policy. The completed form could come back to Teleservices where it would be reviewed to make certain it was signed by the owner. The "suspense" transaction could be released by entering a "control number" from the form into the system. The form could then be microfilmed as a permanent record.

Company requirements should be examined for ALL transactions to see if changes could be made which would make processing in a Teleservicing environment more practical and efficient.

**CONFIDENTIAL**

MP40110704276

MP4011070477

### Expanded Transaction Processing Authority and Responsibility

At the present time Teleservices is processing loan and dividend payments. However, these transactions are subject to certain limitations such as dollar amount. All "reconciliation" cases are referred to Policyholder Services.

At some point in time, Teleservices could become the primary provider of policyholder service. Accordingly, as Teleservices expands, it should be permitted to develop additional responsibility and expertise in these areas to expand the completed processing. A number of additional payment situations could be fully processed in Teleservices very easily.

In addition, in a "Two Tier" environment, Teleservices would be developing high levels of expertise in a number of areas. As this expertise develops, appropriate responsibility and authority should be shifted to Teleservices.

> NOTE: It is expected that this shift in transaction processing would be a gradual process. It is NOT recommended that any immediate consideration be given to combining Teleservices and Policyholder Services. This would not be practical in an expansion mode and, for the immediate future, Policyholder Services will continue to have a wide range of complex, labor intensive transactions including death claims. Any attempt to combine responsibility for all of this while Teleservices is in an expansion mode would most likely work to the detriment of all concerned.

**CONFIDENTIAL**

MP40110704 78

## CUSTOMER EXPECTATIONS

As outlined in numerous recent books and publications, meeting the increasing customer expectations will become a critical marketing and service strategy for achieving success in the marketplace. This has been the stated goal of Metropolitan.

In a 1984 Policyholder survey conducted by the Company, participants were given the opportunity to offer two suggestions as to how Metropolitan could improve service to policyholders. Twenty percent responded with *"more personal contact."*

The following are excerpts regarding policyholder service from a LIMRA Marketing Audit submitted to the Company in 1986:

- *"The new "800" number will provide better policyholder service."*

- *"Orphan policyholders have difficulty obtaining service."*

- *"Metropolitan is rated somewhat lower by its policyholders than has been the case for other companies."*

- *"Agent turnover and inconsistent assignment of orphan policyholders have led to poor policyholder service."*

- *"The Metropolitan does not rate as highly as have other companies in answering inquiries either fully or promptly."*

- *"Policyholders do like to know the status of their insurance but they frequently do not understand written communications from the home office."*

- *"Apparently a number of Metropolitan policyholders do not feel they are receiving an appropriate level of these post-sale services."*

**CONFIDENTIAL**

MP40110704_79

## CUSTOMER EXPECTATIONS - Cont'd.

The Company has taken steps to rectify this situation. Orphan policies are being reassigned. The new compensation program provides incentive for the Sales Representative to provide service. But, *is this enough?*

Metropolitan still faces tremendous challenges in its Field organization which can interfere with the level of service provided through the sales offices. As they should be, our priorities in the field are focused on regaining our manpower position and increasing sales.

This, combined with the existing maturity level of our sales and management force, leaves no alternative but for our field emphasis and energies to be placed on recruiting, training, development and sales activities. So, in spite of the new emphasis on service in our compensation program, it may be awhile before this has any real impact on the service delivered by our sales representatives. The real improvement will be felt as our retention improves and more effective *client relationships* are established by our sales representatives.

In the meantime, Teleservices can ensure that ALL our customers have immediate access to a CONSISTENT level of QUALITY, METROPOLITAN SERVICE. In those instances where the sales representative has developed an effective client relationship with the customer, Teleservices would merely serve as a backup to the service delivered by the sales representative. In fact, some sales reps have indicated they use the 800 number as a selling point for Metropolitan.

In keeping with this, Teleservices should always be managed as a <u>support operation for our Field Force</u> in addition to servicing our policyholders.

**CONFIDENTIAL**

## PORTFOLIO COMPLEXITY

The Insurance and Financial Services industry is becoming highly competitive and offers an extremely complex portfolio of products compared to just a few years ago. Not only must we be concerned with the competition in selling the business, but we must also be more concerned than ever with retaining it once it is sold.

Many of today's consumers are much more knowledgeable about the products available in the marketplace. The complexity of some of these products makes them much more *service intensive* than our traditional policies of the past. Accordingly, they bring with them a high level of expectation on the part of our customers as to how they will obtain service or information. This is particularly true on the investment sensitive products.

An inability on Metropolitan's part to meet *or perhaps exceed* this expectation could have a negative impact on our marketing efforts or in our ability to retain these assets once the product is sold.

A nationwide Teleservicing operation would ensure that these customers always have access to needed information or service. In addition, it would provide Metropolitan with an ongoing opportunity to be alert to changing customer concerns and attitudes concerning these products.

**CONFIDENTIAL**

## Support To The Marketing Organization

### COMPANY IMAGE

Teleservices offers Metropolitan the opportunity to become a leader among the giants in providing true *QUALITY SERVICE. This advantage can be promoted to the general public in our advertising program.* Many of our current advertisements stress our commitment to service and could be easily enhanced to emphasize how we achieve this goal through Teleservices.

By further demonstrating and enhancing our image as *"The Quality Company"* with respect to service, we will be supporting our marketing efforts.

### SALES LEAD GENERATION

While providing QUALITY customer service must always remain the primary responsibility of Teleservices, there should be incentives and commitment to <u>fully developing</u> the sales and income potential for the Company.

The 1986 LIMRA study states:

*"The Metropolitan sales force is missing many opportunities for repeat sales with existing Metropolitan policyholders."*

The report goes on to state that we are missing these opportunities for a variety of reasons, not the least of which is the fact that we lose contact with many of our policyholders and never bother to ask about additional insurance or financial service needs.

**CONFIDENTIAL**

MP401107048l

MP40110704B2

## SALES LEAD GENERATION - Cont'd.

The ease with which a policyholder can contact Metropolitan in a Teleservicing environment should substantially increase the opportunity for the Company to stay abreast of important changes taking place in the policyholder's life and circumstances. With proper training, the Customer Service Representatives should be able to selectively develop specific insurance and financial service needs which can be translated into sales by our Career Agency force.

It must be recognized, however, that this is an extremely complex issue. Past attempts to generate sales leads through Teleservices focused primarily on getting policyholder agreement for contact by a sales representative. This proved to be an expensive and ineffective approach.

A great deal of work is required to determine how to take full advantage of this potential. As a first step, we are proceeding along the following lines:

- Determining the relationships between specific transactions and their potential for needs/lead development. This also entails being alert to certain conversational "signals" from the policyholder that would indicate potential need or interest in an insurance or investment product.

- Target certain markets based on information currently available on the client or other electronic files.

- Experiment with specific product promotion during calls and through, Teleservicing related correspondence generated as a result of the call.

A consistent and effective sales lead generation program through Teleservices would ensure that we lose fewer sales to our competitors because of failure to ask or pursue new sales opportunities with existing clients.

**CONFIDENTIAL**

## CONSERVATION OF ASSETS

Teleservices offers a unique opportunity to dramatically impact the conservation of assets. In the present environment, most conservation efforts within the Company must take place *after a decision has been made by the policyholder*. Consequently, it is more difficult to conserve a policy when we must attempt to get the policyholder to reverse a decision.

In the Teleservicing environment, we get many opportunities to **influence the initial decision**. When a call is received in Teleservices requesting information on the cash value, the policyholder is asked why the information is wanted. In many instances the policyholder is *"considering"* surrendering the policy. The Customer Service Representative then has the opportunity to conserve the policy through a variety of measures.

This includes pointing out such things as:

- **Consideration of the dividend to premium ratio**
- **Cost of replacement and potential uninsurability**

If the issue is strictly financial, the CSR can offer alternatives such as withdrawing dividends or taking a loan rather than surrendering the policy.

As a last resort, the sales office is notified (via SLED) that the policyholder has requested information on surrendering the policy. This gives the sales office an opportunity to intervene before the surrender request is received.

It is also believed that some number of cash surrenders occur strictly because of a failure on the part of the Company to remain in contact with the policyholder. This is particularly true of orphan policyholders and those not having a sales office in close proximity to their home. Teleservices would **provide a means for these policyholders to stay in contact with the Company and have their service or information needs met.**

**CONFIDENTIAL**

MP4011070483

MP401107O484

## CONSERVATION - METROMATIC BUSINESS

There is also an opportunity for the Teleservices operation to impact our present lapse rate on Metromatic business, particularly as it applies to persons dropping out of the groups.

Under the present arrangement, it may be several months before the company becomes fully aware that an individual has been dropped from a group and we arrange to have the policy changed to separate billing. As a result, by the time it is accomplished the policyholder is faced with several months of back premiums in order to reinstate the policy.

Ideally, all Metromatic policyholders (employers) would have access to Teleservices *(but perhaps a separate number)* to report deletions from the group billing. At that time, Teleservices could immediately arrange to have the policy deleted from the group and individual billing started. It could even be followed up with a phone call to the insured to point out the value of retaining the insurance and letting them know that they will be receiving a coupon book.

As a further incentive for the employers to call, Teleservices should have access to the Metromatic billing system. The billing system should be capable of immediately generating corrected billing statements for current additions or deletions. Teleservices could then generate a current and corrected billing statement to the employer based on the phone call.

**CONFIDENTIAL**

## COMPLAINTS

The nationwide promotion and availability of 1+800+MET-LIFE would provide a "neutral" area to receive all types of consumer concerns and complaints. Much of the frustration and dissatisfaction in any complaint situation is not being able to find someone who seems to care and will listen. With Teleservices, there would always be the opportunity to discuss the situation "one on one" with a professional trained to listen. This, in itself, can do much to diffuse a volatile situation and calm a concerned policyholder.

Based on studies conducted by the Technical Assistance Research Programs, prompt and effective response to consumer complaints can result in a more loyal customer. Among things learned By TARP were the following:

- The average business never hears from 96% of its unhappy customers

- For every complaint received, the average company has another 26 customers with problems, 6 of which would be classified as serious

- Complainers are more likely than noncomplainers to do business with the company again

- Studies indicate that up to 95% of the complainers will do business with the company again if the complaint was resolved quickly

It is much easier to call an 800 number than to sit down and write a letter of complaint. By the time a policyholder does write, the complaint has often already been elevated to the Officer or Insurance Department level. In a Teleservicing environment, we could hear from more of our policyholders with complaints or concerns. However, each call would be an opportunity to develop a more loyal customer. Teleservices could provide independent tracking and reporting of complaints. It would also serve as an "early warning system" for all areas of customer complaint. Complaint trends or areas of unusual concern could be spotted and recognized much more easily in the Teleservicing environment.

**CONFIDENTIAL**

# CURRENT OPERATION DESCRIPTION

*(Excluding the New England Head Office Which Has Not Gone "Live")*

The current Teleservices organization in the Central Head Office consists of 28 employees. A breakdown of the positions are as follows:

### Customer Service

This unit is responsible for all activities directly associated with customer service.

- 14 Customer Service Representatives
- 3 Clerical Employees
- 1 Customer Service Supervisor
- 1 Senior CSR/Expeditor

### Training/Support/Systems Administration Positions

This unit provides all support activities including training, analysis, quality control, recommended electronic enhancements and control of all activity associated with the Teleservices and Head Office phone system.

Note: *The staffing in this unit does not increase proportionate to increases in the Customer Service Unit. Much of this staff has been required to support the tremendous demands for information and analysis placed on the operation over the past year and a half. Major expansion of the Customer Service operation could be supported with only minimal increases to this unit.*

- 1 Manager
- 1 PC Specialist/Secretary
- 1 Business Analyst/Supervisor
- 4 Trainers *(2 dedicated to expansion activities)*
- 1 Analyst
- 1 Systems Administrator

**CONFIDENTIAL**

MP4011070486

MP4011070487

# TELESERVICES FACT SHEET
### (As of October, 1987)

| CALL STATISTICS | 1987 | 1986 | Variance 87 VS 86 |
|---|---|---|---|
| Calls Answered - Annually | - | 111,485 | - |
| Calls Answered - Jan. thru Oct. | 111,375 | 94,769 | +17.5% |
| Monthly Average - Jan. thru Oct. | 11,138 | 9,477 | +17.5% |
| Daily Average Answered by CSR's | 53 | 33 | +60.6% |
| Highest Daily Average Answered by CSR | 79 | 47 | +68.1% |
| | | | |
| Calls Abandoned - Annually | - | 13,769 | - |
| Calls Abandoned - Jan. thru Oct. | 15,879 | 10,715 | +48.2% |

| | | |
|---|---|---|
| Annual Call-in Rate (% of inforce policies) | 10% | (Less Than - See Below) |
| Abandon Rate | 12.5% | |

| | |
|---|---|
| Average Minutes Before - Answer | 1.6 |
| Average Minutes Before - Abandon | 2.2 |

Highest volume of calls **received** - 10:00 A.M. to 11:00 A.M.

Highest volume of calls **abandoned** - 11:00 A.M. to 12:00 A.M.

| AVERAGE CALL TIME | 1987 | 1986 | Variance |
|---|---|---|---|
| Talk Time | 4.0 | 4.5 | - .5 |
| After Call Work Time | 1.5 | 1.2 | + .3 |
| Total Call Time | 5.5 | 5.7 | - .2 |

**NOTE:** *See the section on "COST" for more information regarding the call-in rate.*

**CONFIDENTIAL**

| TRANSACTION STATISTICS | 1987 | 1986 | Variance 87 VS 86 |
|---|---|---|---|
| Transactions handled - Annually | - | 193,500 | - |
| Transactions handled - Jan. thru Oct. | 180,520 | 160,910 | +12.2% |
| Monthly Average - Jan. thru Oct. | 18,052 | 16,091 | +12.2% |
| Average trans. per call - Jan. thru Oct. | 1.6 | 1.7 | - |

Transaction Codes - 38 codes identifying transactions handled

Source Codes - 14 codes identifying source of 800 number

| MAJOR TRANSACTIONS HANDLED | % of Transactions Handled 1987 |
|---|---|
| Loan Inquiry | 13.8% |
| Miscellaneous | 9.8% |
| Status | 9.7% |
| Cash Value Quote | 9.6% |
| Dividend Inquiry | 7.1% |
| Change of Address | 5.6% |
| Cash Value Inquiry | 5.5% |
| Check-o-matic | 5.2% |

| CWS TRANSACTION | TOTAL | MONTHLY AVERAGE |
|---|---|---|
| Cash Surrender - Quotes | 10,318 | 1,032 |
| Loan - Quotes & Payments | 3,459 | 346 |
| Dividend - Quotes & Payments | 2,440 | 244 |
| CWS TRANSACTIONS THAT SINGLE CYCLE | | 69.9% |

| CHECK-O-MATIC | TOTAL | MONTHLY AVERAGE |
|---|---|---|
| COM Stops | 2,492 | 249 |
| Change draft date | 87 | 9 |
| Start drafting | 92 | 9 |

**CONFIDENTIAL**

dP4011070488

MP401107O489

## CAMPAIGNS HANDLED

| | |
|---|---|
| Loan Repayment | Jumbo Metromatic |
| IRA | LIMRA Study (Lapsed Policies) |
| DWI to AI | LIMRA Study (Service) |
| Excess Div to AI | Check-o-matic Conversion |
| Certification Campaign | 1st Federal Banking Project |
| Loan Interest Payment | Mercantile Project, St. Louis |
| Asian Market | Military Market |
| Metromatic Brokers | Brokers |
| Baldwin United | Universal Life 11 |
| Address Audit (Industrial Weekly) | Address File Accuracy (HOPS) |

| MAJOR SOURCES OF CALLS RECEIVED | 1987 | 1986 |
|---|---|---|
| Repeat Calls | 29.6% | 25.3% |
| Sales Office Referrals | 19.5% | 20.3% |
| Loan Repayment Campaign | 14.3% | 17.8% |
| Renotification/Policy Sticker | 13.6% | 11.0% |

| ONGOING NOTIFICATIONS | CALLS RECEIVED | LETTERS MAILED | % OF CALLS TO LETTERS |
|---|---|---|---|
| Renotification | 10,918 | 650,248 | 1.7% |
| Loan Repayment | 14,558 | 792,253 | 1.8% |

CONFIDENTIAL

MP4011070490

**CONFIDENTIAL**

MP4011070491

Mr. Robert J. Crimmins
Executive Vice-President

**Re  Teleservices**

Bob, I was just informed that you have had to cancel your visit to Central scheduled for January 21. While I am disappointed, I'm also a little relieved. We have had a barrage of visitors and activities going on in Teleservices since my visit with you and we are not nearly as far along on the presentation and expansion proposal as I expected to be at this point.

I would like to offer an alternative though. While I would really like you, John Falzon and others to see our operation, I know how difficult it would be to coordinate such a visit. By the same token, I know it might be easier to get more of the right people together in the Home Office rather than here.

If you feel it would be a practical and effective approach, I would be more than willing to come to New York and make a 60 to 90 minute presentation on Teleservices to whatever audience you feel is appropriate. I am reasonably confident that I could put a presentation together which would paint a pretty good picture of what it is we do and what we're trying to accomplish. I would welcome the opportunity to convey the vision from the very "front lines" of the operation.

If you are in agreement, I would prefer to do this in late January or early February. If you have any thoughts or ideas that you particularly want to see covered in such a presentation, please let me know.

J. L. Rayl
Manager
Teleservices/Financial Control
**Central Head Office**

January 4, 1988

**CONFIDENTIAL**

Barbara J. Gardner
Assistant Vice-President
Central Head Office

**Re  Teleservices Report**

Barbara, as we discussed, Bob Crimmins asked to meet with me regarding Teleservices.  He was not at all specific as to exactly what he wanted to discuss.  Needless to say, I welcome the opportunity to give Bob our perspective on the current status of the project.  Accordingly, I have prepared and sent him the attached document for review prior to our meeting.  I have attempted to outline what I feel are all the current major issues still pending with respect to the direction and future of Teleservices.

As you witnessed at the last Teleservices meeting in New York, the current focus and emphasis is not on customer service or what Teleservices can potentially do for Metropolitan in this area.  As I see it, the basic question that still needs to be answered is:

### What does Metropolitan want Teleservices to be?

This issue has never really been resolved and everyone involved seems to  have a different idea and perspective.  Is it just to be another administrative operation or is it to be a new **Corporate standard** for customer service?

I think it's time that the Company finally addressed this question.  While I have very specific ideas as to what I think Teleservices can and should be, I am fully prepared to support whatever direction Metropolitan wishes to take.  However, I would just like to find out what direction that is.  Perhaps this is where Bob will be able to "set the stage."

I know the size of this document is intimidating but I have tried to cover all the pertinent points without belaboring any of them.  While I don't expect that Len will be particularly pleased with some parts of it, at least it will get some of these issues on the table so they can be addressed.

James L. Rayl
Manager
Teleservices/Financial Control

November 20, 1987

cc  Dave Martin                              **CONFIDENTIAL**

Mr. Robert J. Crimmins
Executive Vice-President

Re  Teleservices

Dear Bob

It is ironic that on the day you called, I was so frustrated that I was contemplating writing to you to
let you know that I had grown weary of the battle and was about to quit fighting.  I have been
operating with practically no support for my position and I feel as though I no longer know what
Teleservices is supposed to be or what it is expected to accomplish for Metropolitan.  As you know,
my focus has always been on what it can do in terms of customer service and Corporate image.  This
now seems to be only a peripheral issue and I seem to be out of step with the entire project.

I have prepared the attached document which I feel outlines all the major concerns and issues
currently surrounding Teleservices.  While I continue to have strong opinions, I feel they are
supported by our facts and experience.  I realize that the size of this document makes it intimidating,
but I did try to cover each of the issues briefly (but in necessary detail) and without pontificating.
I also tried to make it as readable as possible.

If you don't get a chance to review it before our meeting, we can discuss it at that time.  However,
the basic question that needs to be answered is:

### What does Metropolitan want Teleservices to be?

Is it going to be a new Corporate standard for customer service or is it just going to be a new
administrative operation?

Bob, I don't have to tell you what I think it can and should be.  However, I realize that there are many
considerations and I am prepared to fully support whatever direction the Company wants to take.
My concern is the fact that, at this point, no one really seems to know what that is.

I will look forward to seeing you and I am extremely appreciative of having your time to discuss
this.


James L. Rayl
Manager
Teleservices/Financial Control
Central Head Office

November 19, 1987                        **CONFIDENTIAL**

**CONFIDENTIAL**

Mr. Robert J. Crimmins
39 Polly Drive
Huntington, NY  11743


Dear Bob


CONGRATULATIONS !!!!!

I just heard the word and I can't begin to tell you how happy I am for you (and for the Company.) I don't think there is any other position where a single person can have so much influence and impact on the Company. I know where your heart is and how much you only want the opportunity to make METROPOLITAN all it can be. Certainly this position will provide that opportunity and I know there isn't anyone else around that will do a better job.

Your exact responsibilities (other than total responsibility for Career Agencies) have not been made clear to us yet. Consequently, I'm not sure what role or responsibilities you may have with respect to the Administrative Operations in general, or Teleservices in particular. For selfish reasons I would like to see you have the whole shooting match, but for your sake, it may be better if you only have to focus your attention on the Marketing side. However, whatever you have, I know that you will continue to be a POSITIVE and powerful influence on the future direction of the entire Company and for that I am thankful.

Bob, I'd be less than honest if I told you I wasn't also very happy for a few personal reasons. I'd like to think that we've been tending to one of your other dreams during your temporary absence. Although a lot of positive things have happened recently, we're a long way away from where it can be. Nonetheless, your dream of many years ago is finally beginning to become a reality.

I think we've got the servicing piece going well and in the right direction. We have yet to unleash the full potential of the marketing related aspects you envisioned so many years ago. We have come a long way, but we have truly only scratched the surface. I hope you will be able to find the time to offer a little direction to this project (at the Corporate level) and keep it on track.

Bob, aside from any personal benefits I see from your move, please believe me when I say I am truly, truly happy for you. I feel this is the kind of move you've been waiting for and there is no question that it is well deserved and the greatest move Metropolitan could ever have made. Forgive me for offering a little advice but I know how you put so much energy into everything you do. This is particularly true when faced with a new challenge so I cannot help but worry a little bit about you. Be careful. Always remember to watch and take care of your health.

MP40110704194

MP401107049S

I know this is just the beginning of many great things for you and for Metropolitan. You know you have our full support but, more importantly, **you have so many friends that want to contribute to** and are rooting for your success. You have my deepest and most sincere wishes for nothing but the best as you embark on this exciting challenge.

With warmest personal regards and deep respect

Jim Rayl

August 15, 1987

CONFIDENTIAL

Ex 37

REDACTED CONFIDENTIAL
POL INFO

Lawrence Vranka
Vice-President
P.I. Consulting Services

Re   Single Premium UL

███████████ - Policy 87████████UL

Larry, there's nothing to do on this case, but I thought I his comments were worth passing along anyway.  I received Barbra DiBiase's response to the ████████ case. Ms.████████request was similar to others in asking that she be able to get her money back and that we waive the surrender charges.

While it was my assumption this would not be done, this issue was not specifically addressed in Barbra's response to me.  Is this being done for any of the complainants? I don't know where this whole issue stands, as I don't know how we responded on some of the other cases I sent.  However, it would appear that some of these people are going to make a strong argument for misrepresentation.  Ms.████████inference to that is why I felt you should get the case in the first place.  But, perhaps the question is;  who has authority to decide or rule on these misrepresentation claims?  Do the individual Consumer Relations units still have this authority and should we just be referring our cases to them?  I assume that many of these units are already dealing with some of the Single Premium complaints that surfaced through the sales offices or were made directly to them.

Based on Barbra's response, I assume the official position for everyone is that they received the policy and therefore had the obligation to review it and exercise the 10 Day Free Look option if they had a problem. But, in the absence of their having exercised this right at that time, under what circumstances will we honor a claim for misrepresentation knowing that in some cases, it is highly probable that our representative may have told them that we would not ever exercise the COI provision?  And, have the various Consumer Relations units been notified accordingly?

Larry, I know you have many bigger issues to deal with, but it would seem that the Service Centers and Consumer Relations units need some guidelines for handling the more persistent Single Premium complaints. I suspect that a fair number of these policyholders are likely to be pursue further action through their respective Insurance Departments.  In light of this, I would think we would want our offices and Consumer Relations units to be consistent in how we handle these particular cases and be careful about setting any precedents.  Again, I don't know if anything has been communicated to the Consumer Relations Units but if not, they could be handling these differently which it would seem could possibly create a problem down the road.  By the same token, do you still still want any of thee cases referred to your unit for attention and if so, which ones?

Larry, I'm sure that any guidance your organization can provide to everyone would be appreciated.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center • Tulsa

DEPOSITION
EXHIBIT
37

September 13, 1993

cc   Barbra DiBiase                    CONFIDENTIAL

REDACTED CONFIDENTIAL
- POL INFO

August 31. 1993

Mr. James L. Rayl
Director
Customer Services and Communications
MetLife
12902 East 51st Street
P.O. Box 500
Tulsa, Ok. 74102-0500

Re Policy 87▮▮▮▮▮▮UL

Dear Mr. Rayl

I refer you to your letter of July 1st in which you try to justify MetLife's imposition of a
Cost of Insurance on my policy.

Rather than go through your letter in detail, let me say that in essence MetLife has
broken faith with me in assessing this cost to me. I originally purchased this policy in
part because there was no COI, and because I believed, probably like thousands of
others, that this was an implicit agreement not to impose this charge then or in the
future. That MetLife would now renege is tantamount to sandbagging which is an
underhanded ploy used by unscrupulous card sharks.

I believe that if MetLife really had its policy holders' best interests at heart, it would
have offered them the option of canceling their policies as of the date of first applying
the COI without any penalties.

Sincerely



 

Mr. James L. Rayl
Director
Customer Services and Communications
MetLife
12902 East 51st Street
P.O. Box 500
Tulsa, Ok. 74102-0500

CONFIDENTIAL

Jim Rayl
Director
Customer Services and Communications
Tulsa Customer Service Center

Re   Insured   ████████
      Policy Number 92████████   UL

This is in response to your August 30th memo to Larry Vranka.

I think there are several points that should be made clear in your response to Ms. ████████

1.   Although life insurance coverage may not have been Ms. ████████ primary reason for purchasing her Single Premium Life policy, it does afford her certain benefits, including:

   a. The favorable tax treatment of interest earnings on the Accumulation Fund.   Interest earnings on her policy are tax deferred, while interest on most other investments is taxed in the year it is earned.

   b. The face amount of insurance of $156,300, minus any loan and loan interest is tax free to her beneficiary.   Other investments would pay the beneficiary only the amount of the initial deposit plus interest, and it would likely be taxable as ordinary income.

   c. "Zero net cost" borrowing up to the amount of interest earned on the Accumulation Fund.

2.   Her interest rate is not being reduced by 2.27%.   Interest is credited monthly to the amount in the Accumulation Fund.   Using her current Accumulation Fund balance of $80,898.93, and an interest rate of 6% (.48675% compounded monthly), I've come up with the following calculations:

   - if no cost of insurance were charged, interest would be credited on the entire Accumulation Fund balance of $80,898.93, totalling approximately $393.78 for one month.

   - assuming that $141.00 is deducted from the Accumulation Fund for the cost of insurance (her current charge), the Accumulation Fund balance would then be $80,757.93.   One month's interest on $80,757.93 is approximately $393.09.

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

MP401107061Z

MP4011070613

Lawrence Vranka
Vice-President
P.I. Consulting Services
Area 10-U

Re   Single Premium UL
     ███████████████ - Policies 92█████████UL

Larry, inasmuch as the enclosed letter also apparently went to the President, I am forwarding it to you.  As outlined, this policyholder is requesting to have the policy surrendered with all surrender charges waived.

I assume this will not be done, but I don't really know how these are being handled.  If there's anything you need me or this office to do, please let me know.

J.L. Rayl,  ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 30, 1993

cc    Barbra DiBiase

CONFIDENTIAL                              REDACTED CONFIDENTIAL
                                          POL INFO

**REDACTED CONFIDENTIAL POL
INFO**

MP401107061A

August 25, 1993

Mr. James L. Rayl, Director
Customer Services and Communications
Met Life Customer Service Center
12902 East 51st Street
P.O. Box 500
Tulsa, OK  74102

RE:  Policy 92████████ UL

Dear Mr. Rayl:

In march of 1992 I had my single premium life insurance
policy, which I had owned for several years, rolled over to a
Met Life policy.  I did this because the rating of the carrier
I had slipped in its financial soundness and I wanted a secure
company.  I chose Met Life.

After Mr. Kronemer, Account Representative, and Mr.
Sandifer, Branch Manager, both from the St. Louis office told me
that Met Life carries a single premium life insurance policy,
they explained to me its various aspects very clearly.  This
included details of the policy's death benefit, that the interest
I may draw will reduce that benefit, that their are no dividends
and even the rules regarding borrowing on the principle were
included.  Most important to me, however, was the guarantees of
interest.  This they said would change, roughly correlated , to
the current interest rates, but would never be less than six
(6) percent.  No mention was ever made of a cost of insurance
provision.  I was satisfied that I understood the terms of the
policy.

The death benefit is of little importance to me because I
have no dependents and in any event, the amount will probably be
reduced to its original principle inasmuch as I plan to avail
myself of the interest in order to provide needed income.

When your letter came that you had already begun charging me
"cost of insurance", retroactively, without my knowledge, I was
astonished.  This was something which I had never known could
exist.  With great difficulty I eventually learned that the
explanation is on page six of the policy but even having been
told its' meaning; I find the statement incomprehensible.

**CONFIDENTIAL**

MP4011070615

PAGE 2

I also learned that the amount being deducted is $ 141.00 a month and even that can be increased at any time.

The $ 141.00 comes to $ 1,692.00 a year which is 2.27% interest on my original investment. Six (6) percent less 2.27% leaves only 3.73% available to me.

When an investment no longer make a reasonable return on ones money, he sells it. I however, am trapped. In order to release myself from this contract I must pay taxes on any interest that has accrued and then pay Met Life a very large surrender charge.

Whoever knew or did not know or didn't tell me of the charge is irrelevant. The policy was clearly misrepresented to me.

Because of this I am requesting that you waive the surrender charges and release me from the contract, without penalty. I am the one who is innocent of any wrongdoing and therefore feel I should not be the one to be penalized.

I would appreciate your understanding and cooperation regarding this matter, and if you have any questions or comments please contact me at ███████████

Sincerely,



cc Mr. Harry Kamen

SIGNATURE GUARANTEED

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

MP401107O616

Lawrence Vranka
Vice-President
P.I. Consulting Services
Area 10-U

Re    Single Premium UL
            ██████████████ - Policies 90████████UL  &  90████████UL

Larry, I don't think any reply is required on this, but I thought I'd just pass it along.

J. L. Rayl,  ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 6, 1993

cc    Gardner, Donnelly, Barbra DiBiase

CONFIDENTIAL                    REDACTED
                               CONFIDENTIAL POL INFO

MR. JAMES RAYL
METLIFE CUSTOMER SERVICE CENTER
190 EAST 51ST STREET
PO BOX 500                              RE:POLICY 90-███████UL
TULSA. OKLAHOMA 74102                         90-███████UL


DEAR SIR:

RECEIVED YOUR LETTER OF EXPLANATION. REGARDING WHY YOUR COMPANY.
WITH OVER $116 BILLION DOLLARS IN ASSESTS. HAS TO "PICK THE
POCKETS" OF SELECT CLIENTS.

I NEVER NOTICED ANY MONTHY BONUS. WHEN THE INVESTMENT CLIMATE WAS
EXTREMELY GOOD. IT IS ALSO INTERESTING TO NOTE THAT YOU SELECTED
POLICY HOLDERS LIKE ME. WHO HAVE NO OPTIONS. UNLESS WE PAY STIFF
PENALTIES TO CANCEL OUR POLICIES. PLUS  PAY INCOME TAX ON CAPITAL
GAINS.

ANYWAY. I KNOW IT IS YOUR JOB TO PARROT THE CORPORATE LINE. SO
THIS SITUATION IS NOT YOUR FAULT. IT LOOKS LIKE WE'LL BE FORKING
OVER ABOUT $25.000 BEFORE WE'RE IN THE CLEAR. TELL THE BOYS UP-
STAIRS WHO ISOLATE THEMSELVES FROM CLIENTS TO HAVE A GOOD TIME ON
THE GOLF COURSES AND HAVE A DRINK ON MY MONEY.

IN THE MEANTIME. I'LL BE TELLING EVERYONE I KNOW ABOUT THE
PLIGHT OF METROPOLITAN INSURANCE COMPANY. HOPEFULLY MAYBE WE
CAN GET A TAG DAY GOING FOR THE CORPORATION AND IT'S PROFESSED
$116 BILLION DOLLARS IN ASSESTS.


SINCERELY TOO!!!

████████████████████████████████

**CONFIDENTIAL**

**REDACTED**
**CONFIDENTIAL POL INFO**

MP401107061Z