Ex   A

( 6   OF 14 )

Lawrence Vranka
Vice-President
P.I. Consulting Services
Area 10-U

Re   Single Premium UL
▉▉▉▉▉▉▉▉ - Policies 87▉▉▉▉▉▉UL - 87▉▉▉▉▉▉UL & 87▉▉▉▉▉▉UL

Larry, here is another case for your attention. This is the one I mentioned in my last letter. Since this was written, I have spoken with Mr. ▉▉▉ and given him the current COI charges on his three policies. I have also arranged for inforce illustrations to be sent to him. Copies are enclosed.

In this situation, Mr. ▉▉▉ claims to have spoken with the writing representative involved although he is apparently not still in the same area. According to Mr. ▉▉▉ the representative still contends that he believed the insurance to be "free" and did not think COI charges would ever be imposed.

During my second phone conversation with Mr. ▉▉▉ he briefly mentioned his letter to me and its general content. I informed him at that time that it was not something I felt I could respond to and that it may take a little longer for a reply. I would be very interested in seeing our response to Mr. ▉▉▉.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 2, 1993

CC   Barbra DiBiase

CONFIDENTIAL

REDACTED
CONFIDENTIAL POL INFO



July 30, 1993

James L. Rayl, Director
Customer Services & Communications
P O Box 500
Tulsa OK 74102-0500

RE: Policy 87███████ UL + 87█████████ UL + 87████████ UL

Dear Mr. Rayl,

Thank you for taking the time yesterday to visit with me on the phone regarding the distress I feel over the announcement that MetLife will now charge for the insurance coverage on three different single-premium life policies which I purchased in 1987.

As I explained to you on the phone, I do understand your four-page letter on the reason behind the announcement. However, I did not understand the lack of communication and the lack of follow-up on the part of my agent, Ken Steinman, or whomever has been named to replace him in the Grand Island agency. Also, as of this writing I still have never been notified by the company as to the exact charge that will be debited from my accumulation fund for these monthly charges. Then I discover on the phone yesterday (though I received your letter on July 29) that my accumulation fund has been being debited since April in some amount that no one can explain to me yet.

As I explained to you on the phone, though, my greatest concern of all is that the product was clearly misrepresentated to me by your agent, Ken Steinman by referring to the insurance coverage under these policies as being "free" on several occasions. Never once was it mentioned or reviewed with me that there was a possibility that the company would or could start charging for coverage of basic insurance. I work in an industry where I am held accountable for what I tell people and if something I tell them ends up costing them money, I am responsible for having misled them. Mr. Steinman's representation of this product as being "free" insurance was clearly a misrepresentation of your company's product and he, as an agent for your company, is simply an extension of Metropolitan in the customer's eyes.

You have told me on the phone that you will contact me relative to the monthly charges that I am now incurring so I will have an idea what the actual damages will be over a period of time, in addition to the damage such charges will do to the accumulation fund.

I fully intend to file a complaint with the Nebraska Insurance Commission against Mr. Steinman for his misrepresentation of the product and when I have been able





CONFIDENTIAL



REDACTED CONFIDENTIAL
POL INFO

page -2-

to put together a figure of the total cost of the error, I also intend to file suit against Metropolitan and Ken Steinman acting as their agent. As you will be able to verify, I have an accumulation fund in excess of $150,000.00 and such a misrepresentation is something that cannot be tolerated in any business.

You may be interested in knowing also that last week when I called Mr. Steinman in Gering, Nebraska, where he now lives, he was very subdued in his reaction when questioned about these concerns and he acknowledged that he told me the insurance was "free" because he thought it was, and that he understood my feelings. Though this was nice to hear, it didn't resolve the dollar damage that will be done if Metropolitan continues to debit my account. Mr. Steinman also says that he checked on the cost (verbally) and that my account will be debited $77.00 a month, which to my calculations, if my children and I live another 40 years, would amount to nearly $37,000.00. This charge is totally unacceptable in view of the fact that it was clearly misrepresentated in 1987 when I purchased the product.

I will await hearing from you before I pursue this matter further. You may also want to visit with Mr. Steinman to verify my conversation with him last week. Thank you in advance for your serious consideration of this distressing issue.

Sincerely,

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

MP4011070620

**James L. Rayl,  Director**
*Customer Services & Communications*
MetLife Customer Service Center - Tulsa
12902 East 51st Street, P.O. Box 900, Tulsa, OK 74102-0500

 **MetLife®**

MP4011070621

Re Policies: 87███████ UL - ████████████
            87████████ UL - ████
            87████████ UL -

Dear Mr. ████

Enclosed are the illustrations I promised on the above three policies.  These show the "Illustrative" values based on our current Cost of Insurance projections as well as the "Guaranteed" values based on the maximum COI charges allowable under the terms of the contract.

I don't typically deal with these illustrations so they are somewhat out of my area of expertise.  However, if you have any questions concerning them, feel free to give me a call and I'll do my best to get them answered.

Sincerely

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 2, 1993

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

NEBRASKA

PREPARED FOR ███████
PLAN:  SINGLE PREMIUM LIFE

SINGLE PREMIUM:     $100,000
FACE AMOUNT    :    $655,600
CLASSIFICATION: STANDARD
                NONSMOKER        AGE: 36 MALE

POLICY NUMBER: 87███████UL
ISSUE DATE    :    07/13/87
EXISTING ACCUM. FUND AS OF
LAST POLICY ANN.:  $132,234
EXISTING LOAN AS OF LAST
POLICY ANN.:         $19,838

MP4011070622

| END OF POLICY YEAR | ANNUAL POLICY LOAN BEGINNING OF YEAR | ANNUAL INTEREST ON LOAN | CUMULATIVE POLICY LOAN WITH INTEREST | ILLUSTRATIVE 6.00% | | GUARANTEED 6.00% | |
|---|---|---|---|---|---|---|---|
| | | | | ACCUM. FUND | DEATH BENEFIT AFTER POLICY LOAN | ACCUM. FUND | DEATH BENEFIT AFTER POLICY LOA |
| 7 | 0 | 1,588 | 21,426 | 118,159 | 634,174 | 116,755 | 634,174 |
| 8 | 0 | 1,715 | 23,140 | 124,214 | 632,460 | 121,203 | 632,460 |
| 9 | 0 | 1,852 | 24,991 | 130,574 | 630,609 | 125,728 | 630,609 |
| 10 | 0 | 2,000 | 26,991 | 137,273 | 628,609 | 130,332 | 628,609 |
| 11 | 0 | 2,160 | 29,150 | 144,322 | 626,450 | 135,004 | 626,450 |
| 12 | 0 | 2,332 | 31,482 | 151,747 | 624,118 | 139,745 | 624,118 |
| 13 | 0 | 2,519 | 34,000 | 159,551 | 621,600 | 144,546 | 621,600 |
| 14 | 0 | 2,720 | 36,720 | 167,741 | 618,880 | 149,392 | 618,880 |
| 15 | 0 | 2,938 | 39,658 | 176,325 | 615,942 | 154,267 | 615,942 |
| 16 | 0 | 3,173 | 42,830 | 185,356 | 612,770 | 159,135 | 612,770 |
| 20 | 0 | 4,317 | 58,270 | 226,284 | 597,330 | 177,934 | 597,330 |
| AGE 65 | 0 | 8,629 | 116,482 | 357,888 | 539,118 | 208,000 | 539,118 |
| 30 | 0 | 9,319 | 125,800 | 377,278 | 529,800 | 209,157 | 529,800 |
| AGE 72^ | 0 | 14,788 | 199,629 | 522,808 | 616,725 | 200,068 | 455,971 |
| 50 | 0 | 43,434 | 586,348 | 1,119,809 | 1,205,117 | 0 | 0 |
| AGE 95 | 0 | 86,824 | 1,172,112 | 1,758,654 | 1,758,654 | 0 | 0 |

## THIS ILLUSTRATION ASSUMES THE INTEREST ON THE EXISTING LOAN IS NOT PAID AND NO ADDITIONAL LOANS ARE TAKEN

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

NEBRASKA

**PREPARED FOR** ███████████

VARIOUS SETTLEMENT OPTIONS ARE AVAILABLE WHERE THE DEATH BENEFIT IS PAID AS REGULAR INCOME FOR A SPECIFIED PERIOD OF TIME OR FOR THE BALANCE OF THE BENEFICIARY'S LIFE.

GUARANTEED FIGURES BASED ON GUARANTEED INTEREST RATE AND MORTALITY CHARGES. ILLUSTRATIVE FIGURES BASED ON INDICATED INTEREST RATES AND CURRENT MORTALITY CHARGES - NOT GUARANTEES OR ESTIMATES FOR THE FUTURE. THIS ILLUSTRATION ASSUMES THAT A FULL YEARS MORTALITY CHARGES ARE ASSESSED EVEN THOUGH ACTUAL CURRENT CHARGES BECAME EFFECTIVE MAY 1993.

CASH VALUES REFLECT ANY SURRENDER CHARGE ASSESSED AGAINST THE ACCUMULATION FUND.

POLICY LOANS ARE ILLUSTRATED AS OCCURRING ANNUALLY, AT A FIXED LOAN INTEREST RATE OF 8.00%. ANY AMOUNT LOANED WILL EARN INTEREST AT THE GUARANTEED RATE OF 6.00% OR HIGHER IF DECLARED BY THE COMPANY. LOANED AMOUNTS EQUAL TO THE INTEREST ACCUMULATION WILL BE CREDITED INTEREST OF 8.00%.

INTEREST CHARGES ON LOAN AMOUNTS WILL BE PAID BY THE POLICYHOLDER ANNUALLY.

^AGE AT LIFE EXPECTANCY --- U.S. POPULATION LIFE TABLES.

THIS POLICY IS CONSIDERED A MODIFIED ENDOWMENT CONTRACT FOR FEDERAL INCOME TAX PURPOSES. PLEASE CONSULT YOUR TAX ADVISOR FOR POSSIBLE TAX IMPLICATIONS.

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

EXPLANATORY NOTES FORM 501-SP MUST BE ENCLOSED          PAGE  1

METROPOLITAN INSURANCE AND ANNUITY COMPANY     07/30/93

**EXPLANATORY**
**NOTES**

Single Premium Life is a nonparticipating, interest sensitive policy which provides permanent life insurance protection for a single premium.

This policy provides for payment at the time of death of the Face Amount of insurance or the minimum Death Benefit if greater. The Accumulation Fund will be paid if the insured is alive on the final date of the policy (the policy anniversary on which the insured is age 95). Any loan and loan interest will be deducted from the amount payable at death or on the final date. At issue, the single premium goes into the accumulation fund that is credited with interest daily.

At any time the policy may be surrendered for its current Cash Value. The cash value will never be less than the single premium minus any outstanding loans and loan interest. The cash value equals the accumulation fund less any applicable surrender charge and any outstanding loans and loan interest. The surrender charge is a percentage (varying by duration) of the accumulation fund and will be assessed for the first 7 years.

The Policy Loan provision provides for a fixed policy loan interest rate of 8%. Any amount loaned will earn interest at the guaranteed rate of 6%, or higher if declared by the company. Currently, loaned amounts equal to the accumulation fund less the Single Premium (the interest accumulation) will be credited with interest at the loan interest rate charged against it.

THIS PROPOSAL IS NOT A CONTRACT NOR AN OFFER TO CONTRACT. FOR FULL DETAILS ASK TO SEE A SPECIMEN CONTRACT (FORM 40-85 MIAC).

ANY APPLICATION FOR INSURANCE WILL BE SUBJECT TO METROPOLITAN'S UNDERWRITING LES.

CONFIDENTIAL

FORM 501-SP

METROPOLITAN INSURANCE AND ANNUITY COMPANY    7/93

MP4011070624

NEBRASKA

PREPARED FOR ███████████
PLAN:   SINGLE PREMIUM LIFE

POLICY NUMBER: 87██████UL
ISSUE DATE    :   09/09/87
EXISTING ACCUM. FUND AS OF
LAST POLICY ANN.:   $14,197

SINGLE PREMIUM:     $10,000
FACE AMOUNT    :    $184,600
CLASSIFICATION: STANDARD        AGE: 11 MALE
               NONSMOKER

MP4011070625

| END OF POLICY YEAR | ILLUSTRATIVE 6.00% | | | GUARANTEED 6.00% | | |
|---|---|---|---|---|---|---|
| | CASH VALUE& | ACCUMULATION FUND | DEATH BENEFIT | CASH VALUE& | ACCUMULATION FUND | DEATH BENEFIT |
| 6 | 14,748 | 15,049 | 184,600 | 14,474 | 14,770 | 184,600 |
| 7 | 15,792 | 15,951 | 184,600 | 15,204 | 15,357 | 184,600 |
| 8 | 16,739 | 16,739 | 184,600 | 15,962 | 15,962 | 184,600 |
| 9 | 17,568 | 17,568 | 184,600 | 16,594 | 16,594 | 184,600 |
| 10 | 18,445 | 18,445 | 184,600 | 17,264 | 17,264 | 184,600 |
| 20 | 30,912 | 30,912 | 184,600 | 26,960 | 26,960 | 184,600 |
| 30 | 52,972 | 52,972 | 184,600 | 43,674 | 43,674 | 184,600 |
| 40 | 91,347 | 91,347 | 184,600 | 69,780 | 69,780 | 184,600 |
| 50  AGE 65 | 159,207 | 159,207 | 206,969 | 110,423 | 110,423 | 184,600 |
| | 199,159 | 199,159 | 242,975 | 133,428 | 133,428 | 184,600 |
| 60 | 278,151 | 278,151 | 319,874 | 181,358 | 181,358 | 208,562 |
| 70 | 487,547 | 487,547 | 511,925 | 310,887 | 310,887 | 326,432 |
| AGE 95 | 1,033,508 | 1,033,508 | 1,033,508 | 632,195 | 632,195 | 632,195 |

VARIOUS SETTLEMENT OPTIONS ARE AVAILABLE WHERE THE DEATH BENEFIT IS PAID AS
REGULAR INCOME FOR A SPECIFIED PERIOD OF TIME OR FOR THE BALANCE OF THE
BENEFICIARY'S LIFE.
VALUES SHOWN ASSUME NO LOANS.

&CASH VALUES REFLECT ANY SURRENDER CHARGE ASSESSED AGAINST THE ACCUMULATION
FUND.

GUARANTEED FIGURES BASED ON GUARANTEED INTEREST RATE AND MORTALITY CHARGES.
ILLUSTRATIVE FIGURES BASED ON INDICATED INTEREST RATES AND CURRENT
MORTALITY CHARGES - NOT GUARANTEES OR ESTIMATES FOR THE FUTURE.
THIS ILLUSTRATION ASSUMES THAT A FULL YEARS MORTALITY CHARGES ARE ASSESSED
AS OF LAST POLICY ANNIVERSARY EVEN THOUGH ACTUAL CURRENT CHARGES BECAME
EFFECTIVE MAY 1993.

^AGE AT LIFE EXPECTANCY --- U.S. POPULATION LIFE TABLES.

THIS POLICY IS CONSIDERED A MODIFIED ENDOWMENT CONTRACT FOR FEDERAL INCOME
TAX PURPOSES.  PLEASE CONSULT YOUR TAX ADVISOR FOR POSSIBLE TAX IMPLICATIONS.

CONFIDENTIAL

EXPLANATORY NOTES FORM 501-SP MUST BE ENCLOSED          PAGE  1

METROPOLITAN INSURANCE AND ANNUITY COMPANY     07/30/93

REDACTED CONFIDENTIAL
POL INFO

PREPARED FOR ████████████
PLAN: SINGLE PREMIUM LIFE

POLICY NUMBER: 87████UL
ISSUE DATE    :    09/09/87

SINGLE PREMIUM    :    $10,000
FACE AMOUNT    :    $274,100
CLASSIFICATION: STANDARD    AGE:  8 FEMALE
NONSMOKER

EXISTING ACCUM. FUND AS OF
LAST POLICY ANN.:    $14,197

MP401070626

| END OF POLICY YEAR | | ILLUSTRATIVE 6.00% | | | GUARANTEED 6.00% | | |
|---|---|---|---|---|---|---|---|
| | CASH VALUE& | ACCUMULATION FUND | DEATH BENEFIT | CASH VALUE& | ACCUMULATION FUND | DEATH BENEFIT |
| 6 | 14,748 | 15,049 | 274,100 | 14,547 | 14,844 | 274,100 |
| 7 | 15,792 | 15,951 | 274,100 | 15,362 | 15,517 | 274,100 |
| 8 | 16,909 | 16,909 | 274,100 | 16,216 | 16,216 | 274,100 |
| 9 | 17,923 | 17,923 | 274,100 | 16,945 | 16,945 | 274,100 |
| 10 | 18,999 | 18,999 | 274,100 | 17,708 | 17,708 | 274,100 |
| 20 | 32,038 | 32,038 | 274,100 | 27,951 | 27,951 | 274,100 |
| 30 | 54,962 | 54,962 | 274,100 | 45,168 | 45,168 | 274,100 |
| 40 | 94,565 | 94,565 | 274,100 | 72,090 | 72,090 | 274,100 |
| 50 | 163,827 | 163,827 | 274,100 | 114,182 | 114,182 | 274,100 |
| AGE 65 | 242,949 | 242,949 | 296,397 | 158,894 | 158,894 | 274,100 |
| 60 | 287,996 | 287,996 | 339,836 | 183,614 | 183,614 | 274,100 |
| AGE 78^ | 508,034 | 508,034 | 533,435 | 313,050 | 313,050 | 328,702 |
| 80 | 883,296 | 883,296 | 927,461 | 535,503 | 535,503 | 562,278 |
| AGE 95 | 1,285,676 | 1,285,676 | 1,285,676 | 767,146 | 767,146 | 767,146 |

VARIOUS SETTLEMENT OPTIONS ARE AVAILABLE WHERE THE DEATH BENEFIT IS PAID AS
REGULAR INCOME FOR A SPECIFIED PERIOD OF TIME OR FOR THE BALANCE OF THE
BENEFICIARY'S LIFE.
VALUES SHOWN ASSUME NO LOANS.

&CASH VALUES REFLECT ANY SURRENDER CHARGE ASSESSED AGAINST THE ACCUMULATION
FUND.

GUARANTEED FIGURES BASED ON GUARANTEED INTEREST RATE AND MORTALITY CHARGES.
ILLUSTRATIVE FIGURES BASED ON INDICATED INTEREST RATES AND CURRENT
MORTALITY CHARGES - NOT GUARANTEES OR ESTIMATES FOR THE FUTURE.
THIS ILLUSTRATION ASSUMES THAT A FULL YEARS MORTALITY CHARGES ARE ASSESSED
AS OF LAST POLICY ANNIVERSARY EVEN THOUGH ACTUAL CURRENT CHARGES BECAME
EFFECTIVE MAY 1993.

^AGE AT LIFE EXPECTANCY --- U.S. POPULATION LIFE TABLES.

THIS POLICY IS CONSIDERED A MODIFIED ENDOWMENT CONTRACT FOR FEDERAL INCOME
TAX PURPOSES.  PLEASE CONSULT YOUR TAX ADVISOR FOR POSSIBLE TAX IMPLICATIONS.

CONFIDENTIAL

EXPLANATORY NOTES FORM 501-SP MUST BE ENCLOSED         PAGE   1

METROPOLITAN INSURANCE AND ANNUITY COMPANY    07/30/93

REDACTED CONFIDENTIAL
POL INFO

**To:**   Jerri McCraw
          Carla Hanes
          Barbara Goodwin
          Terry Milligan



Customer Services
& Communications

Darlene West
Cheryl Fager
Kellye Walton
Liz Herrod
Micki Rizzo

**Re   Single Premium Letter**

I received a phone call from Barbra DiBiase telling me that the "Single Premium" letter had been drafted and approval was expected soon.  In the meantime, she was asking that we begin using the letter.

Attached is the fax of that letter.  As you can see, this letter makes contains the "July COI" figure and also indicates we are attaching an illustration.  I have left a PhoneMail for Barbra telling her we do not have the facility to do this unless we're going to go to a lot of manual work.  And, we cannot generate the illustrations.

August 4, 1993

CONFIDENTIAL

PAGE.001

MP4011070628

## FACSIMILE TRANSMISSION

DATE: _____ 8/4/93 _____

TO: ____ Jim Rayl - Teleservicung _____

FROM:     METROPOLITAN LIFE INSURANCE COMPANY
          PERSONAL INSURANCE EXECUTIVE OFFICE
          [FAX #:   (212) 679-3989]

NAME: __ Barbra DiBiase _____

NUMBER: __ (212) 578 - 5580 _____

NO. OF PAGES: ___ 3 ___ (INCLUDING THIS COVER SHEET) _ _ _ _ _

Jim —
This letter has been sent
to Mr. Crimmins for _final_ approval

* * * * * N O T I C E * * * * *

This cover sheet and its attachments are CONFIDENTIAL and intended
exclusively for the individual or entity named above.  ANY OTHER
USE, DISSEMINATION, OR COPYING OF THIS COMMUNICATION IS STRICTLY
PROHIBITED AND IS A TORTIOUS INTERFERENCE WITH OUR CONFIDENTIAL
BUSINESS RELATIONSHIPS.  If this document was erroneously sent to
you, please notify the sender immediately by collect telephone
call, and then destroy this document.

CONFIDENTIAL

AUG  4 '93 14:52   FROM P.I. EXEC. OFFICE                           PAGE.002

{variable text in brackets}

MP401107O629

Re  Policy Number

Dear

This is in response to your recent letter to {Robert J. Crimmins}.

We regret that you are dissatisfied because a monthly charge is now being deducted from the Accumulation Fund of your Single Premium Life policy.  This charge would not be activated if it were not explicitly permitted by the terms of your policy.  If you refer to page 6 of the policy, you will see a section entitled "Cost of Term Insurance" that permits the charge.

Your Single Premium Life policy offers an attractive Accumulation Fund that earns interest.  It also includes an insurance benefit which is required in order to retain the tax deferral of the growth of your Accumulation Fund.

Until recently we did not have to deduct an explicit charge for the insurance protection provided by the policy.  Instead, the insurance costs were covered by periodic fluctuations in the interest rate credited to your Accumulation Fund.  In the current low interest rate environment, however, it is no longer possible to do this and we activated the monthly fee for the insurance.

If you refer to page 4 of the policy, you will see a section called "Table of Guaranteed Maximum Rates For Each $1,000 of Term Insurance."  This table shows the maximum amount that can be charged.  The charge that was recently activated is considerably lower than these maximum rates.

Your cost of insurance charge for the month of {July} was {$00.00}.  The charge will vary slightly from month to month, as it is based, primarily, on two factors: (a) the difference between the Specified Face Amount of your policy and your Accumulation Fund balance for that month, and (b) your age.  The Annual Statement you receive each year on the anniversary of the date your policy was issued will show the exact amounts that have been deducted each month from your policy's Accumulation Fund for the cost of insurance.

CONFIDENTIAL

2

Attached is a projection of the growth of your policy, or a "policy illustration," that includes the effect of the cost of insurance charge.   The figures in the columns marked "Illustrative" are based on the current charge.  The figures in the columns marked "Guaranteed" are values based on the maximum amount, as indicated on page 4 of your policy, that could ever be deducted.  This is the guaranteed minimum your policy will be worth if you do not withdraw funds from it.  All of the columns assume that we are crediting you with an interest rate of 6%.

Your policy is still a very valuable asset.   Today, when the prevailing interest rates on Certificates of Deposit are 3-4%, your Accumulation Fund continues to earn interest at 6% on a tax-deferred basis.   The cost of insurance charge is separate from the credited interest rate.

In closing, let me assure you that we will closely monitor the economic environment to ensure that positive changes will be reflected in the interest rate credited to your policy's Accumulation Fund in a timely manner.

If you have any questions about your policy or its provisions, please contact your MetLife Account Representative or call our Customer Service Center at 1-800-MET-LIFE (1-800-638-5433).

Sincerely

Vice-President

August xx, 1993

CONFIDENTIAL

MP40110706J0

*DQ*
*UL Callfath CSRS*

**To**   **Gayle Martindale**
         **Kellye Walton**
         **Pat Zacharias**
         **Julie Carnes**

**Re**   **Changes to Single Premium Letter**

Please note that I have made some minor changes to the Single Premium Letter.  These are highlighted on the attached.

Also attached for Julie, Pat and Gayle is a copy of the ▬▬▬ case.  (All Supervisors received a separate copy).  This has been referred to Consulting Services for resolution.

July 23, 1993

cc   All Supervisors

**CONFIDENTIAL**

**REDACTED CONFIDENTIAL POL INFO**

MP4011070631

So how does all of this affect your policy? Well, the first thing to remember is that while the policy may have been purchased for its tax deferred savings features, it is still a life insurance policy. The amount of insurance benefit provided in relation to the single premium paid is substantial. Consequently, as a Company, we have a substantial amount of insurance *"at risk"* on these policies. We have and will continue to experience claims on these policies.

We recognize that when your policy was issued, we did not initially impose a charge for the *Cost of Insurance*. At that time, the investment environment was much better than it is today and it was expected that we would be able to recover our *Cost of Insurance* expenses through the difference between the amount earned on our investments and the interest credited to the policy. But, as I have outlined above, the investment returns have declined dramatically and are substantially below what they were just a few short years ago. In an effort to keep pace with this decline, we have reduced the amount credited on your policy to the minimum of 6%. But, regardless of what happens in the economy, we cannot reduce the amount credited to *less than 6%* because of the contractual guarantee.

Were it not for this guaranteed minimum, we could reduce the amount credited to your policy to be more in line with the decline in investment returns. And, because of the guaranteed minimum and the lower investment returns, we are no longer able to recover the *Cost of Insurance (COI)* expense through the difference between the rate earned on our investments and the amount of interest credited to your policy. Consequently, since we cannot reduce the amount of interest credited to your policy below 6%, the only way we can recover this expense is to impose the *COI* charges as provided for in your contract.

We recognize that imposing the *Cost of Insurance* charges will reduce the rate of return to something less than the 6% rate that is credited to your *Accumulation Fund*. On average, it may reduce the current rate of return to something in the neighborhood of 5¼% or better. *(It may be less for some individual policies depending upon the age of the insured and/or the policy rating class.)* Over the long haul, it is generally higher. But, if you look around, you should still find this to be a very competitive rate of return, particularly considering the tax deferred status of this policy growth.

We also received many inquiries asking how we arrived at the exact amount of the *COI* and why it was not included in the letter. Ideally, we would have wanted to include it in the letter. However, because of the complexity involved in doing this for each policyholder, this just wasn't feasible. But, let me try and explain the *COI* in some detail. As outlined in your contract, there is a *"maximum" Cost of Insurance* that can be charged and I will review that calculation with you. However, up to that maximum amount, the *COI* factors are subject to change based on a number of variables with the exact calculation determined by our actuaries. The primary variables in projecting the cost of insurance would be:

- Age and gender of the insured

- The *"Net Amount"* at Risk

- Mortality and claims experience

- The expenses associated with policy administration

- Rate of return on the funds invested

While I expect the amounts charged for the *Cost of Insurance* are subject to change based on our experience, I would like to remind you that the amounts charged cannot exceed the *"maximum" COI* as stipulated in your policy.

CONFIDENTIAL

MP4011070632

On page six (6) of your contract under the heading "Computation of Accumulation Fund" there is a section titled "Monthly Deduction" which defines the *Cost of Term Insurance*. The first thing I would like to point out is that *we are not charging* the "maximum" cost of term insurance. The table of *COI* factors in your contract represents the *maximum* we could charge. However, *as long as we are charging less than the maximum allowed by the contract* and because of the variables involved, I don't have any way of precisely projecting what *COI* charges will be off into the future. But, it is in our interests as well as yours to keep them at the *LOWEST LEVELS POSSIBLE.*

As I indicated, one of the factors in determining the *COI* is the *Net Amount at Risk*. In otherwords, as the policy gets older and the *Accumulation Fund* increases, the *Amount at Risk* decreases. But, at the same time, as the insured gets older, the *"factor"* or *Cost per $1,000* of insurance increases because of the increased claim risk.

This can be illustrated by examining your policy. Let's look at the *COI* calculation. The *Amount of Term Insurance* used to determine the *Cost of Insurance* is defined in your contract as:

- The death benefit ÷ 1.0048675   (Or whatever factor appears on page 6 under the *Cost of Term Insurance* clause)
- MINUS the *Accumulation Fund*

It further states, the *"cost of term insurance"* for any policy month is equal to the amount of term insurance *(defined above)* multiplied by the monthly term insurance rate *(factor)*. Again, this is stated in the contract as follows:

> *"Monthly term insurance rates will be set by us from time to time, based on the insured's age, sex, and underwriting class. But these rates will never be more than the maximum rates shown in the table on page 4."  (Usually page 4)*

Note: For some policies, the table on page 4 may be replaced by an amended table in the back of the contract. If this is the case, the reference to the amendment is noted on page six (6) of the policy under the "Monthly Deduction" clause.

## PLEASE COMPARE THE *COI* WE CHARGED VERSUS THE MAXIMUM ALLOWED BY THE CONTRACT

In order to compare your actual *COI* charge to the *"maximum"* cost as permitted by your policy, you will need to do some simple calculations.  (If you don't know your COI charge, call us at 1+800+638-5433 and we'll be happy to provide it.)

- Death Benefit ÷ 1.0048675   *(Use the factor noted on page 6 of your contract if it is different)*
- (Prior Answer) − (The *Accumulation Fund*)  =  (Amount at Risk)
- (Amount at Risk)   ×   (The maximum COI factor per $1,000 from the Rate Table or amended Rate Table if applicable*)
- * USE THE COST OF INSURANCE FACTOR BASED ON YOUR GENDER AND ATTAINED AGE

If this was done correctly, it should have illustrated the amount we are charging *is substantially below the maximum amounts allowed under the provisions of the contract.*

**CONFIDENTIAL**

DQ
CallFAth CSR's

MP40110'70634

Lawrence Vranka
Vice-President
P.I. Consulting Services
Area 10-U

Re   Misassembled Policy - Single Premium UL
     ████████ - Policy 87████████ UL

Larry, I spoke with Walter Rhodes and he indicated that Consulting Services was handling the Single Premium UL cases involving incorrect or improper contracts. Attached is one such case.

It is my understanding that the prior cases that surfaced all involved Brokerage policies. This case was not written by a Broker. Instead, it appears that the contract was improperly assembled when it was issued in Aurora. Instead of using the UL "Page 6," it appears that the page for our Single Premium "Whole Life" policy was used.

Naturally, I cannot help but wonder if this is an isolated situation or if some significant number of contracts were issued this way. If any other cases surface, I will forward them. Once our position with respect to these cases is determined, I would appreciate knowing what is decided.

I have taken the liberty of providing Mr. ████ an initial response to his letter and a copy is enclosed. Thanks.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 23, 1993

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

July 10, 1993

Telephone: ███████████

Mr. Robert J. Crimmins
Executive Vice-President
Met Life
P.O. Box 21889
Tulsa, Oklahoma 74121-1889

Mr. H. Kamin
President
MetLife
One Madison Avenue
New York, N.Y. 10010

Re: ████████████████████████
    Policy No. 87██████UL

Gentlemen:

This letter is being written on behalf of my son, ██████
████████████, in reference to Mr. Crimmins' letter
of June 15, 1993, and James L. Rayl's four page letter of
July 1, 1993. As my son was 15 when the policy was purchased,
it is obvious that it was I who discussed the insurance with
your agent and arranged for its purchase. If for some tech-
nical reason you want ████████████████████ to sign this
letter, and if it makes any difference in your decisions, he
will be glad to sign.

Before the policy was bought, I read a lot of your literature,
including a specimen Metropolitan Insurance and Annuity Company
policy, which included page 6, copy of which is enclosed. NO
MENTION WAS MADE OF THE COST OF INSURANCE. When the policy was
received, I noticed that the first page mentions a guaranteed
rate of 7.50% for the first three years. NO MENTION IS MADE ON
THAT PAGE OF THE COST OF INSURANCE. I assumed that the Table
for insurance was a technicality that would not be enforced. I
also assumed page 6 was the same as the enclosed page 6, and
which doesn't mention COI.

The Annual Statements say that the "Minimum Guaranteed Rate
is 6.000," and DO NOT MENTION COI.

1

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

As a result, I was misled    when I arranged for the purchase of the policy, not knowing that a Cost of Insurance charge would be imposed. You use the word "mislead" on page four of your July 1, 1993, letter. Had I clearly been told of the definite possibility of their being a charge for the insurance, I WOULD NOT HAVE ARRANGED FOR THE PURCHASE OF THE POLICY. The policy would not have been sold to my son.

On page 3 of the July 1, 1993, letter, Mr. Rayl, quotes from page 6 of the policy, as follows:

"But these rates will never be more  than the maximum rates shown in the table on page 4 (usually)." The word "usually" does not appear in the policy!

The fact that you guessed wrong on interest and other matters does not entitle you to impose the Cost of Insurance which is contrary to the understanding of the policyholders.  On page 4 of your letter you use the word "beginning." The time to have told me about Cost of Insurance was the "beginning" of the attempt to sell me the insurance for my son, and then I would not have bought it!

As long as I am writing I wish to inform you that whereas the policy guaranteed an interest rate of 7.50% for the first three years, that rate was paid only for the first year.  From Nov. 21, 1988 to Nov. 21, 1989, 7.25% was paid.  From Nov. 20, 1989, to Nov. 20, 1990, 7.00% was paid.  I promptly reported the underpayments to your office at 120 East Ogden Ave., Suite 100, Hinsdale, Il. 60521, and which I understand is Sales Office H13, but the underpayment was not corrected.

The main purpose of this letter is to ask you to cancel the cost of insurance charge on the policy of ████████████ ████████, and that this cancellation be made permanent. It is now too late to put him back in the position he was when the policy was bought in 1987. For one thing, as you know, he can no longer buy insurance at the rate he could get it when he was 15.  Because  I considered your company highly rated, I was surprised by your June 15, 1993, letter announcing the cost of insurance charges.  If the Cost of Insurance charge is not cancelled, I believe that this is a matter for the ILLINOIS INSURANCE DEPARTMENT to consider.  I reserve the right to make additional statements, and look forward to hearing from you.

Yours truly,

████████████████

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

James L. Rayl, Director
*Customer Services & Communications*
MetLife Customer Service Center - Tulsa
12902 East 51st Street, P.O. Box 500, Tulsa, OK 74102-0500

 MetLife®

Re Policy 87█████UL

Dear Mr.█████

This is to let you know that I am in receipt of your letter dated July 10, addressed to Robert J. Crimmins, our Executive Vice-President. I appreciate the fact that you sent us a copy of *"Page 6"* from your policy. Seeing this, I can understand why my letter only created additional confusion. It appears that your policy was improperly assembled. The *"Page 6"* you have submitted is not the correct page for the Universal Life *Single Premium* policy. For your information, I am attaching an example of the correct page 6 for our Universal Life policies. In view of the circumstances, I am not in a position to respond regarding the effect of this situation. Therefore I am referring your letter to higher authority in our Corporate New York Home Office for consideration and action.

If I might, I would also like to clarify one other point in your letter. And that is my quote and reference to page 4 and the word *"usually."* You are correct, the word *"usually"* does not appear in the policy. The point I was trying to make with the insertion of the word *usually* was the reference to *"Page 4."* In some policies, there is an *"Endorsement"* which includes a different table of rates on a different page and therefore the rates on *"Page 4"* do not always apply. However, let me make it perfectly clear that the *Cost of Insurance* charges can never exceed the maximum as stipulated by the policy and the appropriate table of rates.

I was also somewhat concerned by your statement that we did not fulfill the contractual provision with respect to the guaranteed rate of return for the first three policy years. Consequently, I ordered a copy of the last Annual Statement which is enclosed. According to this, we credited your policy as follows:

| | |
|---|---|
| November 1987 - November 1988 | 7.50% |
| November 1988 - November 1989 | 7.50% |
| November 1989 - November 1990 | 7.50% |
| November 1990 - November 1991 | 7.05% |
| November 1991 - November 1992 | 6.60% |
| November 1992 *(Current Rate)* | 6.00% |

If you can provide copies of prior Annual Statements which indicate something other than these rates were applied, I will be more than happy to investigate.

Again, Mr.████ you should be hearing further in the near future regarding the *Cost of Insurance* charges.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 23, 1993

CONFIDENTIAL

REDACTED
CONFIDENTIAL POL INFO

MP401107063?

6

# Accumulation Fund

**Accumulation Fund**

The value of the accumulation fund is as follows:

- On the date of policy—The single premium.
- On any policy anniversary—The value on the last policy anniversary;

    PLUS

    One year's interest on such value at the currently applicable rates.
- On other than a policy anniversary—The value on the last policy anniversary;

    PLUS

    Interest to the current date.

**Interest Rate**

The guaranteed interest rate used to determine the accumulation fund is shown on page 4.

Interest will be credited to the accumulation fund in the manner and at the rate we set from time to time. If there is a loan against this policy, we may set a different rate or rates of interest on that portion of the accumulation fund that equals the loan. If a loan is not more than 30% of the earned interest; i.e., the accumulation fund less the single premium, we will credit the full amoun of the loan with interest at a rate equal to the rate we charge for the loan. If a loan is more than 30% of the earned interest, we may credit that part of the loan that is over 30% at a lower rate. (The part equal to 30% will earn interest at the rate we charge for the loan.)

# Payments During Insured's Lifetime

**Payment on Final Date of Policy**

If the insured is alive on the Final Date of Policy, we will pay you the accumulation fund minus an policy loan and loan interest. Coverage under this policy will then end.

**Cash Value**

Your policy has a cash value while the insured is alive.

The cash value is equal to:

- The accumulation fund;

    MINUS

- The applicable surrender charge shown in the table below.

    MINUS

- Any policy loan and loan interest.

We will pay you the cash value after we receive your request at our Designated Office. The cash value will be determined as of the date we receive your request. If you request and are paid the cash value, this policy and all our obligations under it will end. We may require surrender of this policy before we pay you the cash value.

**Table of Surrender Charges**

| During Policy Year | 1-2 | 3 | 4 | 5 | 6 | 7 | 8 and later |
|---|---|---|---|---|---|---|---|
| Percentage of Accumulation Fund | 6% | 5% | 4% | 3% | 2% | 1% | 0% |

**Guaranteed Values**

Guaranteed cash values and minimum accumulation values are shown on page 4. The guaranteed cash value will never be less than the single premium paid, less any policy loan and loan interest.

428-86

CONFIDENTIAL

## Computation of Accumulation Fund

**Accumulation Fund--** The value of the accumulation fund is as follows:

* On the date of policy--The single premium;

    MINUS

    The monthly deduction for the first month.

* On any monthly anniversary--The value on the last monthly anniversary;

    PLUS

    One month's interest on such value at the currently applicable rates;

    MINUS

    The monthly deduction for the month beginning on the current monthly anniversary.

* On other than a monthly anniversary--The value on the last monthly anniversary;

    PLUS

    Interest to the current date.

**Monthly Deduction--** The deduction for any policy month is determined as of the beginning of that month and equals the cost of the term insurance as defined below.

**See Amendment Attached**

**Cost of Term Insurance--** The amount of term insurance for any policy month is equal to:

* The death benefit divided by 1.0048675;

    MINUS

* The accumulation fund.

The accumulation fund used in this calculation is the accumulation fund at the beginning of the policy month before the deduction for the monthly cost of term insurance.

The cost of the term insurance for any policy month is equal to the amount of term insurance multiplied by the monthly term insurance rate. Monthly term insurance rates will be set by us from time to time, based on the insured's age, sex and underwriting class. But these rates will never be more than the maximum rates shown in the table on page 4.

**Interest Rate--** The guaranteed interest rate used to determine the accumulation fund is .48675% a month, compounded monthly. This is equivalent to a rate of 6% a year, compounded annually.

Interest will be credited to the accumulation fund each month in the manner and at the rate we set from time to time. If there is a loan against this policy, we may set a different rate or rates of interest on that portion of the accumulation fund that equals the loan. The rates we set will never be less than the guaranteed interest rate.

## Payments During Insured's Lifetime

**Payment on Final Date of Policy--** If the insured is alive on the Final Date of Policy, we will pay you the accumulation fund minus any policy loan and loan interest. Coverage under this policy will then end.

**Cash Value--** Your policy has a cash value while the insured is alive.

The cash value is equal to:

* The accumulation fund;

    MINUS

* The applicable surrender charge shown in the table below.

    MINUS

* Any policy loan and loan interest.

However, we reserve the right to also deduct interest in excess of the guaranteed rate credited to the fund during the last 12 policy months prior to payment of the cash value.

We will pay you the cash value after we receive your request at our Designated Office. The cash value will be determined as of the date we receive your request. If you request and are paid the cash value, this policy and all our obligations

under it will end. We may require surrender of this policy before we pay you the cash value.

#### Table of Surrender Charges

| During Policy Year | 1-5 | 6 | 7 | 8 | 9 | 10 and later |
|---|---|---|---|---|---|---|
| Percentage of Accumulation Fund | 9% | 7% | 5% | 3% | 1% | 0% |

**Policy Loan--** You may also get cash from us by taking a policy loan. If there is an existing loan you can increase it. The most you can borrow at any time is the current cash value less twice the amount of the monthly deduction just prior to the loan.

Loan interest is charged daily at the rate of 8% a year, and is due at the end of each policy year. Interest not paid within 31 days after it is due will be added to the amount of loan. It will be added as of the due date and will bear interest at the same rate as the rest of the loan.

A loan may affect the interest rate we credit to the accumulation fund (see "Interest Rate" on page 6).

425-85    **CONFIDENTIAL**                    6                    AAAAQ4

**MetLife®**

P. MC
TUL AP

TULSA CUSTOMER SERVICE CENTER

POLICYHOLDER ANNUAL STATEMENT
PERIOD ENDING   NOVEMBER 20, 1992
POLICY NUMBER        87▮▮▮▮▮UL

PAGE    1

DISTRICT H13 /894
TELEPHONE:  708-325-2400

MP4011070640

\*\*\*\*\*\*\*\*\* POLICY SPECIFICATIONS \*\*\*\*\*\*\*\*\*\*

```
INSURED      = ▮▮▮▮▮▮▮▮▮▮
ISSUE AGE    = 15                SOC. SEC. NUMBER  = ▮▮▮▮▮▮▮▮
STATUS       = ACTIVE            DATE OF POLICY    = NOVEMBER 21, 1987
PLAN         = SINGLE PREMIUM LIFE   DEATH BENEFIT TYPE=          LEVEL
                                 PLAN CODE=          710065
```

\*\*\*\*\*\*\*\*\*\*\*\* POLICY VALUES \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  | BEGINNING VALUES NOVEMBER 21, 1991 | ENDING VALUES NOVEMBER 20, 1992 | NEXT YEAR VALUES NOVEMBER 20  1993 |
|---|---|---|---|
| SPECIFIED FACE AMOUNT | 77,900.00 | 77,900.00 | |
| ACCUMULATION FUND | 6,648.55 | 7,086.48 | |
| SURRENDER VALUE | 6,449.09 | 6,873.89* | |
| DEATH BENEFIT | 77,900.00 | 77,900.00 | 77,900.00 |

\* REFLECTS SURRENDER PENALTY OF        212.59 EFFECTIVE DURING PAST POLICY YEAR

```
*****************************************************************************
*                                                                          *
*        THANK YOU FROM THE MET LIFE FAMILY OF COMPANIES.                   *
*        YOU MADE A WISE DECISION WHEN YOU PURCHASED THIS                   *
*        PLAN.                                                              *
*                                                                          *
*        LARGELY BECAUSE OF THE CONFIDENCE YOU AND MILLIONS                 *
*        OF OTHERS HAVE PLACED IN US, MET LIFE AND OUR                      *
*        AFFILIATED COMPANIES TODAY MANAGE MORE THAN $116                   *
*        BILLION IN ASSETS.                                                 *
*                                                                          *
*        FOR MORE INFORMATION ABOUT OUR PRODUCTS AND SERVICES,             *
*        CONTACT YOUR MET REPRESENTATIVE.                                   *
*                                                                          *
*        GET MET.  IT PAYS!                                                 *
*                                                                          *
*****************************************************************************
```

**CONFIDENTIAL**

**REDACTED**
**CONFIDENTIAL POL INFO**

**MetLife®**

POLICY NUMBER — 87 ███ UL

PAGE    2

MP401107064l

************    ACTIVITY FOR POLICY YEAR ENDING ON    NOVEMBER 20, 1992    ************

| TRANSACTION | GROSS AMOUNT | EFFECTIVE DATE | EXPENSE CHARGES | INSURANCE CHARGES BASIC/RIDERS | INTEREST CREDITED | ENDING ACCUM. FUND |
|---|---|---|---|---|---|---|
| PREVIOUS BALANCE | | 11/21/91 | | | | 6,648.55 |
| MONTHLY SUMMARY | | 11/21/91 | | | | 6,648.55 |
| MONTHLY SUMMARY | | 12/21/91 | | | 35.02 | 6,683.57 |
| MONTHLY SUMMARY | | 01/21/92 | | | 36.38 | 6,719.95 |
| MONTHLY SUMMARY | | 02/21/92 | | | 36.58 | 6,756.53 |
| MONTHLY SUMMARY | | 03/21/92 | | | 33.21 | 6,789.74 |
| MONTHLY SUMMARY | | 04/21/92 | | | 36.96 | 6,826.70 |
| MONTHLY SUMMARY | | 05/21/92 | | | 35.96 | 6,862.66 |
| MONTHLY SUMMARY | | 06/21/92 | | | 37.35 | 6,900.01 |
| MONTHLY SUMMARY | | 07/21/92 | | | 36.34 | 6,936.35 |
| MONTHLY SUMMARY | | 08/21/92 | | | 37.75 | 6,974.10 |
| MONTHLY SUMMARY | | 09/21/92 | | | 37.96 | 7,012.06 |
| MONTHLY SUMMARY | | 10/21/92 | | | 36.93 | 7,048.99 |

INTEREST CREDITED FROM 10/21/92  TO   11/20/92                           37.49

TOTALS

| PAYMENT | 0.00 | | 0.00 | 0.00 | 437.93 | 7,086.48 |
|---|---|---|---|---|---|---|

TOTAL INTEREST CREDITED DURING THE POLICY YEAR CONSISTING OF A GUARANTEED
AMOUNT OF $ 399.95 AND AN EXCESS AMOUNT OF $   37.98

*** CONTINUED ON NEXT PAGE ***

CONFIDENTIAL

REDACTED CONFIDENTIAL POL INFO

**MetLife®**

POLICY NUMBER   –   87██████UL

PAGE   3

MF401107064Z

```
********** INTEREST RATES APPLIED *******  **************  LOAN ACTIVITY **************
   EFFECTIVE DATE    RATE                *
   11/20/1987        7.500              *
   11/16/1990        7.050              *                NONE
   11/15/1991        6.600              *
   11/13/1992        6.000              *
                                        *
                                        *
                                        *
                                        *
                                        *
                                        *
                                        *
                                        *
   MINIMUM GUARANTEED RATE IS      6.000 *
                                        *
                                        *
                                        *
```

THE INTEREST RATE CREDITED TO AMOUNTS IN THE ACCUMULATION FUND
(EXCLUDING ANY POLICY LOAN) DURING THE PAST YEAR WAS  6.60%.

FOR QUESTIONS OR SERVICE, CALL YOUR LOCAL SALES OFFICE OR CALL
1-800-MET-LIFE.

```
***************************************************************************
*                                                                         *
*  STARTING MAY 1, 1993, CURRENT COST-OF-INSURANCE RATES HAVE BEEN        *
*  INTRODUCED.  THIS WILL AFFECT THE CASH VALUE GROWTH IN YOUR            *
*  POLICY.  CONTACT YOUR METLIFE REPRESENTATIVE OR BROKER FOR             *
*  MORE INFORMATION.                                                      *
***************************************************************************
```

CONFIDENTIAL                              REDACTED CONFIDENTIAL
                                          POL INFO

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re    Cost of Insurance Charge - Single Premium Policies

Vince, we received in excess of 100 serious phone complaints in response to our implementation of the Cost of Insurance charges on our Single Premium UL policies. We are now starting to receive the written complaints. Almost without exception, these complaints centered around:

- Our failure to notify our policyholders BEFORE we took the action

- Why did we do it?  -  A better explanation was wanted

- Policyholders were unaware that we COULD do it or were allegedly told by the representative that we never would

Attached are just a few examples. Virtually all of these callers were expecting an additional response from the Company with respect to their complaint and these issues.

Inasmuch as Len Miller and Marge Kelly were in the office, I asked if there was going to be any "corporate" attempt to respond to these policyholders *(in writing)*. Marge indicated that Tom LaBadia was involved in this issue and that she would have him contact me. He did and after discussing it with him, it is my understanding that the current strategy is to have these policyholders contacted by the Field Force. There is not going to be any additional formal corporate communication to these policyholders. Consequently, the Service Center is being left pretty much on its own with respect to how we are going to handle the complaints we have received.

In view of the amount of assets represented by these policyholders and the ferocity of their calls and complaints, I felt it was imperative that we provide these callers with an immediate response. However, trying to address each one individually would be impossible. Therefore, I have written and sent the attached general letter to respond to all callers and written complaints regarding this change. I wrote one letter to try and cover all the various issues that were raised. Each letter has been individually addressed and signed. If we get follow-up calls or complaints, we will deal with them separately.

Vince, I fail to understand why, as a Company, we don't recognize that it is much better to inform and educate our policyholders "upfront" when we have to deliver "bad news." Putting myself in the place of the customer, I think the reaction we received was both understandable and justified. Although some of our career representatives are the exception, it is unrealistic to think that our Field Force can or will effectively deliver this type of communication. In many cases, the writing representative is no longer active and no one else will take the responsibility to contact the policyholder.

CONFIDENTIAL

I also sometimes think we don't give our policyholders adequate credit. When things are properly and fully explained, many will understand. They may not be happy about it, but they understand and most will *accept* it. However, when we handle things as we did in this case by taking an action and then notifying them *"after the fact,"* we put ourselves on the defensive and only contribute to a greater sense of skepticism or distrust on the part of our policyholders.

When we're handling a change of this magnitude or impact, we should recognize and utilize the potential of our Teleservicing organizations. We could have sent out a letter with a better explanation and included the representative's number AND the 800 number. Given the time and adequate resources, we could have then been prepared to deal with the policyholders and fully explain the situation. And, the difference would have been that we could have addressed the real issue with the policyholders rather than spend so much of our time and effort just defending the fact that we didn't notify them in advance. As it was, much of our effort was spent dealing with their anger over the way it was all handled rather than the real issue.

Vince, I guess the bottom line is that I hope we learned something from the experience. I also hope my letter will pacify many of these policyholders. As noted, I have encouraged them to call us back if they still have any additional questions or concerns *(or just want to "vent" a little more)*. Again, considering the assets involved in these policies, I felt we should really make an effort to satisfy these customers and conserve this business.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 1, 1993

cc   Gardner, LaBadia, Abela & Schoos

CONFIDENTIAL

**James L. Rayl, Director**
*Customer Services & Communications*
MetLife Customer Service Center - Tulsa
12902 East 51st Street, P.O. Box 500, Tulsa, OK 74102-0500

 **MetLife®**

1 + 800 + MET-LIFE   (1 + 800 + 638-5433)

Re Policy 88█████████UL

Dear Mr. █████

This letter is in response to your phone call to 800+MET-LIFE regarding the letter you received from Executive Vice-President Robert Crimmins and our decision to impose the *"Cost of Insurance"* charges on your *Single Premium* policy. We received a number of calls and letters from many of our policyholders who were understandably upset by this change. However, if you will give me a few minutes of your time, I would like to attempt to explain the situation in more detail as I think it will help you understand why this action was taken and why it was necessary.

First of all, please accept my sincere apology for any delay that may have occurred in your being notified of this change. Back in April we attempted to notify all *Single Premium* policyholders of this change through a personal contact by one of our representatives. The letter you just received was intended to supplement that contact rather than replace it. However, as we have now learned, many of our policyholders were not personally contacted and the letter from Executive Vice-President Crimmins was their first notification. If this is what happened to you, we are very sorry and deeply regret that you were not made aware of the situation back in April. It was certainly not our intent to impose this change without notifying our policyholders in advance.

Please let me explain some of the circumstances that led up to this difficult decision. Your policy has a guaranteed minimum interest rate of 6% on the *Accumulation Fund*. In today's economic environment, you don't have to look very far to realize that this is an attractive rate of return for an investment that is tax deferred and backed by an institution that is as secure and financially strong as MetLife. If you look at the industry ratings of insurance companies such as A.M. Best, Moody's and Standard and Poor's, you will see that MetLife is among a handful of companies which continues to receive top ratings. It is one of the most financially secure companies in the industry.

I'm also sure you recognize what has happened to interest rates over the past few years. It was just a few years ago that *Money Market* or *Certificates of Deposit* were paying in the range of 7% to 9%. They are now in the 3% to 4% range and have been there for quite some time. While these do not have a direct bearing on MetLife's investments, they do illustrate what has happened to the rate of return on many investments over the past few years. On top of this, legislation has been passed which has substantially increased the taxation on life insurance companies thereby having an impact on the overall rate of return.

**CONFIDENTIAL**

**REDACTED**
**CONFIDENTIAL POL INFO**

So how does all of this affect your policy? Well, the first thing to remember is that while the policy may have been purchased for its tax deferred savings features, it is still a life insurance policy. The amount of insurance benefit provided in relation to the single premium paid is substantial. Consequently, as a Company, we have a substantial amount of insurance *"at risk"* on these policies. We have and will continue to experience claims on these policies.

We recognize that when your policy was issued, we did not initially impose a charge for the *Cost of Insurance*. At that time, the investment environment was much better than it is today and it was expected that we would be able to recover our *Cost of Insurance* expenses through the difference between the amount earned on our investments and the interest credited to the policy. But, as I have outlined above, the investment returns have declined dramatically and are substantially below what they were just a few short years ago. In an effort to keep pace with this decline, we have reduced the amount credited on your policy to the minimum of 6%. But, regardless of what happens in the economy, we cannot reduce the amount credited to *less than* 6% because of the contractual guarantee.

Were it not for this guaranteed minimum, we could reduce the amount credited to your policy to be more in line with the decline in investment returns. And, because of the guaranteed minimum and the lower investment returns, we are no longer able to recover the *Cost of Insurance (COI)* expense through the difference between the rate earned on our investments and the amount of interest credited to your policy. Consequently, since we cannot reduce the amount of interest credited to your policy below 6%, the only way we can recover this expense is to impose the *COI* charges as provided for in your contract.

We recognize that imposing the *Cost of Insurance* charges will reduce the rate of return to something less than the 6% rate that is credited to your *Accumulation Fund*. On average, it may reduce the current rate of return to something in the neighborhood of 5¼% or better. Over the long haul, it is significantly higher. But, if you look around, you should still find this to be a very competitive rate of return, particularly considering the tax deferred status of this policy growth.

We also received many inquiries asking how we arrived at the exact amount of the *COI* and why it was not included in the letter. Ideally, we would have wanted to include it in the letter. However, because of the complexity involved in doing this for each policyholder, this just wasn't feasible. But, let me try and explain the *COI* in some detail. As outlined in your contract, there is a *"maximum"* Cost of Insurance that can be charged and I will review that calculation with you. However, up to that maximum amount, the *COI* factors are subject to change based on a number of variables with the exact calculation determined by our actuaries. The primary variables in projecting the cost of insurance would be:

- Age and gender of the insured
- The *"Net Amount"* at Risk
- Mortality and claims experience
- The expenses associated with policy administration
- Rate of return on the funds invested

While I expect the amounts charged for the *Cost of Insurance* are subject to change based on our experience, I would like to remind you that the amounts charged cannot exceed the *"maximum"* COI as stipulated in your policy.

**CONFIDENTIAL**

MP401107064G

On page six (6) of your contract under the heading "Computation of Accumulation Fund" there is a section titled "Monthly Deduction" which defines the *Cost of Term Insurance*. The first thing I would like to point out is that *we are not charging* the "maximum" cost of term insurance. The table of *COI* factors in your contract represents the *maximum* we could charge. However, *as long as we are charging less than the maximum allowed by the contract* and because of the variables involved, I don't have any way of precisely projecting what *COI* charges will be off into the future. But, it is in our interests as well as yours to keep them at the *LOWEST LEVELS POSSIBLE.*

As I indicated, one of the factors in determining the *COI* is the *Net Amount at Risk*. In otherwords, as the policy gets older and the *Accumulation Fund* increases, the *Amount at Risk* decreases. But, at the same time, as the insured gets older, the *"factor"* or *Cost per $1,000* of insurance increases because of the increased claim risk.

This can be illustrated by examining your policy. Let's look at the *COI* calculation. The *Amount of Term Insurance* used to determine the *Cost of Insurance* is defined in your contract as:

- The death benefit ÷ 1.0048675  (Or whatever factor appears on page 6 under the *Cost of Term Insurance* clause)
- MINUS the *Accumulation Fund*

It further states, the *"cost of term insurance"* for any policy month is equal to the amount of term insurance *(defined above)* multiplied by the monthly term insurance rate *(factor)*. Again, this is stated in the contract as follows:

> *"Monthly term insurance rates will be set by us from time to time, based on the insured's age, sex, and underwriting class. But these rates will never be more than the maximum rates shown in the table on page 4 (usually)."*

Note: For some policies, the table on page 4 may be replaced by an amended table in the back of the contract. If this is the case, the reference to the amendment is noted on page six (6) of the policy under the "Monthly Deduction" clause.

## PLEASE COMPARE THE *COI* WE CHARGED VERSUS THE MAXIMUM ALLOWED BY THE CONTRACT

In order to compare your actual *COI* charge to the *"maximum"* cost as permitted by your policy, you will need to do some simple calculations. *(If you don't know your COI charge, call us at 1+800+638-5433 and we'll be happy to provide it.)*

- Face Amount ÷ 1.0048675  (Use the factor noted on page 6 of your contract if it is different)
- (Prior Answer) — (The *Accumulation Fund*) = (Amount at Risk)
- (Amount at Risk)   ×   (The maximum COI factor per $1,000 from the Rate Table or amended Rate Table if applicable*)

  * USE THE COST OF INSURANCE FACTOR BASED ON YOUR GENDER AND ATTAINED AGE

If this was done correctly, it should have illustrated the amount we are charging *is substantially below the maximum amounts allowed under the provisions of the contract.*

**CONFIDENTIAL**

As I mentioned before, it is in both our interests to keep this as low as possible. Imposing these *Cost of Insurance* charges is definitely not something we wanted to do. We would much rather have continued to feel we were able to make up this expense through the return on our investments. But, as you have witnessed, interest rates have remained low for an exceptionally long time and there is no immediate prospect that this is likely to change significantly. Therefore, it was unlikely that we would be able to recover these expenses through an improving investment return in the near future.

With respect to our investment performance, I would like to add that MetLife is extremely proud of its past financial performance and its exceptional financial strength and security. This strength and security is testimony to the quality of our investments and our commitment to protecting the interests of our policyholders. We place an extremely high value on you as our policyholder, and the faith and trust you have placed in us by selecting MetLife as your financial service provider. Our actions are always guided with that trust and responsibility foremost in our minds. At the same time, we remain an extremely competitive provider of financial products and services.

In hindsight, maybe it would have been better to have imposed the *Cost of Insurance* charges from the very beginning. But, who would have really predicted that we would see 7% home mortgage rates again or 3% Money Market Accounts? Considering the long term nature of the insurance contract, we had no alternative but to take some action to ensure that your interests and those of all of our policyholders were protected for the future.

I sincerely hope you have found this explanation to be helpful. While I fully understand the reaction we received to this change, if viewed objectively, I would hope that you can see that there was really no choice but to respond to the changing economy and this decision was not taken lightly. It was also never our intent to mislead any policyholder regarding the terms of the contract or the possibility of this eventuality. Ideally, we would much rather continue to be able to absorb this expense through our investment returns. But, that is just no longer possible. We value you and your business very much. I am in hopes that if you fully understand the situation, you will realize that your confidence and trust in MetLife was not misplaced.

Again, I'm very sorry that this whole situation was not communicated in advance as we had intended. If you have any further questions or concerns, please contact your representative or feel free to call our toll-free number.

Sincerely

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 1, 1993

**CONFIDENTIAL**

Barbara J. Gardner
Vice-President
MetLife Customer Service Center - Tulsa

Re   Single Premium Life - Cost of Insurance Charges

Barbara, I just received this Field Release announcing the fact that we will now begin deducting Cost Of Insurance charges on the Single Premium policies. Inasmuch as it states:

> *"You may want to contact your SPL clients should they have any concerns about their contracts."*

In view of this, it appears that there will not be any formal notification to the policyholders. The odds that many of the representatives will really contact their clients is probably pretty slim. This is hardly the way I would want to be treated if I were the customer.

This situation is likely to generate some difficult and nasty calls to 800 + MET-LIFE when the policyholders receive their annual statements or other unexpected notification and learn that we have begun deducting these charges without first telling them.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

April 16, 1993

**CONFIDENTIAL**

Mark  1 Communications
Career Agency Operations

**MetLife**

Product Development
Career Agency Operations

April 15, 1993

Re    Single Premium Life

To    The Field Force

Due to a steady decline in interest rates over the past few years, the profitability of some of our personal life insurance products has been adversely affected.  This effect is especially apparent on Single Premium Life plans, which currently have no mortality charges being assessed against the accumulation fund.

To compensate for this, we will begin imposing cost of insurance charges on all inforce Single Premium Life policies at their monthly anniversary dates beginning May 1, 1993.  These charges will be similar to the original cost of insurance rates used on Flexible Premium Adjustable Life plans from 1987 to 1989.

You may want to contact your SPL clients should they have any concerns about their contracts.  Single Premium Life illustration software incorporating these charges will be made available to you in May.

If you have further questions regarding this change, please contact your Marketing Services Unit in your Head Office.

Please note that Single Premium Life has not been available for sale since July 1, 1992.

CONFIDENTIAL

MP4011070650



## To All Customer Service Representatives, Trainers & Resource

Re Settlement With The State of Pennsylvania &
    Related Publicity - *"Churning"* and *"Replacement"*

On Friday, March 4th, it is expected that the Pennsylvania Department of Insurance will release a formal announcement that it has reached a settlement and agreement with MetLife. The state of Florida is expected to make a similar announcement next Monday. Both of these actions have the possibility of generating another wave of negative publicity for the Company and/or the insurance industry. This could, in turn, create concern among some of our policyholders about the Company, its financial stability, etc.

You should have adequate material to answer any questions about our financial stability. At this point in time we still have outstanding ratings from all the rating agencies and there's no reason to believe these will change or change significantly. Even if one or more of these were to be lowered a notch, our ratings would still be far superior to the vast majority of insurance companies. And, in relation to our total assets, the amount of fines we are paying *(1.5 million to Pennsylvania - potentially 20 million in total to Florida and other states)* plus the potential refunds to policyholders is relatively small.

   Although you can't say it to a customer, keep in mind that the settlement required for Prudential on their securities situation continues to be quoted at 640 million. Just yesterday morning it was on the business news that it had the potential of going to a billion. And, the impact on Prudential's financial stability was not cited in the broadcast as a major concern.

The situation in the state of Pennsylvania primarily revolves around the issue of *"churning."* This is a term that can be used with respect to life insurance or stocks. Stock brokers *"churn"* stocks when they *"buy and sell"* stocks from an existing portfolio primarily to generate commissions to themselves rather meet the customers' investment objectives. In some cases customers give their broker full authority to "buy and sell" on their behalf and in other cases the stockbroker persuades their clients to sell existing stocks to buy different ones. This has always been a problem with unethical brokers in the brokerage world.

The same principal can apply to life insurance. *"Churning"* occurs when the values from one or more policies are used to purchase a new one for the primary purpose of generating commissions rather than serving the client's best interest.

   BUT, NOT EVERY CASE OF *"REPLACEMENT"* IS *CHURNING* FOR COMMISSIONS. Just like in the brokerage world, in some cases it is in the best interest of the client to replace and in some cases it isn't. *It all depends . . . . . .*

Let me give you a personal experience. Several years ago I had two or three policies I had taken out when I first started with the Company. By the time they were about 15 years old, they were paying pretty good dividends and accumulating cash value. But, I also had significant loans on the policies and the dividends were not accumulating as I had withdrawn them all. At that point in my life, I really needed much more insurance protection than what these policies offered. And, because of the change in insurance products over the years, the pricing and performance of the newer policies had really become much better once you got past the initial costs *(first few policy years)*. The bottom line was that I could purchase significantly more total insurance coverage for relatively few additional premium dollars if I replaced the policies.

CONFIDENTIAL



MF4011070651

Had I left the dividends in the old policies, it might not have made sense to cancel them. They probably would have been eligible or close to being eligible for "AP" *(Accelerated Payment).* I might also have been able to use the dividends to repay some of the loans. But, that was not the case. I had policies that were paying good dividends and accumulating cash value, but they were also being eaten up by the loans and loan interest. And, another consideration was the fact that I could not afford to pay premiums on the additional coverage I needed plus maintain the old policies. Therefore, I determined that I would be better off to put all my premium dollars into a new policy. So, I cashed in my old policies and replaced the coverage with a single, larger face amount policy.

My point is this; . . . Technically, this could be classified as *"churning"* by an outsider looking in *(such as a state Insurance Department).* However, I made an *INFORMED* decision which I personally believed was in my best interests. Therefore, the Account Representative writing the new policy did nothing wrong.

Now, it gets more complicated. Most policyholders are not sophisticated enough in their insurance knowledge to make this kind of judgement and decision on their own. Suppose the representative makes this same assessment and arrives at the same conclusion and convinces a policyholder to replace his older policies. Again, to someone not knowing the full circumstances, it could have the *"appearance"* of *churning* when it really isn't.

In many cases, the Account.Representative *(and the customer)* will recognize that there is a need for a lot higher face amount of insurance than the individual's current policies provide. Consequently, the representative will do this evaluation and suggest to the customer that they can increase their protection for relatively few dollars in additional premiums.

Now, the advent of the Universal Life policies and the PUAR on Whole Life further complicated this whole replacement issue and, unfortunately, some of the tactics that were used in convincing the client to update their insurance. UL and the PUAR provided a vehicle whereby the money from the old policy(ies) could be transferred *("dumped")* to the new policy to further assist with covering higher premiums and/or higher insurance amount requirements. Again, this can still be in the client's best interests and there is nothing wrong with it *PROVIDED* the policyholder has some understanding as to what has transpired and knows what to expect in the future.

Because of the potential for unethical *"churning"*, MetLife established electronic systems and controls years ago to monitor and detect this kind of activity. It is tracked for every representative. When a new policy is issued, it is matched against the Company's existing records to determine if any other policies are being cancelled. The system can detect a cancellation up to 13 months AFTER the new policy is issued. When a match is found, it is tracked and the percentage of such matches are commonly referred to as the representative's "FIP Ratio" *(Financed by Inforce Policies).* It is recognized that, in some small percentage of cases, it may be in the policyholder's best interests to replace their policies. As long as the representative's FIP Ratio was very low *(under 15% of total applications I think),* it is not a major concern. But, if a representative's ratio is near or exceeds this percentage, the Branch Manager is held accountable to investigate and take appropriate action. When policies are *"replaced,"* they are also subject to *"Rewritten Business"* rules. In essence, this means the representative does not earn full commissions. He or she essentially only earns commissions on the difference in premium between the old policy(ies) and the new one.

CONFIDENTIAL

MP4011070652

The total opposite of this scenario is apparently what happened in Pittsburgh. As I understand the situation, there was an organized effort on the part of some representatives to actively churn business while taking specific measures to circumvent the Company's auditing and system controls on FIP and Rewritten Business. One of the ways this was done was by keeping the old policies inforce for more than 13 months before letting them lapse or be cash surrendered. In some cases, it may have still been in the policyholder's best interests to replace the policies but the manner in which it was done violated Company and Insurance Department regulations. In many cases it undoubtedly was not in their best interest, primarily because the policyholders did not understand what was happening. The manner in which these were policies were sold or represented was clearly NOT in keeping with Company guidelines OR Insurance Department regulations. Consequently, the Company is being fined heavily and we are going to offer all these policyholders the opportunity to totally "undo" these transactions.

This situation gets even worse in some cases because of the way the policies were misrepresented or sold. Customers were told that there would be no *out of pocket* expense to the policyholder or that it would be *"free."* In some of these instances the representatives thought this would work or be true. They thought the values being transferred from the old policies would be sufficient to keep the new policies going until they could go on "AP" *(Accelerated Payment),* thereby resulting in no premiums having to be paid by the policyholder. But, the change in dividend scales and the change in AP eligibility dates probably contributed to complaints which surfaced these cases. I suspect that many of these policyholders did not understand the whole concept of "AP" and the potential for additional premiums being required. The subsequent investigation revealed that these tactics were fairly widespread in the Pittsburgh area and, as some of the publicity you have seen reported, a significant number of sales employees were terminated.

---

We must now be prepared to deal with the fact that:

### The Publicity May Generate Calls
### From Policyholders Who Are Concerned
### Because They Had Old Policies Replaced With A New One(s)

## DO NOT AUTOMATICALLY ASSUME THERE WAS WRONGDOING!

*Do Not Say Anything The Policyholder Can Construe As Acknowledgement Of Wrongdoing!*

---

The problem with this whole issue is the fact that there are *a thousand shades of gray.* And, all of this is complicated by the fact that in most cases the policyholder won't really remember or have a thorough understanding of all the considerations involved at the time of the sale. But, let's assume the Account Representative made an honest assessment of the client's existing insurance protection as well as their future needs and objectives. And, based on this, truly believed it was in the client's best interest to replace the older policies. Now, let's further assume the Account Representative explained in good detail to the client why he believed this should be done. And, after hearing the representative, the client agreed and has now replaced all his older policies with a new one(s).

CONFIDENTIAL

MP401107065 3

3

The odds are that the client probably only truly understood 25% to 50% of what the representative tried to explain. And, if more than a year has gone by, the policyholder probably only remembers about 10% of the facts and conversation. This also assumes we're dealing with a representative who really knew his stuff. The probability is that the client was really relying on his "trust" of the representative and the Company.

Now, let's say it's two or three years later. What do you think the odds are that the client really remembers what the representative told him at the time? Let's also suppose he now picks up a newspaper or sees something on T.V. about the *"scams"* in Pittsburgh where representatives were *"bilking"* customers by getting them to *"replace"* their old policies with new insurance *"just to generate commissions."*

If this person is a reasonable human being, he or she will not be able to help but become concerned that he or she may have been a *"victim."* If the Representative who wrote the policy is still active with the Company and their relationship with the client is still good, the representative will probably be able to satisfy the policyholder that they had made the right decision. But, in many cases, the representative is not still there. *Where do they turn?* In all probability, to 800+MET-LIFE.

Now, as I mentioned before, there are a thousand shades of gray involved. And, there will undoubtedly be cases in other areas where the replacement was NOT in the customer's best interests or the transaction was not properly explained. Other issues involved will include; *how knowledgeable was the representative? Was the advice given to the customer well intentioned but not complete? Did the customer have other needs that were a consideration (but are now forgotten) such as a need for some instant cash that would be available through the cash surrender of the old policies?*

My point is this; Depending upon the extent of the publicity, there could be a lot of concern generated among policyholders who really did the *right thing* in replacing their older policies. Or, at the very least, did not do a wrong thing. But, the circumstances could be very different for *EVERY* situation. Therefore, as you handle these calls, please keep the following in mind:

❶      If the customer expresses concern that a Representative "talked them into" replacing older policies something along those lines, your first words should be something along the lines of:

> *Mr/Ms Policyholder, I would like to reassure you that there are many situations where it makes perfect sense and really is in the policyholder's best interests to replace their older policies with a new one. There are many things to take into consideration when making such a decision and each situation is different. It just depends upon the individual circumstances for each person and their personal needs or objectives.*

You should immediately follow-up with a question about their "new" policy:

> *May I ask if you feel there is some problem with the insurance protection you now have? I will be more than happy to review that policy(ies) with you?*

❷      The odds are that in most cases, the policyholder was satisfied until the publicity created some concern. I expect that in most instances they may have a few questions about their new policy but will be generally satisfied with it. If they have questions about their policy, do your best to answer them.

CONFIDENTIAL

4

❸    Any publicity is likely to give the policyholder the impression that *all replacement is bad*.  If, after your first attempt to satisfy the customer they still express serious concerns because of what was in the media, you can consider saying something along the lines of;

> *Mr/Ms Policyholder, I understand your concern.  And, I assure you that MetLife is equally concerned.  But, I'm sure you can appreciate that the news media has a tendency to emphasize only the worst possible scenario.  As I mentioned before, with the dramatic change in the insurance industry and the types and increased competitiveness of our products over the last several years, there many situations where replacing older policies with a new one makes perfect sense.*

> *Have you attempted to discuss this with your Representative?*

### ANSWER IS "No!"

> *Mr/Ms Policyholder, your representative would be the person most familiar with your specific situation.  Why don't you give him/her a call and let them know you would like to discuss your concerns.*

### ANSWER IS "YES" - OR - "THE REPRESENTATIVE NO LONGER WORKS FOR MET"

You will receive more specific instructions.  But, until those are received, do the following:  If the policyholder has discussed the situation with their representative and he/she still has concerns, . . . OR the representative is no longer active, you should make every effort to satisfy the policyholder's concerns.  If you are unable to do so, then it will become a case for Consumer Relations.  Advise the policyholder something along the lines as follows:

> *Mr/Ms Policyholder, I am very sorry that I can't put your mind at ease on this situation, but if you are still concerned, our Consumer Relations Unit will be more than happy to look into this further.  I will refer this situation to them, but in order for them to do a proper investigation, you will need to send them a letter which outlines your specific concerns as well as everything you can remember that transpired at the time your new policy was sold.  If you have any material that was given to you by the sales representative at that time, it would be very helpful to our Consumer Relations people if you could include a copy of that material.*

Then provide the policyholder with the address for Consumer Relations.  Classify the call as a *"Complaint"* - Use Source Code *"TV"* and send a referral to Consumer Relations to let them know they should expect to hear from the policyholder.

████████████████████████████

You should be alert to the fact that you may need to respond to a variety of questions regarding the new policy.  There is a fair probability that you could get into some questions regarding the premium payments and/or when the policy will be eligible for "AP."  It is very possible that "AP" was discussed in conjunction with the sale of the new policy.

**CONFIDENTIAL**

5

MP401070655

**BUT, THERE CAN BE A FINE LINE AS TO WHETHER THE POLICY WAS POTENTIALLY MISREPRESENTED WHEN IT COMES TO "AP"**

Any questions or problems with "AP" should generally be, by themselves, a totally separate issue. As you know, we already have lots of questions regarding the change of "AP" eligibility dates. These issues would be unrelated to the *"churning or replacement"* subject unless promises were made in conjunction with the sale which were obviously clear misrepresentation at the time. If you cannot satisfy the customer's concerns about any "AP" or related issues, then handle it as a Consumer Relations case as outlined previously.

We will provide you with additional information when it becomes available. There will be special campaigns in place to deal with affected policyholders. It is also expected there will be a special "interrupt" screen on PIOS for policies issued in Pennsylvania which were specifically associated with The Sales Representatives involved.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

March 4, 1994

*File This Memo Under Special Campaigns - Temporary Procedures*

CONFIDENTIAL

6

MP401107O656

MP4011070657

Barbara J. Gardner
Vice-President

**Re      1990 Performance - Teleservices**

Barbara, because of all of the activities we both had going, we were never able to connect on the Objectives meeting. I ran across some of the material I prepared and thought you might still be interested in reviewing this information even though it is a little outdated.

Particular attention should be paid to the increases in the C/L/D volumes. There is a dramatic increase in UL payment transactions. For the most part, these are much more time consuming and clerically intensive than regular Notice business.

The complexity of our correspondence work is also increasing. We are encountering many cases where people do not understand their UL policies or how they were funded from other inforce policies. This results in lengthy investigation and, in some cases, complicated reversal transactions to restore old or previously cash surrendered policies to their original status.

We continue to be vulnerable in our Cash/Loan/Dividend area. While we have extensive training taking place, it is a slow process because of the varied and complex activities. We are continuing to watch our staffing in this area as we cannot afford to be caught short as Teleservices expands. The other head offices will surely use any such faltering on our part to argue for having work referred back to them.

At any rate, we will continue to monitor our volumes in this area to make certain we have the appropriate level of staffing to keep pace with the increasing work being generated by the expansion of Teleservices.

J. L. Rayl
Manager
Teleservices - C/L/D

September 15, 1990

CONFIDENTIAL

EX   39

**CONFIDENTIAL**                 **REDACTED CONFIDENTIAL**                 ND
                                 **POL INFO**

█████████████████

Re    Insured    ███████████████
      Policy Number 87 ███████████ UL

Dear Mr. ████████

This is in response to your recent letter addressed to James Rayl of our Tulsa, OK Customer Service Center.

At the outset, let me explain that a cost of insurance charge is permitted by the terms of Mr. ████████ policy. The calculation of this charge is explained on page 6 of the policy, under the heading "Cost of Term Insurance." Page 4 of the policy contains a "Table of Guaranteed Maximum Rates For Each $1,000 of Term Insurance." This table shows the maximum term insurance rates allowed under the policy. Our current term insurance rates are considerably lower than these maximum charges.

Until recently, we did not assess an explicit cost of insurance charge; however, the right to assess such a charge is specifically retained by the provisions of the policy.

Further, Mr. ████████ policy contains a "10-Day Right to Examine the Policy" provision, which is outlined on the front cover of the policy. This provision afforded Mr. ████████ 10 days from the date of delivery in which to review the policy. If, for any reason, the policy was found unacceptable, it could be returned within this period for a full refund. Since the policy was not returned during this period, we could only surmise that it had met with his approval.

I trust that this information will clarify our position in this matter. If I can be of any further assistance, please let me know.

Sincerely

Vice-President

October 20, 1993

cc  J. Rayl



MP401107 0658

CONFIDENTIAL





MP4011070659

October 8, 1993

James L. Rayl
MetLife Customer Service Center
12902 East 51st Street
P.O. Box 500
Tulsa, OK  74102-0500

RE:    Our Client:
       Your Policy No.:    87 ███████ UL
       Our File:.          ███████ v. Metropolitan Life

Dear Mr. Rayl:

This· letter is in response to your correspondence with our
client dated August 9, 1993.  This matter relates to a single
premium life insurance policy purchased by Mr. ███████ through
Metropolitan Life agent John F. Howard on July 24, 1987.  In
consideration for said policy, Mr. ███████ tendered to Metropolitan
Life a single premium payment of $100,000.00 on or about said date.

As you are aware, commencing May 1, 1993, your company is
seeking to have our client tender additional premium payments in
order to maintain the current death benefit, which totals $302,500.
These additional premium payments are being deducted from the
policy's accumulation fund on a monthly basis.

Needless to say, your decision to charge additional premiums
has come as a complete surprise to Mr. ███████ insofar as he was
never advised by his agent that the policy would allow it, nor does
the language of the policy speak to this matter.  Discussions with
agent Howard further reveal that he was unaware that additional
premium payments might be required under the single premium life
policy.  In your correspondence, you have also indicated that
"MetLife has received a number of calls and letters from many of
our policyholders who are understandably upset by this. . .".
Thus, it is clear that our client was justified in understanding
that he had, in fact, purchased a "single premium" insurance policy
and that additional premium payments were never contemplated, let
alone clearly spelled out, under the terms of the insurance
contract.

Our client has authorized us to initiate litigation against

REDACTED CONFIDENTIAL POL
INFO

Company, seeking specific performance on the insurance contract and/or monetary damages. However, before doing so, we believe it is appropriate to afford your company an opportunity to reconsider its position with respect to imposing additional premium charges.

Accordingly, demand is hereby made that your company cease and desist any and all efforts to impose additional premium charges upon our client in order to maintain the death benefit provided under the above-referenced policy. We also require that your company cease and desist off-setting any additional premium payments against the interest credited to the accumulation fund, and further credit the policy's accumulation fund in the amount of those additional premiums which have been charged since May 1, 1993.

We would welcome an opportunity to further discuss this matter with you. We will await your reply with respect to your position.

Very Truly Yours,



cc:

CONFIDENTIAL

REDACTED
CONFIDENTIAL POL
INFO

MP401070660

MF401107065l

## LEADING QUESTIONS

# Stand by Your Pension

## When a company sloughs off an ex-spouse

### BY JANE BRYANT QUINN

**Q: When I divorced, I received part ownership of my ex-husband's pension plan with Northwest Airlines. I have written and called Northwest, on and off, to find out the value of this plan and approximately what I'm entitled to. They say they'll call back and send information, but never do. Without knowing, I can't tell how much more I need to save for my own retirement. At this point, I'm pretty frustrated.**
ANNE WARMUTH, Vancouver, Wash.

**A:** Northwest needs a good swift kick, as do many other companies that are ignoring divorced spouses. Under what's known as a qualified domestic-relations order, you are a plan beneficiary. As such, you're entitled to an individual benefit statement showing the current size of your pension. Many companies also show what it's worth in monthly payments, starting at the age of 65. Under the pension law (ERISA), you're entitled to your answer within 30 days of submitting a written request. You first wrote about a year ago. So far, Northwest is 366 days late.

It's a pity your lawyer didn't get you a statement at the time of divorce, which is the usual procedure. It's also a pity that Northwest's pension director, as well as those he referred you to, failed to tell you how to proceed. With little effort, we discovered pension rep Arte Blexrud. She says she routinely answers these questions, but no one told her you were asking. Write her directly; she'll solve your problem within 10 days.

For ex-spouses, yours isn't an unusual experience. A company can be fined up to $100 a day for neglecting your letter, but it's not what you'd call a hot area of law enforcement. Besides, why should you pay a lawyer to get you a statement you're entitled to? Ex-spouses in a similar plight might try a certified letter to their company's pension director, citing their rights as plan beneficiaries under ERISA, Section 105 (although certified mail didn't work in Warmuth's case). You might try your congressional representative. You might complain to the Department of Labor, Room N5619, 200 Constitution Ave. N.W., Washington D.C. 20210, enclosing a copy of your certified letter. Many women give up and play Pension Surprise. They don't learn how large (or, more likely, how small) their pension is until they get it.

**Q: My wife and I are both 63 and retired. The bulk of our savings ($200,000) is invested in E or EE Savings Bonds, bought during the 1970s. They'll mature in about two years. From a tax point of view, is it more prudent to convert them to HH bonds or to cash them in?**
D. M., Butte, Mont.

**A:** Like many investors, you're starting from the wrong end of this question. You're thinking about taxes first and yield second. What you need most from your savings bonds is the highest income you can muster. If it costs you some taxes to get it, so what?

You have much more time than you think to consider this question. Series E and EE bonds pass through three types of maturity: (1) the original maturity, when the bond's redemption value is guaranteed to equal its face value; (2) the extended maturity, lasting 10 years more; and (3) the final maturity. All

bonds issued since December 1965 reach final maturity in 30 years (prior to that it was 40 years). So your bonds from the '70s keep on paying until 2000 to 2009.

E-bond interest can be tax-deferred. But at each bond's final maturity date, all of its earnings become taxable at once. The only way to continue to shelter those past earnings is to switch into Series HH bonds. Unfortunately, HH bonds are a lousy deal. The current taxable income they pay is pegged at a meager 4 percent for at least 10 years. If you cashed in your E bonds and bought 10-year Treasury notes instead, you'd get 7.25 percent.

To show you how the two compare, I turned to Dan Pederson of the Savings Bond Informer, a Detroit-based service that keeps track of bond values and maturities. Let's say you bought a $1,000 E bond in July 1974 worth $3,174 today. If you rolled $3,000 into HH bonds (they come in $500 denominations), you'd earn a modest $120 a year. But look what happens if you cash in the bonds, get $2,496 after taxes in the 28 percent bracket and invest in Treasuries. Two 10-year T-notes (in $1,000 denominations) pay $145 in interest. If you added enough to buy three T-notes, you'd have $217.50. In the 15 percent bracket, buying Treasuries looks even better.

In short, a no-brainer. Cash in the bonds. You pay no state or local tax on Savings Bonds or Treasuries; there's only a federal tax. Treasuries can be bought, at no sales charge, through any Federal Reserve Bank.



*Firms break the law when they don't reveal retirement benefits*

**Q: In 1987, we bought a single-premium life-insurance policy from MetLife, paying $23,830. We were told we would never owe another payment. Furthermore, our cash values would never earn less than 6 percent. But last year, MetLife told us that, due to the drop in interest rates, a new cost-of-insurance charge would be deducted from our policy. The result is that our guaranteed rate of 6 percent has dropped to a net of about 4.28 percent. I read the policy after I got it and noticed language allowing the charge, but my agent said it would never be imposed.**
JOHN TIMBERLAKE, Richmond, Va.

**A:** Rule One is to disbelieve any agent who contradicts the policy's language. Rule Two is that when charges can be imposed they will be imposed, if interest rates decline enough. Without doubt, MetLife has reduced your return. But the company can keep a straight face when it says, "We did not alter your policy in any way." You're still getting 6 percent on cash values while MetLife takes its insurance charge. Double-talk, yes; illegal, no. The effect of the charge will decrease as the years go by, says actuary James Hunt of the National Insurance Consumer Organization, but your total return will always be less than appeared to be guaranteed.

Retired insurance professor Joseph Belth of Indiana University bristles at the way this type of insurance is typically sold. Agents highlight the investment return without explaining the effect of the policy's charges—an approach he calls deceptive. So think.

*Reported by* TEMMA EHRENFELD *and* DANIEL McGINN

Send questions to Jane Bryant Quinn, NEWSWEEK Focus: ON YOUR MONEY, 251 West 57th St., New York, N.Y. 10019

CONFIDENTIAL

MP401107066Z

**Metropolitan Life Case Creates Industry Scramble to Retain Customers' Trust**

By Paula Crawford Squires, Richmond Times-Dispatch, Va.
Knight-Ridder/Tribune Business News

May 23--Trust, once lost, is difficult to regain, in business as well as in
love.

Just ask the life insurance industry. It's squirming in the wake of an
investigation into deceptive sales practices by Metropolitan Life Insurance
Co. Or talk to John Timberlake of Chesterfield County, Va., who believes he's
a victim of the same kind of tactics now tarnishing MetLife's image.

In March, MetLife agreed to pay a $20 million fine to settle charges that it
deceptively marketed life insurance policies as retirement funds. The final
tally will be higher because MetLife, the nation's largest insurer, has
offered to refund up to $76 million to 60,000 policyholders who may have been
affected, including 1,400 in Virginia.

A probe by the National Association of Insurance Commissioners determined that
some MetLife agents prepared pre-appointment letters, primarily targeting
nurses, that contained misleading descriptions of the benefits and terms of
some policies.

Basically, policies were marketed as something similar to tax-deferred
annuities, instead of life insurance policies. Much of the misleading
literature came from the company's biggest sales office, in Tampa, Fla.

Fallout from the MetLife scandal has been swift. The company recently recalled
thousands of pieces of promotional material for review by its legal
department. The sales literature used by the Tampa office was not approved by
Metropolitan's headquarters staff in New York, as company rules require.

In an effort to prevent future marketing breaches, the American Council of
Life Insurance in Washington has formed a task force on market conduct. Its
members are chief executive officers from many major life insurers, including
Met Life. The task force will examine marketing problems and recommend
solutions, including legislative ones, if necessary.

"The industry is taking this seriously," said Karen Addis, spokeswoman for the
council.

And well it should. Life insurance, like many service industries, cannot
thrive without the public's trust. "If the public doesn't have the trust,
you're going to have trouble selling the product," Addis said.

MetLife can attest to that. Sales of new individual life insurance policies at
MetLife have dropped 23 percent for the year through May 6, compared with the
same time last year.

Like other consumers, Timberlake isn't happy with the product he bought from
the company, although his gripe has nothing to do with the current
controversy. He's mad about a single-premium life policy purchased in 1987, a
product he says was marketed as a retirement savings plan.

"The issue is the same as with the nurses: misrepresentation," he said. Seven
years ago, shortly after he retired, Timberlake was looking for a retirement
fund to replace one he had with his employer. He noticed an advertisement in a
local newspaper promoting MetLife's "Single Premium Life product."

*Interesting ARTICLE ON SINGLE PREMIUM*

*cc ✓ ALL SUPVL + LU RIZZO*

CONFIDENTIAL

tax-deferred growth, tax-deferred income and a guarantee that principal would be protected.

Timberlake met with an agent and decided to go with the plan. He says he paid a single premium of $23,830 and was told by the agent that he never would have to make another premium payment. Meanwhile, the savings part of the plan, an accumulation fund, would grow tax-deferred at an annual interest rate of at least 6 percent.

Timberlake was satisfied with the plan until June 1993. That's when he received a letter from MetLife alerting policyholders to the imposition of a charge due to declining interest rates.

"In the past, due to the higher interest rate environment, we were able to cover expenses related to your policy without an explicit charge for insurance," the letter said. With lower interest rates, however, the company said it could not continue to do this and still maintain the guaranteed interest rate of 6 percent.

Since May 1993, a monthly charge of about $50 has been deducted from Timberlake's accumulation fund.

"Don't you call that a premium? Is there any difference? It's a premium charge to my way of thinking," he said.

Timberlake concedes that the policy contains language allowing for the charge. Still, he's upset because "that's not the way it was promoted or sold."

Plus, he adds, he didn't have an opportunity to read the fine print of the policy until he received a copy a month after he bought it. He then read it closely and called the agent to ask about the paragraph that referred to a possible insurance charge. "He assured me that that would never happen," Timberlake said.

In November, Timberlake filed a formal complaint against MetLife with the Bureau of Insurance, a division of the State Corporation Commission. The bureau investigated but found no violation of Virginia insurance regulations. It closed the case last month, noting that even with the cost of insurance deductions, the equity in the policy will continue to grow.

MetLife's position is that Timberlake wasn't misled. "The insurance department in Virginia agreed with us," said Nancy Peskin, a spokeswoman for MetLife in New York. "This charge is explicitly permitted under the terms of the contract."

As for comparing Timberlake's complaint to recent allegations about deceptive sales practices, Peskin says that's likening apples to oranges.

Based on his experience, Timberlake has this advice for other consumers: "You've got to read the contract and know exactly what's in it. If you have a question, make the agent put the answer in writing."

In 1968, the life insurance industry received a 74 percent favorable rating in an annual survey by the Insurance Information Institute, a nonprofit trade group. That rating has fallen almost every year since, reaching a low of 43 percent in 1991, when consumers began questioning some insurance companies' risky financial investments in products such as junk bonds. By 1993, the rating had climbed to 48 percent.

When less than half the public believes you're doing a favorable job, it's time to retool. Perhaps MetLife and other major insurers should develop a motto along these lines: "No trust, bite dust."

KB\inNewsEDGE

CONFIDENTIAL

MP401107066 3

NU

MP4011070664

Jim Rayl
Director
Customer Services and Communications
Tulsa Customer Service Center

Re  Insured  ███████████████
    Policy Number 92██████████ UL

This is in response to your August 30th memo to Larry Vranka.

I think there are several points that should be made clear in your
response to Ms. ████████.

1.  Although  life  insurance  coverage  may  not  have  been  Ms.
    ████████  primary reason for purchasing her Single Premium Life
policy, it does afford her certain benefits, including:

    a. The favorable tax treatment of interest earnings on the
    Accumulation Fund.  Interest earnings on her policy are tax
    deferred, while interest on most other investments is taxed in
    the year it is earned.

    b. The face amount of insurance of $156,300, minus any loan
    and loan interest is tax free to her beneficiary.  Other
    investments would pay the beneficiary only the amount of the
    initial deposit plus interest, and it would likely be taxable
    as ordinary income.

    c. "Zero net cost" borrowing up to the amount of interest
    earned on the Accumulation Fund.

2.  Her interest rate is not being reduced by 2.27%.  Interest is
credited monthly to the amount in the Accumulation Fund.  Using her
current Accumulation Fund balance of $80,898.93, and an interest
rate of 6% (.48675% compounded monthly), I've come up with the
following calculations:

    - if no cost of insurance were charged, interest would be
    credited on the entire Accumulation Fund balance of
    $80,898.93, totalling approximately $393.78 for one month.

    - assuming that $141.00 is deducted from the Accumulation Fund
    for the cost of insurance (her current charge), the
    Accumulation Fund balance would then be $80,757.93.  One
    month's interest on $80,757.93 is approximately $393.09.

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                               POL INFO

MP4011070665

As you can see, the difference in interest earned per month is not very large. Assuming that we credited interest and charged for insurance only once a year, the difference in the interest would amount to about $100.00 for the year.

Accum. Fund of $80,898.93 *.06 = $4,853.88 annual interest
(Accum. Fund of $80,898.93 - COI of $1,692)*.06 = $4,752.42

3.    The "Ten Day Free Look" provision afforded Ms. ▮▮▮▮ the opportunity to review her policy and return it for a full refund of premiums within ten days of the date of delivery. Both the surrender charge and the cost of insurance provision are fully explained in the policy. It was Ms. ▮▮▮▮ right and responsibility as a policyowner to review her policy.

I hope this information is helpful to you. Please let me know if I can be of any further assistance.


*Barbra DiBiase*

Barbra DiBiase
Staff Consultant
PI Customer Services (17-Y)

September 7, 1993

cc Vranka

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                                POL INFO