

Ex A

( 7 OF 14 )

MP4011070666

Lawrence Vranka
Vice-President
P.I. Consulting Services
Area 10-U

Re    Single Premium UL
███████████ - Policies 92████████ UL

Larry, inasmuch as the enclosed letter also apparently went to the President, I am forwarding it to you.  As outlined, this policyholder is requesting to have the policy surrendered with all surrender charges waived.

I assume this will not be done, but I don't really know how these are being handled.  If there's anything you need me or this office to do, please let me know.

J. L. Rayl,  ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 30, 1993

cc    Barbra DiBiase

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                                POL INFO

MP401107C667

August 25, 1993

████████████

Mr. James L. Rayl, Director
Customer Services and Communications
Met Life Customer Service Center
12902 East 51st Street
P.O. Box 500
Tulsa, OK 74102

                                    RE:  Policy 92████████ UL

Dear Mr. Rayl:

    In march of 1992 I had my single premium life insurance policy, which I had owned for several years, rolled over to a Met Life policy.  I did this because the rating of the carrier I had slipped in its financial soundness and I wanted a secure company.  I chose Met Life.

    After Mr. Kronemer, Account Representative, and Mr. Sandifer, Branch Manager, both from the St. Louis office told me that Met Life carries a single premium life insurance policy, they explained to me its various aspects very clearly.  This included details of the policy's death benefit, that the interest I may draw will reduce that benefit, that their are no dividends and even the rules regarding borrowing on the principle were included.  Most important to me, however, was the guarantees of interest.  This they said would change, roughly correlated , to the current interest rates, but would never be less than six (6) percent.  No mention was ever made of a cost of insurance provision.  I was satisfied that I understood the terms of the policy.

    The death benefit is of little importance to me because I have no dependents and in any event, the amount will probably be reduced to its original principle inasmuch as I plan to avail myself of the interest in order to provide needed income.

    When your letter came that you had already begun charging me "cost of insurance", retroactively, without my knowledge, I was astonished.  This was something which I had never known could exist.  With great difficulty I eventually learned that the explanation is on page six of the policy but even having been told its' meaning; I find the statement incomprehensible.

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                                POL INFO

PAGE 2

I also learned that the amount being deducted is $ 141.00 a month and even that can be increased at any time.

The $ 141.00 comes to $ 1,692.00 a year which is 2.27% interest on my original investment. Six (6) percent less 2.27% leaves only 3.73% available to me.

When an investment no longer make a reasonable return on ones money, he sells it. I however, am trapped. In order to release myself from this contract I must pay taxes on any interest that has accrued and then pay Met Life a very large surrender charge.

Whoever knew or did not know or didn't tell me of the charge is irrelevant. The policy was clearly misrepresented to me.

Because of this I am requesting that you waive the surrender charges and release me from the contract, without penalty. I am the one who is innocent of any wrongdoing and therefore feel I should not be the one to be penalized.

I would appreciate your understanding and cooperation regarding this matter, and if you have any questions or comments please contact me at ▇▇▇▇▇▇

Sincerely,



cc Mr. Harry Kamen

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

Mr. Jim Rayl
Director
Customer Services and Communications
Tulsa Customer Service Center

Re  Single Premium Life (SPL) -- Cost of Insurance Charges

This will supplement my memo of August 10.

We've been advised that some of the early SPL policies contain an
Endorsement R.S. 1077 MIAC in which paragraph 1 reads:

> "The difference between the interest we earn and the interest
> we credit pays for our sales, administrative, and mortality
> expenses. **Therefore, monthly deductions from the Accumulation
> fund for the cost of insurance may not be made under this
> policy.**" (emphasis added)

Any inquiries or complaints received that <u>specifically</u> reference
this wording or provide a copy of this policy endorsement should be
referred to: Mr. P. Hunt, P.I. Compliance Bureau, Bridgewater, Area
3E.

Also, if you will be including an inforce illustration with your
responses, the wording of the "standard" letter may need to be
adjusted based on the assumptions of your illustration.  For
example,

"This is the guaranteed minimum your policy will be worth,

- assuming no additional loans are taken and the annual
  loan interest is not repaid."
- assuming you continue to borrow the accumulated interest
  each year and the loan interest is not repaid."

Therefore, the phrase "if you do not withdraw funds from it" in the
first paragraph of p.2 of the standard letter (copy attached)
should have been put in brackets as variable text.

Please call Barbra DiBiase on extension 5580 or me with any
questions.

*Jeanne O'Connor*

Jeanne M. O'Connor
Director
PI Customer Services (17-Y)
Extension 4886

August 13, 1993

cc    B. DiBiase, B. Gardner, B. Hemer, P. Hunt, F. Lynch,
      L. Vranka

cc ✓ALL SJPIC
   + GAYLE M
   + JULIE C
   + PAT Z.

**CONFIDENTIAL**

Mr. Jim Rayl
Director
Tulsa Customer Service Center

Re    Single Premium Life (SPL) -- Cost of Insurance Charges

At Bob Crimmins' request, the attached "standard" letter has been approved to address customer inquiries/complaints regarding the activation of a cost of insurance charge on SPL policies.

In order that we provide a consistent response to customers, please have your staff use this text.  Of course, if a customer has a specific question, the copy should be adapted as you see fit.  It is particularly helpful to provide the customer with the amount of the most recent cost of insurance deduction and an inforce illustration.  The letter should be signed by the Personal Insurance officer in charge of your site.

Some of the responses we've seen thus far have included a statement to the effect that the SPL customers should have been contacted by their Account Representatives prior to receiving Mr. Crimmins' June 15 letter.  This wording should be discontinued, as it is not entirely accurate.  Although Field Releases were sent out in mid-April and in July, they did not mandate that Account Representatives contact customers to advise them of this change.

We've also received some inquiries as to whether the Company will stop charging for cost of insurance at some point in the future. We have been advised that the position we should take is that, rather than suspending the charge, depending on market conditions, the credited interest rate will be adjusted.  For specific inquiries of this nature, you may wish to incorporate the following wording into your letter:

"We do not foresee that the assessment of cost of insurance charges will be discontinued in the near future. However, I can assure you that we will closely monitor our investment experience as well as the economic environment.  If it is possible to increase the interest rate credited to your policy's Accumulation Fund, we will do so as quickly as possible."

Please call Barbra DiBiase on ext. 5580 or me with any questions or comments.

Jeanne O'Connor
Director
Personal Insurance Customer Services
Ext. 4886

August 10, 1993

cc    B. DiBiase, V. Donnelly, B. Gardner, B. Hemer, F. Lynch,
      L. Vranka

CONFIDENTIAL

{variable text in brackets}

Re  Policy Number

Dear

This is in response to your recent letter to {Robert J. Crimmins}.

We regret that you are unhappy because a monthly charge is now being deducted from your Single Premium Life policy. This charge is explicitly permitted by the policy. If you refer to page 6 of the policy, you will see a section entitled "Cost of Term Insurance" that permits the charge.

Your Single Premium Life policy offers an attractive Accumulation Fund that is guaranteed to credit interest of at least 6%, no matter how low market interest rates go. It also includes an insurance benefit.

Until recently we did not have to deduct an explicit charge for the insurance protection provided by the policy. Instead, the insurance costs were taken into account in setting the interest rate credited to your Accumulation Fund. In the current low interest rate environment, however, it is no longer possible to do this and we activated the monthly fee for the insurance.

If you refer to page 4 of the policy, you will see a section called "Table of Guaranteed Maximum Rates For Each $1,000 of Term Insurance." This table shows the maximum amount that can be charged. The charge that was recently activated is considerably lower than these maximum charges.

Your cost of insurance charge for the month of {July} was {$00.00}. The charge will vary slightly from month to month, as it is based, primarily, on two factors: (a) the difference between the Specified Face Amount of your policy and your Accumulation Fund balance for that month, and (b) your age. The Annual Statement you receive each year on the anniversary of the date your policy was issued will show the exact amounts that have been deducted each month from your policy's Accumulation Fund for the cost of insurance.

CONFIDENTIAL

2

Attached is a projection of the growth of your policy (often referred to as a "policy illustration") that includes the effect of the cost of insurance charge. The figures in the columns marked "Illustrative" are based on the <u>current</u> charge. The figures in the columns marked "Guaranteed" are values based on the <u>maximum</u> amount, as indicated on page 4 of your policy, that could ever be deducted. This is the guaranteed minimum your policy will be worth if you do not withdraw funds from it. All of the columns assume that we are crediting you with an interest rate of 6%. The actual rates credited in the future may be higher, but can <u>never</u> be lower.

Your policy is still a very valuable asset. Today, when the prevailing interest rates on Certificates of Deposit are 3-4%, your Accumulation Fund continues to earn interest at 6% on a tax-deferred basis.

In closing, let me assure you that we will closely monitor the economic environment. If it is possible to increase the interest rate credited to your policy's Accumulation Fund, we will do so as quickly as possible.

If you have any questions about your policy, please contact your MetLife Account Representative or call our Customer Service Center at 1-800-MET-LIFE (1-800-638-5433).

Sincerely

Vice-President

August xx, 1993

**CONFIDENTIAL**

MP401107067Z



Memorandum from:
**Pamela J. Duffy**

Memorandum from:
**Pamela J. Duffy**

MP4011070673

Vince

In hindsight I guess everyone can do it better. We sent out over 21,000 letters at the same time and, so far, "only" about a 2% complaint rate (all offices). Sure, it should be zero.

The customer service centers were supposed to be provided with the Q+A piece before the letters were sent out. We'll have to see what happened here.

I'm concerned that Jim's letter, while well-written, is almost as long as the contract itself and does contain some minor

errors. I hope it was passed through some legal entity.

In the future I hope Jim notifies us of problems and looks for a response before he goes ahead and sends out such a lengthy letter.

Tulsa wasn't the only one getting calls + it would have been better to coordinate.

PJD
7/7

MEMORANDUM from .....

To: Mr Royl

Jim -
Please call me

TY
Lucie B.

V. J. DONNELLY

**CONFIDENTIAL**



Memorandum from:
**Pamela J. Duffy**



Memorandum from:
**Pamela J. Duffy**

Vince

In hindsight I guess everyone can do it better. We sent out over 21,000 letters at the same time and so far, "only" about a 2% complaint rate (all offices). Sure, it should be zero.

The customer service centers were supposed to be provided with the Q+A piece before the letters were sent out. We'll have to see what happened here.

I'm concerned that Jim's letter, while well-written, is almost as long as the contract itself and does contain some minor

errors. I hope it was passed through some legal entity.

In the future I hope Jim notifies us of problems and looks for a response before he goes ahead and sends out such a lengthy letter.

Tulsa wasn't the only one getting calls + it would have been better to coordinate.

PJD
7/7

To: Mr. Page

Jim —

Please call me

TY
Vince D.

MEMORANDUM from ....

**V. J. DONNELLY**

CONFIDENTIAL

MP4011070674

*Pam –*
*F.Y.R.*
*& return*

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re   Cost of Insurance Charge - Single Premium Policies

Vince, we received in excess of 100 serious phone complaints in response to our implementation of the Cost of Insurance charges on our Single Premium UL policies. We are now starting to receive the written complaints. Almost without exception, these complaints centered around:

- Our failure to notify our policyholders BEFORE we took the action

- Why did we do it?  -  A better explanation was wanted

- Policyholders were unaware that we COULD do it or were allegedly told by the representative that we never would

Attached are just a few examples. Virtually all of these callers were expecting an additional response from the Company with respect to their complaint and these issues.

Inasmuch as Len Miller and Marge Kelly were in the office, I asked if there was going to be any "corporate" attempt to respond to these policyholders *(in writing)*. Marge indicated that Tom LaBadia was involved in this issue and that she would have him contact me. He did and after discussing it with him, it is my understanding that the current strategy is to have these policyholders contacted by the Field Force. There is not going to be any additional formal corporate communication to these policyholders. Consequently, the Service Center is being left pretty much on its own with respect to how we are going to handle the complaints we have received.

In view of the amount of assets represented by these policyholders and the ferocity of their calls and complaints, I felt it was imperative that we provide these callers with an immediate response. However, trying to address each one individually would be impossible. Therefore, I have written and sent the attached general letter to respond to all callers and written complaints regarding this change. I wrote one letter to try and cover all the various issues that were raised. Each letter has been individually addressed and signed. If we get follow-up calls or complaints, we will deal with them separately.

Vince, I fail to understand why, as a Company, we don't recognize that it is much better to inform and educate our policyholders "upfront" when we have to deliver "bad news." Putting myself in the place of the customer, I think the reaction we received was both understandable and justified. Although some of our career representatives are the exception, it is unrealistic to think that our Field Force can or will effectively deliver this type of communication. In many cases, the writing representative is no longer active and no one else will take the responsibility to contact the policyholder.

CONFIDENTIAL

I also sometimes think we don't give our policyholders adequate credit. When things are properly and fully explained, many will understand. They may not be happy about it, but they understand and most will *accept* it. However, when we handle things as we did in this case by taking an action and then notifying them *"after the fact,"* we put ourselves on the defensive and only contribute to a greater sense of skepticism or distrust on the part of our policyholders.

When we're handling a change of this magnitude or impact, we should recognize and utilize the potential of our Teleservicing organizations. We could have sent out a letter with a better explanation and included the representative's number AND the 800 number. Given the time and adequate resources, we could have then been prepared to deal with the policyholders and fully explain the situation. And, the difference would have been that we could have addressed the real issue with the policyholders rather than spend so much of our time and effort just defending the fact that we didn't notify them in advance. As it was, much of our effort was spent dealing with their anger over the way it was all handled rather than the real issue.

Vince, I guess the bottom line is that I hope we learned something from the experience. I also hope my letter will pacify many of these policyholders. As noted, I have encouraged them to call us back if they still have any additional questions or concerns *(or just want to "vent" a little more)*. Again, considering the assets involved in these policies, I felt we should really make an effort to satisfy these customers and conserve this business.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 1, 1993

cc    Gardner, LaBadia, Abela & Schoos

CONFIDENTIAL

JUN 18 '93  8:09  FROM METLIFE                    TO 82528847          PAGE.002
   JUN 17 '93 10:35                                                     PAGE.002

P. O. BOX 21889
TULSA, OK 74121-1889

Robert J. Crimmins
Executive Vice-President                           **MetLife**

POLICY NUMBER:  87███████UL

Dear Policyholder

As you know, there has been a steady decline in interest rates over the past few years which
has influenced the returns of many investment vehicles available to consumers. This trend has
also affected some of our personal life insurance products, including Single Premium Life.

In the past, due to the higher interest rate environment, we were able to cover expenses related
to your policy without an explicit charge for insurance. As a result of today's lower interest
rates, the returns on Single Premium Life funds have declined to a level that we must begin to
impose cost of insurance charges on all Single Premium Life policies as of their monthly
anniversary dates beginning May 1, 1993. This means that if your policy anniversary date is
January 15th, for instance, the insurance charge will be deducted from your accumulation fund
once a month, beginning on May 15th.

Despite the change stated above, your cash values will continue to grow tax deferred at a
competitive interest rate. In addition, if your policy was issued on or before June 20, 1988, it will
retain significant tax advantages regarding policy distributions. And remember, your policy is
issued by MetLife, a company with a longstanding tradition of making sound business decisions
and fulfilling the promises it makes to its policyholders.

If you have any questions about this change or about your life insurance policy in general, please
call your MetLife Representative at 314-821-8700 , Sales Office/Agency C71/865.

Sincerely,

Robert J. Crimmins

(May 1, 1993)    JUNE 15, 1993

CONFIDENTIAL              REDACTED CONFIDENTIAL        ** TOTAL PAGE.002 **
                         POL INFO

Product Development
Career Agency Operations

**MetLife**

June 10, 1993

Re  Single Premium Life

To  The Field Force

As stated in our field release dated April 15, 1993, the steady decline in interest rates has made
it necessary to implement cost of insurance (COI) charges on all Single Premium Life policies
as of May 1, 1993.  Since this is the first time SPL policyholders will be subject to these
charges, we have notified them individually of this change.  A sample of this letter is attached.
The following message will also appear on SPL annual statements beginning May 1:

> "Starting May 1, 1993, current cost of insurance rates have been introduced.  This will
> affect the cash value growth in your policy.  Contact your MetLife representative or
> broker for more information."

Many policyholders may have questions about the impact of these charges on their policies.  To
help you respond to such inquiries, we have prepared the following Question and Answer section
and a numerical chart comparing policy values both with and without cost of insurance.  As you
will see, Single Premium Life remains a viable product for your clients.

Q. Exactly which policies are affected by the new cost of insurance charges?

A.  All inforce Single Premium Life policies issued March 1987 and later will be affected.
    These policies were originally issued without COI charges even though their contracts
    include provisions for them.  This change does not affect Single Premium Universal Life
    (available at ages above 70), which has always charged COIs.

Q.  Since all premiums and commissions are paid in the first policy year, why is it
    necessary to now charge COIs to meet expenses on SPL?

A.  There are basically four different types of expenses associated with SPL:  first year
    commissions, underwriting/issue, maintenance and death claims.  The first two expenses,
    while occurring during the first year only, are actually paid for or "amortized" over several
    policy years.  The second two expenses are also paid for after the first year.

**CONFIDENTIAL**

MP401107O679

**Q. How were these expenses paid for before the assessment of COIs?**

**A.** Unlike Universal Life, which has four separate revenue sources (premium loads, policy loads, administrative charges, and mortality charges), SPL had no explicit loads. Expenses were recouped from the difference between earned (interest earned by MetLife) and credited (interest credited to policies) interest rates. Since the current 6.00% credited interest rate is at its guaranteed minimum (and therefore cannot be lowered), and because interest rates have declined, excess interest earnings normally used to cover policy expenses have diminished.

**Q. Is there any other way to recoup expenses?**

**A.** No. Assessment of cost of insurance charges are within the terms of the policy. Until now, it has not been necessary to implement COIs, even though the contract allowed for them.

**Q. Why is it necessary to recoup expenses on a product that comprises only a small percentage of our business.**

**A.** Each product is priced separately and must therefore be profitable on its own. We cannot rely on the successful performance of one product line to compensate for the loss of another. This would be unfair to individual policyholders who own other types of products.

**Q. What if my client wants to surrender or exchange his SPL contract in order to avoid the effect these charges may have on his returns?**

**A.** The insurance charges will not drastically impact rates of return. To help you better explain this relationship, we have created the comparison chart on the next page. As you can see, at the end of 20 years the most these charges will reduce the internal rate of return is 0.51%. Any requests for surrender should be carefully examined since an internal rate of return of 5.25% is still very competitive given today's environment.

Also, remember that contracts issued June 20, 1988 and prior are grandfathered under TAMRA and therefore are not considered Modified Endowment Contracts.

**Q. What if my client wants to see an illustration of his policy values with the COI charges included?**

**A.** Each Head Office and MetLife Brokerage Territorial offices will receive updated inforce SPL illustration software early in June for this purpose. Please contact them for individual illustrations.

CONFIDENTIAL

# Single Premium Life (SPL)

## Affect of COI Charges on Cash Surrender Value/IRR

$20,000 Single Premium
Standard, Nonsmoker
May 1, 1988 Issue Date

| No COIs with Historical Interest Rates: | MALE 20 Year CSV | IRR | FEMALE 20 Year CSV | IRR |
|---|---|---|---|---|
| ALL AGES | $66,908 | 6.22% | $66,908 | 6.22% |

| No COIs with Historical Interest Rates; then COIs as of May '93: | MALE 20 Year CSV | IRR | FEMALE 20 Year CSV | IRR |
|---|---|---|---|---|
| Age 20 | $61,349 | 5.76% | $61,645 | 5.79% |
| Age 30 | $61,337 | 5.76% | $61,433 | 5.77% |
| Age 40 | $61,056 | 5.74% | $61,062 | 5.74% |
| Age 50 | $61,100 | 5.74% | $60,680 | 5.71% |
| Age 60 | $62,505 | 5.86% | $61,010 | 5.73% |
| Age 70 | $62,630 | 5.87% | $61,673 | 5.79% |

CONFIDENTIAL

MP4011070680

Robert J. Crimmins
Executive Vice-President

Dear Policyholder

As you know, there has been a steady decline in interest rates over the past few years which has influenced the returns of many investment vehicles available to consumers. This trend has also affected some of our personal life insurance products, including Single Premium Life.

In the past, due to the higher interest rate environment, we were able to cover expenses related to your policy without an explicit charge for insurance. As a result of today's lower interest rates, the returns on Single Premium Life funds have declined to a level that we must begin to impose cost of insurance charges on all Single Premium Life policies as of their monthly anniversary dates beginning May 1, 1993. This means that if your policy anniversary date is January 15th, for instance, the insurance charge will be deducted from your accumulation fund once a month, beginning on May 15th.

Despite the change stated above, your cash values will continue to grow tax deferred at a competitive interest rate. In addition, if your policy was issued on or before June 20, 1988, it will retain significant tax advantages regarding policy distributions. And remember, your policy is issued by MetLife, a company with a longstanding tradition of making sound business decisions and fulfilling the promises it makes to its policyholders.

If you have any questions about this change or about your life insurance policy in general, please call your MetLife Account Representative at                         , Sales Office/Agency

Sincerely

Robert J. Crimmins

May 1, 1993

**CONFIDENTIAL**

Product Development
Career Agency Operations

**MetLife** DQ
UL Specialists

May 28, 1993

Re    Single Premium Life

To    The Field Force

As stated in our field release dated April 15, 1993, the steady decline in interest rates has made it necessary to implement cost of insurance (COI) charges on all Single Premium Life policies as of May 1, 1993.   Since this is the first time SPL policyholders will be subject to these charges, we have notified them individually of this change.  A sample of this letter is attached. The following message will also appear on SPL annual statements beginning May 1:

> "Starting May 1, 1993, current cost of insurance rates have been introduced.  This will affect the cash value growth in your policy.  Contact your MetLife representative or broker for more information."

Many policyholders may have questions about the impact of these charges on their policies.  To help you respond to such inquiries, we have prepared the following Question and Answer section and a numerical chart comparing policy values both with and without cost of insurance.  As you will see, Single Premium Life remains a viable product for your clients.

Q. Exactly which policies are affected by the new cost of insurance charges?

A. All inforce Single Premium Life policies issued March 1987 and later will be affected. These policies were originally issued without COI charges even though their contracts include provisions for them.  This change does not affect Single Premium Universal Life (available at ages above 70), which has always charged COIs.

Q. Since all premiums and commissions are paid in the first policy year, why is it necessary to now charge COIs to meet expenses on SPL?

A. There are basically four different types of expenses associated with SPL:  1st year commissions, underwriting/issue, maintenance and death claims.  The first two expenses, while occurring during the first year only, are actually paid for or "amortized" over several policy years.  The second two expenses are also paid for after the first year.

CONFIDENTIAL

**Q. How were these expenses paid for before the assessment of COIs?**

A. Unlike Universal Life, which has four separate revenue sources (premium loads, policy loads, administrative charges, and mortality charges), SPL had no explicit loads. Expenses were recouped from the difference between earned (interest earned by MetLife) and credited (interest credited to policies) interest rates. Since the current 6.00% credited interest rate is at its guaranteed minimum (and therefore cannot be lowered), and because interest rates have declined, excess interest earnings normally used to cover policy expenses have diminished.

**Q. Is there any other way to recoup expenses?**

A. No. Assessment of cost of insurance charges are within the terms of the policy. Until now, it has not been necessary to implement COIs, even though the contract allowed for them.

**Q. Why is it necessary to recoup expenses on a product that comprises only a small percentage of our business.**

A. Each product is priced separately, and must therefore be profitable on its own. We cannot rely on the successful performance of one product line to compensate for the loss of another. This would be unfair to individual policyholders who own other types of products.

**Q. What if my client wants to surrender or exchange his SPL contract in order to avoid the effect these charges may have on his returns?**

A. The insurance charges will not drastically impact rates of return. To help you better explain this relationship, we have created the comparison chart on the next page. As you can see, at the end of 20 years, the most these charges will reduce the internal rate of return is 0.51%. Any requests for surrender should be carefully examined since an internal rate of return of 5.25% is still very competitive given today's environment.

Also, remember that contracts issued June 20, 1988 and prior are grandfathered under TAMRA and are therefore not considered Modified Endowment Contracts.

**Q. What if my client wants to see an illustration of his policy values with the COI charges included?**

A. Each Head Office and MetLife Brokerage Territorial offices will receive updated inforce SPL illustration software early in June. Please contact them should you need individual illustrations.

**CONFIDENTIAL**



# Single Premium Life (SPL)

## Affect of COI Charges on Cash Surrender Value/IRR

$20,000 Single Premium
Standard, Nonsmoker
May 1, 1988 Issue Date

| No COIs with Historical Interest Rates: | MALE 20 Year CSV | IRR | FEMALE 20 Year CSV | IRR |
|---|---|---|---|---|
| ALL AGES | $66,908 | 6.22% | $66,908 | 6.22% |

| No COIs with Historical Interest Rates; then COIs as of May '93: | MALE 20 Year CSV | IRR | FEMALE 20 Year CSV | IRR |
|---|---|---|---|---|
| Age 20 | $61,349 | 5.76% | $61,645 | 5.79% |
| Age 30 | $61,337 | 5.76% | $61,433 | 5.77% |
| Age 40 | $61,056 | 5.74% | $61,062 | 5.74% |
| Age 50 | $61,100 | 5.74% | $60,680 | 5.71% |
| Age 60 | $62,505 | 5.86% | $61,010 | 5.73% |
| Age 70 | $62,630 | 5.87% | $61,673 | 5.79% |

CONFIDENTIAL

MP4011070684

Robert J. Crimmins
Executive Vice-President

MP4011070685

Dear Policyholder

As you know, there has been a steady decline in interest rates over the past few years which has influenced the returns of many investment vehicles available to consumers. This trend has also affected some of our personal life insurance products, including Single Premium Life.

In the past, due to the higher interest rate environment, we were able to cover expenses related to your policy without an explicit charge for insurance. As a result of today's lower interest rates, the returns on Single Premium Life funds have declined to a level that we must begin to impose cost of insurance charges on all Single Premium Life policies as of their monthly anniversary dates beginning May 1, 1993. This means that if your policy anniversary date is January 15th, for instance, the insurance charge will be deducted from your accumulation fund once a month, beginning on May 15th.

Despite the change stated above, your cash values will continue to grow tax deferred at a competitive interest rate. In addition, if your policy was issued on or before June 20, 1988, it will retain significant tax advantages regarding policy distributions. And remember, your policy is issued by MetLife, a company with a longstanding tradition of making sound business decisions and fulfilling the promises it makes to its policyholders.

If you have any questions about this change or about your life insurance policy in general, please call your MetLife Account Representative at                    , Sales Office/Agency

Sincerely

Robert J. Crimmins

May 1, 1993

**CONFIDENTIAL**

JUN 18 '93  8:09  FROM METLIFE          TO 82528847          PAGE.002
JUN 17 '93 18:35                                             PAGE.002

DQ
UL Specialists

P. O. BOX 21889
TULSA, OK 74121-1889

**MetLife**

Robert J. Crimmins
Executive Vice President

POLICY NUMBER:   UL

Dear Policyholder

As you know, there has been a steady decline in interest rates over the past few years which
has influenced the returns of many investment vehicles available to consumers. This trend has
also affected some of our personal life insurance products, including Single Premium Life.

In the past, due to the higher interest rate environment, we were able to cover expenses related
to your policy without an explicit charge for insurance. As a result of today's lower interest
rates, the returns on Single Premium Life funds have declined to a level that we must begin to
impose cost of insurance charges on all Single Premium Life policies as of their monthly
anniversary dates beginning May 1, 1993. This means that if your policy anniversary date is
January 15th, for instance, the insurance charge will be deducted from your accumulation fund
once a month, beginning on May 15th.

Despite the change stated above, your cash values will continue to grow tax deferred at a
competitive interest rate. In addition, if your policy was issued on or before June 20, 1988, it will
retain significant tax advantages regarding policy distributions. And remember, your policy is
issued by MetLife, a company with a longstanding tradition of making sound business decisions
and fulfilling the promises it makes to its policyholders.

If you have any questions about this change or about your life insurance policy in general, please
call your MetLife Representative at 314-821-8700 , Sales Office/Agency C71/865.

Sincerely

Robert J. Crimmins

May 1, 1993    JUNE 15, 1993

**CONFIDENTIAL**

**REDACTED**
**CONFIDENTIAL POL INFO**

** TOTAL PAGE.002 **

```
FROM: RUGGIERI, BOB              MSG#: 93-01118325
TO  : UL SYSTEMS ALERT           SENT: 05/05/93 01:55 PM    PRIORITY: 2
 UBJ: SPL COST OF INSURANCE
```
--------------------------------------------------------------------------------
ATTENTION ALL HEAD/ADMIN. OFFICE MANAGEMENT

YOU MAY RECALL YESTERDAY SEEING A MESSAGE FROM NEIL KELLEHER OF MY STAFF.
NEIL ANNOUNCED A FEW CHANGES TO THE ULA (VCS1) POLICYHOLDER ANNUAL STATEMENTS.
ONE ITEM HE MENTIONED WAS A NEW "IMPORTANT NOTICE" THAT WILL APPEAR ON ALL
ANNUAL STATEMENTS PRODUCED FOR SINGLE PREMIUM POLICIES (SPL1 AND SPL3).  IN
ADDITION TO NEIL'S MESSAGE, I THOUGHT IT ADVISABLE TO PROVIDE YOU WITH SOME
ADDITIONAL INFORMATION.

WHEN WE INTRODUCED THE SPL1 AND SPL1 POLICIES, WE DID NOT DEDUCT COST OF
INSURANCE CHARGES FROM THE ACCUMULATION FUND.  IN FACT, THE TERM INSURANCE
ELEMENT WAS FREE - WE MADE OUR MONEY ON THE DIFFERENCE BETWEEN THE INTEREST
RATE WE CREDITED AND EARNED.  HOWEVER, DUE TO THE STEADY DECLINE IN INTEREST
RATES OVER THE PAST FEW YEARS, THE PROFITABILITY OF THIS PRODUCT HAS BEEN
ADVERSELY EFFECTED.  TO COMPENSATE FOR THIS, WE HAVE BEGUN IMPOSING COST OF
INSURANCE CHARGES ON ALL INFORCE SINGLE PREMIUM LIFE POLICIES AT THEIR
MONTHLY ANNIVERSARY DATES BEGINNING MAY 1, 1993.

ON APRIL 15, 1993, A "CAREER AGENCY OPERATIONS" RELEASE WAS SENT TO THE
FIELD FORCE - "RE  SINGLE PREMIUM LIFE" - INFORMING THEM OF THIS FACT, AND
RECOMMENDING THEY CONTACT THEIR SPL CLIENTS SHOULD THEY HAVE ANY CONCERNS
ABOUT THEIR CONTRACTS.  IN ADDITION, SINGLE PREMIUM LIFE ILLUSTRATION
SOFTWARE INCORPORATING THESE CHANGES WILL BE MADE AVAILABLE TO THE FIELD
'N MAY.  IF THEY HAD ANY QUESTIONS, THEY WERE REFERRED TO THE MARKETING
 ERVICES UNIT IN THE HEAD/ADMIN. OFFICE.

IN ADDITION TO THIS FIELD RELEASE, EFFECTIVE 5/1/93, WE HAVE BEGUN PRINTING
A NOTICE ON EACH POLICYHOLDER ANNUAL STATEMENT AS DESCRIBED IN NEIL
KELLEHER'S MESSAGE.  YOU SHOULD ALSO BE AWARE THAT WE ARE IN THE PROCESS OF
WORKING WITH MARKETING ON THE DEVELOPMENT OF A LETTER TO BE SENT TO EACH
POLICYHOLDER EXPLAINING THIS EVENT.  I WOULD EXPECT THIS LETTER WILL BE
GOING OUT WITHIN THE NEXT MONTH OR SO.  WHEN WE HAVE FINAL COPIES OF ALL OF
THE DOCUMENTATION, I WILL HAVE NEIL KELLEHER SEND IT TO INTERESTED PARTIES.

I JUST WANTED TO GIVE YOU A LITTLE MORE BACKGROUND, AS I AM SURE YOUR
PEOPLE WILL RECEIVE QUESTIONS.  IF YOU DO RUN INTO ANY SITUATIONS THAT
YOUR PEOPLE ARE UNABLE TO HANDLE, JUST LET ME KNOW AND I WILL SEE IF I CAN
OBTAIN AN ANSWER.

THANK YOU

BOB RUGGIERI

CC: Supra/Lyons

**CONFIDENTIAL**

CC: Jim Ruede

Metropolitan Life Insurance Company
MetLife Customer Service Center-Tulsa
12902 East 51st Street, P.O. Box 500, Tulsa, OK 74102-0500
800 MET-LIFE

**MetLife**

MP4011070688

MEMORANDUM

DATE March 28, 1994

   TO Jim Rayl, ACS
      Tulsa Customer Services & Communications Director

FROM Rita Ogle
     Tulsa Consumer Relations

   RE Single Premium Life Policies / Cost Of Insurance
      State Insurance Department Cases Claims Of Misleading Or
      Ambiguous Language

Recently we received a Nevada Insurance Department Case
regarding the standard SPL/COI case responses in regards to
sales or advertising literature for the SPL policies. Pat
Hunt of our PI Compliance Bureau responded to the claims of
misleading or ambiguous language.

Due to the nature of this matter, we felt that perhaps this
is information that you would like to share with the persons
involved in handling SPL/COI policy owner concerns.

I have attached copies of Mr. Hunt's reply which has been
accepted by the Nevada Insurance Department as a satisfactory
response at this time.

CL JEFFI
GAYLE
DARLENE
KELLYE
LIZ

KW 3/28

**CONFIDENTIAL**

MAR 28 '94 16:47    FROM P1 COMPLIANCE BUREAU—                    PAGE.003

Metropolitan Life Insurance Company
501 US Highway 22, Bridgewater, NJ 08807
Tel 908 253-2348  Fax 908 253-2945

**MetLife**

Patrick J. Hunt
Director
Personal Insurance Compliance Bureau

March 23, 1994                                              CONFIDENTIAL

Pat May
Consumer Services
Division of Insurance
1665 Hot Springs Road, No. 152
Carson City, Nevada 89710

Re  ▓▓▓▓▓▓▓▓  Policy No. 88▓▓▓▓UL        REDACTED
                Policy No. 87▓▓▓▓UL        CONFIDENTIAL POL
    Your File No. 94-PM0042                INFO

Dear Ms. May

This case was referred to me for review and to respond to your February 24, 1994 letter.
I trust you received my phone messages and I apologize for the delay in responding to
you.

I have read through the correspondence on the case and, as stated by other Company
employees in previous letters, I too regret that Mr. and Mrs.▓▓▓▓have become so
dissatisfied with the policy they purchased. We will certainly do everything that is
reasonably possible to rectify the situation. However, I would like first to address the
comments made in your February 24 letter.

As you know, the policy form in question was approved by the Nevada Insurance
Department. With respect to your contention that our sales material is misleading, I
don't agree. You point out that the material refers to the policy merely as a Single
Premium Life Policy and does not explain that it is a universal life product. My
recollection is that when universal life products were first being introduced, and for
some years thereafter, it was not considered desirable to use the terminology "universal
life" since it was so general and failed to spell out the various features of the contract
such as front or back loads, surrender charges, etc. Consequently, we decided to refer
to these various policy features and to specify and define what they were.

It seems to me that in the case of Mr. and Mrs.▓▓▓▓we were somewhat successful in
our sales material since it was clear to them that there were no administrative fees or
charges. No such fees or charges have been assessed nor will they be. It also seems
clear that they were aware of the loan provision in the contract since there are

MAR-23-1994  15:51                    9082532945                    98%                    P.03

-2-

outstanding loans on both policies. In addition, I got the distinct impression that until we began assessing charges for the cost of the term insurance, the ████ were content with their policies and the return they were receiving.

The cost of the term insurance is an item for which we resisted charging as long as we could. However, when that was no longer possible, we had no alternative but to assess the charge since to do otherwise would be ultimately unfair to owners of other types of policies. But it is important to note that our sales material pointed out this possibility just as clearly as it indicated no administrative fees or charges and the availability of a policy loan. In a section headed "Policy Fees", the following appears:

> "With Met's Single Premium Life, there are no administrative fees or sales charges up front. Currently, policy costs are borne by the excess of interest we earn over the currently declared rate. However, we reserve the right to assess mortality charges in the future."

(Underlining added)

Be that as it may, we are most concerned with serving our clients and doing whatever is reasonably possible to satisfy their needs. If the ████ wish to terminate their policies, as indicated in prior correspondence, they will receive surrender values which are in excess of the initial single premium they paid in. This in spite of the fact that they both have outstanding loans on their policies.

Please let me know via phone, fax or letter what next steps are desired and I will do everything possible to assure that matters are handled as quickly as possible. If there is any other information required or if I can be of any other assistance, please let me know.

Sincerely,

Director

CONFIDENTIAL

REDACTED CONFIDENTIAL POL INFO

MAR-2-94 WED 12:20    CC NEV DEPT OF INS    FAX NO. 7026871393    P. 02

BOB MILLER
*Governor*

**STATE OF NEVADA**



ROSE McKINNEY-JAMES
*Director*

TERESA P. FRONCEK RANKIN, J.D., C.P.C.U.
*Commissioner of Insurance*

MP40110706991

## DEPARTMENT OF BUSINESS AND INDUSTRY
### DIVISION OF INSURANCE
Capital Complex
1665 Hot Springs Road, No. 152
Carson City, Nevada 89710
(702) 687-4270

**CONFIDENTIAL**

February 24, 1994

Brenda Taboas, Consumer Relations
Metropolitan Life Insurance Company
P. O. Box 5071
San Ramon, California 94583-0971

Re: ▮▮▮▮▮▮
   Policy: #88▮▮▮▮▮▮UL
   Policy: #87▮▮▮▮▮▮UL
   Our File: #94-PM0042

Dear Ms. Taboas:

We sent you a letter on February 4, 1994 and have not had a reply. Your in violation of NAC 686A.665.

We were contacted by Mr. & Mrs ▮▮▮▮ They received a letter dated February 9, 1994 and signed by Julia Carnes.

After reviewing all the information in our file and the new information provided by Ms. Carnes it is our position that your advertising regarding the Single Premium Life plan is misleading. No where in your advertising literature does it explain this is a Universal Life product. Your advertising states "Single Premium Life Policy" which leads consumers to believe this is a Single Premium Paid Up Policy. The advertising never mentions that premium for pure insurance costs or "term insurance" will be deducted from the single premium payment.

Bulletin #24, Nevada Revised Statute (NRS) 687B.130, NRS 689A.040, Nevada Administrative Code (NAC) 686A.020 and NAC 689A.270 do not allow misleading (or ambiguous language.

Mr. & Mrs. ▮▮▮▮ maintain they did not need life insurance when they purchased this plan. They purchased it as an investment. They were told the insurance was "incidental" to their investment. They understood the plan to be a one time investment that would allow them to take the interest earned out of the plan with no charges made and tax free. In other words a Single Premium Paid up policy.



**REDACTED CONFIDENTIAL POL INFO**

MAR-02-1994 13:26                                        94%        P.02

MP401107092

February 24, 1994
Brenda Taboas, Consumer Relations
Page 2 cont.

Mr. & Mrs. ████ state they would never have bought your plan had they known it was universal life insurance. They feel this plan was completely misrepresented and want their initial premium returned to them.

Your prompt review and reply is appreciated.

Sincerely,


PAT MAY
Compliance Investigator
Consumer Services

cc: Mr. & Mrs. ████

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                               POL INFO

MAR- 2-94 WED 12:22    CU REV DEPT OF INS       FAX NO. 1020013331         P. 05

**CONFIDENTIAL**

MP4011070693



## A Key Part of Your Financial Plan...

What do you consider when you make a financial decision? Liquidity? Growth potential? Preferential tax treatment? Security that comes from a name you can trust?

If so, then you should consider the significant advantages of a Single Premium Life Policy from Metropolitan.



## Compounded Growth Without Tax Penalty

Make a single premium payment and your money goes to work for you immediately. Earn interest on the entire premium from the date of issue at a fixed, competitive rate, effective for one year, with subsequent rates declared annually to reflect market conditions.

At no time is your Single Premium Life Policy subject to tax while in force. The result? A fast compounding of your premium payment — minimum of $5,000, up to $500,000. Watch your Accumulation Fund grow!

## Interest-Free, Tax-Free Borrowing Power

Metropolitan's Single Premium Life provides a hedge against future demands on your resources. Here's ready money for large outlays — tuition payments, supplemental retirement income, charitable gifts, compensation for key employees — whatever need develops.

After your first year, you may borrow on the interest earned. Pay no taxes on that loan. Currently, amounts borrowed against the accumulated interest will be credited at the same rate as charged against the loan...so there's no net cost to you! Or you can take a loan on your single premium amount for a 3% net charge, and still pay no taxes.



## No Fees, No Charges

With Met's Single Premium Life, there are no administrative fees or charges up front. Your cash value is the amount of the single premium plus interest, less any loans. If you surrender your policy within the first seven years, the cash value will be subject to a surrender charge (grading down to zero over 7 years). If the policy is surrendered during your lifetime, you pay income tax only on the amount you've earned over your single premium payment.

## Life Insurance Protection Without the Burden of Taxes

Why penalize those you choose to protect? At that time of loss your beneficiaries are probably least able to cope with the burdensome taxes. With Met's Single Premium Life death benefit, they will not be liable for income tax on the policy proceeds, and they will have the liquidity they need.



MAR-02-1994  13:27                                        93%          P.04

MAR- 2-94 WED 12:22     CC NEV DEPT OF INS     FAX No. 7020613951     P. 05

CONFIDENTIAL

MF4011070694

# A Key Part of Your Financial Plan...

What do you consider when you make a financial decision? Liquidity? Growth potential? Preferential tax treatment? Security that comes from a name you can trust?

If so, then you should consider the significant advantages of a Single Premium Life Policy from Metropolitan.

## Compounded Growth Without Tax Penalty

Make a single premium payment of at least $5,000, up to $500,000 and your money goes to work for you immediately while it provides you with valuable life insurance protection. Earn interest on the entire premium from the date of issue at a fixed, competitive rate. And with Met's Single Premium Life plan you have a choice of initial interest rate guarantees:

- a one year rate, or
- a three year rate

with subsequent rates declared annually to reflect market conditions. As an established practice, Met credits the same declared interest rate to renewing contracts as is being offered to new contracts (i.e. "new money rate"). While we cannot guarantee this indefinitely, the company intends to continue this practice.

Metropolitan guarantees a minimum interest rate of 6%. Also to protect you when interest rates are rising, we guarantee that the ___ ___ ___ it, any of the first seven policy years will not be less than 1.75% below the month's average rate for five year Treasury Notes.

*The annual rate is calculated based on the 5 year Treasury Notes as published in the Federal Reserve Statistical Release H.15(519) on the first Monday of the month prior to the month in which the policy anniversary falls. ___

At no time is your Single Premium Life Policy subject to tax while in force. The result? A fast compounding of your premium payment.

## Interest-Free, Tax-Free Borrowing Power

Metropolitan's Single Premium Life provides a hedge against future demands on your resources. Here's ready money for large outlays—tuition payments, supplemental retirement income, charitable gifts, compensation for key employees—whatever needs develop.

You may borrow on the interest earned, and pay no taxes on that loan. Currently, amounts borrowed from the accumulated interest will be credited with the same rate as charged against the loan...so there's no net cost to you! Or you can take a loan on your single premium amount for a 2% net charge, and still pay no taxes.

## Policy Fees

With Met's Single Premium Life, there are no administrative fees or sales charges up front. Currently, policy costs are borne by the excess of interest we earn over the currently declared rate. However, we reserve the right to assess mortality charges in the f ___ ___ ___ ... Bused on the amount of the single premium plus interest, less any loans and loan interest. If you surrender your policy within the first seven years, the cash value will be subject to a surrender charge (grading down to zero over 7 years). If the policy is surrendered during your lifetime, you pay income tax only on the amount you've earned over your single premium

MAR-02-1994   13:28                                    94%                          P.05

CONFIDENTIAL

MP4011070695

## Annual Report

An annual report will keep the policy-owner appraised of the status of the policy.

## Policy Fees

There are no expense or administrative fees.

## Insurance Proceeds

The insurance proceeds are a death benefit equal to the greater of the face amount of insurance and the minimum Death Benefit minus any policy loan and loan interest.

The minimum ranges by age from 250% to 100% of the accumulation fund.

## Underwriting Requirements

—Non Medical—

| Age | Premium |
|-----|---------|
| 0-70 | Up to $35,000 |

—Premium in Excess of $35,000—

The underwriting requirements are based on the difference between the single premium and the face amount, i.e., the Underwriting Amount. Certain Sales Representatives will have different limits.

When examination is required by non-medical limits, medical requirements are based on the Underwriting Amount defined previously plus the in force issued within last 12 months.

Ages 0-14 — Individual case basis to be determined by Home Office. There may be additional requirements for amounts in excess of $250,000.

| Amount Within 12 Mos. | 15-40 | 41-50 | 51-60 | 61-65 | 66 & Over |
|---|---|---|---|---|---|
| Up to $75,000 | | | | | |
| $75,001– $99,999 | | | | | |
| $100,000 | | | | | |
| $100,000– $250,000 | | | | | |

☐ Paramedical  ☒ Regular Examiner

☐ Paramedical Consumer Report  ☒ Regular Examiner Home Office Specimen, ECG

☐ Paramedical Home Office Specimen, Consumer Report  ☒ Regular Examiner Home Office Specimen, ECG Consumer Report

### Special Notes

ECG Although a medical examination may not be necessary for nonmedical limits, an ECG may be necessary based on total insurance currently applied for and in force within 12 months.

X-Ray Not routinely required. Requested on individual case basis according to Underwriting guidelines.

Consumer Reports and Motor Vehicle Reports will be ordered by the Underwriter.

The tax information above is subject to change. To determine its applicability to your client's situation a tax advisor should be consulted.

```
FROM: RUGGIERI, BOB              MSG#: 93-01118325
TO  : UL SYSTEMS ALERT           SENT: 05/05/93 01:55 PM    PRIORITY: 2
SUBJ: SPL COST OF INSURANCE
```

------------------------------------------------------------------------

ATTENTION ALL HEAD/ADMIN. OFFICE MANAGEMENT

YOU MAY RECALL YESTERDAY SEEING A MESSAGE FROM NEIL KELLEHER OF MY STAFF.
NEIL ANNOUNCED A FEW CHANGES TO THE ULA (VCS1) POLICYHOLDER ANNUAL STATEMENTS.
ONE ITEM HE MENTIONED WAS A NEW "IMPORTANT NOTICE" THAT WILL APPEAR ON ALL
ANNUAL STATEMENTS PRODUCED FOR SINGLE PREMIUM POLICIES (SPL1 AND SPL3). IN
ADDITION TO NEIL'S MESSAGE, I THOUGHT IT ADVISABLE TO PROVIDE YOU WITH SOME
ADDITIONAL INFORMATION.

WHEN WE INTRODUCED THE SPL1 AND SPL1 POLICIES, WE DID NOT DEDUCT COST OF
INSURANCE CHARGES FROM THE ACCUMULATION FUND.  IN FACT, THE TERM INSURANCE
ELEMENT WAS FREE - WE MADE OUR MONEY ON THE DIFFERENCE BETWEEN THE INTEREST
RATE WE CREDITED AND EARNED.  HOWEVER, DUE TO THE STEADY DECLINE IN INTEREST
RATES OVER THE PAST FEW YEARS, THE PROFITABILITY OF THIS PRODUCT HAS BEEN
ADVERSELY EFFECTED. TO COMPENSATE FOR THIS, WE HAVE BEGUN IMPOSING COST OF
INSURANCE CHARGES ON ALL INFORCE SINGLE PREMIUM LIFE POLICIES AT THEIR
MONTHLY ANNIVERSARY DATES BEGINNING MAY 1, 1993.

ON APRIL 15, 1993, A "CAREER AGENCY OPERATIONS" RELEASE WAS SENT TO THE
FIELD FORCE - "RE  SINGLE PREMIUM LIFE" - INFORMING THEM OF THIS FACT, AND
RECOMMENDING THEY CONTACT THEIR SPL CLIENTS SHOULD THEY HAVE ANY CONCERNS
ABOUT THEIR CONTRACTS.  IN ADDITION, SINGLE PREMIUM LIFE ILLUSTRATION
SOFTWARE INCORPORATING THESE CHANGES WILL BE MADE AVAILABLE TO THE FIELD
IN MAY.  IF THEY HAD ANY QUESTIONS, THEY WERE REFERRED TO THE MARKETING
`ERVICES UNIT IN THE HEAD/ADMIN. OFFICE.

IN ADDITION TO THIS FIELD RELEASE, EFFECTIVE 5/1/93, WE HAVE BEGUN PRINTING
A NOTICE ON EACH POLICYHOLDER ANNUAL STATEMENT AS DESCRIBED IN NEIL
KELLEHER'S MESSAGE.  YOU SHOULD ALSO BE AWARE THAT WE ARE IN THE PROCESS OF
WORKING WITH MARKETING ON THE DEVELOPMENT OF A LETTER TO BE SENT TO EACH
POLICYHOLDER EXPLAINING THIS EVENT.  I WOULD EXPECT THIS LETTER WILL BE
GOING OUT WITHIN THE NEXT MONTH OR SO.  WHEN WE HAVE FINAL COPIES OF ALL OF
THE DOCUMENTATION, I WILL HAVE NEIL KELLEHER SEND IT TO INTERESTED PARTIES.

I JUST WANTED TO GIVE YOU A LITTLE MORE BACKGROUND, AS I AM SURE YOUR
PEOPLE WILL RECEIVE QUESTIONS.  IF YOU DO RUN INTO ANY SITUATIONS THAT
YOUR PEOPLE ARE UNABLE TO HANDLE, JUST LET ME KNOW AND I WILL SEE IF I CAN
OBTAIN AN ANSWER.

THANK YOU

BOB RUGGIERI

CC Supvr/Lyons

CONFIDENTIAL

CC: Jim Rude

To : Distribution List

Re : Introduction of Cost-of-Insurance Charges for Single Premium Life Policies

In my March 11 memo, it was stated that the monthly COI deductions for each individual Single Premium Life policy (1-year and 3-year guarantee product only) will begin on the first policy anniversary after May 1. This has been slightly revised.

The introduction date will remain May 1, however, the monthly COI deductions will begin on the first monthly anniversary effective May 1. For example, if a policy has a February 15 anniversary effective date, the monthly COI deductions will begin on May 15. By the end of the month of May, all policies will have COIs being deducted from their Accumulation Funds.

The COI charges that have already been distributed to the usual people, as noted on the Distribution List, are not being changed.

If you have any questions with regard to this subject, contact me at extension 1342.

Dominic Racco
Sr. Research Assistant
PIAO - PLI Product Development
Bridgewater, NJ
Area 1N-97

March 29, 1993

CONFIDENTIAL

MP4011070697

Ex  40

REDACTED CONFIDENTIAL
POL INFO

Ed Kocis
Project Manager
Information Technology - Scranton

Re  Customer/Policy Identification - █████████

Ed, you will have to bear with me on this as I am just beginning to get involved. However, I have been given the responsibility to try and coordinate some of these specialized marketing programs in Tulsa such as the ██████████ and *Bank Financial Services* initiatives. Donna Michaels has advised me that you have been given responsibility for addressing some of the systems issues for the ████████ activity. I'm not sure what all that encompasses, but I have a number of concerns associated with how the specific needs associated with these specialized marketing programs will be coordinated and implemented. I recognize that some of this probably exceeds your responsibility so I am also copying Tom LaBadia and Bob McDowall. I assume that between the three of you, someone can point me in the right direction if there is the possibility that this can, or should be approached differently.

As I understand it, there have been at least two policies issued in conjunction with the ████████ ████ program. According to what Donna has told me, the current problem and concern stems from the fact that there is nothing currently on the electronic files that would alert anyone accessing these policy records to know that these are ████████ cases.

The administrative support needs for ████████ have many things in common with those for the ████████ *(Bank Financial Services)* customers. While I'm not sure exactly what is the same and what is different, the policy/customer identification is definitely a common issue for both of them. However, I believe there is a much broader issue at stake here.

It seems likely to me that the number of specialized marketing programs that Individual Business will be asked to support is only going to increase. And, within some of these programs, such as *Bank Financial Services*, the needs or requirements may differ from client to client (i.e., ████████ *versus other bank arrangements)*. But, in spite of this, there will still be some administrative support needs that all these programs will share such as:

> Quick and easy identification of the policy record as being associated with one of these specialized marketing programs

> The various programs may have differing levels of expectation with respect to the service content responsiveness. In other words, these customers may demand or expect different or higher levels of service and support than is typically provided to existing policyholders and/or our captive agency force. These may include special needs such as those outlined in Bill Barnewold's August 29th memo and package regarding BFS and ████████

CONFIDENTIAL



DEPOSITION
EXHIBIT
26

➢ Specialized tracking and reporting of service related performance. ▮▮▮▮▮▮ has outlined very specific service standards. I would assume that they will want reporting and accountability which is very specific to their brokers/customer related work. This is likely to be required for each of these programs and any type of consolidated reporting will probably be unacceptable.

➢ Specialized transaction forms to identify the customer and potentially facilitate service level tracking if it is not done electronically. Ideally, all the tracking and reporting would be done electronically. But, that is not likely to be available soon so the forms sent to customers will need to be clearly identified so they can receive appropriate or specialized handling and tracking by the administrative operation when they are received back in the Service Center for processing.

In the case of BFS, one of the requirements states that MetLife sales and marketing material that is normally inserted in envelopes must be excluded from correspondence. This certainly adds an entirely different dimension to the service expectation issue.

Ed, I don't know exactly what requirements have been established for ▮▮▮▮▮▮ or how these issues are being pursued. Perhaps you can give me a call (8+252-8427) and enlighten me as to what you are specifically addressing. It seems apparent that a great deal of effort has been made to try and address the administrative support issues for *Bank Financial Services*. But I don't know if a similar approach is being adopted for ▮▮▮▮▮▮ Bill Barnewold's package outlined a high level of systems support and activity but I'm not sure how much of this is applicable or not applicable for ▮▮▮▮▮▮

But, my concern is whether or not all of these programs will be addressed with an organized structure and consistent systems approach as opposed to just trying to deal with each one on an individual basis as it arises. Therefore, I am wondering if there is any firm plan to develop a systems solution that will offer both flexibility and consistency in terms of meeting the administrative support needs for these various programs. And, clearly, a universal solution is needed for some aspects such as the specialized tracking and reporting that will be required for each such program.

I would welcome any thoughts that you or others on the distribution might have as to how we can address all the administrative support issues that will be associated with these specialized marketing programs.

REDACTED CONFIDENTIAL
POL INFO

J. L. Rayl
Director
MetLife Customer Service Center - Tulsa

September 20, 1996

cc      Gardner, LaBadia, McDowall, Barnewold, Schoos, Michaels-Fisher, West & Rizzo

ONFIDENTIAL

Vincent J. Donnelly
Vice-President
P.I. Customer Services

## Re  *Single Image* - CACS  *(Centralized Change of Address System)*

Vince, your question on the response to the *Single Image* memo was; *"Does this satisfy your concerns?"* Quite simply, my response is "no." After our *Single Image* NWT meeting last week, I have far more serious concerns about the broader picture and where we are going.

Luci Chez participated last week and we did address the *Single Image* platform issue. We were repeatedly assured that the platform issue is not slowing our progress. But, as the discussion evolved, I think some of this is a matter of semantics and the difference in how we look at things. No disrespect to Luci, as she is an extremely nice and well intentioned person. But, there are many larger issues involved which are well out of her control. One of these continues to be the lack of a concerted Corporate commitment to *Single Image*. While progress is being made, there is no urgency or determination to get *Single Image* fully installed *WITHIN ANY DEFINABLE TIMEFRAME.* This is in spite of the fact that many other companies have already implemented SI systems for customer service *(AVIS and Fidelity for example).* Also, if platform is that much of an issue, it would seem that we would have gone to some of these other companies to see what they did rather than restrict our platform debate to just our own "USA" architecture.

Vince, I won't begin to try and cover all the concerns we discussed relating to our systems development efforts. From my perspective we have major problems and it would only be an exercise in futility anyway. Included in this is CACS *(Centralized Change of Address System).* This was discussed at some length. Between this and *Single Image,* I think our Systems Organization speaks volumes relative to the Corporate commitment to the user and the customer. While *Single Image* is clearly user/customer driven, it does *NOT* have the strong Systems Organization support and commitment that some projects do. Consequently, progress has been very slow. By the same token, CACS *(and the online Beneficiary/Owner)* have had strong Systems Organization support. They moved quickly but the actual user and customer needs have been largely ignored. For years Teleservices had been the ones driving the need for an online Beneficiary/Owner system. Yet, we had virtually no input into its design and/or development. CACS seems bound and determined to get their system up and running whether it meets the users' needs or not.

Vince, obviously I'm a little frustrated. But, suffice it to say that at the rate we're going, *Single Image* will not be fully installed in 1994 and quite possibly not in 1995. And, we will probably be asked to cost justify it six more times between now and then. But, eventually, just like Teleservices, it will have become apparent that developing SI was the only appropriate business decision in the first place. *Perhaps all new systems development that directly impacts our customers or our Customer Service Centers should report to your organization?* Then maybe, just maybe, we could be heard.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 6, 1993



**CONFIDENTIAL**

MP40110707070

Thomas M. La Badia
Vice-President
Policy Administration
P.I. Customer Services
Bridgewater

MF401107070l

Re  Online Beneficiary & Owner File

Tom, for many years it was Teleservices that was strongly advocating the need for an online beneficiary and owner file. As I'm sure you recognize, we get lots of calls asking for beneficiary and contingent beneficiary information.  On many other calls, the name of the owner or contingent owner is often needed to properly handle the call or give the customer needed information and direction.

When this project was first initiated under PICX, we were given a reasonable opportunity to express our needs and desires for the system.  We also pointed out that, to be of real value, a substantial percentage of the bene/owner information must be resident on the system. Accordingly we promoted a whole strategy for installing new beneficiary and owner data using Teleservices.

When this project was reinitiated in its present form, I recognize that a major objective was to get something installed quickly.  In this process, both Teleservices and Cash/Loan/Dividend were virtually "shut out" of the needs or design discussion. Now that it has been installed, as evidenced by the attached, we are also having great difficulty just finding out what's going on with the system and being made aware of changes that affect our users.

Perhaps the situation is different for Customer Services & Communications in Warwick due to the fact that Jack Kelly is resident in that office.  However, we would greatly appreciate it if we could be brought into the communications loop with respect to ongoing development and perhaps even be given the opportunity to express our needs or views periodically.  We have attempted to accomplish this on our own but have not been very successful.

If there's anything you can do to see that we are at least included in the ongoing communications, it will be greatly appreciated.  Thanks.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 30, 1993

CONFIDENTIAL

To   *Barbara J. Gardner*
*Vice-President*
*MetLife Customer Service Center - Tulsa*

Re   Electronic Enhancements

Barbara, the supervisors and I have discussed the electronic enhancements (and equipment) that would have the most significant impact on our employee needs. With one exception, most of the changes or enhancements that could be made do not involve substantial numbers of employees. However, taken together, they would have a significant impact on our overall staffing. These are as follows:

## Expansion of MINERVA - Elimination of All Manual Dividend Calculations

Dividend calculations are an extremely time consuming and cumbersome task. They involve the use of hundreds of microfiche. It takes substantial training to get employees proficient in these calculations. We are frequently required to reconstruct past dividend histories or determine a dividend that was payable on a given policy several years ago.

It is our understanding that MINERVA does have the potential to handle most or all of these dividend calculations in an online environment and is doing some work on this. To that end, we were asked several months ago to provide some information necessary to support this effort. However, because of the reorganization and all that has been going on, we have not had any resources available to devote to this request.

Some of this could be achieved by making more resources available on the "Project Team." If this was done, then perhaps an individual on the Project Team could come out and work with us to develop the needed specifications. Having these dividends and associated calculations online would enable us to substantially improve productivity and realize clerical savings. These benefits would also extend far into the future because this availability would eliminate the need for a lot of complex training.

## Online Beneficiary/Owner Information - *Including "Turnaround" Document*

Carried to its fullest potential, *this project offers the most opportunity for employee savings.* However, there are a number of things which must be done in conjunction with this project to achieve these savings. The mere installation of the online capability doesn't do all that much for us by itself. The real savings come from two areas which are:

**CONFIDENTIAL**

MP40110070702

➤ Changing the way we process beneficiary and owner changes

➤ Developing the online file to the point where the owner and *contingent* owner - beneficiary and *contingent* beneficiary information is resident for a *substantial percentage* of the policies. Aside from actual bene/owner changes, there are many processing efficiencies associated with having *contingent* information available. This information *will not be on the file* when it is installed and will only appear *as changes are made.*

Within this framework, there are a number of things that need to be done to achieve maximum employee savings. As I understand it, some of these changes will be installed and some will not. These are:

• Elimination of Policy Endorsement for Beneficiary Changes *(Expected with Installation)*

• The ability to generate a pre-completed *Change of Beneficiary* or *Owner* Form through some type of automated correspondence function. Teleservices should be able to take "simple" bene/owner changes over the phone and generate laser produced forms in duplicate or with a copy. One is signed and returned to us for "online processing" and the other retained by the policyholder for their records. *(Not Expected with Installation)*

Note:     This kind of processing would increase Talk and ACW time for the CSRs as they would have to obtain and verify bene/owner information during the phone call. However, there would be substantial savings on the back end resulting from easier processing including:

➤ Information appearing on the forms would all have been "typed" and verbally verified with the policyowner before the form was signed ensuring legibility, completeness and accuracy.

➤ Questions arising from incorrect or incomplete designations would be resolved at the time of the phone call, eliminating the need for subsequent correspondence.

➤ When the signed form was returned, the transaction could be "electronically" processed in a number of ways to eliminate *rekeying* or *reentering the information into the online file.*

If no special measures are taken, it will be years before the amount of information available in the online bene/owner file has any significant impact on transactions other than the actual bene/owner changes. A very substantial portion of the potential savings comes from HAVING the information available as well as how we currently process transactions. Currently a lot of time and expense is consumed by our efforts to determine or verify *contingent* information. This must be available to facilitate the processing of many payment and non-payment transactions where a primary bene or owner is deceased. This processing will not be impacted until this information is available which will not occur when this new file becomes active.


CONFIDENTIAL

We also receive many phone inquiries on 800+MET-LIFE questioning contingent information. Currently, we are unable to respond to a simple inquiry regarding a contingent owner/bene without resorting to microfilm or the actual policy. Using 800+MET-LIFE, the timeframe required to make a meaningful amount of information available on this file *could be accelerated dramatically*. The integrity of the information available could also be assured. This could be accomplished by a couple of different methods which include:

- Launching a multi-year campaign to encourage policyholders to call 800 + MET-LIFE and have their beneficiary and owner information brought up to date.

- Or, merely launch a campaign whereby we attempt to have people update their beneficiary and owner information on every call to 800 + MET-LIFE where we know the information on the Online File is not current *(in otherwords, where it has not been updated since the installation of the online file)*.

In both of the scenarios above, we would not attempt to verify current information with the policyholder. Instead, we would just ask the policyowners to *rename* beneficiaries and specify contingent owners and beneficiaries where appropriate. In many cases, we find that policyowners do not recognize the importance or value in naming contingents. This would also be an opportunity to provide a real service to our policyholders by properly explaining the needs and benefits of naming "contingents." We run into numerous problems in our administrative processing because no contingents are named and/or that information is not readily available.

It would also provide the foundation for an excellent service oriented Marketing campaign. Just asking our policyholders to "update" this information should generate a lot of opportunities to "review their insurance program" and/or identify specific needs. Our Field Force could support this effort by also contacting policyholders to "update" beneficiary and owner information on our files.

## Installation of Voice Recording Equipment

A significant factor in our ACW time is the time involved in completing the narrative description of what transpired during the call. We are actively pursuing the "automation" of many of the quantitative "notes" such as policy values provided, etc., through TMOS. However, the CSRs also record other information which is descriptive of what transpired during the phone call because it may or may not prove to be pertinent at a later date. Approximately 30% of the phone calls currently received on 800+MET-LIFE are "repeat" calls. In addition, we handled in excess of 5,000 "complaint" calls in 1991. Frequently these *repeat* and/or *complaint* calls involve what a policyholder alleges he/she was previously told by someone else (*Account Rep or CSR*). There are also situations where the policyholder is obviously confused and the CSR is concerned that what he or she is telling the policyholder may come into question at some future date.

CONFIDENTIAL

MP4011070704

MP4011070705

Consequently, an excessive amount of time is spent recording more details of the conversation than what is actually required *provided no question is raised in the future as to what transpired during the call.* At the same time, we have found these detailed files to be extremely valuable in handling many of the difficult or complex cases as they give us a more complete story as to what transpired. For this reason, we continue to feel that a good description of the phone call is cost justified.

But, even these detailed files are not a "complete" record of the call. We frequently encounter cases where it would be extremely valuable to recover the actual phone conversation. One example would be those situations where a policyholder or Account Representative is making some claim as to what was allegedly said by a CSR in a prior conversation and our records indicate something very different. At the moment, our best protection is still having a well documented TMOS file. But, with the continued emphasis on staffing and reducing times, the quality and detail of these files will have to be sacrificed.

We could positively impact After Call Work time if we used the type of recording equipment used by many call centers which records all phone calls (except for those callers who "opt out"). If we knew the actual call itself was captured, we would be able to set new parameters on completion of the TMOS files to save time. The equipment would ensure that we would have access to retrieving the entire conversation if needed. A reduction of 30 seconds in our average ACW time would result in a savings of about two CSRs on an annual basis.

There is new digital technology in this area which should also facilitate new developments in the area of "Voice Authorization" (*not to be confused with voice "recognition"*). In otherwords, if we were able to record and store the actual policyowner's voice which we used to complete or authorize a transaction, we could eliminate the need for a signature (*and further correspondence*) in those situations. Much like the Mutual Fund companies, we could complete transactions over the phone that would typically require a signature. While the electronic systems would record and handle the transaction, the policyowner's voice recording would serve as the authorization. If, even years later, this authorization came into dispute, the recording would serve as the proof. Digital voice recording will ultimately facilitate the transfer, storage and subsequent retrieval of those conversations in a manner and level of quality that is impossible with standard analog recording.

This equipment could pay for itself in a relatively short period of time due to reduced ACW times. If it was advanced to the point it could be used for authorizing transactions, additional savings would be realized through the elimination of correspondence and the capability to "immediately" process some of the transactions (*such as beneficiary changes?*). It would also have a positive impact on our customer handling. If CSRs were aware that all conversations were recorded, some would pay more attention to how they deal with their caller.

CONFIDENTIAL

MET01110707006

## Eliminate Signature Requirement - Loan/Dividends To Pay Premiums, Loan & Loan

## Interest

Although this is not an electronic enhancement, it is one that would offer substantially improved productivity and savings for these transactions. Currently when a policyholder wishes to use a loan or dividends to pay premiums, we require a signature. If this requirement were eliminated for requests received via 800+MET-LIFE only, it would eliminate the need for correspondence and referrals to Cash/Loan/Dividend. These transactions could be handled at the time of the call by the CSR. If necessary, we could microfilm the TMOS file as a permanent record of the request.

We suspect that this requirement should not be lifted at the sales office level. However, when we have satisfied ourselves that we are speaking with the owner of the policy on 800+MET-LIFE, we should complete the transaction on that basis.

## Development of "Single Image" - Impact on the Processing of UL Loan Payments

## - Tax Related Information - Training and Other Transactions

There is no one transaction or specific group of transactions that offer substantial clerical savings through the development of *Single Image*. However, as illustrated by our recent demonstration of a pilot transaction, the potential exists to dramatically change the way we process our transactions. In the CSR environment, significant processing efficiencies on multiple transactions can be incorporated into a single workstation. Thus, the opportunity exists to greatly simplify the CSR job while enabling a CSR to handle more transactions without a need for referral and processing by another administrative unit. In some instances this will place more work at the CSR level. However, this would be more than offset by the savings in the administrative processing unit.

A typical example to demonstrate the capability of *Single Image* is the processing of UL loan payments. At the present time, CSRs are not trained to process these transactions as they are deemed "too complicated." Depending on the type and issue date of the policy, there are many "variables." It is not practical to train a CSR to deal with all these variables while trying to provide an immediate response on the phone.

Under *Single Image*, all these variables can be determined and evaluated by the "system." The CSR does not need to learn all the "ins and outs" of each specific policy. *Single Image* can deal with the variables, determine the exact amount available and do the actual processing. Where appropriate and to facilitate explanation to the customer, these "variables" could be displayed on the terminal for the CSR.

CONFIDENTIAL

This would eliminate the need to train the CSR on how to actually access the UL system to process the payment. It would also eliminate current referrals to C/L/D as well as provide a "fully completed" transaction at the time of the call. There are many other areas where *Single Image* could potentially assist with the processing and/or eliminate the need for a referral to another operating unit.

Single Image can also greatly simplify training of CSRs and other employees. Many of the current processing "rules" or related information must currently be learned and committed to memory or readily available in reference material. The onslaught of tax issues and related considerations is a prime example. Under *Single Image*, the "system" can determine the appropriate tax related issues and considerations for a given transaction and provide the CSR with the relevant information.

This same type of potential exists for many other transactions. When viewed in its entirety, *Single Image* offers significant savings potential and improved customer responsiveness.

NOTE:   The key to achieving maximum savings will be *to drive as much of our work to the phones as possible.* It is far more efficient and satisfying to the customer to handle their transaction by phone rather than control and process a piece of paper that may be illegible, incomplete or does not accurately reflect what the customer really wanted. The offsets and savings are then realized in the administrative processing staff.

## Change Dividend Processing to Permit Current Year Option Changes in the 6 to 8 Week Anniversary "Window"

Many policyholders, upon receiving their premium notice and/or Anniversary Dividend Statement, will call and request that we change the dividend option. Changing the dividend option for the current year during the 6 to 8 week period prior to the anniversary is one of the most manually intensive and time consuming functions we perform. It can take several days to accomplish these changes because the policies must be "downdated" one day and subsequently "updated" on another. In addition, depending upon the dividend options involved, additional work is created in the Adjustment Unit. In addition, there is exposure to duplicate dividend payments during this manual process if everything is not handled perfectly.

We should have the facility to adjust the current year's dividend option online up until the anniversary premium is actually paid if it is a premium paying policy. In instances where the dividend option is "cash," we should be able to change the option up until the date the check is actually produced. This would enable us to handle the case only ONE time instead of multiple times as we do now.

CONFIDENTIAL

MP401107070Z

These requests are likely to become more frequent as a result of the new taxable reporting of dividends. Some policyholders will want to change the current year's option to avoid the taxability. This could result in even more resources being required for this transaction in the future if our systems are not modified to facilitate these changes in an online environment.

## Availability of Online "AP" Eligibility Quotes & Testing

With the increased activity associated with *Accelerated Payment*, we need the capability to provide instant rather than overnight quotes as to "AP" eligibility. In addition, the quote needs to provide the amount of dividends required to provide AP eligibility versus the amount available on the policy. For example; we often need to be know that there are sufficient dividend values available to complete a *"withdrawal to pay premiums"* in addition to the values being sufficient to maintain the policy on AP. In some cases, we also have requests for a withdrawal after the policy has been placed on AP. We need to know how much of the dividend balance is available without disturbing the AP option.

This capability would greatly reduce the number of times we have to handle these cases thereby eliminating work and saving the associated staffing requirements. It would also provide CSRs with another conservation tool. AP could be discussed and offered as another alternative to cash surrender if the CSR was able to immediately determine a policy's eligibility while speaking with the policyholder on the phone.

## Electronic Support of Conservation Activity

Both Warwick and Tulsa have clerically intensive conservation procedures in place for cash surrender requests that are received in the Service Center without first passing through the Branch. Electronic mail messages are sent to the sales offices to notify them of the cash surrender request. These cases are maintained on call-up and action is taken after hearing from the sales office. If no response is received after the specified period of time, the cash surrenders are processed.

We would like to have this done electronically and this request is being considered by the Scranton CWS team. However, again we are hindered by the lack of available resources at the Service Center level to define the system specifications.

CONFIDENTIAL

## Continue Development and Enhancements to WIP  *(Work In Process)*

Apparently due to the volume of work that was added to WIP with the Tulsa installation, a number of significant problems surfaced. These included poor response time, a temporary loss of some search capabilities, printing problems as well as a number of other lesser problems.

The potential exists with WIP to substantially improve the productivity associated with this system. One example would be to have Electronic Mail messages from the Sales Offices *"automatically create"* a WIP file. The centralization and expanded geography associated with the Service Centers and the reorganization has resulted in the increased usage of both E-Mail and "fax." E-Mail messages must currently be rekeyed into WIP.

As we progress with WIP, we are confident that there will be numerous other enhancements that can be made which will positively affect productivity and use of the system. Continued support and emphasis on this project needs to be maintained in 1992.

## Eliminate Need to "Purge and Reenter" Cases on CWS

When cases are entered into CWS by the sales office and they cannot *single cycle* for one reason or another, they become the responsibility of the Service Center to reconcile and pay. When this occurs, the sales offices are supposed to forward all associated paperwork to the Service Center as this may be required to reconcile and pay the case. There are also many cases entered by the Service Center that cannot *single cycle* because additional information is required. This information, such as prior microfilm, may take several days to obtain.

Under current procedures, if the case cannot be paid within <u>five</u> days, the payment is purged and reentered. The reason for this is to ensure that it is paid using the most current values. Because of the new geography associated with the reorganization, it is almost impossible for us to receive and process the paper work from a substantial number of our sales offices within five days. Consequently, we have no alternative but to purge and reenter a substantial portion of these cases.

If a way could be found to *automatically update* the value information on these cases pending reconciliation to ensure that values are current, we could save significant clerical effort in the processing of these cases. A possible approach may be that every weekend CWS would verify and update the values for any pending cases in Reconcilation. This would always ensure that the values were no more than five days old when paid. This suggestion is being forwarded to Scranton separately for consideration.2

CONFIDENTIAL

MF401010709

Barbara, although we have a number of outstanding items on our Electronic "Wish Lists," these are the areas where we feel the most significant impact can be made on our staffing requirements.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 16, 1992

CONFIDENTIAL

**Mr. Jerry Barocas**
**Project Manager**
**TMOS/WIP**
**P.I. Customer Services Systems**
**Wichita Information Systems Center**

MP40110707I1

Re   Electronic Priorities

Jerry, I apologize for the delay in getting to these priorities, but with all that has been going on here, it has been very difficult to try and get everyone together.  Two of the three supervisors are currently on vacation so I am having some difficulty getting a clear picture of these electronic enhancements and their relative importance.

As a point for future reference, it would seem that non-Teleservicing related WIP priorities should be established and *handled separately from the usual Teleservicing priorities.* While I understand that your resources may be shared, it would seem that each application should have its own set of priorities.  You are going to have requests for changes to WIP from many users.  Those WIP needs that affect Teleservicing would then have to be defined and evaluated within the full scope of WIP priorities.

We really need to be given some *realistic* expectation as to when all or the majority of our CSRs might be up and running with *Single Image.*  In establishing the Teleservicing priorities, I have tried to consider the impact of *Single Image.*  While I have high hopes for *SI,* it is my belief that it is still likely to be a *minimum of one year (or probably more)* before we can reasonably expect **ALL** CSRs to have access to *SI.*  Although my perspective could be viewed as pessimistic, I would prefer to think that I am trying to be more realistic as to when *Single Image* will really have a significant impact on our operation.

Warwick indicated that some items on the TMOS agenda should be deferred as a result of the work being done in *Single Image.*  Admittedly, there is a danger of duplicating work in both TMOS and *SI.*  In some cases this may be the right thing to do and in others in may not.   The impact of *Single Image* and just how it will affect the future development of TMOS needs to be better understood.  Some decisions will have to be made as to whether it is still cost justified to proceed with enhancements in TMOS that are also being incorporated into SI.

I think in some cases it will be.  Combine this with the fact that I have an operational objective to reduce Teleservices staffing by 15 employees before year end 1992, and my priorities must be based on those activities that offer the greatest employee savings, which are primarily reflected in Talk and/or After Call Work Time.  For at least the next year, these savings can only come through enhancements made to TMOS.

The following is my attempt to define our priorities.

**CONFIDENTIAL**

## OPEN ITEMS

| Description | PRIORITY LEVEL | |
| --- | --- | --- |
| | Tulsa | Warwick |
| Values Screen | 1 | Defer |
| Automated TMOS Notes | 1 | Completed |
| Reinstatements | 2 | Defer |

> Note: The first two are essentially viewed as parts of the same item. In otherwords, the objective is to place quoted values into the TMOS notes automatically. With all three of these items, there seems to be a consensus that they can best be done in "Single Image" rather than TMOS and that we should just wait. However, all of these are something that would significantly impact ACW Time.
>
> Even if these are done in "Single Image," won't work still be required in TMOS to actually put the values in the notes and/or handle the reinstatement processing? Is it possible that the method used to provide the CSR (or TMOS notes) with quote information in "Single Image" can also be used in TMOS today? In otherwords, even if a separate "Values Screen" will NOT be used in "Single Image," wouldn't some of the same "behind the scenes" processing routines have applicability in TMOS for the short term? TMOS and Single Image are going to have to work together. I suspect that some of the Single Image approach to this objective could still be taken in TMOS and a good portion of the developmental time and effort required in TMOS would NOT be wasted. In the meantime, it might make this capability available to ALL CSRs much sooner than if we wait for full delivery of "Single Image."
>
> At the very least, because of its value to the CSRs, we think a thorough evaluation should be done to determine the feasibility of providing these capabilities to the CSRs as quickly as possible. If the approach or processing routines used in TMOS is transferable to Single Image (Or Vice-Versa), everyone should benefit.

| | | |
| --- | --- | --- |
| Change of Name < $10,000 | 3 | Medium - 3 |
| Policy Facts for UL/UL2 | 4 | High - 5 |
| UL Address Change for O/T Insured | 5 | Medium - 1 |
| WIP - Analyze Interfacing With Other Tracking Systems | 6 | High - 2 |
| TS Call Report - Phase II (Call Outcome + Lead Info) | 7 | High - 4 |
| Conservation Tracking | 8 | High - 6 |
| Load Balancing - Incoming Call Facility | 9 | Medium - 3 |
| Order Coupon Books | * | Low - 1 |
| Investigate CallPath Facility For Warwick | * | Low - 3 |
| Order Non-Forfeiture Valuations (Quote Becoming Available in CWS) | Eliminate | Low - 2 |
| CWS Payment Entry on TMOS | Defer SI | Defer SI |
| Bene Change Interface - Display Entry On TMOS | Defer | Defer - PICX |
| WIP - Move All Teleservicing Referrals Under WIP | ? | High - 1 |
| WIP - Analyze Hold and Release Processing | ? | High - 3 |

CONFIDENTIAL

MP40110701Z