

Ex A

( 8 OF 14 )

## SHORT TERM

| PRIORITY LEVEL Description | Tulsa | Warwick |
|---|---|---|
| Create Separate Trans Codes - Death/Disability | 1 | High - 3 |
| Finalize Regional/Territorial Reports | 2 | Not Ranked |
| Death Claims - Referral Processing | 3 | High - 2 |
| Auto Correspondence - Claim & COM Letters | 4 | High - 1 |
| Indicate Security Checked on Base Screen | 5 | Low - 2 |
| Source/Campaign Code - Switch Fields | 6 | No Need |
| CHA Policies - Eliminate PF11 Twice - Multiple Policies | 7 | No Need |
| Referrals - Insert Blank Line & CSR Name | 8 | High 4 |
| Name Change - Industrial Policies | 9 | Medium - 1 |
| CHA Screen - Errors to Restrict Leaving Screen | 10 | Low 1 |
| State Code Help From Verification Screen | 11 | Low - 3 |
| Message On Retrieval Showing End of Lists | 12 | Medium 3 |
| PFI Screen - Non-Forfeiture Face Value | 13 | Low - 4 |
| TMOS Messages - Print From List of Calls | 14 | Medium - 2 |
| Source Code - Print TMOS File In KeyNet Report | 14 | Low - 5 |
| Restrict the TMOS Notes Area for CLD TMOS IDs | Eliminate | No Need |

Although we have established a priority level for many of these items that differs notably with Warwick, it should be understood that these are not in granite and we are more than willing to accept changes to these priorities. We have essentially listed our desired priority for your reference purposes.

It is assumed that some changes in the priority of these items would occur simply from the fact that some can be done more easily and quickly than others. In addition, some may be accomplished because they are done in conjunction with another pending task. However, if you see any of these as creating a major conflict, we are more than willing to resolve these with yourself and Warwick through a conference call.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 26, 1991

cc:  Gardner, McDowall, Schoos, Szigethy & Bloom

CONFIDENTIAL



MP4011070713

| 1991 Electronic Priorities |
| :---: |
| Teleservices - Cash/Loan/Dividend |

MP4011070714

Barbara J. Gardner
Vice-President
Tulsa Customer Service Center

Re   1991 Electronic Priorities

Barbara, the following are the electronic priorities that were identified by the supervisors. Action on a number of these items is currently in progress. However, we felt it was best to list everything we have identified so the message is clear as to everything we consider to be our need. It is possible that some of these items are not feasible, but we have been told this before and then someone has found a solution such as was done with the Payment History File.

- Online Owner, Contingent Owner, Beneficiary and Contingent Beneficiary Information.   *(Current activity only deals with beneficiary information)*

- Corresponding development of "pre-completed" (by CSR), laser produced *Change of Beneficiary/Owner* forms and associated automated correspondence.

- CSR completed, laser produced *"Turnaround"* documents and associated automated correspondence for other transactions requiring signature.

- Modification of address change facility on UL to eliminate problems associated with changes when there is an *"owner other than insured."*

- Dividend option to automatically pay policy loan interest and principal.

- Online quotes to display the premium amounts for the various modes available with the corresponding facility to "easily" process the Change of Mode online.

- Electronic calculation of death benefit for *"Quick Quote"* and Automated Correspondence.

- Develop a single "umbrella" sign-on for users.

- Modify dividend system to permit changes in dividend options for the current year during the 6-8 week call-up period prior to the anniversary date.

- Revise Dividend Anniversary Statement to provide information previously given such as the amount of *"Additions earned on the Additions."*

- Develop "payment restriction indicator" for UL as exists for traditional products.

CONFIDENTIAL

**1991 Electronic Priorities - Page 2**

- Online "Expiry" Information for UL Policies

- Fix "Excess" dividend problem for pre-1987 policies. Policy provisions permit the excess option to be cash but "system" is automatically changing it to Additional Insurance. This results in numerous complaints and checks must be generated manually.

- Take measures to implement system, procedural and organizational changes such as those outlined in a separate proposal to improve and maintain the integrity of our address files.

- Modify all systems to accept "Zip + 4" address to take advantage of "Code 1" address information associated with changes processed through TMOS.

- Establish a current day "pending transaction" indicator for WCLD payments including IFT transactions.

- Provide policyholders with acceptable envelope for mailing policies when requesting cash surrenders. Envelope presently included is not large enough to accommodate policy.

- Online premium calculations for reinstatements.

- Additional online information:    Basic amount of insurance for Economatics, Amount of insurance for decreasing term plans, Amount of insurance for each covered family member on family plans.

- COM drafts cannot be stopped within three days of the draft date. We would like to see this reduced to at least two days or less if possible.

- Online Nonforfeiture quotes.

- Revise the Nonforfeiture letter.

- Change system to cancel term policies as "cash surrenders" when entered for payment and only value is in dividends. These are automatically reprocessed by the system as "Dividend Withdrawals" and policies are not canceled on the file.

- Provide facility to back date a UL loan, partial withdrawal and full surrender transactions well beyond the current 30 day limit.

- Modify cash surrender statement for COM cases to reduce losses on NG drafts.

- Provide online quote of current and next 12 months projected growth in Guaranteed Cash Value to support conservation activities. This information should be immediately accessible without necessity of doing *Quick Quotes*.

- Provide listing for "open disposition" cases on WCLD

CONFIDENTIAL

MP40110707L5

**1991 Electronic Priorities - Page 3**

- Loan interest information on VCS1

- Develop full accounting procedures for UM policies.

- Make VTG1 (ULII) system more user friendly like VCS1. Example: When the user selects an invalid screen, alert them instead of sending them back to the ID screen.

- Accelerated Pay Eligibility System is generating a "No" response when a policy has a PUAR and the policy is actually eligible for AP. The system does not permit premiums to be automatically withdrawn in combination from both the PUAR and the base policy during the early years.

- Maintain the rate files on MTARTS/PMTARTS for longer than 2 years. Move the file from the sys-test system to the production system to enable "bounce" facility.

- Expansion of Year Of Dividend Credit fields, expansion of premium fields.

- Redesign of the APL Call-up listing of open items to be categorized by Paid-To-Date rather than by sales office.

- Change VCS1 to maintain owner social security number.

- Immediate access to current year tax information.

- Enhance tax reporting/tracking on UL policies. Provide facility to track Cost Basis and taxable gain. Distinguish between a "dump-in" payment and a 1035 exchange payment.

- Enhance tax reporting on traditional policies, provide facility to track 1035 exchange information, Cost Basis, TEFRA premium information and tax gain information.

- Provide facility to "set up" a policy on Accelerated Payment at issue. This would eliminate complaints and manual processing in subsequent policy years. The AP should "kick-in" when the dividend balance is sufficient to carry the policy.

J. L. Rayl
Manager
Teleservices - C/L/D

March 2, 1991

**CONFIDENTIAL**



Richard J. Anderson
Vice-President
Planning & Customer Services

Re    Owner/Name/Beneficiary Change - Online Processing

Rich, it is my understanding that as part of the recent reorganization, the Client File is now under your jurisdiction. In light of this, I would like to ask that one final assessment be made as to how our owner (name) and beneficiary information should be maintained and changed. As you know, we discussed this during your visit to Central a few months back. However, I still have concerns that not everyone understands the full significance of what we have been requesting.

As I pointed out when you were here, it is our customers' expectation that we should be able to provide owner, contingent owner, beneficiary and contingent beneficiary information immediately during a phone call to 800+MET-LIFE. Consequently, for the past several years, we have requested that this information be available online. However, there would be many other benefits to having this information online aside from our ability to quote it to callers. It would bring much greater efficiency to our *processing of changes.*

For example: It was always our expectation that if someone wanted to do a simple name, owner or beneficiary change over the phone, the CSR would obtain all the information at the time of the call. We then asked that a fully completed, laser produced form *(turnaround document)* be sent to the owner. This form should also be pre-printed with the owner's name as the *"required signature."*

Upon return of the form, the electronic system(s) could be updated in one of two ways, whichever is most feasible. The most desirable would be to have pertinent parts of the *turnaround document* optically scanned and captured by the appropriate system(s). If this isn't feasible, a "suspense" transaction file could be established at the time of the call. By reading or entering a "control number" which was assigned to the form, the transaction could be "released" to the appropriate system(s).

The only manual processing involved would be for someone to see that the owner signature is consistent with the owner name pre-printed on the form. By having the form pre-printed, legibility would cease to be a problem for most changes resulting in a higher degree of accuracy. The form could then be microfilmed for future reference. Naturally, the facility would have to exist to make adjustments or corrections if a policyowner made manual changes to the form.

I believe I am correct in stating that Consulting Services has already agreed in principle to the elimination of policy "endorsement" for beneficiary changes providing full information can be maintained by our electronic systems. The potential is here to simplify a very high percentage of our beneficiary and owner change processing. The cost savings associated with not having to mail back changed policies would have to be substantial aside from the savings associated with the clerical efficiencies.

**CONFIDENTIAL**

Just having a provision to view __full__ beneficiary and owner information online will not do Teleservices much good *unless the information is actually on the file.* At the same time, it is recognized that it would not be economically feasible to transfer all existing information from our applications and/or microfilm to the electronic file. However, we could bring a substantial portion of our electronic files up to date in a relatively short period of time *(perhaps two or three years)* by running some special Teleservicing campaigns.

Selected policyowners could be encouraged to "verify" or "change" information by calling 800+MET-LIFE. In other words, when the owner calls we would ask them to "update" for us who they want as beneficiary(ies), contingents and contingent owner. Again, the forms would be pre-printed based on information gathered during the call and mailed. Upon their return the information would be added to our files. I see this as the only way we could get this information added to our electronic files in any kind of a reasonable timeframe.

Rich, my concern continues to be that this project is moving much too slowly considering its value and worth to both Metropolitan and our policyholders. Having this information online would be of great benefit to many areas aside from Teleservicing. I know you are familiar with the frequent need for owner/contingent owner information in the Cash, Loan and Dividend area. We are continually confronted with cases where the owner is deceased and we must research applications or microfilm to determine the contingent. The same is true for other areas of the Company.

In November when the Teleservicing Natural Work Team was given a status report on this project, we were told that owner information was not even going to be addressed in the first phase. Having both beneficiary and owner information available is critical to processing our work as well as responding to our policyholders' inquiries.

In view of the potential benefits associated with this project, I think it would be worth having someone totally reassess its direction and status. We should make certain that we are pursuing it with appropriate diligence and that PICX is the proper file on which to maintain this information considering all the interaction that will be required with other processing systems.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

January 2, 1991

cc   Gardner, Donnelly, Szigethy, McDowall & Schoos

**CONFIDENTIAL**

Robert Ruggieri
Product Manager
Policyholder Services/Administration
Universal/Variable Life Development &
Administration

Lou Loquasto
Manager
Programming III -
Non-Traditional Products
Scranton Information Systems Center

Re     UL Change of Address - Owner Other Than Insured

This is to supplement my previous memorandum of May 18, 1990. I have done some additional investigation and I believe our problem in this area is serious. Accordingly, I would like to again try and convey the urgency of finding some solution.

As outlined in my previous memo, a copy of which is attached, we continue to receive complaints from both our Field Representatives and our 800 callers that when an "owner" address change is submitted, it is the insured's address that gets changed, not the owner's.

Based on our experience in this office, it appears that the root cause may be a lack of understanding and training with our employees. However, this could be overcome by better electronic support.

When going into the system to change an address, there are two choices:

- HE - *Change Regular Address*
- HF - *Add/Change Case Policy Optional Address*

The "HF" screen is to be used to change the address whenever there is an *"owner other than insured."* However, there is a lot of confusion among employees as the "HF" screen description is very misleading.

In checking with our NBSS and my own C/L/D area, we found that virtually all of their UL address changes are processed using the "HE" screen without regard as to whether it is the owner's address or the insured's that is being changed. My supervisor pulled out her original notes from her UL training and found that it was only the "HE" screen that was referenced. Unless the request specifically states that it is an "owner's" address, we found that it gets processed under the "HE" screen which changes the insured's address. It was the belief of the NBSS unit that they did not have access to the "HF" screen and the supervisor indicated they were referring these "owner" changes to the B&A Unit.

This would certainly explain the problem we hear from our Field Force. It would explain why we're not only changing the wrong address, but why the owner's address never gets changed. This problem is remedied using the TMOS *Change of Address* facility as it changes <u>only</u> the owner's address regardless of whether it is other than the insured. If the insured's address is also to be changed, we have to go VCS1 but we are seeking the capability to also have this changed through TMOS in this situation.

CONFIDENTIAL

I cannot help but believe that this problem is far more widespread than just Central. As noted, the screens are very misleading and there is no real "alert" in the Vantage systems to prompt the clerk as to whether it is the owner's address, the insured's address or both that need to be changed.

Surely something can be done to make this process easier. If there is an *owner other than insured,* the "HE" screen should simultaneously provide fields to change *either or both* of the addresses under the *"HE - Change Regular Address"* description.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

December 28, 1990

cc    Ruede, Lyons, Schoos & Barocas

CONFIDENTIAL

MP4011070720

MP4011070721

Ed Kocis
Project Manager
Notice Business Online Systems
Scranton Information Systems Center

Re        Change of Mode Transactions/Information

Ed, as we discussed during our recent visit to Scranton, the change of mode transaction or request for associated information continues to be a real problem for Teleservicing. As it is now, the Customer Service Representative cannot even satisfy a basic request for information for our customers while on the phone such as the available modes and corresponding premiums. Actually completing a change, when desired, is cumbersome and clerically intensive.

Now that Teleservicing is expanding, we are confronted with an increasing number of requests for information or changes. The expectation on the part of our customers is that this information would be immediately available. I suspect that as the Account to Notice transfer is completed, it may surface even more requests. In view of this, we would appreciate anything that can be done to improve this situation. Our needs are as follows:

- The capability to see or determine online all available modes of payment for a given Notice policy with the corresponding premium amounts. It is very difficult to train CSR's as to which modes are available on what policies.

- A greatly simplified way to change the mode _online_ when premiums are paid to the anniversary date. While these changes can currently be processed through MFES and online in PIOS, neither way is efficient or practical in a Teleservicing environment.

    In order to meet the first request, it may be easiest to process these changes and information requests through TMOS. TMOS could do the necessary interfacing with PIOS and any other systems to provide appropriate information, edits and controls.

    Ideally, TMOS could bring back the available modes and premiums to the CSR. If a change is then actually desired _(and the policy is paid to the anniversary date)_, the CSR could enter an "X" by the appropriate mode and be able to effect the change. This action should also automatically generate any appropriate billing notice.

CONFIDENTIAL

XP4011070722

- To take it one step further, we should also have the capability <u>online</u> to calculate the amount of premiums necessary to effect a change of mode when the policy is paid to something other than the anniversary date.  Again, if a change is desired, a "pending" transaction could be set up with the appropriate "sub-item" amount necessary to effect the change.   If the payment is not applied within 30 days, the pending transaction could drop off.

Ed, as I indicated, this has been an issue of concern for Teleservicing for a long time.  We recognize that this is not a simple request.  However, I believe it is one that is essential to providing our customers with the level of service and information they expect when calling 800+MET-LIFE.  Anything that can be done to improve the current situation and provide these or similar capabilities would be extremely beneficial and very much appreciated.  Thanks.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

December 10, 1990

cc      Hodel, Delaney, Szigethy, Schoos, McDowall & Barocas

**CONFIDENTIAL**

Janet Rightor
Consolidated Warrants System
Scranton Information Systems Center

Re    Cash Surrenders - Losses on Check-O-Matic Cases

Janet, as I'm sure you are aware, we continue to suffer significant miscellaneous losses on Check-O-Matic cash surrender cases. We pay the cash surrender on the basis that any current drafts will be honored. We subsequently find that the last draft was not honored by the bank. Although we then write out, explain the situation and try and recover the amount of the NG draft, our success rate is poor.

One of our Field Representatives has made a suggestion that we think would improve our success rate in recovering these premiums. He felt that recovery could be improved if we alerted the policyholder at the time of payment that the cash surrender amount is based on the current draft having been honored. In otherwords, would it be possible to include a comment on the cash surrender statement for Check-O-Matic cases along the following lines:

### If COM Premium (Draft) Amount Can Be Included

*"The amount of the enclosed cash surrender payment assumes that the premium draft in the amount of _____ sent to your bank on _____ will be honored. If, for any reason, that draft is not honored, this amount will still be due and payable."*

### If COM Premium (Draft) Amount Cannot Be Included

*"The amount of the enclosed cash surrender payment assumes that the premium draft sent to your bank on _____ will be honored. If, for any reason, that draft is not honored, the premium(s) represented by the draft will still be due and payable."*

In order to make this effective, I believe the date of the last draft must be included in the statement. It would be nice if we could also include the amount of the draft *(for the particular policy)* but I don't know that this is imperative. I recognize that this would require that CWS "talk" to the COM system to get this information. Consequently, I do not know how complex a task this may be. However, we do believe that it could result in a substantially better success rate in recovering these premiums.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

November 3, 1990

cc    Hodel & Schoos

**CONFIDENTIAL**

MP401107D723

MP4011070724

Nick Scaramastro
Project Manager
Programming I - Traditional Products

Re    PHIOS - Availability of Guaranteed Cash Value Growth

Nick, it is my understanding that you have assumed responsibility for the PHIOS project.  While I am sure you will initially be swamped, I would just like to ensure that the above request doesn't get lost in the shuffle.

Back in late 1988 I requested that the *"Quick Quote"* provide the <u>next</u> year's cash value growth.  I believe that this can valuable information in our conservation efforts.  For example; in many cases on older policies we should be able to demonstrate to a policyholder that a large percentage of their premium dollars during the next year will actually be returned in the form of cash value growth in their policy.  I believe that pointing this out can be very helpful in our conservation efforts.

Attached is a copy of my file on the subject.  This request was supposedly on the PHIOS agenda but no action was ever taken.  I would greatly appreciate it if you would see that it remains on the agenda and is scheduled for implementation at some point in time.  Please feel free to give me a call *(918  252-8427)* if you have any questions concerning this request.

J. L. Rayl
Manager
Teleservices - C/L/D
Central Head Office

October 2, 1990

cc       Bob Szigethy & Kathy Schoos

CONFIDENTIAL

Donald Stadler
Vice-President
Personal Insurance Quality & Planning
Area 4-E

Re    *Automated Correspondence*

Don, at the Teleservices Transactional and Quality Planning Board meeting I was asked to send you the available material on Automated Correspondence. As a point of information, Central and Northeastern were asking for a system that would generate the correspondence and the appropriate **transaction specific** form over three years ago.

We envisioned that this system would be fully integrated with TMOS and the letter and corresponding form would be laser printed together. We developed the concept that the form would be a "turnaround document." For any transaction requiring a returned form, it was our desire to have all the necessary information captured at the time of the call. It would be entered on an electronic transaction screen during the call. The form(s) would then be produced **with all information pre-printed.**

The only thing required would be for the owner to sign the form. Obtaining all the information at the time of the call would enable the policyholder to resolve any questions during that initial call. It would also ensure that we get **all** the information we need on the form. Having the form laser produced and pre-printed would solve all legibility problems with our forms.

We offered two approaches to processing the form upon its return. One would be to set up an electronic suspense file at the time of the call. All the information necessary to change the electronic file (such as a change in owner or beneficiary) would be held in suspense. When the form was returned, someone would verify that it was signed by the owner. Then based on a code number or bar-coding, the form would be "scanned," perhaps by a "wand," and the transaction would be released from suspense and actually change the administrative file.

An alternative approach suggested was to actually have the document optically scanned and read to change the electronic file. Inasmuch as all the information on the document would have been pre-printed by the computer, it should be fully legible for optical scanning. The only thing required would be a review of the form to make certain it was signed by the owner. If a policyholder made corrections to the form, the facility should be there to enter them into the system once the document is "read." This would be a more desirable approach as it would avoid a "suspense" account with potentially uncleared items.

CONFIDENTIAL

As I said, we envisioned that such a system would have to be fully integrated with TMOS. However, as it stands now, the Automated Correspondence project under Bill Mangiafridda is going in a very different direction. At the same time, various projects such as CWS are still enhancing their own Automated Correspondence systems. In the meantime, the TMOS team has essentially been forbidden to work on the system we want.

Enclosed is a lot of material on Automated Correspondence. The most noteworthy is the Automated Correspondence Study Team Report. This information was assembled by a Natural Work Team that was established last year. For the most part, it incorporates all the ideas that I have mentioned above but, by trying to satisfy all users, becomes a project of such magnitude that it may be impossible to develop. Perhaps for this reason, this entire project seems to be moving forward at a snail's pace.

In the meantime, we subject our policyholders to the very perplexing task of trying to figure out our Service Request Form as well as many other forms which are equally confusing for the average person. As I said, we should have a system that can generate various combinations of transaction specific forms that are complete, and very easy for the policyholder to understand and verify. What we are doing now does not create the perception of a Quality Company in the eyes of our policyholders.

At any rate, Don, I hope you find some of this material of interest and help. Please feel free to let me know if you have any questions.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

August 27, 1990

Attachments

ccGardner, Vranka, Szigethy, & Schoos  (No Attachments)

CONFIDENTIAL

MP4011070727

**Vince**

Per our discussion, attached is my attempt at rewriting the memo. I have tried to include more ammunition for you as to why TMOS is an administrative system. I hope you don't mind, but I also threw in the *"Automated Correspondence"* project. This should also definitely report to Rich in my opinion. It is something that could also be given to Bob McDowall. I also assume you are aware that Bob currently has responsibility for a number of other projects that are under Len. This could affect whether Len is willing to give up TMOS and Bob.

Please let me know if you would like me to change this or come at it from some other direction.

July 11, 1990

CONFIDENTIAL

Mr. David G. Martin
Vice-President
P.I. Strategic Planning

Re    Teleservicing

I am asking for your support in seeking a change in the reporting relationship for the system components which support teleservicing.

Although the ultimate teleservicing operation will present us with many marketing opportunities, it is still largely an operations function providing a value-added level of policyholder service. Within this context, we still expect to reduce our processing expenses by completing many of the administrative transactions in an "online" environment while speaking with the policyowner. This, however, will require extensive systems support.

Presently, direct support for teleservicing and this objective rests with the TMOS system and Bob McDowall of the Wichita Information Systems Center. Bob is doing an excellent job but, in the process, TMOS has become an additional administrative processing system as opposed to being just a support system for teleservices. It already interfaces with many of the existing systems such as WCLD, PIOS, Vantage, Check-O-Matic and PICX. Very shortly, the "first notice" for death claims will be recorded on DCWS by being entered on TMOS. TMOS may well have benefits for many users beyond just teleservicing.

All of this work requires close coordination as well as a major commitment on the part of the systems support people in Scranton. There is a great deal more to be done, from a systems perspective, to deliver what is needed for an efficient, cost effective teleservicing operation. It will require extensive support from all systems, and not just TMOS.

Given the many challenges in the field, we would be hard pressed to have to ask Len Miller to direct more of his time and resources to teleservicing. On the other hand, making such requests through Steve White to Rich Anderson would be very appropriate since they have responsibility for administrative systems.

Ideally, Bob and his teleservicing people would report to Rich and work with all head offices, not just Central and Northeastern. This would provide consistent organizational support for all our administrative systems. It would also help to move teleservicing forward faster than we have been able to. In addition, it would also make sense to have the 8100 word processing replacement and "Automated Correspondence" activity report to Rich since it is such an integral part of the head office operations and future direction of teleservicing.

I would like to talk to you about this when you have a chance.


Vincent J. Donnelly
Vice-President

July 12, 1990


Drafted for Vince Donnelly by J. L. Rayl

CONFIDENTIAL



Vincent J. Donnelly
Vice-President
Personal Insurance Quality & Planning

Re     Teleservices Support Meeting - Central Head Office

Vince, on March 13 and 14, a support meeting for Teleservices was held in the Central Head Office. A copy of the agenda and a complete list of attendees is attached. The meeting was primarily aimed at Managers and Project Managers from Scranton. Our stated purpose for this meeting was to:

1.    **Enable the Scranton programming people to gain a better understanding of what Teleservices is and what we're trying to accomplish with the customer base.**

2.    **Understand our servicing perspective and needs and where we're trying to go electronically as this may impact the future direction of other electronic projects.**

3.    **Understand what the TMOS system is, how it evolved, how it is used to support Teleservicing and our efforts to make it "transaction driven."**

4.    **Avoid any unnecessary duplication of effort and/or resources between TMOS and other electronic projects.**

To my knowledge, this was the first time the Wichita TMOS staff had the opportunity to sit in a room with so many of the Scranton projects being represented. This provided a unique opportunity for exchange of information. I believe the meeting was very successful and accomplished its stated purpose.

The meeting was started by providing the attendees with the background and history of Teleservices. This included a slide presentation that outlined what we were trying to accomplish from the broad Company perspective. The Teleservices video was also shown as it provides good insight into the CSR job itself. From that point, the history and evolution of the TMOS application was explained as well as a full demo of the many major capabilities and enhancements that have been made to that system. Several of these features involve interfacing TMOS with some of the Scranton projects.

We then reviewed many of the major enhancements that we had requested for the TMOS system, particularly as they relate to other Scranton systems. We also reviewed our overall electronic needs. These were all outlined in the NWT report.

**CONFIDENTIAL**

1

MP401107073O

The intent here was to try and enable the Scranton people to understand what types of electronic enhancements we were requesting and why. With respect to the TMOS application, we also wanted the Scranton staff to understand that it was Teleservices that was seeking access to their systems through TMOS and not just the Wichita staff.

We discussed a number of the electronic needs in detail and I have addressed these separately. We gained considerable insight into the issue of priorities versus available resources facing the various Scranton projects. Obviously Teleservicing's needs cannot take precedence over all these other activities. We tried to make it understood that the purpose of the meeting was not to try and influence or change the priorities that have been established for the Scranton staff. Instead, we just wanted them to understand what was viewed as a priority from a Teleservicing outlook.

This all went very well and I felt we all gained considerable insight into each other's operation. Over the years Teleservices has tried to be a persistent voice in raising various electronic needs. Many of these are now being addressed such as the Account Quick Quote. That is because in most cases whatever will benefit Teleservices also benefits the general operation and vice-versa.

However, nationwide expansion places a very different level of priority on some of our electronic needs. The impact of some of our electronic shortcomings will become greatly magnified in an expanded Teleservicing environment. The determination and establishment of the **"priorities"** is going to become an even more critical issue. If Teleservicing is to advance as we have discussed, **the electronic needs and priorities of Teleservices versus those of the general administrative operation will have to be confronted.** Perhaps the answer lies in additional resources within these projects dedicated to advancing Teleservices.

Separate documentation is attached on three of the electronic issues which I feel need resolution or direction from your level. These are the specific needs of Teleservices with respect to **Automated Correspondence, the Online Payment History and the Beneficiary/Contingent and Owner/Contingent issue.** For planning purposes, we need to know if these issues are going to be addressed or whether we must just accept things as they stand and plan our expansion and future activities accordingly.

Vince, if the Company is truly committed to making Teleservices all it should be, then everyone must recognize that it means dramatically changing the way we do business for many transactions. What is acceptable in our typical "paper driven" overnight "batch" environment is **not acceptable to the customer at the other end of the line.**

CONFIDENTIAL

Accordingly, all proposed needs and electronic enhancements for administrative transaction processing should be viewed from a Teleservicing perspective. Once we have fully expanded, we will have the ability to drive far more of our service requests to 800+MET-LIFE. This can easily be done through more aggressive promotion and advertising of the service.

> **If this concept is properly supported by our electronic systems, there has to be an opportunity for substantial administrative savings.**

Whatever you can do to see that Teleservices receives the necessary electronic support will be greatly appreciated.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

March 21, 1990

cc     Gardner, Abela, McDowall, Hodel, Delaney, Loquasto, Will, Schoos & Szigethy

CONFIDENTIAL

3

MP401107073Z

Mr. Vincent J. Donnelly
Vice-President
Personal Insurance Quality & Planning


Re      Teleservices Support Meeting
        Electronic Priorities Relating To Teleservices


Vince, during the Teleservices Support Meeting with the Wichita and Scranton representatives, we had the opportunity to discuss the electronic priorities. As you know, the priorities established by the Operations Officers for some of these items are not consistent with the needs of Teleservices. There were three major Electronic priorities that I do not feel are being adequately addressed. These are:

### Complete Beneficiary/Contingent and Owner/Contingent Information Online

On the Head Office development agenda, there are several items carried under "B&A." Included in this was the online owner/beneficiary data and the elimination of the "endorsement" requirement for beneficiary changes. This was given a "**Low**" priority.


**We are in the minority of companies that require the policy on a beneficiary change.** In order to change this requirement, we must have the ability to capture more beneficiary/owner information online. The beneficiary and owner fields are presently very limited for Notice business and do not include any contingent information. In a Teleservicing environment, our customers expect that we would have this information readily available.

Based on our discussions with the Scranton people, **it does not appear that our existing systems can be readily modified to accommodate complete information.** As I understand it, it would not be practical to expand or modify the appropriate fields on PIOS (Personal Insurance Online System) or any other system to accommodate the "field size" required to carry the complete information. Consequently, discussion centered around the possibility of establishing some "side file" to handle it. However, no one seems to be seriously exploring this possibility.

The current procedures to verify and/or change some beneficiary/owner information are extremely manually intensive and costly. Some beneficiary and owner information and **all** contingent information can only be verified through referral and research of microfilm.


CONFIDENTIAL

**Vince, the bottom line is this;**

This project is totally inactive. While it may not be economically feasible to go back and install all existing information online, we should at least be capturing all current and new information. The Account to Notice transfer also makes it an opportune time to install this capability. A separate modification or system for Account business is no longer required.

While the "short term" benefits may not seem to justify the expense, the long term needs and benefits make this project mandatory, particularly if we are going to be concerned with meeting customer expectations. This issue should be examined from a Corporate perspective and assigned an appropriate level of priority. If all that is installed is current and new information, it could be years before we have a significant amount of this information online for our inforce business.

Note:   Refer to "Automated Correspondence" section:

If the "Automated Correspondence" and "Turnaround Document" systems were installed, there would be an easy way to capture and install more of this information online. It could even be done in conjunction with a special marketing effort. We could launch a special campaign by asking all callers to "verify and update" beneficiary and owner designations. Using the systems described, this might be a far cheaper way to put a lot more of this information up online much more quickly. At the same time, it might surface some real marketing opportunities.

## "Automated Correspondence" - Online/Laser Produced "Transaction Documents"

The term "Automated Correspondence" means different things to different people. This is listed on the Head Office Development Agenda with a high priority. However, it is extremely unlikely that it encompasses the needs that Teleservices has expressed. From the Operations Officers' standpoint, it essentially means replacement of the current IBM 8100 system which is totally obsolete.

Teleservicing has put forth the concept and need for an "electronic transaction document" and a laser produced "turnaround document" for the past couple of years. All of this was envisioned in conjunction with a highly sophisticated "Automated Correspondence" system. No action has ever been taken as it was unclear as to where this responsibility fell. This indecision and uncertainty appears to be continuing and should be resolved.

CONFIDENTIAL

MP4011070734

Awhile back an "Automated Correspondence Study" was done which attempted to address the needs of all Head Office users. Based on these needs, it is highly unlikely that any single fully integrated system could be put into production in a reasonable timeframe which will address everyone's requirements. Some "Automated Correspondence" systems already exist. The CWS system has one that continues to focus on needs specific to that application. A similar system also exists for Disability Claims. Other areas are developing separate systems and one is currently being examined for Beneficiary and Assignment work.

**None of these systems fully address the concepts promoted by Teleservicing which are as follows:**

> Teleservices has proposed the concept of an **"electronic transaction document."** In other words, anytime a caller wishes to initiate a transaction(s) with a CSR where a signed form is required, the CSR would call up a separate electronic "transaction screen" on the terminal. This screen would contain all the fields for the information required to complete that transaction. Some could be filled automatically by the system (such as policy number(s), name of insured, etc.) while all others required would be completed **at the time of the call** by the CSR.

> At the end of the call, the CSR would generate the appropriate letter **and a laser printed "transaction form/turnaround document" which would be pre-printed with the required information already entered.** The only thing required on the form would be the signature of the owner. The owner's name would also be pre-printed on the form to eliminate any confusion as to who is supposed to sign the form.

> When the form is returned, the transaction could be processed in a couple of different ways. Ideally, we could "optically" read the pertinent parts of the form and have the required information entered into the appropriate system automatically. This should be possible since the form would have been computer produced with all required information pre-printed and there would be no legibility problem. If this was not feasible, the entire transaction could have been set up in a "suspense file" at the time of the call and "released" to the appropriate system upon receipt of the returned form.

**CONFIDENTIAL**

Either way, there would be many advantages to this approach. Among them:

o     The policyholder would not have to complete the form. Confusion over completion of the form would be eliminated. It would already have been completed for them. All they would have to do is verify that the information is correct.

o     The forms produced would be **transaction specific**. The form would only contain the information required to process the transaction(s) requested.

o     The information required to complete the transaction **would not have to be entered into the system**. It could be optically entered by "reading" the form or would have already been entered at the time of the call.

o     Our image as a **Quality Company** would be greatly enhanced.

All of these capabilities were seen as being a part of an "Automated Correspondence" system that would be at the CSR's fingertips. In addition, many other features were desired such as the flexibility to change (online) the text of "library" letters to suit a specific situation. Both letter and form would be printed together (not matched after printing) using high quality laser technology.

Vince, a system such as described above would be a significant electronic undertaking. It conceptually goes beyond just generating letters and forms. As outlined previously, the facility to process beneficiary/owner changes online is very much involved. The "turnaround document" concept could result in substantial savings in the processing expense for these changes.

**The long term savings associated with the processing capability outlined under this concept have to be substantial.**

At any rate, to the best of my knowledge, no one is really addressing the **Teleservicing specific** needs of the proposed "Automated Correspondence" system. There is tremendous potential here for the future. However, if we are going to be ready in the future, **this issue should be addressed now.**

<u>Online Payment History</u>

This item appears on the Head Office Development Agenda with a "Medium" priority. The indication is that a **"13 month"** history is desired.

CONFIDENTIAL

4

## Online Payment History - Cont'd.

This item has been consistently put forward as a business need by the Teleservicing Natural Work Team. In one instance we were told that the cost of maintaining a 12 or 13 month history was too expensive. At that point, we indicated we would be satisfied with six months. We felt that this would be sufficient to handle and resolve the majority of discrepancies. We presently have a 5 payment history on the Check-O-Matic file and that is sufficient to handle and resolve most COM payment related inquiries. However, we were told that this would not significantly reduce the expense involved.

Payment discrepancies occur for many different reasons. Our inability to respond quickly and effectively to these inquiries is a source of serious customer dissatisfaction. Even though we ultimately resolve many discrepancies in the customer's favor by just "writing them off," the damage has already been done. The customer is so irritated by that point that we have still lost their goodwill. An online history would enable us to resolve these discrepancies at the time of the first call. In many cases, it would be to the Company's favor rather than charging the miscellaneous losses we are now taking or, worse yet, leaving so many unresolved.

Based on the meeting with our Scranton visitors, this project is still inactive. Again, this is the kind of information that should be readily available during a phone call. In order to provide the level of service our customers will expect, an Online Payment History should be given a high priority.

Vince, these three items are essential to the future of a Teleservicing environment as well as to Metropolitan if customer satisfaction is our objective. Anything you can do to have their priorities reevaluated would be greatly appreciated. Perhaps there is also a need to have additional resources dedicated to the overall electronic needs.

J. L. Rayl
Manager
Teleservices – Cash/Loan/Dividend
Central Head Office

March 20, 1990

cc      Gardner, Abela, McDowall, Hodel, Delaney, Loquasto, Will, Schoos & Szigethy

CONFIDENTIAL

5

MP401107073G

MP401107073?

Mr. Bob McDowall
Programming Manager
Wichita Information Systems Center


Re     **Teleservices Electronic Priorities**

Bob, based on what has transpired over the past week or so, it seems to me that we may need to reexamine the direction and priorities for the Wichita staff. My particular areas of concern are as follows:

## Future Direction of TMOS - Support for C/L/D and Other Users

At the Natural Work Team meeting held in NEHO, we indicated that the modification of TMOS to support C/L/D was our number one priority. At the time, I think we envisioned that this was going to be possible with "limited" modifications to TMOS.

Based on my understanding of the meeting that was held with Nancy Green and the Central and Northeastern supervisors, it is not this simple. Some of what we would like done can be accomplished with minor changes such as new campaign and transaction codes. However, some of the other desired features are much more complex and would require major changes in the TMOS system. I believe this primarily relates to our desired method of "linking" records and producing the types of aging and activity reports we want. In a sense, we are also asking that TMOS essentially become our Work in Process system for C/L/D.

> **Bob, I think this brings us to an important "crossroads" with TMOS and a firm decision on future direction is required.**

I think the major considerations are as follows:

- The primary function of TMOS **is and always should be to support the Teleservicing CSR requirements.** Its first priority should be to serve the needs of Teleservices and the CSRs.

- Some of the capabilities desired for C/L/D would give TMOS a totally different functionality. At the same time, it could conceivably require giving consideration to a different base screen for C/L/D or at least additional screens within TMOS. The worst possibility would be to try and accommodate the specific needs of C/L/D by modifying the existing base screen to the point where it would jeopardize the future capabilities of TMOS as it relates to satisfying CSR needs.

**CONFIDENTIAL**

MP4011070738

- TMOS is already being used by non-Teleservicing customers. Some of the present and future capabilities desired for CSR's offer functionality that other users want such as Change of Address.

- The "handwriting is on the wall." There are likely to be many areas of Personal Insurance that will want access to some of the features of TMOS. **If the desired capabilities are installed for C/L/D, this will offer potential users an even stronger incentive to want access. Each will probably also want some modifications to whatever extent they will be permitted.**

- TMOS has the potential to become somewhat of a "single image" and/or "Work in Process" system for all potential users.

Bob, in view of these considerations, I think a firm decision should be made as to **how** and/or **if** some of the C/L/D functionality is going to be addressed.

It is my feeling that if we are going to pursue some of this functionality, perhaps we should be looking at a totally different approach. In otherwords, instead of trying to "modify" the existing CSR based screens and system, maybe we should develop a more "generic" base (and perhaps additional) screen(s) that would accommodate the needs and functionality of C/L/D and other potential users. However, such an arrangement would require that information **could be transferred** from the CSR screens to the "generic" screens and vice-versa.

If you see something like this as being totally beyond the scope of TMOS, then I think you have to make a call that we abandon some of our desired functionality for C/L/D. Basically, this means a decision to the effect that **all** users must operate within the **existing** parameters of the system as it is designed to meet CSR needs. There is just little doubt in my mind that if the desired C/L/D functionality is introduced, some other users will clamor to get access to TMOS and you (and TMOS) should be prepared for that to happen.

I see all this as an issue that goes well beyond Teleservices - C/L/D. I still believe that TMOS has the potential to become a major system within Personal Insurance for many users. I think the time has come for a decision as to whether or not that is the direction it's going to go.

**One final point of clarification. I would respectfully ask that the "minor" modifications to accommodate C/L/D (new transaction/campaign codes, etc.) as requested by Northeastern be installed as quickly as possible.**


**CONFIDENTIAL**

*"Automated Correspondence"* - Electronic *"Transaction/Turnaround"* Document

I don't know whether or not you have had the opportunity to speak with Bill Mangiafridda about the 8100 replacement. He called me the other day and I did speak with him briefly. It was my assessment based on this conversation that he was not very far along on examining the entire 8100 replacement issue.

Based on my discussion, I am convinced that the specific needs of Teleservices are not likely to be addressed anytime in the near future. Accordingly, I think the Natural Work Team needs to reassess the priority of an Automated Correspondence system and our concept of the electronic "transaction/turnaround" document.

If everyone is in agreement that this is the direction we should go, it is my opinion that the only way it will get addressed in the near future is to do it through your staff. We need a more sophisticated Automated Correspondence system as quickly as possible.

We still believe we want the capability to generate the letter and forms or turnaround document through TMOS. Ideally, this would be driven by transaction code. I don't know whether this should be a LAN based project or if there is some other better way to do it. However, I am convinced that our needs are not being addressed and your staff is in the best position to do it. That is providing all members of the Natural Work Team believe it carries the same sense of priority that I do. This project will require extensive research and planning. My guess is that if we started it today, it couldn't be in place before year end or 1991.

Bob, I would appreciate your thoughts. Perhaps we can discuss these issues at our next Natural Work Team meeting.


J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

March 22, 1990

ccDonnelly, Abela, Gardner, Schoos & Szigethy


**CONFIDENTIAL**

3

MP401107073 9

MP4011070740

Vincent J. Donnelly
Vice-President

Re       Reorganization

Vince, I know there are a multitude of considerations in any major reorganization. As outlined in the attached, I think it makes a lot of sense to have all administrative systems reporting to the same Officer. At the same time, I would hope it was recognized that there is a very close relationship between these "administrative systems" and Teleservices. As Teleservices expands, this relationship is going to become even more critical.

In the Teleservices meeting that you chaired in New York, you saw an example of some of the "conflicting" priorities of Teleservices versus those of the typical administrative operations. If Teleservices is to reach its full potential, the future design and enhancements to our administrative systems need to be focused around a fully expanded Teleservicing environment.

At the present time, Teleservices is treated as "just another user" of most of these systems. At some point in the future, we will probably become the dominant user of most of them. So for what it's worth, I just thought I would suggest that if any future reorganizations are planned, it might make sense to have both the administrative systems and Teleservicing reporting to the same senior officer.

This would help ensure maximum cooperation between the various projects and Teleservices and might help to establish more appropriate priorities for Teleservices' needs.

J. L. Rayl
Manager
Teleservices – Cash/Loan/Dividend
**Central Head Office**

January 19, 1990

CONFIDENTIAL

**Mr. Vince Donnelly**
**Vice-President**
**Personal Insurance Quality & Planning**

Re     Teleservices - Electronic Priorities

Vince, it is my understanding that you are interested in knowing the top electronic priorities that Teleservices considers most critical. I am assuming you are interested primarily in the **Non-TMOS (Non-Wichita)** related items. However, there are a couple of our electronic needs that could cross lines between Wichita and the other projects. The following are the immediate electronic needs from Tulsa's perspective. I have discussed these with Kathy Schoos and she is in agreement with these and has added the "Account to Notice Conversion" item with which I am in full agreement.

### Automated Correspondence With Transaction Specific Forms

This item is presently the **"number 2"** priority on the TMOS team agenda but from a Corporate standpoint, responsibility might rest with another area. If a **separate system** is developed, there would be duplication and conflict with the WCLD Automated Correspondence project. However, the WCLD project is still a long way away from the kind of system we would ultimately like to see.

Although WCLD has taken steps in this direction, we need an even more sophisticated Automated Correspondence system that will electronically produce high quality letters to the policyholders with **transaction specific forms** generated with the letter. The present "Service Request Form" is an abomination for the policyholder. It was designed primarily for the convenience of the Account Representatives and not the policyholder. It is an extremely confusing form for a policyholder to complete on their own. The "Payment Request Form" that is generated in conjunction with WCLD is somewhat better, but it is still a far cry from what we should have.

We presently generate letters and forms through two vehicles. One is the WCLD Automated Correspondence system and the other is the **local generation** of letters through the 8100 word processing system. Ideally, we should be able to generate **all** correspondence and **transaction specific forms** through a **single system.**

**You** should also be aware that for the past several years we have discussed the concept of a **"turnaround document"** for Teleservices. I won't go into great detail, but the concept is that instead of just sending the policyholder a form, we would send them an electronically produced **completed** form. In otherwords, depending upon the transaction, we would enter all the required information **at the time of the call.** The form would be laser printed with **all the information entered** and would be mailed with the letter. It would then **only require that it be signed by the** owner. This would eliminate confusion and/or legibility problems in the completion of the form. There are also many transaction processing efficiencies that would be available under this concept.

CONFIDENTIAL

MP4011070741

## Automated Correspondence With Transaction Specific Forms - Cont'd.

The questions are:

Do we develop an entirely new system to accommodate this process for <u>all</u> types of requests?

Do we have "dual" systems with WCLD having their own for the cash, loan and dividend transactions?

Or, do we try and enhance the WCLD Automated Correspondence system to meet our full needs?

## Online Payment History

While the primary intent of an online payment history was to resolve payment discrepancies on the phone, there are many calls received where recent payment history information would be useful. There are calls that do not involve full-fledged discrepancies but where there is confusion or questions as to the application of recent payments. This is particularly true where APL, reinstatement and non-forfeiture situations are involved as well as where some transaction is pending that has resulted in additional monies being held in the pending account (LDGR).

## Full Beneficiary/Contingent & Owner/Contingent Information Available Online

Ideally, we would have full beneficiary and contingent beneficiary information online as well as all owner and contingent owner information online for both Notice and Account. As it is, we have no contingent information available for Notice or Account and no beneficiary information of any kind available for Account.

We handled over 6,000 owner/beneficiary inquiries in 1989. A very large percentage of these must be "referred" to the B&A unit for a response. Many of these referrals are "expensive," not only from a clerical compensation point of view, but also in terms of equipment and supplies as it involves retrieving microfilm. Having this information online would eliminate many of these referrals. Furthermore, our customers <u>expect</u> us to have this information when they call.

We recognize that it may NOT be economically feasible to install all past information online.

At the very least, our systems should be modified immediately to accommodate all of this information <u>online</u> for all future new issues.

In addition, the systems should be modified to accept this information for <u>all future</u> <u>beneficiary/owner changes</u> for our EXISTING policy base.

CONFIDENTIAL

2

### Eliminate Policy Endorsement Requirement for Beneficiary Changes

If the beneficiary information was electronically available online (versus present reliance on microfilm or the actual policy and endorsement) it would no longer be necessary to rely on the policy endorsement method for beneficiary changes. The Company would be spared the expense of requiring, handling and mailing the policies back to the owners following a beneficiary change. The policyholders would be spared the inconvenience of having to locate and mail their policies to us.

The feasibility would then be there to use the "turnaround document" for beneficiary changes which could greatly reduce processing time and costs. The "turnaround document" could be electronically scanned and the beneficiary change added to the electronic file without the need for clerical data entry.

### EDCS – Ability to Retrieve Check Numbers by Policy Number

We need the facility to obtain check numbers from EDCS by policy number. It is necessary that we have the check number in order to determine the disposition of the check on EDCS. We should be able to go into EDCS with only the policy number and have it provide the check number(s) and disposition of the related payment(s).

Note:    At the present time, check numbers for annual dividend payments under the cash option or excess premium reduction are **NOT** available on the electronic system. It is necessary to manually review microfilm to determine the check number. This would be a **number one** priority but it is allegedly forthcoming. Therefore, I have not listed it as an electronic priority.

### Reengineer the Dividend System(s) – Particularly on the Account Side

In 1989, Central Teleservices handled 21,000 dividend inquiry transactions and another 6,500 transactions relating to payment and/or quote information.

The New York Dividend staff has just spent a week training people in my C/L/D and Teleservices unit on the dividend activity. After listening to a synopsis of this training, it is clear that the dividend systems and trails are our own worst enemy, particularly on the Account side. Many of the inquiries we get are related to dividend transactions that were requested but not handled properly. In many cases, the desired change or transaction does not occur because the dividend trails are extremely complex and require that more than one system be addressed for a single change or adjustment.

Due to the complexity, some aspects or file corrections are often overlooked. As a result, dividend errors tend to perpetuate and compound themselves. This entire system should be reengineered to provide a simple means of inputting transaction changes and corrections. It should be addressed from a Teleservicing perspective so that this can be done online with the transactions resolved at the time of the call.

CONFIDENTIAL

3

### Account to Notice Conversion

This issue has been "under study" for a number of years. There are many problems associated with the Account trails. Major differences exist in the information or transactions that can be provided online for Notice but not Account or in the ease with which various transactions can be effected. This would disappear if all Account policies were converted to Notice.

A decision needs to be reached quickly as to whether or not conversion is a practical solution. If it is, it should receive a very high priority. If it is determined that conversion is not a practical alternative, then a strong priority and commitment should be given to modifying the Account trails to address the multitude of issues that have been raised in the past.

Again, wherever practical, all changes or modifications to either system should be approached with the idea in mind that in a few years, we may be in a virtual "total" Teleservicing environment.

Vince, I'm sorry if I went into too much detail for you, but the Teleservicing perspective is somewhat different and it needs to be thoroughly understood. There are tremendous opportunities for clerical savings and more efficient processing in a Teleservicing environment if we are willing to change some of our thinking and our systems.

Please feel free to give me a call if you would like to discuss any of these or if you need further explanation.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

February 19, 1990

cc    Gardner, Schoos, McDowall

CONFIDENTIAL

4

Barbara Gardner
Vice-President

Re     **Automated Correspondence Study Team Report**

Barbara, I checked with Liz and she indicated you did not get a copy of this report. I thought you should see it. It is an impressive package. My concern is that all the work may have been done to put this proposal together rather than really put a system together.

This proposal incorporates about all of the things we indicated we would like to see. Whether such a system is realistic or practical in our present environment is doubtful. The concept of a single "do all" system as proposed in this document sounds great. However, its development and implementation as described is highly unlikely.

As you know, there are already people working on the 8100 replacement. I am sure they are only looking at part of the picture. In addition, there is the CWS Automated Correspondence system. In addition to both of these projects, there are many aspects that are requirements strictly from a Teleservices standpoint. The likelihood that all of this could be coordinated in a single effort seems to me to be an impossibility in our Corporate environment and organization structure.

I also think it would probably be faster to have some of these done separately anyway but there should be at least a general coordination of direction. For example; CWS is already proceeding down the road for some of these needs and is making progress. They may be able to expand or enhance their system to meet some of these objectives for non-CWS activity.

I am also optimistic that our Wichita development team will get some of the work done that addresses Teleservices' specific needs. As long as they communicate with Scranton and we get as much compatibility as possible, I feel sure we will have access to more results quicker than if we wait to try and put this "ideal" system together. At some point down the road, it may or may not make sense to try and put it altogether in one system.

I believe I mentioned it to you, but I invited Mark Davis and some of the Scranton people to come out and take a close look at Teleservices and meet here with the Wichita people to discuss our mutual needs and objectives. Mark called to tell me that they expect to be out sometime in January. If we are permitted to "work together" at this level of the organization, I think we can get a lot accomplished without getting embroiled in the politics and turf issues that seem to develop at the higher levels.

J. L. Rayl
Manager
Teleservices – Cash/Loan/Dividend

November 29, 1989

**CONFIDENTIAL**

XP401107074G

Barbara J. Gardner
Vice-President


Re      1990 Electronic Priorities
        Availability of Beneficiary/Owner Information Online


Barbara, in the previous memo I failed to mention another major problem created by the fact that the Owner/Beneficiary information is not online.

Teleservices will have to refer hundreds of Account cases to C/L/D because the owner information is not online or even available in an overnight quote. If the file indicates the owner is "other than the insured," C/L/D must requisition the application or microfilm file to determine the owner before even quoting the policy values. This creates significant delays and is expensive because it is clerically intensive. Our customers also do not understand when we tell them that it may take two weeks or more to supply this information.

The Account Quick Quote is coming soon. This will magnify the problem because then the CSR will have the value information in front of them but not be able to provide it anytime there is an owner other than the insured. We will still have no way of knowing who that owner is.

Again, Barbara, this entire issue needs to be given a much higher priority.



J. L. Rayl
Manager
Teleservices – Cash/Loan/Dividend

November 20, 1989

cc  Martin & Donnelly



CONFIDENTIAL

Mr. Vince Donnelly
Vice-President
Personal Insurance Quality & Planning

Re     1990 Electronic Priorities
        Availability of Beneficiary/Owner Information Online

Vince, at the recent Operations Officers meeting, the Electronic priorities were discussed and established for 1990. Barbara Gardner asked for feedback from the managers regarding the priorities that were established. Attached is a copy of my response to Barbara.

One of the priorities we had previously communicated to Barbara was the need to have beneficiary/contingent and owner/contingent information online. **This was given a "Low" priority by the Operations Officers.** This is understandable as it does not become "critical" except in a Teleservicing environment.

What is needed is to put all available bene/contingent and owner/contingent information online for **All** Account and Notice policies. This would be a massive undertaking and could take a couple of years. However, if we don't, we are going to spend a lot of money in a Teleservicing environment sending paper referrals to the B&A Units to respond to phone inquiries and provide this information to the customers.

At the very least, **we should begin putting the full bene/owner information online for all new issue.** This is presently not possible because of the character limitations of the appropriate fields. As outlined in my memo to Barbara, we get lots of calls for people wanting this information and the problem will be magnified when we expand nationwide. Additionally, **our customers expect us to know this information when they call.**

Consequently, Vince, I think that additional influence needs to be exerted to make this entire issue a very high priority for Electronics. We need to position ourselves for the obvious future. This will be an absolute necessity if we are going to support a Teleservicing environment and meet customer expectations.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

November 18, 1989

cc      Martin & Gardner

**CONFIDENTIAL**

Barbara J. Gardner
Vice-President

**Re     1990 Electronic Priorities**

Barbara, I have reviewed the Electronic Priorities as established by the Operations Officers. I would like to offer the following comments.

First of all, the priorities were obviously not looked at from a future Teleservicing environment. This is understandable since there are only two of the Operations Officers involved in Teleservicing. However, the Company needs to be concerned with the Teleservices environment.

The Owner/Beneficiary area was given a low priority. There is a major issue aside from the endorsement requirement. We need Owner/Beneficiary information online for all lines of business. In a non-teleservicing environment, this is not a priority. However, this is a source of substantial inquiry for Teleservices. Through October, we have had 5,020 Bene/Owner inquiries and 5,120 calls involving a bene change. Many of these latter calls may be coded as a "Change Of Bene" and forms may be sent because we can't tell the policyholder who is the currently designated beneficiary. To be safe, we have them check their policy but also send the necessary forms.

Many of these "inquiries" wind up as referrals. In most cases, these referrals could be eliminated if we had the owner/bene information online. As you know, these referrals result in more time, work, correspondence and clerical expense than the phone call. Perhaps even more importantly, our customers expect us to have this information when they call.

If the Operations Officers cannot agree on this as a group, then perhaps it needs to be appealed to a higher level strictly as a Teleservices issue.

A couple of the other enhancements we wanted were relatively easy, but misunderstood by the group. Again, I believe this is because these are teleservices issues and not Head Office issues. These include:

**Provide *Economatic* Basic Insurance Amount Online (On SONIC) - Also Show Spouse Coverage Online**

This request was misunderstood. On an Economatic policy the "face" amount is shown on PIOS rather than the "basic" amount. For example, the face amount may be $10,000, but the "basic" amount is about $7,000. It is intended that the difference be made up through the purchase of one year term and this is the required dividend option. As these policies are now older, many more questions are coming up about the dividends. To answer these, the CSR must know the basic amount of insurance and it is not available online. However, it is available on SONIC. Therefore, it shouldn't be a big deal to have it made available on PIOS.

**CONFIDENTIAL**

MP401107D748

For Family Plans, we also need to know the amount of coverage on the spouse. This is not available online. It is dependent upon the relationship between the age of the insured and the age of the spouse so it cannot be automatically calculated by the CSR based on the face amount.

## Identify Premiums Paid By APL On Loan History File

The Loan Repayment Letters and loan interest notices generate a lot of inquiries concerning existing loans. It can be very confusing to review a Loan History with a policyholder when APL is involved. In some cases, the policyholders are unaware that there is an APL provision in their policy. This confusion is compounded by the fact that the Loan History does not indicate which premiums were paid by the APL loans. It can also create confusion over the "paid to" status of the policy. We need the Loan History file to reflect the premium due dates for those payments made by APL.

## Provide Full Change Of Mode Calculation and Amount Required Online (Also Need Mode Availability)

We get a number of calls with people inquiring about changing their mode. Often these calls are not on or around the anniversary date. We need the system to calculate online the amount of "pro-rata" premium required to bring the policy to the anniversary date as well as tell us what the new modal premium would be. In addition, we need to know if a desired mode is available. In other words, some policies can be changed to monthly or quarterly while others cannot. We need to know that while talking with the customer.

## Provide Non-Forfeiture Quotes Online

We get a number of inquiries for quote information on non-forfeiture such as the amount of "Reduced Paid-Up" insurance that would be available. Again, the availability of this information would eliminate Teleservices referrals. This would also be useful for conservation purposes. It is presently an overnight batch process to get the values. We would like to see it online. While it is primarily for Teleservices, it would also benefit all operations not to have to go through the trouble of ordering a val brief.

Most of the other major enhancements were given acceptable priorities considering the complexity of the tasks. However, with the exception of the Bene/Owner issue, the above should be fairly easy tasks. We are also trying to pursue some of these through TMOS but this is a "back door" approach and really isn't the way it should be handled.

J. L. Rayl
Manager
Teleservices – Cash/Loan/Dividend

November 17, 1989

CONFIDENTIAL

MP401107070750

Barbara J. Gardner
Vice-President

Re    Online Payment History File

Barbara, thanks for sharing this file with me. I assume you want to keep it on your personal call-up.

I would like to comment on two statements made by Marge Kelly. She states:

> "This is why we asked the Teleservicing operations to review the study with specific emphasis on reevaluating the benefits. As you can see by the responses, this was not done." (Emphasis mine)

To my knowledge, we were never specifically asked to "reevaluate the benefits." Kathy and I persisted in saying we needed a Payment History File and they kept telling us it had been looked at and was too expensive. They finally shared the study with us, but they did not ask us to do any formal evaluation. All we did was offer our comments to the original study. As you point out, after that nothing happened.

Again, what price do we put on a high level of customer dissatisfaction? At any rate, I appreciate your efforts and those of the other Operations Officers. However, as long as we have people looking at it with such narrow vision instead of putting themselves in the position of the customer, I am not optimistic.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

October 31, 1989

**CONFIDENTIAL**

Janet C. Rightor
Sr. Systems Analyst - CWS
P.I. Information Services
Scranton Information Systems Center

**Re    CWS - Revisions to *"Policy Payment Request Form"***

Janet, we have several suggestions concerning the above form. For the record, we would once again like to state our position as saying this form (and the regular Service Request Form) is cumbersome and confusing to the average policyholder. We receive numerous calls on 1+800+MET-LIFE from policyholders who are having difficulty completing these two forms and need help to fill them out.

I recognize that CWS is only using a modification of the original Service Request Form. It is even worse than the Policy Payment Request Form in terms of the confusion it creates. Our problems with the CWS form are compounded by the fact that it must be manually inserted with the corresponding letters. As you know, this continues to be a source of error.

For your information, one of the things Teleservices is pursuing with the Wichita TMOS staff is the development of letters with transaction specific forms produced to accompany the correspondence. A form sent to the policyholder would have only the sections pertinent to the requested transaction(s).

I don't know how this effort will interface with CWS. I would like to think that "Automated Correspondence" could be modified along these same lines so we do not need to reinvent the wheel. However, whatever we can do to eliminate this form and send our policyholders something simple will be a giant step towards Quality service.

At any rate, our specific comments on the CWS form are as follows:

**Taxpayer Certification**

- This category presently only applies to dividend transactions. Consequently, we would suggest it be placed on the front of the form with the dividend transactions.

- The form states: "Complete this section if your policy was issued after December 31, 1983." In Bob Lawler's memo of May 31, copy attached, he indicates that we should also be concerned with certification for policies issued **prior to 12/31/83.**

**CONFIDENTIAL**

**Taxpayer Certification - Cont'd.**

- This whole issue is very confusing to the average policyholder. They do not understand what needs to be certified or whether or not they are subject to a back-up withholding order. Rather than just stating "**I am subject to a back-up withholding order,**" perhaps the second line should read something along the lines of: "**I have been notified by the Internal Revenue Service that I AM subject to a back-up withholding order.**" If this were done, then most policyholders would realize that they have not been so notified and would check the first box.

  Or, perhaps consideration could be given to reworking the whole format to be more consistent with the Form 16424. I don't think it solves the confusion problem but, in effect, it ensures that most forms will be "certified." It does this by asking the policyholder to "cross out" the statement if is untrue. In most cases, the form will be "certified" simply because the policyholders will not read the form that close and will leave the statement as is.

**Signature Requirements**

The signature requirements as indicated on the form are confusing at best.

- On the first side, below the Taxpayer ID number section, the form states "Complete the appropriate section(s) below and sign your name where indicated." This is further confused by the statement at the bottom of the first side which states: "Sign below if you have completed any sections on this side of the form."

  Right above that, in the Loan Request section, it states: "By signing <u>on the back</u>, I agree.....". But, the loan request section is on the **front side.** Consequently, the form would appear to require signatures on both sides for a loan.

  On the back side of the form, it has additional signature lines but no statement to "**Sign below if you have completed any section on this side of the form.**" To the policyholder, it would appear that we are requiring signatures on both **the front and back** for most transactions.

- The Signature Requirements section needs to state that the OWNER's signature is required for these transactions. It addresses the more complicated situations, but doesn't actually state or emphasize that the owner's signature is required in a "normal" situation. Policyholders need to be aware that it is the owner's signature that is required and not necessarily the insured's.

CONFIDENTIAL

**Change of Address**

- There is a box on the front of the form to indicate a change of address. There should be space for the policyholder to list additional policy numbers if a change of address is indicated.

**Readability of the Form**

- Some of the print on the form is extremely small and policyholders have complained that it was hard to read. Changing the form for the PUAR modifications may further compound this problem.

  I don't see how you will be able to get any additional information on this form. You may want to give consideration to developing a separate form for the **Request For Change of Dividend Option For Future Dividends**. This really isn't a payment transaction as such anyway. Perhaps this would provide enough space to enlarge some of the print on the rest of the form to make it more readable.

Janet, I realize that the addition of a second form could potentially compound our problems with getting the right forms mailed. Accordingly, I don't see that as an ideal solution. However, from a policyholder's standpoint, I think receiving this form (and the regular Service Request Form) is a disgrace anyway. These forms are clearly intimidating and confusing to the average policyholder.

As previously stated, we feel the ideal solution is to have forms printed with the letters that are transaction specific. If this were done, we could even have the forms produced with a lot of the base policy information included such as policy number, owner/insured names, address, etc. This would ensure the accuracy of much of the information and would give our policyholders an impression of real Quality. These forms don't.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

June 13, 1989

cc:    Vranka, Kelly, Geary, Schoos, Petr

**CONFIDENTIAL**

Mr. John Hodel
Manager
P.I. Programming II
Scranton Electronic Installation Center

Re    Policyholder Services Priorities
      Online Check Numbers For Annual Dividend Checks

Don Lyons gave me a copy of your response to his memo concerning the Policyholder Services priorities. According to your comments, the online availability of check numbers for annual dividend checks has a low priority. John, I don't know all the reasons for this, but I would certainly like to ask that this be reconsidered.

In addition to the numerous inquiries received by mail, this Teleservices operation has handled 15,618 dividend inquiries this year by phone. This excludes the calls involving quotes or payments. While I don't have exact figures, a significant number of these calls involve policyholder questions or claims that they "didn't receive their dividend check."

These inquiries generate a lot of work to resolve. The phone call must be referred to the dividend unit which has to go back to the microfilm registers in order to trace the dividend. They then go to EDCS to determine the current disposition of the check. Finally, someone has to call or correspond with the policyholder.

Similar inquiries on CWS are handled much more effectively. We have immediate access to the check number and our CSR (Customer Service Representative) can go directly to EDCS to get the check information. This enables the CSR to resolve many of these inquiries **during the first call.**

By having the check information available at the time of the call, we can tell the policyholder what our records show and often respond by asking the them to first review all their bank records, etc. before we go for check photo's. If photo's are appropriate or necessary, we have the information readily available to obtain them.

John, it does appear that there is expansion planned for Teleservices in 1989. Consequently, the availability of this information will become even more critical as the number of dividend inquiries increases. I would greatly appreciate any thing you can do to give this item a higher priority.


J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

December 16, 1988

**CONFIDENTIAL**

MP4011070754

Vic Will
Manager
Teleservices
Personal Insurance Administration & Information Systems

Re  Payment History File - Due Date/DLP Discrepancies

Vic, a major source of customer dissatisfaction involves Due Date/DLP discrepancies and our inability, as a Company, to promptly resolve them. As you are aware, these are generated by a variety of circumstances. However, whenever they occur, the customer virtually always assumes it is the Company's error when, in reality, most of these are created by the customer.

Because we cannot respond effectively, particularly to phone inquiries and complaints, the Company (and the CSR) are almost always placed on the defensive. The CSR does not have enough information available to adequately respond to the policyholder and, consequently, this only strengthens the customer's belief that responsibility for the error is the Company's. The entire situation is then compounded by the delays and difficulties created when the case is referred to a Head/Administrative office or one of the payment centers. It often takes weeks and sometimes months before the customer is given a reply and then it is seldom adequate to resolve the matter. Too much time has elapsed and the customer has long since been convinced it is our mistake.

The answer to this is an online payment history file. The Check-O-Matic file presently gives a history of the last five payments. In most cases, this is adequate to resolve questions and complaints arising from drafting problems. If there was a payment history file available showing at least the previous six payments, it should be adequate to resolve most discrepancies. (It should be noted that it would only be effective for resolving those discrepancies created _after_ the establishment of the history file).

Many of the discrepancies are created by a policyholder using a new coupon book prematurely. Most of the new errors surface rather quickly as a result of a reinstatement letter. If, at the time of a call, a CSR could review the past few payments with the policyholder, most of these discrepancies would be resolved immediately and in the Company's favor.

Vic, the establishment of such a file would eliminate a major source of customer complaint and dissatisfaction. It would make a CSR's life much easier by providing the information needed to respond to these calls. As it is now, the CSR frequently takes a lot of abuse because the only response we can give is that we will "refer it."

J. L. Rayl
Manager
Teleservices
Central Head Office

August 29, 1988

cc   Gardner, Petr, Geary & Schoos

**CONFIDENTIAL**

# ELECTRONIC SYSTEMS PRIORITIES

From Wichita NWT Meeting

MP4011070756

| CEHO | NEHO | Description |
|------|------|-------------|
| 1 | 1 | TMOS single entry interface with other systems (through PICX) - Change of address highest priority with tentative target date of 3/89 |
| 2 | 2 | "Quick Quote" for Account Business |
| 3 | 3 | Sales Rep Notification - Provide electronic notification to sales representative of transactions processed by Teleservices |
| 4 | - | Transfer of Calls & TMOS records - Eliminate need to send messages to other locations via "Bulletin." Recommendation with cost & benefit statements due 10/1/88. |

Analyze and make recommendation as to how TMOS file can best be sent to another terminal when transferring calls - A "pending" file could be established or it may be more expedient and economical to have "closed" file called up by second CSR and give that individual editing capabilities to the original file -If this is done, file must indicate editing was done and by whom.

| CEHO | NEHO | Description |
|------|------|-------------|
| 5 | 4 | Automated Correspondence - Generate appropriate letters through TMOS letter code entry rather than having letters generated by clerical unit   (Also viewed as a by product of the turnaround document) |
| 5 | 5 | Turnaround Document - Deliver a plan for the development and operation of the Turnaround Document concept - Define initial transaction(s) and prepare for pilot installation - Tentative target date for release of plan is 12/88 |
| 6 | 7 | Development of an online Payment History File |
| 7 | 10 | Mirror Terminals - Provide the ability to "mirror" another 3290 for training and monitoring purposes |
| 8 | - | Investigate and provide recommendation as to whether or not conservation efforts should be tracked and, if so, to what extent. Should only basic policy information be reported or should actual amount of assets conserved be reported - how should these be defined |
| 0 | 6 | Online householding - Ability to establish PICX households online. |

CONFIDENTIAL

**CONFIDENTIAL**

Julie Mullen
P.I.A. Information Systems
Scranton Computer Center

**Re  Personal Insurance Service Request Form**

Julie, I received a copy of your memo concerning the Service Request Form.  We in Teleservices agree with your comments.  We send out many of these forms in conjunction with the calls received on 1+800+MET-LIFE.  In order to try and make completion of this form as clear and easy for the policyholder as possible, we have resorted to "highlighting" various parts of the form depending upon the transaction being requested.  As you pointed out, the form is primarily designed for completion by a Company representative.  It is an extremely intimidating form for the average policyholder.

In your memo, you indicated you were going to have your revised version of the form printed.  I am not sure where you people stand with respect to the laser printing and technology, but I would like to offer the following as a direction I think we should head.

I assume the letters are currently laser printed.  I would like to suggest that in conjunction with the letter, the Service Request Form also be laser printed.  However, there should be a "library" of forms which only contain the paragraphs or portions that are most commonly associated with the type of letter being sent.  In other words, if the transaction associated with the letter is likely to be a loan rather than a cash surrender, we would send them a form that is designed specifically to accommodate that (and any commonly related) transaction(s).  Naturally, some requirements might be  universal and appear on all forms.

This would enable us to send the policyholder a form that is very "clean" and easy to complete.  It would also provide us the with opportunity to provide instructions written specifically for the policyholder.  The appropriate accompanying form could be determined based on the letter itself or perhaps with some coded input when the letter is entered by the clerk.

For your information, Teleservices is exploring the idea of a "turnaround document" that will incorporate this concept.  For transactions requiring a signature, we would basically complete the (electronic) form online at the time of the phone call from the policyholder.  After the call, an appropriate letter with the "completed" laser printed form would be sent to the policyholder.  All the policyowner would have to do is sign the form and return it to finalize the transaction.

At any rate, Julie, I thought I would offer my two cents worth.  If you have any questions about what we're doing, feel free to give me a call (tie line 149 - extension 427).

J. L. Rayl
Manager
Teleservices
Central Head Office

July 13, 1988

cc    Mark Davis, Marcia McDermott, Vic Will, Don Petr, Deborah Geary & Kathy Schoos

Mr. Vic Will
Manager
Special Projects

Re  Teleservices Transaction Processing

Vic, I reviewed the material we had discussed with Fred Muench regarding the transactions that could be completed in their entirety by Teleservices. This was based on the assumption that there would be changes in Company requirements, procedures and/or electronic systems. These transactions are as follows:

## CHANGE OF BENEFICIARY

Teleservices could handle the vast majority of beneficiary changes from start to finish if:

The Company would change its requirement that the policy be endorsed (or change this requirement for a large block of policies such as ALL NOTICE & UL policies)

The "Electronically Generated Document" program we have discussed is put into place. In otherwords, at the time of the call the CSR would:

1. Verify they are speaking with the owner

2. Record ALL the information required for the Change of Beneficiary on the CRT

3. An appropriate letter and a COMPLETED Change Of Bene form would be electronicially produced and mailed to the owner

4. The transaction would be held in a special electronic "pending" file until the signed form is returned

5. Upon receipt of the signed form a special "control number" on the form would be optically scanned (by light pen?) and the transaction would be released from the "pending" file and the change of beneficiary would be entered onto the permanent files

6. The document would be microfilmed as a permanent record of the transaction

## CHANGE OF NAME

The Change of Name transaction could be handled essentially the same as a Change of Beneficiary using the "Electronically Generated Document" program as outlined above. Consideration might also be given as to whether or not a signed form should be required in all cases (such as marriage) if we verify that we are speaking with the owner.

**CONFIDENTIAL**

## CASH SURRENDERS

Teleservices could handle a substantial number of cash surrender payments if:

> The Company would change its requirement that the policy be submitted on cash surrenders or change this requirement for a large block of policies such as all Notice, UL & Account Ordinary policies. If any type of "release" is necessary, it would seem that perhaps this could be part of the endorsement on the back of the check such as is done with loan checks.

These calls could be handled in the same manner as we are presently doing loan and dividend payments. A big advantage to having these handled by telephone and by Teleservices is the opportunity for the CSR to attempt a conservation effort. If this fails, the CSR could still attempt to determine the reason for the cash surrender. Having this information recorded and tracked by our electronic systems could be valuable. It would enable us to monitor any developing trends with respect to our cash surrenders in general and also pick up areas where substantial "replacement" is taking place.

## LOAN AND DIVIDEND PAYMENTS

Teleservices could handle an increased number of loan and dividend payments by expanding our payment limits and permitting limited reconciliation work in Teleservices.

## MATURED ENDOWMENTS

The Matured Endowment transaction is presently very manually intensive. The electronic systems associated with this transaction should be reviewed and updated. Perhaps this could be done with Teleservices in mind to permit a large portion of this activity to be handled by phone.

## CHANGE OF MODES

At the present time, the only Change of Modes handled by Teleservices are Notice policies where the premium is paid to the anniversary date. These are entered on MFES. In instances where the premium is not paid to the anniversary date, Teleservices does not attempt to calculate the amount required to effect the change. This could be done on many cases by accessing PINS to determine the new premium amount.

There are no obstacles to doing this other than working out arrangements with FES/Administration and providing the necessary training and access to PINS. We will investigate this further.

Vic, based on Fred's numbers, some of these transactions involve substantial clerical equivalents. For example, there are approximately 93 employees required at 100% performance for handling Account and Notice cash surrenders. If the requirement that the policy be submitted was dropped and a significant portion of these payments could be initiated by Teleservices, there would be a substantial clerical offsets. Matured Endowments require approximately 56 employees @ 100%. The Change of Name and Beneficiary transactions require approximately 30 employees. These transactions also offer good opportunity for significant clerical offsets and even potential savings.

James L. Rayl
Manager
Teleservices/Financial Control
Central Head Office

September 22, 1987

**CONFIDENTIAL**



EX 41

Ed Rakowski, J.D.
Consultant
ILI Consulting Services
AREA 5-E

MP401107070760

Re Release of Contract Information - Call Center Security Issues

Ed, a couple of the issues that Kathy Schoos and I have wrestled with for a long time have been the whole concept of security as it relates to verifying the identity of the caller and our procedures relative to the release of information. Kathy recently put forward a proposal on the establishment of PIN numbers for our customers which has caused us to reexamine this entire subject.

This has proved to be very timely. For a period of several months, an outside firm *(Dalbar)* conducted *mystery shopper* calls *(posing as policyholders)* to the two ILI call centers and numerous branch offices throughout the country. In their presentation of the final results, they made the following observations:

- Compared to other life insurance companies for which they conduct similar studies, the two ILI call centers were unusually stringent in their attempts to administer security measures to verify callers' identity. They termed our procedures as being *"rigorous and burdensome"* for the customer.

- At the other end of the spectrum was our branch offices where, in most cases, all that was required to obtain similar information was a policy number or a name and policy number.

Their recommendation was essentially that, in the interest of better customer service, we should significantly relax our efforts. It is my personal opinion that our security measures should not necessarily be relaxed. I think our policies with respect to the release of information should be reexamined and possibly liberalized in some areas. But, for some situations or transactions, should probably be significantly enhanced. I believe the key is to ensure that the security measures are commensurate with the level of business risk and only exercised where necessary and appropriate. By the same token, there may be areas where we can significantly improve customer service by making more information available to callers who have a bona-fide interest in a policy but may not be the owner.

## Release of Information

In order to do this, I believe that we need some very definitive legal clarification regarding our true contractual obligations with regard to what information can be provided to whom. The only material I have seen regarding *privacy* regulations relative to insurance dealt more with the specific personal information that a company might acquire or maintain about an individual such as during the underwriting process. I could not find any references to *privacy* regulations as it applies to specific policy *"data."* Among the issues I would like to see clarified are:

CONFIDENTIAL

DEPOSITION
EXHIBIT
41