Ex   A

( 9  OF  14 )

- What information relative to a life insurance contract is legally considered to be restricted solely to the owner and is formally protected or covered under "*privacy*" statutes. Is the real risk only associated with the release of policy value and/or perhaps beneficiary information? Are there other areas that are *specifically protected* or are we free to evaluate and accept the degree of business risk with regard to other information? We need a definitive list of what is specifically protected by law versus those things where it is a matter of judgment and risk assessment.

- Does the type of contract make a difference? In other words, are there differing legal requirements for a traditional life insurance policy versus a Universal Life policy? Does it change when it is an equity based product such as a ULII or variable annuity?

- When the owner is other than the insured, does the insured not have any rights whatsoever to policy information? It would seem to me that an insured should be entitled to some information. If someone owns a policy on their life, it would seem that he or she would be entitled to know such things as the death benefit and/or beneficiary.

- What transactions could we "*reasonably*" permit someone other than the insured to execute? For example; we will currently accept a change of address from a spouse who is not the owner of the policy. To accept it only from the owner would be impractical, expensive and absurd. While there may be a certain degree of business risk, it is one we have to take for both the customers' and the Company's benefit.

- Are there any specific state laws or case law precedents that grant a spouse rights to information? Particularly if they are the insured? I know that there are state laws which supersede contract provisions such as the named beneficiary in divorce situations. Are there other state laws that apply to insurance contracts and/or a person's right to information?

- Can a policy owner "*authorize*" the release of information to someone else? In other words, can a policy owner tell us that it is O.K. to release information to his spouse? If this is possible, must such authorization be given in writing or can we accept it verbally? It is very common in marriages for only one of the partners to attend to the general business matters. And, many of our customers are frustrated when we refuse to release information over the phone but will mail it to the same house addressed to the owner.

- What are the legal risks associated with releasing information to other than an owner? Let's say a loan notice goes out and we receive a call from a spouse who does not own the policy. He or she is unaware that the owner took out a policy loan but we confirm that fact. The owner then becomes upset that we provided the information. Do we have any legal and/or financial liability? To what extent? Do punitive damages apply? Suppose the spouse had never seen the actual loan notice involved but as a result of a call, we made them aware of the loan. Does this affect our liability? Are there other aspects of the policy information that make the risk and liability greater or less?

CONFIDENTIAL

KPKF01107076I

Ed, the current security procedures and our rules governing the release of information in the two ILI centers are largely based on verbal discussions and recommendations by your organization and/or our own decisions as to what seemed appropriate or inappropriate. But, I really don't know of anything we've seen that provides us with the solid legal requirements specifically associated with the contract.

If other companies are much more liberal in their release of information, then I suspect that the actual legal requirements are vague and subject to interpretation. Consequently, a lot of what we're doing may be based on conservative opinion and risk avoidance versus specific legal requirements or our best efforts to service the customer. If we are really going to become a customer focused company, then we may need to reexamine our practices relative to the release of information and come up with a better balance between the level of customer service we provide and the corresponding degree of business risk.

## Security

As I said in the beginning, we may need to actually strengthen some of our security procedures at the same time. If we take a position to provide more information to our policyholders in the interest of providing better customer service, then we may need to take stronger measures to ensure that we are really talking to that individual. I have put forward a proposal for consideration to develop a *security system* that would allow us to maintain more information on file with which we could better verify the identity of the callers.

I suspect that it will take some research to respond to my questions. If I should be pursuing this directly with the Law Department, please let me know. I would, however, appreciate receiving a timely response. This is an issue that should be addressed Company wide. We are currently operating with very disparate levels of security and information release between our sales offices and the Customer Service Centers.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 24, 1995

cc   Barbara Gardner, Ralph Jeffrey & Kathy Schoos

CONFIDENTIAL

MP401107076Z

**Kathy Schoos**
**Director**
**Customer Services & Communications**
**MetLife Customer Service Center - Warwick**

Re    **Establishment of PINs for Security - Customer Identification**

Kathy, I'm sorry it has taken so long, but I thought I would respond to your June 30th memo to Jerri. I have recently been giving a fair amount of thought to the subject of PIN numbers for our customers. Among the things I realized is that we can't look at the concept of PIN numbers in the context of ILI policyholders only. The needs or benefits of a PIN number (or customer identifier) transcend most lines of business.

I see two different issues here. One aspect of the PIN number is the security issue while the second is the potential it holds for enabling us to identify the customer. This can become particularly important for identifying our callers as both an individual and/or the employee of one of the Company's institutional clients. Unfortunately, while I have some ideas, I don't know that there are currently any ideal solutions to either one of these issues.

## PIN NUMBERS IN GENERAL

From a customer perspective, there is the question as to whether the concept of a PIN number is universally applicable or will add enough value to the service interaction to be considered worthwhile. This becomes an extremely complex issue when considering the size, scope and diversity of our entire customer base. In general, it was my conclusion that it could be beneficial for *some* customers with *specific needs*, but this group is very limited. I still believe the majority of the customer base would not view it as adding value even though we might. Consequently, I believe it would be inappropriate to try and impose it on that portion of our customer base who would probably find it to be more of an annoyance than a benefit.

Having said this, this issue still needs to be carefully considered to see if there is a potential benefit for some portion of our customer base. At the same time, if the call center of the future is likely to house multiple LOB's, the use or applicability of a PIN number should be considered as it would apply across MetLife. This prompted the following questions in my mind:

- Is there a way to segment and identify our customer base and provide PIN numbers only in those situations where the customer would perceive it as adding value and improving service?

CONFIDENTIAL

MET0110770763

- What are the situations or transactions where the availability of a PIN number would improve service and be viewed positively from the customer's perspective?

- Are there alternatives to the security or customer identification issues other than a PIN?

In the financial service arena, banks and mutual fund companies are the most aggressive with respect to the use of PIN numbers to obtain information and/or transact business. For the most part, these were introduced to facilitate processing by ATMs and VRUs and the PIN numbers are the primary source of security aside from that offered by requiring the account number itself *(or the card for ATM transactions)*. But, there are different considerations in the banking and mutual fund industry which should not be overlooked:

- In general, to be remembered, a PIN number must be used. The frequency with which customers want information or initiate transactions with their bank accounts and/or mutual funds is quite high compared to most life insurance related activity.

- For whatever reason, it would appear that many of these institutions do not feel the same level of risk in terms of releasing information to someone other than the account owner. There are differing levels of PIN security among some of these institutions. But, many often use only the account number and last four digits of a customer's Social Security number as the PIN for obtaining information via a VRU. The degree of security this provides is debatable since, in general, it is not hard for someone to determine another individual's account and Social Security number.

- At the same time, the spousal issues are not the same. Often the husband and wife are joint owners of bank or mutual fund accounts. Thus, access by a spouse is not an issue. With a life insurance contract, only one of these parties is usually the policy owner. While the policy owner may not object to the spouse being able to obtain information or even transact business, the policy is a legal contract with one individual. As such, we do have specific legal obligations with respect to privacy issues and allowing others to transact business. But, I believe this whole issue needs some definitive legal clarification, particularly with respect to any rights that an insured may have when there is an owner other than the insured.

**CONFIDENTIAL**

XP4011070764

## PIN NUMBERS IN METLIFE

During my MetLife Express visits, I did find that the Pensions operation was already using PIN numbers. They, like other financial service organizations cited above, have defined the PIN to be the last four digits of the individual's Social Security number. And, because of the larger number of equity based products, the frequency of customer inquiry is relatively high for some of their clients. While ILI has a somewhat similar situation with ULII, that currently represents a small portion of our customer base.

I did not attempt to determine exactly what service or transactions a Pensions client could process based on the PIN. But, as I recall, it was mostly the ability to obtain status or value information since very few actual transactions could be processed on-line even by the CSRs. But, as I listened to phone calls, a couple of things were obvious. Many customers were at a loss when prompted for a PIN number on the VRU that initially answered the calls. A high number were defaulting or opting out of the front end voice response/call prompter. Based on their ensuing conversation with the CSR, it was obvious that many customers were not aware of their PIN number. And, some were obviously choosing not to deal with the voice response.

What is not known is the degree to which the Pensions organization attempted to adequately communicate to customers that the Social Security number was being used to establish their PIN number. But, at the same time, it could be that it was communicated effectively but the customer does not call frequently enough to remember that a PIN is required or what the number is.

## PINs FOR CUSTOMER IDENTIFICATION & INSTITUTIONAL CLIENTS

An emerging trait of *World Class* service providers is the ability to:

- Instantly identify the individual customer at the time of the call *(based on DNIS, ANI, a PIN, or some other unique customer identifier)*

- Simultaneous with the call, provide the CSR with pertinent customer file or customer specific information

Within the Group and Pensions areas, customers are generally identified through DNIS as a result of having been given a separate 800 number which is unique to that customer. This approach is an easy and effective way to segregate and identify large blocks of customers.

During the MetLife Express discussions of establishing larger, multi-line call centers, a key concern of senior management in the Group and Pensions areas was the ability to recognize callers as being *institutional* customers. It was deemed very important for a CSR to be able to know that a caller was an employee of a given Group or Pensions client. Furthermore, the CSR should be immediately aware of any rules or conditions that may be specific to that client

CONFIDENTIAL

**Page 3**

MET00110701765

This issue is closely associated with the use of a PIN number and the ability it would provide to *identify* the caller which is separate from any *security* issues. The increasing use of "CTI" *(computer/telephone integration)* has very profound implications for any call center and for the level of customer service and identification it can facilitate. In an effort to try and get people to better understand this whole issue, particularly with respect to the institutional clients, I wrote the attached document on *Call Routing Options.*

As outlined in this document, we may have a variety of reasons for wanting to identify the customer at the time of the call. Aside from the security and basic identification issues, another is to facilitate routing their call to someone who is qualified to meet their service need. If, for example, we know he or she is the owner of a ULII or other equity based product, their call could and should be automatically routed to an NASD registered CSR.

The question, however, is how the identification of the customer is best accomplished. And, in the case of MetLife, there is no easy answer. In the ideal call center environment, when a call comes in and is received by the CSR, it should be accompanied on his or her terminal with a complete customer profile. This profile should show the customer's total relationship with MetLife. Ideally, it might bring up the call record for any call to MetLife within some very recent time frame as well as show any *pending* activity regardless of the LOB involved.

In an increasing number of businesses, this computer integration with a customer file is being done based on matching the ANI of the caller. This was being used very effectively at Time Warner. An alternative to the ANI would be to prompt every customer to enter a PIN number. If this PIN number was then matched against a customer file, it would be possible to accomplish the same thing.

In the case of ILI, we have been capturing phone numbers on TMOS for years. But, there has not been any effort on the part of ILI to transfer or maintain these phone numbers on the *Client File* or any other database which could be used for matching purposes. Consequently, without a phone number on our files, the ANI is useless to us.

The institutional customers pose a separate problem. Currently, there is no information available on the *Consumer Complex* or any other file which readily identifies individual employees of institutional clients and their specific coverage's and/or products. This is also true for owners of other products not purchased through our Career Agency Force such as some Property & Casualty. Consequently, we could not currently identify these customers through use of ANI or a PIN number. Our most effective means for identifying an institutional client is still through the use of DNIS and a client specific 800 number.

**CONFIDENTIAL**

MET01070796

For those individuals who purchased products from a Career Representative, the CSR can obtain a policy number and go into PICX to get the policy and product information ILI has available. But, the CSR must seek this information, it is not automatically provided based on the incoming call itself. And, the CSR has no way of knowing if the individual might also have MetLife coverage under some institutional plan.

A key recommendation of MetLife Express was to extend the *Consumer Complex* to encompass institutional customers and any others who do not appear on the existing ILI *Client File*. Even if the caller can't be immediately identified as the call is received, the CSR needs to be able to recognize any institutional considerations for the individual once the customer record is accessed.

### <u>DAVID's PROPOSAL</u>

Looking at PIN numbers strictly for individual security purposes becomes a somewhat different issue. But I would like to comment on a couple of the issues raised in David's proposal:

- David's memo states that in Warwick, ALL callers are subjected to a five point security check *before* the service even begins. I know we have discussed this issue before as Tulsa does not handle calls this way. The level of security we exercise is based on the transaction. As I understand it, *Single Image* was being designed to facilitate security for both approaches, or at least that's what has been discussed. For Warwick, all security would be covered at the beginning of the call while for Tulsa the CSR would be prompted as needed *(as designed)* based on the transaction.

  While this would seem to solve the issue for Tulsa and Warwick, it becomes a much bigger issue if the two locations are handling other products or LOB's. There should really be more consistent security procedures across the Company. The same is true if we do any significant degree of load balancing in the future. Customers should essentially encounter the same security in Tulsa as they do in Warwick.

  I recognize that, in some areas, we probably need enhanced security as opposed to it being more relaxed. But, from a customer perspective, I would find it annoying to be put through stringent security every time I called, particularly if there was no risk associated with my transaction or service issue. Even though both sites try and make it as painless as possible, based on Dalbar's feedback, it may be a bigger issue than we realized. I am sure it is also annoying to customers who have called recently, and been put through security, to call back in a day or so in regard to the same transaction only to be put through the security measures again.

**CONFIDENTIAL**

MP401107767

- David's memo indicates the Company should allow third party callers to request information and/or process transactions with the policyholder's permission. He further states that we would maintain a file of whom the policyholder has given such permission. There would be two *"levels"* of security, one for information only and a second for transaction processing.

I have a couple of concerns. First of all, I'm not sure there are enough such situations where this would be of benefit to justify the time involved in administering such a system. And, I could see the differing levels of security as potentially creating confusion with respect to what a person might think he or she is authorized to do.

As a side issue, I was a little confused as to how David is defining a *third party*. I assume he just means a *second party* such as a spouse or someone else having a legitimate interest in the policy such as the named insured if there is a different owner, or perhaps the beneficiary. I would define a third party as someone having no legitimate interest in the policy such as; a funeral home, the customer's *"financial advisor"* or some other disinterested relative or acquaintance.

But, assuming he is referring to spouse or owner/insured situations, there might be some desire or advantage to being able to provide information and/or allow a spouse to effect some transactions. But, in today's environment, I would suspect the Company *(Consulting Services?)* would have to be involved in the determination as to which transactions could be initiated or what information can or should be released even if the policy owner agrees to it. I realize that we already do some transactions, such as a change of address, from a spouse. But would we want to let a second or third party initiate a loan or dividend withdrawal even with permission?

If the Company did agree that other persons could be authorized to obtain information and initiate transactions, the requirement would probably be that such authorization be given in writing as opposed to accepting it verbally.

CONFIDENTIAL

# Specific Comments and Proposals

### Practicality of a PIN for Security

A PIN number would facilitate a new approach to security. But, I'm not sure that for the *majority* of our customers it would be worth everything we might have to go through to try and introduce and maintain a PIN number. Particularly when the frequency of customer contact is low. A lot of time would probably be spent dealing with new or forgotten PIN numbers which could be more time consuming or aggravating than the actual security procedures.

I do see a PIN number as being appropriate for *Voice Response* applications and where there is frequent interaction. To the degree that we can make information or transactions available on VRUs, we should have the capability of establishing, communicating and maintaining PIN numbers. This would probably be especially applicable to the equity based products and the customer base that purchases them.

But, for most of our customers where we are going to conduct verbal verification, I see the PIN as being more of a nuisance than a practical solution to our security issues. I just don't believe that most of them will interact with us often enough to remember their PIN or to perceive it as adding value to the service.

### Consistent & Integrated Security

The fact that Tulsa and Warwick exercise different security procedures is a problem. In spite of Dalbar's feedback that the Service Centers seem to be far more stringent than other companies with respect to our security procedures, I believe the environment will cause the industry trend to be towards more security, not less. But, I also believe the Dalbar feedback supports the concept that strict security should only be exercised *when it is relevant to the information or transaction being requested.* At the same time, it would seem to me that *Single Image* does provide us with the opportunity to build the needed level of security into the natural flow of the phone call and transaction. It also offers the potential to improve how many of these security issues are addressed and even provide an optional enhanced level of security if the CSR feels any reason to question the identity of the caller.

CONFIDENTIAL

## Alternative Security System to PIN Numbers

*Single Image* itself will be able to provide the CSRs with some additional features which could enhance security procedures. This would include the automatic calculation and display of attained age and showing other information which is currently not readily available when exercising security. But, this is not enough. More of our activity and transaction processing will be moving to the phones. Consequently, the associated business risks with respect to the release of information or manipulation of funds will be much greater in the future. The Company needs to have an easy and non-offensive process in place to ensure that the individual on the phone is who they represent herself or himself to be.

As an alternative, perhaps the Company could consider the development of a *"security file"* which is incorporated into the *Consumer Complex*. Rather than rely on a PIN number which must be memorized, the *Consumer Complex* would store information which could be used for security purposes.

Examples of the type of information we might maintain would include the maiden names of the insured's or owner's mother, children's names and birth dates, names and/or number of brothers and/or sisters. Ideally, we could begin gathering this information with almost every call. If properly explained to the callers that this is to facilitate future transaction processing and ensure the privacy of their policy records, most should not be offended or reluctant to provide this information. It could be stored on the *Consumer Complex*. And, as outlined earlier, appropriate security measures and prompts could be displayed by *Single Image* based on the transaction or information requested.

## What Information or Transactions are *"Protected"*

Over the years the two ILI call centers have developed general guidelines as to what information or transaction processing can or cannot be released to someone other than the policy owner. However, most of this has been based on verbal conversations with Consulting Services and/or what seemed to be logical. To my knowledge, the two call centers have never been provided with definitive legal opinions as to what information is or is not restricted and to whom. Our general opinion has been that the policy owner is the only person entitled to such things as policy values and beneficiary information. At times, this has been difficult and burdensome for our customers, particularly when dealing with a spouse or an insured who is not the owner.

This entire issue should be reviewed from an authoritative and legal perspective. Obviously, based on the Dalbar feedback, other companies are less stringent with the release of information. A question I don't think we have adequately addressed is what rights does an *"insured"* have who is not the owner. This is often the case in spousal situations. Surely as an insured *(but not owner)* under a policy, that individual is entitled to be given some information.

CONFIDENTIAL

MP4011070770

In some states, there are laws which supersede, change or modify actual contract provisions. One that comes to mind involves the rights of a spouse who is named as a beneficiary on a policy when a divorce takes place. As I recall, in some states the spouse automatically loses their rights as the beneficiary unless a new beneficiary designation is made naming them. Divorce decrees also can modify contract provisions. *Are there any state laws that grant specific rights to information by an insured who is not an owner?*

### "Second or Third Party" Information or Transaction Processing

David raised the issue of allowing a policy owner to authorize a *second or third party* to obtain information or initiate transactions on a policy. I believe this is tied to the above issue and will require a specific legal opinion. But, assuming it can be done and written authorization was required, we could collect the pertinent security information at the same time. To grant such authorization to a second party, we could have a form that is signed by the policy owner with appropriate security information gathered on the second party. The *security file* on the Consumer Complex would have to be capable of maintaining the record of who is authorized apart from the owner and the corresponding security information for the alternate party*(ies)*.

### Multiple 800 Numbers - Identification of Institutional and Other Specific Customers

We have now adopted *800+MET-LIFE* as a general *Corporate* number as opposed to it being a primary service number for ILI and/or other LOB's. We have also made a significant effort to move the ILI service calls away from this number. While there has been strong sentiment that MetLife should move towards a *"single number,"* this continues to be impractical for the short term with respect to trying to direct all calls to one number. While *800+MET-LIFE* does provide easy access for anyone not knowing the specific LOB 800 number, multiple 800 numbers are still the fastest and easiest way to segregate or identify callers. *(This is in the absence of a sophisticated customer file which could identify the caller based on the ANI or through some initial VRU interaction.)*

Neither the ANI or VRU option is likely or practical for ALL MetLife callers in the near future. Consequently, perhaps we should adopt a formal strategy of using multiple *(but minimal)* 800 numbers to identify or segregate specific customer segments. Consideration could be given to providing customers of equity based products with a separate 800 number to call for service. Such calls could be automatically routed to an NASD registered CSR. Such CSRs may have to be trained in both equity based annuity products as well as all life products, but this should be doable.

**CONFIDENTIAL**

In the institutional arena, calls are already largely segregated by 800 numbers. For the time being, this is still going to be the easiest way to identify these customers. But, many of these numbers could probably be consolidated. At the same time, the demographics of some of these institutional customers and the nature of their products are such that VRU applications may be feasible to further identify the callers and/or route their calls.



It was obvious from the Dalbar people that they could not separate information gathering or verification from caller security. If this was their perception, it could be the same with our customers. Although QSS really addresses this issue as well as some of the other points they raised, we are going to take a close look at how our CSRs are handling this on their calls. They should be explaining the need for address and phone verification to make it separate and distinct from any security questions that might be asked.

I would appreciate your thoughts on the idea of a separate *security file* and the concept of security procedures being integrated with *Single Image* based on the transaction or information request. I am also writing to Consulting Services as a starting point to see if we can get definitive legal clarification regarding the privacy issues and the release of information to non-owners. A copy of my memorandum to Ed Rakowski is enclosed.

Aside from this, I'm not sure where we go from here. I suspect this is an issue that will have to be considered by MetLife Express as it applies to all of the Company's call center operations,.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

August 24, 1995

cc       Barbara Gardner, Ralph Jeffrey & Len Miller

CONFIDENTIAL

Page 10

MP401107072

## Transfer of Policyholder Records

A substantial number of our policyholders do not have access to a representative. It is known that there are presently 1,091,000 families in 705 specific zip codes where the business is not currently assigned to an active representative. It is not known if all of these are currently inforce in the proper branch geographically.

It is also known that there are policyholders living in another 600 zip codes where the policies are inforce in abolished sales offices. There is also another percentage of business where it is known that the policies are inforce in the wrong branch geographically.

Both the Company and the customers are losers in this situation. Therefore, the CSR should have the facility to immediately transfer a customer's records in the following situations:

- **The policy records are in an inactive/abolished sales office.** *Single Image* should prompt the CSR if this situation is identified. The policies should then be transferred to the inforce branch nearest the policyholder *(assuming there is one within geographic proximity that can service the customer).*

- **The policyholder records are in multiple branches.** This situation generally occurs in metropolitan areas. If there has been a policy written within the last 10 years and/or the most recent writing agent is still active, all business should be transferred to that office. This is providing it is consistent with what the customer wants. If there is no "writing" agent active, the business should be transferred to the branch office nearest their residence.

- **Policyowner requests their records to be transferred to another office.** We continue to encounter numerous situations where the policyholder requests that there policies be transferred to another office because of a negative experience with an Account Representative, Branch Manager or sales office support staff. Assuming there is another branch within a reasonable distance to provide service, the policy records should be transferred. In most cases, there is not a "writing" representative involved.

- **Policyowner requests their records to be transferred because of a language barrier.** With our targeted marketing efforts in the Asian and Hispanic markets, we sometimes find business inforce in sales offices that can no longer service the customer because they have lost their foreign speaking representatives. Again, this is usually in the larger cities. If this occurs, and it can be determined that another sales office has the capability to deal with these customers in their native language, the business should be transferred. The "writing" representative is obviously no longer active in these situations.

- **The policyholder is reporting a "change of address" and has moved "X" miles from their inforce sales office.** It was determined several years ago that a program called "GEOCODER" could automatically determine for the CSR whether or not someone has moved a given distance such as 150 or 250 miles from their inforce sales office.

**CONFIDENTIAL**

MP401307073

Once this has been determined, the electronic system should tell the CSR whether or not the "writing" representative is active. Or, the CSR could ask the customer if he/she has any objections to their policies being transferred to the nearest branch. If the customer has a strong client relationship with a representative from the inforce branch and still expects that the inforce representative will service them, they will most likely say so. But, in the vast majority of cases this will not be the situation and the business should be transferred.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 15, 1994

CONFIDENTIAL

2

MP401107074

Barbara J. Gardner, ACS
Vice-President
MetLife Customer Service Center - Tulsa

Re   Consumer Education  "Wish List"

Barbara, many of our problems and complaints with customers are due, in part, to their lack of understanding of insurance principles in general and/or the lack of understanding of specific aspects of their policy or transaction.  The problems we are experiencing and are going to face with "AP" *(Accelerated Payment)* cases are a prime example.  Policyholders believe their policies are supposed to be "paid-up" in "X" years.  Or, those currently on AP believe their policies are already paid up.  Many, if not most, of these policyholders do not begin to understand the true concept of AP.  They do not fully realize that premiums are still due on these policies until age 95 or 98 and that the "AP" arrangement is really only a method of using the dividends to pay those policies.  As you know, because of the changing dividend scales, we have continued to experience ongoing complaints because premium payments continue to be required on many of these policies.  And, we face a similar problem with UL policies in that *Target Premiums* are going to be inadequate to maintain some of them.

Now admittedly, this monster was created primarily because of the marketing approach used by some of our Field Force and their own lack of understanding of the implications of this concept.  But, with proper consumer education, we could have greatly reduced the negative impact that we have already experienced as well as that which is going to explode in the future.

A significant percentage of our Field Force does not understand many aspects of the policies they sell or the impact of some of the policy provisions.  For example; some don't understand the complications that can arise from improper or ill-advised beneficiary designations *(minor children)*.  In C/L/D, we encountered many complaints and "reversals" because representatives did not understand or adequately explain to their client the differences between a *Partial Cash Withdrawal* versus a *Loan* on a UL policy.

My point is this; *we are not ever going to be able to fully resolve the problem with our Field Force.*  With the number of new representatives that we appoint each year and the heavy demands of just learning how to sell, it will take these people years to become knowledgeable in all the administrative nuances of our products.  This problem is also compounded by the fact that the level of administrative knowledge or training varies greatly from branch office to branch office.

Many of the problems and complaints we experience would be non-issues had the policyholder thoroughly understood their policy or the administrative aspects associated with various transactions.  The establishment of a Consumer Education department supported through advertising and Teleservices provides MetLife with an opportunity that may be unparalleled in the industry right now.  At the very least, it gives us a definite edge on the competition as well as the opportunity to do a far better job of educating our policyholders, thereby avoiding many of the complaints and misunderstandings in the future.  As we have witnessed, while almost everyone owns a life insurance policy, very few really understand how it works or the many benefits and options that are available to them as a policy owner.

**CONFIDENTIAL**

The best part is that instead of looking at consumer education as an expense, it should be viewed as an *investment as well as a marketing strategy*. If handled properly, many of our consumer education activities could easily be turned into advertising and marketing opportunities. Our Consumer Education effort should not be limited to MetLife policyholders. Instead, we should embark on an effort to educate all consumers. Done well, many non-customers could surely be turned into MetLife clients.

As I see it, there are three different types of opportunities to provide information that will educate our customers as well as promote our products and services. These are:

### STRICTLY METLIFE CONSUMER INFORMATION/EDUCATION

An example would be like one of the examples from Kathy's list such as providing better information on how to read a *Dividend Anniversary Statement* and providing an explanation of terms.

### CONSUMER EDUCATION/PRODUCT PROMOTION & EXPLANATION

An example might be providing information on the differences between a *Whole Life* policy versus *Term* versus *Universal Life*. This could serve to educate both our own policyholders or be offered to non-policyholders. In both cases, it offers opportunity for follow-up contact and potential sale. A similar example would be a generic piece which provides an explanation of how mutual funds work, the various types *(Aggressive Growth, Money Market, Tax-Exempt, Etc.)*, and how they might be used to help an individual meet specific investment objectives.

### SPECIFIC PRODUCT INFORMATION

In this scenario, we may have a more sophisticated customer or current non-customer who understands the concepts, but wants product specific information such as something that describes our various mutual funds and illustrates performance history. Or, something that provides specifics on our annuity, whole life or term products. While some effort would always be made to have this provided through the Career Agency Force, it should be recognized that some percentage of respondents *will not want to talk to a representative for the initial contact*. However, "follow-up" calls should be made to these individuals to see if a Representative can be of assistance once they have had time to review the material.

Having said this, I will attempt to categorize and list some of the types of material we have considered. Also attached is the list which Kathy Schoos prepared for John Abela. We are in agreement with everything on Kathy's list.

CONFIDENTIAL

2

MP401070776

| Pure Consumer Education | |
|---|---|
| **Various Brochures or "Automated Letters" Providing Detailed Explanations of the Impact of Some Policy Transactions** | **Policy Loan** - A detailed explanation as to the impact of taking out a policy loan, effect of unpaid interest, potential termination of policy - tax consequences, etc.<br>**Dividends** - Explanation of Dividend Options, advantages of "Paid-Up" insurance - Potential Tax Consequences<br>**Payments** - Advantages/Disadvantages of various payment arrangements "AP" - Non-Forfeiture Options associated with Lapse & non-payment of premiums. |
| **TAX RELATED Considerations and Consequences Associated with Life Insurance** | There should be a general, but comprehensive booklet, which describes all the various tax issues associated with life insurance. This would include an explanation of the tax deferred status of most policies, those that are classified as "MECs" *(Modified Endowment Contracts)* and their tax implications, the concept of general taxable gain on a policy as well as the taxable implications associated with dividends *(DWI, potential taxable gain from dividends, etc.)*. It could also explain and advise how some of these consequences might be avoided *(i.e., using dividends to purchase paid-up additional insurance as opposed to DWI or cash)*. |
| **General Company History Including Financial Stability** | With people expressing concern or interest in the Company, we should have something in the way of a "PR" piece to send them that tells them about MetLife, a little of its history and traditions, its size in relation to the other companies and its financial stability. |
| **Industry Ratings** | We should be able to send a piece of literature that explains the various organizations rating the insurance industry and how to read the ratings. There should probably be a separate attachment which can be kept current as to MetLife's ratings by these organizations. |
| **Contract Considerations When Purchasing a Life Insurance Policy** | This could explain in plain English the important contract considerations: Rights of the policyowner - explanation and purpose of naming a contingent owner - things to consider when naming a beneficiary *(minor children)* and types of bene designations - explanation of rights and reasons for naming contingent beneficiary(ies). How and when to change ownership or beneficiaries. |
| **Glossary & General Information on Policy Riders and Provisions** | This could include a layman's explanation of what the following riders/provisions are and why you might need or want them: *Disability Waiver, Accidental Death, Accelerated Death Benefit Rider, Paid-Up Additions Rider, AIB, SIB, etc.* |
| **Explanation of Policy Values** | Information on how policies accumulate cash value. Differences between "Guaranteed Cash Value," Dividends, Cash Value of Additional Insurance purchased by Dividends, etc. It could also explain how value information can be accessed and how these values can be used *(income at retirement, etc.)*. |
| **800 Customer Service** | Some type of brochure or "PR" piece is needed that touts the availability of PI Customer Service (800+MET-5000) and provides a list of the information and services that can be obtained. While our number appears on many documents, we don't have anything that makes reference to the services & information available. This same brochure should provide a strong "reminder" to be sure and give us a call whenever the person moves or has an important life event. The same or similar brochure may want to touch on the services available through 800+MET-LIFE. |
| **Replacement** | We have some literature available but we need something more comprehensive. It should be sent in any instance where a CSR perceives the customer may be surrendering their policy or considering replacement. The material should provide the policyholder with a clear and objective explanation of *"churning,"* describe the marketing strategies of some companies with respect to replacement and the "Term Versus Whole Life" argument, and it should cover the many potential benefits associated with policies that have been inforce for awhile such as the growth in guaranteed cash value and possible current dividend performance versus annual premium cost. |

CONFIDENTIAL

3

MP40110707777

## Consumer Education With Advertising/Marketing Related Potential

| | |
|---|---|
| **Whole Life Versus Term Versus UL - ULII** | This was also the first item on Kathy's list. We could offer this via advertising and also have this available for customer inquiries. There continues to be more and more focus on the argument of permanent insurance versus term. A thorough but objective pamphlet or booklet should be available which explains the basic concepts and differences between permanent and term insurance. This could include a long term net cost comparison, concept of a level premium and death benefit, tax deferred savings features, etc. It should also cover the general uses and application of both types of insurance as well as some of the pros and cons and explain why everyone should have a basic program that includes some permanent insurance. Perhaps a separate section could then explain how Universal Life differs from Whole Life as well as the differences with multi-funded Universal Life. While the tone of the booklet should not be to try and "sell" something, it could certainly provide a list of our basic offerings with a bold imprint to call 1+800+MET-LIFE if there are any questions. In some instances it might be appropriate for a CSR or account representative to call the recipient a week or two after the booklet is sent just to see if they have any questions or are interested in speaking with an Account Representative. |
| **Estate Planning** | This could also be offered via advertising to a targeted market or audience. It should also be available to our customer base so it could be sent by the CSR in appropriate situations. It should be an objective booklet or pamphlet on when and why estate planning becomes a serious need. It should outline the primary elements or considerations in general estate planning. It could cover the high cost of dying, the risks associated with improper planning and/or how someone's estate or insurance benefits may not be handled as they anticipated if proper planning was not done. Consideration could be given to including a video, a worksheet or a PC program that would permit the individual to determine the value of their estate. Again, the tone should not be to try and sell anything. However, as an example it could illustrate how our Survivorship Whole Life *(or any life insurance policy)* can be used to address specific estate problems. Again, a call could be made to the recipient to determine if they have any additional questions *(offer booklet on Trusts?)* or if they would like to speak with an Account Representative. |
| **Trusts** | This might go hand in hand with the Estate Planning booklet and could also be offered via advertising or to our customers in the appropriate situations. It should provide *general* information on the various types of trusts and trust agreements and their common usages and purpose. It should cite a few examples as to how life insurance policies are affected and used in conjunction with estate planning. It should also explain how an individual might get a trust established. Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |
| **Planning For The Future** *(Not Just Retirement)* **Family Insurance Needs and Other Considerations** | Most of the younger generation go through life giving very little thought to the future and some of the implications. Part of this brochure should be a "checklist" of things to consider. For example: <br>• The need for a will and the dangers of not having one <br>• Guardianship of children - who gets the kids if both parents were to die <br>• Problems with elderly and/or incapacitated parents - Power of Attorney <br>• The high cost of dying in general - funeral and final expense considerations <br>• Life insurance needs for self - why have insurance on spouse and children? - *(Level premium - protection plus tax deferred savings, etc.)* <br>• Include a list of lifestyle changes that trigger a need for financial review; i.e., having a baby, marriage, divorce, death of spouse, parents, new home, etc. <br>• The odds against collecting retirement from existing or single employer <br>• Property and Casualty needs - Personal liability issues - what else should be covered and for how much? <br>Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |

CONFIDENTIAL

4

MP401107077B

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| Basic Or "Preliminary" Financial Needs Analysis | This could be offered in many ways. However, many people might be interested in doing their own "Basic or Preliminary" Financial Needs Analysis. We could advertise and offer at no cost a simple (but objective) worksheet that highlights some of the key areas and allows an individual to determine on their own some of their areas of need and compare that to their existing program. It should be clearly stated that it is not intended for detailed *needs analysis*, but is only to provide a basic understanding and example of some of the considerations involved. This could be offered free and kept to a reasonable level of expense. We might also consider offering at nominal cost, a videotape that takes a person through the general Financial Needs process. Also, at nominal cost or perhaps free, a PC program diskette that will walk them through a basic Financial Needs Analysis and allow some "modeling" of insurance and/or savings aspects. All of this should be relatively generic, objective, but with strong recommendation that a formal needs analysis be done by a competent professional. Again, whenever this is sent, a follow-up call should be made to determine if we can be of additional service and/or arrange for contact by an Account Representative. |
| Retirement Planning | The detailed Retirement Planning Guide that was recently prepared by Pensions is outstanding but obviously expensive. Perhaps a modified version of that could be made available on a more general basis. Again, a follow-up call should be made. |
| Investment Guide | A general guide to saving and investing could be prepared which outlines some of the reasons as to why this is needed, not only for retirement, but college, home purchase, starting a family, etc. Like the Retirement Guide, it should have savings tables illustrating the amount of savings required to generate money in the future at varying rates of return. It should also cover tax deferred versus non-tax deferred savings issues. It could suggest an initial foundation of life insurance, but should also cover and explain other savings and investment options such as mutual funds and annuities. The booklet could encourage the individual to call us for more specific information on any of the various investment options or vehicles. Again, a follow-up call should be made. |
| Encourage Communication | We should offer or routinely send a sticker or refrigerator magnet that encourages customers to call the 800 number every year to discuss any important life events that may have occurred or questions they might have about their policy or insurance in general. Perhaps this could be sent in the "Welcome to MetLife" letter that will go out from Ted A. The "welcome" letter might also stress the contact and service available through our toll-free number. A major objective here would be the establishment and maintenance of a *permanent ongoing* relationship between the customer and the Company in addition to any relationship that might exist with the representative which, in most cases, *will only be temporary*. |
| Mutual Funds | We are getting more and more questions or opportunities to discuss our Mutual Funds. We should have two separate pieces of literature available. One should be for the first time investor who is interested in learning more about Mutual Funds. This piece should explain how mutual funds work and the various types of funds and their objectives *(aggressive growth, income, money market, etc.)*. We should then have a piece that can be sent to the more sophisticated investor that is familiar with mutual funds, but is interested in the types of funds we have available and their performance history. Again, a follow-up call should be made. |
| Checklists | Offer a variety of *checklists* for *things to consider* when:<br>• Buying a New Home - Homeowners, Mortgage Protection, schools, taxes, etc.<br>• Selling a Home - New paint, selling costs, etc.<br>• You find yourself unemployed (laid off) - Vested Retirement funds & lump sum distributions, COBRA, Unemployment Compensation, Debt/payment modification, etc.<br>• You are starting a small business - Operating capital, insurance, workers comp, etc.<br>• You're going to have a baby - Things you need, how it changes your life, why purchase life insurance, cost of college, etc. |

MP40110707I9


**CONFIDENTIAL**

5

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| Premium/Plan Quotes | We continue to get people calling to ask if we can provide them with an "approximate" quote over the phone as to how much a given amount of insurance might cost. With the increased exposure and advertising of 800 + MET-LIFE, we are likely to get many more *curiosity* calls. While we would always try and refer them to an Account Representative, there is always going to be some percentage of callers that are going to want some preliminary information *before* he or she will be willing to speak with a representative. While we should be able to quote these online *(based on personal data entered into the terminal)*, all verbal quotes should be followed-up by generating a professional looking written quote that would provide approximate premium amounts for basic plans of insurance, both term and permanent. Perhaps only "standard" rates should be quoted and all such quotes should carry a disclaimer to the effect that the premium amount can be influenced either way by underwriting factors as well as optional riders that may be elected for the policy. However, many people have no idea as to what life insurance might cost them and would be open to seeing an Account Representative if we could first provide some basic information. And, in doing so, we might even make the sale easier. Whenever a quote is provided, we could also emphasis the need for a full Financial Needs Analysis. But, the customer would still have a general idea as to the cost of life insurance. |

As I indicated, in addition to all the above, we are in agreement that material should be available on all the items listed in the memo from Kathy Schoos.

Barbara, again, by combining the power of advertising with Consumer Education and our Teleservicing operations, there is tremendous opportunity to make great strides towards achieving our market reach strategies. But, it should also be recognized that while our primary thrust should always be to support these efforts through our Career Agency Force, the reality is that in some geographic areas we are not going to have an Account Representative presence to follow-up on all the marketing opportunities that can be enerated. A fundamental decision must be made as to whether or not we are going to ignore these opportunities or find other methods to seize them. Wherever possible, we need that personal relationship established with a local representative but, as evidenced by some of what has been already been achieved with some policyholders *(Mr. █████ for example)*, it is possible to maintain a close and personal relationship with our policyholders through an effective teleservicing and customer service support organization.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

October 28, 1994

cc Valentino, Porpora, Cross & Schoos

REDACTED CONFIDENTIAL POL INFO

CONFIDENTIAL

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re   Advertising Campaign

Vince, since you didn't get a chance to get back to me I thought I would at least relay a little of what I wanted to tell you. As I understand it, this current advertising campaign was directed by the CMO and/or the Board of Directors. It was intended to be an *"image building"* type of campaign. I thought Bob would like some first hand feedback directly from the *"front line."*

◆   The campaign is working! It is having a very positive impact on the public as well as MetLife policyholders. While we haven't been totally overwhelmed with phone calls, we are getting very favorable response to the ads. Lots of callers are commenting about how great the ads are and the fact that they think what we're doing is great. Some are policyholders and some are not. I have taken some calls myself and have had at least one caller tell me how proud they were to be a MetLife policyholder.

◆   We're not getting calls negative towards MetLife or "crank" calls! I can't speak for Warwick, but the number of calls we have gotten commenting on the negative publicity or that are negative about MetLife in general are negligible. You would think that just showing the number on nationwide television would generate some such calls. However, we can count what we've gotten on one hand.

◆   The Print Ads are also very effective! As of Sunday night, we've had a total of 2,023 formal responses to the ads. *(Some of which have been sales leads.)* Of this, 790 were from the print ads. Warwick's numbers are higher than ours overall because of the difference in population density.

◆   Warwick and Tulsa have gone above and beyond to make this campaign successful. Warwick and Tulsa have gone to exceptional lengths to coordinate this campaign and have people here answering the phone 7 days a week in response to the ads. We have had support and volunteers from throughout the building to help answer our phones at night. The cooperation and communication between Warwick and Tulsa in supporting this campaign has also been outstanding. Kathy and her people have been great to work with.

◆   This has been a very positive experience for CSRs & all employees taking the calls. In recent months the employees and CSRs have been subjected to many negative calls and/or publicity about the Company. The extremely positive nature of these calls and the positive comments about the Company and the commercials has done a lot to make the employees *"feel good"* about MetLife again. This has a very positive impact that is hard to describe or quantify.

In summary, I think this advertising program is doing everything for the Company's image that the CMO might have wanted or expected. I thought Bob might want to pass some of this feedback along personally. At the same time, it wouldn't hurt to note that Warwick and Tulsa *(Personal Insurance)* have worked hard to make it successful.

Whenever you get a chance I'd still like to discuss a couple of issues with you that relate to the Customer Services Task Force and things you were trying to do when the Customer Service Centers reported to you.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 11, 1994

CONFIDENTIAL

Harry P. Kamen
Chairman of the Board and
Chief Executive Officer
AREA 11-E

Re    July Advertising Campaign  - Obtaining Health & Welfare Literature

Dear Mr. Kamen

I sincerely hate to bother you with this but there is no way I can be confident this issue will be addressed if it has to go through the entire chain of command.  I attempted to contact Polly Wittenberg in her new Customer Service responsibilities but I understand she is out of the office for the week.

As I have tried to convey through channels, I believe our current advertising program is definitely having the desired effect in terms of our image building efforts.  The response is consistent with projections and the calls and comments we are receiving are extremely positive.  I personally believe that our advertising has to be making a very favorable impression on a substantial portion of the viewing public that is not calling.  It has also been an uplifting experience for our employees and Customer Service Reps taking the calls to hear such positive comments about our great Company.

Now, for the problem.  As you know, our current advertising program is offering, free to the public, a variety of health and safety literature.  At the beginning of this project, we were told that we would supply virtually any quantity requested.  As you might suspect, the advertising has generated requests from schools, professionals and other organizations for significant quantities of our literature.  As of today, we were advised by Health and Safety Education (*both directly and through Corporate Advertising*) that the maximum number of pamphlets we could send is 5 or 10.

Now, let me backtrack a little.  In the past, if someone called 800+MET-LIFE and requested health and safety literature, our instructions from Health and Safety Education were that we must tell them *to submit their request to them in writing*.  Naturally, our current advertising changes that.  In addition, as evidenced by a copy of the attached pages from the *"Stress"* brochure, we are informing these same callers that additional literature is available . . . . upon writing.

We believe it should also be available by phone.  Accordingly, I attempted to have one of my employees contact Health & Safety Education to see if they would honor a verbal request that comes through 800+MET-LIFE for this other literature rather than require that the request be submitted in writing by the caller.  As outlined in the attached memorandum from my employee, Health & Safety Education is still going to insist on a written request.

Mr. Kamen, this is totally counter-productive to all the image building we're trying to do through our advertising.  Why should a caller *(and customer or prospective customer)* be told they can obtain one booklet by calling 800+MET-LIFE, but if they want the publication on *Preventing Backache*, they will have to write?  This makes no sense.  This campaign is great I believe it's helping immensely to restore the image of MetLife to the great Company that it is.  Please, let's not spoil it by failing to have the entire organization on board.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 13, 1994

CONFIDENTIAL

MP401107073

A. R. De Rosa
Vice-President
Communication Services
External Relations - AREA 12-U

Re   Tulsa Results - USA Today Advertising

Al, Barbara Gardner asked that I send you the results of our experience with the USA today advertisement. Those results and a copy of the specific call records are enclosed. While my initial reaction is to be a little disappointed with the numbers, I think we have to consider that there was really nothing in the ad that would particularly "incite" people to call. And, the number was just in the text rather than being a dominant part of the ad. But, the fact that some people did call expressing an interest in purchasing insurance is encouraging. It will be interesting to compare this experience with our three city campaign in June since those ads will add a "hook" in the form of the free booklets.

I believe that using our advertising in concert with Teleservicing and the 800+MET-LIFE number offers some tremendous potential for the Company. As with our July campaign, this combination could be a particularly effective tool for *"image building."*

Just some food for thought. It is very clear that while almost every person owns some life insurance, *very few understand even the basics of their contract.* One of my long standing ideas for both image building and potential revenue generation is the idea that (800) MetLife would answer "general" questions for non-policyholders. In other words, we could run *(probably print)* advertisements which state something along the lines of:

---

*Do you own a life insurance policy?*
*Did you name a CONTINGENT owner and beneficiary?*
*If you would like to know why this is important, call 1+800+METLIFE.*
*We'll be happy to explain this, EVEN IF YOU DON'T OWN A MetLife POLICY.*

At MetLife, we believe the purchase of life insurance is one of the best decisions you can make. But, to realize its full benefits, you need to understand some of these issues relating to your policy. If you have a general question about life insurance or a life insurance contract, give us a call. We'll do our best to answer it. Or, we'll point you in the right direction. The more you understand about your life insurance policy, the more you will realize what a valuable asset it is. Give us a call, THERE'S NO OBLIGATION.

### 1+800+METLIFE   (1+800+638-5433)

---

Naturally, we would have to be very careful and direct people back to their own company or representative if the question was policy specific. But, I believe there is a very substantial percentage of the population that would love to be able to ask some general insurance related questions but won't call up and ask a representative for fear of being pressured to buy something. This very non-threatening approach could go a long way towards building a *"trust"* relationship with these callers and I am convinced that some significant number could be turned into future clients. On many calls it would probably not be a hard transition to get them to see one of OUR representatives immediately.

**CONFIDENTIAL**

This is just a thought, but it would certainly be some great "PR" for the Company as well as a potential source for generating new customers.


J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

May 23, 1994

cc    Barbara Gardner

CONFIDENTIAL

MP4011070784

Frank P. Lynch
Senior Vice-President
Customer Services

Re    Loan Interest Only Bills. - "Systems Glitches"

Frank, it seems to me that over the past several months we have been encountering an alarming number of systems glitches that create work for us and ultimately impact our customers. The most recent deals with our failure to send Loan Interest Notices on paid-up policies. But, this is only one of many as evidenced by the enclosed material. In some cases we are able to determine the extent of the problem and in others we're not.

For the record, I would like to cite the kinds of problems we'll run into as a result of this particular one. According to the attached, loan interest notices are not being produced for some paid-up policies. With the Account to Notice transfer, we had the reverse. It's a long story, but the bottom line was the fact that we had customers receiving loan interest notices *after years of NOT receiving them.*

Our exposure in both of these situations is the complaint from the customer when a loan interest notice is ultiamtely received as to why they should have to pay loan interest that was never billed and has now been added to their outstanding loan. Naturally, many claim *(and some justifiably so)* that if they had received the notice, they would have paid it. And, some EXPECT that the loan interest should be waived if it was never billed *(or they failed to receive a bill).*

Included in this situation is the fact that at any point in time, we have any number of policyholders who allege that they did not receive past loan interest bills. Based on our experience, we are certainly not comfortable trying to assure them that one was sent. We can verify the current address, etc., *but we cannot say with any certainty whether they were or were not sent a billing notice.* We have had far too many problems in this area. This is especially true on the *Account to Notice* paid-up policies because the Account loan interest billing was getting its address from a separate source prior to their becoming Notice business.

Our solution to some of these cases has been to treat each one separately and try and resolve them fairly and equitably with the customer. In doing so, we have written off or waived interest amounts. But, my concerns are the fact that the number of problems appears to be increasing and I don't think anyone understands the amount of time and effort that goes into coping with and/or resolving some of these problems. In some cases, the impact of the problem isn't realized for years.

Another example of one that could haunt us for years is the incorrect *Non-Forfeiture* statements. This stated an incorrect amount of insurance for several months. When the error was found, we could only send corrected letters for some of the cases. I assure you, at some point we will have people calling us and questioning the amount of insurance when the next statement is received or perhaps challenging the death benefit years from now when the amount paid is not equal to the incorrect letter they have in their possession.

CONFIDENTIAL

MP40110770785

Frank, my point is this; Dealing with the consequences of some of these problems can be a time consuming process, particularly if we attempt to do it right and respond appropriately to our customers (or at all). Other than the Teleservicing customer survey, none of our Benchmarking numbers take correspondence or 800 phone referrals into consideration. Having to deal with correspondence or complaints as a result of numerous systems errors only exacerbates the difficulty we are already experiencing in trying to keep up with the "non-benchmarked" work.

As was done in the past by virtually all offices, *we can always improve our "numbers" at the expense of service*. If we don't attempt to quantify these "non-measured" areas and ascribe some level of quality standards, then we will be bound to repeat our history. If there is no measurement or emphasis on these areas while we simultaneously place heavy emphasis and focus on the Benchmarking Reports, *you will get what you measure* – which will be great "numbers" performance but service which is far from "world class." The mess the Company and most other offices got into with suspense accounts was great testimony to what happens when senior management focuses primarily on the numbers (*production reports and budget*) instead of the customer and the true level and quality of work being performed or service being delivered (*or not being delivered*).

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

May 16, 1994

cc   Gardner & Gelman

CONFIDENTIAL

2

MF011070786



Barbara J. Gardner
Vice-President
MetLife Customer Service Center - Tulsa

Re   Organization Recommendation

In 1987, Teleservices and C/L/D were combined into one division because of the obvious interrelationship between the two. At the time, it was determined that approximately 50% of the Teleservices transactions involved cash, loan or dividend related issues. While this is still true, it is a deceiving number. About 25% of the transactions recorded on TMOS are "generic" and/or don't have a specific division affiliation (i.e., *Change of Address, Group Inquiry, Address/Phone Number Verifications, etc.*). Consequently, if you look at the C/L/D transactions in relationship to those specifically associated *with other Service Center divisions*, the C/L/D transactions outnumber them about 2 to 1.

Placing C/L/D under the same management as Teleservices brought about very distinct changes in both operations. A real synergy was developed with the two organizations. This synergy and working relationship *could not have happened* if the two areas reported separately. Over the years and throughout the reorganization and work transfer, we have continued to improve and build upon the synergy between the two operations. And, the end result is that the *customers* have benefitted significantly by having the C/L/D organization closely tied to Teleservices.

The reorganization and work transfer from the other offices brought with it many other opportunities for both C/L/D and Teleservices. Dealing with the customers was much easier for the CSR because now *ALL* the C/L/D work is done in this office. For C/L/D, the work transfer provided such dramatic growth that it was possible to change the entire *culture* of the operation. C/L/D was able to totally break its bonds and mentality with the past and objectively examine new ways of doing things. We were able to develop a new culture centered around the customer and more meaningful quality issues.

The CSRs developed respect for the support given "behind the scenes" by C/L/D. C/L/D also developed a new respect for the CSRs. The employees no longer *"picked"* at each other's area to find only fault. Instead, they worked together to improve the quality and performance of both areas. The development of the *Correspondent/CSR* position also helped both areas to develop a much greater respect and understanding of the work performed by each other. The supervisory cooperation within and between C/L/D and Teleservices in addressing mutual concerns and issues is unparalleled in the history of this office. In addition, C/L/D derived many other benefits as a result of all the training and support that the combined operation was able to deliver.

In the process, we created a totally new *"customer awareness"* within C/L/D which has shaped the priorities and procedures for the division. Long term, we saw the *Correspondent/CSR* position as being a partial solution to *Managing to Service Level*. Part of the answer to the *Service Level* issue will be in having some portion of the workforce that can be quickly and easily shifted from another operation as dictated by call volume fluctuation.

CONFIDENTIAL

MP401107O787

I am extremely proud of what has been accomplished with the merger and growth of Teleservices and C/L/D in spite of the fact that there has been little recognition or reward for it. In the early days, managing both operations was a reasonable challenge. Teleservices was fairly small and there were only thirty some employees in C/L/D. It was possible to devote a great deal of time to addressing the mutual needs and issues of both areas. However, as Teleservices and C/L/D expanded, managing both areas became an exceptional challenge. But, it was a good and exciting one. During the first couple of years after the work transfer began, I was able to devote significant amounts of my time to C/L/D. At that time, Teleservices was relatively stable and quiet compared to today's environment. And, at that time the need and focus in C/L/D was to deal with the relatively "large scale" issues associated with the rapid employee growth and work transfer.

However, a little over a year ago, things began to change. On the C/L/D side, many of the "large scale" problems were either resolved or were being adequately addressed. We then began to be confronted with a multitude of smaller, more complex and more management intensive systems and operational issues, both internally and externally. On the Teleservicing side, we were beginning to experience dramatic growth in call volume while trying to deal with the age old staffing issues. This was all in the midst of trying to launch or promote several initiatives in Teleservices, not the least of which were *sales opportunities*, *Single Image*, the Corporate 800 number, and the total and complete revision of our training material to our new "modules." And, during the course of the year as we struggled with our staffing, we conducted back to back selection and training of new CSRs while being required to deal with such things as ELNY and the impact of the Florida situation and its associated publicity.

In the latter part of 1992, it became apparent to me that something had to change. I was no longer capable of managing at the level to which I was accustomed. It was virtually impossible for me to keep pace with all the management needs in the division while attempting to deal with the many *higher level* issues that were continuing to surface. Consequently, in late 1992 I met with the respective supervisors on each side of the house. I advised them that I was assigning more responsibility to Darlene and Jerri for overseeing many aspects of the day to day operation. While I did not establish a formal reporting relationship to Jerri and Darlene, their responsibilities were essentially defined as control or involvement in anything that "crossed <u>unit</u> lines." Issues crossing between Teleservices and C/L/D were to be resolved by Jerri and Darlene as opposed to having the individual supervisors try and deal with them. At the same time, all supervisors still had full access to me to deal with anything within their unit. Jerri and Darlene dealt with me on the "cross unit" issues. Or, as needed, I would meet with Jerri and/or Darlene and the involved supervisor(s) to discuss and resolve any issue where there was a question or concern about the course of action to be taken.

On the Teleservicing side, almost every work related issue crosses unit lines because the units are parallel. In C/L/D, the supervisors still had full latitude and control over the work issues that went on within their unit. However, if it affected another unit in any way, it was to be discussed with Darlene. As with Jerri in Teleservices, Darlene had the responsibility to examine these issues from the *"total organization"* perspective in an effort to see that everything was addressed in the most logical and efficient manner for the division rather than just a given unit. Throughout 1993, I continued to delegate more and more direct management responsibility and accountability to Jerri and Darlene. While I continued to keep my *"finger in the pie,"* I gradually relinquished more and more of the day to day management responsibility to them because my time was continuing to be consumed by the larger division issues.

CONFIDENTIAL

2

For the most part, this has worked well, particularly on the Teleservicing side. In spite of the extreme demands being placed on the training and support staff, Jerri continued to deal very effectively *(considering the constraints and available resources)* with the multitude of issues that have arisen. The new training and reference modules, QSS, progress on *Single Image*, and the restructuring of the CSR supervisors responsibilities, which she has managed almost single handedly, are testimony to what she was able to accomplish. In addition, significant progress has been made in many other areas of Teleservices.

On the C/L/D side, the picture is less clear. Because of the size of the operation and the scope of its functions and activities, it is much harder to realize the same degree of progress. There are so many different issues involved that the individual successes are much smaller in scope compared to Teleservices. In 1993 I still devoted significant attention to C/L/D and Darlene has worked tirelessly with the other supervisors to address the issues. She was given some limited resources but she was also maintaining significant ongoing day to day responsibilities. In the end, while very substantial progress has been made in C/L/D, it still seems as though for every issue that gets resolved there are three more to take its place.

As we approached year end 1993 and particularly the last few months, it became apparent to me that even with the responsibilities I've delegated, something still has to give. The C/L/D managerial issues are not likely to diminish. In fact, we are reaching the level where there aren't easy answers and resolution will be more management and time intensive. Given adequate resources and dedicated managerial time and attention, I remain convinced that significant productivity, quality and work improvements can be achieved in C/L/D. But, in the present environment, neither Darlene nor I are capable of providing the amount of dedicated time and effort required to adequately address all the needs.

At the same time, the Teleservices related issues are continuing to explode all around us. The successful implementation of QSS and *Sales Opportunity* generation, the success of Corporate 800 number projects, continued development of *Single Image*, progress towards *Managing to Service Level*, all the training and support activities in maintaining our modules and in dealing with the impact of the publicity and all the related issues and special projects *(such as the upcoming UL programs)* will all pose major challenges for 1994 and beyond. These are going to require significant amounts of managerial time and effort at several levels of the organization.

So, *where do we go from here?* Logically, the initial approach might be to make C/L/D a stand alone division. Certainly its size, issues and complexity would all justify this. Because of the interrelationship of all the work in C/L/D, it makes no sense to separate the pieces as was done in Warwick. But, if C/L/D is separated from Teleservices, the price to be paid should be fully recognized. First of all, in spite of the best managerial efforts, much of the synergy, cooperative spirit and customer focus would be lost. As a stand alone division, it will take on a new life of its own with different managerial focus and priorities.

Over time, it is bound to lose much of its understanding and working relationship with Teleservices. The customer feedback and events in Teleservices have shaped much of the *(positive)* direction for C/L/D. Another manager not directly involved or exposed to the Teleservicing side is unlikely to have the same degree of awareness. It will develop its own set of priorities which can not adequately recognize the Teleservicing implications. This will be no reflection on the management, but just a pure organizational fact which has been demonstrated time and time again. Without the single reporting relationship, there will be no real forces at work that *"require"* that the two areas fully support each other in the manner in which they do today.

CONFIDENTIAL

3

In addition, the whole concept of the *Correspondent/CSR* is likely to be lost. Under separate and distinct management direction, the practicality of moving C/L/D Correspondents to and from Teleservices becomes impossible, or extremely difficult at best. A separate manager with no responsibility for Teleservices will not be inclined to "release" *Correspondent/CSRs* to help out with call volume at the drop of a hat when it is needed. I suspect this is why they left the Correspondence function with Kathy Schoos. But, in the long run, this is also no solution as the Correspondents are losing their working relationship with the rest of C/L/D. The work of the Correspondents may be primarily focused on the customer, but it still requires strong support from the entire C/L/D organization if the work and customer issues and problems are going to be adequately addressed. If these functions are in separate divisions, the synergy from within C/L/D as well as the requirement that they work together is lost.

There is no easy solution. However, if the synergy is to be maintained between C/L/D and Teleservices, the only way this will work is if both C/L/D and Teleservices continue to report to one single person with overall responsibility. At the same time, both areas need competent, full-time managers to oversee these operations on a day to day basis. Having both of these managers report to one entity responsible for maintaining the synergy and enhanced customer service would be an ideal solution. Teleservices is struggling with many issues at the operating level which require single and uniform management direction. At the same time, Teleservices is dealing with a multitude of external managerial issues which require substantial time, effort and energy at the Director level. Some of these must also be implemented and managed on a day to day basis. C/L/D, on the other hand, continues to struggle with a lot of *"nuts and bolts"* type issues that must be viewed and addressed among or across all units. Again, this requires intense day to day management of these activities.

It is unrealistic to believe that, in our present environment, one individual can effectively manage an operation of 200+ people, particularly with the many major issues that are confronting us. This is in spite of the amount of responsibility I have already been able to delegate. If there is going to be any attempt to maintain what has been accomplished, I would recommend that we create two separate manager positions for Teleservices and C/L/D with both reporting to me as Director. If this were done, the synergy and working relationship between the two areas could be maintained through the single point of leadership.

While C/L/D is a major operation by itself, if other organization changes are being considered, thought might be given to combining Beneficiary and Assignment with C/L/D. Beneficiary and owner change is more of an ongoing customer service transaction as opposed to the settlement aspects of a claim. Beneficiary and owner changes or inquiries represent 14.1% of the answered calls in Teleservices. In addition, ownership questions are becoming and increasing issue for C/L/D. While this would significantly add to the management challenge, it would create a single organization that is capable of being responsive to the vast majority of *customer service needs* and transactions. Claims would be a notable exception, but this is a very different transaction from those required to meet the customers' ongoing service expectations.

If this were done, C/L/D would represent an extremely difficult Managerial and Directorial challenge. But, it would also offer the potential to further capitalize on the strengths and benefits that have already been achieved by the merger of Teleservices and C/L/D. It would also permit even greater synergies with respect to meeting the needs and expectations of the customers. Having the separate managers report to one director would ensure that the overall customer focus is maintained while greatly facilitating the managerial cooperation required to maximize organizational and operating efficiencies.

CONFIDENTIAL

MP40110707090

4

MP401107091

I have not given a great deal of thought to the balance of the organization but I am sure other opportunities exist to improve the level of customer focus and service. A similar approach of having the balance of the managers and operating units *(with the exception of Human Resources and perhaps Consumer Relations)* report to one individual may have potential to achieve similar benefits. It would offer the opportunity to achieve the synergies available throughout the rest of the organization. And, if procedural or organizational issues develop between divisions which cannot be resolved by the supervisors or managers, the two Directors could work together to determine the best overall customer solution.

Barbara, it is my belief that more consolidation of responsibility would be far better for the organization and the customer. It is, however, more difficult and challenging from a managerial aspect if we are, in fact, going to strive to achieve all the benefits that are possible. The alternative is to further segregate the organization and the responsibilities. If this is done, it could make some of the respective management challenges easier. But, each manager will be primarily concerned with his or her own area of responsibility versus what has currently happened in Customer Services where every supervisor has to be concerned with <u>ALL</u> areas of the organization.

However, if you are inclined to favor an approach that is going to further segregate responsibilities, *I would urge that C/L/D be maintained as a total organization.* The work and associated issues are so closely interrelated that any attempt to split C/L/D on a functional basis will result in a deterioration of our ability to respond to the customers' needs as well as the needs of the total organization itself. Furthermore, if the approach will be to have C/L/D report independently from Customer Services, I would encourage you to make this happen as quickly as possible. C/L/D is in need of more direct managerial attention than can be provided under the constraints of the existing organization.

Whether C/L/D is maintained as part of Customer Services and Communications or not, I would also recommend that a formal manager's position be established in Teleservices which reports to me as Director. We now have three CSR units with a fourth on the horizon. Because of the growth, we have dramatically changed the role of the supervisory position. It is now much more focused directly on the CSR. To a large degree, the supervisors are responsible for a much higher level of coaching and communication with the CSRs, particularly as it relates to the implementation of QSS, *sales opportunities* and generally making the CSRs more aware of the "management perspectives" that are driving these changes. Seeing that this is effectively carried out in a reasonably consistent manner will require a much more intense level of direct management attention with the supervisors. Another level of management is required to directly control and oversee these areas on a day to day basis.

In addition, it is not known what will happen to the organization with the advent of the Corporate 800 number. At the very least, it will represent additional management challenge that cannot be met through a single Director, particularly as we continue to deal with more "Corporate" level issues. While I have already delegated substantial managerial responsibility to Jerri *(and Darlene)*, this should be recognized both formally and organizationally. *(Although she was never formally given a manager's title, this is essentially the position that was created for Joyce Long in Warwick.)* Teleservices also needs to be permitted to further develop the support organization that is going to be required to meet the challenges that it faces. The telecommunications and traffic management functions should be formalized and a couple of Business Analyst positions should be added. *(C/L/D also needs to formalize a support organization but it could be done without adding to the total staff).*

**CONFIDENTIAL**



Barbara, these are my thoughts as it relates to my area of responsibility. I would welcome the opportunity to discuss these in greater detail with yourself and/or Howard Mase.


J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

February 11, 1994

MP4011070792

CONFIDENTIAL

6

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re   CACS - Centralized Change of Address System

Vince, we have been struggling with our address problem for many years. In doing so, there are several issues that need to be recognized.  These are:

➔   **Our failure to keep addresses current is primarily the result of a management problem _ NOT a systems problem**

As a Company, we have been exposed to the new addresses of our customers in various ways.  Very often they were not received in the form of a formal "change of address."  Instead, new address information was frequently received as a part of other transactions such as in Check-O-Matic with bank changes, in Payment Processing with reinstatements or other non-payment activity, in B&A with beneficiary or owner changes, in C/UD with payment or service requests, or in many other areas of the operation.

But, because of all the former emphasis on *productivity reports and measurements,* anything that wasn't received as a formal "notification" or request and didn't contribute directly to the *Productivity Report* frequently went undone.  Consequently, even though we were aware of a new address, *we didn't change it* and eventually it was lost. We primarily only changed those where the policyholder *formally* requested us to do it. To some degree, this same problem is existent today.  That's why the files are in the shape they're in.  And, a new system is not going to solve this problem.

➔   **There are TWO separate issues  - These are:**

➊   "Cleaning up" our current files to try and correct or obtain better addresses

➋   Making certain that we seize every opportunity to verify, correct and/or change addresses in the future

As you know, this issue has been kicking around for the best part of two years.  Jerri McCraw was recently invited to a meeting of the CACS Natural Work Team.  Her comments and concerns as a result of that meeting are attached (*I have highlighted the most pertinent statements*).  I recognize the potential advantages of having a centralized address file.  And, while there are sound business reasons to do this, I don't think another system is going to solve all the problems associated with our bad addresses. *It could, in fact, exacerbate the problem if the system makes it more difficult to execute address changes/corrections than do our current systems.*  Based on Jerri's comments, this appears to be a very legitimate concern.

CONFIDENTIAL

MP4011070793

Vince, while the users have been provided input into the development of this system, it appears to me that once again it is a project that is being heavily driven from the top down rather than from the user up. There also seems to be some expectation that this system will be the panacea for all our address ills. This system does not make the management and procedural issues go away. **Unchanged addresses are still primarily a management problem versus a systems problem.** We need to redesign our forms and procedures to consistently verify and/or correct address information at every possible opportunity. We also need to ensure that our administrative management is given the resources to carry out this responsibility and that our *"benchmarking"* *measurements* take this kind of peripheral activity into consideration.

We need to set up the Address Correction Units to deal with our EXISTING bad addresses. But, maintaining correct addresses in the future will still have to be EVERYONE'S responsibility. At the same time, we must make carrying out this responsibility easier _ not harder.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 23, 1993

cc    Gardner & Chez    (No Attachment)
      Kelly & O'Connor   (Attachment)

**CONFIDENTIAL**

2



MP401107079S

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re   Extended Hours For Teleservices

Vince, I was just about to leave for the long weekend and a week's vacation when I heard about the memo written to John and Barbara. It certainly put a damper on my holiday.

I know you don't want to hear it, but what you are asking is far more complex than just letting Warwick handle all the calls in the morning and letting me handle them in the evening. All of this sounds nice and easy for those who don't have to manage our call centers day in and day out. This is the type of thing Kathy and I kept hearing before from those who have no idea of what's involved and didn't want to know. You seemed to be listening. That is why we attempted to address this issue at the at the Strategic Planning Board and Kathy put all the work into her memo on this subject.

As for the VRU, it's ludicrous. We've debated it for five years and no VRU exists that can "add value," handle our "general" 800+MET-LIFE calls, or satisfy the security issues. And, it's certainly not something our customers want. It will alienate far more than it might assist.

Vince, to say I am disappointed is an understatement. While I recognize this may be coming from higher authority, it is certainly not being driven by our customers, their needs, or your front line management. We are having great difficulty getting and keeping enough staff to run and develop these operations under normal hours and conditions. Giving us unnecessary major management challenges which have little or no value in terms of the benefits gained versus the problems they create, is not something we need with everything else we're trying to do. Particularly when we don't have the basic power and authority to solve our existing day to day staffing problems. As you know, I will work my fanny off to make Teleservices better and give our customers better service. But, making me work just to deal with the unnecessary problems of our own creation is beyond reason and only hampers progress on the real issues.

It's obvious that there are people around who will carry out whatever the Company wishes no matter whether it makes sense or not, who care not whether it is good for the Company and/or the customers, and who will never offer a peep of opposition or disagreement. Try as I might, I just can't seem to do that. I would like to think I have tried to represent the interests of both the customer and the Company. But if we're going to continue to get mandates without dialogue, then I guess I will have to devote my effort and energy to those mandates rather than trying to make the Personal Insurance Customer Service operation truly different for the Company and the customer. It appears that, no matter what, it just going to be more politics and personal agendas.

For what it's worth, attached is some additional material on this whole subject which you may or may not have seen.


J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

July 2, 1993

CONFIDENTIAL

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re    Customer Confusion

Vince, here is one customer's perspective on the confusion that is often created by having correspondence related to premium payments come from Johnstown while another office is involved in trying to handle the actual service transaction.  This situation and customer confusion will only be compounded if Johnstown is permitted to handle the other transactions being requested by Russ Gramlich.

We still really need to define what transactions are "post issue" and should be handled by the Customer Service Centers and which should be handled by the New Business Centers.  This is extremely muddy and differs by office.  Our own New Business Sales Support is handling many transactions that rightfully belong to the Customer Service Center *(and are now handled that way in Warwick)*.  Consequently, we have confused not only our policyholders, but our sales offices and Account Representatives.

And, you might also note that this policyholder now lives in Illinois but his policies are inforce in a sales office in Maine.  His policy is over 30 years old.  We did not do a change of address so he has obviously lived there awhile.  But, this may also be influencing his perception of our service since no local office is responsible for his business.

J. C. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center • Tulsa

May 28, 1993

cc    Barbara Gardner

← TO : *Jim —*
*Please call me on this*

CONFIDENTIAL

MET00110796

CONFIDENTIAL

REDACTED CONFIDENTIAL POL
INFO

MP401107097



TM0537          062793      Suff First Name      BASE 01 RETRIEVAL      CEHO TS      CAPRON, TANNY
Policy                                    Last Name              Trans Codes   Ltr R Date
BOI            A                                                 Pf1 ST1 MO1 CPL      N

Campaign: LIF1 Source: RBT
Caller Name..: First:                    Last:                          TNotes: N
Relationship/Status: 0 C/O:                                             XNotes: Y
Street:                         State:        Suppress Notification?: N (Y/N)
City.:                                   Zipcode:                DO/BR: E42 R31
Phone.:                         Alt Phone:     HARVARD DR MA           NEHO
Sex...: F (M/F)            Alt Ext:            617 860 5056
Notes: RECORDED: CALLER FEELS THAT METLIFE'S ENTIRE CUSTOMER SERVICE SYSTEM
IS BUREAUCRATIC & NOT CUSTOMER ORIENTED. CALLER STATED HE REC'D A LTR FROM
CEHO-CHANGE UNIT DATED 5/20/93 STATED WE ARE CLOSING HIS FILE DUE TO NOT
HAVING REC'D A RESPONSE FROM HIM. CALLER THEN REC'D A LTR FROM MCAO-FES
DATED 5/25/93 STATING THAT WE HAVE WAIVED THE REIN REQUIREMENT & APPLIED
$154.28 WE HAD PREVIOUSLY BEEN HOLDING. THE LTR WENT ON TO STATE THAT WE
ARE STILL HOLDING AN ADD'L $143.45 & GAVE HIM THE CHOICE OF DOING 1 OF
2 THINGS: 1/ SENDING IN ADD'L $54.45 TO USE IN CONJUNCTION W/THE $143 TO
PAY THE 1/93 ANN PREM OF $297.45; OR 2) WE WILL REFUND THE $143. CALLER
STATED HE WOULD SEND IN $154.45. CALLER STATED THE LTR WENT ON TO SAY THAT
THE OTHER INQUIRIES CONTAINED IN THE LTR HE SENT TO MCAO WOULD BE FORWARDED
TO CEHO FOR HANDLING. CALLER WAS VERY UPSET BY THIS. STATED WE SHOULD HAVE 1
OFC THAT CAN HANDLE EVERYTHING. ASKED CALLER THE NATURE OF HIS INQUIRIES.
OFFERED TO TRY & ANSWER HIS QUESTIONS OR SEND REFERRAL TO THE UNIT(S) THAT
COULD ANSWER. CALLER STATED HE DID NOT WANT MY HELP & IF HE HAD QUESTIONS
IN THE FUTURE, HE WOULD CALL OR WRITE TO HARRY KAMEN, CEO.

Select:    1-Erase 2-ENotes 3-ESlaf 4-ERef 5-CTNotes 8-Index 7-Keys

MP401107079B

Frank P. Lynch
Senior Vice-President
Customer Services

Re    Meeting in Tulsa

Dear Frank

I believe you were somewhat disappointed in the tone of our recent meeting and I regret the
apparent impression it created. In hindsight, I understand your reaction, but I don't want to leave
things on that note. At the same time, I would ask that you try and understand some of the
forces that are at work in our environment today. And, some of what you encountered was
symptomatic of the effect these forces are having on us as well as other issues which were never
really discussed.

The Tulsa management team has a long standing reputation of being a very vocal group. This has
worked for us at times but it has also worked against us. It has surfaced many times that Tulsa
has a *reputation,* which has been both good and bad depending on who was talking.    As a
management group, we were seldom content with the status quo or the pace at which many
issues were addressed. But, we never expected more from others than what we were willing
to give ourselves.

On a more personal level, I have probably been the loudest and most tenacious voice in Tulsa.
I recognize that my tendency to openly express my feelings and opinions has oftentimes given
people the wrong impression or given me a negative *label.* But, I have operated on two
principles. The first is to do any job to the very best of my ability. Secondly, in doing so, I felt
I was then entitled to express my opinion and seek changes and improvement. While I also
recognize that I'm not always right, I am secure in knowing that my motivation has always been
in what I truly believed to be in the best interests of the Company rather than any personal gain.

Frank, I say this not to be critical, but as a pure statement of fact. I don't think that anyone who
is not directly involved in the *first line management* of our administrative operations can
begin to comprehend the changes and complexities that have been introduced to these
responsibilities over the past few years. Back in the days when FES was just starting and evolving,
I thought it was a real challenge and hard work, and by the standards of those days, it was.
However, the environment today and what I confront on a daily basis makes that effort a *stroll
in the park.* The same is true for the first line supervisors.



**CONFIDENTIAL**

MPA01107O799

It is also obvious that the Company's expectations have changed with respect to customer service. Hearing this new emphasis on customer service right from the top at the CMO tour was very gratifying. But, if you stop and think about, you should also realize that no one is defining just what that means in terms of changes in the day to day operation at this level of the organization. It is the first line managers and supervisors who will define it and make those changes. At the same time, I don't think those removed even one level above the operation recognize the differences that have already taken place with respect to our customers' expectations. Consequently, I don't know that anyone really understands what it takes by the "front line" organization to meet these customer service goals and ideals.

We currently deal with individual policyholders and situations in a way that was incomprehensible just a few years ago. Our people are doing a great job of learning to look at things from the customers' perspective and trying to satisfy them. In many cases, this means much more work than what we did in the past. It is an immense challenge and I assure you, the customers' expectations are increasing every day because of the emphasis on customer service throughout the business world. Customers are demanding more than ever and expect to be satisfied. We have customers "demanding" that we Federal Express checks to them all the time now. Just a few short years ago, that thought never occurred to them.

Frank, if what you heard only sounded like griping and moaning, then I sincerely apologize. But, I know there was some of that in there. Just as our customers' expectations are changing, so are management's. Front line management must be more responsive than ever if we're going to satisfy our customers or even begin to "exceed expectations." For us to be responsive, then those we rely on for our support must also be responsive. Some areas of our Company have made a real effort to understand our needs and are extremely responsive, i.e., Hodel's organization and almost everyone in Scranton. But, some others are making very little effort to understand our real needs and are content to "do their own thing." This clearly generates frustration on our part.

Most, if not all, of what you witnessed is also the product of the increasing pressures, stress and frustration that is occurring at our level of the organization. In part, it was vented on you because we perceive a pronounced lack of support and leadership from our own Officer in attempting to deal with these work issues. Our agendas are usually miles apart and there is little understanding of what is really involved in our doing our job. Consequently, we must either admit defeat and accept the unacceptable or fight our own battles. And, as evidenced, doing this gets us labeled as having an "attitude."

Frank, you might ask some of the electronics people just how much of their change and progress has been the product of input from this office. And also what they think of the quality of the information and support we provide. We're vocal, but I am willing to bet we have consistently driven more positive change, which has moved the Company forward, than any other office. Unfortunately, in today's times, it is not enough as some system issues remain unresolved that have been on the table for years.

**CONFIDENTIAL**

Frank, consider the message I am being sent after 31 years, 20 of which have been in management positions in this office. I personally believe I have precipitated more changes and progress than any other administrative manager/director in Personal Insurance. But, it has only been through extreme persistence and my willingness to wage a *paper war* and keep writing to try and get things done. And, at various times I have paid a price in many different ways for my openness and candor. But, nonetheless, I got some things done that would not have otherwise been accomplished.

As a manager within Personal Insurance, I also suspect I have had more exposure to customers and customer feedback than any other single person. We have answered more calls, and dealt with more customers than anybody in the last five years. Yet, after 31 years, am I treated as a competent manager or as a potential resource in our quest for improving customer service? I think not. Most of the input and feedback I provide is unsolicited. At every turn, we are being told to *Listen to and Empower our Employees.* And, I personally believe this is the key to achieving our quality and customer service goals. We are telling our employees to take *personal responsibility* and then hold them accountable for the results. To truly be responsive to our customers, our employees must have the power and authority to make decisions and the ability to *fix things* when they have gone wrong. Yet, we are expected to achieve this in an environment where front line management is virtually impotent to make any of the decisions that are required to truly impact our delivery of service.

Frank, if we can trust our employees to make decisions, then we should trust our managers. If this trust isn't there, then we shouldn't be in our jobs. According to Barbara, you had told her that she needed to be careful of Don and I for we might *stiff her* on our staffing needs. I don't think you would worry about this if you spent a few days in my shoes and listened to the daily concerns and experiences of my supervisors and the customers. As a management group, Tulsa probably did fight for more staffing than other offices, but as our *Suspense* experience clearly illustrates, we were only trying to the job properly and the staffing was always used productively, even if the efforts didn't show up in the *reports.*

After 20 years here, I and many of my long term supervisors should be trusted to know and understand the Company's expense situation as well as its customer service objectives and be given reasonable latitude to manage them to achieve the appropriate balance between staffing and service. We should have the trust to make a decision as to whether it is necessary to replace an employee. If we are really going to be successful in the *Flight to Quality* and achieve our customer service objectives, it has to come from the *bottom up* and not the *top down.* If we're being asked to turn our front line employees loose, then we should turn their management loose. We should then focus on the overall results rather than micromanaging or second guessing every move they try and make.

Frank, obviously there is a lot of pressure and frustration involved here. But, the *front line* is where changes have to be made if our Corporate commitment to customer service and our policyholders is going to be met. And, to accomplish this, we need the same level of support and commitment from all parts of the organization, not just some of them.

**CONFIDENTIAL**

When I first started in Tulsa and began dealing with different parts of the organization, I was extremely critical of those individuals who had *"retreated,"* who never sought change, and who never did one ounce more than they had to. But, now after 20 years in the administrative operations, I understand why that happens. This is the type of behavior that is most often rewarded. Those of us who try and act as strong *"Change Agents"* to bring about meaningful improvements in the Company most often just get a very tough row to hoe.

But, maybe, just maybe, people should pay a little more attention and listen to us once in a while. After 20 years here on the *"front lines"* dealing with the customers, we might know something they don't know. It never ceases to amaze me how many people that never talk to a customer seem to think they know what's best for them. We overlook the fact that it is this level of the organization that is closest to our customer. Surveys, focus groups, etc., all have their value. But, we hear it every day from our customers. And, with the reorganization, we hear it from one heck of a lot of them. But, when we disagree with what some others think is best, it's discounted because it's only *"Tulsa (or Rayl) Talking."* Like I said, I'm not always right, but on the big issues, history has proven me right far more often than it has proven me wrong.

Many times I have tried to tell myself to just quit caring and quit trying to bring about change and give up like others have done before me. I could sit back, **do a good job,** and satisfy the expectations of upper management sitting on my hands. If I did, MetLife would go on, some people would be relieved and others probably wouldn't even notice. But, I assure you that our progress towards meaningful improvements in our customer service would be a lot slower in coming and we'd always be a *follower* . . . . . and never a *leader.* But I am wearing down, I find I am asking myself more and more frequently, *"is all this extra effort really worth it?    Does anyone really care?"* I wonder.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

March 15, 1993

CONFIDENTIAL

MF04011070802

Richard Schramm
Manager
Notice Systems Administration
Policy Administration
Bridgewater
AREA 3E-83


Re    Dividend Option to Apply Dividend to Loan Principal/Interest


Dick, as you know, we have asked for a dividend option which will electronically apply the dividend to loan interest or principal for the past several years.  It is apparent to us through the calls to Teleservices that this capability is becoming an increasing expectation and request by many of our policyholders.

Attached is a memo outlining the results of a one week study which supports our contention that this is a desired option.  In considering this, it should be remembered that these statistics are only the policyholders who are *approaching us*.  If we were to make such an option available and then effectively "promote" it, we should be able to substantially increase the number of such option elections which, in turn, could have a positive impact on the Company's retention of assets.  We could target all policyholders having a cash dividend or cash excess option but also having a loan on their policies.  We could also target other policyholders through our enhanced loan repayment campaign.

I'm not sure where this issue stands for 1993, but I thought you would be interested in the results of our study.


J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 31, 1992

cc    Gardner, LaBadia, Delaney & Schoos


**CONFIDENTIAL**

Neil Giacometti
Project Manager
Notice Business Billing Systems
Scranton Information Systems Center


Re   Anniversary Statements


Neil, this may be too late, but I am going to go ahead and forward some additional comments concerning the Anniversary Statements.

I know there has been a lot of dialogue around the explanation of the "earnings" on prior AI. I believe everyone is in agreement that the word "increment" should be eliminated. However, the current explanation expressing the *"earnings on the cash value of the prior AI"* also seems to be a problem even though it is probably the most accurate. You probably don't need any more suggestions but you might consider saying:

> *"In addition, there are earnings on the VALUE of your prior AI balance of $99.99. These earnings will purchase $99.99 of AI giving you a total of $99.99 of additional paid-up insurance."*

This eliminates the specific reference to the "cash" value which I think is what some people find objectionable. But, there is a good story to tell with the AI and this still provides an accurate explanation.

But, whatever you do, there is going to be a substantial percentage of our policyholders that will not understand the explanation. Many of our policyholders, particularly the older ones, find all of this very confusing because no one has ever really explained it to them. However, it is my personal opinion that we should be doing our best to educate them and give them this type of information. The 800 number is there to provide the explanation. Could we also consider printing a *"Glossary of Terms"* on the reverse side of the statement? Perhaps we could provide even more detailed explanations written in plain english.

At any rate, Neil, I don't envy your position. Everybody has their own opinion, but I believe the more explanation we can provide and the better understanding we can give our policyholders, *the more they will appreciate the value of their policy.*

Let me know if there's anything else we can do.


J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 29, 1992


CONFIDENTIAL

MP401107080 3




Barbara DiBiase
Associate Staff Consultant
P.I. Customer Services
    AREA 5-H


Re  Dividend to Pay Loan Principal & Interest


Barbara, my formal file only goes back to 1989. However, this was an issue that was being raised and requested for at least one if not two years prior to this. In 1989 I attempted to get action by accumulating some of the policyholder requests and complaints we received. These were all submitted to Dick Schramm with my July 27, 1989 memo. I am faxing a few of the files, but I am mailing all of them.

Basically nothing happened. Although it was on the Loan Projects formal Status Reports in 1990 and 1991, we still don't have it. I guess my 1990 memo to Rich Anderson was my last real attempt to get something done. I got tired of fighting this one and since that time I think I have only raised the issue verbally whenever an appropriate opportunity presented itself.

If you have better luck than I did, I'm sure that a number of policyholders would be very grateful. I know my CSRs would.



J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center – Tulsa

November 4, 1992

CONFIDENTIAL

MP401107080.4

XP401107080S

Francis P. Lynch
Senior Vice-President
Customer Services

Re    Teleservicing Call Report - Notification to "Nearest" Sales Office for
Address Changes

One of our most serious problems is the loss of contact we experience with our customer base as a result of address changes. Within this context, there are two different scenarios. These are:

- A policyholder moves but DOES NOT advise us of the change of address. While written communications may be forwarded for some period of time by the Postal Service, this is only temporary. If we are not notified of the address change, we will eventually lose our ability to communicate with this policyholder altogether.

- A second scenario occurs when the policyholder DOES notify us of the change of address. Even though it is properly recorded on our records, the distance involved in the move is such that it is impractical for the inforce sales office to service this business. In many cases, even though the inforce sales office becomes aware of the address change, they are reluctant to transfer the business to the nearest sales office. In this situation, we have not lost our ability to communicate with the policyholder, *BUT WE HAVE LOST the opportunity for Representative contact.*

Teleservicing is becoming a very important vehicle for improving the integrity of our address files. The two sites processed over 100,000 address changes in 1991. However, even having the proper address on file does not eliminate the *"loss of contact"* our policyholders experience with MetLife. The policy often remains inforce in a sales office which cannot possibly contact or service the policyholder's needs.

When address changes are reported through 800+MET-LIFE, the change is recorded on our electronic files and the inforce sales office is notified of both the phone call and the address change through the *Teleservicing Call Report.* However, follow-up by the Account Representative is impractical or impossible because the policyholder may have moved far away from the inforce office. Our perception is that in an extremely high percentage of the cases, the inforce sales office *is not* transferring the business.

Consequently, even though we maintain our ability to send written communications to these policyholders, we lose the opportunity for effective follow-up and contact by a representative because the local sales office is unaware that a policyholder has moved into their area.

**CONFIDENTIAL**



We recognize the sensitivities involved when the writing agent is still active. I have seen many examples where a writing representative is successfully servicing his/her clients even though they are hundreds of miles apart. However, in the vast majority of changes of address involving large distances, *the writing agent is no longer active.*

When the writing agent is no longer active, it is our belief that the local sales office should be made aware of the fact that a policyholder has now moved into the area covered by their office. This could be done as follows for address changes reported through 800+MET-LIFE:

- If a reported address change involves a distance of more than some fixed number of miles (such as 100), both the "nearest" sales office and the inforce sales office would be notified of the phone call and address change on the *Teleservicing Call Report.* This would provide the local office with the opportunity to contact the policyholder, welcome them to the area and determine if they can be of further service.

  Again, this would only be done when it has been determined that the *writing agent* is no longer active. It is believed that a product currently available in our Scranton Computer Center called GEOCODER could be used to determine both the distance involved in the address change and the identity of the "nearest" sales office.

Having such a facility would enable us to:

- Provide the Career Agency Force with the opportunity to establish new client relationships with our existing customer base *and potentially generate additional sales.*

- Encourage and facilitate the transfer of this business to the appropriate sales office. Once the "nearest" sales office becomes aware of the policyholder's move into their area, they could pursue the transfer of the business with the inforce office. Ideally, we should have some facility at the Service Center level to transfer business within certain guidelines. We do receive requests from policyholders to have their business transferred to a local office but we have no way to effect such a transfer. In these cases, we send an E-Mail message to the inforce office to ask that they transfer the business but we have no way of knowing whether or not it is done.

- Reduce orphan accounts and the number of policyholders who feel "abandoned" by MetLife. This perception has been illustrated by frequent policyholder comments to the effect that they have not been contacted by a MetLife representative in years. As illustrated, in some number of cases, contact by a representative is impossible because the "local" representative has no knowledge that the policyholder exists. And, the distance involved makes it impossible for contact by the inforce office.

**CONFIDENTIAL**



MP4011070806

When a policyholder calls 800+METLIFE, it is because they needed service or information concerning their policy(ies). For a representative who is customer and service oriented, it is the opportune time for him or her to call the client, determine if their needs were met by our Call Center and offer to be of further service. One of the points raised on the Customer Satisfaction Index survey done in MidAmerica by Ken Gelman is the fact that our policyholders would like their insurance programs periodically reviewed.

Follow-up to the *Teleservicing Call Report* provides great "timing" to offer that service. However, this can only be done if the Account Representative and the policyholder are in the same area. Notifying the "nearest" sales office of policyholders moving into their area would be an important step in facilitating personal contact with our customer base.

We obviously have a big problem with not having the correct address for a significant percentage of our policyholders. This is a separate issue that needs to be pursued. But, having the correct address doesn't necessarily mean we have the ability to personally contact our policyholders. At the very least, we should let the local office know that a policyholder has moved into their area. We should also pursue some type of control or mechanism to ensure that policy records are transferred when it is not inforce with the writing representative.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

May 15, 1992

cc   Teleservicing Natural Work Team Attendees: Gardner, Abela, Garavaglia, LaBadia, McDowall, Hodel, Gelman, Schoos, Barocas, Green & Szigethy

CONFIDENTIAL

MP4011070807

Richard W. Schramm
Manager
Notice & Account Systems Administration
P.I. Planning & Customer Services

Re   Taxable Dividend Cases - Year End Mailing

Dick, I have had some conversations with Bob Lawler about our notification to policyholders in 1992 who are incurring taxable dividends for the first time. As I understand it, no decision has yet been made as to how this notification will be made. This notification should be done on an ongoing basis and not done at one time as in 1991. The year end notification that was done in 1991 has created a number of problems for us on the administrative side which are made even more serious by the unreasonable workload. And, because of our inability to cope with the volume generated by this campaign, some problems are compounding themselves thereby making more work for us. Let me explain:

We received 51,770 written responses prior to December 31 and about 6,600 since then. While we were able to process all the Social Security number and address changes that we received by year end, we were not able to change all the dividend options and conversions. There were in excess of 16,500 of these in the original 51,770.

We are still attempting to get all of these option changes and conversions processed. We are encountering several different situations. These include:

- **DWI Option Changes to AI** - In those instances where the current dividend option is DWI and the policyholder wants to change the option to AI, we have a problem if the 1992 dividend *has already updated.* At the time the letters were mailed, virtually all January anniversaries had their dividends updated. This is now true for anniversaries into March. In order to eliminate 1992 DWI reportable interest *(as the policyholder is expecting),* we must "downdate" the entire dividend and then "update" it as AI. *This is extremely manually intensive* as separate transactions are required which must be done on different days.

  While we have sorted our letters by anniversary month to try and stay ahead of this, we are still currently stuck with having to *downdate* and *update* the ones with January, February and March anniversaries. If we don't get these done and stay ahead of the others by changing the options before the dividends update, this problem will compound itself. While the transactions may seem relatively simple, the volume of paper we're dealing with makes it more difficult than it sounds.

- **DWI Conversions to AI** - We are finding a significant number of cases *(several hundred so far)* where the calculated AI amount is not on PIOS. Therefore, these must be *manually calculated.* Again, this is time consuming "extra" manual work.

**CONFIDENTIAL**

MP4011070808

MP4011070809

- **The Letter Was Confusing to Policyholders** - Many policyholders were obviously confused by the letter. They are requesting changes that do not appear to be what they want or cannot be done. They were given two options, to *change* their dividend option and/or *convert* their DWI balance. Many policyholders obviously thought they could only choose one. Consequently, we have policyholders with a current option of DWI electing to convert their balance but not changing their option. If they are converting their balance, their intent would also be to change their option in most cases.

The same is true when it's the other way around. A DWI policyholder electing to change their option would most likely also want their balance converted. This would eliminate all taxable reporting.

We have also received several hundred (if not thousand) letters where the dividend option is "cash" but we have received a request to "convert" the DWI balance where there is none. While a DWI balance does exist on some of these policies, in most cases there isn't one. Therefore, what was the policyholder's intent? To change their option?

We don't know, but we have thousands of cases falling into the above categories. In the first two scenarios, we feel we have no alternative but to *convert their DWI balance AND change their option.* We are then writing to let them know what we've done. In the last scenario, we are returning the form with a letter clarifying the fact that we could not comply with their request and if their intent was to change their option, they need to let us know.

This is all a lot of extra work. But, if we don't take action on these cases, we will get the phone calls and complaints later that we did not comply with their requests *(or intent).* It is a question of *Pay Now or Pay Later.* But, our situation was certainly made more difficult by the year end mailing and having to cope with this tremendous volume at one time.

Some of it could have been avoided by having a letter our policyholders could understand better. We received every kind of "number" conceivable by asking for a *"Taxpayer Identification Number"* instead of a *"Social Security Number."* The average policyholder does not relate to a "T.I.N." The Taxpayer ID number could have been mentioned only in the small print for that handful of people to whom it applied. As outlined above, we also needed to do a better job of explaining their choices and options. But, some decision needs to be made promptly for 1992 so we don't get ourselves into this situation again.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

February 18, 1992

cc    Marcia McDermott & Bob Lawler

**CONFIDENTIAL**

Richard W. Schramm
Manager
Notice & Account Systems Administration
Area 9-G

Re  Dividend Anniversary Statements

Dick, if I received something previously regarding changes being made to the dividend *Anniversary Statement* I could not locate it. However, it has obviously been changed in the past year and I would like to offer some comments based on our experience.

Attached is a letter from a policyholder complaining about the difference in the statements received in 1990 versus 1989. We have also had comments and concerns expressed on 800+MET-LIFE. The differences in these statements are as follows:

### 1989  ANNIVERSARY  STATEMENT

The 1989 statement shows:

- *Current Dividend* amount

Under *Additional Paid Up Insurance* it breaks down the following information:

- *Current Amount*
- *Previous Amount*
- *Additional Amount Purchased From Previous Amount*
- *Total Additional Paid-Up Insurance*

Under *Dividends Left to Accumulate With Interest* it shows:

- *Current Interest on Dividends*
- *Total Dividends and Interest*

### 1990  ANNIVERSARY  STATEMENT

The 1990 statement shows <u>only</u> the following:

- *Current Dividend*

Under *"Policy Balances"* it shows only the following information:

- *Additional Paid-Up Insurance*
- *Dividends With Interest*

**CONFIDENTIAL**

MP4011070810

MP401107081l

On the 1990 statement, it is impossible for the policyholder to know whether or not he or she earned *"Additions on the Additions"* or was credited with additional interest earnings on the dividends left to accumulate at interest during the previous year.

Dick, I assume this step may have been taken to "simplify" the statement for our policyholders. However, I believe it has the reverse effect of being a negative rather than a positive. It does not "promote" what the Company is doing for them in terms of illustrating their earnings over and above the current year's dividend. It also does not let the policyholder see precisely how much "paid-up" insurance the current dividend has purchased or how much interest was earned on the accumulated dividends. It is much easier to see or to explain the benefit of the paid-up additions option when you can see the exact difference between the current dividend and its corresponding paid-up insurance amount.

While we, as a Company, should do everything we can to simplify our written communications so they will be understood by our policyholders, it should not be at the expense of suppressing valuable information. Very shortly, policyholders nationwide will have access to 800+MET-LIFE. If policyholders did not understand the previous statement, one of the options now available is to call Teleservicing and get an explanation. At the same time, it gives us a great opportunity to explain and reinforce the benefits and performance of our dividends.

I would ask that the present format of our *Anniversary Statement* be revised to include all information previously shown on the 1989 statement.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

December 31, 1990

cc   Gardner, Hodel, Delaney, Szigethy & Schoos

**CONFIDENTIAL**

**Barbara J. Gardner**
**Vice-President**

**Re**     Referral of *Policy Payment Request Form* to Sales Offices for Cash Surrenders

Barbara, I sent you copies of the initial proposal and my response a couple of weeks ago. However, in the event it isn't handy, a complete file is attached.

At the time, I did not know that the original request had been made by Kathy Schoos. Included in this file is a letter I just received from her asking me to reconsider my position. Also attached is a copy of a memo I just sent to Don Lyons asking for his thoughts.

I cannot help but question Kathy's 20.6% "success rate" on conservation by sending the cases back to the sales office. I don't know how they came up with this statistic. At the same time, I cannot help but believe that it has many other ramifications including:

- Poorer service and a higher level of dissatisfaction among many policyholders over the delays.

- More phone calls and complaints on 800 + MET-LIFE from people trying to determine the status of their payment.

- More invalid payments created by the lack of knowledge and expertise in the sales offices. Some branches are inclined to process cash surrenders without careful regard as to whether the individual signing the request is actually entitled to make the request. In other words, this frequently occurs when the owner is other than the insured. The insured may sign the form but is not contractually able to surrender the policy.

Under the current procedures, the sales office has ample opportunity to conserve a case if they are so inclined. They receive notification of the cash quote inquiry **before** the policyholder ever gets the *Payment Request Form*.

I can support a change that would let the *Policy Payment Request Form* be referred to the sales office as an "option." However, I think it would be a serious mistake to do this for all requests.

Before I respond, I was wondering if you had any thoughts or feelings on the issue.

**J. L. Rayl**
**Manager**
**Teleservices - Cash/Loan/Dividend**

December 4, 1990

**CONFIDENTIAL**

MP4011070812

MP401107081

Robert Szigethy
Technical Consultant
P.I. Quality & Planning

Re     LOMA *Dialog* - Phone Processing of Beneficiary/Dividend Option Changes

Bob, please see the highlighted portion of the attached LOMA publication. According to this, Provident Mutual is permitting Customer Service Representatives to process simple beneficiary changes on the phone. This would appear to go well beyond our proposal to have the CSR generate a *"completed" (except for owner signature)* change of beneficiary form and eliminate endorsement of the policy

Although we will presently process dividend option changes over the phone, our systems are not at all responsive to this transaction. Many of our requests come in when the policyholder has received the annual anniversary dividend statement. Because of the timing, we are not able to change the dividend option for the current year. As it is now, we can't effect a change for the current year during about a six week period prior to the anniversary date.

When anniversary dividend statements are received, we encounter numerous requests to change the dividend option to premium reduction. This requires a substantial manual effort to comply with these requests when it involves the current year's dividend.

> Our dividend system should permit us to effect a change in the current year's option at any time prior to the anniversary date. If a cash payment is involved, it should permit changes up to the point that a check is actually generated.

At any rate, I thought you might find Provident Mutual's procedures to be of interest.

J. L. Rayl
Manager
Teleservices - C/L/D
Central Head Office

October 25, 1990

cc     Vranka, Anderson, Gardner, Schramm, McDowall, Barocas, Hodel & Schoos

CONFIDENTIAL

**CONFIDENTIAL**

MP401107081 4

**Neil Giacometti**
**Project Manager**
**Notice Business Billing Systems**
**Scranton Information Systems Center**


Re    Premium Reduction Dividend Option With Excess Cash Option


Neil, please see the attached memo from my supervisor, Darlene West. If I understand Darlene correctly, once a policy has had the excess option as AI, we can't change it *(back)* to cash. The billing trail is going to automatically set it back to AI in spite of the fact that we may have manually paid out the dividend and entered a change of dividend option. By the same token, I do understand that the "automatic" excess option on post 1987 policies is supposed to be AI. However, *is the policyholder forbidden to select a cash option?* It is also my understanding that for "new" pre-1987 policies the <u>initial</u> excess option is going to be AI. However, the policyholder should still have the ability to elect cash. If this is done, we shouldn't have to pay it out manually every year.

Neil, if my understanding is reasonably accurate, it is imperative that something be done to resolve this situation, particularly for those policies issued prior to 1987. I have been personally reviewing every complaint call into Teleservices. I cannot begin to tell you how many times I have seen our customers complain that they *"have to call every year to get their dividend check."* Unfortunately, my expertise in our various dividend trails and systems is limited. I have been assuming this situation was just one more dividend problem caused by some type of "reject." I assumed we (Central) were not properly "adjusting" the dividend file. I just couldn't believe some of these policyholders when they kept saying that they had to call year after year to get their dividend.

Neither I nor Darlene had enough time to examine the specific cases to isolate this as an excess dividend problem. Until the Dividend Conference, neither of us had considered that it might be a billing trail issue rather than a dividend problem. I just continued to be frustrated with the frequency of this complaint and have continually voiced my concerns to Darlene that we eventually needed to get at the bottom of this situation as it would just not go away.

At any rate, Neil, I assure you this is a significant problem for our customers and the CSR's that have to listen to the complaints. I would appreciate whatever you can do to resolve it. Please let me know if you have any questions or would like any additional information.


J. L. Rayl
Manager
Teleservices - C/L/D
Central Head Office

November 3, 1990

cc    Delaney, Hodel & Schoos

Jim Zaccheo
P.I. Information Services
Scranton Information Systems Center

Re    CWS's Automated Correspondence *Policy Payment Request Form*

# W e   O b j e c t !

Jim, I could probably cite reasons all day as to why I think replacing the Head Office address with that of the inforce branch on the *Policy Payment Request Form* is a bad idea but here are just a few:

- The bottom line is the fact that, in a significant percentage of cases, it would result in a marked deterioration in the level of service received by our policyholders. This is unacceptable for a Company that is going to compete for the Malcom Baldrige Quality Award.

- The level of experience, knowledge, skills and "service orientation" of the sales office clerical staff varies widely throughout the country. Directing more of the actual service work back to the sales office would result in even greater inconsistencies in the level of service received by our customers. In this day an age, we must be striving for a consistent level of high quality service. Not more inconsistencies.

- In an increasing percentage of cases, the *Policy Payment Request Form* will have been generated by a call to 1+800+MET-LIFE. If these service/payment requests were directed back to the sales office, we will lose our ability to track, control and process these requests. Any delays in processing will result in subsequent callbacks and increased complaints to Teleservices with less ability on our part to be responsive to the customer.

- In many, many cases as evidenced by the calls received in Teleservices, the customer is no longer in close proximity to the inforce sales office. In such situations, the inforce office no longer has much of a "vested interest" or incentive for prompt processing of the policyholder request. There are more incentives "not" to process it.

**CONFIDENTIAL**