

EX A

( 10 OF 14 )

MP40110708I6

- A substantial percentage of these payments will not single cycle. When this occurs in the sales office, additional delays are often encountered until the situation can be resolved with the Head Office. It is much easier for the Head Office to control and reconcile these payments when the entire transaction is done in one place. The customer also receives faster service versus the delays that can be encountered by having the payment entered in the sales office and reconciled at the Head Office.

- With the continuing nationwide expansion of Teleservices, more and more of the policyholder requests will be received via the 800 number. When this occurs, the sales office is notified of the request the following day via the *Teleservicing Call Report.*

  The sales office is kept well informed of transactions generated by Teleservices. The Account Representative has the opportunity to provide personal contact or support by utilizing the information on the call report. This notification gives the representative ample warning of any cash surrender requests. If desired, the representative is able to initiate his or her conservation effort **before** the policyholder even receives the letter or form. There is no need to shift the actual processing back to the sales office on the basis that it would better facilitate a conservation effort.

Jim, as I said, I could probably go on all day. We believe strongly that making this change would be a major mistake. If you have any other questions, please feel free to call me to discuss.




J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

November 16, 1990

cc  Hodel, Rightor, Szigethy & Schoos




**CONFIDENTIAL**

Richard J. Anderson
Vice-President
Personal Insurance Financial Management

**Re    Dividend Applied to Loan Interest/Loan Principal**

Rich, one of our policyholders' frequent requests and/or complaints is our lack of a dividend option which would permit the dividend *(or excess dividend)* to be automatically applied to the loan interest/principal. In going through our daily "complaints," I ran into one that I thought was particularly poignant on this issue. I thought you might find it of interest. A second one I encountered is also attached.

We have raised this issue many times over the past several years. Initially we were told it was too complicated to do. In our efforts to get it reconsidered, we submitted a whole stack of TMOS files relating to calls where customers were asking for or complaining about our lack of this option. In some cases, we are obviously losing money by sending dividends in cash that could be applied to loan repayments.

I believe this change is now finally on the electronics agenda but I don't recall the target date. However, I just wanted you to be aware that it continues to be an item of concern for both Teleservices and our customers.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

October 15, 1990

cc      Gardner, Vranka & Donnelly

**CONFIDENTIAL**

## PERSONAL AND CONFIDENTIAL

Vincent J. Donnelly
Vice-President
Personal Insurance Quality & Planning

Re     Marketing Support

Vince, Barbara has told me about her conversation with Bill Goggans and his perception that I am *negative* towards the Field and not viewed as being supportive of the marketing effort. Needless to say, I am both disturbed and somewhat concerned if this is his perception. In truth, there is probably no one that would like to make Teleservices more of a marketing success than I would.

It is my suspicion that this perception probably stems from my attitude and approach towards the generation of sales leads and some of my comments to Bob in the recent coffee Klatch regarding how we can support marketing. However, based on all our experiences with the policyholders, I am convinced there is a *"right"* way and a *"wrong"* way. I believe that approaching sales leads the "wrong way" will ultimately cost us customer loyalty and more in sales in the future than we will gain today.

All I have ever wanted is to see us become a *Quality* company in our approach to *both sales and service.* Everything that is being proposed right now has been done before. I explained how I thought sales support should be approached in my memo to you requesting the addition of a marketing support person to Teleservices. However, thus far, I seem to be the *"lone voice"* with respect to how I think we should support marketing.

As outlined in the enclosed response to the article Dick Gechter gave you, I think there is a great tendency for our marketing people to **oversimplify** the task. By the same token, I don't believe they understand the customer's perspective when dealing with them from the servicing perspective. All my feelings are based on my experience and my strong convictions as to what I truly believe is in the best interests of Metropolitan and our policyholders. I don't want to see all the great things Teleservicing <u>can</u> accomplish corrupted by any tendency to look at only the *"next sale."* However, my beliefs have obviously been at the price of being labeled negative and non-supportive to our marketing effort.

Vince, I don't know what the ultimate decision will be as to how we handle our marketing support. However, I hope at least you are firmly convinced that I believe we can have a dramatic impact on our marketing effort and do want to see that accomplished. I just have my own opinion as to how it should be done.

J. L. Rayl
Manager
Teleservices – Cash/Loan/Dividend
**Central Head Office**

October 1, 1990              **CONFIDENTIAL**



Vincent J. Donnelly
Vice-President
Personal Insurance Quality & Planning

**Re      Teleservicing - Sales Lead Generation**

Vince, I have again reviewed the article that Dick Gechter passed on to you. I agree with the concept and points that Dick highlighted with some qualification.

I would hope that you know that I firmly believe that there is tremendous potential for Teleservicing to generate sales leads. However, I also firmly believe that people that are *"on the outside looking in"* tend to greatly simplify the task. All the years of "heavy duty" sales lead generation activity that was done in the past in Teleservices continues to be overlooked or discounted. But, by the same token, we want *to capitalize on that experience and do the job right.*

With respect to this article, the thing that is not being recognized is the fact that most "up-selling" or "cross-selling" done in a teleservicing environment is done with <u>tangible</u> products. GE does it with appliances and this article specifically cited experience at Buick and Polaroid.

> *It is a lot easier for a customer to relate to a "tangible" product than it is to relate to an intangible product such as life insurance.*

This is not to say it can't or shouldn't be done, but *it is different.*

Whether we like to believe it or not, the insurance industry and insurance selling in general suffers a very serious image problem with the general public. For most people, there is an immediate resistance to any attempt at a "hard sell" approach for insurance or for appointments to sit down with a representative.

> Consequently, the approach that should be used to generate a sales lead in a Teleservicing environment <u>should be</u> much different than the approach that would be used by a typical sales representative.

When the customer is talking with an insurance salesperson, they almost "expect" a *"hit'em between the eyes sales approach."* That's part of what contributes to our image problem. When they are calling for service, *the last thing they want is a "hard sell" approach* for a product or an attempt to get them set up an appointment with a sales rep.

> *This does not mean it can't be done, but it must be done carefully so as not to damage the relationship we are trying to build with the client or potentially alienate them altogether.*

**CONFIDENTIAL**

dP4011070819

XP4011070820

It is true that there is the law of numbers. As the old saying goes, if you *"ask enough people"* some are going to say "yes" no matter what the question is. That approach could be used with Teleservices and it would unquestionably achieve some degree of success. What is being overlooked is the fact that, at the same time, *we would be annoying a substantial percentage of our customer base and potentially drive them to the competition.*

Vince, I have been involved with Teleservices since its inception and I know how easy it is for people to get excited about the marketing potential. Unfortunately, we often want to focus on the *"quick sale"* rather than the <u>long term</u> benefits and sales that can be generated by developing a truly professional servicing approach to our client base.

Again, we are committed to developing the marketing potential associated with Teleservicing. However, we would just like the opportunity to demonstrate that it will pay far bigger dividends to take the more difficult approach. We want to train our CSR's to *"develop"* sales leads rather than just *"ask"* for them and play the *"numbers game"* that was the marketing driven approach used in the past.

J. L. Rayl
Manager
Teleservices - C/L/D
Central Head Office

September 19, 1990

cc    Szigethy, Schoos

CONFIDENTIAL

Mr. Robert G. Schwartz
Charirman, President and CEO

Re     "Setting Priorities"

Dear Mr. Schwarz

I have just received my copy of MLQ and reviewed your five priorities for the 1990's. Perhaps I am especially sensitive to the issue, but I was somewhat saddened to see that a continuing or increased commitment to customer service wasn't among them.

Perhaps you've already seen the attached article from "Across the Board." It outlines the growing correlation between superior customer service and marketing results. In Personal Insurance, we have made some great strides towards improving customer service. But, in all honesty, I think we have only scratched the surface of its potential impact on our customer base and the marketplace in general.

While we are moving forward quite nicely, we have the opportunity to place ourselves in a position of real strategic advantage and industry leadership with respect to how we service our customers. Delivering a **superior level of Quality** customer service which consistently exceeds expectations cannot help but translate into increased sales. At the same time, it can offer our Field Force an enhanced level of marketing support.

It seems to me that to do this effectively, there must be a continuing "Corporate" commitment to customer service. Perhaps you are considering a high level of customer service to be a "given," and your message was not intended to be construed as any change. However, I would hate to see the idea of exceptional customer service lose its sense of priority and urgency within Metropolitan.

Sincerely

James L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**1+800+MET-LIFE    (1+800+638-5433)**
**Central Head Office - Tulsa**

December 18, 1989

**CONFIDENTIAL**

Mr. Len Miller
Vice-President

Re    Voice Response - Project K9697

I have reviewed the above plan memorandum as it relates to Teleservices. As you know, we have considered potential applications for voice response several times in the past. I remain convinced there will be a growing opportunity for voice response, particularly as it relates to our more sophisticated products and clients. However, the uses proposed in this document for Teleservices are extremely superficial and poorly thought out.

While what your staff is proposing may seem feasible from a technological point of view, the security issue is far more complex than outlined. Furthermore, these applications make little business sense when considering our environment **and the actual needs and wants of our customers.**

With respect to the initial Teleservices applications proposed for December of this year, the document indicates that we would use voice response for:

*Requests for Coupon Book/Mailing Envelopes*
The document does not take into consideration that **41.3% of these requests are in combination** with another type of request for service.

*Requests for Change of Beneficiary/Owner or Name Forms*
Based on the same extensive study of TMOS transactions codes, we found that **46.9% of these requests are in combination** with another type of request for service.

*What is the point of having voice response handle a "piece" of our customer's needs?*

*How does the call get routed to voice response for this one piece?*

*It is stated that these transactions comprise 4% of our total volume. Are we going to subject the other 96% of the customers to a "menu" of these two transactions before they can get to a CSR. This would create additional line usage expense, not to mention irritation and inconvenience for our customers.*

The document lists a lot of other transactions that could be handled by voice response **"provided security arrangements could be worked out."** That is not a simple issue. Protecting the client's right to privacy is becoming an increasing legal responsibility and cannot be easily accomplished by a machine for these kinds of transactions.

**CONFIDENTIAL**

MP4011070822

MP401107082J

*Can it distinguish a male voice from a female voice?* Both husband (or ex) and wife (or ex) may have access to social security numbers or any other controls such as a PIN number. Yet, if the owner is listed as a male and it is definitely a female voice, your machine won't know the difference.

It wasn't clear whether a PIN number was still being considered for our general policyholder base. This is what has been proposed so often in the past. However, once again for the record, we believe this approach is totally unrealistic. Over 90% of our traditional policyholders don't call us once a year and that is not enough frequency to maintain or remember a PIN number. PIN numbers might work for equity based products where there is frequent contact or inquiry by the customer.

Len, there is a lot more I could respond to in regards to this plan memorandum but it is not worth my time. We have been down this road before and I don't see that much has changed.

**None of the people supporting this proposal have the first hand experience in dealing with the customers as both we and Northeastern do.** I think you will find that Northeastern shares our view that using voice response for the policyholder transactions outlined in this document is impractical and undesirable **if** we wish to give consideration to what our customers feel they want and need.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

July 31, 1989

ccGardner, Goodman, McDowall, Schoos

CONFIDENTIAL

MP4011070824

**Mr. Richard W. Schramm**
Manager
Notice & Account Systems Administration

Re    Additional Dividend Option
        Dividend or Excess Dividend Applied to Loan Interest/Principal

Dick, I was very disappointed to learn at the Policyholder Services Managers' meeting that the plans to have an additional dividend option of applying the dividend or excess dividend to the loan interest/principal had been dropped. **This has always been a common request by callers to 1+800+MET-LIFE.**

When I returned from the meeting, I asked some of the CSRs to try and remember to print a copy of our TMOS file for any calls they received where a policyholder was indicating a desire for such an option. Attached are copies of the TMOS files for 32 such calls.

As you know, we are only serving a small percentage of our total policyholder base. If our experience is projected out over the entire inforce, it would seem clear that a significant number of our customers want this option. In addition, this option does offer advantages for the Company, particularly where the current dividend or excess option is "cash."

In view of this, I would ask that serious consideration once again be given to providing this option.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

July 27, 1989

cc    Gardner & Miller   (No Attachments)
        Kelly   (With Attachments)

**CONFIDENTIAL**

Mr. Joe Alinoski
Project Manager
Policy Loan Administration

Re     **Policy Loan Repayment Processing  -  Suggestion #89-CH-3010**

Joe, the Loan Repayment Letters continue to generate a significant number of calls and often complaints to Teleservices. On the positive side, I believe it is clear that these letters and the subsequent explanations and information obtained through Teleservices result in significantly more loan repayments than we otherwise would have gotten.  However, this activity has surfaced important issues concerning how we handle our policy loan repayment processing.

We have two major areas of concern.  First, our policyholders continue to want some type of written confirmation that a loan has been repaid in full.  As far as I know, we presently do not provide anything except by specific request.

Secondly, we get a lot of complaints stemming from the fact that a policyholder thinks a loan has been repaid in full based on the amount appearing in the Loan Repayment Letter or on a premium notice. However, in many cases this payment is not made (or processed) in a timely manner and a small balance is still left on the loan file.  These customers tend to be <u>very upset</u> when they receive their anniversary notice or another Loan Repayment Letter indicating there is still a loan balance.

Some portion of this problem is solved by "freezing" the loan amount shown on the Loan Repayment Letter. However, I am confident there will continue to be a substantial number of cases where the policyholder believes they have made a full repayment but, in reality, has not.  Consequently, these policyholders should be alerted to that fact.

The attached suggestion was initially submitted to our office by one of the Customer Service Representatives. I subsequently responded with my comments but felt it needed to go to your area for final consideration. Although this was submitted through channels in April, I have no idea whether or not you may have seen it.  Accordingly, I would appreciate your consideration of this suggestion or some type of action to help resolve the situations outlined above.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

June 20, 1989

cc     Geary, Schoos

**CONFIDENTIAL**

MP4011070825

**CONFIDENTIAL**

**Robert J. Crimmins**
**Executive Vice-President**

**Re    Policyholders Service Quality Study - Status Report**

Bob, I have just reviewed Mr. Gelman's status report of November 17 and am sorely disappointed. Mr. Gelman has repeated the approach that has been used in every other policyholder service study we have conducted in the past. That is to focus on payment transactions. This is a very deceiving measurement.

I have no doubts that customer satisfaction with respect to our handling of these transactions is quite high. **That's what we do the fastest and the best.** Our electronic systems and productivity measurements are all geared towards handling payment transactions. But, as evidenced by the calls (and complaints) that come in to 800+MET-LIFE, payment transactions are only a small piece of the policyholder service (and policyholder satisfaction) picture.

If we want to get a true picture of our service, we should be attempting to measure perceptions of how easy it was for the policyholder to initiate and complete non-payment transactions. This would include:

    o    How easy was it for the policyholder to obtain an answer to a simple question?

    o    What is the policyholders' perception of our various correspondence and forms? Our calls would indicate that many have difficulty understanding them and subsequently obtaining answers to the questions they generate.

    o    Did the policyholder encounter any problems effecting a change of address?

    o    How easy was it for the policyholder to effect some other non-payment transactions such as a change of name, beneficiary or change on their Check-O-Matic account? Was it handled by the Sales Rep, Sales Office or sent direct to the Head Office?

Bob, the overall perception of Metropolitan Service will be formed based on the above equally or more so than how well we handle payment transactions. Our future sales leads and repeat business will come from those customers that are fully satisfied with how well we handle **all transactions** on a day to day basis and not those just involving money. It's fairly easy to satisfy the policyholder when we're giving them money. And, we do it well.

I would hope that Mr. Gelman will take some time to explore these other areas of policyholder service and customer perception.

J. L. Rayl
Manager
Teleservices
**Central Head Office**

November 23, 1988

MP4011070826

Mr. Vic Will
Manager
Teleservices
Personal Insurance Administration &
Information Systems

Re  Endorsement Requirement - Beneficiary Changes

Vic, as you know, we have repeatedly voiced our contention that there is a significant opportunity for clerical savings if the Company would change its position on requiring the policy when changing the beneficiary. This, in combination with the proposed Teleservices "turnaround document," would enable much of this to be done over the phone.

Inasmuch as I am presently instructing LOMA 2, I could not resist sending you a copy of the text dealing with beneficiary changes. Obviously, Metropolitan is in a distinct minority of companies still requiring the policy. Even other companies claiming to use the "endorsement" method for beneficiary changes no longer require submission of the policy.

Requiring the policy is an inconvenience and expense to both the policyholder and the Company. I think it is time we examined this issue more carefully and got in line with the industry. The savings would be significant.

J. L. Rayl
Manager
Teleservices
Central Head Office

October 5, 1988

cc  Crimmins, Vranka, Gardner, Miller, Geary, McDowall, Petr & Schoos

CONFIDENTIAL

MP401107082?

**CONFIDENTIAL**

Barbara J. Gardner
Assistant Vice-President

Re  Service Quality Study of P.I. Policyholders

Barbara, I have reviewed Mr. Gelman's memo and would like to offer the following comments:

The transactions/service categories he wishes to survey are essentially the same ones that have been examined in **all** of our past Policyholder Attitude Surveys.  **It has been and still is my strong feeling that these transactions are not adequate indicators of general policyholder attitude!**

The results of these surveys in the past have always been quite positive.  I believe this is because of the transactions selected.  As a Company, we are well geared administratively to handling the "payment" transactions. I'm not sure what the customers' expectations are in this area, but it seems that as long as they get their money within a reasonable time frame they are generally happy with us.  By measuring primarily these transactions (and the new issue related ones), I don't believe we get a true picture of the perception of our broad base of inforce policyholders who have not initiated a recent payment, claim or new business transaction.

If we really want to find out how our customers feel, I think we should be examining a number of other transactions including:

> Check-O-Matic:    Start - Stop - Change of Bank
>
> Change of Beneficiary
>
> Change of Address
>
> DLP Discrepancies
>
> Loan/Dividend/Cash INQUIRY Transactions

In each case, we should determine **where** the policyholder first went to get the information.  Did they go (or attempt to go) to the Representative, the Sales Office, **a** Head Office or 1+800+MET-LIFE.  In the case of the Head Office, did they write directly or did they include a request with a premium payment?  (In which case the proper servicing office could be different.)

Barb, if we really are intent on getting a handle on what our policyholders think of us, we will have to approach this radically different that what we have in the past.

J. L. Rayl
Manager
Teleservices

July 21, 1988

MP4011070828



Thomas M. La Badia
Assistant Vice-President
Personal Insurance Administration &
Information Systems

**Re  Teleservices Involvement - Loan Interest Rate Update Program**

Tom, Vic Will has been sending me copies of the correspondence on the Loan Interest Rate Update Program including your recent memo to Jay Dworkin.

As you outline, this will be a very complex program.  It is my personal feeling that there is no way the Company will be able to effectively communicate the purpose and intent of this program strictly in writing.  I recognize that the program is designed for follow-up by contact by a  Sales Representative.  However, the reality is that there will still be vast numbers of policyholders that are not contacted due to their proximity to a sales office or for a variety of other reasons.

There is little doubt that Teleservices will be involved in this campaign either directly or indirectly.  We will receive calls and questions from those policyholders having access to the **800+MET-LIFE** number.  The real issue is whether or not we should support this program actively by having the 800 number promoted on the letter and/or informational material.

I am convinced that, if the Company so desired, Teleservices could play an instrumental role in the success of this campaign.  However, I don't know what the increased success would be worth in terms of actual dollar benefit to the Company.  The amount of staffing and support it would require from Teleservices could be significant.

Perhaps we could experiment with the Teleservicing approach as part of the **test marketing** program you are suggesting.  We could then determine if **active** Teleservices involvement would be worth the associated expense.  But, it should also be remembered that there would be other benefits which do not have a direct dollar value such as the improved communication with our policyholders.  It would also seem that there might be significant potential to develop additional sales opportunities for our Career Agency Force through this contact.

J. L. Rayl
Manager
Teleservices
**Central Head Office**

August 29, 1988

cc  Gardner, Will, Dworkin, Geary & Schoos

**CONFIDENTIAL**

MP401107O829

CONFIDENTIAL

MP401107083O

Mr. Vic Will
Manager
Personal Insurance Administration &
Information Systems


Re  Loan Interest Rate Update Program


Vic, if the above program is run as proposed, there will be some impact on Teleservices. I would expect that we would get some calls with questions even if the 800 number is not on the letter. However, I have no way to predict what the response rate might be. Much of this could depend upon the clarity of our communication and I just can't imagine our being able to make such an offer in a written form and have it easily understood by many of our policyholders without some additional discussion.

Additionally, I would suspect that in the large geographic territories such as ours, a significant number of policyholders will not be contacted by a sales representative because of their distance from a sales office. Consequently, a higher percentage of these policyholders may call if the number is available to them.

On the other side of the coin, it would seem to me that this program would offer a tremendous opportunity for Teleservices and/or a Telemarketing approach. As I said, I don't think many people will really be able to comprehend the significance or terms of the offer without some additional discussion. Perhaps we should have a separate 800 number for them to call to get additional information. Naturally, I believe any such operation should be a subset of Teleservices.

We might also want to consider making calls to the policyholder to try and encourage them to accept the offer. Will the sales representatives be given a time frame in which to contact the policyholders? If this is done, perhaps once that time frame has expired, we could make a call to the policyholder. However, if a telephone call is made and the effort is successful, Teleservices (or the Telemarketing operation) should receive a budget credit for the amount of the commissions or payment that would have been made to the sales representative. If there is interest in the discount on a new policy, that information could be passed on to the sales office as a lead.

Vic, I don't know that the timing is particularly good, but there is a real opportunity here if we would choose to capitalize on it. The only other concern I would have is how this program will be handled administratively and what impact that may have on how Teleservices will process it.



J. L. Rayl
Manager
Teleservices
Central Head Office

July 8, 1988

cc Gardner, Geary & Schoos

Mrs. Nancy Peskin
Supervisor
Corporate Communications

**Re  Teleservices**

Nancy, enclosed are excerpts from a report I prepared on Teleservices.  As outlined, we firmly believe that Teleservices is the easiest, fastest way to make Metropolitan known as "The Quality Company," in both the minds of our policyholders and throughout the insurance industry.

I could write a book about Teleservices and what I think it can do for Metropolitan.  However, we are still in the process of trying to convince some of the skeptics and expand this into a nationwide operation.

We at Central have a "vision."  It is a vision that was first perceived by Executive Vice-President Bob Crimmins back in 1981.  **We are committed to totally redefining CUSTOMER SERVICE** for Metropolitan.  And, we are diligently pursuing a level of QUALITY that is beyond the comprehension of many people within the company.  Unfortunately, the existing Metropolitan culture prevents many people from seeing "our dream."

Naturally we want to provide customer service that is fast, accurate and efficient.  But, we have taken John Creedon very seriously and believe in his conviction and goal of making Metropolitan "The Quality Company."  We want to go beyond just meeting the service needs of our policyholders.  We want to show them that **WE CARE!**  When a customer hangs up from talking to one of our professional Customer Service Representatives, we want that person to know Metropolitan cares about him or her as an individual and values their business.

As you know, we continue to be in an environment that is very cost conscious.  It has been very difficult to try and demonstrate the dollar and cents value of delivering this level of service.  Yet, I firmly believe John Creedon knows that value and we know in our hearts it is the right thing to do.  Many of the benefits of Teleservices are intangibles but more and more people are beginning to realize the importance of the customer and the value of these intangibles to long term **marketing goals.**

If I sound a little obsessed, I am.  My supervisors and I have been trying to start a revolution.  A revolution in the way Metropolitan treats and handles its customers.

**CONFIDENTIAL**

MP401107083l

MP401107O832

As I said, I could probably write a book but I hope this material will give you some insight into what we are trying to accomplish (and have been since 1982). **I am enclosing a cassette tape** of a few of our phone calls just to give you an idea of the type of service and policyholder treatment we're talking about. I would sincerely welcome the opportunity to discuss Teleservices with you. If possible, you might even consider coming out here to take a look at it first hand. Please give me a call if you have any questions or there is some other information you would like to have.

J. L. Rayl
Manager
Teleservices
**Central Head Office**

February 12, 1988

**CONFIDENTIAL**

Ex 42

MP4011070833

## DISTRIBUTION LIST

### New York Home Office

| | |
|---|---|
| McDermott, Marcia | Area 5E |
| Shuman, Ira | 315 Park Ave, So. |

### Warwick

Arnold, Bob
Beaudreau, Janice
Farugia, Charles
Glittone, Barbara
Knott, Paula
Schoos, Kathy
Smith, Alice
Stewart, Mary

### Bridgewater

| | |
|---|---|
| La Badia, Tom | Area 2E |
| Barnewold, Bill | Area 3E |
| Brennan, Bob | Area 2E |
| Di Piazza, Mike | Area 1N |
| Doby, Greg | Area 1N |
| Harwood, Mike | Area 1N |
| Kandel, Alan | Area 1N |
| Kapolovics, Sol | Area 2E |
| Kerr, Barbara | Area 1N |
| Kirk, Kevin | Area 1N |
| McLoughlin, Patricia | Area 3E |
| Nugent, Gina | Area 1N |
| Riggio, Bob | Area 1E |
| Schwartz, Toby | Area 1N |
| Stoddart, Jane | Area 3E |
| Zeldin, Marian | Area 1E |

### Tampa

Cue, Tom,

### Princeton

Wasilewski, Al

### Tulsa

Eidschun, Jean
Fager, Cheryl
Fobbs, Kimberly
Grant, Lori
Hornsby, Theresa
Rayl, Jim
West, Darlene
Westerlund, Karin

### Scranton

Corrente, Tony
Craven, Kathy
Delaney, Russ
Godlewski, Bill
Grotzinger, Dan
Hodel, John
Kocis, Ed
Kubick, Rich
Lovelace, Terry
Magnot, Wayne
Rightor, Janet
Tyson, Jim
Wasser, Eric

Please review the attached material in preparation for the Accelerated Payment Arrangement Options meeting scheduled for 1/15/97.

Thanks.

Jim Ancharski
1/8/97



DEPOSITION
EXHIBIT
42

XP4011070834

Re      Accelerated Payment Arrangement (AP) Option Program

To      The Field Force

The November 4, 1996 letter discussing the 1997 dividend scale for Individual (ordinary) life Insurance policies referred to an enhanced Accelerated Payment Arrangement option program. The purpose of this letter is to Introduce that program. Many of the features of the program are currently available and are being introduced now. Other features will be introduced as soon as they're available.

There are currently more than 175,000 customers who have elected the Accelerated Payment Arrangement. Based on the 1997 dividend scale, less than 1/3 of those customers will have to make additional out-of-pocket premium payments at some point in order to keep their policy on this arrangement. More than 15,000 will be expected to make out-of-pocket premium payments within the next five years. Of course, there are other customers (we currently can not identify) who, based on sales illustrations provided at issue, may be planning to elect the Accelerated Payment Arrangement but may not be able to begin it as early as planned because of insufficient policy values.

The goal of the AP Option Program is to equip you with materials to help you explain why dividends have been reduced, as well as to provide clients with options to adjust their premium payment patterns.

Details of the AP Option Program are provided on the following pages. The program was developed based on substantial research and input from your field associates. We think it's a great program, but that doesn't mean it can't be improved. If you have any ideas along these lines, please let me know.

Sincerely,

Executive Vice-President
December 29, 1996

Attachment

**CONFIDENTIAL**

### *DETAILS*

## YOUR ACCELERATED PAYMENT ARRANGEMENT CUSTOMERS

Lists of all current Accelerated Payment Arrangement policyholders will be distributed next month to your Regional Vice-President, who will in turn get this information to you. Those customers whose values are insufficient based on the 1997 dividend scale to pay all future premiums will be separately identified. In addition, the report will indicate the year in which additional out-of-pocket premium payments are expected to be needed for these customers. The listing will identify customers assigned to an active account representative regardless of where the policyholder resides. Policyholders who are not currently assigned to an active account representative and who reside in your region/ agency will also be listed. The listings will include information about other MetLife products in-force in the household. This information will be distributed annually at the beginning of each year (approximately, January 15th in 1997). Appendix A shows a sample report.

In addition, you will receive advance notification on a monthly basis via anniversary statement/billing processing about policies which, based on the 1997 dividend scale, are expected to become "insufficient" within 5 years. Additional details are provided below under "Anniversary Processing".

### THE OPTIONS

*Pay None*

- **"Wait & See"**
  Existing policy values may be sufficient to pay premiums for several more years before any out-of-pocket premium payments will be necessary. Because capital markets are so dynamic, there is a possibility that dividend scales in the future could increase sufficiently such that, by waiting, no out-of-pocket premium payments may be needed. By waiting, however, if dividends don't increase, the total out-of-pocket premium payment required would be more than if some out-of-pocket premium payments were made now.

  This option is probably not a good choice for a policyholder who would have to make an out-of-pocket premium payment within the next three years. This option involves risk of further policyholder concerns because premium dollars paid today will provide substantially more value than future premiums would.

- **"Reduce the Amount of Coverage"**
  By reducing the amount of coverage by no more than 25% of the original amount, we can guarantee that no further out-of-pocket premium payments will be needed. Depending on the policy type and the issue year, this option will consist of either a reduced paid-up nonforfeiture option or a 1035 exchange to a newly designed universal life policy, whichever is more beneficial to the policyholder. The universal life policy will not be available until July or later because of insurance department filing requirements.

  The "Reduce Face" option is only available to policyholders who have paid premiums out-of-pocket in full for at least 7 years after issue. It is not available for policies with outstanding policy loans or for which the dividend option at

CONFIDENTIAL

MP401107083S

any time since issue has been other than Additional Insurance or Dividends
With Interest.

*Pay Some*

*Remember: The more premiums paid the more total life insurance protection and
cash value; also, the more cushion against the need to pay unexpected premiums
in the future.*

- "Pay Full Premium"
  By paying a premium now and maybe for a few more years, values could
  increase sufficiently based on the current dividend scale to enable the
  Accelerated Payment Arrangement to fully engage again in the future.

- "Pay the Difference"
  The out-of-pocket premium needed would be the difference between the full
  premium and the current annual dividend. While this out-of-pocket premium
  payment is less than the full premium, it would result in out-of-pocket
  premium payments being needed for a longer period of time than the "Pay
  Full Premium" option described above.

- "Pay Part of the Full Premium"
  The out-of-pocket premium calculated will be the out-of-pocket premium
  needed each year for the remaining number of policy years, based on the
  current dividend scale, to make up the shortfall that the Accelerated Payment
  Arrangement is insufficient to pay. Once calculated, the premium must be
  paid for the remainder of the life of the policy. While this out-of-pocket
  premium payment is less than the full premium, it would result in out-of-
  pocket premium payments being needed for a longer period of time than the
  "Pay Full Premium" option described above.

- "Pay A Full Premium Every 4 Years"
  This "Leap Year" option is only available when current policy values are
  determined to be sufficient, based on the current dividend scale, to pay
  premiums in the other three years via the Accelerated Payment Arrangement.

**SUPPORT**

The following mechanisms have been or are being developed to support these
options.

Inforce
Illustrations
Until April, 1997.

The illustration system as it currently exists has to be used.
Currently, the in-force illustration system provides either an
Accelerated Payment (AP) or Summary/Ledger (S/L) input
option. Under the AP input option: (a) if the Accelerated
Payment Arrangement is already effective, a sufficiency type
of illustration (the "Wait & See" illustration described below)
is produced; or (b) if the Accelerated Payment Arrangement
is not in effect, the illustration will show the earliest year in
which the Accelerated Payment Arrangement can be elected
(based on the current dividend scale).

The S/L input option will have to be used to illustrate other
than the "Wait & See" option. The S/L illustrations allow a

CONFIDENTIAL

MP401107083G



schedule of withdrawals to be input allowing you to mimic the system that will be available in April, e.g., input a withdrawal of X% of the annual premium each year. It is a trial and error process and it's recommended the analysis be done prior to visiting a client. Instructions on how to maneuver the S/L input option are provided in Appendix B.

**Inforce Illustrations From April, 1997 Until July, 1997**

By April, 1997 the traditional life in-force illustration system will have been enhanced to eliminate the trial and error approach. It will allow you to much more simply illustrate the options described above for policies whose values under the Accelerated Payment Arrangement are no longer sufficient.

The enhancements to the current in-force illustration facility will apply only to an existing policy on which the Accelerated Payment Arrangement is in effect and will:
- Apply only when the current dividend option is AI
- Ignore any scheduled PUAR payments
- Not allow changes in dividend options
- Apply only to policies without an outstanding loan balance
- Apply beginning on the next policy anniversary. Thus, you will be required to input requests for these illustrations/options prior to the current policy anniversary.

The AP input option will provide the following options based on the current dividend scale for policies whose values are no longer sufficient. In each situation, the "Wait & See" illustration will always be produced. In addition, you may choose other illustrations to correspond with the option chosen.

⇒ <u>Wait & See</u>–The illustration will indicate how many more years existing values would be sufficient to pay premiums and, therefore, the year when additional out-of-pocket premiums are expected to be needed.

⇒ <u>Pay Full</u>–The illustration will solve for the number of additional years out-of-pocket premium payments would be needed to eliminate the insufficiency.

⇒ <u>Dividend Reduction</u>–The illustration will indicate the out-of-pocket premium payment required based on the current dividend scale. It will show the year when out-of-pocket premiums could be stopped, if ever, based on the payment pattern.

⇒ <u>Partial Payment Each Year</u>–The illustration will solve for the amount of out-of-pocket premium payment required each year in conjunction with the balance of the premium being paid by the Accelerated Payment Arrangement.

⇒ <u>"Leap Year"</u>–The illustration will indicate when values are sufficient for this option to be chosen.

It is important to note that the full and partial payment

CONFIDENTIAL

MP401107083 7



Illustrations will solve conservatively so that if, for example, based on the current dividend scale it is calculated that 1 more premium is needed to make the policy sufficient for the Accelerated Payment Arrangement the illustration will indicate 2 premiums are needed; or, if 9% of the premium needs to be paid out-of-pocket for the balance to be paid under the Accelerated Payment Arrangement, the illustration will indicate 15% is needed. This provides some cushion for any future dividend reductions



Inforce Illustrations From July, 1997

Illustration capability will become available for policies for which premiums have been paid at least seven years regardless of whether current and projected dividend balances are expected to be sufficient to elect the Accelerated Payment Arrangement. In addition, the following option will be able to be illustrated:
⇒ Reduce Face–The illustration will indicate the amount of face reduction required to eliminate the need for further out-of-pocket premium payments.

*Anniversary Processing (Billing)*

Changes to Anniversary Processing Immediately Available

For policies on the Accelerated Payment Arrangement, the anniversary statement will, when an additional out-of-pocket premium payment is expected to be needed within 5 years, indicate the expected insufficiency. This information will be provided to you at least two weeks prior to being released to the policyholder.

Changes to Anniversary Processing Available By June, 1997

In addition, by June, 1997, via SONIC, the following information will be provided:
⇒ A new AP year until which out-of-pocket premiums must be paid based on the current dividend scale.
⇒ The out-of-pocket percent of premium payment needed for the remaining number of policy years with the balance of the premium being paid by the Accelerated Payment Arrangement.
⇒ If 1 out-of-pocket premium is paid, the Accelerated Payment Arrangement will then pay premiums until (date).
⇒ If 2 out-of-pocket premiums are paid, the Accelerated Payment Arrangement will then pay premiums until (date).
⇒ If 3 out-of-pocket premiums are paid, the Accelerated Payment Arrangement will then pay premiums until (date).

Changes to Anniversary Processing Available 1998 and later

Once an option is elected, future (i.e., 1998 and later) billing notices/anniversary statement will recognize the option elected. For example, if the policyholder elected to pay 25% of the annual premium out-of-pocket, the bill will request payment of 25% of the premium and state that the balance will be deducted from their dividend/PUAR balance. There will always be an option to pay the full premium out-of-pocket. Further, if future dividend scale reductions occur, such that the 25% out-of-pocket premium payment becomes insufficient, the bill will indicate the new date of insufficiency.

ENTIAL

MP401107083B

*Option Election Form*

An easy to complete request for a modified Accelerated Payment Arrangement has been developed and is now available. A sample is provided in Appendix C.

## PACKAGING

To help you understand and explain the Accelerated Payment Arrangement option program we have developed the following materials:
- Track Book [order # APTP (1/97)]
- Video [order # APVIDEO (1/97)]
- Customer Brochure [order # APBRO (1/97)]
- Option Election Form [order # APELECT (1/97)]

These materials are available as a package [order # APPACK 1/97]. Each piece can also be ordered separately.

MP401107083 9

**CONFIDENTIAL**

### Appendix A

**Re    Household Information Regarding Policies Under the Accelerated Payment Arrangement**

The report will be distributed to Regional Vice-President and will include the following information:
- For each agency the policies for which the Accelerated Payment Arrangement has been elected
- For those policyholders with a policy on which the Accelerated Payment Arrangement has been elected, other MetLife products in-force in the household

There will be separate reports for agency managers and for the servicing agents. The agency manager report will include a control list indicating the number of policies assigned to an active servicing account representative in the agency, regardless of where the policyholder resides. It will also include orphaned contracts that have to be assigned to an agent. The number of policies will be broken down to show those whose values are still sufficient and those with insufficient values. It will look like the following:

---

**Manager's Control List**
**Policies Under the Accelerated Payment Arrangement**
Sales Office: A18 (Alderwood, WA)

This list contains the agencies in your sales office with policies under the Accelerated Payment Arrangement which are assigned to an active servicing agent. Orphaned policies are listed on a separate page and should be assigned to an active agent. The number of policies which are sufficient and the number insufficient are shown separately.

| Agency Index | Name of Servicing Agent | # of Sufficient Policies | # of Insufficient Policies | # Insufficient Within 5 Years |
|---|---|---|---|---|
| xxxx-y | John Doe | 4 | 2 | 1 |
| aaa-b | Sally Smith | 1 | 3 | 0 |
| | | | | |
| **Total** | | **14** | **9** | **3** |

---

For each policy under the Accelerated Payment Arrangement a household report for each account representative will be provided in duplicate—one for the account representative and one for the agency manager. The report will look like the following:

---

Sales Office: A18 (Alderwood, WA)
Servicing Agent: xxx   John Doe

| Address | Policy Suffix | Owner | Plan | Issue Date | Acct Bal/ Face Amt | Date When Insufficient | Date Phoned | Appt Date |
|---|---|---|---|---|---|---|---|---|
| 123 Street | 1234567 A | Name | Life | 5/2/87 | 150,000 | 5/2/03 | -/-/- | -/-/- |
| Any City, State | 4567890 O | Name | MPC | 9/17/91 | | | | |
| Tel:1111111111 | 3425678 AB | Name | Pen | 11/2/83 | 67,444 | | | |
| | | | | | | | | |
| 456 Street | 2345677 A | Name | Life | 10/16/65 | 50,000 | NA | -/-/- | -/-/- |
| Any City, State | 6785321 AB | Name | Pen | 12/1/71 | 36,743 | | | |
| Tel:1111111111 | | | | | | | | |

---

CONFIDENTIAL

MP401107 0840

## Appendix B

**Re     Maneuvering the S/L Input Option In-Force Illustration System**

MP4011070841

**CONFIDENTIAL**

MP40110710842

**Appendix C**

**Re    Request for a Modified Accelerated Payment Arrangement**

| REQUEST FOR A MODIFIED ACCELERATED PAYMENT ARRANGEMENT |
|---|

Sales Office # and Name:_____     Agency: _____

Policy #:_____     Suffix:_____     Policyholder's Name: _____

Policyholder's Address: _____     Insured's Name (if Different: _____

_____     Current Dividend Option: _____

Telephone #: _____     Taxpayer ID: ☐ ☐ ☐   ☐ ☐   ☐ ☐ ☐ ☐

By signing this form I certify under penalties of perjury that my taxpayer ID is correctly shown on this form and I am not subject to a backup withholding order issued by the Internal Revenue Service.

**PAY NONE**

☐ I understand my policy's values might not be sufficient to pay all subsequent annual premiums when due, but I elect to *Wait and See* what happens.

☐ I elect to *Reduce My Face Amount* of insurance coverage to $_____. I understand by electing this option I won't ever have to pay another premium out-of-pocket for coverage under this policy. I further understand that once reduced, I cannot reinstate coverage under this policy. Finally, I understand this option is available only if I have paid premiums in full for at least seven years, my only dividend option since issue has been AI or DWI, and I have never made a withdrawal or loan from my policy.

**PAY SOME**

☐ I elect to pay the next __ annual premium(s) for the above policy out-of-pocket with the balance being paid as indicated below.

☐ I elect to pay $_____ of my annual premium for the above policy out-of-pocket each year with the balance being paid as indicated below

☐ I elect to use dividends to reduce the amount of annual premium I pay each year and to pay the balance of my annual premium(s) for the above policy out-of-pocket each year.

☐ I elect to pay my annual premium for the above policy out-of-pocket once every 4 years and to pay the annual premium in the other three years by a withdrawal from the policy's dividend balance.

**PAY BALANCE**

☐ I authorize that each year the balance of the annual premium for the above policy that I do not pay out-of-pocket be paid via a withdrawal of the policy's dividend balance 1st. If the cash value of the dividend balance is not sufficient to pay the full premium, the balance of the premium should then be paid by a withdrawal from the cash value of the Paid-Up Additions Rider.

☐ I authorize that each year the balance of the annual premium for the above policy that I do not pay out-of-pocket be paid via a withdrawal of the policy's dividend balance only.

☐ I authorize that each year the balance of the annual premium for the above policy that I do not pay out-of-pocket be paid via a withdrawal from the cash value of the Paid-Up Additions Rider only. I understand this will result in the crediting of smaller future dividends for the PUAR.

☐ I authorize that each year the balance of the annual premium for the above policy that I do not pay out-of-pocket be paid via a withdrawal from the cash value of the Paid-Up Additions Rider. If the cash value of the PUAR is not sufficient to pay the full premium, the balance of the premium should then be paid by a withdrawal of the policy's dividend balance. I understand this will result in the crediting of smaller future dividends for the PUAR.

With regard to any of the "PAY SOME" options, I understand that future dividends are not guaranteed. If future dividends scales decrease and/or I make a withdrawal from or take a loan against the policy, it may not be possible to have future premiums paid under the Accelerated Payment Arrangement. In such case, I understand that the Accelerated Payment Arrangement will terminate and if I want the policy to remain in effect, out-of-pocket premium payments will be required.

**SIGNATURE**

_____     _____

(Signature of Policyowner)     (Date)

CONFIDENTIAL

**≋MetLife**

**≋MetLife®**

**Metropolitan Life Insurance Company**
**New York, New York**

**CONFIDENTIAL**

MP4011070843

SS121 MRV (rev 1290) MRE:LD

APTB (1/91)

**CONFIDENTIAL**

MP401107084

**MetLife**

# REVIEWING YOUR WHOLE LIFE POLICY

The goal of our meeting is to:

■ Review your life insurance program.

■ Discuss your Whole Life policy's features and benefits.

■ Evaluate options to help ensure your policy's performance in the future.



**CONFIDENTIAL**

# WHOLE LIFE INSURANCE—A CHOICE TO LAST A LIFETIME

**≋MetLife**

You purchased your Whole Life policy to meet your needs throughout your life.

Whole Life is the *only* type of insurance that provides you with *guaranteed* protection and benefits at a *guaranteed* premium level — no matter how long you live.

## CERTAIN

 Your premium is guaranteed not to increase.

 Your death benefit is guaranteed as long as premiums are paid.

 Your policy's cash values are guaranteed to grow at a minimum rate as long as premiums are paid.

## UNCERTAIN

 Dividends





DIVIDENDS

UNCERTAIN

GUARANTEED PREMIUM
GUARANTEED DEATH BENEFIT
CASH VALUE

CERTAIN

MP4011070845

MP401070846

# THE ACCELERATED PAYMENT ARRANGEMENT

**MetLife®**

## ORIGINALLY ILLUSTRATED




Your Whole Life premiums **must** be paid each year to ensure your policy's guarantees. Premiums can be paid:

- Out-of-pocket

  or

- Through the option you selected, the Accelerated Payment Arrangement.

The Accelerated Payment Arrangement is based on dividend performance. Increases or decreases in dividends from those originally illustrated can impact the actual year in which out-of-pocket premium outlays can stop and the Accelerated Payment Arrangement can take over.

In our example at the left, the policy was originally illustrated as having sufficient dividends to end out-of-pocket payments in year 10. Because the dividend scale was reduced, out-of-pocket premiums are now required through year 15 as shown in our example at right. If however, dividends had been greater than illustrated, fewer out-of-pocket premium cash payments may have been required.

## ACTUAL PERFORMANCE

**CONFIDENTIAL**

MP4011070847

# How Dividends Are Determined

**MetLife®**

Each year, MetLife declares dividends on new and in force policies. Dividends do not depend *solely* on earnings, but are determined based on the following factors:

**Premiums**
**+**
**Interest income**

**The new money received to be used to provide benefits and be invested.**

Earnings on investments, which are dependent upon interest rates and other changes in the financial markets.

**– Expenses**    Our cost of doing business, including taxes.

**– Mortality**    The amount of death claims we pay each year and reserves for future death claims.

**= Dividends**

*It is the net effect of these factors that determines the dividend level.*



CONFIDENTIAL

# ꟷ MetLife®

# DIVIDENDS AND THE METLIFE PORTFOLIO*

A particular component of dividends can have a significant impact on their overall performance, as is the case with the interest income portion of the "dividend pie." It is the investments in the MetLife portfolio that help determine the dividend interest rate. This rate is actually the combined result of all the rates of return for all investments (bonds, stocks, etc.) in the portfolio.

The MetLife portfolio is comprised of a mix of investment vehicles, with the largest portion of funds invested in bonds with medium- to long-term maturities.

## METLIFE'S PORTFOLIO

65% of MetLife's portfolio is comprised of Bonds, 98.1% of which are investment grade.*

...with medium- to long-term maturities.



* As of 12/31/95

CONFIDENTIAL

MP40110708848

# DIVIDENDS — A LONG-TERM VIEW

**MetLife®**

Interest rates were at double digit levels in the late 70s and early 80s. However, rates began to decline sharply by the mid-80s. Because of the longer-term maturities in our portfolio, we were able to weather these declines and did not have to lower our dividend scales until 1992.

This is because as market rates fell ↓ older investments in the port-folio continued to earn higher rates ↑ and therefore helped keep the overall dividend interest rate above current rates for a time.

Conversely, if market rates were to ↑ rise, the dividend interest rate might not increase for several years ↓ as older investments in the portfolio still earn lower rates.

This is also why interest rates in the economy in a given year do not have a one-to-one correlation with dividend interest rates.



10-Year T-Bond Index

Interest Rate Used In MetLife's Dividend Scale

CDs

CONFIDENTIAL

MP4011070849

MetLife

## PAYMENT OPTIONS

■ PAY NONE

■ PAY SOME

**CONFIDENTIAL**

MP4011070850



PAYMENT OPTIONS

You have a variety of options to help ensure your policy's benefits and guarantees will remain in place. As you examine your payment options, you also need to carefully consider what the right choice is for you.

MetLife®

PAY NONE

PAY SOME $

CERTAIN

UNCERTAIN

REDUCE FACE AMOUNT

WAIT AND SEE

CERTAIN

UNCERTAIN

PAY FOR "X" YEARS

PAY THE DIFFERENCE
(PREMIUM-CURRENT DIVIDEND)

PAY 25% OF THE PREMIUM

PAY PREMIUMS ONCE EVERY FOUR YEARS

CONFIDENTIAL

MP4011070851

## 🏦 MetLife®

# 🚫 PAY NONE — NO OUT-OF-POCKET OUTLAY REQUIRED

## Reduce the Face Amount

The Face Amount of your policy is permanently reduced under this option to ensure you do not have to make further out-of-pocket payments.

### PROS
- Cash outlay is eliminated. Regardless of interest rates and other capital market fluctuations, we will never require you to make further out-of-pocket premium cash outlays.

### CONS
- The Death Benefit is reduced and, once reduced, cannot be reinstated.
- The cash value of your policy will not grow as fast as a premium paying policy, and could eventually decrease to zero.

## Wait and See

Depending on your policy, you may have some time to monitor the situation and then determine whether to begin making full or partial out-of-pocket payments if this becomes necessary.

### PROS
- The capital markets could change over the next several years, so that future out-of-pocket premium cash outlays won't be needed.

### CONS
- You are likely to have to pay more out-of-pocket if you wait.



**CONFIDENTIAL**

MP4011070852

**MetLife**

# $ PAY SOME — OUT-OF-POCKET OUTLAY REQUIRED

## Pay Some Additional Premiums

Under this option, you pay the full premium out-of-pocket for one or more years, and a new Accelerated Payment date is calculated.

### PROS
■ Maintains original Death Benefit.
■ Requires some current cash outlay but is less costly over the long term.

### CONS
■ Cash outlay required now.
■ There may be a need to revisit these options in the future.

## Pay the Difference

Your cash outlay under this option would be the difference between the full premium and the current dividend.

### PROS
■ Maintains original Death Benefit.
■ Less current out-of-pocket than full premium.

### CONS
■ Cash outlay required now.
■ You are likely to pay more out-of-pocket then if you pay the full premium.






**CONFIDENTIAL**

4011070853

10

MP401070854

## 💲 PAY SOME — OUT-OF-POCKET OUTLAY REQUIRED

**MetLife®**

11

### Pay A Percentage Of Your Premium

You'll make ongoing cash outlays, but at only a specified percentage of the actual full premium due at the time you elect this option.

**PROS**
- Maintains original Death Benefit.
- Less current out-of-pocket than full premium.

**CONS**
- Cash outlay required now.
- You are likely to pay more out-of-pocket than if you pay the full premium.

### Pay Every 4 Years

You'll pay the full premium under this option, but only every fourth year.

**PROS**
- Maintains original Death Benefit.
- Less overall out-of-pocket than full premium each year.

**CONS**
- Cash outlay required now.
- You are likely to pay more total out-of-pocket than if you pay the full premium each year.



**CONFIDENTIAL**

MP4011070855

# Your MetLife Policy and the Accelerated Payment Arrangement

CONFIDENTIAL



MP4011070856

## UNDERSTANDING YOUR POLICY— AND YOUR OPTIONS.

When you purchased your whole life policy from MetLife, you took steps necessary to provide valuable protection for you and your family. You chose the only type of insurance that provides you with guaranteed protection and benefits no matter how long you live.

That protection will be there throughout your life, as long as you need it, if you continue to pay premiums. *You'll also be assured that:*

- *Your premium will never increase*
- *Your death benefit will be in effect when you die*
- *Your policy's cash values will be maintained and will grow.*

### THERE ARE BASICALLY TWO WAYS TO PAY YOUR WHOLE LIFE PREMIUMS:

*Cash:* Making out-of-pocket payments of the guaranteed annual premium.

*The Accelerated Payment Arrangement:* Using a combination of your current and accumulated dividends to pay future annual premiums after you have paid premiums out-of-pocket for a number of years.

It is important for you to understand the impact that your Accelerated Payment Arrangement has on the insurance protection and cash value provided by your policy. This guide is designed to give you some of the information needed to make the right decision regarding your policy. It contains a series of questions and answers on topics relevant to your policy and information on the options you have to keep it in place.

1

CONFIDENTIAL

**Q.** Can you review how the Accelerated Payment Arrangement Works?

**A.** To be eligible to elect the Accelerated Payment Arrangement, you have to pay your premiums out-of-pocket for a number of years. You also have to elect a dividend option that applies the dividends to your policy. This is usually the Additional Paid-Up Insurance dividend option.

When the current dividend balance, together with all future dividends, is illustrated to be sufficient to pay all future premiums (based on the current dividend scale), you can elect to pay premiums through the Accelerated Payment Arrangement.

This method of paying premiums does not automatically mean the policy is now paid for. It also does not reduce the number of years premiums must be paid. It simply allows you to pay your premiums automatically using the policy's dividends (as long as the dividend balance is sufficient) instead of paying them out-of-pocket.

**Q.** What affects my Accelerated Payment Arrangement?

**A.** A number of things can impact this Arrangement. First, it is important to understand that the Accelerated Payment Arrangement is completely dependent on dividends, which are not guaranteed. The Accelerated Payment Arrangement illustration you originally received was based on future performance. Increases and decreases in dividends from those originally illustrated will impact the actual year in which out-of-pocket premium outlays can stop and the Accelerated Payment Arrangement can take over.

*In this example, the policy was originally illustrated as having sufficient dividends to end out-of-pocket payments in year 10.*



Any increase in dividends may allow you to elect the Accelerated Payment Arrangement sooner than originally anticipated. On the other hand, a decrease in dividends could require you to make more out-of-pocket payments than expected. That could result in your having to pay a portion of some premium payments in cash or even resume full premium payments after the Accelerated Payment Arrangement has started.

2

3

CONFIDENTIAL

MP401107085?

MP4011070858

*If actual dividends for the policy are lower than expected, out-of-pocket premiums will have to be paid longer, as in the following example where payments extend to year 15.*



**Q.** Since dividends have such an impact on my Accelerated Payment Arrangement, can you tell me more about how they work?

**A.** Your whole life policy is what is called *a participating policy*. One of its important features is that it can generate dividends. Unlike the premium, death benefit and cash values of your policy, *dividends are not guaranteed.* The dividend we pay each year is based on the following formula:

4

## Premiums + Investment Income − Expenses − Mortality = Dividends

*Premiums:* The new money we receive which is used to provide benefits and which we use to invest.

*Investment Income:* Our investment earnings, which depend upon interest rates and other changes in financial markets. It is a weighted average of our rates of return on our investment portfolio from interest, dividends and capital gains.

*Expenses:* Our cost of doing business, including operating expenses and the taxes we pay.

*Mortality:* The amount of death claims we pay each year and reserves for future claims.

It is the net effect of these dividend components that determines if overall dividends will increase, decrease or stay the same during the following year. For example, even if the expenses and mortality are both favorable, a significant decrease in the investment component, such as one resulting from a decrease in interest rates, could have the net effect of a dividend reduction.

**Q.** What kind of an impact have interest rates had on MetLife's dividends?

**A.** Interest rate trends have had a considerable effect on MetLife's dividends in the last few years. That effect is not much different from what individual investors and the economy in general have experienced.

As you know, interest rates were at double-digit levels in the 1970's and early 1980's. However, rates began to decline sharply by the mid-1980's.

5

**CONFIDENTIAL**

MetLife's philosophy, and our legal obligation, is to protect the long-term interests of our policy-holders. Therefore, much of our portfolio is invested in longer-term maturities which have enabled us to weather these declines for a number of years. Although MetLife's dividends have decreased some-what in the past few years, the investment results reflected in our dividend scales have shown a solid return over time as compared to a number of invest-ment and capital market indices, such as those shown on the chart below. Because of that return, MetLife did not have to lower dividend rates until 1992.



**Q.** Have other companies lowered their dividends?

**A.** Yes. Trends in interest rates have had an impact on individuals and companies, including most life insurers. As a result, many have made changes in their dividend scales over the last few years. In addition to the negative impact from the investment portion of dividends, taxes have also had an effect. The Deferred Acquisition Cost (DAC) Proxy Tax, which began in 1992, represents a considerable federal income tax liability which the entire insurance industry has shared. The com-bined effect has forced many life insurers to reduce their actual dividend interest scales. This has had

an impact on their policies which rely on dividends for their illustrative values.

**Q.** If interest rates start to increase, would dividends increase also?

**A.** They could, but probably not immediately. Interest rates in the economy in a given year do not have a one-to-one correlation with the interest component of dividends in that same year. This is because as market rates rise, the dividend interest rate may not increase for a period of time as older investments in the portfo-lio still earn lower rates.

Conversely, as market rates fall, older investments in the portfolio will continue to earn higher rates until they mature. Therefore, the overall dividend interest rate will remain above current rates for a time.

**Q.** Where are MetLife's investments?

**A.** MetLife's portfolio is comprised of a mix of investment vehicles and other assets. A major part of our portfolio (65%) consists of bonds* with medium- to long-term maturities. Of those bonds, 98.1% are investment grade (of the highest quality).

The performance of these investments deter-mines the portfolio rate which is actually the com-bined effect of the rates of return for each investment (so it is not the same as a money market or CD rate). For example, if you purchased a 10-year bond in the same amount each year for 10 years, each bond would still have its own interest rate (the "new money" rate) but the overall rate your entire portfolio of bonds would earn is the average of all the bonds in that portfolio.

*As of 12/31/95

6

7

CONFIDENTIAL

MP4011070859

As we've stated, our investment philosophy is to protect the long-term interests of our policyholders. The mix in our portfolio reflects that philosophy while minimizing the amount of risk that we take to obtain favorable results.



*65% of MetLife's portfolio is comprised of bonds, 98.1% of which are investment grade\**

*...with medium- to long-term maturities.*



*Q.* What are my options when it comes to keeping my policy in place?

*A.* You have a number of options that will help ensure that your policy's benefits and guarantees will remain intact. It's important that you understand each option and how it can effect your policy. Just as you based the purchase of your whole life policy on your needs, you must evaluate these options carefully and select the one that is right for you.

You have at least six options to consider that fall into two basic categories. You can either not pay any additional premium now, or choose to make some payments. Your options are:

## PAY NONE
- *Reduce the Face Amount of Your Policy*
- *Do Nothing Right Now—Wait and See*

## PAY SOME
- *Pay the Full Premium for a Specified Additional Number of Years*
- *Pay the Difference Between the Full Premium and the Current Dividend*
- *Pay A Percentage of Your Premium*
- *Pay The Full Premium Once Every Four Years*

The following chart details each of these options and the pros and cons associated with each.

### PAY NONE

*Reduce the Face Amount*

*Pros:* Cash outlay is eliminated. Regardless of interest rates and other capital market fluctuations, we will never require you to make further out-of-pocket premium cash outlays.

*Cons:*
- The death benefit is reduced and, once reduced, cannot be reinstated.
- The cash value of your policy will not grow as fast as a premium paying policy, and could eventually decrease to zero.

*Wait and See*

*Pros:* The capital markets could change over the next several years so that future out-of-pocket premium cash outlays won't be needed.

*Cons:* You are likely to eventually pay more out-of-pocket if you wait.

### PAY SOME

*Pay Some Additional Premiums*

*Pros:*
- Maintains the original death benefit.
- Requires some current cash outlay but is less costly over the long term.

*(Chart continued on next page)*

8

9

MP40110708600

ML003 LeaveBehind/qk  12/30/96 2:41 PM  Page 10

MP401070861

## PAY SOME, CONTINUED

**Cons:**
• Requires cash outlay now.
• There may be a need to revisit these options in the future.

### Pay the Difference

**Pros:**
• Maintains the original death benefit.
• Smaller current out-of-pocket outlay than full premium.

**Cons:**
• Requires cash outlay now.
• You are likely to pay more out-of-pocket than if you pay the full premium.

### Pay A Percentage of Your Premium

**Pros:**
• Maintains the original death benefit.
• Smaller current out-of-pocket outlay than full premium.

**Cons:**
• Requires cash outlay now.
• You are likely to pay more out-of-pocket than if you pay the full premium.

### Pay Every Four Years

**Pros:**
• Maintains the original death benefit.
• Less current out-of-pocket.

**Cons:**
• Requires cash outlay now.
• You are likely to pay more total out-of-pocket than if you pay the full premium each year.

**Q.** Which option would allow me to pay premiums for the same number of years as I had originally planned?

**A.** It depends on your policy. You may have suffi-cient time to see if there is a significant enough

change over the next few years to eliminate the need for additional out-of-pocket payments. However, keep in mind that a rise in interest rates may not nec-essarily result in an increase, or even a continuance, of dividends. As a result, you may still ultimately need to select one of the "Pay Some" options.

You can also opt to reduce your face amount. Under this option, your cash outlay will be eliminated. Regardless of interest rates and other capital market fluctuations, MetLife will never require you to make further out-of-pocket premium payments.

**Q.** If I elect to "Pay Some" now, how long will I need to make payments?

**A.** With two of the "Pay Some" options, you will have additional cash outlays for a limited time. In turn you will receive a newly-calculated date, based on the current dividend scale, upon which your Accelerated Payment Arrangement takes over. This pertains to both the "Pay Some Additional Premiums" and the "Pay the Difference" options.

For the other two "Pay Some" options, you will make payments throughout the life of the policy. If you decide to "Pay A Percentage of Your Premium," you will continue to make payments for the life of the policy. However, the payments will be at a speci-fied percentage of the current premium based on your policy. If the dividend rate decreases in the future, you may need to pay a higher percentage than originally projected in order to maintain the guaran-tees and benefits your policy provides.

"Pay Every Four Years" requires a full premium payment once every four years.

None of the "Pay Some" options is guaranteed.

10

11

**CONFIDENTIAL**

ML003 LeaveBehind/qk  12/30/96 2:41 PM  Page 12

**Q.** How do I know which option is right for me?

**A.** Your decision about which option to choose depends on what's right for you! Each option entails different degrees of risk. You need to determine if you are comfortable waiting to see if conditions change, or if you can or want to make payments now and how much.

You bought your policy because of specific needs and for the guaranteed protection it provides for you and your family. But the only way to ensure that protection is to maintain premiums without interruption. This will maximize your policy's insurance protection and cash value.

Your choice was most likely also based on your current personal and financial situation and what you anticipated for the future. Choosing one of these options is, in a way, a chance to reevaluate what you need now, and may need down the road.

**Q.** Should I be worried about my policy or MetLife?

**A.** Both your policy and MetLife will continue to provide the protection you need.

As a mutual company, MetLife is able to share favorable performance with policyholders in the form of dividends, which it has done continuously on its new and in force policies since it became a mutual company in the early 1900's.

The overall strength and stability of the company is at the center of any decisions made regarding dividends. Our earnings must be sufficient to maintain capital for long-term solvency and future growth. Changes in our dividend scale are normal and are intended to ensure that the necessary capital is provided regardless of performance experienced

12

by different policies. *Our future is assured through our strengths:*

- A strong capital base of assets over liabilities
- Diversity of investments to limit risk
- Sufficient liquidity of assets
- Growth of both capital and surplus.

The way for you to assure the future of your policy is to carefully review the options we have outlined here and decide which is right for you. Choosing an option that ensures your premiums keep getting paid will mean that your policy will be there when you need it to provide the guaranteed death benefit and cash values you intended.

You can also rest assured that the company behind your policy will continue to provide protection, just as it has since it became a mutual company in 1915.

*To discuss these options or if you have additional questions, speak with your MetLife account representative, or call 1-800-MET-LIFE.*

13

MP4011070862

**CONFIDENTIAL**

MP4011070863



**CONFIDENTIAL**

‡‡‡ **MetLife®**

Metropolitan Life Insurance Company
New York, New York

APBRO (1/97)                    96121 MWG (exp. 1298) MLIC-LD