Ex    A

( 13 OF 14 )

-2-

I have attached a copy of Mike Rigby's January 11, 1994
memorandum wherein Company records indicate nearly 83,000
policies are currently on APP as of year-end 1993.  Of those, 25%
do not have sufficient dividends/dividend balances to remain on
APP for the "life of the contract."  It is also important to note
that these figures do not include policies with a Paid-Up
Additions Rider (4,551).  However, Mike conducted a sampling of
25 such policies and 21 of the PUAR policies or 84%, failed the
eligibility test.

As discussed at the meeting, for each policy already on APP, a
"full" eligibility test would be conducted as part of the
anniversary processing.  We agreed on the following approach for
polices that fail the eligibility test.

Offer the policyholder the following options:

#1.  MetLife pays the full annual premium from dividends
     and/or PUAR for as many years as the balance(s) is
     sufficient.  Include the calendar year in which the
     dividend/PUAR balance(s) will not be sufficient to pay
     the full premium.  It is important to note that this
     date may change based on dividend scale decreases or
     increases.

     We should, also let them know that thereafter, we can
     or will use the annual dividend credited each year
     toward the payment of the premium.

From what I have seen of policies that fail the eligibility test,
the projected annual dividend for the "APP failure year," is
substantial and is often only a year or two prior to the year in
which the annual dividend would exceed the premium, i.e.,
crossover year.  For example:

| | |
|---|---|
| Annual Premium | $7315 |
| Annual Div."APP Failure Yr." | $7055 (18th Year) |
| Crossover Year Dividend | $7520 (19th Year) |

#2.  policyholder pays a partial premium -- the difference
     between the annual dividend and the annual premium.

     Although this payment option mirrors the Premium
     Reduction Dividend option on the surface, the existing
     dividend option (AI or DWI) would not be changed.

#3.  policyholder pays the full annual premium out of pocket

CONFIDENTIAL

MP401107D952

-3-

An additional option could be offered to clients whose policies
fail the eligibility test, but includes the Paid-Up Additions
Rider (PUAR):

    #4.  policyholder makes a lump sum payment to the PUAR that
         would allow the policy to go on APP effective with that
         anniversary

The anniversary eligibility test will be based on the dividend
scale then in effect.  Therefore, any increase or decrease in our
dividend scale may:

    •change the policy year provided in payment option #1.

    •cause a policyholder who re-established eligibility when
    they originally elected payment option 4 (lump sum PUAR
    payment) to again become ineligible because of the dividend
    scale reduction.

Options #1, #2 and #3 do not attempt to re-establish eligibility
but instead offer alternatives to eligibility.  Each year the
policyholder will be offered all three options and provided with
the most current information in order to make an informed
decision.

When presenting these payment options to policyholders, we should
also tell them the effect each option will have on their
dividend/PUAR values.  Based on the amount of data that would be
included on the APP Anniversary Statement, I believe we should
change the size of the existing form to an 8 1/2" X 11" form with
an additional perforated return stub.  See sample attached.

The anniversary statement should include wording along the
following lines :

    "The premiums for this policy are being paid through our
    Accelerated Payment Plan.  Under this payment plan, the
    annual premium is paid by withdrawing the premium amount
    from the [policy's dividend balance], as long as the balance
    is sufficient.

    Based on our current dividend scale, we have determined that
    the full annual premium can be paid until mo/day/year.  As a
    result, we offer you the following payment options:

    Option #1                  )
    Option #2                  )
    Option #3                  ) Specific wording for each
    Option #4 (PUAR cases only)   ) option will be developed

[ ] varies based on the APP Type selected by policyholder.

CONFIDENTIAL

-4-

The following is a list of the four APP types available:

AP Type 1              Withdraw PUAR values only to pay annual
                       premiums

AP Types 2 & 3         Withdraw dividends and PUAR
                       values to pay annual premium

                       Type 2 = withdraw PUAR first,
                       followed by dividends

                       Type 3 = withdraw dividends first,
                       followed by PUAR

AP Type 4              Withdraw only dividends to pay premiums
(AI or DWI)

If you have any questions, please give me a call on Ext. 1250 in
Bridgewater.


Wilhelmenia J. Taylor
Product Manager
Life Product Planning
Bridgewater, NJ

April 4, 1994


cc:  B. Barnewold, M. DiPiazza, T. LaBadia
     P. McLoughlin, M. Rigby

CONFIDENTIAL

## FUTURE STATUS OF POLICIES ON THE ACCELERATED PAYMENT PLAN

A policy level projection of policies on the accelerated payment plan (APP) as of 11/93 was completed based on year end 1993 information. This analysis involved 82,778 policies and showed that 25% of the policies currently on APP have insufficient dividends and dividend balances to remain on APP. Attached is a breakdown by year of the dates of failure of these policies.

In my analysis of policies on APP I have excluded 4,551 policies with a paid up additions rider (PUAR). I will continue to work on these as time permits. A random sample of 25 policies with PUAR were tested using the online CWS APP quote system and 21 policies failed to sustain APP.

The following assumptions should be noted:

   1) The 1994 dividend scale will continue unaltered.

   2) Policies with both AI and DWI balances will use both dividend balances to remain on APP.

   3) Policy holders will not withdraw any dividend balances other than for the APP arrangement.

   4) No policyholder deaths, disabilities or cash surrenders.

In addition, some of the policies on APP as of 11/93 had become non-premium paying by 12/31/93.  Some had their cash-value paid while 180 policies were on extended term implying they had reached there anniversary after 11/93 and had insufficient dividends and dividend balances to pay their 1993 premium.

Michael K. Rigby
Actuarial Associate

1/11/94

CONFIDENTIAL

## NUMBER OF POLICIES BY YEAR
### FALLING OFF APP STATUS
(Excludes policies with PUAR)

| YEAR | POLICIES |
|------|----------|
| 1994 | 517 |
| 1995 | 878 |
| 1996 | 1,595 |
| 1997 | 2,153 |
| 1998 | 2,484 |
| 1999 | 2,575 |
| 2000 | 2,390 |
| 2001 | 2,064 |
| 2002 | 1,282 |
| 2003 | 962 |
| 2004 | 807 |
| 2005 | 735 |
| 2006 | 627 |
| 2007 | 477 |
| 2008 | 359 |
| 2009 | 279 |
| 2010 | 270 |
| 2011 | 160 |
| 2012 | 111 |
| 2013 | 60 |
| 2014 | 68 |
| 2015 | 23 |
| 2016 | 28 |
| 2017 | 16 |
| 2018 | 5 |
| TOTAL | 20,925 |

CONFIDENTIAL



**MetLife**

METROPOLITAN LIFE INSURANCE CO
41 PERIMETER CTR E SU 620
ATLANTA  GA 30346

Questions?
Contact your MetLife Representative
☎ 404-399-9260
Sales Office / Agency:
3M6/671

**Payment Reminder for The Enricher,**
**MetLife's Paid-Up Additions Rider**

Anniversary Date
**March 28, 1994**

JOHN POLICYHOLDER
123 ANY STREET
APT A
ANYWHERE USA

Policy Number
**123456789 PR**

Coverage Issue Date
**March 28, 1993**

Name of Insured
JOHN POLICYHOLDER

Current Status
**ISSUED NO PMTS**

Plan
**$250,000**

Face Amount of Insurance

Amount Paid, Date Paid
WHOLE LIFE WITH THE ENRICHER

When you purchased the life insurance policy indicated above, you also chose to add The Enricher – our Paid-Up Additions Rider – to your policy. With this valuable rider, you can accumulate additional cash value, earn attractive dividends and increase your insurance protection.

Our records indicate that we have not yet received a payment for The Enricher.

According to the terms of this rider, in order to retain the right to purchase additional insurance, a payment must be made before the first anniversary date of the policy. If you do not make a payment by the anniversary date listed above, your right to make future payments will end. However, you will continue to receive basic protection under the terms of your life insurance policy.

If you wish to make a payment to The Enricher, please indicate the amount on the bottom portion of this notice and return it with your payment in the enclosed envelope.

If you have any questions, please call your MetLife Representative at the telephone number listed above.

At MetLife, we value your business and look forward to providing you with quality service – now and in the years ahead.

---

**MetLife**

Enricher® Payment

Mail to:

METROPOLITAN LIFE INSURANCE CO
P O BOX 435
WARWICK  RI 02887-0435

Sales Office / Agency:
3M6/671

Policy Number:
123456789 PR

Name of Insured:
JOHN POLICYHOLDER

JOHN POLICYHOLDER
123 ANY STREET
APT A
ANYWHERE USA

**CONFIDENTIAL**

MP401107O956

MP401107095Z

To:   Frank Lynch
      Senior Vice President
      PI Customer Services
      NYHO
      Area - 5H

Re:   *Referral of Accelerated Payment Plan as "Paid Up"*

In reference to your note and Jim Rayl's 12\23 memorandum (copies attached). I have been working with Pam Duffy and Mike Harwood on this issue and the related "Reappearing Premiums" that are occurring because of lower dividend scales, higher cost of insurance charges, and lower UL interest rates.

Pam Duffy responded to Jim Rayl last month on his proposal to retest all policies on APP and notify all those who no longer pass the eligibility test. In lieu of that, marketing is creating an education program with material to be sent to the field and policyholders on APP explaining how it works and why it is important to periodically recheck eligibility through their field office.

sincerely,

*Tom La Badia*

Thomas M. La Badia
Vice President                                    **CONFIDENTIAL**
P.I. Customer Services
Bridgewater
Area - 2E

January 12, 1993

cc:   Pam Duffy, Barbara Gardner, Jim Rayl



**GET MET. IT PAYS.**

© 1958 United Feature Syndicate, Inc.

Memorandum from . . . - FRANCIS P. LYNCH

To: Tom La Badia

With whom in marketing
are you working?
Frank
/H.

**CONFIDENTIAL**

MET01107096S

**CONFIDENTIAL**

Thomas La Badia
Vice-President
P. I. Customer Services
Bridgewater   Area 2-E

RE:  Reappearing UL Premiums – Accelerated Payment Cases

We have reviewed Jim Rayl's November 7, 1992 memorandum and your memorandum dated November 11, 1992.

We agree with all the points made in Jim's memorandum.

Ongoing eligibility testing for policies currently operating on Accelerated Payment has become a necessity because of current economic conditions.  Even if we undergo an economic recovery which will allow us to increase our dividend scales in future years, the lowering of the 1992 and 1993 dividend scales could impact policies currently operating on AP, after the recovery has taken place.

Our customers will be more accepting of the problem if they are notified while lower returns on investments are a reality.  If we wait until after economic recovery to tell them that a policy is no longer eligible for AP because of something that happened in the past, we could create more ill-will.  We do not want to unnecessarily alarm our customers.  However, we feel we owe it to our customers to notify them as soon as we become aware of a problem.

We strongly agree that some type of letter or brochure that fully explains AP should be sent to a customer as soon as his/her policy is placed on AP.  Too many policyholders interpret AP as making their policy "fully paid up".  So, when they are told their policy is no longer eligible for AP due to lowered dividend scales or dividend withdrawals, they almost immediately start to complain or accuse the sales representative of lying.

Tom, we do not feel Jim is crying "wolf".  We have had to address many of the situations he describes.  We feel a proactive approach is the best approach.

*Kathy Schoos*

Kathy Schoos
Director
Customer Services & Communications
MetLife Customer Service Center – Warwick

December 17, 1992

cc:  J. Abela, J. Rayl, B. Glittone, P. Knott

MP4011070960

Pamela J. Duffy
Vice-President

Re:  Reappearing UL Premiums and APP Cases

Tom LaBadia received the attached memo from Jim Rayl of the Tulsa Customer Service
Center regarding APP situations.  The memo provides additional information with
regards to Jim's previous statements that policyholders believe that a policy is "paid-up"
when the APP arrangement is operative and may be unaware that premiums are being
paid by dividends and or PUAR value.

This information may be useful to you in preparing your communications on how APP
really works.

Richard W. Schramm, FLMI
Manager
Personal Insurance Customer Services
Bridgewater Area (3E)   Ext.  2316
December 11, 1992

cc:  (Cover memo only)  B. Gardner (Tulsa), T. LaBadia, J. Rayl (Tulsa)

**CONFIDENTIAL**

Thomas LaBadia
Vice-President
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater — AREA 2-E

Re "Reappearing UL Premiums" - Accelerated Payment Cases

Tom, the article which follows appeared in the *National Underwriter* and it dealt with the idea of "reappearing premiums" on UL policies. Of equal or perhaps even greater concern to me are the reappearing premiums we are likely to encounter on existing "AP" cases. I raised this issue with Paul Garavaglia and John Hodel during their recent visit so perhaps it is being addressed. But I had not heard anything and this article prompted me to think about it again.

As I'm sure you're aware, as a result of the change in dividend scale this year we had cases where eligibility quotes were done by our sales offices at year end 1992 which indicated policies were eligible. However, when they came into us in early 1993 after our electronic systems had been modified for the new scale, these cases became ineligible and could not be placed on AP. This change in dividend scale has undoubtedly impacted the eligibility status of many of the policies currently on AP. I'm sure it goes beyond those that were placed on AP last year but would have been declared ineligible this year. As I understand it, once a policy is placed on AP, there is no ongoing "eligibility testing."

In some cases, it may not surface for several years that the dividends have become inadequate to fund the policy premiums. The point I tried to make to John and Paul was that it would be a lot easier to explain this situation to our policyholders now than it might be in the future. In otherwords, the national economy and the dramatic decline in interest *(and earnings)* rates is very obvious. If we notify these policyholders now that they may well have a problem in the future, they should be able to recognize what is happening in our economy. If, on the other hand, we wait until their policies run out of dividend values, it might be at a time when the economy and interest rates are much higher. And it would be more difficult to explain and harder for the policyholder to accept.

We are currently dealing with many complaints where policies were sold on the basis that they would be eligible for AP in "X" years. "X" years is now here and, because of the dividend scale change, eligibility has been pushed into the future. In spite of the "disclaimer" on the illustration about dividend projections, the policyholders get pretty upset and want to claim "misrepresentation." But, we have found that if you can get them to calm down and "look around" at what has happened, they will usually accept it. This would not be the case if the changes that have taken place in the economy weren't so obvious.

CONFIDENTIAL

NOTE:    THE CURRENT PROBLEM IS ALSO COMPOUNDED BY THE WAY THESE POLICIES WERE SOLD. IN THE VAST MAJORITY OF CASES WE SEE, "AP" WAS SOLD AND EXPLAINED BY THE REPRESENTATIVE THAT THE POLICY WOULD BECOME "PAID-UP" IN "X" YEARS. WHILE THIS MAY HAVE BEEN THE EASIEST WAY TO EXPLAIN THE CONCEPT TO THE POLICYHOLDER, IT ONLY COMPLICATES OUR EXPLANATION OF CURRENT INELIGIBILITY. WE NEED TO PROVIDE POLICYHOLDERS WITH A BETTER UNDERSTANDING AND EXPLANATION OF "AP" AS WELL AS THE POTENTIAL IMPACT OF ECONOMIC CONDITIONS. WE WOULD BE MUCH BETTER OFF TO EXPLAIN THIS AT THE TIME THE POLICY IS PLACED ON "AP" THAN AT SOME POINT IN THE FUTURE WHEN DIVIDENDS BECOME INADEQUATE TO COVER PREMIUMS.

Tom, my recommendation would be to run new eligibility tests on all cases *currently on AP*. If they fail the eligibility testing or perhaps are even close to failing, we should notify those policyholders NOW that they may run into a problem in the future. I think our explanation will be much more readily accepted now. On the other hand, if any significant number of policyholders are so affected in the future, it could do great damage to our image of financial stability and all the great strides we have made in becoming a customer oriented Company. For cases where eligibility is inadequate or "close," we could recommend that the policyholder pay one *(or more)* additional year's premium.

I would also recommend a couple other steps. One, we may wish to consider "tightening" up our eligibility testing. I have heard that we may be going to have another change in dividend scale. If this occurs, we will have another whole block of policies that could potentially have the same problem.

In addition, I think some type of letter or a little brochure should be prepared and sent to policyholders when they place their policies on AP. It should explain the AP concept in plain english as well as where dividends come from and why they are impacted by the general economy. In doing so, this would help to reinforce the initial disclaimer on dividend projections.

We cannot afford to leave policyholders with the impression that AP is a *"done deal"* or that their policies are *"paid-up"* and no future premiums will ever be required unless we can be absolutely, positively sure of it *(assuming the policyholder leaves the dividend balance undisturbed)*. This is the impression many of them have because of the way the policies were sold or explained.

Tom, perhaps I'm crying "wolf" a little too soon, but from where I'm sitting and what I see, I think this could be a real problem unless we take some proactive measures to deal with it.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

**CONFIDENTIAL**

November 7, 1992

cc   Barbara Gardner

# Companies Are Tackling 'Reappearing' Premiums

By Linda Koco

"It's not a pretty story, but it's a real story, and one we're going to hear about more in the future," said Ben Hannum, a partner of Safe Harbor Financial brokerage in Philadelphia.

He was referring to the arrival of so-called "reappearing" premiums on universal life policies that were written on a vanish- or single-premium basis during the 1980s.

News reports have recently surfaced about companies notifying owners of such policies that they'll have to pay additional premiums—sometimes whopping ones—just to keep their policies in force. The reason most often cited is lower-than-projected investment performance, stemming from the nation's falling interest rate environment, and sometimes complicated by policy loans, skipped premiums, or failure to pay dump-in premiums as intended.

Mr. Hannum tells of one man with a $50,000 single premium UL who was upset to learn that "he will run out of policy by the time he is 67 years old, even if he lowers the face amount to $25,000." To keep the policy in force, the man had to deposit more money.

"Four or five years ago, I don't think agents or companies ever envisioned this would happen," he said.

The extent to which it is happening is a matter of dispute. Company executives contacted by *National Underwriter* indicated that most of their companies' existing UL policies have "no problems." This may be because their companies wrote very little vanish-premium business in the 1980s, or because they used conservative interest assumptions, the executives said.

Some also questioned the implications which UL critics draw from reappearing premium stories. The premiums may have come back due to heavy policy loan activity rather than lower-than-expected investment performance, they said.

Even so, the executives indicated that if today's low interest rate environment continues much longer, there will be more reappearing—and more increasing—UL premiums, and policy lapses may follow as angry and financially-strapped policyholders cancel out. Because of this, a number of companies are taking steps to "preempt" the problem.

Penn Mutual Life, for instance, is piloting a program that will detect existing contracts with declining cash values. "We will send a letter to the client and agent that will say what might happen if there is no change in the future," said Tom Harr, assistant vice president and product manager of the Philadel-

Cont'd on Page 18

CONFIDENTIAL

NW404107096J

CONFIDENTIAL

# Cos. Go Proactive On Reappearing UL Premiums

Cont'd from Page 15.

phis Insurer, [unclear] will be recommendations about "what can be done to stop the decline, and maybe even ensure growth."

This is like the company's lapse notification procedure, he added, "only now, we'll do it sooner."

The pilot is in addition to the company's existing practice of giving rate projections, on both a current and guaranteed basis, in the annual statement sent to policyholders and agents, complete with a [unclear] note showing when the policy will lapse on both a guaranteed and current basis.

Another proactive program comes from New England Mutual Life, Boston. The strategy, says Mitchell Ridge, assistant officer of traditional product management, is to suggest that certain customers "delay" the vanish point" for one to three years. This way, the customer will pay an additional premium now and avoid having a larger premium reappear later on. To do this, the company sends its agents a list of targeted clients; the agents then work with the clients on what to do.

New England is also focusing on field force education. "Through seminars and classroom training, we talk about how vanish works, why it breaks down, how our delay/vanish program works," and other optional changes, said Mr. Ridge. This helps build up confidence in discussing the subject with clients, he said.

Kemper Life Cos., Long Grove, Ill., is sending letters to clients. "We explain that interest rates are down, and we remind customers that the vanish is based on interest rates," said Robert A. Miller, director of marketing services. When the company started the program two years ago, he added, "we did have some lapses, but that has flattened out now."

Agents are instrumental in keeping businesses on the books, Mr. Miller added, explaining that their personal relationship with clients put them in a position to help clients understand. Also, he said the contact, about potential reappearing premiums, provides the agent with a good opportunity to work with clients in [unclear] "actively management" of their ULs.

Other companies are currently looking into proactive programs. For example, Alexander Hamilton Life, Farmington Hills, Mich., is looking at ways to notify policyholders, in a positive way, about the impact of lower interest rates on policy performance, said Joe Renfro, assistant vice president-product planning. It's also considering encouraging agents to undertake annual or semi-annual policy reviews.

Meanwhile, ITT Life, Minneapolis, is considering developing a program that analyzes policies and communicates with clients about options, in cases of potential reappearing premium.

"It's not only UL policies that are vulnerable," stressed Mr. Ridge. It can happen to any interest-sensitive policy written on a vanish basis, including dividend-paying whole life.

Some people view the reappearing premium more as a UL problem than a WL problem, he suggested, because ULs are initially more sensitive to falling interest rates, due to its heavy reliance on new money rates—which, in the 1980s, were very high. (Today, the interest sensitivity of the two are more comparable, he added, because ULs are invested in longer-term obligations, as are WLs.)

Another reason for the UL focus: "The premium that seems to reappear vanished UL is often larger than the original premium, and it's no as contrast that has no underlying cash value," said Mr. Miller.

The policy essentially becomes an annual renewable term plan with high premiums," added Mr. Renfro.

By contrast, said Mr. Ridge, the most an ordinary life policyholder will be asked to pay is the actual premium, if there are no outstanding policy loans. (But they may need to up the premium for several years.)

The problem can become compounded, for both UL and WL contracts, "if the interest sensitivity of contracts was not explained to clients very well in the first place," said Mr. Ridge.

"If companies and agents sat nothing and let the policy lapse without distinguishing for clients," warned Mr. Miller, "the bad faith/lawsuit potential will be much larger." ◇

MP010070994

Ex 43

REDACTED - ATTORNEY
CLIENT



 **Jim L Rayl**
08/25/97 01:55 PM

**To:**   KATHLEEN SCHOOS [NYVK.NEPIKS] @ SNAPI, Jim Ancharski/Ind/MetLife/US, Bill Barnewold/Bsg/MetLife/US
**cc:**   Richard Anderson/Bsg/MetLife/US, Jim L Judd/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US
**Subject:** AP Program

Kathy

I am not exactly certain what all issues we will attempt to address on the Tuesday conference call, but I would like to share a few thoughts and concerns. First of all, I cannot help but wonder if senior MetLife management really has any grasp of exactly what is happening. Based on all the comments and dialogue, it would appear that their expectation was similar to mine, in that it was believed that a proactive program was being developed to effectively deal with our policyholders on this issue.

During the OCR meeting in New York, █████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Based on
what was presented in New York at the AP meeting, the program is definitely not a comprehensive or fully proactive program to deal with AP. I cannot help but wonder if MetLife's senior management fully recognizes that fact or if they are under the impression that it is much more aggressive than it really is.

It seemed obvious to me that the design and implementation of the current program is far more geared to providing options to the existing representatives who, for whatever reason, have to deal with their own clients on this issue. This is as opposed to developing a program to fully address the concerns of ALL the affected policyholders. There was no proactive effort mentioned whereby representatives would contact anyone other than their own clientele.

I suspect that for the vast majority of the policyholders affected by the AP issue, the writing representative is long gone. Consequently, the existing program is clearly not going to be a proactive effort to contact ALL policyholders currently on AP or those who might be expecting their policies to be eligible for AP at some specific future date. I suspect that the contacts made by the agency force involving their own clientele will be no more than 10% to 20% of the affected customer base if even that.

I suppose some may see the letter going to the L95 policyholders as being a proactive AP effort. However, I see that letter as being so vague that most policyholders will not understand the significance of calling to explore or discuss the "options." While it may serve as some form of legal "notification" to those policyholders, I suspect that few will comprehend the significance of the letter or the situation. Furthermore, it was obvious that no real consideration was given to addressing those policyholders who come directly to the administrative organization either through the call center or through direct correspondence. While it was stated that an attempt should be made to refer them to "their rep," this will not be a viable option for the orphans. And, I suspect it will not be a viable option in any situation where the "servicing rep" is also not the "writing rep."

Consequently, I see these as still leaving some very big issues on the table with respect to AP for MetLife and the administrative side of the house. I believe there are some very fundamental issues

**CONFIDENTIAL**



DEPOSITION
EXHIBIT
47

to address. And, I see most of these as requiring a very high level decision within Individual Business. These would include:

- If the current (Field) program is not going to proactively or even reactively address the AP situation for the vast majority of affected policyholders, is there any intent to have or design a program that will?

- Once the new program is officially introduced, what is the responsibility/obligation of the Business Unit to inform affected policyholders that new and different options exist? How does this apply to the following groups of affected policyholders:

  - Those policyholders currently on AP with collapse dates within five years and options already provided on the billing statement.

  - Those policyholders currently on AP with collapse dates beyond five years with no options indicated on the billing statement

  - Those policyholders who are or were expecting their policy to be eligible for AP on some past, present or future date but remain ineligible because of the dividend inadequacies.

- What are sales offices going to be instructed to do when policyholders affected by AP call the sales office and are either not in force in that office or who do not have a representative assigned to service them from that office?

- Is Field Management and/or the sales offices going to be given specific responsibilities with respect to what "servicing" reps are expected to handle with regard to AP issues and inquiries?

- What will the responsibilities will/should the call center have in attempting to administer this program? The quick answer in New York was that the CSC could sent them a brochure and/or to refer them back to "their" rep. But what constitutes "their" rep. The "writing" rep or a "servicing" rep?

- Based on the sentiments voiced by some of the Product Wholesalers, it is questionable whether "servicing" reps, who are not also the writing rep, will really deal with customers on the AP issue. Consequently, does it make sense for the call center to refer the policyholder back to the rep whenever the "servicing rep" is not the "writing rep?" My concern is that this will only set an expectation with the customer that will not be met, thereby further aggravating the customer and making the situation worse.

- Consequently, whenever a call or complaint is received regarding AP (either before or after a brochure is mailed), should the CSC be required to check and see if the policy is still serviced by the writing rep before referring the policyholder back to the rep?

- And, perhaps more importantly, what about all the customers who do not have either a writing rep OR a servicing rep? How are they to be handled?

- Should new and different procedures be established for the call center with respect to handling some or all of the AP related calls? While it was mentioned that the first step may be to just have the call center mail the brochure, what about phone calls received after the brochure has been sent? Does the call center handle them? If so, should it be restricted to a limited number of CSCs? Or, do they refer them to the administrative operation?

- Under what circumstances does a given AP situation or call become the responsibility of the administrative "back office?"

**CONFIDENTIAL**

- Under what circumstances does either the CSC and/or the back office tell policyholders questioning any aspect of the AP arrangement that there are options available?

- Will orphan policyholders responding to the L95 letter be told something different from other policyholders questioning the arrangement? In other words, it would appear that the Company is fully obligated to tell all L95 policyholders receiving the letter about ALL the options available. This may or may not be true for other policyholders.

- In those situations where the full options will be explained, who will handle the calls? Should this be a fully detailed process whereby the customer is presented with illustrations of all the options and then given the opportunity to discuss them? If so, by call back or appointment?

- Will this expectation be changed if licensing is required?

Kathy, I suppose I could go on and on. But, the real question remains, to what length or degree is the administrative operation going to go in terms of addressing the entire AP issue. And, to what degree will additional resources be available to deal with this program?

Jim Rayl

**CONFIDENTIAL**

XP4011070967

**Return Receipt**

Your document:  AP Program
was received by:  Richard Anderson/Bsg/MetLife/US
at:             08/29/97 05:32:52 PM EDT

MP401107096 8

**CONFIDENTIAL**

**Return Receipt**

Your document:    AP Program
was received by:  Bill Barnewold/Bsg/MetLife/US
at:               03:02:16 PM EDT Today

MF4011070669

**CONFIDENTIAL**

**Return Receipt**

Your document:   AP Program
was received by:  Jim Ancharski/Ind/MetLife/US
at:                      03:06:57 PM EDT Today

MP4011070970

**CONFIDENTIAL**



**Return Receipt**

Your document:    AP Program
was received by:  Jim L Judd/Ind/MetLife/US
at:               02:00:07 PM Today

CONFIDENTIAL

**Return Receipt**

Your document:     AP Program
was received by:   KATHLEEN SCHOOS[NYVK.NEPIKS]
at:                05:35:00 PM EDT Today

**CONFIDENTIAL**

MP4011070972

Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010-3690
Tel 212 578-6630



Joseph W. Jordan
Senior Vice-President

**Re**    Accelerated Payment Arrangement (AP) Option Program

**To**    The Field Force

The purpose of this letter is to introduce the AP Option Program.

There are currently more than 175,000 customers who have elected the Accelerated Payment arrangement. Based on the 1997 dividend scale, almost 1/3 of those customers will have to make additional out-of-pocket premium payments at some point in order to keep their policy on this arrangement. More than 45,000 may need to make out-of-pocket premium payments within the next five years. Of course, there are other customers (we currently can not identify) who may have planned to opt for the AP arrangement or have not been able to because of insufficient dividend values; this program applies to them as well.

The goals of the AP Option Program are: (a) to equip you with materials to help you explain why dividends have been reduced, and (b) to provide clients with options to adjust their premium payment patterns.

Details of the AP Option Program are provided on the following pages. Please note that the single premium life insurance policy developed for the "Reduce Face–PAY NONE" option must be approved by the policy owner's state of residence before this option can be illustrated and elected by the policy owner. Accordingly, even though you will have the ability to illustrate this option, you may not do so until you have been notified that the policy form has been approved. An election of this option will not be processed and will be returned if it is used in a jurisdiction which has not approved the policy form.

The Program was developed based on substantial research and input from your associates. We think it's a great Program, but that does not mean it cannot be improved. If you have any ideas along these lines, please let me know.

Sincerely,

Joseph W. Jordan
Senior Vice-President

August 18, 1997

Attachment

**CONFIDENTIAL**



_DETAILS_

**YOUR ACCELERATED PAYMENT ARRANGEMENT CUSTOMERS**

Lists of all current Accelerated Payment arrangement policy owners will be distributed at the end of the month to your Regional Vice-President, who will in turn forward this information to you. These lists will identify, based on the 1997 dividend scale (including the enhancement), both customers whose values are sufficient and those whose values are insufficient to pay all future premiums. In addition, for the customers with insufficient values, the report will indicate the year in which additional out-of-pocket premium payments are expected to be needed for these customers. The listing will identify customers assigned to an active account representative regardless of where the policy owner resides. Policy owners who are not currently assigned to an active account representative and who reside in your region/agency will also be listed. The listings will include information about other MetLife products inforce in the household. This information will be distributed annually at the beginning of each year. Appendix B shows a sample report.

In addition, you will receive notification on a weekly basis via the anniversary statement/billing process about policies that, based on the current dividend scale, are expected to become "insufficient" within 5 years. Additional details are provided below under "Anniversary Processing".

**THE OPTIONS**

**Pay None**

- "Wait & See"
  Existing policy values may be sufficient to pay premiums for several more years before any out-of-pocket premium payments might be necessary. Because capital markets are so dynamic, there is a possibility that dividend scales in the future could increase sufficiently such that, by waiting, no out-of-pocket premium payments may be needed. By waiting, however, if dividends do not increase, the total out-of-pocket premium payment required would be more than if some out-of-pocket premium payments were made now.

  Remember, premium dollars paid today will provide substantially more value than future premiums would. Therefore, this option is probably not a good choice for a policy owner who would have to make an out-of-pocket premium payment within the next couple of years.

- "Reduce the Face Amount of Coverage" (L@95 only)
  By reducing the face amount by no more than 30% of the original amount, we can guarantee that no further out-of-pocket premium payments will be needed. Depending on the cash value of the policy at the time the option is elected, the reduced coverage will be provided as a reduced paid-up (RPU) nonforfeiture option or, if the amount of RPU is less than 70% of the original face amount, a 1035 exchange to a newly designed single premium life policy. Please refer to Appendix C for a description of the new Single Premium Life (SPL) policy. Note: Even when the SPL policy provides a greater initial death benefit than the reduced paid-up (RPU) nonforfeiture option, long term, the death benefit under the RPU could grow to an amount equal to or greater than what will be provided under the SPL policy. This can happen because the

**CONFIDENTIAL**

1

RPU is participating and the SPL policy is not. Therefore, it will be important to illustrate (see below) both approaches if this option is being considered.

The "Reduce Face" (SPL policy) option will be made available only to Life @95 policy owners who have paid premiums **out-of-pocket** in full for at least the following number of years after issue:

| # of Years | Policy Type | Underwriting Class |
|---|---|---|
| | Life @95 | Preferred or Standard--Nonsmokers |
| | Life @95 | Preferred or Standard--Smokers & Rated 1 or 2-Nonsmoker |

It will also be made available to policy owners whose Paid-up Additions Rider (PUAR) premiums were sufficient to pay premiums the number of years indicated in the above table and, in fact, were withdrawn to pay such premiums, i.e., withdrawals from PUAR will be considered "out-of-pocket" premiums for this purpose.

The "Reduce Face" (SPL policy) option will not be available:
- For L@95 policies in underwriting classes of Rated 2--Smoker and below
- For L@95 policies with outstanding policy loans and/or on which dividend balances have been withdrawn
- For L@ 95 policies on which the dividend option at any time since issue has been other than Additional Insurance or Dividends With Interest
- For Metromatic L@95 policies

This option is appropriate when there are reduced insurance needs, if the policy owner cannot afford to pay additional premiums out-of-pocket, and when a guaranteed death benefit is more important than dividends and cash values. Accordingly, it will be generally inappropriate to re-direct premiums to a new policy when this option is chosen. If this occurs and the transaction is determined to be unsuitable, commissions on the new policy will be rescinded and other action will be taken as necessary.

Also, please note, when the reduce face option is chosen, state replacement requirements apply. We are required by regulation to notify all policy owners who are eligible for this option. A copy of the letter we are using is provided in Appendix A.

**Pay Some**

*Remember: The more premiums paid the more total life insurance protection and cash value; also, the more cushion against the possible need to resume paying out-of-pocket premiums in the future.*

- "Pay Full Premium"
  By paying a premium now and maybe for a few more years, values could increase sufficiently based on the current dividend scale to enable the Accelerated Payment arrangement to fully engage again in the future.

- "Pay the Difference"
  The out-of-pocket premium paid would be the difference between the full premium and the current annual dividend. While this out-of-pocket premium payment is less than the full premium, it would result in out-of-pocket premium payments being needed for a longer period of time than the "Pay Full Premium" option described above.

CONFIDENTIAL

2

- **"Pay Part of the Full Premium"**
  The out-of-pocket premium calculated will be the out-of-pocket premium needed each year for the remaining number of policy years, based on the current dividend scale, to make up the shortfall that the Accelerated Payment arrangement is insufficient to pay. Once calculated, it is expected that the premium will be paid for the remainder of the life of the policy. However, if the dividend scale decreases in the future, a larger partial premium amount might be needed.

- **"Pay A Full Premium Every 4 Years"**
  This "Leap Year" option is only available when current policy values are determined to be sufficient, based on the current dividend scale, to pay premiums in the other three years via the Accelerated Payment arrangement.

**SUPPORT**

The following mechanisms have been or are being developed to support these options.



**Inforce Illustrations**

The traditional life in-force illustration system has been enhanced to allow you to illustrate the options.

The enhancements to the current in-force illustration facility will:
- Apply only when the current dividend option is AI or DWI
- Ignore any scheduled Paid-Up Additions Rider (PUAR) payments
- Not allow changes in dividend options
- Apply only to policies without an outstanding loan balance
- Apply beginning on the next policy anniversary, except for the Reduce Face option, which will also be available as of the prior anniversary.
  Note: The prior anniversary capability is intended for situations where (i) the prior anniversary is within three months of the date of the illustration, and (ii) the policy owner would have been eligible for the Reduce Face option on the prior anniversary.

The AP Input option will provide the following choices based on the current dividend scale. In addition, for all options except the Reduce Face option, you may choose to illustrate the options using a reduced dividend scale.

⇒ Reduce Face–The illustration will indicate the amount of face reduction (up to 30%) required to eliminate the need for further out-of-pocket premium payments under the SPL policy. When you illustrate this option the nonforfeiture reduced paid-up (RPU) option will automatically be illustrated too. It is important to note that even when the SPL policy provides a greater initial death benefit than the (RPU) option, long term, the death benefit under the RPU could grow to an amount equal to or greater than what will be provided under the SPL

CONFIDENTIAL

MP4011070976

P401107097T

**Inforce Illustrations (continued)**

policy because the RPU is participating and the SPL policy is not.

⇒ Wait & See—The illustration will indicate how many more years existing values would be sufficient to pay premiums and, therefore, the years when additional out-of-pocket premiums may be needed.

⇒ Pay Full—The illustration will solve for the fewest additional years out-of-pocket premium payments are needed to eliminate the insufficiency (natural AP). It will also allow you to select the AP year (if the AP year selected is not sufficient, it will still be used and the illustration will resemble a "Wait & See" one after the AP collapses).

⇒ Pay the Difference—The illustration will indicate the out-of-pocket premium payment required after reduction by the amount of the annual dividend based on the current dividend scale. It will show the year when out-of-pocket premiums could be stopped, if ever, based on the payment pattern. It is not available for policies with PUAR.

⇒ Partial Payment Each Year—The illustration will solve for the minimum amount of out-of-pocket premium payment required each year (based on the current dividend scale) with the balance of the premium being paid by the Accelerated Payment arrangement.

⇒ "Leap Year"—Based on the current dividend scale, the illustration will show, if a full annual premium is paid on the next anniversary and every 4 years thereafter whether any additional out-of-pocket premiums will be needed in the other years and, if so, how much.

**Changes to Anniversary Processing Immediately Available**

For policies on the Accelerated Payment arrangement, when an additional out-of-pocket premium payment is expected to be needed within 5 years: (a) the anniversary statement will indicate the expected insufficiency (this information will be provided to you at the same time it's released to the policy owner); and (b) the following information will be available to you via SONIC:

⇒ The message will indicate whether or not the policy owner is eligible for the Reduce Face option. When the policy owner is not eligible for the Reduce Face option, SONIC will indicate that it is not available and why, e.g., "not available, outstanding loan", "not eligible because not L@95", "not available, Metromatic", etc.

⇒ A new AP year until which out-of-pocket premiums would need to be paid based on the current dividend scale.

⇒ The out-of-pocket partial premium payment needed for the remaining policy years with the balance of the premium being paid by the Accelerated Payment arrangement.

⇒ Whether premiums can be paid once every 4 years with the first payment on the next anniversary.

⇒ If 1 out-of-pocket premium is paid, the Accelerated Payment arrangement will then pay premiums until (date).

⇒ If 2 out-of-pocket premiums are paid, the Accelerated

CONFIDENTIAL

4



Payment arrangement will then pay premiums until (date).
⇒ If 3 out-of-pocket premiums are paid, the Accelerated
Payment arrangement will then pay premiums until (date).



Once an option is elected, future (i.e., 1998 and later) billing notices/anniversary statements will recognize the option elected. For example, if the policy owner elected to pay $250 of a $1,000 annual premium out-of-pocket, the bill will request payment of $250 of the premium and state that $750 will be deducted from their dividend/PUAR balance. Of course, there will always be an option for the policy owner to pay the full premium out-of-pocket. Further, if future dividend scale reductions occur, such that the partial out-of-pocket premium payment becomes insufficient within the next five years, the bill will indicate the new date of insufficiency. Note: For the "Leap Year" option, billing will be in sync with the option and illustration only when values are sufficient to be able to pay premiums in full in the other three years, based on the current dividend scale.

*Option Election Form*

An easy to complete request for a modified Accelerated Payment arrangement has been developed and is now available. A sample is provided in Appendix D. When an option is elected, in addition to submitting the election form, please submit a copy of the illustration provided to the customer in connection with the option elected. For options other than "Reduce Face", these items should be submitted to Tampa if there is a payment attached; otherwise, they should be sent to the Customer Service Center you normally send materials to (i.e., Tulsa or Warwick).

For the "Reduce Face" option, these items should be sent to the New Business office you normally send materials to (i.e., Pearl River, Aurora, Tampa). Please also send the original Life @ 95 policy and, if there is a change in beneficiary, owner or address, a completed Part A of the Change application.

**PACKAGING**

To help you understand and explain the AP Option Program we have developed the following materials:

| | |
|---|---|
| • Track Book (order # APTB (1/97)) | • Customer Brochure (order # APBRO1/97)) |
| • Video (order # APVIDEO (1/97)) | • Option Election Form (order # 036-ET (1/97)) |

These materials are also available as a package (order # APPACK 1/97).

**CONFIDENTIAL**

### Appendix A

Dear Policy owner

We are pleased that you are a MetLife policy owner. Your policy records demonstrate that you appreciate the protection and value your policy provides. You have paid your premiums to date and have used your dividends wisely to increase the protection as well as the cash value of your policy.

The dividends we distribute each year are based on the following formula:

*Premiums + Investment Income – Operating Expenses*
*– Mortality Expenses – Other Expenses*

Essentially, it is the net effect of these dividend components that determine if dividends increase, decrease or stay the same.

Interest rates have had a considerable effect on MetLife's dividends in the last few years and we want you to understand why. As you know, interest rates were at double-digit levels in the 1970s and early 1980s. However, interest rates began to decline sharply by the mid-1980s.

MetLife's philosophy, and our legal obligation, is to protect the long term interests of our policy owners. Therefore, much of our portfolio is invested in longer term bonds that has resulted in a slower and less dramatic decline in our investment return, as compared to a number of investment and capital market indices. Because of that return, MetLife did not have to lower dividends until 1992.

We truly value you as a MetLife customer. We urge you to contact your MetLife representative if we can be of service in any way or if you want additional information about dividends and options for keeping your policy in force. You may also contact us at 1-800-MET-5000.

Your business is important to us–please be sure to let us know if there is any way we can better meet your needs.

CONFIDENTIAL

MP401107097 9

### Appendix B

**Re**   Household Information Regarding Policies Under the Accelerated Payment Arrangement

The report will be distributed to Regional Vice-President and will include the following information:

- For each agency all policies on the Accelerated Payment arrangement
- For those policy owners with a policy on the Accelerated Payment arrangement, other MetLife products in-force in the household

There will be separate reports for agency managers and for the servicing agents. The agency manager report will include a control list indicating the number of policies assigned to each active servicing account representative in the agency, regardless of where the policy owner resides. It will also include orphaned contracts that have to be assigned to an agent. The number of policies will be broken down to show those whose values are still sufficient and those with insufficient values. It will look like the following:

**Manager's Control List**
**Policies Under the Accelerated Payment Arrangement**
Sales Office:  A18 (Alderwood, WA)

This list contains the agencies in your sales office with policies under the Accelerated Payment arrangement that are assigned to an active servicing agent. Orphaned policies are listed on a separate page and should be assigned to an active agent. The numbers of policies that are sufficient and the number insufficient are shown separately.

| Agency Index | Name of Servicing Agent | # of Sufficient Policies | # of Insufficient Policies | # Insufficient Within 5 Years |
|---|---|---|---|---|
| xxx-y | John Doe | 4 | 2 | 1 |
| aaa-b | Sally Smith | 1 | 3 | 0 |
| Total | | 14 | 9 | 3 |

For each policy under the Accelerated Payment arrangement a household report for each account representative will be provided in duplicate—one for the account representative and one for the agency manager. The report will look like the following:

Sales Office: A18 (Alderwood, WA)
Servicing Agent: xxx   John Doe

| Address | Policy Suffix | Owner | Plan | Issue Date | Acct Bal/ Face Amt | Date When Insufficient | Date Phoned | Appt Date |
|---|---|---|---|---|---|---|---|---|
| 123 Street Any City, State Tel:1111111111 | 1234567 A 4567890 O 3425678 AB | Name Name Name | Life MPC Pen | 5/2/87 9/17/91 11/2/83 | 150,000 67,444 | 5/2/03 | -/-/- | -/-/- |
| 456 Street Any City, State Tel:1111111111 | 2345677 A 6785321 AB | Name Name | Life Pen | 10/16/65 12/1/71 | 50,000 36,743 | NA | -/-/- | -/-/- |

**CONFIDENTIAL**

7

## Appendix C

Re    Single Premium Life Policy for AP Option Program

The Single Premium Life policy provides a guaranteed death benefit at no less than 70% of the original policy's face amount, all riders and supplementary benefits are eliminated, and no further premiums are payable. The policy is not paid-up. Instead, the cash value is credited with interest and reduced each year to pay for the cost of insurance and administration (as in our UL policies). The cash value may eventually become zero, but the death benefit remains in effect for the rest of insured's life. This policy does not earn dividends.

It is important that you compare the Single Premium Life policy design with the nonforfeiture reduced paid-up option of the basic policy. The nonforfeiture reduced paid-up insurance is of the same type as the original basic policy, except that the face amount may be reduced to an amount less than 70% of the original policy's face amount, all riders and supplementary benefits are eliminated, and no further premiums are payable. But, since the reduced paid-up policy continues to be eligible for dividends, the cash value and death benefit will continue to grow.

Thus, in time, the death benefit under the reduced paid-up policy could surpass the death benefit provided by the Single Premium Life policy.

Please Note: If the Reduce Face option is elected and the cash value from the Life @95 policy is being 1035 exchanged to the Single Premium Life, all 1035 exchange rules apply. Thus, for example, the policy owner and insured cannot be changed. State required replacement forms and the replacement checklist must be completed.

CONFIDENTIAL

MP4011070982

### Appendix D
**Re    Request for a Modified Accelerated Payment Arrangement**

---

**REQUEST FOR A MODIFIED ACCELERATED PAYMENT ARRANGEMENT**

Sales Office # and Name: _____    Agency: _____
Policy #: _____    Suffix: _____    Policy owner's Name: _____

Policy owner's Address: _____    Insured's Name (if Different): _____
_____    Current Dividend Option: _____
Telephone #: _____    Taxpayer ID: ☐☐☐ ☐☐ ☐☐☐☐

---

**PAY NONE**

☐ *"Wait & See"*—I understand my policy's values might not be sufficient to pay all subsequent annual premiums when due, but I elect to Wait and See what happens.

☐ *"Reduce Face"*—I elect to Reduce my Face Amount of insurance coverage to $_____ and exchange my policy for a non-participating Single Premium Life Policy. I understand by electing this option I will not ever have to pay another premium out-of-pocket for coverage under this policy provided there is no subsequent withdrawal or loan. I further understand that once reduced, I cannot reinstate coverage under this policy and that my current cash value will be used to pay for the cost of the insurance. Finally, I understand this option is available only if I have paid premiums in full for at least 7-11 years (depending on my plan and underwriting class), my only dividend option since issue has been AI or DWL, I have never made a withdrawal from my policy, and there are no outstanding policy loans. I understand election of this option is subject to MetLife's approval.

☐ *"Reduced Paid-Up"*—I elect the Reduced Paid-Up option described in my policy.

**PAY SOME**

☐ *"Pay Full"*—I elect to pay the next __ annual premium(s) for the above policy out-of-pocket.

☐ *"Pay Part"*—I elect to pay $____ of my annual premium for the above policy out-of-pocket each year with the balance being paid as indicated below

☐ *"Pay the Difference"*—I elect to use future dividends to reduce the amount of annual premium I pay each year and to pay the balance of my annual premium(s) for the above policy out-of-pocket each year.

☐ *"Pay Every 4 Years"*—I elect to pay my annual premium for the above policy out-of-pocket once every 4 years and to pay the annual premium in the other three years as indicated below.

Further, I authorize that each year the balance of the annual premium for the above policy that I do not pay out-of-pocket be paid via a withdrawal of the policy's dividend balance 1st. If the cash value of the dividend balance is not sufficient to pay the full premium, the balance of the premium should then be paid by a withdrawal from the cash value of the Paid-Up Additions Rider, if any. With regard to any of the "PAY SOME" options, I understand that future dividends are not guaranteed. If future dividend scales decrease and/or I make a withdrawal from or take a loan against the policy, it may not be possible to have all future premiums paid under the Accelerated Payment arrangement. In such case, I understand that the Accelerated Payment arrangement will terminate and if I want the policy to remain in effect, out-of-pocket premium payments will be required.

**SIGNATURE**

(Signature of Policyowner) _____    (Date) _____

---

**CONFIDENTIAL**

9

MP4011070983

## Accelerated Payment
### Providing Our Customers With Options

**MetLife**
Metropolitan Life Insurance Company
One Madison Avenue, New York, NY
For Internal Use Only
8798219M(exp1099)MLIC-LD

---

## Accelerated Payment
### Agenda

- AP Guiding Principles
- Current AP Situation
- Industry and MetLife Response
- New Illustration Demonstration

---

## AP Program
### Guiding Principles
- We Are In the Agent Business
- Sales Rep/Customer Interaction is Fundamental
- Market Forces Cannot Be Resisted
- Things Do What They Do
- All Customers Are Not Created Equal
- Range of Options
- Fairness
- Meet Customer Expectations



CONFIDENTIAL

MP4011070984

---

### Accelerated Payment

**_Current Situation_**

- Expectations Not Met
  - ◆ Sales Rep ⎫ "I/my client will pay X
  - ◆ Customer ⎬ premium for Y years."
- Reason ➝ Market Forces
  - ◆ Declining Interest Rates
  - ◆ Expenses

---

 

### Industry Response

 

---

 **A Sampling of Industry Responses** 

- Enhanced Value Policy
- Optional Enhanced Loan
- Enhanced Value Annuity



---

**CONFIDENTIAL**

MP4011070985



*Industry Reponses in Simpler Terms*



- Pay More (Policy)
- Pay More (Loan)
- Pay Once (Annuity)




---

*Enhanced Value Policy Option*

Pay More

- New policy subject to underwriting (liberalized)
- No Commissions
- 1st year premium must be paid
- Enhancement = 50% of new policy premium deposited into a PUAR



*Here's An Example...*

---

*Enhanced Value Policy Option*

Pay More

| | | |
|---|---|---|
| Issue Age | 35 | 42 | Prem Diff. |
| Original Premium | $1,500 | $2,050 | $550 |
| | | X 50% |
| Enhanced Amount | | $1,025 |

Policyholder buys a new policy increasing his/her premium payment by $550 (new prem minus orig. prem) in order to receive the enhancement.



**CONFIDENTIAL**

3

MP4011070986

**Pay More**

### *Optional Enhanced Loan*

- Loan Rate = Cost of Funds + 50 bp
- Maximum Loan = Annual Premium (up to 6 loans)
- Loans secured by policy values

*Summary*

- Loans reduce the Death Benefit
- With a $2500 premium, the interest saved is $37.50/yr (based on average difference of 150bp between regular loan rate and enhanced rate

**Pay Once**

### *Enhanced Value Annuity Option*



**Pay Once**

### *Enhanced Value Annuity Option*

- Nonqualified SPDA
- No commissions
- Payment amount:
  - Minimum = $2,500
  - Maximum = $10,000 to $50,000 (depending upon original face amount)

**CONFIDENTIAL**