Ex A

(14   OF  14)



MP401107098'7

---

**Pay Once**

## Enhanced Value Annuity Option
### (Cont'd)

*Enhancements*

- 1% above current credited rate (1st year only)
- Payment:
  - ◆ 2% on single payments of ≤ $25,000
  - ◆ 3% on single payments > $25,000
- Surrender charges waived at later of 59 1/2 or 4th contract year

---



## Industry Response Summary

| Option | Death Benefit | Cost |
|---|---|---|
| Life Insurance (Pay More) | New | Increased |
| Loan (Pay More) | Reduced | Increased |
| Annuity (Pay Once) | None (Possibly) | None |

---

## Accelerated Payment

*Current Situation*

- Expectations Not Met
  - ◆ Sales Rep }
  - ◆ Customer } "I/my client will pay X premium for Y years."
- Reason ➔ Market Forces
  - ◆ Declining Interest Rates
  - ◆ Expenses

---

**CONFIDENTIAL**

MET0110798

*AP Issue*

*MetLife's Action Plans*
- *Educate reps/customers*
- Provide options to facilitate trade-offs



YOUR METLIFE POLICY
AND THE
ACCELERATED PAYMENT ARRANGEMENT
🔵 MetLife

*Reviewing Your Whole Life Policy*
*(From Trackbook)*

**CONFIDENTIAL**

6

MP401107099

*Whole Life Insurance—A Choice
to Last a Lifetime
(From Trackbook)*

_____
_____
_____
_____
_____
_____
_____
_____

*The Accelerated Payment
Arrangement
(From Trackbook)*

_____
_____
_____
_____
_____
_____
_____

*How Dividends Are Determined
(From Trackbook)*

_____
_____
_____
_____
_____
_____
_____

**CONFIDENTIAL**

MP4011070990

*Dividends Are The MetLife Portfolio*
(From Trackbook)

*Dividends — A Long-term View*
(From Trackbook)

AP Issue

*MetLife's Action Plans*
- Educate reps/customers
- *Provide options to facilitate trade-offs*

**CONFIDENTIAL**

8

MP4011070991

**AP Issue**
*Options*

Principle
● All customers are NOT equal

*Irate Guy*       *Not So Irate Guy*

"I want to pay
X Premium for Y years"    "I'd rather pay X Premium
for Y years, but what are
my options?"

**AP Issue**

*Current Options*
● Pay full premium
● APL
● Elect "Dividends to Reduce"
● Elect nonforfeiture provision
   ◆ Extended term
   ◆ Reduced paid-up
● Wait and see
● Lapse

*Payment Options*
*(From Trackbook)*

**CONFIDENTIAL**

9.

MP4011070992

*Payment Options (Cont'd)*
*(From Trackbook)*

_____
_____
_____
_____
_____
_____



*AP Issue*
*Options*
**Irate Guy**

Pay None

Reduce Face          Wait and See

_____
_____
_____
_____
_____
_____



*Pay None*
*Reduce Face*
*2 Choices*

**Face Reduction**          **Reduced Paid-Up**
                        **(Nonforfeiture)**

_____
_____
_____
_____
_____
_____

**CONFIDENTIAL**

MP40110770993







CONFIDENTIAL

MP4011070994

*Pay None — No Out-of-Pocket*
*Outlay Required*
*(From Trackbook)*

---

*Pay None*
*Wait and See*



**Trade-offs**

| Positive | Negative |
|---|---|
| - Market forces could yield dividend scale increase; no out-of-pocket payments needed | - Total out-of-pocket payment could be more if dividend scale doesn't increase |

---

**AP Issue**
*Options*

**Not So Irate Guy**

Pay Some

| Pay It Again | Pay 25% | Leap Year | Pay the Difference |
|---|---|---|---|

**CONFIDENTIAL**

MP4011070995

*Pay Some — Out-of-Pocket*
*Outlay Required*
*(From Trackbook)*

*Pay Some — Out-of-Pocket*
*Outlay Required (Cont'd)*
*(From Trackbook)*

*MetLife's AP Program*

*Coming September 1!*

The Same Illustrative and
Administrative Support for Your Inforce
That You Now Have for New Business

**CONFIDENTIAL**

*13*

MP4011070996

**MetLife's AP Program**
*The Value to You*

- Rep Driven
- Information to you before your client
- Household Information
- New options:
  - ◆ Reduce Face
  - ◆ Pay Some
  - ◆ Leap Year
- Existing options now easier to use

---

*Request Form*

| Sales Office No. and Name | Agency | |
| Policy No. | Suffix | Principal Sale's Name |

**Pay None**

☐ "Wait and See"—I understand my policy values might not be sufficient to pay all

☐ "Reduce Face"—I elect to exchange my policy for a non-participating Single

this option I won't ever have to pay another premium out-of-pocket for this coverage. I understand that once reduced, I cannot reinstate coverage under this policy and that

**Pay Some**

☐ "Pay Full"—I elect to pay the next annual premium(s) for the above policy out-of-pocket.

☐ "Pay Part"—I elect to pay I _____ of my annual premium

to reduce the amount of annual premium I pay each year and to pay the balance of my annual premium(s) for the above policy out-of-pocket

☐ "Pay Every 4 Years"—I elect to pay the annual premium for the above policy out-of-pocket

---

Inforce Life: LIFE PAID UP AT 65

Insured
MALE 25 PREFERRED N-SM          State OH

Face Amount $250,000

Dividend Option: Additional Insurance

Policy on AP Arrangement
Policy #: 97xxxxxx
Issue Date: 02/13/1987

Enter "X" to CANCEL

**AP Options**

Pay None
1 Wait and See
Pay Some Options
2 Reduce Face
3 Calculate reduced AP year
4 Enter "Desired AP year
5 Pay the difference
6 Solve for level amount of premium
7 Pay each Leap Year (every 4th year)
Maximum Value Option
8 Pay Full Ledger

---

**CONFIDENTIAL**

MP401107097

DIST:XXXX                AGENCY:####              STATE

PREPARED FOR JOHN DOE

PLAN: LIFE PAID-UP AT 85                POLICY # 870 283 7277FR

                                        ISSUE DATE: 3/12/97

CLASSIFICATION        ISSUE AGE   SEX   INITIAL AMOUNT OF INSURANCE

PREFERRED NONSMOKER      25      M                 $290,800

                                        PREMIUM MODE: ANNUAL
                      ANNUAL PREMIUM       YEARS PAYABLE
                                         FROM DATE OF ISSUE
BASIC POLICY               $2,817.50           70
DISABILITY WAIVER            85.00             40
ACCIDENTAL DEATH BENEFIT    134.75             45
   TOTAL PREMIUM          $2,807.25
      ADDITIONAL INSURANCE BALANCE AS OF 3/10/97:        $30,329.40

**THE ILLUSTRATIVE VALUES THAT FOLLOW ARE BASED ON
THE 1997 DIVIDEND SCALE AND ARE NOT GUARANTEED.**

---

Pay None          *WAIT & SEE*
                NON-GUARANTEED VALUES
       ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | PREMIUM OUTLAY | AMOUNT WITHDRAWN | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | NONE | 2,808 | 1,702 | 5,078 | 17,139 | 292,183 |
| 12 | NONE | 2,808 | 1,792 | 5,082 | 18,062 | 281,336 |
| 13 | NONE | 2,808 | 1,890 | 4,373 | 19,372 | 279,448 |
| 14 | NONE | 2,808 | 1,997 | 3,961 | 20,561 | 272,553 |
| 15 | NONE | 2,808 | 2,107 | 2,897 | 22,147 | 387,536 |
| 16 | NONE | 2,808 | 2,235 | 2,328 | 23,829 | 382,383 |
| 17 | 448 | 2,320 | 2,350 | 2,350 | 28,108 | 382,967 |
| 18 | 458 | 2,320 | 2,487 | 2,487 | 28,737 | 383,875 |
| 19 | 328 | 2,487 | 2,627 | 2,627 | 39,377 | 382,186 |
| 20 | 180 | 2,627 | 2,785 | 2,785 | 34,215 | 283,330 |
| 21 | 25 | 2,785 | 2,950 | 2,950 | 36,350 | 283,512 |
| 22 | NONE | 2,808 | 3,043 | 3,193 | 38,943 | 283,862 |
| 23 | NONE | 2,808 | 3,135 | 3,343 | 43,043 | 284,835 |
| AGE 65 | NONE | 2,808 | 5,827 | 36,884 | 142,834 | 332,861 |

---

Pay None         *REDUCE FACE*
                NON-PARTICIPATING

| END OF POLICY YEAR | COST OF INSURANCE | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE* | DEATH BENEFIT |
|---|---|---|---|---|---|
| 11 | 453.76 | 0 | 0 | 17,138 | 187,500 |
| 12 | 484.15 | 0 | 0 | 17,309 | 187,500 |
| 13 | 529.80 | 0 | 0 | 17,805 | 187,500 |
| 14 | 563.46 | 0 | 0 | 17,808 | 187,500 |
| 15 | 619.33 | 0 | 0 | 17,753 | 187,500 |
| 16 | 667.53 | 0 | 0 | 17,779 | 187,500 |
| 17 | 724.74 | 0 | 0 | 17,791 | 187,500 |
| 18 | 784.08 | 0 | 0 | 17,848 | 187,500 |
| 19 | 855.80 | 0 | 0 | 17,841 | 187,500 |
| 20 | 928.09 | 0 | 0 | 17,313 | 187,300 |
| 21 | 988.53 | 0 | 0 | 17,808 | 187,500 |
| 22 | 1,087.34 | 0 | 0 | 18,825 | 187,500 |
| 23 | 1,161.28 | 0 | 0 | 18,133 | 187,500 |
| AGE 65 | 4,247.54 | 0 | 0 | 4,250 | 187,500 |

* Non-guaranteed values can increase the cash value

**CONFIDENTIAL**

MP401107099B

## REDUCED PAID-UP
### PARTICIPATING NON-GUARANTEED VALUES

Pay None

| END OF POLICY YEAR | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | TOTAL CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|
| 11 | 919.97 | 835.90 | 17,128 | 102,579 |
| 12 | 998.84 | 1,310.32 | 18,312 | 107,216 |
| 13 | 813.37 | 1,765.27 | 19,888 | 110,817 |
| 14 | 882.34 | 2,482.20 | 21,186 | 114,079 |
| 15 | 726.20 | 3,266.34 | 22,808 | 117,808 |
| 16 | 781.84 | 4,172.80 | 24,828 | 121,373 |
| 17 | 845.91 | 5,147.84 | 32,980 | 125,120 |
| 18 | 912.81 | 6,216.91 | 28,688 | 128,808 |
| 19 | 883.97 | 7,387.08 | 28,452 | 722,790 |
| 20 | 1,080.82 | 8,685.80 | 34,383 | 726,739 |
| 21 | 1,138.04 | 10,065.33 | 32,409 | 140,672 |
| 22 | 1,222.84 | 11,384.33 | 33,913 | 144,809 |
| 23 | 1,304.43 | 13,105.00 | 36,312 | 148,730 |
| AGE 65 | 3,304.84 | 45,731.00 | 80,598 | 393,984 |

## NATURAL AP YEAR=PAY 1
### NON-GUARANTEED VALUES

Pay Some

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | PREMIUM OUTLAY | AMOUNT WITHDRAWN | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | NONE | 2,808 | 1,702 | 5,879 | 17,126 | 293,160 |
| 12 | NONE | 2,808 | 1,782 | 8,091 | 21,631 | 306,174 |
| 13 | NONE | 2,808 | 1,880 | 7,434 | 22,434 | 299,536 |
| 14 | NONE | 2,808 | 1,997 | 8,905 | 23,808 | 293,803 |
| 15 | NONE | 2,808 | 2,107 | 6,454 | 23,704 | 286,971 |
| 16 | NONE | 2,808 | 2,225 | 9,906 | 27,391 | 285,186 |
| 17 | NONE | 2,808 | 2,350 | 5,830 | 29,580 | 282,111 |
| 18 | NONE | 2,808 | 2,447 | 5,606 | 31,830 | 279,900 |
| 19 | NONE | 2,808 | 2,627 | 5,879 | 34,429 | 278,506 |
| 20 | NONE | 2,808 | 2,785 | 6,925 | 37,075 | 277,938 |
| 21 | NONE | 2,808 | 2,966 | 6,143 | 40,143 | 278,140 |
| 22 | NONE | 2,808 | 3,042 | 6,571 | 43,321 | 279,789 |
| 23 | NONE | 2,808 | 3,135 | 7,314 | 46,816 | 281,137 |
| AGE 65 | NONE | 2,808 | 5,827 | 47,357 | 151,107 | 300,859 |

## DESIRED AP YEAR=PAY 3
### NON-GUARANTEED VALUES

Pay Some

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | PREMIUM OUTLAY | AMOUNT WITHDRAWN | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | NONE | 2,808 | 1,702 | 6,875 | 17,130 | 293,163 |
| 12 | 2,808 | NONE | 1,782 | 8,091 | 31,631 | 308,174 |
| 13 | 2,808 | NONE | 1,880 | 99,412 | 29,412 | 318,366 |
| 14 | 2,808 | NONE | 1,997 | 13,044 | 30,044 | 332,604 |
| 15 | 2,808 | NONE | 2,107 | 12,804 | 32,314 | 328,480 |
| 16 | 2,808 | NONE | 2,225 | 12,880 | 34,480 | 325,077 |
| 17 | 2,808 | NONE | 2,350 | 13,346 | 35,884 | 322,382 |
| 18 | 2,808 | NONE | 2,447 | 13,437 | 39,087 | 329,632 |
| 19 | 2,808 | NONE | 2,627 | 13,880 | 42,836 | 319,679 |
| 20 | 2,808 | NONE | 2,785 | 14,808 | 45,756 | 319,500 |
| 21 | 2,808 | NONE | 2,966 | 15,391 | 49,331 | 320,223 |
| 22 | 2,808 | NONE | 3,042 | 16,398 | 53,008 | 321,317 |
| 23 | 2,808 | NONE | 3,135 | 17,388 | 56,886 | 322,800 |
| AGE 65 | NONE | 2,808 | 5,827 | 71,730 | 175,480 | 402,484 |

**CONFIDENTIAL**

MP4011070999

**Pay Some**

## PAY THE DIFFERENCE
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TOWARDS PAYMENT OF PREMIUM

| END OF POLICY YEAR | GUARANTEED CONTRACT PREMIUM | ANNUAL DIVIDENDS | PREMIUM OUTLAY AFTER PRIOR YEAR DIVIDEND | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|
| 11 | 2,808 | 1,702 | NONE | 17,128 | 282,364 |
| 12 | 2,808 | 1,792 | 1,106 | 18,324 | 282,791 |
| 13 | 2,808 | 1,890 | 1,016 | 21,303 | 283,230 |
| 14 | 2,808 | 1,997 | 910 | 23,887 | 283,882 |
| 15 | 2,808 | 2,107 | 810 | 26,840 | 284,141 |
| 16 | 2,808 | 2,225 | 709 | 28,336 | 284,811 |
| 17 | 2,808 | 2,349 | 583 | 32,040 | 285,082 |
| 18 | 2,808 | 2,487 | 468 | 38,034 | 285,380 |
| 19 | 2,808 | 2,677 | 326 | 38,048 | 286,844 |
| 20 | 2,808 | 2,785 | 180 | 41,088 | 288,819 |
| 21 | 2,808 | 2,968 | 23 | 44,418 | 287,157 |
| 22 | 2,808 | 3,042 | NONE | 47,846 | 287,825 |
| 23 | 2,808 | 3,125 | NONE | 80,848 | 288,088 |
| AGE 86 | 2,808 | 8,827 | NONE | 129,109 | 297,737 |

**Pay Some**

## SOLVE FOR LEVEL PREMIUM
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | CONTRACT PREMIUM | AMOUNT WITHDRAWN | PREMIUM OUTLAY | ANNUAL DIVIDEND | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | 2,808 | 2,808 | 141 | 1,702 | 17,128 | 293,182 |
| 12 | 2,808 | 2,987 | 141 | 1,792 | 18,291 | 298,381 |
| 13 | 2,808 | 2,987 | 141 | 1,890 | 19,840 | 280,523 |
| 14 | 2,808 | 2,987 | 141 | 1,997 | 21,023 | 373,501 |
| 15 | 2,808 | 2,987 | 141 | 2,107 | 22,802 | 371,902 |
| 16 | 2,808 | 2,987 | 141 | 2,225 | 24,884 | 368,290 |
| 17 | 2,808 | 2,987 | 141 | 2,350 | 26,627 | 363,849 |
| 18 | 2,808 | 2,987 | 141 | 2,487 | 28,981 | 364,253 |
| 19 | 2,808 | 2,987 | 141 | 2,677 | 31,425 | 363,477 |
| 20 | 2,808 | 2,987 | 141 | 2,785 | 34,044 | 363,387 |
| 21 | 2,808 | 2,987 | 141 | 2,860 | 37,083 | 364,130 |
| 22 | 2,808 | 2,987 | 141 | 3,042 | 40,236 | 363,293 |
| 23 | 2,808 | 2,987 | 141 | 3,125 | 43,502 | 368,736 |
| AGE 86 | 2,808 | 2,987 | 141 | 8,827 | 147,573 | 343,148 |

**Pay Some**

## PAY EACH LEAP YEAR
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | CONTRACT PREMIUM | AMOUNT WITHDRAWN | PREMIUM OUTLAY | ANNUAL DIVIDEND | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | 2,808 | 2,808 | NONE | 1,702 | 17,128 | 293,182 |
| 12 | 2,808 | NONE | 2,808 | 1,792 | 17,830 | 298,174 |
| 13 | 2,808 | 2,808 | NONE | 1,890 | 21,800 | 298,526 |
| 14 | 2,808 | 2,808 | NONE | 1,997 | 23,303 | 293,853 |
| 15 | 2,808 | NONE | 2,808 | 2,107 | 23,766 | 288,971 |
| 16 | 2,808 | 2,808 | NONE | 2,225 | 30,581 | 302,345 |
| 17 | 2,808 | NONE | 2,808 | 2,350 | 32,734 | 298,430 |
| 18 | 2,808 | 2,808 | NONE | 2,487 | 36,300 | 297,480 |
| 19 | 2,808 | 2,808 | NONE | 2,627 | 37,387 | 298,250 |
| 20 | 2,808 | NONE | 2,808 | 2,785 | 43,791 | 310,118 |
| 21 | 2,808 | 2,808 | NONE | 2,860 | 47,240 | 310,607 |
| 22 | 2,808 | NONE | 2,808 | 3,042 | 50,836 | 391,876 |
| 23 | 2,808 | 2,808 | NONE | 3,125 | 84,860 | 313,063 |
| AGE 86 | 2,808 | NONE | 2,808 | 8,827 | 192,791 | 430,361 |

**CONFIDENTIAL**



 

CONFIDENTIAL

MP401107100O

18

### The Next Steps

- Field Release (draft completed)
- Track Book (completed)
- Bills and Statements will reflect the option selected
- Roll-out
  - State Approvals
  - Conference Calls
  - Training Meeting
  - Illustration Capability

MP4011071001

**CONFIDENTIAL**

*19*

Ex 46

MP401071129

Frank Lynch
Senior Vice-President
ILI Customer Services

Re  *"Collapse Date Notification"* - Accelerated Premium Payment

Frank, I have just reviewed the October 25th release to the Field on;
    *Accelerated Payment (AP) Arrangement Customer Communications*

I hate to keep beating a dead horse but I am sorely disappointed.  As the records will show, based on all the customer feedback we were getting about three years ago, I recommended that the Company take *immediate action* to address the *Accelerated Payment* issue with our policyholders. The result has been that it has taken the Company the best part of three years to begin to deal with this problem with *specific* affected policyholders.  This action is outlined in the above release and, based on the *"re"* line, the Company apparently believes it is now *"communicating"* this issue to *some* of its affected customers.  This communication consists of an innocuous statement on the billing document that will be confusing at best or will enrage those who believe they have been misled.

Of real concern is the fact that the Company is not fully addressing the problem.  It is only *notifying* (*not explaining to*) those policyholders whose *AP* arrangement is going to cease within the next *five* years.  The Company's failure to notify the entire 25% of the *AP* policyholders whose policies would currently be ineligible based on current *AP* calculations seems indefensible.  I recognize that the Company has tried to address the *AP* issue in general terms with its policyholders through *MetLife Outlook* and other communications.  But, we have not attacked the problem directly by going straight to those specific policyholders who we know are at risk.  And, part of the problem is the fact that since the *AP* arrangement was never properly explained to the policyholder in the first place, he or she may not realize the Company is talking about them in some of the general communications.

The *AP Natural Work Team* offered several proposals to deal with specific policyholders.  One proposal suggested notifying all 93,000 policyholders currently on the *AP* arrangement and I believe giving them the specifics for their policy.  There was at a projected cost of $150,000 and I'm led to believe the cost was a consideration for not doing it.  While this approach excludes all those policyholders *currently expecting* their policies to be *"paid-up"* in the near future, it would have at least addressed those whose *AP* arrangement is currently projected to fail at some future date.  If cost was the reason for not doing it, it seems to me that $150,000 could wind up being an insignificant amount in light of some of the judgements currently being awarded associated with *vanishing premium* cases.

**CONFIDENTIAL**



And, the Company's failure to deal with the whole spectrum of potential *AP* misrepresentation is only going to prolong the agony. At this pace, our Customer Service Representatives and Consumer Relations areas will *never* be able to get out from under these difficult calls and complaints. Is the intent to pray that if we address it a little at a time we are at less risk? Somehow I don't think that strategy is going to work. Considering all the current lawsuits associated with *vanishing premiums*, it only increases the length of time the Company is vulnerable to once again being brought to its knees by some future class action suit or renegade Insurance Commissioner. And, any such action will once again demoralize the entire Field Force, customer service organization and the CSRs who have to live through it.

The Company should make no mistake about it, as I graphically illustrated several years ago from our phone calls, many of our representatives *DID* misrepresent *AP* to our customers. Applicants or policyholders were told their policies would be *"paid-up"* in "X" years with no further premiums required. Some of this may have been done out of ignorance, a lack of training or knowledge, but, whatever the reason, . . . . *it was done* and the Company needs to recognize and address that fact.

And, as we now know, this was the terminology and tactic used to sell these policies throughout the industry. Yet, in spite of our educational efforts, the Company is going forward on a very limited basis with our *known AP* problem policyholders. This is being done in an environment where other insurance companies are having judgements against them right and left for real and alleged misrepresentations associated with vanishing premiums. **Do we not run a far greater risk of lawsuits, heavy fines or actions forced by some state Insurance Department by *failing* to deal with this issue head on????**

We have now lowered our dividend scale for 1996. This probably means that the 25% figure is now low. And, we don't know how many are still out there *"waiting and expecting"* to be eligible on some future date that isn't going to happen. The lower dividend scale is going to further exacerbate the AP problem and will make it even more difficult to deal with our policyholders. The Company has lowered it at a time when, in the eyes of the policyholder, we should be raising it. The stock market has gone crazy, interest rates are up, and most investments would appear to be recovering.

Had we addressed this problem three years ago, it would have been much easier for the customers to accept that the economy was a major factor in our *Accelerated Payment* problems. The Customer Service Centers were far more successful in appeasing even misrepresented policyholders at that time by adequately explaining *AP* and the relationship between dividends and the economy. But, the Service Centers have really only been dealing with those policyholders who are expecting their policies to *become eligible* for AP. Now, we will begin dealing with those policyholders whose policies are *currently on AP* as well as those *who are expecting* their policies to go on AP at some future date.

**CONFIDENTIAL**

MP40110711131

Even though we are only addressing a small piece of the affected customer base, this current communication was obviously not considered from a customer perspective. The one statement *"Your dividends will pay the premiums until —"* is hardly an explanation to those policyholders who are most likely under the impression that he or she *will never have to pay another premium.* And, as much as some people might like to believe our representatives will be out there to explain it, I think history tells us it won't happen. Most of the reps involved in the sales are long gone and those who are there won't want to deliver this kind of bad news to anyone. It is the **Customer Service Representatives** who will eventually get these calls.

The lower dividend scale for 1996 will undoubtedly give us a new wave of *Accelerated Payment* complaints a few years from now when we don't meet those dates. Like it or not, our reps did mislead policyholders. If the Company intends to be *World Class*, the customer service organization needs to compensate for our reps by ensuring that, as a Company, we *communicate effectively* with our policyholders and that we *educate* them. One or two sentences on a billing document hardly qualifies.

Perhaps now that I'm back in the real world most of the time, I find my skepticism is returning. It is still my perception that in ILI, customer service interactions are viewed primarily as an expense versus being an opportunity or an investment in the Company's future. I believe Kathy Schoos brought this point home very well in her excellent response to Larry Baum's LOMA study comparisons. As she so eloquently pointed out to Larry, ILI's administrative mentality still seems to be that a *three minute* phone call has to be better than a *four minute* phone call. The assumption always seems to be that cheaper has to be better. It seems that little or no consideration is given to the value of spending a little time trying to actively *educate* our customers or trying to *build a relationship*. And, enhancing our efforts to generate even greater numbers of sales opportunities is going to add time. At a time when our existing customer base would appear to be critical to the Company's future livelihood, constant focus on the expense side or *"numbers"* is a very shortsighted philosophy.

It is also totally contrary to the Company's stated *Market Reach Strategy* to *Build Customer Relationships through Service - Education & Trust.* The Company's approach to handling *Accelerated Payment* is not service, does not educate and will not create trust. This, and failure to develop a genuine customer focus that permeates the entire organization, will only serve as evidence to those on the front lines with the customer that while the Company may talk the talk, it's not walking the walk.

After the devastation the call centers experienced as a result of the publicity, restoration and restitution, we have recovered. All of us want to put that unfortunate part of MetLife's history behind us. MetLife Express appeared to provide hope and evidence that MetLife is going to change. But, if we don't put *all* of our bad experience behind us, making a complete transformation to a customer focused Company is going to be exceedingly difficult or impossible. Our Customer Service Representatives will be among the first to know whether the change is real or not. They will be taking the phone calls and complaints over the coming years. And, if they don't sense that the Company is seriously addressing these issues with genuine customer focus, all the rhetoric about MetLife becoming a *World Class* customer service organization will be just that.

)NFIDENTIAL

MP40110711132

After Phase 2, I was excited and optimistic. I walked away from my five months on MetLife Express walking on a cloud with high hopes and high expectations for the Company and for Individual Life Insurance. For the first time in a long time I had a sense of renewed hope and enthusiasm that the *value and opportunity* associated with the delivery of customer service was finally being recognized. Everything I saw and heard during our CMO presentations and interactions told me that the most senior management of this Company really did want to change MetLife. I sincerely believe they want all the customer service organizations to be genuine advocates for the customer and become the model for the industry with respect to the delivery of customer service.

I continue to have a strong sense that the very senior management of this Company does want the change. So does the bottom. Everywhere I went and continue to go around the Company, the *"front lines"* are eager and ready for change. They recognize that, as a Company, we must change. But now, as I have time to reflect on it, perhaps the Company has bitten off more than it can chew. Creating an entire organization that is genuinely customer focused and driven to action based on customer needs will be a monumental challenge for this Company. This would be an outstanding achievement if it were the only MetLife Express initiative. But, when you really get inside the ILI organization, there is just so much history and culture to overcome that I really don't know if it can be accomplished.

For years within ILI, the marketing organization was the center of its universe. The Field drove most of the major actions taken. The needs or wants of the customer usually wound up pretty far down on the priority list. If ILI is to survive, and hopefully flourish, we must make *the customer* the center of the universe. But, this will require a totally new culture and mindset and so much of the organization is so far removed from the customers that they cannot properly relate to the issues at hand. The entire administrative and systems organization and its associated culture must develop a real commitment to the customer and the delivery of a dramatically higher level of customer service.

In Phase 2, I thought MetLife Express did a good job of outlining why this must happen and the benefits associated with it. But, consolidation, new technologies or even a new organization will not bring all the needed changes. For an organization to change, *the people in it must change* and I don't see that MetLife Express has the power to make that happen. From my vantage point, the approach the Company has taken to AP would appear to be testimony to the fact that the Company has a very long way to go towards achieving a real customer focus and meeting the customer service challenge.

**CONFIDENTIAL**

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 4, 1995

cc  Gardner & Tweedie