# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT G. WYCKOFF | ) | Civil Action No. 00-2248 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Chief Judge Donetta W. Ambrose |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY and KENNETH F. KACZMAREK, | ) | |
| | ) | |
| Defendants | ) | |

---

## PLAINTIFF'S BRIEF IN RESPONSE TO METROPOLITAN LIFE INSURANCE COMPANY'S MOTION IN LIMINE TO EXCLUDE FROM EVIDENCE PLAINTIFF'S EXHIBIT NOS. 21, 39, 40, 41, 42, 46, 52, 55, 58, 112 AND 113 DOCUMENTS AUTHORED BY AND RELATING TO JAMES RAYL

---

### PRELIMINARY STATEMENT

In this Motion in Limine, Defendants argue that evidence of letters written by former MetLife employee James Rayl, head of MetLife's Tulsa Ok, Customer Service Center during relevant time periods to this case are inadmissible. This Court permitted the introduction of these same documents during the trial of <u>Tran v MetLife, et al</u>. Civil Action No. 01-262 and in <u>Solarchick v. MetLife</u>, Civil Action no. 01-444. In both these cases this Court found that the documents were relevant and admissible. <u>See</u> May 12, 2006 Order of Court entered in <u>Solarchick</u>.

The fact that Mr. Rayle's letters or the letters relating to James Rayl were authored after the sale in the instant case does not change the fact that his letters address an ongoing problem with the manner in which policies were sold pursuant to use of MetLife's APP program. The APP program

was introduced by MetLife in 1982 and the sales method used was consistent from the inception through the time of sales to the plaintiff and thereafter. Where the same habit custom and practice is engaged in over a period of time, evidence of the practice before, during and after the sale at issue is relevant to establish that the same conduct took place in the sale at issue.

In **Commonwealth v. Porter**, 659 F.2d 206 (3d Cir. 1981), cert. denied, 458 U.S. 1121 (1982), the Third Circuit Court held that the district court's admission of evidence of a pattern of civil rights violations was proper. This pattern or routine practice occurred over more than two years prior to the filing of the suit and also subsequent to the litigation. The Court held this evidence relevant to showing a routine practice of the defendant. **See also Stauffer v. Stauffer**, 351 A.2d 236, 244 (Pa. 1976) "**A fraudulent intention at the time of a transaction can be inferred from the totality of the circumstances surrounding the transaction, including subsequent conduct on the part of the defendant**." (emphasis added)

Additionally, the evidence of a continuous course of outrageous conduct after the sales at issue goes to establish proof of whether punitive damages should be awarded.

Plaintiff was provided a "vanishing" premium illustration for the whole life policy under the APP plan. The evidence plaintiff seeks to introduce supports the fact that MetLife had a regular business practice of selling "vanishing" premium policies.

The identical problem that occurred in the APP sales in the 1980's continued into the mid-1990's and the plaintiffs are evidence of this problem.

The sales methods used in the instant case are identical to the sales methods that Mr. Rayl was concerned about as being deceptive. Indeed, the evidence demonstrates that the same deceptive sales practices were used by Metropolitan Life sales agents on a national basis. Therefore, the fact

-2-

that Mr. Rayl is not specifically mentioning sales in Pennsylvania is irrelevant.

Plaintiff alleges that MetLife had a business practice of selling whole life policies based upon misrepresentations as to the number of years that the policyholder would be required to make out-of-pocket premium payments on their life insurance policies. <u>See</u> Complaint.  The evidence will demonstrate that MetLife, through its sales agents, used this deceptive business practice routinely, widely and repeatedly, and further MetLife condoned this business conduct either directly through awards and bonuses, or tacitly by not taking appropriate measures to stop such practices once senior management had knowledge they were occurring.

 Moreover, this very same business conduct occurred in the sale of the policy at issue in this case and plaintiff was harmed thereby.  This evidence will tend to prove the allegations of plaintiffs are true and supports the credibility of the plaintiffs and the lack of credibility of the defendants.

Furthermore, plaintiff seeks to introduce this evidence for the purpose of establishing the context of MetLife's knowledge, intent and corporate culture which permitted this business practice of selling life insurance policies by misrepresenting the actual cost of the policies.  The pattern and practice evidence demonstrates that MetLife is liable for the sale to the plaintiffs through misrepresentations as to the performance and cost of the three universal life policies and the whole Life life insurance policy.

The testimony of the former and current MetLife executives, as well as the documents sought to be introduced by the plaintiffs, are relevant to the plaintiffs' claims and should be admitted by this Court as they were found to be admissible in the <u>Tran</u> and <u>Solarchick</u> cases.

Finally, MetLife is incorrect in its reading of Rule of Evidence 404(b).  Indeed, this Court properly found that these documents are relevant and admissible in the <u>Tran</u> and <u>Solarchick</u> case.

**ARGUMENT**

I.    **THE PROPOSED EXHIBITS NOS. 21, 39, 40, 52, 55 AND 58, ARE RELEVANT TO THIS CASE EVEN IF AUTHORED SUBSEQUENT TO THE SALES AT ISSUE**.

MetLife's argument is premised on the basis that the letters were drafted subsequent to the sale in the instant case and therefore MetLife could not have been on notice of the use of deceptive sales tactic in 1991. This argument is erroneous for two solid reasons: (1) the deceptive sales addressed in the letters took place in the mid to late-1980's and early 1990's, the same as in the instant case and (2) plaintiff can demonstrate that a fraudulent misrepresentation occurred through the use of habit and practice evidence that occurred, prior to, contemporaneously with or subsequent to the sale at issue.

In **Commonwealth v. Porter**, 659 F.2d 206 (3d Cir. 1981), cert. denied, 458 U.S. 1121 (1982), the Third Circuit Court held that the district court's admission of evidence of a pattern of civil rights violations was proper. This pattern or routine practice occurred over more than two years prior to the filing of the suit and also subsequent to the litigation. The Court held this evidence relevant to showing a routine practice of the defendant. **See also Stauffer v. Stauffer**, 351 A.2d 236, 244 (Pa. 1976) "**A fraudulent intention at the time of a transaction can be inferred from the totality of the circumstances surrounding the transaction, including subsequent conduct on the part of the defendant**." (emphasis added); **see also Wigmore on Evidence Chapter 13, Other Offenses or Similar Acts, as Evidence of Knowledge, Design, or Intent, § 302. Theory of Evidencing Intent**. p, 245, ftnt1 ("Where other acts are offered as evidentiary of intent under the rule heretofore mentioned, it matters not whether they are subsequent or prior in time. Regina v. May, 1 Cox Cr. 236 (1845); Shreve v. United States, 103 F.2d 796 (9 Cir., 1939).").

-4-

Significantly, the Rayl documents address the fact that whole life policies were sold improperly as if they were "paid-up" policies after a set number of years of payments. The identical problem in the instant litigation.

The focus of all of the letters is the manner in which the policies were sold was deceptive, and when or how the policyholder learns of the deception is immaterial to the fact that the letters describe the sales method of how the policies were deceptively sold that is identical to the sale to plaintiff. The fact that the letters authored by or sent to Jim Rayl on the APP problem of the agents selling the policies as it they were "paid-up" policies are dated after the sale to the Plaintiff is immaterial. The problems with "vanishing" premium sales detailed in the letters are identical to the "vanishing" premium sales problem with the sale to plaintiff. The premiums did not disappear when the dividend and interest rates were reduced, and MetLife had no reasonable basis for using either the interest or dividend rates that were used in the illustrations since the rates of returns could not be projected with any accuracy beyond one year. This is the exact same problem in every APP sale and is what occurred in the sale to plaintiff.

## II. METLIFE'S DEFENSE BASED THE LOCATION OF THE MISREPRESENTATION IS IRRELEVANT.

In State Farm v. Campbell, 538 U.S.408,123 S.Ct. 1513, 1522 (2003), the Supreme Court determined that "**...[O]ut-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious**, but that conduct must have a nexus to the specific harm suffered to the plaintiff." (Emphasis added). The out-of-state conduct of selling policies using APP illustrations is identical to that used in the instant case and is therefore relevant and admissible.

III.    **EXHIBIT NOS. 41 AND 42 DEMONSTRATE USE OF THE "VANISHING" PREMIUM SALES TACTIC AS A REGULAR SALES METHOD.**

Exhibit 42 is a letter from Mr. Rayl to Kathy Schoos, Director of the MetLife Customer Service Center in Warwick RI., thanking her for writing a letter of support to the Home Office demonstrating that there was a widespread problem with the MetLife sales force making "vanishing" premium sales throughout the entire country. See Ex. 42.

During the trial of the Tran v. Metropolitan Life case, MetLife asserted that the problem with "vanishing" premium sales was only a problem west of the Mississippi as demonstrated by the fact that only Jim Rayl was complaining. However, Exhibit 42 destroys this argument since it demonstrates that "vanishing" premium sales were also a widespread problem east of the Mississippi. Id.

Contrary to MetLife's assertions that Exhibit 42 relates to a complaint for a sale made in Ohio, Exhibit 42 is a "key" document that confirms that sales agents were using APP illustrations to sell policies as if they were "paid-up" after a limited number of years on a widespread basis throughout the entire United States since both of MetLife's Customer Service Centers, (Tulsa, OK and Warwick, RI), had identified the same problem. See Ex. 42.

Similarly, Exhibit 41 is an important document since it speaks to the "vanishing" premium problem in the companywide sense. See Ex. 41. Mr. Rayl states: "From our perspective, the problem has been seriously compounded because of the marketing strategy used to sell or explain the concept of AP. It is very apparent from our experience that a substantial percentage of these policyholders were told that once AP took effect, they were "*paid up*" policies." Id. This is the identical marketing tactic used in the sales to the plaintiff.

MetLife's argument that the letters do not specifically reference Pennsylvania is immaterial. See TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)(Similar out-of-state business conduct is relevant to establish the harm suffered by the plaintiff).

Accordingly, both Exhibits 41 and 42 are relevant and should be admitted.

## IV.    EXHIBIT NOS. 46, 112 AND 113 ARE RELEVANT AND MATERIAL.

Portions of Exhibit 46 are relevant to proof that the misuse use of the APP illustrations to sell policies with "vanishing" premiums was ongoing. The January 19, 1994, letter to Robert Cirmmins, MetLife's Vice President in charge of Personal Insurance for the entire United States, provides evidence of MetLife's corporate culture. Mr. Rayl explains in relevant part that he informed management for the past three years that "I tried to convince people we were (and are) sitting on a time bomb with the way the Accelerated Payment Plan was presented and sold to our customers." See Pl. Ex. No 46 at 2.

The portion of the letter that identifies the sales problem with regard to the use of APP is the identical problem that occurred in the sales to plaintiff. This evidence tends to prove that the problem was real, ongoing and left unresolved by MetLife management for years. The evidence supports plaintiff's credibility, supports proof of liability and the punitive damages claim.

MetLife's argument that the letter was written after the sale is immaterial since evidence of similar subsequent conduct is admissible. See Commonwealth v. Porter, 659 F.2d 206 (3d Cir. 1981), cert. denied, 458 U.S. 1121 (1982)(evidence of subsequent use of business practice is relevant to showing a routine practice of the defendant); See also Stauffer v. Stauffer, 351 A.2d 236, 244 (Pa. 1976)("A fraudulent intention at the time of a transaction can be inferred from ... subsequent conduct

-7-

on the part of the defendant."); <u>Wigmore on Evidence</u> Chapter 13, Other Offenses or Similar Acts, as Evidence of Knowledge, Design, or Intent, § 302. Theory of Evidencing Intent. p, 245, ftnt1 ("Where other acts are offered as evidentiary of intent under the rule heretofore mentioned, it matters not whether they are subsequent or prior in time. <u>Regina v. May</u>, 1 Cox Cr. 236 (1845); <u>Shreve v. United States</u>, 103 F.2d 796 (9 Cir., 1939).").

Exhibits 112 and 113 are a job evaluation for Mr. Rayl in 1991 and a document detailing the accomplishments of the Tulsa office in 1992. Exhibits 112 and 133 demonstrates that Mr. Rayl was part of MetLife management and Director in charge of the Customer Service Center anmd set forth his responsibilities and achievements within MetLife. The Exhibits support his credibility as to his testimony regarding the use of APP sales and MetLife's corporate culture.

## V.    APPLICATION OF RULE 404(B)(2) PERMITS THE ADMISSION OF PLAINTIFF'S RELEVANT EVIDENCE.

F.R.E. Rule 404(b)(2) also permits the introduction of evidence of prior acts on the part of a party where those acts may demonstrate "**proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,** . . .". [Emphasis added].

Particularly instructive is the case of <u>Rosenburg v. Lincoln American Life Ins. Co.</u>, 883 F.2d 1328 (7th Cir. 1989), where the defendant life insurance company sales agents were routinely as a business practice misrepresenting that Lincoln was providing guaranteed coverage. Evidence of other examples of the same sales practices was permitted. "A Lincoln Administrative Assistant, testified that the company was aware that agents had represented that Lincoln was providing guaranteed coverage to dependents in other cities and had compiled a list of cities where such "misrepresentations" had occurred." <u>Id.</u> at 1331. Lincoln objected to this testimony of statements

made to others outside of the individual sale and Mr. Rosenburg's presence regarding Lincoln's program in Granite City and other cities in Indiana claiming that these statements were irrelevant, prejudicial and inadmissible under Fed.R.Evid. 404(b) as evidence of other wrongs or bad acts.

The District Court and the Seventh Circuit both rejected the insurer's arguments and concluded the evidence was relevant and admissible under F.R.E. 406.  The Seventh Circuit in permitting the evidence of other sales and bad acts held:

> **There was sufficient evidence of such a routine practice by Lincoln agents such that the testimony in question was properly admissible under Fed.R.Evid. 406 to establish that Lincoln acted in conformity with its routine business practice in this instance.**[fn5] See G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1533 (11th Cir. 1985).

Rosenburg, at 1336.

In another case where another life insurance company was sued for fraudulent business practices and pattern and practice evidence was permitted under F.R.E. Rule 406, in Brennan v. The Paul Revere Life Insurance Company, Case No. 00 C 0725 (N.D. Ill. 2002), in denying the insurer's motion in limine to preclude evidence of other similar acts and business practices the District Court held, "Though there may, in some cases, be a fine line between "routine practice" evidence admissible under Rule 406 and "other act" evidence generally rendered inadmissible under Rule 404(b), Brennan's policy evidence does not come close to that line."  See Exhibit 1 a copy of the Brennan opinion.  In Brennan, the Plaintiff offered evidence that the insurance company had a business practice to target high amount claims and Defendants sought through fourteen motions in limine to restrict Plaintiff's evidence.

Similarly, to the instant motion filed by MetLife seeking to limit any evidence outside of the first hand knowledge of the individual sale, the insurer in Brennan filed the same motion. "Their

third motion in limine seeks to exclude the testimony of Dr. William Fiest, a former Provident

medical director, concerning that company's policies.  Defendants argue that Brennan's claims

concern defendants' handling of his particular insurance claim, and not how they may have handled

other claims made by other people at other times." Id.  The District Court rejected this motion,

holding:

> **Some of the evidence offered by Brennan tends to show the existence of a**
> **regularly-followed policy or practice that is sufficiently routine and**
> **"automatic" to permit its admission under Rule 406 as construed in Simplex**
> **and Rosenburg.**  Specifically, plaintiff has direct evidence consisting of the
> testimony of Dr. William Fiest, a former Vice President and Medical Director of Paul
> Revere, that that company had a policy of targeting for termination certain types of
> high-level disability insurance claims (including those of the type made by Brennan)
> and then marshaling evidence to support the termination, rather than dealing with the
> claims fairly.  Though, as defendants point out, Fiest left Paul Revere before the time
> period when Brennan's benefits were terminated, **plaintiff has sufficient evidence**
> **of the continuation of this policy or practice into the relevant time period,**
> **including the period after Paul Revere was acquired by Provident, to provide**
> **an adequate foundation for a reasonable inference that it did in fact continue.**
> **Plaintiff likewise as sufficient circumstantial evidence to permit a reasonable**
> **inference that the policy was followed in his particular case. Though defendants**
> **dispute this evidence and the inferences to be drawn from it, those are matters**
> **for the jury; Brennan has laid an adequate foundation for admission of this**
> **evidence.**  Though there may, in some cases, be a fine line between "routine practice"
> evidence admissible under Rule 406 and "other act" evidence generally rendered
> inadmissible under Rule 404(b), Brennan's policy evidence does not come close to
> that line.

Id. (emphasis added).  Likewise, in the instant case, plaintiffs seek to introduce relevant evidence

to establish liability of the injury caused by MetLife's business practices.

Just because the evidence of the custom, habit and business practice demonstrates that

negligent and/or fraudulent conduct took place as a regular business practice does not mean that it

is prejudicial to the Defendants, nor does this prevent the admission of the evidence to prove the

elements of negligence and fraud as well as aids in establishing the credibility of the parties. **See**

**Rohm and Haas Co. v. Continental Cas. Co.**, 781 A.2d 1172 at 1179 fn6 (Pa. 2001) (circumstantial evidence of a pattern of conduct was permissible to establish proof of intent. "While a single isolated incident of some event followed by a second event may render tenuous an inference that the first event caused the second, a series of such incidents accompanied by other circumstantial evidence may result in a much more compelling conclusion."); **General Equipment Manufacturers v. Westfield Insurance Co.**, 635 A.2d 173, 185 (Pa. Super. 1993)("evidence of similar acts or transactions is admissible when relevant to prove an issue in the case. Accordingly, evidence of a course of conduct or dealing followed by a person may be admitted to prove that he acted in accordance with it on a given occasion, provided such a course of conduct or dealing is shown to have been continuous and systematic.").

Similarly with MetLife, plaintiffs must prove that MetLife knew about not only the activity of its employee sales agents for some time, but also the regular business practices used by its employee sales agents and should have been more responsive to the situation. Plaintiffs also have to prove that MetLife knew or should have known of the necessity and opportunity for exercising such control. To meet this required showing, plaintiffs must establish that the Defendants had some form of notice. Thus, it is important for plaintiffs to demonstrate that other incidents of the use of the same sales practices has occurred involving other sales agents who may have been similarly situated within MetLife and MetLife took no effective action to stop such conduct, or indeed, approved of the conduct.

The business practices and knowledge of MetLife itself are at issue, since MetLife is also a defendant, along with the manner in which it supervised its employees. The inability to present any evidence of the business practices and knowledge of MetLife itself would prejudice and harm

plaintiffs' proof of their claims as to liability against MetLife regarding its business practices and how they directly relate to the sale of the polices to plaintiffs.

This principal of permitting evidence of the business practices in fraud cases is based upon the concept that evidence of similar business practices evidence is admissible to prove a course of conduct, if the evidence falls into one of five exceptions to the general rule that this evidence is inadmissible because it generally is prejudicial. The five exceptions are: "(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial — in other words, where there is such a logical connection between the [frauds] that proof of one will naturally tend to show that the accused is the person who committed the other." See Commonwealth v. Peterson, 307 A.2d 264 (Pa.1973); see also Commonwealth v. Marsh, 566 A.2d 296 (Pa. Super. 1989); citing Commonwealth v. Clayton, 532 A.2d 385, 392 n.8 (Pa. 1987).

All five of these exceptions exist in the evidence that plaintiffs seeks to offer at trial. The Pennsylvania Supreme Court in Commonwealth v. Peterson, further held that where evidence relates **to any one of these five issues** it is admissible: **"When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value."** Id. at 307 A.2d 264 at 269-270 (Emphasis added).

Moreover, there is a procedure for resolving any possibility of confusion or misunderstanding of the jury as to purpose of the admission of the evidence. Any possible misunderstanding can be clarified through instructions by the trial court. If evidence is admissible for one purpose, but not for another, the trial judge should instruct the jury on the restricted purpose for which the evidence has

-12-

been admitted.  F.R.E. 105 requires the judge to give such and instruction if a party requests it. A

party should request that instructions be given to insure that the jury make the proper use of the

evidence and that it is not used for an improper purpose.  This exact issue was also discussed and

explained in Commonwealth v. Peterson, and the Pennsylvania Supreme Court held that any possible

confusion of the purpose for the admission of the prior bad acts or any possible prejudice that might

be caused thereby could be explained and clarified through cautionary charges by the trial court:

> The trial judge informed the jury at the outset that they were in effect trying two separate cases at one time and for this reason would have to pay especially close attention to the evidence so as to be able to properly segment it. **At the close of trial an extensive cautionary instruction was given which again directed the jury to confine the relevant evidence to each offense. This instruction was precise and unassailable.**

Commonwealth v. Peterson, 307 A.2d 264 at 271.

Moreover, in a fraudulent misrepresentation, the standards of evidence are relaxed for

plaintiffs to prove their claims.  As Henry on Pennsylvania Evidence stated:

> **The rule which excludes evidence of other acts to prove a particular act is greatly relaxed in cases of fraud.**  Thus allegations of misrepresentations as to financial condition and of conveyance of property to defraud creditors may be supported by showing similar misrepresentations to others and transfers of other property as a series of acts constituting a general scheme to defraud.  And **where a conspiracy to cheat and defraud in a particular instance is charged, evidence of a scheme to cheat and defraud the public generally may be given.**  If notes are alleged to have been fraudulently raised in amount, evidence of raising or of other notes by the same person is admissible where it tends to show a general scheme to obtain money on raised notes.

See Pennsylvania Evidence by Henry, Volume 1, Chapter 1 §36 Similar Facts, Conditions or

Conduct - Fraud, p.73 (Emphasis Added); See also Wigmore on Evidence, Third Edition, Vol. II,

§ 367; Lisenba v. The People of the State of California, 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 179

(1941);  Snayberger v. Fahl, 195 Pa. 336, 342 (1900)("Where fraud is alleged, great latitude of proof

is allowed and every fact or circumstance from which a legal inference of fraud may be drawn is admissible."); <u>Gee v. CBS, Inc.</u>, 471 F. Supp. 600, 617-634 (E.D. Pa., 1979).

Evidence of prior acts to establish and prove a system or method of fraud is admissible also to demonstrate that a party's conduct was consistent with a general course of conduct on their part, a general design, or purpose:

> **Where a series of acts indicates a general design, purpose or course of conduct on the part of the person who committed them, they become competent evidence on the question of whether or not a similar particular act was done by the same person.** Even though an act is so remote in point of time from that charged that the statute of limitations would bar a prosecution for it, it would still be admissible if one of a series of acts tending to show guilt of the party charged. ...

<u>Pennsylvania Evidence by Henry</u>, Chapter 1, §36 Similar Facts, Conditions or Conduct - Course of Conduct, p.67. (emphasis added).

The documents also demonstrate MetLife's repeated use of the deceptive sales method are also directly relevant to the issue of whether Defendants' conduct was egregious.  As the United States Supreme Court has determined:

> **Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law.** <u>See</u> [TXO] <u>id.</u>, at 462, n. 28. Our holdings that **a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.** <u>See</u> <u>Gryger v. Burke</u>, 334 U.S. 728, 732 (1948).

<u>BMW v. Gore</u>, 517 U.S. 559 at 576-77 (Emphasis added).

In <u>TXO Prod. Corp. v. Alliance Resources Corp.</u>, 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), the United States Supreme Court addressed the relevancy and admissibility of similar improper out-of-state business conduct. If out-of-state business conduct is relevant to the

harm suffered by the plaintiff, so is in-state improper business conduct. Thus, this out-of-state and

in-state unlawful conduct properly may be considered by a jury in the context of imposing punitive

damages. The U.S. Supreme Court held in <u>TXO</u> that the defendant's unlawful out-of-sate conduct

was admissible for consideration by the fact finder, stating:

> **TXO also contends that the admission of evidence of its alleged wrongdoing in other parts of the country**, as well as the evidence of its impressive net worth, led the jury to base its award on impermissible passion and prejudice. Brief for Petitioner 22-23. **Under well-settled law, however, factors such as these are typically considered in assessing punitive damages.** Indeed, the Alabama factors **we approved in <u>Haslip</u> included both**. <u>See</u> <u>Pacific Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 21-22 (1991) **("(b) . . . the existence and frequency of similar past conduct**; . . . (d) the 'financial position' of the defendant").

<u>TXO</u>, 509 U.S. at 462, fn28. (Emphasis added). The decision in <u>Haslip</u> cited in <u>TXO</u>, is referenced

with approval in the Pennsylvania Suggested Standard Civil Jury Instructions. <u>See</u> Chapter XIV

Punitive Damages, p.9. ("Although <u>Haslip</u> dealt with an Alabama punitive damage award, the

opinion provides guidance in assessing punitive damage awards under Pennsylvania law").

Furthermore, the holding in <u>TXO</u> was not altered by the decision in <u>State Farm v. Campbell</u>,

538 U.S.408,123 S.Ct. 1513, 1522 (2003)("**...[O]ut-of-state conduct may be probative when it

demonstrates the deliberateness and culpability of the defendant's action in the State where

it is tortious**, but that conduct must have a nexus to the specific harm suffered to the

plaintiff.")(Emphasis added).

## VI.    THE RAYL DOCUMENTS ARE ADMISSIBLE AS BUSINESS RECORDS.

Defendants cite to no caselaw in support of the premise that the business records of MetLife

are inadmissible hearsay. They only reference generically to Federal Rule of Evidence 803(6). As

the documents objected to by the Defendants are not privileged and are admissible under the

-15-

Business Records Exception to the hearsay rule, the fact that the documents were made at or near the time of the events it purports to relate; generated as a regular practice of the business; and trustworthy as to the source of information or the method or circumstances of preparation, the business records of MetLife are clearly admissible.

The justification for the business records exception rests on the assumption that business records are reliable because they are created on a day-to-day basis and "[t]he very regularity and continuity of the records are calculated to train the recordkeeper in habits of precision." McCormick on Evidence § 286 5th ed.). The business records exception to the hearsay rule applies only if the person who makes the statement "is himself acting in the regular course of business." Florida Canal Industries, Inc. v. Rambo, 537 F.2d 200, 202 (5th Cir. 1976).

In U.S. v. Pelullo, 964 F.2d 193 (3d Cir. 1992), the United States Court of Appeals for the Third Circuit addressing Rule 803(6) explained when business records are admissible:

> The business records exception permits admission of documents containing hearsay provided foundation testimony is made by `the custodian or other qualified witness,' that: (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

Id. at 200.

The documents meet all four requirements: (1) Jim Rayl, through sworn testimony authenticates the letters and he describes that he personally wrote the letters based upon his knowledge and information gained as the head of the Tulsa Customer Service Center; 2) he wrote the letters in the early nineties when the problems regarding the sales agents selling policies as paid-up when they were not was taking place; (3) he wrote the letters in the regular course of business to

bring the information regarding the numerous complaints received in the Customer Service Center regarding the use of deceptive sales tactics of "paid-up" policies to the attention of his superiors; and (4) records regarding complaints in the manner in which sales agents are selling policies are kept in the regular course of business - they are required to be kept by every Insurance Department in the country.

Additionally, these documents should be admissible under either Rule 801(d)(2)(A) (statement by a party offered against that party) or Rule 803(6) (business records exception). The letters and testimony of Jim Rayl are of an employee of MetLife concerning events that took place in the company and was communicated to the highest levels of the company and also comprises a statement of MetLife offered against MetLife.

Therefore, the documents are admissible as business records. However, MetLife objects that they are not trustworthy documents. They provide no support for this accusation, that one of their own employees reports of wrongdoing in the sale of policies as paid-up policies, which was confirmed by MetLife's own internal investigation as well as investigations of various insurance departments, e.g. Pennsylvania, Connecticut and Florida.

The basic requirements (regular business with regularly kept record; source with personal knowledge; record made in a timely fashion; foundation testimony) are enough in the run of cases to justify the conclusion that the record is trustworthy. The phrasing of the exception points toward this conclusion: It applies unless problems of trustworthiness appear. The objecting party bears the burden of raising the trustworthiness issue and showing the record is untrustworthy. Shelton v. Consumer Products Safety Commission, 277 F.3d 998, 1109 (8th Cir. 2001) (in enforcement suit against maker and importer, admitting private laboratory report to show that fireworks were banned

-17-

hazardous substances; **party objecting to evidence fitting exception bears burden of raising trustworthiness issues and showing that record is untrustworthy**)(emphasis added).  MetLife cites to no specific material reasons or any caselaw in support thereof as to why the materials are untrustworthy.  Indeed, MetLife ignores that fact that Mr. Rayls observations were supported by several Insurance Commissioners, who also found that MetLife was deceptively selling policies as paid-up policies, e.g. Pennsylvania, Connecticut and Florida.  Thus, MetLife has failed to meet its burden.

In Hertz v. Luzenac America, Inc., 370 F.3d 1014 (10th Cir. 2004), the Tenth Circuit set forth the necessary indicia of trustworthiness for a document to be admitted as a business record, holding: "We have identified several factors that relate to trustworthiness: (1) the business significance of the document outside the litigation context, (2) the level of experience of the preparer in creating such documents, and (3) the neutrality of the preparer."  Id. at 1020; see also 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 450, at 534-36 (2d ed. 1994) (listing as factors showing trustworthiness "extent to which the matter recorded is important to the business outside the context of litigation," experience of preparer, and absence of motive on behalf of preparer).

Again, instantly all of the elements exist as to the evidence; (1) there is business significance of the documents outside of the litigation since it is presumed that MetLife Senior Management would want to know that the sales force is using deceptive and illegal sales techniques; (2) Mr. Rayl worked a MetLife for over twenty years in various capacities prior to the promotion to rune the Tulsa Customer Service Center and he oversaw 200 employees; and (3) Mr. Rayl was an employee of MetLife and was not writing the document in preparation for litigation, he was writing the letters based upon his personal knowledge obtained as the supervisor of the Tulsa Customer Service Center.

Although satisfying the basic requirements brings the exception into play, many more decisions cite trustworthiness as a reason to admit records than untrustworthiness as a reason to exclude. Many factors support a finding of trustworthiness: Foremost among them is the extent to which the matter recorded is important to the business outside the context of litigation. United States v. Frazier, 53 F.3d 1105, 1110 (10th Cir. 1995) (audit report having use in areas other than suit and prepared by neutral party); Coates v. Johnson & Johnson, 756 F.2d 524, 549-550 (7th Cir. 1985) (disciplinary memoranda kept for routine business purpose). A point that is especially persuasive if the report was acted on in some serious, costly, or elaborate way that tends to verify the point it is offered to prove. Matador Drilling Co. v. Post, 662 F.2d 1190, 1198-1199 (5th Cir. 1981) (oil drilling rig reports, relied on for payroll); United States v. Ullrich, 580 F.2d 765, 771-772 (5th Cir. 1978) (inventory schedule used to keep track of collateral in floor-plan financing).

The fact that a record was prepared with no eye toward litigation counts. See Selig v. United States, 740 F.2d 572, 578 (7th Cir. 1984); Tupman Thurlow Co. v. S.S. Cap Castillo, 490 F.2d 302, 310 (2d Cir. 1974). Also tending to show trustworthiness is the fact that a record was prepared by trained or experienced people. American Intl. Pictures, Inc. v. Price Enters., Inc., 636 F.2d 933, 935 (4th Cir. 1980) (reports by checkers surveying attendance at movie theaters; officers detailed procedures for selecting, training, and supervising checkers), cert. denied, 451 U.S. 1010; United States v. Stonehouse, 452 F.2d 455, 459 (7th Cir. 1971)(cable diagrams; likelihood of misunderstanding or misdescription was remote).

Independent corroborative evidence helps too. Extensive corroboration supports an inference that the record as a whole is trustworthy, and specific corroboration of the point the record is offered to prove also alleviates trustworthiness concerns. See United States v. Cincotta, 689 F.2d 238, 243

-19-

(1st Cir. 1982) (admitting driver notebook; delivery tickets signed by commercial customers corroborated notebook), cert. denied, 459 U.S. 991; United States v. Wigerman, 549 F.2d 1192, 1193-1194 (8th Cir. 1977) (admitting records of motel registrations, car rentals, airline shipments; witnesses corroborated documents).

Accordingly, the documents demonstrate the necessary trustworthiness and should be admitted into evidence

## **CONCLUSION**

For all the foregoing reasons, Defendants Motion in Limine should be denied.

Respectfully Submitted,

\s\ Kenneth R. Behrend
Kenneth R. Behrend
PA I.D. # 37961
Behrend and Emsberger, P.C.
Union Bank Building  - Suite 300
306 Fourth Ave.
Pittsburgh, PA 15222
(412) 391-2515   (phone)
(412) 391-2762    (Fax)

## CERTIFICATE OF SERVICE

I Kenneth R. Behrend certify that a true and correct copy of the foregoing document was

served via the electronic filing service, on this 17th day of July, 2006, on the following counsel of

record:

B. John Pendleton, Jr.
McCarter and English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056

\s\ Kenneth R. Behrend
Kenneth R. Behrend
PA I.D. # 37961
Behrend and Emsberger, P.C.
Union Bank Building  - Suite 300
306 Fourth Ave.
Pittsburgh, PA 15222
(412) 391-2515   (phone)
(412) 391-2762    (Fax)